James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| AVAYA INC., *et al.*[1] | ) Case No. 17-10089 (SMB) |
| Debtors. | ) (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

KE 45212771

**SUPPLEMENTAL DECLARATION OF
ERIC KOZA IN SUPPORT OF THE DEBTORS' (I) CUSTOMER
PROGRAMS MOTION AND (II) CRITICAL VENDORS MOTION**

Pursuant to 28 U.S.C. § 1746, I, Eric Koza, hereby declare as follows under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:[2]

1. My background and qualifications are set forth in the First Day Declaration, and I submit this declaration (the "Declaration") to supplement my First Day Declaration with respect to certain interim relief requested by the Debtors pursuant to their Customer Programs Motion and their Critical Vendors Motion (collectively, the "Motions"). Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, discussions with other members of the Debtors' management team and the Debtors' advisors, review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or represent my opinions and beliefs based upon my professional experience and knowledge of the Debtors and their operations. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in: (a) the *Debtors' Motion Seeking Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Honor Certain Prepetition Obligations to Customers and Partners and (II) Otherwise Continue Certain Customer and Partner Programs in the Ordinary Course of Business and (B) Granting Related Relief* [Docket No. 4] (the "Customer Programs Motion"); (b) the *Debtors' Motion Seeking Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of (I) Critical Vendors, and (II) Carrier, Warehousemen, and Section 503(b)(9) Claims and (B) Granting Related Relief* [Docket No. 5] (the "Critical Vendor Motion"); or (c) the *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration") [Docket No. 22], as applicable.

KE 45212771

**Supplemental Declaration**

2.     As set forth more fully herein and in the First Day Declaration, more than half of the Debtors' sales are effectuated by third-party distributors or "channel partners."[3]  In effect, these business partners are the Debtors' salesforce and, in turn, are the lifeblood of the Debtors' businesses.  Due to the generally short-term and non-exclusive contractual arrangements with these channel partners,[4] these parties have few incentives to promote the Debtors' products and services and, instead, may focus on selling competitors' products and services.  If this were to occur, the Debtors' revenue would not only be impaired in the near term, but, as detailed below, the Debtors will permanently damage business relationships with both their channel partners and end users who must "choose Avaya" and not a competitor if these chapter 11 cases are to succeed.  Such losses will result in an immediate, non-speculative, and irreparable damage to these estates, thereby adversely impacting both the Debtors' businesses and creditors far in excess of the interim relief requested by the Motions.  Conversely, I believe the Debtors' requested relief will not put creditor recoveries at risk; rather, such payments will protect creditors (including general unsecured creditors) in a material way by stabilizing operations at this critical juncture.

3.     Pursuant to the Customer Program Motion, the Debtors seek interim authority, but not direction, to honor certain non-priority prepetition obligations due to their business partners in an aggregate amount up to:  (a) $15.6 million on account of prepetition claims outstanding under the Partner Programs; (b) up to $1.0 million general unsecured claims outstanding under

---

[3]    (See generally First Day Decl. ¶¶ 27–31.)

[4]    (Id.)

3

the DevConnect Program; and (c) up to $22.4 million general unsecured claims outstanding under the Third Party Providers.[5] Pursuant to the Critical Vendors Motion, the Debtors seek interim authority to honor up to $9.8 million on account of non-priority prepetition obligations due to their Critical Vendors.[6] The relief requested by the Motions was also reviewed with, and vetted by, two sets of experienced financial advisors representing the Ad Hoc First Lien Group and the Ad Hoc Crossover Group in the weeks prior to the commencement of the Debtors' chapter 11 cases.

4.  As set forth in my First Day Declaration, I believe the interim relief requested by the Motions is essential to avoid immediate and irreparable harm to the Debtors' estates in the form of damage to the Debtors' reputation, loss of business relationships and goodwill, and degradation of the value of the Debtors' estates. Specifically, the majority of the Avaya Enterprise's approximately $3.7 billion of annual revenues are generated by indirect sales, as opposed to sales generated directly by Avaya sales personnel.[7] In 2016 alone, more than half of the Avaya Enterprise's revenues were generated by such third parties, rather than as a result of direct transactions between the Debtors and an end-user. While the Debtors do, in many instances, have contracts in place with their sales or distribution partners, those agreements do <u>not</u> require partners to sell the Debtors' products or services on an exclusive basis.[8] Those

---

[5] Pursuant to the Customer Programs Motion, the Debtors also seek interim relief with respect to certain warranty or customer service claims arising in the ordinary course.

