Hearing Date:  March 3, 2017 at 10:00 a.m. (prevailing Eastern Time)

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING PROPOSED**
**FORM OF FINAL ORDER (I) AUTHORIZING**
**DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT**
**TO 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1)**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

**AND 364(E), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(B)**

**PLEASE TAKE NOTICE** that on January 19, 2017, the above-captioned debtors and
debtors in possession (the "Debtors") filed the *Debtors' Motion Seeking Entry of Interim and
Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and
(B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to
Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and
(III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 13]
(the "Motion").

**PLEASE TAKE FURTHER NOTICE** that attached as **Exhibit A** to the Motion was a
proposed *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant
to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e),
and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate
Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and
507(b) and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)*
(the "Initial Proposed Order").

**PLEASE TAKE FURTHER NOTICE** that on January 23, 2017, the Court entered the
*Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and
(B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to
Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and*

*(III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 61] (the "Entered Interim Order").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a proposed form of *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* as **Exhibit A** (the "Proposed Final Order").

**PLEASE TAKE FURTHER NOTICE** that a blackline reflecting the changes from the Initial Proposed Order versus the Proposed Final Order is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that a blackline reflecting the changes from the Entered Interim Order versus the Proposed Final Order is attached hereto as **Exhibit C**.

**PLEASE TAKE FURTHER NOTICE** that the hearing to consider approval of the Motion will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in Courtroom 723, One Bowling Green, New York, New York on **March 3, 2017 at 10:00 a.m.** (prevailing Eastern Time) or as soon thereafter as counsel may be heard.

Dated: February 28, 2017          */s/ Ryan Preston Dahl*
New York, New York                James H.M. Sprayregen, P.C.
                                  Jonathan S. Henes, P.C.
                                  KIRKLAND & ELLIS LLP
                                  KIRKLAND & ELLIS INTERNATIONAL LLP
                                  601 Lexington Avenue
                                  New York, New York 10022
                                  Telephone:    (212) 446-4800
                                  Facsimile:    (212) 446-4900

                                  - and -

                                  Patrick J. Nash, Jr., P.C. (admitted *pro hac vice* a)
                                  Ryan Preston Dahl (admitted *pro hac vice*)
                                  Bradley Thomas Giordano (admitted *pro hac vice*)
                                  KIRKLAND & ELLIS LLP
                                  KIRKLAND & ELLIS INTERNATIONAL LLP
                                  300 North LaSalle Street
                                  Chicago, Illinois 60654
                                  Telephone:    (312) 862-2000
                                  Facsimile:    (312) 862-2200

                                  *Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**FINAL ORDER (I) AUTHORIZING DEBTORS**
**(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO**
**11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)**
**AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO**
**11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION TO PREPETITION**
**SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b)**

Upon the motion (the "Motion") of Avaya Inc. (the "Company" or the "Borrower"),

Avaya Holdings Corp. ("Holdings"), Sierra Communication International LLC ("Sierra"), and

the other subsidiaries of the Company that are debtors and debtors-in-possession (collectively,

the "Subsidiary Guarantors"; collectively, with the Company and Holdings, the "Loan Parties";

and together, with Sierra, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

Code"), and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

Procedure (the "Bankruptcy Rules"), and the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules"), seeking, among other things:

A.       authorization for the Borrower to obtain postpetition financing (the "DIP Financing"), and for Holdings and the Subsidiary Guarantors (collectively the "Guarantors") to guarantee the Borrower's obligations in connection with the DIP Financing, consisting of a senior secured non-amortizing term loan facility (the "DIP Term Facility") in an aggregate principal amount up to $725,000,000, including an initial draw in the aggregate principal amount of $425,000,000 on an interim basis, a portion of which may be used to fund a cash collateralized letter of credit facility (the "DIP L/C Facility" and, together with the DIP Term Facility, the "DIP Facilities," and the letters of credit issued (or deemed issued) pursuant to the DIP L/C Facility, the "L/C Facility Letters of Credit") in an aggregate amount not to exceed $150,000,000, from Citibank, N.A. ("Citi"), acting as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the DIP Lenders (as defined below), all on the terms and conditions set forth in this Final Order and the DIP Documents (each as defined below), and arranged by Citigroup Global Markets Inc., Barclays Bank PLC and Deutsche Bank Securities Inc., as Joint Lead Arrangers and Bookrunners (collectively, the "Lead Arrangers").

B.       authorization for the Loan Parties to execute and enter into that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017, by and among the Borrower, the Guarantors, the DIP Agent, the lenders from time to time party thereto (including Citi as issuer under the DIP L/C Facility, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and the Lead Arrangers, a copy of which is attached hereto as **Exhibit A** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement" and, collectively with

the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Security Agreement (as defined in the DIP Credit Agreement), dated as of January 24, 2017, among the Loan Parties and the DIP Agent (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Collateral Agreement"), the "DIP Documents"), and to perform all such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the establishment by the Borrower of an account pursuant to Section 2.04(a) of the DIP Credit Agreement (the "Letter of Credit Account") under the sole and exclusive control of the DIP Agent, which Letter of Credit Account shall be funded by the Borrower with deposits of cash collateral (the "L/C Cash Collateral") as set forth in the DIP Credit Agreement;

C.    authorization for the Loan Parties to use proceeds of the DIP Financing and Cash Collateral (as defined below) on the terms and conditions set forth herein, simultaneously with the initial draw of $425,000,000 under the DIP Term Facility, (i)(A) to refinance all of the Prepetition Domestic ABL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible (which shall be deemed to have occurred, upon the expiration of the Challenge Period (as defined below) if no adversary proceeding or contested matter is timely and properly asserted, in accordance with Paragraph 28 hereof, with respect to the Prepetition Domestic ABL Debt or against the Prepetition Domestic ABL Agent (as defined below) or the Prepetition Domestic ABL Lenders (as defined below), or if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Domestic ABL Secured Parties (as defined below) by order of a court of

competent jurisdiction); *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Domestic ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this Final Order unless the Prepetition Domestic ABL Debt is reinstated) (the "Domestic ABL Discharge"), (B) subject to the Intercompany Security Protocol (as defined below), to loan funds to Sierra which shall be on-lent to certain of Sierra's direct and indirect subsidiaries in accordance with this Final Order, including to refinance all of the Prepetition Foreign ABL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible (which shall be deemed to have occurred, upon the expiration of the Challenge Period if no adversary proceeding or contested matter is timely and properly asserted, in accordance with Paragraph 28 hereof, with respect to the Prepetition Foreign ABL Debt or against the Prepetition Foreign ABL Agent (as defined below) or the Prepetition Foreign ABL Lenders (as defined below), or if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Foreign ABL Secured Parties by order of a court of competent jurisdiction; *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Foreign ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this Final Order unless the Prepetition Foreign ABL Debt is reinstated) (the "Foreign ABL Discharge"); *provided* that the Loan Parties' indemnification, subrogation, contribution, and reimbursement rights with respect to the Foreign Borrowers for the repayment of the Prepetition Foreign ABL Debt (the "Foreign ABL Repayment Rights"), pursuant to Section 3.01 of the U.S. Guaranty, dated as of June 4, 2015, among Avaya Inc., certain U.S. subsidiaries of Avaya Inc. and Citi, are fully preserved and shall be Collateral (as defined below), and (C) to immediately deem existing

4

letters of credit under the Prepetition Domestic ABL Credit Facility (as defined below) and Prepetition Foreign ABL Credit Facility (subject to the Intercompany Security Protocol) to be issued under the DIP L/C Facility, (ii) to cash collateralize L/C Facility Letters of Credit, (iii) to fund the Cash Pool Requirements Account (as defined below), (iv) to pay obligations arising from or related to the Carve-Out (as defined below) and make disbursements therefrom, including by funding the Carve-Out Reserves (as defined below), (v) to pay Professional Fees (as defined below), (vi) to make adequate protection payments, (vii) to pay fees and expenses incurred in connection with the transactions contemplated hereby, and (viii) for general corporate purposes;

D.    authorization for the Loan Parties to continue to guarantee the obligations (the "Cash Pooling Obligations") of certain non-debtor subsidiaries of the Borrower that are "Group Companies" (as defined in the Cash Pooling Agreement) and that arise after the Petition Date (as defined below) pursuant to the Cash Pooling Agreement between Citibank and the Group Companies dated March 20, 2002 (the "Cash Pooling Agreement");

E.    authorization for the Borrower to establish and fund a segregated account with proceeds from the DIP Term Facility in an amount equal to $75,000,000 (the "Cash Pool Requirements Account"), which funds shall be available to the Borrower for disbursement through Sierra to any Group Company (as defined in the Cash Pooling Agreement) by deposit into any Currency Pool (as defined in the Cash Pooling Agreement) as needed (in the Borrower's sole discretion) following a written request by the requesting Group Company to Borrower; *provided* that any disbursement from the Cash Pool Requirements Account to any Group Company through Sierra shall be subject to the Intercompany Security Protocol and, for the avoidance of doubt, funds held in the Cash Pool Requirements Account shall be used solely

5

for the purposes of intercompany borrowing by any Group Company in accordance with the Intercompany Security Protocol[2] and shall not be available to general creditors of the Debtors' estates, whether pursuant to a chapter 11 plan or otherwise; *provided further* that any unused amounts in the Cash Pool Requirements Account shall be, subject to the Carve-Out, distributed to the DIP Agent upon maturity of the DIP Facilities in partial repayment of the DIP Obligations;

F.       until the irrevocable discharge of the Prepetition Domestic ABL Debt as hereinafter provided, the granting of adequate protection and contingent liens to the Prepetition Domestic ABL Agent for the benefit of the Prepetition Domestic ABL Lenders under or in connection with (i) the Amended and Restated Credit Agreement, amended and restated as of October 29, 2012, by and among the Company, Holdings, Citicorp USA, Inc., as Administrative Agent (in such capacity, the "Prepetition Domestic ABL Agent"), Citicorp North America, Inc., as Swing Line Lender, Citibank N.A., as L/C Issuer, and each lender from time to time party thereto (collectively, in such capacities, the "Prepetition Domestic ABL Lenders" and, together with the Prepetition Domestic ABL Agent, the "Prepetition Domestic ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Domestic ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Domestic ABL Credit Facility") and (ii) that certain Pledge and Security Agreement, dated as of October 26, 2007, between the Borrower, Sierra Holdings Corp., the Prepetition Domestic ABL Agent and the pledgors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Domestic ABL Security Agreement" and, collectively with the Prepetition Domestic ABL Credit Agreement, and the

---

[2]     Any credit support, guarantee, cash and/or cash equivalents (in each case, out of the proceeds of the DIP Financing and Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to any direct or indirect subsidiary of the Borrower that is not a Debtor (a "Non-Debtor Subsidiary") and any transaction outside the ordinary course of business between any Loan Party, Sierra, or a Non-Debtor Subsidiary shall be subject to the Intercompany Security Protocol.

mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Domestic ABL Agreements"), whose liens and security interests with respect to the Cash Flow Priority Collateral (as defined below) are being primed by the DIP Liens (as defined below);

G.    the granting of adequate protection to the Prepetition Cash Flow Parties (as defined below) under or in connection with: (i) that certain Third Amended and Restated Credit Agreement, amended and restated as of December 21, 2012, by and among the Company, Holdings, Citibank, N.A. as Administrative Agent (in such capacity, the "Prepetition Cash Flow Agent"), Swing Line Lender and L/C Issuer, and the lenders and issuing banks party thereto from time to time (collectively, in such capacities, the "Prepetition Cash Flow Lenders" and, together with the Prepetition Cash Flow Agent, the "Prepetition Cash Flow Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Cash Flow Credit Agreement") and (ii) that certain Pledge and Security Agreement, dated as of October 26, 2007, between the Borrower, Sierra Holdings Corp., the Prepetition Cash Flow Agent and the other grantors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Cash Flow Security Agreement" and, collectively with the Prepetition Cash Flow Credit Agreement and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Cash Flow Agreements"), whose liens on and security interests in the Prepetition Collateral (as defined below) are being primed by the DIP Liens;

H.    the granting of adequate protection to (i) the 7.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of February 11, 2011 (the "7.00% First Lien Notes Indenture" and, together with the security agreements, pledge

agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 7.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "7.00% First Lien Noteholders"), the "7.00% First Lien Notes Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and Notes Collateral Agent (in such capacities, the "7.00% First Lien Notes Trustee" and together with the 7.00% First Lien Noteholders, the "7.00% First Lien Secured Parties"), pursuant to which the Borrower issued 7.00% Senior Secured Notes due 2019, whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens, and (ii) the 9.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of December 21, 2012 (the "9.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 9.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "9.00% First Lien Noteholders"), the "9.00% First Lien Notes Agreements" and, together with the 7.00% First Lien Notes Agreements, the "First Lien Notes Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent (in such capacities, the "9.00% First Lien Notes Trustee" and, together with the 9.00% First Lien Noteholders, the "9.00% First Lien Notes Secured Parties" and, together with the 7.00% First Lien Notes Secured Parties, the "First Lien Notes Secured Parties"), pursuant to which the Company issued 9.00% Senior Secured Notes due 2019, whose liens on and security interests in the Prepetition Collateral are being primed by the DIP Liens;

8

I.      the granting of adequate protection to the Second Lien Notes Secured Parties (as defined below) under or in connection with that certain indenture, dated as of March 7, 2013 (the "Second Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Second Lien Notes Trustee (as defined below), for its benefit and for the benefit of the Second Lien Noteholders (in such capacities, the "Second Lien Noteholders"), the "Second Lien Notes Agreements" and, together with the Prepetition Domestic ABL Agreements, the Prepetition Cash Flow Agreements and the First Lien Notes Agreements, the "Existing Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent, which was succeeded by Wilmington Savings Fund Society, FSB as Trustee and as Notes Collateral Agent[3] (in such capacities, the "Second Lien Notes Trustee" and, together with the Second Lien Noteholders, the "Second Lien Notes Secured Parties" and, together with the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties and First Lien Notes Secured Parties, the "Prepetition Secured Parties"), pursuant to which the Borrower issued 10.50% Senior Secured Notes due 2021, whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens;

J.      authorization for the Debtors to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

---

[3]    Pursuant to that Agreement of Resignation, Appointment, and Acceptance, dated as of January 27, 2017 by and among Avaya, Inc., The Bank of New York Mellon Trust Company, N.A., and Wilmington Savings Fund Society, FSB.

K.      subject to certain challenge rights set forth herein, approval of certain stipulations

by the Debtors with respect to the Prepetition Debt (as defined below) and the claims, liens and

security interests arising therefrom;

L.      subject to the Carve-Out in all respects, the grant of superpriority claims pursuant

to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and

secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming

liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition

property of the Loan Parties' estates (other than the Excluded Assets (as defined below)) and all

proceeds thereof (including, subject only to and effective upon entry of this Final Order (as

defined below), any Avoidance Proceeds (as defined below)), subject to (i) prior perfected liens

that are not also Primed Liens (as defined below), if any, to which the Primed Liens are junior at

the time of the commencement of the Chapter 11 Cases and (ii) liens that are not also Primed

Liens and to which the Primed Liens are junior at the time of the commencement of the Chapter

11 Cases and that are perfected after the commencement of the Chapter 11 Cases to the extent

permitted by section 546(b) of the Bankruptcy Code (the foregoing clauses (i) and (ii) together,

the "Permitted Liens");

M.      subject only to and effective upon entry of this Final Order, the waiver of the

Debtors' right to surcharge the Prepetition Collateral and the Collateral pursuant to

section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the

case" exception in section 552(b) of the Bankruptcy Code with respect to the Prepetition Debt

(as defined below);

N.      modification of the automatic stay to the extent set forth herein and in the

DIP Documents; and

10

O.    approval of the Intercompany Security Protocol (as defined below);

and the Court having reviewed the Motion; and the interim hearing on the Motion having been

held by this Court on January 19, 2017 and January 23, 2017 (the "Interim Hearing"); and the

Court having (i) entered the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition*

*Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3),*

*364(d)(1) and 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363*

*(II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361,*

*362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules*

*4001(b) and (c)* [Docket No. 61] (the "Interim Order"); (ii) entered the *Stipulation and Agreed*

*Order Regrading Certain Adequate Protection Payments* [Docket No. 137]; and (iii) scheduled

the final hearing (the "Final Hearing") on the Motion to be held before this Court on

February 8, 2017 at 10:00 a.m. (prevailing Eastern Time) to consider entry of an order granting

the Motion on a final basis (this "Final Order"), which Final Hearing was adjourned to

March 3, 2017 at 10:00 a.m. (prevailing Eastern Time); and upon the initial draw under the DIP

Facilities, the Debtors having refinanced all of the Prepetition Domestic ABL Debt and

Prepetition Foreign ABL Debt in full; and notice of the Motion and the Final Hearing having

been served by the Debtors on (a) the Office of the U.S. Trustee for the Southern District of New

York (the "U.S. Trustee"); (b) the holders of the 50 largest unsecured claims against the Debtors

(on a consolidated basis); (c) the DIP Agent; (d) counsel to the DIP Agent; (e) counsel to the Ad

Hoc First Lien Group; (f) counsel to the Ad Hoc Crossover Group; (g) the Prepetition Cash Flow

Agent; (h) counsel to the Prepetition Cash Flow Agent; (i) the Prepetition Domestic ABL Agent;

(j) counsel to the Prepetition Domestic ABL Agent; (k) the 7.00% First Lien Notes Trustee;

(l) counsel to the 7.00% First Lien Notes Trustee; (m) the 9.00% First Lien Notes Trustee;

(n) counsel to the 9.00% First Lien Notes Trustee; (o) the Second Lien Notes Trustee; (p) counsel to the Second Lien Notes Trustee; (q) the United States Attorney's Office for the Southern District of New York; (r) the Internal Revenue Service; (s) the United States Securities and Exchange Commission; (t) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (u) the state attorneys general for states in which the Debtors conduct business; (v)  counsel to the DIP Lenders; (w) all parties known, after reasonable inquiry, to have asserted a lien or security interest in the Debtors' assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and it appearing that notice was in the Debtors' belief, the best notice available under the circumstances; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Chapter 11 Cases; and the Court having found and determined that the relief requested in the Motion is necessary to avoid immediate and irreparable loss and damage to the Debtors' estates; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the *Declaration of Eric Koza in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "Koza Declaration"), the *Declaration of Samuel Greene in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to U.S.C. §§105, 361, 364(c)(1),*

*364(c)(2),364(C)(3),and 364(d)(1), (B) Use Cash Collateral, (C) Grant Adequate Protection; (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "Greene Declaration"), and the *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22] (the "First Day Declaration," together with the Koza Declaration and Greene Declaration, the "Declarations") and at the Interim Hearing and the Final Hearing; and after due deliberation and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition.*  The relief requested in the Motion is granted on a final basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Final Order shall become effective immediately upon its entry.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, the relief requested in the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Debtors' Stipulations*.  Without prejudice to the rights of any party in interest, (but subject in all respects to the limitations set forth in Paragraph 3(k) and Paragraph 28 herein) the Debtors admit, stipulate and agree that:

(a)      (i) as of January 19, 2017 (the "Petition Date"), the Borrower and the Guarantors were justly and lawfully indebted and liable to (A) the Prepetition Domestic ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $55,000,000 in respect of loans made and $44,292,130.77 in respect of

13

letters of credit[4] issued by the Prepetition Domestic ABL Lenders pursuant to, and in accordance

with the terms of, the Prepetition Domestic ABL Agreements, plus accrued and unpaid interest

thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial

advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Domestic

ABL Agreements), charges, indemnities and other obligations incurred in connection therewith

(whether arising before or after the Petition Date) as provided in the Prepetition Domestic ABL

Agreements (collectively, the "Prepetition Domestic ABL Debt"), which Prepetition Domestic

ABL Debt has been guaranteed on a joint and several basis by all of the Guarantors, (B) the

Prepetition Foreign ABL Secured Parties (as defined below), without defense, counterclaim or

offset of any kind, in the aggregate principal amount of not less than $50,000,000 in respect of

loans made and $22,690,539.65 in respect of letters of credit[5] issued by the Prepetition Foreign

ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition Foreign ABL

Agreements (as defined below), which Prepetition Foreign ABL Debt has been guaranteed on a

joint and several basis by all of the Subsidiary Guarantors, (C) the Prepetition Cash Flow

Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal

amount of approximately $3,234,727,423 in respect of loans made by the Prepetition Cash Flow

Lenders pursuant to, and in accordance with the terms of, the Prepetition Cash Flow Agreements,

plus accrued and unpaid interest thereon and fees, expenses (including any attorneys',

accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or

reimbursable under the Prepetition Cash Flow Agreements), charges, indemnities and other

obligations incurred in connection therewith as provided in the Prepetition Cash Flow

---

[4]    Includes letters of credit issued in foreign currencies at January 1, 2017.

[5]    Includes letters of credit issued in foreign currencies at January 1, 2017.

Agreements (collectively, the "<u>Prepetition Cash Flow Debt</u>"), which Prepetition Cash Flow Debt has been guaranteed on a joint and several basis by all of the Guarantors, (D) the 7.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,009,000,000 in respect of notes issued to the 7.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 7.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 7.00% First Lien Notes Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the 7.00% First Lien Notes Agreements (collectively, the "<u>7.00% First Lien Notes Debt</u>"), which 7.00% First Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, (E) the 9.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $290,000,000 in respect of notes issued to the 9.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 9.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 9.00% First Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the 9.00% First Lien Notes Agreements (collectively, the "<u>9.00% First Lien Notes Debt</u>" and together with the Prepetition Cash Flow Debt and the 7.00% First Lien Notes Debt, the "<u>First Lien Debt</u>"), which 9.00% First Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, and (F) the Second Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,384,000,000 in respect

of notes issued to the Second Lien Noteholders pursuant to, and in accordance with the terms of, the Second Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Second Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the Second Lien Notes Agreements (collectively, the "Second Lien Notes Debt" and, together with the Prepetition Domestic ABL Debt, and the First Lien Debt, the "Prepetition Debt"), which Second Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors; (ii) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrower and the Guarantors or Subsidiary Guarantors, as applicable, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b)    the liens and security interests granted to the Prepetition Domestic ABL Secured Parties (the "Prepetition Domestic ABL Liens") pursuant to and in connection with the Prepetition Domestic ABL Agreements, are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the ABL Priority Collateral;[6] (ii) valid, binding, perfected,

---

[6]    "ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

enforceable, second-priority liens and security interests in the Cash Flow Priority Collateral[7] (the "Cash Flow Priority Collateral" and, together with the ABL Priority Collateral, the "Prepetition Collateral"); (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is Cash Flow Priority Collateral, subject and subordinate to the Prepetition First-Priority Liens (as defined below);

(c)      the liens and security interests granted to the Prepetition Cash Flow Secured Parties, the 7.00% First Lien Notes Secured Parties, and the 9.00% First Lien Notes Secured Parties (collectively, the "Prepetition First-Priority Secured Parties") pursuant to and in connection with the Prepetition Cash Flow Agreements, the 7.00% First Lien Notes Agreements and the 9.00% First Lien Notes Agreements (the "Prepetition First-Priority Liens") are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens, and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition Domestic ABL Liens;

(d)      the liens and security interests granted to Second Lien Noteholders (the "Prepetition Second-Priority Liens" and, together with the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens, the "Primed Liens") pursuant to and in connection with the

---

[7]   "Cash Flow Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

Second Lien Notes Agreements are: (i) valid, binding, perfected, enforceable, third-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, third-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, subject and subordinate to the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens;

(e)    the aggregate value of the ABL Priority Collateral exceeds the aggregate amount of the Prepetition Domestic ABL Debt;

(f)    the aggregate value of the Foreign ABL Collateral exceeds the aggregate amount of the Prepetition Foreign ABL Debt;

(g)    none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Existing Agreements;

(h)    the Debtors and their estates have no claims or causes of action against the Prepetition Secured Parties, with respect to either the Prepetition Debt or the Primed Liens;

(i)    each of (i) that certain First Lien Intercreditor Agreement dated as of February 11, 2011 among the Company, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee (collectively, the "Prepetition First Lien Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "First Lien Intercreditor Agreement") and (ii) the Amended and Restated

Intercreditor Agreement dated as of October 29, 2012 among the Prepetition Domestic ABL Agent and the Prepetition Cash Flow Agent and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "ABL Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement, the "ICAs") are binding and enforceable against the Borrower and the Guarantors in accordance with their terms, and the Borrower and the Guarantors are not entitled to take any action that would be contrary to the provisions thereof;

(j)    all cash, securities, cash equivalents and other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan Parties in any account or accounts with any depository institution (collectively, the "Depository Institutions"), were subject to rights of set-off and valid, perfected, enforceable, first priority liens under the Existing Agreements and applicable law, for the benefit of the Prepetition Secured Parties.  "Cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") includes, without limitation, all cash proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral); and

(k)    notwithstanding anything herein to the contrary, (a) the Debtors make no stipulation, and reserve all rights, with respect to the assets identified on **Exhibit C** attached hereto (collectively, the "Retained Claims Collateral"), including with respect to any liens asserted against the Retained Claims Collateral on account of the Prepetition Debt and (b) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal

and/or to seek a determination on the value of the Prepetition Collateral securing the Prepetition Debt are fully reserved.  For the avoidance of doubt, and without limiting the foregoing, the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Retained Claims Collateral are expressly preserved.

4.      *Findings Regarding the DIP Financing and Cash Collateral.*

(a)     Good and sufficient cause has been shown for the entry of this Final Order.

(b)     The Debtors have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order, among other things, to avoid the liquidation of these estates, and to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay adequate protection, to repay the Prepetition ABL Debt (as defined below), to fund the Cash Pool Requirements Account, to deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and to issue new letters of credit and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to avoid a liquidation and for the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative

expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1),

364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Agent and the

DIP Lenders, subject to the Carve-Out and the Permitted Liens, the DIP Liens and the DIP

Superpriority Claims (as defined below) and incurring the Adequate Protection Obligations (as

defined below), in each case, under the terms and conditions set forth in this Final Order and in

the DIP Documents.

(d)     The Debtors have an immediate need to continue to guarantee, on a

postpetition basis, the Cash Pooling Obligations and to establish and fund the Cash Pool

Requirements Account in order to ensure the continuing operation of the Group Companies in

the ordinary course and thereby help to preserve the value of the Debtors' equity interests in the

Group Companies in the ordinary course for the overall benefit of the Debtors' estates and

creditors.

(e)     Based on the Motion, the Declarations filed in support of the Motion, and

the record presented to the Court at the Interim Hearing (including the Declarations) and the

Final Hearing, the terms of the DIP Financing and the terms on which the Debtors may continue

to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the

DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business

judgment consistent with their fiduciary duties and constitute reasonably equivalent value and

fair consideration.

(f)     The Prepetition Secured Parties have consented or are deemed under the

applicable ICA to have consented to the Debtors' use of Cash Collateral and the other Prepetition

Collateral (solely in accordance with the terms of this Final Order and the DIP Documents), and

21

the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and

conditions in this Final Order and the DIP Documents.

(g)    The DIP Financing and the use of the Prepetition Collateral (including

Cash Collateral) have been negotiated in good faith and at arm's-length among the Debtors, the

DIP Agent, the DIP Lenders, and certain of the Prepetition Secured Parties and all of the Loan

Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP

Financing and the DIP Documents, including, without limitation: (i) all loans made to and

guarantees issued by the Debtors pursuant to the DIP Documents (the "DIP Loans"); (ii) any L/C

Obligations (as defined in the DIP Credit Agreement); (iii) any Cash Management Obligations

(as defined in the DIP Credit Agreement); (iv) any Hedging Obligations (as defined in the

DIP Credit Agreement); (v) any Cash Pooling Obligations, to the extent provided herein; and

(vi) any other Obligations (as defined in the DIP Credit Agreement, in each case owing to the

DIP Agent, any DIP Lender or any of their respective banking affiliates (all of the foregoing in

clauses (i) through (vi) collectively, the "DIP Obligations"), shall be deemed to have been

extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as

that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the

protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP

Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section

364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is

vacated, reversed or modified, on appeal or otherwise.  The Prepetition Secured Parties have

negotiated in good faith the Debtors' use of the Prepetition Collateral (including the Cash

Collateral) to fund the administration of the Debtors' estates and continued operation of their

businesses (including the incurrence and payment of the Adequate Protection Obligations), in

accordance with the terms and conditions of the DIP Documents and this Final Order, and the Prepetition Secured Parties (and their successors and assigns) shall be entitled to the full protections afforded parties acting in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(h)     The Prepetition Secured Parties are entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion, the Declarations and on the record presented to the Court, the terms of the proposed adequate protection arrangements for the use of and diminution of value of the Prepetition Collateral (including the Cash Collateral), if any, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including the Cash Collateral); *provided* that nothing in this Final Order or the other DIP Documents shall (w) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order, (x) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (y) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the ICAs, to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition Secured Parties; *provided further*, *however*, that in the event any request for new, different, or additional relief per clause (y), all parties' rights to oppose such relief are fully reserved.

(i)     Payment of the Prepetition ABL Debt reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(j)     The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Final Order and the DIP Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

5.     *Authorization of the DIP Financing and the DIP Documents.*

(a)     The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized pursuant to this Final Order to forthwith borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guarantee the Borrower's obligations with respect to such borrowings and letters of credit, up to an aggregate principal amount equal to $725,000,000 of term loans under the DIP  Term Facility and full access to the issuance of up to $150,000,000 in letters of credit under the DIP L/C Facility, subject to any conditions and limitations under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to refinance the Prepetition ABL Debt as provided herein and deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and, in connection therewith, to fund the Letter of Credit Account as set forth in the DIP Credit Agreement, to fund the Cash Pool Requirements Account, to provide working capital for the Debtors, to pay adequate protection, for general corporate purposes, to pay interest, fees and expenses in accordance with this Final Order and the DIP Documents, to fund the Carve-Out

(including the Carve-Out Reserves), and to pay Professional Fees.  For the avoidance of doubt, the L/C Cash Collateral shall be funded with proceeds of the DIP Loans to the extent such proceeds have not been exhausted, and the DIP Liens in respect of the L/C Obligations shall not be subject or subordinate to any senior liens.

(b)    In furtherance of the foregoing and without further approval of this Court, each Loan Party is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for or in connection with the Loan Parties' performance of their obligations under the DIP Financing, including as applicable and, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Documents;

(ii)    the continuation of the guarantee of the Cash Pooling Obligations on a postpetition basis;

(iii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the requisite parties under the DIP Documents may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any ordinary course fees paid in connection therewith) that do <u>not</u> (a) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder, (b) increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any ordinary course amendment, consent or waiver fee), (c) amend, modify

or supplement any events of default, termination provisions or provisions relating to asset sales (excluding, for the avoidance of doubt, any waiver of such provisions), or (d) modify Section 2.05 (Prepayments) of the DIP Credit Agreement in a manner adverse to the Debtors (such authorizations, amendments, waivers, consents or other modifications not requiring further approval of the Court, "Immaterial Amendments"), *provided* that the Debtors shall provide notice of any proposed Immaterial Amendment to counsel to the Creditors' Committee no less than three (3) business days prior to the effectiveness thereof;

(iv)    the non-refundable payment to the DIP Agent, Lead Arrangers, or the DIP Lenders, as the case may be, of all fees (which fees shall be, and shall be deemed to have been, approved upon entry of this Final Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by the DIP Agent and the DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party;

(v)    the creation of intercompany loans in accordance with the Intercompany Security Protocol; and

(vi)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party thereto in accordance with the terms of the DIP Documents and this Final Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

6.    *Payment of the Prepetition ABL Debt.*

(a)    The Debtors are hereby authorized and directed to use proceeds of the DIP Financing and Cash Collateral to, at the initial closing of the DIP Financing, pay in full in cash the Prepetition Domestic ABL Debt and, subject to the Intercompany Security Protocol, the Prepetition Foreign ABL Debt.[8]  The Prepetition Domestic ABL Liens shall be automatically

---

[8]    "Prepetition Foreign ABL Debt" means the aggregate principal amount of obligations outstanding pursuant to, and in accordance with the terms of, the senior secured asset-based revolving credit facility made available to Avaya Canada Corp., Avaya UK, Avaya International Sales Limited, Avaya Deutschland GMBH and Avaya GMBH & CO. KG (collectively, the "Foreign Borrowers") pursuant to that certain Credit Agreement, dated as of June 4, 2015, by and among the Foreign Borrowers, the guarantors from time to time party thereto, Citibank, N.A. as Administrative Agent and L/C Issuer (the "Prepetition Foreign ABL Agent"), Citibank, N.A., Canadian Branch as Canadian Swing Line Lender, Citibank, N.A., London Branch as European Swing Line Lender, and the other lenders from time to time party thereto (the "Prepetition Foreign ABL Lenders" and together with the Prepetition Foreign ABL Agent, the "Prepetition Foreign ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Foreign ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Foreign ABL Credit Facility") and the other Loan Documents (as defined in the Prepetition Foreign ABL Credit Agreement and, collectively with the Prepetition Foreign ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Foreign ABL Agreements"), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Foreign ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Foreign ABL Agreements.  The Prepetition

released and terminated upon the Domestic ABL Discharge.  Until then, subject to the terms and conditions contained in this Final Order (including, without limitation, the DIP Liens granted hereunder and the Carve-Out), any and all prepetition or postpetition liens and security interests (including, without limitation, any adequate protection replacement liens at any time granted to the Prepetition Domestic ABL Secured Parties by this Court) that the Prepetition Domestic ABL Secured Parties have or may have in the Prepetition Collateral or any other assets and properties of the Debtors and their estates shall (i) continue to secure the unpaid portion of any Prepetition Domestic ABL Debt (including, without limitation, any Prepetition Domestic ABL Debt subsequently reinstated after the repayment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition Domestic ABL Debt shall not have been avoided) and (ii) be junior and subordinate in all respects to (A) the Carve-Out, (B) valid, perfected, unavoidable and senior liens in existence immediately prior to the Petition Date, and (C) with respect to the Cash Flow Priority Collateral, the DIP Liens, the Prepetition First-Priority Liens, the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens (as defined below) and the First Lien Notes Primed Parties Adequate Protection Liens (as defined below) granted under this Final Order and the Existing Agreements (such liens and security interests of the Prepetition Domestic ABL Secured Parties are hereinafter referred to as the "Contingent ABL Liens", and any such unpaid or reinstated Prepetition Domestic ABL Debt described in clause (i) of this sentence is hereinafter referred to as the "Contingent Prepetition ABL Debt").

(b)     For the avoidance of doubt, the repayment of the Prepetition Domestic ABL Debt and the Prepetition Foreign ABL Debt shall be conditional and subject to

---

Foreign ABL Debt, together with the Prepetition Domestic ABL Debt shall be collectively referred to herein as "Prepetition ABL Debt."

disgorgement, in whole or in part, pending occurrence of the Domestic ABL Discharge and the occurrence of the Foreign ABL Discharge, respectively.

7.    *Carve-Out.*

(a)    The "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any committee of unsecured creditors (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day (as defined in the DIP Credit Agreement) following delivery by the DIP Agent of a written notice delivered by email (or other electronic means) to the DIP Lenders, the Debtors, their lead restructuring counsel, the United States Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Crossover Group, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an "Event of Default" under the DIP Credit Agreement (a "DIP Event of Default") and acceleration of either DIP Facilities stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the "Carve-Out Trigger Notice"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger

Notice, subject to an investigation budget cap of (x) $250,000 with respect to Professional Fees to be incurred by the Creditors' Committee and (y) $150,000 with respect to Professional Fees to be incurred by the Debtors solely with respect to the Retained Claims Collateral, under the investigation budget (collectively, the "Investigation Budget Cap"); and (iv) Professional Fees in an aggregate amount not to exceed $20,000,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

(b)     On the day on which a Carve-Out Trigger Notice is given by the DIP Agent as set forth herein (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Loan Party to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

(c)     The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims (including the DIP Superpriority Claims).  On the Termination Declaration Date, the Debtors shall be required to deposit in a segregated account at the DIP Agent an amount equal to the Post Carve-Out Trigger Notice Cap and hold in trust to pay such Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d)      All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in Paragraph 7(a) (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition Secured Parties under the Existing Agreements on a pro rata basis in accordance with their rights and priorities as of the Petition Date, including the ICAs.

(e)      All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth in Paragraph 7(a) (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition Secured Parties under the Existing Agreements in accordance with their rights and priorities as of the Petition Date, including the ICAs.

(f)      Notwithstanding anything herein, the DIP Documents, or the Final Order to the contrary: (i) if any Carve-Out Reserve is not funded in full in the amounts set forth herein,

31

then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Agent or the Prepetition First Lien Agents, as applicable; (ii) following delivery of a Carve-Out Trigger Notice, the DIP Agent and the agents under the Prepetition Debt shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded or unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve-Out Reserves, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent or the Prepetition First Lien Agents for application in accordance with this Final Order; (iii) disbursements by the Debtors from the Carve-Out Reserves shall not constitute term loans under the DIP Facilities or increase or reduce the balance of DIP Superpriority Claims outstanding; (iv) the failure of the Carve-Out Reserves to satisfy, in full, the Professional Fees shall not affect or impair the priority of the Carve-Out; and (v) in no way shall any of the Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any budget or financial projection delivered in connection with this Final Order or the DIP Facilities be construed as a cap or limitation on the amount of the Professional Fees due and payable by, or that may be administrative claims allowed against the Debtors or their estates.

(g)     Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.  Any payment or reimbursement made on a final basis on or after the occurrence of the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

32

(h)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, other than the investigation of such claims by the Creditors' Committee prior to the delivery of a Carve-Out Trigger Notice and subject to the Investigation Budget Cap, (i) against any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Existing Agreements, including, in each case without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders or the DIP Agent with respect to the DIP Facilities; (c) preventing, hindering, or delaying any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once a DIP Event of Default has occurred after the DIP Remedies Notice Period (as defined below), (d) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under or in respect of (i) the DIP Facilities, the Prepetition Domestic ABL Credit Facility, the Prepetition Cash Flow Credit Facility, the First Lien Notes Agreements or the Prepetition Second Lien Agreements, (ii) the liens securing the DIP Facilities or the Primed Liens; (iii) any other rights or interest of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties following the occurrence of a DIP Event of Default (as defined below) and after the DIP Remedies Notice Period, or (e) asserting, commencing or prosecuting any claims or causes of action, including,

without limitation, any Avoidance Actions (as defined below) against the DIP Agent, any DIP

Lender, any Prepetition Secured Party or any of their respective affiliates, agents, attorneys,

advisors, professionals, officers, directors and employees, each in their capacities as such;

*provided* that, for the avoidance of doubt, this Paragraph 7 (including, for the avoidance of doubt,

the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to seek

recharacterization of adequate protection as being applied to principal.

(i)    For the avoidance of doubt and notwithstanding anything to the contrary

herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims securing

the DIP Facilities (including the DIP Superpriority Claims and the DIP Liens) and any adequate

protection (including any liens and claims granted on account of the Adequate Protection

Obligations); *provided* that the Carve-Out shall not apply to the L/C Facility Letters of Credit or

any cash (or cash equivalent or similar) collateral pledged in support thereof (including, in all

respects, the Letter of Credit Account and all amounts credited thereto).

8.    *DIP Superpriority Claims.*  Subject in all respects to the Carve-Out, pursuant to

section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed

superpriority administrative expense claims against the Loan Parties (without the need to file any

proof of claim) with priority over any and all claims against the Loan Parties, now existing or

hereafter arising, of any kind whatsoever, including, without limitation, all administrative

expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and

all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365,

503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the

Adequate Protection Obligations), whether or not such expenses or claims may become secured

by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the

"DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of this Final Order, Avoidance Proceeds), subject only to the liens on such property and the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

9.      *DIP Liens*.  As security for the DIP Obligations, subject and subordinate in all respects to the Carve-Out, effective and perfected upon the date of this Final Order and without the necessity of the execution, recordation or filing by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Final Order and the DIP Documents, the "DIP Liens"):

(a)      First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon all Collateral, to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or valid and non-avoidable liens in favor of third parties that were in

existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code ("Unencumbered Property");

(b)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected junior security interests in and liens on the Collateral, to the extent such Collateral is subject to (x) valid, perfected and non-avoidable liens as of the Petition Date to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases or (y) valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code and to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases, other than:

(i)    the Prepetition First-Priority Liens; *provided* that DIP Liens securing Cash Pooling Obligations shall be subordinate to the Prepetition First-Priority Liens on Cash Flow Priority Collateral;

(ii)    prior to the Domestic ABL Discharge, and solely with respect to (A) Cash Flow Priority Collateral and (B) L/C Cash Collateral (*provided* that any funds deposited in the Letter of Credit Account shall be deemed to be funded from proceeds of the DIP Loans to the extent such proceeds have not been exhausted), the Prepetition Domestic ABL Liens; and

(iii)    the Prepetition Second-Priority Liens;

(c)    Priming Liens.

(i)    Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully-

36

perfected priming senior security interests in and liens upon the Collateral.  Except as set forth in the foregoing subparagraph (b), the DIP Liens shall prime the Primed Liens in accordance with the priorities shown in **Exhibit B** attached hereto (the "Priming Liens");

(ii)    Notwithstanding anything herein to the contrary, the Priming Liens (a) shall be subject and junior to the Carve-Out in all respects, (b) shall be junior to liens that are senior to the Primed Liens (unless such liens are themselves Primed Liens), (c) shall be senior in all respects to the Primed Liens, (d) shall be senior in all respects to liens and security interests that are junior to the Primed Liens and (e) shall also be senior to any liens granted after the Petition Date to provide adequate protection with respect of any of the Primed Liens.  The Primed Liens shall be primed by and made subject and subordinate to the Carve-Out and the Priming Liens, but the Priming Liens shall not prime perfected liens, if any, to which the Primed Liens are subject at the time of the commencement of the Chapter 11 Cases or liens to which the Primed Liens are subject and that are perfected after the commencement of the Chapter 11 Cases to the extent permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Carve-Out and any such liens that are themselves Primed Liens);

(d)    Relative Priority of Liens.  Notwithstanding anything to the contrary in this Final Order or the DIP Documents, the relative priority of each DIP Lien granted in this Paragraph 9, the Primed Liens, the Contingent ABL Liens, and the Adequate Protection Liens, shall be as set forth in **Exhibit B** attached hereto; *provided* that, for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve-Out in all respects;

(e)    Excluded Assets.  Notwithstanding anything to the contrary in this Final Order or the DIP Documents, the Collateral shall not include (i) any claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code

(collectively, the "Avoidance Actions"), (ii) any Excluded Asset (as defined in the DIP Collateral Agreement), (iii) the Cash Pool Requirements Account, (iv) any Excluded Security (as defined in the DIP Collateral Agreement), (v) leased (not owned) real property, (vi) prior to entry of this Final Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code, (vii) any equity interests in Sierra in excess of 65% of the equity interests issued and outstanding, and (viii) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (i) – (vii) (it being understood that subject only to and effective upon entry of this Final Order, the Collateral shall include any proceeds or property recovered, unencumbered or otherwise from successful Avoidance Actions, whether by judgment, settlement or otherwise (collectively, the "Avoidance Proceeds")) (the assets described in the foregoing clauses (i) through (viii), the "Excluded Assets").

10.    *Collateral*.  For purposes of this Final Order, "Collateral" shall mean all property, other than Excluded Assets, whether now owned or hereafter acquired or existing and wherever located, of each Loan Party and each Loan Party's "estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash (whether maintained with the DIP Agent or otherwise), Intercompany Notes/Receivables (excluding any Non-Debtor Subsidiary Note/Receivable held by a Non-Debtor Subsidiary other than Sierra), the Foreign ABL Repayment Rights, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit

38

rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock held by each Debtor, other equity or ownership interests, including, without limitation, equity interests in subsidiaries (including non-wholly owned and Non-Debtor Subsidiaries), money, investment property and upon entry of this Final Order, any proceeds of Avoidance Actions, the proceeds, products rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing.

11.    *Maintenance of Letters of Credit.*  To the extent permitted by the DIP Documents, the Loan Parties are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Credit Agreements on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis.

12.    *Protection of DIP Lenders' Rights.*

(a)    Until the indefeasible Payment in Full (as defined in the DIP Credit Agreement) of all DIP Obligations and the termination of all remaining Commitments (as defined in the DIP Credit Agreement) under the DIP Facilities, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Existing Agreements or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against Collateral, including in connection with the Contingent ABL Liens or the Adequate Protection Liens except to the extent authorized by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any Collateral, to the extent such transfer, disposition, sale or release is authorized under the DIP Documents (as in effect on or about the entry of this Final Order); and (iii) deliver or cause to be delivered, at the Loan Parties' cost and expense, any

termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Collateral subject to any sale or disposition or, solely with respect to the Prepetition Domestic ABL Secured Parties, in connection with the Domestic ABL Discharge.  Upon the Domestic ABL Discharge, the Debtors are authorized to file any termination statements, releases, or documents necessary to effectuate and/or evidence the release and termination of the Prepetition Domestic ABL Secured Parties' liens on or security interests in any portion of the Collateral.

(b)    To the extent the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent or any other Prepetition Secured Party (i) has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral, and (ii) has consented to, or is deemed to have consented to, the relief provided in this Paragraph 12(b) (including, for the avoidance of doubt, by participating in or not objecting to the DIP Facility and/or consenting to, being deemed to have consented to,  or not objecting to the Debtors' use of its Cash Collateral) then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the

DIP Lenders to (i) immediately upon the occurrence of a DIP Event of Default and concurrently with delivery of the Carve-Out Trigger Notice, declare (A) the termination, reduction or restriction of any further Commitment (as defined in the DIP Credit Agreement) to the extent any such Commitment remains and (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (ii) unless the Court orders otherwise during the DIP Remedies Notice Period (as defined below), upon the occurrence of a DIP Event of Default and the giving of five calendar days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "DIP Remedies Notice Period") (extended to the next business day if such five calendar day period shall expire on a day that is not a business day) via email to counsel to the Prepetition Cash Flow Agent, the Debtors, and counsel to the Debtors (and, upon receipt, the Debtors shall promptly provide a copy of such notice to counsel to the Creditors' Committee, the U.S. Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group) to (A) foreclose on any of the Collateral and (B) exercise all other rights and remedies under the DIP Documents, this Final Order and applicable law.

(d)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Final Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party

41

13.     *Marshaling.*  None of the DIP Collateral, the DIP Lenders, the DIP Agent, the

Prepetition Collateral, the Adequate Protection Liens or the Prepetition Secured Parties shall be

subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds

thereof shall be received and used in accordance with this Final Order; *provided*, *however*, that

the Prepetition Secured Parties, DIP Agent and the DIP Lenders shall use commercially

reasonable efforts to first use all DIP Collateral or Prepetition Collateral other than Avoidance

Proceeds to repay the DIP Obligations or Adequate Protection Obligations, as applicable.

Further, subject only to and effective upon entry of this Final Order, in no event shall the

"equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured

claims of the Prepetition Secured Parties.

14.     *Limitation on Charging Expenses Against Collateral.*  Effective upon entry of this

Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the

Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or

recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the

Bankruptcy Code or any similar principle of law, without the prior written consent of the

DIP Agent, the Prepetition Domestic ABL Agent (prior to the Domestic ABL Discharge) or the

Prepetition Cash Flow Agent (at the direction of the Required Lenders (as defined in the

Prepetition Cash Flow Credit Agreement)), as the case may be, and no such consent shall be

implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the

Prepetition Domestic ABL Agent or the Prepetition Cash Flow Agent, and nothing contained in

this Final Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the

Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

15.    *Payments Free and Clear*.   Subject in all respects to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or First Lien Agents on behalf of the Prepetition First-Priority Secured Parties pursuant to the provisions of this Final Order, the Final Order, or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability.

16.    *Use of Cash Collateral*.   The Debtors are hereby authorized, subject to the terms and conditions of this Final Order (including Paragraph 17 hereof), to use all Cash Collateral, and the Prepetition Secured Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them; *provided* that the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth, and so long as no Cash Collateral Event of Default shall have occurred and be continuing.   For purposes of this Final Order, the term "Cash Collateral Event of Default" shall mean:

(a)    unless waived by the Prepetition Cash Flow Agent with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, a DIP Event of Default;

(b)    the failure of any of the following to occur:

(i)    the filing of a chapter 11 plan that is acceptable to the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement), on the one hand, and the Debtors, on the other hand (an "Acceptable Plan"), and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with this Court within 150 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have filed the Acceptable Plan and Disclosure Statement;

(ii)      entry by this Court of an order approving the Disclosure Statement within 180 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court shall have entered an order approving the Disclosure Statement;

(iii)      entry by this Court of an order confirming the Acceptable Plan within 250 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court has entered an order confirming the Acceptable Plan;

(iv)      consummation of the Acceptable Plan within 270 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have consummated the Acceptable Plan; or

(c)      any Cash Collateral Event of Default set forth in Paragraph 25.

17.      *Termination of Use of Cash Collateral.*

(a)      Promptly upon delivery of a written notice of a Cash Collateral Event of Default (a "Cash Collateral Adequate Protection Notice") from the Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, to (i) the Debtors, (ii) counsel for the other Prepetition First Lien Notes Agents, (iii) counsel to the Ad Hoc First Lien Group, (iv) counsel to the Ad Hoc Crossover Group, (iv) the Creditors' Committee, and (v) the U.S. Trustee, the Debtors shall seek an expedited hearing (a "Cash Collateral Hearing") with the Court to consider the Debtors' use of Cash Collateral on a non-consensual basis.  Following delivery of a Cash Collateral Adequate Protection Notice in accordance with this Paragraph 17(a), the Debtors' right to use Cash Collateral shall continue until the later of (x) a ruling from the Court in respect of the Cash Collateral Hearing or (y) such time as otherwise agreed to by the Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement.

(b)    For the avoidance of doubt, and notwithstanding anything herein to the contrary, the occurrence of a Cash Collateral Event of Default pursuant to Paragraph 16(b) through 16(b)(iv) hereof, shall (i) not constitute a default with respect to the DIP Facilities or a DIP Event of Default, and (ii) the occurrence and pendency of a Cash Collateral Event of Default shall not cause the Debtors to be prohibited from using the cash proceeds from the DIP Facilities and Collateral securing the DIP Facilities (other than Cash Collateral) except as expressly set forth in this Final Order and the DIP Documents.

18.    *Contingent Liens and Adequate Protection of Prepetition Domestic ABL Secured Parties*.  Subject in all respects to the Carve-Out, until the occurrence of the Domestic ABL Discharge, the Prepetition Domestic ABL Secured Parties are entitled to (x) the Contingent ABL Liens and (y) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Domestic ABL Secured Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Domestic ABL Liens by the DIP Liens pursuant to the DIP Documents and this Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Prepetition Domestic ABL Adequate Protection Claim"); *provided* that the avoidance of any Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral shall not constitute diminution in the value of such Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral.  In consideration of the foregoing, and, for the avoidance of doubt, subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby

45

granted the following (collectively, the "Prepetition Domestic ABL Primed Parties Adequate Protection Obligations"):

(a)      Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), (1) in the amount of any Contingent Prepetition ABL Debt, the Contingent ABL Liens, and (2) in the amount of the Prepetition Domestic ABL Adequate Protection Claim, a valid, perfected replacement security interest in and liens (the "Prepetition Domestic ABL Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of this Final Order, the Avoidance Action Proceeds, in each case (i) subject and subordinate only to (A) with respect to Collateral other than ABL Priority Collateral, the DIP Liens and any other liens that are senior to the DIP Liens, (B) any liens that are senior to the Prepetition Domestic ABL Liens (C) the Carve-Out and (D) solely with respect to the Cash Flow Priority Collateral, the Prepetition First-Priority Liens and the Prepetition First-Priority Adequate Protection Liens (as defined below), (ii) with respect to Collateral other than Cash Flow Priority Collateral, senior to the Prepetition First-Priority Liens and the Prepetition First-Priority Adequate Protection Liens, and (iii) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens (as defined below).  The Prepetition Domestic ABL Adequate Protection Liens shall secure the Prepetition ABL Adequate Protection Claim, and the Contingent ABL Liens shall secure the amount of any Contingent Prepetition ABL Debt;

(b)      Prepetition Domestic ABL 507(b) Claim.    Subject in all respects to the
Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted an allowed
superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy
Code in the amount of the Prepetition Domestic ABL Adequate Protection Claim (the
"Prepetition Domestic ABL 507(b) Claim"), which Prepetition Domestic ABL 507(b) Claim
shall have recourse to and be payable from all of the Collateral, including, without limitation,
subject to entry of this Final Order, the Avoidance Proceeds.   The Prepetition Domestic ABL
507(b) Claim shall be (i) subject to the Carve-Out, (ii) subordinate to the DIP Superpriority
Claims, (iii) *pari passu* with the Cash Flow Credit Agreement Primed Parties 507(b) Claim and
First Lien Notes Primed Parties 507(b) Claim, and (iv) senior to the Second Lien Notes Primed
Parties 507(b) Claim.   Except to the extent expressly set forth in this Final Order or the DIP
Credit Agreement, the Prepetition Domestic ABL Secured Parties shall not receive or retain any
payments, property or other amounts in respect of the Prepetition Domestic ABL 507(b) Claim
until the indefeasible Payment in Full of all DIP Obligations and the termination of all remaining
Commitments under the DIP Facilities;

(c)      Prepetition Domestic ABL Fees and Expenses.   The Prepetition Domestic
ABL Agent shall receive from the Debtors, for the benefit of the Prepetition Domestic ABL
Lenders, current cash payments of the reasonable and documented prepetition and postpetition
fees and expenses payable to the Prepetition Domestic ABL Agent under the Prepetition
Domestic ABL Agreements, including, but not limited to, the reasonable and documented fees
and disbursements of counsel promptly upon receipt of invoices therefor, which payments shall
be made in the manner provided for in Paragraph 31 below (subject, in the event that the
Prepetition Domestic ABL Debt is reinstated, to recharacterization as principal payments (solely

upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such)); and

(d)    Contingent Prepetition ABL Debt.    In the event that the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender (each in their capacities as such) is ordered by the Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("Disgorged Amounts") leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account, which shall be subject to the Carve Out in all respects, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Domestic ABL Agent and the Prepetition Domestic ABL Lenders, distributing such amounts to the Debtors or otherwise); *provided* that, to the extent the Disgorged Amounts are returned to the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender, they shall receive such amounts plus any interest accrued at the default rate set forth in the Prepetition Domestic ABL Agreements; *provided further* that, after entry of a final non-appealable order of a court of competent jurisdiction ordering such Disgorged Amounts to be remitted to the Debtors, the Disgorged Amounts shall be Collateral pursuant to the terms of this Final Order.

19.    *Adequate Protection of Prepetition Cash Flow Credit Agreement Primed Parties.* The Prepetition Cash Flow Credit Agreement Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the diminution in value, if any, of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Cash Flow Credit Agreement Primed Parties' interests in the Prepetition Collateral from and after the

48

Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens of the Prepetition Cash Flow Credit Agreement Primed Parties by the DIP Liens pursuant to the DIP Documents and this Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (the "Cash Flow Credit Agreement Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Prepetition Cash Flow Credit Agreement Primed Parties are hereby granted the following (collectively, the "Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)      Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens.  The Prepetition Cash Flow Agent (for itself and for the benefit of the Prepetition Cash Flow Lenders) is hereby granted for the diminution in the value, if any, of the Prepetition Cash Flow Parties' interests in the Prepetition Collateral as of the Petition Date, a valid, perfected replacement security interest in and lien (the "Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds, in each case (i) subject and subordinate only to (A) the DIP Liens (other than, solely with respect to the Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens

49

secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition Domestic ABL Adequate Protection Liens; (iii) *pari passu* with the First Lien Notes Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;

(b)     <u>Prepetition Cash Flow Credit Agreement Primed Parties 507(b) Claim</u>. The Prepetition Domestic Cash Flow Credit Agreement Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Cash Flow Credit Agreement Primed Parties Adequate Protection Claim (the "<u>Cash Flow Credit Agreement Primed Parties 507(b) Claim</u>"), which Cash Flow Credit Agreement Primed Parties 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds.  The Cash Flow Credit Agreement Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the First Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this Final Order or the DIP Credit Agreement, the Prepetition Cash Flow Credit Agreement Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Cash Flow Credit Agreement Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)     <u>Prepetition Cash Flow Credit Agreement Primed Parties Fees and Expenses; Cash Payments</u>.  The Prepetition Cash Flow Agent shall receive from the Debtors, for the benefit of the Prepetition Cash Flow Lenders, (i) cash payments as set forth in Paragraph

21(a) and (ii) current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Cash Flow Agent under the Prepetition Cash Flow Agreements, including, but not limited to, the reasonable and documented fees and disbursements of one primary counsel to the Prepetition Cash Flow Agent promptly upon receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

20.    *Adequate Protection of Prepetition First Lien Notes Primed Parties*. The Prepetition First Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Debtors' interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Prepetition First Lien Notes Primed Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens by the DIP Liens pursuant to the DIP Documents and this Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "First Lien Notes Primed Parties Adequate Protection Claim"). In consideration of the foregoing, the Prepetition First Lien Notes Primed Parties are hereby granted the following (collectively, the "First Lien Notes Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)    Prepetition First Lien Notes Primed Parties Adequate Protection Liens. The 9.00% First Lien Notes Trustee and the 7.00% First Lien Notes Trustee (for themselves and

for the benefit of the 9.00% First Lien Noteholders and the 7.00% First Lien Noteholders, respectively) are each hereby granted (effective and perfected upon the date of this Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution of value, if any, of the Prepetition First Lien Notes Parties' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "First Lien Notes Adequate Protection Liens" and, together with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens, the "Prepetition First-Priority Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds, in each case (i) subject and subordinate only to (A) the DIP Liens (other than, solely with respect to the Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition Domestic ABL Adequate Protection Liens; (iii) *pari passu* with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;

(b)    Prepetition First Lien Notes Primed Parties 507(b) Claim. The Prepetition First Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the

First Lien Notes Primed Parties Adequate Protection Claim (the "First Lien Notes Primed Parties 507(b) Claim"); which First Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds. The First Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the Cash Flow Credit Agreement Primed Parties 507(b) Claim. Except to the extent expressly set forth in this Final Order or the DIP Credit Agreement, the Prepetition First Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)     Prepetition First Lien Notes Primed Parties Fees and Expenses; Cash Payments. The 9.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 9.00% First Lien Noteholders (i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 9.00% First Lien Indenture) current cash payments of the reasonable and documented fees  and expenses of the 9.00% First Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 9.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such). The 7.00% First Lien

Notes Trustee shall receive from the Debtors, for the benefit of the 7.00% First Lien Noteholders (i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 7.00% First Lien Indenture) current cash payments of the reasonable and documented fees and expenses of the 7.00% First Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 7.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such).

21.    *Additional First Lien Adequate Protection.*  Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, each of the Prepetition First-Priority Secured Parties whose liens will be primed by the DIP Liens and whose Cash Collateral will be authorized for use by the Debtors, will receive as additional adequate protection, in each case subject to the Carve-Out in all respects:

(a)    the following adequate protection payments:

(i)    cash payments in an amount equal to interest at the non-default rate under the Prepetition Cash Flow Credit Agreement, on the applicable payment dates as provided in the Prepetition Cash Flow Credit Agreement;

(ii)    cash payments in an amount equal to interest at the non-default rate under the 9.00% First Lien Indenture, on the applicable payment dates as provided in the 9.00% First Lien Indenture; and

(iii)    cash payments in an amount equal to interest at the non-default rate under the 7.00% First Lien Indenture, on the applicable payment dates as provided in the 7.00% First Lien Indenture; *provided* that the adequate protection payments set forth in the foregoing clauses (i) through (iii) shall be distributed by the Debtors ratably to (a) the Prepetition Cash Flow Agent, for the benefit of the Prepetition Cash Flow Secured Parties, (b) the 7.00% First Lien Notes Trustee, for the benefit of the 7.00% First Lien Noteholders, and (c) the 9.00% First Lien Notes Trustee, for the benefit of the 9.00% First Lien Noteholders, based on the principal and accrued interest outstanding under the Prepetition Cash Flow Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture, respectively, as of the Petition Date, each as set forth in **Exhibit D** attached hereto; *provided further* that each of the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee shall apply the payments received pursuant to the foregoing clauses (i) through (iii) in accordance with the Prepetition Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture without regard to the First Lien Intercreditor Agreement, including Section 2.01(a) thereof;

(b)    current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of this Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of certain holders of First Lien Debt (the "Ad Hoc First Lien Group"), in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of First Lien Debt (solely upon a motion by the Debtors, the Creditors'

Committee or any other party in interest), so long as the Ad Hoc First Lien Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019; and

(c)    current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of this Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of certain holders of First Lien Debt and Second Lien Notes Debt (the "Ad Hoc Crossover Group"), in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc Crossover Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019.

22.    *Adequate Protection of the Second Lien Notes Primed Parties.*

(a)    Subject and subordinate to the Carve-Out in all respects, the Second Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Second-Priority Liens of the Prepetition Second Lien Notes Primed Parties by the DIP Liens pursuant to the DIP Documents

and this Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Second Lien Notes Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Second Lien Notes Primed Parties are hereby granted the following (collectively, the "Second Lien Notes Primed Parties Adequate Protection Obligations" and, together with the Prepetition Domestic ABL Primed Parties Adequate Protection Obligations, the Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations and the First Lien Notes Primed Parties Adequate Protection Obligations, the "Adequate Protection Obligations");

        (b)      Prepetition Second Lien Notes Primed Parties Adequate Protection Liens. The Second Lien Notes Trustee (for itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution in the value of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "Second Lien Notes Adequate Protection Liens" and, collectively with the Prepetition Domestic ABL Adequate Protection Liens and the Prepetition First-Priority Adequate Protection Liens, the "Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds, in each case subject and subordinate to (i) the DIP Liens and any other liens that are senior to the DIP Liens, (ii) the Carve-Out, (iii) the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens and (iv) the Prepetition First-Priority Liens and Prepetition First-Priority Adequate Protection Liens;

(c)    Prepetition Second Lien Notes Primed Parties 507(b) Claim.    The Prepetition Second Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Second Lien Notes Primed Parties Adequate Protection Claim (the "Second Lien Notes Primed Parties 507(b) Claim" and, collectively with the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim and the First Lien Notes Primed Parties 507(b) Claim, the "507(b) Claims")); which Second Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of this Final Order, the Avoidance Proceeds.    The Second Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims, and (iii) subordinate to the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim, and the First Lien Notes Primed Parties 507(b) Claims.    Except to the extent expressly set forth in this Final Order or the DIP Credit Agreement, the Prepetition Second Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Second Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities.

(d)    The Second Lien Notes Trustee shall receive from the Debtors (pursuant to the schedule of fees in effect upon the appointment of the successor Second Lien Notes Trustee), for the benefit of the Second Lien Noteholders, current cash payments of the reasonable and documented fees and expenses of the Second Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable

and documented postpetition fees and expenses of one primary counsel to the Second Lien Notes Trustee only and no other professional, promptly upon the receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of the Second Lien Debt and/or disgorgement (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

23.    *Reservation of Rights of Prepetition Secured Parties*.   Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that, subject to the terms of the ICAs, the Prepetition Secured Parties may request further or different adequate protection (a) following an Event of Default and expiration of the DIP Remedies Notice Period or Cash Collateral Notice Period, as applicable (but not beforehand) or (b) upon a material change in circumstances; *provided further* that all parties' rights to contest such adequate protection requests are fully preserved.

24.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Prepetition

Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Final Order. Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Final Order may, in the discretion of the DIP Agent or the Prepetition First Lien Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent or the Prepetition First Lien Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

25.    *Certain Events of Default*. The occurrence of any the following events, unless waived in writing by the DIP Agent, shall constitute a DIP Event of Default and a Cash Collateral Event of Default:

(a)      if any of the Debtors, without the prior written consent of the DIP Agent seeks, proposes or supports, in each case pursuant to a pleading filed by the Debtors in the Court that is not withdrawn after three (3) days' notice by the DIP Agent or Prepetition First Lien Agents to the Debtors, or if there is entered or confirmed (in each case, as applicable):

i.      any modifications, amendments or extensions of this Final Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

ii.      an order converting or dismissing any of the Chapter 11 Cases;

iii.      an order appointing a chapter 11 trustee, receiver or an examiner with expanded powers in the Chapter 11 Cases;

iv.      an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

v.      a plan of reorganization other than a plan that provides for the payment in cash in full of the DIP Obligations as of the effective date of such plan; or

vi.      the sale of all or substantially all of the assets of the Debtors, which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made) upon the consummation thereof;

vii.      subject to Paragraph 17(b) hereof and the last Paragraph of Section 8.01 of the DIP Credit Agreement (beginning, "Notwithstanding anything herein to the contrary (including Section 8.01(o) hereof),

61

there shall be no Default or Event of Default arising from…"), reversal, vacatur, modification or stay of this Final Order;

(b)        failure of the Debtors to pay the Adequate Protection Fees or the Adequate Protection Interest Payments when due (subject to expiration of applicable grace periods, if any);

(c)        any other "Event of Default" under the DIP Documents that is not waived by the Required DIP Lenders; or

(d)        any material breach by any Debtor of any provision of this Final Order or the Final Order, in each case, that is not cured within five (5) business days of notice thereof (without duplication of any grace period under the DIP Credit Agreement).

26.        *Preservation of Rights Granted Under This Final Order.*  Subject in all respects to Paragraph 26(e) hereof:

(a)        Other than the Carve-Out and other claims and liens expressly granted by this Final Order or as permitted pursuant to the DIP Credit Agreement, absent the express written consent of the DIP Agent (in its sole discretion) or the Prepetition Cash Flow Agent, no claim or lien having a priority superior to or *pari passu* with those granted by this Final Order to the DIP Agent and the DIP Lenders, the Prepetition Domestic ABL Secured Parties, the Prepetition First-Priority Secured Parties, or the Second Lien Notes Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding other than senior adequate protection liens permitted pursuant to clause (ii) below. Except as otherwise expressly provided in the DIP Credit Agreement or this Final Order and set forth in **Exhibit B** hereto, and subject to the Carve-Out in all respects, the DIP Liens, the Adequate Protection Liens and the Contingent ABL Liens shall not be: (i) subject or subordinate

62

to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, other than adequate protection liens granted on account of liens that are senior to the DIP Liens pursuant to Paragraph 9(b) in an amount not to exceed $15,000,000 in the aggregate; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and (iv) subject or subordinate to any intercompany or affiliate liens or security interests against the Debtors.

(b)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the Adequate Protection Liens and, prior to the Domestic ABL Discharge, the Contingent ABL Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Final Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph 26 and otherwise in this Final Order.

(c)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the

validity, priority or enforceability of the Carve-Out, any DIP Obligations, or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agents, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the Carve-Out, the DIP Liens, the Adequate Protection Liens or the Contingent ABL Liens.   Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agent, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and the DIP Documents.

(d)     Except as expressly provided in this Final Order or in the DIP Documents, the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Contingent ABL Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Chapter 11

64

Cases or by any other act or omission; (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except with respect to the Collateral being sold to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Chapter 11 Cases and in any superseding chapter 7 cases under the Bankruptcy Code, and the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Contingent ABL Liens, the 507(b) Claims and all of the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Final Order and the DIP Documents shall continue in full force and effect until the indefeasible Payment in Full of all DIP Obligations, as set forth herein and in the DIP Documents, and the termination of all remaining Commitments under the DIP Facilities.

(e)    Notwithstanding anything herein or in the DIP Credit Agreement to the contrary, there shall be no DIP Event of Default arising from: (i) the occurrence of a Cash Collateral Event of Default set forth in Paragraph 16(b) or termination of the Debtors' consensual use of Cash Collateral, or (ii) in the event of such termination (A) any request by the Loan Parties seeking to use Collateral or Cash Collateral subject to the Primed Liens on a nonconsensual basis or (B) any order of the Court granting such request, in each case so long as the adequate protection requested by the Loan Parties or approved by the Court, as applicable, is materially consistent with the adequate protection granted on account of the Primed Liens pursuant to the Orders or permitted herein.

27.     *Releases*.   Subject to the rights and limitations set forth in Paragraph 28, each of the Debtors, and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of the (a) Existing Agreements or the transactions contemplated under such documents (subject to the Debtors' Retained Claims Challenge Period), and (b) as applicable, the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority,

66

perfection, or availability of the liens of the Prepetition Secured Parties (including Avoidance Actions), subject to the Debtors' Retained Claims Challenge Period.

28.    *Effect of Stipulations on Third Parties.*

(a)    The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 3 and 28 of this Final Order (collectively, the "Stipulations") shall be binding on the Debtors, the Debtors' estates, and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period by: (x) the Creditors' Committee; or (y) a party in interest with requisite standing other than the Creditors' Committee, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee").  The Stipulations contained in this Final Order, shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, or any other party in interest (including any Trustee) (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing, has duly filed an adversary proceeding or contested matter challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the Prepetition Debt or the Primed Liens or otherwise asserting or prosecuting any Avoidance Actions (each, a "Challenge") or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Secured Obligations or the Existing Agreements by no later than the latest of (i) ninety (90) days after the entry of this Final Order and (ii) any such later date agreed to in writing by the (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic

ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, as applicable, (the time period established by the latest of the foregoing clauses (i) and (ii) the "Challenge Period"); *provided*, *however*, that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any Trustee, commencing on the date of the occurrence of either of the events described in the foregoing (x) or (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding or contested matters; *provided* that nothing in this Paragraph 28 shall limit (or be deemed to limit) any of the Debtors' or any other party in interest's rights to seek disgorgement of adequate protection or recharacterization of adequate protection as being applied to principal, as applicable, or to seek a determination on the value of Prepetition Collateral securing any of the Prepetition Debt at any time; *provided further* that should the Creditors' Committee file a motion with this Court seeking requisite standing and authority to pursue any challenge (with a draft complaint attached) (a "Standing Motion") prior to the expiration of the Challenge Period, the Challenge Period shall be tolled for the Creditors' Committee (and no other party) solely with respect to the claims or causes of action asserted in the complaint attached to the Standing Motion until the day on which the such Standing Motion is granted or denied by an order of this Court. If no Challenge is timely commenced prior to the expiration of the Challenge Period, without further order of this Court (x) the obligations in respect of the Prepetition Debt shall constitute allowed claims, not subject to

68

any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the Prepetition Secured Obligations shall not be subject to any other or further Challenge, including, without limitation, any Claims and Defenses, which shall be deemed to be forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (z) all of the findings, the Debtors' stipulations, waivers, releases, and affirmations set forth in Paragraphs 3 and 28 herein, shall be of full force and effect and forever binding upon the applicable Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any successor cases.  If any such Standing Motion or Challenge is timely filed or commenced, as applicable, prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee and any other person or party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge and (b) any Claims and Defenses not brought in a timely filed Challenge shall be forever barred; *provided* that, if and to the extent any Challenges to a particular Stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such Stipulation also shall be

binding on the Debtors' estates and all parties in interest. Nothing in this Final Order vests or confers on any Person, including a Creditors' Committee or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

(b)     Notwithstanding anything herein to the contrary, any Claim, Challenge, or action by the Debtors on account of liens asserted with respect to the Retained Claims Collateral must be filed on or before the first Business Day (as defined in the DIP Credit Agreement) following two (2) months after the Petition Date (the "Debtors' Retained Claims Challenge Period"), or shall otherwise be waived, and all defenses of the Prepetition Secured Parties with respect to any such Claim, Challenge or action are expressly preserved; *provided* that such date may be extended by agreement of the Debtors, on the one hand and (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, on the other hand. For the avoidance of doubt, any informal discovery or examination conducted pursuant to Bankruptcy Rule 2004 relating to the foregoing matters or claims shall not be deemed or construed to be a Challenge.

29.     *Expenses and Indemnification*.   All reasonable and documented out-of-pocket expenses (including but not limited to reasonable fees and expenses of legal advisors (which shall include the fees and expenses of counsel) and administrative fees and "seasoning fees," to the extent applicable, for the DIP Agent, in connection with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the DIP Credit Agreement and the DIP Documents, whether or not the DIP Facilities are successfully consummated, in connection with all collateral appraisals and

field exams prepared or conducted by or on behalf of the DIP Agent, and in connection with the Chapter 11 Cases are to be paid by the Loan Parties pursuant to this Paragraph 29, including for the avoidance of doubt, all reasonable and documented fees, costs and expenses of Davis Polk and Wardwell LLP, as primary counsel to the DIP Agent, local counsel in each applicable jurisdiction, conflicts counsel, to the extent necessary.

30.    In addition, the Loan Parties will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (with respect to legal fees and expenses, limited to the reasonable and documented out-of-pocket legal fees and expenses of one counsel for the DIP Agent) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities; *provided*, *however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the (x) gross negligence, bad faith or willful misconduct of such person (or their related persons) or (y) a material breach of the obligations of such person under the DIP Documents.

31.    *Payment of Fees and Expenses*.    The payment of the fees, expenses and disbursements pursuant to this Final Order (to the extent incurred after the Petition Date) shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by (i) the Debtors, (ii) counsel for the Debtors, (iii) counsel for the Ad Hoc First Lien Group, (iv) the Creditors' Committee, (v) the U.S. Trustee, (vi) counsel for the DIP Agent, (vii) the Prepetition First Lien Agents, (viii) counsel for the Ad Hoc Crossover Group, and (ix) the Second Lien Notes Trustee (collectively, the "Notice Parties") (the "Review Period") of

71

invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).  The Notice Parties may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto.

32.     *Limitation on Use of the DIP Facilities, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  Notwithstanding anything herein or in any other order of this Court to the contrary, neither the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, nor the Carve-Out (other than the Investigation Budget Cap) may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Secured Debt Documents or the liens or claims granted under this Final Order, the DIP Documents or the Prepetition Secured Debt Documents; (b) assert any Claims and Defenses (as defined below) or

any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) following the DIP Remedies Notice Period or Cash Collateral Notice Period (where the automatic stay has been lifted), as applicable, prevent, hinder or otherwise delay the DIP Agent's or the Prepetition First Lien Agents' assertion, enforcement, or realization on the Prepetition Collateral or the DIP Collateral, in accordance with the DIP Documents, the Prepetition Debt Documents or this Final Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or any of the Prepetition First Lien Agents or the Second Lien Notes Trustee hereunder or under the DIP Documents or the Prepetition Secured Debt Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court or otherwise permitted under the DIP Documents; *provided* that, notwithstanding anything to the contrary herein, the Debtors shall not be authorized to use the DIP Facilities or DIP Collateral to pay fees or expenses in excess of the Investigation Budget for the Creditors' Committee, to investigate Claims and Defenses against the Prepetition Secured Parties or to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties; *provided further* that, for the avoidance of doubt, this Paragraph 32 (including, for the avoidance of doubt, the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to (x) seek recharacterization of adequate protection as being applied to principal, or (y) seek to use Cash Collateral on a non-consensual basis after termination of the consensual use of Cash Collateral.

33.     *Limitation on Sierra Liability*.  Notwithstanding anything herein, the Final Order, or any of the DIP Documents to the contrary, Sierra's obligations with respect to the

Intercompany Security Protocol (including with respect to any borrowings, fees, expenses, indemnities, or otherwise but not, for the avoidance of doubt, with respect to any claim against Sierra that does not arise under or in relation to the Intercompany Protocol) and any adequate protection granted by the Court against Sierra or its assets with respect to the First Lien Debt and the Second Lien Notes (whether pursuant to the Final Order or otherwise) shall be limited to: (a) an amount equal to funds actually disbursed, if any, from the Cash Pool Requirements Account in accordance with the Intercompany Security Protocol, (b) repayment of the Prepetition Foreign ABL Debt, as an obligation of Sierra subject to the Intercompany Security Protocol (as described below), and (c) any other intercompany loans created pursuant to the Intercompany Security Protocol.

34.    *Intercompany Security Protocol*.  Except as prohibited by local law, any credit support, guarantee, cash and/or cash equivalents (in each case, including proceeds of the DIP Financing, Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to or for the benefit of any Non-Debtor Subsidiary (either in the form of restricted payments, investments, intercompany advances, guarantees of obligations (including interest thereon), sale of assets, provision of services or otherwise (except for repayments of intercompany liabilities incurred in the ordinary course of business)), in excess of $2,000,000 in the aggregate (the "De Minimis Exception"), shall be lent to Sierra and evidenced by an intercompany note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Sierra Note/Receivable"), which shall be pledged (individually or pursuant to a global note issued by Sierra) to one or more intercompany lenders and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Sierra Documents") as Collateral to the DIP Agent for the benefit of the DIP Lenders and to the

Prepetition Secured Parties as adequate protection.  The proceeds of each such investment shall be further transferred, in one or more steps, to the applicable Non-Debtor Subsidiary; each step of such transfer shall be evidenced by an intercompany unsecured note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Non-Debtor Subsidiary Note/Receivable"; together with the Sierra Note/Receivable, the "Intercompany Notes/Receivables"), with all such Intercompany Notes/Receivables accruing interest at the same rate as the DIP Facilities and which shall be payable in full in cash upon the maturity of the DIP Facilities.  The Sierra Notes/Receivables shall be secured by (i) 65% of the issued and outstanding Voting Stock (as defined in the DIP Collateral Agreement and including for this purpose, any instruments treated as equity for U.S. federal income tax purposes) of any Non-Debtor Subsidiary owned by Sierra, (ii) 100% of the issued and outstanding Equity Interests (as defined in the DIP Credit Agreement) in any Debtor Subsidiary owned by Sierra, and (iii) any Non-Debtor Subsidiary Note/Receivable held by Sierra.  All Non-Debtor Subsidiary Notes/Receivables held by Sierra shall be pledged in support of the Sierra Notes/Receivables (individually or pursuant to a global note issued by the applicable Non-Debtor Subsidiary to Sierra) and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Intercompany Security Protocol").  To the extent that local law limits the implementation of the foregoing and notwithstanding the fact that the Non-Debtor Subsidiary Notes/Receivables shall be unsecured obligations of the applicable Non-Debtor Subsidiaries, for all purposes in connection with these Chapter 11 Cases (including, without limitation for purposes of creditor recoveries and value allocation in connection with these Chapter 11 Cases (including in connection with any chapter 11 plan or otherwise)), all Intercompany Notes/Receivables and amounts in respect of the De Minimis Exception (in each case whether

documented or otherwise) shall be deemed to be secured obligations of Sierra or the applicable Non-Debtor Subsidiary, as applicable; the intent being to ensure that no creditor of the Debtors that asserts claims against Non-Debtor Subsidiaries on account of any claim against, obligation of, or transaction with, the Debtors (in respect of asserted joint and several liability or otherwise) unjustly benefits from the funding of Non-Debtor Subsidiaries through the use of proceeds of the DIP Facilities or Cash Collateral following the Petition Date.   The Debtors shall provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with advance notice (and shall use commercially reasonable efforts to provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with at least five (5) business days' advance notice) of any transfer or delivery of any credit support, guarantee, cash and/or cash equivalents by any Loan Party to or for the benefit of any Non-Debtor Subsidiary pursuant to this paragraph 34 that is not subject to the De Minimis Exception.

35.     *Loss or Damage to Collateral*.  Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent, the DIP Lenders and the Prepetition Secured Parties comply with their obligations under the DIP Documents and this Final Order and their obligations, if any, under

applicable law (including the Bankruptcy Code), (a) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

36.    *Reservation of Rights Under the ICAs.*   Except as expressly provided in this Final Order, nothing in this Final Order shall amend, modify or waive the terms or provisions of the ICAs and all parties' rights and remedies under the ICAs are preserved.

37.    *Final Order Governs.*   In the event of any inconsistency between the provisions of the Interim Order, the Final Order, and the DIP Documents, the provisions of this Final Order shall govern.

38.    *Binding Effect; Successors and Assigns.*   The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided*, *however*, that the DIP Agent, the DIP Lenders and the Prepetition Secured

Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors).

39.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, none of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; and (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

40.    *Master Proof of Claim*.  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Domestic ABL Agent, Prepetition Cash Flow Agent, 7.00% First Lien Notes Trustee, 9.00% First Lien Notes Trustee and Second Lien Notes Trustee is authorized to file in the Debtors' lead chapter 11 case, *In re Avaya Inc., et al.*, Case No. 17-10089 (SMB), a single, master proof of claim on behalf of the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties, 7.00% First Lien Notes Secured Parties, 9.00% First Lien Notes Secured Parties and the Second Lien Notes Secured Parties**,** as applicable, on account of any and all of their respective claims arising under the applicable Existing Agreements and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors, the (i) Prepetition Domestic ABL Agent and the Prepetition Domestic ABL Secured Parties, (ii) Prepetition Cash Flow Agent and Prepetition Cash Flow Secured Parties, (iii) 7.00% First Lien Notes Trustee and 7.00% First Lien Notes Secured Parties, (iv) 9.00% First Lien Notes Trustee and 9.00% First Lien Notes Secured Parties

and (v) Second Lien Notes Trustee and Second Lien Notes Secured Parties, as applicable, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Existing Agreements, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amend to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this Paragraph 40 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Domestic ABL Agent, Prepetition First Lien Agents, and Second Lien Notes Trustee, as applicable.

41.    *Information and Other Covenants*.  The Loan Parties shall comply in all material respects with the reporting requirements set forth in the DIP Credit Agreement, and shall provide copies of all such reporting to the Creditors' Committee, subject to confidentiality agreements no less restrictive than those in the DIP Credit Agreement with respect to such reporting.  The

Debtors shall maintain their cash management arrangements in a manner consistent with that described in the Cash Management Motion (as defined in the First Day Declaration) and any successor or final orders with respect thereto.

42.    *Insurance*.    To the extent that any of the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent, the Prepetition First Lien Agents or Second Lien Notes Trustee is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the Prepetition Debt.

43.    *Effectiveness*.    This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

44.    *Headings*.    Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

45.    *Payments Held in Trust*.    Except as expressly permitted in this Final Order or the DIP Documents and subject to the Carve-Out in all respects, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the

DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order; *provided* that, prior to the Domestic ABL Discharge, the foregoing shall not apply to the receipt of ABL Priority Collateral (or any proceeds thereof to the extent not constituting Cash Flow Priority Collateral) by any Prepetition Domestic ABL Secured Party on account of its security interest in ABL Priority Collateral.

46.    *Credit Bidding*.  Upon entry of this Final Order and subject to the terms of the DIP Documents and the ICAs and to the right of the Creditors' Committee to seek entry of an order for cause pursuant to section 363(k) of the Bankruptcy Code: (i) the DIP Agent shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of the DIP Obligations during any sale of the Loan Parties' assets (in whole or in part), including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); and (ii) subject to the ICAs in all respects, the Debtors acknowledge that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of their respective claims, including, for the avoidance of doubt, Adequate Protection Claims, if any, during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Secured Parties as of the Petition Date, including without limitation, sales occurring

pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii).

47. *Bankruptcy Rules*. The requirements of Bankruptcy Rules 4001, 6003, 6003(b), and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

48. *Necessary Action*. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Final Order.

49. *Retention of Jurisdiction*. The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

50. *Choice of Law; Jurisdiction.* The DIP Facilities and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by and construed and interpreted in accordance with the laws of the State of New York, including without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and to the extent applicable, the Bankruptcy Code. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or DIP Documents.


Dated: _____, 2017
      New York, New York


_____
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Execution Version**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of January 24, 2017

among

AVAYA INC.,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

AVAYA HOLDINGS CORP.,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, as Holdings,

THE SUBSIDIARIES OF AVAYA, INC. FROM TIME TO TIME PARTY HERETO,
each a Debtor and Debtor-in-possession under Chapter 11 of the Bankruptcy Code, as Guarantors

CITIBANK, N.A.,
as Administrative Agent and L/C Issuer,

and

THE OTHER LENDERS PARTY HERETO
_____

CITIGROUP GLOBAL MARKETS INC.,
DEUTSCHE BANK SECURITIES INC.
AND
BARCLAYS BANK PLC
as Joint Lead Arrangers and Bookrunners

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Defined Terms ................................................................................ 1
SECTION 1.02.    Other Interpretive Provisions .................................................... 45
SECTION 1.03.    Accounting Terms ........................................................................ 46
SECTION 1.04.    [Reserved]. .................................................................................... 46
SECTION 1.05.    References to Agreements, Laws, Etc. ...................................... 46
SECTION 1.06.    Times of Day ................................................................................. 46
SECTION 1.07.    Additional Alternative Currencies ........................................... 46
SECTION 1.08.    Currency Equivalents Generally ............................................... 47
SECTION 1.09.    Change in Currency ..................................................................... 48
SECTION 1.10.    Permitted Liens ............................................................................ 48

## ARTICLE II

### THE COMMITMENTS AND CREDIT EXTENSIONS

SECTION 2.01.    The Loans ....................................................................................... 48
SECTION 2.02.    Borrowings, Conversions and Continuations of Loans ........... 49
SECTION 2.03.    Letters of Credit ........................................................................... 51
SECTION 2.04.    Cash Collateralized Letter of Credit Account.......................... 57
SECTION 2.05.    Prepayments .................................................................................. 58
SECTION 2.06.    Termination or Reduction of Commitments ............................ 60
SECTION 2.07.    Repayment of Loans ................................................................... 61
SECTION 2.08.    Interest ........................................................................................... 61
SECTION 2.09.    Fees ................................................................................................. 61
SECTION 2.10.    Computation of Interest and Fees ............................................ 62
SECTION 2.11.    Evidence of Indebtedness ........................................................... 62
SECTION 2.12.    Payments Generally ..................................................................... 63
SECTION 2.13.    Sharing of Payments .................................................................... 64
SECTION 2.14.    [Reserved] ...................................................................................... 65
SECTION 2.15.    [Reserved] ...................................................................................... 65
SECTION 2.16.    Priority and Liens......................................................................... 65
SECTION 2.17.    No Discharge; Survival of Claims ............................................. 67
SECTION 2.18.    Payment of Obligations............................................................... 68

## ARTICLE III

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.01.    Taxes .............................................................................................. 68
SECTION 3.01.    Illegality ......................................................................................... 73

SECTION 3.02.    Inability to Determine Rates ................................................................. 74
SECTION 3.03.    Increased Cost and Reduced Return; Capital Adequacy; Reserves on
Eurocurrency Rate Loans .................................................................... 74
SECTION 3.04.    Funding Losses. ................................................................................... 76
SECTION 3.05.    Matters Applicable to All Requests for Compensation ......................... 76
SECTION 3.06.    Replacement of Lenders under Certain Circumstances ......................... 77
SECTION 3.07.    Survival ................................................................................................ 78

# ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

SECTION 4.01.    Conditions to Initial Credit Extension ................................................. 78
SECTION 4.02.    Conditions to All Credit Extensions .................................................... 81

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES

SECTION 5.01.    Existence, Qualification and Power; Compliance with Laws .................. 82
SECTION 5.02.    Authorization; No Contravention ........................................................ 83
SECTION 5.03.    Governmental Authorization ............................................................... 83
SECTION 5.04.    Binding Effect ..................................................................................... 83
SECTION 5.05.    Financial Statements; No Material Adverse Effect ............................... 83
SECTION 5.06.    Litigation ............................................................................................. 84
SECTION 5.07.    Labor Matters ...................................................................................... 84
SECTION 5.08.    Ownership of Property; Liens .............................................................. 84
SECTION 5.09.    Environmental Matters ......................................................................... 84
SECTION 5.10.    Taxes ................................................................................................... 85
SECTION 5.11.    ERISA Compliance .............................................................................. 86
SECTION 5.12.    Subsidiaries ......................................................................................... 86
SECTION 5.13.    Margin Regulations; Investment Company Act .................................... 86
SECTION 5.14.    Disclosure ............................................................................................ 87
SECTION 5.15.    Intellectual Property; Licenses, Etc ..................................................... 87
SECTION 5.16.    Economic Sanctions and Anti-Corruption. ........................................... 87
SECTION 5.17.    Use of Proceeds ................................................................................... 88

# ARTICLE VI

## AFFIRMATIVE COVENANTS

SECTION 6.01.    Financial Statements ............................................................................ 88
SECTION 6.02.    Certificates; Other Information ............................................................ 90
SECTION 6.03.    Notices ................................................................................................. 94
SECTION 6.04.    Payment of Obligations ........................................................................ 94
SECTION 6.05.    Preservation of Existence, Etc ............................................................. 94
SECTION 6.06.    Maintenance of Properties .................................................................... 95
SECTION 6.07.    Maintenance of Insurance ..................................................................... 95

#89281377v6

SECTION 6.08.    Compliance with Laws ........................................................................ 95
SECTION 6.09.    Books and Records ............................................................................. 95
SECTION 6.10.    Inspection Rights ............................................................................... 95
SECTION 6.11.    Covenant to Guarantee Obligations and Give Security ..................... 96
SECTION 6.12.    Compliance with Environmental Laws ............................................... 98
SECTION 6.13.    Further Assurances and Post-Closing Covenants .............................. 98
SECTION 6.14.    First and Second Day Orders ............................................................. 99
SECTION 6.15.    Ratings ............................................................................................... 99
SECTION 6.16.    Compliance with Anti-Corruption Laws ............................................ 99
SECTION 6.17.    Schedules ........................................................................................... 99

## ARTICLE VII

### NEGATIVE COVENANTS

SECTION 7.01.    Liens .................................................................................................. 100
SECTION 7.02.    Investments ........................................................................................ 103
SECTION 7.03.    Indebtedness ...................................................................................... 105
SECTION 7.04.    Fundamental Changes ........................................................................ 108
SECTION 7.05.    Dispositions ....................................................................................... 109
SECTION 7.06.    Restricted Payments ........................................................................... 111
SECTION 7.07.    Change in Nature of Business ............................................................ 112
SECTION 7.08.    Transactions with Affiliates ............................................................... 112
SECTION 7.09.    Burdensome Agreements ................................................................... 114
SECTION 7.10.    Use of Proceeds ................................................................................ 115
SECTION 7.11.    Accounting Changes .......................................................................... 115
SECTION 7.12.    Prepayments, Etc. of Indebtedness ................................................... 115
SECTION 7.13.    Equity Interests of Certain Subsidiaries ............................................ 115
SECTION 7.14.    Financial Covenants ........................................................................... 115
SECTION 7.15.    Limitations on Holdings .................................................................... 116
SECTION 7.16.    Intercompany Limitations .................................................................. 117

## ARTICLE VIII

### EVENTS OF DEFAULT AND REMEDIES

SECTION 8.01.    Events of Default ............................................................................... 118
SECTION 8.02.    Remedies upon Event of Default ........................................................ 123
SECTION 8.03.    Application of Funds .......................................................................... 123

## ARTICLE IX

### ADMINISTRATIVE AGENT AND OTHER AGENTS

SECTION 9.01.    Appointment and Authorization of the Administrative Agent ............... 126
SECTION 9.02.    Delegation of Duties .......................................................................... 128
SECTION 9.03.    Liability of Agents ............................................................................. 128
SECTION 9.04.    Reliance by the Administrative Agent ................................................. 129

#89281377v6

SECTION 9.05.    Notice of Default.................................................................. 130
SECTION 9.06.    Credit Decision; Disclosure of Information by Agents ......... 130
SECTION 9.07.    Indemnification of Agents ...................................................... 131
SECTION 9.08.    Withholding Tax ...................................................................... 131
SECTION 9.09.    Agents in Their Individual Capacities ................................... 132
SECTION 9.10.    Successor Administrative Agent.............................................. 133
SECTION 9.11.    Administrative Agent May File Proofs of Claim.................... 134
SECTION 9.12.    Collateral and Guaranty Matters ........................................... 135
SECTION 9.13.    Other Agents; Arrangers and Managers ................................ 136
SECTION 9.14.    Appointment of Supplemental Administrative Agents.......... 136

## ARTICLE X

### MISCELLANEOUS

SECTION 10.01.    Amendments, Etc ..................................................................... 137
SECTION 10.02.    Notices and Other Communications; Facsimile Copies ......... 139
SECTION 10.03.    No Waiver; Cumulative Remedies .......................................... 140
SECTION 10.04.    Attorney Costs and Expenses................................................... 140
SECTION 10.05.    Indemnification by the Borrower............................................ 141
SECTION 10.06.    Payments Set Aside.................................................................. 142
SECTION 10.07.    Successors and Assigns............................................................ 142
SECTION 10.08.    Confidentiality ........................................................................ 146
SECTION 10.09.    Treatment of Information......................................................... 147
SECTION 10.10.    Setoff........................................................................................ 148
SECTION 10.11.    Interest Rate Limitation .......................................................... 149
SECTION 10.12.    Counterparts ............................................................................ 149
SECTION 10.13.    Integration; Orders Control.................................................... 149
SECTION 10.14.    Survival of Representations and Warranties........................... 149
SECTION 10.15.    Severability .............................................................................. 150
SECTION 10.16.    GOVERNING LAW.................................................................. 150
SECTION 10.17.    WAIVER OF RIGHT TO TRIAL BY JURY......................... 151
SECTION 10.18.    Binding Effect.......................................................................... 151
SECTION 10.19.    Judgment Currency.................................................................. 151
SECTION 10.20.    Lender Action .......................................................................... 152
SECTION 10.21.    USA PATRIOT Act.................................................................. 152
SECTION 10.22.    No Advisory or Fiduciary Responsibility ............................... 152
SECTION 10.23.    No Personal Liability ............................................................... 153
SECTION 10.24.    Defaulting Lender. ................................................................... 153
SECTION 10.25.    Acknowledgment and Consent to Bail-In
                 of EEA Financial Institutions................................................ 154

## ARTICLE XI

### GUARANTY

SECTION 11.01.    Guaranty.................................................................................... 155
SECTION 11.02.    Guaranty of Payment .............................................................. 155

#89281377v6

SECTION 11.03.     No Limitations, etc................................................................................. 155
SECTION 11.04.     Reinstatement.......................................................................................... 157
SECTION 11.05.     Agreement To Pay, Subrogation ............................................................. 157
SECTION 11.06.     Indemnity; Subrogation and Subordination. ........................................... 157
SECTION 11.07.     No Waiver; Enforcement; Indemnification. ............................................ 158
SECTION 11.08.     Information .............................................................................................. 159
SECTION 11.09.     Keepwell .................................................................................................. 159

SCHEDULES

| | |
|---|---|
| I | Commitments |
| 1.01B | Closing Date Guarantors |
| 1.01C | Existing Letters of Credit |
| 1.01D | Excluded Subsidiaries |
| 5.06 | Litigations and Investigations |
| 5.08 | Closing Date Secured Real Property |
| 5.12 | Subsidiaries and Other Equity Investments |
| 7.08 | Transactions with Affiliates |
| 7.09 | Burdensome Agreements |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

| | |
|---|---|
| A | Form of 13-Week Projection |
| B | Form of Assignment and Assumption |
| C | Form of Calculation Certificate |
| D | Form of Committed Loan Notice |
| E | Form of Interim Order |
| F | Form of Note |
| G | Form of Security Agreement |
| H | Forms of Tax Compliance Certificate |
| I | Form of Joinder Agreement |

#89281377v6

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of January 24, 2017, among AVAYA INC., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("**Holdings**"), the Subsidiaries of the Borrower from time to time party hereto as Guarantors, each Guarantor on the date hereof, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, CITIBANK, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**").

INTRODUCTORY STATEMENTS

WHEREAS, on January 19, 2017 (the "**Petition Dat**e"), the Borrower and each of the Guarantors filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the cases of the Borrower and the Guarantors, each a "**Case**" and collectively, the "**Cases**") and have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrower has requested that the Lenders provide it with (i) a term loan facility in an aggregate principal amount equal to $725,000,000 (the "**Term Facility**") and (ii) a cash collateralized letter of credit facility in an aggregate amount equal to $150,000,000 (the "**L/C Facility**", and together with the Term Facility, the "**Facilities**"), in each case subject to the conditions set forth herein. All of the Borrower's obligations under the Facilities are to be guaranteed by the Guarantors. The Lenders are willing to extend such credit, and the L/C Issuer is willing to issue letters of credit, to the Borrower, in each case, on the terms and subject to the conditions set forth herein.

WHEREAS, the respective priorities of the Facilities and the other Obligations with respect to the Collateral shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I

### Definitions and Accounting Terms

SECTION 1.01.    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"**13-Week Projection**" means a projected statement of sources and uses of cash for the Borrower and the other Debtors on a weekly basis for the following 13 calendar weeks,

including the anticipated uses of the Facilities for each week during such period, in substantially the form of Exhibit A hereto.  As used herein, "13-Week Projection" shall initially refer to the initial 13-Week Projection delivered in accordance with Section 4.01(a)(vii) and thereafter shall refer to the most recent 13-Week-Projection delivered by the Borrower in accordance with Section 6.01(e).

"**Acceptable Reorganization Plan**" shall mean a Reorganization Plan that provides for the termination of the Commitments and the Payment in Full of the Obligations (other than contingent indemnification obligations not yet due and payable) on the Consummation Date of such Reorganization Plan.

"**Activities**" has the meaning specified in Section 9.09(b).

"**Administrative Agent**" means Citibank, in its capacity as administrative agent and collateral agent under the Loan Documents, or any successor administrative agent and collateral agent.

"**Administrative Agent's Office**" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.  For the avoidance of doubt, none of the Arrangers, the Agents, their respective lending affiliates or any entity acting as the L/C Issuer hereunder shall be deemed to be an Affiliate of Holdings, the Borrower or any of their respective Subsidiaries.

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"**Agent's Group**" has the meaning specified in Section 9.09(b).

"**Agents**" means, collectively, the Administrative Agent, the Supplemental Administrative Agents (if any) and the Arrangers.

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Agreement**" means this Superpriority Secured Debtor-in-Possession Credit Agreement, as amended, restated, modified or supplemented from time to time in accordance with the terms hereof.

"**Agreement Currency**" has the meaning specified in Section 10.19.

"**Alternative Currency**" means Euros and each other currency (other than Dollars) that is approved in accordance with Section 1.07, it being understood that for purposes of extending or renewing any Existing Letter of Credit, the denomination of such Existing Letter of Credit shall be deemed approved for such purposes.

"**Alternative Currency Equivalent**" means, at any time, with respect to any amount denominated in Dollars, the equivalent amount thereof in the applicable Alternative Currency as determined by the L/C Issuer at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of such Alternative Currency with Dollars.

"**Alternative Currency L/C Obligations**" means, as at any date of determination, the aggregate maximum amount then available to be drawn under all outstanding Alternative Currency Letters of Credit (whether or not (i) such maximum amount is then in effect under any such Alternative Currency Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Alternative Currency Letter of Credit or (ii) the conditions to drawing can then be satisfied). For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Alternative Currency Letter of Credit**" means a Letter of Credit denominated in an Alternative Currency.

"**Annual Financial Statements**" means the audited consolidated balance sheet of the Borrower as of September 30, 2015, and the related consolidated statements of income, stockholders' equity and cash flows for the Borrower for the fiscal year then ended.

"**Applicable Rate**" means (x) 6.50% *per annum*, in the case of Base Rate Loans and (y) 7.50% *per annum*, in the case of Eurocurrency Rate Loans.

"**Applicable Time**" means, with respect to any payments in any Alternative Currency, the local time in the place of settlement for such Alternative Currency as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be necessary for timely settlement on the relevant date in accordance with normal banking procedures in the place of payment.

"**Approved Electronic Communications**" means each Communication that any Loan Party is obligated to, or otherwise chooses to, provide to the Administrative Agent pursuant to any Loan Document or the transactions contemplated therein, including any financial statement, financial and other report, notice, request, certificate and other information material; provided, however, that, solely with respect to delivery of any such Communication by any Loan Party to the Administrative Agent and without limiting or otherwise affecting either the Administrative Agent's right to effect delivery of such Communication by posting such Communication to the Platform or the protections afforded hereby to the Administrative Agent in connection with any such posting, "Approved Electronic Communication" shall exclude

-3-

#89281377v6

(i) any notice of borrowing, letter of credit request, notice of conversion or continuation, and any other notice, demand, communication, information, document and other material relating to a request for a new, or a conversion of an existing, Borrowing, (ii) any notice pursuant to Section 2.05(a) and Section 2.05(b) and any other notice relating to the payment of any principal or other amount due under any Loan Document prior to the scheduled date therefor, (iii) all notices of any Default or Event of Default and (iv) any notice, demand, communication, information, document and other material required to be delivered to satisfy any of the conditions set forth in Article IV or any other condition to any Borrowing or other extension of credit hereunder or any condition precedent to the effectiveness of this Agreement.

"**Approved Fund**" means, with respect to any Lender, any Fund that is administered, advised or managed by (a) such Lender, (b) an Affiliate of such Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Arrangers**" means Citigroup Global Markets Inc., Deutsche Bank Securities Inc. and Barclays Bank PLC, in each case in its capacity as a joint lead arranger and bookrunner.

"**Assignees**" has the meaning specified in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit B hereto or any other form approved by the Administrative Agent and the Borrower.

"**Attorney Costs**" means all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Auto-Renewal Letter of Credit**" has the meaning specified in Section 2.03(b)(iii).

"**Avoidance Action**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified in 11 U.S.C. Section 101 et seq.

-4-

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Cases from time to time and any Federal appellate court thereof.

"**Base Rate**" means for any day the highest of (i) the rate of interest in effect for such date as publicly announced from time to time by the Administrative Agent as its "prime rate", (ii) the Federal Funds Rate plus 1/2 of 1% and (iii) the Eurocurrency Rate for an interest period of one month.  In no event, notwithstanding the rate determined pursuant to the foregoing, shall the Base Rate be less than 2.00%.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basel II**" has the meaning specified in Section 3.04(a).

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement.

"**Borrowing**" means a Term Borrowing.

"**Business Day**" means any day other than (i) a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York, New York or in the jurisdiction where the Administrative Agent's Office is located and (ii) if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, then any such day on which dealings in deposits in Dollars are not conducted by and between banks in the London interbank eurodollar market.

"**Calculation Certificate**" means a certificate substantially in the form of Exhibit C hereto.

"**Capitalized Leases**" means all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Capitalized Software Expenditures**" shall mean, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by a Person and its Subsidiaries during such period in respect of licensed or purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of a Person and its Subsidiaries.

"**Carve-Out**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Carve-Out Reserve**" has the meaning specified in the Interim Order or the Final Order, as applicable.

-5-

"**Carve-Out Trigger Notice**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Case**" or "**Cases**" has the meaning specified in the Introductory Statement.

"**Cash Collateral**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Cash Collateralize**" means, in respect of an obligation, provide and pledge (as a first priority perfected security interest) cash collateral in Dollars, at a location and pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent (and "**Cash Collateralization**" has a corresponding meaning).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)     Dollars;

(b)     (i) Canadian Dollars, Yen, Sterling, Euros or any national currency of any participating member state of the EMU or (ii) in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(c)     securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(d)     certificates of deposit, time deposits and eurodollar time deposits with maturities of two years or less from the date of acquisition, bankers' acceptances with maturities not exceeding two years and overnight bank deposits, in each case with any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks and $100,000,000 (or the Dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(e)     repurchase obligations for underlying securities of the types described in clauses (c), (d) and (g) entered into with any financial institution meeting the qualifications specified in clause (d) above;

(f)     commercial paper rated at least P-2 by Moody's or at least A-2 by S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within 24 months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition;

(g)     marketable short-term money market and similar funds having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither

-6-

Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(h)      Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(i)      solely for the purpose of determining if an Investment therein is allowed under this Agreement, readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) with maturities of 24 months or less from the date of acquisition;

(j)      solely for the purpose of determining if an Investment therein is allowed under this Agreement, readily marketable direct obligations issued by any foreign government or any political subdivision or instrumentality thereof having an Investment Grade Rating from either Moody's or S&P (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) with maturities of 24 months or less from the date of acquisition; and

(k)      investment funds investing substantially all of their assets in securities of the types described in clauses (a) through (h) above.

In the case of Investments by any Foreign Subsidiary that is a Subsidiary or Investments made in a country outside the United States of America, Cash Equivalents shall also include (i) investments of the type and maturity described in clauses (a) through (k) above of foreign obligors, which Investments or obligors (or the parents of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (ii) other short-term investments utilized by Foreign Subsidiaries that are Subsidiaries in accordance with normal investment practices for cash management in investments analogous to the foregoing investments in clauses (a) through (k) and in this paragraph.

"**Cash Management Bank**" means any Person that is the Administrative Agent or a Lender or an Affiliate of the Administrative Agent or a Lender at the time it provides any Cash Management Services, whether or not such Person subsequently ceases to be a Lender or an Affiliate of a Lender and any Person that delivers to the Administrative Agent a letter agreement reasonably satisfactory to it (a) appointing the Administrative Agent as its agent under the applicable Loan Documents and (b) agreeing to be bound by Sections 10.05, 10.16 and 10.17 and Article IX as if it were a Lender (and shall also include all counterparties with regard to Existing Cash Management Obligations).

#89281377v6

"**Cash Management Obligations**" means obligations owed by the Borrower or any other Loan Party to any Cash Management Bank in respect of or in connection with any Cash Management Services (including any Guarantee of any such Cash Management Services). Cash Management Obligations shall include all Existing Cash Management Obligations, but shall exclude all Cash Pooling Obligations.

"**Cash Management Services**" means any agreement or arrangement to provide cash management services, including treasury, depository, overdraft, credit or debit card, purchase card, electronic funds transfer and other cash management arrangements.

"**Cash Pool Requirements Account**" means a segregated account in the name of Avaya, Inc., into which the Borrower shall (on or prior to the Closing Date) deposit an amount equal to (but not in excess of) $75,000,000, which amounts shall be available to the Borrower to make Investments as described in Section 7.02(n) and subject to Section 7.16, following a written request by the requesting Foreign Group Company to Sierra and the Borrower (which request contains the amount and purpose of such requested funds).  For the avoidance of doubt, once withdrawn, amounts in the Cash Pool Requirements Account may not be replenished, other than with (i) interest and principal payments received by the Borrower in repayment of the Sierra Intercompany Notes funded with amounts withdrawn from Cash Pool Requirements Account, (ii) return of capital or distributions received by the Borrower in respect of Investments in Sierra made pursuant to Section 7.02(n) and (iii) interest and other returns received on account of funds deposited in such account.

"**Cash Pooling Agreement**" means that certain "Cash Pooling Agreement" between Citibank, N.A. and certain Affiliates of the Borrower dated as of March 20, 2002 (as amended, modified or supplemented from time to time).

"**Cash Pooling Obligations**" means (i) the obligations of the Foreign Group Companies or any of their Affiliates arising under or in connection with the Cash Pooling Agreement (including for periods prior to the Petition Date and after the Petition Date) and all related arrangements between the Administrative Agent (or any Affiliate thereof) and the Foreign Group Companies or their Affiliates with respect thereto or in connection therewith (including any guarantee thereof made by any of the Loan Parties) and (ii) all other obligations of Non-Loan Parties in respect of arrangements designated as "Cash Management Obligations" under the Domestic Prepetition ABL Facility prior to the Petition Date arising under such designated arrangements for periods both prior to the Petition Date and after the Petition Date).

"**Cash Pooling Provider**" means Citibank, N.A. or its Affiliates with respect to Cash Pooling Obligations.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CFC**" means a "controlled foreign corporation" within the meaning of Section 957(a) of the Code.

-8-

"**Change of Control**" means the earliest to occur of:

(a)    the Permitted Holders ceasing to own, in the aggregate, directly or indirectly, beneficially and of record, at least a majority of the then outstanding voting power of the Voting Stock of Holdings or the Sponsors ceasing to have the right or the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of Holdings; or

(b)    the Borrower ceasing to be a direct wholly-owned Subsidiary of Holdings.

"**Citibank**" means Citibank, N.A.

"**Claiming Party**" has the meaning specified in Section 11.06(b).

"**Closing Date**" means January 24, 2017, the date on which all conditions set forth in Section 4.01 were satisfied.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means all the "Collateral" (or equivalent term) as defined in any Collateral Document, including the Orders, and including Owned Real Property constituting Material Real Property owned by the Loan Parties as of the Closing Date and all Owned Real Property acquired by the Loan Parties after the Closing Date, but excluding, for the avoidance of doubt, any Excluded Assets.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(iii) or pursuant to Section 6.11, Section 6.13 or Section 7.16 at such time, each (other than the Orders) duly executed by each Loan Party thereto;

(b)    all Obligations shall have been unconditionally guaranteed by Holdings and each Subsidiary of the Borrower that is a Debtor in the Cases on the date hereof (other than Sierra) and each other Person that is required to become a Guarantor in accordance with Section 6.11;

(c)    in respect of any Guarantor that is a Debtor, the Obligations and the Guaranty, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases;

(d)    in respect of any Guarantor that is a Debtor, the Obligations and the Guaranty, pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien (subject to the terms of the Security Agreement and the Orders) on (i) all the Equity Interests of

-9-

the Borrower and (ii) all Equity Interests owned by any Loan Party (except to the extent constituting Excluded Assets);

(e)        the Obligations and the Guaranty shall have been secured by a perfected security interest in all tangible and intangible personal property of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, IP Rights, other general intangibles, deposit accounts, securities accounts, the Sierra Intercompany Note, Foreign ABL Repayment Rights and proceeds of the foregoing), to the extent perfection may be achieved by the entry of the Interim Order (and the Final Order, when applicable) and the perfection steps required to be taken under the Security Agreement, in each case, with the priority required by the Collateral Documents (excluding in all respects, Excluded Assets);

(f)        none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.01; and

(g)        the Administrative Agent shall have received (x) on the Closing Date with respect to Material Real Property on the Closing Date and (y) within 60 days after the acquisition thereof with respect to Owned Real Property acquired by any Loan Party after the Closing Date, with respect to all Owned Real Property that constitutes Collateral on which a "Building" or "Mobile Home" (as contemplated by the Flood Laws) is located, a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination (together with, if such Real Property is located in a special flood hazard area, (A) a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto, and (B) evidence of flood insurance in form and substance reasonably satisfactory to the Administrative Agent).

"**Collateral Documents**" means, collectively, the Security Agreement, Security Agreement Supplements, Mortgages (if any), the control agreement governing the Letter of Credit Account, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 4.01(a)(iii), Section 6.11, Section 6.13 or Section 7.16, the Guaranty and each of the other agreements, instruments or documents that creates or purports to create a Lien or Guarantee in favor of the Administrative Agent for the benefit of the Secured Parties, including the Orders. The Collateral Documents shall supplement, and shall not limit, the grant of security interests in the Collateral pursuant to the Orders.

"**Commercial Letter of Credit**" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection of the purchase of any materials, goods or services by a Borrower or a Subsidiary in the ordinary course of business of such Borrower or Subsidiary.

"**Commitment**" means a Term Commitment.

"**Committed Loan Notice**" means a notice of a Borrowing with respect to the Term Loans, which, if in writing, shall be substantially in the form of <u>Exhibit D</u> hereto.

-10-

"**Committee Professionals**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. 1 et seq.), as amended from time to time, and any successor statute.

"**Communications**" means each notice, demand, communication, information, document and other material provided for hereunder or under any other Loan Document or otherwise transmitted between the parties hereto relating this Agreement, the other Loan Documents, any Loan Party or its Affiliates, or the transactions contemplated by this Agreement or the other Loan Documents including, without limitation, all Approved Electronic Communications.

"**Consolidated Depreciation and Amortization Expense**" means, with respect to any Person for any period, the total amount of depreciation and amortization expense of such Person, including the amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses and Capitalized Software Expenditures for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"**Consolidated EBITDA**" means, with respect to any Person for any period, the Consolidated Net Income of such Person for such period:

(a)     increased (without duplication) by the following:

(i)     provision for taxes based on income or profits or capital, including federal, state, franchise, excise and similar taxes and foreign withholding taxes of such Person paid or accrued during such period, including any penalties and interest related to such taxes or arising from any tax examinations, to the extent the same were deducted (and not added back) in computing such Consolidated Net Income and the net tax expense associated with any adjustments made pursuant to clauses (a) through (o) of the definition of "Consolidated Net Income"; plus

(ii)     total interest expense of such Person for such period and, to the extent not reflected in such total interest expense, any losses with respect to obligations under any Swap Contracts or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains with respect to such obligations, plus bank fees and costs of surety bonds in connection with financing activities, to the extent in each case the same were deducted (and not added back) in calculating such Consolidated Net Income; plus

(iii)     Consolidated Depreciation and Amortization Expense of such Person for such period to the extent deducted (and not added back) in computing Consolidated Net Income; plus

-11-

(iv)     the amount of any restructuring charges, accruals and reserves deducted (and not added back) in such period in computing Consolidated Net Income; plus

(v)     the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly-owned Subsidiary to the extent deducted (and not added back) in such period in computing such Consolidated Net Income; plus

(vi)     [reserved]; plus

(vii)     the amount of extraordinary, non-recurring or unusual losses (including all fees and expenses relating thereto) or expenses, Transaction Expenses, costs incurred in connection with being a public company prior to the Closing Date, integration costs, transition costs, pre-opening, opening, consolidation and closing costs for facilities, costs incurred in connection with any strategic initiatives, costs incurred in connection with acquisitions after the Closing Date, other business optimization expenses (including costs and expenses relating to business optimization programs and new systems design and implementation costs), project start-up costs, restructuring costs and curtailments or modifications to pension and post-retirement employee benefit plans; plus

(viii)    restructuring-related or similar charges, fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with this Agreement and the other Loan Documents (including on account of professional fees and expenses, and including fees and expenses paid as adequate protection), the Cases, any reorganization plan in connection with the Cases, any "exit" credit agreements or "exit" financings, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case, if required, to the extent approved by the Bankruptcy Court), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Loan Parties (for the avoidance of doubt, in each case, without duplication of amounts added-back pursuant to clause (iv) of this definition); plus

(ix)     any net loss from discontinued operations; plus

(x)     cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to paragraph (b) below for any previous period and not added back;

(b)     decreased (without duplication) by the following, in each case to the extent included in determining Consolidated Net Income for such period:

-12-

(i)        any net income from discontinued operations; <u>plus</u>

(ii)       the amount of extraordinary, non-recurring or unusual gains (less all fees and expenses relating thereto);

(c)       increased or decreased (without duplication) by, as applicable, any adjustments resulting from the application of FASB Interpretation No. 45 (Guarantees).

"**Consolidated Liquidity**" means, on any date, the sum of unrestricted Cash Equivalents of the Loan Parties (but excluding, in any event, (i) any restricted Cash Equivalents (other than Cash Equivalents restricted for the benefit of the Lenders (other than Letter of Credit Account or amounts deposited therein)), (ii) any Cash Equivalents pledged as collateral to secure L/C Facility and (iii) any Cash Equivalents held in the Cash Pool Requirements Account).

"**Consolidated Net Income**" means, with respect to any Person for any period, the aggregate of the Net Income of such Person and its Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP; *provided*, *however*, that, without duplication,

(a)       the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period shall be excluded,

(b)       any net after-tax gains or losses on disposal of disposed, abandoned or discontinued operations shall be excluded,

(c)       any net after-tax effect of gains or losses (less all fees, expenses and charges) attributable to asset dispositions or abandonments or the sale or other disposition of any Equity Interests of any Person other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded,

(d)       the Net Income for such period of any Person that is not a Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; *provided* that Consolidated Net Income of the Borrower shall be increased by the amount of dividends or distributions or other payments that are actually paid in Cash Equivalents (or to the extent converted into Cash Equivalents) to the Borrower or a Subsidiary thereof in respect of such period,

(e)       effects of adjustments (including the effects of such adjustments pushed down to the Borrower and the Subsidiaries) in such Person's consolidated financial statements pursuant to GAAP (including in the inventory, property and equipment, software, goodwill, intangible assets, in-process research and development, deferred revenue and debt line items thereof) resulting from the application of recapitalization accounting or purchase accounting, as the case may be, in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded,

-13-

(f)        any net after-tax effect of income (loss) from the early extinguishment or conversion of (i) Indebtedness, (ii) obligations under any Swap Contracts or (iii) other derivative instruments shall be excluded,

(g)        any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP shall be excluded,

(h)        any non-cash compensation charge or expense, including any such charge or expense arising from the grants of stock appreciation or similar rights, stock options, restricted stock or other rights or equity incentive programs (in each case prior to the Petition Date) shall be excluded, and any cash charges associated with the rollover, acceleration or payout of Equity Interests by management of the Borrower or any of its direct or indirect parents in connection with the Transactions (in each case prior to the Petition Date), shall be excluded,

(i)        any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, asset disposition, incurrence or repayment of Indebtedness (including such fees, expenses or charges related to the Loans and any credit facilities), issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (including any amendment or other modification of the Loans and any credit facilities) and including, in each case, any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed, and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, in each case whether or not successful, shall be excluded,

(j)        accruals and reserves that are established within twelve months after the Closing Date that are so required to be established as a result of the Transactions (or within twelve months after the closing of any acquisition that are so required to be established as a result of such acquisition) in accordance with GAAP shall be excluded,

(k)        any expenses, charges or losses that are covered by indemnification or other reimbursement provisions in connection with any Investment or any sale, conveyance, transfer or other disposition of assets permitted under this Agreement, to the extent actually reimbursed, or, so long as the Borrower has made a determination that a reasonable basis exists for indemnification or reimbursement and only to the extent that such amount is in fact indemnified or reimbursed within 365 days of such determination (with a deduction in the applicable future period for any amount so added back to the extent not so indemnified or reimbursed within such 365 days), shall be excluded,

(l)        to the extent covered by insurance and actually reimbursed, or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (with a deduction

-14-

in the applicable future period for any amount so added back to the extent not so reimbursed within such 365 days), expenses, charges or losses with respect to liability or casualty events or business interruption shall be excluded,

(m)     any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of Statement on Financial Accounting Standards Nos. 87, 106 and 112, and any other items of a similar nature, shall be excluded,

(n)     the following items shall be excluded:

(i)     any net unrealized gain or loss (after any offset) resulting in such period from obligations under any Swap Contracts and the application of Statement of Financial Accounting Standards No. 133,

(ii)     any net unrealized gain or loss (after any offset) resulting from currency translation gains or losses related to currency remeasurements of Indebtedness (including  any net gain or loss resulting from obligations under an Swap Contracts for currency exchange risk) and any foreign currency translation gains or losses,

(iii)     any non-cash charges, expenses and losses, including any (A) write-offs or write-downs, (B) equity-based awards compensation expense, (C) losses on sales, disposals or abandonment of, or any impairment charges or asset write-down or write-off related to, intangible assets, long-lived assets and investments in debt and equity securities and (D) all losses from investments recorded using the equity method, reducing such Consolidated Net Income for such period (*provided* that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall reduce Consolidated Net Income to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), and

(iv)     any non-cash gains for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income in any prior period and any non-cash gains with respect to cash actually received in a prior period so long as such cash did not increase Consolidated Net Income in such prior period.

"**Consummation Date**" means the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court; provided, that for purposes hereof the Consummation Date of the Reorganization Plan shall be no later than the "effective date" thereof.

#89281377v6

"**Contact Center Business**" means the business of the Borrower and its applicable Subsidiaries with respect to call-center software and services and related technology (including IP Rights) and assets.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contributing Party**" has the meaning specified in Section 11.06(b).

"**Control**" has the meaning specified in the definition of "Affiliate."

"**Credit Extension**" means each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"**Creditors' Committee**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**De Minimis Exception**" has the meaning specified in Section 7.16(a).

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Debtors**" means Holdings, the Borrower and any Subsidiary thereof that shall be a debtor in the Cases.

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means, at any time, a Lender as to which the Administrative Agent has notified the Borrower that (i) such Lender has failed for three or more Business Days to comply with its obligations under this Agreement to make a Loan (a "**funding obligation**"), (ii) such Lender has notified the Administrative Agent, or has stated publicly, that it will not comply with any such funding obligation hereunder, or has defaulted on its funding obligations under any other loan agreement or credit agreement or other similar financing agreement (absent a good faith dispute), (iii) such Lender has, for three or more Business Days, failed to confirm in writing to the Administrative Agent, in response to a written request of the Administrative Agent, that it will comply with its funding obligations hereunder, or (iv) a Lender Insolvency Event has occurred and is continuing with respect to such Lender.  Any

-16-

determination that a Lender is a Defaulting Lender under clauses (i) through (iv) above will be made by the Administrative Agent in its sole discretion acting in good faith. The Administrative Agent will promptly supply to Lenders a copy of any notice to the Borrower provided for in this definition.

"**DIP Budget**" means the sensitized latest financial outlook projections of the Borrower and its Subsidiaries (prepared on a quarterly basis) through September 30, 2017.

"**DIP Motion**" means that certain Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C), filed in the Cases on the Petition Date [Docket No. 13].

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests of a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; provided that no transaction or series of related transactions shall be considered a "Disposition" for purposes of Section 2.05(b)(ii) or Section 7.05 unless the Net Cash Proceeds resulting from such transaction or series of transactions would exceed $500,000.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or any other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable, the termination of the Commitments and the termination of or backstop on terms satisfactory to the Administrative Agent in its sole discretion all outstanding Letters of Credit), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part or (c) provides for the scheduled payments of dividends in cash, in each case, prior to the date that is ninety-one (91) days after the Scheduled Termination Date at the time such Equity Interest is first issued.

"**Disqualified Lenders**" means (a) those banks, financial institutions and other institutional lenders separately identified in writing as such by the Borrower to the Arrangers prior to the Petition Date, (b) those competitors of the Borrower and its Subsidiaries separately identified in writing as such by the Borrower to the Arrangers prior to the Petition Date or by the Borrower to the Administrative Agent from time to time following the Closing Date or (c) any affiliates of the foregoing that are reasonably identifiable on the basis of their name; provided that, notwithstanding the foregoing, in no event shall any "Lender" in respect of the Pre-Petition Cash Flow Facility (or any affiliate thereof) be a Disqualified Lender.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Amount**" means, at any time:

(a)    with respect to an amount denominated in Dollars, such amount; and

(b)    with respect to an amount denominated in an Alternative Currency, an equivalent amount thereof in Dollars as determined by the Administrative Agent or the L/C Issuer, as the case may be, at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such Alternative Currency.

"**Dollar L/C Obligation**" means, as at any date of determination, the aggregate maximum amount then available to be drawn under all outstanding Dollar Letters of Credit (whether or not (i) such maximum amount is then in effect under any such Dollar Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Dollar Letter of Credit or (ii) the conditions to drawing can then be satisfied).  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"**Dollar Letter of Credit**" means a Letter of Credit denominated in Dollars.

"**Domestic Prepetition ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement, amended and restated as of October 29, 2012, by and among the Borrower, Holdings, Citicorp USA, Inc., as Administrative Agent, Citicorp North America, Inc., as Swing Line Lender, Citibank N.A., as L/C Issuer, and each lender from time to time party thereto.

"**Domestic Prepetition ABL Facility**" means the credit facility provided for pursuant to the Domestic Prepetition ABL Credit Agreement.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

-18-

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any assignee permitted by and, to the extent applicable, consented to in accordance with Section 10.07(b); *provided* that under no circumstances shall (i) any Loan Party or any of its Subsidiaries, (ii) any natural person or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural person, (iii) a Defaulting Lender or a Potential Defaulting Lender and (iv) a Disqualified Lender, be an Assignee.

"**eligible contract participant**" has the meaning specified under the Commodity Exchange Act.

"**EMU**" means the economic and monetary union as contemplated in the Treaty on European Union.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**Environment**" means ambient air, indoor air, surface water, drinking water, groundwater, land surfaces, subsurface strata and natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigations (other than reports prepared by any Loan Party or any of its Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings with respect to any Environmental Liability (hereinafter "**Claims**"), including (i) any and all Claims by a Governmental Authority for enforcement, response or other actions or damages pursuant to any Environmental Law and (ii) any and all Claims by any Person seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief pursuant to any Environmental Law.

"**Environmental Laws**" means any and all Laws relating to the pollution or protection of the Environment including those relating to the generation, use, handling, storage, treatment, transportation, disposal, Release or threat of Release of Hazardous Materials or, to the extent relating to exposure or threat of exposure to Hazardous Materials, human health.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) directly or indirectly resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, or Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other

-19-

consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with Holdings or the Borrower and is treated as a single employer pursuant to Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan for which notice to the PBGC is not waived by regulation; (b) a withdrawal by Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates from a Multiemployer Plan, notification of Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is insolvent or is critical or endangered within the meaning of Title IV of ERISA; (d) the filing by Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates of a notice of intent to terminate a Pension Plan; (e) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (f) the failure to make by its due date a required contribution under Section 412(m) of the Code (or Section 430(j) of the Code, as amended by the Pension Protection Act of 2006) with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (g) the filing pursuant to Section 412(d) of the Code and Section 303(d) of ERISA (or, after the effective date of the Pension Protection Act of 2006, Section 412(c) of the Code and Section 302(c) of ERISA) of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (h) the filing by the PBGC of a petition under Section 4042 of ERISA to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in liability to Holdings or the Borrower.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Euro**" and "**€**" mean the lawful single currency of the European Union.

"**Eurocurrency Rate**" means, for any Interest Period with respect to any Euro currency Rate Loan, (i) the rate per annum equal to the Screen Rate for delivery on the first day of such Interest Period with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) London Business Days prior to the first day of such Interest Period, (ii) if the rate referenced in the preceding clause (i) is not available at such time for such Interest Period, the rate per annum equal to the Interpolated Screen Rate for delivery on the first day of such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) London Business Days prior to the first day of such Interest Period, or (iii) if the rates referenced in the preceding clauses (i) and (ii) are not available at such time for such Interest Period, the rate per annum equal to (x) the Screen Rate or (y) if the rate referenced in the preceding clause (x) is not available at such time for such Interest Period, the Interpolated Screen Rate, in each case with a term equivalent to such Interest Period quoted for delivery on the most recent London Business Day preceding the first day of such Interest Period for which such rate is available (which London Business Day shall be no more than seven (7) London Business Days prior to the first day of such Interest Period), and in the case of clauses (i) through (iii), if any such rate is below 1.00%, the Eurocurrency Rate shall be deemed to be 1.00%.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Excluded Assets**" means "Excluded Asset" and "Excluded Security", in each case as defined under the Security Agreement.

"**Excluded Subsidiary**" means  (a) any Subsidiary that is not a wholly-owned Subsidiary, (b) each Subsidiary listed on Schedule 1.01D to this Agreement, (c) any Subsidiary that is prohibited by applicable Law from guaranteeing the Obligations, (d) any Domestic Subsidiary (i) that is a Subsidiary of a Foreign Subsidiary that is a CFC or (ii) if substantially all of its assets consist of the stock of one or more Foreign Subsidiaries that are CFCs and (e) any Foreign Subsidiary; provided that, notwithstanding the foregoing, no Debtor shall be an Excluded Subsidiary.

"**Excluded Swap Obligations**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guaranty of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guaranty thereof) (after giving effect to any keepwell, guaranty or other support agreement) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

-21-

"**Existing Cash Management Obligations**" means any and all obligations in respect of "Cash Management Agreements" (as defined in the Domestic Prepetition ABL Credit Agreement) existing on the Petition Date between the "Cash Management Bank" (under and as defined in the Domestic Prepetition ABL Credit Agreement) and any Loan Party.

"**Existing Hedge Agreements**" means those Swap Contracts existing on the Petition Date between the Administrative Agent (or any of its Affiliates) and any Loan Party (or Avaya International Sales Ltd.).

"**Existing Letters of Credit**" means those letters of credit set forth on Schedule 1.01C.

"**Existing Secured Debt**" means all obligations in respect of (i) the Pre-Petition Cash Flow Facility, (ii) the Pre-Petition ABL Facilities, (iii) the Pre-Petition First Lien 7.00% Notes, (iv) the Pre-Petition First Lien 9.00% Notes and (v) the Pre-Petition Second Lien 10.50% Notes.

"**Facilities**" means the Term Facility and the L/C Facility.

"**Fair Market Value**" means, with respect to any asset or liability, the fair market value of such asset or liability as determined in good faith by a Responsible Officer of the Borrower.

"**FATCA**" has the meaning specified in Section 3.01(a)(iv).

"**FCPA**" has the meaning specified in Section 5.16.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letters**" means (i) that Fee Letter, dated January 19, 2017, by and among Holdings, the Borrower and Citigroup Global Markets Inc., (ii) that Joint Lead Arranger and Bookrunner Appointment and Fee Letter, dated January 19, 2017, by and among Holdings, the Borrower and Deutsche Bank Securities Inc. and (iii) that Joint Lead Arranger and Bookrunner Appointment and Fee Letter, dated January 19, 2017, by and among Holdings, the Borrower and Barclays Bank PLC.

"**Final Order**" has the meaning specified in Section 4.02(b).

"**Final Order Entry Date**" means the date on which the Final Order is entered by the Bankruptcy Court.

"**Financial Covenants**" means the covenants specified in Section 7.14.

"**First Day Orders**" means all orders entered by the Bankruptcy Court on or, within five days of, the Petition Date, or based on motions filed on or about the Petition Date which shall include a "cash management order".

"**Flood Laws**" means (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.) and (iv) the Flood Insurance Reform Act of 2004, and any regulations promulgated thereunder.

"**Foreign ABL Repayment Rights**" has the meaning specified in the Interim Order or Final Order, as applicable.

"**Foreign Group Companies**" means those Affiliates of the Borrower that are party to the Cash Pooling Agreement.

"**Foreign Intercompany Loans**" has the meaning specified in Section 7.16(a).

"**Foreign Intercompany Notes/Receivables**" has the meaning specified in Section 7.16(b)(iii).

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by, or entered into with, Holdings, the Borrower or any Subsidiary of the Borrower with respect to employees employed outside the United States.

"**Foreign Prepetition ABL Facility**" means that certain Credit Agreement, dated as of June 4, 2015, by and among Avaya Canada Corp., Avaya UK, Avaya International Sales Limited, Avaya Deutschland GMBH and Avaya GMBH & CO. KG, the guarantors from time to time party thereto, Citibank, N.A. as Administrative Agent and L/C Issuer, Citibank, N.A., Canadian Branch as Canadian Swing Line Lender, Citibank, N.A., London Branch as European Swing Line Lender, and the other lenders from time to time party thereto.

"**Foreign Subsidiary**" means any direct or indirect Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

-23-

"**funding obligation**" has the meaning assigned to such term in the definition of "Defaulting Lender".

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" has the meaning specified in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

-24-

"**Guarantors**" means (a) Holdings, (b) each Domestic Subsidiary that is a party hereto on the Closing Date, whose names are set forth on Schedule 1.01B, which in any event will include all Subsidiaries that are Debtors on the Closing Date (other than Sierra) and (c) each Domestic Subsidiary that becomes a party hereto pursuant to a Joinder Agreement in accordance with, and subject to the requirements of, Section 6.11 (including becoming a Debtor in the Cases unless waived).

"**Guaranty**" means the guaranty made by the Guarantors pursuant to Article XI hereof, and any guaranty or guaranty supplement delivered with respect thereto (including by way of any Joinder Agreement).

"**Hazardous Materials**" means any materials, chemicals, substances, compounds, wastes, pollutants and contaminants, in any form, including all explosive or radioactive substances or wastes, mold, petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and infectious or medical wastes, in each case regulated pursuant to any Environmental Law.

"**Hedge Bank**" means any Person that is an Agent, a Lender, or an Affiliate of any of the foregoing at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, whether or not such Person subsequently ceases to be an Agent, a Lender or an Affiliate of any of the foregoing (and shall also include any counterparty to an Existing Hedge Agreement).

"**Hedging Obligations**" means obligations of the Borrower or any other Loan Party arising under any Secured Hedge Agreement.

"**Holdings**" has the meaning specified in the introductory paragraph to this Agreement.

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)    net obligations of such Person under any Swap Contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses payable in the ordinary course of business and (ii) any earn-out obligation until such obligation becomes

-25-

a liability on the balance sheet of such Person in accordance with GAAP and if not paid after becoming due and payable);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person in respect of Disqualified Equity Interests; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness constitutes Indebtedness for borrowed money, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning specified in Section 10.05.

"**Indemnified Taxes**" has the meaning specified in Section 3.01(a).

"**Indemnitees**" has the meaning specified in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Borrower, qualified to perform the task for which it has been engaged and that is independent of the Borrower and its Affiliates.

"**Information**" has the meaning specified in Section 10.08.

"**Interest Payment Date**" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of such Loans; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Loans.

-26-

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter (or such period of less than one month as may be consented to by the Administrative Agent), as selected by the Borrower in its Committed Loan Notice; *provided* that:

(a)    any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)    no Interest Period shall extend beyond the Maturity Date.

"**Interpolated Screen Rate**" means, for any Interest Period with respect to any Eurocurrency Rate Loan, the rate which results from interpolating on a linear basis between (a) the applicable Screen Rate for the period next longer than the length of such Interest Period and (b) the applicable Screen Rate for the period next shorter than the length of such Interest Period.

"**Interim Order**" means an order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) approving the Loan Documents on an interim basis and in the form attached hereto as Exhibit E, with any changes to such form as are satisfactory to the Borrower and the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned). For the avoidance of doubt, on the Closing Date, all references to the Interim Order shall be to that certain Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) [Docket No. 61].

"**Interim Order Entry Date**" means the date on which the Interim Order is entered by the Bankruptcy Court, which date was January 23, 2017.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment at any time shall be the

-27-

amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any return representing a return of capital with respect to such Investment.

"**Investment Grade Rating**" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other nationally recognized statistical rating agency selected by the Borrower.

"**IP Rights**" has the meaning specified in Section 5.15.

"**ISP**" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"**Issuer Documents**" means, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the L/C Issuer and the Borrower (or any of its Subsidiaries) or in favor of such L/C Issuer and relating to such Letter of Credit.

"**Joinder Agreement**" means a joinder hereto in the form of Exhibit I.

"**Judgment Currency**" has the meaning specified in Section 10.19.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities and executive orders, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"**L/C Collateralization Amount**" means an amount in Dollars equal to (i) until the Maturity Date, the sum of (x) 101.5% multiplied by the amount of all Dollar L/C Obligations existing at such time plus (y) 103% multiplied by the Dollar Amount of all Alternative Currency L/C Obligations existing at such time, and (ii) upon and following the Maturity Date, the sum of (x) 105% multiplied by the amount of all Dollar L/C Obligations existing at such time plus (y) 105% multiplied by the Dollar Amount of all Alternative Currency L/C Obligations existing at such time.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Disbursement**" shall mean a payment or disbursement made by the L/C Issuer, including, for the avoidance of doubt, a payment or disbursement made by the L/C Issuer pursuant to a Letter of Credit upon or following the reinstatement of such Letter of Credit.

"**L/C Facility**" has the meaning specified in the Introductory Statements to this Agreement.

-28-

"**L/C Facility Cap**" means $150,000,000.

"**L/C Issuer**" means Citibank, in each case, in its capacity as an issuer of Letters of Credit hereunder, or any successor issuer of Letters of Credit hereunder.

"**L/C Obligation**" means the collective reference to the Dollar L/C Obligations and the Alternative Currency L/C Obligations.

"**Leased Real Property**" means any Real Property that is leased or otherwise rented and not owned in fee simple by any Loan Party.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes (i) the L/C Issuer and (ii) each of their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender."

"**Lender Insolvency Event**" means that (i) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment, or (iii) such a Lender or its Parent Company is the subject of a Bail-In Action, provided that an event shall not be a Lender Insolvency Event solely by virtue of the Lender's ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means any (a) Commercial Letter of Credit, (b) standby letter of credit or (c) indemnity, guarantee, exposure transmittal memorandum or similar form of credit support, in each case issued (or deemed issued) or to be issued by the L/C Issuer pursuant to Sections 2.01(b) and/or 2.03 (as applicable).

"**Letter of Credit Account**" means the account established by the Administrative Agent for the benefit of the Borrower pursuant to Section 2.04(a) under the sole and exclusive control of the Administrative Agent.

#89281377v6

"**Letter of Credit Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the L/C Issuer.

"**Letter of Credit Deposit Amount**" means, at any time of calculation, the total amount deposited in the Letter of Credit Account.

"**Letter of Credit Expiration Date**" means the day that is five (5) Business Days prior to the scheduled Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"**LIBOR**" has the meaning specified in the definition of "Eurocurrency Rate."

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory, judgment or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing); *provided*, that in no event shall an operating lease in and of itself be deemed a Lien.

"**Loan**" means a Term Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Collateral Documents and (iv) the Issuer Documents.

"**Loan Parties**" means, collectively, (i) Holdings, (ii) the Borrower and (iii) each other Guarantor.

"**Management Stockholders**" means the members of management of Holdings or any of its Subsidiaries who are investors in Holdings or any direct or indirect parent thereof.

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means any circumstance or condition that would individually or in the aggregate, have a material adverse effect on (i) the business, assets, liabilities (actual or contingent), operations, properties or financial condition of the Borrower and its Subsidiaries taken as a whole (other than as a result of events leading up to and following the commencement of the Cases and the continuation and prosecution thereof), (ii) the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document (other than as a result of events leading up to and following the commencement of the Cases and the continuation and prosecution thereof), or (iii) the rights and remedies of the Lenders or the Administrative Agent under any Loan Document, including the ability of the Administrative Agent and Lenders to enforce the Loan Documents; provided that nothing disclosed in any of the following filings by the Borrower: (1) the annual report on Form 10-K for the year ended September 30, 2015 and/or (2) any filings on Form 8-K or 10-Q made through

December 31, 2016 and/or (3) any event relating to or resulting from the existing defaults under any Pre-Petition Debt, shall, in any case, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein) constitute a Material Adverse Effect.

"**Material Domestic Subsidiary**" means, at any date of determination, each of the Borrower's Domestic Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP; *provided* that if, at any time and from time to time after the Closing Date, Domestic Subsidiaries that are not Guarantors solely because they do not meet the thresholds set forth in clauses (a) or (b) comprise in the aggregate more than 5.0% of Total Assets as of the end of the most recently ended fiscal quarter of the Borrower for which financial statements have been delivered pursuant to Section 6.01 or more than 5.0% of the gross revenues of the Borrower and the Subsidiaries for the period of four consecutive fiscal quarters ending as of the last day of such fiscal quarter, then the Borrower shall, not later than 45 days after the date by which financial statements for such quarter are required to be delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Domestic Subsidiaries as "Material Domestic Subsidiaries" to the extent required such that the foregoing condition ceases to be true and comply with the provisions of Section 6.11 applicable to such Subsidiary.

"**Material Foreign Subsidiary**" means, at any date of determination, each of the Borrower's Foreign Subsidiaries (a) whose total assets at the last day of the most recent Test Period were equal to or greater than 2.5% of Total Assets at such date or (b) whose gross revenues for such Test Period were equal to or greater than 2.5% of the consolidated gross revenues of the Borrower and the Subsidiaries for such period, in each case determined in accordance with GAAP.

"**Material Real Property**" means (i) the Owned Real Property set forth on Schedule 5.08 and (ii) any Owned Real Property owned by any Loan Party with a Fair Market Value in excess of $5,000,000.

"**Material Subsidiary**" means any Material Domestic Subsidiary or any Material Foreign Subsidiary.

"**Maturity Date**" means the earliest to occur of: (a) the Scheduled Termination Date; (b) the Prepayment Date; (c) the Consummation Date; (d) the acceleration of the Loans and the termination of the Commitments with respect to the Term Facility in accordance with this Agreement; and (e) the consummation of a sale of all or substantially all of the assets of the Borrower (or the Borrower and the Guarantors), including a sale of all or substantially all of the Contact Center Business.

"**Maximum Rate**" has the meaning specified in Section 10.11.

-31-

"**Milestone Event**" means the failure of the Loan Parties to satisfy any case milestone as set forth at Paragraph 17(b) of the Interim Order and the equivalent provision in the Final Order, as applicable.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgages**" means collectively, the deeds of trust, trust deeds, hypothecs and mortgages, as the same may be amended, restated, supplemented or otherwise modified from time to time made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties creating and evidencing a Lien on a Material Real Property in form and substance reasonably satisfactory to the Administrative Agent, and any other mortgages executed and delivered pursuant to Section 6.11(d).

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates makes or is obligated to make contributions, or with respect to which the Borrower or any Subsidiary would reasonably be expected to incur liability.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by the Borrower or any of the Subsidiaries or any Casualty Event with respect to an asset, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash and Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any of the Subsidiaries) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), (B) the out-of-pocket fees and expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) incurred by the Borrower or such Subsidiary in connection with such Disposition or Casualty Event, (C) taxes paid or reasonably estimated to be payable as a result thereof, (D) in the case of any Disposition or Casualty Event by a non-wholly-owned Subsidiary, the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (D)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly-owned Subsidiary as a result thereof, and (E) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include the amount of any

-32-

reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in this clause (E); *provided* that, no net cash proceeds shall constitute Net Cash Proceeds under this clause (a) until the aggregate amount of all such net cash proceeds shall exceed $5,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Subsidiary by the Borrower or any direct or indirect parent of the Borrower, the excess, if any, of (A) the sum of the cash and Cash Equivalents received in connection with such incurrence or issuance over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Subsidiary in connection with such incurrence or issuance.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP.

"**Networking Business**" means the business of the Borrower and its applicable Subsidiaries in respect of systems networking and network configuration and related technology (including IP Rights) and assets.

"**Non-Consenting Lender**" has the meaning specified in Section 3.07(d)(iii).

"**Non-Loan Party**" means any Subsidiary of the Borrower that is not a Loan Party.

"**Nonrenewal Notice Date**" has the meaning specified in Section 2.03(b)(iii).

"**Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit F, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender.

"**Obligations**" means all (w) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (x) Hedging Obligations, (y) Cash Management Obligations and (z) Cash Pooling Obligations. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and any of their Subsidiaries to the extent they have obligations under the Loan Documents) include the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document. Notwithstanding anything to the contrary herein, the "Obligations" shall not include any Excluded Swap Obligations.

-33-

"**Orders**" means, collectively, the Interim Order and the Final Order.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Connection Taxes**" means, with respect to the Agent or any Lender, Taxes imposed as a result of a present or former connection between such Agent or Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" has the meaning specified in Section 3.01(c).

"**Outstanding Amount**" means (a) with respect to the Term Loans, the amount thereof after giving effect to any borrowings and prepayments or repayments of Term Loans; and (b) with respect to any L/C Obligations on any date, the Dollar Amount thereof on such date after giving effect to any related L/C Credit Extension occurring on such date and any other changes thereto as of such date, including any reductions in the maximum amount available for drawing under related Letters of Credit taking effect on such date.

"**Owned Real Property**" means Real Property owned in fee simple by any Loan Party.

"**Overnight Rate**" means, for any day, (a) with respect to any amount denominated in Dollars, the greater of (i) the Federal Funds Rate and (ii) an overnight rate determined by the Administrative Agent or the L/C Issuer in accordance with banking industry rules on interbank compensation, and (b) with respect to any amount denominated in an Alternative Currency, the rate of interest per annum at which overnight deposits in the applicable Alternative Currency, in an amount approximately equal to the amount with respect to which such rate is being determined, would be offered for such day by a branch or Affiliate of the Administrative Agent in the applicable offshore interbank market for such currency to major banks in such interbank market.

"**Parent Company**" means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"**Participant**" has the meaning specified in Section 10.07(e).

"**Participant Register**" has the meaning specified in Section 10.07(e).

"**Participating Member State**" means each state so described in any EMU Legislation.

"**Payment in Full**" means the time at which no Lender or L/C Issuer shall have (a) any Commitments, any Loan or other Obligations unpaid, unsatisfied or outstanding (other than in respect of contingent obligations, indemnities and expenses related thereto that are not then payable or in existence) as a result of all such Loans and other Obligations having been paid in full in cash and (b) Letters of Credit outstanding that (i) have not been Cash Collateralized in accordance with the terms of this Agreement or (ii) have not had other arrangements made with respect to them that are satisfactory to the L/C Issuer.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is either (i) sponsored or maintained by Holdings, the Borrower, any Subsidiary or any of their ERISA Affiliates or (ii) to which Holdings, the Borrower, any Subsidiary or any of their ERISA Affiliates contributes or has an obligation to contribute or with respect to which the Borrower or any Subsidiary would reasonably be expected to incur liability.

"**Permitted ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan for which notice to the PBGC is not waived by regulation; (b) a withdrawal by Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as a termination under Section 4062(e) of ERISA; (c) the filing by Holdings, the Borrower, any Subsidiary or any of their respective ERISA Affiliates of a notice of intent to terminate a Pension Plan; (d) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (e) the failure to make by its due date a required contribution under Section 412(m) of the Code (or Section 430(j) of the Code, as amended by the Pension Protection Act of 2006) with respect to any Pension Plan; (f) the filing pursuant to Section 412(d) of the Code and Section 303(d) of ERISA (or, after the effective date of the Pension Protection Act of 2006, Section 412(c) of the Code and Section 302(c) of ERISA) of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the filing by the PBGC of a petition under Section 4042 of ERISA to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to a Pension Plan which could result in liability to Holdings or the Borrower.

"**Permitted Holder**" means any Sponsor, member of Sierra Co-Invest, LLC on the Closing Date (or any Affiliate thereof), member of Sierra Co-Invest II, LLC,   Management Stockholder or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the

-35-

Exchange Act) of which any of the foregoing are members; *provided* that in the case of such group and without giving effect to the existence of such group or any other group, one or more Sponsors have beneficial ownership of more than 50.0% of the total voting power of the Voting Stock of Holdings.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, exchange or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced, exchanged or extended except by an amount equal to unpaid accrued interest and premium thereon (including tender premiums) plus other reasonable amounts paid, and fees and expenses (including upfront fees and original issue discount) reasonably incurred, in connection with such modification, refinancing, refunding, renewal, replacement, exchange or extension and by an amount equal to any existing commitments unutilized thereunder, (b) at the time thereof, no Event of Default shall have occurred and be continuing and (c) if such Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended is subordinated to the Obligations, (i) such modification, refinancing, refunding, renewal, replacement, exchange or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, (ii) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate and redemption premium) of any such modified, refinanced, refunded, renewed, replaced, exchanged or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, taken as a whole; *provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal, replacement, exchange or extension is incurred by the Person who is the obligor of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning specified in the Introductory Statement.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA), other than a Foreign Plan, established, maintained or contributed to by the Borrower or any Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

-36-

"**Platform**" has the meaning specified in Section 6.02.

"**Potential Defaulting Lender**" means, at any time, a Lender (i) as to which the Administrative Agent has notified the Borrower that an event of the kind referred to in the definition of "Lender Insolvency Event" has occurred and is continuing in respect of any financial institution affiliate of such Lender or (ii) as to which the Administrative Agent has in good faith determined that such Lender or its Parent Company or a financial institution affiliate thereof has notified the Administrative Agent, or has stated publicly, that it will not comply with its funding obligations under any other loan agreement or credit agreement or other financing agreement.  Any determination that a Lender is a Potential Defaulting Lender under any of clauses (i) and (ii) above will be made by the Administrative Agent, in its sole discretion acting in good faith.  The Administrative Agent will promptly supply to the Lenders a copy of any notice to the Borrower provided for in this definition.

"**Prepayment Date**" means the date that is 60 days after the Interim Order Entry Date if the Final Order has not been entered by the Bankruptcy Court prior to such date.

"**Pre-Petition ABL Facilities**" means the Domestic Prepetition ABL Facility and the Foreign Prepetition ABL Facility.

"**Pre-Petition Cash Flow Credit Agreement**" means that certain Third Amended and Restated Credit Agreement, amended and restated as of December 21, 2012, by and among Borrower, Holdings, Citibank, N.A. as Administrative Agent, Swing Line Lender and L/C Issuer, and each lender from time to time party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof).

"**Pre-Petition Cash Flow Facility**" means the credit facility provided pursuant to the Pre-Petition Cash Flow Credit Agreement.

"**Pre-Petition Debt**" means, collectively, the Indebtedness of each Debtor outstanding and unpaid on the date on which such Person becomes a Debtor.

"**Pre-Petition First Lien 7.00% Notes**" means the 7.00% senior secured first lien notes issued pursuant to that certain Indenture, dated as of February 11, 2011, by and among the Borrower, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent.

"**Pre-Petition First Lien 9.00% Notes**" means the 9.00% senior secured first lien notes issued pursuant to that certain Indenture, dated as of December 21, 2012, by and among the Borrower, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. as Trustee and Notes Collateral Agent.

"**Pre-Petition Second Lien 10.50% Notes**" means the 10.50% second lien notes issued pursuant to that certain Indenture, dated as of March 7, 2013, by and among the Borrower, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A. as Trustee and Notes Collateral Agent.

"**Pre-Petition Payment**" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical or foreign vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other pre-petition claims against any Debtor.

"**primary obligor**" has the meaning specified in the definition of "Guarantee."

"**Primed Liens**" has the meaning specified in Section 2.16(a).

"**Priming Liens**" has the meaning specified in Section 2.16(a).

"**Professional Fees**" has the meaning specified in the Interim Order or the Final Order, as applicable.

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments and, if applicable and without duplication, Term Loans of such Lender under the Term Facility at such time and the denominator of which is the amount of the Aggregate Commitments and, if applicable and without duplication, Term Loans under the Term Facility at such time.

"**Public Lender**" has the meaning specified in Section 6.02.

"**Qualified ECP Guarantor**" means in respect of any Swap Obligation, each Guarantor that constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell, support or other agreement under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Quarterly Financial Statements**" means the unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for the fiscal quarter ended June 30, 2016.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of our interests in real property owned in fee or leased by any Loan Party, together with, in each case, all easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Refinancing**" means (i) the payment in cash in full of all obligations in respect of the Domestic Prepetition ABL Facility, (ii) the occurrence of both (x) the payment in cash in full by the Borrower of all obligations in respect of the Foreign Prepetition ABL Facility and (y) the arising of the Foreign ABL Repayment Rights, (iii) the termination of the Pre-Petition ABL Facilities, and (iv) the release of all Liens securing the Pre-Petition ABL Facilities (it being understood that such Liens will not be released until the later of (A) the Final Order Entry Date

and (B) the date of the second Borrowing hereunder), on terms and conditions reasonably satisfactory to the Administrative Agent and the Borrower.

"**Register**" has the meaning specified in Section 10.07(d).

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating in, into, onto or through the Environment.

"**Reorganization Plan**" means a plan of reorganization in the Cases.

"**Reportable Event**" means, with respect to any Plan any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Request for Credit Extension**" means (a) with respect to a Borrowing, conversion or continuation of Term Loans, a Committed Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings and (b) total unused Aggregate Commitments; *provided* that the Term Commitment and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, chief operating officer, chief financial officer, chief restructuring officer, chief accounting officer, or treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references in this Agreement to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"**Restricted Casualty Event**" has the meaning specified in Section 2.05(b)(ii).

"**Restricted Disposition**" has the meaning specified in Section 2.05(b)(ii).

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of the Borrower or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's or a Subsidiary's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricting Information**" has the meaning specified in Section 10.09(a).

"**Revaluation Date**" means with respect to any Alternative Currency Letter of Credit, each of the following: (i) each date of issuance of an Alternative Currency Letter of Credit, (ii) each date of an amendment of any such Letter of Credit having the effect of increasing the amount thereof (solely with respect to the increased amount), (iii) each date of any payment by the L/C Issuer under any Letter of Credit denominated in an Alternative Currency, (iv) each date of withdrawal of any amount from the Letter of Credit Account and (iv) such additional dates as the Administrative Agent or the L/C Issuer shall reasonably determine.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means (a) with respect to disbursements and payments in Dollars, immediately available funds, and (b) with respect to disbursements and payments in an Alternative Currency, same day or other funds as may be determined by the Administrative Agent or the L/C Issuer, as the case may be, to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Alternative Currency.

"**Sanctions**" has the meaning specified in Section 5.16.

"**Scheduled Termination Date**" means the date that is twelve months after the Closing Date (or if such day shall not be a Business Day, the next succeeding Business Day).

"**Screen Rate**" means the rate appearing on Reuters Page LIBOR01 (or any successor or substitute page of such Reuters service, or if the Reuters service ceases to be available, any successor to or substitute for such service providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time in consultation with the Borrower, for purposes of providing quotations of interest rates applicable to deposits in Dollars in the London interbank market).

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Section 7.03(f) that is entered into by and between any Loan Party (or Avaya International Sales Ltd.) and any Hedge Bank and designated in writing by the Borrower to the Administrative Agent as a "Secured Hedge Agreement", including all Existing Hedge Agreements (whether or not so designated in writing).

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, the L/C Issuer, each Hedge Bank, each Cash Management Bank, the Cash Pooling Provider, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(c).

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement**" means, collectively, the Security Agreement executed by the Loan Parties, substantially in the form of Exhibit G, together with each other Security Agreement Supplement executed and delivered pursuant to Section 6.11.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Sierra**" means Sierra Communication International LLC, a Debtor and a direct wholly-owned Subsidiary of the Borrower. For the avoidance of doubt, Sierra shall not be a Guarantor or a Loan Party hereunder.

"**Sierra Intercompany Loan**" has the meaning specified in Section 7.16(a).

"**Sierra Intercompany Note**" has the meaning specified in Section 7.16(b).

"**SPC**" has the meaning specified in Section 10.07(h).

"**Specified Collateral**" means all Collateral consisting of the following:

(i)     all Accounts (as defined in the Uniform Commercial Code), other than Accounts which constitute identifiable proceeds of Collateral that does not otherwise constitute Specified Collateral;

(ii)     all Chattel Paper (as defined in the Uniform Commercial Code), other than Chattel Paper which constitutes identifiable proceeds of Collateral that does not otherwise constitute Specified Collateral;

(iii)(x) all Deposit Accounts (as defined in the Uniform Commercial Code) (other than Deposit Accounts that are intended to solely contain identifiable proceeds of Collateral that does not otherwise constitute Specified Collateral) and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein, and (y) Securities Accounts (other than Securities Accounts (as defined in the Uniform Commercial Code) that are intended to solely contain identifiable proceeds of Collateral that does not otherwise constitute Specified Collateral), Security Entitlements (as defined in the Uniform Commercial Code) and securities credited to such a Securities Account, and, in each case, all cash, checks and other property held therein or credited thereto; provided, however, that during the continuance of an Event of Default to the extent that identifiable proceeds of Collateral that does not otherwise constitute Specified Collateral are deposited in any such Deposit Accounts or Securities Accounts, such identifiable proceeds shall be treated as Specified Collateral;

(iv)     all Inventory (as defined in the Uniform Commercial Code);

(v)     to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (i) through (iv) constituting Specified Collateral, all Documents (as defined in the Uniform Commercial Code), General Intangibles (as defined in the Uniform Commercial Code) (other than any IP Rights), Instruments (as defined in the Uniform Commercial Code) (including promissory notes), and Commercial Tort Claims (as defined in the Uniform Commercial Code); *provided*, that to the extent any of the foregoing also relates to

-41-

Collateral of a type not referred to in clauses (i) through (iv), only that portion relating to the items referred to in the preceding clauses (i) through (iv) shall be included in the Specified Collateral;

(vi)    to the extent relating to any of the items referred to in the preceding clauses (i) through (v) constituting Specified Collateral, all Supporting Obligations (as defined in the Uniform Commercial Code) and Letter-of-Credit Rights (as defined in the Uniform Commercial Code); *provided*, that to the extent any of the foregoing also relates to Collateral that does not otherwise constitute Specified Collateral, only that portion related to those items referred to in the preceding clauses (i) through (v) shall be included in the Specified Collateral;

(vii)    all books and Records (as defined in the Uniform Commercial Code) relating to the items referred to in the preceding clauses (i) through (vi) constituting Specified Collateral (including all books, databases, customer lists, engineer drawings and Records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (i) through (vi)); and

(viii)    all collateral security and guarantees with respect to any of the foregoing and all cash, Money (as defined in the Uniform Commercial Code), insurance proceeds, Instruments, Securities, Financial Assets (as defined in the Uniform Commercial Code) and Deposit Accounts received as proceeds of any of the foregoing (such proceeds, "**Specified Collateral Proceeds**"); *provided*, *however*, that no proceeds of Specified Collateral Proceeds will constitute Specified Collateral unless such proceeds of Specified Collateral Proceeds would otherwise constitute Specified Collateral.

Notwithstanding the foregoing, "Specified Collateral" shall not include the Letter of Credit Account, the Cash Pool Requirements Account, or any amounts deposited therein in accordance with the terms of this Agreement.

"**Sponsor**" means any of Silver Lake Group, L.L.C., TPG Capital, L.P., TPG Partners V, L.P., TPG FOF V-A, L.P., TPG FOF V-B, L.P. and any of their respective Affiliates and funds or partnerships managed or advised by any of them or their respective Affiliates but not including, however, any portfolio company of any of the foregoing.

"**Spot Rate**" for a currency means the rate determined by the L/C Issuer to be the rate quoted by the L/C Issuer as the spot rate for the purchase by the L/C Issuer of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two (2) Business Days prior to the date as of which the foreign exchange computation is made; *provided* that the L/C Issuer may obtain such spot rate from another financial institution designated by the L/C Issuer if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency; and *provided* that the L/C Issuer may use such spot rate quoted on the date as of which the foreign exchange computation is made in the case of any Alternative Currency Letter of Credit.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (excluding, for the avoidance of doubt, charitable foundations) of which a majority of the shares of securities or other interests having ordinary

-42-

voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Superpriority Claim**" means a claim against any Debtor in any of the Cases which is an administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"**Supplemental Administrative Agent**" has the meaning specified in Section 9.14 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act (including without limitation any Swap Agreement).

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" has the meaning specified in Section 3.01(a).

-43-

"**Term Borrowing**" means a borrowing consisting of Term Loans of the same Type, and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Term Lenders pursuant to Section 2.01(a).

"**Term Commitment**" means, as to any Term Lender, the amount set forth opposite such Lender's name on Schedule I hereto as such Lender's Term Commitment, as such amount may be reduced pursuant to Section 2.06 or otherwise adjusted from time to time in accordance with this Agreement.

"**Term Facility**" has the meaning specified in the Introductory Statements to this Agreement.

"**Term Lender**" means, at any time, a Lender with an outstanding Term Loan or a Term Commitment at such time.

"**Term Loan**" has the meaning set forth in Section 2.01(a).

"**Term Upfront Fee**" has the meaning specified in Section 2.09(b).

"**Term Upfront Fee Percentage**" has the meaning specified in Section 2.09(b).

"**Test Period**" in effect at any time means the most recent period of four consecutive fiscal quarters of the Borrower ended on or prior to such time in respect of which financial statements for each quarter or fiscal year in such period have been or are required to be delivered pursuant to Section 6.01(a) or (b); *provided* that, prior to the first date that financial statements have been or are required to be delivered pursuant to Section 6.01(a) or (b), the Test Period in effect shall be the period of four consecutive fiscal quarters of the Borrower ended June 30, 2016.  A Test Period may be designated by reference to the last day thereof (i.e., the "December 31, 2016 Test Period" refers to the period of four consecutive fiscal quarters of the Borrower ended December 31, 2016), and a Test Period shall be deemed to end on the last day thereof.

"**Threshold Amount**" means $20,000,000.

"**Total Assets**" means the total assets of the Borrower and the Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b), if for the period prior to the time any such statements are so delivered pursuant to Section 6.01(a) or (b), the most recent financial statements delivered pursuant to the corresponding terms of the Pre-Petition Cash Flow Credit Agreement.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction Expenses**" means any fees or expenses incurred or paid by Holdings or any of its Subsidiaries in connection with this Agreement and the other Loan Documents.

"**Transactions**" means, collectively, (a) the closing and effectiveness of this Agreement, (b) the consummation of the Refinancing, (c) the consummation of any other

-44-

transactions in connection with the foregoing and (d) the payment of the fees and expenses incurred in connection with any of the foregoing.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Uniform Commercial Code**" means the Uniform Commercial Code or any successor provision thereof as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code or any successor provision thereof (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**USA PATRIOT Act**" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as amended or modified from time to time.

"**U.S. Lender**" has the meaning specified in Section 3.01(b)(ii)(A).

"**Voting Stock**" means, with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such Person.

"**wholly-owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" means the liability of a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02.    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

-45-

(b)      (i)   The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)      Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)      The term "including" is by way of example and not limitation.

(iv)      The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(d)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)      The word "or" is not exclusive.

SECTION 1.03.    <u>Accounting Terms</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Annual Financial Statements, except as otherwise specifically prescribed herein.

SECTION 1.04.    [Reserved].

SECTION 1.05.    <u>References to Agreements, Laws, Etc</u>.  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06.    <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.07.    <u>Additional Alternative Currencies</u>.

(a)      The Borrower may from time to time request that Alternative Currency Letters of Credit be issued in a currency other than those specifically listed in the definition of

-46-

"Alternative Currency"; *provided* that such requested currency is a lawful currency (other than Dollars) that is readily available and freely transferable and convertible into Dollars.  In the case of any such issuance of Alternative Currency Letters of Credit, such request shall be subject to the approval of the Administrative Agent and the L/C Issuer.

(b)    Any such request shall be made to the Administrative Agent not later than 11:00 a.m., ten Business Days prior to the date of the desired Letter of Credit issuance (or such other time or date as may be agreed by the L/C Issuer, in its sole discretion).  The L/C Issuer shall notify the Administrative Agent, not later than 11:00 a.m., five Business Days after receipt of such request whether it consents, in its sole discretion, to the issuance of Alternative Currency Letters of Credit in such requested currency.

(c)    Any failure by the L/C Issuer to respond to such request within the time period specified in the preceding sentence shall be deemed to be a refusal by the L/C Issuer to permit Alternative Currency Letters of Credit to be issued in such requested currency.  If the L/C Issuer consents to the issuance of Alternative Currency Letters of Credit in such requested currency, the Administrative Agent shall so notify the Borrower and such currency shall thereupon be deemed for all purposes to be an Alternative Currency hereunder for purposes of any Alternative Currency Letter of Credit issuances (unless the Borrower and the L/C Issuer shall otherwise agree in writing).  If the Administrative Agent shall fail to obtain consent to any request for an additional currency under this Section 1.07, the Administrative Agent shall promptly so notify the Borrower.

SECTION 1.08.    <u>Currency Equivalents Generally</u>.

(a)    The Administrative Agent shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Amounts of Credit Extensions and Outstanding Amounts denominated in Alternative Currencies.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  Except for purposes of financial statements delivered by Loan Parties hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Amount as so determined by the Administrative Agent.

(b)    Wherever in this Agreement in connection with the issuance, amendment or extension of an Alternative Currency Letter of Credit, an amount is expressed in Dollars, but such Alternative Currency Letter of Credit is denominated in an Alternative Currency, such amount shall be the relevant Alternative Currency Equivalent of such Dollar Amount (rounded to the nearest unit of such Alternative Currency, with 0.5 of a unit being rounded upward), as determined by the L/C Issuer, as the case may be.

(c)    Notwithstanding the foregoing, for purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; *provided* that, for the avoidance of doubt, the foregoing provisions of this Section 1.08

-47-

shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

SECTION 1.09.    Change in Currency.

(a)    Each obligation of the Borrower to make a payment denominated in the national currency unit of any member state of the European Union that adopts the Euro as its lawful currency after the Closing Date shall be redenominated into Euro at the time of such adoption (in accordance with the EMU Legislation).  If, in relation to the currency of any such member state, the basis of accrual of interest expressed in this Agreement in respect of that currency shall be inconsistent with any convention or practice in the London interbank market for the basis of accrual of interest in respect of the Euro, such expressed basis shall be replaced by such convention or practice with effect from the date on which such member state adopts the Euro as its lawful currency.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect the adoption of the Euro by any member state of the European Union and any relevant market conventions or practices relating to the Euro.

(c)    Each provision of this Agreement also shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify to be appropriate to reflect a change in currency of any other country and any relevant market conventions or practices relating to the change in currency.

SECTION 1.10.    Permitted Liens.  The permission of the existence of Liens set forth under Section 7.01 is not intended to subordinate or postpone, and shall not be interpreted as a subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created under any of the Loan Documents to any such Lien; it being understood that the priority of any such Lien and the Lien created under any of the Loan Documents shall be determined by the Orders and by operation of the applicable Law.

## ARTICLE II

## The Commitments and Credit Extensions

SECTION 2.01.    The Loans.

(a)    (i)    *The Term Borrowings*.  Subject to the terms and conditions set forth herein and in the Orders, each Term Lender agrees, severally and not jointly, to make term loans (each a "**Term Loan**") in Dollars to the Borrower in up to two draws on any Business Day on or after the Closing Date and prior to the date that is two (2) Business Days following the Final Order Entry Date, in an aggregate principal amount not to exceed its respective Term Commitment.  For the avoidance of doubt, any Term Commitments (x) shall be reduced dollar for dollar at the time of funding of any Loans thereunder and (y) shall terminate upon the earlier of (i) the second Borrowing hereunder and (ii) the date that is two (2) Business Days following the Final Order Entry Date (or, if earlier, the Prepayment Date).  Each Term Borrowing shall be

-48-

in an aggregate amount of $100,000,000 or an integral multiple of $25,000,000 in excess thereof and shall consist of Term Loans of the same Type made on the same day by the Term Lenders ratably according to their respective Term Commitments; provided, that (x) the first Borrowing of Term Loans shall be in the full amount authorized by the Bankruptcy Court in the Interim Order (which shall not be less (or more) than $425,000,000) and (y) the second Borrowing of Term Loans shall be in an amount equal to the difference between (i) the lesser of (A) the full amount authorized by the Bankruptcy Court in the Final Order and (B) the aggregate amount of Term Commitments then outstanding and (ii) the amount of the first Borrowing.  Term Loans prepaid or repaid may not be reborrowed.

(b)     *Letters of Credit*.  Subject to the terms and conditions set forth herein and in the Orders, the Lenders agree to permit the issuance of Letters of Credit in accordance with Section 2.03.  Upon the occurrence of the Closing Date, all Existing Letters of Credit shall be (and shall be deemed to be) Letters of Credit issued hereunder, without the need for the taking of any further action by any Person.

SECTION 2.02.     Borrowings, Conversions and Continuations of Loans.

(a)     Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent (i) not later than 12:00 noon (New York, New York time) one (1) Business Day (or with respect to the second Borrowing, three (3) Business Days) prior to the requested date of any Borrowing or continuation of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans and (ii) not later than 11:00 a.m. on the requested date of any Borrowing of Base Rate Loans; *provided* that the Borrower may condition each Borrowing in such notice on the entry of the Interim Order or the Final Order, as applicable; *provided* further that the Borrower may deliver new notices if such condition fails to be satisfied on the proposed Borrowing date.  Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of the amount of $500,000 in excess thereof.  Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or which existing Loans are to be converted and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as Base Rate Loans.  If the Borrower fails to deliver a Committed Loan Notice to continue any Eurocurrency Rate Loans, then the Eurocurrency Rate Loans shall be deemed to have chosen to convert such Loan to a Base Rate Borrowing.  If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice,

-49-

but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans.  In the case of each Borrowing, each Term Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office in Dollars not later than 1:00 p.m. New York City time on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is on the Closing Date, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan.  During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted to or continued as Eurocurrency Rate Loans on the last day of the then current Interest Period with respect thereto.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate.  The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)    After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect unless otherwise agreed between the Borrower and the Administrative Agent.

(f)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

(g)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's Pro Rata Share of such Borrowing, the Administrative Agent may assume that such Lender has made such Pro Rata Share available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (b) above, and the Administrative Agent may

#89281377v6

(but shall not be obligated to), in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such Pro Rata Share available to the Administrative Agent, each of such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Overnight Rate plus any administrative, processing, or similar fees customarily charged by the Administrative Agent in accordance with the foregoing.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.02(g) shall be conclusive in the absence of manifest error.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower (to the extent such amount is covered by interest paid by such Lender) the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.03.    Letters of Credit.

(a)    *The Letter of Credit Commitments*.

(i)    Subject to the terms and conditions set forth herein and in the Orders, (A)(1) the L/C Issuer agrees, (x) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Alternative Currency Letters of Credit and/or Dollar Letters of Credit for the account of the Borrower (*provided* that any Letter of Credit may be for the benefit of any Subsidiary of the Borrower; *provided further* that as of the Closing Date, certain Existing Letters of Credit are issued for the account of certain Non-Loan Party Affiliates of the Borrower, and for all purposes hereunder, shall be treated as though they were issued for the account of the Borrower but for the benefit of such Subsidiary for which they were originally issued) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (y) to honor drawings under the Letters of Credit; *provided* that after giving effect to any L/C Credit Extensions with respect to any Letter of Credit, (I) the Letter of Credit Deposit Amount shall not be less than the L/C Collateralization Amount at such time and (II) the L/C Obligations at such time shall not exceed the L/C Facility Cap.  Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower and each applicable Subsidiary that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence.  Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

-51-

(ii)    The L/C Issuer shall not issue any Letter of Credit if:

(A)    subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve (12) months after the date of issuance or last renewal, unless otherwise agreed by the L/C Issuer and the Administrative Agent, each in its sole discretion; or

(B)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date; provided, however, that notwithstanding the foregoing, if the other conditions to issuance are then satisfied, the L/C Issuer shall be required to issue a Letter of Credit (prior to the Letter of Credit Expiration Date) having an expiry date that is later than the Letter of Credit Expiration Date (but in no event later than the date that is twelve (12) months from the Letter of Credit Expiration Date then in effect); provided, further that, until the Maturity Date, such Letters of Credit shall be Cash Collateralized in an amount equal to the L/C Collateralization Amount, and after the Maturity Date, such Letters of Credit shall continue to be Cash Collateralized in an amount equal to the L/C Collateralization Amount, after giving effect to the step-up in collateralization rate provided for in the definition of L/C Collateralization Amount and the receipt of additional cash collateral on account thereof.  All obligations in this Agreement to Cash Collateralize Letters of Credit shall survive the satisfaction or discharge of all other Obligations and the termination of this Agreement or any other Loan Document.

(iii)    The L/C Issuer shall not be obligated to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the L/C Issuer from issuing such Letter of Credit, or any Law applicable to the L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the L/C Issuer shall prohibit, or direct that the L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which the L/C Issuer is not otherwise compensated hereunder);

(B)    the issuance of such Letter of Credit would violate one or more policies of the L/C Issuer applicable to letters of credit generally; or

(C)    except as otherwise agreed by the Administrative Agent and the L/C Issuer, such Letter of Credit is to be denominated in a currency other than (i) in the case of Dollar Letters of Credit, Dollars and (ii) in the case of Alternative Currency Letters of Credit, an Alternative Currency.

-52-

(iv)    The L/C Issuer and the Borrower shall not amend any Letter of Credit to contain terms that would not, pursuant to the terms of this Agreement, be permitted to be contained in a newly issued Letter of Credit hereunder.

(v)    The L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) the L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(vi)    The L/C Issuer shall have all of the benefits and immunities (A) provided to the Administrative Agent in Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in Article IX included the L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to the L/C Issuer.

(b)    *Procedures for Issuance and Amendment of Letters of Credit; Auto-Renewal Letters of Credit.*

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower. Such Letter of Credit Application must be received by the L/C Issuer and the Administrative Agent not later than 12:00 noon at least two (2) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such later date and time as the L/C Issuer may agree in a particular instance in its sole discretion. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer: (a) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (b) the amount thereof; (c) the expiry date thereof; (d) the name and address of the beneficiary thereof; (e) the documents to be presented by such beneficiary in case of any drawing thereunder; (f) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; (g) the currency in which the requested Letter of Credit will be denominated; and (h) such other matters as the L/C Issuer may reasonably request. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the L/C Issuer may reasonably request.

(ii)    Promptly after receipt of any Letter of Credit Application, the L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, the L/C Issuer will provide the Administrative Agent with a copy thereof. Unless the relevant L/C Issuer has received written notice from the

#89281377v6

Administrative Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied, then, subject to the terms and conditions hereof, the L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower (or the applicable Subsidiary) or enter into the applicable amendment, as the case may be, in each case in accordance with the L/C Issuer's usual and customary business practices.

(iii)    If the Borrower so requests in any applicable Letter of Credit Application, the L/C Issuer shall agree to issue a Letter of Credit that has automatic renewal provisions (each, an "**Auto-Renewal Letter of Credit**"); *provided* that any such Auto-Renewal Letter of Credit must permit the L/C Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Nonrenewal Notice Date**") in each such twelve-month period to be agreed upon by the L/C Issuer and the Borrower at the time such Letter of Credit is issued.  Unless otherwise directed by the L/C Issuer, the Borrower shall not be required to make a specific request to the L/C Issuer for any such renewal.  Once an Auto-Renewal Letter of Credit has been issued, the L/C Issuer may permit the renewal of such Letter of Credit at any time until an expiry date not later than the applicable Letter of Credit Expiration Date (or such later date referred to in Section 2.03(a)(ii)(B)); *provided* that the L/C Issuer shall not be required to effect any such renewal if (A) the L/C Issuer has determined that it would not be permitted, or would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise) or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Nonrenewal Notice Date from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied;

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    *Drawings and Reimbursements.*

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the L/C Issuer shall notify promptly the Borrower and the Administrative Agent thereof.  Subject to the proviso below in this clause (i), the Borrower shall reimburse the L/C Issuer in the currency in which such Letter of Credit was issued, unless the L/C Issuer (at its option) shall have specified in such notice that it will require reimbursement in Dollars for any Alternative Currency Letter of Credit.  In the case of any such reimbursement in Dollars of a drawing under an Alternative Currency Letter of Credit, the L/C Issuer shall notify the Borrower of the Dollar Amount of such drawing promptly following the determination thereof.  Not later than 11:00 a.m. on the first Business Day following the date of any payment by the L/C Issuer under a

Dollar Letter of Credit, or the Applicable Time on the first Business Day following the date of any payment by the L/C Issuer under an Alternative Currency Letter of Credit, the Borrower shall reimburse the L/C Issuer in an amount equal to the amount of such drawing and in the applicable currency; provided that the Borrower's obligation to reimburse the L/C Issuer with respect to such drawing shall, unless the Borrower and L/C Issuer shall otherwise each agree, first be satisfied by funds (in Dollars) withdrawn by the Administrative Agent from the Letter of Credit Account and transferred to the L/C Issuer in accordance with Section 2.04(a)(iii) (and the Borrower hereby irrevocably authorizes and instructs the Administrative Agent to make such withdrawals and transfers).

(d)      *[Reserved]*.

(e)      *Obligations Absolute*.  The obligation of the Borrower to reimburse the L/C Issuer for each drawing under each Letter of Credit issued by it shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)      any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii)      the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)      any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)      any payment by the L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)      any adverse change in the relevant exchange rates or in the availability of the relevant Alternative Currency to the Borrower or any Subsidiary or in the relevant currency markets generally;

-55-

(vi)    any exchange, release or nonperfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations of any Loan Party in respect of such Letter of Credit; or

(vii)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

*provided* that the foregoing shall not excuse the L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to punitive or consequential damages or lost profits, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by acts or omissions of the L/C Issuer constituting gross negligence or willful misconduct on the part of the L/C Issuer.

(f)    *Role of the L/C Issuer*.  The Borrower agrees that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement.  None of the L/C Issuer, any Agent-Related Person, nor any of the respective correspondents, participants or assignees of the L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (iii) of this Section 2.03(f); *provided* that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the L/C Issuer, and the L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to lost profits or punitive or consequential damages suffered by the Borrower that were caused by the L/C Issuer's willful misconduct or gross negligence or the L/C Issuer's willful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit.  In furtherance and not in limitation of the foregoing, the L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and the L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)    *[Reserved]*.

(h)    *Applicability of ISP and UCP*.  Unless otherwise expressly agreed by the relevant L/C Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP shall apply to each standby Letter of Credit, and (ii) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each Commercial Letter of Credit.

-56-

(i)     *[Reserved]*.

(j)     *Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer*.  The Borrower shall pay directly to the L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued (or deemed issued) by it hereunder, equal to 0.125% per annum of the daily maximum amount then available to be drawn under such Letter of Credit.  Such fronting fees shall be computed on a quarterly basis in arrears.  Such fronting fees shall be due and payable on the first Business Day after the end of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date (or applicable later date referred to in Section 2.03(a)(ii)(B)) and thereafter on demand.  In addition, the Borrower shall pay directly to the L/C Issuer for its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the L/C Issuer relating to Letters of Credit as from time to time in effect.  Such customary fees and standard costs and charges shall be due and payable on demand and shall be nonrefundable.

(k)     *Conflict with Letter of Credit Application*.  Notwithstanding anything else to the contrary in any Letter of Credit Application, in the event of any conflict between the terms hereof and the terms of any Letter of Credit Application, the Letter of Credit Application shall control.

(l)     *[Reserved]*.

(m)     *Letters of Credit Issued for Subsidiaries*.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrower shall be obligated to reimburse the L/C Issuer hereunder for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

(n)     For the avoidance of doubt, this Section 2.03 is solely for the benefit of the Loan Parties and the L/C Issuer and any amendment, modification or waiver thereof shall not require the consent of any other Lender hereunder.

SECTION 2.04.     Cash Collateralized Letter of Credit Account.

(a)     *Establishment of a Letter of Credit Account*.  Subject to the terms and conditions set forth herein and in the Orders, the Borrower shall establish the Letter of Credit Account on or prior to the Closing Date.  Amounts on deposit in the Letter of Credit Account shall be invested, or caused to be invested, by the Administrative Agent as set forth in subsection (d) below.

(b)     *Deposits in the Letter of Credit Account*.  The Letter of Credit Account shall be funded by the Borrower from time to time in an amount equal to (but not exceeding) the L/C Collateralization Amount.  If, as a result of any revaluation of currency (on any Revaluation Date or otherwise) with respect to any Alternative Currency Letters of Credit, the amount on

-57-

deposit in the Letter of Credit Account shall be less than the L/C Collateralization Amount then applicable after giving effect to such revaluation, the Borrower shall, within two (2) Business Days' notice from the Administrative Agent of such revaluation, deposit in the Letter of Credit Account cash in an amount necessary to cause the amount on deposit in the Letter of Credit Account to be equal to the L/C Collateralization Amount.

(c)      *Withdrawals From and Closing of Letter of Credit Account.*  Amounts on deposit in the Letter of Credit Account shall be withdrawn and distributed as follows:

(i)      on any date on which the L/C Issuer is to be reimbursed by the Borrower for any payment made by the L/C Issuer with respect to a Letter of Credit, the Administrative Agent shall, unless the Borrower shall have so reimbursed the L/C Issuer in cash in accordance with Section 2.03(c), withdraw from the Letter of Credit Account an amount equal to the amount of such payment, and make such amount available to the L/C Issuer;

(ii)      amounts in the Letter of Credit Account may be withdrawn by the Borrower so long as (i) no Default has occurred and is continuing or would result therefrom, (ii) the Borrower shall have delivered to the Administrative Agent a certificate executed by a Responsible Officer to the foregoing effect and (iii) after giving effect to such withdrawal, the Letter of Credit Deposit Amount would not be less than the L/C Collateralization Amount at such time; and

(iii)      upon the Maturity Date and the expiration or cancellation of all outstanding Letters of Credit (or Cash Collateralization thereof in an amount equal to the L/C Collateralization Amount pursuant to arrangements reasonably satisfactory to the L/C Issuer), the Administrative Agent shall withdraw from the Letter of Credit Account the aggregate amount then on deposit therein and apply such funds to repay the Obligations as set forth herein.

(d)      *Investments of Letter of Credit Deposit Amount*. The Administrative Agent shall, on behalf of the Borrower, invest the Letter of Credit Deposit Amount in an account or investment reasonably acceptable to the Borrower and the Administrative Agent (which the Administrative Agent may require to be an account managed by the Administrative Agent or its Affiliates).

SECTION 2.05.    Prepayments.

(a)      *Optional Prepayments*.

(i)      The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part; *provided* that (1) such notice must be received by the Administrative Agent not later than 12:00 noon (New York, New York time)  (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans, and (B) one (1) Business Day prior to any date of prepayment of Base Rate Loans and (2) any partial prepayment of any Loans shall be in a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof or, if less, the

-58-

entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid and the payment amount specified in such notice shall be due and payable on the date specified therein.  The Administrative Agent will promptly notify each Term Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; provided that any such notice may be contingent upon the consummation of a refinancing or other contingent event and such notice may otherwise be extended or revoked, in each case, with the requirements of Section 3.05 to apply to any failure of the contingency to occur and any such extension or revocation.  Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the Loans pursuant to this Section 2.05(a) shall be paid to the Term Lenders in accordance with their respective Pro Rata Shares.

        (b)        *Mandatory Prepayments*.

        (i)        [*Reserved*].

        (ii)        *Disposition or Casualty Event*.  (A)  If (x) the Borrower or any of its Subsidiaries Disposes of any property or assets (other than (1) any Disposition of any property or assets permitted by Section 7.05(a), (b), (c), (d), (e), (g), (h), (i), (k), (l), (m), (o) or (p) or (2) any Disposition of any property or assets made pursuant to Section 7.05(j) to the extent the aggregate amount of Net Cash Proceeds received by the Borrower or a Subsidiary from all such Dispositions does not exceed $20,000,000, and if the aggregate amount of Net Cash Proceeds exceeds $20,000,000, only the amount in excess of $20,000,000 shall be subject to this clause (A)) or (y) any Casualty Event occurs, which results in the realization or receipt by the Borrower or such Subsidiary of Net Cash Proceeds, the Borrower shall offer to prepay on or prior to the date which is three (3) Business Days after the date of the realization or receipt of such Net Cash Proceeds an aggregate principal amount of Term Loans (on a pro rata basis based on the amount thereof) equal to 100% of all Net Cash Proceeds realized or received; *provided* that, notwithstanding any other provision of this Section 2.05(b), (i) to the extent that any or all of the Net Cash Proceeds of any Disposition by a Subsidiary that is a Foreign Subsidiary otherwise giving rise to a prepayment pursuant to Section 2.05(b)(ii) (a "**Restricted Disposition**"), the Net Cash Proceeds of any Casualty Event of a Subsidiary that is a Foreign Subsidiary (a "**Restricted Casualty Event**") would be prohibited or delayed by applicable local law from being distributed or otherwise transferred to the Borrower, the Borrower shall not be required to make a prepayment at the time provided in Section 2.05(b)(ii), for so long, but only so long, as the applicable local law will not permit such distribution or transfer (the Borrower hereby agreeing to cause the applicable Subsidiary to promptly take all commercially reasonable actions available under the applicable local law to permit such repatriation), and once distribution or transfer of any of such affected Net Cash Proceeds is permitted under the applicable local law, the amount of such Net Cash Proceeds permitted to be distributed or transferred (net of additional taxes payable or reserved against as a result thereof) will be

-59-

promptly (and in any event not later than two (2) Business Days after such distribution or transfer is permitted) taken into account in measuring the Borrower's obligation to repay the Term Loans pursuant to this Section 2.05(b)(ii) to the extent provided herein and (ii) to the extent that the Borrower has determined in good faith (as set forth in a written notice delivered to the Administrative Agent) that repatriation of any or all of the Net Cash Proceeds of any Restricted Disposition or any Restricted Casualty Event attributable to a Foreign Subsidiary would have a material adverse tax consequence (taking into account any foreign tax credit or benefit received in connection with such repatriation), the amount of the Net Cash Proceeds so affected shall not be taken into account in measuring the Borrower's obligation to repay Term Loans pursuant to this Section 2.05(b)(ii).

(iii)     *Certain Indebtedness.*  If the Borrower or any Subsidiary incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall immediately prepay an aggregate principal amount of Term Loans equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt of such Net Cash Proceeds.

(c)     *Interest, Funding Losses, Etc.*  All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date prior to the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05.

(d)     Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurocurrency Rate Loans is required to be made under this Section 2.05 prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurocurrency Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into an account designated by the Administrative Agent until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05.  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with the relevant provisions of this Section 2.05.

SECTION 2.06.    Termination or Reduction of Commitments.

(a)     *[Reserved.]*

(b)     *Commitments.*  The Commitments (x) shall be automatically and promptly reduced on the date of any Borrowing of Term Loans pursuant to Section 2.01(a)(i), by the

-60-

amount of such Borrowing and (y) shall automatically terminate on the Business Day that is three (3) Business Days following the Final Order Entry Date.

(c)     *Application of Commitment Reductions; Payment of Fees*.  The Administrative Agent will promptly notify the Term Lenders of any termination or reduction of the Commitments under this Section 2.06.  Upon any reduction of unused Commitments, the Commitment of each Lender shall be reduced by such Lender's Pro Rata Share of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).

SECTION 2.07.   Repayment of Loans.  To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

SECTION 2.08.   Interest.

(a)     Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)     At all times during which an Event of Default is continuing, the Borrower shall pay interest on the principal amount of all Loans outstanding hereunder (and any past due amounts not constituting principal) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

SECTION 2.09.   Fees.  In addition to certain fees described in Section 2.03(j), the Borrower shall pay to the Arrangers, the Administrative Agent and the Lenders (as applicable), for their respective accounts, in Dollars:

(a)     all fees in the amounts and at the times specified in the Fee Letter due and payable to the Arrangers and the Administrative Agent; and

(b)     without duplication of amounts referred to in clause (a) above, to the Administrative Agent, for the account of each Lender, an upfront fee (the "**Term Upfront Fee**") (which, at the discretion of the Administrative Agent, may take the form of original issue discount) equal to 1.00% (the "**Term Upfront Fee Percentage**") of (i) the aggregate principal amount of the Loans funded hereunder in respect of the first Borrowing referred to in Section

-61-

2.01(a), which first Term Upfront Fee shall be earned, due and payable on the date of such first Borrowing and calculated by multiplying the Term Upfront Fee Percentage by the aggregate principal amount of Loans funded by such Lender on the date of such first Borrowing and (ii) the aggregate principal amount of the Loans funded hereunder in respect of the second Borrowing referred to in Section 2.01(a), which second Term Upfront Fee shall be earned, due and payable on the date of such second Borrowing and calculated by multiplying the Term Upfront Fee Percentage by the aggregate principal amount of Loans funded by such Lender on the date of such second Borrowing; *provided* that notwithstanding the foregoing, for the avoidance of doubt no applicable original issue discount shall reduce the amount of Obligations required to be prepaid or repaid with respect to the Loans owing hereunder.

All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for appropriate distribution. Once paid, none of the fees shall be refundable under any circumstances.

SECTION 2.10.    Computation of Interest and Fees.  All computations of interest for Base Rate Loans when the Base Rate is determined by the Administrative Agent's "prime rate" shall be made on the basis of a year of 365 days or 366 days, as the case may be), and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360 day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.  For the avoidance of doubt, the effect of any original issue discount shall be disregarded when calculating the amount of any interest or fees otherwise due hereunder.

SECTION 2.11.    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note or Notes payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach

schedules to its Note and endorse thereon the date, Type, amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made in good faith by the Administrative Agent in the Register pursuant to Section 2.11(a), and by each Lender in its account or accounts pursuant to Section 2.11(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

SECTION 2.12.    Payments Generally.

(a)    All payments to be made by the Borrower or any other Loan Party shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein and except with respect to payments in an Alternative Currency, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders and/or L/C Issuer to which such payment is owed, at the applicable Administrative Agent's Office for payment and in Same Day Funds not later than 2:00 p.m. on the date specified herein. Except as otherwise expressly provided herein, all payments by the Borrower hereunder in an Alternative Currency shall be made to the Administrative Agent, for the account of the respective Lenders and/or L/C Issuer to which such payment is owed, at the applicable Administrative Agent's Office in such Alternative Currency and in Same Day Funds not later than the Applicable Time on the dates specified herein. If, for any reason, the Borrower is prohibited by any Law from making any required payment hereunder in an Alternative Currency, the Borrower shall make such payment in Dollars in the Dollar Amount of the Alternative Currency payment amount. The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. (New York, New York time), shall in each case be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)    Unless the Borrower has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder for the account of any Lender or the L/C Issuer hereunder, that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to such Lender or L/C Issuer. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then such Lender or L/C Issuer shall forthwith on demand repay to the Administrative Agent the portion of such assumed

-63-

payment that was made available to such Lender or L/C Issuer in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender or L/C Issuer to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Overnight Rate from time to time in effect.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    The obligations of the Lenders hereunder to make Loans are several and not joint. The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan.

(f)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of (a) the Outstanding Amount of all Loans outstanding at such time and (b) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

SECTION 2.13.    <u>Sharing of Payments</u>. If any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender

-64-

under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon. The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.10) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased. For the avoidance of doubt, the foregoing shall not apply with regard to the application of the Letter of Credit Deposit Amount in respect of Letters of Credit or related obligations.

SECTION 2.14.   [Reserved].

SECTION 2.15.   [Reserved].

SECTION 2.16.   Priority and Liens.

(a)   Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, an Interim Order (and when applicable, the Final Order) and subject to the Carve-Out in all respects, the Obligations: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases, which Superpriority Claims in respect of the Facilities (including in respect of the Cash Pooling Obligations, Cash Management Obligations and Secured Hedge Agreement) shall rank *pari passu* with each other; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien (subject to the terms of the Security Agreement and the Orders but which will, in any event, be subject to the Carve-Out) on all of the Collateral (but excluding a claim on Avoidance Actions (but including, upon entry of the Final Order, unless waived by the Administrative Agent, the proceeds of Avoidance Actions)), whether now existing or hereafter acquired, that is not subject to valid, perfected, non-voidable liens in existence at the time of commencement of the Cases or to valid, non-voidable liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, and on all of its cash (or other assets) maintained in the Letter of Credit Account and any investment of the funds contained therein, provided that the Letter of Credit Deposit Amount shall not be subject to the Carve-Out; (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected junior Lien upon all Collateral, other than Excluded Assets, whether now existing or hereafter acquired, that is subject to valid,

-65-

perfected and nonvoidable Liens in favor of Persons that are not Affiliates of the Loan Parties and in existence at the time of the commencement of the Cases or that is subject to valid Liens in existence at the time of the commencement of the Cases that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code (other than certain property that is subject to the existing Liens that secure the Existing Secured Debt, which liens shall be primed by the liens described in the following clause (iv)); and (iv) pursuant to Section 364(d)(l) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable perfected first priority senior priming Lien on all Collateral, other than Excluded Assets, that is subject to the Liens (the "**Primed Liens**") which secure the Existing Secured Debt other than (a) Liens on the Specified Collateral securing Domestic Prepetition ABL Credit Agreement and (b) with respect to Liens securing the Cash Pooling Obligations (as set forth in paragraph (c) below), Liens on Collateral that is not Specified Collateral securing the Pre-Petition Cash Flow Facility, Pre-Petition First Lien 7.00% Notes and Pre-Petition First Lien 9.00% Notes, all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Administrative Agent, which senior priming Liens in favor of the Administrative Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection Liens to the extent of any diminution in the value of the collateral of the Primed Liens as provided in the Interim Order and the Final Order in respect of any of the Primed Liens, subject in each case (other than with respect to the Letter of Credit Deposit Amount) to the Carve-Out in all respects and as set forth in the Orders (the "**Priming Liens**") and with respect to perfection, solely to the extent it may be achieved by the entry of the Orders and the perfection steps required to be taken under the Security Agreement.

(b)      The Priming Liens, (i) except as set forth in clause (c) below, shall be subject and junior to the Carve-Out in all respects, (ii) shall be junior to Liens that are senior to the Primed Liens (unless such Liens are themselves Primed Liens), (iii) shall be senior in all respects to the interests of such property of the holders of the obligations in respect of the Primed Liens and (iv) shall also be senior to any Liens granted after the Petition Date to provide adequate protection in respect of the Primed Liens.

(c)      Notwithstanding anything to the contrary in clause (a) above, the Liens securing, and the superpriority claims in respect of, the guarantees of the Loan Parties in respect of the Cash Pooling Obligations of any Subsidiaries of the Borrower that are not Loan Parties shall only apply or attach on a priming basis with respect to the Pre-petition Cash Flow Facilities, Pre-Petition First Lien 7.00% Notes and Pre-Petition First Lien 9.00% Notes with respect to the Specified Collateral, and shall attach to all other Collateral that is not Specified Collateral subject to the prepetition Liens in respect of the Pre-petition Cash Flow Facilities, Pre-Petition First Lien 7.00% Notes and Pre-Petition First Lien 9.00% Notes (and adequate protection liens in respect thereof).  Further, in no event shall the claims of the L/C Issuer with respect to the Letter of Credit Deposit Amount be subject to the Carve-Out.

(d)      The relative priorities of the Liens described in this Section 2.16 with respect to the Collateral shall be as set forth in the Interim Order (and, when entered, the Final Order) and the Security Agreement.  In accordance with the Interim Order (or, once entered, the Final Order), all of the Liens described in this Section 2.16 shall be effective and perfected upon entry of the Interim Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or

-66-

other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral, as set forth in the Interim Order.

(e)    Further to Section 2.16(a) and the Interim Order (and, when entered, the Final Order), to secure the full and timely payment and performance of the Obligations, each Loan Party hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Administrative Agent, for the ratable benefit of the Secured Parties, the Real Property and property and interests relating thereto (which, for the avoidance of doubt, shall include all of such Loan Party's right, title and interest now or hereafter acquired in and to (A) all improvements now owned or hereafter acquired by such Loan Party, (B) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by such Loan Party and now or hereafter attached to, installed in or used in connection with the Real Property, and all utilities whether or not situated in easements, and all equipment, inventory and other goods in which such Loan Party now has or hereafter acquires any rights or any power to transfer rights and that are or are to become fixtures (as defined in the Uniform Commercial Code) related to the Real Property, (C) [reserved], (D) all reserves, escrows or impounds and all deposit accounts maintained by such Loan Party with respect to the Real Property, (E) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use, all or any part of the Real Property, together with all related security and other deposits, (F) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise enjoying the Real Property, (G) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Real Property, (H) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (I) all property tax refunds payable with respect to the Real Property, (J) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (K) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Loan Party as an insured party, and (L) all awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made to any Loan Party by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof) of all or any Real Property), TO HAVE AND TO HOLD to the Administrative Agent, and such Loan Party does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Administrative Agent. Notwithstanding the foregoing, excluded from the foregoing grant of Lien is any right, title and interest of any Loan Party in and to any Excluded Asset.

SECTION 2.17.    No Discharge; Survival of Claims.  Each of the Loan Parties agrees that prior to Payment in Full of the Obligations and termination of the Commitments, (a) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4)

-67-

of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Orders and the Liens granted to the Agents and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

SECTION 2.18.    Payment of Obligations.  Subject to the last paragraph of Section 8.03, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Loan Parties under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

## ARTICLE III

## Taxes, Increased Costs Protection and Illegality

SECTION 3.01.    Taxes.

(a)    Except as required by law, any and all payments by any Loan Party to or for the account of any Agent or any Lender (which term shall, for the avoidance of doubt, include, for the purposes of Section 3.01, the L/C Issuer) under any Loan Document shall be made free and clear of, and without deduction for, any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings (including backup withholdings) or similar charges, and all liabilities (including additions to tax, penalties and interest) with respect thereto, imposed by any Governmental Authority ("**Taxes**").  If a Loan Party or the Administrative Agent is required by law (as determined in the good faith discretion of any applicable withholding agent) to deduct any Indemnified Taxes (as defined below) or Other Taxes (as defined below but only to the extent not otherwise described in Indemnified Taxes) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable by the Loan Party shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01(a)), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Party or the Administrative Agent shall make such deductions, (iii) the Loan Party shall pay the full amount deducted to the relevant taxing authority, and (iv) as soon as reasonably practicable after the date of such payment, the Loan Party shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt issued by the relevant taxing authority evidencing the payment, or other evidence of payment reasonably satisfactory to the Administrative Agent.  If the Loan Party fails to pay any Indemnified Taxes or other Taxes when due to the appropriate taxing authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence that has been made available to the Loan Party, the Loan Parties shall jointly and severally indemnify such Agent and such Lender for any incremental Taxes or Other Taxes that may become payable by such Agent or such Lender arising out of such failure (without duplication of any indemnity obligation pursuant to Section 3.01(d)).  "**Indemnified Taxes**" refers to any Taxes arising from any payment made under any Loan Document excluding, in the case of each Agent and each Lender, (i) Taxes imposed on or measured by such Lender or such Agent's net income, franchise Taxes and branch profits Taxes by a jurisdiction as a result of any connection between such Agent or Lender and such jurisdiction other than the

-68-

connection arising from executing, entering into, performing or enforcing any Loan Document or any of the Transactions contemplated by any Loan Document, (ii) any U.S. federal withholding Taxes imposed on amounts payable to or for the account of any Lender pursuant to a law in effect on the date on which such Lender becomes a party hereto (or designates a new lending office), except (x) to the extent that such Lender (or its assignor, if any) was entitled, immediately before such designation of a new lending office (or assignment), to receive additional amounts or indemnity payments from any Loan Party with respect to such withholding Tax pursuant to Section 3.01 or (y) if such Lender is an assignee pursuant to a request by the Borrower under Section 3.01(f) or 3.07, (iii) any Taxes imposed as a result of the failure of any Agent or Lender to comply with the provisions of Section 3.01(b) or Section 3.01(g), and (iv) any United States federal withholding Taxes under Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor provision that is substantially comparable and not materially more onerous to comply with), and any current or future regulations promulgated thereunder and any agreement entered into pursuant to Section 1471(b)(1) and any interpretation or other guidance issued by the IRS or the Treasury Department in connection therewith and any intergovernmental agreement implementing the foregoing and any laws or regulations implementing any such intergovernmental agreement ("**FATCA**").

(b)    (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in (ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    Any Lender that is a "United States person" (within the meaning of Section 7701(a)(30) of the Code) (each a "**U.S. Lender**") shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax.

(B)    Any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each a "**Foreign Lender**") shall, to the extent it is

-69-

legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)  in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of Internal Revenue Service Form W-8BEN-E (or Form W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, Internal Revenue Service Form W-8BEN-E (or Form W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)  executed copies of Internal Revenue Service Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of <u>Exhibit H-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (y) executed copies of Internal Revenue Service Form W-8BEN-E (or Form W-8BEN, as applicable); or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of Internal Revenue Service Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or Form W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit H-2</u> or <u>Exhibit H-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit H-4</u> on behalf of each such direct and indirect partner;

(C)      Each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient), on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a

-70-

reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(c)    Each Loan Party agrees to pay any and all present or future stamp, court, documentary, excise, property, intangible, filing, recording or similar Taxes, charges or levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, including additions to tax, penalties and interest related thereto except any Taxes that are Other Connection Taxes imposed on or with respect to an assignment (other than an assignment made pursuant to Section 3.01(f) or Section 3.07) (all such Taxes described in this Section 3.01(c) being hereinafter referred to as "**Other Taxes**").

(d)    The Loan Parties shall jointly and severally indemnify each Lender or Agent for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Lender or Agent or required to be withheld or deducted from a payment to such Lender or Agent and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or Agent (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or Agent, shall be conclusive absent manifest error.  If any Indemnified Taxes or Other Taxes are directly asserted against any Agent or Lender, such Agent or Lender may pay to the relevant Governmental Authority such Indemnified Taxes or Other Taxes, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted, and the Borrower will promptly pay such additional amounts so that each of such Agent

-71-

and such Lender receives an amount equal to the sum it would have received had no such Indemnified Taxes or Other Taxes been asserted. Payments under this Section 3.01(d) shall be made within ten (10) days after the date Borrower receives demand for payment from such Agent or Lender. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Administrative Agent (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender or any other Agent, shall be conclusive absent manifest error.

(e)     If any Lender or Agent determines, in its sole discretion exercised in good faith, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall remit such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund) to the Borrower, net of all reasonable out of pocket expenses of the Lender or Agent, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund to such party in the event such party is required to repay such refund to the Governmental Authority. Nothing herein contained shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any tax refund or make available its tax returns (or any other information it deems confidential) or require any Lender to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remission or repayments to which it may be entitled. In no event will a Lender or the Administrative Agent be required to pay any amount under this Section 3.01(e) the payment of which would place the Lender or the Administrative Agent in a less favorable net after-Tax position than such Person would have been in if the Tax giving rise to the refund had never been imposed and additional amounts or indemnity payments under Section 3.01 had never been paid.

(f)     Each Lender agrees that, if pursuant to the operation of Section 3.01(a) or (d) the Borrower is required to pay and Indemnified Taxes or Other Taxes or additional amounts or indemnity payments with respect to such Lender it will, if requested by the Borrower, such Lender will use commercially reasonable efforts (subject to legal and regulatory restrictions) to designate another Lending Office for any applicable Loan or Letter of Credit or assign its rights and obligations hereunder to another of its offices, branches or affiliates; *provided* that the Borrower agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and such efforts are on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.01(f) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (d).

(g)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(e)

-72-

relating to the maintenance of a Participant Register and (iii) any Taxes excluded from the definition of Indemnified Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)      If the Administrative Agent (or any sub-agent thereof, if applicable) is not a "United States person" (as such term is defined in Section 7701(a)(30) of the Code), the Administrative Agent (and any sub-agent thereof, if applicable) shall deliver to the Borrower on or before the date on which it becomes the Administrative Agent (or sub-agent) under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower) (x) an accurate and complete signed copy of IRS Form W-8ECI with respect to any amounts payable to the Administrative Agent (or sub-agent) for its own account and (y) an accurate and complete signed copy of IRS Form W-8IMY with respect to any amounts payable to the Administrative Agent (or sub-agent) for the account of others, certifying that it is a "U.S. branch," that the payments its receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. person with respect to such payments (and the Borrower and the Administrative Agent (and any sub-agent) agree to so treat the Administrative Agent (and any sub-agent thereof, if applicable) as a U.S. person with respect to such payments as contemplated by, and in accordance with, Section 1.1441-1T(b)(2)(iv) of the United States Treasury regulations). If the Administrative Agent (and any sub-agent thereof, if applicable) is a United States person (as such term is defined in Section 7701(a)(30) of the Code), it shall deliver to the Borrower on or before the date on which it becomes the Administrative Agent (or sub-agent) under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower) an accurate and complete Form W-9 setting forth an exemption from backup withholding.

(i)      Each party's obligations under this Section 3.01 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

For the avoidance of doubt for purposes of this Section 3.01, the term "Lender" includes any L/C Issuer and the term "law" includes FATCA.

SECTION 3.01.    **Illegality**.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund any Eurocurrency Rate Loans, or to determine or charge interest rates based upon the applicable Eurocurrency Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue any affected Eurocurrency Rate Loans or to convert Base

-73-

Rate Loans to such Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans and shall upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all then outstanding affected Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

SECTION 3.02.    <u>Inability to Determine Rates</u>.  If the Required Lenders determine that by reason of any changes affecting the applicable interbank eurodollar market adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that deposits are not being offered to banks in the relevant interbank eurodollar market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, in each case due to circumstances arising on or after the Closing Date, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain any affected Eurocurrency Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, in the case of Loans denominated in Dollars, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

SECTION 3.03.    <u>Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans</u>.

(a)    If any Lender reasonably determines that as a result of the introduction of, or any change in, or in the interpretation of, any Law, in each case after the Closing Date, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurocurrency Rate Loans or issuing or participating in Letters of Credit, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes, or any Taxes excluded from the definition of Indemnified Taxes, (ii) reserve requirements contemplated by Section 3.04(c) and (iii) the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement ("**Basel II**") or any other law or regulation which implements Basel II (whether such

implementation, application or compliance is by a government, regulator, the Lenders or any of its Affiliates or the Agents or any of its Affiliates)), then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.  At any time that any Eurocurrency Rate Loan is affected by the circumstances described in this Section 3.04(a), the Borrower may either (i) if the affected Eurocurrency Rate Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower receives any such demand from such Lender or (ii) if the affected Eurocurrency Rate Loan is then outstanding and is denominated in Dollars, upon at least three Business Days' notice to the Administrative Agent, require the affected Lender to convert such Eurocurrency Rate Loan into a Base Rate Loan, if applicable.

(b)     If any Lender determines that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall promptly pay to such Lender such additional amounts as will compensate such Lender for such reduction after receipt of such demand.

(c)     The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice at least fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan or Letter of Credit affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such

-75-

Lender and its Lending Office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(d) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b) or (c).

For the avoidance of doubt and notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203, H.R. 4173), and all requests, rules, guidelines and directives promulgated thereunder, and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been introduced or adopted after the Closing Date, regardless of the date enacted or adopted.

SECTION 3.04.    Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense reasonably incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan on a day prior to the last day of the Interest Period for such Loan; or

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurocurrency Rate Loan on the date or in the amount notified by the Borrower;

including any loss or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Eurocurrency Rate Loan or from fees payable to terminate the deposits from which such funds were obtained.

SECTION 3.05.    Matters Applicable to All Requests for Compensation.

(a)    Any Agent or Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or Lender may use any reasonable averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under Sections 3.01, 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another Eurocurrency Rate Loans, or to convert Base Rate Loans into

-76-

Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)     If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

SECTION 3.06.    <u>Replacement of Lenders under Certain Circumstances</u>.

(a)     If at any time (i) any Lender requests reimbursement for amounts owing pursuant to Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on five (5) Business Days' prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to and in accordance with Section 10.07(b) (with the assignment fee to be paid by the Borrower, in the case of clauses (i) and (iii) only) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided further* that in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents.  No such replacement shall be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(b)     Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent (or a lost or destroyed note indemnity in lieu thereof).  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) the assignee Lender shall purchase, at par, all Loans, accrued interest, accrued fees and other amounts owing to the assigning Lender as of the date of replacement and (C) upon such payment (regardless of whether such replaced Lender has executed an Assignment and Assumption or delivered its Notes to the Borrower or the Administrative Agent), the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

-77-

(c)     [*Reserved*].

(d)     In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 or all the Lenders and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

SECTION 3.07.    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## Conditions Precedent to Credit Extensions

SECTION 4.01.    Conditions to Initial Credit Extension.  The obligations of each Lender and the L/C Issuer to make the initial Credit Extensions hereunder on the Closing Date is subject to satisfaction of the following conditions precedent:

(a)     The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party and by an authorized representative of each other Person party thereto (as applicable), each in form and substance reasonably satisfactory to the Administrative Agent:

(i)     executed counterparts of this Agreement;

(ii)     [reserved];

(iii)     the Security Agreement, duly executed by each Loan Party thereto, together with:

(A)     proper financing statements under the Uniform Commercial Code covering the Collateral described therein with respect to each Loan Party;

(B)     evidence (including a customary perfection certificate) that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent; and

(C)     a cash collateral and blocked account control agreement with respect to the Letter of Credit Account, in form and substance reasonably satisfactory to the L/C Issuer;

-78-

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date and customary good standing certificates for each Loan Party;

(v)    copies of the Organization Documents of each Loan Party (in the case of a certificate or articles of incorporation, formation or organization or equivalent or comparable document, certified as of a recent date by an appropriate government official in the applicable Loan Party's jurisdiction of organization, and in the case of bylaws or an operating agreement or equivalent or comparable document, certified by a secretary, assistant secretary or Responsible Officer of the applicable Loan Party as being true and correct as of the Closing Date) and that each Loan Party is validly existing and in good standing in its jurisdiction of organization;

(vi)    a customary opinion from Kirkland & Ellis LLP, New York counsel to the Loan Parties in form and substance reasonably satisfactory to the Administrative Agent, covering matters customarily covered in opinion of this type;

(vii)    (A) the initial 13-Week Projection (as of a date not more than five (5) days prior to the Closing Date)), (B) the DIP Budget and (C) the audited annual consolidated financial statements of the Borrower for the fiscal year ended September 30, 2016 (to the extent actually available);

(viii)    a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, certifying that each of the conditions set forth in Sections 4.01(g) and 4.02(d) and (e) has been satisfied as of such date; and

(ix)    with respect to all Owned Real Property that constitutes Collateral on which a "Building" or "Mobile Home" (as contemplated by the Flood Laws) is located, a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination (together with, if such Real Property is located in a special flood hazard area, (A) a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto, and (B) evidence of flood insurance in form and substance reasonably satisfactory to the Administrative Agent).

(b)    Prior to or substantially simultaneously with the initial Credit Extension on the Closing Date, all fees, costs and expenses (including, without limitation, invoiced legal fees and expenses), in the case of costs and expenses and legal fees (but not other fees) to the extent invoiced at least two Business Days prior to the Closing Date required to be paid to the Administrative Agent, the Arrangers and the Lenders, if any, on or before the Closing Date shall have been paid in full in cash.

#89281377v6

(c)      The Petition Date shall have occurred.

(d)      The Interim Order Entry Date shall have occurred not later than seven (7) Business Days following the Petition Date, and the Interim Order shall not have been vacated, reversed, modified, amended or stayed.

(e)      All First Day Orders (which, for the avoidance of doubt, shall include a "cash management order") shall have been entered by the Bankruptcy Court and all such entered First Day Orders shall be reasonably satisfactory in form and substance to the Administrative Agent, it being understood that drafts approved by counsel to the Administrative Agent, on or prior to the Petition Date are reasonably satisfactory.

(f)      No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(g)      Since September 30, 2015, there shall have been no Material Adverse Effect.

(h)      All necessary governmental and third party consents and approvals necessary in connection with the Facilities and the transactions contemplated hereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Administrative Agent), after giving effect to the Interim Order and any other order of the Bankruptcy Court, and shall remain in effect; and, after giving effect to the Interim Order and any other order of the Bankruptcy Court entered on or prior to the Closing Date, no law or regulation shall be applicable that restrains, prevents or imposes materially adverse conditions upon the Facilities or the transactions contemplated hereby.

(i)      The amount of the Loans made on the Closing Date shall not exceed the amount authorized by the Interim Order.

(j)      The Administrative Agent and each Lender that has requested the same shall have received on or prior to the Closing Date all documentation and other information reasonably requested in writing by them at least ten (10) days prior to the Closing Date in order to allow the Arrangers and the Lenders to comply with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(k)      the Lenders shall have valid and perfected Liens on all Collateral, to the extent contemplated hereby, and pursuant to the other Loan Documents, including the Interim Order;

(l)      the Refinancing shall have occurred substantially simultaneously with the initial Borrowing hereunder; and

(m)      the Letter of Credit Account shall have been established and shall have been funded in a sufficient amount to Cash Collateralize all Existing Letters of Credit in an amount equal to the L/C Collateralization Amount.

-80-

SECTION 4.02.    <u>Conditions to All Credit Extensions</u>.  On the date of (x) each Borrowing and (y) each issuance, amendment, extension or renewal of a Letter of Credit:

(a)    The Closing Date shall have occurred.

(b)    The Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended without the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); provided that at the time of the second Borrowing under the Term Facility, the Administrative Agent shall have received a final copy of an order of the Bankruptcy Court in substantially the form of the "form of" Interim Order filed with the DIP Motion on the Petition Date (with only such modifications thereto as are satisfactory in form and substance to the Borrower and the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); provided that any such order that does not approve the Term Facility in the amount of $725,000,000 shall not be acceptable to the Administrative Agent) and authorizing the Term Facility on a final basis (the "**Final Order**"), which, in any event, shall have been entered by the Bankruptcy Court no later than the date that is sixty (60) days following the Interim Order Entry Date and at the time of the second Borrowing under the Term Facility, the Final Order shall be in full force and effect, and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended without the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); and if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the issuance of any Letter of Credit nor the performance by any Loan Party of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  Solely with respect to the issuance, amendment, extension or renewal of a Letter of Credit, at the time of such issuance, amendment, extension or renewal, the L/C Obligations then outstanding shall not exceed the amount of the L/C Facility approved by the Interim Order or the Final Order, as applicable.

(c)    With respect to the second Borrowing under the Term Facility, all material First Day Orders (including, for the avoidance of doubt, a "cash management order", unless such deadline shall have been waived by the Administrative Agent) shall have been entered by the Bankruptcy Court on a final basis and shall be reasonably satisfactory in form and substance to the Administrative Agent.  The Administrative Agent acknowledges that, with respect to such final First Day Orders, the form of such orders substantially in the forms filed on the Petition Date are acceptable.

(d)    The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further* that, any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

-81-

(e)     No Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(f)     The Administrative Agent and, with respect to any Letter of Credit other than in connection with the initial deemed issuance hereunder of any Existing Letter of Credit, the L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof.

(g)     The making of such Loan (or the issuance of such Letter of Credit) shall not violate any requirement of material Law applicable to the Loan Parties, after giving effect to the Orders and any other order of the Bankruptcy Court entered on or prior to the date of the applicable Credit Extension, and shall not be enjoined, temporarily, preliminarily or permanently.

(h)     The Administrative Agent and the Lenders shall have received the fees in the amounts previously agreed in writing by the Administrative Agent or otherwise pursuant to the Loan Documents, if any, on or prior to such date and all expenses (including the reasonable fees, disbursements and other charges of counsel) payable by the Loan Parties for which, with respect to expenses, invoices have been presented at least one Business Day prior to such date shall have been paid; which amounts may be paid from the proceeds of the Term Loans funded on the date of such Borrowing unless required to be paid by the Borrower prior to such date.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by a Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(d) and (e) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V

## **Representations and Warranties**

Each Loan Party represents and warrants to the Administrative Agent and the Lenders, on behalf of itself and its Subsidiaries, at the times expressly set forth in Section 4.02, that:

SECTION 5.01.    Existence, Qualification and Power; Compliance with Laws. Each of the Borrower and the Material Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing (limited to the Loan Parties and to the extent such concept exists in such jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has all corporate or other organizational power and authority to (i) own its assets and carry on its business and (ii) subject to the entry of the Orders and subject to the terms thereof, execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept exists in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all applicable Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations,

-82-

consents and approvals to operate its business as currently conducted; except in each case referred to in clause (b)(i), (c), (d) or (e), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.02.    Authorization; No Contravention.  Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party have been duly authorized by all necessary corporate or other organizational action.  Neither the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party nor the consummation of the transactions contemplated by the Loan Documents will (a) contravene the terms of any of such Person's Organization Documents, (b) except to the extent arising under the documents governing the Pre-Petition Debt, result in any breach or contravention of, or the creation of any Lien upon any of the property or assets of such Person or any of the Subsidiaries under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any applicable Law; except with respect to any breach, contravention or violation (but not creation of Liens) referred to in clauses (b) and (c), to the extent that such breach or contravention would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.03.    Governmental Authorization.  Subject to the entry of the Orders and subject to the terms thereof, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by any Loan Party of this Agreement or any other Loan Document, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings that have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

SECTION 5.04.    Binding Effect.  Subject to the entry of the Orders and subject to the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the Orders and subject to the terms thereof, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws (other than in the case of each Loan Party that is a Debtor) and by general principles of equity and principles of good faith and fair dealing.

SECTION 5.05.    Financial Statements; No Material Adverse Effect.

(a)    The Annual Financial Statements and the Quarterly Financial Statements fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the dates thereof and their results of operations for the periods covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, (A) except

-83-

as otherwise expressly noted therein, and (B) subject, in the case of the Quarterly Financial Statements, to changes resulting from normal year end adjustments and the absence of footnotes.

(b)    Since September 30, 2015, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)    The DIP Budget and each 13-Week Projection has been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time made, it being understood that projections as to future events are not to be viewed as facts  and are subject to material contingencies and assumptions,  many of which are beyond the control of the Loan Parties, and actual results may vary materially from such forecasts.

SECTION 5.06.    <u>Litigation</u>.  Except for the Cases and matters set forth on <u>Schedule 5.06</u>, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, overtly threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against Holdings, the Borrower or any of the Subsidiaries that would reasonably be expected to have a Material Adverse Effect.

SECTION 5.07.    <u>Labor Matters</u>.  Except as would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any of the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made based on hours worked to employees of each of the Borrower or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters; and (c) all payments due from any of the Borrower or its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

SECTION 5.08.    <u>Ownership of Property; Liens</u>.  Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title or other interest would not reasonably be expected to have a Material Adverse Effect. Schedule 5.08 lists the street address for each Owned Real Property constituting Material Real Property by any Loan Party on the Closing Date.

SECTION 5.09.    <u>Environmental Matters</u>.

(a)    Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, (i) each Loan Party and each of its Subsidiaries is in compliance with all applicable Environmental Laws (including having obtained all Environmental Permits) and (ii) none of the Loan Parties or any of their respective Subsidiaries is subject to any pending, or to the knowledge of the Borrower, threatened Environmental Claim or any other Environmental Liability.

-84-

(b)     None of the Loan Parties or any of their respective Subsidiaries has treated, stored, transported or disposed of Hazardous Materials at, or arranged for the disposal or treatment or for transport for disposal or treatment, of Hazardous Materials from, any currently or formerly owned or operated real estate or facility in a manner that would reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(c)     Except as would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect, (i) none of the properties currently or, formerly owned, leased or operated by the Loan Parties or their respective Subsidiaries is listed or formally proposed for listing on the "National Priorities List" or any analogous foreign, state or local list; (ii) there are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on at or under any property currently owned or operated by Holdings, the Borrower or any of its Subsidiaries; (iii) there is no asbestos or asbestos-containing material at or on any facility, equipment or property currently owned or operated by Holdings, the Borrower or any of its Subsidiaries; and (iv) there has been no Release of Hazardous Materials by any Person on any property currently or formerly owned or operated by the Loan Parties or their respective Subsidiaries, and there has been no Release of Hazardous Materials by the Loan Parties or any of their Subsidiaries at any other location.

(d)     The properties currently owned, leased or operated by the Loan Parties and their Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute, or constituted a violation of, (ii) require response or other corrective action under, or (iii) could give rise to Environmental Liability, which violations, actions and liability, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(e)     The Loan Parties and their Subsidiaries are not conducting or financing, either individually or together with other potentially responsible parties, any investigation or assessment or response or other corrective action relating to any actual or threatened Release of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except for such investigation or assessment or response or action that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(f)     Except as would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, neither the Loan Parties nor any of their Subsidiaries has contractually assumed any liability or obligation under any Environmental Law or is subject to any order, decree or judgment which imposes any obligation under any Environmental Law.

SECTION 5.10.    Taxes.  Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, Holdings, the Borrower and its Subsidiaries have timely filed all U.S. federal, state, local, non-U.S. and other Tax returns and reports required to be filed and all such returns and reports are true and accurate in all material respects, and have timely paid all U.S. federal, state, local, non-U.S. and other Taxes, assessments, fees and other governmental charges (including satisfying its withholding Tax obligations) levied or imposed on their properties, income or assets or otherwise due and

-85-

payable**,** except those which are being contested in good faith by appropriate actions diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

SECTION 5.11.    ERISA Compliance.

(a)    Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and other than with respect to a Permitted ERISA Event, each Plan is in compliance with the applicable provisions of ERISA and the Code.

(b)    Other than with respect to a Permitted ERISA Event, no ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events that, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Except where noncompliance or the incurrence of an obligation would not reasonably be expected to result in a Material Adverse Effect, (i) each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable Laws, statutes, rules, regulations and orders, and (ii) neither Holdings nor any Subsidiary has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.  Except as would not reasonably be expected to result in a Material Adverse Effect, (i) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is required to be funded, determined as of the end of the most recently ended fiscal year of a Loan Party or Subsidiary (based on the actuarial assumptions used for purposes of the applicable jurisdiction's financial reporting requirements), did not exceed the current value of the assets of such Foreign Plan, and (ii) for each Foreign Plan which is not required to be funded, the obligations of such Foreign Plan are properly accrued.

SECTION 5.12.    Subsidiaries.  As of the Closing Date, neither Holdings nor any other Loan Party has any Subsidiaries other than those specifically disclosed on Schedule 5.12, and all of the outstanding Equity Interests in Holdings, the Borrower and the Material Subsidiaries have been validly issued and are fully paid and nonassessable, and all Equity Interests owned by Holdings or any other Loan Party are owned free and clear of all security interests of any Person except (i) those created under the Collateral Documents, (ii) those granted to secure the Existing Secured Debt, (iii) those created pursuant to the Interim Order and (iv) any nonconsensual Lien that is permitted under Section 7.01.  As of the Closing Date, Schedule 5.12 (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of Holdings, the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary that is a Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement.

SECTION 5.13.    Margin Regulations; Investment Company Act.

(a)    No Loan Party is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or

-86-

carrying margin stock, and no proceeds of any Borrowings or drawings under any Letter of Credit will be used for any purpose that violates Regulation U.

      (b)     Neither the Borrower nor any of the Subsidiaries of the Borrower is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

      SECTION 5.14.   Disclosure.  None of the factual information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such factual information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading; it being understood that for purposes of this Section 5.14, such factual information and data shall not include projections and pro forma financial information or information of a general economic or general industry nature.

      SECTION 5.15.   Intellectual Property; Licenses, Etc.  The Borrower and its Subsidiaries have good and marketable title to, or a valid license or right to use, all patents, patent rights, trademarks, servicemarks, trade names, copyrights, domain names, technology, software, know-how, database rights, rights of privacy and publicity, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except to the extent that the failure to have any such rights, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  The operation of the respective businesses of the Borrower or any of its Subsidiaries as currently conducted does not infringe upon, misuse, misappropriate or otherwise violate any rights held by any Person, except for such infringements, misuses, misappropriations or violations that, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any IP Rights is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

      SECTION 5.16.   Economic Sanctions and Anti-Corruption.  None of the Borrower or any of its Subsidiaries, nor any director or officer thereof, nor, to the knowledge the Borrower, any employee or agent of the Borrower or any of its Subsidiaries is, or is owned or controlled by Persons that are:  (i) the subject of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control or the U.S. State Department, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions (currently, Crimea, Cuba, Iran, North Korea, Sudan and Syria).  The Borrower and its Subsidiaries and their respective directors, officers and employees are in compliance in all material respects with all applicable Sanctions and with the Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), and all other applicable anti-corruption laws.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance

-87-

by the Borrower, its Subsidiaries and their respective directors, officers and employees with the FCPA and other applicable anti-corruption laws and applicable Sanctions.

SECTION 5.17.    Use of Proceeds.  The Borrower will use the proceeds from the Loans and the issuance of Letters of Credit for working capital and general corporate purposes of the Loan Parties and their Subsidiaries, including: (i) to consummate the Refinancing, (ii) to Cash Collateralize the Letters of Credit, (iii) to fund the Cash Pool Requirements Account, (iv) to pay obligations arising from or related to the Carve-Out, (v) to pay professional fees in connection with the Cases, (vi) to make adequate protection payments and (vii) to pay fees and expenses incurred in connection with the transactions contemplated by this Agreement; *provided* that, for the avoidance of doubt, it is acknowledged and agreed that any DIP Budget or 13-Week Projection provided by Borrower is for informational purposes only and not a restriction or limitation on Borrower's use of proceeds or the Carve-Out in any respect whatsoever.

SECTION 5.18.    Orders.  The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

SECTION 5.19.    Status of Obligations; Perfection and Priority of Security Interests.  Subject to entry of the Interim Order (and the Final Order, as applicable) the Obligations shall have the status and priority set forth in Section 2.16 and, for the avoidance of doubt, are subject to the Carve-Out in all respects (except with respect to the Letter of Credit Account).

## ARTICLE VI

## Affirmative Covenants

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than Cash Management Obligations, Hedging Obligations or Cash Pooling Obligations) hereunder that is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized (including with funds held in the Letter of Credit Account in accordance with the terms hereof) or, if satisfactory to the L/C Issuer in its sole discretion, a backstop letter of credit is in place), the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Subsidiaries to:

SECTION 6.01.    Financial Statements.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    as soon as available, but in any event (i) with respect to the fiscal year of the Borrower ended September 30, 2016, on or prior to January 31, 2017 (subject to a 30 day extension in the discretion of the Administrative Agent, such consent not to be unreasonably withheld) and (ii) with respect to the fiscal year of the Borrower ending September 30, 2017, on or prior to December 31, 2017, in each case (A) a consolidated balance sheet of the Borrower

#89281377v6

and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of PricewaterhouseCoopers LLP or any other independent registered public accounting firm of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit and (B) a narrative report and management's discussion and analysis, in a form reasonably satisfactory to the Administrative Agent, of the financial condition and results of operations of the Borrower for such fiscal year, as compared to amounts for the previous fiscal year and budgeted amounts;

(b)    as soon as available, but in any event within sixty (60) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended December 31, 2016), (i) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (A) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (B) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to changes resulting from normal year-end adjustments and the absence of footnotes and (ii) a narrative report and management's discussion and analysis, in a form reasonably satisfactory to the Administrative Agent, of the financial condition and results of operations of the Borrower for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and budgeted amounts;

(c)    as soon as available, but in any event within thirty (30) days after the end of each fiscal month (or, in the case of any month that is the last month of a fiscal quarter of the Borrower within forty-five (45) days after the end of such month), commencing with the month ending January 31, 2017, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal month, and the related (i) consolidated statements of income or operations, for such fiscal month and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, all in reasonable detail; and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, changes in stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to changes resulting from normal quarter and year-end accruals and other audit adjustments and the absence of footnotes; provided that to the extent any of the financial information required to be delivered by this Section 6.01(c) is contained in a "Monthly Operating Report" filed with the Bankruptcy Court for the applicable month on or prior to the date specified for compliance in this Section 6.01(c), then the requirements of this Section 6.01(c) shall be deemed satisfied by the timely filing of such "Monthly Operating Report";

#89281377v6

(d)        copies of all "Monthly Operating Reports" filed with the Bankruptcy Court for the applicable month within two (2) Business Days of such filing;

(e)        on the 20th day of every calendar month (or more frequently to the extent available), commencing on February 20, 2017 an updated 13-Week Projection;

(f)        on the Friday following each two-week period (with the first such delivery on February 3, 2017 with respect to the two-week period ending on January 28, 2017 and with the second such delivery on February 17, 2017 with respect to the two-week period ending on February 11, 2017), a report, in each case, in form reasonably satisfactory to the Administrative Agent (it being understood that any form previously agreed with the Administrative Agent is satisfactory), for the immediately preceding two-week period, that (i) sets forth the variances for the Loan Parties, excluding any foreign branch offices (on a line item basis (but grouping payroll and severance into one line item), as a percentage and as a dollar amount) between the actual results and the corresponding projected amounts reflected in the 13-Week Projection then in effect for the corresponding period, (ii) sets forth the variance in cash for the foreign branch offices of the Loan Parties and the Foreign Subsidiaries, as applicable, and (iii) provides an explanation in reasonable detail of the reason for any such variance; and

(g)        concurrently with the delivery of monthly financial statements required to be delivered under Section 6.01(c), a written report, in form and substance reasonably acceptable to the Administrative Agent, containing the gross accounts receivable and inventory of the Loan Parties (as of the last day of the applicable month).

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (c) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by (A) furnishing the applicable financial statements of any direct or indirect parent of the Borrower that holds all of the Equity Interests of the Borrower or (B) filing the Borrower's or such entity's Form 10-K or 10-Q (with respect to Section 6.01(a) and (b), as applicable), as applicable, with the SEC; provided that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to the Borrower (or such parent), on the one hand, and the information relating to the Borrower and the Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of PricewaterhouseCoopers LLP or any other independent registered public accounting firm of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any qualification or exception as to the scope of such audit.

SECTION 6.02.    Certificates; Other Information.  Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)        no later than five (5) Business Days after the date that the financial statements referred to in Section 6.01(a), (b) and (c) are required to be delivered, a duly completed Calculation Certificate signed by a Responsible Officer of the Borrower, which

-90-

Calculation Certificate shall include calculations in reasonable detail for the purposes of determining compliance with the Financial Covenants;

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings or the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant to any other clause of this Section 6.02;

(c)    promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02;

(d)    together with the delivery of the financial statements pursuant to Section 6.01(a) and 6.01(b), (i) a report setting forth the information required by Section 3.03(b) of the Security Agreement or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such financial statements requiring a mandatory prepayment under Section 2.05(b) and (iii) a list of each Subsidiary of the Borrower as of the date of delivery of such financial statements or a confirmation that there is no change in such information since the later of the Closing Date and the date of the last such list;

(e)    promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Material Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent may from time to time reasonably request;

(f)    upon request by the Administrative Agent, copies of: (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Holdings, the Borrower, any Subsidiary or any of their ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (ii) the most recent actuarial valuation report for each Pension Plan; and (iii) such other documents or governmental reports or filings relating to any Plan as the Administrative Agent shall reasonably request.  Promptly following any reasonable request therefor by the Administrative Agent, copies of (i) any documents described in Section 101(k) of ERISA that Holdings, the Borrower, any Subsidiary or any of their ERISA Affiliates obtained during the last twelve months with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that Holdings, the Borrower, any Subsidiary or any of their ERISA Affiliates obtained during the last twelve months with respect to any Multiemployer Plan; provided that if such documents or notices have not been obtained or requested from the administrator or sponsor of the applicable Multiemployer Plan upon reasonable request by the Administrative Agent, the applicable Person shall promptly make a request for such documents

-91-

or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(g)     (i) as soon as reasonably practicable in advance of filing with the Bankruptcy Court or delivering to the Creditors' Committee or the U.S. Trustee, as the case may be, the Final Order and all other proposed orders and pleadings related to the Loans and the Loan Documents, any Reorganization Plan and/or any disclosure statement related thereto and (ii) by the earlier of (A) three (3) Business Days prior to being filed (and if impracticable, then as soon as possible and in no event later than promptly after being filed) on behalf of any of the Debtors with the Bankruptcy Court or (B) at the same time as such documents are provided by any of the Debtors to any statutory committee appointed in the Cases or the U.S. Trustee, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or any request for relief under Section 363, 365, 1113 or 1114 of the Bankruptcy Code or Section 9019 of the Federal Rules of Bankruptcy Procedure.

Documents required to be delivered pursuant to Section 6.01 or Sections 6.02(a) or 6.02(c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on DebtDomain or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents or a link thereto and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers will make available to the Lenders Communications by posting such Communications on DebtDomain or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "**Public Lender**"). The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Communications that may be distributed to the Public Lenders and that (w) all such Communications shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arrangers and the Lenders to treat such Communications as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States federal and state securities laws (*provided, however,* that to the extent such Communications constitute Information, they shall be treated as set forth in Section 10.08); (y) all Communications marked

-92-

"PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and the Arrangers shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor." Neither the Administrative Agent nor any of its Affiliates shall be responsible for any statement or other designation by a Loan Party regarding whether a Communication contains or does not contain material non-public information with respect to any of the Loan Parties or their securities nor shall the Administrative Agent or any of its Affiliates incur any liability to any Loan Party, any Lender or any other Person for any action taken by the Administrative Agent or any of its Affiliates based upon such statement or designation, including any action as a result of which Restricting Information is provided to a Lender that may decide not to take access to Restricting Information.  Nothing in this Section 6.02 shall modify or limit a Lender's obligations under Section 10.08 with regard to Communications and the maintenance of the confidentiality of or other treatment of Information.  Further, notwithstanding the foregoing, the Administrative Agent may post any "Notice of Default" or "Notice of Event of Default" to any "public" of the DebtDomain (or other) electronic systems, so long as such notice remains subject to the confidentiality provisions of this Agreement.

Although the Platform and its primary web portal are secured with generally-applicable security procedures and policies implemented or modified by the Administrative Agent from time to time (including, as of the Closing Date, a dual firewall and a User ID/Password Authorization System) and the Platform is secured through a single-user-per-deal authorization method whereby each user may access the Platform only on a deal-by-deal basis, each of the Lenders and each Loan Party acknowledges and agrees that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.  In consideration for the convenience and other benefits afforded by such distribution and for the other consideration provided hereunder, the receipt and sufficiency of which is hereby acknowledged, each of the Lenders and each Loan Party hereby approves distribution of the Approved Electronic Communications through the Platform and understands and assumes the risks of such distribution.

THE PLATFORM AND THE APPROVED ELECTRONIC COMMUNICATIONS ARE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF THE ADMINISTRATIVE AGENT NOR ANY OTHER MEMBER OF THE AGENT'S GROUP WARRANT THE ACCURACY, ADEQUACY OR COMPLETENESS OF THE APPROVED ELECTRONIC COMMUNICATIONS OR THE PLATFORM AND EACH EXPRESSLY DISCLAIMS ANY LIABILITY FOR ERRORS OR OMISSIONS IN THE APPROVED ELECTRONIC COMMUNICATIONS OR THE PLATFORM.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENTS IN CONNECTION WITH THE APPROVED ELECTRONIC COMMUNICATIONS OR THE PLATFORM.

Each of the Lenders and each Loan Party agree that the Administrative Agent may, but (except as may be required by applicable Law) shall not be obligated to, store the

#89281377v6

Approved Electronic Communications on the Platform in accordance with the Administrative Agent's generally-applicable document retention procedures and policies.

SECTION 6.03.    Notices.  Promptly after a Responsible Officer obtains actual knowledge thereof, notify the Administrative Agent, for prompt further distribution to each Lender (which shall be satisfied by the Administrative Agent by posting to "private" Lenders only) of:

(a)    the occurrence of any Default;

(b)    any event which could reasonably be expected to have a Material Adverse Effect; and

(c)    (i) any dispute, litigation, investigation or proceeding between any Loan Party and any Governmental Authority, (ii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights, the occurrence of any noncompliance by any Loan Party or any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, (iii) the occurrence of any ERISA Event or any pending or threatened job action by a labor union or claim of violation of a labor agreement that has resulted or would reasonably be expected to result in a Material Adverse Effect or (iv) the occurrence of an event described in Section 5.11(c) with respect to a Foreign Plan, that, in any such case, has resulted or would reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03 and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

SECTION 6.04.    Payment of Obligations.  Timely pay, discharge or otherwise satisfy, as the same shall become due and payable, all of its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property (in the case of any such Person that is a Debtor, solely to the extent arising after the Petition Date), except, in each case, to the extent (i) any such Tax is being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP or (ii) the failure to pay or discharge the same would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

SECTION 6.05.    Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to preserve, renew and maintain in full force and effect all corporate rights, privileges (including its good standing), IP Rights, and licenses that are, in the Borrower's reasonable business judgment, necessary in the normal conduct of its business, except, in the case of (a) (other than in the case of the Borrower except to the extent expressly permitted by Section 7.04) or (b), to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect or pursuant to a transaction permitted by Article VII.

-94-

SECTION 6.06.    Maintenance of Properties.  Except if the failure to do so would not reasonably be expected to have a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted and consistent with past practice.

SECTION 6.07.    Maintenance of Insurance.

(a)    Maintain with insurance companies that the Borrower believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons.

(b)    Obtain flood insurance in such total amounts as the Administrative Agent may from time to time reasonably require, if at any time the area in which any improvements located on any Owned Real Property that constitutes Material Real Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the Flood Laws.

(c)    Within sixty (60) days after the Closing Date (or such later date as the Administrative Agent may reasonably agree), all such insurance (other than business interruption insurance) as to which the Administrative Agent shall have reasonably requested to be so named, shall name the Administrative Agent as loss payee and/or additional insured, as applicable.

SECTION 6.08.    Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code with respect to any Loan Party that is a Debtor, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees of any Governmental Authority applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

SECTION 6.09.    Books and Records.  Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be.

SECTION 6.10.    Inspection Rights.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom (other than the records of the Board of Directors of such Loan Party or such Subsidiary) and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to customary access agreements), all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often

-95-

as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default; *provided further* that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.  Notwithstanding anything to the contrary in this Section 6.10, none of the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any written confidentiality agreement not entered into in contemplation hereof (provided that a Responsible Officer of the Borrower is made available to discuss such confidential information to the extent permitted) or (iii) is subject to attorney-client or similar privilege or constitutes attorney work product.

SECTION 6.11.    Covenant to Guarantee Obligations and Give Security.  At the Borrower's expense, subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitation in any Collateral Document, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including, upon the formation or acquisition of any new direct or indirect Material Domestic Subsidiary (in each case, other than an Excluded Subsidiary) by any Loan Party or any Domestic Subsidiary (for the avoidance of doubt, other than Sierra) becoming a wholly-owned Material Domestic Subsidiary or any Domestic Subsidiary becoming a Debtor (for the avoidance of doubt, other than Sierra):

(a)    within forty five (45) days after such formation, acquisition or designation or such longer period as the Administrative Agent may agree in its reasonable discretion:

(i)    cause each such Subsidiary to furnish to the Administrative Agent a description of the Owned Real Properties owned by such Subsidiary in detail reasonably satisfactory to the Administrative Agent (it being understood that no Lien shall attach with respect to such Real Property prior to the Administrative Agent's confirmation that applicable "flood" requirements have been satisfied);

(ii)    cause each such Subsidiary to duly execute and deliver to the Administrative Agent Guaranties (by way of executing a Joinder Agreement), Security Agreement Supplements, intellectual property security agreements and other security agreements and documents, as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent (consistent with this Agreement, the Security Agreement, intellectual property security agreements and other Collateral Documents in effect on the Closing Date), in each case granting Liens and Guaranties required by the Collateral and Guarantee Requirement;

-96-

(iii)    cause each such Subsidiary to deliver any and all certificates representing Equity Interests (to the extent certificated) that are required to be pledged pursuant to the Collateral and Guarantee Requirement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Subsidiary and required to be pledged pursuant to the Collateral Documents, indorsed in blank to the Administrative Agent; and

(iv)    take and cause such Subsidiary and each direct or indirect parent of such Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to take whatever action (including the filing of Uniform Commercial Code financing statements and delivery of stock and membership interest certificates to the extent certificated) may be necessary in the reasonable opinion of the Administrative Agent to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid Liens required by the Collateral and Guarantee Requirement; and

(v)    unless otherwise agreed in writing by the Administrative Agent in its sole discretion, cause such Material Domestic Subsidiary to become a Debtor in the Cases, and its obligations and Liens granted hereunder and pursuant to the other Loan Documents to become subject to and governed by the Interim Order and/or Final Order, as applicable;

(b)    within forty-five (45) days after the request therefor by the Administrative Agent (or such longer period as the Administrative Agent may agree in its reasonable discretion), deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request;

(c)    [Reserved];

(d)    promptly after the acquisition of any Owned Real Property constituting Material Real Property by any Loan Party that is not a Debtor or the formation, acquisition or designation a Material Domestic Subsidiary that is not a Debtor owning Owned Real Property constituting Material Real Property, the Borrower shall give notice thereof to the Administrative Agent and promptly thereafter shall provide the Administrative Agent with a Mortgage of such Material Real Property, together with:

(i)    evidence that counterparts of such Mortgage has been duly executed, acknowledged and delivered and is in a form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

-97-

(ii)     a policy or policies of title insurance issued by a nationally recognized title insurance company insuring the Lien of the Mortgage on such Material Real Property as a valid Lien on the property described therein, in form and substance, with endorsements and in amount, reasonably acceptable to the Administrative Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances, subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent may reasonably request;

(iii)     an opinion of local counsel for the relevant Loan Party in states in which such Material Real Property is located, with respect to the enforceability and perfection of such Mortgage and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent;

(iv)     upon the request of the Administrative Agent, a survey with respect to such Material Real Property in form and substance reasonably acceptable to the Administrative Agent and the title insurance company; and

(v)     such other evidence that all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in the Mortgages has been taken.

SECTION 6.12.   <u>Compliance with Environmental Laws</u>.  Except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all reasonable actions to cause any lessees and other Persons operating or occupying its properties or facilities to comply with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations, properties and facilities; and, (c) in each case to the extent required by applicable Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any response or other corrective action necessary to investigate, remove and clean up all Hazardous Materials at, on, under, or emanating from any of its properties and facilities, in accordance with the requirements of all applicable Environmental Laws.

SECTION 6.13.   <u>Further Assurances and Post-Closing Covenants</u>.

(a)     Subject to the provisions of the Collateral and Guarantee Requirement and any applicable limitations in any Collateral Document, promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time

-98-

to time in order to carry out more effectively the purposes of the Collateral Documents; provided, however, that notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, but without limiting the grant of a Lien on and security interest in the Collateral pursuant to the Orders and the Collateral Documents, the Debtors will not be obligated to (i) enter into any mortgage, (ii) authorize any fixture filing, (iii) other than with respect to the Letter of Credit Account or as required by the terms of the Security Agreement, enter into any agreement providing "control" (as defined in Section 9-104, 9-105, 9-106 and 9-107 of the UCC as in effect in any relevant jurisdiction) (it being understood that, to the extent the agent for the Domestic Prepetition ABL Facility (even after the repayment in full and termination of the Domestic Prepetition ABL Facility) or the Pre-Petition Cash Flow Facility has "control" over any Collateral, the Administrative Agent may direct such agent to exercise rights relating to such "control" on the Administrative Agent's behalf, as set forth in the Interim Order or the Final Order, as applicable), (iv) to undertake any registration in respect of assets subject to a certificate of title, (v) to take any perfection steps outside or under the laws of any jurisdiction other than the United States or any state thereof.

(b)        Within 30 days after the Closing Date, deliver the Sierra Intercompany Note to evidence any Indebtedness owed by Sierra from time to time in connection with the Sierra Intercompany Loans and, if not otherwise secured and perfected by the Orders, enter into any security agreements required to provide valid and perfected Liens with respect to the collateral securing the Sierra Intercompany Notes as required under Section 7.16.

(c)        Within (i) 30 days after the Closing Date, enter into one or more Foreign Intercompany Notes/Receivables in favor of Sierra to evidence any Foreign Intercompany Loans made on or prior to such date and (ii) with respect to any Foreign Intercompany Loans made after the date that is 30 days after the Closing Date, enter into one or more Foreign Intercompany Notes/Receivables in favor of Sierra within 5 Business Days after such Foreign Intercompany Loans are made.

SECTION 6.14.    First and Second Day Orders.  Cause all proposed First Day Orders and "second day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Administrative Agent, it being understood and agreed that the forms of orders approved by the Administrative Agent prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are reasonably acceptable.

SECTION 6.15.    Ratings .  Use commercially reasonable efforts to obtain, prior to the Final Order Entry Date, public ratings (but not any minimum rating) of the Term Loan Facility from each of Moody's and S&P.

SECTION 6.16.    Compliance with Anti-Corruption Laws.  The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with the FCPA and other applicable anti-corruption laws and applicable Sanctions.

SECTION 6.17.    Schedules.  Deliver to the Administrative Agent, not later than seventy-five (75) days following the Closing Date (or such later date as the Administrative Agent

shall agree in its reasonable discretion), schedules setting forth, to the knowledge of the Borrower after due inquiry, as of the Petition Date, (i) all Liens on assets of the Borrower and its Subsidiaries (other than Liens permitted under Section 7.01 (other than Section 7.01(b))), (ii) all Investments held by the Borrower and its Subsidiaries (other than Investments permitted under Section 7.02 (other than Section 7.02(g))) and (iii) all Indebtedness of the Borrower and its Subsidiaries (other than Indebtedness permitted under Section 7.03 (other than Section 7.03(b))).

## ARTICLE VII

## **Negative Covenants**

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation (other than Cash Management Obligations, Hedging Obligations or Cash Pooling Obligations) hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding (unless the Outstanding Amount of the L/C Obligations related thereto has been Cash Collateralized in accordance with the terms hereof (including or with funds held in the Letter of Credit Account in accordance with the terms hereof)), Holdings (solely with respect to Section 7.15) and the Borrower shall not, nor shall the Borrower permit any Subsidiary to, directly or indirectly:

SECTION 7.01.   Liens.   Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)     Liens created pursuant to any Loan Documents, including the Orders (which, for the avoidance of the doubt, include Liens granted as adequate protection on account of the Primed Liens);

(b)     Liens existing on the Petition Date;

(c)     Liens for taxes, assessments or governmental charges that are not overdue for a period of more than thirty (30) days or that are being contested in good faith and by appropriate actions for which appropriate reserves have been established in accordance with GAAP;

(d)     statutory or common law Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, so long as, in each case, such Liens arise in the ordinary course of business;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit (other than Letters of Credit) or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

-100-

(f)        deposits of cash and Cash Equivalents to (i) secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business, or (ii) to provide "adequate assurances of payment" as that term is used in Section 366 of the Bankruptcy Code;

(g)        easements, rights-of-way, restrictions (including zoning restrictions), encroachments, protrusions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries;

(h)        Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 8.01(g);

(i)        (i) Liens securing Indebtedness permitted under Section 7.03(e); *provided* that (A) such Liens attach concurrently with or within two hundred and seventy (270) days after completion of the acquisition, construction, repair, replacement or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds and the products thereof and customary security deposits and (C) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets, replacements and proceeds and products thereof and customary security deposits) other than the assets subject to such Capitalized Leases; *provided* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender and (ii) Liens on assets of Subsidiaries that are Non-Loan Parties securing Indebtedness of such Subsidiaries permitted pursuant to Section 7.03(n);

(j)        (A) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness and (B) leases, licenses, subleases or sublicenses constituting a Disposition permitted under Section 7.05;

(k)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)        Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of set off) and that are within the general parameters customary in the banking industry;

(m)        Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02(o) to be applied against the

-101-

purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05;

(n)     [Reserved];

(o)     Liens in favor of a Loan Party securing Indebtedness permitted under Section 7.03(d);

(p)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the Closing Date (other than Liens on the Equity Interests of any Person that becomes a Subsidiary); *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (iii) the Indebtedness secured thereby is permitted under Section 7.03(e);

(q)     any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(r)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Subsidiaries in the ordinary course of business;

(s)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02 and reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts maintained in the ordinary course of business and not for speculative purposes;

(t)     Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of the Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Subsidiaries (including pursuant to the Cash Pooling Agreement) or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of the Subsidiaries in the ordinary course of business;

(u)     [Reserved];

(v)     [Reserved];

#89281377v6

(w)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(x)    Liens arising from precautionary Uniform Commercial Code financing statement or similar filings;

(y)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(z)    [Reserved];

(aa)    any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(bb)    Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(cc)    the modification, replacement, renewal or extension of any Lien permitted by clauses (b), (i) or (p) of this Section 7.01; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 7.03 and otherwise permitted to be secured under this Section 7.01, and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 7.03; and

(dd)    other Liens securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed $20,000,000.

SECTION 7.02.    Investments.    Make any Investments, except:

(a)    Investments by the Borrower or any of its Subsidiaries in assets that were Cash Equivalents when such Investment was made;

(b)    loans or advances to officers, directors and employees of Holdings, the Borrower or any Subsidiary in an aggregate amount not to exceed $10,000,000 at any time outstanding, for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes;

(c)    asset purchases (including purchases of inventory, supplies and materials) and the granting of non-exclusive licenses of IP Rights pursuant to joint marketing arrangements, original equipment manufacturer arrangements or similar arrangements with other Persons, in each case in the ordinary course of business;

-103-

(d)       Investments (i) by the Borrower or any Subsidiary that is a Loan Party in the Borrower or any Subsidiary that is a Loan Party, (ii) by any Non-Loan Party in any other Non-Loan Party that is a Subsidiary, (iii) by any Non-Loan Party in the Borrower or any Subsidiary that is a Loan Party and (iv) by any Loan Party in Sierra (the proceeds of which shall be used concurrently to make Investments in other Non-Loan Parties); *provided* that the aggregate amount of Investments made pursuant to this clause (iv) shall not at any time exceed $30,000,000;

(e)       Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors in the ordinary course of business;

(f)       Investments consisting of Liens, Indebtedness, fundamental changes, Dispositions, Restricted Payments and prepayments, redemptions, purchases, defeasances or other satisfactions of Indebtedness permitted under Sections 7.01, 7.03 (other than Sections 7.03(d)), 7.04, 7.05 (other than 7.05(d)(ii) or 7.05(e)), 7.06 (other than 7.06(d)) and 7.12, respectively;

(g)       Investments (i) existing on the Petition Date and (ii) any modification, replacement, renewal or reinvestment, or extension thereof; <u>provided</u> that the amount of any Investment made pursuant to this <u>clause (ii)</u> does not increase the amount of the related Investment unless otherwise permitted by Section 7.02;

(h)       Investments in Swap Contracts permitted under Section 7.03(f);

(i)       promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.05;

(j)       [Reserved];

(k)       [Reserved];

(l)       Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers consistent with past practices;

(m)       Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(n)       Investments by the Borrower in Sierra solely utilizing the proceeds of the Cash Pool Requirements Account and the substantially concurrent Investments by Sierra in any Foreign Group Company solely utilizing such proceeds;

-104-

(o)    other Investments that do not exceed in the aggregate at any time outstanding $40,000,000 (provided that no more than $10,000,000 at any time outstanding shall be used for Investments, directly or indirectly, by any Loan Party in a Non-Loan Party);

(p)    advances of payroll payments to employees in the ordinary course of business;

(q)    Investments made with the Letter of Credit Deposit Amount pursuant to an agreement between the Borrower and the Administrative Agent;

(r)    Investments held by a Subsidiary acquired after the Closing Date or of a Person merged or amalgamated with or into the Borrower or merged, amalgamated or consolidated with a Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(s)    Guarantees by the Borrower or any of its Subsidiaries of leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; and

(t)    for the avoidance of doubt to avoid double counting, Investments made by any Subsidiary that is not a Loan Party to the extent such Investments are financed with the proceeds received by such Subsidiary from an Investment made pursuant to clauses (d)(iv), (n) or (o) of this Section 7.02.

Notwithstanding the foregoing, any Investments by any Loan Party in any Non-Loan Party (directly or indirectly) shall be subject to Section 7.16.

SECTION 7.03.    Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, other than the following items:

(a)    Indebtedness of the Borrower and the Subsidiaries under the Loan Documents;

(b)    Indebtedness existing on the Petition Date;

(c)    Guarantees by the Borrower or any of its Subsidiaries in respect of Indebtedness (other than Indebtedness outstanding on the Petition Date) of the Borrower or any of its Subsidiaries otherwise permitted hereunder (except that a Subsidiary that is not a Loan Party may not, by virtue of this Section 7.03(c), Guarantee Indebtedness that such Subsidiary could not otherwise incur under this Section 7.03); *provided* that (A) no Guarantee by any Subsidiary of any other Indebtedness for borrowed money  that is subordinated in right of payment to the Obligations shall be permitted unless such Subsidiary shall have also provided a Guarantee of the Obligations on the terms set forth herein and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guaranty shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in

-105-

the subordination of such Indebtedness and (C) no Guarantee by a Loan Party of obligations of a Non-Loan Party shall be permitted unless otherwise permitted pursuant to Sections 7.02 and 7.08;

(d)     Indebtedness of the Borrower or any of its Subsidiaries owing to the Borrower or any other Subsidiary to the extent constituting an Investment permitted by Section 7.02, including any Sierra Intercompany Note and any Foreign Intercompany Notes/Receivables; provided that all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be unsecured and subordinated pursuant to an intercompany note reasonably satisfactory to the Administrative Agent;

(e)     (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; *provided* that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement, (ii) Attributable Indebtedness arising out of sale-leaseback transactions, (iii) Indebtedness arising under Capitalized Leases other than those in effect on the Closing Date or entered into pursuant to subclauses (i) and (ii) of this clause (e), and (iv) any Permitted Refinancing of any of the foregoing, provided, that the aggregate principal amount of all such Indebtedness outstanding under this Section 7.03(e) shall not exceed $20,000,000 at any time;

(f)     Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks, or to facilitate currency exchange transactions, in each case in the ordinary course of business and not for speculative purposes and Guarantees thereof;

(g)     [Reserved];

(h)     [Reserved];

(i)     Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business;

(j)     Cash Pooling Obligations incurred in the ordinary course of business;

(k)     Indebtedness incurred by the Borrower or any of its Subsidiaries in connection with any Investment expressly permitted hereunder or any Disposition expressly permitted hereunder, in each case to the extent constituting indemnification obligations or obligations in respect of adjustment of purchase price (including earn-outs) or other similar adjustments;

(l)     Indebtedness consisting of obligations of the Borrower and its Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with any Investment expressly permitted hereunder;

-106-

(m)      Cash Management Obligations and, with respect to Foreign Subsidiaries, other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof;

(n)      Indebtedness in an aggregate principal amount at any time outstanding not to exceed $50,000,000;

(o)      Indebtedness consisting of (a) the financing of insurance premiums in an aggregate amount not to exceed $5,000,000 or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)      Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of letters of credit (other than Letters of Credit) bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business or consistent with past practice, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(q)      obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Subsidiaries or obligations in respect of letters of credit (other than Letters of Credit), bank guarantees or similar instruments related thereto, in each case incurred after the Petition Date and in the ordinary course of business or consistent with past practice;

(r)      [Reserved];

(s)      [Reserved];

(t)      [Reserved];

(u)      [Reserved];

(v)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (u) above and (w) through (cc) below;

(w)      Guarantees incurred in the ordinary course of business in respect of obligations to suppliers, customers, franchisees, lessors and licensees;

(x)      Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(y)      [Reserved];

(z)      [Reserved];

-107-

(aa)    [Reserved];

(bb)    [Reserved];

(cc)    Indebtedness supported by a letter of credit (including a Letter of Credit) otherwise permitted to be incurred hereunder, in a principal amount not to exceed the undrawn face amount of such letter of credit.

Notwithstanding the foregoing, no Subsidiary that is a Non-Loan Party will guarantee any Indebtedness for borrowed money of a Loan Party unless such Subsidiary becomes a Guarantor.

For purposes of determining compliance with any Dollar-denominated restriction on the incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to extend, replace, refund, refinance, renew or defease other Indebtedness denominated in a foreign currency, and such extension, replacement, refunding, refinancing, renewal or defeasance would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such extension, replacement, refunding, refinancing, renewal or defeasance, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being extended, replaced, refunded, refinanced, renewed or defeased plus the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

SECTION 7.04.    Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into one or more Persons, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of one or more Persons, except that:

(a)    any Subsidiary may merge or consolidate with the Borrower; *provided* that (x) the Borrower shall be the continuing or surviving Person and (y) such merger or consolidation does not result in the Borrower ceasing to be a Delaware corporation;

(b)    (i) any Subsidiary that is not a Loan Party may merge or consolidate with or into any other Subsidiary of the Borrower that is not a Loan Party and (ii) any Subsidiary may liquidate or dissolve (without limiting clause (c) below) or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its

-108-

Subsidiaries and if not materially disadvantageous to the Lenders; provided that this Section 7.04(b) shall not permit the liquidation or dissolution of any Debtor or any merger or consolidation involving a Debtor, unless a Debtor is the surviving entity;

(c)    any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution or otherwise) to the Borrower or another Subsidiary; *provided* that if the transferor in such a transaction is a Loan Party, then (i) the transferee must be a Loan Party or (ii) to the extent constituting an Investment or giving rise to the incurrence of Indebtedness, such Investment must be a permitted Investment in or such Indebtedness must be Indebtedness of a Subsidiary which is not a Loan Party in accordance with Sections 7.02 and 7.03, respectively;

(d)    [reserved];

(e)    so long as no Default exists or would result therefrom, any Subsidiary may merge or consolidate with any other Person (i) in order to effect an Investment permitted pursuant to Section 7.02; *provided* that (A) the continuing or surviving Person shall be the Borrower or a Subsidiary, which together with each of its Subsidiaries, shall have complied with the applicable requirements of Section 6.11; and (B) if (1) the merger or consolidation involves a Guarantor and such Guarantor is not the surviving Person, the surviving Subsidiary shall expressly assume all the obligations of such Guarantor under this Agreement and the other Loan Documents to which the Guarantor is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (2) the merger or consolidation involves a Debtor, the surviving Person shall also be a Debtor, and (3) the Borrower shall be in compliance with the Financial Covenants immediately after giving effect thereto;

(f)    [reserved]; and

(g)    so long as no Default exists or would result therefrom, a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition to a Person that is not a Loan Party or a Subsidiary thereof permitted pursuant to Section 7.05 (other than 7.05(e)).

SECTION 7.05.    Dispositions.    Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete, worn out, used or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and the Subsidiaries;

(b)    Dispositions of inventory, goods held for sale in the ordinary course of business and allowing any immaterial IP Rights to lapse or go abandoned in the ordinary course of business or to allow any IP Rights to expire in accordance with the applicable statutory term;

(c)    Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such

-109-

Disposition are applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(d)    Dispositions of property to the Borrower or a Subsidiary; *provided* that if the transferor of such property is a Loan Party (i) the transferee thereof must be a Loan Party or (ii) to the extent such transaction constitutes an Investment, such transaction is permitted under Section 7.02;

(e)    Dispositions permitted by Sections 7.02, 7.04, 7.06 and 7.12 and Liens permitted by Section 7.01;

(f)    Dispositions of property pursuant to sale-leaseback transactions; provided that all Net Cash Proceeds thereof shall be applied to prepay Term Loans in accordance with Section 2.05(b)(ii)(A) and may not be reinvested in the business of the Borrower or a Subsidiary and the aggregate amount of all proceeds received on account of all sale-leaseback transactions permitted hereunder shall not exceed $20,000,000;

(g)    Dispositions of Cash Equivalents;

(h)    leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower or any of its Subsidiaries, taken as a whole;

(i)    transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(j)    Dispositions of property not otherwise permitted under this Section 7.05; *provided* that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default exists), no Default shall exist or would result from such Disposition; (ii) to the extent the aggregate amount of proceeds from all such Dispositions made pursuant to this clause (j) shall exceed $5,000,000, with respect to such excess, the Borrower or any of the Subsidiaries shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Sections 7.01(a), (b) (but only in respect of the Existing Secured Debt), (l) and (s) and clauses (i) and (ii) of Section 7.01(t)) and (iii) the aggregate Fair Market Value of all assets disposed of pursuant to this clause (j) shall not exceed $50,000,000;

(k)    the Disposition of the Networking Business;

(l)    Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(m)    Dispositions of accounts receivable in connection with the collection or compromise thereof;

-110-

(n)     [reserved];

(o)     to the extent allowable under Section 1031 of the Code (or comparable or successor provision), any exchange of like property (excluding any boot thereon permitted by such provision) for use in any business conducted by the Borrower or any of its Subsidiaries that is not in contravention of Section 7.07; and

(p)     the unwinding of any Swap Contract;

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Section 7.05(d), Section 7.05(e), Section 7.05(i), Section 7.05(l), Section 7.05(m) and Section 7.05(p) and except for Dispositions from the Borrower or a Subsidiary that is a Loan Party to the Borrower or a Subsidiary that is Loan Party), shall be for no less than the Fair Market Value of such property at the time of such Disposition. To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than an Affiliate of any Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and, subject to Section 9.12, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 7.06.     Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Subsidiary may make Restricted Payments to the Borrower and to any other Subsidiary and, in the case of a Restricted Payment by a non-wholly-owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests;

(b)     [reserved];

(c)     [reserved];

(d)     to the extent constituting Restricted Payments, the Borrower and the Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.02, 7.04 or 7.08 (other than Section 7.08(a) or (j));

(e)     [reserved];

(f)     [reserved];

(g)     the Borrower may make Restricted Payments to Holdings:

(i)     the proceeds of which will be used to pay the tax liability imposed by each foreign, federal, state or local jurisdiction for any taxable period in respect of which a consolidated, combined, unitary or affiliated return is filed by Holdings that includes the Borrower and/or any of its Subsidiaries, to the extent such tax liability does not exceed the lesser of (A) the taxes that would have been payable by the Borrower and/or its Subsidiaries as a stand-alone group and

-111-

(B) the actual tax liability of Holdings' consolidated, combined, unitary or affiliated group, reduced by any such payments paid or to be paid directly by the Borrower or its Subsidiaries;

(ii)    the proceeds of which shall be used to pay its operating costs and expenses incurred in the ordinary course of business and other overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, attributable to the ownership or operations of the Borrower and its Subsidiaries, only to the extent such amounts are deducted, for the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, in calculating Consolidated EBITDA for any period;

(iii)    the proceeds of which shall be used to pay franchise taxes and other fees, taxes and expenses required to maintain its legal existence;

(iv)    [reserved]

(v)    [reserved];

(vi)    the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to officers and employees of Holdings to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and the Subsidiaries, only to the extent such amounts are deducted, for the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, in calculating Consolidated EBITDA for any period.

SECTION 7.07.    Change in Nature of Business.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Subsidiaries on the Closing Date or any business reasonably related or ancillary thereto or constituting a reasonable extension thereof.

SECTION 7.08.    Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)    transactions (i) between or among the Loan Parties, (ii) between or among Subsidiaries that are not Loan Parties or (iii) between a Loan Party and a Subsidiary that is not a Loan Party in the ordinary course of business;

(b)    transactions on terms substantially as favorable to the Borrower or such Subsidiary as would reasonably be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)    [Reserved];

(d)    [Reserved];

-112-

(e)      [Reserved];

(f)      Investments permitted under Section 7.02;

(g)      employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to employee benefit plans and arrangements;

(h)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and the Subsidiaries or Holdings in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Subsidiaries;

(i)      any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 7.08, or any amendment thereto (so long as any such amendment is not disadvantageous to the Lenders when taken as a whole in any material respect as compared to the applicable agreement as in effect on the Closing Date as reasonably determined in good faith by the board of directors of the Borrower);

(j)      Restricted Payments permitted under Section 7.06;

(k)      [reserved];

(l)      transactions in which the Borrower or any of the Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or meets the requirements of clause (b) of this Section 7.08,

(m)      transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Subsidiaries, in the reasonable determination of the board of directors or the senior management of the Borrower, or are on terms at least as favorable as would reasonably have been obtained at such time from an unaffiliated party,

(n)      [reserved];

(o)      [reserved];

(p)      payments to or from, and transactions with, any joint venture in the ordinary course of business; and

(q)      affiliate transactions authorized or approved pursuant to (i) the Interim Order, and, when applicable, the Final Order, or any First Day Order or (ii) any other order entered by the Bankruptcy Court without the objection of the Administrative Agent; provided, for the avoidance of doubt, that such objection need not be filed with the Bankruptcy Court.

-113-

SECTION 7.09.    <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Subsidiary that is not a Loan Party to make Restricted Payments to any Loan Party (other than Holdings) or (b) any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations or under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations that:

(i)    (A) exist on the Closing Date and (to the extent not otherwise permitted by this Section 7.09) are listed on <u>Schedule 7.09</u> and (B) to the extent Contractual Obligations permitted by clause (A) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted modification, replacement, renewal, extension or refinancing of such Indebtedness so long as such modification, replacement, renewal, extension or refinancing does not expand the scope of such Contractual Obligation,

(ii)    are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary;

(iii)    [reserved],

(iv)    (a) with respect to clause (b) only, arise in connection with any Lien permitted by Section 7.01(a), (l), (s), (t)(i) or (t)(ii) and relate to the property subject to such Lien or (b) arise in connection with any Disposition permitted by Section 7.05,

(v)    are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture entered into in the ordinary course of business,

(vi)    are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness that is subordinated to the Obligations) and the proceeds and products thereof,

(vii)    are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto,

(viii)    comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 7.03(e) or 7.03(n) (with respect to Non-Loan Parties), 7.03(r) or 7.03(aa) to the extent that such restrictions apply only to the property or assets securing such Indebtedness,

(ix)    are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of any Subsidiary,

-114-

(x)      are customary provisions restricting assignment of any agreement entered into in the ordinary course of business,

(xi)      are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business,

(xii)      are customary restrictions contained in the documents governing any Pre-Petition Debt,

(xiii)      arise in connection with cash or other deposits permitted under Section 7.01, and

(xiv)      are restrictions in any one or more agreements governing Indebtedness of a Subsidiary that is not a Loan Party that is permitted to be incurred by Section 7.03.

SECTION 7.10.    Use of Proceeds.

(a) Use the proceeds of any Credit Extension, whether directly or indirectly, in a manner inconsistent with the uses set forth in this Section 7.10.  The Loans and Letters of Credit will be used to effect the Refinancing and for general corporate purposes of the Borrower and its Subsidiaries.

(b) Use the proceeds of any Credit Extension, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, except to the extent permissible for a Person required to comply with Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person participating in the Loans, whether as lender, underwriter, advisor, investor, or otherwise.

SECTION 7.11.    Accounting Changes.  Make any change in fiscal year except to, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 7.12.    Prepayments, Etc. of Indebtedness.  Except as expressly permitted by the terms and conditions set forth in the Orders, the Borrower or any Subsidiary shall not make any prepayment on account of (or set aside funds for the prepayment of) any Indebtedness that is subordinated or otherwise junior in priority to the Obligations.

SECTION 7.13.    Equity Interests of Certain Subsidiaries.  Permit any Domestic Subsidiary that is a wholly-owned Subsidiary to become a non-wholly-owned Subsidiary, except (i) to the extent such Subsidiary continues to be a Guarantor or (ii) in connection with a Disposition of all or substantially all of the assets or all or a portion of the Equity Interests of such Subsidiary permitted by Section 7.05.

SECTION 7.14.    Financial Covenants

-115-

(a)    *Minimum Liquidity*.  Permit the Consolidated Liquidity to be less than the amount set forth in the table below for five (5) consecutive Business Days, reported on the last Business Day of each month:

| Period | Minimum Liquidity |
|---|---|
| From the Closing Date until the second Borrowing of Term Loans | $20,000,000 |
| From the second Borrowing of Term Loans until June 30, 2017 | $100,000,000 |
| From July 1, 2017 until Maturity Date | $76,000,000 |

(b)    *Minimum Cumulative Consolidated EBITDA*.  Permit the Consolidated EBITDA of the Borrower and its Subsidiaries, for the period commencing on January 1, 2017 and ending on the date set forth in the table below, to be less than the amount set forth in the table below opposite such date; provided that (i) in the calculation of Consolidated EBITDA for the periods commencing on January 1, 2017 and ending on June 30, 2017 and September 30, 2017 respectively, the Consolidated EBITDA for the quarter ending on March 31, 2017 included in the calculation of such Consolidated EBITDA shall not exceed $166,000,000 and (ii) in the calculation of Consolidated EBITDA for the period commencing on January 1, 2017 and ending on September 30, 2017, the Consolidated EBITDA for the quarter ending on June 30, 2017 included in the calculation of such Consolidated EBITDA shall not exceed $140,000,000.

| Month | Minimum Cumulative Consolidated EBITDA |
|---|---|
| March 31, 2017 | $133,000,000 |
| June 30, 2017 | $252,000,000 |
| September 30, 2017 | $386,000,000 |

SECTION 7.15.    Limitations on Holdings.  In the case of Holdings, (a) incur any Indebtedness or any other material liabilities following the Petition Date (other than (i) intercompany Indebtedness, (ii) the Obligations and (iii) as provided in the Orders), (b) following the Petition Date, guarantee, or use its assets to secure (except in the case of non-consensual Liens arising by operation of Law), the Indebtedness of any other Person (except for (i) the Obligations and (ii) as provided in the Orders), (c) conduct any business (other than as necessary to continue to maintain its existence and comply with Laws, as reasonably determined by it or the Borrower), (d) own any material assets except for Cash Equivalents and any rights in any intercompany notes or intercompany loan agreements expressly permitted hereunder, and except for the assets owned by it on the Petition Date (including the Equity Interests of its Subsidiaries), (e) make any Investments other than Investments in other Loan Parties or (f) enter into any merger or consolidation. For the avoidance of doubt, the provisions of this Section 7.15 shall not restrict Holdings from incurring Obligations under the Loan Documents or taking any action required to be taken by it thereunder.

-116-

SECTION 7.16.    <u>Intercompany Limitations</u>.  Notwithstanding anything herein to the contrary and without limiting any other covenant contained herein, no credit support, guarantee, cash and/or Cash Equivalents (in each case, including proceeds of the Facilities, Cash Collateral (as defined in the Orders), proceeds of the Cash Pool Requirements Account or otherwise) may be transferred or otherwise provided by any Loan Party, directly or indirectly, to or for the benefit of any Non-Loan Party (either in the form of Restricted Payments, Investments, intercompany advances, guarantee of obligations (including interest thereon) or otherwise (except for repayment of account payables for goods delivered or services rendered in the ordinary course of business)) other than:

(a)    in order to effectuate the Refinancing of the Foreign Prepetition ABL Facility; and

(b)    additional amounts, if:

(i)    any such amounts in excess of $2,000,000 in the aggregate (the "**De Minimis Exception**"), shall be made, *first*, as an intercompany loan from the applicable Loan Party to Sierra (the "**Sierra Intercompany Loans**") and *then*, except as prohibited by local law, as a substantially concurrent unsecured intercompany loan from Sierra to the applicable Non-Loan Party which is the recipient or beneficiary of the proceeds, credit support or guarantee (the "**Foreign Intercompany Loans**");

(ii)    the Sierra Intercompany Loans shall be evidenced by an intercompany note, in form and substance reasonably satisfactory to the Administrative Agent and the Borrower (the "**Sierra Intercompany Note**"), with such Sierra Intercompany Note accruing interest at the same rate as the Facilities and which shall be payable in full in cash upon the Maturity Date hereunder.  The Sierra Intercompany Note shall be pledged by the Borrower as Collateral under the Collateral Documents. Sierra's obligations under the Sierra Intercompany Note shall be secured by all assets and properties now owned or at any time hereafter acquired by Sierra, including Sierra's right, title and interest in the Foreign Intercompany Notes/Receivables, but excluding more than 65% of the issued and outstanding Voting Stock of any Foreign Subsidiary that is a direct Subsidiary of Sierra; and

(iii)    each Foreign Intercompany Loan shall be evidenced by an intercompany unsecured note or intercompany ledger entry, in each case as is reasonably satisfactory to the Administrative Agent and the Borrower (individually or pursuant to a global note issued by one or more applicable intercompany borrowers) (the "**Foreign Intercompany Notes/Receivables**"), with such Foreign Intercompany Notes/Receivables accruing interest at the same rate as the Facilities and which shall be payable in full in cash upon the Maturity Date hereunder.  All such Foreign Intercompany Notes/Receivables payable to Sierra shall be pledged by Sierra to the Borrower as collateral securing Sierra's obligations under the Sierra Intercompany Note. To the extent the proceeds of such Investment is further transferred, in one or more steps, to another Non-Loan Party, each step of such transfer shall be evidenced by a Foreign Intercompany Note/Receivables.

-117-

To the extent that local law limits the implementation of the foregoing and notwithstanding the fact that the Foreign Intercompany Notes/Receivables shall be unsecured obligations of the applicable Non-Loan Parties, the Orders shall provide that for all purposes in connection with the Cases (including, without limitation for purposes of creditor recoveries and value allocation in connection with these Cases (including in connection with any chapter 11 plan or otherwise)), all Foreign Intercompany Notes/Receivables, amounts in respect of the De Minimis Exception and the Foreign ABL Repayment Rights (in each case whether documented or otherwise) shall be deemed to be secured obligations of the applicable Non-Loan Parties; the intent being to ensure that no creditor of the Debtors that asserts claims against Subsidiaries that are not Debtors on account of any claim against, obligation of, or transaction with, the Debtors (in respect of asserted joint and several liability or otherwise) unjustly benefits from the funding of Subsidiaries that are not Debtors through the use of proceeds of the Facilities or Cash Collateral following the Petition Date.

## ARTICLE VIII

## Events of Default and Remedies

SECTION 8.01.    Events of Default.  Each of the events referred to in clauses (a) through (t) of this Section 8.01 shall constitute an "**Event of Default**":

(a)    *Non-Payment*.  The Borrower fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a) or 6.05(a) (solely with respect to the Borrower) or Article VII; or

(c)    *Other Defaults*.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days (or (i) in the case of Section 6.01(a), 6.01(b), 6.01(c), 6.01(d), or 6.02(d), twenty (20) days or (ii) in the case of Section 6.01(e), 6.01(f) or 6.02(a), ten (10) days), in each case after receipt by the Borrower of written notice thereof from the Administrative Agent); or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by any Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made; or

(e)    *Cross-Default*.  Any Loan Party or any Subsidiary (A) fails to make any payment beyond the applicable grace period, if any, whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, in respect of any Indebtedness having an aggregate outstanding principal amount (individually or in the aggregate with all other Indebtedness as to which such a failure shall exist) of not less than the Threshold Amount or (B)

-118-

fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that this clause (e) shall not apply to (x) any Indebtedness outstanding hereunder, (y) any Indebtedness of any Debtor that was incurred prior to the Petition Date unless such Indebtedness has been accelerated and the enforcement of remedies with respect to such Indebtedness shall not have been stayed by the commencement of the Cases or (z) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder; provided further that such failure is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02; or

(f)        *Insolvency Proceedings, Etc.*  An involuntary proceeding shall be commenced or a voluntary or involuntary petition shall be filed in a court of competent jurisdiction seeking (1) relief in respect of any Material Subsidiary that did not become a Debtor on the Petition Date, or of a substantial part of the assets of any Material Subsidiary that did not become a Debtor on the Petition Date, under any Debtor Relief Laws (unless, in the case of a Material Domestic Subsidiary, (A) immediately (but in any event not later than 3 Business Days) following the commencement of such case such Material Domestic Subsidiary becomes a Loan Party hereunder, (B) within five (5) Business Days after the commencement of such case such Material Domestic Subsidiary's case becomes jointly administered with the Cases and (C) each of the Interim Order and/or Final Order (as applicable) are made applicable to such Material Domestic Subsidiary as a post-petition Guarantor hereunder, (2)  the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Material Subsidiary that did not become a Debtor on the Petition Date  or for a substantial part of the assets of any Material Subsidiary that did not become a Debtor on the Petition Date or (3) the winding-up or liquidation of any Material Subsidiary that did not become a Debtor on the Petition Date (except in a transaction permitted by Section 7.04); *provided* that in the case of any of the foregoing with respect to any Material Foreign Subsidiary or Material Foreign Subsidiaries, an Event of Default pursuant to this clause (f) shall only be deemed to occur if such occurrence shall result (or would reasonably be expected to result) in a Material Adverse Effect; or

(g)        *Judgments*.  There is entered against any Loan Party or any Material Subsidiary a final judgment or order for the payment of money (excluding any First Day Order or any order fixing the amount of any claim in the Cases) in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied or failed to acknowledge coverage thereof) (and in the case of such a judgment against any of the Debtors, such judgment arose post-petition) and such judgment or order shall not have been satisfied,

-119-

vacated, discharged or stayed (including pursuant to the Bankruptcy Code) or bonded pending appeal for a period of thirty (30) consecutive days; or

(h)      *ERISA*.  (i)  Other than with respect to a Permitted ERISA Event, an ERISA Event occurs that, when taken alone or together with all other such ERISA Events, would reasonably be expected to result in liability of Holdings, the Borrower or their respective ERISA Affiliates under Title IV of ERISA in an aggregate amount greater than the Threshold Amount or which would reasonably be expected to result in a Material Adverse Effect, (ii) Holdings, the Borrower or any of their respective ERISA Affiliates fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount greater than the Threshold Amount or which would reasonably be expected to result in a Material Adverse Effect, or (iii) with respect to a funded Foreign Plan a termination, withdrawal or noncompliance with applicable Law or plan terms that would reasonably be expected to result in a Material Adverse Effect; or

(i)      *Invalidity of Loan Documents*.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender or the Payment in Full of all the Obligations, ceases to be in full force and effect; or any Loan Party (or any Subsidiary) contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party (or any Subsidiary) denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of Payment in Full of the Obligations and termination of the Commitments), or purports in writing to revoke or rescind any Loan Document; or

(j)      *Collateral Documents*.  (i)  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.11 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create (with respect to the Security Agreement, to the extent such Lien may be created pursuant to the New York UCC), or any Lien purported to be created by any Collateral Document shall be asserted in writing by any Loan Party (or any Subsidiary) not to be, a valid and perfected lien (to the extent a Lien may be perfected by way of the perfection steps required to be taken thereunder or by the Orders), with the priority required by the Collateral Documents (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and except as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied or failed to acknowledge coverage, or (ii) any of the Equity Interests of the Borrower ceasing to be pledged pursuant to the Security Agreement free of Liens other than non-consensual Liens permitted hereunder and consensual Liens granted to secure Existing Secured Debt; or

#89281377v6

(k)     *Change of Control*.  There occurs any Change of Control; or

(l)     *Dismissal; Conversion*.  (i) any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtors shall file a motion or other pleading seeking the dismissal of any of Case of any Debtor under Section 1112 of the Bankruptcy Code or otherwise without causing Payment in Full of all Obligations hereunder and immediate termination of all Commitments or (ii) a trustee under Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors and the order appointing such trustee or examiner shall not be reversed or vacated within thirty (30) days after the entry thereof (or the Loan Parties or their Affiliates shall have acquiesced to the entry of such order) unless consented to by the Required Lenders; or

(m)     *Superpriority Claims*.  An application shall be filed by any Debtor for the approval of (i) any other Superpriority Claim or Lien, or an order of the Bankruptcy Court shall be entered granting any other Superpriority Claim or Lien (other than the Carve-Out), in any of the Cases of the Debtors that is pari passu with or senior to the claims (as such word is defined in the Bankruptcy Code) or Liens of the Administrative Agent, the L/C Issuer, the Lenders and the other Secured Parties against the Borrower or any other Loan Party hereunder or under any of the other Loan Documents (including the adequate protection Liens and claims provided for in the Orders) or (ii) any Liens senior or pari passu with (A) the Liens under the Pre-Petition Cash Flow Facility, Pre-Petition First Lien 7.00% Notes or Pre-Petition First Lien 9.00% Notes or (B) the adequate protection Liens granted on account of the Primed Liens, or there shall arise or otherwise be granted any such pari passu or senior Superpriority Claim or senior Lien, in each case other than adequate protection Liens granted by the Bankruptcy Court on account of Liens that are senior to the Liens securing the Obligations in an amount that does not exceed $15,000,000 in the aggregate for all such Liens; or

(n)     *Stay Relief*.  The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $25,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(o)     *Orders; Actions*.  Subject to the last paragraph of Section 8.01 in all respects, (i) the Final Order Entry Date shall not have occurred by the date that is sixty (60) days following the Interim Order Entry Date; (ii) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order or Holdings, the Borrower or any Subsidiary of the Borrower shall apply for the authority to do so, in each case in a manner that is adverse in any respect to the Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Required Lenders; (iii) an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral (as defined in the Orders) by the Loan Parties or imposing any additional conditions on such use (and such order remains unstayed for more than three (3) Business Days) and the Loan Parties shall have not obtained use of Cash

#89281377v6

Collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Administrative Agent; (iv) the Interim Order (prior to the entry of the Final Order) or Final Order (at all times thereafter) shall cease to create a valid and perfected Lien on the Collateral described therein or the Final Order shall cease to be in full force and effect; (v) any of the Loan Parties or any Subsidiary of the Borrower shall fail to comply with the Orders in any material respect; (vi) other than with respect to the Carve-Out (as provided for in <u>Section 2.16</u>), a final non-appealable order in the Cases shall be entered (without the consent of the Administrative Agent) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders; (vii) the Final Order shall not authorize the borrowing by the Borrower of the full amount of the Commitments provided for hereunder; (viii) the entry of an order in the Cases seeking to use cash collateral or obtain financing pursuant to Section 364 of the Bankruptcy Code (other than the Facilities), unless such financing would (and actually does) provide for Payment in Full of all Obligations and terminate all Commitments upon the consummation thereof; (ix) any order shall be entered in the Cases providing adequate protection, other than the Interim Order or Final Order (as applicable) or pursuant to any First Day Order or "second day order" or any other order reasonably acceptable to the Administrative Agent or as otherwise permitted pursuant to clause (m) of this Section 8.01; or (x) the Borrower or any of its Subsidiaries shall take any action in support of the items referred to in the foregoing clauses (i)-(ix); or

(p)      *Pre-Petition Payments*.  Except as permitted by the Orders or as otherwise agreed to by the Administrative Agent permitted by the Bankruptcy Court, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments (i) authorized by the Bankruptcy Court in accordance with the First Day Orders or "second day orders" of the Bankruptcy Court reasonably satisfactory to the Administrative Agent, (ii) authorized by other orders entered by the Bankruptcy Court in amounts reasonably acceptable to the Administrative Agent; <u>provided</u> that any such payments shall be deemed satisfactory if the Administrative Agent does not object within five (5) Business Days after receipt of notice thereof, or (iii) not in excess of $2,500,000 in the aggregate for all such payments; or

(q)      *Adverse Actions*.  The Loan Parties or any of their Subsidiaries, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any Lender or the L/C Issuer (in any of their respective capacities as such) relating to the Facilities, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Administrative Agent, any Lender or the L/C Issuer; or

(r)      *Reorganization Plan*.  A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Debtors, or any of the Loan Parties or any of their Subsidiaries shall file, propose, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order; or

(s)      *Supporting Actions*.  Any Loan Party or any of their Subsidiaries shall file any pleading with the Bankruptcy Court in support of any matter set forth in paragraphs (l), (m), (n), (o), (p) or (r) and not withdrawn after 3 days' the notice from Administrative Agent; or

-122-

(t)    *Sale Motions*.  The Borrower shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties (including a sale of the Contact Center Business), unless such sale would result in the Payment in Full of all Obligations under this Agreement and the other Loan Documents upon consummation thereof.

Notwithstanding anything herein to the contrary (including Section 8.01(o) hereof), there shall be no Default or Event of Default arising from: (i) the termination of the Loan Parties' consensual use of collateral or Cash Collateral subject to the Primed Liens as a result of a Milestone Event or (ii) in the event of such termination described in clause (i), (A) any request by the Loan Parties seeking to use collateral or Cash Collateral subject to the Primed Liens on a nonconsensual basis or (B) any order of the Bankruptcy Court granting such request, in each case so long as the adequate protection requested by the Loan Parties or approved by the Bankruptcy Court, as applicable, is materially consistent with the adequate protection granted on account of the Primed Liens pursuant to the Orders or permitted hereunder.

SECTION 8.02.    Remedies upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of the Required Lenders, take any or all of the following actions, subject to the terms of the Orders:

(a)    declare Commitments of each Lender and any obligation of the L/C Issuers to make L/C Credit Extensions to be terminated, whereupon such Commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    [Reserved]; and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that with respect to the enforcement of Liens or other remedies with respect to the Collateral of the Loan Parties under the preceding clause (d), the Administrative Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the action contemplated thereby (with a copy to counsel for the Creditors' Committee in the Cases and to the United States Trustee for the Southern District of New York).

SECTION 8.03.    Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, but subject and subordinate to the Carve-Out in all respects (other than with respect to the Letter of Credit Account and any assets or amounts credited thereto in accordance with the terms of this Agreement), including with respect to amounts received to be funded into the Carve-Out Reserve:

-123-

#89281377v6

(a)       with respect to any Collateral other than Specified Collateral or the Letter of Credit Account (and all amounts on deposit therein to the extent not in excess of the amounts permitted to be deposited therein pursuant to the terms of this Agreement):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and fees in respect of Letters of Credit or Cash Pooling Obligations) payable to the Lenders and the L/C Issuer (in their capacities as such) (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations (excluding reimbursement obligations in respect of Letters of Credit and Cash Pooling Obligations, but including obligations in respect of Secured Hedge Agreements and Cash Management Obligations), ratably among the Administrative Agent and Lenders (or holders of Cash Management Obligations and/or Secured Hedge Agreements) in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize (to the extent not already Cash Collateralized in such amount) that portion of L/C Obligations in an amount not less than the L/C Collateralization Amount;

*Fifth*, to the payment of any remaining Obligations (other than Cash Pooling Obligations) of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties (other than the Cash Pooling Provider on account of Cash Pooling Obligations) on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and such other Secured Parties on such date;

*Sixth,* to the extent constituting a distribution of collateral securing the Pre-Petition Cash Flow Facilities, the Pre-Petition First Lien 7.00% Notes and the Pre-Petition First Lien 9.00% Notes, to the payment in full of the Indebtedness secured by the Pre-Petition Cash Flow Facilities, the Pre-Petition First Lien 7.00% Notes and the Pre-Petition First Lien 9.00% Notes, ratably in accordance with the documents governing such Indebtedness;

*Seventh*, to the payment of any remaining Cash Pooling Obligations that are due and payable to the Cash Pooling Provider on such date; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

(b)    with respect to Specified Collateral (but excluding, for the avoidance of doubt, the Letter of Credit Account, all amounts on deposit therein (to the extent not in excess of the amounts permitted to be deposited therein pursuant to the terms of this Agreement) or any proceeds thereof):

*First*, to the payment of the Cash Pooling Obligations;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Third*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and fees in respect of Letters of Credit and Cash Pooling Obligations) payable to the Lenders and the L/C Issuer (in their capacities as such) (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations (including Cash Management Obligations and obligations in respect of Secured Hedge Agreements but excluding Cash Pooling Obligations), ratably among the Lenders (or holders of Cash Management Obligations and/or Secured Hedge Agreements) in proportion to the respective amounts described in this clause *Fourth* payable to them;

*Fifth*, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize (to the extent not already Cash Collateralized in such amount) that portion of L/C Obligations in an amount not less than the L/C Collateralization Amount;

*Sixth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

(c)    with respect to the Letter of Credit Account, all amounts on deposit therein, all amounts on deposit therein (to the extent not in excess of the amounts permitted to be deposited therein pursuant to the terms of this Agreement) and all proceeds thereof:

*First*, to the Administrative Agent for the account of the L/C Issuer, to Cash Collateralize (to the extent not already Cash Collateralized in such amount) that portion of L/C Obligations in an amount not less than the L/C Collateralization Amount and to reimburse the L/C Issuer for any other amounts with respect to such Letters of Credit not so reimbursed;

-125-

*Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Third*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest and fees in respect of Letters of Credit) payable to the Lenders and the L/C Issuer (in their capacities as such) (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations (including Cash Management Obligations, Cash Pooling Obligations and obligations in respect of Secured Hedge Agreements), ratably among the Lenders (or holders of Cash Management Obligations and/or Secured Hedge Agreements) in proportion to the respective amounts described in this clause *Fourth* payable to them;

*Fifth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause *Fifth* above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired and L/C Disbursements have been paid in cash in full, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in any intercreditor agreement, the Loan Documents, or in any of the documents evidencing Pre-Petition Debt, the Carve-Out shall be senior to all Liens and claims securing the Facilities, and any and all other forms of adequate protection, liens or claims security the Facilities or the obligations under the Existing Secured Debt, including the Primed Liens, except, in all cases, with respect to the Letter of Credit Account and any assets or amounts credited thereto.

## ARTICLE IX

## Administrative Agent and Other Agents

SECTION 9.01.    Appointment and Authorization of the Administrative Agent.

-126-

(a)     Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or Participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.  The provisions of this Article (other than Sections 9.10 and 9.12) are solely for the benefit of the Administrative Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)     The L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the L/C Issuer shall have all of the benefits and immunities (i) provided to the Administrative Agent in this Article IX with respect to any acts taken or omissions suffered by the L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit as fully as if the term "Administrative Agent" as used in this Article IX and in the definition of "Agent-Related Person" included the L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to the L/C Issuer.

(c)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender, L/C Issuer (if applicable), Cash Pooling Provider and a potential Hedge Bank and/or Cash Management Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or on trust for) such Lender and its Affiliates for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto. Without limiting the generality of the foregoing, the Lenders hereby expressly authorize the Administrative Agent to execute any and all documents (including releases) with respect to the

-127-

Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and acknowledge and agree that any such action by any Agent shall bind the Lenders.

SECTION 9.02.    Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through agents, sub-agents, employees or attorneys-in-fact (including for the purpose of any Borrowing or payment in Alternative Currencies) as shall be deemed necessary by the Administrative Agent and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  Each such sub-agent and the Affiliates of the Administrative Agent and each such sub-agent shall be entitled to the benefits of all provisions of this Article IX and Sections 10.04 and 10.05 (as though such sub-agents were the "Administrative Agent" under the Loan Documents) as if set forth in full herein with respect thereto.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

SECTION 9.03.    Liability of Agents.  No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or Participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by any Agent under or in connection with, this Agreement or any other Loan Document, or the execution, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or Participant to ascertain or to inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the perfection or priority of any Lien or security interest created or purported to be created by the Collateral Documents, (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or (vi) or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.  No Agent-Related Person shall have any duties or obligations to any Lender or Participant except those expressly

-128-

set forth herein and in the other Loan Documents, and  without limiting the generality of the foregoing, the Agent-Related Persons:

(a)  shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Person is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that such Person shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable Law; and

(c)  shall not be required to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Administrative Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Administrative Agent or any of its Affiliates.

No Agent-Related Person be liable (i) to any Participant or Secured Party or their Affiliates for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or such Person shall believe in good faith shall be necessary under the circumstances) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

SECTION 9.04.    <u>Reliance by the Administrative Agent</u>.

(a)    The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders; *provided* that the Administrative Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may

-129-

expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law.

(b)    For purposes of determining compliance with the conditions specified in Section 4.01, each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed closing date specifying its objection thereto.

SECTION 9.05.    Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default."  The Administrative Agent will notify the Lenders of its receipt of any such notice (it being understood that posting of such notice to the "private side" of the Platform shall be sufficient).  The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; *provided* that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

SECTION 9.06.    Credit Decision; Disclosure of Information by Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession.  Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

-130-

SECTION 9.07.    <u>Indemnification of Agents</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Administrative Agent and each other Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless the Administrative Agent and each other Agent-Related Person (on an after-Tax basis) from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower, *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

SECTION 9.08.    <u>Withholding Tax</u>.  To the extent required by any applicable Law, the Agents may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that an Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting or expanding the obligation of the Borrower to do so) all amounts paid, directly or indirectly, by the Administrative Agent as taxes or otherwise, including any interest, additions to tax or penalties thereto, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such taxes were correctly or legally imposed or asserted by the relevant Government Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under

-131-

this Section 9.08.  The agreements in this Section 9.08 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all other obligations.

SECTION 9.09.    <u>Agents in Their Individual Capacities</u>.  (a) Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as an Agent hereunder in its individual capacity.  Each Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though such Agent were not an Agent or the L/C Issuer hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, any Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that no Agent shall be under any obligation to provide such information to them.  With respect to its Loans, each Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent or the L/C Issuer, and the terms "Lender" and "Lenders" include each Agent in its individual capacity.

(b)        Each Lender understands that the Person serving as Administrative Agent, acting in its individual capacity, and its Affiliates (collectively, the "**Agent's Group**") are engaged in a wide range of financial services and businesses (including investment management, financing, securities trading, corporate and investment banking and research) (such services and businesses are collectively referred to in this Section 9.09 as "**Activities**") and may engage in the Activities with or on behalf of one or more of the Loan Parties or their respective Affiliates. Furthermore, the Agent's Group may, in undertaking the Activities, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of others (including the Loan Parties and their Affiliates and including holding, for its own account or on behalf of others, equity, debt and similar positions in the Borrower, another Loan Party or their respective Affiliates), including trading in or holding long, short or derivative positions in securities, loans or other financial products of one or more of the Loan Parties or their Affiliates. Each Lender understands and agrees that in engaging in the Activities, the Agent's Group may receive or otherwise obtain information concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) which information may not be available to any of the Lenders that are not members of the Agent's Group.  None of the Administrative Agent nor any member of the Agent's Group shall have any duty to disclose to any Lender or use on behalf of the Lenders, and shall not be liable for the failure to so disclose or use, any information whatsoever about or derived from the Activities or otherwise (including any information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party) or to account for any revenue or profits obtained in connection with the Activities, except that the Administrative

#89281377v6

Agent shall deliver or otherwise make available to each Lender such documents as are expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lenders.

(c)    Each Lender further understands that there may be situations where members of the Agent's Group or their respective customers (including the Loan Parties and their Affiliates) either now have or may in the future have interests or take actions that may conflict with the interests of any one or more of the Lenders (including the interests of the Lenders hereunder and under the other Loan Documents). Each Lender agrees that no member of the Agent's Group is or shall be required to restrict its Activities as a result of the Person serving as Administrative Agent being a member of the Agent's Group, and that each member of the Agent's Group may undertake any Activities without further consultation with or notification to any Lender. None of (i) this Agreement nor any other Loan Document, (ii) the receipt by the Agent's Group of information (including Information) concerning the Loan Parties or their Affiliates (including information concerning the ability of the Loan Parties to perform their respective Obligations hereunder and under the other Loan Documents) nor (iii) any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) owing by the Administrative Agent or any member of the Agent's Group to any Lender including any such duty that would prevent or restrict the Agent's Group from acting on behalf of customers (including the Loan Parties or their Affiliates) or for its own account.

SECTION 9.10.    Successor Administrative Agent. The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' prior notice to the Lenders and the Borrower. If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower at all times (which consent of the Borrower shall not be unreasonably withheld, delayed or conditioned). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders and the Borrower, a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent, and the term "Administrative Agent" shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated. After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement. If no successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of

-133-

the Liens granted or purported to be granted by the Collateral Documents, including the Orders or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents (if not already discharged therefrom as provided above in this Section 9.10).  After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and 10.05 shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Administrative Agent.

Anything herein to the contrary notwithstanding, if at any time the Required Lenders determine that the Person serving as Administrative Agent is (without taking into account any provision in the definition of "Defaulting Lender" or "Potential Defaulting Lender" requiring notice from the Administrative Agent or any other party) a Defaulting Lender or a Potential Defaulting Lender, the Required Lenders (determined after giving effect to Section 10.01) may by notice to the Borrower and such Person remove such Person as Administrative Agent and, with the consent of the Borrower (not to be unreasonably withheld), appoint a replacement Administrative Agent hereunder.  Such removal will, to the fullest extent permitted by applicable Law, be effective on the date a replacement Administrative Agent is appointed.

SECTION 9.11.    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)       to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(i) and (j), 2.09 and 10.04) allowed in such judicial proceeding; and

(b)       to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their

#89281377v6

respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 9.12.    Collateral and Guaranty Matters.  The Lenders irrevocably agree:

(a)    that any Lien on any property granted to or held by the Administrative Agent under any Loan Document shall be automatically released (i) upon termination of the Aggregate Commitments and Payment in Full of all Obligations (other than (x) obligations under Secured Hedge Agreements not yet due and payable and (y) Cash Management Obligations or Cash Pooling Obligations not yet due and payable and (x) contingent indemnification obligations not yet accrued and payable) and the expiration or termination of all Letters of Credit (other than Letters of Credit in which the Outstanding Amount of the L/C Obligations related thereto have been Cash Collateralized (including with funds held in the Letter of Credit Account in accordance with the terms hereof) or, if satisfactory to the L/C Issuer in its sole discretion, for which a backstop letter of credit is in place), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than a Loan Party, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)    to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i); and

(c)    that any Guarantor other than Holdings shall be automatically released from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction or designation permitted hereunder.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.12.  In each case as specified in this Section 9.12, the Administrative Agent will promptly (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12; provided, that the Administrative Agent shall not be required to execute and deliver any such

#89281377v6

documents unless it shall have received a certification from the Borrower to the effect that such release or subordination, and the applicable transaction giving rise thereto, is permitted by this Agreement and the other Loan Documents.

SECTION 9.13.    Other Agents; Arrangers and Managers.  Except as expressly provided herein, none of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "joint bookrunner" or "joint lead arranger" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 9.14.    Appointment of Supplemental Administrative Agents.

(a)    It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)    In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

-136-

(c)    Should any instrument in writing from any Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

## ARTICLE X

## Miscellaneous

SECTION 10.01.  Amendments, Etc.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document (other than the Orders), and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders, or by the Administrative Agent with the consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce the amount of, any payment of principal or interest under Section 2.07 or 2.08 or fee under Section 2.03 or 2.09(a) without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Term Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce the principal of, or the rate of interest or premium specified herein on, any Loan, or (subject to clause (ii) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; *provided* that, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    change any provision of this Section 10.01, the definition of "Required Lenders" or "Pro Rata Share", Sections 2.05 and 2.06 as they relate to the pro rata application of payments or commitment reductions, Section 2.13 or Section 8.03 without the written consent of each Lender affected thereby;

-137-

(e)      release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(f)      other than in a transaction permitted under Section 7.04, release all or substantially all of the aggregate value of the Guaranty, without the written consent of each Lender;

(g)      change the currency in which any Loan is denominated or interest or fees thereon is paid without the written consent of the Lender holding such Loans;

(h)      [reserved];

(i)      amend the definition of "Interest Period" to allow intervals in excess of six months or shorter than one month without the written consent of each Lender affected thereby; and

(j)      modify or waive any provision of this Agreement in order to permit the incurrence of any financing pursuant to Section 364 of the Bankruptcy Code (other than the Facilities in the maximum amounts permitted after giving effect to the Final Order) that would be secured by the Collateral (or any portion thereof) on a pari passu or senior basis with the Obligations or that would benefit from any Superpriority Claim in the Cases that is pari passu or senior to the Superpriority Claims with respect to the Obligations as provided in the Orders, without the written consent of each Lender;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by the L/C Issuer (but without requiring consent of the Lenders required above), affect the rights or duties of the L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document, (iii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders) and (iv) the L/C Issuer shall have the sole right to waive any condition set forth in Section 4.01 or 4.02 with respect to the issuance, amendment or extension of any Letter of Credit.

Notwithstanding anything to the contrary contained in Section 10.01, guarantees, collateral security documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent at the request of the Borrower without the need to obtain the consent of any other Lender

-138-

if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel to the Administrative Agent, (ii) to cure ambiguities or defects or (iii) to cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents.

SECTION 10.02.  <u>Notices and Other Communications; Facsimile Copies</u>.

(a)    *General*.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile or electronic transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower, any other Loan Party, the Administrative Agent or the L/C Issuer, to the address, facsimile number, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u> or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)    if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent and the L/C Issuer.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(c)), when delivered and (E) if delivered by posting to a Platform, an Internet website or a similar telecommunication device requiring that a user have prior access to such Platform, website or other device (to the extent permitted by Section 10.02(e) to be delivered thereunder), when such notice, demand, request, consent and other communication shall have been made generally available on such Platform, Internet website or similar device to the class of Person being notified (regardless of whether any such Person must accomplish, and whether or not any such Person shall have accomplished, any action prior to obtaining access to such items, including registration, disclosure of contact information, compliance with a standard user agreement or undertaking a duty of confidentiality) and such Person has been notified in respect of such posting that a communication has been posted to the Platform; *provided* that notices and other communications to the Administrative Agent and the L/C Issuer pursuant to Article II or Article IX shall not be effective until actually received by such Person.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

-139-

(b)     *Effectiveness of Facsimile Documents and Signatures*.  Loan Documents may be transmitted and/or signed by facsimile or other electronic communication (i.e., TIF or PDF or other similar communication).  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(c)     *Reliance by Agents and Lenders*.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct of such Person, as determined by the final non-appealable judgment of a court of competent jurisdiction.  All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

(d)     Notwithstanding clause (a) (unless the Administrative Agent requests that the provisions of clause (a) be followed) and any other provision in this Agreement or any other Loan Document providing for the delivery of any Approved Electronic Communication by any other means, the Loan Parties shall deliver all Approved Electronic Communications to the Administrative Agent by properly transmitting such Approved Electronic Communications in an electronic/soft medium in a format acceptable to the Administrative Agent to oploanswebadmin@citi.com or such other electronic mail address (or similar means of electronic delivery) as the Administrative Agent may notify to the Borrower.  Nothing in this clause (d) shall prejudice the right of the Administrative Agent or any Lender to deliver any Approved Electronic Communication to any Loan Party in any manner authorized in this Agreement or to request that the Borrower effect delivery in such manner.

SECTION 10.03.  No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 10.04.  Attorney Costs and Expenses.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, provided with respect to

-140-

Attorney Costs, limited to all Attorney Costs of Davis Polk & Wardwell LLP and one local and foreign counsel in each relevant jurisdiction, and (b) to pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including the Cases and all such costs in connection with any refinancing, restructuring or "work-out" of the Facilities, and including Attorney Costs but limited to those of one counsel to the Administrative Agent and the Lenders (which shall be Davis Polk & Wardwell LLP, and one local counsel in each applicable jurisdiction and, in the event of any actual conflict of interest, one additional counsel to the affected parties).  The agreements in this Section 10.04 shall survive the termination of the Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid promptly following receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail (but not including any time detail or associated narrative).  If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

SECTION 10.05.  Indemnification by the Borrower.  The Borrower shall indemnify and hold harmless the Administrative Agent, each Lender, each Arranger and their respective Affiliates, directors, officers, employees, agents, trustees or advisors (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs, which shall be limited to Attorney Costs of one counsel to the Administrative Agent and the Arrangers (which shall be Davis Polk & Wardwell LLP, and one local counsel in each applicable jurisdiction for each such group and, in the event of any actual conflict of interest, one additional counsel to the affected parties)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (c) any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, under or from any property or facility currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability arising out of the activities or operations of the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"); *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from

(x) the gross negligence, bad faith or willful misconduct, as determined by the final, non-appealable judgment of a court of competent jurisdiction, of such Indemnitee or of any affiliate, director, officer, member, employee, agent, trustee or advisor of such Indemnitee or (y) a breach of any obligations under any Loan Document by such Indemnitee or of any affiliate, director, officer, employee, agent, trustee or advisor of such Indemnitee as determined by the final, non-appealable judgment of a court of competent jurisdiction.  To the extent that the undertakings to indemnify and hold harmless set forth in this Section 10.05 may be unenforceable in whole or in part because they are violative of any applicable Law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through DebtDomain or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).  In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated.  All amounts due under this Section 10.05 shall be paid within 10 Business Days after written demand therefor.  This Section 10.05 shall not apply with respect to Taxes, except any Taxes that represent losses or damages arising from any non-Tax claim.  The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

SECTION 10.06.  <u>Payments Set Aside</u>.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with the Cases or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

SECTION 10.07.  <u>Successors and Assigns</u>.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may assign or otherwise transfer any of its rights or

-142-

obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Sections 10.07(g) and 10.07(i) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees ("**Assignees**") all or a portion of its rights and obligations under this Agreement (including its Loans and/or Commitments (including unfunded Commitments) with the prior written consent (such consent not to be unreasonably withheld or delayed, it being understood that the Borrower shall have the right to withhold its consent if the Borrower would be required to obtain the consent of, or make a filing or registration with, a Governmental Authority) of:

(A)        the Borrower, *provided* that no consent of the Borrower shall be required for an assignment (i) to a Lender, an Affiliate of a Lender or an Approved Fund or (ii) if an Event of Default has occurred and is continuing, of any Loans to any Assignee; *provided further*, that if the Borrower fails to respond to a request for a consent to an assignment of Term Loans within five (5) Business Days following the date such request is received by the Borrower, then the Borrower shall be deemed to have consented to such assignment; and

(B)        the Administrative Agent; *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to another Lender, an Affiliate of a Lender or an Approved Fund;

(ii)        Assignments shall be subject to the following additional conditions:

(A)        except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or such other date on which such Assignment and Assumption is effective) shall not be less than and shall be an integral multiple of $1,000,000 unless each of the Borrower and the Administrative Agent otherwise consents, *provided* that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)        the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and

-143-

recordation fee of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment;

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)      the Assignee shall comply with Section 3.01(b).

(c)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)      The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, amounts due under Section 2.03, owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and, with respect to itself, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)      Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement

-144-

and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 (subject to the requirements and limitations therein, including the requirements under Section 3.01(b)), 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c). To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.10 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"). The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of the participation in question for all purposes of this Agreement notwithstanding any notice to the contrary.

(f)      A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless, in the case of Section 3.01, the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld or delayed).

(g)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)      Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), except, in the case of Section 3.01, the increase or change results from a Change in Law after the SPC becomes a SPC and the grant was made with the Borrower's prior written consent (not to be unreasonably withheld or delayed), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for

-145-

all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)        Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

SECTION 10.08.  <u>Confidentiality</u>.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, and to not use or disclose such Information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' respective managers, administrators, directors, officers, employees, trustees, investment advisors, partners, advisors, agents and other representatives, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made shall be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (c) to any other party to this Agreement; (d) subject to an agreement to be bound by provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(g), Eligible Assignee of or Participant in, or any prospective Eligible Assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or to any actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) to any swap or derivative or similar transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder, any rating agency, or the CUSIP Service Bureau or any similar organization; (e) with the written consent of the Borrower; (f) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08 or becomes available to the Administrative Agent, any Lender, the L/C Issuer or any of their respective affiliates on a nonconfidential basis from a source other than a Loan Party who is not known to such Person to be in breach of any obligation of confidentiality; (g) to any Governmental Authority, examiner, self-regulatory authority or other regulatory authority

-146-

(including the National Association of Insurance Commissioners or any other similar organization) regulating or purporting to regulate any Lender; or (h) in connection with the administration of this Agreement or any other Loan Documents or the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions. For the purposes of this Section 10.08, "**Information**" means all information received from or on behalf of any Loan Party or its Subsidiaries or any Loan Party's or its Subsidiaries' directors, officers, employees, trustees, investment advisors or agents, including accountants, legal counsel and other advisors, relating to Holdings, the Borrower or any of their subsidiaries or their respective businesses, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; *provided* that, in the case of information received from a Loan Party after the Closing Date, such information is clearly identified at the time of delivery as confidential or (ii) is delivered pursuant to Section 6.01, 6.02 or 6.03 hereof. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 10.09. <u>Treatment of Information</u>. (a) Certain of the Lenders may enter into this Agreement and take or not take action hereunder or under the other Loan Documents on the basis of information that does not contain material non-public information with respect to any of the Loan Parties or their securities ("**Restricting Information**"). Other Lenders may enter into this Agreement and take or not take action hereunder or under the other Loan Documents on the basis of information that may contain Restricting Information. Each Lender acknowledges that United States federal and state securities laws prohibit any person from purchasing or selling securities on the basis of material, non-public information concerning the issuer of such securities or, subject to certain limited exceptions, from communicating such information to any other Person. Neither the Administrative Agent nor any of its Affiliates shall, by making any Communications (including Restricting Information) available to a Lender, by participating in any conversations or other interactions with a Lender or otherwise, make or be deemed to make any statement with regard to or otherwise warrant that any such information or Communication does or does not contain Restricting Information nor shall the Administrative Agent or any of its Affiliates be responsible or liable in any way for any decision a Lender may make to limit or to not limit its access to Restricting Information. In particular, none of the Administrative Agent nor any of its Affiliates (i) shall have, and the Administrative Agent, on behalf of itself and each of its Affiliates, hereby disclaims, any duty to ascertain or inquire as to whether or not a Lender has or has not limited its access to Restricting Information, such Lender's policies or procedures regarding the safeguarding of material, nonpublic information or such Lender's compliance with applicable Laws related thereto or (ii) shall have, or incur, any liability to any Loan Party or Lender or any of their respective Affiliates arising out of or relating

-147-

to the Administrative Agent or any of its Affiliates providing or not providing Restricting Information to any Lender.

(b)     Each Lender acknowledges that circumstances may arise that require it to refer to Communications that might contain Restricting Information.  Accordingly, each Lender agrees that it will nominate at least one designee to receive Communications (including Restricting Information) on its behalf and identify such designee (including such designee's contact information) on such Lender's Administrative Questionnaire.  Each Lender agrees to notify the Administrative Agent from time to time of such Lender's designee's e-mail address to which notice of the availability of Restricting Information may be sent by electronic transmission.

(c)     Each Lender acknowledges that Communications delivered hereunder and under the other Loan Documents may contain Restricting Information and that such Communications are available to all Lenders generally.  Each Lender that elects not to take access to Restricting Information does so voluntarily and, by such election, acknowledges and agrees that the Administrative Agent and other Lenders may have access to Restricting Information that is not available to such electing Lender.  None of the Administrative Agent nor any Lender with access to Restricting Information shall have any duty to disclose such Restricting Information to such electing Lender or to use such Restricting Information on behalf of such electing Lender, and shall not be liable for the failure to so disclose or use, such Restricting Information.

(d)     The provisions of the foregoing clauses of this Section 10.09 are designed to assist the Administrative Agent, the Lenders and the Loan Parties, in complying with their respective contractual obligations and applicable Law in circumstances where certain Lenders express a desire not to receive Restricting Information notwithstanding that certain Communications hereunder or under the other Loan Documents or other information provided to the Lenders hereunder or thereunder may contain Restricting Information.  Neither the Administrative Agent nor any of its Affiliates warrants or makes any other statement with respect to the adequacy of such provisions to achieve such purpose nor does the Administrative Agent or any of its Affiliates warrant or make any other statement to the effect that an Loan Party's or Lender's adherence to such provisions will be sufficient to ensure compliance by such Loan Party or Lender with its contractual obligations or its duties under applicable Law in respect of Restricting Information and each of the Lenders and each Loan Party assumes the risks associated therewith.

SECTION 10.10.  Setoff.  Subject to the Orders and the proviso of Section 8.02, in addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates and the L/C Issuer and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing to, such Lender and its Affiliates or the L/C Issuer and its Affiliates, as the case may be, to or for the

-148-

credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the L/C Issuer and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Each Lender and the L/C Issuer agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender or the L/C Issuer, as the case may be; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent, each Lender and the L/C Issuer under this Section 10.10 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender and the L/C Issuer may have.

SECTION 10.11.  Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.12.  Counterparts.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile or electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by facsimile or electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or electronic transmission.

SECTION 10.13.  Integration; Orders Control.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control. To the extent that any specific provision hereof is inconsistent with any of the Orders, the Interim Order or Final Order (as applicable) shall control.

SECTION 10.14.  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other

#89281377v6

document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof, and shall continue in full force and effect as long as any Loan or any other Obligation (other than Secured Hedge Agreements, Cash Management Obligations and other Obligations that are not accrued and payable) hereunder shall remain unpaid or unsatisfied or any Letter of Credit (other than any Letter of Credit that has been Cash Collateralized (including with funds held in the Letter of Credit Account in accordance with the terms hereof) in an amount not less than the L/C Collateralization Amount).

SECTION 10.15.  Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and the intent of such illegal, invalid or unenforceable provision shall be followed as closely as legally possible.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.16.  GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE THE BANKRUPTCY CODE.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, MAY BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS AND THE APPELLATE COURTS THEREOF AND AGREES NOT TO COMMENCE ANY SUCH LEGAL ACTION OR PROCEEDING IN ANY OTHER JURISDICTION.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HERETO IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN TELEPHONE, FACSIMILE OR ELECTRONIC TRANSMISSION) IN SECTION 10.02.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY

-150-

HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

SECTION 10.17.  <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.17 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 10.18.  <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Administrative Agent and the Administrative Agent shall have been notified by each Lender and the L/C Issuer that each such Lender and the L/C Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the Borrower, Holdings, each Agent and each Lender and their respective successors and assigns.

SECTION 10.19.  <u>Judgment Currency</u>.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

#89281377v6

SECTION 10.20.  Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents or the Secured Hedge Agreements or agreements governing Cash Management Obligations (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provision of this Section 10.20 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.21.  USA PATRIOT Act.  Each Lender and the Administrative Agent hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA PATRIOT Act.  This notice is given in accordance with the requirements of the USA PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

SECTION 10.22.  No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby, each of Holdings and the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the Facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Affiliates, on the one hand, and the Agents, the Arrangers and the Lenders, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Agents, the Arrangers and the Lenders is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower or any of its Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Agents, the Arrangers or the Lenders has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any Agent or Lender has advised or is currently advising the Borrower or any of its Affiliates on other matters) and none of the Agents, the Arrangers or the Lenders has any obligation to the Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Agents, the Arrangers and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, and may conflict with, those of the Borrower and its Affiliates, and none of the Agents, the Arrangers or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Agents, the Arrangers and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions

-152-

contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and Holdings and the Borrower have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate.  Each of Holdings and the Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Agents, the Arrangers and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty.

SECTION 10.23.  <u>No Personal Liability</u>.  No past, present or future director, officer, employee, incorporator, member, partner or stockholder of the Borrower, Holdings or any Loan Party or any of their direct or indirect parent companies (other than the Borrower, Holdings and any other Loan Party) shall have any liability for any obligations of the Borrower or the Loan Parties under the Loans, the Letters of Credit, the Guaranty, the Facilities, this Agreement or any other Loan Document or for any claim based on, in respect of, or by reason of such obligations or their creation.  Each Lender hereby waives and releases all such liability.

SECTION 10.24.  <u>Defaulting Lender</u>.

(a)    *Reallocation*.  Notwithstanding anything contained in this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Laws:

(i)    Any payment or prepayment (i) of any portion of the principal amount of Loans of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) shall be applied, *first*, to the Loans of other Lenders as if such Defaulting Lender had no Loans outstanding, until such time as the Outstanding Amount of Loans of each Lender shall equal its pro rata share thereof based on its Pro Rata Share (without giving effect to this Section 10.24), ratably to the Lenders in accordance with their Pro Rata Share of Loans being repaid or prepaid, *second*, to the then outstanding amounts (including interest thereon) owed under the terms hereof by such Defaulting Lender to the Administrative Agent or (to the extent the Administrative Agent has received notice thereof) to any other Lender, ratably to the Persons entitled thereto, and *third*, the balance, if any, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction, and (ii) of any other amounts thereafter received by the Administrative Agent for the account of such Defaulting Lender (including amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 10.10) to have been paid to such Defaulting Lender and applied on behalf of such Defaulting Lender, *first*, to the liabilities above referred to in item *second* of clause (i) above, *second*, to the matters above referred to in item *third* of clause (i) above, and *third*, the balance, if any, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any of such amounts as are reallocated pursuant to this Section 10.24 that are payable or paid to such Defaulting Lender shall be deemed paid to such Defaulting Lender and applied by the Administrative Agent on behalf of such Defaulting Lender, and each Lender hereby irrevocably consents thereto.

(b)    *Cure*.  A Lender that has become a Defaulting Lender because of an event referenced in the definition of "Defaulting Lender" may cure such status and shall no longer constitute a Defaulting Lender as a result of such event when (i) such Defaulting Lender shall

-153-

have fully funded or paid, as applicable, all Loans or other amounts required to be funded or paid by it hereunder as to which it is delinquent (together, in each case, with such interest thereon as shall be required to any Person as otherwise provided in this Agreement), (ii) the Administrative Agent and each of the Borrower shall have received a certification by such Defaulting Lender of its ability and intent to comply with the provisions of this Agreement going forward and (iii) each of the Administrative Agent and the Borrower shall have determined (and the Borrower shall have notified the Administrative Agent) that they are satisfied, in their sole discretion, that such Defaulting Lender intends to continue to perform its obligations as a Lender hereunder and has all approvals required to enable it, to continue to perform its obligations as a Lender hereunder. No reference in this subsection to an event being "cured" shall by itself preclude any claim by any Person against any Lender that becomes a Defaulting Lender for such damages as may otherwise be available to such Person arising from any failure to fund or pay any amount when due hereunder or from any other event that gave rise to such Lender's status as a Defaulting Lender.

(c)    *Notices*. The Administrative Agent will promptly send to each Lender and the L/C Issuer a copy of any notice to the Borrower provided for in this Section 10.24.

SECTION 10.25. Acknowledgment and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

-154-

# ARTICLE XI

## Guaranty

SECTION 11.01.  <u>Guaranty</u>.  Each Loan Party irrevocably, absolutely and unconditionally guarantees, jointly and severally with the other Loan Parties, the due and punctual payment and performance of the Obligations for the ratable benefit of the Secured Parties and their respective successors, endorsees, transferees and assigns, in each case whether such Obligations are now existing or hereafter incurred under or arising out of any Loan Document, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance herewith or with any other Loan Documents.  Each Loan Party further agrees that the Obligations may be extended, increased or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension, increase or renewal, in whole or in part, of any Obligation.  To the extent permitted by applicable Law, each Loan Party waives presentment to, demand of payment from and protest to the Borrower or any other Loan Party of any of the Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.

SECTION 11.02.  <u>Guaranty of Payment</u>.  Each Loan Party further agrees that its guarantee hereunder constitutes a guarantee of payment when due and not of collection, and, to the extent permitted by applicable Law, waives any right to require that any resort be had by the Administrative Agent or any other Secured Party to any security held for the payment of the Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrower or any other Person.

SECTION 11.03.  <u>No Limitations, etc</u>.

(a)  Except for termination of a Guarantor's obligations hereunder as expressly provided for in Section 9.12, the obligations of each Loan Party under this Article XI shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor under this Article XI shall not be discharged or impaired or otherwise affected by:

(i)  the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Loan Document or otherwise;

(ii)  any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document or any other agreement, including with respect to any other Loan Party under this Agreement;

(iii)  the failure to perfect any security interest in, or the exchange, substitution, release or any impairment of, any security held by the Administrative Agent or any other Secured Party for the Obligations;

-155-

(iv)    any default, failure or delay, willful or otherwise, in the performance of the Obligations;

(v)    any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the indefeasible Payment in Full of all the Obligations);

(vi)    any illegality, lack of validity or enforceability of any Obligation;

(vii)    any change in the corporate existence, structure or ownership of the Borrower;

(viii)    the existence of any claim, set-off, appropriation or other rights that the Guarantor may have at any time against the Borrower, the Administrative Agent, or any other corporation or person, whether in connection herewith or any unrelated transactions, provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim; and

(ix)    any other circumstance (including without limitation, any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or the Guarantor or any other guarantor or surety.

Each Loan Party expressly authorizes the Secured Parties to take and hold security for the payment and performance of the Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Obligations, all without affecting the obligations of any Loan Party under this Article XI.

(b)    To the fullest extent permitted by applicable Law, each Loan Party waives any defense, set-off and counterclaim based on or arising out of any defense of the Borrower or any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower or any other Loan Party, other than the indefeasible Payment in Full of all the Obligations. The Administrative Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with the Borrower or any other Loan Party or exercise any other right or remedy available to them against the Borrower or any other Loan Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent the Obligations have been fully and indefeasibly paid in full in cash and discharged. To the fullest extent permitted by applicable Law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable Law, to impair or to extinguish any right of

-156-

reimbursement or subrogation or other right or remedy of such Guarantor against the Borrower or any other Loan Party, as the case may be, or any security.

SECTION 11.04.  <u>Reinstatement</u>.  Each Loan Party agrees that its obligations in respect of this Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Obligation is rescinded or must otherwise be restored by the Administrative Agent or any other Secured Party upon the bankruptcy, insolvency, dissolution, liquidation or reorganization of any other Loan Party or otherwise, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

SECTION 11.05.  <u>Agreement To Pay, Subrogation</u>.  In furtherance of the foregoing and not in limitation of any other right that the Administrative Agent or any other Secured Party has at law or in equity against any Loan Party by virtue hereof, upon the failure of the Borrower or any other Loan Party to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Loan Party hereby promises to and will forthwith pay, or cause to be paid, to the Administrative Agent for distribution to the applicable Secured Parties in cash the amount of such unpaid Obligation. Upon payment by any Guarantor of any sums to the Administrative Agent as provided above, all rights of such Loan Party against the Borrower, or other Loan Party or any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subject to Article V of the Security Agreement.

SECTION 11.06.  <u>Indemnity; Subrogation and Subordination</u>.

(a)    In addition to all such rights of indemnity and subrogation as the Loan Party may have under applicable Law (but subject to <u>Section 11.06(c)</u>), the Borrower agrees that in the event a payment of an obligation shall be made by any Loan Party under this Agreement, the Borrower shall indemnify such Loan Party for the full amount of such payment and such Loan Party shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment.

(b)    Each Loan Party (a "**Contributing Party**") agrees (subject to <u>Section 11.06(c)</u>) that, in the event a payment shall be made by any other Loan Party hereunder in respect of any Obligation and such other Loan Party (the "**Claiming Party**") shall not have been fully indemnified by the Borrower as provided in <u>Section 11.06(a)</u>, the Contributing Party shall indemnify the Claiming Party in an amount equal to the amount of such payment, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date hereof and the denominator shall be the aggregate net worth of all the Contributing Parties together with the net worth of the Claiming Party on the date hereof (or, in the case of any Loan Party becoming a party hereto pursuant to a Joinder Agreement, the date of the Joinder Agreement executed and delivered by such Loan Party). Any Contributing Party making any payment to a Claiming Party pursuant to this <u>Section 11.06(b)</u> shall be subrogated to the rights of such Claiming Party to the extent of such payment. Each Loan Party recognizes and acknowledges that the rights to contribution arising hereunder shall constitute an asset in favor of the party entitled to such contribution. In this connection, each Loan Party has the right to waive,

-157-

to the fullest extent permitted by applicable Law, its contribution right against any other Loan Party to the extent that after giving effect to such waiver such Loan Party would remain solvent, in the determination of the Lenders.

(c)    Notwithstanding any provision of this Agreement to the contrary, all rights of the Loan Parties under Section 11.06(a) and 11.06(b) and all other rights of indemnity, contribution or subrogation under applicable Law or otherwise shall be fully subordinated to the Payment in Full of the Obligations; provided that if any amount shall be paid to such Loan Party on account of such subrogation rights at any time prior to the Payment in Full of the Obligations, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent to be credited and applied against the Obligations, whether matured or unmatured, in connection with Section 8.03. No failure on the part of any Loan Party to make the payments required by Sections 11.06(a) and 11.06(b) (or any other payments required under applicable Law or otherwise) shall in any respect limit the obligations and liabilities of any Loan Party with respect to its obligations hereunder, and each Loan Party shall remain liable for the full amount of the obligations hereunder.

SECTION 11.07.  No Waiver; Enforcement; Indemnification.

(a)    None of the Administrative Agent or Lenders shall by any act (except by a written instrument pursuant to Section 10.01), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy under this Article XI or to have acquiesced to any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent or any Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Administrative Agent or any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which such Administrative Agent or Lender would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(b)    Each Guarantor agrees to pay or reimburse each Secured Party for all its reasonable and documented costs and expenses incurred in collecting against such Guarantor under this Guaranty or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Guarantor is a party subject to the expense reimbursement and indemnity obligations of the Borrower pursuant to Section 10.03, Section 10.04 and Section 10.05.

(c)    Each Guarantor agrees to pay, and to save the Administrative Agent, the Lenders and the other Persons referenced in Section 10.03, Section 10.04 and Section 10.05 of this Agreement harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Borrower would be required to do so pursuant to Section 10.03, Section 10.04 and Section 10.05 of this agreement.

-158-

(d)       The agreements in this <u>Section 11.07</u> shall survive Payment in Full.

SECTION 11.08.  <u>Information</u>.  Each Loan Party assumes all responsibility for being and keeping itself informed of the financial condition and assets of the Borrower and each other Loan Party, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that none of the Administrative Agent or the other Secured Parties will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 11.09.  <u>Keepwell</u>.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this Guaranty in respect of Swap Obligations that would otherwise constitute Obligations under the Loan Documents (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.09 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Guaranty, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the termination of the Commitments and the repayment, satisfaction or discharge in full in cash of all other Obligations under the Loan Documents. Each Qualified ECP Guarantor intends that this Section 11.09 constitute, and this Section 11.09 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

#89281377v6

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the date first above written.

AVAYA INC., as Borrower

By: _____
    Name: Kevin J. Kennedy
    Title: President and Chief
        Executive Officer

**AVAYA HOLDINGS CORP.,** as
    Holdings

By: _____
    Name: Kevin J. Kennedy
    Title: President and Chief
        Executive Officer

**AVAYA CALA INC.**
**AVAYA EMEA LTD.**
**AVAYA HOLDINGS LLC**
**AVAYA HOLDINGS TWO, LLC**
**AVAYA INTEGRATED CABINET**
**SOLUTIONS INC.**
**AVAYA MANAGEMENT**
**SERVICES INC.**
**AVAYA SERVICES INC.**
**AVAYA WORLD SERVICES INC.**
**OCTEL COMMUNICATIONS LLC**
**SIERRA ASIA PACIFIC INC.**
**TECHNOLOGY CORPORATION**
**OF AMERICA, INC.**
**UBIQUITY SOFTWARE**
**CORPORATION**
**VPNET TECHNOLOGIES, INC.**
**ZANG, INC.,**
as Guarantors

By: _____
    Name: John Sullivan
    Title:  Vice President

[Signature Page to Credit Agreement]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

AVAYA INC., as Borrower

By: _____
      Name: Kevin J. Kennedy
      Title: President and Chief
           Executive Officer


AVAYA HOLDINGS CORP., as Holdings

By: _____
      Name: Kevin J. Kennedy
      Title: President and Chief
           Executive Officer


AVAYA CALA INC.
AVAYA EMEA LTD.
AVAYA HOLDINGS LLC
AVAYA HOLDINGS TWO, LLC
AVAYA INTEGRATED CABINET SOLUTIONS INC.
AVAYA MANAGEMENT SERVICES INC.
AVAYA SERVICES INC.
AVAYA WORLD SERVICES INC.
OCTEL COMMUNICATIONS LLC
SIERRA ASIA PACIFIC INC.
TECHNOLOGY CORPORATION OF AMERICA, INC.
UBIQUITY SOFTWARE CORPORATION
VPNET TECHNOLOGIES, INC.
ZANG, INC.,
as Guarantors


By: _____
      Name: John Sullivan
      Title:  Vice President

[Signature Page to Credit Agreement]

**AVAYA FEDERAL SOLUTIONS, INC.**
as Guarantor

By: _____

Name: John Sullivan
Title:   Treasurer

[Signature Page to Credit Agreement]

**CITIBANK, N.A.,**
as Administrative Agent, L/C Issuer
and as a Lender

By: _____

    Name: Brendan Mackay
    Title: Director

**<u>Schedule I</u>**

**Commitments**

| Term Lender | Commitment |
|---|---|
| Citibank, N.A. | $725,000,000.00 |

## Schedule 1.01B

## Closing Date Guarantors

| Closing Date Guarantors |
|---|
| Avaya CALA Inc. |
| Avaya EMEA Ltd. |
| Avaya Federal Solutions, Inc. |
| Avaya Holdings LLC |
| Avaya Holdings Two, LLC |
| Avaya Integrated Cabinet Solutions Inc. |
| Avaya Management Services Inc. |
| Avaya Services Inc. |
| Avaya World Services Inc. |
| Octel Communications LLC |
| Sierra Asia Pacific Inc. |
| Technology Corporation of America, Inc. |
| Ubiquity Software Corporation |
| VPNet Technologies, Inc. |
| Zang, Inc. |

**Schedule 1.01C**

**Existing Letters of Credit**

| Loan Party | L/C Number | Issue Date | Expiration Date | Beneficiary | Amount |
|---|---|---|---|---|---|
| Avaya Inc. | 61621406 | 09/16/04 | 09/18/17 | CITIBANK TEL AVIV | ILS 120,000.00 |
| Avaya Inc. | 61626925 | 11/12/04 | 12/10/17 | CITIBANK INTERNATIONAL PLC | GBP 300,000.00 |
| Avaya Inc. | 61644089 | 09/06/05 | 09/29/29 | CITIBANK N.A. | AED 50,000.00 |
| Avaya Inc. | 61647326 | 01/13/06 | 02/16/17 | CITIBANK A.S. PRAHA | EUR 22,139.00 |
| Avaya Inc. | 63661002 | 02/29/08 | 06/30/17 | Citibank Hungary | EUR 235,251.00 |
| Avaya Inc. | 63661089 | 03/19/08 | 04/30/17 | Travelers Casualty | USD 2,092,648.00 |
| Avaya Inc. | 63661123 | 03/19/08 | 04/30/17 | National Union Fire Insurance | USD 5,788,803.00 |
| Avaya Inc. | 63664023 | 02/02/09 | 02/25/17 | Lumbermans Insurance | USD 89,816.96 |
| Avaya Inc. | 63654806 | 06/25/10 | 05/31/17 | Citibank Chandigarh | INR 50,000.00 |
| Avaya Inc. | 63655764 | 10/12/10 | 09/30/17 | CITIBANK SINGAPORE | SGD 324,616.38 |
| Avaya Inc. | 63656640 | 01/13/11 | 01/31/17 | SRI Seven Lakes LLC | USD 600,000.00 |
| Avaya Inc. | 63657135 | 03/11/11 | 03/01/17 | HSBC Trinkaus & Burkhardt AG | EUR 18,482,117.11 |
| Avaya Inc. | 63658582 | 09/09/11 | 09/30/17 | Prudential Insurance | USD 2,000,000.00 |
| Avaya Inc. | 63658615 | 09/13/11 | 11/01/17 | Citibank Canada | CAD 500,000.00 |
| Avaya Inc. | 63667082 | 01/07/13 | 12/10/17 | Gelco Corporation | USD 700,000.00 |

| Loan Party | L/C Number | Issue Date | Expiration Date | Beneficiary | Amount |
|---|---|---|---|---|---|
| Avaya Inc. | 63667183 | 01/17/13 | 03/02/18 | Citibank Dubai | AED 50,000.00 |
| Avaya Inc. | 63669184 | 09/19/13 | 10/18/17 | Citibank Chandigarh | INR 50,000.00 |
| Avaya Inc. | 69600250 | 03/10/14 | 03/07/17 | MR 12121 LLC | USD 3,000,000.00 |
| Avaya Inc. | 69600226 | 03/18/14 | 04/15/17 | Citi Delhi | INR 250,000.00 |
| Avaya Inc. | 69600348 | 03/21/14 | 10/31/17 | Citibank UAE | USD 37,000.00 |
| Avaya Inc. | 69600393 | 03/26/14 | 03/26/17 | 10-30 South Wacker | USD 120,718.30 |
| Avaya Inc. | 69601231 | 07/01/14 | 07/30/17 | Citibank Canada | CAD 129,666.66 |
| Avaya Inc. | 69602834 | 01/15/15 | 02/14/17 | CITIBANK, N.A. PUNE | INR 10,000,000.00 |
| Avaya Inc. | 69603356 | 03/03/15 | 04/03/17 | CITIBANK N.A. TEL-AVIV, ISRAEL | ILS 4,826,038.80 |
| Avaya Inc. | 69607086 | 04/29/16 | 01/30/17 | AO MT KEMBLE, LLC | USD 2,000,000.00 |
| Avaya Inc. | 69608283 | 10/12/16 | 10/12/17 | ATLANTIC SPECIALTY INSURANCE | USD 2,358,647.99 |
| Avaya Inc. | 69608310 | 10/13/16 | 10/13/17 | ZURICH AMERICAN INSURANCE | USD 750,000.00 |
| Avaya Inc. | 69608750 | 12/14/16 | 12/14/17 | AMERICAN EXPRESS | USD 2,500,000.00 |
| Avaya International Sales Ltd. | 69604973 | 08/7/15 | 08/7/17 | Deutsche Bank (DB) AG, Amsterdam Branch | EUR 18,900,00.00 |
| Avaya International Sales Ltd. | 69605293 | 09/17/15 | 06/15/17 | Citibank Japan Ltd. | JPY 80,000,000.00 |
| Avaya International Sales Ltd. | 69605734 | 11/6/15 | 11/6/17 | Citibank, N.A. London | GBP 150,000.00 |

| Loan Party | L/C Number | Issue Date | Expiration Date | Beneficiary | Amount |
|---|---|---|---|---|---|
| Avaya International Sales Ltd. | 69606988 | 04/19/16 | 04/19/17 | Banco Citibank | BRL 3,034,381.90 |
| Avaya International Sales Ltd. | 69607481 | 06/30/16 | 07/29/17 | Banco Citibank | BRL 2,758,580.73 |
| Avaya International Sales Ltd. | 69607919 | 08/25/16 | 08/25/17 | Citibank Bangalore | INR 10,000,000.00 |
| Avaya International Sales Ltd. | 69608340 | 10/18/16 | 08/25/17 | Citibank Banglore | INR 10,000,000.00 |

## Schedule 1.01D

## Excluded Subsidiaries

| Current Legal Entities Owned | Jurisdiction of Organization | Record Owner |
|---|---|---|
| Persony, Inc. | Delaware | Avaya Inc. |
| KnoahSoft, Inc. | Delaware | Avaya Inc. |
| Esna Technologies Corp. | Delaware | Esna Technologies Inc. |

## Schedule 5.06

### Litigations and Investigations

1. Avaya Inc. v. Telecom Labs, Inc., et al., US District Court, District of NJ, Case 1:06-cv-02490.

2. SAE Power Incorporated and SAE Power Company ("SAE") v. Avaya Inc., Essex County Superior Court, Law Division, Civil Action No. L-1136-11.

3. Network-1 Security Solutions, Inc. v. Avaya Inc., US District Court, Eastern District of Texas, Tyler Division, Case 6:11-cv-492.

4. Charter Communications v. Avaya Inc., Somerset County Superior Court, Law Division, New Jersey, Case SOM-L-281-14

5. Uniloc USA Inc. and Uniloc Luxembourg, SA v. Avaya Inc. (Uniloc I), US District Court, Eastern District of Texas, Tyler Division, Case 6:15-cv-01168.

6. Straight Path IP Group, Inc. v. Avaya Inc., US District Court, Northern District of California, San Jose Division, Case No. 5:15-cv-3459.

7. Uniloc USA, Inc. and Uniloc Luxembourg, S.A. (Uniloc II), US District Court, Eastern District of Texas, Marshall Division, Case 2:16-cv-00777.

8. BlackBerry Limited and BlackBerry Corporation v. Avaya Inc., US District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:16-02185

9. Magnacross LLC v. Avaya Inc., Case No. 2:16-cv-1461, US District Court, Eastern District of Texas, Marshall Division.

10. Interactive Intelligence, Inc. v. Avaya Inc., US District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:16-cv-2062

11. Avaya Inc. v. Interactive Intelligence, Inc., AAA Arbitration, Case No. 01-16-0004-7193

12. Division De Empresas Vinculadas (Argentina Customs Cases involving years 2008-2011).

13. Challenge to Avaya France's FY15 restructuring.

**Schedule 5.08**

**Closing Date Secured Real Property**

1.  Avaya Inc.'s Owned Real Property located at 9650 Interport Drive, Shreveport, Louisiana 71118.

**Schedule 5.12**

**Subsidiaries and Other Equity Investments**

| Current Legal Entities Owned | Jurisdiction of Organization | Record Owner | No. Shares / Interest Owned | Total Shares Authorized | Stock / Membership Certificate No. |
|---|---|---|---|---|---|
| Avaya Inc. | Delaware | Avaya Holdings Corp. | 100 common shares; 100% | 100 common shares | No. 1 |
| Sierra Asia Pacific Inc. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya CALA Inc. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya EMEA Ltd. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya Federal Solutions, Inc. | Delaware | Avaya Inc. | 100 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya Integrated Cabinet Solutions Inc. | Delaware | Avaya Inc. | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya Management Services Inc. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya World Services Inc. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Technology Corporation of America, Inc. | Delaware | Sierra Communication International LLC | 1,000 common shares; 100% | 1,000 common shares | No. 10 |
| VPNet Technologies, Inc. | Delaware | Avaya Inc. | 1,000 common shares; 100% | 1,000 common shares | No. 1 |
| Avaya Holdings LLC | Delaware | Avaya Inc. | N/A; 100% | N/A | Uncertificated |
| Avaya Holdings Two, LLC | Delaware | Avaya Inc. | N/A; 100% | N/A | Uncertificated |
| Sierra Communication International LLC | Delaware | Avaya Inc. | N/A; 100% | N/A | Uncertificated |
| Octel Communications LLC | Delaware | Avaya Inc. | N/A; 100% | N/A | Uncertificated |
| Ubiquity Software Corporation | Delaware | Avaya Inc. | 1,000 common shares; 100% | 1,000 common shares | No. CS-3 |
| Zang, Inc. | Delaware | Avaya Inc. | 100 common shares; 100% | 100 | Uncertificated |

| Current Legal Entities Owned | Jurisdiction of Organization | Record Owner | No. Shares / Interest Owned | Total Shares Authorized | Stock / Membership Certificate No. |
|---|---|---|---|---|---|
| Avaya Services Inc. | New York | Avaya Inc. | 1,000 common shares; 100% | 1,000 | Uncertificated |
| Persony, Inc. | Delaware | Avaya Inc. | 3,000,000; 100% | 5,000,000 | Uncertificated |
| Sipera Systems Private Limited | India | Avaya Inc.<br><br>Eklovya Rai Nagpal | 9,999; 99.99%<br><br>1; 0.01% | 10,000 | Uncertificated |
| Avaya Canada Corp. | Nova Scotia (NSULC) | Avaya Holdings LLC | 101 common shares; 100% | 1,000,000,000 common shares | No. 1 (65 shares) |
| 3102455 Nova Scotia Company | Nova Scotia (NSULC) | Avaya Inc. | 1 common share; 100% | 100,000 common shares | No. 4 |
| Nimcat Networks General Partnership | Canada | Avaya Inc.<br><br>3102455 Nova Scotia Company | 99.1% LP interest<br><br>0.9% GP interest | N/A<br><br>N/A | Uncertificated |
| Avaya Mauritius Ltd | Mauritius | Avaya Inc. | 2,812,350 shares; 100% | Unlimited | N7 (1,828,027 shares) |
| Avaya Australia Pty Ltd | Australia | Avaya Inc. | 100,000 shares; 100% | 100,000 shares | No. 2 (65,000 shares) |
| Mosaix Limited | UK | Avaya Inc. | 269,515 shares; 100% | 269,515 shares | No. 2 (175,185 shares) |
| Avaya Venezuela S.R.L. | Venezuela | Avaya CALA Inc. | 2,000 quotas with nominal value of Bs. 1,000 each; 100% | Bs. 2,000 | Uncertificated |
| Avaya Communication de Colombia S.A. | Colombia | Sierra Communication International LLC<br><br>Avaya CALA Inc.<br><br>Avaya World Services Inc.<br><br>Sierra Asia Pacific Inc.<br><br>Avaya EMEA Ltd. | 90.227%<br><br><br>9.764%<br><br>0.003%<br><br><br>0.003%<br><br>0.003% | | |
| Avaya Philippines Inc. | Philippines | Sierra Communication International LLC | 100%   [Note: Each director holds 1 share in trust] | | |
| Avaya Slovakia s.r.o. | Slovakia | Sierra Communication International LLC | 100% | | |

| Current Legal Entities Owned | Jurisdiction of Organization | Record Owner | No. Shares / Interest Owned | Total Shares Authorized | Stock / Membership Certificate No. |
|---|---|---|---|---|---|
| Avaya Hungary Ltd./Avaya Hungary Communication Limited Liability Company (both are legal entity names) | Hungary | Sierra Communication International LLC<br><br>Avaya EMEA Ltd. | 99.994%<br><br>0.006% | | |
| Avaya Panama Ltda. | Panama | Sierra Communication International LLC<br><br>Avaya CALA Inc. | 95%<br><br>5% | | |
| Avaya (Gibraltar) Investments Ltd. | Gibraltar | Sierra Communication International LLC | 100% | | |
| Avaya Communication Israel Ltd. | Israel | Sierra Communication International LLC | 100% | | |
| Avaya Communication de Mexico SA de C.V. | Mexico | Sierra Communication International LLC<br><br>Avaya CALA Inc. | 99.99%<br><br>0.01% | | |
| Avaya (China) Communication Co., Ltd. | China | Sierra Communication International LLC | 100% | | |
| Avaya India Pvt. Ltd. | India | Sierra Communication International LLC<br><br>Avaya International Enterprises Ltd. | 99.99%<br><br>.01% | | |
| Avaya India (SEZ) Pvt. Ltd. | India | Sierra Communication International LLC<br><br>Avaya International Enterprises Ltd. | 99.90%<br><br>.10% | | |
| P.T. Avaya Indonesia | Indonesia | Sierra Communication International LLC<br><br>Sierra Asia Pacific Inc. | 99%<br><br>1% | | |
| Avaya UK Holdings Limited. | UK | Sierra Communication International LLC | 100% | | |

11

| Current Legal Entities Owned | Jurisdiction of Organization | Record Owner | No. Shares / Interest Owned | Total Shares Authorized | Stock / Membership Certificate No. |
|---|---|---|---|---|---|
| PT Sierra Communication Indonesia | Indonesia | Sierra Communication International LLC<br><br>Sierra Asia Pacific Inc. | 99%<br><br><br>1% | | |
| Avaya International Enterprises Ltd. | Ireland | Sierra Communication International LLC<br><br>Avaya Gibraltar (Investments) Limited | .02%<br><br><br>99.98% | | |
| Avaya UK | England & Wales | Sierra Communication International LLC<br><br>Avaya UK Holdings Limited | .01%<br><br><br>99.99% | | |
| Sipera Systems UK Limited | United Kingdom | Sierra Communication International LLC | 100% | | |
| Esna Technologies Inc. | Canada | Avaya Inc. | 100% | | C-1, C-2, C-3 |
| Esna Technologies Corp. | Delaware | Esna Technologies Inc. | 100% | 1,500 common stock | 01 |
| KnoahSoft, Inc. | Delaware | Avaya Inc. | 100% | 20,000,000 common stock<br><br>5,00,000 preferred sock | uncertificated |
| KnoahSoft Technologies Private Limited | India | Avaya Inc. – 1%<br>KnoahSoft, Inc. 99% | Avaya Inc. – 1%<br>KnoahSoft, Inc. 99% | | uncertificated |

## **Schedule 7.08**

### **Transactions with Affiliates**

None.

## **Schedule 7.09**

### **Burdensome Agreements**

None.

## Schedule 10.02

### Administrative Agent's Office, Certain Addresses for Notices

**Loan Parties**

c/o Avaya Inc.
4655 Great America Parkway
Santa Clara, California 95054
Attention: John Sullivan, Vice President and Corporate Treasurer
Phone: 408-496-3211
Email: jpsullivan@avaya.com

with a copy to, which such copy shall not constitute notice:
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Melissa J. Hutson, P.C.
Phone: 212-446-6459
Fax: 212-446-4900
Email: melissa.hutson@kirkland.com

**Administrative Agent**

Citibank, N.A.
1615 Brett Road
New Castle, DE 19720
Fax: 646-274-5025
Attention: US ABTF Team / Kimberly Shelton

with a copy to:
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:  Kenneth J. Steinberg
Phone:  212-450-4566
Fax:  212-701-5566
Email:  kenneth.steinberg@davispolk.com

**L/C Issuer**

Citibank, N.A.
390 Greenwich Street – 1st Fl
New York, NY 10013
Attention: Denise Perry/Katy Noel
Fax: 646-291-3358
E-mail: denise.perry@citi.com and katy.noel@citicom

EXHIBIT A

**FORM OF**

**13-WEEK PROJECTION**

[Attached separately]

STRICTLY PRIVATE CONFIDENTIAL
DRAFT – PRELIMINARY AND SUBJECT TO SUBSTANTIAL REVISION

**Project Arrowhead - US Weekly Cash Flow Forecast**
DRAFT

($ in 000's)

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1/21 | 1/28 | 2/4 | 2/11 | 2/18 | 2/25 | 3/4 | 3/11 | 3/18 | 3/25 | 4/1 | 4/8 | 4/15 | 1/21 |
| | 1/27 | 2/3 | 2/10 | 2/17 | 2/24 | 3/3 | 3/10 | 3/17 | 3/24 | 3/31 | 4/7 | 4/14 | 4/21 | 4/21 |
| **DOMESTIC** | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Cash Receipts** | | | | | | | | | | | | | | |
| AR Collection | $ 41,683 | $ 40,797 | $ 30,184 | $ 38,360 | $ 36,682 | $ 35,436 | $ 24,354 | $ 35,148 | $ 27,764 | $ 74,002 | $ 23,578 | $ 18,866 | $ 21,234 | $ 448,086 |
| Special Collection | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | 250 | 1,232 | 250 | 250 | 250 | 1,232 | 250 | 250 | 250 | 250 | 1,232 | 250 | 250 | 6,196 |
| **Total Cash Receipts** | 41,933 | 42,029 | 30,434 | 38,610 | 36,932 | 36,668 | 24,604 | 35,398 | 28,014 | 74,252 | 24,810 | 19,116 | 21,484 | 454,282 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Vendor Payments | (27,233) | (25,061) | (49,687) | (28,675) | (19,012) | (6,594) | (40,469) | (6,853) | (8,292) | (8,288) | (37,948) | (7,511) | (11,261) | (276,886) |
| Payroll | (11,861) | (8,334) | (1,026) | (5,306) | (30,815) | (17,116) | (1,026) | (5,306) | (1,026) | (39,265) | (1,026) | (5,306) | (1,026) | (128,439) |
| Severance | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | (500) | (500) | (100) | - | (3,000) | (500) | (100) | - | (3,000) | (500) | (50) | (50) | (3,000) | (11,300) |
| Pension | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Benefits | (1,400) | (2,900) | (1,400) | (2,900) | (1,400) | (2,900) | (1,400) | (2,900) | (1,400) | (2,900) | (1,400) | (2,900) | (1,400) | (27,200) |
| Other Payments | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (250) | (3,250) |
| **Total Operating Cash Disbursements** | (41,244) | (37,044) | (52,463) | (37,131) | (54,477) | (27,359) | (43,245) | (15,309) | (13,968) | (51,204) | (40,674) | (16,017) | (16,937) | (447,074) |
| **OPERATING CASH FLOW** | 688 | 4,984 | (22,030) | 1,480 | (17,545) | 9,308 | (18,641) | 20,089 | 14,046 | 23,048 | (15,864) | 3,099 | 4,547 | 7,208 |
| **Debt Service** | | | | | | | | | | | | | | |
| Principal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest and Financing Fees | (56,287) | (1,505) | - | - | - | (4,864) | - | - | - | (5,377) | (48,365) | - | - | (116,398) |
| **Total Financing Cash Disbursements** | (56,287) | (1,505) | - | - | - | (4,864) | - | - | - | (5,377) | (48,365) | - | - | (116,398) |
| **Non-Recurring** | | | | | | | | | | | | | | |
| L/C Collateralization | (68,813) | - | - | - | - | - | - | - | - | - | - | - | - | (68,813) |
| Professional Fees | (198) | (2,225) | (125) | (1,070) | (190) | (2,800) | (65) | (380) | (5,415) | (2,050) | (8) | (1,700) | (8,780) | (25,006) |
| Other | (500) | - | - | - | - | - | - | - | - | - | - | - | - | (500) |
| **Total Restructuring Disbursements** | (69,511) | (2,225) | (125) | (1,070) | (190) | (2,800) | (65) | (380) | (5,415) | (2,050) | (8) | (1,700) | (8,780) | (94,319) |
| **NET CASH FLOW** | (125,109) | 1,254 | (22,155) | 410 | (17,735) | 1,644 | (18,706) | 19,709 | 8,631 | 15,621 | (64,237) | 1,399 | (4,233) | (203,508) |
| **InterCo** | | | | | | | | | | | | | | |
| Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payments | (50,000) | - | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| **Intercompany, net** | (50,000) | - | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| **NET CASH FLOW POST INTERCOMPANY** | (175,109) | 1,254 | (22,155) | 410 | (17,735) | 1,644 | (18,706) | 19,709 | 8,631 | 15,621 | (64,237) | 1,399 | (4,233) | (253,508) |
| **Liquidity** | | | | | | | | | | | | | | |
| Beginning Cash | 14,275 | 204,916 | 206,170 | 184,015 | 481,425 | 463,689 | 465,333 | 446,627 | 466,336 | 474,967 | 490,588 | 426,351 | 427,750 | 14,275 |
| Net Cash Flow | (125,109) | 1,254 | (22,155) | 410 | (17,735) | 1,644 | (18,706) | 19,709 | 8,631 | 15,621 | (64,237) | 1,399 | (4,233) | (203,508) |
| ABL (Repay)/Draw | (55,000) | - | - | - | - | - | - | - | - | - | - | - | - | (55,000) |
| DIP (Repay)/Draw | 420,750 | - | - | 297,000 | - | - | - | - | - | - | - | - | - | 717,750 |
| Transfer (To) / From Foreign | (50,000) | - | - | - | - | - | - | - | - | - | - | - | - | (50,000) |
| **Ending Cash** | 204,916 | 206,170 | 184,015 | 481,425 | 463,689 | 465,333 | 446,627 | 466,336 | 474,967 | 490,588 | 426,351 | 427,750 | 423,517 | 423,517 |
| Cash Pooling Support | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) |
| **UNRESTRICTED CASH** | $ 129,916 | $ 131,170 | $ 109,015 | $ 406,425 | $ 388,689 | $ 390,333 | $ 371,627 | $ 391,336 | $ 399,967 | $ 415,588 | $ 351,351 | $ 352,750 | $ 348,517 | $ 348,517 |

**Avaya  - Weekly Forecast to Actuals - Week 1-2**

**Updated**

*Privileged and Confidential*

*Actuals vs. DIP Budget - Domestic*

*($ in 000's)*

| | | Week 1 - 2 | Week 1 - 2 | $ Variance | % Variance | Comment |
|---|---|---|---|---|---|---|
| | | 1/14 | 1/14 | | | |
| | | 1/27 | 1/27 | | | |
| | | *Actual* | *Forecast* | | | |
| **Cash Receipts** | AR Collection & Other Receipts | $          - | $          - | $          - | 0% | |
| | **Total Cash Receipts** | - | - | - | **0%** | |
| **Operating Disbursements** | Vendor Payments | - | - | - | 0% | |
| | Payroll & Severance | - | - | - | 0% | |
| | Taxes | - | - | - | 0% | |
| | Pension | - | - | - | 0% | |
| | Benefits | - | - | - | 0% | |
| | Other Payments | - | - | - | 0% | |
| | **Total Operating Cash Disbursements** | - | - | - | **0%** | |
| | **OPERATING CASH FLOW** | - | - | - | **0%** | |
| **Debt Service** | Principal | - | - | - | 0% | |
| | Interest and Financing Fees | - | - | - | 0% | |
| | **Total Financing Cash Disbursements** | - | - | - | **0%** | |
| **Non-Recurring** | L/C Collateralization | - | - | - | 0% | |
| | Professional Fees | - | - | - | 0% | |
| | Other | - | - | - | 0% | |
| | **Total Restructuring Disbursements** | - | - | - | **0%** | |
| | **NET CASH FLOW** | - | - | - | **0%** | |
| **Liquidity** | Beginning Cash | - | - | - | 0% | |
| | Net Cash Flow | - | - | - | 0% | |
| | ABL (Repay)/Draw | - | - | - | 0% | |
| | DIP (Repay)/Draw | - | - | - | 0% | |
| | **Ending Cash** | - | - | - | **0%** | |
| | Cash Pooling Support | - | - | - | 0% | |
| | **UNRESTRICTED DOMESTIC DEBTOR CASH** | $          - | $          - | $          - | **0%** | |
| | **FOREIGN BRANCHES** | $          - | $          - | $          - | **0%** | |
| | **FOREIGN SUBSIDIARIES** | $          - | $          - | $          - | **0%** | |
| | **TOTAL CASH** | $          - | $          - | $          - | **0%** | |

EXHIBIT B

# FORM OF

## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [the] [each][1] Assignor (as defined below) and [the] [each][2] Assignee (as defined below) pursuant to Section 10.07 of the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto, receipt of a copy of which is hereby acknowledged by [the] [each] Assignee. [It is understood and agreed that the rights and obligations of [the Assignors] [the Assignees][3] hereunder are several and not joint.][4] Capitalized terms used in this Assignment and Assumption and not otherwise defined herein have the meanings specified in the Credit Agreement. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, [the] [each] Assignor hereby irrevocably sells and assigns to [the Assignee] [the respective Assignees], and [the] [each] Assignee hereby irrevocably purchases and assumes from [the Assignor] [the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of [the Assignor's] [the respective Assignors'] rights and obligations in [its capacity as a Lender] [their respective capacities as Lenders] under the Credit Agreement, any other Loan Documents and any other documents or instruments delivered pursuant to any of the foregoing to the extent related to the amount and

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language. If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

percentage interest identified below of all of such outstanding rights and obligations of [the Assignor] [the respective Assignors] under the facility identified below and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)] [the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other Loan Document or any other documents or instruments delivered pursuant to any of the foregoing or the transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned by [the] [any] Assignor to [the] [any] Assignee pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as [[the] [an] "**Assigned Interest**"). Such sale and assignment is without recourse to [the] [any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the] [any] Assignor.

1.    Assignor[s] (the "**Assignor[s]**"):    _____

2.    Assignee[s] (the "**Assignee[s]**"):    _____

        Assignee is an Affiliate of: [Name of Lender]

        Assignee is an Approved Fund of: [Name of Lender]

3.    Borrower: Avaya Inc.

4.    Administrative Agent: Citibank, N.A.

5.    Assigned Interest:

| Facility | Aggregate Amount of Commitments/Loans of all Lenders | Amount of Commitments/Loans Assigned[5] | Percentage Assigned of Commitments/Loans[6] |
|---|---|---|---|
| Term Loans | $ | $ | % |

Effective Date:

---

[5] Set forth, to be no less than an integral multiple of $1,000,000 unless the Borrower and the Administrative Agent each consent.

[6] Set forth, to at least 8 decimals, as a percentage of the Commitments/Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

[NAME OF ASSIGNOR], as Assignor,

By: _____

    Name:

    Title:

[NAME OF ASSIGNEE], as Assignee,

By: _____

    Name:

    Title:

[Consented to and]<sup>7</sup> Accepted:

CITIBANK, N.A.,
as Administrative Agent,


By: _____
       Name:
       Title:

---

[7] No consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to another Lender, an Affiliate of a Lender or an Approved Fund.

AVAYA INC.[8]

By: _____
    Name:
    Title:

---

[8] No consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any Assignee.

Annex I

# CREDIT AGREEMENT[9]

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ASSUMPTION

1.  Representations and Warranties.

1.1.  <u>Assignor</u>. [The] [Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [the relevant] Assigned Interest, (ii) [the] [such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of Holdings, the Borrower, or any of their Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by Holdings, the Borrower, or any of their Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2.  <u>Assignee</u>. [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 10.07(b) of the Credit Agreement (subject to such consents, if any, as may be required under Section 10.07(b)(i) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of [the] [the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by [the] [such] Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the] [such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received copies of the most recent financial statements delivered pursuant to Section 4.01(a)(vii)(C) or 6.01 of the Credit Agreement, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, (vi) it has, independently and without reliance on any Agent or any other Lender and based on

---

[9] Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto.

such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, (vii) if it is not already a Lender under the Credit Agreement, attached to the Assignment and Assumption is an Administrative Questionnaire, (viii) the Administrative Agent has received a processing and recordation fee of $3,500 as of the Effective Date and (ix) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to Section 3.01 of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance upon any Agent, [the] [any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the] [each] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [each] Assignee for amounts which have accrued from and after the Effective Date.

3. <u>General Provisions</u>. This Assignment and Assumption shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

#89242009v10

EXHIBIT C

FORM OF CALCULATION CERTIFICATE

Financial Statement Date:      ,

To:      Citibank, N.A., as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The undersigned Responsible Officer hereby certifies as of the date hereof that he/she is the of  the Borrower, and that, as such, he/she is authorized to execute and deliver this Certificate to the Administrative Agent on the behalf of the Borrower, and that:

*[Use following paragraph 1 for fiscal **year-end** financial statements]*

1.      Attached hereto as Schedule 1 are (a) the year-end audited financial statements required by Section 6.01(a) of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, together with the report and opinion of PriceWaterhouseCoopers LLP or an independent certified public accountant that is deemed acceptable under Section 6.01(a) and (b) a narrative report and management's discussion and analysis required by Section 6.01(a)(ii)(B) of the Credit Agreement for the fiscal year of the Borrower ended as of the above date, as compared to amounts for previous fiscal years and budgeted amounts.

*[Use following paragraph 1 for fiscal **quarter-end** financial statements]*

1.      Attached hereto as Schedule 1 are (a) the unaudited financial statements required by Section 6.01(b)(i) of the Agreement for the fiscal quarter of the Borrower ended as of the above date. Such financial statements fairly present in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP as at such date and for such period, subject only to normal year-end adjustments and the absence of footnotes and (b) a narrative report and management's discussion and analysis required by Section 6.01(b)(ii) of the Credit Agreement for the fiscal quarter of the Borrower ended as of the above date and the then elapsed portion of the fiscal year as compared to the comparable periods in the previous fiscal year and budgeted amounts.

2.        [Set forth on Schedule 2 attached hereto are descriptions of all events, conditions or circumstances during the fiscal quarter ended as of the above date requiring a mandatory prepayment under Section 2.05(b).][10]

*[Use following paragraph 1 for fiscal **month-end** financial statements]*

1.        Attached hereto as Schedule 1 are the unaudited financial statements required by Section 6.01(c) of the Agreement for the fiscal month of the Borrower ended as of the above date. Such financial statements fairly present in all material respects the financial condition, results of operations, changes in shareholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP as at such date and for such period, subject only to normal quarter and year-end accruals and other audit adjustments and the absence of footnotes.

2.        The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a review of the financial condition of the Borrower and the other Loan Parties during the accounting period covered by the attached financial statements.

3.        A review of the activities of the Borrower and the other Loan Parties during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Borrower and the other Loan Parties performed and observed all of their Obligations under the Loan Documents; and

[select one:]

**[to the best knowledge of the undersigned during such fiscal period, no Default has occurred and is continuing.]**

*—or—*

**[the following covenants have not been performed or observed and the following is a list of each such Default and its nature and status:]**

4.        The financial covenant analyses and information set forth on Schedule 3 attached hereto are true and accurate in all material respects on and as of the date of this Certificate.

5.        [[Set forth on Schedule 4 attached hereto is a][there have been no changes to the] list of each Subsidiary of the Borrower [as of the date hereof][most recently delivered by the Borrower].][11]

6.        [[Set forth on Schedule 5 attached hereto is a][there have been no changes to the] report setting forth the information required by Section 3.03(b) of the Security Agreement [as of the date hereof][most recently delivered by the Borrower].][12]

---

[10]        To be included with quarterly and annual Calculation Certificates.

[11]        To be included with quarterly and annual Calculation Certificates.

9

*IN WITNESS WHEREOF*, the undersigned has executed this Certificate as of_____, _____.

**AVAYA INC.**

By:

Name:

Title:

(continued….)

---

[12]    To be included with quarterly and annual Calculation Certificates.

#89242009v10

For the Month/Quarter/Year ended _____, _____ (the "Statement Date")

## SCHEDULE 2
to the Calculation Certificate

Events Requiring a Mandatory Prepayment

## SCHEDULE 3
[13]to the Calculation Certificate
($ in 000's)

**I.**     Section 7.14(a) – Minimum Liquidity.

    **A.**     Consolidated Liquidity as of the close of business on the fourth Friday preceding the Statement Date:

        1.     aggregate amount of all unrestricted Cash Equivalents held by the Loan Parties:

$_____

        2.     Cash Equivalents held by the Loan Parties that are restricted (other than Cash Equivalents restricted for the benefit of the Lenders (other than Letter of Credit Account or amounts deposited therein)):

$_____

        3.     Cash Equivalents pledged as collateral to secure the L/C Facility:

$_____

---

[13] This schedule is a summary of the terms of the Credit Agreement.  To the extent any conflict exists, the Credit Agreement shall control.

11

4.      Cash Equivalents held in the Cash Pool
Requirements Account:

$_____

5.      Consolidated Liquidity (Line I.A.1 minus Lines I.A.2
through I.A.4):

$_____

*Minimum Liquidity in effect as of the close of business on such Friday:*  $_____

**B.**      Consolidated Liquidity as of the close of business on the third Friday preceding
the Statement Date:

1.      aggregate amount of all unrestricted Cash Equivalents
held by the Loan Parties:

$_____

2.      Cash Equivalents held by the Loan Parties that
are restricted (other than Cash Equivalents
restricted for the benefit of the Lenders (other
than Letter of Credit Account or amounts
deposited therein)):

$_____

3.      Cash Equivalents pledged as collateral to secure the
L/C Facility:

$_____

12

4.      Cash Equivalents held in the Cash Pool
        Requirements Account:

                                                                        $_____

5.      Consolidated Liquidity (Line I.B.1 minus Lines I.B.2
        through I.B.4):

                                                                        $_____

*Minimum Liquidity in effect as of the close of business on such Friday:*  $_____

C.      Consolidated Liquidity as of the close of business on the second Friday
        preceding the Statement Date:

        1.      aggregate amount of all unrestricted Cash Equivalents
                held by the Loan Parties:

                                                                        $_____

        2.      Cash Equivalents held by the Loan Parties that
                are restricted (other than Cash Equivalents
                restricted for the benefit of the Lenders (other
                than Letter of Credit Account or amounts
                deposited therein)):
                                                                        $_____

        3.      Cash Equivalents pledged as collateral to secure the
                L/C Facility:

                                                                        $_____

        4.      Cash Equivalents held in the Cash Pool
                Requirements Account:

                                                                        $_____

13

5.    Consolidated Liquidity (Line I.C.1 minus Lines I.C.2 through I.C.4):

$\underline{\hspace{3cm}}$

*Minimum Liquidity in effect as of the close of business on such Friday:*  $\underline{\hspace{3cm}}$

**D.**    Consolidated Liquidity as of the close of business on the Friday immediately preceding the Statement Date:

1.    aggregate amount of all unrestricted Cash Equivalents held by the Loan Parties:

$\underline{\hspace{3cm}}$

2.    Cash Equivalents held by the Loan Parties that are restricted (other than Cash Equivalents restricted for the benefit of the Lenders (other than Letter of Credit Account or amounts deposited therein)):

$\underline{\hspace{3cm}}$

3.    Cash Equivalents pledged as collateral to secure the L/C Facility:

$\underline{\hspace{3cm}}$

4.    Cash Equivalents held in the Cash Pool Requirements Account:

$\underline{\hspace{3cm}}$

14

5.     Consolidated Liquidity (Line I.D.1 minus Lines I.D.2 through I.D.4):

$_____

*Minimum Liquidity in effect as of the close of business on such Friday:* $_____

**II.**    Section 7.14(b) – Minimum Consolidated EBITDA.

A.    Consolidated EBITDA of the Borrower and its Subsidiaries:

1.     Consolidated Net Income for the Subject Period:

$_____

2.     taxes based on income or profits or capital, including federal, state, franchise, excise and similar taxes and foreign withholding taxes paid or accrued (including any penalties and interest arising from such taxes, to the extent the same were deducted (and not added back) in computing such Consolidated Net Income and the net tax expenses associated with any adjustments made pursuant to clauses (a) through (o) of the definition of "Consolidated Net Income"):

$_____

15

3.      total interest expense and, to the extent not reflected in such total interest expense, any losses with respect to obligations under any Swap Contracts or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains with respect to such obligations, plus bank fees and costs of surety bonds in connection with financing activities, to the extent in each case the same were deducted (and not added back) in calculating such Consolidated Net Income:

$_____

4.      Consolidated Depreciation and Amortization Expense to the extent deducted (and not added back) in computing Consolidated Net Income:

$_____

5.      any restructuring charges, accruals and reserves deducted (and not added back) in computing Consolidated Net Income:

$_____

6.      any amount of minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly-owned Subsidiary to the extent deducted (and not added back) in computing Consolidated Net Income:

$_____

16

7.  extraordinary, non-recurring or unusual losses
    (including all fees and expenses relating thereto) or
    expenses, Transaction Expenses, costs incurred in
    connection with being a public company prior to the
    Closing Date, integration costs, transition costs, pre-
    opening, opening, consolidation and closing costs for
    facilities, costs incurred in connection with any
    strategic initiatives, costs incurred in connection with
    acquisitions after the Closing Date, other business
    optimization expenses (including costs and expenses
    relating to business optimization programs and new
    systems design and implementation costs), project start-
    up costs, restructuring costs and curtailments or
    modifications to pension and post-retirement employee
    benefit plans:

$_____

8.  restructuring related or similar charges, fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with the Credit Agreement and the other Loan Documents (including on account of professional fees and expenses, and including fees and expenses paid as adequate protection), the Cases, any reorganization plan in connection with the Cases, any "exit" credit agreement or "exit" financings, and any and all transactions contemplated by the foregoing, including the write-off of any receivables, the termination or settlement of executory contracts, professional and accounting costs, fees and expenses, management incentive, employee retention or similar plans (in each case, if required, to the extent approved by the Bankruptcy Court), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization of the Loan Parties (for the avoidance of doubt, in each case, without duplication of amounts added-back pursuant to Item 5 above):

$_____

9.  any net loss from discontinued operations:

$_____

18

10.    cash receipts (or any netting arrangements resulting in reduced cash expenditures) not representing Consolidated EBITDA or Consolidated Net Income in any period to the extent non-cash gains relating to such income were deducted in the calculation of Consolidated EBITDA pursuant to Items 11 and 13 below:

$\underline{\hspace{3cm}}$

11.    Sum of Lines II.A.1 through II.A.10, in each case without duplication:

$\underline{\hspace{3cm}}$

12.    net income from discontinued operations:

$\underline{\hspace{3cm}}$

13.    amount of extraordinary, non-recurring or unusual gains (less all fees and expenses relating thereto):

$\underline{\hspace{3cm}}$

14.    Sum of Lines II A.12 through 13, in each case without duplication:

$\underline{\hspace{3cm}}$

15.    adjustment resulting from the application of FASB Interpretation No. 45 (Guarantees):

$\underline{\hspace{3cm}}$

16.    Consolidated EBITDA (Line II A. 11 minus Line II A. 14 plus or minus (as applicable) Line II A. 15):

$\underline{\hspace{3cm}}$

*Minimum Cumulative Consolidated EBITDA*[14]

$\underline{\hspace{3cm}}$

---

[14] Minimum Cumulative Consolidated EBITDA for the periods ending March 31, 2017, June 30, 2017 and September 30, 2017 shall be no less than $133,000,000, $252,000,000 and $386,000,000, respectively; *provided*, that (i) in the calculation of Consolidated EBITDA for the periods commencing on January 1, 2017 and ending on June 30, 2017 and September 30, 2017 respectively, the Consolidated EBITDA for the quarter ending on March 31, 2017 included in the calculation of such Consolidated EBITDA shall not exceed $166,000,000 and (ii) in the calculation of Consolidated EBITDA for the period commencing on January 1, 2017 and ending on September 30, 2017, the Consolidated EBITDA for the quarter ending on June 30, 2017 included in the calculation of such Consolidated EBITDA shall not exceed $140,000,000.

#89242009v10

[SCHEDULE 4
to the Calculation Certificate

Subsidiaries]


[SCHEDULE 5
to the Calculation Certificate

Perfection Certificate Updates]

EXHIBIT D

**FORM OF**

**COMMITTED LOAN NOTICE**

To:    Citibank, N.A., as Administrative Agent
Citi Global Loans
1615 Brett Road OPS III
New Castle, Delaware 19720
Attn: Kimberly Shelton / U.S. ABTF Team
Telecopy: (646) 274-5025
E-mail: kimberly.shelton@citi.com glabfunitloansops@citi.com

[Date]

Ladies and Gentlemen:

Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby gives you notice, irrevocably, pursuant to Section 2.02(a) of the Credit Agreement that it hereby requests (select one):

☐    A Borrowing of new Loans

☐    A conversion of Loans

☐    A continuation of Loans

to be made on the terms set forth below:

(A)    Date of Borrowing, conversion or continuation (which is a Business Day)    _____

(B)      Principal amount[15]

(C)      Type of Loan[16]

(D)      Interest Period[17]


The Borrower hereby represents and warrants that the conditions to lending specified in Sections 4.02(d) and (e) of the Credit Agreement will be satisfied as of the date of Borrowing set forth above.

[The above request has been made to the Administrative Agent by telephone at (212) [          ]].

---

[15] Eurocurrency Rate Loans shall be in minimum of $1,000,000 (and any amount in excess of $1,000,000 shall be an integral multiple of $500,000). Base Rate Loans shall be in a minimum of $500,000 (and any amount in excess of $500,000 shall be an integral multiple of $100,000).

[16] Specify Eurocurrency or Base Rate.

[17] Applicable for Eurocurrency Rate Loans only.

22

AVAYA INC.

By: _____
     Name:
     Title:

EXHIBIT E

**FORM OF**

**INTERIM ORDER**

[Attached separately]

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

## INTERIM ORDER (I) AUTHORIZING DEBTORS
## (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
## 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e),
## AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363
## (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES
## PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING
## FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)

Upon the motion (the "Motion")[2] of Avaya Inc. (the "Company" or the "Borrower"),

Avaya Holdings Corp. ("Holdings"), Sierra Communication International LLC ("Sierra"), and

the other subsidiaries of the Company that are debtors and debtors-in-possession (collectively,

the "Subsidiary Guarantors"; collectively, with the Company and Holdings, the "Loan Parties";

and together, with Sierra, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

[2]     Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion.

Code"), and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and the local bankruptcy rules for the Southern District of

New York (the "Local Bankruptcy Rules"); and

Notice of the Motion and the Interim Hearing having been served by the Debtors as set

forth in the affidavit of service filed at [Docket No.  ], and and it appearing that notice was in the

Debtors' belief, the best notice available under the circumstances; and the Court having reviewed

the Motion; and the Interim Hearing having been held by this Court on January [__], 2017; and

upon the record made by the Debtors in the Motion, the Koza Declaration, the Greene

Declaration, the First Day Declaration and at the Interim Hearing, and after due deliberation and

sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition.*  The relief requested in the Motion is granted on an interim basis in

accordance with the terms of this Interim Order.

2.      *Relief Necessary to Avoid Immediate and Irreparable Harm.*  The interim relief

granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their

estates pending the Final Hearing.

3.      *Findings Regarding the DIP Financing and Cash Collateral.*  The DIP Financing

and the use of the Prepetition Collateral (including Cash Collateral (as that term is defined by the

Bankruptcy Code)) have been negotiated in good faith and at arm's-length, and the DIP Agent

and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full

protection of section 364(e) of the Bankruptcy Code.  The Prepetition Secured Parties have acted

in good faith regarding the DIP Financing and the Debtors' use of the Prepetition Collateral

(including the Cash Collateral) and the Prepetition Secured Parties (and the successors and

2

assigns thereof), and shall be entitled to the full protection of section 363(m) of the Bankruptcy Code.

4. *Authorization of the DIP Financing and the DIP Documents.*

(a)    The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents, including the credit agreement substantially in the form attached to the Motion as **Exhibit B** (the "DIP Credit Agreement") and to pay the non-refundable payment to the DIP Agent, Lead Arrangers or the DIP Lenders, as the case may be, of all fees and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement and the costs and expenses as may be due from time to time.

(b)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party thereto in accordance with their terms and this Interim Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

5. *Payment of the Prepetition ABL Debt.*

(a)    The Debtors are hereby authorized and directed to use proceeds of the DIP Financing and Cash Collateral to, at the initial closing of the DIP Financing, pay in full in cash all obligations of the Borrower and Guarantors to the Prepetition Domestic ABL Lenders in respect of loans made and letters of credit issued pursuant to the Prepetition Domestic ABL

3

Agreements, as provided in the Prepetition Domestic ABL Agreements (collectively, the "Prepetition Domestic ABL Debt") and, subject to the Intercompany Security Protocol, the Prepetition Foreign ABL Debt.[3]

(b)    The liens and security interests granted to the Prepetition Domestic ABL Secured Parties pursuant to and in connection with the Prepetition Domestic ABL Agreements (the "Prepetition Domestic ABL Liens") shall be automatically released and terminated upon the Domestic ABL Discharge. Until then, subject to the terms and conditions contained in this Interim Order, any and all prepetition or postpetition liens and security interests (including adequate protection replacement granted to the Prepetition Domestic ABL Secured Parties) shall (i) continue to secure the unpaid portion of any Prepetition Domestic ABL Debt and (ii) be junior and subordinate in all respects to (A) the Carve-Out, (B) valid, perfected, unavoidable and senior liens in existence immediately prior to the Petition Date, and (C) otherwise ordered in the priorities set forth on **Exhibit A** attached hereto (such liens and security interests of the Prepetition Domestic ABL Secured Parties are hereinafter referred to as the "Contingent ABL

---

[3]    "Prepetition Foreign ABL Debt" means the aggregate principal amount of obligations outstanding pursuant to, and in accordance with the terms of, the senior secured asset-based revolving credit facility made available to Avaya Canada Corp., Avaya UK, Avaya International Sales Limited, Avaya Deutschland GMBH and Avaya GMBH & CO. KG (collectively, the "Foreign Borrowers") pursuant to that certain Credit Agreement, dated as of June 4, 2015, by and among the Foreign Borrowers, the guarantors from time to time party thereto, Citibank, N.A. as Administrative Agent and L/C Issuer (the "Prepetition Foreign ABL Agent"), Citibank, N.A., Canadian Branch as Canadian Swing Line Lender, Citibank, N.A., London Branch as European Swing Line Lender, and the other lenders from time to time party thereto (the "Prepetition Foreign ABL Lenders" and together with the Prepetition Foreign ABL Agent, the "Prepetition Foreign ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Foreign ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Foreign ABL Credit Facility") and the other Loan Documents (as defined in the Prepetition Foreign ABL Credit Agreement and, collectively with the Prepetition Foreign ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Foreign ABL Agreements"), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Foreign ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Foreign ABL Agreements. The Prepetition Foreign ABL Debt, together with the Prepetition Domestic ABL Debt shall be collectively referred to herein as "Prepetition ABL Debt."

Liens", and any such unpaid or reinstated Prepetition Domestic ABL Debt described in clause (i) of this sentence is hereinafter referred to as the "Contingent Prepetition ABL Debt").

(c)    For the avoidance of doubt, repayment of Prepetition Domestic ABL Debt and Prepetition Foreign ABL Debt shall be conditional and subject to disgorgement, in whole or in part, pending occurrence of the Domestic ABL Discharge and the occurrence of the Foreign ABL Discharge, respectively.

6.    *Carve-Out.*

(a)    The "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any committee of unsecured creditors (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day (as defined in the DIP Credit Agreement) following delivery by the DIP Agent of a written notice delivered by email (or other electronic means) to the DIP Lenders, the Debtors, their lead restructuring counsel, the United States Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Crossover Group, and counsel to the Creditors' Committee, which notice may be delivered following the

occurrence and during the continuation of an "Event of Default" under the DIP Credit Agreement (a "DIP Event of Default") and acceleration of either DIP Facilities stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the "Carve-Out Trigger Notice"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Professional Fees in an aggregate amount not to exceed $20,000,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided* that, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

(b)    On the day on which a Carve-Out Trigger Notice is given by the DIP Agent as set forth herein (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Loan Party to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

(c)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities (including the DIP Superpriority Claims and the DIP Liens) and any adequate protection (including any liens and claims granted on account of the Adequate Protection Obligations); *provided* that, the Carve-Out shall not apply to the L/C Facility Letters of Credit or any cash (or cash equivalent or similar) collateral pledged in support thereof (including, in all respects, the Letter of Credit Account and all amounts credited thereto).

7.      *DIP Superpriority Claims.*  Subject in all respects to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of the Final Order, Avoidance Proceeds), subject only to the liens on such property and the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.      *DIP Liens*.  As security for the DIP Obligations, subject and subordinate in all respects to the Carve-Out, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the

following security interests and liens are hereby granted to the DIP Agent for its own benefit and

the benefit of the DIP Lenders (all such liens and security interests granted to the DIP Agent, for

its benefit and for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP

Documents, the "DIP Liens"):

        (a)      First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of

the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding,

continuing, enforceable, fully-perfected first priority senior security interests in and liens upon

all Collateral, to the extent such Collateral is not subject to valid, perfected and non-avoidable

liens as of the Petition Date or valid and non-avoidable liens in favor of third parties that were in

existence immediately prior to the Petition Date that are perfected as permitted by section 546(b)

of the Bankruptcy Code ("Unencumbered Property");

        (b)      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding,

continuing, enforceable, fully-perfected junior security interests in and liens on the Collateral, to

the extent such Collateral is subject to valid, perfected and non-avoidable liens as of the Petition

Date or valid and unavoidable liens in favor of third parties that were in existence immediately

prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy

Code, other than:

        (i)      the liens and security interests granted to the Prepetition First-

Priority Secured Parties pursuant to and in connection with the Prepetition Cash Flow

Agreements, the 7.00% First Lien Notes Agreements and the 9.00% First Lien Notes

Agreements (the "Prepetition First-Priority Liens"); *provided* that, DIP Liens securing Cash

Pooling Obligations shall be subordinate to the Prepetition First-Priority Liens on Cash Flow Priority Collateral;

(ii)     prior to the Domestic ABL Discharge, and solely with respect to (A) Cash Flow Priority Collateral and (B) the L/C Cash Collateral (*provided*, that any funds deposited in the Letter of Credit Account shall be deemed to be funded from proceeds of the DIP Loans to the extent such proceeds have not been exhausted), the Prepetition Domestic ABL Liens; and

(iii)     the liens and security interests granted to Second Lien Noteholders pursuant to and in connection with the Second Lien Notes Agreements (the "Prepetition Second-Priority Liens" and, together with the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens, the "Primed Liens"); *provided that*, for the avoidance of doubt, the Primed Liens shall not include any liens of any other creditor or group of creditors that has not consented to the relief provided by this Order (including by participating in the DIP Facility and/or consenting to the Debtors' use of its Cash Collateral);

(c)     Priming Liens.

(i)     Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected priming senior security interests in and liens upon the Collateral which security interests and liens shall prime the Primed Liens except as set forth in the foregoing clause (b) in accordance with the priorities shown in **Exhibit A** (the "Priming Liens");

(ii)     Notwithstanding anything herein to the contrary, the Priming Liens (a) shall be subject and junior to the Carve-Out in all respects, (b) shall be junior to liens that are senior to the Primed Liens (unless such liens are themselves Primed Liens), (c) shall be senior in

9

all respects to the Primed Liens, and (d) shall also be senior to any liens granted after the Petition

Date to provide adequate protection with respect of any of the Primed Liens.  The Primed Liens

shall be primed by and made subject and subordinate to the Carve-Out and the Priming Liens,

but the Priming Liens shall not prime perfected liens, if any, to which the Primed Liens are

subject at the time of the commencement of the Chapter 11 Cases or liens to which the Primed

Liens are subject and that are perfected after the commencement of the Chapter 11 Cases to the

extent permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Carve-

Out and any such liens that are themselves Primed Liens);

(d)    <u>Relative Priority of Liens</u>.  Notwithstanding anything to the contrary in

this Interim Order or the DIP Documents, the relative priority of each DIP Lien granted in this

Paragraph 8, the Primed Liens, the Contingent ABL Liens, and the Adequate Protection Liens,

shall be as set forth in **<u>Exhibit A</u>** attached hereto; *provided* that, for the avoidance of doubt, each

such lien shall be subject and subordinate to the Carve-Out in all respects;

9.    *Collateral*.

(a)    For purposes of this Interim Order, "<u>Collateral</u>" shall mean all property,

other than Excluded Assets (as defined in the DIP Credit Agreement), whether now owned or

hereafter acquired or existing and wherever located, of each Loan Party and each Loan Party's

"estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature

whatsoever.

(b)    For purposes of this Interim Order, "<u>Excluded Asset</u>" means (i) any

amount in excess of 65% of the equity interests in any non-US subsidiary of a Debtor, (ii) any

leasehold interest of a Debtor, (iii) "avoidance actions" under chapter 5 of the Bankruptcy Code,

(iv) the Cash Pool Requirements Account, (v) any escrow, fiduciary, or trust accounts, (vi)

intellectual property of the Debtors, to the extent the assignment or a creation of a lien thereon would cause the Debtors to forfeit their rights thereunder (except insofar as such provision causing forfeiture is overridden by the Bankruptcy Code or other applicable law), and (vii) any other assets of the Debtors' estates to the extent that a pledge or creation of a lien on such assets would violate applicable non-bankruptcy law, except insofar as such law is overridden by the Bankruptcy Code or other applicable law.

        10.     *Protection of DIP Lenders' Rights.*

        (a)     Until the indefeasible Payment in Full (as defined in the DIP Credit Agreement) of all DIP Obligations and the termination of all remaining Commitments (as defined in the DIP Credit Agreement) under the DIP Facilities, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Existing Agreements or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against Collateral, including in connection with the Contingent ABL Liens or the Adequate Protection Liens except to the extent authorized by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any Collateral, to the extent such transfer, disposition, sale or release is authorized under the DIP Documents (as in effect on or about the entry of this Interim Order); and (iii) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Collateral subject to any sale or disposition or, solely with respect to the Prepetition Domestic ABL Secured Parties, in connection with the Domestic ABL Discharge. Upon the Domestic ABL Discharge, the Debtors are authorized to

11

file any termination statements, releases, or documents necessary to effectuate and/or evidence the release and termination of the Prepetition Domestic ABL Secured Parties' liens on or security interests in any portion of the Collateral.

(b)    To the extent the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent or any other Prepetition Secured Party (i) has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral, and (ii) has consented to the relief provided in this Paragraph 10(b) (including, for the avoidance of doubt, by participating in the DIP Facility and/or consenting to the Debtors' use of its Cash Collateral), then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents and this Interim Order and (i) immediately upon the occurrence of a DIP Event of Default and concurrently with delivery of the Carve-Out Trigger Notice, declare (A) the termination, reduction or restriction of any further Commitment (as defined in the DIP Credit Agreement) to the extent any such Commitment remains and (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors

12

and (ii) unless the Court orders otherwise during the DIP Remedies Notice Period (as defined

below), upon the occurrence of a DIP Event of Default and the giving of five calendar days'

prior written notice (which shall run concurrently with any notice required to be provided under

the DIP Documents) (the "**DIP Remedies Notice Period**") (extended to the next business day if

such five calendar day period shall expire on a day that is not a business day) via email to

counsel to the Prepetition Cash Flow Agent, the Debtors, and counsel to the Debtors (and, upon

receipt, the Debtors shall promptly provide a copy of such notice to counsel to the Creditors'

Committee and the U.S. Trustee) to (A) foreclose on any of the Collateral and (B) exercise all

other rights and remedies provided for in the DIP Documents and under applicable law.

(d)    No rights, protections or remedies of the DIP Agent or the DIP Lenders

granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified

or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to

the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination

of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order

or stipulation related to the Debtors' continued use of Cash Collateral or the provision of

adequate protection to any party

11.    *Marshaling.*  Subject to the entry of the Final Order, none of the DIP Collateral,

the DIP Lenders, the DIP Agent, the Prepetition Collateral, the Adequate Protection Liens or the

Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other

similar doctrine, and all proceeds thereof shall be received and used in accordance with this

Interim Order.

12.    *Payments Free and Clear.*  Subject in all respects to the Carve-Out, any and all

payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or First Lien

13

Agents on behalf of the Prepetition Secured Parties pursuant to the provisions of this Interim

Order, the Final Order, or the DIP Documents shall be received free and clear of any claim,

charge, assessment or other liability.

13.    *Use of Cash Collateral*.

(a)    The Debtors are hereby authorized, subject to the terms and conditions of

this Interim Order (including Paragraph 14 hereof), to use all Cash Collateral and the Prepetition

Secured Parties are directed promptly to turn over to the Debtors all Cash Collateral received or

held by them.

(b)    "Cash Collateral Event of Default" shall mean, unless waived by the

Prepetition Cash Flow Agent with the consent of the "Required Lenders" under the Prepetition

Cash Flow Credit Agreement, a DIP Event of Default.

14.    *Termination of Use of Cash Collateral*.  Promptly upon delivery of a written

notice of a Cash Collateral Event of Default (a "Cash Collateral Adequate Protection Notice")

from the Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the

Prepetition Cash Flow Credit Agreement, to (i) the Debtors, (ii) counsel for the other Prepetition

First Lien Notes Agents, (iii) counsel to the Ad Hoc First Lien Group, (iv) counsel to the Ad Hoc

Crossover Group, (iv) the Creditors' Committee, if any, and (v) the U.S. Trustee, the Debtors

shall seek an expedited hearing (a "Cash Collateral Hearing") with the Court to consider the

Debtors' use of Cash Collateral on a non-consensual basis.  The Debtors' right to use Cash

Collateral shall continue until a ruling from the Court in respect of the Cash Collateral Hearing

or as otherwise agreed to by the parties.

15.    *Contingent Liens and Adequate Protection of Prepetition Domestic ABL Secured

Parties*.  Subject in all respects to the Carve-Out, until the occurrence of the Domestic ABL

Discharge, the Prepetition Domestic ABL Secured Parties are entitled to (x) the Contingent ABL Liens and (y) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Domestic ABL Secured Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Domestic ABL Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Prepetition Domestic ABL Adequate Protection Claim"); *provided* that, the avoidance of any Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral shall not constitute diminution in the value of such Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral.  In consideration of the foregoing, and, for the avoidance of doubt, subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted the following (collectively, the "Prepetition Domestic ABL Primed Parties Adequate Protection Obligations"):

(a)    Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), (1) in the amount of any Contingent Prepetition ABL Debt, the Contingent ABL Liens, and (2) in the amount of the Prepetition Domestic ABL Adequate Protection Claim, a valid, perfected replacement security interest in and liens (the

15

"Prepetition Domestic ABL Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Action Proceeds, in each case in accordance with the priorities shown in Exhibit A;

(b)    Prepetition Domestic ABL 507(b) Claim.  Subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Domestic ABL Adequate Protection Claim (the "Prepetition Domestic ABL 507(b) Claim"), which Prepetition Domestic ABL 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Prepetition Domestic ABL 507(b) Claim shall be (i) subject to the Carve-Out, (ii) subordinate to the DIP Superpriority Claims, (iii) *pari passu* with the Cash Flow Credit Agreement Primed Parties 507(b) Claim and First Lien Notes Primed Parties 507(b) Claim, and (iv) senior to the Second Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition Domestic ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Domestic ABL 507(b) Claim until the indefeasible Payment in Full of all DIP Obligations and the termination of all remaining Commitments under the DIP Facilities;

(c)    Prepetition Domestic ABL Fees and Expenses.  The Prepetition Domestic ABL Agent shall receive from the Debtors, for the benefit of the Prepetition Domestic ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Domestic ABL Agent under the Prepetition Domestic ABL Agreements, including, but not limited to, the reasonable and documented fees

16

and disbursements of counsel promptly upon receipt of invoices therefor, which payments shall

be made in the manner provided for in Paragraph **Error! Reference source not found.** below

(subject to recharacterization as principal payments (solely upon a motion by the Debtors, the

Creditors' Committee or any other party in interest and only upon entry of a final, non-

appealable order ordering as such)); and

(d)     <u>Contingent Prepetition ABL Debt</u>.    In the event that the Prepetition

Domestic ABL Agent or any Prepetition Domestic ABL Lender (each in their capacities as such)

is ordered by the Court to disgorge, refund or in any manner repay to any of the Debtors or their

estates any amounts ("<u>Disgorged Amounts</u>") leading to Contingent Prepetition ABL Debt, the

Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated

interest bearing account, which shall be subject to the Carve Out in all respects, pending a further

final, non-appealable order of a court of competent jurisdiction regarding the distribution of such

Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Domestic ABL

Agent and the Prepetition Domestic ABL Lenders, distributing such amounts to the Debtors or

otherwise); *provided* that, to the extent the Disgorged Amounts are returned to the Prepetition

Domestic ABL Agent or any Prepetition Domestic ABL Lender, they shall receive such amounts

plus any interest accrued at the default rate set forth in the Prepetition Domestic ABL

Agreements; *provided further* that, after entry of a final non-appealable order of a court of

competent jurisdiction ordering such Disgorged Amounts to be remitted to the Debtors, the

Disgorged Amounts shall be Collateral pursuant to the terms of this Interim Order.

16.     *Adequate Protection of Prepetition Cash Flow Credit Agreement Primed Parties.*

The Prepetition Cash Flow Credit Agreement Primed Parties are entitled, pursuant to sections

361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the

diminution in value, if any, of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Cash Flow Credit Agreement Primed Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens of the Prepetition Cash Flow Credit Agreement Primed Parties by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (the "Cash Flow Credit Agreement Primed Parties Adequate Protection Claim").    In consideration of the foregoing, the Prepetition Cash Flow Credit Agreement Primed Parties are hereby granted the following (collectively, the "Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)    Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens.    The Prepetition Cash Flow Agent (for itself and for the benefit of the Prepetition Cash Flow Lenders) is hereby granted for the diminution in the value, if any, of the Prepetition Cash Flow Parties' interests in the Prepetition Collateral as of the Petition Date, a valid, perfected replacement security interest in and lien (the "Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds, in each case in accordance with the priorities shown in Exhibit A;

(b)    Prepetition Cash Flow Credit Agreement Primed Parties 507(b) Claim. The Prepetition Domestic Cash Flow Credit Agreement Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the

18

Bankruptcy Code in the amount of the Cash Flow Credit Agreement Primed Parties Adequate

Protection Claim (the "Cash Flow Credit Agreement Primed Parties 507(b) Claim"), which Cash

Flow Credit Agreement Primed Parties 507(b) Claim shall have recourse to and be payable from

all of the Collateral, including, without limitation, subject to entry of the Final Order, the

Avoidance Proceeds. The Cash Flow Credit Agreement Primed Parties 507(b) Claim shall be

(i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority

Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the First Lien

Notes Primed Parties 507(b) Claim. Except to the extent expressly set forth in this Interim Order

or the DIP Credit Agreement, the Prepetition Cash Flow Credit Agreement Primed Parties shall

not receive or retain any payments, property or other amounts in respect of the Cash Flow Credit

Agreement Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out

have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations,

and the termination of all remaining Commitments under the DIP Facilities; and

(c)    Prepetition Cash Flow Credit Agreement Primed Parties Fees and

Expenses; Cash Payments. The Prepetition Cash Flow Agent shall receive from the Debtors, for

the benefit of the Prepetition Cash Flow Lenders, current cash payments (i) in an amount equal

to interest at the non-default rate under the Prepetition Cash Flow Credit Agreement and (ii) of

the reasonable and documented prepetition and postpetition fees and expenses payable to the

Prepetition Cash Flow Agent under the Prepetition Cash Flow Agreements, including, but not

limited to, the reasonable and documented fees and disbursements of one primary counsel to the

Prepetition Cash Flow Agent promptly upon receipt of invoices therefor, which payments shall

be made in the manner provided for in Paragraph 15(d), in each case subject to recharacterization

as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

17.     *Adequate Protection of Prepetition First Lien Notes Primed Parties*. The Prepetition First Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Debtors' interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Prepetition First Lien Notes Primed Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "First Lien Notes Primed Parties Adequate Protection Claim").   In consideration of the foregoing, the Prepetition First Lien Notes Primed Parties are hereby granted the following (collectively, the "First Lien Notes Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)     Prepetition First Lien Notes Primed Parties Adequate Protection Liens. The 9.00% First Lien Notes Trustee and the 7.00% First Lien Notes Trustee (for themselves for the benefit of the 9.00% First Lien Noteholders and the 7.00% First Lien Noteholders) are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution of value, if any, of the Prepetition First Lien Notes Parties' interests in the Prepetition Collateral, a valid, perfected replacement security

20

interest in and lien  (the "First Lien Notes Adequate Protection Liens" and, together with the

Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens, the

"Prepetition First-Priority Adequate Protection Liens") upon all of the Collateral including,

without limitation, subject to entry of the Final Order, the Avoidance Proceeds, in each case in

accordance with the priorities shown in Exhibit A;

> (b)    Prepetition First Lien Notes Primed Parties 507(b) Claim.  The Prepetition

First Lien Notes Primed Parties are hereby granted an allowed superpriority administrative

expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the

First Lien Notes Primed Parties Adequate Protection Claim (the "First Lien Notes Primed Parties

507(b) Claim"); which First Lien Notes Primed Parties Superpriority Claim shall have recourse

to and be payable from all of the Collateral, including, without limitation, subject to entry of the

Final Order, the Avoidance Proceeds.  The First Lien Notes Primed Parties 507(b) Claim shall be

(i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority

Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the Cash Flow

Credit Agreement Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this

Interim Order or the DIP Credit Agreement, the Prepetition First Lien Notes Primed Parties shall

not receive or retain any payments, property or other amounts in respect of the First Lien Notes

Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid

in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the

termination of all remaining Commitments under the DIP Facilities; and

> (c)    Prepetition First Lien Notes Primed Parties Fees and Expenses; Cash

Payments.  The 9.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of

the 9.00% First Lien Noteholders current cash payments (i) in an amount equal to interest at the

non-default rate under the 9.00% First Lien Indenture and (ii) of the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 9.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph 15(d), in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest).  The 7.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 7.00% First Lien Noteholders current cash payments (i) in an amount equal to interest at the non-default rate under the 7.00% First Lien Indenture and (ii) of the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 7.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph 15(d), in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such).

18.    **Additional First Lien Adequate Protection.**  Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, each of the Prepetition First Priority Secured Parties whose liens will be primed by the DIP Liens and whose Cash Collateral will be authorized for use by the Debtors, will receive as additional adequate protection, in each case subject to the Carve-Out in all respects:

(a)    current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of the Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of holders of First Lien Debt[4] ("Ad Hoc First Lien Group"),

---

[4]    The "First Lien Debt" means all obligations of the Borrower and Guarantors to the (a) Prepetition Cash Flow Lenders in respect of loans made pursuant to the Prepetition Cash Flow Agreements, plus accrued and unpaid

in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), subject to recharacterization as principal payments of First Lien Debt (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc First Lien Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019; and

(b)    current cash payment of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of the Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of holders of First Lien Debt and Second Lien Notes Debt[5] ("Ad Hoc Crossover Group") , in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc Crossover Group holds not less than 20.0% of the aggregate principal amount of all First Lien

---

interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cash Flow Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Cash Flow Agreements, (b) 7.00% First Lien Notes Secured Parties in respect of notes issued pursuant to the 7.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 7.00% First Lien Notes Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the 7.00% First Lien Notes Agreements and (c) 9.00% First Lien Notes Secured Parties in respect of notes issued to the 9.00% First Lien Noteholders pursuant to the 9.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 9.00% First Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the 9.00% First Lien Notes Agreements.

[5] The "Second Lien Notes Debt" means all Obligations of the Borrower and Guarantors to the Second Lien Notes Secured Parties in respect of notes issued pursuant to the Second Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Second Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the Second Lien Notes Agreements.

Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019.

19.    *Adequate Protection of the Second Lien Notes Primed Parties.*

(a)    Subject and subordinate to the Carve-Out in all respects, the Second Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Second-Priority Liens of the Prepetition Second Lien Notes Primed Parties by the DIP Liens pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Second Lien Notes Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Second Lien Notes Primed Parties are hereby granted the following (collectively, the "Second Lien Notes Primed Parties Adequate Protection Obligations" and, together with the Prepetition Domestic ABL Primed Parties Adequate Protection Obligations, the Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations and the First Lien Notes Primed Parties Adequate Protection Obligations, the "Adequate Protection Obligations");

(b)    Prepetition Second Lien Notes Primed Parties Adequate Protection Liens. The Second Lien Notes Trustee (for itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing

statements or other agreements), for the diminution in the value of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "Second Lien Notes Adequate Protection Liens" and, collectively with the Prepetition Domestic ABL Adequate Protection Liens and the Prepetition First-Priority Adequate Protection Liens, the "Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds, in each case in accordance with the priorities shown in Exhibit A;

(c)    Prepetition Second Lien Notes Primed Parties 507(b) Claim.    The Prepetition Second Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Second Lien Notes Primed Parties Adequate Protection Claim (the "Second Lien Notes Primed Parties 507(b) Claim" and, collectively with the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim and the First Lien Notes Primed Parties 507(b) Claim, the "507(b) Claims")); which Second Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of the Final Order, the Avoidance Proceeds.  The Second Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims, and (iii) subordinate to the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim, and the First Lien Notes Primed Parties 507(b) Claims.  Except to the extent expressly set forth in this Interim Order or the DIP Credit Agreement, the Prepetition Second Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Second Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the

Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP

Obligations, and the termination of all remaining Commitments under the DIP Facilities.

20.     *Reservation of Rights of Prepetition Secured Parties.*   Under the circumstances

and given that the above-described adequate protection is consistent with the Bankruptcy Code,

including section 506(b) thereof, the Court finds that the adequate protection provided herein is

reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that,

subject to the terms of (I) the First Lien Intercreditor Agreement dated as of February 11, 2011

among the Company, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and

the 9.00% First Lien Notes Trustee (collectively, the "Prepetition First Lien Agents"), and the

other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof,

the "First Lien Intercreditor Agreement") and (II) the Amended and Restated Intercreditor

Agreement dated as of October 29, 2012 among the Prepetition Domestic ABL Agent and the

Prepetition Cash Flow Agent and the other parties thereto (as amended, supplemented or

otherwise modified prior to the date hereof, the "ABL Intercreditor Agreement" and, together

with the First Lien Intercreditor Agreement, the "ICAs"), the Prepetition Secured Parties may

request further or different adequate protection (a) following an Event of Default and expiration

of the DIP Remedies Notice Period or Cash Collateral Notice Period, as applicable (but not

beforehand) or (b) upon a material change in circumstances; *provided* further, all parties' rights

to contest such adequate protection requests are fully preserved.

21.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are

hereby authorized, but not required, to file or record (and to execute in the name of the Debtors,

as their true and lawful attorneys, with full power of substitution, to the maximum extent

permitted by law) financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agent or the Prepetition First Lien Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent or the

27

Prepetition First Lien Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

22.    *Preservation of Rights Granted Under This Interim Order.*  Subject in all respects to Paragraph 22(e) hereof:

(a)    Other than the Carve-Out and other claims and liens expressly granted by this Interim Order or as permitted pursuant to the DIP Credit Agreement, absent the express written consent of the DIP Agent (in its sole discretion) or the Prepetition Cash Flow Agent, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agent and the DIP Lenders, the Prepetition Domestic ABL Secured Parties, the Prepetition First-Priority Secured Parties [6], or the Second Lien Notes Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding other than senior adequate protection liens permitted pursuant to clause (ii) below.   Except as otherwise expressly provided in the DIP Credit Agreement or this Interim Order and set forth in **Exhibit A** hereto, and subject to the Carve-Out in all respects, the DIP Liens, the Adequate Protection Liens and the Contingent ABL Liens shall not be: (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, other than adequate protection liens granted on account of liens that are senior to the DIP Liens pursuant to Paragraph 8(b) in an amount not to exceed $15,000,000 in the aggregate; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of

---

[6] "Prepetition First-Priority Secured Parties" means the Prepetition Cash Flow Secured Parties, 7.00% First Lien Notes Secured Parties, and the 9.00% First Lien Notes Secured Parties.

any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and (iv) subject or subordinate to any intercompany or affiliate liens or security interests against the Debtors.

(b)    Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the Adequate Protection Liens and, prior to the Domestic ABL Discharge, the Contingent ABL Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of the Carve-Out, any DIP Obligations, or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agents, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the Carve-Out, the DIP Liens, the Adequate Protection Liens or the Contingent ABL Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of

29

Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agent, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Contingent ABL Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except with respect to the Collateral being sold to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11

Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Contingent ABL Liens, the 507(b) Claims and all of the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the Commitments have been terminated.

(e)    Notwithstanding anything herein or in the DIP Credit Agreement to the contrary, there shall be no DIP Event of Default arising from: (i) the occurrence of a Cash Collateral Event of Default set forth in Paragraph 17(b) or termination of the Debtors' consensual use of Cash Collateral, or (ii) in the event of such termination (A) any request by the Loan Parties seeking to use Collateral or Cash Collateral subject to the Primed Liens on a nonconsensual basis or (B) any order of the Court granting such request, in each case so long as the adequate protection requested by the Loan Parties or approved by the Court, as applicable, is materially consistent with the adequate protection granted on account of the Primed Liens pursuant to the Orders or permitted herein.

23.    *Releases*.

(a)    Effective upon entry of the Interim Order, but subject to clause (b) of this Paragraph, each of the Debtors shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents,

31

representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each in their capacities as such of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of the (a) Existing Agreements or the transactions contemplated under such documents, and (b) as applicable, the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses and (ii) any and all claims and causes of action arising under the Bankruptcy Code.  For the avoidance of doubt, the releases set forth in this Paragraph 23(a) shall be binding only upon the Debtors and shall not bind any other party in interest.

(b)    Notwithstanding anything herein to the contrary, (i) the Debtors make no stipulation, and reserve all rights, with respect to the assets identified on **Exhibit B** attached hereto (collectively, the "Retained Claims Collateral"), including liens asserted against the Retained Claims Collateral on account of the Prepetition Debt[7] and (ii) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal and/or to seek a determination on the value of the Prepetition Collateral securing the Prepetition Debt are fully

---

[7]    "Prepetition Debt" means First Lien Debt and the Second Lien Notes Debt.

reserved.  For the avoidance of doubt, the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Retained Claims Collateral are expressly preserved.

24.    *Limitation on Use of the DIP Facilities, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  Notwithstanding anything herein or in any other order of this Court to the contrary, neither the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, nor the Carve-Out may be used to (a) object to or contest any amount due under the DIP Documents, the Prepetition Secured Debt Documents or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Secured Debt Documents; (b) following the DIP Remedies Notice Period or Cash Collateral Notice Period (where the automatic stay has been lifted), as prevent or delay the DIP Agent's or the Prepetition First Lien Agents' assertion, enforcement, or realization on the Collateral (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or any of the Prepetition First Lien Agents or the Second Lien Notes Trustee hereunder or under the DIP Documents or the Prepetition Secured Debt Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent *provided* that, for the avoidance of doubt, this Paragraph shall not limit (or be deemed to limit) the Debtors' rights to (x) seek recharacterization of adequate protection as being applied to principal, or (y) seek to use Cash Collateral on a non-consensual basis after termination of the consensual use of Cash Collateral.

25.    *Intercompany Security Protocol.*  Except as prohibited by local law, any credit support, guarantee, cash and/or cash equivalents (in each case, including proceeds of the DIP Financing, Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to or for the benefit of any Non-Debtor Subsidiary (either in the form of restricted

payments, investments, intercompany advances, guarantees of obligations (including interest thereon), sale of assets, provision of services or otherwise (except for repayments of intercompany liabilities incurred in the ordinary course of business)), in excess of $2,000,000 in the aggregate (the "De Minimis Exception"), shall be lent to Sierra and evidenced by an intercompany note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Sierra Note/Receivable"), which shall be pledged (individually or pursuant to a global note issued by Sierra) to one or more intercompany lenders and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Sierra Documents") as Collateral to the DIP Agent for the benefit of the DIP Lenders and to the Prepetition Secured Parties as adequate protection.  The proceeds of each such investment shall be further transferred, in one or more steps, to the applicable Non-Debtor Subsidiary; each step of such transfer shall be evidenced by an intercompany unsecured note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Non-Debtor Subsidiary Note/Receivable"; together with the Sierra Note/Receivable, the "Intercompany Notes/Receivables"), with all such Intercompany Notes/Receivables accruing interest at the same rate as the DIP Facilities and which shall be payable in full in cash upon the maturity of the DIP Facilities.  The Sierra Notes/Receivables shall be secured by (i) 65% of the issued and outstanding Voting Stock (as defined in the DIP Collateral Agreement and including for this purpose, any instruments treated as equity for U.S. federal income tax purposes) of any Non-Debtor Subsidiary owned by Sierra, (ii) 100% of the issued and outstanding Equity Interests (as defined in the DIP Credit Agreement) in any Debtor Subsidiary owned by Sierra, and (iii) any Non-Debtor Subsidiary Note/Receivable held by Sierra.  All Non-Debtor Subsidiary Notes/Receivables held by Sierra shall be pledged in support of the Sierra Notes/Receivables

(individually or pursuant to a global note issued by the applicable Non-Debtor Subsidiary to

Sierra) and pursuant to documentation in form and substance reasonably satisfactory to the DIP

Agent (the "Intercompany Security Protocol").   To the extent that local law limits the

implementation of the foregoing and notwithstanding the fact that the Non-Debtor Subsidiary

Notes/Receivables shall be unsecured obligations of the applicable Non-Debtor Subsidiaries, for

all purposes in connection with these Chapter 11 Cases (including, without limitation for

purposes of creditor recoveries and value allocation in connection with these Chapter 11 Cases

(including in connection with any chapter 11 plan or otherwise)), all Intercompany

Notes/Receivables and amounts in respect of the De Minimis Exception (in each case whether

documented or otherwise) shall be deemed to be secured obligations of Sierra or the applicable

Non-Debtor Subsidiary, as applicable; the intent being to ensure that no creditor of the Debtors

that asserts claims against Non-Debtor Subsidiaries on account of any claim against, obligation

of, or transaction with, the Debtors (in respect of asserted joint and several liability or otherwise)

unjustly benefits from the funding of Non-Debtor Subsidiaries through the use of proceeds of the

DIP Facilities or Cash Collateral following the Petition Date.

26.    *Interim Order Governs*.  In the event of any inconsistency between the provisions

of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

27.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions

of this Interim Order, including all findings herein, shall be binding upon all parties in interest in

these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the

Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed

or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns

(including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of

any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided, however*, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors).

28.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; and (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

29.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.

30.    *Credit Bidding*.  Upon entry of this Interim Order and subject to the terms of the DIP Documents and the ICAs: (i) the DIP Agent shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of the DIP Obligations during any sale of the Loan Parties' assets (in whole or in part), including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); and (ii)

subject to the ICAs in all respects, the Debtors acknowledge that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of their respective claims, including, for the avoidance of doubt, Adequate Protection Claims, if any, during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Secured Parties as of the Petition Date, including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii); *provided* that such relief will be binding on the Debtors' estates and all parties in interest upon entry of the Final Order.

31.     *Final Hearing*.  The Final Hearing is scheduled for **February 8th**, 2017 at **10:00** a.m. before this Court.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon counsel to the Debtors to allow actual receipt by the foregoing no later than **February 6th**, 2017 at 4:00 p.m., prevailing Eastern Time.

Dated:    **January 23rd, 2017**
          New York, New York

                              **/s/ STUART M. BERNSTEIN**
                              THE HONORABLE STUART M. BERNSTEIN
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit A**

| | ABL Priority Collateral | Cash Flow Priority Collateral | L/C Cash Collateral | All other Collateral |
|---|---|---|---|---|
| **1st:** | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) |
| **2nd:** | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations |
| **3rd:** | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing Cash Pooling Obligations |
| **4th:** | • DIP Liens to the extent securing L/C Obligations | • DIP Liens to the extent securing Cash Pooling Obligations | • Prepetition Domestic ABL Adequate Protection Liens | • Prepetition Domestic ABL Adequate Protection Liens |
| **5th:** | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens |
| **6th:** | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens | • Prepetition Second-Priority Adequate Protection Liens |

**Exhibit B**

# **Retained Claims Collateral**[1]

1. Each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399.

2. All intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing any of the foregoing, in each case registered or arising under non-U.S. law.

3. Assets of that certain Avaya Inc. Savings Restoration Plan held in  the Avaya Inc. Savings Restoration Plan Trust and maintained by Fidelity Management Trust Company ("Fidelity"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom.

4. Assets of that certain Avaya Inc. Deferred Compensation Plan effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by the Bank of New York, as Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom.

5. Assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom

6. Commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.).

7. Proceeds from the Debtors' insurance policies.

8. Owned real property identified on **Exhibit 1** attached hereto.

9. The Debtors' leasehold interests identified on **Exhibit 2** attached hereto.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the Interim DIP Order to which this exhibit is attached as **Exhibit B**.

**Exhibit 1**
[Owned Real Property]

| Owned Real Property Address | City | State | Country |
|---|---|---|---|
| 9650 Interport Drive | Shreveport | LA | USA |

\*        \*        \*        \*        \*

**Exhibit 2**
[Leased Real Property]

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 2601 Almeda Dr. aka 5425 Robin Hood Road | Norfolk | VA | USA |
| 1601 Veterans Memorial Highway | Islandia | NY | USA |
| 80 M Street SE | Washington | DC | USA |
| 12730 Fair Lakes Circle | Fairfax | VA | USA |
| Moberly Professional Park | Bentonville | AR | USA |
| 18201 Von Karmen Avenue | Irvine | CA | USA |
| 4655 Great American Parkway | Santa Clara | CA | USA |
| 8740 Lucent Boulevard | Highlands Ranch | CA | USA |
| 8744 Lucent Boulevard | Highlands Ranch | CA | USA |
| 12121 Grant Street | Thornton | CO | USA |
| 1300 West 120th Avenue | Westminster | CO | USA |
| 1250 Connecticut Ave., N.W. | Washington | DC | USA |
| 1000 NW 57th Court | Miami | FL | USA |
| 530 S. Main Street | Alpharetta | GA | USA |
| 1145 Sanctuary Parkway | Alpharetta | GA | USA |
| 30 South Wacker | Chicago | IL | USA |
| 2399 S. Finley Road | Lombard | IL | USA |
| 8321 W, 125th Street | Overland Park | KS | USA |
| 9150 Guildford Road | Columbia | MD | USA |
| 600 Technology Park Drive | Billerica | MA | USA |
| 225 South Sixth Street | Minneapolis | MN | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 10820 Sunset Office Drive | Sunset Hills | MO | USA |
| 14301 Josephine Street | Omaha | NE | USA |
| 8 Commerce Drive | Bedford | NH | USA |
| 211 Mount Airy Road | Baskin Ridge | NJ | USA |
| 770 Nesconset Highway | Nesconset | NY | USA |
| Two Penn Plaza | New York | NY | USA |
| 4001 E. Chapel Hill/Nelson Highway Nortel Gateway Court | Raleigh | NC | USA |
| 445 Hutchinson Avenue | Columbus | OH | USA |
| 14400 Hertz Quail Springs Pkwy | Oklahoma City | OK | USA |
| 161 Washington Street | Conshohocken | PA | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 11540 St. Charles Rock Road | Bridgeton | MO | USA |
| 1111 Freeport Parkway | Coppel | TX | USA |
| 1900 Firman Drive | Richardson | TX | USA |
| 8718 Carolina Boulevard | Clyde | TX | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 7580 North Dobson Road | Scottsdale | AZ | USA |
| 7183 South Union Park Avenue | Salt Lake City | UT | USA |
| 28223 Telegraph Road | Southfield | MI | USA |
| 4475 Pouncey Tract Road | Glen Allen | VA | USA |
| 8727 Philips Highway | Jacksonville | FL | USA |

\* \* \* \* \*

EXHIBIT F

LENDER: [•]
PRINCIPAL AMOUNT: $[•]

**FORM OF**

**NOTE**

New York, New York
[Date]

FOR VALUE RECEIVED, the undersigned, AVAYA INC., a Delaware corporation (the "**Borrower**"), hereby promises to pay to the Lender set forth above (the "**Lender**") or its registered assigns, in lawful money of the United States of America in immediately available funds at the Administrative Agent's Office (such term, and each other capitalized term used but not defined herein, having the meaning assigned to it in the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto) (i) on the dates set forth in the Credit Agreement, the principal amounts set forth in the Credit Agreement with respect to Term Loans made by the Lender to the Borrower pursuant to Section 2.01(a)(i) of the Credit Agreement and (ii) on each Interest Payment Date, interest at the rate or rates per annum as provided in the Credit Agreement on the unpaid principal amount of all Term Loans made by the Lender to the Borrower pursuant to the Credit Agreement.

The Borrower promises to pay interest, on demand, on any overdue principal and, to the extent permitted by law, overdue interest from their due dates at the rate or rates provided in the Credit Agreement.

The Borrower hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The nonexercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

All borrowings evidenced by this note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; *provided*, *however*, that the failure of the

holder hereof to make such a notation or any error in such notation shall not affect the obligations of the Borrower under this note.

This note is one of the Notes referred to in the Credit Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Credit Agreement, all upon the terms and conditions therein specified. This note is secured and guaranteed as provided in the Credit Agreement and the Collateral Documents. Reference is hereby made to the Credit Agreement and the Collateral Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this note in respect thereof.

**THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE CREDIT AGREEMENT. TRANSFERS OF THIS NOTE MUST BE RECORDED IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

#89242009v10

AVAYA INC.

By: _____
     Name:
     Title:

[Signature Page – Note]

## LOANS AND PAYMENTS

| Date | Amount of Loan | Maturity Date | Payments of Principal/Interest | Principal Balance of Note | Name of Person Making the Notation |
|------|----------------|---------------|-------------------------------|---------------------------|-----------------------------------|

4

EXHIBIT G

**FORM OF**

**SECURITY AGREEMENT**

[Attached separately]

PLEDGE AND SECURITY AGREEMENT

dated as of

January 24, 2017

among

AVAYA INC.,
as Borrower

AVAYA HOLDINGS CORP.,
as Holdings

CERTAIN SUBSIDIARIES OF AVAYA INC.
IDENTIFIED HEREIN

and

CITIBANK, N.A.,
as Administrative Agent

# TABLE OF CONTENTS

PAGE

### ARTICLE 1
DEFINITIONS

Section 1.01.    *Credit Agreement* ...................................................1
Section 1.02.    *Other Defined Terms* ..............................................1

### ARTICLE 2
PLEDGE OF SECURITIES

Section 2.01.    *Pledge* .................................................................8
Section 2.02.    *Delivery of the Pledged Collateral* .........................8
Section 2.03.    *Representations, Warranties and Covenants* ...........9
Section 2.04.    *Certification of Limited Liability Company and Limited Partnership Interests* ............................................................11
Section 2.05.    *Registration in Nominee Name; Denominations* .....11
Section 2.06.    *Voting Rights; Dividends and Interest* ...................12

### ARTICLE 3
SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01.    *Security Interest* ..................................................14
Section 3.02.    *Representations and Warranties* ............................16
Section 3.03.    *Covenants* ...........................................................18
Section 3.04.    *Other Actions* ......................................................21

### ARTICLE 4
REMEDIES

Section 4.01.    *Remedies upon Default* .........................................22
Section 4.02.    *Application of Proceeds* ........................................24
Section 4.03.    *Grant of License to Use Intellectual Property; Power of Attorney* ......24

### ARTICLE 5
INDEMNITY, SUBROGATION AND SUBORDINATION

Section 5.01.    *Indemnity* .............................................................25
Section 5.02.    *Contribution and Subrogation* ...............................25
Section 5.03.    *Subordination* ......................................................26

### ARTICLE 6
MISCELLANEOUS

Section 6.01.    *Notices* ................................................................26
Section 6.02.    *Waivers; Amendment* ...........................................26

Section 6.03.    *Administrative Agent's Fees and Expenses* ..........................................26
Section 6.04.    *Successors and Assigns* ...............................................................27
Section 6.05.    *Survival of Agreement* ................................................................27
Section 6.06.    *Counterparts; Effectiveness; Successors and Assigns; Several
Agreement* ................................................................................27
Section 6.07.    *Severability* ..............................................................................28
Section 6.08.    *Right of Set-Off* .........................................................................28
Section 6.09.    *Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to
Service of Process* ....................................................................28
Section 6.10.    *Headings* ...................................................................................28
Section 6.11.    *No Requirement to Marshal* ........................................................28
Section 6.12.    *Security Interest Absolute* ..........................................................29
Section 6.13.    *Termination or Release* ...............................................................29
Section 6.14.    *Automatic Stay* ..........................................................................30
Section 6.15.    *Additional Guarantors* ...............................................................30
Section 6.16.    *Administrative Agent Appointed Attorney-in-Fact* ......................30
Section 6.17.    *General Authority of the Administrative Agent* ...........................31
Section 6.18.    *Reasonable Care* ........................................................................31
Section 6.19.    *Reinstatement* ............................................................................31
Section 6.20.    *Miscellaneous* ...........................................................................32
Section 6.21.    *The Orders* ................................................................................32

ANNEX A       List of Loan Parties

**Schedules**

SCHEDULE I         Pledged Equity; Pledged Debt
SCHEDULE II        Commercial Tort Claims

**Exhibits**

EXHIBIT I          Form of Security Agreement Supplement
EXHIBIT II         Form of Perfection Certificate
EXHIBIT III        Form of Patent Security Agreement
EXHIBIT IV         Form of Trademark Security Agreement
EXHIBIT V          Form of Copyright Security Agreement

PLEDGE AND SECURITY AGREEMENT dated as of January 24, 2017 among AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), AVAYA INC., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), the Subsidiaries of the Borrower listed on the signature pages hereof, each of which is a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code, and those additional Subsidiaries of the Borrower which at any time execute and deliver a Security Agreement Supplement in substantially the form attached hereto as <u>Exhibit I</u> (together with Holdings and the Borrower, the "**Grantors**") and CITIBANK, N.A., as administrative agent for the Secured Parties (as defined below).

Reference is made to that certain Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, Holdings, the Subsidiaries of the Borrower party thereto as Guarantors, Citibank, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**"). The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the Credit Agreement. The obligations of the Lenders to extend such credit are conditioned upon, among other things, the execution and delivery of this Agreement. Each of Holdings and each Subsidiary party hereto is an affiliate of the Borrower and will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and is willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, the parties hereto agree as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01.  *Credit Agreement.*

(a)     Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Credit Agreement. All terms defined in the New York UCC (as defined herein) and not defined in this Agreement have the meanings specified therein; the term "instrument" shall have the meaning specified in Article 9 of the New York UCC.

(b)     The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

Section 1.02.  *Other Defined Terms.*  As used in this Agreement, the following terms have the meanings specified below:

"**Account Control Agreement**" has the meaning specified in Section 3.04(b)(i).

"**Account Debtor**" means any Person who is or who may become obligated to any Grantor under, with respect to or on account of an Account.

"**Accounts**" has the meaning specified in Article 9 of the New York UCC.

"**Administrative Agent**" means Citibank, N.A., as Administrative Agent under the Credit Agreement, or any successor Administrative Agent thereunder.

"**Agreement**" means this Pledge and Security Agreement.

"**Borrower**" has the meaning assigned to such term in the preamble to this Agreement.

"**Claiming Party**" has the meaning assigned to such term in Section 5.02.

"**Collateral**" means the General Collateral and the Pledged Collateral.

"**Contributing Party**" has the meaning assigned to such term in Section 5.02.

"**Copyright License**" means any written agreement, now or hereafter in effect, granting any right to any third party under any Copyright now or hereafter owned by any Grantor or that such Grantor otherwise has the right to license, or granting any right to any Grantor under any Copyright now or hereafter owned by any third party, and all rights of such Grantor under any such agreement.

"**Copyrights**" means all of the following now owned or hereafter acquired by any Grantor: (a) all copyright rights in any work subject to the copyright laws of the United States or any other jurisdiction or territory, whether as author, assignee, transferee or otherwise; (b) all registrations and applications for registration of any such copyright in the United States or any other jurisdiction or territory, including registrations, recordings, supplemental registrations and pending applications for registration in the USCO; (c) all renewals of any of the foregoing; (d) all income, royalties, damages, claims and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; and (e) all rights to sue for past, present and future infringements of any of the foregoing.

"**Credit Agreement**" has the meaning assigned to such term in the preamble of this Agreement.

"**Debtor Grantors**" means all Grantors that are Debtors in the Cases.

"**Deposit/Securities Accounts**" means, for each Grantor, all Deposit Accounts and Securities Accounts set forth opposite such Grantor's name on Schedule 8 to the Perfection Certificate (together with all deposit accounts or securities accounts now owned or hereafter acquired or established by any Grantor.

"**Excluded Account**": (a) any payroll account, other employee wage and benefit accounts, (b) tax accounts, including sales tax accounts, (c) petty cash accounts funded in the ordinary course of business having an aggregate balance not exceeding $1,500,000 at any time, (d) escrow, fiduciary or trust accounts, (e) any zero balance account or any account that is automatically swept to an account that is not an Excluded Account, (f) any account with deposits of cash collateral solely for the benefit of third parties to the extent such cash collateral is permitted by the Credit Agreement, (g) any other deposit account so long as at any date of determination the aggregate average monthly balance for the 12 months ending on such date in

2

any such deposit account is not in excess of $1,500,000 and the aggregate average monthly balance for the 12 months ending on such date of all deposit accounts that are not subject to Deposit Account Control Agreements is not in excess of $6,000,000 and (f) any deposit account with a depository bank that has located the account outside of the United States of America, or any of its territories or possessions and (g) the Cash Pool Requirements Account.

"**Excluded Assets**" means:

(a)    any assets owned by any Grantor on the date hereof or hereafter acquired that are subject to a Lien of the type described in Section 7.01(i) of the Credit Agreement that is permitted to be incurred pursuant to the provisions of the Credit Agreement if and to the extent that the contract or other agreement pursuant to which such Lien is granted (or the documentation relating thereto) validly prohibits the creation of any other Lien on such asset;

(b)    [Reserved];

(c)    any Intellectual Property to the extent that the attachment of the security interest of this Agreement thereto, or any assignment thereof, would result in the forfeiture of the Grantors' rights in such property (in each case, except insofar as such provision causing forfeiture is overidden by the Bankruptcy Code or other applicable law), including, without limitation, any Trademark applications filed in the USPTO on the basis of such Grantor's "intent to use" such Trademark, unless and until acceptable evidence of use of such Trademark has been filed with the USPTO pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. 1051, et seq.), to the extent that granting a lien in such Trademark application prior to such filing would adversely affect the enforceability or validity of such Trademark application;

(d)    any rights of a Grantor arising under any contract, lease, instrument, license or other document or any Intellectual Property subject thereto to the extent that and only for so long as the grant of a security interest therein would (x) constitute a violation or of a valid and enforceable restriction in respect of, or result in the abandonment, invalidation or unenforceability of any right, title and interest of such Grantor in, such rights in favor of a third party or under any law, regulation, permit, order or decree of any Governmental Authority (for the avoidance of doubt, the restrictions described herein shall not include negative pledges or similar undertakings in favor of a lender or other financial counterparty), or (y) result in a breach, termination, or default under any such contract, lease, instrument, license or other document, or expressly give any other party in respect of any such contract, lease, instrument, license or other document or any Intellectual Property subject thereto, the right to terminate its obligations thereunder, provided, however, that the limitation set forth in this clause (d) shall not affect, limit, restrict or impair the grant by a Grantor of a security interest pursuant to this Agreement in any such assets to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity, and provided, further, that, at such time as the condition causing the conditions in subclauses

#89231334v17

(x) and (y) of this clause (d) shall be remedied, whether by contract, change of law, the Orders or otherwise, the contract, lease, instrument, license or other documents shall immediately cease to be an Excluded Asset, and any security interest that would otherwise be granted herein shall attach immediately to such contract, lease, instrument, license or other document or any Intellectual Property subject thereto, or to the extent severable, to any portion thereof that does not result in any of the conditions in subclauses (x) or (y) above;

(e)    any assets to the extent and for so long as the pledge of such assets is prohibited by law and such prohibition is not overridden by the Uniform Commercial Code or other applicable law (including the Bankruptcy Code);

(f)    Avoidance Actions and, unless otherwise provided in the Final Order, Avoidance Action Proceeds;

(g)    the Cash Pool Requirements Account and any amounts or other assets credited thereto and held therein (but not in excess of $75,000,000 together with any returns or profits therefrom and credited thereto and held therein); provided, however, that any unused amount in the Cash Pool Requirements Account shall be, subject to the Carve-Out, distributed to the Administrative Agent upon the Maturity Date in partial repayment of the Obligations;

(h)    any Leased Real Property;

(i)    any Owned Real Property owned as of the Closing Date that is not Material Real Property;

(j)    any Owned Real Property unless and until the Administrative Agent shall have received a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination (together with, if such Real Property is located in a special flood hazard area, (A) a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto and (B) evidence of flood insurance in form and substance reasonably satisfactory to the Administrative Agent;

(k)    prior to entry of the Final Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code; and

(l)    all proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (a) – (k).

"**Excluded Security**" means:

(a)    more than 65% of the issued and outstanding Voting Stock (including for this purposes, any instruments treated as equity for U.S. federal income tax purposes) of any Foreign Subsidiary that is a direct subsidiary of a Loan Party;

(b)        more than 65% of the issued and outstanding Voting Stock (including for this purpose any instruments treated as equity for U.S. federal income tax purposes) of any Subsidiary if substantially all of its assets consist of the Equity Interests or Indebtedness of one or more Foreign Subsidiaries that are controlled foreign corporations within the meaning of Section 957 of the Code;

(c)        any Equity Interests of any Subsidiary that is not directly held by a Loan Party;

(d)        any interest in a joint venture or non-wholly owned Subsidiary or any Person that is not a Subsidiary of the Borrower (unless held in a securities account) to the extent and for so long as the attachment of the security interest created hereby therein would violate any joint venture agreement, organization document, shareholders agreement or equivalent agreement relating to such joint venture or non-wholly owned Subsidiary or such Person that is not a Subsidiary that was entered into for legitimate and customary business reasons; provided, however, that the limitation set forth in this clause (d) shall not affect, limit or restrict or impair the grant by a Grantor of a security interest pursuant to this Agreement in any such assets to the extent that an otherwise applicable prohibition or restriction on such grant is rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity, and provided, further, that, at such time as the condition causing the condition of this clause (d) shall be remedied, whether by contract, change of law, the Orders or otherwise, such interest shall immediately cease to be an Excluded Security, and any security interest that would otherwise be granted herein shall attach immediately to such interest subject thereto, or to the extent severable, to any portion thereof that does not result in the condition above;

(e)        any shares of stock or debt to the extent and for so long as the pledge of such shares of stock or debt is prohibited by law and such prohibition is not overridden by applicable law (including the Bankruptcy Code).

"**General Collateral**" has the meaning assigned to such term in Section 3.01(a).

"**General Intangibles**" has the meaning specified in Article 9 of the New York UCC and includes for the avoidance of doubt corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, Swap Contracts and other agreements), goodwill, registrations, franchises, tax refund claims and any letter of credit, guarantee, claim, security interest or other security held by or granted to any Grantor, as the case may be, to secure payment by an Account Debtor of any of the Accounts.

"**Grantors**" has the meaning assigned to such term in the preamble to this Agreement.

"**Holdings**" has the meaning assigned to such term in the preamble to this Agreement.

"**Insurance**" means all insurance policies covering any or all of the Collateral (regardless of whether the Administrative Agent is the loss payee thereof) or whether respect to which any Grantor is otherwise the beneficiary.

"**Intellectual Property**" means all intellectual property and similar property of every kind and nature now owned or hereafter acquired by any Grantor, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information, the intellectual property rights in software and databases and all related documentation and registrations and all additions, improvements and accessions to, and books and records describing any of the foregoing.

"**Intellectual Property Security Agreements**" means the short-form Patent Security Agreement, short-form Trademark Security Agreement, and short-form Copyright Security Agreement, each substantially in the form attached hereto as <u>Exhibits III</u>, <u>IV</u> and <u>V</u>, respectively.

"**Investment Property**" has the meaning specified in Article 9 of the New York UCC, but shall not include any Pledged Collateral.

"**L/C Issuer**" has the meaning assigned to such term in the preamble to this Agreement.

"**Lender**" has the meaning assigned to such term in the preamble to this Agreement.

"**License**" means any Patent License, Trademark License, Copyright License or other Intellectual Property license or sublicense agreement to which any Grantor is a party, together with any and all (i) renewals, extensions, supplements and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder or with respect thereto, including damages and payments for past, present or future infringements or violations thereof, and (iii) rights to sue for past, present and future violations thereof.

"**New York UCC**" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"**Non-Debtor Grantor**" means, if any, all Grantors that are not Debtors in the Cases.

"**Patent License**" means any written agreement, now or hereafter in effect, granting to any third party any right to make, use or sell any invention on which a Patent, now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, is in existence, or granting to any Grantor any right to make, use or sell any invention on which a Patent, now or hereafter owned by any third party, is in existence, and all rights of any Grantor under any such agreement.

"**Patents**" means all of the following now owned or hereafter acquired by any Grantor: (a) all letters Patent of the United States or any other jurisdiction or territory in or to which any Grantor now or hereafter has any right, title or interest, all registrations and recordings thereof, and all applications for letters Patent of the United States or any other jurisdiction or territory, including registrations, recordings and pending applications in the USPTO; (b) all reissues, continuations, divisions, continuations-in-part, renewals, improvements or extensions thereof,

6

and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein; (c) all income, royalties, damages, claims and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; and (d) all rights to sue for past, present and future infringements of any of the foregoing.

"**Perfection Certificate**" means a certificate substantially in the form of <u>Exhibit II</u>, completed and supplemented with the schedules and attachments contemplated thereby, and as amended, updated, modified or supplemented from time to time, and duly executed as of the Closing Date, and as of any subsequent delivery date as required pursuant to the Loan Documents, by a Responsible Officer of the Borrower.

"**Pledged Collateral**" has the meaning assigned to such term in Section 2.01.

"**Pledged Debt**" has the meaning assigned to such term in Section 2.01.

"**Pledged Equity**" has the meaning assigned to such term in Section 2.01.

"**Pledged Securities**" means any promissory notes, stock certificates or other securities now or hereafter included in the Pledged Collateral, including all certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"**Security Agreement Supplement**" means an instrument in the form of <u>Exhibit I</u> hereto.

"**Security Interest**" has the meaning assigned to such term in Section 3.01(a).

"**Trademark License**" means any written agreement, now or hereafter in effect, granting to any third party any right to use any Trademark now or hereafter owned by any Grantor or that any Grantor otherwise has the right to license, or granting to any Grantor any right to use any Trademark now or hereafter owned by any third party, and all rights of any Grantor under any such agreement.

"**Trademarks**" means all of the following now owned or hereafter acquired by any Grantor: (a) all United States and foreign trademarks, service marks, trade names, corporate names, trade dress, logos, designs, fictitious business names, other source or business identifiers, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including registrations and registration applications in the USPTO or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all extensions or renewals thereof, as well as any unregistered trademarks and service marks used by a Grantor; (b) all goodwill connected with the use of and symbolized by the foregoing; (c) all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; and (d) all rights to sue for past, present and future infringements of any of the foregoing.

"**USCO**" means the United States Copyright Office.

"**USPTO**" means the United States Patent and Trademark Office.

#89231334v17

# ARTICLE 2
## PLEDGE OF SECURITIES

Section 2.01. *Pledge.* In addition to the security interest set forth in the Interim Order (and, when applicable, the Final Order) with respect to each Debtor Grantor, as security for the payment or performance, as the case may be, in full of the Obligations, including the Guaranty, each Grantor (including each Non-Debtor Grantor (if any)) hereby pledges to the Administrative Agent, its successors and assigns, for its benefit and the benefit of the Secured Parties, and hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a continuing security interest in all of such Grantor's right, title and interest in, to and under (i) all Equity Interests held by it, including those listed on Schedule I and any other Equity Interests obtained in the future by such Grantor and, to the extent certificated, the certificates representing all such Equity Interests (the "**Pledged Equity**"); provided that the Pledged Equity shall not include any Excluded Security; (ii) the debt securities owned by it, including those listed opposite the name of such Grantor on Schedule I, any debt securities obtained in the future by such Grantor and the promissory notes and any other instruments evidencing any debt (the "**Pledged Debt**")[1]; provided that the Pledged Debt shall not include any Excluded Security; (iii) subject to Section 2.06, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the Pledged Equity and Pledged Debt; (iv) subject to Section 2.06, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (i), (ii), and (iii) above; and (v) all Proceeds of any of the foregoing (the items referred to in clauses (i) through (v) above being collectively referred to as the "**Pledged Collateral**").

TO HAVE AND TO HOLD the Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, forever, subject, however, to the terms, covenants and conditions hereinafter set forth.

Section 2.02. *Delivery of the Pledged Collateral.*

(a)    Each Grantor shall, to the extent permitted by and in accordance with the Interim Order (and when applicable, the Final Order) and without further notice from the Bankruptcy Court (with respect to Debtor Grantors), deliver on the Closing Date all Pledged Securities owned by it on the Closing Date to the Administrative Agent and with respect to any Pledged Securities issued or acquired after the Closing Date, it agrees to deliver or cause to be delivered as promptly as practicable (and in any event, within 45 days after the date of acquisition thereof or such longer period as to which the Administrative Agent may agree in its reasonable discretion) to the Administrative Agent, for the benefit of the Secured Parties, any and all such Pledged Securities (other than any uncertificated securities, but only for so long as such securities remain uncertificated) to the extent such Pledged Securities, in the case of promissory

---

[1]       The schedule or any supplement thereof will include, among other things, the Sierra Intercompany Note issued to the Borrower and any Foreign Intercompany Notes/Receivables issued to the Borrower for the Borrower's Foreign ABL Indemnity Rights.

notes or other instruments evidencing Indebtedness, are required to be delivered pursuant to paragraphs (b) and (d) of this Section 2.02.

(b)    The Grantors shall, to the extent permitted by and in accordance with the Interim Order (and when applicable, the Final Order) and without further notice from the Bankruptcy Court (with respect to Debtor Grantors), cause any Indebtedness for borrowed money owed to any Grantor by such Person (other than (a) loans to directors, officers and employees permitted under the Credit Agreement, (b) intercompany Indebtedness between Loan Parties, (c) any other Indebtedness owned by any Person (other than a Subsidiary of the Borrower that is not a Loan Party) having a principal amount not in excess of the Dollar Amount of $1,000,000) to be evidenced by a duly executed promissory note that is pledged and delivered to the Administrative Agent, for the benefit of the Secured Parties, pursuant to the terms hereof.

(c)    To the extent permitted by and in accordance with the Interim Order (and when applicable, the Final Order) and without further notice from the Bankruptcy Court with respect to Debtor Grantors, and in all cases with respect to any Non-Debtor Grantors, upon delivery to the Administrative Agent, (i) any Pledged Securities shall be accompanied by stock or security powers duly executed in blank or other instruments of transfer reasonably satisfactory to the Administrative Agent and by such other instruments and documents as the Administrative Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by proper instruments of assignment or transfer duly executed by the applicable Grantor and such other instruments or documents as the Administrative Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing the securities, which schedule shall be attached hereto as Schedule I and made a part hereof; provided that failure to attach any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(d)    Notwithstanding any provision to the contrary contained herein or in any other Loan Document, until the obligations in respect of the Prepetition Cash Flow Credit Agreement are paid in full and terminated, the Grantors need not comply with clauses (a) and/or (b) of this Section 2.02 with respect to the delivery to the Administrative Agent of any Pledged Collateral referred to in such clauses (a) and/or (b) if and to the extent such Pledged Collateral was delivered (prior to the Petition Date) to the collateral agent in respect of the Pre-Petition Cash Flow Credit Agreement; provided that, in the event that the collateral agent in respect of the Pre-Petition Cash Flow Credit Agreement misplaces or loses, or has misplaced or lost, any such Pledged Collateral, upon receipt by the Grantor of a lost certificate affidavit from the collateral agent in respect of the Pre-Petition Cash Flow Credit Agreement, the Grantor shall deliver a replacement certificate to the Administrative Agent within forty-five (45) days (or such longer period as the Administrative Agent may agree in its reasonable discretion) after receipt of such lost certificate affidavit.

Section 2.03.    *Representations, Warranties and Covenants*.    Holdings and the Borrower jointly and severally represent, warrant and covenant, as to themselves and the other Grantors, to and with the Administrative Agent, for the benefit of the Secured Parties, that:

#89231334v17

(a)      Schedule I correctly sets forth as of the Closing Date the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity and includes all Equity Interests, debt securities and promissory notes required to be pledged in order to satisfy the Collateral and Guarantee Requirement;

(b)      the Pledged Equity and Pledged Debt (solely with respect to Pledged Debt issued by a Person other than the Borrower or a Subsidiary of the Borrower, to Holdings' and the Borrower's knowledge) have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity, are fully paid and nonassessable and (ii) in the case of Pledged Debt (solely with respect to Pledged Debt issued by a Person other than the Borrower or a Subsidiary of the Borrower, to Holdings' and the Borrower's knowledge), are legal, valid and binding obligations of the issuers thereof;

(c)      except for the security interests granted hereunder and by the Interim Order (and, when applicable, the Final Order), each of the Grantors (i) is and, subject to any transfers made in compliance with the Credit Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule I as owned by such Grantors, (ii) holds the same free and clear of all Liens, other than (A) Liens created by the Collateral Documents, (B) Liens created by the Interim Order (and, when applicable, the Final Order) and (C) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement, (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, other than (A) Liens created by the Collateral Documents, (B) Liens created by the Interim Order (and, when applicable, the Final Order) and (C) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement, and (iv) if requested by the Administrative Agent, will defend its title or interest thereto or therein against any and all Liens (other than the Liens permitted pursuant to this Section 2.03(c)), however arising, of all Persons whomsoever;

(d)      except for restrictions and limitations imposed by the Loan Documents or applicable laws generally and except as described in the Perfection Certificate, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter or bylaw provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Administrative Agent of rights and remedies hereunder;

(e)      subject to the entry of the Interim Order with respect to all Debtor Grantors, each of the Grantors has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f)      upon entry of the Interim Order (and, when applicable, the Final Order), no consent or approval of any Governmental Authority, any securities exchange or any other Person was or is necessary to the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect);

10

(g)     in addition to the perfected Liens provided for by the Orders, by virtue of the execution and delivery by the Grantors of this Agreement, when any Pledged Securities are delivered to the Administrative Agent in the State of New York and assuming continual possession of such Pledged Securities in the State of New York in accordance with this Agreement, subject to the entry of the Interim Order, the Administrative Agent for the benefit of the Secured Parties will obtain a legal, valid and perfected Lien upon and security interest in such Pledged Securities as security for the payment and performance of the Obligations, subject only to Liens permitted by Section 7.01 of the Credit Agreement, to the extent such perfection is governed by the New York UCC; and

(h)     upon and subject to the entry of the Interim Order, the pledge effected hereby is effective to vest in the Administrative Agent, for the benefit of the Secured Parties, the rights of the Administrative Agent in the Pledged Collateral as set forth herein.

Each Grantor hereby agrees that upon the occurrence and during the continuance of an Event of Default and after compliance with the proviso at the end of Section 8.02 of the Credit Agreement, it will comply with instructions of the Administrative Agent with respect to the Equity Interests in such Grantor that constitute Pledged Equity hereunder that are not certificated without further consent by the applicable owner or holder of such Equity Interests.

Section 2.04.    *Certification of Limited Liability Company and Limited Partnership Interests.*  Any limited liability company and any limited partnership controlled by any Grantor shall either (a) not include in its operative documents any provision that any Equity Interests in such limited liability company or such limited partnership be a "security" as defined under Article 8 of the Uniform Commercial Code or (b) certificate any Equity Interests in any such limited liability company or such limited partnership. To the extent an interest in any limited liability company or limited partnership controlled by any Grantor and pledged under Section 2.01 is certificated or becomes certificated, (i) each such certificate shall be delivered to the Administrative Agent, pursuant to Section 2.02(a) (subject to Section 2.02(d)) and (ii) such Grantor shall fulfill all other requirements under Section 2.02 applicable in respect thereof. Each Grantor hereby agrees that if any of the Pledged Collateral are at any time not evidenced by certificates of ownership, then each applicable Grantor shall, to the extent permitted by and in accordance with applicable law and the Interim Order (and when applicable, the Final Order) and without further order from the Bankruptcy Court (with respect to Debtor Grantors), (i) if necessary or desirable to perfect a security interest in such Pledged Collateral, cause such pledge to be recorded on the equityholder register or the books of the issuer, execute any customary pledge forms or other documents necessary or appropriate to complete the pledge and give the Administrative Agent the right to transfer such Pledged Collateral under the terms hereof, and (ii) after the occurrence and during the continuance of any Event of Default, upon request by the Administrative Agent, (A) cause the Organization Documents of each such issuer that is a Subsidiary of the Borrower to be amended to provide that such Pledged Collateral shall be treated as "securities" for purposes of the Uniform Commercial Code and (B) cause such Pledged Collateral to become certificated and delivered to the Administrative Agent.

Section 2.05.    *Registration in Nominee Name; Denominations.*  Subject to the proviso at the end of Section 8.02 of the Credit Agreement, if an Event of Default shall occur and be continuing, (a) the Administrative Agent, on behalf of the Secured Parties, shall have the right

11

(in its sole and absolute discretion) to hold the Pledged Securities in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Administrative Agent, and each Grantor will promptly give to the Administrative Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of such Grantor and (b) the Administrative Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement; provided, that the Administrative Agent shall give the Borrower prior notice of its intent to exercise such rights.

Section 2.06. *Voting Rights; Dividends and Interest.*

(a)    Unless and until an Event of Default shall have occurred and be continuing and the Administrative Agent shall have notified the Borrower that the rights of the Grantors under this Section 2.06 are being suspended and shall have complied with the proviso at the end of Section 8.02 of the Credit Agreement:

(i)    Each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Loan Documents; provided that such rights and powers shall not be exercised in any manner, except as may be permitted under this Agreement, the Credit Agreement or the other Loan Documents, that would materially and adversely affect the rights and remedies of any of the Administrative Agent or the other Secured Parties under this Agreement, the Credit Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)    The Administrative Agent shall execute and deliver to each Grantor, or cause to be executed and delivered to each Grantor, all such proxies, powers of attorney and other instruments as each Grantor may reasonably request for the purpose of enabling such Grantor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii)    Each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Loan Documents and applicable Laws; provided that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity or Pledged Debt, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Grantor, shall not be commingled by such Grantor with any of its other funds or property but shall be held separate and apart therefrom, shall, to the extent permitted by and in accordance

12

with the Interim Order (and when applicable, the Final Order) and without further order from the Bankruptcy Court (with respect to Debtor Grantors), be held in trust for the benefit of the Administrative Agent and the Secured Parties and shall, to the extent permitted by and in accordance with the Interim Order (and when applicable, the Final Order) and without further order from the Bankruptcy Court (with respect to Debtor Grantors), be promptly (and in any event within 5 Business Days) delivered to the Administrative Agent in the same form as so received (with any necessary endorsement reasonably requested by the Administrative Agent).

(b)     Upon the occurrence and during the continuance of an Event of Default, after the Administrative Agent shall have notified the Borrower of the suspension of the rights of the Grantors under Section 2.06(a)(iii) and shall have complied with the proviso at the end of Section 8.02 of the Credit Agreement, then all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to Section 2.06(a)(iii) shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.06 shall be held in trust for the benefit of the Administrative Agent, shall be segregated from other property or funds of such Grantor and shall be promptly (and in any event within 5 Business Days) delivered to the Administrative Agent upon demand in the same form as so received (with any necessary endorsement reasonably requested by the Administrative Agent). Any and all money and other property paid over to or received by the Administrative Agent pursuant to the provisions of this paragraph (b) shall be retained by the Administrative Agent in an account to be established by the Administrative Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02 hereof. After all Events of Default have been waived, the Administrative Agent shall promptly repay to each Grantor (without interest) all dividends, interest, principal or other distributions that such Grantor would otherwise be permitted to retain pursuant to the terms of Section 2.06(a)(iii) that remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, after the Administrative Agent shall have provided the Borrower with five (5) Business Days' written notice of the suspension of the rights of the Grantors under Section 2.06(a)(i) and shall have complied with the proviso at the end of Section 8.02 of the Credit Agreement, then all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to Section 2.06(a)(i), and the obligations of the Administrative Agent under Section 2.06(a)(ii), shall, to the extent permitted by and in accordance with the Interim Order (and when applicable, the Final Order) and without further order from the Bankruptcy Court (with respect to Debtor Grantors), cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that, unless otherwise directed by the Required Lenders, the Administrative Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Grantors to exercise such rights at the discretion of the Administrative Agent. After all Events of Default have been cured or waived, each Grantor shall have the exclusive right to exercise the voting and/or consensual rights and powers that such Grantor would otherwise be entitled to exercise pursuant to the terms of Section 2.06(a)(i).

(d)      Any notice given by the Administrative Agent to the Borrower suspending the rights of the Grantors under Section 2.06(a)(i) shall be given in writing, (ii) may be given with respect to one or more of the Grantors at the same or different times and (iii) may suspend the rights of the Grantors under Section 2.06(a)(i) or Section 2.06(a)(iii) in part without suspending all such rights (as specified by the Administrative Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Administrative Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.

## ARTICLE 3
### SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01.    *Security Interest*.

(a)      In addition to the security interest set forth in the Interim Order (and, when applicable, the Final Order), as security for the payment or performance, as the case may be, in full of the Obligations, including the Guaranty and the payment of amounts accruing during the pendency of the Cases in all circumstances, each Grantor hereby assigns and pledges to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Administrative Agent, its successors and assigns, for its benefit and the benefit of the Secured Parties, a security interest (the "**Security Interest**") in all right, title or interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**General Collateral**"):

(i)      all Accounts, including all receivables;

(ii)      all As-Extracted Collateral;

(iii)      all cash and all Deposit Accounts, Securities Accounts and Commodities Accounts;

(iv)      all Chattel Paper;

(v)      all Commercial Tort Claims, including those listed on Schedule II hereto;

(vi)      all Documents;

(vii)      all Equipment;

(viii)      all Fixtures;

(ix)      all General Intangibles (including all Intellectual Property and any Equity Interests in other Persons that do not constitute Investment Property);

(x)      all Goods;

(xi)      all Instruments;

14

(xii)    all Insurance;

(xiii)    all Intellectual Property;

(xiv)    all Inventory;

(xv)    all Investment Property;

(xvi)    all Letter of Credit Accounts;

(xvii)    all Letters of Credit and Letter-of-Credit Rights;

(xviii)    all Money;

(xix)    all Owned Real Property

(xx)    all Pledged Securities;

(xxi)    all Vehicles;

(xxii)    all Cash Collateral (as defined in the Interim Order or Final Order, as applicable);

(xxiii)    all books and records (including customer lists, credit files, computer programs, printout and other computer materials and records) of such Grantor pertaining to any of its General Collateral;

(xxiv)    subject to entry of, and the terms of, the Final Order, Proceeds of Avoidance Actions;

(xxv)    all rights and interests of any Grantor in the Sierra Intercompany Loan, the Sierra Intercompany Note and any Foreign Intercompany Loans and Foreign Intercompany Notes/Receivables held by such Grantor; and

(xxvi)    to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing; provided that notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in any Excluded Asset or any Excluded Security.

Without limiting the foregoing grant in any respect, each Grantor does hereby, in addition, collaterally grant, bargain, sell, convey, transfer, set over, assign and deliver to the Administrative Agent, for its benefit and the benefit of the other Secured Parties, all right, title and interest of such Grantor in and to the Sierra Intercompany Loan, the Sierra Intercompany Note, all Foreign Intercompany Loans and Foreign Intercompany Notes/Receivables held by such Grantor, such collateral assignment being absolute and effective immediately and without possession.  Upon the occurrence and during the continuance of an Event of Default, subject to compliance with the proviso at the end of Section 8.02 of the Credit Agreement, the

15

Administrative Agent will be entitled to enforce all rights of each Grantor under the Sierra Intercompany Loan, the Sierra Intercompany Note and any Foreign Intercompany Loans and Foreign Intercompany Notes/Receivables held by each Grantor and each Grantor agrees that it will facilitate in all reasonable ways the enforcement of such rights.

(b)      Each Grantor hereby irrevocably authorizes the Administrative Agent for the benefit of the Secured Parties at any time and from time to time to file in any relevant jurisdiction any financing statements with respect to the General Collateral or any part thereof and amendments thereto that (i) indicate the Collateral as all assets of such Grantor or words of similar effect as being of an equal or lesser scope or with greater detail, and (ii) contain the information required by Article 9 of the Uniform Commercial Code or the analogous legislation of each applicable jurisdiction for the filing of any financing statement or amendment, including whether such Grantor is an organization, the type of organization and, if required, any organizational identification number issued to such Grantor. Each Grantor agrees to provide such information to the Administrative Agent promptly upon any reasonable request.

(c)      The Security Interest is granted as security only and shall not subject the Administrative Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the General Collateral.

(d)      The Administrative Agent is authorized to file with the USPTO or the USCO (or any successor office) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest in United States Intellectual Property granted by each Grantor, without the signature of any Grantor, and naming any Grantor or the Grantor as debtors and the Administrative Agent as secured party.

(e)      Notwithstanding anything to the contrary in the Loan Documents, none of the Grantors shall be required (i) to perfect the Security Interests granted by this Security Agreement (including Security Interests in Investment Property and Fixtures) by any means other than by (A) filings pursuant to the Uniform Commercial Code of the relevant State(s) (excluding fixture filings), (B) filings in United States government offices with respect to Intellectual Property as expressly required elsewhere herein, (C) delivery to the Administrative Agent to be held in its possession of all Collateral consisting of Instruments or Pledged Securities as expressly required elsewhere herein or (D) other methods expressly provided herein, (ii) take any action (other than the actions listed in Section 3.01(e)(i)(A) and (C) above) with respect to any assets located outside of the United States, (iii) to take additional actions beyond execution of the Agreement and entry of the Orders to perfect in any assets subject to a certificate of title statute, or (iv) to deliver any Pledged Securities, other than the Pledged Securities of any Domestic Subsidiary or Foreign Subsidiary representing Equity Interests pledged hereunder.

Section 3.02.    *Representations and Warranties*.  Holdings and the Borrower jointly and severally represent and warrant, as to themselves and the other Grantors, to the Administrative Agent and the Secured Parties that:

(a)      Subject to Liens permitted by Section 7.01 of the Credit Agreement and by the Interim Order (and, when applicable, the Final Order), each Grantor has good and valid rights in and title to the General Collateral with respect to which it has purported to grant a Security

16

Interest hereunder and has full power and authority to grant to the Administrative Agent the Security Interest in such General Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained or any consent or approval that is not required after giving effect to any anti-assignment provisions in the UCC or other law or the Orders.

(b)    The Uniform Commercial Code financing statements or other appropriate filings, recordings or registrations prepared by the Administrative Agent based upon the information provided to the Administrative Agent in the Perfection Certificate for filing in each governmental office specified in Schedule 4 to the Perfection Certificate (or specified by notice from the Borrower to the Administrative Agent after the Closing Date in the case of filings, recordings or registrations (other than filings required to be made in the USPTO and the USCO in order to perfect the Security Interest in General Collateral consisting of United States Patents, Trademarks and Copyrights) required by Section 6.11 of the Credit Agreement), are all the filings, recordings and registrations that are necessary to establish a legal, valid and perfected security interest in favor of the Administrative Agent (for the benefit of the Secured Parties) in respect of all General Collateral in which the Security Interest may be perfected by filing, recording or registration in such governmental office specified in Schedule 4 to the Perfection Certificate or specified by notice from the Borrower after the Closing Date, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in such filing office, except as provided under applicable law with respect to the filing of continuation statements.

(c)    Each Grantor represents and warrants that short-form Intellectual Property Security Agreements containing a description of all General Collateral consisting of United States Patents, United States registered Trademarks (and Trademarks for which United States registration applications are pending, unless it constitutes an Excluded Asset) and United States registered Copyrights, respectively, have been delivered to the Administrative Agent for recording by the USPTO and the USCO pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, as may be necessary to establish a valid and perfected security interest in favor of the Administrative Agent (for the benefit of the Secured Parties) in respect of all General Collateral consisting of registrations and applications for all such Patents, Trademarks and Copyrights to the extent a security interest may be perfected by filing, recording or registration in the USPTO or USCO under the Federal intellectual property laws, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary therefor (other than (i) such filings and actions as are necessary to perfect the Security Interest with respect to any General Collateral consisting of Patents, Trademarks and Copyrights (or registration or application for registration thereof) acquired or developed by any Grantor after the date hereof and (ii) the UCC financing and continuation statements contemplated in Section 3.02(b)).

(d)    With respect to any Grantor that is not a Debtor, the Security Interest constitutes (i) a legal and valid security interest in, and Liens on, all the General Collateral securing the payment and performance of the Obligations to the extent such security interest or Lien may be validly created or perfected under the New York UCC; (ii) subject to the filings described in Section 3.02(b), a perfected security interest in, and Liens on, all General Collateral in which a

security interest may be perfected by filing, recording or registering a financing statement or analogous document in such filing office and (iii) subject to the filings described in Section 3.02(c), a perfected security interest in, and Liens on, all registrations and applications for Patents, Trademarks and Copyrights to the extent a security interest may be perfected upon the receipt and recording of fully executed shortform Intellectual Property Security Agreements with the USPTO and the USCO, as applicable. The Security Interest is and shall be prior to any other Lien on any of the General Collateral, other than (1) any nonconsensual Lien that is expressly permitted pursuant to Section 7.01 of the Credit Agreement and has priority as a matter of law and (2) Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement.

(e)     [Reserved].

(f)     The General Collateral is owned by the Grantors free and clear of any Lien, except for Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement and by the Interim Order (and, when applicable, the Final Order). None of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the New York UCC or any other applicable United States laws covering any General Collateral, (ii) any assignment in which any Grantor assigns any General Collateral or any security agreement or similar instrument covering any General Collateral with the USPTO or the USCO or (iii) any assignment in which any Grantor assigns any General Collateral or any security agreement or similar instrument covering any General Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens expressly permitted pursuant to Section 7.01 of the Credit Agreement and by the Interim Order (and, when applicable, the Final Order).

Section 3.03.    *Covenants*.

(a)     The Borrower agrees promptly (and in any event within 60 days of such change) to notify the Administrative Agent in writing of any change in (i) legal name of any Grantor, (ii) the type of organization of any Grantor, (iii) the jurisdiction of organization of any Grantor, or (iv) the chief executive office of any Grantor.

(b)     At the time of delivery of any annual and quarterly financial statements with respect to the preceding fiscal year or quarter (as applicable) pursuant to Section 6.01 of the Credit Agreement, the Borrower shall deliver to the Administrative Agent a certificate executed by the Responsible Officer of each of Holdings and the Borrower, setting forth any information required pursuant to Schedules 1, 2, 5, 6(a), 6(b), 7 and 8 to the Perfection Certificate that has changed or confirming that there has been no change in such information since the date of the Perfection Certificate or the date of the most recent certificate delivered pursuant to this Section 3.03(b).

(c)     The Borrower agrees, on its own behalf and on behalf of each other Grantor, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions (to the extent not prohibited by the Interim Order (and, when applicable, the Final Order) and without further order from the Bankruptcy Court), as the Administrative Agent may from time to time reasonably request to better assure,

18

preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith.

(d)     At its option, the Administrative Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the General Collateral and not permitted pursuant to Section 7.01 of the Credit Agreement, and may pay for the maintenance and preservation of the General Collateral to the extent any Grantor fails to do so as required by the Credit Agreement or this Agreement and within a reasonable period of time after the Administrative Agent has requested that it do so, and each Grantor jointly and severally agrees to reimburse the Administrative Agent within 10 Business Days after demand for any payment made or any reasonable expense incurred by the Administrative Agent pursuant to the foregoing authorization; provided, however, Grantors shall not be obligated to reimburse the Administrative Agent with respect to any Intellectual Property Collateral which any Grantor has failed to maintain or pursue, or otherwise allowed to lapse, terminate or be put into the public domain, in accordance with Section 3.03(g)(iv). Nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Administrative Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(e)     If at any time the Grantors shall take a security interest in any property of any Account Debtor or any other Person, the value of which is in excess of (i) $1,000,000 individually or (ii) when aggregated with all other such property for which this clause has not been satisfied, $5,000,000 in the aggregate, to secure payment and performance of an Account, such Grantor shall promptly assign such security interest to the Administrative Agent for the benefit of the Secured Parties. Such assignment need not be filed of public record unless necessary to continue the perfected status of the security interest against creditors of and transferees from the Account Debtor or other Person granting the security interest.

(f)     *Commercial Tort Claims*. If the Grantors shall at any time hold or acquire a Commercial Tort Claim in an amount reasonably estimated by such Grantor to exceed (i) $10,000,000 individually for any Debtor Grantor or $1,000,000 for any Non-Debtor Grantor or (ii) when aggregated with all other Commercial Tort Claims for which this clause has not been satisfied, $50,000,000 in the aggregate for all Debtor Grantors or $5,000,000 in the aggregate for all Non-Debtor Grantors, and, in each case, for which a complaint in a court of competent jurisdiction has been filed, such Grantor shall within 45 days after the end of the fiscal quarter in which such complaint was filed notify the Administrative Agent thereof in a writing signed by such Grantor including a summary description of such claim and grant to the Administrative Agent, for the benefit of the Secured Parties, in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Administrative Agent.

(g)     *Intellectual Property Covenants*.

#89231334v17

(i)    Other than to the extent permitted herein or in the Credit Agreement or with respect to registrations and applications no longer used or useful, with respect to registration or pending application of each item of its Intellectual Property Collateral for which such Grantor has standing to do so, each Grantor agrees to take, at its expense, all necessary or reasonably requested steps, including, without limitation, in the USPTO, the USCO and any other governmental authority located in the United States, to pursue the registration and maintenance of each Patent, Trademark, or Copyright registration or application, now or hereafter included in such Intellectual Property Collateral of such Grantor.

(ii)    Other than to the extent permitted herein or in the Credit Agreement, or with respect to registrations and applications no longer used or useful, no Grantor shall do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property Collateral may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in the case of a trade secret, becomes publicly known).

(iii)    Other than as excluded or as permitted herein or in the Credit Agreement, or with respect to Patents, Copyrights or Trademarks which are no longer used or useful in the Grantor's business operations or except where failure to do so would not reasonably be expected to have a Material Adverse Effect, each Grantor shall take all necessary or reasonably requested steps to preserve and protect each item of its Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all necessary or reasonably requested steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to standards of quality.

(iv)    Nothing in this Agreement or any other Loan Document prevents any Grantor from disposing of, discontinuing the use or maintenance of, failing to pursue, or otherwise allowing to lapse, terminate or be put into the public domain, any of its Intellectual Property Collateral to the extent permitted by the Credit Agreement if such Grantor determines in its reasonable business judgment that such Intellectual Property Collateral is no longer material or useful to the conduct of its business.

(v)    Within 60 days after the end of each calendar quarter each Grantor shall provide a list of any additional applications for or registrations of Intellectual Property filed or acquired by such Grantor not previously disclosed to the Administrative Agent including such information as is necessary for such Grantor to make appropriate filings in the USPTO and the USCO.

(vi)    Each Grantor shall, within forty-five (45) days of the date of this Agreement, execute and deliver to the Administrative Agent, the Intellectual Property Security Agreements in order to record the security interest granted herein to the Administrative Agent for the benefit of the Administrative Agent and the Secured Parties with the USPTO and USCO, as applicable.

#89231334v17

(h)    Each Grantor shall, to the extent not prohibited by the Interim Order (and, when applicable, the Final Order) and upon request of the Administrative Agent, at its own expense and without further order from a Bankruptcy Court, take any and all commercially reasonable actions necessary to defend title to the General Collateral against all Persons and to defend the Security Interest of the Administrative Agent in the General Collateral and the priority thereof against any Lien not expressly permitted pursuant to Section 7.01 of the Credit Agreement. Each Grantor (rather than the Administrative Agent or any Secured Party) shall remain liable (as between itself and any relevant counterparty) to observe and perform all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the General Collateral, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Administrative Agent and the Secured Parties from and against any and all liability for such performance.

Section 3.04.    *Other Actions*.  Without limiting the effect of the Orders to cause the automatic perfection of the security interests of the Secured Parties against all Debtor Grantors to the extent such security interests may be perfected by the entry of the Orders, in order to further insure the attachment, perfection and priority of, and the ability of the Administrative Agent to enforce, the Security Interest, each Grantor agrees, in each case at such Grantor's own expense, to take the following actions with respect to the following General Collateral:

(a)    *Instruments*.

(i)    If the Grantors shall at any time hold or acquire any Instruments constituting General Collateral (excluding checks), and evidencing an amount in excess of (i) $1,000,000 (other than Interests required to be pledged under Section 7.16 of the Credit Agreement) individually or (ii) when aggregated with all other such Instruments for which this clause has not been satisfied $5,000,000 (other than Interests required to be pledged under Section 7.16 of the Credit Agreement) in the aggregate, such Grantor shall, to the extent not prohibited by the Interim Order (and, when applicable, the Final Order), promptly endorse, assign and deliver the same to the Administrative Agent for the benefit of the Secured Parties, accompanied by such instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time reasonably request.

(ii)    Notwithstanding any provision to the contrary contained herein or in any other Loan Document, until the Prepetition Cash Flow Credit Agreement obligations are paid in full, the Grantors need not comply with clause (a) of this Section 3.04 with respect to the delivery to the Administrative Agent of any Instruments constituting General Collateral referred to in such clause (a) if and to the extent such Instruments were delivered (prior to the Petition Date) to the collateral agent in respect of the Pre-Petition Cash Flow Credit Agreement.

(b)    *Deposit/Securities Accounts*.  Prior to the Payment in Full of all Obligations:

(i)    Within sixty (60) days of the date of this Agreement (or the date of any Security Agreement Supplement with respect to any Person that becomes a Grantor after the date hereof) (or such later date as the Administrative Agent may agree), each Grantor will enter into springing control agreements with the financial institutions holding the

Deposit/Securities Accounts, other than Excluded Accounts, pursuant to which each applicable financial institution shall agree with such Grantor and the Administrative Agent to, upon notice from the Administrative Agent upon the occurrence and during the continuance of an Event of Default, to comply with instructions originated by the Administrative Agent directing the disposition of funds in such deposit account without the further consent of such Grantor, such agreement to be in form and substance reasonably satisfactory to the Administrative Agent (an "**Account Control Agreement**"). For the avoidance of doubt, the control agreement with respect to the Letter of Credit Account will be entered into on the Closing Date and shall be a "locked" (not "springing") control agreement.

(ii)    Subject to the compliance with the proviso at the end of Section 8.02 of the Credit Agreement, the Administrative Agent may at any time and without notice to, or consent from, any Grantor, transfer, or direct the transfer of, funds from the Deposit/Securities Accounts to satisfy any Grantor's Obligations if an Event of Default shall have occurred and be continuing. As soon as reasonably practicable after any such transfer, the Administrative Agent agrees to give written notice thereof to the applicable Grantor.

ARTICLE 4
REMEDIES

Section 4.01.    *Remedies upon Default*.  (a) Upon the occurrence and during the continuance of an Event of Default, it is agreed that the Administrative Agent shall have the right to exercise any and all rights afforded to a secured party with respect to the Obligations under the Uniform Commercial Code or other applicable law and also may (i) require each Grantor to, and each Grantor agrees that it will at its expense and upon request of the Administrative Agent promptly, assemble all or part of the Collateral as directed by the Administrative Agent and make it available to the Administrative Agent at a place and time to be designated by the Administrative Agent that is reasonably convenient to both parties; (ii) occupy any premises owned or, to the extent lawful and permitted, leased by any of the Grantors where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation; provided that the Administrative Agent shall provide the applicable Grantor with notice thereof prior to such occupancy; (iii) require each Grantor to, and each Grantor agrees that it will at its expense and upon the request of the Administrative Agent promptly, assign the entire right, title, and interest of such Grantor in each of the Patents, Trademarks, domain names, Copyrights and other Intellectual Property Collateral to the Administrative Agent for the benefit of the Secured Parties; (iv) exercise any and all rights and remedies of any of the Grantors under or in connection with the Collateral, or otherwise in respect of the Collateral; provided that the Administrative Agent shall provide the applicable Grantor with notice thereof prior to such exercise; and (v) subject to the mandatory requirements of applicable law and the notice requirements described below, sell or otherwise dispose of all or any part of the Collateral securing the Obligations at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Administrative Agent shall deem appropriate. The Administrative Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will

22

represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Administrative Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any sale of Collateral shall hold the property sold absolutely, free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

(b)    The Administrative Agent shall give the applicable Grantors 5 Business Days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9611 of the New York UCC or its equivalent in other jurisdictions) of the Administrative Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Administrative Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Administrative Agent may (in its sole and absolute discretion) determine. The Administrative Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given.

(c)    The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Administrative Agent until the sale price is paid by the purchaser or purchasers thereof, but the Administrative Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Administrative Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Administrative Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Administrative Agent may proceed by a suit or suits at law or in equity to foreclose this

23

Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court appointed receiver. Any sale pursuant to the provisions of this Section 4.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

Section 4.02. *Application of Proceeds.*

(a)     The Administrative Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, in accordance with Section 8.03 of the Credit Agreement or the Interim Order (and, when applicable, the Final Order).

(b)     The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, monies or balances in accordance with this Agreement and the Credit Agreement. Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof.

(c)     In making the determinations and allocations required by this Section 4.02, the Administrative Agent may conclusively rely upon information supplied to or by the Administrative Agent as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Obligations, and the Administrative Agent shall have no liability to any of the Secured Parties for actions taken in reliance on such information, provided that nothing in this sentence shall prevent any Grantor from contesting any amounts claimed by any Secured Party in any information so supplied. All distributions made by the Administrative Agent pursuant to this Section 4.02 shall be (subject to any decree of any court of competent jurisdiction) final (absent manifest error), and the Administrative Agent shall have no duty to inquire as to the application by the Administrative Agent of any amounts distributed to it.

Section 4.03. *Grant of License to Use Intellectual Property; Power of Attorney.* For the exclusive purpose of enabling the Administrative Agent to exercise rights and remedies under this Agreement at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies at any time after and during the continuance of an Event of Default, each Grantor hereby grants to the Administrative Agent a non-exclusive, royalty-free, limited license (until the termination or cure of the Event of Default) for cash, upon credit or for future delivery as the Administrative Agent shall deem appropriate to use, license or sublicense any of the Intellectual Property Collateral now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof; provided, however, that all of the foregoing rights of the Administrative Agent to use such licenses, sublicenses and other rights, and (to the extent permitted by the terms of such licenses and sublicenses) all licenses and sublicenses granted thereunder, shall expire immediately upon the termination or cure of all Events of Default and shall be exercised by the Administrative Agent solely during the

24

continuance of an Event of Default and upon 5 Business Days' prior written notice to the Borrower, and nothing in this Section 4.03 shall require Grantors to grant any license that is prohibited by any rule of law, statute or regulation, or is prohibited by, or constitutes a breach or default under or results in the termination of any contract, license, agreement, instrument or other document evidencing, giving rise to or theretofore granted, to the extent permitted by the Credit Agreement, with respect to such property or otherwise unreasonably prejudices the value thereof to the relevant Grantor; provided, further, that such licenses granted hereunder with respect to Trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such Trademarks are used sufficient to preserve the validity of such Trademarks. For the avoidance of doubt, the use of such license by the Administrative Agent may be exercised, at the option of the Administrative Agent, only during the continuation of an Event of Default. Furthermore, each Grantor hereby grants to the Administrative Agent an absolute power of attorney to sign, subject only to the giving of 5 Business Days' notice to the Grantor, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the USPTO or the USCO in order to effect an absolute assignment of all right, title and interest in each registration and application for a Patent, Trademark or Copyright, and to record the same.

Notwithstanding anything set forth above, the exercise of any remedies under this Article 4 shall be subject to the compliance with the proviso at the end of Section 8.02 of the Credit Agreement.

## ARTICLE 5

### INDEMNITY, SUBROGATION AND SUBORDINATION

Section 5.01.   *Indemnity*.  In addition to all such rights of indemnity and subrogation as the Grantors may have under applicable law (but subject to Section 5.03), the Borrower agrees that, in the event any assets of any Grantor shall be sold pursuant to this Agreement or any other Collateral Document to satisfy in whole or in part an Obligation owed to any Secured Party, the Borrower shall indemnify such Grantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

Section 5.02.   *Contribution and Subrogation*.  Each Grantor (a "**Contributing Party**") agrees (subject to Section 5.03) that, in the event assets of any other Grantor shall be sold pursuant to any Collateral Document to satisfy any Obligation owed to any Secured Party, and such other Grantor (the "**Claiming Party**") shall not have been fully indemnified by the Borrower as provided in Section 5.01, the Contributing Party shall indemnify the Claiming Party in an amount equal to the greater of the book value or the fair market value of such assets, in each case multiplied by a fraction of which the numerator shall be the net worth of the Contributing Party on the date hereof and the denominator shall be the aggregate net worth of all the Contributing Parties together with the net worth of the Claiming Party on the date hereof (or, in the case of any Grantor becoming a party hereto pursuant to Section 6.15, the date of the Security Agreement Supplement hereto executed and delivered by such Grantor). Any Contributing Party making any payment to a Claiming Party pursuant to this Section 5.02 shall be subrogated to the rights of such Claiming Party to the extent of such payment.

25

Section 5.03.  *Subordination*.  Notwithstanding any provision of this Agreement to the contrary, all rights of the Grantors under Sections 5.01 and 5.02 and all other rights of indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the payment in full in cash of the Obligations. No failure on the part of the Borrower or any Grantor to make the payments required by Sections 5.01 and 5.02 (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Grantor with respect to its obligations hereunder, and each Grantor shall remain liable for the full amount of the obligations of such Grantor hereunder.

## ARTICLE 6
### MISCELLANEOUS

Section 6.01.  *Notices*.  All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 10.02 of the Credit Agreement. All communications and notices hereunder to any Grantor shall be given to it in care of the Borrower as provided in Section 10.02 of the Credit Agreement.

Section 6.02.  *Waivers; Amendment*.

(a)    No failure or delay by the Administrative Agent, the L/C Issuer or any other Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the L/C Issuer and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 6.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender or the L/C Issuer may have had notice or knowledge of such Default at the time. No notice or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 10.01 of the Credit Agreement.

Section 6.03.  *Administrative Agent's Fees and Expenses*.

(a)    The parties hereto agree that the Administrative Agent shall be entitled to reimbursement of its expenses incurred hereunder and indemnity for its actions in connection herewith as provided in Sections 10.04 and 10.05 of the Credit Agreement.

#89231334v17

(b)     Any such amounts payable as provided hereunder shall be additional Obligations secured hereby and by the other Collateral Documents. The provisions of this Section 6.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any other Secured Party. All amounts due under this Section 6.03 shall be payable within 5 Business Days' of written demand therefor.

Section 6.04.   *Successors and Assigns*.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Administrative Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns, to the extent permitted under Section 10.07 of the Credit Agreement.

Section 6.05.   *Survival of Agreement*.  All covenants, agreements, representations and warranties made by the Grantors in the Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any Lender or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the L/C Issuer or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under any Loan Document is outstanding and unpaid or any Letter of Credit is outstanding (other than any Letter of Credit in which the Outstanding Amount of the L/C Obligations related thereto have been Cash Collateralized or back-stopped by a letter of credit in form and substance satisfactory to the Administrative Agent in its sole discretion) or any Commitment is outstanding.

Section 6.06.   *Counterparts; Effectiveness; Successors and Assigns; Several Agreement*. (a) This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by facsimile or other electronic communication of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.

(b)     The Administrative Agent may also require that any such documents and signatures delivered by facsimile or other electronic communication be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by facsimile or other electronic communication. This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Administrative Agent and a counterpart hereof shall have been executed on behalf of the Administrative Agent, and

thereafter shall be binding upon such Grantor and the Administrative Agent and their respective successors and assigns permitted thereby, and shall inure to the benefit of such Grantor, the Administrative Agent and the other Secured Parties and their respective successors and assigns permitted thereby, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein or in the Collateral (and any such assignment or transfer shall be void) except as expressly contemplated by this Agreement or the other Loan Documents. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

Section 6.07.    *Severability*.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 6.08.    *Right of Set-Off*.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates and the L/C Issuer and its Affiliates shall have the rights specified in Section 10.10 of the Credit Agreement but are subject to any applicable limitations in the Orders.

Section 6.09.    *Governing Law; Jurisdiction; Venue; Waiver of Jury Trial; Consent to Service of Process.*

(a)    The terms of Section 10.16 and 10.17 of the Credit Agreement with respect to governing law, submission of jurisdiction, venue and waiver of jury trial are incorporated herein by reference, mutatis mutandis, and the parties hereto agree to such terms.

(b)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 6.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 6.10.    *Headings*.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 6.11.    *No Requirement to Marshal*.  Neither the Administrative Agent nor any other Secured Party shall be required to marshal any present or future collateral security (including but not limited to the Collateral for, or other assurance of payment of, the Obligations or any of them) or to resort to such collateral security or other assurances of payment in any particular order, and all of their rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising.

#89231334v17

Section 6.12.  *Security Interest Absolute*.  To the extent permitted by applicable law and, with respect to any Debtor Grantor, the Interim Order (and when applicable, the Final Order) and without further order from the Bankruptcy Court (with respect to Debtor Grantors), all rights of the Administrative Agent hereunder, the Security Interest, the grant of a security interest in the Pledged Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Obligations or this Agreement.

Section 6.13.  *Termination or Release*.

(a)    This Agreement, the Security Interest and all other security interests granted hereby shall terminate with respect to all Obligations and any Liens arising therefrom shall be automatically released when all the outstanding Obligations (in each case other than (w) Cash Pooling Obligations not yet due and payable, (x) obligations under Secured Hedge Agreements not yet due and payable, (y) Cash Management Obligations not yet due and payable and (z) contingent indemnification obligations not yet accrued and payable) have been paid in full and the Lenders have no further commitment to lend under the Credit Agreement, the Outstanding Amount of L/C Obligations have either been (i) Cash Collateralized in accordance with the terms of the Credit Agreement or (ii) have had other arrangements made with respect to them that are satisfactory to the L/C Issuer and the L/C Issuer has no further obligations to issue Letters of Credit under the Credit Agreement.

(b)    A Grantor (other than the Borrower) shall automatically be released from its obligations hereunder as provided in Section 9.12 of the Credit Agreement; provided that the Lenders shall have consented to such transaction (to the extent required by the Credit Agreement) and the terms of such consent did not provide otherwise.

(c)    Upon any sale or other transfer by any Grantor of any Collateral that is permitted under the Credit Agreement (other than a sale to another Grantor), or upon the effectiveness of any written consent to the release of the security interest granted hereby in any Collateral pursuant to Section 9.12 or 10.01 of the Credit Agreement, the security interest of such Grantor in such Collateral shall be automatically released.

(d)    In connection with any termination or release pursuant to paragraph (a), (b) or (c) of this Section 6.13, the Administrative Agent shall execute and deliver to any Grantor, at such Grantor's expense, all documents that such Grantor shall reasonably request to evidence such termination or release, in each case in accordance with the terms of Section 9.12 of the Credit Agreement. Any execution and delivery of documents pursuant to this Section 6.13 shall be without recourse to or warranty by the Administrative Agent.

#89231334v17

(e)    Notwithstanding anything to the contrary set forth in this Agreement, each Cash Pooling Provider, each Cash Management Bank and each Hedge Bank by the acceptance of the benefits under this Agreement hereby acknowledge and agree that (i) the obligations of the Borrower or any Subsidiary under the Cash Pooling Agreement, any Secured Hedge Agreement and the Cash Management Obligations shall be secured pursuant to this Agreement only to the extent that, and for so long as, the other Obligations are so secured and (ii) any release of Collateral effected in the manner permitted by this Agreement shall not require the consent of any Cash Pooling Provider, any Hedge Bank or Cash Management Bank.

Section 6.14.  *Automatic Stay*.  Performance of the obligations of any Debtor Grantor or Administrative Agent hereunder, or any enforcement of rights as permitted hereunder, shall in no way constitute, for purposes of the Cases, a violation of the automatic stay provided by Section 362 of the Bankruptcy Code, and the Debtor Grantors hereby waive applicability thereof.

Section 6.15.  *Additional Guarantors*.  Each Material Domestic Subsidiary of the Borrower that is required to enter into this Agreement as a Grantor pursuant to Section 6.11 of the Credit Agreement shall, and any Domestic Subsidiary of the Borrower may, execute and deliver a Guaranty Supplement and thereupon such Domestic Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein, provided that such Subsidiary shall not become a "Loan Party" unless it shall have complied with the other requirements of the Loan Documents including, unless otherwise excused, becoming a Debtor in the Cases and bound by the Orders.  The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

Section 6.16.  *Administrative Agent Appointed Attorney-in-Fact*.  Each Grantor hereby appoints the Administrative Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Administrative Agent shall have the right, upon the occurrence and during the continuance of an Event of Default and notice by the Administrative Agent to the Borrower of its intent to exercise such rights, with full power of substitution either in the Administrative Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (d) to send verifications of Accounts to any Account Debtor; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Administrative Agent; (h) to make, settle and adjust claims in respect of General Collateral under policies of insurance, including endorsing the name of any

30

Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance, making all determinations and decisions with respect thereto and obtaining or maintaining the policies of insurance required by Section 6.07 of the Credit Agreement or paying any premium in whole or in part relating thereto; and (i) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Administrative Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Administrative Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Administrative Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Administrative Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein. No Agent-Related Person shall be liable in the absence of its own gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction. All sums disbursed by the Administrative Agent in connection with this paragraph, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, within 5 Business Days' of demand, by the Grantors to the Administrative Agent and shall be additional Obligations secured hereby.

Section 6.17.  *General Authority of the Administrative Agent*.  By acceptance of the benefits of this Agreement and any other Collateral Documents, each Secured Party (whether or not a signatory hereto) shall be deemed irrevocably (a) to consent to the appointment of the Administrative Agent as its agent hereunder and under such other Collateral Documents, (b) to confirm that the Administrative Agent shall have the authority to act as the exclusive agent of such Secured Party for the enforcement of any provisions of this Agreement and such other Collateral Documents against any Grantor, the exercise of remedies hereunder or thereunder and the giving or withholding of any consent or approval hereunder or thereunder relating to any Collateral or any Grantor's obligations with respect thereto, (c) to agree that it shall not take any action to enforce any provisions of this Agreement or any other Collateral Document against any Grantor, to exercise any remedy hereunder or thereunder or to give any consents or approvals hereunder or thereunder except as expressly provided in this Agreement or any other Collateral Document and (d) to agree to be bound by the terms of this Agreement and any other Collateral Documents.

Section 6.18.  *Reasonable Care*.  The Administrative Agent is required to exercise reasonable care in the custody and preservation of any of the Collateral in its possession; provided that the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral, if such Collateral is accorded treatment substantially similar to that which the Administrative Agent accords its own property.

Section 6.19.  *Reinstatement*.  This Security Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any

31

other Loan Party or any substantial part of its property, or otherwise, all as though such payments had not been made.

Section 6.20.  *Miscellaneous*.

(a)    The Administrative Agent may execute any of the powers granted under this Agreement and perform any duty hereunder either directly or by or through agents or attorneys-in-fact.

(b)    The Administrative Agent shall not be deemed to have actual, constructive, direct or indirect notice or knowledge of the occurrence of any Event of Default unless and until the Administrative Agent shall have received a notice of Event of Default or a notice from the Grantor or the Secured Parties to the Administrative Agent in its capacity as Administrative Agent indicating that an Event of Default has occurred. The Administrative Agent shall have no obligation either prior to or after receiving such notice to inquire whether an Event of Default has, in fact, occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice so furnished to it.

Section 6.21.  *The Orders*.  With respect to any Debtor Grantor, this Agreement is subject in all respects (including with respect to all obligations and agreements of the Debtor Grantors provided for hereunder) to the terms of the Interim Order (and, when applicable, the Final Order) and the Interim Order or the Final Order (as applicable) shall control and notwithstanding anything in the foregoing, the Debtor Grantors shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim Order (and, when applicable, the Final Order).

[Signatures on following page]

32

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**AVAYA INC**, as Borrower

By: _____
     Name:
     Title:

**AVAYA HOLDINGS CORP.**, as Holdings

By: _____
     Name:
     Title:

**EACH OF THE LOAN PARTIES
LISTED ON ANNEX A HERETO**

By: _____
     Name:
     Title:

**CITIBANK, N.A.,**
as Administrative Agent

By: _____
     Name:
     Title:

[Signature Page for Pledge and Security Agreement]

#89231334v17

**Annex A**

**List of Borrower Subsidiaries that are Loan Parties**

1. Avaya Cala Inc.

2. Avaya EMEA Ltd.

3. Avaya Federal Solutions, Inc.

4. Avaya Holdings LLC

5. Avaya Holdings Two, LLC

6. Avaya Integrated Cabinet Solutions Inc.

7. Avaya Management Services Inc.

8. Avaya Services Inc.

9. Avaya World Services Inc.

10. Octel Communications LLC

11. Sierra Asia Pacific Inc.

12. Technology Corporation of America, Inc.

13. Ubiquity Software Corporation

14. VPNet Technologies, Inc.

15. Zang, Inc.

#89231334v17

**SCHEDULE I**

**Pledged Equity**

| Pledgor | Pledged Interest |
|---------|------------------|
|         |                  |

**Pledged Debt**

| Pledgor | Pledged Interest |
|---------|------------------|
|         |                  |

**SCHEDULE II**

**Commercial Tort Claims**

The following list includes all commercial tort claims of each Grantor, which each such Grantor is required to notify the Administrative Agent pursuant to Section 3.03(f) of the this Agreement:

#89231334v17

## EXHIBIT I TO THE
## SECURITY AGREEMENT

SUPPLEMENT NO. dated as of January 24, 2017, to the Pledge and Security Agreement (as amended, supplemented or otherwise modified, the "**Security Agreement**") dated as of January 24, 2017 among AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), AVAYA, INC., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), certain Subsidiaries of Borrower from time to time party thereto, certain of which are Debtors and Debtors-in-Possession under chapter 11 of the Bankruptcy Code (together with Holdings and the Borrower, the "**Grantors**"), and CITIBANK, N.A., as Administrative Agent for the Secured Parties (the "**Administrative Agent**").

A.      Reference is made to the Credit Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, Holdings, Citibank, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**").

B.      Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Security Agreement.

C.      Section 6.14 of the Security Agreement provides that additional Subsidiaries of the Borrower may become Grantors under the Security Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "**New Subsidiary**") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Grantor under the Security Agreement.

Accordingly, the Administrative Agent and the New Subsidiary agree as follows:[2]

SECTION 1.      In accordance with Section 6.14 of the Security Agreement, the New Subsidiary by its signature below becomes a Grantor under the Security Agreement with the same force and effect as if originally named therein as a Grantor and the New Subsidiary hereby (a) agrees to all the terms and provisions of the Security Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof. In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of the Obligations does hereby create and grant to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, their successors and assigns, a security interest in and lien on all of the New Subsidiary's right, title and interest in and to the Collateral (as defined in the Security

---

[2] To be modified as necessary (and consistent with the Security Agreement) to reflect the status of any Debtor Grantor or Non-Debtor Grantor as such.

EXHIBIT I-1

#89231334v17

Agreement) of the New Subsidiary. Each reference to a "Grantor" in the Security Agreement shall be deemed to include the New Subsidiary. The Security Agreement is hereby incorporated herein by reference.

SECTION 2.    The New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

SECTION 3.    This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Supplement shall become effective when the Administrative Agent shall have received a counterpart of this Supplement that bears the signature of the New Subsidiary, and the Administrative Agent has executed a counterpart hereof. Delivery of an executed signature page to this Supplement by facsimile transmission or other electronic communication shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4.    The New Subsidiary hereby represents and warrants that (a) set forth on Schedule I attached hereto is a true and correct schedule of the location of any and all Collateral of the New Subsidiary and (b) set forth under its signature hereto is the true and correct legal name of the New Subsidiary, its jurisdiction of formation and the location of its chief executive office. Schedule I shall be incorporated into, and after the date hereof be deemed part of, the Perfection Certificate.

SECTION 5.    Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

SECTION 6.    **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 7.    If any provision of this Supplement is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Supplement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 8.    All communications and notices hereunder shall be in writing and given as provided in Section 6.01 of the Security Agreement.

SECTION 9.    The New Subsidiary agrees to reimburse the Administrative Agent for its reasonable out-of-pocket expenses in connection with the execution and delivery of this Supplement, including the reasonable fees, other charges and disbursements of counsel for the Administrative Agent.

EXHIBIT I-2

IN WITNESS WHEREOF, the New Subsidiary and the Administrative Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

**[NAME OF NEW SUBSIDIARY]**

By: _____
      Name:
      Title:


Jurisdiction of Formation:
Address of Chief Executive Office:

**CITIBANK, N.A.,**
as Administrative Agent

By: _____
      Name:
      Title:

EXHIBIT I-3

**SCHEDULE I**
**TO SUPPLEMENTAL NO TO THE**
**SECURITY AGREEMENT**

## LOCATION OF COLLATERAL

| Description | Location |
| --- | --- |
| | |

## EQUITY INTERESTS

| Issuer | Number of Certificate | Registered Owner | Number and Class of Equity Interests | Percentage of Equity Interests |
| --- | --- | --- | --- | --- |
| | | | | |

## DEBT SECURITIES

| Issuer | Principal Amount | Date of Note | Maturity Date |
| --- | --- | --- | --- |
| | | | |

SCHEDULE I-1

**Exhibit II**

**FORM OF
PERFECTION CERTIFICATE**

EXHIBIT II-1

#89231334v17

<strong>Exhibit III</strong>

**FORM OF**
**PATENT SECURITY AGREEMENT**
**(SHORT-FORM)**

PATENT SECURITY AGREEMENT, dated as of [          ], 2017 among AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), AVAYA, INC., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), certain Subsidiaries of Borrower from time to time party thereto, certain of which is are Debtors and Debtors-in-Possession under chapter 11 of the Bankruptcy Code (together with Holdings and the Borrower, the "**Grantors**"), and CITIBANK, N.A., as Administrative Agent for the Secured Parties (the "**Administrative Agent**").

Reference is made to the Pledge and Security Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Security Agreement**"), among Holdings, the Borrower, certain Subsidiaries of the Borrower from time to time party thereto and the Administrative Agent. The Secured Parties' agreements in respect of extensions of credit to the Borrower are set forth in the Credit Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, Holdings, CITIBANK, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**"). Each of Holdings and the Subsidiaries party hereto is an affiliate of the Borrower and will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and is willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, the parties hereto agree as follows:

Section 1.    *Terms*.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Security Agreement. The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

Section 2.    *Grant of Security Interest*.  As security for the payment or performance, as the case may be, in full of the Obligations, each Grantor, pursuant to and in accordance with the Security Agreement, did and hereby does grant to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Patent Collateral**"):

(a) All letters Patent of the United States, all registrations and recordings thereof, and all applications for letters Patent of the United States in or to which any Grantor now or hereafter has any right, title or interest, including registrations, recordings and pending applications in the USPTO; (b) all reissues, continuations, divisions, continuations-in-

EXHIBIT III-1

part, renewals, improvements or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein; (c) all income, royalties, damages, claims and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; and (d) all rights to sue for past, present and future infringements of any of the foregoing, in each case, including the items listed on Schedule I.

Section 3.    *Termination*.  This Agreement is made to secure the satisfactory performance and payment of the Obligations. This Patent Security Agreement and the security interest granted hereby shall terminate with respect to all of a Grantor's Obligations and any Lien arising therefrom shall be automatically released upon termination of the Security Agreement or release of such Grantor's obligations thereunder. The Administrative Agent shall, in connection with any termination or release herein or under the Security Agreement, execute and deliver to any Grantor as such Grantor may request, an instrument in writing releasing the security interest in the Patent Collateral acquired under this Agreement.

Additionally, upon such satisfactory performance or payment, the Administrative Agent shall reasonably cooperate with any efforts made by a Grantor to make of record or otherwise confirm such satisfaction including, but not limited to, the release and/or termination of this Agreement and any security interest in, to or under the Patent Collateral.

Section 4.    *Supplement to the Security Agreement*.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Patent Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

Section 5.    *Representations and Warranties*.  Holdings and the Borrower jointly and severally represent and warrant, as to themselves and the other Grantors, to the Administrative Agent and the Secured Parties, that a true and correct list of all of the existing Patent Collateral consisting of U.S. Patent registrations or applications owned by the Grantor, in whole or in part, is set forth in Schedule I.

Section 6.    *Miscellaneous*.  The provisions of Article VI of the Security Agreement are hereby incorporated by reference.

[Signatures on following page]

EXHIBIT III-2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**AVAYA INC**.,
as Borrower


By: _____
     Name:
     Title:


**AVAYA HOLDINGS CORP.**,
as Holdings,


By: _____
     Name:
     Title:


**EACH OF THE LOAN PARTIES
LISTED ON ANNEX A HERETO**


By: _____
     Name:
     Title:


**CITIBANK, N.A.**,
as Administrative Agent,


By: _____
     Name:
     Title:

**Annex A**

**List of Borrower Subsidiaries that are Loan Parties**

**Schedule I**

**Short Particulars of U.S. Patent Collateral**

**Exhibit IV**

**FORM OF
TRADEMARK SECURITY AGREEMENT
(SHORT-FORM)**

TRADEMARK SECURITY AGREEMENT, dated as of [        ], 2017 among AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), AVAYA, INC., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), certain Subsidiaries of Borrower from time to time party thereto, certain of which are Debtors and Debtors-in-Possession under chapter 11 of the Bankruptcy Code (together with Holdings and the Borrower, the "**Grantors**"), and CITIBANK, N.A., as Administrative Agent for the Secured Parties (the "**Administrative Agent**").

Reference is made to the Pledge and Security Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Security Agreement**"), among Holdings, the Borrower, certain Subsidiaries of the Borrower from time to time party thereto and the Administrative Agent. The Secured Parties' agreements in respect of extensions of credit to the Borrower are set forth in the Credit Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, Holdings, CITIBANK, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**"). Each of Holdings and the Subsidiaries party hereto is an affiliate of the Borrower and will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and is willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, the parties hereto agree as follows:

Section 1.    *Terms*.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Security Agreement. The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

Section 2.    *Grant of Security Interest*.  As security for the payment or performance, as the case may be, in full of the Obligations, each Grantor, pursuant to and in accordance with the Security Agreement, did and hereby does grant to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Trademark Collateral**"):

(a) all trademarks, service marks, trade names, corporate names, trade dress, logos, designs, fictitious business names, other source or business identifiers, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all registration and recording applications filed in connection therewith, including

EXHIBIT IV-1

registrations and registration applications in the USPTO, and all extensions or renewals thereof, as well as any unregistered trademarks and service marks used by a Grantor, including those listed on Schedule I; (b) all goodwill connected with the use of and symbolized by the foregoing; (c) all income, royalties, damages, claims and payments now or hereafter due or payable with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; and (d) all rights to sue for past, present and future infringements of any of the foregoing; *provided* that the Trademark Collateral shall not include, and in no event shall the Security Interest attach to, any trademark, service mark or other application for registration that may be deemed invalidated, canceled or abandoned due to the grant and/or enforcement of such Security Interest unless and until such time that the grant and/or enforcement of the Security Interest will not affect the validity of such trademark, service mark or other application for registration, including any intent-to-use trademark applications filed in the USPTO, pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. Section 1051, prior to the accepted filing of a "Statement of Use" and issuance of a "Certificate of Registration" pursuant to Section 1(d) of the Lanham Act or an accepted filing of an "Amendment to Allege Use" whereby such intent-to-use trademark application is converted to a "use in commerce" application pursuant to Section 1(c) of the Lanham Act.

Section 3.    *Termination*.  This Agreement is made to secure the satisfactory performance and payment of the Obligations. This Trademark Security Agreement and the security interest granted hereby shall terminate with respect to all of a Grantor's Obligations and any Lien arising therefrom shall be automatically released upon termination of the Security Agreement or release of such Grantor's obligations thereunder. The Administrative Agent shall, in connection with any termination or release herein or under the Security Agreement, execute and deliver to any Grantor as such Grantor may request, an instrument in writing releasing the security interest in the Trademark Collateral acquired under this Agreement. Additionally, upon such satisfactory performance or payment, the Administrative Agent shall reasonably cooperate with any efforts made by a Grantor to make of record or otherwise confirm such satisfaction including, but not limited to, the release and/or termination of this Agreement and any security interest in, to or under the Trademark Collateral.

Section 4.    *Supplement to the Security Agreement*.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Trademark Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

Section 5.    *Representations and Warranties*.  Holdings and the Borrower jointly and severally represent and warrant, as to themselves and the other Grantors, to the Administrative Agent and the Secured Parties, that a true and correct list of all of the

EXHIBIT IV-2

#89231334v17

existing Trademark Collateral consisting of U.S. Trademark registrations or applications owned by the Grantor, in whole or in part, is set forth in Schedule I.

Section 6.    *Miscellaneous*.  The provisions of Article VI of the Security Agreement are hereby incorporated by reference.

[Signatures on following page]

EXHIBIT IV-3

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**AVAYA INC.**,
as Borrower

By: _____
    Name:
    Title:

**AVAYA HOLDINGS CORP.**,
as Holdings,

By: _____
    Name:
    Title:

**EACH OF THE LOAN PARTIES
LISTED ON ANNEX A HERETO**

By: _____
    Name:
    Title:

**CITIBANK, N.A.**,
as Administrative Agent,

By: _____
    Name:
    Title:

[Signature Page for Trademark Security Agreement]

**Annex A**

**List of Borrower Subsidiaries that are Loan Parties**

Schedule I to
Trademark Security Agreement Supplement

**UNITED STATES Trademarks, Service Marks and Trademark Applications**

| Grantor | Trademark or Service Mark | Date Granted | Registration No. and Jurisdiction |
|---|---|---|---|
| | | | |

| Grantor | Trademark or Service Application | Date Filed | Application No. and Jurisdiction |
|---|---|---|---|
| | | | |

**Exhibit V**

# FORM OF
# COPYRIGHT SECURITY AGREEMENT
# (SHORT-FORM)

COPYRIGHT SECURITY AGREEMENT, dated as of [      ], 2017 among AVAYA HOLDINGS CORP., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code ("**Holdings**"), AVAYA, INC., a Delaware corporation and a Debtor and Debtor-in-Possession under chapter 11 of the Bankruptcy Code (the "**Borrower**"), certain Subsidiaries of Borrower from time to time party thereto, certain of which are Debtors and Debtors-in-Possession under chapter 11 of the Bankruptcy Code (together with Holdings and the Borrower, the "**Grantors**"), and CITIBANK, N.A., as Administrative Agent for the Secured Parties (the "**Administrative Agent**").

Reference is made to the Pledge and Security Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Security Agreement**"), among Holdings, the Borrower, certain Subsidiaries of the Borrower from time to time party thereto and the Administrative Agent. The Secured Parties' agreements in respect of extensions of credit to the Borrower are set forth in the Credit Agreement dated as of January 24, 2017 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among the Borrower, Holdings, CITIBANK, N.A., as Administrative Agent and L/C Issuer, and each lender from time to time party thereto (collectively, the "**Lenders**" and individually, a "**Lender**"). Each of Holdings and the Subsidiaries party hereto is an affiliate of the Borrower and will derive substantial benefits from the extension of credit to the Borrower pursuant to the Credit Agreement and is willing to execute and deliver this Agreement in order to induce the Lenders to extend such credit. Accordingly, the parties hereto agree as follows:

Section 1.    *Terms*.  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Security Agreement. The rules of construction specified in Article I of the Credit Agreement also apply to this Agreement.

Section 2.    *Grant of Security Interest*.  As security for the payment or performance, as the case may be, in full of the Obligations, each Grantor, pursuant to and in accordance with the Security Agreement, did and hereby does grant to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Copyright Collateral**"):

(a) all copyright rights in any work subject to the copyright laws of the United States, whether as author, assignee, transferee or otherwise; (b) all registrations and applications for registration of any such copyright in the United States, including registrations, recordings, supplemental registrations and pending applications for

EXHIBIT V-1

#89231334v17

registration in the USCO; (c) all renewals of any of the foregoing; (d) all income, royalties, damages, claims and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; and (e) all rights to sue for past, present and future infringements of any of the foregoing, in each case, including the items listed on Schedule I.

Section 3.    *Termination*. This Agreement is made to secure the satisfactory performance and payment of the Obligations. This Copyright Security Agreement and the security interest granted hereby shall terminate with respect to all of a Grantor's Obligations and any Lien arising therefrom shall be automatically released upon termination of the Security Agreement or release of such Grantor's obligations thereunder. The Administrative Agent shall, in connection with any termination or release herein or under the Security Agreement, execute and deliver to any Grantor as such Grantor may request, an instrument in writing releasing the security interest in the Copyright Collateral acquired under this Agreement. Additionally, upon such satisfactory performance or payment, the Administrative Agent shall reasonably cooperate with any efforts made by a Grantor to make of record or otherwise confirm such satisfaction including, but not limited to, the release and/or termination of this Agreement and any security interest in, to or under the Copyright Collateral.

Section 4.    *Supplement to the Security Agreement*.  The security interests granted to the Administrative Agent herein are granted in furtherance, and not in limitation of, the security interests granted to the Administrative Agent pursuant to the Security Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Copyright Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the Security Agreement, the terms of the Security Agreement shall govern.

Section 5.    *Representations and Warranties*.  Holdings and the Borrower jointly and severally represent and warrant, as to themselves and the other Grantors, to the Administrative Agent and the Secured Parties, that a true and correct list of all of the existing Copyright Collateral consisting of U.S. Copyright registrations or applications owned by the Grantor, in whole or in part, is set forth in Schedule I.

Section 6.    *Miscellaneous*.  The provisions of Article VI of the Security Agreement are hereby incorporated by reference.

[Signatures on following page]

EXHIBIT V-2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**AVAYA INC.**,
as Borrower

By: _____
       Name:
       Title:

**AVAYA HOLDINGS CORP.**,
as Holdings,

By: _____
       Name:
       Title:

**EACH OF THE LOAN PARTIES LISTED ON ANNEX A HERETO**

By: _____
       Name:
       Title:

**CITIBANK, N.A.**,
as Administrative Agent,

By: _____
       Name:
       Title:

[Signature Page for Copyright Security Agreement]

**Annex A**

**List of Borrower Subsidiaries that are Loan Parties**

**Schedule I**

**Short Particulars of U.S. Copyright Collateral**

#89231334v17

EXHIBIT H-1

## UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Not Treated As Partnerships or Other Pass-Through Entities For
U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017  (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 3.01(b)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower and the Administrative Agent with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall furnish the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which payment is to be made by the Borrower or the Administrative Agent to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

H-1-1

#89242009v10

[Foreign Lender]

By: _____
    Name:
    Title:

[Address]


Dated: _____, 20[  ]

H-1-2

#89242009v10

EXHIBIT H-2

## UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Treated As Partnerships or Other Pass-Through Entities For U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017  (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 3.01(b)(ii)(B) and 10.07(e) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with an IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

[Foreign Participant]

By: _____
    Name:
    Title:

[Address]

Dated: _____, 20[  ]

H-2-2

EXHIBIT H-3

UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Foreign Participants That Are Not Treated As Partnerships or Other Pass-Through Entities
For
U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017  (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 3.01(b)(ii)(B) and Section 10.07(d) of the Credit Agreement, the  undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

[Foreign Participant]

By: _____
     Name:
     Title:

[Address]

Dated: _____, 20[  ]

EXHIBIT H-4

## UNITED STATES TAX COMPLIANCE CERTIFICATE
(For Foreign Lenders That Are Treated As Partnerships or Other Pass-Through Entities
For
U.S. Federal Income Tax Purposes)

Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017  (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among Avaya Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "**Borrower**"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, Citibank, N.A., as administrative agent (in such capacity, the "**Administrative Agent**") and L/C Issuer, and each lender from time to time party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 3.01(b)(ii)(B) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to the Credit Agreement, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of  Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Borrower and the Administrative Agent with an IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

*[Signature Page Follows]*

H-3-3

[Foreign Lender]

By: _____
    Name:
    Title:

[Address]

Dated: _____, 20[  ]

4

EXHIBIT I

## FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT (this "Joinder Agreement"), dated as of _____, 20__, made by _____, a _____ [corporation][18] (the "Additional Guarantor"), in favor of Citibank, N.A., as administrative agent (in such capacity, the "Administrative Agent") for the benefit of the lenders (collectively, the "Lenders") and the L/C Issuer parties to the Credit Agreement referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in such Credit Agreement. The Lenders, the Cash Pooling Provider, each Cash Management Bank, each Hedge Bank, the L/C Issuer and the Administrative Agent shall be referred to collectively herein as the "Secured Parties".

W I T N E S S E T H :

WHEREAS, Avaya, Inc., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), Avaya Holdings Corp., a Delaware corporation and a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code ("Holdings"), the Subsidiaries of the Borrower from time to time party thereto as Guarantors, each Guarantor on the Closing Date, a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code, the L/C Issuer, the Lenders and the Administrative Agent have entered into a Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, pursuant to the Credit Agreement, the Guarantors (other than the Additional Guarantor) have guaranteed to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Loan Parties when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations, in each case on the terms set forth therein;

WHEREAS, Section 6.11 of the Credit Agreement requires the Additional Guarantor to become a party to the Credit Agreement; and

WHEREAS, the Additional Guarantor has agreed to execute and deliver this Joinder Agreement in order to become a party to the Credit Agreement.

NOW, THEREFORE, IT IS AGREED:

1. Joinder. By executing and delivering this Joinder Agreement, the Additional Guarantor, as provided in Section 6.11 of the Credit Agreement, hereby becomes a party to the Credit Agreement as a Guarantor thereunder with the same force and effect as if originally named therein as a Guarantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Guarantor thereunder and agrees to be

---

[18] Specify other type of entity, as applicable.

[Signature Page – Joinder Agreement]

bound by all covenants, waivers, agreements and obligations of the other Guarantors pursuant to the Credit Agreement and any other Loan Document. Upon execution and delivery of this Joinder Agreement by the Additional Guarantor, each reference to the "Guarantors" or the "Loan Parties" in the Credit Agreement and in all other Loan Documents shall, from and as of the date hereof, be deemed to include the Additional Guarantor, but only to the extent the Additional Guarantor is (and remains) a Debtor in the Cases (unless otherwise waived in writing by the Administrative Agent in its sole discretion).[The information set forth in Annex 1 hereto is hereby added to the information set forth in Schedule 10.02 to the Credit Agreement.][19] The Additional Guarantor hereby represents and warrants as to itself that each of the representations and warranties contained in Article V of the Credit Agreement is true and correct in all material respects on and as the date hereof (after giving effect to this Joinder Agreement), except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date (after giving effect to this Joinder Agreement). This Joinder Agreement shall constitute a Loan Document.

      **2.** <u>**Governing Law**</u>**. THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE.**

---

[19] Include only if the Additional Guarantor's notice address is different from that of the Borrower and the other Loan Parties.

[Signature Page – Joinder Agreement]

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GUARANTOR],
as the Additional Guarantor

By:
    Name:
    Title:

ACKNOWLEDGED AND ACCEPTED:

CITIBANK, N.A.,
as Administrative Agent

By:
    Name:
    Title:

[Signature Page – Joinder Agreement]

Annex 1 to Joinder Agreement

Notice Information

[Include if applicable]

[Signature Page – Joinder Agreement]

**<u>Exhibit B</u>**

| | ABL Priority Collateral | Cash Flow Priority Collateral | L/C Cash Collateral | All other Collateral |
|---|---|---|---|---|
| **1st:** | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) |
| **2nd:** | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations |
| **3rd:** | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing Cash Pooling Obligations |
| **4th:** | • DIP Liens to the extent securing L/C Obligations | • DIP Liens to the extent securing Cash Pooling Obligations | • Prepetition Domestic ABL Adequate Protection Liens | • Prepetition Domestic ABL Adequate Protection Liens |
| **5th:** | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens |
| **6th:** | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens | • Prepetition Second-Priority Adequate Protection Liens |

**Exhibit C**

**<u>Retained Claims Collateral</u>**[1]

1. Each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399.

2. All intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing any of the foregoing, in each case registered or arising under non-U.S. law.

3. Assets of that certain Avaya Inc. Savings Restoration Plan held in the Avaya Inc. Savings Restoration Plan Trust and maintained by Fidelity Management Trust Company ("<u>Fidelity</u>"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom.

4. Assets of that certain Avaya Inc. Deferred Compensation Plan effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by the Bank of New York, as Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom.

5. Assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom

6. Commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.).

7. Proceeds from the Debtors' insurance policies.

8. Owned real property identified on **<u>Exhibit 1</u>** attached hereto.

9. The Debtors' leasehold interests identified on **<u>Exhibit 2</u>** attached hereto.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Final DIP Order to which this exhibit is attached as **<u>Exhibit C</u>**.

**Exhibit 1**

[Owned Real Property]

| Owned Real Property Address | City | State | Country |
|---|---|---|---|
| 9650 Interport Drive | Shreveport | LA | USA |

\*       \*       \*       \*       \*

**<u>Exhibit 2</u>**
[Leased Real Property]

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 2601 Almeda Dr. aka 5425 Robin Hood Road | Norfolk | VA | USA |
| 1601 Veterans Memorial Highway | Islandia | NY | USA |
| 80 M Street SE | Washington | DC | USA |
| 12730 Fair Lakes Circle | Fairfax | VA | USA |
| Moberly Professional Park | Bentonville | AR | USA |
| 18201 Von Karmen Avenue | Irvine | CA | USA |
| 4655 Great American Parkway | Santa Clara | CA | USA |
| 8740 Lucent Boulevard | Highlands Ranch | CA | USA |
| 8744 Lucent Boulevard | Highlands Ranch | CA | USA |
| 12121 Grant Street | Thornton | CO | USA |
| 1300 West 120th Avenue | Westminster | CO | USA |
| 1250 Connecticut Ave., N.W. | Washington | DC | USA |
| 1000 NW 57th Court | Miami | FL | USA |
| 530 S. Main Street | Alpharetta | GA | USA |
| 1145 Sanctuary Parkway | Alpharetta | GA | USA |
| 30 South Wacker | Chicago | IL | USA |
| 2399 S. Finley Road | Lombard | IL | USA |
| 8321 W, 125th Street | Overland Park | KS | USA |
| 9150 Guildford Road | Columbia | MD | USA |
| 600 Technology Park Drive | Billerica | MA | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 225 South Sixth Street | Minneapolis | MN | USA |
| 10820 Sunset Office Drive | Sunset Hills | MO | USA |
| 14301 Josephine Street | Omaha | NE | USA |
| 8 Commerce Drive | Bedford | NH | USA |
| 211 Mount Airy Road | Baskin Ridge | NJ | USA |
| 770 Nesconset Highway | Nesconset | NY | USA |
| Two Penn Plaza | New York | NY | USA |
| 4001 E. Chapel Hill/Nelson Highway Nortel Gateway Court | Raleigh | NC | USA |
| 445 Hutchinson Avenue | Columbus | OH | USA |
| 14400 Hertz Quail Springs Pkwy | Oklahoma City | OK | USA |
| 161 Washington Street | Conshohocken | PA | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 11540 St. Charles Rock Road | Bridgeton | MO | USA |
| 1111 Freeport Parkway | Coppel | TX | USA |
| 1900 Firman Drive | Richardson | TX | USA |
| 8718 Carolina Boulevard | Clyde | TX | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 7580 North Dobson Road | Scottsdale | AZ | USA |
| 7183 South Union Park Avenue | Salt Lake City | UT | USA |
| 28223 Telegraph Road | Southfield | MI | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 4475 Pouncey Tract Road | Glen Allen | VA | USA |
| 8727 Philips Highway | Jacksonville | FL | USA |

\*        \*        \*        \*        \*

**<u>Exhibit D</u>**

| | Principal Amount[1] | Accrued Interest[2] | Total Obligations[3] | % of Total |
|---|---|---|---|---|
| B-3 Term Loan | $615,928,097 | $7,654,658 | $623,582,756 | 13.53% |
| B-4 Term Loan | 819,794 | 14,517 | 834,311 | 0.02% |
| B-6 Term Loan | 537,033,060 | 8,241,966 | 545,275,026 | 11.83% |
| B-7 Term Loan | 2,080,946,472 | 30,708,411 | 2,111,654,884 | 45.81% |
| 7% 1L Notes | 1,009,000,000 | 21,581,389 | 1,030,581,389 | 22.36% |
| 9% 1L Notes | 290,000,000 | 7,975,000 | 297,975,000 | 6.46% |
| **Total** | **$4,533,727,424** | **$76,175,941** | **$4,609,903,365** | **100.00%** |

**Notes**

1    Principal amount outstanding as of Petition Date of 1/19/2017

2    Accrued interest outstanding as of Petition Date of 1/19/2017

3    The amounts set forth herein are solely for the purposes of this Stipulation and Agreed Order and shall be without prejudice to the rights of any party to assert or challenge, subject to the terms of the Interim DIP Order and Final DIP Order, any claims arising under the First Lien Debt, the Prepetition Cash Flow Credit Agreement, the 7.00% First Lien Indenture and the 9.00% First Lien Indenture.

# **EXHIBIT B**

**Blackline Against Initial Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*,[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | ~~(Joint Administration Requested)~~(Jointly Administered) |
| | ) | |
| | ) | |

~~INTERIM~~FINAL ORDER (I) AUTHORIZING DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)
AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) ~~AND
(III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b)
AND (c)~~

Upon the motion (the "Motion") of Avaya Inc. (the "Company" or the "Borrower"),

Avaya Holdings Corp. ("Holdings"), Sierra Communication International LLC ("Sierra"), and

the other subsidiaries of the Company that are debtors and debtors-in-possession (collectively,

the "Subsidiary Guarantors"; collectively, with the Company and Holdings, the "Loan Parties";

and together, with Sierra, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal
Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC
(3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya
Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia
Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc.
(9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The
location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America
Parkway, Santa Clara, CA 95054.

Code"), and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules"), seeking, among other things:

A.    authorization for the Borrower to obtain postpetition financing (the "DIP Financing"), and for Holdings and the Subsidiary Guarantors (collectively the "Guarantors") to guarantee the Borrower's obligations in connection with the DIP Financing, consisting of a senior secured non-amortizing term loan facility (the "DIP Term Facility") in an aggregate principal amount up to $725,000,000, including an initial draw in the aggregate principal amount of $425,000,000 on an interim basis, a portion of which may be used to fund a cash collateralized letter of credit facility (the "DIP L/C Facility" and, together with the DIP Term Facility, the "DIP Facilities," and the letters of credit issued (or deemed issued) pursuant to the DIP L/C Facility, the "L/C Facility Letters of Credit") in an aggregate amount not to exceed $150,000,000, from Citibank, N.A. ("Citi"), acting as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the DIP Lenders (as defined below), all on the terms and conditions set forth in this InterimFinal Order and the DIP Documents (each as defined below), to beand arranged by Citigroup Global Markets Inc., Barclays Bank PLC and Deutsche Bank Securities Inc., as Joint Lead Arrangers and Bookrunners (collectively, the "Lead Arrangers").

B.    authorization for the Loan Parties to execute and enter into thethat certain Superpriority Secured Debtor-in-Possession Credit Agreement to be, dated on or as of the date hereof,January 24, 2017, by and among the Borrower, the Guarantors, the DIP Agent, the lenders from time to time party thereto (including Citi as issuer under the DIP L/C Facility, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and the DIP Agent,

2

substantially in the form Lead Arrangers, a copy of which is attached to the Motion hereto as

**Exhibit B A** (as amended, supplemented or otherwise modified from time to time in accordance

with the terms hereof and thereof, the "DIP Credit Agreement" and, collectively with the

schedules and exhibits attached thereto and all agreements, documents, instruments and/or

amendments executed and delivered in connection therewith, including, without limitation, the

Security Agreement (as defined in the DIP Credit Agreement )), dated as of the Closing

Date January 24, 2017, among the Loan Parties and the DIP Agent (as amended, supplemented

or otherwise modified from time to time in accordance with the terms hereof and thereof, the

"DIP Collateral Agreement"), the "DIP Documents ")"), and to perform all such other and further

acts as may be required in connection with the DIP Documents, including, without limitation, the

establishment by the Borrower of an account pursuant to Section 2.04(a) of the DIP Credit

Agreement (the "Letter of Credit Account") under the sole and exclusive control of the

DIP Agent, which Letter of Credit Account shall be funded by the Borrower with deposits of

cash collateral (the "L/C Cash Collateral") as set forth in the DIP Credit Agreement;

C.      authorization for the Loan Parties to use proceeds of the DIP Financing and

Cash Collateral (as defined below) on the terms and conditions set forth herein, simultaneously

with the initial draw of $425,000,000 under the DIP Term Facility, (i)(A) to refinance all of the

Prepetition Domestic ABL Debt (as defined below) in full, including interest and fees through

the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible

(which shall be deemed to have occurred, upon the expiration of the Challenge Period (as

defined below) if no adversary proceeding or contested matter is timely and properly asserted, in

accordance with Paragraph 29 8 hereof, with respect to the Prepetition Domestic ABL Debt or

against the Prepetition Domestic ABL Agent (as defined below) or the Prepetition Domestic

ABL Lenders (as defined below)), or, if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Domestic ABL Secured Parties (as defined below) by order of a court of competent jurisdiction;); *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Domestic ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this InterimFinal Order unless the Prepetition Domestic ABL Debt is reinstated) (the "Domestic ABL Discharge"), (B) subject to the Intercompany Security Protocol (as defined below), to loan funds to Sierra which shall be on-lent to certain of Sierra's direct and indirect subsidiaries in accordance with this InterimFinal Order, including to refinance all of the Prepetition Foreign ABL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible (which shall be deemed to have occurred, upon the expiration of the Challenge Period if no adversary proceeding or contested matter is timely and properly asserted, in accordance with Paragraph 298 hereof, with respect to the Prepetition Foreign ABL Debt or against the Prepetition Foreign ABL Agent (as defined below) or the Prepetition Foreign ABL Lenders (as defined below)), or, if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Foreign ABL Secured Parties by order of a court of competent jurisdiction; *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Foreign ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this InterimFinal Order unless the Prepetition Foreign ABL Debt is reinstated) (the "Foreign ABL Discharge"); *provided* that, the Loan Parties' indemnification, subrogation, contribution, and reimbursement rights with respect to the Foreign Borrowers for the repayment

4

of the Prepetition Foreign ABL Debt (the "Foreign ABL Repayment Rights"), pursuant to sSection 3.01 of the U.S. Guaranty, dated as of June 4, 2015, among Avaya Inc., certain U.S. subsidiaries of Avaya Inc. and Citi, are fully preserved and shall be Collateral (as defined below), and (C) to immediately deem existing letters of credit under the Prepetition Domestic ABL Credit Facility (as defined below) and Prepetition Foreign ABL Credit Facility (subject to the Intercompany Security Protocol) to be issued under the DIP L/C Facility, (ii) to cash collateralize L/C Facility Letters of Credit, (iii) to fund the Cash Pool Requirements Account (as defined below), (iv) to pay obligations arising from or related to the Carve-Out (as defined below) and make disbursements therefrom, including by funding the Carve-Out Reserves (as defined below), (v) to pay Professional Fees (as defined below), (vi) to make adequate protection payments, (vii) to pay fees and expenses incurred in connection with the transactions contemplated hereby, and (viii) for general corporate purposes;

D.    authorization for the Loan Parties to continue to guarantee the obligations (the "Cash Pooling Obligations") of certain non-debtor subsidiaries of the Borrower that are "Group Companies" (as defined in the Cash Pooling Agreement) and that arise after the Petition Date (as defined below) pursuant to the Cash Pooling Agreement between Citibank and the Group Companies dated March 20, 2002 (the "Cash Pooling Agreement");

E.    authorization for the Borrower to establish and fund a segregated account with proceeds from the DIP Term Facility in an amount equal to $75,000,000 (the "Cash Pool Requirements Account"), which funds shall be available to the Borrower for disbursement through Sierra to any Group Company (as defined in the Cash Pooling Agreement) by deposit into any Currency Pool (as defined in the Cash Pooling Agreement) as needed (in the Borrower's sole discretion) following a written request by the requesting Group Company to Borrower;

*provided* that, any disbursement from the Cash Pool Requirements Account to any Group Company through Sierra shall be subject to the Intercompany Security Protocol and, for the avoidance of doubt, funds held in the Cash Pool Requirements Account shall be used solely for the purposes of intercompany borrowing by any Group Company in accordance with the Intercompany Security Protocol[2] and shall not be available to general creditors of the Debtors' estates, whether pursuant to a chapter 11 plan or otherwise; *provided further,* that any unused amounts in the Cash Pool Requirements Account shall be, subject to the Carve-Out, distributed to the DIP Agent upon maturity of the DIP Facilities in partial repayment of the DIP Obligations;

F.      until the irrevocable discharge of the Prepetition Domestic ABL Debt as hereinafter provided, the granting of adequate protection and contingent liens to the Prepetition Domestic ABL Agent for the benefit of the Prepetition Domestic ABL Lenders (each as defined below) under or in connection with (i) the Amended and Restated Credit Agreement, amended and restated as of October 29, 2012, by and among the Company, Holdings, Citicorp USA, Inc., as Administrative Agent (in such capacity, the "Prepetition Domestic ABL Agent"), Citicorp North America, Inc., as Swing Line Lender, Citibank N.A., as L/C Issuer, and each lender from time to time party thereto (collectively, in such capacities, the "Prepetition Domestic ABL Lenders" and, together with the Prepetition Domestic ABL Agent, the "Prepetition Domestic ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Domestic ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Domestic ABL Credit Facility") and (ii) that certain Pledge and Security Agreement, dated as of October 26, 2007, between the

---

[2]    Any credit support, guarantee, cash and/or cash equivalents (in each case, out of the proceeds of the DIP Financing and Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to any direct or indirect subsidiary of the Borrower that is not a Debtor (a "Non-Debtor Subsidiary") and any transaction outside the ordinary course of business between any Loan Party, Sierra, or a Non-Debtor Subsidiary shall be subject to the Intercompany Security Protocol.

Borrower, Sierra Holdings Corp., the Prepetition Domestic ABL Agent and the pledgors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Domestic ABL Security Agreement" and, collectively with the Prepetition Domestic ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Domestic ABL Agreements"), whose liens and security interests with respect to the Cash Flow Priority Collateral (as defined below) are being primed by the DIP Liens (as defined below);

G.    the granting of adequate protection to the Prepetition Cash Flow Parties (as defined below) under or in connection with: (i) that certain Third Amended and Restated Credit Agreement, amended and restated as of December 21, 2012, by and among the Company, Holdings, Citibank, N.A. as Administrative Agent (in such capacity, the "Prepetition Cash Flow Agent"), Swing Line Lender and L/C Issuer, and the lenders and issuing banks party thereto from time to time (collectively, in such capacities, the "Prepetition Cash Flow Lenders" and, together with the Prepetition Cash Flow Agent, the "Prepetition Cash Flow Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Cash Flow Credit Agreement") and (ii) that certain Pledge and Security Agreement, dated as of October 26, 2007, between the Borrower, Sierra Holdings Corp., the Prepetition Cash Flow Agent and the other grantors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Cash Flow Security Agreement" and, collectively with the Prepetition Cash Flow Credit Agreement and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Cash Flow Agreements"), whose liens on and security interests in the Prepetition Collateral (as defined below) are being primed by the DIP Liens;

H.    the granting of adequate protection to (i) the 7.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of February 11, 2011 (the "7.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 7.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "7.00% First Lien Noteholders")"),), the "7.00% First Lien Notes Agreements"), dated as of February 11, 2001, by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and Notes Collateral Agent (in such capacities, the "7.00% First Lien Notes Trustee" and together with the 7.00% First Lien Noteholders, the "7.00% First Lien Secured Parties"), pursuant to which the Borrower issued 7.00% Senior Secured Notes due 2019, whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens, and (ii) the 9.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of December 21, 2012, (the "9.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 9.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "9.00% First Lien Noteholders"), the "9.00% First Lien Notes Agreements" and, together with the 7.00% First Lien Notes Agreements, the "First Lien Notes Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent (in such capacityies, the "9.00% First Lien Notes Trustee" and, together with the 9.00% First Lien Noteholders, the "9.00% First Lien Notes Secured Parties" and, together with the 7.00% First Lien Notes Secured Parties, the "First Lien

Notes Secured Parties"), pursuant to which the Company issued 9.00% Senior Secured Notes due 2019 ~~(the "9.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 9.00% First Lien Notes Trustee, for its benefit and for the benefit of the noteholders (in such capacities, the "9.00% First Lien Noteholders") the "9.00% First Lien Notes Agreements" and, together with the 7.00% First Lien Notes Agreements, the "First Lien Notes Agreements" and, collectively with the Prepetition Cash Flow Agreements, the "First Lien Agreements"),~~ whose liens on and security interests in the Prepetition Collateral are being primed by the DIP Liens;

I.    the granting of adequate protection to the Second Lien Notes ~~Trustee (as defined below) for the benefit of the noteholders (in such capacities, the "Second Lien Noteholders") under or in connection with that certain indenture, dated as of March 7, 2013,~~ Secured Parties (as defined below) under or in connection with that certain indenture, dated as of March 7, 2013 (the "Second Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Second Lien Notes Trustee (as defined below), for its benefit and for the benefit of the Second Lien Noteholders (in such capacities, the "Second Lien Noteholders"), the "Second Lien Notes Agreements" and, together with the Prepetition Domestic ABL Agreements, the Prepetition Cash Flow Agreements and the First Lien Notes Agreements, the "Existing Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent, which was

succeeded by Wilmington Savings Fund Society, FSB as Trustee and as Notes Collateral Agent[3]

(in such capacity~ies~, the "Second Lien Notes Trustee" and, together with the Second Lien Noteholders, the "Second Lien Notes Secured Parties" and, together with the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties and First Lien Notes Secured Parties, the "Prepetition Secured Parties"), pursuant to which the Borrower issued 10.50% Senior Secured Notes due 2021 ~(the "Second Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Second Lien Notes Trustee, for its benefit and for the benefit of the Second Lien Noteholders, the "Second Lien Notes Agreements" and, together with the Prepetition Domestic ABL Agreements, the Prepetition Cash Flow Agreements and the First Lien Notes Agreements, the "Existing Agreements"),~ . whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens;

J.    authorization for the Debtors to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

K.    subject to certain challenge rights set forth herein, approval of certain stipulations by the Debtors with respect to the Prepetition Debt (as defined below) and the claims, liens and security interests arising therefrom;

L.    subject to the Carve-Out in all respects, the grant of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and

---

[3]    Pursuant to that Agreement of Resignation, Appointment, and Acceptance, dated as of January 27, 2017 by and among Avaya, Inc., The Bank of New York Mellon Trust Company, N.A., and Wilmington Savings Fund Society, FSB.

secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than the Excluded Assets (as defined below)) and all proceeds thereof (including, subject only to and effective upon entry of theis Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to (i) prior perfected liens that are not also Primed Liens (as defined below), if any, to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases and (ii) liens that are not also Primed Liens and to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases and that are perfected after the commencement of the Chapter 11 Cases to the extent permitted by section 546(b) of the Bankruptcy Code (the foregoing clauses (i) and (ii) together, the "Permitted Liens");

M.    subject only to and effective upon entry of theis Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral and the Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code with respect to the Prepetition Debt (as defined below);

N.    modification of the automatic stay to the extent set forth herein and in the DIP Documents; and

O.    approval of the Intercompany Security Protocol (as defined below);

P.    pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of an order granting the Motion on an interim basis (this "Interim Order"); and

~~Q.        that this Court schedule a final hearing (the "Final Hearing") to be held within 40 days of the entry of this Interim Order to consider entry of a final order (the "Final Order") approving the relief requested in the Motion on a final basis and authorizing the Borrower to forthwith borrow from the DIP Lenders under the DIP Documents up to the full amount of the DIP Financing and the Guarantors to guarantee all obligations owing to the DIP Lenders under the DIP Documents;~~

~~Notice of the Motion and the Interim~~and the Court having reviewed the Motion; and the interim hearing on the Motion having been held by this Court on January 19, 2017 and January 23, 2017 (the "Interim Hearing"); and the Court having (i) entered the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 61] (the "Interim Order"); (ii) entered the *Stipulation and Agreed Order Regrading Certain Adequate Protection Payments* [Docket No. 137]; and (iii) scheduled the final hearing (the "Final Hearing") on the Motion to be held before this Court on February 8, 2017 at 10:00 a.m. (prevailing Eastern Time) to consider entry of an order granting the Motion on a final basis (this "Final Order"), which Final Hearing was adjourned to March 3, 2017 at 10:00 a.m. (prevailing Eastern Time); and upon the initial draw under the DIP Facilities, the Debtors having refinanced all of the Prepetition Domestic ABL Debt and Prepetition Foreign ABL Debt in full; and notice of the Motion and the Final Hearing having been served by the Debtors on (a) the Office of the U.S. Trustee for the Southern District of New York (the "U.S. Trustee"); (b) the holders of the 50 largest unsecured claims

12

against the Debtors (on a consolidated basis); (c) the DIP Agent; (d) counsel to the DIP Agent; (e) counsel to the Ad Hoc First Lien Group; (f) counsel to the Ad Hoc Crossover Group; (g) the Prepetition Cash Flow Agent; (h) counsel to the Prepetition Cash Flow Agent; (i) the Prepetition Domestic ABL Agent; (j) counsel to the Prepetition Domestic ABL Agent; (k) the 7.~~0~~000% First Lien Notes Trustee; (l) counsel to the 7.~~000~~% First Lien Notes Trustee; (m) the 9.~~000~~% First Lien Notes Trustee; (n) counsel to the 9.~~000~~% First Lien Notes Trustee; (o) the Second Lien Notes Trustee; (p)~~-~~ counsel to the Second Lien Notes Trustee; (q) the United States Attorney's Office for the Southern District of New York; (r) the Internal Revenue Service; (s) the United States Securities and Exchange Commission; (t) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (u) the state attorneys general for states in which the Debtors conduct business; (v)  counsel to the DIP Lenders; (w) all parties known, after reasonable inquiry, to have asserted a lien or security interest in the Debtors' assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002~~;~~; and it appearing that notice was in the Debtors' belief, the best notice available under the circumstances; and the ~~Court having reviewed the Motion; and the Interim Hearing having been held by this Court on January [__], 2017; and the~~ relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Chapter 11 Cases; and the Court having found and determined that the relief requested in the Motion is necessary to avoid immediate and irreparable loss and damage to the Debtors' estates; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the *Declaration of Eric Koza in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (~~I) Authorizing the Debtors to (A)~~A) to Obtain Postpetition*

13

*Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(~~C~~c)(3), 364(d)(1) and 364(~~d)(1),~~e), and (B) ~~Use~~ to Utilize Cash Collateral, ~~(C) Grant~~ Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection~~; (II)~~ to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling ~~a~~ Final Hearing, Pursuant to Bankruptcy Rules 4001(b) and ~~(III) Granting Related Relief~~)* (the "Koza Declaration"), the *Declaration of Sam~~uel~~ Greene in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to U.S.C. §§105, 361, 364(c)(1), 364(c)(2),364(C)(3),and 364(d)(1), (B) Use Cash Collateral, (C) Grant Adequate Protection; (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "Greene Declaration"), and the *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* ~~(~~[Docket No. ~~[    ]~~ 22] (the "First Day Declaration," together with the Koza Declaration and Greene Declaration, the "Declarations~~")~~,") and at the Interim Hearing and the Final Hearing; and after due deliberation and sufficient cause appearing therefor~~;~~:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition.*  The relief requested in the Motion is granted on ~~an interim~~a final basis in accordance with the terms of this ~~Interim~~Final Order.  Any objections to the Motion with respect to the entry of this ~~Interim~~Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits. This ~~Interim~~Final Order shall become effective immediately upon its entry.

2.    *Jurisdiction.*  This Court has core jurisdiction over the Chapter 11 Cases, the relief requested in the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14

3.      *Relief Necessary to Avoid Immediate and Irreparable Harm.*  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

4.3.     *Debtors' Stipulations*.  Without prejudice to the rights of any party in interest, (but subject in all respects to the limitations set forth in Paragraph 4<u>3</u>(k) and Paragraph 29<u>28</u> herein) the Debtors admit, stipulate and agree that:

(a)      (i) as of the date<u>January 19, 2017</u> (the "<u>Petition Date</u>") of the filing of the Chapter 11 Cases,"<u>),</u> the Borrower and the Guarantors were justly and lawfully indebted and liable to (A) the Prepetition Domestic ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $55,000,000 in respect of loans made and $44,292,130.77 in respect of letters of credit[4] issued by the Prepetition Domestic ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition Domestic ABL Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Domestic ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Domestic ABL Agreements (collectively, the "<u>Prepetition Domestic ABL Debt</u>"), which Prepetition Domestic ABL Debt has been guaranteed on a joint and several basis by all of the Guarantors, (B) the Prepetition Foreign ABL Secured Parties (as defined below), without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $50,000,000 in respect of loans made and

---

[4]      Includes letters of credit issued in foreign currencies at January 1, 2017.

15

$22,690,539.65 in respect of letters of credit[5] issued by the Prepetition Foreign ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition Foreign ABL Agreements (as defined below), which Prepetition Foreign ABL Debt (as defined below) has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, (C) the Prepetition Cash Flow Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $3,234,727,4243 in respect of loans made by the Prepetition Cash Flow Lenders pursuant to, and in accordance with the terms of, the Prepetition Cash Flow Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cash Flow Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Cash Flow Agreements (collectively, the "Prepetition Cash Flow Debt"), which Prepetition Cash Flow Debt has been guaranteed on a joint and several basis by all of the Guarantors, (D) the 7.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,009,000,000 in respect of notes issued to the 7.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 7.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 7.00% First Lien Notes Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the 7.00% First Lien Notes Agreements (collectively, the "7.00% First Lien Notes Debt"), which 7.00% First Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, (E) the

---

[5]    Includes letters of credit issued in foreign currencies at January 1, 2017.

9.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $290,000,000 in respect of notes issued to the 9.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 9.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 9.00% First Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the 9.00% First Lien Notes Agreements (collectively, the "9.00% First Lien Notes Debt" and together with the Prepetition Cash Flow Debt and the 7.00% First Lien Notes Debt, the "First Lien Debt"), which 9.00% First Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, and (F) the Second Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,384,000,000 in respect of notes issued to the Second Lien Noteholders pursuant to, and in accordance with the terms of, the Second Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Second Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the Second Lien Notes Agreements (collectively, the "Second Lien Notes Debt" and, together with the Prepetition Domestic ABL Debt, and the First Lien Debt, the "Prepetition Debt"), which Second Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors; (ii) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrower and the Guarantors or Subsidiary Guarantors, as applicable, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy

17

Code); and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b)    the liens and security interests granted to the Prepetition Domestic ABL Secured Parties (the "Prepetition Domestic ABL Liens") pursuant to and in connection with the Prepetition Domestic ABL Agreements, are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the ABL Priority Collateral;[6] (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the Cash Flow Priority Collateral[7] (the "Cash Flow Priority Collateral" and, together with the ABL Priority Collateral, the "Prepetition Collateral"); (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is Cash Flow Priority Collateral, subject and subordinate to the Prepetition First-Priority Liens (as defined below);

(c)    the liens and security interests granted to the Prepetition Cash Flow Secured Parties, the 7.00% First Lien Notes Secured Parties, and the 9.00% First Lien Notes Secured Parties (collectively, the "Prepetition First-Priority Secured Parties") pursuant to and in connection with the Prepetition Cash Flow Agreements, the 7.00% First Lien Notes Agreements

---

[6]    "ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

[7]    "Cash Flow Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

and the 9.00% First Lien Notes Agreements (the "Prepetition First-Priority Liens") are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens, and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is ABL Priority Collateral, subject and subordinate to the ~~liens and security interests in favor of the~~ Prepetition Domestic ABL ~~Secured Parties~~Liens;

(d)    ~~as of the Petition Date,~~ the liens and security interests granted to Second Lien Noteholders (the "Prepetition Second-Priority Liens" and, together with the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens, the "Primed Liens") pursuant to and in connection with the Second Lien Notes Agreements are: (i) valid, binding, perfected, enforceable, third-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, third-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) <u>as of the Petition Date,</u> subject and subordinate to the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens;

(e)    the aggregate value of the ABL Priority Collateral exceeds the aggregate amount of the Prepetition Domestic ABL Debt;

(f)    the aggregate value of the Foreign ABL Collateral exceeds the aggregate amount of the Prepetition Foreign ABL Debt;

(g)        none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Existing Agreements;

(h)        the Debtors and their estates have no claims or causes of action against the Prepetition Secured Parties, with respect to either the Prepetition Debt or the Primed Liens;

(i)        each of (i) that certain First Lien Intercreditor Agreement dated as of February 11, 2011 among the Company, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee (collectively, the "Prepetition First Lien Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "First Lien Intercreditor Agreement") and (ii) the Amended and Restated Intercreditor Agreement dated as of October 29, 2012 among the Prepetition Domestic ABL Agent and the Prepetition Cash Flow Agent and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "ABL Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement, the "ICAs") are binding and enforceable against the Borrower and the Guarantors in accordance with their terms, and the Borrower and the Guarantors are not entitled to take any action that would be contrary to the provisions thereof;

(j)        all cash, securities, cash equivalents and other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash securities or other property (and the proceeds therefrom) and other amounts on deposit or maintained by the Loan Parties in any account or accounts with any depository institution

20

(collectively, the "Depository Institutions"), were subject to rights of set-off and valid, perfected, enforceable, first priority liens under the Existing Agreements and applicable law, for the benefit of the Prepetition Secured Parties. All "Cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") includes, without limitation, all cash proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral) are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"); and); and

(k)    notwithstanding anything herein to the contrary, (a) the Debtors make no stipulation, and reserve all rights, with respect to the assets identified on **Exhibit B C** attached hereto (collectively, the "Retained Claims Collateral"), including with respect to any liens asserted against the Retained Claims Collateral on account of the Prepetition Debt and (b) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal and/or to seek a determination on the value of the Prepetition Collateral securing the Prepetition Debt are fully reserved.  For the avoidance of doubt, and without limiting the foregoing, the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Retained Claims Collateral are expressly preserved.

5.4.     *Findings Regarding the DIP Financing and Cash Collateral.*

(a)     Good and sufficient cause has been shown for the entry of this Interim Order and to avoid immediate and irreparable loss or damage to the Debtors' estates Final Order.

(b)     The Debtors have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order, among other things, to avoid the liquidation of these estates, and to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay adequate protection, to repay the Prepetition ABL Debt, (as defined below), to fund the Cash Pool Requirements Account, to deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and to issue new letters of credit and to satisfy other working capital and operational needs.  The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to avoid a liquidation and for the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Agent and the

DIP Lenders, subject to the Carve-Out and the Permitted Liens, the DIP Liens and the DIP Superpriority Claims (as defined below) and incurring the Adequate Protection Obligations (as defined below), in each case, under the terms and conditions set forth in this ~~Interim~~Final Order and in the DIP Documents.

(d)     The Debtors have an immediate need to continue to guarantee, on a postpetition basis, the Cash Pooling Obligations and to establish and fund the Cash Pool Requirements Account in order to ensure the continuing operation of the Group Companies in the ordinary course and thereby help~~ing~~ to preserve the value of the Debtors' equity interests in the Group Companies in the ordinary course for the overall benefit of the Debtors' estates and creditors.

(e)     Based on the Motion, the Declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing (including the ~~First Day Declaration),~~Declarations) and the Final Hearing, the terms of the DIP Financing and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this ~~Interim~~Final Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(f)     The Prepetition Secured Parties have consented or are deemed under the applicable ICA to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral (solely in accordance with the terms of this ~~Interim~~Final Order and the DIP Documents), and the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this ~~Interim~~Final Order and the DIP Documents.

(g)     The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent, the DIP Lenders, and certain of the Prepetition ~~First Priority~~ Secured Parties and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: (i) all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents (the "DIP Loans"); (ii) any L/C Obligations (as defined in the DIP Credit Agreement); (iii) any Cash Management Obligations (as defined in the DIP Credit Agreement); (iv) any Hedging Obligations (as defined in the DIP Credit Agreement); (v) any Cash Pooling Obligations, to the extent provided herein; and (vi) any other Obligations (as defined in the DIP Credit Agreement, in each case owing to the DIP Agent, any DIP Lender or any of their respective banking affiliates (all of the foregoing in clauses (i) through (vi) collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  The Prepetition ~~First Priority~~ Secured Parties have ~~acted~~negotiated in good faith ~~regarding the DIP Financing and~~ the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations), in accordance with the terms ~~hereof~~and conditions of the DIP Documents and this Final Order, and the Prepetition Secured Parties (and

24

their successors and assigns ~~thereof),~~) shall be entitled to the full ~~protection~~protections afforded parties acting in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(h)    The Prepetition Secured Parties are entitled to the adequate protection provided in this ~~Interim~~Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion, the Declarations and on the record presented to the Court, the terms of the proposed adequate protection arrangements for the use of and diminution of value of the Prepetition Collateral (including the Cash Collateral), if any, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including the Cash Collateral); *provided* that~~,~~ nothing in this ~~Interim~~Final Order or the other DIP Documents shall (w) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this ~~Interim~~Final Order and in the context of the DIP Financing authorized by this ~~Interim~~Final Order, (x) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (y) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the ICAs, to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition Secured Parties~~, or (z)~~; *provided further, however,* that in the event ~~of~~ any ~~such~~ request for new, different, or additional relief per clause (y~~)~~), all parties' rights to oppose such relief are fully reserved.

(i)      Payment of the Prepetition ABL Debt reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(j)      The Debtors have requested ~~immediate~~ entry of this ~~Interim~~Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. ~~Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.~~  Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this ~~Interim~~Final Order and the DIP Documents are ~~therefore~~ in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

~~6.~~5.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized pursuant to this ~~Interim~~Final Order to forthwith borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guarantee the Borrower's obligations with respect to such borrowings and letters of credit, up to an aggregate principal ~~face~~ amount equal to $4~~7~~25,000,000 of term loans under the DIP  Term Facility and full access to the issuance of up to $150,000,000 in letters of credit under the DIP L/C Facility, subject to any conditions and limitations under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to refinance the Prepetition ABL Debt as provided herein and deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and, in connection therewith, to fund the Letter of Credit Account as set forth in the DIP Credit Agreement, to fund the Cash Pool Requirements Account, to provide working capital for

the Debtors, to pay adequate protection, for general corporate purposes, to pay interest, fees and expenses in accordance with this ~~Interim~~Final Order and the DIP Documents, to fund the Carve-Out (including the Carve-Out Reserves), and to pay Professional Fees.  For the avoidance of doubt, the L/C Cash Collateral shall be funded with proceeds of the DIP Loans to the extent such proceeds have not been exhausted, and the DIP Liens in respect of the L/C Obligations shall not be subject or subordinate to any senior liens.

(b)     In furtherance of the foregoing and without further approval of this Court, each Loan Party is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for or in connection with the Loan Parties' performance of their obligations under the DIP Financing, including as applicable and, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the continuation of the guarantee of the Cash Pooling Obligations on a postpetition basis;

(iii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the requisite parties under the DIP Documents may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any ordinary course fees paid in connection therewith) that do <u>not</u> (a) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest

27

payable thereunder, (b) increase existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any ordinary course amendment, consent or waiver fee), (c) amend, modify or (esupplement any events of default, termination provisions or provisions relating to asset sales (excluding, for the avoidance of doubt, any waiver of such provisions), or (d) modify Section 2.05 (Prepayments) of the DIP Credit Agreement in a manner adverse to the Debtors (such authorizations, amendments, waivers, consents or other modifications not requiring further approval of the Court, "Immaterial Amendments");"), *provided* that the Debtors shall provide notice of any proposed Immaterial Amendment to counsel to the Creditors' Committee no less than three (3) business days prior to the effectiveness thereof;

(iv)    the non-refundable payment to the DIP Agent, Lead Arrangers, or the DIP Lenders, as the case may be, of all fees (which fees shall be, and shall be deemed to have been, approved upon entry of this InterimFinal Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained by the DIP Agent and the DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party;

28

(v)    the creation of intercompany loans in accordance with the Intercompany Security Protocol; and

(vi)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party thereto in accordance with the terms of the DIP Documents and this ~~Interim~~Final Order.  No obligation, payment, transfer or grant of security under the DIP Documents or this ~~Interim~~Final Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

~~7.~~6.    *Payment of the Prepetition ABL Debt.*

(a)    The Debtors are hereby authorized and directed to use proceeds of the DIP Financing and Cash Collateral to, at the initial closing of the DIP Financing, pay in full in cash the Prepetition Domestic ABL Debt and, subject to the Intercompany Security Protocol, the Prepetition Foreign ABL Debt.[8]  The Prepetition Domestic ABL Liens shall be automatically

---

[8]    "Prepetition Foreign ABL Debt" means the aggregate principal amount of obligations outstanding pursuant to, and in accordance with the terms of, the senior secured asset-based revolving credit facility made available to Avaya Canada Corp., Avaya UK, Avaya International Sales Limited, Avaya Deutschland GMBH and Avaya GMBH & CO. KG (collectively, the "Foreign Borrowers") pursuant to that certain Credit Agreement, dated as of June 4, 2015, by and among the Foreign Borrowers, the guarantors from time to time party thereto, Citibank, N.A. as Administrative Agent and L/C Issuer (the "Prepetition Foreign ABL Agent"), Citibank, N.A., Canadian Branch as Canadian Swing Line Lender, Citibank, N.A., London Branch as European Swing Line Lender, and the other lenders from time to time party thereto (the "Prepetition Foreign ABL Lenders" and together with the Prepetition Foreign ABL Agent, the "Prepetition Foreign ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Foreign ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Foreign ABL Credit Facility") and the other Loan Documents (as defined in the Prepetition Foreign ABL Credit Agreement and, collectively with the Prepetition Foreign ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Foreign ABL Agreements"),

released and terminated upon the Domestic ABL Discharge.  Until then, subject to the terms and conditions contained in this ~~Interim~~Final Order (including, without limitation, the DIP Liens granted hereunder and the Carve-Out), any and all prepetition or postpetition liens and security interests (including, without limitation, any adequate protection replacement liens at any time granted to the Prepetition Domestic ABL Secured Parties by this Court) that the Prepetition Domestic ABL Secured Parties have or may have in the Prepetition Collateral or any other assets and properties of the Debtors and their estates shall (i) continue to secure the unpaid portion of any Prepetition Domestic ABL Debt (including, without limitation, any Prepetition Domestic ABL Debt subsequently reinstated after the repayment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition Domestic ABL Debt shall not have been avoided) and (ii) be junior and subordinate in all respects to (A) the Carve-Out, (B) valid, perfected, unavoidable and senior liens in existence immediately prior to the Petition Date, and (C) with respect to the Cash Flow Priority Collateral, the DIP Liens, the Prepetition First-Priority Liens, the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens (as defined below) and the First Lien Notes Primed Parties Adequate Protection Liens (as defined below) granted under this ~~Interim~~Final Order and the Existing Agreements (such liens and security interests of the Prepetition Domestic ABL Secured Parties are hereinafter referred to as the "Contingent ABL Liens", and any such unpaid or reinstated Prepetition Domestic ABL Debt described in clause (i) of this sentence is hereinafter referred to as the "Contingent Prepetition ABL Debt").

---

plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Foreign ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Foreign ABL Agreements.  The Prepetition Foreign ABL Debt, together with the Prepetition Domestic ABL Debt shall be collectively referred to herein as "Prepetition ABL Debt."

(b)    For the avoidance of doubt, the repayment of the Prepetition Domestic ABL Debt and the Prepetition Foreign ABL Debt shall be conditional and subject to disgorgement, in whole or in part, pending occurrence of the Domestic ABL Discharge and the occurrence of the Foreign ABL Discharge, respectively.

8.7.    *Carve-Out.*

(a)    The "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any committee of unsecured creditors (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day (as defined in the DIP Credit Agreement) following delivery by the DIP Agent of a written notice delivered by email (or other electronic means) to the DIP Lenders, the Debtors, their lead restructuring counsel, the United States Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Crossover Group, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an "Event of Default" under the DIP Credit Agreement (a "DIP Event of Default") and acceleration of either DIP Facilities stating that the

Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the "Carve-Out Trigger Notice"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, subject to an investigation budget cap of (x) $175250,000 with respect to Professional Fees to be incurred by the Creditors' Committee and (y) $150,000 with respect to Professional Fees to be incurred by the Debtors solely with respect to the Retained Claims Collateral, under the investigation budget (collectively, the "Investigation Budget Cap"); and (iv) Professional Fees in an aggregate amount not to exceed $20,000,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

(b)    On the day on which a Carve-Out Trigger Notice is given by the DIP Agent as set forth herein (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Loan Party to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

(c)    The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims (including the DIP Superpriority Claims).  On the Termination Declaration Date, the Debtors shall be required to deposit in a segregated account at the DIP Agent an amount equal to the Post Carve-Out Trigger Notice Cap and hold in trust to pay such Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the

"Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d)        All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in Paragraph 87(a) (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition First Priority Secured Parties under the Existing Agreements on a pro rata basis in accordance with their rights and priorities as of the Petition Date, including the ICAs.

(e)        All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth abovein Paragraph 7(a) (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition First Priority Secured Parties under the Existing Agreements on a pro rata basis in accordance with their rights and priorities as of the Petition Date, including the ICAs.

33

(f)        Notwithstanding anything herein, the DIP Documents, or the Final Order to the contrary: (i) if any Carve-Out Reserve is not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Agent or the Prepetition First Lien Agents, as applicable; (ii) following delivery of a Carve-Out Trigger Notice, the DIP Agent and the agents under the Prepetition Debt shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded or unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve-Out Reserves, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent or the Prepetition First Lien Agents for application in accordance with this ~~Interim~~Final Order; (iii) disbursements by the Debtors from the Carve-Out Reserves shall not constitute term loans under the DIP Facilities or increase or reduce the balance of DIP Superpriority Claims outstanding; (iv) the failure of the Carve-Out Reserves to satisfy, in full, the Professional Fees shall not affect or impair the priority of the Carve-Out; and (v) in no way shall any of the Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any budget or financial projection delivered in connection with this ~~Interim~~Final Order or the DIP Facilities be construed as a cap or limitation on the amount of the Professional Fees due and payable by, or that may be administrative claims allowed against the Debtors or their estates.

(g)        Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any ~~A~~allowed Professional Fees shall not reduce the Carve-Out.  Any payment or reimbursement made on a final basis on or after the occurrence of

34

the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(h)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, other than the investigation of such claims by the Creditors' Committee prior to the delivery of a Carve-Out Trigger Notice and subject to the Investigation Budget Cap, (i) against any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Existing Agreements, including, in each case without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders or the DIP Agent with respect to the DIP Facilities; (c) preventing, hindering, or delaying any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once a DIP Event of Default has occurred after the DIP Remedies Notice Period (as defined below), (d) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under or in respect of (i) the DIP Facilities, the Prepetition Domestic ABL Credit Facility, the Prepetition Cash Flow Credit Facility, the First Lien Notes Agreements or the Prepetition Second Lien Agreements, (ii) the liens securing the DIP Facilities or the Primed Liens; (iii) any other rights or interest of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties following the

35

occurrence of a DIP Event of Default (as defined below) and after the DIP Remedies Notice Period, or (e) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any Avoidance Actions (as defined below) against the DIP Agent, any DIP Lender, any Prepetition Secured Party or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, each in their capacities as such; *provided* that, for the avoidance of doubt, this Paragraph 7 (including, for the avoidance of doubt, the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal.

(i)  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities (including the DIP Superpriority Claims and the DIP Liens) and any adequate protection (including any liens and claims granted on account of the Adequate Protection Obligations); *provided* that, the Carve-Out shall not apply to the L/C Facility Letters of Credit or any cash (or cash equivalent or similar) collateral pledged in support thereof (including, in all respects, the Letter of Credit Account and all amounts credited thereto).

9.8.  *DIP Superpriority Claims.*  Subject in all respects to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the

Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of th~~e~~is Final Order, Avoidance Proceeds), subject only to the liens on such property and the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this ~~Interim~~Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

~~10.~~9.  *DIP Liens*.  As security for the DIP Obligations, subject and subordinate in all respects to the Carve-Out, effective and perfected upon the date of this ~~Interim~~Final Order and without the necessity of the execution, recordation or filing by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this ~~Interim~~Final Order and the DIP Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon

all Collateral, to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or valid and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code ("Unencumbered Property");

(b) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected junior security interests in and liens on the Collateral, to the extent such Collateral is subject to (x) valid, perfected and non-avoidable liens as of the Petition Date ~~or~~to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases or (y) valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code and to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases, other than:

(i) the Prepetition First-Priority Liens; *provided* that~~,~~ DIP Liens securing Cash Pooling Obligations shall be subordinate to the Prepetition First-Priority Liens on Cash Flow Priority Collateral;

(ii) prior to the Domestic ABL Discharge, and solely with respect to (A) Cash Flow Priority Collateral and (B) ~~the~~ L/C Cash Collateral (*provided*~~,~~ that any funds deposited in the Letter of Credit Account shall be deemed to be funded from proceeds of the DIP Loans to the extent such proceeds have not been exhausted), the Prepetition Domestic ABL Liens; and

(iii) the Prepetition Second-Priority Liens;

(c)    <u>Priming Liens</u>.

(i)    Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected priming senior security interests in and liens upon the Collateral which security interests and liens shall prime the Primed Liens except.  Except as set forth in the foregoing clause subparagraph (b), the DIP Liens shall prime the Primed Liens in accordance with the priorities shown in **Exhibit A B** attached hereto (the "Priming Liens");

(ii)    Notwithstanding anything herein to the contrary, the Priming Liens (a) shall be subject and junior to the Carve-Out in all respects, (b) shall be junior to liens that are senior to the Primed Liens (unless such liens are themselves Primed Liens), (c) shall be senior in all respects to the Primed Liens, and (d(d) shall be senior in all respects to liens and security interests that are junior to the Primed Liens and (e) shall also be senior to any liens granted after the Petition Date to provide adequate protection with respect of any of the Primed Liens.  The Primed Liens shall be primed by and made subject and subordinate to the Carve-Out and the Priming Liens, but the Priming Liens shall not prime perfected liens, if any, to which the Primed Liens are subject at the time of the commencement of the Chapter 11 Cases or liens to which the Primed Liens are subject and that are perfected after the commencement of the Chapter 11 Cases to the extent permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Carve-Out and any such liens that are themselves Primed Liens);

(d)    <u>Relative Priority of Liens</u>.  Notwithstanding anything to the contrary in this InterimFinal Order or the DIP Documents, the relative priority of each DIP Lien granted in this Paragraph 109, the Primed Liens, the Contingent ABL Liens, and the Adequate Protection

Liens, shall be as set forth in **Exhibit ~~A~~ B** attached hereto; *provided* that, for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve-Out in all respects;

(e)    Excluded Assets. Notwithstanding anything to the contrary in this Final Order or the DIP Documents, the Collateral shall not include (i) any claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions") and, prior to entry of the Final Order, the proceeds of Avoidance Actions (it being understood that subject only to and effective upon entry of the Final Order, the Collateral shall include any proceeds or property recovered, unencumbered or otherwise from successful Avoidance Actions, whether by judgment, settlement or otherwise ("Avoidance Proceeds")),"), (ii) any Excluded Asset (as defined in the DIP Collateral Agreement), (iii) the Cash Pool Requirements Account, (iv) any Excluded Security (as defined in the DIP Collateral Agreement), (v) leased (not owned) real property, (vi) prior to entry of theis Final Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code;, (vii) any equity interests in Sierra in excess of 65% of the equity interests issued and outstanding, and (viii) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (i) – (vii) (it being understood that subject only to and effective upon entry of this Final Order, the Collateral shall include any proceeds or property recovered, unencumbered or otherwise from successful Avoidance Actions, whether by judgment, settlement or otherwise (collectively, the "Avoidance Proceeds")) (the assets described in the foregoing clauses (i) through (viii), the "Excluded Assets").

11.10. *Collateral*.  For purposes of this InterimFinal Order, "Collateral" shall mean all property, other than Excluded Assets, whether now owned or hereafter acquired or existing and wherever located, of each Loan Party and each Loan Party's "estate" (as created pursuant to

Bankruptcy Code section 541(a)), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash (whether maintained with the DIP Agent or otherwise), Intercompany Notes/Receivables (excluding any Non-Debtor Subsidiary Note/Receivable held by a Non-Debtor Subsidiary other than Sierra), the Foreign ABL Repayment Rights, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock held by each Debtor, other equity or ownership interests, including, without limitation, equity interests in subsidiaries (including non-wholly owned and Non-Debtor Subsidiaries), money, investment property and upon entry of the~~e~~is Final Order, any proceeds of Avoidance Actions, the proceeds, products rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing.

~~12.~~11.  *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents, the Loan Parties are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Credit Agreements on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis.

~~13.~~12.  *Protection of DIP Lenders' Rights*.

(a)    Until the indefeasible Payment in Full (as defined in the DIP Credit Agreement) of all DIP Obligations and the termination of all remaining Commitments (as

defined in the DIP Credit Agreement) under the DIP Facilities, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Existing Agreements or this ~~Interim~~Final Order, or otherwise seek to exercise or enforce any rights or remedies against Collateral, including in connection with the Contingent ABL Liens or the Adequate Protection Liens except to the extent authorized by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any Collateral, to the extent such transfer, disposition, sale or release is authorized under the DIP Documents: (as in effect on or about the entry of this Final Order); and (iii) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Collateral subject to any sale or disposition or, solely with respect to the Prepetition Domestic ABL Secured Parties, in connection with the Domestic ABL Discharge.  Upon the Domestic ABL Discharge, the Debtors are authorized to file any termination statements, releases, or documents necessary to effectuate and/or evidence the release and termination of the Prepetition Domestic ABL Secured Parties' liens on or security interests in any portion of the Collateral.

(b)      To the extent the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent or any other Prepetition Secured Party (i) has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral, and (ii) has consented to, or is deemed to have consented to, the relief provided in this Paragraph 12(b) (including, for the avoidance of doubt, by participating in or not objecting to the DIP Facility and/or consenting to, being deemed to have consented to,  or not objecting to the Debtors'

use of its Cash Collateral) then such Prepetition Secured Party shall be deemed to maintain such

possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for

the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the

DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be

deemed, without incurring any liability or duty to any party, to maintain possession or control of

any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent

for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)     The automatic stay provisions of section 362 of the Bankruptcy Code are

hereby vacated and modified to the extent necessary to permit the DIP Agent and the

DIP Lenders to enforce all of their rights under the DIP Documents and this Interim Order and

(i) immediately upon the occurrence of a DIP Event of Default and concurrently with delivery of

the Carve-Out Trigger Notice, declare (A) the termination, reduction or restriction of any further

Commitment (as defined in the DIP Credit Agreement) to the extent any such Commitment

remains and (B) all Obligations to be immediately due and payable, without presentment,

demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors

and (ii) unless the Court orders otherwise during the DIP Remedies Notice Period (as defined

below), upon the occurrence of a DIP Event of Default and the giving of five calendar days'

prior written notice (which shall run concurrently with any notice required to be provided under

the DIP Documents) (the "DIP Remedies Notice Period") (extended to the next business day if

such five calendar day period shall expire on a day that is not a business day) via email to

counsel to the Prepetition Cash Flow Agent, the Debtors, and counsel to the Debtors (and, upon

receipt, the Debtors shall promptly provide a copy of such notice to counsel to the Creditors'

Committee and, the U.S. Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad

Hoc Crossover Group) to (A) foreclose on any of the Collateral and (B) exercise all other rights and remedies ~~provided for in~~under the DIP Documents, this Final Order and ~~under~~ applicable law.

(d)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this ~~Interim~~Final Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party

~~14.~~13. *Marshaling.*   None of the DIP Collateral, the DIP Lenders, the DIP Agent, the Prepetition Collateral, the Adequate Protection Liens or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds thereof shall be received and used in accordance with this ~~Interim~~Final Order~~.~~; *provided, however,* that the Prepetition Secured Parties, DIP Agent and the DIP Lenders shall use commercially reasonable efforts to first use all DIP Collateral or Prepetition Collateral other than Avoidance Proceeds to repay the DIP Obligations or Adequate Protection Obligations, as applicable.   Further, subject only to and effective upon entry of th~~e~~is Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

~~15.~~14. *Limitation on Charging Expenses Against Collateral.*   ~~Subject only to and effective~~Effective upon entry of th~~e~~is Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result

44

therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition Domestic ABL Agent (prior to the Domestic ABL Discharge) or the Prepetition Cash Flow Agent (at the direction of the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement)), as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Domestic ABL Agent or the Prepetition Cash Flow Agent, and nothing contained in this ~~Interim~~Final Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

~~16.~~15.  *Payments Free and Clear.*  Subject in all respects to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or First Lien Agents on behalf of the Prepetition First-Priority Secured Parties pursuant to the provisions of this ~~Interim~~Final Order, the Final Order, or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability.

~~17.~~16.  *Use of Cash Collateral.*  The Debtors are hereby authorized, subject to the terms and conditions of this ~~Interim~~Final Order (including Paragraph 1~~8~~7 hereof), to use all Cash Collateral, and the Prepetition Secured Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them; *provided* that the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth, and so long as no Cash Collateral Event of Default shall have occurred and be continuing.  For purposes of this ~~Interim~~Final Order, the term "Cash Collateral Event of Default" shall mean:

(a)    unless waived by the Prepetition Cash Flow Agent with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, a DIP Event of Default;

(b)    the failure of any of the following to occur:

(i)    the filing of a chapter 11 plan, that is acceptable to the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement), on the one hand, and the Debtors, on the other hand (an "Acceptable Plan")"), and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with this Court within 150 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have filed the Acceptable Plan and Disclosure Statement;

(i)    entry by this Court of an order approving the Disclosure Statement within 180 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have filed the Acceptable Plan and Disclosure Statement;

(ii)    entry by this Court of an order approving the Disclosure Statement within 210 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court shall have entered an order approving the Disclosure Statement;

(iii)    entry by this Court of an order confirming the Acceptable Plan within 2850 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court has entered an order confirming the Acceptable Plan; or

(iv)    consummation of the Acceptable Plan within 300270 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have consummated the Acceptable Plan; or

(c)    any Cash Collateral Event of Default set forth in Paragraph 2625.

46

18.17.  *Termination of Use of Cash Collateral.*

(a)    Promptly upon delivery of a written notice of a Cash Collateral Event of Default (a "Cash Collateral Adequate Protection Notice") from the Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, to (i) the Debtors, (ii) counsel for the other Prepetition First Lien Notes Agents, (iii) counsel to the Ad Hoc First Lien Group, (iv) counsel to the Ad Hoc Crossover Group, (iv) the Creditors' Committee, if any, and (v) the U.S. Trustee, the Debtors shall seek an expedited hearing (a "Cash Collateral Hearing") with the Court to consider the Debtors' use of Cash Collateral on a non-consensual basis.  TheFollowing delivery of a Cash Collateral Adequate Protection Notice in accordance with this Paragraph 17(a), the Debtors' right to use Cash Collateral shall continue until the later of (x) a ruling from the Court in respect of the Cash Collateral Hearing or (y) such time as otherwise agreed to by the partiesPrepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement.

(b)    For the avoidance of doubt, and notwithstanding anything herein to the contrary, the occurrence of a Cash Collateral Event of Default pursuant to Paragraph 17(b) or 17(b)(iv)16(b) through 16(b)(iv) hereof, shall (i) not constitute a default with respect to the DIP Facilities or a DIP Event of Default, and (ii) the occurrence and pendency of a Cash Collateral Event of Default shall not cause the Debtors to be prohibited from using the cash proceeds from the DIP Facilities and Collateral securing the DIP Facilities (other than Cash Collateral) except as expressly set forth in this InterimFinal Order and the DIP Documents.

19.18.  *Contingent Liens and Adequate Protection of Prepetition Domestic ABL Secured Parties.*  Subject in all respects to the Carve-Out, until the occurrence of the Domestic ABL Discharge, the Prepetition Domestic ABL Secured Parties are entitled to (x) the Contingent ABL

Liens and (y) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Domestic ABL Secured Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the ~~depreciation,~~ sale, lease or use by the Debtors ~~(or other decline in value)~~ of the Prepetition Collateral, the priming of the Prepetition Domestic ABL Liens by the DIP Liens pursuant to the DIP Documents and this ~~Interim~~<u>Final</u> Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "<u>Prepetition Domestic ABL Adequate Protection Claim</u>"); *provided* that~~,~~ the avoidance of any Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral shall not constitute diminution in the value of such Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral.  In consideration of the foregoing, and, for the avoidance of doubt, subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted the following (collectively, the "<u>Prepetition Domestic ABL Primed Parties Adequate Protection Obligations</u>"):

(a)     <u>Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens</u>.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted (effective and perfected upon the date of this ~~Interim~~<u>Final</u> Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), (1) in the amount of any Contingent Prepetition ABL Debt, the Contingent ABL Liens, and (2) in the amount of the Prepetition Domestic ABL Adequate Protection Claim, a valid, perfected replacement security interest in and liens (the "<u>Prepetition Domestic ABL Adequate Protection Liens</u>") upon all of the Collateral

including, without limitation, subject to entry of the~~is~~ Final Order, the Avoidance Action Proceeds, in each case (i) subject and subordinate only to (A) with respect to Collateral other than ABL Priority Collateral, the DIP Liens and any other liens that are senior to the DIP Liens, (B) any liens that are senior to the Prepetition Domestic ABL Liens (C) the Carve-Out and (D) solely with respect to the Cash Flow Priority Collateral, the Prepetition First-Priority Liens and the Prepetition First-Priority Adequate Protection Liens~~,~~ (as defined below), (ii) with respect to Collateral other than Cash Flow Priority Collateral, senior to the Prepetition First-Priority Liens and the Prepetition First-Priority Adequate Protection Liens, and (iii) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens (as defined below). The Prepetition Domestic ABL Adequate Protection Liens shall secure the Prepetition ABL Adequate Protection Claim, and the Contingent ABL Liens shall secure the amount of any Contingent Prepetition ABL Debt;

(b)     _Prepetition Domestic ABL 507(b) Claim_.  Subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Domestic ABL Adequate Protection Claim (the "Prepetition Domestic ABL 507(b) Claim"), which Prepetition Domestic ABL 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of the~~is~~ Final Order, the Avoidance Proceeds.  The Prepetition Domestic ABL 507(b) Claim shall be (i) subject to the Carve-Out, (ii) subordinate to the DIP Superpriority Claims**,** (iii) _pari passu_ with the Cash Flow Credit Agreement Primed Parties 507(b) Claim and First Lien Notes Primed Parties 507(b) Claim, and (iv) senior to the Second Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this ~~Interim~~Final Order or the

49

DIP Credit Agreement, the Prepetition Domestic ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Domestic ABL 507(b) Claim until the indefeasible Payment in Full of all DIP Obligations and the termination of all remaining Commitments under the DIP Facilities;

(c)    Prepetition Domestic ABL Fees and Expenses.  The Prepetition Domestic ABL Agent shall receive from the Debtors, for the benefit of the Prepetition Domestic ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Domestic ABL Agent under the Prepetition Domestic ABL Agreements, including, but not limited to, the reasonable and documented fees and disbursements of counsel promptly upon receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 32~~31 below~~: below (subject, in the event that the Prepetition Domestic ABL Debt is reinstated, to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such)); and

(d)    Contingent Prepetition ABL Debt.  In the event that the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender (each in their capacities as such) is ordered by the Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("Disgorged Amounts") leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account, which shall be subject to the Carve Out in all respects, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Domestic ABL Agent and the Prepetition Domestic ABL Lenders, distributing such amounts to the Debtors or

50

otherwise); *provided* that, to the extent the Disgorged Amounts are returned to the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender, they shall receive such amounts plus any interest accrued at the default rate set forth in the Prepetition Domestic ABL Agreements; *provided further* that, after entry of a final non-appealable order of a court of competent jurisdiction ordering such Disgorged Amounts to be remitted to the Debtors, the Disgorged Amounts shall be Collateral pursuant to the terms of this ~~Interim~~Final Order.

~~20.~~19.  *Adequate Protection of Prepetition Cash Flow Credit Agreement Primed Parties.* The Prepetition Cash Flow Credit Agreement Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the diminution in value, if any, of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Cash Flow Credit Agreement Primed Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the ~~depreciation,~~ sale, lease or use by the Debtors ~~(or other decline in value)~~ of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens of the Prepetition Cash Flow Credit Agreement Primed Parties by the DIP Liens pursuant to the DIP Documents and this ~~Interim~~Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (the "Cash Flow Credit Agreement Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Prepetition Cash Flow Credit Agreement Primed Parties are hereby granted the following (collectively, the "Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)    Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens.  The Prepetition Cash Flow Agent (for itself and for the benefit of the

51

Prepetition Cash Flow Lenders) is hereby granted for the diminution in the value, if any, of the Prepetition Cash Flow Parties' interests in the Prepetition Collateral as of the Petition Date, a valid, perfected replacement security interest in and lien (the "Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of th~~e~~is Final Order, the Avoidance Proceeds, in each case (i) subject and subordinate only to (A) the DIP Liens (other than, solely with respect to the Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition Domestic ABL Adequate Protection Liens; (iii) *pari passu* with the First Lien Notes Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;

(b)      Prepetition Cash Flow Credit Agreement Primed Parties 507(b) Claim. The Prepetition Domestic Cash Flow Credit Agreement Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Cash Flow Credit Agreement Primed Parties Adequate Protection Claim (the "Cash Flow Credit Agreement Primed Parties 507(b) Claim"), which Cash Flow Credit Agreement Primed Parties 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of th~~e~~is Final Order, the

Avoidance Proceeds.  The Cash Flow Credit Agreement Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the First Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this ~~Interim~~Final Order or the DIP Credit Agreement, the Prepetition Cash Flow Credit Agreement Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Cash Flow Credit Agreement Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)    Prepetition Cash Flow Credit Agreement Primed Parties Fees and Expenses; Cash Payments.  The Prepetition Cash Flow Agent shall receive from the Debtors, for the benefit of the Prepetition Cash Flow Lenders, ~~current cash payments (i) in an amount equal to interest at the non-default rate under the First Lien Debt when due under the First Lien Agreements and (ii)~~(i) cash payments as set forth in Paragraph 21(a) and (ii) current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Cash Flow Agent under the Prepetition Cash Flow Agreements, including, but not limited to, the reasonable and documented fees and disbursements of one primary counsel to the Prepetition Cash Flow Agent promptly upon receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph ~~15(d),~~ 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

21. 20. *Adequate Protection of Prepetition First Lien Notes Primed Parties*. The Prepetition First Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Debtors' interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Prepetition First Lien Notes Primed Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens by the DIP Liens pursuant to the DIP Documents and this Interim Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "First Lien Notes Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Prepetition First Lien Notes Primed Parties are hereby granted the following (collectively, the "First Lien Notes Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

    (a)  Prepetition First Lien Notes Primed Parties Adequate Protection Liens. The 9.00% First Lien Notes Trustee and the 7.00% First Lien Notes Trustee (for themselves and for the benefit of the 9.00% First Lien Noteholders and the 7.00% First Lien Noteholders, respectively) are each hereby granted (effective and perfected upon the date of this Interim Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution of value, if any, of the Prepetition First Lien Notes Parties' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien  (the "First Lien Notes Adequate Protection Liens" and, together with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection

Liens, the "Prepetition First-Priority Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of theis Final Order, the Avoidance Proceeds, in each case (i) subject and subordinate only to (A) the DIP Liens (other than, solely with respect to the Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition Domestic ABL Adequate Protection Liens; (iii) *pari passu* with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;

(b)    Prepetition First Lien Notes Primed Parties 507(b) Claim.  The Prepetition First Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the First Lien Notes Primed Parties Adequate Protection Claim (the "First Lien Notes Primed Parties 507(b) Claim"); which First Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of theis Final Order, the Avoidance Proceeds.  The First Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the Cash Flow Credit Agreement Primed Parties 507(b) Claim.  Except to the extent expressly

55

set forth in this ~~Interim~~Final Order or the DIP Credit Agreement, the Prepetition First Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)    Prepetition First Lien Notes Primed Parties Fees and Expenses; Cash Payments. The 9.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 9.00% First Lien Noteholders ~~current cash payments (i) in an amount equal to interest at the non-default rate for the First Lien Debt when due under the First Lien Agreements and (ii) of~~(i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 9.00% First Lien Indenture) current cash payments of the reasonable and documented fees and expenses of the 9.00% First Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 9.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph ~~15(d),~~ 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such). The 7.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 7.00% First Lien Noteholders ~~current cash payments (i) in an amount equal to interest at the non-default rate for the First Lien Debt when due under the First Lien Agreements and (ii) of~~(i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 7.00% First Lien Indenture) current cash payments of the reasonable and documented fees and expenses of the 7.00% First Lien Notes Trustee, including

fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 7.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph 15(d), 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such).

22.21. *Additional First Lien Adequate Protection.* Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, each of the Prepetition First-Priority Secured Parties whose liens will be primed by the DIP Liens and whose Cash Collateral will be authorized for use by the Debtors, will receive as additional adequate protection, in each case subject to the Carve-Out in all respects:

(a)    the following adequate protection payments:

(i)    cash payments in an amount equal to interest at the non-default rate under the Prepetition Cash Flow Credit Agreement, on the applicable payment dates as provided in the Prepetition Cash Flow Credit Agreement;

(ii)    cash payments in an amount equal to interest at the non-default rate under the 9.00% First Lien Indenture, on the applicable payment dates as provided in the 9.00% First Lien Indenture; and

(iii)    cash payments in an amount equal to interest at the non-default rate under the 7.00% First Lien Indenture, on the applicable payment dates as provided in the 7.00% First Lien Indenture; *provided* that the adequate protection payments set forth in the foregoing clauses (i) through (iii) shall be distributed by the Debtors ratably to (a) the Prepetition Cash Flow Agent, for the benefit of the Prepetition Cash Flow Secured Parties, (b) the 7.00%

First Lien Notes Trustee, for the benefit of the 7.00% First Lien Noteholders, and (c) the 9.00% First Lien Notes Trustee, for the benefit of the 9.00% First Lien Noteholders, based on the principal and accrued interest outstanding under the Prepetition Cash Flow Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture, respectively, as of the Petition Date, each as set forth in **Exhibit D** attached hereto; *provided further* that each of the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee shall apply the payments received pursuant to the foregoing clauses (i) through (iii) in accordance with the Prepetition Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture without regard to the First Lien Intercreditor Agreement, including Section 2.01(a) thereof;

(a)(b)  current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of this Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of certain holders of First Lien Debt ("(the "Ad Hoc First Lien Group")"), in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of First Lien Debt (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc First Lien Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019; and

(b)(c)  current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of this

Final Order) and postpetition professionals' fees and expenses for one primary counsel and one

financial advisor to the ad hoc group of certain holders of First Lien Debt and Second Lien Notes

Debt ("(the "Ad Hoc Crossover Group")"), in each case as set forth in the applicable engagement

letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or

similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject

to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors'

Committee or any other party in interest), so long as the Ad Hoc Crossover Group holds not less

than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure

filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019.

        23.22.  *Adequate Protection of the Second Lien Notes Primed Parties*.

        (a)     Subject and subordinate to the Carve-Out in all respects, the Second Lien

Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the

Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, in an

amount equal to the aggregate diminution in the value, if any, of the Second Lien Notes Primed

Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition

Date, if any, including, without limitation, any such diminution resulting from the depreciation,

sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the

priming of the Second-Priority Liens of the Prepetition Second Lien Notes Primed Parties by the

DIP Liens pursuant to the DIP Documents and this InterimFinal Order and the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code (the "Second Lien Notes Primed

Parties Adequate Protection Claim").  In consideration of the foregoing, the Second Lien Notes

Primed Parties are hereby granted the following (collectively, the "Second Lien Notes Primed

Parties Adequate Protection Obligations" and, together with the Prepetition Domestic ABL

Primed Parties Adequate Protection Obligations, the Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations and the First Lien Notes Primed Parties Adequate Protection Obligations, the "Adequate Protection Obligations");

(b)    Prepetition Second Lien Notes Primed Parties Adequate Protection Liens. The Second Lien Notes Trustee (for itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this ~~Interim~~Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution in the value of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "Second Lien Notes Adequate Protection Liens" and, collectively with the Prepetition Domestic ABL Adequate Protection Liens and the Prepetition First-Priority Adequate Protection Liens, the "Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of th~~e~~is Final Order, the Avoidance Proceeds, in each case subject and subordinate to (i) the DIP Liens and any other liens that are senior to the DIP Liens, (ii) the Carve-Out, (iii) the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens and (iv) the Prepetition First-Priority Liens and Prepetition First-Priority Adequate Protection Liens;

(c)    Prepetition Second Lien Notes Primed Parties 507(b) Claim.    The Prepetition Second Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Second Lien Notes Primed Parties Adequate Protection Claim (the "Second Lien Notes Primed Parties 507(b) Claim" and, collectively with the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim and the First Lien Notes

Primed Parties 507(b) Claim, the "507(b) Claims")); which Second Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of theis Final Order, the Avoidance Proceeds. The Second Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims, and (iii) subordinate to the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim, and the First Lien Notes Primed Parties 507(b) Claims. Except to the extent expressly set forth in this InterimFinal Order or the DIP Credit Agreement, the Prepetition Second Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Second Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities.

(d)     The Second Lien Notes Trustee shall receive from the Debtors (pursuant to the schedule of fees in effect upon the appointment of the successor Second Lien Notes Trustee), for the benefit of the Second Lien Noteholders, current cash payments of the reasonable and documented fees and expenses of the Second Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented postpetition fees and expenses of one primary counsel to the Second Lien Notes Trustee only and no other professional, promptly upon the receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of the Second Lien Debt and/or disgorgement (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

61

24.23.  *Reservation of Rights of Prepetition Secured Parties.*  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that, subject to the terms of the ICAs, the Prepetition Secured Parties may request further or different adequate protection (a) following an Event of Default and expiration of the DIP Remedies Notice Period or Cash Collateral Notice Period, as applicable (but not beforehand) or (b) upon a material change in circumstances; *provided further, that* all parties' rights to contest such adequate protection requests are fully preserved.

25.24.  *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this InterimFinal Order.  Upon the request of the DIP Agent,

each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this ~~Interim~~Final Order may, in the discretion of the DIP Agent or the Prepetition First Lien Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this ~~Interim~~Final Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent or the Prepetition First Lien Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

~~26.~~25.   *Certain Events of Default*.  The occurrence of any the following events, unless waived in writing by the DIP Agent, shall constitute a DIP Event of Default and a Cash Collateral Event of Default:

~~(a)    the first business day that is 60 days after the entry of this Interim Order if the Final Order has not been entered by this Court on or before such date;~~

~~(b)~~(a)   if any of the Debtors, without the prior written consent of the DIP Agent seeks, proposes or supports, in each case pursuant to a pleading filed by the Debtors in the Court that is not withdrawn after three (3) days' notice by the DIP Agent or

Prepetition First Lien Agents to the Debtors, or if there is entered or confirmed (in each case, as applicable):

        i.        any modifications, amendments or extensions of this ~~Interim~~Final Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

        ii.        an order converting or dismissing any of the Chapter 11 Cases;

        iii.        an order appointing a chapter 11 trustee, receiver or an examiner with expanded powers in the Chapter 11 Cases;

        iv.        an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code~~:~~);

        v.        a plan of reorganization other than a plan that provides for the payment in cash in full of the DIP Obligations as of the effective date of such plan; or

        vi.        the sale of all or substantially all of the assets of the Debtors, which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made) upon the consummation thereof;

        vii.        subject to Paragraph 17(b) hereof and the last Paragraph of Section 8.01 of the DIP Credit Agreement (beginning, "Notwithstanding anything herein to the contrary (including Section 8.01(o) hereof), there shall be no Default or Event of Default arising from…"), reversal, vacatur, modification or stay of this ~~Interim~~Final Order ~~other than any modifications to implement the relief set forth in paragraph 18(b);~~.

(c)(b)    failure of the Debtors to pay the Adequate Protection Fees or the Adequate

Protection Interest Payments when due (subject to expiration of applicable grace periods,

if any);

(d)(c)    any other "Event of Default" under the DIP Documents that is not waived

by the Required DIP Lenders; or

(e)(d)    any material breach by any Debtor of any provision of this InterimFinal

Order or the Final Order, in each case, that is not cured within five (5) business days of

notice thereof (without duplication of any grace period under the DIP Credit Agreement).

27.26.    *Preservation of Rights Granted Under This InterimFinal Order.*    Subject in all

respects to Paragraph 27(e)26(e) hereof:

(a)    Other than the Carve-Out and other claims and liens expressly granted by

this InterimFinal Order or as permitted pursuant to the DIP Credit Agreement, absent the express

written consent of the DIP Agent (in its sole discretion) or the Prepetition Cash Flow Agent, no

claim or lien having a priority superior to or *pari passu* with those granted by this InterimFinal

Order to the DIP Agent and the DIP Lenders, the Prepetition Domestic ABL Secured Parties, the

Prepetition First-Priority Secured Parties, or the Second Lien Notes Secured Parties, respectively,

shall be granted or allowed while any of the DIP Obligations or the Adequate Protection

Obligations remain outstanding other than senior adequate protection liens permitted pursuant to

clause (ii) below.  Except as otherwise expressly provided in the DIP Credit Agreement or this

InterimFinal Order and set forth in **Exhibit A B** hereto, and subject to the Carve-Out in all

respects, the DIP Liens, the Adequate Protection Liens and the Contingent ABL Liens shall not

be: (i) subject or subordinate to any lien or security interest that is avoided and preserved for the

benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or

65

made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, other than adequate protection liens granted on account of liens that are senior to the DIP Liens pursuant to Paragraph ~~10~~9(b) in an amount not to exceed $15,000,000 in the aggregate; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and (iv) subject or subordinate to any intercompany or affiliate liens or security interests against the Debtors.

(b)    Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the Adequate Protection Liens and, prior to the Domestic ABL Discharge, the Contingent ABL Liens shall continue in full force and effect and shall maintain their priorities as provided in this ~~Interim~~Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this ~~Interim~~Final Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph 26 and otherwise in this ~~Interim~~Final Order.

(c)    If any or all of the provisions of this ~~Interim~~Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of the Carve-Out, any DIP Obligations, or

Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agents, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the Carve-Out, the DIP Liens, the Adequate Protection Liens or the Contingent ABL Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agent, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this ~~Interim~~Final Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this ~~Interim~~Final Order and the DIP Documents.

(d)    Except as expressly provided in this ~~Interim~~Final Order or in the DIP Documents, the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Contingent ABL Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this ~~Interim~~Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving

67

the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except with respect to the Collateral being sold to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this ~~Interim~~Final Order and the DIP Documents shall continue in these Chapter 11 Cases, ~~in any successor cases if these Chapter 11 Cases cease to be jointly administered~~ and in any superseding chapter 7 cases under the Bankruptcy Code, and the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Contingent ABL Liens, the 507(b) Claims and all of the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this ~~Interim~~Final Order and the DIP Documents shall continue in full force and effect until the indefeasible Payment in Full of all DIP Obligations ~~are indefeasibly paid in full in cash~~, as set forth herein and in the DIP Documents, and the termination of all remaining Commitments ~~have been terminated~~under the DIP Facilities.

(e)        Notwithstanding anything herein or in the DIP Credit Agreement to the contrary, there shall be no DIP Event of Default arising from: (i) the occurrence of a Cash Collateral Event of Default set forth in Paragraph ~~17~~16(b) or termination of the Debtors' consensual use of Cash Collateral, or (ii) in the event of such termination (A) any request by the Loan Parties seeking to use Collateral or Cash Collateral subject to the Primed Liens on a nonconsensual basis or (B) any order of the Court granting such request, in each case so long as the adequate protection requested by the Loan Parties or approved by the Court, as applicable, is

materially consistent with the adequate protection granted on account of the Primed Liens pursuant to the Orders or permitted herein.

28.27.  *Releases.*  Subject to the rights and limitations set forth in Paragraph 29, effective upon entry of the Interim Order28, each of the Debtors, and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of the (a) Existing Agreements or the transactions contemplated under such documents (subject to the Debtors' Retained Claims Challenge Period), and (b) as applicable, the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of

action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or availability of the liens of the Prepetition Secured Parties (including Avoidance Actions), subject to the Debtors' Retained Claims Challenge Period.

29.28.  *Effect of Stipulations on Third Parties*.

(a)    The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 43 and 298 of this InterimFinal Order (collectively, the "Stipulations") shall be binding on the Debtors, the Debtors' estates, and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period by: (x) the Creditors' Committee, if any; or (y) a party in interest with requisite standing other than the Creditors' Committee, if any, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee").  The Stipulations contained in this InterimFinal Order, shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, if any, or any other party in interest (including any Trustee) (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing, has duly filed an adversary proceeding or contested matter (each, a "Challenge") challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the Prepetition Debt or the Primed Liens or otherwise asserting or prosecuting any Avoidance Actions (each, a "Challenge") or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Secured Obligations or the Existing Agreements by no later than the latest of (i) sixty (60ninety

(90) days after the entry of the~~is~~ Final Order and (ii) any such later date agreed to in writing by the (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, as applicable, (the time period established by the latest of the foregoing clauses (i) and (ii) the "Challenge Period"); *provided*, *however*, that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any Trustee, commencing on the date of the occurrence of either of the events described in the foregoing (x) or (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding or contested matters; *provided* that~~,~~ nothing in this Paragraph 2~~9~~8 shall limit (or be deemed to limit) any of the Debtors' or any other party in interest's rights to seek disgorgement of adequate protection or recharacterization of adequate protection as being applied to principal, as applicable, or to seek a determination on the value of Prepetition Collateral securing any of the Prepetition Debt at any time.~~ If no Challenge is timely filed~~; *provided further* that should the Creditors' Committee file a motion with this Court seeking requisite standing and authority to pursue any challenge (with a draft complaint attached) (a "Standing Motion") prior to the expiration of the Challenge Period, the Challenge Period shall be tolled for the Creditors' Committee (and no other party) solely with respect to the claims or causes of action asserted in the complaint attached to the Standing Motion until the day on which the such Standing Motion is granted or denied by an order of this

Court.  If no Challenge is timely commenced prior to the expiration of the Challenge Period, without further order of this Court (x) the obligations in respect of the Prepetition Debt shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the Prepetition Secured Obligations shall not be subject to any other or further Challenge, including, without limitation, any Claims and Defenses, which shall be deemed to be forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (z) all of the findings, the Debtors' stipulations, waivers, releases, and affirmations set forth in Paragraphs 4 and 293 and 28 herein, shall be of full force and effect and forever binding upon the applicable Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any successor cases.  If any such Standing Motion or Challenge is timely filed or commenced, as applicable, prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this InterimFinal Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee, if any, and any other person or party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge and

(b) any Claims and Defenses not brought in a timely filed Challenge shall be forever barred; *provided* that, if and to the extent any Challenges to a particular Stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such Stipulation also shall be binding on the Debtors' estates and all parties in interest. Nothing in this ~~Interim~~Final Order vests or confers on any Person, including a Creditors' Committee ~~(if any)~~ or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

(b)     Notwithstanding anything herein to the contrary, any Claim, Challenge, or action by the Debtors on account of liens asserted with respect to the Retained Claims Collateral must be filed on or before the first Business Day (as defined in the DIP Credit Agreement) following two (2) months after the Petition Date (the "Debtors' Retained Claims Challenge Period"), or shall otherwise be waived, and all defenses of the Prepetition Secured Parties with respect to any such Claim, Challenge or action are expressly preserved; *provided* that such date may be extended by agreement of the Debtors, on the one hand and (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, on the other hand.  For the avoidance of doubt, any informal discovery or examination conducted pursuant to Bankruptcy Rule 2004 relating to the foregoing matters or claims shall not be deemed or construed to be a Challenge.

~~30.~~29.  *Expenses and Indemnification*.  All reasonable and documented out-of-pocket expenses (including but not limited to reasonable fees and expenses of legal advisors (which shall include the fees and expenses of counsel) and administrative fees and "seasoning fees," to the extent applicable, for the DIP Agent, in connection with the preparation, execution and

delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the DIP Credit Agreement and the DIP Documents, whether or not the DIP Facilities are successfully consummated, in connection with all collateral appraisals and field exams prepared or conducted by or on behalf of the DIP Agent, and in connection with the Chapter 11 Cases are to be paid by the Loan Parties pursuant to this Paragraph 3029, including for the avoidance of doubt, all reasonable and documented fees, costs and expenses of Davis Polk and Wardwell LLP, as primary counsel to the DIP Agent, local counsel in each applicable jurisdiction, conflicts counsel, to the extent necessary.

31.30.  In addition, the Loan Parties will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (with respect to legal fees and expenses, limited to the reasonable and documented out-of-pocket legal fees and expenses of one counsel for the DIP Agent) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities; *provided*, *however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the (x) gross negligence, bad faith or willful misconduct of such person (or their related persons) or (y) a material breach of the obligations of such person under the DIP Documents.

32.31.  *Payment of Fees and Expenses*.   The payment of the fees, expenses and disbursements pursuant to this InterimFinal Order (to the extent incurred after the Petition Date) shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by (i) the Debtors, (ii) counsel for the Debtors, (iii) counsel for the

Ad Hoc First Lien Group, (iv) the Creditors' Committee, (v) the U.S. Trustee, (vi) counsel for the DIP Agent, (vii) the Prepetition First Lien Agents, (viii) counsel for the Ad Hoc Crossover Group, and (ix) the Second Lien Notes Trustee (collectively, the "Notice Parties") (the "Review Period") of invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided,* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).  The Notice Parties may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that, payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto.

33.32.  *Limitation on Use of the DIP Facilities, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  Notwithstanding anything herein or in any other order of this Court to the contrary, neither the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, nor the Carve-Out (other than the Investigation Budget Cap) may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority,

75

extent or enforceability of any amount due under the DIP Documents, the Prepetition Secured Debt Documents or the liens or claims granted under this ~~Interim~~Final Order, the DIP Documents or the Prepetition Secured Debt Documents; (b) assert any Claims and Defenses (as defined below) or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) following the DIP Remedies Notice Period or Cash Collateral Notice Period (where the automatic stay has been lifted), as applicable, prevent, hinder or otherwise delay the DIP Agent's or the Prepetition First Lien Agents' assertion, enforcement, or realization on the Prepetition Collateral or the DIP Collateral, in accordance with the DIP Documents, the Prepetition Debt Documents or this ~~Interim~~Final Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or any of the Prepetition First Lien Agents or the Second Lien Notes Trustee hereunder or under the DIP Documents or the Prepetition Secured Debt Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court or otherwise permitted under the DIP Documents; *provided* that, notwithstanding anything to the contrary herein, the Debtors shall not be authorized to use the DIP Facilities or DIP Collateral to pay fees or expenses in excess of the Investigation Budget for the Creditors' Committee, ~~if any,~~ to investigate Claims and Defenses against the Prepetition Secured Parties or to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties; *provided further*~~,~~ that, for the avoidance of doubt, this Paragraph 32 (including, for the avoidance of doubt, the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to (x) seek recharacterization of adequate protection as being applied to

76

principal, or (y) seek to use Cash Collateral on a non-consensual basis after termination of the consensual use of Cash Collateral.

34.33.  *Limitation on Sierra Liability*.  Notwithstanding anything herein, the Final Order, or any of the DIP Documents to the contrary, Sierra's obligations with respect to the Intercompany Security Protocol (including with respect to any borrowings, fees, expenses, indemnities, or otherwise but not, for the avoidance of doubt, with respect to any claim against Sierra that does not arise under or in relation to the Intercompany Protocol) and any adequate protection granted by the Court against Sierra or its assets with respect to the First Lien Debt and the Second Lien Notes (whether pursuant to the Interim Order, the Final Order, or otherwise) shall be limited to: (a) an amount equal to funds actually disbursed, if any, from the Cash Pool Requirements Account in accordance with the Intercompany Security Protocol, (b) repayment of the Prepetition Foreign ABL Debt, as an obligation of Sierra subject to the Intercompany Security Protocol (as described below), and (c) any other intercompany loans created pursuant to the Intercompany Security Protocol.

35.34.  *Intercompany Security Protocol*.  Except as prohibited by local law, any credit support, guarantee, cash and/or cash equivalents (in each case, including proceeds of the DIP Financing, Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to or for the benefit of any Non-Debtor Subsidiary (either in the form of restricted payments, investments, intercompany advances, guarantees of obligations (including interest thereon), sale of assets, provision of services or otherwise (except for repayments of intercompany liabilities incurred in the ordinary course of business)), in excess of $2,000,000 in the aggregate (the "De Minimis Exception"), shall be lent to Sierra and evidenced by an intercompany note or intercompany ledger entry, in each case as is reasonably satisfactory to the

DIP Agent and the Debtors (the "Sierra Note/Receivable"), which shall be pledged (individually or pursuant to a global note issued by Sierra) to one or more intercompany lenders and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Sierra Documents") as Collateral to the DIP Agent for the benefit of the DIP Lenders and to the Prepetition Secured Parties as adequate protection.  The proceeds of each such investment shall be further transferred, in one or more steps, to the applicable Non-Debtor Subsidiary; each step of such transfer shall be evidenced by an intercompany unsecured note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Non-Debtor Subsidiary Note/Receivable"; together with the Sierra Note/Receivable, the "Intercompany Notes/Receivables"), with all such Intercompany Notes/Receivables accruing interest at the same rate as the DIP Facilities and which shall be payable in full in cash upon the maturity of the DIP Facilities.  The Sierra Notes/Receivables shall be secured by (i) 65% of the issued and outstanding Voting Stock (as defined in the DIP Collateral Agreement and including for this purpose, any instruments treated as equity for U.S. federal income tax purposes) of any Non-Debtor Subsidiary owned by Sierra, (ii) 100% of the issued and outstanding Equity Interests (as defined in the DIP Credit Agreement) in any Debtor Subsidiary owned by Sierra, and (iii) any Non-Debtor Subsidiary Note/Receivable held by Sierra.  All Non-Debtor Subsidiary Notes/Receivables held by Sierra shall be pledged in support of the Sierra Notes/Receivables (individually or pursuant to a global note issued by the applicable Non-Debtor Subsidiary to Sierra) and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Intercompany Security Protocol").   To the extent that local law limits the implementation of the foregoing and notwithstanding the fact that the Non-Debtor Subsidiary Notes/Receivables shall be unsecured obligations of the applicable Non-Debtor Subsidiaries, for

all purposes in connection with these Chapter 11 Cases (including, without limitation for purposes of creditor recoveries and value allocation in connection with these Chapter 11 Cases (including in connection with any chapter 11 plan or otherwise)), all Intercompany Notes/Receivables and amounts in respect of the De Minimis Exception (in each case whether documented or otherwise) shall be deemed to be secured obligations of Sierra or the applicable Non-Debtor Subsidiary, as applicable; the intent being to ensure that no creditor of the Debtors that asserts claims against Non-Debtor Subsidiaries on account of any claim against, obligation of, or transaction with, the Debtors (in respect of asserted joint and several liability or otherwise) unjustly benefits from the funding of Non-Debtor Subsidiaries through the use of proceeds of the DIP Facilities or Cash Collateral following the Petition Date.  The Debtors shall provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with advance notice (and shall use commercially reasonable efforts to provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with at least five (5) business days' advance notice) of any transfer or delivery of any credit support, guarantee, cash and/or cash equivalents by any Loan Party to or for the benefit of any Non-Debtor Subsidiary pursuant to this paragraph 34 that is not subject to the De Minimis Exception.

36.35.  *Loss or Damage to Collateral*.  Nothing in this InterimFinal Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or Prepetition

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent, the DIP Lenders and the Prepetition Secured Parties comply with their obligations under the DIP Documents and this ~~Interim~~Final Order and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

~~37.~~36.  *Reservation of Rights Under the ICAs*.  Except as expressly provided in ~~the Interim~~ this Final Order, nothing in this ~~Interim~~Final Order shall amend, modify or waive the terms or provisions of the ICAs~~.~~ and all parties' rights and remedies under the ICAs are preserved.

~~38.~~37.  *~~Interim~~Final Order Governs*.  In the event of any inconsistency between the provisions of th~~is~~e Interim Order, the Final Order, and the DIP Documents, the provisions of this ~~Interim~~Final Order shall govern.

~~39.~~38.  *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this ~~Interim~~Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and

assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided*, *however*, ~that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors).

~~40.~~39.  *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this ~~Interim~~Final Order or the DIP Documents, none of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; and (ii) ~~owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates~~; ~~and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).~~.

~~41.~~40.  *Master Proof of Claim*.  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Domestic ABL Agent, Prepetition Cash Flow Agent, 7.00% First Lien Notes Trustee, 9.00% First Lien Notes Trustee and Second Lien Notes Trustee is authorized to file in the

Debtors' lead chapter 11 case, *In re Avaya Inc., et al.,* Case No. 17-[   ] (   ), 10089 (SMB), a single, master proof of claim on behalf of the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties, 7.00% First Lien Notes Secured Parties, 9.00% First Lien Notes Secured Parties and the Second Lien Notes Secured Parties, as applicable, on account of any and all of their respective claims arising under the applicable Existing Agreements and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors, the (i) Prepetition Domestic ABL Agent and the Prepetition Domestic ABL Secured Parties, (ii) Prepetition Cash Flow Agent and Prepetition Cash Flow Secured Parties, (iii) 7.00% First Lien Notes Trustee and 7.00% First Lien Notes Secured Parties, (iv) 9.00% First Lien Notes Trustee and 9.00% First Lien Notes Secured Parties and (v) Second Lien Notes Trustee and Second Lien Notes Secured Parties, as applicable, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Existing Agreements, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amend to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this Paragraph 4140 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote

separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Domestic ABL Agent, Prepetition First Lien Agents, and Second Lien Notes Trustee, as applicable.

42.41.  *Information and Other Covenants*.  The Loan Parties shall comply in all material respects with the reporting requirements set forth in the DIP Credit Agreement, and shall provide copies of all such reporting to the Creditors' Committee, subject to confidentiality agreements no less restrictive than those in the DIP Credit Agreement with respect to such reporting.  The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the Cash Management Motion (as defined in the First Day Declaration) and any successor or final orders with respect thereto.

43.42.  *Insurance*.  To the extent that any of the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent, the Prepetition First Lien Agents or Second Lien Notes Trustee is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and <u>second</u>, to the payment of the Prepetition Debt.

44.43.  *Effectiveness*.  This InterimFinal Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable <u>nunc</u> <u>pro</u> <u>tunc</u> to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h),

6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this ~~Interim~~Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this ~~Interim~~Final Order.

45.44.  *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this ~~Interim~~Final Order.

46.45.  *Payments Held in Trust*.  Except as expressly permitted in this ~~Interim~~Final Order or the DIP Documents and subject to the Carve-Out in all respects, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this ~~Interim~~Final Order; *provided* that, prior to the Domestic ABL Discharge, the foregoing shall not apply to the receipt of ABL Priority Collateral (or any proceeds thereof to the extent not constituting Cash Flow Priority Collateral) by any Prepetition Domestic ABL Secured Party on account of its security interest in ABL Priority Collateral.

47.46.  *Credit Bidding*.  Upon entry of this ~~Interim~~Final Order and subject to the terms of the DIP Documents and the ICAs and to the right of the Creditors' Committee to seek entry of an order for cause pursuant to section 363(k) of the Bankruptcy Code: (i) the DIP Agent shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the

full amount of the DIP Obligations during any sale of the Loan Parties' assets (in whole or in part), including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); and (ii) subject to the ICAs in all respects, the Debtors acknowledge that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of their respective claims, including, for the avoidance of doubt, Adequate Protection Claims, if any, during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Secured Parties as of the Petition Date, including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)*; provided* that such relief will be binding on the Debtors' estates and all parties in interest upon entry of the Final Order.).

48.47.  *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, 6003(b), and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

49.48.  *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this InterimFinal Order.

50.49.  *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this InterimFinal Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

51.50.  *Choice of Law; Jurisdiction.*  The DIP Facilities and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by and construed and interpreted

in accordance with the laws of the State of New York, including without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and to the extent applicable, the Bankruptcy Code.   The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or DIP Documents.

52.    *Interim Borrowings*.  Notwithstanding anything herein to the contrary, the Loan Parties' borrowings under the DIP Credit Agreement shall not exceed $425,000,000 pending further order of the Court.

53.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2017 at _____ __.m. before this Court.

54.    *Objections*.    Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon  counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10021 (Attention: Jonathan S. Henes and Natasha Hwangpo) and 300 North LaSalle Chicago, Illinois 60654 (Attention: Patrick J. Nash and Ryan Preston Dahl),  counsel to the DIP Agent and Prepetition Cash Flow Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attention: Damian S. Schaible, Natasha Tsiouris, Aryeh E. Falk),  counsel to the Prepetition Domestic ABL Agent, Skadden, Arps, Slate, Meagher & Flom LLP, [ ], Chicago, IL [ ] (Attention: [  ]),  the U.S. Trustee [ ], New York, NY [ ] (Attention: [ ]), (e) counsel to the Ad Hoc First Lien Group, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036 (Attention: Ira S. Dizengoff and Philip C. Dublin), (f) counsel to the Ad Hoc Crossover Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY, 10036 (Attention: Kris M. Hansen and Sayan Bhattacharyya),and (g) any other

86

party that has filed a request for notices with this Court, in each case to allow actual receipt by the foregoing no later than _____, 2017 at 4:00 p.m., prevailing Eastern Time.

55.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under sections 506(c) and 552(b) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated: _____, 2017
        New York, New York

                                    _____
                                    THE HONORABLE [ ]STUART M.
                                    BERNSTEIN
                                    UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Exhibit B**

| | ABL Priority Collateral | Cash Flow Priority Collateral | L/C Cash Collateral | All other Collateral |
|---|---|---|---|---|
| **1st:** | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) |
| **2nd:** | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations |
| **3rd:** | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing Cash Pooling Obligations |
| **4th:** | • DIP Liens to the extent securing L/C Obligations | • DIP Liens to the extent securing Cash Pooling Obligations | • Prepetition Domestic ABL Adequate Protection Liens | • Prepetition Domestic ABL Adequate Protection Liens |
| **5th:** | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens |
| **6th:** | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens | • Prepetition Second-Priority Adequate Protection Liens |

**Exhibit BC**

## Retained Claims Collateral[1]

1. Each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399.

2. All intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing any of the foregoing, in each case registered or arising under non-U.S. law.

3. Assets of that certain Avaya Inc. Savings Restoration Plan held in  the Avaya Inc. Savings Restoration Plan Trust and maintained by Fidelity Management Trust Company ("Fidelity"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom.

4. Assets of that certain Avaya Inc. Deferred Compensation Plan effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by the Bank of New York, as Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom.

5. Assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom

6. Commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.).

7. Proceeds from the Debtors' insurance policies.

8. Owned real property identified on **Exhibit 1** attached hereto.

9. The Debtors' leasehold interests identified on **Exhibit 2** attached hereto.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the ~~Interim~~Final DIP Order to which this exhibit is attached as **Exhibit ~~B~~ C**.

**<u>Exhibit 1</u>**
[Owned Real Property]

| Owned Real Property Address | City | State | Country |
|---|---|---|---|
| 9650 Interport Drive | Shreveport | LA | USA |

\*      \*      \*      \*      \*

**<u>Exhibit 2</u>**
[Leased Real Property]

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 2601 Almeda Dr. aka 5425 Robin Hood Road | Norfolk | VA | USA |
| 1601 Veterans Memorial Highway | Islandia | NY | USA |
| 80 M Street SE | Washington | DC | USA |
| 12730 Fair Lakes Circle | Fairfax | VA | USA |
| Moberly Professional Park | Bentonville | AR | USA |
| 18201 Von Karmen Avenue | Irvine | CA | USA |
| 4655 Great American Parkway | Santa Clara | CA | USA |
| 8740 Lucent Boulevard | Highlands Ranch | CA | USA |
| 8744 Lucent Boulevard | Highlands Ranch | CA | USA |
| 12121 Grant Street | Thornton | CO | USA |
| 1300 West 120th Avenue | Westminster | CO | USA |
| 1250 Connecticut Ave., N.W. | Washington | DC | USA |
| 1000 NW 57th Court | Miami | FL | USA |
| 530 S. Main Street | Alpharetta | GA | USA |
| 1145 Sanctuary Parkway | Alpharetta | GA | USA |
| 30 South Wacker | Chicago | IL | USA |
| 2399 S. Finley Road | Lombard | IL | USA |
| 8321 W, 125th Street | Overland Park | KS | USA |
| 9150 Guildford Road | Columbia | MD | USA |
| 600 Technology Park Drive | Billerica | MA | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 225 South Sixth Street | Minneapolis | MN | USA |
| 10820 Sunset Office Drive | Sunset Hills | MO | USA |
| 14301 Josephine Street | Omaha | NE | USA |
| 8 Commerce Drive | Bedford | NH | USA |
| 211 Mount Airy Road | Baskin Ridge | NJ | USA |
| 770 Nesconset Highway | Nesconset | NY | USA |
| Two Penn Plaza | New York | NY | USA |
| 4001 E. Chapel Hill/Nelson Highway Nortel Gateway Court | Raleigh | NC | USA |
| 445 Hutchinson Avenue | Columbus | OH | USA |
| 14400 Hertz Quail Springs Pkwy | Oklahoma City | OK | USA |
| 161 Washington Street | Conshohocken | PA | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 11540 St. Charles Rock Road | Bridgeton | MO | USA |
| 1111 Freeport Parkway | Coppel | TX | USA |
| 1900 Firman Drive | Richardson | TX | USA |
| 8718 Carolina Boulevard | Clyde | TX | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 7580 North Dobson Road | Scottsdale | AZ | USA |
| 7183 South Union Park Avenue | Salt Lake City | UT | USA |
| 28223 Telegraph Road | Southfield | MI | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 4475 Pouncey Tract Road | Glen Allen | VA | USA |
| 8727 Philips Highway | Jacksonville | FL | USA |

\*       \*       \*       \*       \*

**Exhibit D**

| | Principal Amount[1] | Accrued Interest[2] | Total Obligations[3] | % of Total |
|---|---|---|---|---|
| B-3 Term Loan | $615,928,097 | $7,654,658 | $623,582,756 | 13.53% |
| B-4 Term Loan | 819,794 | 14,517 | 834,311 | 0.02% |
| B-6 Term Loan | 537,033,060 | 8,241,966 | 545,275,026 | 11.83% |
| B-7 Term Loan | 2,080,946,472 | 30,708,411 | 2,111,654,884 | 45.81% |
| 7% 1L Notes | 1,009,000,000 | 21,581,389 | 1,030,581,389 | 22.36% |
| 9% 1L Notes | 290,000,000 | 7,975,000 | 297,975,000 | 6.46% |
| **Total** | **$4,533,727,424** | **$76,175,941** | **$4,609,903,365** | **100.00%** |

**Notes**

1    Principal amount outstanding as of Petition Date of 1/19/2017

2    Accrued interest outstanding as of Petition Date of 1/19/2017

3    The amounts set forth herein are solely for the purposes of this Stipulation and Agreed Order and shall be without prejudice to the rights of any party to assert or challenge, subject to the terms of the Interim DIP Order and Final DIP Order, any claims arising under the First Lien Debt, the Prepetition Cash Flow Credit Agreement, the 7.00% First Lien Indenture and the 9.00% First Lien Indenture.

# EXHIBIT C

**Blackline Against Entered Interim Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) ~~(Joint Administration Requested)~~(Jointly Administered) |
| | ) |
| | ) |

~~INTERIM~~**FINAL** ORDER (I) AUTHORIZING DEBTORS
(A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) ~~AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b) AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)~~ AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507(b)

Upon the motion (the "Motion")[2] of Avaya Inc. (the "Company" or the "Borrower"),

Avaya Holdings Corp. ("Holdings"), Sierra Communication International LLC ("Sierra"), and

the other subsidiaries of the Company that are debtors and debtors-in-possession (collectively,

the "Subsidiary Guarantors"; collectively, with the Company and Holdings, the "Loan Parties";

and together, with Sierra, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"),

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

[2]    ~~Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion.~~

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the local bankruptcy rules for the Southern District of New York (the "Local Bankruptcy Rules"); and"), seeking, among other things:

A.    Notice of the Motion and the

A.    authorization for the Borrower to obtain postpetition financing (the "DIP Financing"), and for Holdings and the Subsidiary Guarantors (collectively the "Guarantors") to guarantee the Borrower's obligations in connection with the DIP Financing, consisting of a senior secured non-amortizing term loan facility (the "DIP Term Facility") in an aggregate principal amount up to $725,000,000, including an initial draw in the aggregate principal amount of $425,000,000 on an interim basis, a portion of which may be used to fund a cash collateralized letter of credit facility (the "DIP L/C Facility" and, together with the DIP Term Facility, the "DIP Facilities," and the letters of credit issued (or deemed issued) pursuant to the DIP L/C Facility, the "L/C Facility Letters of Credit") in an aggregate amount not to exceed $150,000,000, from Citibank, N.A. ("Citi"), acting as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the DIP Lenders (as defined below), all on the terms and conditions set forth in this Final Order and the DIP Documents (each as defined below), and arranged by Citigroup Global Markets Inc., Barclays Bank PLC and Deutsche Bank Securities Inc., as Joint Lead Arrangers and Bookrunners (collectively, the "Lead Arrangers").

B.    authorization for the Loan Parties to execute and enter into that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 24, 2017, by and among the Borrower, the Guarantors, the DIP Agent, the lenders from time to time party

2

thereto (including Citi as issuer under the DIP L/C Facility, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and the Lead Arrangers, a copy of which is attached hereto as **Exhibit A** (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement" and, collectively with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, including, without limitation, the Security Agreement (as defined in the DIP Credit Agreement), dated as of January 24, 2017, among the Loan Parties and the DIP Agent (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Collateral Agreement"), the "DIP Documents"), and to perform all such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the establishment by the Borrower of an account pursuant to Section 2.04(a) of the DIP Credit Agreement (the "Letter of Credit Account") under the sole and exclusive control of the DIP Agent, which Letter of Credit Account shall be funded by the Borrower with deposits of cash collateral (the "L/C Cash Collateral") as set forth in the DIP Credit Agreement;

C.     authorization for the Loan Parties to use proceeds of the DIP Financing and Cash Collateral (as defined below) on the terms and conditions set forth herein, simultaneously with the initial draw of $425,000,000 under the DIP Term Facility, (i)(A) to refinance all of the Prepetition Domestic ABL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible (which shall be deemed to have occurred, upon the expiration of the Challenge Period (as defined below) if no adversary proceeding or contested matter is timely and properly asserted, in accordance with Paragraph 28 hereof, with respect to the Prepetition Domestic ABL Debt or

3

against the Prepetition Domestic ABL Agent (as defined below) or the Prepetition Domestic ABL Lenders (as defined below), or if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Domestic ABL Secured Parties (as defined below) by order of a court of competent jurisdiction); *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Domestic ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this Final Order unless the Prepetition Domestic ABL Debt is reinstated) (the "Domestic ABL Discharge"), (B) subject to the Intercompany Security Protocol (as defined below), to loan funds to Sierra which shall be on-lent to certain of Sierra's direct and indirect subsidiaries in accordance with this Final Order, including to refinance all of the Prepetition Foreign ABL Debt (as defined below) in full, including interest and fees through the date of repayment (at the non-default contract rate), which refinancing shall be indefeasible (which shall be deemed to have occurred, upon the expiration of the Challenge Period if no adversary proceeding or contested matter is timely and properly asserted, in accordance with Paragraph 28 hereof, with respect to the Prepetition Foreign ABL Debt or against the Prepetition Foreign ABL Agent (as defined below) or the Prepetition Foreign ABL Lenders (as defined below), or if an adversary proceeding or contested matter is timely and properly asserted, upon the final disposition of such adversary proceeding or contested matter in favor of the Prepetition Foreign ABL Secured Parties by order of a court of competent jurisdiction); *provided* that, for the avoidance of doubt, interest shall cease to accrue on the Prepetition Foreign ABL Debt upon the repayment from the initial draw under the DIP Facilities as provided in this Final Order unless the Prepetition Foreign ABL Debt is reinstated) (the "Foreign ABL Discharge"); *provided* that the Loan Parties' indemnification, subrogation, contribution, and reimbursement rights with

respect to the Foreign Borrowers for the repayment of the Prepetition Foreign ABL Debt (the "Foreign ABL Repayment Rights"), pursuant to Section 3.01 of the U.S. Guaranty, dated as of June 4, 2015, among Avaya Inc., certain U.S. subsidiaries of Avaya Inc. and Citi, are fully preserved and shall be Collateral (as defined below), and (C) to immediately deem existing letters of credit under the Prepetition Domestic ABL Credit Facility (as defined below) and Prepetition Foreign ABL Credit Facility (subject to the Intercompany Security Protocol) to be issued under the DIP L/C Facility, (ii) to cash collateralize L/C Facility Letters of Credit, (iii) to fund the Cash Pool Requirements Account (as defined below), (iv) to pay obligations arising from or related to the Carve-Out (as defined below) and make disbursements therefrom, including by funding the Carve-Out Reserves (as defined below), (v) to pay Professional Fees (as defined below), (vi) to make adequate protection payments, (vii) to pay fees and expenses incurred in connection with the transactions contemplated hereby, and (viii) for general corporate purposes;

D.    authorization for the Loan Parties to continue to guarantee the obligations (the "Cash Pooling Obligations") of certain non-debtor subsidiaries of the Borrower that are "Group Companies" (as defined in the Cash Pooling Agreement) and that arise after the Petition Date (as defined below) pursuant to the Cash Pooling Agreement between Citibank and the Group Companies dated March 20, 2002 (the "Cash Pooling Agreement");

E.    authorization for the Borrower to establish and fund a segregated account with proceeds from the DIP Term Facility in an amount equal to $75,000,000 (the "Cash Pool Requirements Account"), which funds shall be available to the Borrower for disbursement through Sierra to any Group Company (as defined in the Cash Pooling Agreement) by deposit into any Currency Pool (as defined in the Cash Pooling Agreement) as needed (in the Borrower's

sole discretion) following a written request by the requesting Group Company to Borrower; *provided* that any disbursement from the Cash Pool Requirements Account to any Group Company through Sierra shall be subject to the Intercompany Security Protocol and, for the avoidance of doubt, funds held in the Cash Pool Requirements Account shall be used solely for the purposes of intercompany borrowing by any Group Company in accordance with the Intercompany Security Protocol[3] and shall not be available to general creditors of the Debtors' estates, whether pursuant to a chapter 11 plan or otherwise; *provided further* that any unused amounts in the Cash Pool Requirements Account shall be, subject to the Carve-Out, distributed to the DIP Agent upon maturity of the DIP Facilities in partial repayment of the DIP Obligations;

F.     until the irrevocable discharge of the Prepetition Domestic ABL Debt as hereinafter provided, the granting of adequate protection and contingent liens to the Prepetition Domestic ABL Agent for the benefit of the Prepetition Domestic ABL Lenders under or in connection with (i) the Amended and Restated Credit Agreement, amended and restated as of October 29, 2012, by and among the Company, Holdings, Citicorp USA, Inc., as Administrative Agent (in such capacity, the "Prepetition Domestic ABL Agent"), Citicorp North America, Inc., as Swing Line Lender, Citibank N.A., as L/C Issuer, and each lender from time to time party thereto (collectively, in such capacities, the "Prepetition Domestic ABL Lenders" and, together with the Prepetition Domestic ABL Agent, the "Prepetition Domestic ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Domestic ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Domestic ABL Credit Facility") and (ii) that certain Pledge

---

[3]    Any credit support, guarantee, cash and/or cash equivalents (in each case, out of the proceeds of the DIP Financing and Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to any direct or indirect subsidiary of the Borrower that is not a Debtor (a "Non-Debtor Subsidiary") and any transaction outside the ordinary course of business between any Loan Party, Sierra, or a Non-Debtor Subsidiary shall be subject to the Intercompany Security Protocol.

and Security Agreement, dated as of October 26, 2007, between the Borrower, Sierra Holdings Corp., the Prepetition Domestic ABL Agent and the pledgors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Domestic ABL Security Agreement" and, collectively with the Prepetition Domestic ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Domestic ABL Agreements"), whose liens and security interests with respect to the Cash Flow Priority Collateral (as defined below) are being primed by the DIP Liens (as defined below);

G.    the granting of adequate protection to the Prepetition Cash Flow Parties (as defined below) under or in connection with: (i) that certain Third Amended and Restated Credit Agreement, amended and restated as of December 21, 2012, by and among the Company, Holdings, Citibank, N.A. as Administrative Agent (in such capacity, the "Prepetition Cash Flow Agent"), Swing Line Lender and L/C Issuer, and the lenders and issuing banks party thereto from time to time (collectively, in such capacities, the "Prepetition Cash Flow Lenders" and, together with the Prepetition Cash Flow Agent, the "Prepetition Cash Flow Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Cash Flow Credit Agreement") and (ii) that certain Pledge and Security Agreement, dated as of October 26, 2007, between the Borrower, Sierra Holdings Corp., the Prepetition Cash Flow Agent and the other grantors party thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "Cash Flow Security Agreement" and, collectively with the Prepetition Cash Flow Credit Agreement and the mortgages and all other agreements and documentation executed in connection therewith, the

"Prepetition Cash Flow Agreements"), whose liens on and security interests in the Prepetition Collateral (as defined below) are being primed by the DIP Liens;

H.    the granting of adequate protection to (i) the 7.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of February 11, 2011 (the "7.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 7.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "7.00% First Lien Noteholders"), the "7.00% First Lien Notes Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and Notes Collateral Agent (in such capacities, the "7.00% First Lien Notes Trustee" and together with the 7.00% First Lien Noteholders, the "7.00% First Lien Secured Parties"), pursuant to which the Borrower issued 7.00% Senior Secured Notes due 2019, whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens, and (ii) the 9.00% First Lien Notes Parties (as defined below) under or in connection with that certain indenture, dated as of December 21, 2012 (the "9.00% First Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the 9.00% First Lien Notes Trustee (as defined below), for its benefit and for the benefit of the noteholders (in such capacities, the "9.00% First Lien Noteholders"), the "9.00% First Lien Notes Agreements" and, together with the 7.00% First Lien Notes Agreements, the "First Lien Notes Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent (in such capacities, the "9.00% First Lien Notes Trustee" and,

8

together with the 9.00% First Lien Noteholders, the "9.00% First Lien Notes Secured Parties" and, together with the 7.00% First Lien Notes Secured Parties, the "First Lien Notes Secured Parties"), pursuant to which the Company issued 9.00% Senior Secured Notes due 2019, whose liens on and security interests in the Prepetition Collateral are being primed by the DIP Liens;

I.       the granting of adequate protection to the Second Lien Notes Secured Parties (as defined below) under or in connection with that certain indenture, dated as of March 7, 2013 (the "Second Lien Notes Indenture" and, together with the security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Second Lien Notes Trustee (as defined below), for its benefit and for the benefit of the Second Lien Noteholders (in such capacities, the "Second Lien Noteholders"), the "Second Lien Notes Agreements" and, together with the Prepetition Domestic ABL Agreements, the Prepetition Cash Flow Agreements and the First Lien Notes Agreements, the "Existing Agreements"), by and among the Borrower, the guarantors party thereto, and The Bank of New York Mellon Trust Company, N.A. as Trustee and as Notes Collateral Agent, which was succeeded by Wilmington Savings Fund Society, FSB as Trustee and as Notes Collateral Agent[4] (in such capacities, the "Second Lien Notes Trustee" and, together with the Second Lien Noteholders, the "Second Lien Notes Secured Parties" and, together with the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties and First Lien Notes Secured Parties, the "Prepetition Secured Parties"), pursuant to which the Borrower issued 10.50% Senior Secured Notes due 2021, whose liens and security interests in the Prepetition Collateral are being primed by the DIP Liens;

---

[4]    Pursuant to that Agreement of Resignation, Appointment, and Acceptance, dated as of January 27, 2017 by and among Avaya, Inc., The Bank of New York Mellon Trust Company, N.A., and Wilmington Savings Fund Society, FSB.

J.      authorization for the Debtors to continue to use Cash Collateral and all other Prepetition Collateral in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of their Cash Collateral and the other Prepetition Collateral;

K.      subject to certain challenge rights set forth herein, approval of certain stipulations by the Debtors with respect to the Prepetition Debt (as defined below) and the claims, liens and security interests arising therefrom;

L.      subject to the Carve-Out in all respects, the grant of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Secured Parties payable from, and secured by liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on, all prepetition and postpetition property of the Loan Parties' estates (other than the Excluded Assets (as defined below)) and all proceeds thereof (including, subject only to and effective upon entry of this Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to (i) prior perfected liens that are not also Primed Liens (as defined below), if any, to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases and (ii) liens that are not also Primed Liens and to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases and that are perfected after the commencement of the Chapter 11 Cases to the extent permitted by section 546(b) of the Bankruptcy Code (the foregoing clauses (i) and (ii) together, the "Permitted Liens");

M.      subject only to and effective upon entry of this Final Order, the waiver of the Debtors' right to surcharge the Prepetition Collateral and the Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the

case" exception in section 552(b) of the Bankruptcy Code with respect to the Prepetition Debt (as defined below);

N.    modification of the automatic stay to the extent set forth herein and in the DIP Documents; and

O.    approval of the Intercompany Security Protocol (as defined below);

Interim Hearing having been served by the Debtors as set forth in the affidavit of service filed at [Docket No.   ], and and it appearing that notice was in the Debtors' belief, the best notice available under the circumstances; and the Court having reviewed the Motion; and the Interim Hearing having been held by this Court on January [__], 2017; and upon the record made by the Debtors in the Motion, the Koza *Declaration*, the Greene Declaration, the *First Day* Declaration and at the Interim Hearing, and after due deliberation and sufficient cause appearing therefor;

and the Court having reviewed the Motion; and the interim hearing on the Motion having been held by this Court on January 19, 2017 and January 23, 2017 (the "Interim Hearing"); and the Court having (i) entered the *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* [Docket No. 61] (the "Interim Order"); (ii) entered the *Stipulation and Agreed Order Regrading Certain Adequate Protection Payments* [Docket No. 137]; and (iii) scheduled the final hearing (the "Final Hearing") on the Motion to be held before this Court on February 8, 2017 at 10:00 a.m. (prevailing Eastern Time) to consider entry of an order granting the Motion on a final basis (this "Final Order"), which Final Hearing was adjourned to

March 3, 2017 at 10:00 a.m. (prevailing Eastern Time); and upon the initial draw under the DIP Facilities, the Debtors having refinanced all of the Prepetition Domestic ABL Debt and Prepetition Foreign ABL Debt in full; and notice of the Motion and the Final Hearing having been served by the Debtors on (a) the Office of the U.S. Trustee for the Southern District of New York (the "U.S. Trustee"); (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Agent; (d) counsel to the DIP Agent; (e) counsel to the Ad Hoc First Lien Group; (f) counsel to the Ad Hoc Crossover Group; (g) the Prepetition Cash Flow Agent; (h) counsel to the Prepetition Cash Flow Agent; (i) the Prepetition Domestic ABL Agent; (j) counsel to the Prepetition Domestic ABL Agent; (k) the 7.00% First Lien Notes Trustee; (l) counsel to the 7.00% First Lien Notes Trustee; (m) the 9.00% First Lien Notes Trustee; (n) counsel to the 9.00% First Lien Notes Trustee; (o) the Second Lien Notes Trustee; (p) counsel to the Second Lien Notes Trustee; (q) the United States Attorney's Office for the Southern District of New York; (r) the Internal Revenue Service; (s) the United States Securities and Exchange Commission; (t) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (u) the state attorneys general for states in which the Debtors conduct business; (v) counsel to the DIP Lenders; (w) all parties known, after reasonable inquiry, to have asserted a lien or security interest in the Debtors' assets; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002; and it appearing that notice was in the Debtors' belief, the best notice available under the circumstances; and the relief requested in the Motion being in the best interests of the Debtors, their creditors and their estates and all other parties-in-interest in these Chapter 11 Cases; and the Court having found and determined that the relief requested in the Motion is necessary to avoid immediate and irreparable loss and damage to the Debtors' estates; and the Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon the record made by the Debtors in the Motion, the *Declaration of Eric Koza in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "Koza Declaration"), the *Declaration of Samuel Greene in Support of the Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing Pursuant to U.S.C. §§105, 361, 364(c)(1), 364(c)(2),364(C)(3),and 364(d)(1), (B) Use Cash Collateral, (C) Grant Adequate Protection; (II) Scheduling a Final Hearing, and (III) Granting Related Relief* (the "Greene Declaration"), and the *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22] (the "First Day Declaration," together with the Koza Declaration and Greene Declaration, the "Declarations") and at the Interim Hearing and the Final Hearing; and after due deliberation and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Disposition*.  The relief requested in the Motion is granted on ~~an interim~~a final basis in accordance with the terms of this ~~Interim~~Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Final Order shall become effective immediately upon its entry.

13

2.    *Relief Necessary to Avoid Immediate and Irreparable Harm.*  The interim relief granted herein is necessary to avoid immediate and irreparable harm

2.    *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, the relief requested in the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    to the

3.    *Debtors' Stipulations*.  Without prejudice to the rights of any party in interest, (but subject in all respects to the limitations set forth in Paragraph 3(k) and Paragraph 28 herein) the Debtors admit, stipulate and agree that:

(a)    (i) as of January 19, 2017 (the "Petition Date"), the Borrower and the Guarantors were justly and lawfully indebted and liable to (A) the Prepetition Domestic ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $55,000,000 in respect of loans made and $44,292,130.77 in respect of letters of credit[5] issued by the Prepetition Domestic ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition Domestic ABL Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Domestic ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Domestic ABL Agreements (collectively, the "Prepetition Domestic ABL Debt"), which Prepetition Domestic ABL Debt has been guaranteed on a joint and several basis by all of the Guarantors, (B) the Prepetition Foreign ABL Secured Parties (as defined below), without defense, counterclaim or

---

[5]    Includes letters of credit issued in foreign currencies at January 1, 2017.

14

offset of any kind, in the aggregate principal amount of not less than $50,000,000 in respect of loans made and $22,690,539.65 in respect of letters of credit[6] issued by the Prepetition Foreign ABL Lenders pursuant to, and in accordance with the terms of, the Prepetition Foreign ABL Agreements (as defined below), which Prepetition Foreign ABL Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, (C) the Prepetition Cash Flow Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $3,234,727,423 in respect of loans made by the Prepetition Cash Flow Lenders pursuant to, and in accordance with the terms of, the Prepetition Cash Flow Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cash Flow Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Cash Flow Agreements (collectively, the "Prepetition Cash Flow Debt"), which Prepetition Cash Flow Debt has been guaranteed on a joint and several basis by all of the Guarantors, (D) the 7.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,009,000,000 in respect of notes issued to the 7.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 7.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 7.00% First Lien Notes Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the 7.00% First Lien Notes Agreements (collectively, the "7.00% First Lien Notes Debt"), which 7.00% First Lien Notes

---

[6]    Includes letters of credit issued in foreign currencies at January 1, 2017.

15

Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, (E) the 9.00% First Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $290,000,000 in respect of notes issued to the 9.00% First Lien Noteholders pursuant to, and in accordance with the terms of, the 9.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 9.00% First Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the 9.00% First Lien Notes Agreements (collectively, the "9.00% First Lien Notes Debt" and together with the Prepetition Cash Flow Debt and the 7.00% First Lien Notes Debt, the "First Lien Debt"), which 9.00% First Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors, and (F) the Second Lien Notes Secured Parties without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $1,384,000,000 in respect of notes issued to the Second Lien Noteholders pursuant to, and in accordance with the terms of, the Second Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Second Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the Second Lien Notes Agreements (collectively, the "Second Lien Notes Debt" and, together with the Prepetition Domestic ABL Debt, and the First Lien Debt, the "Prepetition Debt"), which Second Lien Notes Debt has been guaranteed on a joint and several basis by all of the Subsidiary Guarantors; (ii) the Prepetition Debt constitutes the legal, valid and binding obligations of the Borrower and the Guarantors or Subsidiary Guarantors, as applicable, enforceable in accordance with its terms

16

(other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (iii) no portion of the Prepetition Debt or any payments made to the Prepetition Secured Parties or applied to or paid on account of the obligations owing under the Existing Agreements prior to the Petition Date is subject to any contest, attack, rejection, recovery, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law;

(b)     the liens and security interests granted to the Prepetition Domestic ABL Secured Parties (the "Prepetition Domestic ABL Liens") pursuant to and in connection with the Prepetition Domestic ABL Agreements, are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the ABL Priority Collateral;[7] (ii) valid, binding, perfected, enforceable, second-priority liens and security interests in the Cash Flow Priority Collateral[8] (the "Cash Flow Priority Collateral" and, together with the ABL Priority Collateral, the "Prepetition Collateral"); (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is Cash Flow Priority Collateral, subject and subordinate to the Prepetition First-Priority Liens (as defined below);

(c)     the liens and security interests granted to the Prepetition Cash Flow Secured Parties, the 7.00% First Lien Notes Secured Parties, and the 9.00% First Lien Notes Secured Parties (collectively, the "Prepetition First-Priority Secured Parties") pursuant to and in

---

[7]     "ABL Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

[8]     "Cash Flow Priority Collateral" has the meaning specified in the ABL Intercreditor Agreement (as defined below).

connection with the Prepetition Cash Flow Agreements, the 7.00% First Lien Notes Agreements and the 9.00% First Lien Notes Agreements (the "Prepetition First-Priority Liens") are: (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, second-priority liens, and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense, or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, with respect to Prepetition Collateral that is ABL Priority Collateral, subject and subordinate to the Prepetition Domestic ABL Liens;

(d)      the liens and security interests granted to Second Lien Noteholders (the "Prepetition Second-Priority Liens" and, together with the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens, the "Primed Liens") pursuant to and in connection with the Second Lien Notes Agreements are: (i) valid, binding, perfected, enforceable, third-priority liens and security interests in the Cash Flow Priority Collateral; (ii) valid, binding, perfected, enforceable, third-priority liens and security interests in the ABL Priority Collateral; (iii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or Claim under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) as of the Petition Date, subject and subordinate to the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens;

(e)      the aggregate value of the ABL Priority Collateral exceeds the aggregate amount of the Prepetition Domestic ABL Debt;

(f)      the aggregate value of the Foreign ABL Collateral exceeds the aggregate amount of the Prepetition Foreign ABL Debt;

(g)     none of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Existing Agreements;

(a)(h)   the Debtors and their estates pending the Final Hearing. have no claims or causes of action against the Prepetition Secured Parties, with respect to either the Prepetition Debt or the Primed Liens;

(i)     each of (i) that certain First Lien Intercreditor Agreement dated as of February 11, 2011 among the Company, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee (collectively, the "Prepetition First Lien Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "First Lien Intercreditor Agreement") and (ii) the Amended and Restated Intercreditor Agreement dated as of October 29, 2012 among the Prepetition Domestic ABL Agent and the Prepetition Cash Flow Agent and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "ABL Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement, the "ICAs") are binding and enforceable against the Borrower and the Guarantors in accordance with their terms, and the Borrower and the Guarantors are not entitled to take any action that would be contrary to the provisions thereof;

(j)     all cash, securities, cash equivalents and other property of the Loan Parties (and the proceeds therefrom) as of the Petition Date, including, without limitation, all cash securities or other property (and the proceeds therefrom) and other amounts on deposit or

maintained by the Loan Parties in any account or accounts with any depository institution (collectively, the "Depository Institutions"), were subject to rights of set-off and valid, perfected, enforceable, first priority liens under the Existing Agreements and applicable law, for the benefit of the Prepetition Secured Parties. "Cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") includes, without limitation, all cash proceeds of the Prepetition Collateral (including cash on deposit at the Depository Institutions as of the Petition Date, securities or other property, whether subject to control agreements or otherwise, in each case that constitutes Prepetition Collateral); and

(k)    notwithstanding anything herein to the contrary, (a) the Debtors make no stipulation, and reserve all rights, with respect to the assets identified on **Exhibit C** attached hereto (collectively, the "Retained Claims Collateral"), including with respect to any liens asserted against the Retained Claims Collateral on account of the Prepetition Debt and (b) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal and/or to seek a determination on the value of the Prepetition Collateral securing the Prepetition Debt are fully reserved.  For the avoidance of doubt, and without limiting the foregoing, the Debtors' rights to challenge any lien (whether pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise) asserted by any party with respect to the Retained Claims Collateral are expressly preserved.

4._____*Findings Regarding the DIP Financing and Cash Collateral.* ~~The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral (as that term is defined by the Bankruptcy Code))~~

(a)_____Good and sufficient cause has been shown for the entry of this Final Order.

(b)_____The Debtors have an immediate need to obtain the DIP Financing and continue to use the Prepetition Collateral (including Cash Collateral) in order, among other things, to avoid the liquidation of these estates, and to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay adequate protection, to repay the Prepetition ABL Debt (as defined below), to fund the Cash Pool Requirements Account, to deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and to issue new letters of credit and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to avoid a liquidation and for the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)_____The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Agent and the

DIP Lenders, subject to the Carve-Out and the Permitted Liens, the DIP Liens and the DIP Superpriority Claims (as defined below) and incurring the Adequate Protection Obligations (as defined below), in each case, under the terms and conditions set forth in this Final Order and in the DIP Documents.

(d)    The Debtors have an immediate need to continue to guarantee, on a postpetition basis, the Cash Pooling Obligations and to establish and fund the Cash Pool Requirements Account in order to ensure the continuing operation of the Group Companies in the ordinary course and thereby help to preserve the value of the Debtors' equity interests in the Group Companies in the ordinary course for the overall benefit of the Debtors' estates and creditors.

(e)    Based on the Motion, the Declarations filed in support of the Motion, and the record presented to the Court at the Interim Hearing (including the Declarations) and the Final Hearing, the terms of the DIP Financing and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(f)    The Prepetition Secured Parties have consented or are deemed under the applicable ICA to have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral (solely in accordance with the terms of this Final Order and the DIP Documents), and the Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Final Order and the DIP Documents.

(b)(g)    The DIP Financing and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's-length among the Debtors, the DIP Agent, the DIP Lenders, and certain of the Prepetition Secured Parties and all of the Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: (i) all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents (the "DIP Loans"); (ii) any L/C Obligations (as defined in the DIP Credit Agreement); (iii) any Cash Management Obligations (as defined in the DIP Credit Agreement); (iv) any Hedging Obligations (as defined in the DIP Credit Agreement); (v) any Cash Pooling Obligations, to the extent provided herein; and (vi) any other Obligations (as defined in the DIP Credit Agreement, in each case owing to the DIP Agent, any DIP Lender or any of their respective banking affiliates (all of the foregoing in clauses (i) through (vi) collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code. in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.    The Prepetition Secured Parties have actednegotiated in good faith regarding the DIP Financing and the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations), in accordance with the terms and conditions of the DIP Documents and this Final Order, and the Prepetition Secured Parties (and their successors and assigns thereof),

and ) shall be entitled to the full protection protections afforded parties acting in "good faith" within the meaning of section 363(m) of the Bankruptcy Code. in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(h)    The Prepetition Secured Parties are entitled to the adequate protection provided in this Final Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion, the Declarations and on the record presented to the Court, the terms of the proposed adequate protection arrangements for the use of and diminution of value of the Prepetition Collateral (including the Cash Collateral), if any, are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral (including the Cash Collateral); *provided* that nothing in this Final Order or the other DIP Documents shall (w) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral, other than on the terms set forth in this Final Order and in the context of the DIP Financing authorized by this Final Order, (x) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (y) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties, subject to any applicable provisions of the ICAs, to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition Secured Parties; *provided further, however,* that in the event any request for new, different, or additional relief per clause (y), all parties' rights to oppose such relief are fully reserved.

(i)    Payment of the Prepetition ABL Debt reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(j)    The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Final Order and the DIP Documents are in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

4.5.    *Authorization of the DIP Financing and the DIP Documents.*

(a)    The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents, including the credit agreement substantially in the form attached to the Motion as **Exhibit B** (the "DIP Credit Agreement") and to pay

(a)    The Loan Parties are hereby authorized to execute, enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized pursuant to this Final Order to forthwith borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guarantee the Borrower's obligations with respect to such borrowings and letters of credit, up to an aggregate principal amount equal to $725,000,000 of term loans under the DIP Term Facility and full access to the issuance of up to $150,000,000 in letters of credit under the DIP L/C Facility, subject to any conditions and limitations under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, to refinance the Prepetition ABL Debt as provided herein and deem existing letters of credit under the Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility to be issued under the DIP L/C Facility and, in connection therewith, to fund the Letter of Credit Account as set forth in the DIP Credit Agreement, to fund the Cash Pool Requirements Account, to provide working capital for the Debtors, to pay adequate protection, for general corporate purposes, to pay interest, fees and

25

expenses in accordance with this Final Order and the DIP Documents, to fund the Carve-Out (including the Carve-Out Reserves), and to pay Professional Fees.  For the avoidance of doubt, the L/C Cash Collateral shall be funded with proceeds of the DIP Loans to the extent such proceeds have not been exhausted, and the DIP Liens in respect of the L/C Obligations shall not be subject or subordinate to any senior liens.

(b)      In furtherance of the foregoing and without further approval of this Court, each Loan Party is authorized to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees that may be reasonably required or necessary for or in connection with the Loan Parties' performance of their obligations under the DIP Financing, including as applicable and, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Documents;

(ii)      the continuation of the guarantee of the Cash Pooling Obligations on a postpetition basis;

(iii)      the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the requisite parties under the DIP Documents may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and any ordinary course fees paid in connection therewith) that do not (a) shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder, (b) increase existing fees or add new fees thereunder (excluding, for the

26

avoidance of doubt, any ordinary course amendment, consent or waiver fee), (c) amend, modify or supplement any events of default, termination provisions or provisions relating to asset sales (excluding, for the avoidance of doubt, any waiver of such provisions), or (d) modify Section 2.05 (Prepayments) of the DIP Credit Agreement in a manner adverse to the Debtors (such authorizations, amendments, waivers, consents or other modifications not requiring further approval of the Court, "Immaterial Amendments"), *provided* that the Debtors shall provide notice of any proposed Immaterial Amendment to counsel to the Creditors' Committee no less than three (3) business days prior to the effectiveness thereof;

(i)(iv)   the non-refundable payment to the DIP Agent, Lead Arrangers, or the DIP Lenders, as the case may be, of all fees (which fees shall be, and shall be deemed to have been, approved upon entry of this Final Order and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Credit Agreement (and in any separate letter agreements between any or all Debtors, on the one hand, and the DIP Agent and/or DIP Lenders, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time., including, without limitation, fees and expenses of the professionals retained by the DIP Agent and the DIP Lenders, in each case, as provided for in the DIP Documents, without the need to file retention motions or fee applications or to provide notice to any party;

(v)   the creation of intercompany loans in accordance with the Intercompany Security Protocol; and

(vi)    the performance of all other acts required under or in connection with the DIP Documents.

(b)(c)   Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Loan Parties, enforceable against each Loan Party thereto in accordance with their terms of the DIP Documents and this InterimFinal Order.   No obligation, payment, transfer or grant of security under the DIP Documents or this InterimFinal Order to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment, claim or counterclaim.

5.6.    *Payment of the Prepetition ABL Debt.*

(a)    The Debtors are hereby authorized and directed to use proceeds of the DIP Financing and Cash Collateral to, at the initial closing of the DIP Financing, pay in full in cash all obligations of the Borrower and Guarantors to the Prepetition Domestic ABL Lenders in respect of loans made and letters of credit issued pursuant to the Prepetition Domestic ABL Agreements, as provided in the Prepetition Domestic ABL Agreements (collectively, the "Prepetition Domestic ABL Debt") and, subject to the Intercompany Security Protocol, the Prepetition Foreign ABL Debt.[9]

---

[9]    "Prepetition Foreign ABL Debt" means the aggregate principal amount of obligations outstanding pursuant to, and in accordance with the terms of, the senior secured asset-based revolving credit facility made available to Avaya Canada Corp., Avaya UK, Avaya International Sales Limited, Avaya Deutschland GMBH and Avaya GMBH & CO. KG (collectively, the "Foreign Borrowers") pursuant to that certain Credit Agreement, dated as of June 4, 2015, by and among the Foreign Borrowers, the guarantors from time to time party thereto, Citibank, N.A. as Administrative Agent and L/C Issuer (the "Prepetition Foreign ABL Agent"), Citibank, N.A., Canadian Branch as Canadian Swing Line Lender, Citibank, N.A., London Branch as European Swing Line Lender, and the other lenders from time to time party thereto (the "Prepetition Foreign ABL Lenders" and together with the Prepetition Foreign ABL Agent, the "Prepetition Foreign ABL Secured Parties") (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Prepetition Foreign ABL Credit Agreement" and such credit facility thereunder, the "Prepetition Foreign ABL

(b)(a)   The liens and security interests granted to the Prepetition Domestic ABL Secured Parties pursuant to and in connection with the Prepetition Domestic ABL Agreements (the "Prepetition Domestic ABL Liens") shall be automatically released and terminated upon the Domestic ABL Discharge. _Until then, subject to the terms and conditions contained in this InterimFinal Order, (including, without limitation, the DIP Liens granted hereunder and the Carve-Out), any and all prepetition or postpetition liens and security interests (including, without limitation, any adequate protection replacement liens at any time granted to the Prepetition Domestic ABL Secured Parties) by this Court) that the Prepetition Domestic ABL Secured Parties have or may have in the Prepetition Collateral or any other assets and properties of the Debtors and their estates shall (i) continue to secure the unpaid portion of any Prepetition Domestic ABL Debt (including, without limitation, any Prepetition Domestic ABL Debt subsequently reinstated after the repayment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition Domestic ABL Debt shall not have been avoided) and (ii) be junior and subordinate in all respects to (A) the Carve-Out, (B) valid, perfected, unavoidable and senior liens in existence immediately prior to the Petition Date, and (C) otherwise ordered in the priorities set forth on **Exhibit A** attached heretowith respect to the Cash Flow Priority Collateral, the DIP Liens, the Prepetition First-Priority Liens, the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens (as defined below) and the First Lien Notes Primed Parties

---

Credit Facility") and the other Loan Documents (as defined in the Prepetition Foreign ABL Credit Agreement and, collectively with the Prepetition Foreign ABL Credit Agreement, and the mortgages and all other agreements and documentation executed in connection therewith, the "Prepetition Foreign ABL Agreements"), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Foreign ABL Agreements), charges, indemnities and other obligations incurred in connection therewith (whether arising before or after the Petition Date) as provided in the Prepetition Foreign ABL Agreements.  The Prepetition Foreign ABL Debt, together with the Prepetition Domestic ABL Debt shall be collectively referred to herein as "Prepetition ABL Debt."

Adequate Protection Liens (as defined below) granted under this Final Order and the Existing Agreements (such liens and security interests of the Prepetition Domestic ABL Secured Parties are hereinafter referred to as the "Contingent ABL Liens", and any such unpaid or reinstated Prepetition Domestic ABL Debt described in clause (i) of this sentence is hereinafter referred to as the "Contingent Prepetition ABL Debt").

(c)(b)    For the avoidance of doubt, the repayment of the Prepetition Domestic ABL Debt and the Prepetition Foreign ABL Debt shall be conditional and subject to disgorgement, in whole or in part, pending occurrence of the Domestic ABL Discharge and the occurrence of the Foreign ABL Discharge, respectively.

6.7.    *Carve-Out.*

(a)    The "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success or transaction fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any committee of unsecured creditors (the "Creditors' Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day (as defined in the DIP Credit Agreement) following delivery by the DIP Agent of a written notice delivered by email

(or other electronic means) to the DIP Lenders, the Debtors, their lead restructuring counsel, the United States Trustee, counsel to the Ad Hoc First Lien Group, counsel to the Ad Hoc Crossover Group, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an "Event of Default" under the DIP Credit Agreement (a "DIP Event of Default") and acceleration of either DIP Facilities stating that the Post-Carve-Out Trigger Notice Cap (as defined below) has been invoked (the "Carve-Out Trigger Notice"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, subject to an investigation budget cap of (x) $250,000 with respect to Professional Fees to be incurred by the Creditors' Committee and (y) $150,000 with respect to Professional Fees to be incurred by the Debtors solely with respect to the Retained Claims Collateral, under the investigation budget (collectively, the "Investigation Budget Cap"); and (iv) Professional Fees in an aggregate amount not to exceed $20,000,000 incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii) or (iv) above, on any grounds.

(b)    On the day on which a Carve-Out Trigger Notice is given by the DIP Agent as set forth herein (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand (including Cash Collateral) as of such date and any available cash thereafter held by any Loan Party to fund a reserve in an amount equal to the then accrued and unpaid amounts of the Professional Fees.

(c)      The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims (including the DIP Superpriority Claims).  On the Termination Declaration Date, the Debtors shall be required to deposit in a segregated account at the DIP Agent an amount equal to the Post Carve-Out Trigger Notice Cap and hold in trust to pay such Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.

(d)      All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth in Paragraph 7(a) (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition Secured Parties under the Existing Agreements on a pro rata basis in accordance with their rights and priorities as of the Petition Date, including the ICAs.

(e)      All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth in Paragraph 7(a) (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the

32

DIP Lenders, unless the DIP Facilities have been indefeasibly paid in full, in cash, all commitments under the DIP Facilities have been terminated and the L/C Facility Letters of Credit have been cash collateralized at a rate of 105% of the face amount thereof, in which case any such excess shall be paid to the Prepetition First Lien Agents to be paid to the Prepetition Secured Parties under the Existing Agreements in accordance with their rights and priorities as of the Petition Date, including the ICAs.

(f)    Notwithstanding anything herein, the DIP Documents, or the Final Order to the contrary: (i) if any Carve-Out Reserve is not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Agent or the Prepetition First Lien Agents, as applicable; (ii) following delivery of a Carve-Out Trigger Notice, the DIP Agent and the agents under the Prepetition Debt shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded or unless the proceeds of such sweep or foreclosure are applied immediately to fund the Carve-Out Reserves, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent or the Prepetition First Lien Agents for application in accordance with this Final Order; (iii) disbursements by the Debtors from the Carve-Out Reserves shall not constitute term loans under the DIP Facilities or increase or reduce the balance of DIP Superpriority Claims outstanding; (iv) the failure of the Carve-Out Reserves to satisfy, in full, the Professional Fees shall not affect or impair the priority of the Carve-Out; and (v) in no way shall any of the Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any

budget or financial projection delivered in connection with this Final Order or the DIP Facilities be construed as a cap or limitation on the amount of the Professional Fees due and payable by, or that may be administrative claims allowed against the Debtors or their estates.

(g)    Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.  Any payment or reimbursement made on a final basis on or after the occurrence of the Termination Declaration Date in respect of any Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

(h)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, other than the investigation of such claims by the Creditors' Committee prior to the delivery of a Carve-Out Trigger Notice and subject to the Investigation Budget Cap, (i) against any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Existing Agreements, including, in each case without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the DIP Lenders or the DIP Agent with respect to the DIP Facilities; (c) preventing, hindering, or delaying any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral once a DIP Event of Default has occurred after the DIP Remedies Notice Period (as defined below),

(d) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the obligations under or in respect of (i) the DIP Facilities, the Prepetition Domestic ABL Credit Facility, the Prepetition Cash Flow Credit Facility, the First Lien Notes Agreements or the Prepetition Second Lien Agreements, (ii) the liens securing the DIP Facilities or the Primed Liens; (iii) any other rights or interest of any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties following the occurrence of a DIP Event of Default (as defined below) and after the DIP Remedies Notice Period, or (e) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any Avoidance Actions (as defined below) against the DIP Agent, any DIP Lender, any Prepetition Secured Party or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, each in their capacities as such; *provided* that, for the avoidance of doubt, this Paragraph 7 (including, for the avoidance of doubt, the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal.

(c)(i)   For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities (including the DIP Superpriority Claims and the DIP Liens) and any adequate protection (including any liens and claims granted on account of the Adequate Protection Obligations); *provided* that, the Carve-Out shall not apply to the L/C Facility Letters of Credit or any cash (or cash equivalent or similar) collateral pledged in support thereof (including, in all respects, the Letter of Credit Account and all amounts credited thereto).

7.8.    *DIP Superpriority Claims.*  Subject in all respects to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed

superpriority administrative expense claims against the Loan Parties (without the need to file any proof of claim) with priority over any and all claims against the Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "DIP Superpriority Claims") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, effective upon entry of theis Final Order, Avoidance Proceeds), subject only to the liens on such property and the Carve-Out.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this InterimFinal Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.9.    *DIP Liens*.  As security for the DIP Obligations, subject and subordinate in all respects to the Carve-Out, effective and perfected upon the date of this InterimFinal Order and without the necessity of the execution, recordation or filing by the Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any Collateral, the following security interests and liens are hereby granted to the DIP Agent for its own benefit and the benefit of the DIP Lenders (all such liens and security interests granted to the DIP Agent, for

its benefit and for the benefit of the DIP Lenders, pursuant to this ~~Interim~~Final Order and the DIP- Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens upon all Collateral, to the extent such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or valid and non-avoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code ("Unencumbered Property");

(b)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, valid, binding, continuing, enforceable, fully-perfected junior security interests in and liens on the Collateral, to the extent such Collateral is subject to (x) valid, perfected and non-avoidable liens as of the Petition Date ~~or~~to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases or (y) valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that are perfected as permitted by section 546(b) of the Bankruptcy Code and to which the Primed Liens are junior at the time of the commencement of the Chapter 11 Cases, other than:

(i)    ~~the liens and security interests granted to~~ the Prepetition First-Priority ~~Secured Parties pursuant to and in connection with the Prepetition Cash Flow Agreements, the 7.00% First Lien Notes Agreements and the 9.00% First Lien Notes Agreements (the "Prepetition First-Priority~~ Liens"~~)~~;~~,~~ *provided* that~~,~~ DIP Liens securing Cash

Pooling Obligations shall be subordinate to the Prepetition First-Priority Liens on Cash Flow Priority Collateral;

(ii)    prior to the Domestic ABL Discharge, and solely with respect to (A) Cash Flow Priority Collateral and (B) ~~the~~ L/C Cash Collateral (*provided,* that any funds deposited in the Letter of Credit Account shall be deemed to be funded from proceeds of the DIP Loans to the extent such proceeds have not been exhausted), the Prepetition Domestic ABL Liens; and

~~(iii)    the liens and security interests granted to Second Lien Noteholders pursuant to and in connection with the Second Lien Notes Agreements (the "Prepetition Second-Priority Liens" and, together with the Prepetition Domestic ABL Liens and the Prepetition First-Priority Liens, the "Primed Liens"); *provided that*, for the avoidance of doubt, the Primed Liens shall not include any liens of any other creditor or group of creditors that has not consented to the relief provided by this Order (including by participating in the DIP Facility and/or consenting to the Debtors' use of its Cash Collateral);~~

(iii)    the Prepetition Second-Priority Liens;

(c)    <u>Priming Liens</u>.

(i)    Pursuant to section 364(d)(1) of the Bankruptcy Code, and subject and subordinate in all respects to the Carve-Out, a valid, binding, continuing, enforceable, fully-perfected priming senior security interests in and liens upon the Collateral ~~which security interests and liens shall prime the Primed Liens except.~~ Except as set forth in the foregoing ~~clause~~ subparagraph (b)~~,~~ the DIP Liens shall prime the Primed Liens in accordance with the priorities shown in **Exhibit ~~A~~ B** attached hereto (the "Priming Liens");

(ii)    Notwithstanding anything herein to the contrary, the Priming Liens (a) shall be subject and junior to the Carve-Out in all respects, (b) shall be junior to liens that are senior to the Primed Liens (unless such liens are themselves Primed Liens), (c) shall be senior in all respects to the Primed Liens, (d) shall be senior in all respects to liens and (d security interests that are junior to the Primed Liens and (e) shall also be senior to any liens granted after the Petition Date to provide adequate protection with respect of any of the Primed Liens.   The Primed Liens shall be primed by and made subject and subordinate to the Carve-Out and the Priming Liens, but the Priming Liens shall not prime perfected liens, if any, to which the Primed Liens are subject at the time of the commencement of the Chapter 11 Cases or liens to which the Primed Liens are subject and that are perfected after the commencement of the Chapter 11 Cases to the extent permitted by section 546(b) of the Bankruptcy Code (in each case, other than the Carve-Out and any such liens that are themselves Primed Liens);

(d)    Relative Priority of Liens.   Notwithstanding anything to the contrary in this InterimFinal Order or the DIP Documents, the relative priority of each DIP Lien granted in this Paragraph 9, the Primed Liens, the Contingent ABL Liens, and the Adequate Protection Liens, shall be as set forth in **Exhibit A B** attached hereto; *provided* that, for the avoidance of doubt, each such lien shall be subject and subordinate to the Carve-Out in all respects;

9.    *Collateral.*

(e)    Excluded Assets. Notwithstanding anything to the contrary in this Final Order or the DIP Documents, the Collateral shall not include (i) any claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"), (ii) any Excluded Asset (as defined in the DIP Collateral Agreement), (iii) the Cash Pool Requirements Account, (iv) any Excluded Security (as

defined in the DIP Collateral Agreement), (v) leased (not owned) real property, (vi) prior to entry of this Final Order, any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code, (vii) any equity interests in Sierra in excess of 65% of the equity interests issued and outstanding, and (viii) proceeds of any of the foregoing, but only to the extent such proceeds would otherwise independently constitute "Excluded Assets" under clauses (i) – (vii) (it being understood that subject only to and effective upon entry of this Final Order, the Collateral shall include any proceeds or property recovered, unencumbered or otherwise from successful Avoidance Actions, whether by judgment, settlement or otherwise (collectively, the "Avoidance Proceeds")) (the assets described in the foregoing clauses (i) through (viii), the "Excluded Assets").

(a)    *Collateral*.  For purposes of this ~~Interim~~Final Order, "Collateral" shall mean all property, other than Excluded Assets ~~(as defined in the DIP Credit Agreement),~~, whether now owned or hereafter acquired or existing and wherever located, of each Loan Party and each Loan Party's "estate" (as created pursuant to Bankruptcy Code section 541(a)), of any kind or nature whatsoever~~.~~

~~10.    For purposes of this Interim Order, "Excluded Asset" means (i) any amount in excess of 65% of the equity interests in any non-US subsidiary of a Debtor, (ii) any leasehold interest of a Debtor, (iii) "avoidance actions" under chapter 5 of the Bankruptcy Code, (iv) the Cash Pool Requirements Account, (v) any escrow, fiduciary, or trust accounts, (vi) intellectual property of the Debtors, to the extent the assignment or a creation of a lien thereon would cause the Debtors to forfeit their rights thereunder (except insofar as such provision causing forfeiture is overridden by the Bankruptcy Code or other applicable law), and (vii) any other assets of the Debtors' estates to the extent that a pledge or creation of a lien on such assets would violate~~

applicable non-bankruptcy law, except insofar as such law is overridden by the Bankruptcy Code or other applicable law.

10.      , real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash (whether maintained with the DIP Agent or otherwise), Intercompany Notes/Receivables (excluding any Non-Debtor Subsidiary Note/Receivable held by a Non-Debtor Subsidiary other than Sierra), the Foreign ABL Repayment Rights, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock held by each Debtor, other equity or ownership interests, including, without limitation, equity interests in subsidiaries (including non-wholly owned and Non-Debtor Subsidiaries), money, investment property and upon entry of this Final Order, any proceeds of Avoidance Actions, the proceeds, products rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing.

11.      *Maintenance of Letters of Credit*.  To the extent permitted by the DIP Documents, the Loan Parties are authorized to maintain and renew letters of credit issued or deemed issued under the DIP Credit Agreements on an uninterrupted basis and to take all actions reasonably appropriate with respect thereto on an uninterrupted basis.

11.12.  *Protection of DIP Lenders' Rights.*

(a)    Until the indefeasible Payment in Full (as defined in the DIP Credit Agreement) of all DIP Obligations and the termination of all remaining Commitments (as defined in the DIP Credit Agreement) under the DIP Facilities, the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Existing Agreements or this InterimFinal Order, or otherwise seek to exercise or enforce any rights or remedies against Collateral, including in connection with the Contingent ABL Liens or the Adequate Protection Liens except to the extent authorized by an order of this Court; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, any Collateral, to the extent such transfer, disposition, sale or release is authorized under the DIP Documents (as in effect on or about the entry of this Interim Final Order); and (iii) deliver or cause to be delivered, at the Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agent or the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of such Collateral subject to any sale or disposition or, solely with respect to the Prepetition Domestic ABL Secured Parties, in connection with the Domestic ABL Discharge.  Upon the Domestic ABL Discharge, the Debtors are authorized to file any termination statements, releases, or documents necessary to effectuate and/or evidence the release and termination of the Prepetition Domestic ABL Secured Parties' liens on or security interests in any portion of the Collateral.

(b)    To the extent the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent or any other Prepetition Secured Party (i) has possession of any Prepetition Collateral or Collateral or has control with respect to any Prepetition Collateral or Collateral, and

42

(ii) has consented to, or is deemed to have consented to, the relief provided in this Paragraph 10(b)12(b) (including, for the avoidance of doubt, by participating in or not objecting to the DIP Facility and/or consenting to, being deemed to have consented to, or not objecting to the Debtors' use of its Cash Collateral),) then such Prepetition Secured Party shall be deemed to maintain such possession or exercise such control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders and shall comply with the instructions of the DIP Agent with respect to the exercise of such control and the DIP Agent agrees, and shall be deemed, without incurring any liability or duty to any party, to maintain possession or control of any Prepetition Collateral in its possession or control as gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Prepetition Secured Parties with respect to bank accounts.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents and this Interim Order and (i) immediately upon the occurrence of a DIP Event of Default and concurrently with delivery of the Carve-Out Trigger Notice, declare (A) the termination, reduction or restriction of any further Commitment (as defined in the DIP Credit Agreement) to the extent any such Commitment remains and (B) all Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors and (ii) unless the Court orders otherwise during the DIP Remedies Notice Period (as defined below), upon the occurrence of a DIP Event of Default and the giving of five calendar days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) (the "DIP Remedies Notice Period") (extended to the next business day if

such five calendar day period shall expire on a day that is not a business day) via email to counsel to the Prepetition Cash Flow Agent, the Debtors, and counsel to the Debtors (and, upon receipt, the Debtors shall promptly provide a copy of such notice to counsel to the Creditors' Committee and, the U.S. Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group) to (A) foreclose on any of the Collateral and (B) exercise all other rights and remedies provided for in under the DIP Documents, this Final Order and under applicable law.

(d)    No rights, protections or remedies of the DIP Agent or the DIP Lenders granted by the provisions of this Interim Final Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party

12. 13.    *Marshaling.*    Subject to the entry of the Final Order, none None of the DIP Collateral, the DIP Lenders, the DIP Agent, the Prepetition Collateral, the Adequate Protection Liens or the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine, and all proceeds thereof shall be received and used in accordance with this Interim Order Final Order; *provided, however,* that the Prepetition Secured Parties, DIP Agent and the DIP Lenders shall use commercially reasonable efforts to first use all DIP Collateral or Prepetition Collateral other than Avoidance Proceeds to repay the DIP Obligations or Adequate Protection Obligations, as applicable.  Further, subject only to and effective upon

entry of this Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition Secured Parties.

14.     *Limitation on Charging Expenses Against Collateral.*  Effective upon entry of this Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition Domestic ABL Agent (prior to the Domestic ABL Discharge) or the Prepetition Cash Flow Agent (at the direction of the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement)), as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, the Prepetition Domestic ABL Agent or the Prepetition Cash Flow Agent, and nothing contained in this Final Order shall be deemed to be a consent by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.15.  *Payments Free and Clear.*  Subject in all respects to the Carve-Out, any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or First Lien Agents on behalf of the Prepetition First-Priority Secured Parties pursuant to the provisions of this InterimFinal Order, the Final Order, or the DIP Documents shall be received free and clear of any claim, charge, assessment or other liability.

14.    *Use of Cash Collateral.*

(a)    The Debtors are hereby authorized, subject to the terms and conditions of this ~~Interim~~Final Order (including Paragraph 1~~6~~7 hereof), to use all Cash Collateral, and the Prepetition Secured Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them.

16.    ; *provided* that the Prepetition Secured Parties are granted the adequate protection as hereinafter set forth, and so long as no Cash Collateral Event of Default shall have occurred and be continuing.  For purposes of this Final Order, the term "Cash Collateral Event of Default" shall mean~~,~~:

~~(b)~~(a)  unless waived by the Prepetition Cash Flow Agent with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, a DIP Event of Default~~.~~;

(b)    the failure of any of the following to occur:

(i)    the filing of a chapter 11 plan that is acceptable to the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement), on the one hand, and the Debtors, on the other hand (an "Acceptable Plan"), and disclosure statement with respect to the Acceptable Plan (the "Disclosure Statement") with this Court within 150 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have filed the Acceptable Plan and Disclosure Statement;

(ii)    entry by this Court of an order approving the Disclosure Statement within 180 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court shall have entered an order approving the Disclosure Statement;

(iii)    entry by this Court of an order confirming the Acceptable Plan within 250 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Court has entered an order confirming the Acceptable Plan;

(iv)    consummation of the Acceptable Plan within 270 days of the Petition Date, unless prior to delivery of a Cash Collateral Adequate Protection Notice, the Debtors have consummated the Acceptable Plan; or

(c)    any Cash Collateral Event of Default set forth in Paragraph 25.

17.    *Termination of Use of Cash Collateral.*

~~(c)~~(a)    Promptly upon delivery of a written notice of a Cash Collateral Event of Default (a "Cash Collateral Adequate Protection Notice") from the Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement, to (i) the Debtors, (ii) counsel for the other Prepetition First Lien Notes Agents, (iii) ~~ ~~ counsel to the Ad Hoc First Lien Group, (iv) counsel to the Ad Hoc Crossover Group, (iv) the Creditors' Committee, ~~if any,~~ and (v) the U.S. Trustee, the Debtors shall seek an expedited hearing (a "Cash ~~ ~~ Collateral Hearing") with the Court to consider the Debtors' use of Cash Collateral on a non-consensual basis.  ~~The~~Following delivery of a Cash Collateral Adequate Protection Notice in accordance with this Paragraph 17(a), the Debtors' right to use Cash Collateral shall continue until the later of (x) a ruling from the Court in respect of the Cash Collateral Hearing or (y) such time as otherwise agreed to by the ~~parties~~Prepetition Cash Flow Agent, with the consent of the "Required Lenders" under the Prepetition Cash Flow Credit Agreement.

(b)    For the avoidance of doubt, and notwithstanding anything herein to the contrary, the occurrence of a Cash Collateral Event of Default pursuant to Paragraph 16(b) through 16(b)(iv) hereof, shall (i) not constitute a default with respect to the DIP Facilities or a

DIP Event of Default, and (ii) the occurrence and pendency of a Cash Collateral Event of Default shall not cause the Debtors to be prohibited from using the cash proceeds from the DIP Facilities and Collateral securing the DIP Facilities (other than Cash Collateral) except as expressly set forth in this Final Order and the DIP Documents.

15.18.  *Contingent Liens and Adequate Protection of Prepetition Domestic ABL Secured Parties*.  Subject in all respects to the Carve-Out, until the occurrence of the Domestic ABL Discharge, the Prepetition Domestic ABL Secured Parties are entitled to (x) the Contingent ABL Liens and (y) pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Domestic ABL Secured Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Prepetition Domestic ABL Liens by the DIP Liens pursuant to the DIP Documents and this InterimFinal Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Prepetition Domestic ABL Adequate Protection Claim"); *provided* that, the avoidance of any Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral shall not constitute diminution in the value of such Prepetition Domestic ABL Secured Party's interests in Prepetition Collateral.  In consideration of the foregoing, and, for the avoidance of doubt, subject in all respects to the Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted the following (collectively, the "Prepetition Domestic ABL Primed Parties Adequate Protection Obligations"):

48

(a)     Contingent ABL Liens and Prepetition Domestic ABL Adequate
Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition
ABL Lenders) is hereby granted (effective and perfected upon the date of this ~~Interim~~Final Order
and without the necessity of the execution of any mortgages, security agreements, pledge
agreements, financing statements or other agreements), (1) in the amount of any Contingent
Prepetition ABL Debt, the Contingent ABL Liens, and (2) in the amount of the Prepetition
Domestic ABL Adequate Protection Claim, a valid, perfected replacement security interest in
and liens (the "Prepetition Domestic ABL Adequate Protection Liens") upon all of the Collateral
including, without limitation, subject to entry of ~~the Final Order, the Avoidance Action Proceeds,
in each case in accordance with the priorities shown in Exhibit A~~this Final Order, the Avoidance
Action Proceeds, in each case (i) subject and subordinate only to (A) with respect to Collateral
other than ABL Priority Collateral, the DIP Liens and any other liens that are senior to the DIP
Liens, (B) any liens that are senior to the Prepetition Domestic ABL Liens (C) the Carve-Out and
(D) solely with respect to the Cash Flow Priority Collateral, the Prepetition First-Priority Liens
and the Prepetition First-Priority Adequate Protection Liens (as defined below), (ii) with respect
to Collateral other than Cash Flow Priority Collateral, senior to the Prepetition First-Priority
Liens and the Prepetition First-Priority Adequate Protection Liens, and (iii) senior to the
Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens (as
defined below).  The Prepetition Domestic ABL Adequate Protection Liens shall secure the
Prepetition ABL Adequate Protection Claim, and the Contingent ABL Liens shall secure the
amount of any Contingent Prepetition ABL Debt;

(b)     Prepetition Domestic ABL 507(b) Claim.  Subject in all respects to the
Carve-Out, the Prepetition Domestic ABL Secured Parties are hereby granted an allowed

49

superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Prepetition Domestic ABL Adequate Protection Claim (the "Prepetition Domestic ABL 507(b) Claim"), which Prepetition Domestic ABL 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of theis Final Order, the Avoidance Proceeds.  The Prepetition Domestic ABL 507(b) Claim shall be (i) subject to the Carve-Out, (ii) subordinate to the DIP Superpriority Claims, (iii) *pari passu* with the Cash Flow Credit Agreement Primed Parties 507(b) Claim and First Lien Notes Primed Parties 507(b) Claim, and (iv) senior to the Second Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this InterimFinal Order or the DIP Credit Agreement, the Prepetition Domestic ABL Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Domestic ABL 507(b) Claim until the indefeasible Payment in Full of all DIP Obligations and the termination of all remaining Commitments under the DIP Facilities;

(c)    Prepetition Domestic ABL Fees and Expenses.  The Prepetition Domestic ABL Agent shall receive from the Debtors, for the benefit of the Prepetition Domestic ABL Lenders, current cash payments of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Domestic ABL Agent under the Prepetition Domestic ABL Agreements, including, but not limited to, the reasonable and documented fees and disbursements of counsel promptly upon receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 2631 below (subject, in the event that the Prepetition Domestic ABL Debt is reinstated, to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such)); and

50

(d)      Contingent Prepetition ABL Debt.  In the event that the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender (each in their capacities as such) is ordered by the Court to disgorge, refund or in any manner repay to any of the Debtors or their estates any amounts ("Disgorged Amounts") leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless otherwise ordered by the Court, shall be placed in a segregated interest bearing account, which shall be subject to the Carve Out in all respects, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition Domestic ABL Agent and the Prepetition Domestic ABL Lenders, distributing such amounts to the Debtors or otherwise); *provided* that, to the extent the Disgorged Amounts are returned to the Prepetition Domestic ABL Agent or any Prepetition Domestic ABL Lender, they shall receive such amounts plus any interest accrued at the default rate set forth in the Prepetition Domestic ABL Agreements; *provided further* that, after entry of a final non-appealable order of a court of competent jurisdiction ordering such Disgorged Amounts to be remitted to the Debtors, the Disgorged Amounts shall be Collateral pursuant to the terms of this ~~Interim~~Final Order.

~~16.~~19.  *Adequate Protection of Prepetition Cash Flow Credit Agreement Primed Parties.* The Prepetition Cash Flow Credit Agreement Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the diminution in value, if any, of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value of the Prepetition Cash Flow Credit Agreement Primed Parties' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the ~~depreciation,~~ sale, lease or use by the Debtors ~~(or other decline in value)~~ of the Prepetition

Collateral, the priming of the Prepetition First-Priority Liens of the Prepetition Cash Flow Credit Agreement Primed Parties by the DIP Liens pursuant to the DIP Documents and this ~~Interim~~Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, (the "Cash Flow Credit Agreement Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Prepetition Cash Flow Credit Agreement Primed Parties are hereby granted the following (collectively, the "Cash Flow Credit Agreement Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)    Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens.  The Prepetition Cash Flow Agent (for itself and for the benefit of the Prepetition Cash Flow Lenders) is hereby granted for the diminution in the value, if any, of the Prepetition Cash Flow Parties' interests in the Prepetition Collateral as of the Petition Date, a valid, perfected replacement security interest in and lien (the "Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of ~~the Final Order, the Avoidance Proceeds, in each case in accordance with the priorities shown in Exhibit A~~this Final Order, the Avoidance Proceeds, in each case (i) subject and subordinate only to (A) the DIP Liens (other than, solely with respect to the Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition

Domestic ABL Adequate Protection Liens; (iii) *pari passu* with the First Lien Notes Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;

(b)     Prepetition Cash Flow Credit Agreement Primed Parties 507(b) Claim. The Prepetition Domestic Cash Flow Credit Agreement Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Cash Flow Credit Agreement Primed Parties Adequate Protection Claim (the "Cash Flow Credit Agreement Primed Parties 507(b) Claim"), which Cash Flow Credit Agreement Primed Parties 507(b) Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of th~~e~~is Final Order, the Avoidance Proceeds.  The Cash Flow Credit Agreement Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the First Lien Notes Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this ~~Interim~~Final Order or the DIP Credit Agreement, the Prepetition Cash Flow Credit Agreement Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Cash Flow Credit Agreement Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)     Prepetition Cash Flow Credit Agreement Primed Parties Fees and Expenses; Cash Payments.  The Prepetition Cash Flow Agent shall receive from the Debtors, for the benefit of the Prepetition Cash Flow Lenders, (i) cash payments as set forth in Paragraph 21(a) and (ii) current cash payments ~~(i) in an amount equal to interest at the non-default rate~~

~~under the Prepetition Cash Flow Credit Agreement and (ii)~~ of the reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Cash Flow Agent under the Prepetition Cash Flow Agreements, including, but not limited to, the reasonable and documented fees and disbursements of one primary counsel to the Prepetition Cash Flow Agent promptly upon receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph ~~15(d),~~ 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

~~17.~~20.  *Adequate Protection of Prepetition First Lien Notes Primed Parties*. The Prepetition First Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in the Debtors' interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Prepetition First Lien Notes Primed Parties' prepetition security interests in all Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the ~~depreciation,~~ sale, lease or use by the Debtors ~~(or other decline in value)~~ of the Prepetition Collateral, the priming of the Prepetition First-Priority Liens by the DIP Liens pursuant to the DIP Documents and this ~~Interim~~Final Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "First Lien Notes Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Prepetition First Lien Notes Primed Parties are hereby granted the following (collectively, the "First Lien Notes Primed Parties Adequate Protection Obligations"), in each case, subject in all respects to the Carve-Out:

(a)     <u>Prepetition First Lien Notes Primed Parties Adequate Protection Liens</u>. The 9.00% First Lien Notes Trustee and the 7.00% First Lien Notes Trustee (for themselves <u>and</u> for the benefit of the 9.00% First Lien Noteholders and the 7.00% First Lien Noteholders<u>, respectively</u>) are each hereby granted (effective and perfected upon the date of this ~~Interim~~<u>Final</u> Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution of value, if any, of the Prepetition First Lien Notes Parties' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "<u>First Lien Notes Adequate Protection Liens</u>" and, together with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens, the "<u>Prepetition First-Priority Adequate Protection Liens</u>") upon all of the Collateral including, without limitation, subject to entry of th<u>is</u> Final Order, the Avoidance Proceeds, in each case ~~in accordance~~<u>(i) subject and subordinate only to (A) the DIP Liens (other than, solely</u> with <u>respect to</u> the ~~priorities shown in Exhibit A~~<u>Cash Flow Priority Collateral, to the extent such liens secure Cash Pooling Obligations), and any other liens that are senior to the liens securing the DIP Facilities, (B) the Carve-Out, (C) with respect to the ABL Priority Collateral, the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens, (D) with respect to Collateral other than Cash Flow Priority Collateral, the Prepetition Domestic ABL Adequate Protection Liens; (ii) solely with respect to the Cash Flow Priority Collateral, senior to (A) the DIP Liens to the extent such DIP Liens secure Cash Pooling Obligations, (B) the Contingent ABL Liens and (C) the Prepetition Domestic ABL Adequate Protection Liens; (iii) pari passu with the Prepetition Cash Flow Credit Agreement Primed Parties Adequate Protection Liens; and (iv) senior to the Prepetition Second-Priority Liens and the Second Lien Notes Adequate Protection Liens;</u>

55

(b)        Prepetition First Lien Notes Primed Parties 507(b) Claim.  The Prepetition First Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the First Lien Notes Primed Parties Adequate Protection Claim (the "First Lien Notes Primed Parties 507(b) Claim"); which First Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of the~~is~~ Final Order, the Avoidance Proceeds.  The First Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims and (iii) *pari passu* with the Prepetition Domestic ABL 507(b) Claim and the Cash Flow Credit Agreement Primed Parties 507(b) Claim.  Except to the extent expressly set forth in this ~~Interim~~Final Order or the DIP Credit Agreement, the Prepetition First Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities; and

(c)        Prepetition First Lien Notes Primed Parties Fees and Expenses; Cash Payments.  The 9.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 9.00% First Lien Noteholders ~~current cash payments (i) in an amount equal to interest at the non-default rate under the 9.00% First Lien Indenture and (ii) of~~(i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 9.00% First Lien Indenture) current cash payments of the reasonable and documented fees  and expenses of the 9.00% First Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and

expenses of one primary counsel to the 9.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph ~~15(d),~~ 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such).  The 7.00% First Lien Notes Trustee shall receive from the Debtors, for the benefit of the 7.00% First Lien Noteholders ~~current cash payments (i) in an amount equal to interest at the non-default rate under the 7.00% First Lien Indenture and (ii) of~~(i) cash payments as set forth in Paragraph 21(a) and (ii) (pursuant to the schedule of fees in the 7.00% First Lien Indenture) current cash payments of the reasonable and documented fees and expenses of the 7.00% First Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented prepetition and postpetition fees and expenses of one primary counsel to the 7.00% First Lien Notes Trustee, which payments shall be made in the manner provided for in Paragraph ~~15(d),~~ 31, in each case subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and upon entry of a final, non-appealable order ordering as such).

~~18.~~21.  *Additional First Lien Adequate Protection.*  Pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, each of the Prepetition First-Priority Secured Parties whose liens will be primed by the DIP Liens and whose Cash Collateral will be authorized for use by the Debtors, will receive as additional adequate protection, in each case subject to the Carve-Out in all respects:

> (a)    the following adequate protection payments:

(i)      cash payments in an amount equal to interest at the non-default rate under the Prepetition Cash Flow Credit Agreement, on the applicable payment dates as provided in the Prepetition Cash Flow Credit Agreement;

(ii)      cash payments in an amount equal to interest at the non-default rate under the 9.00% First Lien Indenture, on the applicable payment dates as provided in the 9.00% First Lien Indenture; and

(iii)      cash payments in an amount equal to interest at the non-default rate under the 7.00% First Lien Indenture, on the applicable payment dates as provided in the 7.00% First Lien Indenture; *provided* that the adequate protection payments set forth in the foregoing clauses (i) through (iii) shall be distributed by the Debtors ratably to (a) the Prepetition Cash Flow Agent, for the benefit of the Prepetition Cash Flow Secured Parties, (b) the 7.00% First Lien Notes Trustee, for the benefit of the 7.00% First Lien Noteholders, and (c) the 9.00% First Lien Notes Trustee, for the benefit of the 9.00% First Lien Noteholders, based on the principal and accrued interest outstanding under the Prepetition Cash Flow Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture, respectively, as of the Petition Date, each as set forth in **Exhibit D** attached hereto; *provided further* that each of the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee shall apply the payments received pursuant to the foregoing clauses (i) through (iii) in accordance with the Prepetition Credit Agreement, 7.00% First Lien Notes Indenture and 9.00% First Lien Notes Indenture without regard to the First Lien Intercreditor Agreement, including Section 2.01(a) thereof;

(a)(b)  current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of theis

Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of certain holders of First Lien Debt[10] (" (the "Ad Hoc First Lien Group"), in each case as set forth in the applicable engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of First Lien Debt (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc First Lien Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019; and

(b)(c)  current cash payments of reasonable and documented prepetition (with any accrued and unpaid prepetition fees and expenses payable promptly following entry of theis Final Order) and postpetition professionals' fees and expenses for one primary counsel and one financial advisor to the ad hoc group of certain holders of First Lien Debt and Second Lien Notes Debt[11] (" (the "Ad Hoc Crossover Group") ,"), in each case as set forth in the applicable

---

[10] The "First Lien Debt" means all obligations of the Borrower and Guarantors to the (a) Prepetition Cash Flow Lenders in respect of loans made pursuant to the Prepetition Cash Flow Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Prepetition Cash Flow Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the Prepetition Cash Flow Agreements, (b) 7.00% First Lien Notes Secured Parties in respect of notes issued pursuant to the 7.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 7.00% First Lien Notes Agreements), charges, indemnities and other obligations incurred in connection therewith as provided in the 7.00% First Lien Notes Agreements and (c) 9.00% First Lien Notes Secured Parties in respect of notes issued to the 9.00% First Lien Noteholders pursuant to the 9.00% First Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the 9.00% First Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the 9.00% First Lien Notes Agreements.

[11] The "Second Lien Notes Debt" means all Obligations of the Borrower and Guarantors to the Second Lien Notes Secured Parties in respect of notes issued pursuant to the Second Lien Notes Agreements, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, that are chargeable or reimbursable under the Second Lien Notes), charges, indemnities and other obligations incurred in connection therewith as provided in the Second Lien Notes Agreements.

engagement letters executed by the Debtors prior to the Petition Date (but not any "success," "transaction," or similar fee), which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest), so long as the Ad Hoc Crossover Group holds not less than 20.0% of the aggregate principal amount of all First Lien Debt as evidenced by a disclosure filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019.

19.22.  *Adequate Protection of the Second Lien Notes Primed Parties.*

(a)     Subject and subordinate to the Carve-Out in all respects, the Second Lien Notes Primed Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral, the priming of the Second-Priority Liens of the Prepetition Second Lien Notes Primed Parties by the DIP Liens pursuant to the DIP Documents and this InterimFinal Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Second Lien Notes Primed Parties Adequate Protection Claim").  In consideration of the foregoing, the Second Lien Notes Primed Parties are hereby granted the following (collectively, the "Second Lien Notes Primed Parties Adequate Protection Obligations" and, together with the Prepetition Domestic ABL Primed Parties Adequate Protection Obligations, the Cash Flow Credit Agreement Primed

Parties Adequate Protection Obligations and the First Lien Notes Primed Parties Adequate Protection Obligations, the "Adequate Protection Obligations");

(b)    Prepetition Second Lien Notes Primed Parties Adequate Protection Liens. The Second Lien Notes Trustee (for itself and for the benefit of the Second Lien Noteholders) is hereby granted (effective and perfected upon the date of this ~~Interim~~Final Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), for the diminution in the value of the Second Lien Notes Primed Parties' interests in the Debtors' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien (the "Second Lien Notes Adequate Protection Liens" and, collectively with the Prepetition Domestic ABL Adequate Protection Liens and the Prepetition First-Priority Adequate Protection Liens, the "Adequate Protection Liens") upon all of the Collateral including, without limitation, subject to entry of th~~e~~is Final Order, the Avoidance Proceeds, in each case ~~in accordance with~~subject and subordinate to (i) the DIP Liens and any other liens that are senior to the ~~priorities shown in Exhibit A~~DIP Liens, (ii) the Carve-Out, (iii) the Contingent ABL Liens and Prepetition Domestic ABL Adequate Protection Liens and (iv) the Prepetition First-Priority Liens and Prepetition First-Priority Adequate Protection Liens;

(c)    Prepetition Second Lien Notes Primed Parties 507(b) Claim.    The Prepetition Second Lien Notes Primed Parties are hereby granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the Second Lien Notes Primed Parties Adequate Protection Claim (the "Second Lien Notes Primed Parties 507(b) Claim" and, collectively with the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim and the First Lien Notes

Primed Parties 507(b) Claim, the "507(b) Claims")); which Second Lien Notes Primed Parties Superpriority Claim shall have recourse to and be payable from all of the Collateral, including, without limitation, subject to entry of theis Final Order, the Avoidance Proceeds.  The Second Lien Notes Primed Parties 507(b) Claim shall be (i) subject and subordinate to the Carve-Out, (ii) subject and subordinate to the DIP Superpriority Claims, and (iii) subordinate to the Prepetition Domestic ABL 507(b) Claim, the Cash Flow Credit Agreement Primed Parties 507(b) Claim, and the First Lien Notes Primed Parties 507(b) Claims.  Except to the extent expressly set forth in this InterimFinal Order or the DIP Credit Agreement, the Prepetition Second Lien Notes Primed Parties shall not receive or retain any payments, property or other amounts in respect of the Second Lien Notes Primed Parties 507(b) Claim until all obligations benefitting from the Carve-Out have been paid in full on a final basis, the indefeasible Payment in Full of all DIP Obligations, and the termination of all remaining Commitments under the DIP Facilities.

(d)      The Second Lien Notes Trustee shall receive from the Debtors (pursuant to the schedule of fees in effect upon the appointment of the successor Second Lien Notes Trustee), for the benefit of the Second Lien Noteholders, current cash payments of the reasonable and documented fees and expenses of the Second Lien Notes Trustee, including fees and expenses for services performed in connection with these chapter 11 cases, and the reasonable and documented postpetition fees and expenses of one primary counsel to the Second Lien Notes Trustee only and no other professional, promptly upon the receipt of invoices therefor, which payments shall be made in the manner provided for in Paragraph 31, subject to recharacterization as principal payments of the Second Lien Debt and/or disgorgement (solely upon a motion by the Debtors, the Creditors' Committee or any other party in interest and only upon entry of a final, non-appealable order ordering as such).

20.23.  *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that, subject to the terms of ~~(I) the First Lien Intercreditor Agreement dated as of February 11, 2011 among the Company, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee and the 9.00% First Lien Notes Trustee (collectively, the "Prepetition First Lien Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "First Lien Intercreditor Agreement") and (II) the Amended and Restated Intercreditor Agreement dated as of October 29, 2012 among the Prepetition Domestic ABL Agent and the Prepetition Cash Flow Agent and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, the "ABL Intercreditor Agreement" and, together with the First Lien Intercreditor Agreement, the "ICAs")~~,the ICAs, the Prepetition Secured Parties may request further or different adequate protection (a) following an Event of Default and expiration of the DIP Remedies Notice Period or Cash Collateral Notice Period, as applicable (but not beforehand) or (b) upon a material change in circumstances; *provided further~~,~~ that* all parties' rights to contest such adequate protection requests are fully preserved.

21.24.  *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, notices of lien or similar instruments in any jurisdiction, or take possession of or control over cash or securities, or

take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, on behalf of the DIP Lenders, or the Prepetition Secured Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, notices of lien or similar instruments, or take possession of or control over any cash or securities, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this ~~Interim~~Final Order.  Upon the request of the DIP Agent, each of the Prepetition Secured Parties and the Loan Parties, without any further consent of any party, is authorized (in the case of the Loan Parties) and directed (in the case of the Prepetition Secured Parties) to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)  A certified copy of this ~~Interim~~Final Order may, in the discretion of the DIP Agent or the Prepetition First Lien Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this ~~Interim~~Final Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Agent or the Prepetition First Lien Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

64

25.     *Certain Events of Default*.  The occurrence of any the following events, unless waived in writing by the DIP Agent, shall constitute a DIP Event of Default and a Cash Collateral Event of Default:

(a)     if any of the Debtors, without the prior written consent of the DIP Agent seeks, proposes or supports, in each case pursuant to a pleading filed by the Debtors in the Court that is not withdrawn after three (3) days' notice by the DIP Agent or Prepetition First Lien Agents to the Debtors, or if there is entered or confirmed (in each case, as applicable):

i.     any modifications, amendments or extensions of this Final Order, and no such consent shall be implied by any other action, inaction or acquiescence by any party;

ii.     an order converting or dismissing any of the Chapter 11 Cases;

iii.     an order appointing a chapter 11 trustee, receiver or an examiner with expanded powers in the Chapter 11 Cases;

iv.     an order appointing an examiner with enlarged powers in the Chapter 11 Cases (beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code);

v.     a plan of reorganization other than a plan that provides for the payment in cash in full of the DIP Obligations as of the effective date of such plan; or

vi.     the sale of all or substantially all of the assets of the Debtors, which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent indemnification or expense reimbursement obligations for which no claim has been made) upon the consummation thereof;

vii.     subject to Paragraph 17(b) hereof and the last Paragraph of Section 8.01 of the DIP Credit Agreement (beginning, "Notwithstanding anything herein to the contrary (including Section 8.01(o) hereof), there shall be no Default or Event of Default arising from…"), reversal, vacatur, modification or stay of this Final Order;

(b)     failure of the Debtors to pay the Adequate Protection Fees or the Adequate Protection Interest Payments when due (subject to expiration of applicable grace periods, if any);

(c)     any other "Event of Default" under the DIP Documents that is not waived by the Required DIP Lenders; or

(d)     any material breach by any Debtor of any provision of this Final Order or the Final Order, in each case, that is not cured within five (5) business days of notice thereof (without duplication of any grace period under the DIP Credit Agreement).

~~22.~~26.  *Preservation of Rights Granted Under This ~~Interim~~Final Order.*  Subject in all respects to Paragraph ~~24(e)~~26(e) hereof:

(a)     Other than the Carve-Out and other claims and liens expressly granted by this ~~Interim~~Final Order or as permitted pursuant to the DIP Credit Agreement, absent the express written consent of the DIP Agent (in its sole discretion) or the Prepetition Cash Flow Agent, no claim or lien having a priority superior to or *pari passu* with those granted by this ~~Interim~~Final Order to the DIP Agent and the DIP Lenders, the Prepetition Domestic ABL Secured Parties, the Prepetition First-Priority Secured Parties [12], or the Second Lien Notes Secured Parties, respectively, shall be granted or allowed while any of the DIP Obligations or the Adequate

---

[12] ~~"Prepetition First-Priority Secured Parties" means the Prepetition Cash Flow Secured Parties, 7.00% First Lien Notes Secured Parties, and the 9.00% First Lien Notes Secured Parties.~~

Protection Obligations remain outstanding other than senior adequate protection liens permitted pursuant to clause (ii) below.  Except as otherwise expressly provided in the DIP Credit Agreement or this ~~Interim~~Final Order and set forth in **Exhibit ~~A~~ B** hereto, and subject to the Carve-Out in all respects, the DIP Liens, the Adequate Protection Liens and the Contingent ABL Liens shall not be: (i) subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise, other than adequate protection liens granted on account of liens that are senior to the DIP Liens pursuant to Paragraph 9(b) in an amount not to exceed $15,000,000 in the aggregate; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and (iv) subject or subordinate to any intercompany or affiliate liens or security interests against the Debtors.

(b)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the Adequate Protection Liens and, prior to the Domestic ABL Discharge, the Contingent ABL Liens shall continue in full force and effect and shall maintain their priorities as provided in this ~~Interim~~Final Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest);

(ii) the other rights granted by this ~~Interim~~Final Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this Paragraph 26 and otherwise in this ~~Interim~~Final Order.

(c)    If any or all of the provisions of this ~~Interim~~Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of the Carve-Out, any DIP Obligations, or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agents, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the Carve-Out, the DIP Liens, the Adequate Protection Liens or the Contingent ABL Liens.  Notwithstanding any such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent, the Prepetition Domestic ABL Agent, the Prepetition First Lien Agent, the Second Lien Notes Trustee, the Ad Hoc First Lien Group or the Ad Hoc Crossover Group, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this ~~Interim~~Final Order, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this ~~Interim~~Final Order and the DIP Documents.

(d)    Except as expressly provided in this ~~Interim~~Final Order or in the DIP Documents, the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, Contingent ABL Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this ~~Interim~~Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except with respect to the Collateral being sold to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this ~~Interim~~Final Order and the DIP Documents shall continue in these Chapter 11 Cases~~, in any successor cases if these Chapter 11 Cases cease to be jointly administered~~ and in any superseding chapter 7 cases under the Bankruptcy Code, and the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Contingent ABL Liens, the 507(b) Claims and all of the Adequate Protection Obligations and all other rights and remedies of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this ~~Interim~~Final Order and the DIP Documents shall continue in full force and effect until the indefeasible Payment in Full of all DIP Obligations ~~are indefeasibly paid in full in cash~~, as set forth herein and in the DIP Documents, and the termination of all remaining Commitments ~~have been terminated~~under the DIP Facilities.

69

(e)     Notwithstanding anything herein or in the DIP Credit Agreement to the contrary, there shall be no DIP Event of Default arising from: (i) the occurrence of a Cash Collateral Event of Default set forth in Paragraph ~~17~~16(b) or termination of the Debtors' consensual use of Cash Collateral, or (ii) in the event of such termination (A) any request by the Loan Parties seeking to use Collateral or Cash Collateral subject to the Primed Liens on a nonconsensual basis or (B) any order of the Court granting such request, in each case so long as the adequate protection requested by the Loan Parties or approved by the Court, as applicable, is materially consistent with the adequate protection granted on account of the Primed Liens pursuant to the Orders or permitted herein.

~~23.     *Releases*.~~

~~24.~~27.   ~~Effective upon entry of~~ Subject to the ~~Interim Order, but subject to clause (b) of this~~rights and limitations set forth in Paragraph 28, each of the Debtors, and the Debtors' estates, on their own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Secured Parties, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, predecessors and predecessors in interest, each in their capacities as such (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known,

unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract (under U.S. laws), of every nature and description that exist on the date hereof arising out of, relating to, or in connection with any of the (a) Existing Agreements or the transactions contemplated under such documents, and (b) (subject to the Debtors' Retained Claims Challenge Period), and (b) as applicable, the DIP Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses and, (ii) any and all claims and causes of action arising under the Bankruptcy Code. For, and (iii) any and all claims and causes of action regarding the avoidance of doubt, validity, priority, perfection, or availability of the releases set forth in this Paragraph 23(a) shall be binding only upon liens of the Debtors and shall not bind any other party in interest. Prepetition Secured Parties (including Avoidance Actions), subject to the Debtors' Retained Claims Challenge Period.

25.    Notwithstanding anything herein to the contrary, (i) the Debtors make no stipulation, and reserve all rights, with respect to the assets identified on **Exhibit B** attached hereto

28.    *Effect of Stipulations on Third Parties.*

(a)    (collectively, the "Retained Claims Collateral"), including liens asserted against the Retained Claims Collateral on account of the Prepetition Debt[13] and (ii) the Debtors' rights to seek recharacterization of adequate protection as being applied to principal and/or to seek a determination on the value of the Prepetition Collateral securing the Prepetition Debt are fully reserved. For the avoidance of doubt, the Debtors' rights to challenge any lien (whether

---

[13]    "Prepetition Debt" means First Lien Debt and the Second Lien Notes Debt.

~~pursuant to an action commenced pursuant to chapter 5 of the Bankruptcy Code or otherwise)~~

~~asserted by any party with respect to the Retained Claims Collateral~~

(a)    The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 3 and 28 of this Final Order (collectively, the "Stipulations") shall be binding on the Debtors, the Debtors' estates, and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period by: (x) the Creditors' Committee; or (y) a party in interest with requisite standing other than the Creditors' Committee, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee").  The Stipulations contained in this Final Order, shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, or any other party in interest (including any Trustee) (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing, has duly filed an adversary proceeding or contested matter challenging the validity, perfection, enforceability, allowability, priority or extent of the obligations in respect of the Prepetition Debt or the Primed Liens or otherwise asserting or prosecuting any Avoidance Actions (each, a "Challenge") or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Secured Obligations or the Existing Agreements by no later than the latest of (i) ninety (90) days after the entry of this Final Order and (ii) any such later date agreed to in writing by the (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow

Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, as applicable, (the time period established by the latest of the foregoing clauses (i) and (ii) the "Challenge Period"); *provided, however,* that in the event that, prior to the expiration of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any Trustee, commencing on the date of the occurrence of either of the events described in the foregoing (x) or (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge in any such duly filed adversary proceeding or contested matters; *provided* that nothing in this Paragraph 28 shall limit (or be deemed to limit) any of the Debtors' or any other party in interest's rights to seek disgorgement of adequate protection or recharacterization of adequate protection as being applied to principal, as applicable, or to seek a determination on the value of Prepetition Collateral securing any of the Prepetition Debt at any time; *provided further* that should the Creditors' Committee file a motion with this Court seeking requisite standing and authority to pursue any challenge (with a draft complaint attached) (a "Standing Motion") prior to the expiration of the Challenge Period, the Challenge Period shall be tolled for the Creditors' Committee (and no other party) solely with respect to the claims or causes of action asserted in the complaint attached to the Standing Motion until the day on which the such Standing Motion is granted or denied by an order of this Court.  If no Challenge is timely commenced prior to the expiration of the Challenge Period, without further order of this Court (x) the obligations in respect of the Prepetition Debt shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination,

recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the Prepetition Secured Obligations shall not be subject to any other or further Challenge, including, without limitation, any Claims and Defenses, which shall be deemed to be forever waived and barred, and all parties in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period); and (z) all of the findings, the Debtors' stipulations, waivers, releases, and affirmations set forth in Paragraphs 3 and 28 herein, shall be of full force and effect and forever binding upon the applicable Debtor's bankruptcy estate and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any successor cases.  If any such Standing Motion or Challenge is timely filed or commenced, as applicable, prior to the expiration of the Challenge Period, (a) the stipulations and admissions contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee and any other person or party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge and (b) any Claims and Defenses not brought in a timely filed Challenge shall be forever barred; *provided* that, if and to the extent any Challenges to a particular Stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such Stipulation also shall be binding on the Debtors' estates and all parties in interest. Nothing in this Final Order vests or

74

confers on any Person, including a Creditors' Committee or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

(b)      are expressly preserved.

(b)      Notwithstanding anything herein to the contrary, any Claim, Challenge, or action by the Debtors on account of liens asserted with respect to the Retained Claims Collateral must be filed on or before the first Business Day (as defined in the DIP Credit Agreement) following two (2) months after the Petition Date (the "Debtors' Retained Claims Challenge Period"), or shall otherwise be waived, and all defenses of the Prepetition Secured Parties with respect to any such Claim, Challenge or action are expressly preserved; *provided* that such date may be extended by agreement of the Debtors, on the one hand and (w) with respect to the Prepetition Domestic ABL, the Prepetition Domestic ABL Agent, (x) with respect to the Prepetition Cash Flow Facility, the Prepetition Cash Flow Agent, (y) with respect to the First Lien Notes, the Prepetition First Lien Notes Trustees, and (z) with respect to the Second Lien Notes, the Second Lien Notes Trustee, on the other hand.  For the avoidance of doubt, any informal discovery or examination conducted pursuant to Bankruptcy Rule 2004 relating to the foregoing matters or claims shall not be deemed or construed to be a Challenge.

29.    *Expenses and Indemnification*.  All reasonable and documented out-of-pocket expenses (including but not limited to reasonable fees and expenses of legal advisors (which shall include the fees and expenses of counsel) and administrative fees and "seasoning fees," to the extent applicable, for the DIP Agent, in connection with the preparation, execution and delivery, administration, amendment, waiver or modification (including proposed amendments, waivers or modifications) of the DIP Credit Agreement and the DIP Documents, whether or not the DIP Facilities are successfully consummated, in connection with all collateral appraisals and

field exams prepared or conducted by or on behalf of the DIP Agent, and in connection with the Chapter 11 Cases are to be paid by the Loan Parties pursuant to this Paragraph 29, including for the avoidance of doubt, all reasonable and documented fees, costs and expenses of Davis Polk and Wardwell LLP, as primary counsel to the DIP Agent, local counsel in each applicable jurisdiction, conflicts counsel, to the extent necessary.

30.    In addition, the Loan Parties will indemnify the DIP Lenders, the DIP Agent and their respective affiliates, and hold them harmless from and against all reasonable and documented out-of-pocket costs, expenses (with respect to legal fees and expenses, limited to the reasonable and documented out-of-pocket legal fees and expenses of one counsel for the DIP Agent) and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities; *provided, however*, that no such person will be indemnified for costs, expenses or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the (x) gross negligence, bad faith or willful misconduct of such person (or their related persons) or (y) a material breach of the obligations of such person under the DIP Documents.

31.    *Payment of Fees and Expenses.*   The payment of the fees, expenses and disbursements pursuant to this Final Order (to the extent incurred after the Petition Date) shall be made within ten (10) days (which time period may be extended by the applicable professional) after the receipt by (i) the Debtors, (ii) counsel for the Debtors, (iii) counsel for the Ad Hoc First Lien Group, (iv) the Creditors' Committee, (v) the U.S. Trustee, (vi) counsel for the DIP Agent, (vii) the Prepetition First Lien Agents, (viii) counsel for the Ad Hoc Crossover Group, and (ix) the Second Lien Notes Trustee (collectively, the "Notice Parties") (the "Review Period") of

invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications, including such amounts arising before or after the Petition Date.  The invoices for such Invoiced Fees shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided*, *however*, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (*provided* that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).  The Notice Parties may object to any portion of the Invoiced Fees (the "Disputed Invoiced Fees") within the Review Period by filing with the Court a motion or other pleading, on at least ten (10) days' prior written notice of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees in reasonable narrative detail and the bases for such objections; *provided* that payment of any undisputed portion of Invoiced Fees shall not be delayed based on any objections thereto.

32.    *Limitation on Use of the DIP Facilities, the DIP Collateral, and the Prepetition Collateral (Including the Cash Collateral).*  Notwithstanding anything herein or in any other order of this Court to the contrary, neither the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including the Cash Collateral, nor the Carve-Out (other than the Investigation Budget Cap) may be used to (a) object to or, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Secured Debt Documents or the liens or claims granted under this InterimFinal Order, the DIP Documents or the Prepetition Secured Debt Documents; (b) assert any Claims and Defenses (as

defined below) or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) following the DIP Remedies Notice Period or Cash Collateral Notice Period (where the automatic stay has been lifted), as applicable, prevent, hinder or otherwise delay the DIP Agent's or the Prepetition First Lien Agents' assertion, enforcement, or realization on the ~~Collateral~~Prepetition Collateral or the DIP Collateral, in accordance with the DIP Documents, the Prepetition Debt Documents or this Final Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, or any of the Prepetition First Lien Agents or the Second Lien Notes Trustee hereunder or under the DIP Documents or the Prepetition Secured Debt Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of this Court or otherwise permitted under the DIP Documents; *provided* that, notwithstanding anything to the contrary herein, the Debtors shall not be authorized to use the DIP Facilities or DIP Collateral to pay fees or expenses in excess of the Investigation Budget for the Creditors' Committee, to investigate Claims and Defenses against the Prepetition Secured Parties or to initiate or prosecute proceedings or actions on account of any Claims and Defenses against the Prepetition Secured Parties; *provided further* that, for the avoidance of doubt, this Paragraph 32 (including, for the avoidance of doubt, the Investigation Budget Cap) shall not limit (or be deemed to limit) the Debtors' rights to (x) seek recharacterization of adequate protection as being applied to principal, or (y) seek to use Cash Collateral on a non-consensual basis after termination of the consensual use of Cash Collateral.

26.33.  *Limitation on Sierra Liability.*  Notwithstanding anything herein, the Final Order, or any of the DIP Documents to the contrary, Sierra's obligations with respect to the Intercompany Security Protocol (including with respect to any borrowings, fees, expenses, indemnities, or otherwise but not, for the avoidance of doubt, with respect to any claim against Sierra that does not arise under or in relation to the Intercompany Protocol) and any adequate protection granted by the Court against Sierra or its assets with respect to the First Lien Debt and the Second Lien Notes (whether pursuant to the Final Order or otherwise) shall be limited to: (a) an amount equal to funds actually disbursed, if any, from the Cash Pool Requirements Account in accordance with the Intercompany Security Protocol, (b) repayment of the Prepetition Foreign ABL Debt, as an obligation of Sierra subject to the Intercompany Security Protocol (as described below), and (c) any other intercompany loans created pursuant to the Intercompany Security Protocol.

27.34.  *Intercompany Security Protocol.*  Except as prohibited by local law, any credit support, guarantee, cash and/or cash equivalents (in each case, including proceeds of the DIP Financing, Cash Collateral or otherwise) transferred or otherwise provided by any Loan Party to or for the benefit of any Non-Debtor Subsidiary (either in the form of restricted payments, investments, intercompany advances, guarantees of obligations (including interest thereon), sale of assets, provision of services or otherwise (except for repayments of intercompany liabilities incurred in the ordinary course of business)), in excess of $2,000,000 in the aggregate (the "De Minimis Exception"), shall be lent to Sierra and evidenced by an intercompany note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Sierra Note/Receivable"), which shall be pledged (individually or pursuant to a global note issued by Sierra) to one or more intercompany lenders and pursuant

to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Sierra Documents") as Collateral to the DIP Agent for the benefit of the DIP Lenders and to the Prepetition Secured Parties as adequate protection.  The proceeds of each such investment shall be further transferred, in one or more steps, to the applicable Non-Debtor Subsidiary; each step of such transfer shall be evidenced by an intercompany unsecured note or intercompany ledger entry, in each case as is reasonably satisfactory to the DIP Agent and the Debtors (the "Non-Debtor Subsidiary Note/Receivable"; together with the Sierra Note/Receivable, the "Intercompany Notes/Receivables"), with all such Intercompany Notes/Receivables accruing interest at the same rate as the DIP Facilities and which shall be payable in full in cash upon the maturity of the DIP Facilities.  The Sierra Notes/Receivables shall be secured by (i) 65% of the issued and outstanding Voting Stock (as defined in the DIP Collateral Agreement and including for this purpose, any instruments treated as equity for U.S. federal income tax purposes) of any Non-Debtor Subsidiary owned by Sierra, (ii) 100% of the issued and outstanding Equity Interests (as defined in the DIP Credit Agreement) in any Debtor Subsidiary owned by Sierra, and (iii) any Non-Debtor Subsidiary Note/Receivable held by Sierra.  All Non-Debtor Subsidiary Notes/Receivables held by Sierra shall be pledged in support of the Sierra Notes/Receivables (individually or pursuant to a global note issued by the applicable Non-Debtor Subsidiary to Sierra) and pursuant to documentation in form and substance reasonably satisfactory to the DIP Agent (the "Intercompany Security Protocol").  To the extent that local law limits the implementation of the foregoing and notwithstanding the fact that the Non-Debtor Subsidiary Notes/Receivables shall be unsecured obligations of the applicable Non-Debtor Subsidiaries, for all purposes in connection with these Chapter 11 Cases (including, without limitation for purposes of creditor recoveries and value allocation in connection with these Chapter 11 Cases

80

(including in connection with any chapter 11 plan or otherwise)), all Intercompany Notes/Receivables and amounts in respect of the De Minimis Exception (in each case whether documented or otherwise) shall be deemed to be secured obligations of Sierra or the applicable Non-Debtor Subsidiary, as applicable; the intent being to ensure that no creditor of the Debtors that asserts claims against Non-Debtor Subsidiaries on account of any claim against, obligation of, or transaction with, the Debtors (in respect of asserted joint and several liability or otherwise) unjustly benefits from the funding of Non-Debtor Subsidiaries through the use of proceeds of the DIP Facilities or Cash Collateral following the Petition Date.  The Debtors shall provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with advance notice (and shall use commercially reasonable efforts to provide the Creditors' Committee, counsel to the Prepetition Cash Flow Agent, counsel to the DIP Agent, counsel to the 9.00% First Lien Notes Trustee, counsel to the 7.00% First Lien Notes Trustee, counsel to the Ad Hoc First Lien Group and counsel to the Ad Hoc Crossover Group with at least five (5) business days' advance notice) of any transfer or delivery of any credit support, guarantee, cash and/or cash equivalents by any Loan Party to or for the benefit of any Non-Debtor Subsidiary pursuant to this paragraph 34 that is not subject to the De Minimis Exception.

35.    *Interim**Loss or Damage to Collateral*.  Nothing in this Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their

restructuring efforts.  So long as the DIP Agent, the DIP Lenders and the Prepetition Secured Parties comply with their obligations under the DIP Documents and this Final Order and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

36.    *Reservation of Rights Under the ICAs*.  Except as expressly provided in this Final Order, nothing in this Final Order shall amend, modify or waive the terms or provisions of the ICAs and all parties' rights and remedies under the ICAs are preserved.

28.37.  *Final Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order, the Final Order, and the DIP Documents, the provisions of this InterimFinal Order shall govern.

29.38.  *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this InterimFinal Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Creditors' Committee, any non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with

respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided*, *however*, that the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) or to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors).

30.39. *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Credit Agreement, to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this InterimFinal Order or the DIP Documents, none of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall (i) be deemed to be in "control" of the operations or participating in the management of the Debtors; and (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

40.    *Master Proof of Claim*.  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Domestic ABL Agent, Prepetition Cash Flow Agent, 7.00% First Lien Notes Trustee, 9.00% First Lien Notes Trustee and Second Lien Notes Trustee is authorized to file in the Debtors' lead chapter 11 case, *In re Avaya Inc., et al.*, Case No. 17-10089 (SMB), a single, master proof of claim on behalf of the Prepetition Domestic ABL Secured Parties, Prepetition Cash Flow Secured Parties, 7.00% First Lien Notes Secured Parties, 9.00% First Lien Notes Secured Parties and the Second Lien Notes Secured Parties, as applicable, on account of any and all of their respective claims arising under the applicable Existing Agreements and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim against each of the Debtors, the (i) Prepetition Domestic ABL Agent and the

Prepetition Domestic ABL Secured Parties, (ii) Prepetition Cash Flow Agent and Prepetition Cash Flow Secured Parties, (iii) 7.00% First Lien Notes Trustee and 7.00% First Lien Notes Secured Parties, (iv) 9.00% First Lien Notes Trustee and 9.00% First Lien Notes Secured Parties and (v) Second Lien Notes Trustee and Second Lien Notes Secured Parties, as applicable, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Existing Agreements, and the claim of each Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amend to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this Paragraph 40 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Domestic ABL Agent, Prepetition First Lien Agents, and Second Lien Notes Trustee, as applicable.

41.      *Information and Other Covenants*.  The Loan Parties shall comply in all material respects with the reporting requirements set forth in the DIP Credit Agreement, and shall provide copies of all such reporting to the Creditors' Committee, subject to confidentiality agreements no less restrictive than those in the DIP Credit Agreement with respect to such reporting.  The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the Cash Management Motion (as defined in the First Day Declaration) and any successor or final orders with respect thereto.

42.      *Insurance*.  To the extent that any of the Prepetition Domestic ABL Agent, the Prepetition Cash Flow Agent, the Prepetition First Lien Agents or Second Lien Notes Trustee is listed as loss payee under the Borrower's or Guarantors' insurance policies, the DIP Agent is also deemed to be the loss payee under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the Prepetition Debt.

~~31.~~43.  *Effectiveness*.   This ~~Interim~~Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

44.      *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

45.      *Payments Held in Trust*.   Except as expressly permitted in this Final Order or the DIP Documents and subject to the Carve-Out in all respects, in the event that any person or entity receives any payment on account of a security interest in Collateral, receives any Collateral or any proceeds of Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Documents, and termination of the Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order; *provided* that, prior to the Domestic ABL Discharge, the foregoing shall not apply to the receipt of ABL Priority Collateral (or any proceeds thereof to the extent not constituting Cash Flow Priority Collateral) by any Prepetition Domestic ABL Secured Party on account of its security interest in ABL Priority Collateral.

32.46.  *Credit Bidding*.  Upon entry of this ~~Interim~~Final Order and subject to the terms of the DIP Documents and the ICAs and to the right of the Creditors' Committee to seek entry of an order for cause pursuant to section 363(k) of the Bankruptcy Code: (i) the DIP Agent shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of the DIP Obligations during any sale of the Loan Parties' assets (in whole or in part), including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii); and (ii) subject to the ICAs in all respects, the Debtors acknowledge that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process

and shall have the right to credit bid the full amount of their respective claims, including, for the avoidance of doubt, Adequate Protection Claims, if any, during any sale of the Debtors' assets (in whole or in part) with respect to any asset subject to a duly perfected lien in favor of the Prepetition Secured Parties as of the Petition Date, including without limitation, sales occurring pursuant to Bankruptcy Code section 363 or included as part of any restructuring plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)~~; *provided* that such relief will be binding on the Debtors' estates and all parties in interest upon entry of the Final Order.~~).

~~33.    *Final Hearing*.  The Final Hearing is scheduled for _____, 2017 at _____ __.m. before this Court.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon counsel to the Debtors to allow actual receipt by the foregoing no later than _____, 2017 at 4:00 p.m., prevailing Eastern Time.~~

47.    *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, 6003(b), and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

48.    *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Final Order.

49.    *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

50.    *Choice of Law; Jurisdiction.*  The DIP Facilities and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by and construed and interpreted

in accordance with the laws of the State of New York, including without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and to the extent applicable, the Bankruptcy Code.  The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facilities or DIP Documents.

Dated: _____, 2017
        New York, New York

                                          _____
                                          THE HONORABLE STUART M. BERNSTEIN
                                          UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit A</u>**

**Exhibit B**

| | ABL Priority Collateral | Cash Flow Priority Collateral | L/C Cash Collateral | All other Collateral |
|---|---|---|---|---|
| **1st:** | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) |
| **2nd:** | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing L/C Obligations | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • DIP Liens to the extent securing L/C Obligations |
| **3rd:** | • DIP Liens<br>(other than to the extent securing Cash Pooling Obligations and L/C Obligations) | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • DIP Liens to the extent securing Cash Pooling Obligations | • DIP Liens to the extent securing Cash Pooling Obligations |
| **4th:** | • DIP Liens to the extent securing L/C Obligations | • DIP Liens to the extent securing Cash Pooling Obligations | • Prepetition Domestic ABL Adequate Protection Liens | • Prepetition Domestic ABL Adequate Protection Liens |
| **5th:** | • Prepetition First-Priority Adequate Protection Liens<br>• Prepetition First-Priority Liens | • Contingent ABL Liens<br>• Prepetition Domestic ABL Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens | • Prepetition First-Priority Adequate Protection Liens |
| **6th:** | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens<br>• Prepetition Second-Priority Liens | • Prepetition Second-Priority Adequate Protection Liens | • Prepetition Second-Priority Adequate Protection Liens |

**Exhibit BC**

## Retained Claims Collateral[1]

1. Each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399.

2. All intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing any of the foregoing, in each case registered or arising under non-U.S. law.

3. Assets of that certain Avaya Inc. Savings Restoration Plan held in  the Avaya Inc. Savings Restoration Plan Trust and maintained by Fidelity Management Trust Company ("Fidelity"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom.

4. Assets of that certain Avaya Inc. Deferred Compensation Plan effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by the Bank of New York, as Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom.

5. Assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom

6. Commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.)

7. Proceeds from the Debtors' insurance policies.

8. Owned real property identified on **Exhibit 1** attached hereto.

9. The Debtors' leasehold interests identified on **Exhibit 2** attached hereto.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the ~~Interim~~Final DIP Order to which this exhibit is attached as **Exhibit ~~B~~ C**.

**<u>Exhibit 1</u>**
[Owned Real Property]

| Owned Real Property Address | City | State | Country |
|---|---|---|---|
| 9650 Interport Drive | Shreveport | LA | USA |

\*       \*       \*       \*       \*

**<u>Exhibit 2</u>**
[Leased Real Property]

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 2601 Almeda Dr. aka 5425 Robin Hood Road | Norfolk | VA | USA |
| 1601 Veterans Memorial Highway | Islandia | NY | USA |
| 80 M Street SE | Washington | DC | USA |
| 12730 Fair Lakes Circle | Fairfax | VA | USA |
| Moberly Professional Park | Bentonville | AR | USA |
| 18201 Von Karmen Avenue | Irvine | CA | USA |
| 4655 Great American Parkway | Santa Clara | CA | USA |
| 8740 Lucent Boulevard | Highlands Ranch | CA | USA |
| 8744 Lucent Boulevard | Highlands Ranch | CA | USA |
| 12121 Grant Street | Thornton | CO | USA |
| 1300 West 120th Avenue | Westminster | CO | USA |
| 1250 Connecticut Ave., N.W. | Washington | DC | USA |
| 1000 NW 57th Court | Miami | FL | USA |
| 530 S. Main Street | Alpharetta | GA | USA |
| 1145 Sanctuary Parkway | Alpharetta | GA | USA |
| 30 South Wacker | Chicago | IL | USA |
| 2399 S. Finley Road | Lombard | IL | USA |
| 8321 W, 125th Street | Overland Park | KS | USA |
| 9150 Guildford Road | Columbia | MD | USA |
| 600 Technology Park Drive | Billerica | MA | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 225 South Sixth Street | Minneapolis | MN | USA |
| 10820 Sunset Office Drive | Sunset Hills | MO | USA |
| 14301 Josephine Street | Omaha | NE | USA |
| 8 Commerce Drive | Bedford | NH | USA |
| 211 Mount Airy Road | Baskin Ridge | NJ | USA |
| 770 Nesconset Highway | Nesconset | NY | USA |
| Two Penn Plaza | New York | NY | USA |
| 4001 E. Chapel Hill/Nelson Highway Nortel Gateway Court | Raleigh | NC | USA |
| 445 Hutchinson Avenue | Columbus | OH | USA |
| 14400 Hertz Quail Springs Pkwy | Oklahoma City | OK | USA |
| 161 Washington Street | Conshohocken | PA | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 11540 St. Charles Rock Road | Bridgeton | MO | USA |
| 1111 Freeport Parkway | Coppel | TX | USA |
| 1900 Firman Drive | Richardson | TX | USA |
| 8718 Carolina Boulevard | Clyde | TX | USA |
| 1420 Baltimore Pike | Springfield | PA | USA |
| 7580 North Dobson Road | Scottsdale | AZ | USA |
| 7183 South Union Park Avenue | Salt Lake City | UT | USA |
| 28223 Telegraph Road | Southfield | MI | USA |

| Leased Property Address | City | State | Country |
|---|---|---|---|
| 4475 Pouncey Tract Road | Glen Allen | VA | USA |
| 8727 Philips Highway | Jacksonville | FL | USA |

\*       \*       \*       \*       \*

**Exhibit D**

| | Principal Amount[1] | Accrued Interest[2] | Total Obligations[3] | % of Total |
|---|---|---|---|---|
| B-3 Term Loan | $615,928,097 | $7,654,658 | $623,582,756 | 13.53% |
| B-4 Term Loan | 819,794 | 14,517 | 834,311 | 0.02% |
| B-6 Term Loan | 537,033,060 | 8,241,966 | 545,275,026 | 11.83% |
| B-7 Term Loan | 2,080,946,472 | 30,708,411 | 2,111,654,884 | 45.81% |
| 7% 1L Notes | 1,009,000,000 | 21,581,389 | 1,030,581,389 | 22.36% |
| 9% 1L Notes | 290,000,000 | 7,975,000 | 297,975,000 | 6.46% |
| **Total** | **$4,533,727,424** | **$76,175,941** | **$4,609,903,365** | **100.00%** |

**Notes**

1    Principal amount outstanding as of Petition Date of 1/19/2017

2    Accrued interest outstanding as of Petition Date of 1/19/2017

3    The amounts set forth herein are solely for the purposes of this Stipulation and Agreed Order and shall be without prejudice to the rights of any party to assert or challenge, subject to the terms of the Interim DIP Order and Final DIP Order, any claims arising under the First Lien Debt, the Prepetition Cash Flow Credit Agreement, the 7.00% First Lien Indenture and the 9.00% First Lien Indenture.