[6] Pursuant to the Vendor Motion, the Debtors seek interim relief with respect to certain lien claims and claims entitled to priority pursuant to section 503(b)(9) of the Bankruptcy Code.

[7] (See First Day Decl. ¶¶ 27–31.)

[8] (Id. ¶ 30.)

KE 45212771

contracts generally permit sales and distribution partners to terminate such contracts for convenience on 30 to 90 days' notice.[9]

5.      The Debtors' sales partners therefore have a choice as to whether to "push" the Debtors' products and services or those of a competitor. After all, those sales partners can terminate their sales relationships with the Debtors at practically any time for cause or convenience, and those parties are incentivized to "push" the Debtors' products only if they believe the Debtors will also remain a strong business business partner for the long-term. In other words, the Debtors critically rely on the continued confidence, goodwill, and support of their business partners to sustain and build value and to maintain the Debtors' goodwill and reputation as a leading communications company in the marketplace.

6.      I further believe that the Debtors' need to maintain such confidence is particularly acute here. Unlike other business sectors (such as automotive, retail, or aviation), many of the Debtors' key customers, vendors, and, business partners have limited experience with a significant counterparty in chapter 11. In many cases, such business partner's immediate basis of comparison is the extensive litigation and ultimate liquidation resulting from Nortel's chapter 11 filing in 2009. The Motions are thus vitally important to the Debtors' ability to send a strong message, at the outset of these cases, that the Debtors are "here to stay" for the long term, which will, in turn, allow the Debtors to continue to maintain the goodwill they have built in the marketplace and continue to grow business relationships that would otherwise be lost.

7.      The timing of the relief requested by the Customer Programs Motion and Critical Vendors Motion is also critical to the Debtors' supply chain stability at the immediate outset of

---

[9]    (Id.)

these chapter 11 cases. For example, certain end users' product and software requirements effectively mean the Debtors can only use a small subset of available suppliers or service providers and, in fact in many instances such end users (including governmental entities, such as hospitals and 911 call centers) prohibit the Debtors from using any vendors other than specifically-identified providers.[10] If the Debtors are cut off from such product or services—or their access is delayed, even for a limited term—the Debtors will both lose revenue from the end user and permanently damage their relationship with the applicable sales partner. Thus, the Debtors have sought relief with respect to their Third Party Providers, for example, to ensure that the Debtors will be able to deliver seamless product and service performance to end users without disruption.

8.  Moreover, the Debtors operate a "just in time" supply chain with respect to projects for hardware and software systems. Put another way, the Debtors do not have inventory "on hand" they can otherwise use to satisfy existing product and supply commitments. Project requirements often demand a lead time of anywhere from 8 to 16 weeks, and even longer in many instances, on component parts or software for a particular end user. The Debtors must therefore place orders now for component parts and software to timely satisfy product and service deliveries that must occur weeks and months in the future, and the Debtors cannot assure their immediate access to necessary goods and services absent the relief requested by their Motions. Similarly, I do not believe that end users such as 911 centers, hospitals, and financial institutions will simply "wait and see" if the Debtors are ultimately able to compel their vendors and business partners into performing. Rather, I believe such parties will quickly engage

---

[10] (See, e.g., Customer Programs Mot. ¶ 28.)

6

alternative parts and services from alternative service providers, and that the Debtors' sale partners (and competitors) will move quickly to fill that demand with product and services supplied by the Debtors' competitors—as they are free to do given the Debtors' non-exclusive relationships with their distributors.

9.      Nor do I believe that the prospect of a stay enforcement action, even a successful one, will in every instance be sufficient to prevent material and permanent damage to the Debtors' businesses.  As noted above, the Debtors' sales relationships are generally governed by short term, non-exclusive contracts that do not lend themselves to long-term litigation.  Nor do I believe litigating with what, in effect, is the Debtors' sales force will be conducive to driving revenue.  Additionally, the Debtors' supply chain relies on a critical subset of suppliers and service providers with whom the Debtors either do not have long-term contracts or with whom they are obliged to obtain necessary goods and services.

10.     Moreover, the Debtors' just-in-time inventory system and service requirements do not allow for the delays inherent to litigation—even expedited litigation.  Many of the Debtors' essential vendors are also located in jurisdictions outside of the United States, and such parties are either unfamiliar with, or simply unfazed by, potential litigation in a U.S. court.  While the Debtors will seek to enforce their contractual rights by litigation where necessary, the relief requested by the Motions will allow the Debtors to make such a determination on a case-by-case basis rather than mandating a "litigation first" approach at the outset of these chapter 11 cases.[11]

---

[11]  The Debtors intend to vigorously enforce their rights under long term contracts.  Thus, the Debtors seek authorization, but not direction, to honor prepetition claims held by parties under contracts only where necessary, in the Debtors' reasonable business judgment, to avoid immediate and irreparable harm absent such relief.  (See, e.g., Critical Vendors Mot. ¶ 19.)

7

11. Again, the timing of the Debtors' requested relief remains vitally important. To date, no less than nine separate vendors subject to the Motions (including four international vendors) have already refused to ship goods or cut off services to the Debtors. I believe this trend will only accelerate absent the relief requested by the Motion. The Debtors' failure to successfully place an order with a particular Critical Vendor, the Debtors' inability to ensure distributor support through the Customer Programs Motion, or the delays associated with stay-enforcement litigation against key business counterparties will permanently impair the Debtors' ability to service existing businesses because it likely will result in the loss of material distributor and third-party sales relationships. These events will irreparably damage the businesses, because the Debtors will not be able to recover from the loss of these business relationships and concomitant degradation of goodwill, which is also likely to result in a substantial diminution of value of the Debtors' estates for which money damages would be insufficient. I further believe that the limited relief requested by the Motions is a reasonable, albeit necessary, insurance policy against this risk.

12. At the same time, I readily acknowledge the scrutiny applied by the Court with respect to such interim relief on account of non-priority claims. To this end, the Debtors and their restructuring professionals (including at Zolfo Cooper LLC and Kirkland & Ellis LLP), and under my supervision, extensively vetted the Motions to ensure that such relief was measured to reflect only the balance absolutely necessary to prevent immediate, non-speculative and irreparable harm to the Debtors' estates. Further, and subject to the Court's approval, any sums actually proposed to be paid pursuant to such relief will also be subject to my personal oversight as the Debtors' Chief Restructuring Officer to provide a further layer of supervision with respect to the implementation of that relief.

KE 45212771

13. And, as noted above, the Motions and the interim relief requested were also vetted by the financial professionals at PJT Partners, retained by the Ad Hoc First Lien Group, and at Rothschild, retained by the Ad Hoc Crossover Group.[12] This process involved diligence, discussion, and dialogue, in addition to my own review and that of my team at Zolfo Cooper. And, as noted at the Court's January 20, 2017 hearing, neither ad hoc creditor constituency opposes the relief requested by the Motion. As a result, I believe the relief requested herein reflects a substantial amount of oversight both from the Debtors' restructuring advisors, and two separate creditor constituencies and their own advisors in these chapter 11 cases.

## Conclusion

14. For the reasons set forth herein, in the Motions, and in the First Day Declaration, I believe that the interim relief requested by the Motions is necessary to avoid immediate and irreparable harm to the Debtors' estates during the first 21 days of these chapter 11 cases.

[*Remainder of page intentionally left blank*]

---

[12] As set forth in the First Day Declaration, the Debtors' $6 billion of funded debt consists entirely of first lien and second secured debt, with the Ad Hoc Crossover Group holding more than 80% of such second lien debt. See First Day Decl. ¶ 18; see also *Verified Statement of Ad Hoc Group of Crossover Holders Pursuant to Bankruptcy Rule 2019* [Docket No. 31].

KE 45212771

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 23, 2017
       New York, New York

|  |  |
|---|---|
| By: | */s/ Eric Koza* |
| Name: | Eric Koza |
| Title: | Chief Restructuring Officer |
|  | Avaya Inc. et al. |

KE 45212771