**EXHIBIT A**

## FORM OF BILL OF SALE

### [●], 2017

THIS BILL OF SALE ("Bill of Sale") is made this [●], 2017 by Avaya, Inc., a Delaware corporation ("Avaya") , and its subsidiaries listed as "Sellers" on the signature pages attached hereto (collectively, the "Sellers"), in favor of Extreme Networks, Inc., a Delaware corporation ("Purchaser").

### W I T N E S S E T H:

WHEREAS, Sellers and Purchaser entered into that certain Asset Purchase Agreement dated as of March 7, 2017 (as may be amended, modified or supplemented from time to time, the "Purchase Agreement") with respect to the sale of certain Transferred Assets identified therein. Any capitalized term used, but not otherwise defined herein, shall have the meaning set forth in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers do hereby, sell, transfer, assign and deliver to Purchaser or one or more of Purchaser's designees all of Sellers' right, title, and interest, if any, in and to, the Transferred Assets, without representation or warranty of any kind whatsoever except as set forth in, and subject to the terms of, the Purchase Agreement. Sellers further agree to execute and deliver such other documents, instruments, conveyances, assurances, and papers and take such further actions as may be reasonably required or desirable to carry out the provisions hereof and the transfers contemplated hereby.

This Bill of Sale is executed and delivered at the Closing pursuant to the Purchase Agreement. Nothing contained herein shall be deemed or construed to limit, amend, reduce or expand the rights of Sellers or Purchaser provided for in the Purchase Agreement, all of which shall remain in full force and effect. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms of this Bill of Sale, the terms of the Purchase Agreement shall control.

This Bill of Sale, the negotiation, execution or performance of this Bill of Sale shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

This Bill of Sale, to the extent signed and delivered by means of a facsimile machine or electronic mail, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

\* \* \* \* \*

*[Signature Page follows]*

**IN WITNESS WHEREOF**, Sellers have executed this Bill of Sale to be effective as of the date first above written.

**SELLERS**:

[_____]

By:    _____
Name:
Its:

[_____]

By:    _____
Name:
Its:

# FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is executed as of the [●] day of [●], 2017 (the "Closing Date"), and is from Avaya Inc., a Delaware corporation ("Avaya"), and its subsidiaries listed as "Assignors" on the signature pages attached hereto (together with Avaya, the "Assignors"), to [●], a [●] ("Assignee"). Assignors and Assignee may be referred to herein, individually, as a "Party" and, collectively, as the "Parties."

This Agreement is being delivered in connection with the Closing under the Asset Purchase Agreement dated as of March 7, 2017, by and among Avaya, as a Seller, and Assignee, as Purchaser (the "Asset Purchase Agreement"). Capitalized terms used but not defined in this Assignment have the meanings given such terms in the Asset Purchase Agreement.

## I.

## ASSIGNMENT AND ASSUMPTION

1.1.   Assignment.  For the consideration set forth in the Asset Purchase Agreement, the receipt and sufficiency of which Assignors and Assignees hereby acknowledge, Assignors have transferred and assigned, and do hereby transfer and assign, to Assignee, effective as of the Closing Date, all of Assignors' rights, titles, and interests in, to and under the Transferred Assets, as provided in Section 1.03(a) of the Asset Purchase Agreement.

1.2.   Excluded Assets.  Assignors except, reserve, and exclude all of Assignors' right, title and interest in, to and under the Excluded Assets, as provided in Section 1.03(b) of the Asset Purchase Agreement.

1.3.   Assumed Liabilities.  Subject to the terms of the Asset Purchase Agreement, Assignee hereby assumes and agrees to pay, perform, discharge or otherwise satisfy, when due, the Assumed Liabilities, as provided in Section 1.05(a) of the Asset Purchase Agreement. Schedule A attached hereto sets forth each of the Assignors assigning Transferred Assets or Assumed Liabilities, the Assignees accepting such Transferred Assets or assuming such Assumed Liabilities and the corresponding jurisdiction of such Assignors and Assignees.

## II.

## MISCELLANEOUS

2.1.   Asset Purchase Agreement.  This Agreement is expressly made subject to the terms of the Asset Purchase Agreement.  The delivery of this Agreement shall not affect, enlarge, diminish, or otherwise impair any of the representations, warranties, covenants, indemnities, terms, or provisions of the Asset Purchase Agreement.  The representations, warranties, covenants, indemnities, terms, and provisions contained in the Asset Purchase Agreement shall not be merged with or into this Agreement but shall survive the execution and delivery of this Agreement to the extent, and in the manner, set forth in the Asset Purchase Agreement.

2.2.   Successors and Assigns.  The provisions of this Agreement shall bind and inure to the benefit of Assignors and Assignee and their respective successors and assigns.  If at any time

*Signature page to Assignment and Assumption Agreement*

Assignors liquidate or otherwise have a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to exercise the rights of Assignors under this Agreement.

      2.3.    <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver</u>

      (a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

      (b)    Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; <u>provided</u> that, if the Bankruptcy Cases are closed, any Proceeding against any Party arising out of or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have jurisdiction, the state courts of New York located in New York County, and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam* with respect to any such Proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such Proceeding has been brought in an inconvenient forum.  Notwithstanding the foregoing, any final judgment in any suit, action or other Proceeding may be enforced in other jurisdictions by suit on the judgment in any other manner provided by applicable Law.  The Parties consent to service of process by mail (in accordance with Section 11.12 of the Asset Purchase Agreement) or any other manner permitted by law**.**

      (c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR DISPUTES RELATING HERETO OR THERETO.  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 2.3(c)</u>.

2.4.    <u>Captions</u>.  The captions and article and section numbers in this Agreement are for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to articles and sections are to articles and sections of this Agreement unless otherwise specified.

2.5.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "<u>Electronic Delivery</u>") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute the original form of this Agreement and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

**[*signature pages follow*]**

EXECUTED on the Closing Date, to be EFFECTIVE as of the Closing Date.

**ASSIGNORS:**

[_____]

By:_____
Name:_____
Title:_____

**ASSIGNEE:**

[_____]

By:_____
Name:_____
Title:_____

**Schedule A**

| Assignor | Assignee | Jurisdiction |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**EXHIBIT C**

## FORM OF PATENT ASSIGNMENT AGREEMENT

This PATENT ASSIGNMENT AGREEMENT is dated as of [●], 2017 (this "**Assignment**") and is by and among AVAYA INC., a Delaware corporation ("**Avaya**"), AVAYA COMMUNICATION ISRAEL LTD, an Israel limited liability company, AVAYA HOLDINGS LIMITED, an Ireland limited liability company, and AVAYA GmBH & CO KG, a Germany corporation, (each, an "**Assignor**" and collectively with Avaya, the "**Assignors**"), and Extreme Networks, Inc., a Delaware corporation, ("**Assignee**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, Assignors are the owners of the patents and patent applications identified on **Exhibit A** (collectively, the "**Assigned Patents**");

WHEREAS, Avaya and Assignee have entered into that certain Asset Purchase Agreement, dated March 7, 2017 (the "**Purchase Agreement**"), pursuant to which Avaya has agreed to, and to cause the other Assignors to, sell, transfer, assign and deliver to Assignee, and Assignee has agreed to purchase, acquire, assume and accept from Avaya and the other Assignors all of their right, title and interest in and to the Transferred Assets, all upon the terms and subject to the conditions set forth in the Purchase Agreement, which assets include the Assigned Patents; and

WHEREAS, this Assignment is being executed and delivered pursuant to Section 2.02(a) of the Purchase Agreement.

NOW, THEREFORE, in accordance with the Purchase Agreement and in consideration of the premises and the mutual agreements and covenants set forth in this Agreement and the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.    <u>Assignment</u>.  Each of Avaya and the other Assignors, subject to any encumbrances related to prior agreements, hereby sells, conveys, transfers, assigns and delivers to Assignee all of Avaya's and such other Assignor's right, title and interest throughout the world in, to and under, the Assigned Patents, including any continuation, continuation-in-part, divisional, extension, substitution, re-examination or reissue thereof or any legal equivalent in the United States or a foreign country for the full term or terms for which the same may be granted, including the right to claim priority in accordance with international treaties and conventions, the right to all income, royalties, damages and payments hereafter due or payable with respect to the Assigned Patents (except to the extent arising under prior patent license agreements included in the Excluded Contracts), the right to prosecute, maintain and defend the Assigned Patents before any public or private agency, office or registrar, and all claims, causes of action and rights to sue for past, present and future infringement or unconsented use of the Assigned Patents.  The assignments contemplated herein are meant to be absolute assignments and not by way of security.  Each of Avaya and the other Assignors hereby authorizes the Commissioner of Patents and Trademarks in the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities, to record Assignee as

the assignee of all of Avaya's and such other Assignor's right, title and interest in, to and under the Assigned Patents and to deliver to Assignee, and to Assignee's attorneys, agents, successors or assigns, all official documents and communications.

2.        Existing Licenses. The Assigned Patents, to the best of Avaya and the other Assignors knowledge, have been licensed to multiple unaffiliated third parties as part of broader license arrangements.  Such licenses will not be modified or extended before or after the Closing Date, to the extent each may relate to the rights governed under the Assigned Patents.

3.        No Third Party Beneficiaries.  This Assignment is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder.

4.        Terms of Purchase Agreement; Conflicts.    The scope, nature, and extent of the Transferred Assets are expressly set forth in the Purchase Agreement.  Nothing contained herein changes, amends, extends, or alters (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever.  This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein.  In the event of any conflict between the provisions of this Assignment (including the Exhibits) and the provisions of the Purchase Agreement (including the Disclosure Schedules and Exhibits), the provisions of the Purchase Agreement shall control.

5.        Governing Law.  This Assignment, the negotiation, execution or performance of this Assignment and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

6.        Entire Agreement.  This Assignment, and the Exhibits annexed hereto, and the Purchase Agreement, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding among the parties hereto with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto.  The parties agree to define their rights, liabilities, and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of the Purchase Agreement and this Assignment, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Assignment or the Purchase Agreement.

7.        Counterparts.  This Assignment may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**")

2

shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute the original form of this Assignment and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

[SIGNATURE PAGE FOLLOWS]

3

IN WITNESS WHEREOF, the parties have duly executed this Assignment as of the date first written above.

**ASSIGNORS:**

**AVAYA INC.**

By: _____
Name:
Title:

**AVAYA COMMUNICATION ISRAEL LTD**

By: _____
Name:
Title:

**AVAYA HOLDINGS LIMITED**

By: _____
Name:
Title:

**AVAYA GMBH & CO. KG**

By: _____
Name:
Title:

[SIGNATURE PAGE TO PATENT ASSIGNMENT AGREEMENT]

**ASSIGNEE:**

**EXTREME NETWORKS, INC.**

**By:** _____

**Name:**

**Title:**

# EXHIBIT A

## ASSIGNED PATENTS

*See attached.*

**EXHIBIT D**

## FORM OF TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT is dated as of [●], 2017 (this "**Assignment**"), and is by and among AVAYA INC., a Delaware corporation ("**Avaya**"), and AVAYA HOLDINGS LIMITED, an Ireland limited liability company (an "**Assignor**" and collectively with Avaya, the "**Assignors**"), and Extreme Networks, Inc., a Delaware corporation ("**Assignee**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, Assignors are the owners of the trademark registrations and applications identified on **Exhibit A** (collectively, the "**Assigned Trademarks**");

WHEREAS, Avaya and Assignee have entered into that certain Asset Purchase Agreement, dated March 7, 2017 (the "**Purchase Agreement**"), pursuant to which Avaya has agreed to, and to cause the other Assignors to, sell, transfer, assign and deliver to Assignee, and Assignee has agreed to purchase, acquire, assume and accept from Avaya and the other Assignors all of their right, title and interest in and to the Transferred Assets, all upon the terms and subject to the conditions set forth in the Purchase Agreement, which assets include the Assigned Trademarks; and

WHEREAS, this Assignment is being executed and delivered pursuant to Section 2.02(a) of the Purchase Agreement.

NOW, THEREFORE, in accordance with the Purchase Agreement and in consideration of the premises and the mutual agreements and covenants set forth in this Assignment and the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.    <u>Assignment</u>. Each of Avaya and the other Assignors hereby sells, conveys, transfers, assigns and delivers to Assignee all of Avaya's and such other Assignor's worldwide right, title and interest in, to and under, the Assigned Trademarks, together with that portion of such Assignor's business connected with the use of and symbolized by the Assigned Trademarks, and all past and present goodwill associated therewith or symbolized thereby, all common law rights thereto, all registrations that have been or may be granted thereon, all applications for registrations thereof, the right to claim priority in accordance with international treaties and conventions, the right to all income, royalties, damages and payments hereafter due or payable with respect to the Assigned Trademarks, the right to register, prosecute, maintain and defend the Assigned Trademarks before any public or private agency, office or registrar, and all claims, causes of action and rights to sue for past, present and future infringement or unconsented use of the Assigned Trademarks. The assignments contemplated herein are meant to be absolute assignments and not by way of security. Each of Avaya and the other Assignors hereby authorizes the Commissioner of Patents and Trademarks in the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities, to record Assignee as the assignee of all of Avaya's and such other Assignor's right, title and interest in, to and under the Assigned Trademarks and to deliver to

Assignee, and to Assignee's attorneys, agents, successors or assigns, all official documents and communications.

2.    <u>No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder.

3.    <u>Terms of Purchase Agreement; Conflicts</u>.   The scope, nature, and extent of the Transferred Assets are expressly set forth in the Purchase Agreement.  Nothing contained herein changes, amends, extends, or alters (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever.  This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein.  In the event of any conflict between the provisions of this Assignment (including the Exhibits) and the provisions of the Purchase Agreement (including the Disclosure Schedules and Exhibits), the provisions of the Purchase Agreement shall control.

4.    <u>Governing Law</u>.  This Assignment, the negotiation, execution or performance of this Assignment and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

5.    <u>Entire Agreement</u>.  This Assignment, and the Exhibits annexed hereto, and the Purchase Agreement, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding among the parties hereto with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto.  The parties hereto agree to define their rights, liabilities, and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Assignment, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Assignment or the Purchase Agreement.

6.    <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute the original form of this Assignment and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic

2

Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Assignment as of the date first written above.

**ASSIGNORS:**

**AVAYA INC.**

By: _____
Name:
Title:

**AVAYA HOLDINGS LIMITED**

By: _____
Name:
Title:

[SIGNATURE PAGE TO TRADEMARK ASSIGNMENT AGREEMENT]

**ASSIGNEE:**

**EXTREME NETWORKS, INC.**

By: _____
Name:
Title:

## EXHIBIT A

## ASSIGNED TRADEMARKS

| | Name | Jurisdiction | Application/ Registration No. | Status | Registration Date | Record Owner |
|---|---|---|---|---|---|---|
| 1 | **BAYSTACK** | Canada | 567746 | Registered | 9/19/2002 | Avaya Holdings Limited |
| 2 | **BAYSTACK** | EU | 1562115 | Registered | 4/30/2001 | Avaya Holdings Limited |
| 3 | **BAYSTACK** | US | 2456966 | Registered | 6/5/2001 | Avaya Holdings Limited |
| 4 | **CONTIVITY** | Argentina | 2511972 | Registered | 6/25/2002 | Avaya Holdings Limited |
| 5 | **CONTIVITY** | Brazil | 821249169 | Registered | 7/16/2002 | Avaya Holdings Limited |
| 6 | **CONTIVITY** | Canada | 548958 | Registered | 7/31/2001 | Avaya Holdings Limited |
| 7 | **CONTIVITY** | China | 1399370 | Registered | 5/21/2000 | Avaya Holdings Limited |
| 8 | **CONTIVITY** | Colombia | 226197 | Registered | 1/21/2010 | Avaya Holdings Limited |
| 9 | **CONTIVITY** | Finland | 215358 | Registered | 8/31/1999 | Avaya Holdings Limited |
| 10 | **CONTIVITY** | Hong Kong | 199916995 | Registered | 6/10/1998 | Avaya Holdings Limited |
| 11 | **CONTIVITY** | Israel | 124405 | Registered | 11/4/1999 | Avaya Holdings Limited |
| 12 | **CONTIVITY** | Japan | 4352293 | Registered | 1/21/2000 | Avaya Holdings Limited |
| 13 | **CONTIVITY** | Korea (South) | 4004571500000 | Registered | 10/21/1999 | Avaya Holdings Limited |
| 14 | **CONTIVITY** | New Zealand | 302353 | Registered | 5/6/1999 | Avaya Holdings Limited |
| 15 | **CONTIVITY** | Sweden | 339406 | Registered | 8/11/2000 | Avaya Holdings Limited |

|    | Name | Jurisdiction | Application/ Registration No. | Status | Registration Date | Record Owner |
|----|------|-------------|-------------------------------|--------|-------------------|--------------|
| 16 | **CONTIVITY** | Taiwan | 962861 | Registered | 9/30/2001 | Avaya Holdings Limited |
| 17 | **CONTIVITY** | US | 2301696 | Registered | 12/21/1999 | Avaya Holdings Limited |
| 18 | **IDENGINES** | US | 3349489 | Registered | 12/4/2007 | Avaya Inc. |
| 19 | **IGNITION** | US | 3349580 | Registered | 12/4/2007 | Avaya Inc. |

SUBLEASE

BETWEEN

**EXTREME NETWORKS, INC.**
SUBLESSOR

and

**AVAYA CANADA CORP.**
SUBLESSEE

Dated: _____2017

\* \* \* \*

       The mailing, delivery or negotiation of this Sublease shall not be deemed an offer to enter into any transaction or to enter into any other relationship, whether on the terms contained herein or on any other terms.  This Sublease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Sublease and the Head Landlord has consented in writing to this Sublease.  Until such execution and delivery of, and consent to this Sublease, either party may terminate all negotiation and discussion of the subject matter hereof, without cause and for any reason, without recourse or liability.

\* \* \* \*

## SUBLEASE

This Sublease is entered into as of this _____ day of _____, 2017 by and between EXTREME NETWORKS, INC. (hereinafter "**Sublessor**"), and AVAYA CANADA CORP. (hereinafter "**Sublessee**").

## INTRODUCTORY STATEMENTS

A.      By Memorandum of Agreement of Lease dated September 12, 2011 (the "**Head Lease"**) which is attached hereto as **Exhibit A**, by and between 425 LEGGET DRIVE PROPERTY GP INC, in its capacity as general partner for 425 LEGGET DRIVE PROPERTY, LIMITED PARTNERSHIP  ("**Head Lessor**"), Avaya Canada Corp. (the "**Tenant**") and Avaya Inc. (the "**Indemnifier**"), pursuant to which the Head Lessor leased to the Tenant certain space in the building commonly known as 425 Legget Drive, Ottawa, Ontario, Canada (the "**Building**") consisting of approximately 103,443 rentable square feet (the "**Premises**").

B.      By an Assignment of Lease, dated _____, 2017, Tenant has assigned its interest as tenant under the Head Lease to Sublessor.

C.      Sublessee has agreed to sublet from Sublessor certain portions of the Building.

D.      The parties desire to enter into this Sublease defining their respective rights, duties and liabilities relating to the Subleased Premises (defined below).

## WITNESSETH

NOW THEREFORE, Sublessor and Sublessee, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and each with intent to be legally bound, for themselves and their respective successors and assigns, agree as follows:

### 1.      SUBLEASE

Sublessor, for and in consideration of the Sublessee's payment of the rent and performance of the covenants contained in this Sublease, does hereby demise and lease to Sublessee the following portions of the Building: approximately 56,968 rentable square feet on the 1st floor of the Building as shown on the floor plan which is attached hereto as **Exhibit B** (the "**Subleased Premises**").

### 2.      PARKING

Sublessee shall be entitled to use the parking spaces in accordance with the Head Lease for the same amount of spaces it currently occupies as of the date hereof.

3.      **HEAD LEASE**

A true copy of the Head Lease is attached hereto as **Exhibit A**.  Where not expressly inconsistent with the terms hereof and except as otherwise stated herein to the contrary, this Sublease shall be subject and subordinate to all of the terms and conditions contained in the Head Lease as said terms and conditions affect the Subleased Premises, and all of the terms and conditions of the Head Lease, except as otherwise set forth herein, are hereby incorporated into this Sublease and shall be binding upon Sublessee with respect to the Subleased Premises to the same extent as if Sublessee were named as tenant and Sublessor as landlord under the Head Lease.  For purposes of this Sublease, references in the Head Lease to the "Term" shall mean the Term of this Sublease (defined below) and references to the "Premises" in the Head Lease shall mean the Subleased Premises.  Except as otherwise provided herein, when any fraction, factor or formula, which is based on the number of square feet leased, is expressed in the Head Lease, it will be adjusted by substituting the number of square feet of the Subleased Premises for the number of square feet of the Premises leased in the Head Lease.  Each party to this Sublease agrees that it shall not do or omit to do anything which would result in a default under the Head Lease, and each party to this Sublease agrees to indemnify and hold the other harmless from and against all claims, demands or liabilities resulting from such party's breach, violation or nonperformance of any of its obligations under the Head Lease, as incorporated herein.  For the sake of clarity, if Sublessee fails to satisfy its payment or other obligations under this Agreement, then Sublessee shall be deemed to be in breach of the Head Lease.  With the exceptions set forth herein, Sublessee shall be entitled to all of the rights and privileges of the Sublessor as tenant under the terms of the Head Lease with respect to the Subleased Premises.

4.      **DEFINITIONS**

All terms not expressly defined in this Sublease shall have the meanings given to them in the Head Lease.

5.      **HEAD LESSOR**

Sublessee agrees to look solely to the Head Lessor, and not to Sublessor, for the performance of all services and obligations of the Head Lessor under the Head Lease with respect to the Subleased Premises.  At Sublessee's written request and expense, Sublessor will take all reasonable actions necessary to enable Sublessee to enforce the Sublessor's rights as tenant under the Head Lease with respect to the Subleased Premises.

6.      **TERM; END OF TERM**

(a)      The term of this Sublease (the "**Term**") shall commence on the later of: (i) the date on which Sublessor has obtained the written consent of the Head Lessor; and (ii) the date on which the transaction contemplated by the **asset purchase agreement made as of March 7, 2017 between the Sublessor, the Sublessee and Avaya Inc. has been completed** (the "**Commencement Date**") (provided that if the Commencement Date has not occurred by December 31, 2017, this Sublease shall be null and void), and ending on December 31, 2022 ("**Termination Date**").  The Term is subject to the term of the Head Lease.  In the event that the term of the Head Lease expires or is terminated at any time, the Term of this Sublease shall

terminate one (1) day prior to the termination or expiration of the term of the Head Lease. If requested by either party, the parties agree to execute a Commencement Date Memorandum upon receipt of the Head Lessor's consent.

(b)    Upon the expiration or other termination of the Term of this Sublease, Sublessee shall peaceably quit and surrender to Sublessor the Subleased Premises and remove all alterations and additions thereto, broom clean, in good order, repair and condition excepting only ordinary wear and use and damage by fire or other casualty for which, under other provisions of this Sublease, Sublessee has no responsibility of repair or restoration. Sublessee shall remove all of its property and, to the extent specified by Sublessor, all alterations and additions made by Sublessee and all partitions wholly within the Subleased Premises, and shall repair any damage to the Subleased Premises or the Building caused by their installation or by such removal. Within ten (10) days prior to the expiration or other termination of the Term of this Sublease, Sublessor or its agents shall have the right, but not the obligation, to conduct a walk-thru of the Subleased Premises to determine the condition of the Subleased Premises and to prepare a punch-list for Sublessee of the items Sublessee is required to repair and restore pursuant to this Subparagraph 6(b). Sublessee's obligation to observe or perform this covenant shall survive the expiration or other termination of this Sublease. Sublessee will remove any personal property from the Building and the Subleased Premises upon or prior to the expiration or termination of this Sublease and any such property which shall remain in the Building or the Subleased Premises thereafter shall be conclusively deemed to have been abandoned, and may either be retained by Sublessor as its property or sold or otherwise disposed of in such manner as Sublessor may see fit. If any part thereof shall be sold, Sublessor may receive and retain the proceeds of such sale and apply the same, at its option, against the expenses of the sale, the cost of moving and storage, any arrears of Rent, additional or other charges payable hereunder by Sublessee to Sublessor and/or any damages to which Sublessor may be entitled pursuant to this Sublease.

7.    **RENT**

(a)    Base Rent

Commencing on the Commencement Date, basic rent under this Sublease shall be Base Rent, and shall be as follows: 1) Twelve and 65/100  Dollars ($12.65 CAD) per rentable square foot per annum payable in equal monthly installments of $60,053.77CAD until the end of the fifth year of the Term of the Head Lease, which is October 30, 2017; and 2) starting on November 1, 2017 Thirteen and 85/100 Dollars ($13.85 CAD) per rentable square foot per annum payable in equal monthly installments of $65,750.57 CAD.

(b) Additional Rent:

In addition to the Base Rent set forth in subparagraph 7(a) above, Sublessee shall pay Sublessor (as and when due under the terms of the Head Lease), as additional rent, without duplication; (i) all goods and services taxes, sales taxes, and value added taxes imposed on Sublessee and required to be paid by Sublessor in respect of Sublessee's Base Rent and Additional Rent; (ii) Sublessee's proportionate share (being a fraction which has as its numerator the rentable area of the Subleased Premises and as its denominator the rentable area of the

Premises) of the Tenant's Proportionate Share Real Estate Taxes, Operating Expenses and Tax on Capital, subject to and in accordance with Sections 5 and 6 of the Head Lease; and (iii) its proportionate share of electricity consumed in the Subleased Premises (being a fraction which has as its numerator the rentable area of the Subleased Premises and as its denominator the rentable area of the Premises).

(c)    The Rent shall be payable in lawful money of Canada.

(d)    The terms "Base Rent" and "basic rent" are each sometimes referred to herein as "Rent" or "rent" and shall include all sums due from Sublessee to Sublessor under the terms of this Sublease.  Sublessee shall pay all basic rent when due and, in the case of basic rent, without notice of any  kind, and without any abatement, deduction or set-off for any reason whatsoever, except as may be explicitly provided in this Sublease.  All Rent shall be payable at the office of the Sublessor at the following address:

Regular Mail to:

Extreme Networks, Inc.
6480 Via Del Oro
San Jose, CA 95119

Overnight Mail to:

Extreme Networks, Inc.
6480 Via Del Oro
San Jose, CA 95119

or at such other address as directed by written notice from Sublessor to Sublessee.

(c)    Timely payment is of the essence of this Sublease and Sublessee may not delay or refuse any payment of Base Rent for any reason.  All sums owning by Sublessee under this Sublease not paid when due shall be subject to Section 25(d) under the Head Lease.

8.    **USE OF SUBLEASED PREMISES**

(a)    The Subleased Premises shall only be used as permitted under the Head Lease, and Sublessee shall not, without the Sublessor's prior written consent, use, suffer or permit the use of all or any portion thereof for any other purpose.  The Sublessee shall use the Subleased Premises and all parking areas, sidewalks, hallways or other similar facilities or areas of the Building or the land on which the Building is located ("**Building Parcel**") available for use by the Sublessee in common with other occupants of the Building (collectively, "**Common Areas**") only as permitted by the terms of the Head Lease and in a careful, lawful, safe and proper manner and in accordance with all requirements of any governmental or quasi-governmental body and, in addition, shall comply with such reasonable rules and regulations as the Head Landlord may from time to time impose, as may be permitted under the Head Lease,

upon written notice to Sublessee.  The Sublessee shall not use the Subleased Premises or any of the Common Areas for any use or activity which is hazardous or which would constitute a nuisance or which: (i) would violate any covenant, agreement, term, provision or condition of the Head Lease or this Sublease, (ii) is in contravention of the certificate of occupancy for the Subleased Premises or the Building, (iii) would violate any requirement of any governmental or quasi-governmental body or (iv) may in any way impair or interfere with any of the Building services or the proper and economic heating, air conditioning, cleaning or other servicing of the Subleased Premises or the Building, the Common Areas or the Building Parcel or any portion thereof or impair or interfere with the use of any of the Common Areas by, or occasion discomfort, inconvenience or annoyance to, other occupants of the Building or their employees, guests or invitees (including, without limitation, the Sublessor) or impair the appearance of the Building.

   (b)   As between Sublessor and Sublessee, Sublessee shall be solely responsible for the performance of those items of maintenance and repair of the Subleased Premises specified as being the responsibility of the Sublessor as tenant under the Head Lease. In this regard, the Sublessee shall, to the same extent as required by Sublessor as tenant under the Head Lease:

     (i)  Promptly comply with all laws, orders, rules and requirements of governmental authorities, insurance carriers, board or fire underwriters, or similar groups.

     (ii)  Maintain the Subleased Premises and all equipment and fixtures in it in good repair and appearance, ordinary wear and tear excepted.

     (iii)  Make all necessary repairs to the Subleased Premises and all equipment and fixtures in it, except structural repairs.

     (iv)  Maintain the Subleased Premises in a neat, clean, safe, and sanitary condition, free of all garbage.

     (v)  Use all electric, plumbing and other facilities in the Subleased Premises safely.

     (vi)  Use no more electricity than the wiring or feeders to the Subleased Premises can safely carry.

     (vii)  Promptly replace all broken glass in the Subleased Premises.

     (viii)  Do nothing to destroy, deface, damage, or remove any part of the Subleased Premises.

     (ix)  Keep nothing in the Subleased Premises which is inflammable, dangerous or explosive or which might increase the danger of fire or other casualty in the Subleased Premises or the Building.

     (x)  Do nothing to destroy the peace and quiet of the Sublessor, other tenants, or persons in the neighborhood.

(xi)     Avoid littering in the Building or on its grounds.

The Sublessee shall pay any and all expense involved in complying with the above.

(c)     The Sublessee shall indemnify and hold the Sublessor harmless from and against any fine, penalty, cost, expense (including, without limitation, reasonable attorneys' fees) or other damage or loss suffered by the Sublessor as a result of the Sublessee's failure to perform its obligations under the Head Lease or this Sublease, including without limitation this Paragraph 8. All of the Sublessee's obligations under this Paragraph 8 shall survive termination of this Sublease and surrender of the Subleased Premises to the Sublessor.

## 9.     DEFAULT OF SUBLESSEE AND SUBLESSOR'S  REMEDIES. REMEDIES

The provisions of Article 23 of the Head Lease are incorporated herein, with Sublessee being substituted for Tenant, Sublessor being substituted for Landlord, and Sublease being substituted for Lease.

## 10.     CONDITION OF PREMISES

Sublessee acknowledges that it has examined the Subleased Premises and is taking the Subleased Premises, including all existing leasehold improvements of Sublessor existing on the date of this Sublease, and all existing wiring and cabling within the Subleased Premises, in their "AS IS" condition on the date hereof, subject to reasonable wear and tear, and damage from fire or other casualty. Sublessor shall have no obligations to make any alterations or improvements to the Subleased Premises to make them ready for Sublessee's occupancy.

## 11.     ALTERATIONS

Sublessee shall not make any alterations, improvements or installations in or to the Subleased Premises without the prior written consent of Sublessor, which consent shall not be unreasonably withheld, conditioned or delayed; *provided* that any such alterations, improvement or installations must be approved by the Head Lessor as provided in the Head Lease. All alterations and improvements shall be subject to the terms and conditions of the Head Lease, and in those instances, if required, shall be subject to the Head Lessor's approval as provided in the Head Lease. Any alterations, improvements or installations consented to by Sublessor shall be made at the sole cost and expense of Sublessee.

## 12.     REPAIRS AND MAINTENANCE

Any repair and maintenance obligations with respect to the Subleased Premises which are the responsibility of the Sublessor, as tenant under the Head Lease, shall be performed by Sublessee at Sublessee's sole cost and expense. Sublessee agrees that it will notify Sublessor promptly of the need for any repair to the Subleased Premises, even if Sublessor is not responsible for any such repair. Notwithstanding anything contained herein to the contrary, in the event that a condition exists in the Subleased Premises that Head Lessor is obligated to repair under the terms of the Head Lease, Sublessee shall so advise Sublessor, and Sublessor, in turn,

shall promptly advise Head Lessor thereof.  Sublessor shall have no liability to Sublessee for Head Lessor's failure to make any such repair.

### 13.    UTILITIES AND SERVICES

Sublessee shall be entitled to all those services and utilities which Head Lessor is required to provide under the terms of the Head Lease.  Sublessee shall pay, to Sublessor, for tenant electric charges as and when due under the Head Lease. Sublessee shall look solely to the Head Lessor for the provision of such services and utilities, and Sublessor shall not be responsible for Head Lessor's failure to provide the same nor shall any such failure constitute an abrogation of any other terms or conditions of this Sublease.  To the extent that Head Lessor charges Sublessor for any increases in the cost of such services or utilities and such charge or increase is due to Sublessee's use of the Subleased Premises or such utilities or services, Sublessee agrees to pay the charges therefore promptly to Sublessor upon receipt of Sublessor's bill.  If Sublessee fails to make payments for Sublessee's utility charges, Sublessor shall not be liable for any interruption of services.

### 14.    ASSIGNMENT AND SUBLEASING

(a)    Sublessee shall not have the right to assign this Sublease or sublet the Subleased Premises, in whole or in part, without the prior written consent of Sublessor which shall not be unreasonably withheld, conditioned or delayed, and Head Lessor if required under the Head Lease.  The consent by Sublessor to any assignment or to any sublease or occupancy of the Subleased Premises by any other party than Sublessee, or any part thereof, shall not be deemed to relieve or release (i) Sublessee from the full performance and observance by Sublessee of all of its obligations under this Sublease, or (ii) Sublessee or any assignee or sublessee of Sublessee from the obligation of obtaining the consent in writing of Sublessor and Head Lessor to any further assignment, sublease or occupancy.  Sublessee shall pay to Sublessor upon demand, (x) any cost, expense or fee of Head Lessor charged to Sublessor or to Sublessee which is required to be paid in connection with any assignment, subletting or occupancy pursuant to this Paragraph 14, and (y) any reasonable cost or expense of Sublessor which is incurred by Sublessor from non-related third parties in connection with any request for consent to any assignment, subletting or occupancy pursuant to this Paragraph.

(b)    In the event that Sublessee shall desire Sublessor's consent to an assignment of this Sublease or to a subletting of all or any part of the Subleased Premises, Sublessee shall request such consent by submitting to Sublessor a proposal setting forth the terms and conditions of the assignment or sublease and financial information with respect to the assignee or sublessee, and such other information as Sublessor may reasonably require.

(c)    In the event that Sublessor and Head Lessor shall grant their consent to subletting all or part of the Subleased Premises or an assignment of this Sublease, Sublessee shall, in consideration therefor, promptly pay to Sublessor as Additional Rent, as and when received by Sublessee, fifty percent (50%) of the Net Profit (as hereinafter defined), if any, and deliver to Sublessor an executed copy of such assignment or sublease.  The term, "Net Profit" shall mean (i) in the case of a sublease, the amount by which the amounts payable to Sublessee by any subtenant of Sublessee for rent and additional rent or other consideration paid under the sublease

(including, but not limited to, sums paid for the sale or rental of Sublessee's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, to the extent that such sums are in excess of the fair market value thereof) exceed the amounts payable by Sublessee to Sublessor for Base Rent and Additional Rent in connection with the sublet portion of the Subleased Premises after Sublessee has first fully recovered all of its reasonable and customary transaction costs incurred in connection with such subleasing or assignment, and (ii) in case of an assignment, an amount equal to any amounts paid by any assignee of Sublessee, to Sublessee, as consideration for said assignment (including, but not limited to, sums paid for the sale or rental of Sublessor's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property) less, in either case, the reasonable and customary real estate brokers commissions, marketing expenses and attorneys' fees incurred by Sublessee in connection therewith.

(d)    If this Sublease shall be assigned or if the Subleased Premises, or any part thereof, shall be sublet or occupied by any person or persons other than Sublessee, whether or not such assignment, sublet or occupancy was made with the consent of Sublessor, Sublessor may after an Event of Sublease Default by Sublessee, collect rent from the assignee, subtenant or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection of rent shall be deemed a waiver of any of the covenants, terms or provisions contained in this Section, nor shall it be deemed an acceptance of the assignee, subtenant or occupant as subtenant hereunder, or a release or Sublessee from the full performance and observance by Sublessee of all of the covenants and obligations contained in this Sublease on the part of Sublessee to be performed or observed.

## 16.    INSURANCE

Sublessee agrees to comply with all of the insurance requirements and obligations of Sublessor as set forth in the Head Lease and to name both Sublessor and Head Lessor as additional insureds on any required insurance policies.

## 17.    COMPLIANCE WITH LAWS

(a)    In addition to any obligations under the Head Lease, Sublessee shall promptly comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, Provincial and municipal Governments applicable to the use and occupancy of the Subleased Premises by Sublessee or any subtenant or assignee of Sublessee, for the correction, prevention and abatement of nuisances, violations or other grievances, in, upon or connected with the Subleased Premises during the Term or any renewal thereof (collectively referred to as "Legal Requirements") at its own cost and expense.  Nothing in this paragraph shall be deemed a consent to the alteration, subletting or assignment of all or any portion of the Subleased Premises or of all or any of Sublessee's interests in this Sublease.

(b)    If Sublessee shall fail or neglect to comply with the aforesaid Legal Requirements, or if Sublessee shall fail or neglect to make any repairs required by the terms of this Sublease, then Sublessor or its agents may (but shall not be obligated to) enter the Subleased Premises and take such actions as necessary to cure the breach and comply with any and all of the said Legal Requirements, at the cost and expense of Sublessee; and, in case of Sublessee's

failure to pay therefor, the said cost and expense shall be added to the next month's Rent and be due and payable as such.

## 18.    LIMITATIONS ON SUBLESSOR'S LIABILITY

(a)    Sublessee acknowledges that Sublessor has made no representations or warranties with respect to the Building or the Subleased Premises except as provided in this Sublease and Sublessee accepts the Subleased Premises in its "AS IS" condition.

(b)    If Sublessor assigns its leasehold estate in the Building, Sublessor shall have no obligation to Sublessee arising after the date of such assignment.  Sublessee shall then recognize Sublessor's assignee as Sublessor of this Sublease.

(c)    Sublessor shall not be required to perform any of the covenants and obligations of the Head Lessor under the Head Lease, and insofar as any of the obligations of the Sublessor hereunder are required to be performed under the Head Lease by the Head Lessor thereunder, Sublessee shall rely on and look solely to the Head Lessor for the performance thereof.  If the Head Lessor shall default in the performance of any of its obligations under the Head Lease or breach any provision of the Head Lease pertaining to the Subleased Premises, Sublessee shall have the right, at Sublessee's expense and upon prior notice to Sublessor, and in the name of Sublessor to make any demand or institute any action or proceeding, in accordance with and not contrary to any provision of the Head Lease, against the Head Lessor under the Head Lease for the enforcement of the Head Lessor's obligations thereunder.  Sublessee shall defend, indemnify and hold Sublessor harmless from and against any suit, action, cost, expense, damage or liability which arises out of or results from or is alleged to arise out of or result from Sublessee's exercise of its rights under this paragraph.

## 19.    ESTOPPEL CERTIFICATES

Either party hereto (the requested party) agrees that from time to time upon not less than ten (10) days prior notice by the other party (requesting party), the requested party or its duly authorized representative having knowledge of the following facts will deliver to the requesting party, or to such person or persons as the requesting party may designate, a statement in writing certifying (a) that this Sublease is unmodified and in full force and effect (or if there have been modifications, that the Sublease as modified is in full force and effect); (b) the date to which the Rent and other charges have been paid; (c) that to the best of the requested party's knowledge, the requesting party is not in default under any provision of this Sublease or if in default, the nature thereof in detail.

## 20.    SUBORDINATION

This Sublease shall be automatically subject and subordinate to the Head Lease, any ground lease and to any mortgage or deed of trust thereon or on the fee simple interest in the Building or the land on which the Building is located.  This Paragraph 20 shall be self-operative and no further instrument of subordination shall be required, it being understood that neither Head Lessor nor Sublessor shall be obligated to provide Sublessee with any non-disturbance agreement.  To confirm such subordination, Sublessee shall execute within ten (10) days after demand, or such shorter period as may be required under the Head Lease, any reasonable

certificate, agreement or instrument that Head Lessor requests Sublessee to execute pursuant to the terms of the Head Lease.

### 21.    CASUALTY AND CONDEMNATION

If the Head Lease is terminated with respect to the Subleased Premises pursuant to the provisions of the Head Lease due to casualty or condemnation, this Sublease shall automatically terminate at the same time and Sublessee shall have no claim against Sublessor or Head Lessor for the loss of its subleasehold interest or any of Sublessee's property.  If the Head Lease is not terminated with respect to the Subleased Premises upon the occurrence of a casualty or condemnation, the provisions of the Head Lease with respect to casualty or condemnation shall apply to this Sublease and the Subleased Premises.

### 22.    CONSENT OR APPROVAL OF HEAD LESSOR

If the consent or approval of Head Lessor is required under the Head Lease with respect to any matter relating to the Subleased Premises, Sublessee shall be required first to obtain the consent or approval of Sublessor with respect thereto and, if Sublessor grants such consent or approval, Sublessor or Sublessee may forward a request for consent or approval to the Head Lessor, but Sublessor shall not be responsible for obtaining such consent or approval.  Sublessor shall have no liability to Sublessee for the failure of Head Lessor to give its consent.

### 23.    NOTICES

All notices given pursuant to the provisions of this Sublease shall be in writing, addressed to the party to whom notice is given and sent registered or certified mail, return receipt requested, in a postpaid envelope or by nationally recognized overnight delivery service as follows:

To Sublessee at the following address:

> Avaya Canada Corp.
> 11 Allstate Parkway Suite 300
> Markham, Ontario, L3R 9T8
> Attention: Wasim Haque | Canada Controller

To Sublessor at the following address:

> Extreme Networks
> 6480 Via Del Oro
> San Jose, CA 95119
> Attention: Ted Lawson

It is understood and agreed that unless specifically modified by this Sublease, Sublessor shall be entitled to the length of notice required to be given Head Lessor under the Head Lease plus five (5) days and shall be entitled to give Sublessee the amount of notice required to be

given tenant under the Head Lease less five (5) days.  All notices shall be deemed given upon receipt or rejection.

Either party by written notice to the other may change or add persons and places where notices are to be sent or delivered.

### 24.    BROKERS

Sublessor hereby confirms to and in favour of Sublessee that it has not retained the services of a broker in connection with this Sublease, Sublessee hereby confirms to and in favour of Sublessor that it has not retained the services of a broker in connection with this Sublease.

### 25.    SUBLESSOR'S AND SUBLESSEE'S POWER TO EXECUTE

Sublessor (subject to Head Lessor's consent) and Sublessee covenant warrant and represent that they have full power and proper authority to execute this Sublease.

### 26.    CONSENT TO SUBLEASE BY HEAD LESSOR

This Sublease shall not become operative until and unless the Head Lessor has given to Sublessor its consent hereto.  Sublessor shall not be responsible for Head Lessor's failure to consent to this Sublease.  Should Head Lessor not consent to this Sublease, each party shall be released from all obligations with respect hereto and neither party shall have any further rights in law or in equity with respect to this Sublease.

### 27.    ENTIRE AGREEMENT

This Sublease (which includes each of the Exhibits attached hereto) contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Sublease.  This Sublease may not be changed, modified, terminated or discharged, in whole or in part, nor any of its provisions waived except by a written instrument which (a) shall expressly refer to this Sublease and (b) shall be executed by the party against whom enforcement of the change, modification, termination, discharge or waiver shall be sought.

### 28.    RULES AND REGULATIONS

Sublessee shall comply with all rules and regulations regarding the Subleased Premises and the Building as may be prescribed by Sublessor and Head Lessor including without limitation, the rules and regulations set forth in the Head Lease.

### 29.    GOVERNING LAW

The exercise, validity, construction, operation and effect of the terms and provisions of this Sublease shall be determined and enforced in accordance with the laws of the Province of Ontario.

### 30.    NO AUTHORITY

The Sublessee has no authority to contact or make any agreement with the Head Lessor about the Subleased Premises or the Head Lease, unless agreed to by all the parties.  No purported agreement between Head Lessor and Sublessee shall be binding upon Sublessor, and shall not act to increase or modify Sublessor's obligations or liabilities under the Head Lease, unless and except Sublessor has documented its agreement in a signed writing.  The Sublessee may not pay rent or other charges to the Head Lessor, but only to the Sublessor, unless otherwise instructed in a written notice signed by Sublessor.

### 31.    **SUCCESSORS**

Unless otherwise stated, the Sublease is binding on all parties who lawfully succeed to the rights or take the place of the Sublessor or the Sublessee.

### 32.    **MISCELLANEOUS**

(a)    The headings of the articles and the numbers of the items in this Sublease are inserted as a matter of convenience to the parties and shall not affect the construction of this Sublease.

(b)    The terms, conditions, covenants and provisions of this Sublease shall be deemed to be severable.  If any clause or provision herein contained shall be adjudged to be invalid or unenforceable by a court of competent jurisdiction or by operation of any applicable law, it shall not affect the validity of any other clause or provision herein, but such other clauses or provisions shall remain in full force and effect.  In addition, Sublessor may pursue the relief or remedy sought in any invalid clause, by conforming the said clause with the provisions of the statutes or the regulations of any governmental agency in such case made and provided as if the particular provisions of the applicable statutes or regulations were set forth herein at length.

(c)    In all references herein to any parties, person, entities or corporations the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the context of the within instrument may require.  All the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the parties hereto, and their respective heirs, executors, administrators, personal or legal representatives, successors and assigns.

### 33.    **FURNITURE**

Sublessee shall continue to own all furniture and equipment currently located at the Premises on the date hereof.

### 34.    **FORCE MAJEURE**

In the event Sublessor or Sublessee shall be delayed, hindered or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor or materials, delay in obtaining governmental approvals or permits, strikes, fire, or any other reasons beyond its reasonable control ("Force Majeure"), the performance of such act shall be excused for the period of delay, and the period for performance of any such act shall be extended as necessary to complete performance after the delay period.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be properly executed as of the day and year first above written.

ATTEST/WITNESS:                         **SUBLESSOR**
                                        **EXTREME NETWORKS, INC.**

_____          By:    _____

_____                 _____
Name and Title                          Name and Title


ATTEST/WITNESS:                         **SUBLESSEE**
                                        **AVAYA CANADA CORP.**



_____          By:    _____

_____                 _____
Name and Title                          Name and Title

# **EXHIBIT A**

## Head Lease

# EXHIBIT B

Description of Subleased Premises





## FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT

This DOMAIN NAME ASSIGNMENT AGREEMENT is dated as of [●], 2017 (this "**Assignment**"), and is by and among AVAYA INC., a Delaware corporation ("**Avaya**"), and Extreme Networks, Inc., a Delaware corporation ("**Assignee**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, Assignors are the owners of the domain name registrations identified on **Exhibit A** (collectively, the "**Assigned Domain Names**");

WHEREAS, Avaya and Assignee have entered into that certain Asset Purchase Agreement, dated March 7, 2017 (the "**Purchase Agreement**"), pursuant to which Avaya has agreed to sell, transfer, assign and deliver to Assignee, and Assignee has agreed to purchase, acquire, assume and accept from Avaya all of its right, title and interest in and to the Transferred Assets, all upon the terms and subject to the conditions set forth in the Purchase Agreement, which assets include the Assigned Domain Names; and

WHEREAS, this Assignment is being executed and delivered pursuant to Section 2.02(a) of the Purchase Agreement.

NOW, THEREFORE, in accordance with the Purchase Agreement and in consideration of the premises and the mutual agreements and covenants set forth in this Assignment and the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.      <u>Assignment</u>.  Avaya hereby sells, conveys, transfers, assigns and delivers to Assignee all of Avaya's worldwide right, title and interest in, to and under, the Assigned Domain Names and the relevant registry entity registrations related thereto, together with all right, title and interest in all claims for damages by reason of past, present or future infringement of any rights in and to the Assigned Domain Names, with the right to sue for and collect the same.

2.      <u>No Third Party Beneficiaries</u>.  This Assignment is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder.

3.      <u>Terms of Purchase Agreement; Conflicts</u>.  The scope, nature, and extent of the Transferred Assets are expressly set forth in the Purchase Agreement.  Nothing contained herein changes, amends, extends, or alters (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever.  This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement.  The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein.  In the event of any conflict between

the provisions of this Assignment (including the Exhibits) and the provisions of the Purchase Agreement (including the Disclosure Schedules and Exhibits), the provisions of the Purchase Agreement shall control.

4.      Governing Law.  This Assignment, the negotiation, execution or performance of this Assignment and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

5.      Entire Agreement.  This Assignment, and the Exhibits annexed hereto, and the Purchase Agreement, and the other agreements, certificates, and other documents contemplated hereby and thereby constitute the entire understanding among the parties hereto with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto.  The parties hereto agree to define their rights, liabilities, and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of the Purchase Agreement and this Assignment, and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Assignment or the Purchase Agreement.

6.      Counterparts.  This Assignment may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto shall re-execute the original form of this Assignment and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

[SIGNATURE PAGE FOLLOWS]

2

IN WITNESS WHEREOF, the parties have duly executed this Assignment as of the date first written above.

**ASSIGNORS:**

**AVAYA INC.**

By: _____

Name:

Title:

**ASSIGNEE:**

**EXTREME NETWORKS, INC.**


By: _____
Name:
Title:

# EXHIBIT A

## ASSIGNED DOMAIN NAMES

| Domain Name | Expiration Date | Registrant Name | Registrant Organization | Registrar |
|---|---|---|---|---|
| idengines.com | 1/13/2018 | Domain Administrator | Avaya Inc. | MarkMonitor, Inc. |
| idengines.net | 8/12/2017 | Domain Administrator | Avaya Inc. | MarkMonitor, Inc. |
| identityengines.com | 2/11/2018 | Domain Administrator | Avaya Inc. | MarkMonitor, Inc. |
| identityengines.net | 2/11/2018 | Domain Administrator | Avaya Inc. | MarkMonitor, Inc. |

CONFIDENTIAL
**EXHIBIT G**

## FORM OF TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT is dated as of [●], 2017 (this "**Agreement**"), and is by and between AVAYA INC., a Delaware corporation ("**Avaya**"), and Extreme Networks, Inc., a Delaware corporation ("**Purchaser**"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, on January 19, 2017, Avaya, together with certain of its subsidiaries, filed voluntary petitions for relief (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, Purchaser and Avaya have entered into that certain Asset Purchase Agreement, dated March 7, 2017 (the "**Purchase Agreement**"), pursuant to which Avaya has agreed to, and to cause the applicable Sellers to, sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire and accept from the applicable Sellers all of their right, title and interest in and to the Transferred Assets and to assume the Assumed Liabilities, all upon the terms and subject to the conditions set forth in the Purchase Agreement; and

WHEREAS, to facilitate the transactions contemplated by the Purchase Agreement, Avaya and Purchaser deem it to be appropriate and in their mutual best interests that Avaya and its subsidiaries provide certain services to Purchaser and its subsidiaries and that Purchaser and its subsidiaries provide certain services to Avaya and its subsidiaries, in each case pursuant to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

ARTICLE I
SERVICES

Section 1.1    Description of Services.

(a)    On the terms and conditions of this Agreement, (i) Avaya shall provide, or cause to be provided by its applicable subsidiary, on a non-exclusive basis, the transition services set forth in Exhibit A hereto (collectively, the "**Seller Transition Services**"), to Purchaser or its applicable subsidiary and (ii) Purchaser shall provide, or cause to be provided by its applicable subsidiaries, on a non-exclusive basis, the transition services set forth in Exhibit B hereto (collectively, the "**Purchaser Transition Services**" and together with the Seller Transition Services, the "**Transition Services**"), to Avaya or its applicable subsidiary following the Closing. The Transition Services shall be limited to those services described in Exhibit A and Exhibit B unless specifically supplemented pursuant to Section 1.2 or modified by amendment in accordance with Section 7.12. It is understood that (i) the Seller Transition Services to be provided to Purchaser (or its applicable subsidiary) under this Agreement shall only be provided

for the purpose of conducting the Business substantially as conducted in the twelve months prior to the Closing (the "**Lookback Period**") and (ii) the Purchaser Transition Services to be provided to Avaya (or its applicable subsidiary) under this Agreement shall only be provided for the purpose of conducting Avaya's businesses other than the Business (the "**Retained Business**") as conducted in the Lookback Period.

(b)      The parties acknowledge and agree that (i) a party (in its capacity as a provider of Transition Services, the "**Providing Party**") may satisfy its obligations hereunder to provide Transition Services to the other party (such other party, the "**Receiving Party**") by causing one or more of its subsidiaries to provide or procure such Transition Services (in which case, such subsidiaries shall be included in the definition of "Providing Party" for all purposes hereof in respect of such Transition Services), which subsidiaries such Providing Party may change in its discretion from time to time and (ii) subject to a Providing Party's compliance with its obligations under this Agreement (including Section 1.5), a Providing Party or any of its subsidiaries may be providing similar services, and/or services that involve the same resources as those used to provide the Transition Services, to its internal organizations, other subsidiaries and/or Third Parties (as defined below).  If the provision of any Transition Service would violate any Law applicable to the Providing Party, the Providing Party shall notify the Receiving Party and the Providing Party may modify any or all of the Transition Services to the extent reasonably necessary so that the provision of such Transition Services would not violate any Law applicable to the Providing Party.

Section 1.2      Additional Services.

(a)      If Purchaser reasonably determines that additional services that (i) had been provided to the Business prior to the Closing but are not set forth in Exhibit A, (ii) are necessary to conduct the Business substantially as conducted during the Lookback Period, other than any services of the types listed on Exhibit C, and (iii) neither Purchaser nor any of its subsidiaries are reasonably able to provide or otherwise reasonably obtain such services (each such service, an "**Additional Seller Service**"), then Purchaser may, by written notice to Avaya, request that Avaya provide (or cause to be provided pursuant to Section 1.7(b)) such Additional Seller Service.  Upon receipt of such request by Avaya, Avaya shall consider any such request for Additional Seller Services in good faith and the parties will mutually discuss such request, including duration, service levels, resource requirements and additional associated Fees, it being understood that Avaya may no longer have the resources or personnel to provide such Additional Seller Service.  If the parties agree to the provision of such Additional Seller Service, the parties shall effect an amendment to Exhibit A setting forth the Additional Seller Service, the terms and conditions for the provision of such Additional Seller Service and the Fees payable by Purchaser for such Additional Seller Service, and such Additional Seller Service shall, as of such amendment to Exhibit A, be deemed "Seller Transition Services" for the purposes of this Agreement.  To the extent reasonably practicable, the Additional Seller Services shall be priced using a consistent pricing methodology with that used in pricing of other Seller Transition Services.

(b)      If Avaya reasonably determines that additional services had been provided to the Retained Business prior to the Closing but not set forth in Exhibit B are necessary to conduct the Retained Business substantially as conducted during the Lookback Period, other than

2

any services of the types listed on Exhibit D, and neither Avaya nor any of its subsidiaries are reasonably able to provide or otherwise reasonably obtain such services (each such service, an "**Additional Purchaser Service**"), then Avaya may, by written notice to Purchaser, request that Purchaser provide (or cause to be provided pursuant to Section 1.7(b)) such Additional Purchaser Service.  Upon receipt of such request by Purchaser, Purchaser shall consider any such request for Additional Purchaser Services in good faith and the parties will mutually discuss such request, including duration, service levels, resource requirements and additional associated Fees it being understood that Purchaser may not have the resources or personnel to provide such Additional Purchaser Service.  If the parties agree to the provision of such Additional Purchaser Service, the parties shall effect an amendment to Exhibit B setting forth the Additional Purchaser Service, the terms and conditions for the provision of such Additional Purchaser Service and the Fees payable by Avaya for such Additional Purchaser Service, and such Additional Purchaser Service shall, as of such amendment to Exhibit B, be deemed "Purchaser Transition Services" for the purposes of this Agreement.  To the extent reasonably practicable, the Additional Purchaser Services shall be priced using a consistent pricing methodology with that used in pricing of other Purchaser Transition Services.

Section 1.3    Shared Space.

(a)    The premises leased by a Seller, as lessee, as applicable (the "**Shared Leased Premises**"), pursuant to the leases set forth on Section 7 of Exhibit A (each, a "**Shared Space Lease**" and collectively, the "**Shared Space Leases**") are used both in the Business and in the Retained Business.

(b)    For the period commencing on the date hereof until the date that is set forth on Section 7 of Exhibit A with respect to each Shared Space Lease (each, a "**Shared Space Term**"), each of Avaya or its applicable subsidiary, on the one hand, and Purchaser or its applicable subsidiary (including, if applicable, the Transferred Assets or the Business), on the other hand, shall have the right to continue to use and occupy that portion of the Shared Leased Premises, and to use that portion of the common areas related to the Shared Leased Premises, that it uses and occupies as of the date hereof in substantially the same manner and on the same terms and conditions that it currently uses and occupies such space and for no other purpose nor in any other manner and, in any event, in accordance with the terms and conditions of the Shared Space Leases.  For the purposes of this Section 1.3, the party that is the tenant under the applicable Shared Space Lease immediately following the Closing is Avaya or its subsidiary and the party using the Shared Leased Premises pursuant to the terms hereof is Purchaser.  During the applicable Shared Space Term, with respect to each Shared Leased Premises (including all common areas related thereto), all costs relating to such Shared Leased Premises, including, rent, maintenance, water, sewer, telephone, electricity and gas service, common area charges, amounts of public liability, damage, fire, and extended coverage insurance as may be required under the Shared Space Lease, and any real estate property taxes owed by Avaya or its subsidiary (together, the "**Rental Costs**") shall be borne pro rata by Avaya or such subsidiary, on the one hand, and Purchaser, on the other hand, based on the portion of such Shared Leased Premises used and/or occupied by Avaya or its subsidiary or Purchaser, as the case may be, as set forth on Section 7 of Exhibit A.  Purchaser shall have no right to terminate its obligations hereunder with respect to any Shared Leased Premises for the duration of the service as set forth on Section 7 of Exhibit A. In the event that Purchaser vacates the Shared Leased Premises prior to the expiration of the

3

applicable Shared Space Term, Purchaser shall remain responsible for Purchaser's pro rata portion of the Rental Costs relating to such Shared Leased Premises for the remained of such Shared Space Term.

(c)    The Purchaser shall vacate its portion of the Shared Leased Premises on or prior to the expiration of the Shared Space Term applicable to the Shared Leased Premises.  The Purchaser shall be responsible for all moving and similar costs associated with vacating such Shared Leased Premises and will leave its portion of such Shared Leased Premises in broom clean condition; provided that the Purchaser shall not be responsible for returning its portion of the Shared Leased Premises to any pre-existing condition (other than fully cleaned), unless such obligation is imposed upon Avaya or its subsidiary pursuant to the applicable Shared Space Lease.

(d)    Purchaser shall indemnify, defend and hold harmless Avaya and its subsidiaries from and against all Losses imposed upon or incurred by or asserted against Avaya or its subsidiaries, as the case may be, by reason of (i) any accident, injury to or death of Persons or loss of or damage to property occurring on or about any portion of the Shared Leased Premises then used or occupied by Purchaser or its subsidiaries or any other Person (excluding Avaya or its subsidiaries), to the extent such Person's use or occupancy is authorized or permitted by Purchaser or its subsidiaries during the Shared Space Term, (ii) any failure on the part of Purchaser or its subsidiaries to perform or comply with any obligation of lessee under, or any other term of, any Shared Space Lease during the Shared Space Term, (iii) performance of any labor or services or the furnishing of any materials or other property in respect of any portion of the Shared Leased Premises then used or occupied by any Person (excluding Avaya or its subsidiaries), to the extent such Person's use or occupancy is authorized or permitted by Purchaser or its subsidiaries or (iv) the use or occupancy of any of the Shared Leased Premises by Purchaser or its subsidiaries or any other Person (excluding Avaya or its subsidiaries), to the extent such Person's use or occupancy is authorized or permitted by Purchaser or its subsidiaries, except in each case to the extent any such Losses arise as the result of (x) gross negligence or willful misconduct of Avaya or any of its subsidiaries or (y) the failure of Avaya or any of its subsidiaries to comply with the terms of any Shared Space Lease or the failure of Avaya or its applicable subsidiary to pay the obligations required to be paid pursuant to Section 1.3(b) herein.

(e)    Avaya shall indemnify, defend and hold harmless Purchaser and its subsidiaries from and against all Losses imposed upon or incurred by or asserted against Purchaser or any of its subsidiaries, as the case may be, by reason of (i) any accident, injury to or death of Persons or loss of or damage to property occurring on or about any portion of the Shared Leased Premises then used or occupied by Seller or any other Person (excluding Purchaser or its subsidiaries), to the extent such Person's use or occupancy is authorized or permitted by Seller or its subsidiaries, during the Shared Space Term, (ii) any failure on the part of Seller to perform or comply with any obligation of lessee under, or any other term of, any Shared Space Lease during the Shared Space Term, (iii) performance of any labor or services or the furnishing of any materials or other property in respect of any portion of the Shared Leased Premises then used or occupied by Seller or any other Person (excluding Purchaser or its subsidiaries), to the extent such Person's use or occupancy is authorized or permitted by Seller or its subsidiaries, as the case may be or (iv) the use or occupancy of any of the Shared Leased Premises by any Person (excluding Purchaser or its subsidiaries), to the extent such Person's use or occupancy is

4

authorized or permitted by Seller or its subsidiaries, except in each case to the extent any such Losses arise as the result of (x) the gross negligence or willful misconduct of Purchaser or its subsidiaries, (y) the failure of Purchaser or any of its subsidiaries to comply with the terms of any Shared Space Lease or the failure of Purchaser or its applicable subsidiary to pay the obligations required to be paid pursuant to Section 1.3(b) herein.

(f)    Notwithstanding anything to the contrary in this Agreement, the obligations of the Providing Parties to provide any Transition Service relating to real property, facilities or other similar matters under this Agreement shall be subject to, in all cases, the terms and conditions of any relevant underlying lease, sublease or agreement or instrument with a party (other than a subsidiary of the Providing Party) (each, an "**Underlying Document**"). Without limitation to the foregoing, any Transition Service of the type described in the preceding sentence shall immediately terminate without any further action on the part of the parties in the event that the Underlying Document terminates (i) in accordance with its terms and is not replaced by a similar arrangement (provided that the Providing Party shall use commercially reasonable efforts to provide the Receiving Party with notice of any such termination as promptly as practicable. In the event of any conflict between this Agreement and the terms and conditions of any Underlying Document, the terms and conditions of the Underlying Document shall control).

Section 1.4    Third Party Services. Without limiting anything set forth in Section 1.7(b), the parties acknowledge and agree that certain of the Transition Services to be provided under this Agreement have been, and will continue to be, provided (in accordance with this Agreement) by one or more Persons that are not subsidiaries of the Providing Party (each, a "**Third Party**"). To the extent any such Transition Services are so provided prior to the Closing, the Providing Party shall use commercially reasonable efforts to cause such Third Party to provide such Transition Services under this Agreement; provided that if any such Third Party is unable or unwilling or not contractually obligated to provide any such Transition Services to the Receiving Party and the Providing Party is unable to perform such Transition Service, the Providing Party will provide written notice to the Receiving Party as promptly as practicable to discontinuation of such Transition Service and the Providing Party shall use all reasonable efforts to arrange an alternative manner that is reasonably acceptable to the Receiving Party in which such Transition Services can be provided; provided further, that the Providing Party shall not be responsible for any payments due for any such Transition Services provided in an alternative manner (except for payments for which the Receiving Party agrees to reimburse the Providing Party).

Section 1.5    Standard of Services. Unless Exhibit A or Exhibit B expressly indicate otherwise or the parties agree in writing to a different arrangement, (a) Avaya shall at all times perform the Seller Transition Services in substantially the same manner and with substantially the same effort and degree of care as the Transition Services were performed by Avaya or its applicable subsidiary in the Lookback Period or, if a Transition Service had not been performed within the Lookback Period, with reasonable care and good industry practice and (b) Purchaser shall at all times perform the Purchaser Transition Services with reasonable care and good industry practice. The Receiving Party shall promptly notify the Providing Party in writing that the provision of any Transition Service is not in accordance with the standards herein (as set forth in this Section 1.5, Exhibit A or Exhibit B). In the event of such notice by the Receiving Party, the Providing Party shall, use all reasonable standards to, and to cause Third Parties to, at

the Receiving Party's reasonable request, correct such provision to the extent necessary such that such Transition Service is provided in accordance with the terms of the Agreement (as set forth in this Section 1.5, Exhibit A or Exhibit B).

Section 1.6    Modification of Services.    Upon written notice to, and subject to the written consent of, the Receiving Party (which consent shall not be unreasonably withheld, delayed or conditioned), the Providing Party may modify, change or enhance the manner, methodology, systems, applications, nature, quality or standard of care of any Transition Service provided to the Receiving Party to the extent that the Providing Party is making a similar change in the performance of such services for its businesses or its subsidiaries or otherwise to the extent such change does not have a material and adverse effect on the Fees, scope or timing for such Transition Service or the standard of service set forth in this Section 1.6.  If the Receiving Party believes that a modification, change or enhancement to any Transition Service is reasonably necessary, the Receiving Party will submit a written request to the Providing Party describing the requested modification and the parties shall discuss in good faith the requested modification, including duration, service levels, resource requirements and additional associated Fees (it being understood that the Providing Party will not be under obligation to make such modification, change or enhancement, or to pay any additional Fees, unless the parties mutually agree).

Section 1.7    Provision of Services.

(a)    Employment and Supervision.  All labor matters relating to employees of the Providing Party (including employees involved in the provision of the Transition Services to the Receiving Party) shall be within the exclusive control of the Providing Party, and the Receiving Party shall not take any action affecting such matters.  Nothing in this Agreement is intended to transfer the employment of employees engaged in the provision of any Transition Service from one party to the other.  The Providing Party shall have the sole responsibility to employ, pay, supervise, direct and discharge all of the personnel used in its provision of Transition Services hereunder.  The Providing Party shall be solely responsible for the payment of all employee benefits and any other direct and indirect compensation for any of its personnel assigned to perform Transition Services under this Agreement, as well as worker's compensation insurance, employment taxes and other employer liabilities relating to such personnel as required by Law.

(b)    Subcontractors.  The Providing Party may hire or engage one or more subcontractors (other than any parties that are competitors of the Receiving Party) to perform all or any of its obligations under this Agreement; provided that (i) the Providing Party shall use the same degree of care in selecting any subcontractors as it would if such subcontractor was being retained to provide similar services to the Providing Party and (ii) the Providing Party shall in all cases remain responsible for ensuring that obligations with respect to the Transition Services set forth in this Agreement (including standards of services and confidentiality obligations) are satisfied with respect to any Transition Service provided by a subcontractor hired or engaged by the Providing Party.  The Providing Party shall be responsible for all payments to subcontractors it engages to provide Transition Services.

US-DOCS\77191498.6

(c)     Management of Services.  Except as may otherwise be expressly provided in this Agreement, the management of, and control over, the provision of the Transition Services by the Providing Party shall reside solely with the Providing Party.

(d)     Independence.  Each of Avaya and Purchaser acknowledges that they are separate entities, each of which has entered into this Agreement for independent business reasons. The Providing Party shall be an independent contractor in connection with the performance of Transition Services hereunder for any and all purposes (including federal, state or local tax purposes), and the employees performing Transition Services in connection herewith shall not be deemed to be employees or agents of the Receiving Party and nothing contained herein shall be deemed to create a joint venture or partnership or a "single employer," "joint employer," "alter ego" or "co-employer" relationship or a principal-agent relationship.

(e)     Compliance with Law. Each of the Providing Party and the Receiving Party shall, during the term of this Agreement, comply with any applicable Laws, including any antitrust, competition or trade regulation Law, relating to the provision or use (as applicable) of Transition Services.

Section 1.8     Cooperation and Governance.

(a)     During the term of this Agreement and subject to Section 1.9 and Section 1.10, the parties shall, and shall cause each of their respective subsidiaries and each of the foregoing entities' respective Representatives to, cooperate with each other in good faith (i) in the performance of the Transition Services and the parties' respective obligations under this Agreement to provide required services specified herein and (ii) to facilitate an orderly and efficient transition of services, processes and functions contemplated in this Agreement, and in each case in a manner consistent with the intent of this Agreement.  Avaya shall, or shall cause its applicable subsidiaries to, cooperate with Purchaser as reasonably requested by Purchaser in connection with the migration of Business data that is included in the Transferred Assets to Purchaser systems, including the transfer of records, segregation and migration of historical data, and cooperation with and assistance to third party consultants engaged by Purchaser in connection with the foregoing.  Purchaser shall be responsible for any reasonable out-of-pocket costs approved in writing in advance by Purchaser and actually incurred by Avaya in providing such assistance.  Where necessary for the Providing Party to provide the Transition Services, the Receiving Party shall use all reasonable efforts to (i) provide information and documentation reasonably sufficient for the Providing Party to perform, or cause to be performed, the Transition Services provided that the Receiving Party shall not be required to provide any information or documentation if the provisions of such information or documentation would violate any Law or any Contract to which the Receiving Party is a party or is subject to, or would result in the disclosure of information or materials subject to any applicable privilege (including the attorney-client or similar privilege) and (ii) make available, as reasonably requested by the Providing Party, sufficient resources, timely decisions, approvals and acceptances so that the Providing Party may accomplish its obligations hereunder in a timely manner.

(b)     Each party shall appoint a representative with responsibility for managing such party's obligations under this Agreement ("**TSA Manager**").  The TSA Manager shall be a Person of sufficient authority to be able to make decisions under this Agreement and to serve as

7

an effective channel for escalations. The TSA Managers shall meet in Person or by phone on at least a monthly basis during the Term of this Agreement to discuss matters under this Agreement. The TSA Managers will mutually agree on any additional operational governance that may be required to (i) facilitate the effective and timely delivery of Transition Services, (ii) assist in the resolution of any operational issues or related disputes and (iii) help ensure the effective communication, cooperation and information exchanges between the parties.

(c)    Without limiting Section 1.8(b), if a dispute, controversy or claim ("**Dispute**") arises between the parties relating to the interpretation or performance of this Agreement, within fifteen (15) days from a request from a party in writing, the TSA Managers shall meet to discuss in good faith a potential (or actual) resolution of the Dispute prior to pursuing other available remedies. If the TSA Managers are unable to resolve such dispute within fifteen (15) Business Days, either TSA Manager may request in writing a meeting of appropriate executives of each party with authority to resolve the Dispute. In the event of such a request, appropriate executives (with authority to resolve the Dispute) of each party will promptly meet within ten (10) Business Days to discuss in good faith a potential (or actual) resolution of the Dispute prior to pursuing other available remedies. If such executives are not able to resolve the Dispute within thirty (30) days from their initial meeting, such Dispute will be governed by a Proceeding subject to the terms of Section 7.8, Section 7.9, Section 7.10 and Section 7.11.

Section 1.9    Service Interruption. Without limiting anything set forth in Section 1.10, upon reasonable prior notice to the Receiving Party, the Providing Party or any relevant Third Party will have the right to temporarily interrupt or suspend, in the Providing Party's reasonable judgment, (a) the provision of Transition Services for emergency maintenance purposes or (b) the operation of the facilities or systems of the Providing Party or Third Party providing any Transition Services for ordinary course maintenance purposes consistent with past practice. Whenever such maintenance is required, the Providing Party shall (or in the case of such maintenance affecting any Third Party providing Transition Services, shall request that the relevant Third Party to) notify the Receiving Party as far in advance as reasonably practicable under the circumstances that maintenance is required. Any other routine maintenance or preventative services shall take place at such time as is mutually agreed upon by the applicable Providing Party and Receiving Party. In performing any maintenance contemplated by this Section 1.9, the Providing Party shall use commercially reasonable efforts to minimize the impact of such maintenance on the Transition Services and the Receiving Party's business. The Providing Party will be relieved of its obligations to provide Transition Services only for the period of time that the relevant facilities or systems are shut down during such maintenance, but shall also use commercially reasonable efforts to minimize each period of shut down for such purpose and resume the provision of the relevant Transition Services as soon as reasonably practicable thereafter.

Section 1.10    Force Majeure. Neither the Providing Party nor any Third Party providing any Transition Services shall be liable for any interruption, delay or failure to fulfill any obligation under this Agreement, including any interruption, delay or failure of any Transition Service or the quality or quantity thereof if such interruption, delay or failure results from causes beyond its reasonable control, including acts of God, acts of any public enemy, storms, floods, riots, fires, sabotage, civil commotion or civil unrest, interference by governmental, civil or

8

military authorities, declaration, continuation, escalation or acts of war or terrorism, strike, walkout, lockout or other labor dispute, failure or shortage of energy sources, raw materials or components or other similar events outside the reasonable control of the Providing Party or applicable Third Party ("**Force Majeure Event**").  Upon the occurrence of a Force Majeure Event, the Providing Party shall (or in the case of a Force Majeure Event affecting any Third Party providing Transition Services, shall request that the relevant Third Party) promptly notify the Receiving Party of the Force Majeure Event and the estimated extent and duration of its inability to perform its obligations.  The Providing Party (or such Third Party) shall reasonably promptly notify the Receiving Party upon the cessation of any Force Majeure Event.  The Providing Party shall use all reasonable efforts to minimize the effect of the Force Majeure Event on its obligations hereunder; provided that nothing in this Section 1.10 shall be construed to require the settlement of any strike, walkout, lockout or other labor dispute on terms which, in the reasonable judgment of the affected party, are contrary to its interests.  If the Providing Party or any relevant Third Party is unable to provide any of the Transition Services due to a Force Majeure Event, the parties shall use commercially reasonable efforts to cooperatively seek a solution that is mutually satisfactory.  During the period of any such Force Majeure Event, the Receiving Party shall be free to acquire such Transition Services from an alternate source, at the Receiving Party's sole cost and expense.  For the avoidance of doubt, the Receiving Party shall not be obligated to pay the Providing Party for such Transition Services during the period when the Providing Party is not itself, or through a Third Party, providing such Transition Services.

Section 1.11    Obligations.  The provision of Transition Services hereunder is subject to the following.

(a)    The Providing Party, its subsidiaries and any relevant Third Party may rely upon any written notice or other written (including via e-mail) communication from the TSA Manager of the Receiving Party.

(b)    The Providing Party shall not have any obligation to perform any Transition Service to the extent that performing such Transition Service is dependent upon, or otherwise requires, the Receiving Party or any of its subsidiaries to perform some service, operation or function prior to the Providing Party performing any such Transition Service unless the Receiving Party or its subsidiaries shall have, in fact, prior to when the Providing Party is required to perform such Transition Service, performed such other service, operation or function consistent with commercially reasonable business practices.

(c)    The Receiving Party shall not, and shall cause its subsidiaries to not, and shall take commercially reasonable efforts to cause each of their Representatives to not, break, bypass or circumvent, or attempt to break, bypass or circumvent, any security system of the Providing Party or any of its respective subsidiaries or any Third Party providing Transition Services hereunder or obtain access to any program or data other than that to which access has been specifically granted by the Providing Party or any of its subsidiaries or any Third Party providing Transition Services hereunder.  The Receiving Party shall, and shall cause its subsidiaries to, use commercially reasonable efforts to ensure that, in connection with the receipt of Transition Services by such Party or any of its subsidiaries, no computer virus or other malicious code is introduced to the IT systems (as defined below) of the Providing Party or any of its subsidiaries.

9

(d)    Representatives of the Receiving Party receiving the Transition Services or working with the Providing Party in connection with the provision of Transition Services shall at all times be instructed to comply with, and the Receiving Party shall take all reasonable efforts to cause them to comply with, all physical and technological security rules, policies and procedures of the Providing Party, its subsidiaries and any relevant Third Party provided in writing to the Receiving Party by the Providing Party, its subsidiaries or a relevant Third Party.

(e)    Subject to Section 1.5 hereof, in providing the Transition Services, the Providing Party shall not be obligated to: (i) hire or train any additional employees, except, in case of training, as may be set forth on Exhibit A or Exhibit B; (ii) purchase, lease or license any additional equipment, Intellectual Property or other personal property; or (iii) convert or transfer any of the Receiving Party's data to any alternate supplier of the Transition Services or pay any costs related thereto.

Section 1.12    IT Systems Firewalls.  Without limiting Section 1.11, the provision of Transition Services hereunder is subject to the following.

(a)    As of the Closing Date, except as otherwise expressly provided in this Agreement, neither party nor any of its subsidiaries shall have access to or use of the computer software, hardware, networks or other information technology systems (collectively, "**IT Systems**") of the other party or any of its subsidiaries, and any such access or use shall be subject to the terms and conditions of this Section 1.12.

(b)    After the parties' respective IT Systems are separated and operated as separate instances, if applicable, (i) the Providing Party may grant to the Receiving Party or any of its subsidiaries or personnel access to or use of any IT Systems of the Providing Party or any of its subsidiaries, or (ii) the Receiving Party may grant to the Providing Party or its subsidiaries or personnel access to or use any IT Systems of the Receiving Party or any of its subsidiaries, in each case as required to perform or receive the Transition Services under this Agreement.  To the extent that such access is granted, the party having such access shall, and shall cause its subsidiaries and personnel to, comply with all reasonable and generally applicable written policies, procedures and limitations of the other party or such subsidiaries with respect to such access or use (including information security and firewall, antivirus protection, physical security, access control for computer access, password sharing, and dual connection policies, procedures, and limitations), each as the same have been communicated to the party receiving access in writing from time to time and subject to amendment from time to time by the party providing access (collectively, the "**IT Firewall Policies**").  For the avoidance of doubt, the IT Firewall Policies attached as Exhibit E-1 have been communicated by Avaya to Purchaser and the IT Firewall Policies attached as Exhibit E-2 have been communicated by Purchaser to Avaya.  The party receiving such access shall be responsible hereunder for each of its subsidiaries' and personnel's compliance with the applicable IT Firewall Policies of the party providing such access and shall ensure that the access contemplated by this Section 1.12 shall be used by its subsidiaries and personnel only for the purposes contemplated by, and subject to the terms of, this Agreement.

(c)    No Receiving Party shall permit any of its personnel to access the Providing Party's IT Systems unless such access is approved by such Providing Party in advance and an

10

expiration date for such access is implemented.  The Receiving Party's personnel's computers and system accounts, if any, on the Providing Party's IT Systems that are not required for the transition or otherwise under this Agreement must be blocked from unauthorized access to the Providing Party's network and/or associated computer applications.  The Receiving Party acknowledges that computing assets connected to the Providing Party's IT Systems are subject to monitoring by intrusion detection instrumentation and are subject to routine vulnerability assessment scans and e-mail filtering which may occur at any time.  The Providing Party shall maintain commercially reasonable security measures consistent with past practice with respect to all of the Providing Party's IT Systems used in connection with the provision of Transition Services and all of the data contained therein throughout the term of this Agreement.

(d)    Without limiting the foregoing in <u>Section 1.7(e)</u> or this <u>Section 1.12</u>, each party shall, and shall cause its subsidiaries to, comply with all applicable antitrust, competition or trade regulation Laws in connection with any access to or use of IT Systems hereunder, including by limiting any access to or disclosure of sensitive proprietary information of a party to the other party to the extent such access or disclosure is prohibited by such antitrust, competition or trade regulation Law.

ARTICLE II
FEES AND PAYMENT

Section 2.1    <u>Fees</u>.  The fees payable by Purchaser to Avaya for each of the Seller Transition Services are as set forth in <u>Exhibit A</u> (the "**Seller Fees**") and the fees payable by Avaya to Purchaser for each of the Purchaser Transition Services are as set forth in <u>Exhibit B</u> (the "**Purchaser Fees**," and collectively with the Seller Fees, the "**Fees**").

Section 2.2    <u>Invoice and Payment</u>.  Unless <u>Exhibit A</u> or <u>Exhibit B</u> provide otherwise or the parties agree in writing to a different arrangement, each month during the term of this Agreement, the Providing Party shall invoice the Receiving Party for the Fees for the Transition Services provided to the Receiving Party during the preceding month; <u>provided</u> that the Providing Party will issue such invoice, or cause its subsidiary to issue such invoice, and the Receiving Party will receive, or cause its subsidiary to receive such invoice, in each case, in the same country that the applicable Transition Services are provided and received in if the Receiving Party has a legal entity in such country, and otherwise the Providing Party shall issue such invoice, or cause its subsidiary to issue such invoice, and the Receiving Party will receive, or cause its subsidiary to receive such invoice, in the United States in US Dollars.  The actual date of notification of amounts due will be determined according to the Providing Party's regular business practices and systems capabilities.  Subject to <u>Section 2.4</u>, the Receiving Party shall pay, by wire transfer of immediately available funds payable to the order of the Providing Party, or to such account or accounts designated by the Providing Party, the undisputed invoiced Fees to the Providing Party within forty-five (45) days of receipt of the invoice.

Section 2.3    <u>Failure to Make Payment</u>.  If the Receiving Party fails to make payment of any undisputed Fees (subject to <u>Section 2.4</u>) in accordance with <u>Section 2.2</u>, it shall be required to pay, in addition to the amount of such unpaid Fees, interest on such amount at 6% per annum.

US-DOCS\77191498.6

Section 2.4    <u>Disputes and Resolution</u>.  The Receiving Party shall promptly, and in no event later than thirty (30) days following receipt of the Providing Party's invoice, notify the Providing Party in writing of any amounts billed to it that are in dispute and reasonably detail the basis for such dispute. Upon receipt of such notice, the Providing Party will research the items in question in a reasonably prompt manner and cooperate with the Receiving Party to resolve any such dispute. The amount of invoiced Fees payable by the Receiving Party shall be reduced by the amount of any Fees disputed in accordance with this <u>Section 2.4</u>, which disputed Fees shall be paid to the Providing Party within thirty (30) days after settlement of such dispute to the extent owed to the Providing Party; <u>provided</u> that any undisputed portion of such amount shall be included in the calculation of the amount due and paid in accordance with <u>Section 2.2</u>.

Section 2.5    <u>Audit Rights</u>.  Not more than once (a) for any twelve (12) month period during the term of this Agreement and (b) during the three (3) years thereafter, upon thirty (30) days' advance written notice, a Receiving Party may audit (or subject to the specifications and limitations set forth in <u>Exhibit A</u> or <u>Exhibit B</u> to this Agreement applicable to the audited Transition Service, cause an independent third party auditor to audit), during regular business hours, the books and records of the Providing Party (in each case subject to the specifications and limitations set forth in the applicable <u>Exhibit A</u> or <u>Exhibit B</u> to this Agreement with respect to the audited Transition Service) pertaining to the Transition Service in question.  The Receiving Party shall use commercially reasonable efforts to conduct any such audit in a manner that does not materially interfere or disrupt the normal operations of the Providing Party's conduct of its business.  If the audit demonstrates that an overcharge occurred, the Providing Party shall promptly (but in any event within forty-five (45) days after written notice thereof from the Receiving Party, together with a copy of such audit) pay to the Receiving Party the amount of the overcharge. The Receiving Party requesting an audit pursuant to this <u>Section 2.5</u> shall be responsible for all costs of conducting such audit, and shall reimburse the applicable Providing Party for any reasonable documented out-of-pocket costs and expenses incurred in connection with such audit; provided that if the audit demonstrates that an overcharge has occurred in an amount greater than 10% of the total fees paid by the Receiving Party in the calendar year in which the overcharge occurred, as accurately stated, then the Providing Party shall pay to the Receiving Party the reasonable costs and expenses incurred by the Receiving Party in connection with such audit.

Section 2.6    <u>Records</u>.  Each Providing Party shall maintain records of all receipts, invoices, reports and other documents relating to the Transition Services rendered under this Agreement in accordance with its standard accounting practices and procedures.  Each Providing Party shall retain such accounting records and make them reasonably available to the applicable Receiving Party's auditors for a period of three (3) years from the close of each fiscal year of such Receiving Party during which Transition Services were provided.  Each Providing Party will cooperate with the applicable Receiving Party and its auditors, as reasonably requested by such Receiving Party, in connection with any such audit; <u>provided</u> that Receiving Party shall use commercially reasonable efforts to conduct any such audit in a manner that does not materially interfere or disrupt the normal operations of the Providing Party's conduct of its business.

Section 2.7    <u>Taxes</u>.

(a)     The Receiving Party or its applicable subsidiary shall pay any and all sales, use, value added or other similar Taxes (but, for the avoidance of doubt, excluding any franchise Taxes, Taxes imposed on or measured by the gross or net income of a party or personal or real property Taxes on property owned or leased by a party, except as otherwise provided herein), levied upon the provision of the Transition Services (including Fees due in exchange therefor), as provided to the Receiving Party by the Providing Party (such Taxes, "**Covered Taxes**"). Any such Covered Taxes shall only be charged at the prevailing rate and in accordance with applicable Law and shall be reduced or eliminated if and to the extent that the Receiving Party has provided any valid and applicable exemption certificates or other applicable documentation that eliminates or reduces the obligation to collect and/or pay such Covered Taxes. The parties shall use commercially reasonable endeavors to eliminate or minimize any Covered Taxes payable in connection with this Agreement (including through the use of local services agreements, alternative contractual arrangements or alternative invoicing arrangements). In addition, the Providing Party shall provide such other information as required to be provided by the Providing Party in accordance with applicable Law and as otherwise reasonably requested by the Receiving Party that is necessary for the Receiving Party to report such Covered Taxes on its Tax Returns (including for purposes of claiming Tax deductions, credits or refunds). The Receiving Party shall not be responsible for interest, penalties or additions to tax imposed as a result of the Providing Party's failure to timely invoice or remit Covered Taxes except to the extent such failure results from the Receiving Party's failure to timely or accurately provide information pursuant to the proceeding sentence.

(b)     Except as otherwise required under applicable Law, the Providing Party shall be solely responsible to withhold and remit to the applicable governmental authority any employment, income or other Taxes required to be withheld in respect of its employees related to the sale, performance, provision or delivery of Transition Services (the "**Employee Taxes**"). Except as otherwise required under applicable Law, the Providing Party shall timely prepare and file all Tax Returns required to be filed with any governmental authority with respect to such Employee Taxes.

(c)     The Receiving Party shall be entitled to deduct and withhold any amounts in respect of Taxes required to be deducted or withheld from any Fees payable hereunder, and any amounts so deducted or withheld shall be treated as having been paid to the Providing Party for all purposes of this Agreement; <u>provided</u> that the parties will use commercially reasonable efforts to reduce or minimize any such deductions or withholdings to the extent practicable.

ARTICLE III
DISCLAIMER AND LIMITATION OF LIABILITY

Section 3.1     <u>Disclaimer of Warranties</u>.  Each Receiving Party hereby acknowledges that the applicable Providing Party does not regularly provide third party services such as the Transition Services as part of their business.  EXCEPT AS SET FORTH IN <u>SECTION 1.5</u> AND <u>Section 1.7(e)</u> (OR, IF APPLICABLE, AS OTHERWISE EXPRESSLY SET FORTH IN ANY APPLICABLE EXHIBIT HERETO), EACH PARTY MAKES NO, AND SPECIFICALLY DISCLAIMS ALL, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE TRANSITION SERVICES TO BE PROVIDED OR RECEIVED BY IT OR OTHERWISE WITH RESPECT TO THIS AGREEMENT OR THE MATTERS

13

CONTEMPLATED HEREBY AND EACH PARTY ACKNOWLEDGES AND AGREES THAT THE SERVICES ARE PROVIDED "AS IS," WITHOUT WARRANTY OF ANY KIND, THAT THE RECEIVING PARTY ASSUMES ALL RISKS AND LIABILITY ARISING FROM OR RELATING TO ITS AND ITS SUBSIDIARIES' USE OF AND RELIANCE UPON THE TRANSITION SERVICES, AND THAT THE PROVIDING PARTY DOES NOT MAKE, AND HEREBY SPECIFICALLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED (INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF NONINFRINGEMENT, SUFFICIENCY, QUALITY, USEFULNESS, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE); PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT LIMIT EITHER PARTY'S EXPRESS OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING WITH RESPECT TO THE SERVICE LEVEL STANDARDS; PROVIDED FURTHER THAT THIS AGREEMENT SHALL NOT IN ANY WAY LIMIT THE REPRESENTATIONS AND WARRANTIES OF ANY PERSON UNDER THE PURCHASE AGREEMENT.

Section 3.2    <u>Limitation of Liability</u>.

(a)    Except for a breach of <u>Article V</u>, in no event shall any party or any of its affiliates or Representatives be liable for any special, indirect, incidental, exemplary, punitive or consequential damages of the other party (including for lost or anticipated profits, revenues or opportunities or business interruption), or for any damages calculated by reference to a multiplier of revenue, profits, EBITDA or similar methodology or any diminution in value, whether or not foreseeable or caused by or resulting from the actions of such party hereunder due to, resulting from or arising in connection with, any of the Transition Services or the performance of or failure to perform any of a party's respective obligations under this Agreement. Except for a breach of <u>Article V</u>, the maximum liability of any party or any of its affiliates or Representatives resulting from or arising in connection with any of the Transition Services or the performance of or failure to perform any of a party's respective obligations under this Agreement shall be an amount equal to twice the maximum fees paid under this Agreement, with respect to the Transition Service to which such breach relates, over the course of the proceeding twelve (12) month period (or, if shorter, to date) prior to the date of any such breach.

(b)    A Receiving Party shall, and shall cause its subsidiaries to, take all reasonable steps to mitigate its damages and those of any of its subsidiaries, whether direct or indirect, due to, resulting from or arising in connection with any failure by a Providing Party to comply fully with its obligations under this Agreement.

## ARTICLE IV
## INTELLECTUAL PROPERTY

Section 4.1    <u>Intellectual Property and Data</u>.    With respect to all data and other Intellectual Property that is generated by the Providing Party in performing a Transition Service ("**Service Data**"), as between the parties, (i) Purchaser shall own all such Service Data to the extent it is Related to the Business or primarily related to Purchaser's other businesses, and (ii) Avaya shall own all Service Data to the extent that it is primarily related to the Retained

14

Business, and to the extent any right, title or interest in or to any Service Data designated to be owned by a party vests in the other party or any of its subsidiaries, such other party shall and hereby does, on behalf of itself and such subsidiaries, irrevocably assign to such party all such right, title and interest. Except as otherwise provided in this <u>Section 4.1</u>, each of Avaya and Purchaser shall, on behalf of itself and its subsidiaries, retain all rights, title and interest in and to its respective Intellectual Property.

ARTICLE V
CONFIDENTIALITY

Section 5.1    <u>Confidentiality</u>.  Each party shall, and shall cause their respective affiliates and Representatives to (a) keep confidential the terms of this Agreement and all information, materials and processes relating to a party or any affiliate of such party obtained by the other party or any affiliate thereof at any time (whether prior to or after the date hereof) in any format whatsoever (whether orally, visually, in writing, electronically or in any other form) relating to, arising out of or in connection with the Transition Services but shall not include (i) information which becomes generally available to the public other than by release in breach of the provisions of this Agreement, including matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto, (ii) information which becomes available on a non-confidential basis to a party from a source other than the other party to this Agreement or its affiliates, (iii) information which was in the possession of a party prior to disclosure by the other party (<u>provided</u> that any information regarding the Business in the possession of Avaya prior to the Closing Date or provided to Avaya pursuant to, or maintained by Avaya under, this Agreement shall not be subject to this provision) or (iv) is independently developed by a party without the use or reference to any information obtained from the other party ("**Confidential Information**"), and shall not disclose such Confidential Information except where such disclosure is reasonably necessary to perform or receive, or settle any dispute regarding, their respective duties, benefits or rights under this Agreement or as required by applicable Law, Governmental Entity, Proceeding (including the Bankruptcy Case) or the rules and regulations of any stock exchange or quotation services on which such party's stock is traded or quoted, and (b) shall not use any Confidential Information other than for the purposes of performance or receipt of Transition Services under this Agreement.  Without limiting the generality of the foregoing, each party shall cause its Representatives to exercise the same level of care with respect to Confidential Information relating to the other party or any of its affiliates as it would with respect to similar proprietary information, materials and processes relating to itself or any of its affiliates. Notwithstanding any provision of this <u>Article V</u> to the contrary, a party may disclose such portion of Confidential Information relating to the other party to the extent, but only to the extent, the disclosing party reasonably believes that such disclosure is required by judicial or administrative process or by other requirements of applicable Law, Governmental Entity, Proceeding (including the Bankruptcy Case) or the rules and regulations of any stock exchange or quotation services on which such party's stock is traded or quoted; <u>provided</u> that if permissible under applicable Law, rules or regulations and reasonably practicable under the circumstances, the disclosing party first notifies the other party of such requirement and allows such party a reasonable opportunity to: (i) seek a protective order or other appropriate remedy to prevent such disclosure, (ii) consult with the disclosing party with respect to the such party's taking steps to resist or narrow the scope of such request or legal process or (iii) waive compliance, in whole or in part, with the terms of this <u>Section 5.1</u>.  The party disclosing the

15

Confidential Information or its affiliate or Representative, as the case may be, shall use commercially reasonable efforts (y) to disclose only that portion of the Confidential Information that such party is advised in writing by its legal counsel is legally required to be disclosed and (z) to ensure that all Confidential Information that is so disclosed will be accorded confidential treatment.  The obligations of the parties and their respective affiliates and Representatives under this Article V shall remain in effect until the expiration of the applicable statute of limitations following the expiration or termination of this Agreement, except for the obligation to keep confidential the trade secrets of any party which shall not expire.  If all or any part of the Transition Services under this Agreement are terminated, each party and their respective affiliates will, and will cause their respective officers and employees, and will use their commercially reasonable efforts to cause their Representatives to, destroy or deliver to the other Party, upon request, all documents and other materials, and all copies thereof, obtained by such party or its affiliates or on their behalf from the other party in connection with the Transition Services so terminated that are subject to such confidence.  For clarity and notwithstanding anything to the contrary herein, the Confidential Information of Purchaser shall not include any Excluded Assets, and the Confidential Information of Avaya shall not include any Transferred Assets.

ARTICLE VI
TERM AND TERMINATION

Section 6.1     Term.

(a)     Term of Agreement.  This Agreement shall commence on the date hereof, and shall end on the earliest of (i) the date all Transition Services have either expired in accordance with the terms of this Agreement or been terminated in accordance with the terms of this Agreement, (ii) the date on which this Agreement is terminated in accordance with its terms or (iii) two years from the date of this Agreement.

(b)     Term of Services.  The Providing Party shall provide each Transition Service beginning on the date hereof, or agreed to herein or in writing by the parties and continuing for a period equal to the service term set forth for such Transition Service in Exhibit A or Exhibit B, as applicable, unless renewed or sooner terminated in accordance with the provisions of this Agreement.

Section 6.2     Termination of Services.

(a)     Termination by the Receiving Party.  Subject, if applicable, to any requirements that certain interdependent Transition Services be terminated concurrently (as set forth in Exhibit A or Exhibit B, respectively), the Receiving Party may terminate its right to receive any particular Transition Service for any or no reason, by providing the Providing Party written notice of termination (the "**Termination Notice**"), not less than forty-five (45) days prior to the date on which services shall be terminated (the "**Termination Date**") setting forth in reasonable detail the Transition Services to be terminated (the "**Terminated Services**") and the Termination Date for each Terminated Service which, in the case of termination of Transition Services by the Receiving Party, shall not be less than forty-five (45) days from the receipt of the Termination Notice by the Providing Party.

16

(b)    <u>Termination for Breach</u>.  If a party materially breaches any of its obligations under this Agreement, and does not cure such default within sixty (60) days after receiving written notice thereof from the non-breaching party, then the non-breaching party may, at its option, terminate any Transition Service affected by such breach or this Agreement in its entirety by providing a Termination Notice to the breaching party, for which termination the effective Termination Date shall be date of receipt of such Termination Notice.

(c)    <u>By Mutual Consent</u>.  Any Transition Service may be terminated by mutual consent of the parties in writing at any time.

(d)    <u>Termination Services</u>.  Notwithstanding the termination of any Transition Service, the Receiving Party shall be responsible and shall pay all Fees in connection with such Transition Service for the duration of the respective Service Term for such Transition Service, except to the extent that such Fees involve variable costs that the Providing Party is able to cease incurring prior to the end of such Service Term, without further incurring any other costs or Liabilities as a result of such termination or cessation.  If requested by the Receiving Party, the Providing Party will, at the Receiving Party's sole expense, provide reasonable cooperation and use commercially reasonable efforts to assist the Receiving Party in accomplishing an orderly transition to an alternative provider of the applicable Transition Services, including, to the extent reasonably necessary in connection therewith, providing, upon reasonable advance notice, reasonable access during normal business hours to the Providing Party's applicable books, records, systems, facilities and employees to the extent relating to the Transition Services; <u>provided</u> that the Receiving Party shall use commercially reasonable efforts to ensure that such access does not materially interfere or disrupt the normal operations of the Providing Party's conduct of its business; and <u>provided</u> <u>further</u> that in the event that affording any such access to the Receiving Party would (i) breach any fiduciary duty, duty of confidentiality owed to any Person (whether such duty arises contractually, statutorily or otherwise), Law or any Contract with any other Person, (ii) waive or jeopardize any privileges, including the attorney-client privilege, or any work product protection, or (iii) share any information which constitutes trade secrets or other sensitive information, the parties shall take such steps as are reasonably necessary to permit the Providing Party's compliance with such request in a manner that avoids any such breach, waiver, detriment, harm or consequence.  Notwithstanding the foregoing, nothing contained in this <u>Section 6.2(d)</u> shall obligate the Providing Party to provide any such service beyond the applicable Service Term set forth on <u>Exhibit A</u> or <u>Exhibit B</u> herein, except to the extent otherwise agreed in writing.

Section 6.3    <u>Survival</u>.  Articles <u>II</u>, <u>III</u>, <u>IV</u>, <u>V</u>, <u>VI</u> and <u>VII</u> shall survive the expiration or any termination of this Agreement.  Notwithstanding the foregoing, in the event of any termination with respect to one or more, but less than all of the Transition Services, this Agreement shall continue in full force and effect with respect to any Transition Services not terminated hereby.

ARTICLE VII<br>MISCELLANEOUS

Section 7.1    <u>Assignment</u>.  Subject to <u>Section 1.7(b)</u>, neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by Purchaser, on the one

17

hand, or Avaya, on the other hand, without the prior written consent of Avaya (in the case of Purchaser) or Purchaser (in the case of Avaya), as applicable; provided that either party may assign any of its rights and obligations hereunder to any of its affiliates or any person in connection with a transfer or sale of a material portion of its assets, a change of control or merger, reorganization, reincorporation or similar transaction or series of transaction, in each case, without the consent of any other person; provided, however, that no such assignment shall release the applicable assignor from any Liability under this Agreement in the event its obligations are not performed.  Subject to the first sentence of this Section 7.1, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Any attempted assignment or transfer in violation of this Section 7.1 shall be null and void.

Section 7.2    No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such successors and assigns, any legal or equitable rights hereunder

Section 7.3    Notices.    All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered, if delivered personally to the intended recipient, (b) one (1) Business Day following sending by overnight delivery via a national courier service and (c) when delivered by fax or email (in each case in this clause (c), (i) followed by delivery of an original via overnight courier and (ii) solely if receipt is confirmed prior to 5 p.m. at the place of receipt on a Business Day (or the following Business Day if receipt is confirmed after 5 p.m. at the place of receipt or a day other than a Business Day)) and, in each case, addressed to a party at the following address for such party.

(a)    if to Avaya:

Avaya Inc.
4655 Great America Parkway
Santa Clara, California 95054
Attention: Corporate Secretary
Facsimile:    (408) 562-2853
Email:    afreedman@avaya.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:    Richard J. Campbell, P.C.
        Steve Toth
Facsimile: (312) 862-2200
Email:    richard.campbell@kirkland.com
        steve.toth@kirkland.com

18

(b)    if to Purchaser:

>        Extreme Networks, Inc.
>        6480 Via Del Oro
>        San Jose, CA 95119
>        Attention:    Katy Motiey, Chief Administrative
>                      Officer – HR, Legal & Corporate
>                      Secretary
>        Email:        kmotiey@extremenetworks.com
>
>        with copies to (which shall not constitute notice):
>
>        Latham & Watkins LLP
>        140 Scott Drive
>        Menlo Park, California 94024
>        Attention:    Tad Freese
>        Facsimile:    (650-) 463-2600
>        Email:         tad.freese@lw.com

or to such other address(es) as shall be furnished in writing by any such party to the other party hereto in accordance with the provisions of this <u>Section 7.3</u>.

Section 7.4    <u>Interpretation</u>.    Any capitalized terms used in any Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement. References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular. The word "extent" in the phrase "to the extent means the degree to which a subject or other thing extends, and such phrase does not mean simply "if". The descriptive headings of the several Articles, Sections and subsections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references herein to "Articles", "Sections", or "Exhibits" shall be deemed to be references to Articles or Sections hereof or Exhibits hereto unless otherwise indicated. The terms "hereof", "herein", "hereby" and derivative or similar words refer to this entire Agreement, including all Exhibits and Schedules. The use of "or" is not intended to be exclusive unless expressly indicated otherwise. Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefore and all rules, regulations and statutory instruments issued or related to such legislation.

Section 7.5    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each party hereto shall have received counterparts hereof signed by each of the other parties hereto. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed

US-DOCS\77191498.6

counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in Person. At the request of any party hereto, each other party hereto shall re-execute the original form of this Agreement and deliver such form to all other parties. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

Section 7.6    <u>Entire Agreement</u>. This Agreement, the Exhibits annexed hereto and the other agreements specifically referred to herein constitute the entire understanding between the parties with respect to the subject matter hereof and thereof, and supersede all other understandings and negotiations with respect thereto. The parties agree to define their rights, liabilities and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement, and the parties expressly disclaim that they are owed any duties or are entitled to any remedies with respect thereto not expressly set forth in this Agreement. Each Exhibit attached hereto or referenced herein is hereby incorporated into and shall form a part of this Agreement by reference; <u>provided</u> that the terms contained in such Exhibit shall only apply with respect to the Transition Services provided under that Exhibit. In the event of a conflict between the terms contained in an individual Exhibit and the terms in the body of this Agreement, the terms in this Agreement shall take precedence with respect to the Transition Services under such Exhibit. No terms contained in individual Exhibits shall modify the terms of this Agreement.

Section 7.7    <u>Severability</u>.

(a)    In the event that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

(b)    In the event that any provision contained in this Agreement shall be removed or modified by the Bankruptcy Court in connection with the entry of the Sale Order (as defined in the APA), then all other terms of this Agreement shall nevertheless remain in full force and effect and be enforceable to the maximum extent permitted by applicable law.

Section 7.8    <u>Governing Law</u>. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of law principles.

Section 7.9    <u>Jurisdiction</u>. Without limitation of either party's right to appeal any order of the Bankruptcy Court, each party irrevocably agrees that any Proceeding against them arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States Bankruptcy Court for the Southern District of New York

or if the Bankruptcy Case is closed, in the United States District Court for the Southern District of New York, or, if such court does not have jurisdiction, the state courts of New York located in New York County, and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts *in personam* with respect to any such Proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such Proceeding has been brought in an inconvenient forum.  Notwithstanding the foregoing, any final judgment in any suit, action or other Proceeding may be enforced in other jurisdictions by suit on the judgment in any other manner provided by applicable Law.

Section 7.10    Service of Process.  Each of the parties consents to service of any process, summons, notice or document which may be served in any Proceeding in the Bankruptcy Court or the United States District Court for the Southern District of New York or the state courts of New York located in New York County as provided in Section 11.04 of the Purchase Agreement (other than by fax or email).

Section 7.11    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR DISPUTES RELATING HERETO.  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 7.11.

Section 7.12    Amendments and Waivers.  This Agreement may be amended, modified, superseded or canceled and any of the terms, agreements or conditions hereof may be waived only by an instrument in writing signed by each of the parties or, in the case of a waiver, by or on behalf of the party waiving compliance.  No course of dealing between the parties or any of their subsidiaries or Representatives shall be effective to amend or waive any provision of this Agreement.

Section 7.13    Conflicts.  In the case of conflict between the terms and conditions of this Agreement and the Purchase Agreement, the Purchase Agreement shall control.

Section 7.14    Joint Drafting.  The parties hereto have been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by each of the parties hereto, and no rule of construction will be invoked respecting the authorship of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

AVAYA INC.

By: _____
Name: _____
Title: _____


[PURCHASER]

By: _____
Name: _____
Title: _____

## Exhibit A

**Seller Transition Services**

# Exhibit A
# Transition Services Schedule

The services set forth on Exhibit A and Exhibit B will be finalized after signing of the Asset Purchase Agreement, dated March 7, 2017 by and between Purchaser and Avaya (the "**Purchase Agreement**") in accordance with Section 5.21 of the Purchase Agreement.

This Exhibit A is governed by the terms of the Transitional Services Agreement, dated as of [     ], 2017 ("**TSA**") by and between Purchaser and Avaya and deals with the general separation touch points which are required to ensure business continuity during the transition period.  Any capitalized terms used but not defined herein shall have the meanings set forth in the TSA.

1. **Parties**

Purchaser ("**Purchaser**") and Avaya Inc. ("**Avaya**") are the parties to this agreement.  In the below schedules, "Recipient" and "Provider" denote the party receiving service and the party providing services

**Exhibit A – TSA Sections:**

- Section 1: Products – R&D
- Section 2: Services – APS
- Section 3: Services – Maintenance
- Section 5: People/HR
- Section 6: Marketing
- Section 7: Real Estate
- Section 8: IT
- Section 9: Sales
- Section 10: Operations
- Section 11: Finance – Tax
- Section 12: Finance – Accounting and Controlling
- Section 13: Finance – FP&A
- Section 14: Finance – Treasury
- Section 15: Supply Chain

**Transition Services Agreement (TSA)**

# Section 1: Products - R&D

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Tools Access | PRD.5.1 PRD.5.2 PRD.5.3 PRD.5.4 PRD.5.5 PRD.5.6 PRD.5.7 PRD.5.8 PRD.5.9 PRD.5.10 PRD.5.11 PRD.5.12 PRD.5.13 PRD.5.14 PRD.5.15 PRD.5.16 | • Avaya shall continue to provide Transferred Employees access to the following programs and applications, including procurement of necessary licenses subject to the applicable third party consents of the licensors and the terms of Section 1.4 of the TSA.<br>– MSDN, VMware, Cadence/Mentor, Agile, WindRiver, Bamboo, BlackDuck CodeCenter, Clearcase, Clearquest, COMPAS, Confluence, Coverity, Crowd, Crucible/Fisheye, GIT, IDCE, Jenkins, JIRA, JIRA Agile, Nexus, PPMT, Program Center, Quality Center, QTP, Risky Files Analysis, Sonar, Subversion, Toolkit, Zephyr/ZAPI for JIRA<br>– Proprietary data and intellectual property contained in shared systems will be segregated prior to end of the term of this service.<br>– Access to the R&D tools and data will be provided on the existing systems<br>– Access controls to be established in applicable systems and tools.<br>– For each application that has an associated database, Avaya will provide an export or a copy of the database which includes only data of the Business, including, where applicable, a full schema mapping of all relevant database objects to be migrated | Based on correct client established SLAs in contractual agreements | Purchaser | Avaya | (6 months) | $104,070 |

2

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | including table definitions, primary/foreign key constraints, indices, stored procedures, triggers, views, and functions if requested by Purchaser:  For the avoidance of doubt, the data transfer will include data previously generated using Blackduck Protex and Budget Tool. | | | | | |

3

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

# Section 2: APS

## A. Service Schedule

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Professional Services Staff | APS.2.5 | • Access to the professional services staff members that are staying with Avaya in order to support in-flight projects transferred to the Business during transition period to complete implementation or project work. | Complete projects based on scope of work and within the established timelines<br><br>Charged on a variable basis at $110 per hour | Purchaser | Avaya | 12 months or until identified projects completed | $[0] net, based on assumption that reverse TSA APS.2.6 will offset the cost |
| Tool access | APS.5.1 | • Avaya shall continue to provide Transferred Employees access to the programs and applications used by the APS team to provide existing APS services, including project management software eProject | | Purchaser | Avaya | 12 months | $690 |
| APS | APS.2.7 | • Systems Access: Avaya will ensure access for to existing instances supporting Purchaser in its APS Lab | | Purchaser | Avaya | 12 months | $3,925 |

4

Transition Services Agreement (TSA)

# Section 3: Maintenance[1]

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Support Tools | GSS.5.1 GSS.5.2 GSS.5.3 GSS.5.4 GSS.5.5 GSS.5.6 GSS.5.7 | • Avaya will provide Purchaser access to the following:<br>o Workforce Availability and skills tools (Mercury, GSCAPe, schedule manager, OCD)<br><br>— Onsite Support Tools<br>o Remote Access, RA intelligence and alarming (SAL Connect 2/Connect 3, SSG & modems)<br>o Network and quality of service monitoring (Avaya Diagnostic Server (ASD) with SLA MonTM)<br>o Validate health of a particular product (Healthcheck)<br>o Technical configuration and testing of remote connectivity and alarming (ATOM)<br>o Remote user authentication for products (Avaya Secure Gateway, Enhanced Avaya Secure Gateway)<br>o Two factor authentication for remote access (eToken)<br>o Alarm registration tool (Alarm System)<br>o Expert Systems Tool (Avaya Expert Systems(SM))<br>o Services command line communication (ToolsA) | | Purchaser | Avaya | 12 months | The cost for GSS.5.1-5.7 is included in the cost for GSS.2.12 below |

---

[1] Note to Purchaser:  Some of the APS and GSS processes and systems are required to function as a group and may not be capable of operating independently.  Therefore, they cannot be excluded on an individual basis.  Additional information will be provided upon request.)

5

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | — Back office tools<br>   o Online process documentation (Nimbus)<br>   o Manager SR backlog and monitor service metrics (OpsSuite Support Metrics Database)<br>   o Customer satisfaction survey and survey results (Walker Survey Service)<br>   o Request critical account status for additional technical or executive visibility through 'critical accounts program' (CAP access/dashboard) | | | | | |
| Cross-business Products and Obligations | GSS.2.10 | • Avaya may provide support to Purchaser's products and obligations. Services include:<br>— Tier 1 - 3 services for interoperability support issues<br><br>Based on current client established SLAs on contractual agreements | Charged on a variable basis at $78 per hour | Purchaser | Avaya | 12 months | $[0] net, based on assumption that reverse TSA GSS 2.09 will offset the cost |
| Support Services and Tools Management | GSS.2.12 | • Avaya will provide support services for Purchaser's products and obligations. Services include:<br>— Vendor Management for Purchaser OEM contracts<br>— Operational reporting support forbusiness intelligence and analytics<br>— Infrastructure management support<br>— Ongoing Services R&D for continued improvement of diagnostic tools<br>Based on current client established SLAs on contractual agreements | | Purchaser | Avaya | 12 months | $41,607 This cost covers GSS.2.12 and GSS.5.1-5.7. |

6

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Field Support Services | GSS.2.13 | • Avaya will provide field support services for Purchaser's products and obligations. Services include:<br>— Field Tech | Charged on a variable basis at $87 per hour | Purchaser | Avaya | 12 months | $15,750<br><br>estimated based on historical usage |

7

**Transition Services Agreement (TSA)**

# Section 5: People/HR

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Payroll Services | HR 4.2 | • Avaya will provide temporary payroll services for Transferred Employees located in jurisdictions for which Purchaser does not have a legal entity as of the Closing. | | Purchaser | Avaya | 3 months | [_____] |

## B. Service Levels Notes

Purchaser to directly cover all costs and expenses related to Avaya having to carry any Transferred Employees in which Purchaser does not have a legal entity available to employ such Transferred Employees as of the Closing.

8

US-DOCS\78259466.11

# Section 6: Marketing

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Digital Marketing Campaign | MKT.2.15 MKT.2.16 | • Avaya will provide digital marketing campaign services support:<br>— Campaign assets creation provided by creative services team in Colombia<br>— Campaign programming services provided by Eloqua programming team in India<br>— Database mining provided by team in India<br>• Avaya shall also provide break/fix maintenance of its Eloqua microsites related to the aforementioned marketing campaigns.<br>• Avaya shall provide Purchaser with a weekly extract of forms submitted.<br><br>Note: Campaigns landing pages will be provided on Eloqua microsites with the current sub-site urls: news.avaya.com. Alternatively an Eloqua form can be embedded into a Purchaser page to reduce visibility of the Avaya domain. | Marketing campaign services based on % business allocation | Purchaser | Avaya | 3 months | $18,530 |
| Marketing Content | MKT.2.17 | • Avaya will provide all source files of all networking products content. | | Purchaser | Avaya | | None |

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Website | | • Avaya to include a link on its website at www.avaya.com and subdomains thereof which predominantly showcase Business Products or which primarily relate to the Business to redirect servers/web pages designated by Purchaser.<br>• Avaya to implement a notification of the sale of the Business to Purchaser's preferred link, with a ribbon or banner posting on pages related to the Business. | | Purchaser | Avaya | 3 months | None |

10

Transition Services Agreement (TSA)

# Section 7: Real Estate
## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Bangalore Facility | RE.3.2 | Avaya will provide Purchaser staff access to Bangalore facility pursuant to terms of 1.3 of TSA.  During this period, Avaya will provide pass through costs as set forth in Section 1.3(b) of TSA.<br><br>Fees will not include significant one-time events (e.g., Fixtures, Furniture and Equipment upgrades, remodels, facility closures or moves). | Access to Purchaser portion of facilities at all times for duration of this service | Purchaser | Avaya | From Closing until current lease expiration (May 19, 2018)<br><br>Purchaser remains liable for the entire portion of its costs through May 19, 2018 regardless if Purchaser leaves the facility prior to such time pursuant to 6.2(a) of the TSA. | $49,707 |
| Santa Clara Facility | RE 3.3 | • Avaya will provide Purchaser staff access to Santa Clara facility pursuant to terms of 1.3 of TSA.  During this period, Avaya will provide pass through costs as set forth in Section 1.3(b) of TSA<br><br>Fees will not include significant one-time events (e.g., Fixtures, Furniture and Equipment upgrades, remodels, facility closures or moves). | Access to Purchaser portion of facilities at all times for duration of this service | Purchaser | Avaya | At least 3 months following the Closing through a maximum of the end of the current lease term (on May 31, 2021).<br><br>Purchaser | $248,045 |

11

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | | | | | remains liable for the entire portion of its costs for three months following the Closing regardless if Purchaser leaves the facility prior to such time pursuant to 6.2(a) of the TSA. | |
| Billerica Facility | RE 3.4 | If Purchaser is not taking the Billerica lease, the premises must be vacated within the time frame during which the Debtors are permitted to elect to assume or reject the lease under the Bankruptcy Code (including any potential extensions thereunder).  If this period extends past the Closing, Purchaser must exit all operations in a fully cleaned state within [three months] of Closing (or, if earlier, the end of such period).  . | Short Term Access in accordance with Detailed Requirements | Purchaser | Avaya | See Detailed Requirements section of Billerica Facility for duration conditions.   3 months following the Closing, subject to duration conditions.  In the event circumstances allow, Purchaser is responsible for the three months of costs regardless of | $340,052 |

12

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | | | | | what period during the month Purchaser has entirely moved out | |
| Valbonne, France Facility | RE 3.5 | Avaya plans to exit facility.  Purchaser has to the earlier of (a) 120 days from Closing and (b) December 30, 2017 to exit facility and remove all lab equipment Related to the Business. | | Purchaser | Avaya | Earlier of 120 days after Closing and December 30, 2017.

Purchaser remains liable for the entire portion of its costs for the earlier of 120 days after Closing and December 30, 2017. following the Closing regardless if Purchaser leaves the facility prior to such time pursuant to 6.2(a) of the TSA. | $5,265 |

13

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Cushman & Wakefield Fees | RE.3.6 | Avaya will continue to pay for Cushman and Wakefield fees as relates to all facilities under TSA for the duration of the lease. Avaya will provide pass-through costs to Purchaser for its pro rata portion of the Bangalore, Santa Clara, Billerica and Valbonne facilities. | | Purchaser | Avaya | Through Shared Space Term of Bangalore, Santa Clara, Billerica and Valbonne facilities, respectively | $18,140 |

**Annex I to Real Estate Service Summary**

Lease Assignment
Ottawa, Ontario, Canada (Assumed Lease in APA)
Maidenhead, UK (Assumed Lease in APA)

Governed by terms of TSA including Section 1.3
1.    Bangalore, India
2.    Santa Clara, CA
3.    Billerica, MA
4. .    Valbonne, France

Other Facilities:

   1)   Purchaser has 30 days from Closing to exit all other Avaya facilities where there are Transferred Employees.

14

# Section 8: IT
## A.  Service Schedule

The costs and services set forth in this Section 8 are allocated based on the following assumptions:

- Purchaser shall pay monthly costs that cover direct costs for using Avaya infrastructure, applications, services until migration is completed per each service set forth in this Section 8.
- Access to third party applications, programs, or services is subject to third party consent, if required, and the terms of Section 1.4 of the TSA.

- Avaya will require 16 weeks lead time prior to "Day 1" in order to effectuate the operational and financial reporting separation contemplated in the table below. In the event that the required lead time is not provided, Avaya and Purchaser will need to agree upon alternative arrangements which may include Avaya operating its current systems on Purchaser's behalf and providing certain data to Purchaser relative to the Business.  Such processes would need to be scoped, manual work identified, and appropriate costs agreed.[2]

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Infrastructure - Datacenter Facilities | IT.1 | <ul><li>Providing services for Purchaser at IT owned and managed data centers - cost includes lease cost and consumables (power, cooling, etc.)</li><li>5 total data centers but 4 are active facilities:</li><li>US1 Cincinnati Bell (Lebanon, Ohio), EMEA1 Telehouse (Frankfurt, Germany), APAC AT&T (Singapore),  Digital realty (Carrollton, Texas)</li></ul>Day 1:<ul><li>TSA until Purchaser final system solution</li></ul> | 99.9% system availability | Purchaser | Avaya | 12 months | $ 28,688 |
| Infrastructure - Operations and Support | IT.2 | <ul><li>[All support resources are shared between Purchaser and Avaya (Labor for support).][3]</li><li>Support labor covers data center, network, systems, database, SAP Basis, operations monitoring, change management, trouble resolution, job scheduling, and STARS.</li><li>Only includes infrastructure supported by</li></ul> | | Purchaser | Avaya | 12 months | $ 68,967 |

---

[2] Note to Avaya: under review by Extreme.  Parties to discuss.

[3] Note to Avaya: Extreme expects Avaya would provide the labor to support the various services set forth in IT.2.

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | IT.<br><u>Day 1:</u><br>• No Day 1 changes, provide support back to Purchaser through a TSA.<br>• Purchaser able to initiate tickets via Purchaser help desk via authorized individuals who have system access to initiate and route tickets to the proper IT teams or field services within Purchaser. | | | | | |
| Infrastructure - Computing Environment | IT.3 | • Provide hardware maintenance services under existing hardware maintenance contracts (servers, storage, network components) | | Purchaser | Avaya | 12 months | $ 17,005 |
| Infrastructure Software - Computing Software, System Mgmt., VMWare Virtualization | IT.4 | • Provide software maintenance services under existing software maintenance contracts (Operations, database, VMware, operating systems, network software) | | Purchaser | Avaya | 12 months | $ 47,960 |
| Shared Service - Print Services | IT.5 | • Provide print services for Avaya<br>• Includes HP leases for global print services - all the printers and ink, and paper is purchased internally.<br>• Includes additional leases for outside of US<br><u>Day 1:</u><br>• TSA print services on Day 1. | | Purchaser | Avaya | 12 months | $ 3,150 |
| Shared Service - Help Desk | IT.6 | • Avaya will continue to manage Help Desk support relating to requests for the Business.<br><u>Day 1:</u><br>• If Purchaser would like separate ACD, voice portal and chat routing, would need to estimate that cost and time | | Purchaser | Avaya | 12 months | None |

16

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Shared Service - Field Services Operations Support | IT.7 | • The Transferred Employees will co-manage and use the same set of tools to manage both Avaya and Business requests. | | Purchaser | Avaya | 12 months | $ 17,880 |
| Infrastructure - Exchange Email, Spam, Directory Services, Archiving | IT.9 | • Forwarding emails until application dependencies are resolved<br>• Email Maintenance contracts (Exchange, Spam, Directory Services, Archiving)<br>One Time Costs associated with migration of transferring employees to Purchaser email infrastructure, retaining avaya.com email addresses forwarded to Purchaser accounts, no change to email integrated applications and tools until final separation<br>Notes:<br>• Email boxes used by tools for Purchaser and Avaya customers will not be changed on Day 1 as this requires new development.<br>Day 1:<br>• Transferred Employees move to Purchaser email system<br>• Forward existing emails until application dependencies are resolved.<br>• Purchaser users will be contained within their own Purchaser email domain.<br>• MDM support to be reviewed.<br>• Manual forwarding of common email addresses required<br>• Provide 90 days of existing non-archived email data on server<br>• Provide 90 additional days of archived email data on server (after initial 90 above) | | Purchaser | Avaya | 12 months<br><br>$71,500 paid to Avaya at Closing separate from monthly costs | $ 6,909 |

17

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Infrastructure - Network & Circuits, Internet, Wireless (Telecom) | IT.10 | • Includes network connectivity for sites IT manages between system centers, people sites, data, video, internet, WAN acceleration, LAN, Wi-Fi, Disti connection, VPN, 800 numbers<br>Day 1:<br>• TSA Network use until network is established post circuit drop. | | Purchaser | Avaya | 12 months | $95,000 |
| Infrastructure Security - Firewall and Security, Remote Access(VPN) | IT.11 | • Covers network threat, secure file sharing, web proxy, soft tokens, malware protection, monitoring, PKI, internal & external SSO / identity / directory<br>Day 1:<br>• Access will continue BAU for employees | | Purchaser | Avaya | 12 months (can be sooner if Purchaser employees migrate to Purchaser IT environment) | $26,130 |
| Infrastructure - Voice over IP (VoIP), Voicemail, Scopia, Conference systems and Contact Center (IT On Avaya services) | IT.12 | • All internal communications - office phone systems, voice mail, Scopia, AAC, broadcast and conferencing services.<br>• Limited to IT supported contact centers. | | Purchaser | Avaya | 12 months | $4,349 |
| Applications - Sales - Marketing | IT.13 | • Access, maintenance, and support of marketing applications:<br>– Avaya.com CMS<br>– SFDC tie-ins<br>– Reporting via AIA | | Purchaser | Avaya | 12 months | $5,664 |

18

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | — SharePoint for collaboration<br>— Eloqua for Campaign Management<br>— PMC (Zift)<br>— Oracle Social Relationship Management | | | | | |
| Applications - Sales - Direct & Indirect incl. Renewals | IT.14 | • Access, maintenance, and support of sales applications:<br>— sales.avaya.com portal<br>   - The portal contains Purchaser related external-facing content<br>— Salesforce PRM/CRM<br>   - Salesforce is used for lead-capturing and -generation.<br>   - Avaya will support cutover to applicable Purchaser application during transition.<br>— Avaya OneSource<br>   - A1S is used for Quote creation and pricing.<br>— Deal Desk<br>   - Deal desk tracks the any special pricing requests<br>   - Deal desk has access to special bids database.<br>— Incentive Compensation<br>   - Callidus is currently used for sales comp<br>   - Avaya will support cutover to applicable Purchaser application during transition<br>— BECS<br>   - BECS is used for partner commitments for discounts.<br>   - It is a crediting service to offer credit back to partners<br>   - Avaya will support cutover to | | Purchaser | Avaya | 12 months | $30,450 |

19

Transition Services Agreement (TSA)

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | applicable Purchaser application for Purchaser<br>— Avaya University is a set of learning tools<br>— SAP is used for booking<br>— AIA(Avaya Intelligence Analytics)/ADW(Avaya Data Warehouse)/EDW(Enterprise Data Warehouse) are the data warehouses N+H22 may need to support operations<br>— MSQT(Multi System Quoting Tool) and A1SR quoting for service renewals.<br>— For A1SR, see the install base and evaluate what equipment is currently used.<br>— Sales and Partner Portal (content)<br>// MSQT will retire into A1SR during TSA | | | | | |
| Applications -Sales - Configuration, Quoting & Order Management | IT.15 | • Access, maintenance, and support of Configuration, Quoting & Order Management applications:<br>— A1S is used for product catalog, solution configuration, guided selling, establishing end customer requirements, special bids<br>— SAP is used for discounting and approvals and pricing<br>— A1S is used for quote creation, pricing, software and hardware and cloud solutions<br>— SAP is used for pricing<br>— PSN is used for support and installation services<br>— APSQT is used for services quoting<br>— Qvidian is used for proposal management<br>— TBC is used for multi-channel selling<br>— PLDS/Moduslink is used for software license management<br>— SAL<br>— Avaya One Source is used for order changes | | Purchaser | Avaya | 12 months | $53,034 |

20

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | and cancellations | | | | | |
| Applications - Sales - Account Management | IT.16 | • Access, maintenance, and support of account management applications:<br>— SAP is used for Ship–to & Sold–to management<br>— SFDC is used for prospect management, account relationships, contact management and account territory planning (CRM)<br>— OFC, CAT, AVA, Mobile Web Portal, Nortel<br>— CXP incl. SSO and Password Reset<br>— OSC for PRM | | Purchaser | Avaya | 12 months | $6,503 |
| Applications - Sales - Support & Professional Services | IT.17 | • Access, maintenance, and support of service delivery applications:<br>— Open Channel Solutions<br>— Siebel is used for service delivery, incident management, escalation management and customer satisfaction<br>— SAP<br>— AOK is used for Knowledgebase<br>— ServicePower, TWBS and FSAC are used for Ticket, dispatch process for technicians<br>— Remedy – Services ticketing system<br>— eProject tool is used internally to manage and schedule the technicians.<br>— Support.Avaya.com website and supporting technology<br>— Oracle Knowledgebase (InQuira) | | Purchaser | Avaya | 12 months | $15,787 |
| Applications - Sales - Billing & Receivables | IT.18 | • Access, maintenance, and support of billing & collections applications:<br>— Biller Direct allows customer to make payments in US using cards. BD is an add-on to SAP. Pay metric is the | | Purchaser | Avaya | 12 months | $7,030 |

21

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | Purchaser vendor for Biller Direct.<br>– GETPAID is used for all billing.<br>– SAP<br>– Clarify, Vistex are unique to N box.<br>– Vertex does taxation engine.<br>– RevPro is on the customer side for revenue recognition.<br>– Biller Direct is used for payments<br>– GETPAID is used for disputes and collections | | | | | |
| Applications - Corporate - Supply Chain & Logistics | IT.19 | • Access, maintenance, and support of supply chain & logistics applications:<br>– Global Planning Tool<br>– Sterling Commerce – EDI Hosted Solution<br>– Livingston International Technologies<br>– Kinaxis is a material planning software. It is a Cloud product (SaaS) to create purchase orders.<br>– Baxter is used for spare parts planning. It is a SaaS product with similar process to Kinaxis but not integrated to SAP.<br>– Siebel is used for reverse logistics (Returns)<br>– SAP interfaces with most of these systems to orchestrate processes | | Purchaser | Avaya | 12 months | $16,320 |

22

## Transition Services Agreement (TSA)

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Applications - Corporate - Finance, Procurement & Payments | IT.20 | • Access, maintenance, and support of core finance, procurement & payments applications:<br>— AIA (Avaya Intelligence Analytics) is a data warehouse; Essbase/SAP is used for financial management reporting<br>— Government uses CostPoint; Vistex is used for partner compensation<br>— Concur is used for travel services and expense; TBC is used for treasury management<br>— GTS is used for import/export and trade compliance<br>— MJE (Manual Journal Entry) tool; SAP/Vertex/Sabrix is used for tax management<br>— Bloomberg for Treasury; Coupa: a cloud-based provider integrated into SAP (AP)<br>— Fieldglass for time & material; Concur aka TREX for travel and expenses<br>— EDW and BW are two data warehouse application for reporting<br>— InvoiceGate workflow management for invoices<br>One Time Costs to create bespoke reports during TSA transition phase.<br>Delivery:<br>• Partition Key Operational & Financial Reports (e.g. Open Orders, AR, Inventory, deferred revenue  etc. ) between Network/Avaya<br>Day 1:<br>• Create separate cost centers and profit centers for Purchaser | | Purchaser | Avaya | 12 months<br><br>$200,000 paid to Avaya at Closing separate from monthly costs | $12,967 |
| Applications - Corporate - HR | IT.21 | • Access to SAP and service support systems:<br>• Access to SAP and service support systems: | | Purchaser | Avaya | 12 months | $8,304 |

23

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | - HR and Payroll - n/a - all data to be transferred pre Day 1, transferred employees will be supported by the Purchasers payroll services Day 1<br>- Access will continue to be granted to key Avaya QTC applications e.g. SFDC, A1S, SAP, Siebel, eProject etc to transferred employees in order to perform their roles on an as needed basis<br>One Time Costs associated with report segregation.<br>Delivery – Finance:<br>• Create new profit centers to streamline the revenue between Business/Avaya, rather than manually extracting revenue at material level to partition<br>• Create Cost Centers to segregate direct costs between Avaya & Networking Business<br>• Create separate plants for inventory management and reseller transactions<br>• Semi-Automate allocation processes for shared costs<br>• Modification of commercial documentation to reflect "Agent / on behalf of"<br><br>Day 1:<br>• Avaya will act as Purchaser's agent for the Business by processing orders, delivering product and invoicing on behalf of Purchaser | | | | $450,000 paid to Avaya at Closing separate from monthly costs | |

24

**Transition Services Agreement (TSA)**

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Applications - Corporate - Corporate (Other) | IT.22 | • Access, Maintenance, and Support of Corporate Applications: <br> — Serengeti/Apptus and Oracle GCP for legal <br> — Fusion for real estate management <br> — EASE is used by M&A <br> — SAP GRC is used to provide access control to the users. <br> — HPSM is an IT asset management tool. <br> — SAP PPM is used for portfolio management. <br> — SAP Fiori is used for internal time reporting. <br> — Cadency Comp is used for SOX compliance management <br> — FUSION(Big center) is used for facilities management system <br> — Global Trade is used for import/export | | Purchaser | Avaya | 12 months | $1,779 |
| Data Transfer | IT 23 | • Avaya will provide data from its systems for Purchaser to map into Purchaser's systems. For example: Avaya will provide data from its SAP instances and Purchaser will map the data into its Oracle instance. Avaya is responsible for providing definitions (data dictionary / data structure) of its data for all data to be converted. Avaya will also provide walk-throughs of relevant application code, configuration, available technical and functional documentation and Business specific custom code and logic relevant to the IT systems used in the Business' "opportunity to cash" transactions including Business licensing systems.   Avaya's business and IT team members will be made available for Purchaser to ask data and systems related questions relative to the Business. Avaya and Purchaser will collectively determine mutually agreeable formats to provide / receive required data. | | Purchaser | Avaya | 12 months | No cost to Purchaser unless consulting services are elected. |

25

### Transition Services Agreement (TSA)

| Function | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | • In addition to the foregoing, at Purchaser's election, Avaya will make available consulting services resources at an amount to be agreed in order to further assist Purchaser (e.g. if Purchaser requires dedicated consulting work over and above the walk-throughs described, etc.).<br><br>• Migrate SaaS configuration from Avaya instance to Purchaser instance if Avaya, Purchaser and the associated 3rd party are in agreement (example is Kinaxis), including agreement as to fee arrangements and responsibilities. | | | | | |

## B. Service Levels Notes and Service Level by Application

26

**Service level by Application**

| App ID | Application Search Code | Name | Usage | Business Unit | Service Level | Criticality Level | Rationale For SL Level Not Aligned | Config Admin Workgroup Searchcode | BP Owner | IT Owner | EC+1 | EC+2 | Hosting Delivery Model | Application Architecture | Application Package |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1QS | A1SCOMMON-QUOTE-PROD | A1S Common Quote Service | Quoting | IT, SVCS | Gold | 1 | | IT-AVA-CSQT | Cleary, Colm | Sankuratri, Mitra | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| A2K | A2KREPT-PROD | A2K Reporting | Business Intelligence/Reporting | SVCS | Bronze | 2 | No DR, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Reynolds, Fred | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| AAC | AACC-PROD | Avaya Aura Contact Center | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Home-grown |
| ABL | ABLAPP-PROD | Avaya Batch Loader | Middleware | SALES | Bronze | 3 | | AVA-AP-ADM-AVAYA-BATCH-LOADER | Davis, Dorothy | Naseef, Ali | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| ACP | ACCPAC-FINANCIAL-APAC-PROD | ACCPAC-APAC-FINANCIAL - Statutory - Accounting Package | Enterprise Resource Planning | FIN, OEFC | Bronze | 2 | No DR, No App Vendor Support, Inadequate Hosting, Out of support OS | INTL-APPS-ACCPAC | Cottrell, Amy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| ACG | ACGPRODUCTION-PROD | Avaya Common Gateway | Middleware | CAO, FIN, GOV, GSMB, HR, IT, MLP, | Silver | 1 | No DR, No HA, Inadequate Hosting | IT-AVA-FMW | Kirck, Theresa | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MRK TG, OEFC, R&D, SALES, SVCS | | | | | | | | | | | |
| ABI | ACSBI-PROD | ACS Business Intelligence | Business Intelligence/Reporting | SVCS | Silver | 2 | Criticality Score | STARS | Brost, William | Anderson, Erica | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ACD | ACTIVE-DIRECTORY-GLOBAL | Active Directory Global | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRK TG, OEFC, R&D, SALES, SVCS | Gold | 1 | | AVAGOV-APPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| RMD | ACTIVE-DIRECTORY-REMOTE | ACTIVE-DIRECTORY-REMOTE | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRK TG, OEFC, R&D, SALES, SVCS | Gold | 1 | | AVAGOV-APPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| ADI | ADI-PROD | Avaya Direct International | eCommerce | SALES | Silver | 1 | No DR, Non standard OS, Out of support | AVA-AP-ADM-ADI-SUPP | Elias-Radler, Diane | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Commercially Available |

28

**Transition Services Agreement (TSA)**

| | | | | | | | OS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AUP | ADP-US-PAYROLL-PROD | ADP US Payroll | Payroll | HR | Silver | 2 | | AVA-IT-OP-PAYROLL | Ysordia, Tracey | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | External/Outsourced | other | Commercially Available |
| ADS | ADS-PROD | Avaya Diagnostic Server | Administer/Manage/Monitor Systems | | Bronze | 3 | | AVAYA-HD-VIDEO | Gleason, Gregory | Gleason, Gregory | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | | |
| ADT | ADT-CS1000-PROD | Advanced Diagnostic Tool CS1000 | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| AGI | AGILE93-PROD | Agile Product Collaboration 9.3 | Product Development | R&D | Silver | 1 | Criticality Score | AVA-AP-ADM-AGILE | Soans, Ullas | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| AKA | AKAMAI-KONA-PROD | Akamai Kona Site Defender | Infrastructure | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | KONA-RESPONSE | Cookson, John | Cookson, John | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Outsourced | 3-tier | Commercially Available |
| AKW | AKAMAI-WEBACC-PROD | Akamai Web Accelerator | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | IT-WEB-ACC | Cookson, John | Cookson, John | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Outsourced | 3-tier | Commercially Available |

29

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALD | ALDARS-PROD | ALDARS | Document/File repository | SALES, SVCS | Silver | 2 | | AVA-AP-ADM-LTNT-EMEA | Davis, JuliAnna | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Hybrid |
| ALL | ALLGRESS-IRMS-PROD | Allgress Business Risk Intelligence | Security | IT | Bronze | 3 | | IT-SEC-ALLGRESSDBO | John, Abie | Sayles, James | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| AMA | AMAG-PROD | AMAG Badging System | Security | CAO | Silver | 2 | Criticality Score | AMAG | Ryan, Timothy | Ryan, Timothy | McCarthy, Elizabeth | Parkin, William | Internal/Outsourced | 2-tier | Commercially Available |
| ANG | ANGSTROM-PROD | ANGSTROM | Middleware | IT | Silver | 2 | | IT-AVA-WEBMETHODS | Kuppuswammy, Swamynathan | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Hybrid |
| AOK | AOKEBOND-PROD | AOK eBond | Middleware | GSMB | Silver | 2 | | TEN-IT-APPS-DMS | Stiller, Thomas | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| AMX | AOS-MATRIX-PROD | AOS Matrix | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, App Support Ineffective | AVA-HD-APPS | Reynolds, Fred | Reynolds, Fred | Scalf, Wayne | Nothaft, Kelly | External/Outsourced | 3-tier | Commercially Available |
| APL | APP-LISTSERV-PROD | List Service Mass Mail | Communications/Collaboration | IT | Silver | 2 | | AVA-IT-OP-POST | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| APS | APS-TOOLSA-COMMS-PROGRAMS-PROD | Command Line Programs for Customer | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, App Support Ineffective, Non standard OS | SVCS-APS-TOOLSA-BIZ | Carroll, Chuck | Simpson, Michael | Brennan, Thomas | Bustamante, Troy | Internal/Insourced | 1-tier | Home-grown |
| APT | APTTUS-PROD | Quote-to-Cash (QTC) Application | Document/File repository | SALES | Silver | 2 | | IT-APPS-SFDC | Martin, Dianne | Bylappa, Mahesh | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |
| ARI | ARIBA-PROD | Ariba Production | Procurement | MLP | Silver | 2 | Criticality Score | AVA-AP-ADM-ARIBAI | Konteh, Lisa | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| ART | ART-PROD | Alarm Registration Tool | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, Non standard OS, Out of support | STARS | Brost, William | Sharma, Manish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

30

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | OS | | | | | | | | |
| ASD | ASD-PROD | Avaya Solution Designer | Quoting | SALES | Gold | 1 | | AVA-APP-ASDPLAT | Hill, Waldon | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| ASG | ASG-PROD | Access Security Gateway | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | Criticality Score | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| AWM | ASGWM-PROD | ASG Web Mobile | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ADC | ASSET-CERT-APPLICATION-PROD | Asset Cert Application | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | Criticality Score | IT-INTERNAL-CERTIFICATE-SERVICE | Hicks, James | Zhou, Tao | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| FTR | ASSET-VALIDATION-SAL-FTR-PROD | Asset Validation SAL FTR | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Brost, William | Reyes, Hugo | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| AGY | ASSOCIATE-GATEWAY-PROD | Associate Gateway | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, No HA, Non standard OS, Out of support OS | AVA-AP-ADM-FIELD-SERVICE-ADMIN | Murray, Christopher | Murray, Christopher | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | 2-tier | Home-grown |
| ATA | ATA-PROD | Asset Tracking Application | Infrastructure | IT | Bronze | 3 | | AVA-ATA-APPL | Cuervo, Diego | Dor, Hugues | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ATC | ATLASPRO-01-COLOMBIA-PROD | ATLASPRO-COLOMBIA | Business Intelligence/Reporting | FIN | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-3 | Sotelo Fajardo, Armando | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Commercially Available |
| ATP | ATP-PROD | Avaya Transfer Program | Resource Management | HR | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Rhoades, Mary | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |

31

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AUF | AUTHFILE-PROD | AUTHFILE | Security | R&D | Silver | 2 | | AVA-AUTHFILE | | Lefebvre, Stephane | Mahmood, Shahid | Madhdhipatla, Munisekaran | Lanthier, Louis | Internal/Insourced | 3-tier | Home-grown |
| ALG | AUTOMATED-LOG-COLLECTOR-PROD | Automated Log Collector | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | | Brost, William | Sharma, Manish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| AUT | AUTOSYS-B1P-PROD | Autosys B1P | Middleware | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No HA, No App Bug & Enhancement support, Non standard OS, Out of support OS | AV-IT-EJS-OPS | | Colin, Pierre | Sreekumar, Salini | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| AUS | AUTOSYS-ENGPTL-PROD | Autosys ENGPTL | Middleware | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No App Bug & Enhancement support, Inadequate Hosting, Non standard OS, Out of support OS | AV-IT-EJS-OPS | | Colin, Pierre | Sreekumar, Salini | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| ADL | AV-DATA-LICENSING-PROD | Avaya Data Licensing | License Management | SVCS | Silver | 2 | | AVA-AP-ADM-FIELD-SERVICE-ADMIN | | Goddard, Michael | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Home-grown |
| AVF | AVA-APP-FBT-PROD | Avaya Fast Bug Track | Product Development | GSMB | Bronze | 3 | | AVA-APP-FBT-AG | | Bernhard, Reiner | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Hybrid |

32

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVC | AVA-AUDIO-CONF-PROD | Avaya Audio Conference | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 2 | | | INFRA-CONF-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | appliance based | Home-grown |
| EPO | AVA-EPO-PROD | ePO | Infrastructure | IT | Bronze | 3 | | | AVA-IT-GEUCS | Heuvel, Richard | Hubbard, Martyn | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| AIA | AVA-INTELLIGENCE-ANALYTICS-PROD | Avaya Intelligence and Analytics | Business Intelligence/Reporting | MRKTG, IT, OEFC, CAO, SALES, SVCS | Bronze | 3 | | | AVA-APP-HYPERION-ESSBASE | Kuppuswamy, Swamynathan | Kommalapati, Kishore | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| SCC | AVA-SCCM-PROD | SCCM | Administer/Manage/Monitor Systems | IT | Bronze | 3 | | | AVA-IT-GEUCS | Heuvel, Richard | Hubbard, Martyn | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| AAA | AVAYA-ALARM-DICTIONARY-PROD | Avaya Alarm Dictionary | Administer/Manage/Monitor Systems | | Bronze | 3 | | | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ASW | AVAYA-ANSWERS-PROD | Avaya Answers Web Site | Web Portal | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, | Bronze | 3 | | | IT-AVA-INN | Moshrefi, Afshin | Moshrefi, Afshin | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SALES, SVCS | | | | | | | | | | | |
| AUR | AVAYA-AURA-CONF-PROD | Avaya Aura Conferencing | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | INFRA-VOICE-OPS | Snell, E | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| AAM | AVAYA-AURA-MESSAGING-PROD | Avaya Aura Messaging | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | appliance based | Home-grown |
| ADW | AVAYA-DATA-WAREHOUSE-PROD | Avaya Data Warehouse | Business Intelligence/Reporting | FIN, MLP, OEFC, SALES, SVCS | Gold | 1 | No DR, No HA, App Support Ineffective, Non standard OS | GCS-DATA-WAREHOUSE | Hake, Robert | Hake, Robert | Osborne, Pierre | Hake, Robert | Internal/Insourced | 3-tier | Hybrid |

34

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EDP | AVAYA-EDP-PROD | Engagement Development Platform | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | AVAYA-HD-VIDEO | Snell, E | Snell, E | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| AEN | AVAYA-ENGAGEMENT-ASSISTANT-PROD | Avaya Engagement Assistant | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | AVAYA-HD-VIDEO | Snell, E | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| FTP | AVAYA-FTP-PROD | Avaya FTP | Document/File repository | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, Non standard OS | CC-AVA-EBIZ-FTP | Burgess, Barbara | Burgess, Barbara | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |

35

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALA | AVAYA-LEARNING-ENVIRONMENT-PROD | Avaya Learning Environment | | | Bronze | 3 | | AVA-AL-INT-DEV | Butler, Dorothea | Kite, Nazi | Pennell, David | Butler, Dorothea | | | |
| ACV | AVAYA-LIVE-VIDEO-PROD | Avaya Live Video - Scopia | eCommerce | SALES | Silver | 1 | No DR, App Support Ineffective, Non standard OS, Out of support OS | AVAYA-LIVE-VIDEO-SUPPORT | Cottrell, Amy | Robert, Paul | Brennan, Thomas | Bustamante, Troy | Internal/Insourced | 2-tier | Home-grown |
| AMN | AVAYA-MESSAGE-NETWORKING-PROD | Message Networking | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | No DR | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | appliance based | Home-grown |
| AMM | AVAYA-MULTIMEDIA-MESSAGING-PROD | Avaya Multimedia Messaging | | | Bronze | 3 | | AVAYA-HD-VIDEO | Snell, E | Thomas, Scott | Ebrahimi, Fariborz | Kavouspour, Dinyar | | | |
| ANS | AVAYA-NOTIFICATION-SYSTEM-PROD | Avaya Crisis Notification System | Communications/Collaboration | CAO | Bronze | 3 | | INFRA-VOICE-OPS | Parkin, William | Thomas, Scott | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| A1W | AVAYA-ONE-WAREHOUSE-PROD | Avaya One Warehouse | | | Silver | 1 | No DR, No HA, Inadequate Hosting, Non standard OS, Out of support OS | IT-AVA-AIA | Kuppuswamy, Swamynathan | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | | | |

36

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A1X | AVAYA-ONEXCES-PROD | Avaya OneExces | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | appliance based | Home-grown |
| BLG | AVAYA.COM-BLOG-PROD | Avaya.com Blogs | | | Bronze | 3 | | | AVAYA-BLOG-PROJECT | Archer, James | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | | | |
| AVO | AVAYA.COM-OWCS-PROD | Avaya Oracle WebCenter Sites | Web Portal | MRKTG, SALES | Gold | 1 | | | AVA-AVAYACOM-T2-T3 | Chang, Eric | Gworek, James | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| AVW | AVAYA.COM-WEBCHAT-PROD | Avaya Web Chat | Communications/Collaboration | MRKTG, SVCS | Gold | 1 | | | AVA-WEBCHAT | Chang, Eric | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | External/Insourced | 3-tier | Commercially Available |
| ACA | AVAYAITCLIENTCA-PROD | Avaya Certificate Authority | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | | IT-INTERNAL-CERTIFICATE-SERVICE | Hicks, James | Zhou, Tao | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| BGM | AVYA-BYOD-GM-PROD | Guest Manager Application | Security | CAO, FIN, GOV, GSMB, HR, | Bronze | 3 | | | IT-INFRA-BUILD-NETWORK | Pang, Kiang | Pang, Kiang | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |

**Transition Services Agreement (TSA)**

| | | | | IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AZA | AZAP-PROD | Azaleos Provisioning Tool | Administer/Manage/Monitor Systems | IT | Bronze | 3 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| BED | BEDITO-PROD | Bereitschaftdienst tool | Resource Management | GSMB | Bronze | 2 | No DR, Out of support OS | AVA-IT-MASKUS-WEBAPPS-GERMANY | Hellbrueck, Peter | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | External/Insourced | 2-tier | Home-grown |
| BIZ | BIZTALK-ENT-PROD | Biztalk | Middleware | MLP, OEFC, SALES, SVCS | Silver | 1 | No DR, Inadequate Hosting, Out of support OS | IT-AVA-EDI | Kuppuswamy, Swamynathan | Kirck, Theresa | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| BZT | BIZTALK-PROD | Microsoft Biztalk Server 2004 | Middleware | MLP, OEFC, SALES, SVCS | Silver | 1 | No DR, No App Bug & Enhancement support, Out of support OS | AVA-APPS-BIZTALK | Kamp, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Commercially Available |
| BLK | BLACKDUCK-PROD | Open Source Software Manager | Product Management | CAO, R&D | Bronze | 3 | | BLACKDUCK | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Hybrid |
| BOG | BOOMI-GER-PROD | Dell Boomi Germany | Middleware | HR, IT | Silver | 2 | | GER-IT-APPS-SAP-HR | Elsner, Gerald | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | External/Outsourced | 3-tier | Commercially Available |
| BOO | BOOMI-PROD | Cloud Customer Business-Intergration Service | Middleware | HR | Silver | 2 | | IT-AVA-FMW | Kuppuswamy, Swamynathan | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | External/Insourced | other | Commercially Available |
| BXI | BOXI-ENT-PROD | BOXI Reporting | Business Intelligence/Reporting | SALES, SVCS | Silver | 2 | | IT-APPS-EDW | Greene, Charles | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |

38

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BPA | BPA-PROD | SAP-BPA | Business Intelligence/Reporting | OEFC, FIN, SALES, MLP, SVCS, IT | Silver | 2 | | AVA-SAP-BASIS | Ellison, Mark | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| APC | BPCC-PROD | BPCC | Project Management | SALES | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |
| BPO | BPOFFER-PROD | BP Offer | Quoting | GSMB | Silver | 2 | | TEN-IT-APPS-XOFFER | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| BBK | BRANDBOOK-PROD | Digital Brand Book | | | Bronze | | | AVAYA-BLOG-PROJECT | Archer, James | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | | | |
| BRC | BRC-INFONGEN-PROD | BRC InfoNGen | Business Intelligence/Reporting | MRKTG | Bronze | 3 | | BRC-INFONGEN-WG | Nespatti, Isabella | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | External/Outsourced | 3-tier | Commercially Available |
| BSM | BSM-PROD | HP Business Service Management | Administer/Manage/Monitor Systems | IT | Silver | 2 | | SMT | Draye, Jean-Philippe | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| C3O | C3000-FRANKFURT-PROD | C3000 | Printing | IT | Silver | 2 | | ION-GERMANY-SUPPORT | Hinek, Ingo | Ritzert, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 2-tier | Home-grown |
| CDN | CADENCY-PROD | Cadency | | | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-2 | Peoples, Shawna | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | | | |
| CAN | CANTO-PROD | Call Annahme tool | Ticketing | GSMB | Bronze | 3 | | AVA-IT-MASKUS-WEBAPPS-GERMANY | Hellbrueck, Peter | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | External/Insourced | 2-tier | Home-grown |
| CRV | CAREVIEWS-PROD | CareViews Portal | Business Intelligence/Reporting | OEFC | Silver | 1 | No DR, Non standard OS, Out of support OS | AVA-IT-OP-CAREPORTAL | Erbele, Jeff | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| CCM | CC-MOBILE-PROD | CC Mobile | Communications/Collaboration | SALES | Bronze | 3 | | AVA-CCMOBILE | Hillis, Brian | Jangam, Rahul | Nabors, Christopher | Matula, Valentine | Internal/Insourced | 2-tier | Home-grown |
| CCC | CCC-ENT-PROD | Clarify Clear Contracts | Customer Management | SVCS | Silver | 1 | No DR, Non standard OS, Out of support | CSC-ENT-CLARIFY | Greene, Charles | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |

39

**Transition Services Agreement (TSA)**

| | | | | | | | OS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EPL | CCT-EP-AVAYA-LEARNING-PROD | CCT Avaya Learning | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-ALHD-T1 | Wren, Kathy | Finino, Nicolas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| EPI | CCT-EP-CBA-PROD | CCT Inbound Outbound | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EPC | CCT-EP-CLICKTOCALLAGENT-PROD | CCT Click to Call Agent | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| GOA | CCT-EP-GO-AVAYA-PROD | OFEC Go Avaya IVR | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EPR | CCT-EP-IT-ABSENCE-REPORTING-PROD | CCT Absence Reporting | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EPB | CCT-EP-IT-BUSINESSPARTNER-PROD | CCT Business Partner | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-HD-PARTNER | Wren, Kathy | Finino, Nicolas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| EPS | CCT-EP-IT-SERVICE-DESK-PROD | CCT Service Desk | Communications/Collaboration | OEFC | Bronze | 3 | | AICCC-TEAMB | Wren, Kathy | Finino, Nicolas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| NSS | CCT-EP-NUANCE-PROD | CCT Nuance Speech/Text to Speech | Communications/Collaboration | IT, OEFC SVCS | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| IVR | CCT-EP-OFEC-US-IVR-PROD | CCT OFEC US IVR | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EPV | CCT-EP-VERINT-SURVEY-WRAPPER-PROD | Verint Survey Wrapper | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EPA | CCT-EP-VP-AGENT-CONNECTOR-PROD | CCT Agent Connector | Communications/Collaboration | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| CCT | CCT-IC-PROD | CCT Interaction Center | | | Gold | 1 | | AVAYA-HD-VIDEO | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | | | |
| CCO | CCT-OA-PROD | Operational Analyst | Billing/Invoicing | OEFC | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| WF1 | CCT-WFO-APP-PROD | CCT-Workforce Management | Communications/Collaboration | SALES, SVCS | Bronze | 3 | | IT-ON-AVAYA-WFO | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| CIC | CICFORM-PROD | CIC Formular | Quoting | GSMB | Silver | 2 | | AVA-IT-APPS-CICFORM-GERMANY | Arhelger, Claudia | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CII | CII-PROD | Common Input Interface | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, No HA, Non standard OS, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| CWI | CLEARQUESTWI-PROD | Workflow Automation Bug Tracking System | Business Intelligence/Reporting | R&D | Silver | 1 | No DR, App Support Ineffective | THEMIS-WI | Distasio, Sandra | Distasio, Sandra | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Hybrid |
| COG | COGNOS-PROD | Cognos | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | CSC-AP-ODS-COGNOS-ETL | Kanamariapudi, Padmanabha | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| COI | COI-PROD | Common Output Interface | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, Non standard OS, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Home-grown |
| CWP | COLDFUSION7-WMPMDB | COLDFUSION7-WMPMDB | Project Management | R&D | Bronze | 3 | | RDPS-ONSITE-WESTMINSTER | Thomson, Rodney | Flores, Mark | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Commercially Available |
| COL | COLLAB-PROD | Collaboratory | Web Portal | IT, R&D, SALES, SVCS | Silver | 2 | | AVAYA-LIVE-VIDEO-SUPPORT | Heath, Valerie | Gizzi, Louis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| CPS | COMPAS-PROD | COMPAS | Enterprise Content Management | R&D | Silver | 1 | No DR, App Support Ineffective | COMPAS | Krishnan, Ramnath | Krishnan, Ramnath | Mhaskar, Vijay | Krishnan, Ramnath | Internal/Insourced | 2-tier | Home-grown |

41

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | ve, Inadequate Hosting | | | | | | | | |
| CO M | COMPATIBILITY-MATRIX-PROD | Compatibility Matrix | Product Management | SVCS | Bron ze | 3 | | STARS | Curnow, Michael | Anderson, Erica | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| CO N | CONDITION-SHEETS-PROD | Condition Sheets | Payroll | HR | Silv er | 1 | No DR, No HA, Out of support OS | AVA-AP-ADM-HR-WEB-APP S | Melamed, Steven | Yockey, Stephen | Ebrahimi Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| CN 2 | CONNECT2-PROD | Product Connect2 | Administer/Manage /Monitor Systems | SVCS | Silv er | 1 | No DR, Inadequ ate Hosting, Non standard OS, Out of support OS | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| CN 3 | CONNECT3-PROD | Connect3 | Administer/Manage /Monitor Systems | SVCS | Silv er | 1 | No DR, Inadequ ate Hosting, Non standard OS, Out of support OS | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| CN D | CONNECTDIRECT-PROD | Connect Direct | Middleware | IT, R&D, SVCS | Silv er | 1 | No DR, No HA, Inadequ ate Hosting | AVA-AP-ADM-LTNT-GLOBA L-1 | Yockey, Stephen | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Inso urced | applian ce based | Commer cially Availabl e |
| CN S | CONTENTSERVER-PROD | Content Server | Document/File repository | SVCS | Bron ze | 3 | | STARS | Brost, William | Anderson, Erica | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| CO U | COUPA-PROD | Coupa | Procurement | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK | Silv er | 2 | | IT-AVA-COUPA-SAPFA | Konteh, Lisa | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | other | Hybrid |

42

**Transition Services Agreement (TSA)**

| | | | | TG, OEFC, R&D, SALES, SVCS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CVY | COVERITY-PROD | Coverity Analytics | Business Intelligence/Reporting | R&D | Silver | 2 | | COVERITY | Krishnan, Ramnath | Krishnan, Ramnath | Mhaskar, Vijay | Krishnan, Ramnath | Internal/Insourced | 2-tier | Home-grown |
| CAP | CPA-MEMOTECH-PROD | IP Lifecycle Management | Business Intelligence/Reporting | CAO | Silver | 1 | No DR, No HA, Inadequate Hosting, Out of support OS | AVA-AP-ADM-LTNT-EMEA | Cottrell, Amy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| CPI | CPITRADEMARKS-PROD | CPI Trademark Web System | Business Intelligence/Reporting | CAO | Bronze | 3 | | AVA-CAO-CPI-TRADEMARK | Matwiejczyk, Tadeusz | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| CPT | CPT-ENT-PROD | Consolidated Productivity Tool | Order Management | SALES, OEFC | Silver | 2 | Criticality Score | IT-AVA-EDI | Washington, Thomas | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| CRE | CRE-PROD | Credit Risk Expert | Customer Management | SVCS | Bronze | 3 | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Home-grown |
| CRM | CRMWS-PROD | CRMWS | Middleware | SVCS, IT | Silver | 2 | Criticality Score | AVA-AP-ADM-FIELD-SERVICE-ADMIN | Brost, William | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| CSQ | CSQT-PROD | Consolidate Services Quoting Tool | Quoting | SALES | Silver | 1 | No DR, No HA | IT-AVA-CSQT | Greene, Charles | Sankuratri, Mitra | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| CSS | CSS-PORTAL-PROD | Customer Support Site | Web Portal | SVCS | Silver | 1 | No DR, No App Vendor Support, Out of support OS | AVA-AP-ADM-SUPPORTSITE | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| CRF | CURRENCY-FEED-PROD | Currency Feed for SAP | Accounting/Finance/Treasury | FIN | Silver | 2 | | AVA-AP-ADM-LTNT-EMEA | Moore, Maureen | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| SRP | CUSTOMER-CONNECT-OEFC-PORTAL-PROD | Customer Connect (OEFC) Portal | Communications/Collaboration | SALES | Bronze | 3 | | IT-OPS-OEFC-SUPPORT-PORTAL | Cleary, Colm | Mohamed, Omar | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Home-grown |

43

**Transition Services Agreement (TSA)**

| CVT | CVT-PROD | Configuration Validation Tool | Administer/Manage /Monitor Systems | SVCS | Silver | 2 | | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
|-----|----------|-------------------------------|-----------------------------------|------|--------|---|---|-------|---------------|--------------------|--------------------|--------------------|--------------------|--------|-----------|
| CXP | CXP-PORTAL-PROD | Customer Experience Portal | Web Portal | SVCS | Silver | 1 | No DR, No App Vendor Support, Out of support OS | AVA-AP-ADM-CXP | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| D3A | D3-PROD | D3 | Document/File repository | GSMB | Silver | 1 | Review Criticality Score | AVA-IT-APPS-GER-D3 | Kamp, Thomas | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| DSC | DANTE-SOCKS-PROD | DANTE SOCKS TOOL | Security | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| DSL | DATA-SCIENCE-LAB-PROD | Data Science Lab | Business Intelligence/Reporting | IT | Silver | 2 | | IT-AVA-AIA | Kuppuswamy, Swamynathan | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | other | Commercially Available |
| DTP | DATAPOWER-PROD | Avaya datapower xml processing device used by citi user. | Middleware | MLP, OEFC, SALES, SVCS | Bronze | 3 | | IT-AVA-EDI | Kuppuswamy, Swamynathan | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | appliance based | Hybrid |
| DBS | DB-SYNCH-PROD | SAL Database SYNCH Tool | Middleware | SVCS | Bronze | 3 | | STARS | Brost, William | Reyes, Hugo | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ORO | DBA-WEB | http://dba.avaya.com | Infrastructure | IT | Silver | 2 | | CC-AVA-DBA1 | Cappello, Sam | Cappello, Sam | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| DBH | DBAHN-PROD | DBahn Instance | Web Portal | GSMB | Bronze | 3 | | AVA-IT-APPS-DBAHN-GERMANY | Boerner, Dirk | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

44

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DDM | DDMVOYAGER-PROD | DDM Voyager | Payroll | SALES | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |
| CPG | DELTEK-COSTPOINT-PROD | Deltek Cost Point | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, No HA, Out of support OS | IT-AVA-COSTPOINT | Kandell, Michael | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| CIR | DELTEK-IMPROMPTU-RPT-PROD | Cognos Impromptu Reporting | | Bronze | 3 | | IT-AVA-COSTPOINT | Kandell, Michael | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | | | |
| DTC | DIAGNOSTICS-AND-TOOLS-CENTER-PROD | Diagnostics & Tools Center | Enterprise Content Management | SVCS | Silver | 1 | Criticality Score | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| DJI | DJINVOICE-PROD | Telephone Invoice Tool | Billing/Invoicing | GSMB | Bronze | 3 | | AVA-IT-APPS-GER-DJINVOICE | Rosenthal, Oliver | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Hybrid |
| DMS | DMS-01-PROD | Document Management System Instance | Document/File repository | GSMB | Silver | 1 | No DR, No HA, Out of support OS | TEN-IT-APPS-DMS | Stiller, Thomas | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| DOC | DOCUWARE-PROD | Docuware | Administer/Manage/Monitor Systems | FIN | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Schattovits, Peter | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| DPA | DPA-PROD | Data Protection Advisor | Infrastructure | IT | Bronze | 3 | | IT-INFRA-OPS-BACKUP | King, Anthony | Castle, Kevin | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| DST | DST-PROD | DST EDI Conversion | Middleware | IT, MLP | Bronze | 3 | Criticality Score | AVA-AP-ADM-LTNT-GLOBAL-1 | Northcutt, Sue | Kirck, Theresa | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| DRT | DTR-ENT-PROD | Document Tracking and Reporting | Administer/Manage/Monitor Systems | MLP | Bronze | 3 | | IT-AVA-EDI | Kirck, Theresa | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| E9S | E911-SOFTLOC-PROD | E911 Call Routing | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, | Bronze | 3 | | AVAYA-HD-VIDEO | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |

45

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | R&D, SALES, SVCS | | | | | | | | | | | |
| E91 | E911US1-PROD | E911 Call Routing US | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | AV-VOICE-E911 | Womack, Samuel | Womack, Samuel | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| EAS | EAS2010-PROD | Exchange Active Sync 2010 | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | Out of support OS | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| ESG | EASG-PROD | Access Security Gateway | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| EC1 | EC-PROD | Enterprise Configurator | Quoting | SALES | Gold | 1 | | IT-EBIZ-T3-EC-CONFIGURATORS | Cleary, Colm | Donohoe, John | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| ECP | ECOCKPIT-PROD | e-Cockpit | Customer Management | GSMB | Silver | 1 | No DR, Out of support OS | TEN-IT-APPS-ECOCKPIT | Arhelger, Claudia | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| EC | ECOENTERPRISE-PROD | ECO Enterprise | Billing/Invoicing | GSM | Silv | 1 | No DR, | APP-OM-ECOENTERPRISE- | Fink, | Stiller, | Ebrahimi | Gill, | Internal/Inso | 3-tier | Home-g |

46

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| O | | | | B | er | | Out of support OS | GERMANY | Anneliese | Thomas | , Fariborz | Clayton | urced | | rown |
| EDI | EDI-GIS PROD | EDI-GIS PROD | Middleware | MLP, OEFC, SALES, SVCS | Silver | 1 | No DR, No HA, Out of support OS | AVA-AP-ADM-GIS | Kuppuswamy, Swamynathan | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| ELO | ELOQUA-PROD | Eloqua Marketing Platform Cloud Services | Customer Management | MRKTG | Bronze | 3 | | AVA-ELOQUA-SAAS | Pearson, Jeffrey | Gworek, James | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |
| EMC | EMCRM-PROD | EMC Replication Manager | Infrastructure | IT | Bronze | 3 | | IT-INFRA-OPS-STORAGE | King, Anthony | King, Anthony | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| ENS | EN-SRVC-AIC-TRAPS-PROD | Maskus AIC Trap Receiver | Administer/Manage/Monitor Systems | GSMB | Bronze | 3 | | ION-GERMANY-SUPPORT | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Commercially Available |
| ENS | EN-SRVC-WSUS-PROD | MS Patch Service | Administer/Manage/Monitor Systems | GSMB | Bronze | 3 | | ION-GERMANY-SUPPORT | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Commercially Available |
| ENP | ENTERPRISE-PORTAL-PROD | Enterprise Portal | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | No DR, No App Vendor Support, Out of support OS | AVA-AP-ADM-ENT-PORTAL | Baals, James | Baals, James | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| EFR | ENTERPRISE1C-FINANCIAL-RUSSIA-PROD | Russia Enterprise Local Accounting Application | Accounting/Finance/Treasury | FIN | Bronze | 3 | | INTL-APPS-HR-AND-PRODUCTIVITY | Petukhova, Elena | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |
| EOF | EOFFER-PROD | EOffer | Quoting | GSMB | Silver | 1 | No DR, No HA, Out of support OS | TEN-IT-APPS-XOFFER | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |

47

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EPO | EPO-DEPOAP02 | EPO - DEPOAP02 | Administer/Manage /Monitor Systems | IT | Bron ze | 3 | | AVA-ITOPS-EPO | Heuvel, Richard | Hubbard, Martyn | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| SAU | EPROJECT-PROD | eProject Management Tool | Project Management | SALE S, SVCS , OEFC , FIN | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Hybrid |
| ESC | ESC-EMPLOYEE-SERVICE-CE NTER | Employee Service Center (ESC) | Web Portal | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC , R&D, SALE S, SVCS | Bron ze | 2 | No DR, Out of support OS | AVA-AP-ADM-HR-WEB-APP S | Reyes, Monica | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| ESY | ESUPPLY-PROD | E-Supply | Customer Management | FIN | Silv er | 1 | No DR, Non standard OS, Out of support OS | AVA-IT-OP-FIN | Kotera, Charu | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| ETM | ETIME-PROD | ETime | Transactional | HR | Bron ze | 3 | | AVA-ADM-ETIME | Ysordia, Tracey | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Commer cially Availabl e |
| EAC | EVAPPLICATION | Symantec Enterprise Vault 8 - Email and SharePoint Archiving Application | Document/File repository | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC , | Bron ze | 3 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Out sourced | 3-tier | Commer cially Availabl e |

48

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | R&D, SALES, SVCS | | | | | | | | | | |
| EXC | EXCHANGE2010-PROD | EXCHANGE 2010 | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| EXP | EXPERIENCE-PORTAL-PROD | Experience Portal | Communications/Collaboration | | Silver | 1 | Criticality Score | INFRA-VOICE-OPS | Naghshineh, Anushiravan | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| EXS | EXPERT-SYSTEMS-PROD | Expert Systems Tools PROD | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, Non standard OS | STARS | Premji, Altaf | Sharma, Manish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| FTS | FAST-TENOVIS-PROD | Fast Tenovis Application | Middleware | GSMB | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-1 | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| FSN | FASTNAV-PROD | FASTNAV | Administer/Manage/Monitor Systems | IT, OEFC, SVCS | Bronze | 3 | | AVA-GSD-EU-SUPPORT-FASTNAV | Spengler, Kenneth | Spengler, Kenneth | Brennan, Thomas | Wilaby, Marguerite | Internal/Insourced | desktop based | Home-grown |
| FAX | FAXCOMM-ENT-PROD | Fax Communications | Printing | IT | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-3 | | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | appliance based | Commercially Available |
| FGS | FIELDGLASS-PROD | Field Glass Vendor Mgmt | Resource Management | HR | Bronze | 3 | | AVA-FIELDGLASS | Konteh, Lisa | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | External/Outsourced | 3-tier | Commercially Available |
| FMR | FILEMOVER-PROD | File Mover | Middleware | IT | Bronze | 3 | | IT-AVA-FMW | Kuppuswamy, Swamynathan | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Home-grown |

49

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FMW | FMWPRODUCTION | Fusion Middleware | Middleware | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC, R&D, SALE S, SVCS | Gold | 1 | | IT-AVA-FMW | Kuppuswa my, Swamynath an | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Inso urced | 2-tier | Commer cially Availabl e |
| BP M | FMWPRODUCTION-PS6-BPM -PROD | Oracle Business Process Management | Middleware | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC , R&D, SALE S, SVCS | Gold | 1 | | IT-AVA-FMW | Kuppuswa my, Swamynath an | Tyagi, Ajay | Ebrahimi, Fariborz | Hassan, Walid | Internal/Inso urced | 2-tier | Commer cially Availabl e |
| FO R | FOREMAN-PROD | Foreman | Infrastructure | IT | Bron ze | 3 | | IT-INFRA-OPS-UNIX | King, Anthony | Basuveswa ran, Rajkumar | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| FM L | FORMULARGEN-PROD | FormularGenerato r | Web Portal | GSM B | Silv er | 1 | No DR, No HA, Out of support OS | TEN-IT-APPS-XOFFER | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Inso urced | 3-tier | Home-g rown |
| FR M | FRM-PROD | Firewall Rule Management | Infrastructure | IT | Bron ze | 3 | | IT-FRM | Zhou, Tao | Zhou, Tao | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | applian ce based | Commer cially Availabl e |
| FR U | FRU-TOOL-PROD | Field Replacement Unit Tool | Product Management | SVCS | Bron ze | 3 | | AVA-FRU-TOOL | Baruah, Pundarikaks ha | Baruah, Pundarikak sha | Hayes, Frederic k | Green, Benjami n | Internal/Inso urced | 3-tier | Home-g rown |

50

**Transition Services Agreement (TSA)**

| FSS | FSAC-SS-PROD | Field Service Administrative Center | Resource Management | SVCS | Silver | 1 | No DR, No HA, No App Bug & Enhancement support, Non standard OS, Out of support OS | AVA-AP-ADM-FIELD-SERVICE-ADMIN | Brost, William | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | 2-tier | Home-grown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FES | FT-EDI-STERLING | FT-EDI-STERLING | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | IT-AVA-EDI | Papillon, Christian | Kirck, Theresa | Ebrahimi, Fariborz | Hassan, Walid | External/Outsourced | 1-tier | Home-grown |
| FUS | FUSION-PROD | Fusion work ticket system | Ticketing | CAO, FIN, GOV, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | ITSS-PROCESS-DUMMY-WG | Cottrell, Amy | Cottrell, Amy | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Outsourced | other | Commercially Available |
| GCP | GABG-CUSTOMER-PORTAL-PROD | GABG Customer Portal | Web Portal | GSMB | Silver | 1 | No DR, Non standard OS, Out of support OS | AVA-IT-APPS-KUNDENPORTAL-GERMANY | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| GAR | GARANT-PROD | Garant | Accounting/Finance/Treasury | CAO | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Scherbatova, Marina | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | External/Outsourced | other | Commercially Available |
| GCA | GCC-AES-PROD | Germany Application Enablement Services | Communications/Collaboration | SVCS | Bronze | 3 | | AV-SVC-APPS-GCC | Kern, Patrick | Wingen, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 1-tier | Home-grown |
| GCC | GCC-AIC-PROD | Germany Avaya Interaction Center | Communications/Collaboration | SVCS | Bronze | 3 | | AV-SVC-APPS-GCC | Kern, Patrick | Wingen, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 2-tier | Home-grown |
| GCM | GCC-CMS-PROD | Germany Call Management | Communications/Collaboration | SVCS | Bronze | 3 | | AV-SVC-APPS-GCC | Kern, Patrick | Wingen, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 1-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | System | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GCQ | GCC-QTAPI-PROD | Germany Interface for Microsoft TAPI Applications | Communications/Collaboration | SVCS | Bronze | 3 | | AV-SVC-APPS-GCC | Kern, Patrick | Wingen, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 1-tier | Home-grown |
| GCV | GCC-VP-PROD | Germany Voice Portal System | Communications/Collaboration | SVCS | Bronze | 3 | | AV-SVC-APPS-GCC | Kern, Patrick | Wingen, Alexander | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 1-tier | Home-grown |
| GDI | GDW-IDM-ENT-PROD | Global Data Warehouse Interim Data Marts | Business Intelligence/Reporting | MLP, OEFC | Silver | 1 | No DR, No HA, No App Bug & Enhancement support, Non standard OS | CSC-ENT-LEGACY | Johnson, Judy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| GDM | GDW-MARTS-ENT-PROD | Global Data Warehouse | Business Intelligence/Reporting | MLP | Silver | 1 | No DR, No App Bug & Enhancement support, Non standard OS | CSC-ENT-LEGACY | Greene, Charles | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| GRE | GER-REFERENCE-TOOL-PROD | Germany Reference Tool | Communications/Collaboration | | Bronze | 3 | | TEN-IT-APPS-XOFFER | Volter, Sabine | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 1-tier | Home-grown |
| GET | GER-TIMESYS-PROD | Germany Timesystem | Resource Management | HR | Bronze | 3 | | GER-IT-APPS-SAP-HR | Elsner, Gerald | Elsner, Gerald | Dell'Osso, Luino | Albert-Lebrun, Philippe | Internal/Insourced | 3-tier | Commercially Available |
| GTP | GETPAID-PROD | Get Paid | Billing/Invoicing | OEFC | Silver | 1 | Criticality Score | AVA-AP-ADM-GETPAID | Erbele, Jeff | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| GFI | GFIWLIAPP-PROD | GFI Application | Middleware | FIN | Bronze | 2 | No App Vendor Support, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Rosenthal, Oliver | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| GBT | GHBT-PROD | Global Headcount and Budget Tracking Tool | Resource Management | SVCS | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Foss, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| GPS | GLOBAL-PRINT-SERVERS-PROD | Printer Servers | Printing | IT | Bronze | 3 | | NAR-ITOPS-REMOTE | Cuervo, Diego | Cuervo, Diego | Ebrahimi, Fariborz | Wu, Stacey | Internal/Insourced | 1-tier | Commercially Available |

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | e |
| GLD | GLOBALDOMAIN-PRODUCTION | Global Domain | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| GSC | GLOBALSALESCOMP-PROD | Global Sales Compensation Prod Instance | Payroll | SALES | Gold | 1 | | AVA-AP-ADM-SALES-COMP | Davis, Dorothy | Naseef, Ali | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| SMS | GMO-SMS-PROD | System Center Configuration Manager | Infrastructure | IT | Bronze | 3 | | AVA-ITOPS-SCCM | Hubbard, Martyn | Hubbard, Martyn | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| GSA | GOOGLE-SEARCH-APPL-PROD-INT | Google Search | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | AVA-AP-ADM-GSA | Brost, William | S N, Lekshmi Priya | Ebrahimi, Fariborz | Morsy, Hazem | External/Insourced | 3-tier | Commercially Available |
| GPC | GPPC-PROD | Global Product Pricing Catalogue | Quoting | SALES | Silver | 2 | | IT-EBIZ-T2-GPPC-R-OC | Cleary, Colm | Donohoe, John | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| GPR | GPPR-PROD | Global Product Pricing Repository | Quoting | SALES | Silver | 2 | Out of support OS | IT-EBIZ-T3-GPPR | Cleary, Colm | Donohoe, John | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| GQ | GQMS-PROD | Global Quotation | Order Management | SALE | Gold | 1 | | IT-EBIZ-T3-GQMS | Cleary, | Patel, | Ebrahimi | Morsy, | Internal/Inso | 3-tier | Home-g |

53

**Transition Services Agreement (TSA)**

| M | | Management System | | S | | | | | Colm | Mahesh | , Fariborz | Hazem | urced | | rown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GRP | GREP-TOOL-PROD | Avaya Grep Tool | Administer/Manage/Monitor Systems | SVCS | Bronze | 2 | Criticality Score | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| GRT | GRT-PROD | Global Registration Tool | Product Management | SVCS | Gold | 1 | | IT-APPS-GRT | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| GCS | GSC-CALLIDUS-SAAS-PROD | GSC SaaS | Business Intelligence/Reporting | SALES | Gold | 1 | | AVA-AP-ADM-SALES-COMP | Davis, Dorothy | Naseef, Ali | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | 3-tier | Commercially Available |
| GSP | GSCAPE-PROD | Global Scheduling and Capacity Planning | Resource Management | SVCS | Silver | 2 | Criticality Score | AVA-AP-ADM-LTNT-GLOBAL-2 | Morris, Gregory | Trivedi, Nikhil | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| GTC | GSS-TOOLSA-COMMS-PROGRAMS-PROD | Services Command Line Communication | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | No DR, App Support Ineffective, Non standard OS | SVCS-GSS-TOOLSA-APPS-BIZ | Brost, William | Simpson, Michael | Brennan, Thomas | Bustamante, Troy | Internal/Insourced | 1-tier | Home-grown |
| GTW | GSS-TOOLSA-WEBSITES-PROD | TOOLSA WEBSITE | Administer/Manage/Monitor Systems | SVCS | Silver | 2 | | SVCS-GSS-TOOLSA-APPS-BIZ | Brost, William | Simpson, Michael | Brennan, Thomas | Bustamante, Troy | Internal/Insourced | 3-tier | Home-grown |
| GW1 | GUEST-WIRELESS-PROD | Guest Wireless | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | INFRA-LAN-OPS | Sam, Wayne | Sam, Wayne | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| HAI | HAILSTORM-PROD | Cenzic Hailstorm | Security | IT | Bronze | 3 | | AVA-INFOSEC-RISK | Cookson, John | Cookson, John | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| HLC | HEALTHCHECK-PROD | Product Health Check | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Cottrell, Amy | Chitneni, Saujanya | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

54

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HFM | HFM-PROD | Hyperion Financial Management | Business Intelligence/Reporting | FIN | Silver | 2 | | AVA-APP-HYPERION-ENTERPRISE | Clevenger, Chris | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| HPP | HP-ACCESS-CONTROL-PROD | HPAC US Printing | Printing | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | HP-HW-NETPRINTE | Cuervo, Diego | Cuervo, Diego | Ebrahimi, Fariborz | Wu, Stacey | Internal/Insourced | 3-tier | Commercially Available |
| HPQ | HP-QUALITY-CENTER-PROD | RND HP Quality Center | Product Development | R&D | Bronze | 2 | No DR | ENG-QUALITY-CENTER | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Commercially Available |
| HPO | HPOO-PROD | HP Operations Orchestration | Automation | IT | Bronze | 3 | | SMT | Colin, Pierre | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| HPM | HPPM-PROD | HP Performance Manager | Administer/Manage/Monitor Systems | IT | Bronze | 3 | | SMT | Draye, Jean-Philippe | Dor, Hugues | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| HPS | HPSIM-PROD | HP Systems Insight Manager | Administer/Manage/Monitor Systems | IT | Bronze | 3 | | SMT | Draye, Jean-Philippe | Dor, Hugues | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| HYP | HYPERION-ESSBASE-PROD | Hyperion Essbase | Business Intelligence/Reporting | FIN | Silver | 1 | No DR, No HA | AVA-APP-HYPERION-ESSBASE | Cottrell, Amy | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| IIE | I-INQUIRE-ENT-PROD | I-Inquire | Business Intelligence/Reporting | FIN | Silver | 1 | Criticality Score | AVA-AP-ADM-LTNT-GLOBAL-6 | Kotera, Charu | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| IDA | IDA-ENT-PROD | IDA Document Management System | Document/File repository | MLP, OEFC | Silver | 1 | No DR, No HA, Non standard OS | CSC-ENT-LEGACY | Washington, Thomas | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |

55

**Transition Services Agreement (TSA)**

| IFA | IFA-01-PROD | IFA-01 | Resource Management | GSM B | Silver | 2 | | TEN-IT-APPS-IFA | Brambilla, Elvira | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IND | INSIDE-PROD | German Payroll System | Web Portal | HR | Bronze | 3 | | GER-IT-APPS-SAP-HR | Elsner, Gerald | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | other | Home-grown |
| ISL | INSTANT-MESSAGING-LYNC-PROD | Instant Messaging | Communications/Collaboration | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| ITM | INSTANT-TEAM-MEETING-PROD | INSTANT TEAM MEETING | Communications/Collaboration | R&D, IT | Silver | 2 | | IT-INNOVATION-SUPPORT-T2 | Snell, E | Moshrefi, Afshin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| INL | INTACT-PROD | ADI License Key Generation for IP Office | eCommerce | SVCS | Silver | 1 | Criticality Score | AVA-AP-ADM-LTNT-GLOBAL-3 | Cottrell, Amy | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | appliance based | Home-grown |
| INC | INTERACTION-CENTER-PROD | Interaction Center Instance | Communications/Collaboration | HR | Bronze | 2 | No DR, Out of support OS | AVA-AP-ADM-HR-WEB-APPS | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| INV | INVESTORS.AVAYA.COM-PROD | INVESTOR RELATION | Web Portal | MRKTG | Bronze | 3 | | INVESTOR-ADMIN | Nunziati, John | Gworek, James | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| IVG | INVOICEGATE-PROD | Invoice Gate | Billing/Invoicing | GSM B | Silver | 2 | | AVA-IT-APPS-INVOICEGATE-GERMANY | Rosenthal, Oliver | Orth, Matthias | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| IOD | IOD-PROD | Informatica On Demand | Business Intelligence/Reporting | SVCS | Silver | 1 | No DR, Out of support OS | BI-OPS-INFORMATICA | Kanamariapudi, Padmanabha | Kanamariapudi, Padmanabha | Ebrahimi, Fariborz | Hassan, Walid | External/Insourced | 3-tier | Commercially Available |
| ION | ION-RST-PROD | ION Remote Service Tools | Administer/Manage/Monitor Systems | GSM B | Silver | 1 | No DR, No HA, Inadequate Hosting, Non | AVA-IT-MASKUS-PROGRAMS-GERMANY | Wollenhaupt, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | External/Insourced | 2-tier | Commercially Available |

56

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | standard OS, Out of support OS | | | | | | | | |
| INS | ION-SRVC-PROD | ION Services | Administer/Manage /Monitor Systems | GSMB | Bronze | 3 | | ION-SRVC-APPS-CI-ADMIN | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | External/Insourced | 2-tier | Commercially Available |
| ISP | ION-SUPPORT-PORTAL-PROD | ION Support Portal | Web Portal | GSMB | Silver | 1 | No DR, No HA, App Support Ineffective, Out of support OS | ION-GERMANY-SUPPORT | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Commercially Available |
| IOS | IP-OFFICE-SSL-VPN-PROD | IP Office VPN | Administer/Manage /Monitor Systems | SVCS | Bronze | 3 | | IPO-SSL-VPN | Skinner, Glenn | Galletti, Gordon | Brennan, Thomas | Skinner, Glenn | Internal/Insourced | 3-tier | Home-grown |
| IPP | IPPHONEFW-PROD | IP Phone Firmware | Communications/Collaboration | IT | Bronze | 3 | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | other | Commercially Available |
| IQI | IQIPT-PROD | IQ Implementation Planning Tool | Business Intelligence/Reporting | SALES | Bronze | 3 | | APP-IQ-IPT | Singh, Yashveer | Singh, Yashveer | Mhaskar, Vijay | Kanade, Rajesh | Internal/Insourced | 3-tier | Home-grown |
| I3E | IS3E-PROD | IS3E Enterprise Application | Middleware | SVCS | Silver | 1 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Reynolds, Fred | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| ISA | ISA-PROD | ISA | Infrastructure | IT | Silver | 2 | | AVAGOV-APPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| IPC | ISAIPC-PROD | ISAIPC | Web Portal | GSMB | Silver | 1 | No DR, No App Vendor Support, Out of support OS | GER-IT-APPS-SAP-ISAIPC | Hihn, Angelika | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Hybrid |

57

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITW | IT-REPORTING-WAREHOUSE-PROD | IT Reporting Data Warehouse | Business Intelligence/Reporting | IT | Bronze | 3 | | IT-EUS-REPORTING | Beecroft, Kris | Tikal, Joshua | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Hybrid |
| ITS | IT-SEC-ASSESSMENT-PROD | IT SEC Assessment | Security | IT | Bronze | 3 | | AVA-INFOSEC-RISK | O'Connor, Maeve | O'Connor, Maeve | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Home-grown |
| IPT | ITVOICE-PROV-TOOL-PROD | Provisioning to for Aura environment | Communications/Collaboration | IT | Bronze | 3 | | INFRA-VOICE-OPS | Thomas, Scott | Snell, E | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Home-grown |
| IVI | IVIEW-PROD | Scopia IView | Communications/Collaboration | IT | Gold | 1 | | AVAYA-HD-VIDEO | Snell, E | Snell, E | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| IXO | IXOS-ENT-PROD | IXOS Content Management | Enterprise Content Management | SVCS | Bronze | 3 | | AVA-SAP-BASIS | | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| JOB | JOB-LIBRARY-PROD | HR IT Job Library | Web Portal | HR | Bronze | 1 | No DR, No App Bug & Enhancement support, Out of support OS | AVA-AP-ADM-HR-WEB-APPS | Reyes, Monica | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| KAL | KALTURA-PROD | Kaltura Video Service | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | IT-AVA-OWCS-DEV | Brost, William | Gworek, James | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |
| DFA | KECCI-PROD | KECCI (China Tax Filling) | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, No HA, App Support Ineffective | AVA-KECCI-SUPPORT | Gao, Lishan | Cottrell, Amy | Ebrahimi, Fariborz | Kavouspour, Dinyar | External/Insourced | 3-tier | Commercially Available |

58

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KMS | KMS-PROD | MS Key Management System | License Management | IT | Bronze | 3 | | AVA-ITOPS-SCCM | Heuvel, Richard | Hubbard, Martyn | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| KNB | KNOWLEDGE-BASE-PROD | IP Office Knowledge Base | Product Development | R&D | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Gallagher, Mark | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| KRS | KRS-PROD | Keycode Retrieval System | License Management | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | IT-EBIZ-T2-KRS-SMS | Cleary, Colm | Raju, Satya | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| LBP | LABELPRINT-PROD | Barcode Labelprint | Printing | GSMB | Silver | 2 | | AVA-AP-ADM-LTNT-EMEA | Storch, Michael | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |
| LLA | LAS-LEAVE-ABSENSE-PROD | Leave of Absence System | Resource Management | HR | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-6 | Ysordia, Tracey | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| LWC | LAW-CONVERSIVE-CHAT-PROD | Avaya Automated Chat | Communications/Collaboration | IT, SALES, SVCS | Silver | 1 | No DR, No HA, App Support Ineffective, Inadequate Hosting, Non standard OS, Out of support OS | LAW-AVAYACHAT-EU-SUPP | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | External/Insourced | other | Hybrid |
| LVD | LAW-VIDEO-PROD | LAW Video | Communications/Collaboration | IT, SALES, SVCS | Silver | 1 | No DR, App Support Ineffecti | LAW-AVAYACHAT-EU-SUPP | Brost, William | Snell, E | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Home-grown |

59

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Code | Name | Description | Category | Group | Tier | # | Issues | Support | Name1 | Name2 | Name3 | Name4 | Sourcing | Tier2 | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | ve, Inadequate Hosting | | | | | | | | |
| LWT | LAW-WEB-TALK-PROD | LAW Web Talk | Communications/Collaboration | IT, SALES, SVCS | Silver | 1 | No DR, App Support Ineffective | LAW-AVAYACHAT-EU-SUPP | Brost, William | Snell, E | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Home-grown |
| LIR | LIRAM-PROD | Liram | Accounting/Finance/Treasury | FIN | Bronze | 3 | | AVA-AP-ADM-ISRL | Tsabari, Keren | Arbiv, David | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| LGM | LOGMEIN-PROD | Log Me In Rescue | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | Criticality Score | AVA-SVC-LOGMEIN-EU-SUPP | Molnar, Laszlo | Molnar, Laszlo | Brennan, Thomas | Wilaby, Marguerite | Internal/Outsourced | 3-tier | Hybrid |
| LTN | LOTUS-NOTES-PROD | Lotus Notes | Communications/Collaboration | MLP | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-3 | Goetz, Donald | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Commercially Available |
| LRS | LRS-PROD | LRS - Leave Request System (Prod instance) | Resource Management | GSMB | Bronze | 3 | | AVA-AP-ADM-LRS | Ysordia, Tracey | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| LVO | LVOFFER-PROD | LVOffer | Web Portal | FIN, GSMB | Silver | 1 | No DR, Out of support OS | TEN-IT-APPS-XOFFER | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| MKA | MASKUS-APP-PROD | MASKUS Prod Instance | Ticketing | GSMB | Silver | 1 | No DR, Out of support OS | AVA-IT-MASKUS-EXE-GERMANY | Hellbrueck, Peter | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 2-tier | Home-grown |
| MSS | MASKUS-SERVICE-SAP-ADAPTER-1-PROD | Maskus SAP Adapter 1 | Middleware | GSMB | Silver | 1 | No DR, No HA, Out of support OS | AVA-IT-MASKUS-EXE-GERMANY | Hellbrueck, Peter | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | External/Insourced | 3-tier | Home-grown |
| MKS | MASKUS-SERVICE-SAP-ADAPTER-2-PROD | Maskus SAP Adapter 2 | Middleware | GSMB | Silver | 1 | No DR, No HA, Out of support OS | AVA-IT-MASKUS-EXE-GERMANY | Hellbrueck, Peter | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | External/Insourced | 3-tier | Home-grown |
| MSO | MASOFFER-PROD | MASOffer | Web Portal | GSMB | Silver | 1 | No DR, Out of support OS | TEN-IT-APPS-XOFFER | Stiller, Thomas | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| MBE | MATDB-ENT-PROD | MAT Data Warehouse | Business Intelligence/Reporting | MLP, OEFC | Bronze | 2 | No DR, Out of support | AVA-AP-ADM-LTNT-LEGACY-0 | Hall, Thomas | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | OS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| XDM | MDM-SFS-PROD | Mobile Device Manager | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | IT-MOBILE-DEVICE-MANAGEMENT | Hicks, James | Zhou, Tao | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| MDB | MEDIABIN-PROD | Interwoven MediaBin | Enterprise Content Management | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | AVA-AP-ADM-ECM-SUPP | Kau, Ingren | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| MT1 | MENTOR-PROD | Mentor | Administer/Manage /Monitor Systems | IT | Bronze | 3 | | IT-MENTOR-GRAPHICS | Cottrell, Amy | Castrovince, Thomas | Madhdhipatla, Munisekaran | Lanthier, Louis | Internal/Outsourced | 3-tier | Commercially Available |
| MQC | MERCURY-QUALITY-CENTER-PROD | Mercury Quality Center | Infrastructure | IT | Bronze | 3 | | IT-AVAYA-MQC9 | Isbell, Paul | Ni, Bin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | appliance based | Commercially Available |
| MSB | MERCURYSKILLSBANK-PROD | Mercury Skills Bank | Resource Management | HR | Silver | 2 | No DR, No HA, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Morris, Gregory | Trivedi, Nikhil | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| MST | MESSAGE-TRACER-PROD | MESSAGE-TRACER | Administer/Manage /Monitor Systems | SVCS | Bronze | 3 | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, | Kavousour, | Internal/Insourced | 3-tier | Home-grown |

61

## Transition Services Agreement (TSA)

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MES | MESSIA-PROD | Messia Registraton Tool | Quoting | SALES | Gold | 1 | | IT-EBIZ-T3-EC-CONFIGURATORS | Cleary, Colm | Heneghan, Sean | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| MFA | MFA-PROD | Multi-Factor Authenication | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | IT-MFA | Zhou, Tao | Zhou, Tao | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| CEN | MIDMARKET-FRAMEWORK-PROD | One Source Cloud Framework | Quoting | SVCS | Gold | 1 | | IT-AVA-ONESOURCE-CLOUD | Becerra, Cynthia | Supasithumrong, Samathi | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | 3-tier | Hybrid |
| MII | MIIS-PROD | MIIS | Infrastructure | HR | Silver | 1 | No DR, No HA, Out of support OS | AVA-IT-OP-MIIS | Yockey, Stephen | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| MIN | MINITAB-PROD | Minitab | Accounting/Finance/Treasury | FIN, MRKTG | Bronze | 3 | | IT-AVA-DE-MINITAB | Hedderich, Stefan | Simon, Hans-Walter | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 1-tier | Commercially Available |
| MAP | MKT-ANONYMOUS-PORTAL-PROD | Marketing Anonymous Portal | Web Portal | MRKTG, SALES | Silver | 2 | | INTL-APPS-SALES-AND-MKTING | Khedekar, Mandar | Lopez Reta, Mariano | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| MKD | MKT-DATAMART-PROD | Marketing Datamart | Business Intelligence/Reporting | MRKTG | Bronze | 3 | | AVA-MRKTNG-DB | Pearson, Jeffrey | Pearson, Jeffrey | Ruefenacht, Michel | Pearson, Jeffrey | Internal/Insourced | 3-tier | Home-grown |
| TEM | MMS-PROD | MMS | Infrastructure | IT | Bronze | 3 | | IT-MMS | Boyea, Thomas | Litton, Patricia | Ebrahimi, Fariborz | Gill, Clayton | Software As a Service (SaaS) | 3-tier | Commercially Available |
| MPQ | MPA-QUOTE-SERVICE-PROD | MPATool Quote Transfer | Quoting | SVCS | Silver | 1 | No DR, No HA | IT-AVA-FMW | Lawrence, Russell | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 2-tier | Commercially Available |

62

**Transition Services Agreement (TSA)**

| MPP | MPATOOL-PROD | EMEA Maintenance Price Automation Production Instance | Quoting | SVCS | Silver | 1 | No DR, Out of support OS | AVA-AP-ADM-MPA | Lawrence, Russell | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Out sourced | 3-tier | Commercially Available |
| MPD | MPD-PROD | My Personal Data | Web Portal | HR | Bronze | 2 | No DR, Out of support OS | AVA-AP-ADM-HR-WEB-APPS | Reyes, Monica | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| MQE | MQSERIES-ENT-PROD | MQSeries ENT | Middleware | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No HA, App Support Ineffective, No App Bug & Enhancement support, Out of support OS | IT-AVA-EDI | Kuppuswamy, Swamynathan | Kirck, Theresa | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Home-grown |
| MQS | MQSERIES-PROD | MQSERIES-HSPAPP1 | Middleware | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No App Bug & Enhancement support, Inadequate Hosting | AVA-AP-ADM-MQ-SERIES | Kuppuswamy, Swamynathan | Kirck, Theresa | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | appliance based | Commercially Available |
| MSQ | MSQT-PROD | Multi-Site Quote Tool | Quoting | SVCS | Silver | 1 | No DR, No HA, Inadequate Hosting, Non standard OS, Out of | AVA-APP-MSQT | Greene, Charles | Smithgall, Evan | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | support OS | | | | | | | |
| SQM | MSSQL-MONITOR-PROD | MS SQL Monitor | Infrastructure | IT | Bronze | 3 | | CC-AVA-DBA1 | Voorhees, Ned | Voorhees, Ned | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| MUL | MULTICASH-PROD | Multicash Frankfurt | Billing/Invoicing | FIN, GSMB | Bronze | 3 | | TEN-IT-APPS-BBV | Rosenthal, Oliver | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| NTT | NETTIME-PROD | netTIME | Payroll | HR | Bronze | 3 | | AVA-IT-OP-TIMETREX | Ysordia, Tracey | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| NVW | NETVIEWER-PROD | Netviewer | Infrastructure | GSMB | Silver | 2 | No DR, No HA, App Support Ineffective | ION-GERMANY-SUPPORT | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Commercially Available |
| NHC | NETWORK-HEALTHCHECK-PROD | Network Healthcheck | Administer/Manage /Monitor Systems | SVCS | Bronze | 2 | Criticality Score | STARS | Brost, William | Chitneni, Saujanya | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| NTZ | NETZER-PROD | NETZER | Resource Management | HR | Bronze | 3 | | AVA-AP-ADM-ISRL | Cohen, Guy | Arbiv, David | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| NEX | NEXUS-PROD | NEXUS Database | Accounting/Finance /Treasury | FIN | Silver | 2 | | AVA-FIN-AVA-NEXUS | Hynes, John | Hynes, John | Dell'Osso, Luino | Albert-Lebrun, Philippe | Internal/Insourced | desktop based | Commercially Available |
| NFI | NFIWLIAPP-PROD | Nortel Financial Interface | Middleware | FIN | Silver | 2 | | AVA-AP-ADM-LTNT-GLOBAL-5 | Cottrell, Amy | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| NMB | NIMBUS-PROD | NIMBUS | Product Development | IT | Silver | 2 | | AVA-AP-ADM-LTNT-EMEA | Amitrano, Maria Florencia | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| NNM | NNMI-PROD | HP Network Node Manager | Administer/Manage /Monitor Systems | IT | Silver | 2 | | SMT | Draye, Jean-Philippe | Dor, Hugues | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| NRP | NORTEL-REVPRO-PROD | Nortal Revpro | Middleware | SVCS | Silver | 2 | | AVA-AP-ADM-LTNT-GLOBAL-5 | Girgis, George | Tendulkar, Dipak | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |

64

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NME | NOTIFYME-PROD | NOTIFYME | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | IT-AVA-INN | Moshrefi, Afshin | Moshrefi, Afshin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| NRS | NRS-TOOL-PROD | NRS-TOOL-PROD (Application instance | | | Bronze | 3 | | NRS-TOOL | Macklin, Steve | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | | | |
| NST | NUANCE-PROD | Nuance Speech/Text to Speech | Communications/Collaboration | IT, OEFC, SVCS | Bronze | 3 | | AVA-CCT-INTERIM | Wren, Kathy | Allen, Robert | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| OAG | OAG-PROD | Oracle API Gateway | | | Bronze | 3 | | IT-AVA-FMW | Cottrell, Amy | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |
| OC1 | OC-PROD | Order Centre | Enterprise Content Management | SALES | Gold | 1 | | IT-EBIZ-T2-GPPC-R-OC | Cleary, Colm | Patel, Mahesh | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| OCD | OCD-PROD | OneStop Case Distributor | Ticketing | SVCS | Bronze | 3 | | QQ | Welty, Holly | Welty, Holly | Brennan, Thomas | Skinner, Glenn | Internal/Insourced | 3-tier | Home-grown |
| OCS | OCS-PROD | Office Communicator Server | Communications/Collaboration | IT | Silver | 2 | No DR, No HA | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| DBN | ODBA-MGMT-REPORTING-TOOL-PROD | ODBA Management Tool | Infrastructure | IT | Bronze | 3 | | CC-AVA-DBA1 | Voorhees, Ned | Voorhees, Ned | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| OAC | ODS-APP-COGNOS-84-PROD | ODS Cognos 84 Application | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, | Silver | 2 | | BI-COGNOS-DEV | Kuppuswamy, Swamynathan | Kanamariapudi, Padmanabha | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |

65

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | OEFC, R&D, SALES, SVCS | | | | | | | | | | |
| ODC | ODS-APP-COGNOS-PROD | ODS Cognos | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | CSC-AP-ODS-COGNOS-ETL | Kuppuswamy, Swamynathan | Kanamariapudi, Padmanabha | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| OD8 | ODS-APP-INFORMATICA8-PROD | ODS Informatica | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, Out of support OS | BI-OPS-INFORMATICA | Kuppuswamy, Swamynathan | Kanamariapudi, Padmanabha | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| OAO | ODS-APP-ORACLE-PROD | ODS Oracle | Document/File repository | MLP, MRKTG, SALES | Silver | 2 | | BI-OPS-INFORMATICA | Yarra, Sreeram | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| OKC | OKC-AES-01-PROD | OKC AES | Communications/Collaboration | SVCS | Silver | 2 | | INFRA-VOICE-OPS | Wren, Kathy | Snell, E | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | appliance based | Home-grown |
| 1SB | ONESOURCE-B2B-WEB-PROD | B2B Integration to OneSource Quote | Quoting | SALES | Gold | 1 | | IT-EBIZ-T2-EC-SBA-MGR-OP | Cleary, Colm | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |

66

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1XS | ONEX-SPEECH | ONEX-SPEECH | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| 1XT | ONEX-TXT2SPCH | ONEX-TXT2SPCH | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| OND | ONLINE-DIRECTORIES-PROD | Online Directories | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Brost, William | Anderson, Erica | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| OOK | OOKLA-SPEEDTEST-PROD | OOKLA SPEEDTEST | Infrastructure | IT | Bronze | 3 | | INFRA-BACKBONE-OPS | Iovine, Michael | Sam, Wayne | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| OPE | OPERA-PROD | Opera | Business Intelligence/Reporting | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-5 | Konteh, Lisa | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |

67

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | , R&D, SALES, SVCS | | | | | | | | | | | |
| OQT | OQT-PROD | APS pricing and quoting tool (Online Quoting Tool) | Quoting | SALES | Silver | 1 | No DR, No HA, Inadequate Hosting, Out of support OS | IT-OQT-APP-SUPP | Rowlen, Kenneth | Mohamed, Omar | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| OKB | ORACLE-KNOWLEDGE-PROD | Oracle Knowledge Management | Document/File repository | SVCS | Gold | 1 | | IT-APP-KB | Brost, William | Vadavottu Surendranathan, Vipinachandran | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| OME | ORACLE-MDM-ENT-PROD | Oracle Replication | Document/File repository | IT | Bronze | 3 | | CSC-ENT-LEGACY | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| O12 | ORACLE-OEM12-US1-GRID-CONTROL-PROD | Oracle OEM12 US1 | | | Bronze | 1 | No DR | CC-AVA-DBA1 | Cappello, Sam | Cappello, Sam | Ebrahimi, Fariborz | Kavousour, Dinyar | | | |
| ORC | ORACLE-OEM12-US2-GRID-CONTROL-PROD | Oracle OEM12 US2 | | | Silver | 2 | | CC-AVA-DBA1 | Cappello, Sam | Cappello, Sam | Ebrahimi, Fariborz | Kavousour, Dinyar | | | |
| ORS | ORS-PROD | ORS | Project Management | SALES | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |
| OIC | OSC-INC-COMP-PROD | Oracle Sales Cloud Incentive Comp | Accounting/Finance/Treasury | FIN, GSMB, HR, IT, SALES | Silver | | | AVA-AP-ADM-SALES-COMP | Nelson, Maria | Chauhan, Rajesh | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | other | Hybrid |
| OSC | OSC-PROD | One Source Configurator | Quoting | SALES | Gold | 1 | | IT-EBIZ-T2-ONESOURCE-APM | Cleary, Colm | Supasithumrong, Samathi | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| OSM | OSM-PROD | Online Services Manager - OSM PROD | Middleware | SVCS | Bronze | 3 | | STARS | Cottrell, Amy | Sharma, Manish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| OSR | OSR-PROD | Oracle SRM | Enterprise Content Management | MRKTG | Silver | 2 | | AVA-AVAYACOM-T2-T3 | Pearson, Jeffrey | Gworek, James | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |

68

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OVO | OVO-PROD | HP OpenView Operations | Administer/Manage/Monitor Systems | IT | Silver | 2 | | | SMT | Draye, Jean-Philippe | Dor, Hugues | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| OWA | OWA2010-PROD | Outook Web Access 2010 | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| ECM | OWCC-PROD | Oracle WebCenter Content | Document/File repository | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | | IT-APP-OWCC | Naseef, Ali | Vadavottu Surendranathan, Vipinachandran | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| PAA | PAAUTOECR-PROD | Personnel Admin Auto Employee Change Request | Resource Management | SVCS | Bronze | 3 | | | AVA-AP-ADM-LTNT-EMEA | Molnar, Laszlo | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| PME | PARTSMART-ENT-PROD | Parts Mart | | | Silver | 2 | | | AVA-AP-ADM-LTNT-GLOBAL-2 | La Tour, Scott | Lopez Reta, Mariano | Ebrahimi, Fariborz | Hassan, Walid | | | |
| PWC | PASSWORDCHANGE-PROD | SD Password Change | Security | CAO, FIN, GOV, GSMB, HR, IT, | Bronze | 3 | | | IT-INTERNAL-CERTIFICATE-SERVICE | Cottrell, Amy | Cottrell, Amy | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Home-grown |

69

Transition Services Agreement (TSA)

|  |  |  |  | MLP, MRK TG, OEFC , R&D, SALE S, SVCS |  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PBS | PBS-CONTENT-LINK-PROD | PBS Content Link | Document/File repository | GSM B | Bron ze | 3 |  | AVA-SAP-BASIS-GERMANY | Boerner, Dirk | Boerner, Dirk | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| PC S | PCS-PROD | Password Change System | Administer/Manage /Monitor Systems | SVCS | Bron ze | 3 |  | STARS | Cottrell, Amy | Gadicherla , Sushma | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| PC U | PCUI-PROD | Product Connect User Interface | Administer/Manage /Monitor Systems | SVCS | Bron ze | 3 |  | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| PE M | PEM-PROD | Problem and Error Management | Ticketing | GSM B | Bron ze | 3 |  | TEN-IT-APPS-PEM | Cottrell, Amy | Boerner, Dirk | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Hybrid |
| PE T | PET-PROD | E-Buyer | Product Management | GSM B | Bron ze | 2 |  | TEN-IT-APPS-EBUYER | Rosenthal, Oliver | Volkmann, Gerd | Hayes, Frederic k | Allen, Daniel | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| PF B | PFB-PROD | Phone Firmware and backup | Infrastructure | IT | Bron ze | 3 |  | IT-INFRA-OPS-WINDOWS | Lee, Chih Pin | King, Anthony | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 2-tier | Home-g rown |
| PIC | PICO-PROD | PICO | Resource Management | GSM B | Bron ze | 3 |  | TEN-IT-APPS-PICO | Stiller, Thomas | Boerner, Dirk | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| PIE | PIE-PROD | Product Information Expert | Administer/Manage /Monitor Systems | SVCS | Silv er | 2 | No DR, Non standard OS | STARS | Brost, William | Anderson, Erica | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| PIP | PIP-PROD | PROVISION PIP tool AUSLABS | Web Portal | SVCS | Silv er | 2 | Criticalit y Score | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| PP L | PIPELINE-PROD | PIPELINE (Prod instance) | Middleware | MRK TG, SALE S | Bron ze | 3 |  | INTL-APPS-FRANCE | LASIERRA, DOMINIQU E | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| PL A | PLAT-PROD | Price List Adminstration Tool | Quoting | OEFC | Silv er | 1 | No DR, Non standard OS, Out of | AVA-APP-ASDPLAT | Hill, Waldon | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Inso urced | 2-tier | Home-g rown |

70

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | support OS | | | | | | | | |
| PMC | PMC-PROD | Partner Marketing Central | Web Portal | MRK TG | Silver | 2 | | CC-AVA-EBIZ-CALACAN | Caramico, Cynthia | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | External/Out sourced | other | Commercially Available |
| PWP | PMDBAPP-WMPMDB | PMDBAPP-WMPMDB | Project Management | R&D | Bronze | 3 | | RDPS-ONSITE-WESTMINSTER | Thomson, Rodney | Flores, Mark | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Home-grown |
| PMS | PMM-STAGING-ENT-PROD | PMM Staging | Quoting | FIN | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-3 | | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| PMV | PMM-VENDAVO-ENT-PROD | PMM Vendavo | Business Intelligence/Reporting | FIN | Silver | 2 | No DR, No App Bug & Enhancement support, Non standard OS | CSC-ENT-SAP | Rooney, Douglas | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Commercially Available |
| PTL | PMTOOL-PROD | PMTool | Product Management | SVCS | Bronze | 3 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Hybrid |
| POS | POST-PROD | Post | Resource Management | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRK TG, OEFC, R&D, SALES, SVCS | Silver | 2 | | AVA-IT-OP-POST | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Home-grown |
| RPM | PPMT-PROD | Product and Project Management Tool | Product Development | R&D | Bronze | 3 | | ENE-PPMT-PROD | Krishnan, Ramnath | Nair, Smideep | Mhaskar, Vijay | Krishnan, Ramnath | Internal/Insourced | 1-tier | Home-grown |
| PLD | PRODUCT-LICENSING-DELIVERY-PROD | Product Licensing and Delivery System | License Management | SVCS | Gold | 1 | | AVA-AP-ADM-PLD | Elias-Radler, Diane | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| PGM | PROGRAMCENTER-PROD | Program Center | Product Development | MRK TG, SALE | Silver | 1 | No DR, No HA | GCS-PROGRAM-CENTER | Gallegos, Patrick | Sayed, Abdul Rahim | Mhaskar, Vijay | Krishnan, Ramnath | Internal/Insourced | 3-tier | Home-grown |

71

Transition Services Agreement (TSA)

| | | | | S | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PJP | PROJECT-PORTAL-PROD | Project Portal | Resource Management | SVCS | Bronze | 3 | | QQ | | Brost, William | Trivedi, Nikhil | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| PPE | PROOFPOINT-EMAILSECURITY-PROD | Proofpoint Email Security Service | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | No DR, No HA, Inadequate Hosting | AVA-ACERT-PROOFPOINT | | Zhao, Xin | Cookson, John | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | appliance based | Commercially Available |
| PPT | PROPHET-PROD | Prophet By Baxter | Billing/Invoicing | OEFC, MLP | Gold | 1 | | AVA-BAXTER-IT | | Cottrell, Amy | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | External/Outsourced | other | Commercially Available |
| PRO | PROPOSAL-SUITE-PROD | Proposal Suite | Quoting | SALES | Silver | 1 | No DR, App Support Ineffective, Inadequate Hosting, Non standard OS, Out of support OS | IT-EBIZ-T3-PMT | | Strong, Sharon | Strong, Sharon | Irgang, Howard | Cleary, Colm | External/Insourced | 3-tier | Commercially Available |
| PRS | PROSERVICES-PROD | ProServices | eCommerce | SALES | Silver | 1 | No DR, No HA | IT-PSN-APP-SUPP | | Rowlen, Kenneth | Mohamed, Omar | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| PRV | PROVISION-PROD | PROVISION PIP | Administer/Manage/Monitor Systems | SVCS | Bronze | 1 | No DR, No HA, Inadequate Hosting | STARS-REMOTE-ACCESS | | Metcalfe, Catherine | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | desktop based | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| PRT | PRTG-PROD | PRTG network monitor - server | | | Bronze | 3 | | SMT | Greene, John | Haertig, David | Ebrahimi, Fariborz | Kavousour, Dinyar | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PTM | PTMS-PROD | Property Tax Management System | Business Intelligence/Reporting | FIN | Silver | 1 | No DR | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| PVC | PVCSTRACKER-PROD | PVCS Tracker | Document/File repository | R&D | Bronze | | | IT-APPS-PVCSTRACKER | Baals, James | Baals, James | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| QQ1 | QQ-PROD | QQ Defect Tracking | Product Development | R&D | Bronze | 3 | | QQ | Brost, William | Blatt, Jeffrey | Brennan, Thomas | Wilaby, Marguerite | Internal/Insourced | 3-tier | Commercially Available |
| QRT | QTLY-REP-TOOL-PROD | Quarterly Representation Tool | Accounting/Finance/Treasury | FIN | Silver | 2 | No DR, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Cottrell, Amy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| QAA | QUALITY-ASSURANCE-AUTO-PROD | Quality Assurance Automation (ALM) | Quality | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, SALES, SVCS | Bronze | 3 | | IT-QA-TOOLSSUPPORT | Ye, Qing | Ye, Qing | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| QUA | QUALYS-PROD | QUALYS Scanner | Security | IT | Silver | 2 | | IT-SECURITY-SCAN | Cookson, John | Bhise, Apurva | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | appliance based | Commercially Available |
| QKE | QUICK-ENT-PROD | Quick Quality Integrated Cube Knowledge | Quoting | SVCS | Bronze | 3 | | CSC-ENT-LEGACY | Carbone, Frank | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Home-grown |
| MMS | QUICK-PRICE-TOOL-PROD | Avaya Quick Price Tool | Quoting | SALES | Silver | 2 | | IT-EBIZ-T3-EC-CONFIGURATORS | Cleary, Colm | Damodaram, Ramakanth | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| QQW | QUICKQUOTE-WIRELINE-ENT-PROD | Quick Quote Wireline | Quoting | SVCS | Bronze | 3 | | AVA-AP-ADM-LTNT-EMEA | Cottrell, Amy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |

73

**Transition Services Agreement (TSA)**

| QVI | QVIDIAN-PROD | Qvidian Proposal Automation | Quoting | SALES | Silver | 1 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | IT-EBIZ-T3-PMT | McKinlay, Ron | Pandrangi, Surya | Ebrahimi, Fariborz | Morsy, Hazem | External/Insourced | other | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RPR | RAPIDRESPONSE-PROD | RapidResponse | Product Management | MLP | Silver | 2 | | AVA-AP-ADM-RAPIDRESPONSE | Carbone, Frank | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| RED | REDWOOD-ENT-PROD | Redwood | Middleware | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No App Bug & Enhancement support, Non standard OS | CSC-ENT-SAP | Colin, Pierre | Sreekumar, Salini | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| RGC | REMEDY-GCT-PROD | Remedy for Global Ticketing | Middleware | SVCS | Silver | 1 | No DR | REMEDY-GCT-PROD | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | 3-tier | Hybrid |
| RAD | REMOTE-ACCESS-DNS-PROD | Remote Access DNS | Infrastructure | IT | Silver | 2 | | INFRA-DNS-OPS | McCrory, Tony | McCrory, Tony | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Hybrid |
| RAC | REPORT.AVAYA.COM-PROD | Report.avaya.com | Business Intelligence/Reporting | SVCS | Silver | 2 | | AVA-SERVICES360-COGNOS-REPORTS | Bernstein, Marc | Bernstein, Marc | Pratt, Daniel | Bernstein, Marc | Internal/Insourced | 3-tier | Home-grown |
| REP | REPORTER-PROD | HP OpenView Reporter | Business Intelligence/Reporting | IT | Bronze | 3 | | SMT | Draye, Jean-Philippe | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| REG | RETENTION-GER-PROD | Retention Tool Germany Instance | Customer Management | GSMB | Silver | 1 | No DR, Out of support OS | IT-APPS-RETENTIONTOOL-GER | Arhelger, Claudia | Stiller, Thomas | Ebrahimi, Fariborz | Gill, Clayton | Internal/Insourced | 3-tier | Home-grown |
| RVP | REVPRO-PROD | RevPro | Accounting/Finance/Treasury | FIN | Silver | 2 | No DR | AVA-AP-ADM-REVPRO | Girgis, George | Yockey, Stephen | Ebrahimi, | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially |

74

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | Fariborz | | | | Availabl e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFA | RFA-APP-PROD | Remote Feature Activation | License Management | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC , R&D, SALE S, SVCS | Silv er | 1 | No DR, Non standard OS, Out of support OS | RFA | Cottrell, Amy | Cottrell, Amy | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| RFX | RIGHTFAX-PROD | Right Fax | Printing | FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC , R&D, SALE S, SVCS , CAO | Silv er | 1 | No DR, No HA | INFRA-VOICE-OPS | Thomas, Scott | Womack, Samuel | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Out sourced | applian ce based | Commer cially Availabl e |
| RMJ | RMJ-PROD | Redwood RMJ Scheduler | Middleware | IT, CAO, FIN, GOV, GSM B, HR, MLP, MRK TG, OEFC , R&D, SALE S, | Gold | 1 | | AV-IT-EJS-ADMIN | Colin, Pierre | Sreekumar , Salini | Ebrahimi , Fariborz | Kavousp our, Dinyar | Software As a Service (SaaS) | other | Commer cially Availabl e |

75

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SVCS | | | | | | | | | | | |
| RM S | RMS-PROD | Resource Management System | Resource Management | SVCS | Bron ze | 3 | | AVA-AP-ADM-LTNT-EMEA | Butler, Dorothea | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| RB B | RND-BAMBOO-PROD | R&D Build Tool | | | Silv er | 1 | No DR, App Support Ineffecti ve, Inadequ ate Hosting, Out of support OS | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | | | |
| RC B | RND-CBT-PROD | R&D Budget Tracking Tool | Accounting/Finance /Treasury | R&D | Bron ze | 2 | Criticalit y Score | ENG-CBT | Bolyard, Virginia | Krishnan, Ramnath | Mhaskar, Vijay | Krishnan , Ramnath | Internal/Inso urced | 3-tier | Home-g rown |
| RC A | RND-CLEARCASE-ADMIN-PR OD | R&D Clearcase Admin Tool | | | Silv er | 2 | | ENG-CLEARCASE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | | | |
| RC N | RND-CLEARCASE-NEU-PRO D | R&D Clearcase Nortel Enhanced UCM | Product Development | R&D | Silv er | 1 | No DR, App Support Ineffecti ve, Non standard OS | ENG-CLEARCASE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | Internal/Inso urced | 3-tier | Home-g rown |
| RC C | RND-CLEARCASE-PROD | R&D Clearcase | Business Intelligence/Reporti ng | R&D | Silv er | 1 | No DR, App Support Ineffecti ve, Non standard OS, Out of support OS | ENG-CLEARCASE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | Internal/Inso urced | 3-tier | Hybrid |
| RC S | RND-CLEARCASE-SUBMIT-P ROD | R&D Clearcase Submit | Business Intelligence/Reporti ng | R&D | Silv er | 2 | | ENG-CLEARCASE | Goddard, Michael | Goddard, Michael | Kiely, William | Arifovic, Mirza | Internal/Inso urced | 3-tier | Hybrid |
| RC F | RND-CONFLUENCE-PROD | R&D Confluence | | | Silv er | 2 | | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | | | |
| RC R | RND-CRUCIBLE-PROD | R&D Crucible | Quality | R&D | Bron ze | 3 | | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | Internal/Inso urced | 1-tier | Home-g rown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RDT | RND-DTD-PROD | R&D Design Tool | License Management | R&D | Bronze | 3 | | ENG-DTD | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 1-tier | Home-grown |
| RGF | RND-GFORGE-PROD | R&D GForge | Product Development | R&D | Silver | 1 | No DR, App Support Ineffective, Inadequate Hosting | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 2-tier | Home-grown |
| RID | RND-IDCE-PROD | R&D Integrated Defect Collection Environment IDCE | Quality | R&D | Bronze | 3 | | ENG-IDCE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 1-tier | Home-grown |
| RJI | RND-JIRA-PROD | R&D JIRA | Product Development | R&D | Silver | 2 | | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 2-tier | Home-grown |
| RMP | RND-MPL-PROD | R&D Meridian PEP Library | Administer/Manage/Monitor Systems | R&D | Silver | 1 | No DR, No HA, App Support Ineffective, Non standard OS, Out of support OS | ENG-MPL | Arkhipov, Alexander | Arkhipov, Alexander | Madhdhipatla, Munisekaran | Cowley, Keith | External/Insourced | 3-tier | Home-grown |
| RPW | RND-PRODUCT-SW-PROD | R&D Product SW Distribution | | | Bronze | 3 | | ENG-PRODUCT-SW | Patel, Monica | Patel, Monica | Madhdhipatla, Munisekaran | Cowley, Keith | | | |
| RSV | RND-SUBVERSION-PROD | R&D Subversion | | | Silver | 2 | | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | | | |
| RWB | RND-WEBMPL-PROD | R&D WEBMPL | Administer/Manage/Monitor Systems | R&D | Silver | 1 | No DR, No HA, App Support Ineffective, Non standard OS, Out of support OS | ENG-WEBMPL | Henley, David | Arkhipov, Alexander | Madhdhipatla, Munisekaran | Cowley, Keith | Internal/Insourced | 3-tier | Home-grown |
| RWI | RND-WIKI-PROD | R&D WIKI | Communications/Collaboration | R&D | Bronze | 3 | | ENG-AVAYAFORGE | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Hybrid |
| SAB | SABLIME-PROD | Sablime | Business Intelligence/Reporting | R&D | Silver | 2 | | SABLIME | Flores, Mark | Flores, Mark | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Commercially Available |

77

**Transition Services Agreement (TSA)**

| SBX | SABRIX-ENT-PROD | Sabrix | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, Non standard OS | CSC-ENT-SAP | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAL | SAL-ALARMING-PROD | Secure Access Link | Administer/Manage/Monitor Systems | SVCS | Gold | 1 | | STARS | Brost, William | Chitneni, Saujanya | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| SBP | SAL-REMOTE-ACCESS-BP-HOSTED-PROD | Secure Access Link BP Hosted | Administer/Manage/Monitor Systems | SVCS | Gold | 1 | | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | 3-tier | Hybrid |
| AXE | SAL-REMOTE-ACCESS-US1-PROD | Secure Access Link | Administer/Manage/Monitor Systems | SVCS | Gold | 1 | | STARS-REMOTE-ACCESS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | 3-tier | Hybrid |
| SMW | SALARY-MOSCOW-PROD | SALARY - Local Payroll | Payroll | HR | Silver | 2 | | INTL-APPS-HR-AND-PRODUCTIVITY | Ysordia, Tracey | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | other | Hybrid |
| SPP | SALESANDPARTNERPORTAL-PROD | Sales and Partner Portal | Web Portal | SALES | Gold | 1 | | AVA-AP-ADM-SPP | Sayers, Pamela | Dhanapalan, Amarnath | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| SUT | SALESANDUSETAX-PROD | Sales and Use Tax | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, No HA, Non standard OS, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| SFD | SALESFORCE.COM-PROD | Salesforce.com | Web Portal | SALES | Gold | 1 | | IT-APPS-SFDC | Cleary, Colm | Bylappa, Mahesh | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |
| SPA | SAP-A3P | SAP A Box Accounts Payable (e-Supply) | Accounting/Finance/Treasury | FIN | Bronze | 3 | | AVA-SAP-BASIS | Cottrell, Amy | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| B1P | SAP-B1P | SAP B Box | Product Management | OEFC | Bronze | 3 | | AVA-SAP-BASIS | Lad, Santosh | Kumarappan, Ramesh | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| BOJ | SAP-BOP | Business Objects Reporting | Business Intelligence/Reporting | IT | Bronze | 3 | | IT-APPS-EDW | Ellison, Mark | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| BWE | SAP-BW-ENT-PROD | SAP-BW-ENT | Business Intelligence/Reporting | GOV | Bronze | 3 | | IT-APPS-EDW | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SPC | SAP-CSO-PCS | SAP Content Server 6.40 | Accounting/Finance/Treasury | FIN | Silver | 2 | No DR, No HA | AVA-SAP-BASIS | Yockey, Stephen | Lad, Santosh | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| BDJ | SAP-EBP | SAP Biller Direct | Billing/Invoicing | FIN | Gold | 1 | | AVA-SAP-BASIS | Wren, Kathy | Lad, Santosh | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| EDW | SAP-EDW | SAP EDW Application instances | Business Intelligence/Reporting | FIN, IT, MLP, MRKTG, OEFC, SALES, SVCS | Silver | 1 | No DR, Non standard OS | IT-APPS-EDW | Ellison, Mark | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| EPJ | SAP-EPP | SAP Enterprise Portal | Web Portal | IT | Silver | 2 | | AVA-SAP-BASIS | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| FTE | SAP-FT-ENT-PROD | SAP Nortel Finance and Sales | Product Management | FIN | Silver | 1 | No DR, Non standard OS | CSC-ENT-SAP | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Commercially Available |
| GTS | SAP-G1P | SAP-G1P | Product Management | MLP | Gold | 1 | | AVA-SAP-BASIS | Carbone, Frank | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| GAP | SAP-GAP | SAP GRC Access Control 10.1 | Security | OEFC, FIN, SALES, MLP, SVCS, IT | Silver | 2 | | AVA-SAP-BASIS | Bharatha, Suresh | Bharatha, Suresh | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| GWP | SAP-GWP | SAP FIORI | Enterprise Content Management | IT | Bronze | 3 | | AVA-SAP-BASIS | Walker, Tereasa | Brown, William | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Home-grown |
| H2P | SAP-H2P | SAP-H2P | Resource Management | HR | Silver | 2 | | AVA-SAP-BASIS | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| I2P | SAP-I2P | SAP-I2P | Product Management | OEFC, FIN, SALES, MLP, | Gold | 1 | | AVA-SAP-BASIS | Brown, William | Kumarappan, Ramesh | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |

79

**Transition Services Agreement (TSA)**

| | | | | SVCS, IT | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MDM | SAP-MDM-ENT-PROD | SAP Nortel Master Data | Document/File repository | GOV, SALES | Silver | 1 | No DR, Non standard OS, Out of support OS | CSC-ENT-SAP | Brown, William | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Commercially Available |
| P74 | SAP-P74-PROD | SAP-P74 | Resource Management | GSMB | Silver | 1 | No DR, No HA, No App Vendor Support | GER-IT-APPS-SAP-HR | Elsner, Gerald | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| PB2 | SAP-PB2-PROD | SAP-PB2 | Business Intelligence/Reporting | GSMB | Bronze | 3 | | GER-IT-APPS-SAP-BUSINESSWAREHOUSE | Rosenthal, Oliver | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Out sourced | 3-tier | Hybrid |
| PE2 | SAP-PE2-PROD | SAP-PE2 | Business Intelligence/Reporting | GSMB | Gold | 1 | | AVA-SAP-BASIS-GERMANY | Rosenthal, Oliver | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Out sourced | 3-tier | Hybrid |
| PPM | SAP-PP1 | SAP PPM 5.0 | Project Management | IT | Bronze | 3 | | SAP-SOLUTION-CENTER | Walker, Tereasa | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| PSM | SAP-PSM-PROD | SAP-PSM | Product Management | GSMB | Bronze | 3 | | AVA-SAP-BASIS-GERMANY | Boerner, Dirk | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Out sourced | 3-tier | Commercially Available |
| PT7 | SAP-PT7-PROD | SAP-PT7 | Accounting/Finance/Treasury | GSMB | Silver | 1 | No DR, No HA, Inadequate Hosting | AVA-SAP-BASIS-GERMANY | Rosenthal, Oliver | Boerner, Dirk | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Out sourced | 3-tier | Hybrid |
| SMM | SAP-SM1 | SAP Monitoring | Administer/Manage/Monitor Systems | | Bronze | 3 | | AVA-SAP-BASIS | Kumarappan, Ramesh | Lad, Santosh | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| XP1 | SAP-XP1 | SAP PI Box -PRD (Projects) | Product Management | MLP | Bronze | 3 | | AVA-SAP-MIDDLEWARE | Kuppuswamy, Swamynathan | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| SAS | SAS-ANALYTICS-PROD | SAS Analytics | Business Intelligence/Reporting | SALES | Bronze | 3 | | AVA-SALES-BUS-ANALYTICS | Yarra, Sreeram | Yarra, Sreeram | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |
| SCD | SAU-COI-DESKTOP-PROD | SAU COI Desktop | Administer/Manage/Monitor Systems | FIN | Silver | 1 | No DR, No HA, Non | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | e |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SBA | SBA-MANAGER-PROD | Special Business Agreement (SBA) Manager | Quoting | SALES | Silver | 1 | No DR, Non standard OS, Out of support OS | IT-EBIZ-T3-SBA | Rooney, Douglas | Heneghan, Sean | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| SCO | SCOPIA-DESKTOP-PROD | Scopia Desktop | Communications/Collaboration | GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS, CAO, FIN | Gold | 1 | | AVAYA-HD-VIDEO | Bronshtein, Yossi | Snell, E | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| SC1 | SCOUT-01-PROD | Scout | Billing/Invoicing | GSMB | Silver | 1 | No DR, App Support Ineffective, Out of support OS | TEN-SLS-APPS-SCOUT | Hollubarsch, Manfred | Hollubarsch, Manfred | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Home-grown |
| SCS | SCSOCKS-PROD | Socks Protocol | Security | IT, CAO, FIN, GOV, GSMB, HR, MLP, MRKTG, OEFC, | Bronze | 3 | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

81

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | R&D, SALES, SVCS | | | | | | | | | | |
| SEC | SECURE-ACCESS-LINK-PROD | Secure Access Link | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, Non standard OS | STARS | Cabrera, Jorge Luis | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| SEE | SEEBURGER-PROD | Seeburger Prod Environment | Middleware | GSMB | Bronze | 3 | | AVA-IT-OP-QTC | | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| SSY | SELECTSURVEY-PROD | SELECTSURVEY-PROD (Application instance) | Customer Management | SALES, MRKTG | Bronze | 3 | | SELECT-SURVEY | Horn, Larry | Horn, Larry | Augun, Barbara | Chan, Raymond | Internal/Insourced | 3-tier | Home-grown |
| STP | SEMTP-PROD | SEM Team Portal | Web Portal | SALES | Bronze | 3 | | CC-AVA-ATAC | Cottrell, Amy | Bursztyn, Diego | Turgeon, Jean | Schuler, Timothy | Internal/Insourced | 3-tier | Home-grown |
| SVP | SERVICE-POWER-NEW-PROD | Service Power | Resource Management | SVCS | Silver | 1 | No DR, No HA, Non standard OS | AVA-AP-ADM-FIELD-SERVICE-ADMIN | Brost, William | Westbrook, Bart | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | 3-tier | Commercially Available |
| SVD | SERVICEDESK-PROD | HP Service Desk | Ticketing | IT | Bronze | 3 | | SMT | Sefack, Lori-Ann | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| SMG | SERVICEMANAGER-PROD | HP Service Manager | Ticketing | IT | Silver | 2 | | SMT | Colin, Pierre | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| SIR | SERVICES-IR-PROD | Services IR | Communications/Collaboration | SVCS | Bronze | 3 | | INFRA-VOICE-OPS | Blatt, Jeffrey | Womack, Samuel | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| SFA | SFAP-PROD | Software Framework Access Policy | Enterprise Content Management | SVCS | Silver | 1 | No DR, Non standard OS, Out of support OS | AVA-APP-SFAP | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| SFC | SFDC-PRM-PROD | Salesforce.com PRM | Web Portal | SALES | Gold | 1 | | SFDC-O&M | Cleary, Colm | Bylappa, Mahesh | Ebrahimi, Fariborz | Morsy, Hazem | Software As a Service (SaaS) | other | Commercially Available |

82

**Transition Services Agreement (TSA)**

| SFS | SHAREFILE-PROD | ShareFile | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | IT-AVA-SHAREFILE | Hicks, James | Zhou, Tao | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | other | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | SHAREPOINT-2013-PROD | Sharepoint | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | AVA-AP-ADM-SHAREPOINT | Naseef, Ali | Juneja, Rajesh | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| SFB | SHIFTBID-PROD | Shift Bid | Resource Management | SVCS | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-1 | Foss, Stephen | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| GCT | SIEBEL-GCT-PROD | Siebel Global Customer and Ticketing | Ticketing | MRKTG, SALES, SVCS | Gold | 1 | | AVA-AP-ADM-SIEBEL-TKT | Brost, William | Trivedi, Nikhil | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| SGG | SIEBEL-GOLDEN-GATE-PROD | SIEBEL-GCT Replicated DB | Ticketing | MRKTG, SALES, SVCS | Gold | 1 | | AVA-AP-ADM-SIEBEL-TKT | Brost, William | Supasithumrong, Samathi | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| SSP | SIPSLEUTH-TOOL-PROD | SipSleuth Tool | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

83

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| SKK | SKILLTRAK-PROD | SKILLTRAK | Resource Management | SVCS | Bronze | 3 | | IT-AVA-SKILLPORTAL | Cottrell, Amy | Cottrell, Amy | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SMB | SMBSP-PROD | Sales and Marketing Tool | Business Intelligence/Reporting | SVCS, FIN | Bronze | 3 | | SMBSP-GROUP | Joseph, Manojkumar | Joseph, Manojkumar | Sherry, William | Joseph, Manojkumar | Internal/Insourced | 2-tier | Home-grown |
| SO1 | SMS-01-PROD | Software Management System | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | IT-EBIZ-T3-SMS | Walsh, Kieran | Cottrell, Amy | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| SGY | SMTP-GATEWAY-PROD | SMTP Gateway | Infrastructure | IT | Gold | 1 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | appliance based | Commercially Available |
| SMT | SMTP-RELAY-PROD | SMTP Relay Service - IronPort Appliances | Infrastructure | IT | Gold | 1 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | appliance based | Commercially Available |
| SNE | SNAP-ENGAGE-PROD | Snap Engage | Web Portal | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | IT-AVA-INN | Moshrefi, Afshin | Moshrefi, Afshin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

84

**Transition Services Agreement (TSA)**

| ST A | SOCIAL-TEXT-AL-PROD | Social Text | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | AVA-AL-T3-POSTPROD | Frank, Anita | Butler, Dorothea | Pennell, David | Butler, Dorothea | External/Outsourced | 3-tier | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SL C | SOFTCLIENTS-LOG-COLLECTOR-PROD | Avaya Softclients Log Collector (ASLC) | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Cottrell, Amy | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| ST L | SOFTWARE-MANAGEMENT-TOOL-PROD | Software Management Tool | Quoting | SALES | Silver | 2 | No DR, No HA | IT-AVA-SOFTWARE-MANAGEMENT-TOOL | McCormack, Stephen | Abdel-Rahim, Tamer | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| SO X | SOX-EXPRESS-PROD | SOX Express | Business Intelligence/Reporting | FIN | Bronze | 2 | No DR, Out of support OS | AVA-AP-ADM-LTNT-GLOBAL-2 | Adedoyin-Akibayo, Ade | Lopez Reta, Mariano | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| SP G | SP-GPS-PROD | ServicePower/GPS Production | Resource Management | SVCS | Silver | 2 | | AVA-AP-ADM-FIELD-SERVICE-ADMIN | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Commercially Available |
| SI C | SPARK-IM-CLIENT-PLUG-IN-PROD | Spark IM client Plug-in Prod Instance | Communications/Collaboration | SVCS | Bronze | 3 | | APP-GSD-OPERATION-SUPPORT | Brost, William | Riemer, Aaron | Brennan, Thomas | Wilaby, Marguerite | Internal/Insourced | 3-tier | Home-grown |
| SP T | SPEECHTALK-PROD | Speech Talk | Communications/Collaboration | MRKTG, SALES | Silver | 2 | | INFRA-VOICE-OPS | Wren, Kathy | Snell, E | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| SP F | SPP-FORUM-PROD | Sales Partner Portal Forum | Communications/Collaboration | SALES | Bronze | 3 | | AVA-AP-ADM-VBULLETIN | Kau, Ingren | Kau, Ingren | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 1-tier | Home-grown |
| SR M | SRAM-PROD | Secure Remote Alarm Manager - See Notes for Outage declarations | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, Inadequate Hosting, Non standard OS | STARS | Brost, William | Sharma, Manish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

85

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SCM | SRVC-CM-MONITOR-PROD | Call Monitor German HD | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | ION-SRVC-APPS-CI-ADMIN | Wollenhaupt, Thomas | Wollenhaupt, Thomas | Denk, Walter | Hellbrueck, Peter | Internal/Insourced | 3-tier | Commercially Available |
| SS1 | SS-PROD | Security Advisory Letters | Product Management | SVCS | Bronze | 3 | | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| SSD | SSDP-PROD | Secure Services Delivery Platform | Web Portal | SVCS | Silver | 2 | No DR, Non standard OS, Out of support OS | STARS | Brost, William | Gadicherla, Sushma | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| SSO | SSO-APP-PROD | Single Sign On | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 1 | No DR, No App Bug & Enhancement support, Non standard OS, Out of support OS | AVA-AP-ADM-SSO | Hicks, James | Ala, Shirish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Hybrid |
| CMI | SSO-CMI-APP-PROD | Control Minder | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | | AVA-AP-ADM-SSO | Hicks, James | Ala, Shirish | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |

86

**Transition Services Agreement (TSA)**

| IDM | SSO-IDM-APP-PROD | Indentity Minder | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Silver | 2 | No DR | AVA-AP-ADM-SSO | Hicks, James | Ala, Shirish | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OED | SSO-OED-APP-PROD | Oracle Enterprise Directory | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | AVA-AP-ADM-SSO | Hicks, James | Ala, Shirish | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 2-tier | Commercially Available |
| SM2 | SSO-SM2-APP-PROD | Site Minder | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Gold | 1 | | AVA-AP-ADM-SSO | Hicks, James | Ala, Shirish | Ebrahimi, Fariborz | Kavouspour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CRG | STARS-CALL-ROUTING-GUIDE-PROD | Call Routing Guide | Administer/Manage/Monitor Systems | SVCS | Bronze | 3 | | STARS | Brost, William | Anderson, Erica | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| STC | STC-PROD | Supervisor Transaction Center | Resource Management | HR | Silver | 2 | | AVA-AP-ADM-HR-WEB-APPS | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| STQ | STEPQ-PROD | SQA StepQ | Quality | FIN | Silver | 2 | | AVA-AP-ADM-STEPQ | Skaggs, Debbie | Kanamarapudi, Padmanabha | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | other | Commercially Available |
| SCJ | SUPPLY-CHAIN-JETFORMS-ADOBE-PROD | Supply Chain Forms | Product Management | MLP | Silver | 1 | No DR, Inadequate Hosting, Non standard OS, Out of support OS | AVA-IT-OP-APPSUPPT | Tendulkar, Dipak | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |
| SUP | SUPPORT-SITE-PROD | Support Site | Web Portal | SVCS | Gold | 1 | | AVA-AP-ADM-SUPPORTSITE | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Home-grown |
| SWR | SWRT-V4-PROD | Services Web Registration Tool | Quoting | SVCS | Bronze | 3 | | AVA-AP-ADM-SWRT | Van Willigenburg, Richard | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| TAB | TABLEAU-GER-PROD | Tableau Server for Germany | | | Bronze | 3 | | AVA-IT-APPS-TABLEAU-GERMANY | Hihn, Angelika | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | | | |
| SFP | TALENTMAKER2-PROD | SuccessFactors | Resource Management | HR | Silver | 2 | | IT-AVA-SF | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | other | Commercially Available |
| TXW | TAXWEB-PROD | Tax Depreciation | Accounting/Finance/Treasury | FIN | Bronze | 3 | | AVA-AP-ADM-LTNT-GLOBAL-1 | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| TOD | TEAMSITE-OPENDEPLOY-PROD | Interwoven TeamSite | Enterprise Content Management | SVCS | Bronze | 3 | | AVA-AP-ADM-ECM-SUPP | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| TSP | THESOURCEPORTAL-PROD | The Source Portal | Web Portal | HR | Silver | 2 | No DR | AVA-AP-ADM-THESOURCE | Walenciak, Kellie | Dhanapalan, Amarnath | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Insourced | 3-tier | Hybrid |
| TWP | TICAPP-WMPMDB | TICAPP-WMPMDB | Business Intelligence/Reporting | R&D | Bronze | 3 | | RDPS-ONSITE-WESTMINSTER | Thomson, Rodney | Flores, Mark | Augun, Barbara | Spengler, Cara | Internal/Insourced | 3-tier | Home-grown |
| TMC | TIMECARD-PROD | TIMECARD application | Payroll | IT | Bronze | 3 | | AVA-IT-OP-TIMETREX | Daniels, Helane | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TMS | TM-SCHEDULE-PROD | Transfer Manager Schedule | Resource Management | HR, SVCS | Bronze | 2 | Criticality Score | AVA-AP-ADM-LTNT-GLOBAL-2 | Brost, William | Lopez Reta, Mariano | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Home-grown |
| TMG | TMG-PROD | Threat Management Gateway | Security | IT | Silver | 2 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 3-tier | Commercially Available |
| TKT | TOOLKIT-PROD | Document review tool | Document/File repository | R&D | Bronze | 3 | | TOOLKIT | Bolyard, Virginia | Krishnan, Ramnath | Mhaskar, Vijay | Krishnan, Ramnath | Internal/Insourced | 1-tier | Home-grown |
| TLA | TOOLSA-WEB | toolsa-web | Administer/Manage/Monitor Systems | SVCS | Silver | 1 | No DR, No HA, Non standard OS | SVCS-GSS-TOOLSA-APPS-BIZ | | King, Anthony | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Home-grown |
| TRX | TREX-PROD | Trex | Expense Management | FIN | Silver | 2 | Review Criticality Score | AVA-CORPORATE-APP-SUP | Hamilton, Mark | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Software As a Service (SaaS) | 3-tier | Commercially Available |
| TRI | TRIMMA-PROD | Trimma | Web Portal | MRKTG, SALES | Bronze | 3 | | IT-AVA-TRI-KONFTEL | Anens, Daniel | Anens, Daniel | Monday, Mark | Renkel, Peter | Internal/Insourced | 3-tier | Commercially Available |
| TRP | TRIPWIRE-ENTERPRISE-PROD | Tripwire Enterprise | Security | IT | Silver | 1 | Criticality Score | APP-TRIPWIRE-SUPPORT | John, Abie | Draye, Jean-Philippe | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| TUC | TRYMOBILITY-TRYAAC-PROD | Try Avaya Aura Conferencing | eCommerce | SALES | Silver | 1 | Review Criticality Score | RADVISION-TRYSCOPIA | Higgins, Sharon | Higgins, Sharon | Steen, Andy | Higgins, Sharon | Internal/Insourced | 3-tier | Home-grown |
| SCT | TRYSCOPIA-APP | Try Scopia Application | Communications/Collaboration | SALES | Silver | 1 | Review Criticality Score | RADVISION-TRYSCOPIA | Higgins, Sharon | Higgins, Sharon | Steen, Andy | Higgins, Sharon | Internal/Insourced | 3-tier | Home-grown |
| TSE | TSE-PROD | Traffic Study Expert | Business Intelligence/Reporting | SVCS | Bronze | 3 | | STARS | Brost, William | Anderson, Erica | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| TSG | TSG-PROD | Terminal Services Gateway | Infrastructure | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, R&D, SALE | Bronze | 3 | | IT-AZALEOS-OPS | Hicks, James | Zhao, Xin | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |

89

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | S, SVCS | | | | | | | | | | |
| LMS | TSX-LMS-PROD | TSX Learning | Training | CAO, FIN, GOV, GSM B, HR, IT, MLP, MRK TG, OEFC, R&D, SALE S, SVCS | Silv er | 2 | | AVA-AL-T3-OPS | Butler, Dorothea | Butler, Dorothea | Pennell, David | Butler, Dorothea | Internal/Inso urced | 3-tier | Home-g rown |
| TW E | TWB4G-EMEA-PROD | Tech Workbench EMEA | Resource Management | SVCS | Gold | 1 | | AVA-AP-ADM-FIELD-SERVI CE-ADMIN | Brost, William | Murray, Christophe r | Ebrahimi , Fariborz | Morsy, Hazem | Internal/Out sourced | 3-tier | Hybrid |
| TW G | TWB4G-PROD | Tech Workbench | Resource Management | SVCS | Gold | 1 | | AVA-AP-ADM-FIELD-SERVI CE-ADMIN | Brost, William | Murray, Christophe r | Ebrahimi , Fariborz | Morsy, Hazem | Internal/Out sourced | 3-tier | Hybrid |
| TW S | TWB4G-SDP-PROD | Tech Workgroup SDP | Resource Management | SVCS | Silv er | 2 | | AVA-AP-ADM-FIELD-SERVI CE-ADMIN | Brost, William | Murray, Christophe r | Ebrahimi , Fariborz | Morsy, Hazem | Internal/Out sourced | 3-tier | Hybrid |
| UC M | UCM-CMD-PROD | Unified Customer Master | Middleware | IT | Silv er | 1 | No DR, Inadequ ate Hosting, Out of support OS | AVA-AP-ADM-CMD | Brost, William | Murray, Christophe r | Ebrahimi , Fariborz | Morsy, Hazem | Internal/Inso urced | 3-tier | Hybrid |
| UC D | UCMDB-PROD | HP Universal CMDB | Administer/Manage /Monitor Systems | IT | Bron ze | 3 | | SMT | | Draye, Jean-Philip pe | Ebrahimi , Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| UC T | UCONNECT-PROD | UCONNECT | Training | SALE S | Bron ze | 3 | | AVA-UCONNECT | Cottrell, Amy | Putney, Cree | Ho, Lee | Putney, Cree | External/Ins ourced | 3-tier | Commer cially Availabl e |
| VA R | VARTECH-PROD | Vartech | Payroll | SALE S | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi , Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Hybrid |

90

**Transition Services Agreement (TSA)**

| VBF | VBULLETIN-FORUM-PROD | Services Support Forum Prod Instance | Communications/Collaboration | SVCS | Silver | 2 | | AVA-AP-ADM-VBULLETIN | Brost, William | Kalathil, Sundeep | Ebrahimi, Fariborz | Morsy, Hazem | Internal/Outsourced | 3-tier | Commercially Available |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VCE | VCENTER-PROD | VCenter | Infrastructure | IT | Bronze | 3 | | IT-INFRA-OPS-ESX | King, Anthony | King, Anthony | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 1-tier | Commercially Available |
| VSG | VERASMART-GCDRS-PROD | VeraSMART Enterprise Global Call Detail Recording System | Infrastructure | IT | Bronze | 3 | | INFRA-VOICE-OPS | Thomas, Scott | Thomas, Scott | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Outsourced | 1-tier | Commercially Available |
| VXO | VERTEX-O-PROD | Vertex Sales and Use Tax | Accounting/Finance/Treasury | FIN | Gold | 1 | | AVA-IT-OP-FIN | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | |
| VTX | VERTEX-PROD | Vertex Sales and Use Tax | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, No HA, Non standard OS, Out of support OS | AVA-IT-OP-FIN | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| VQ9 | VERTEX-QR9-PROD | Vertex QR9 | Accounting/Finance/Treasury | FIN | Silver | 1 | No DR, Out of support OS | AVA-IT-OP-FIN | Miranda, Ana | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 1-tier | Commercially Available |
| VDH | VISICON-DATA-HUB-PROD | Visicon Data Hub | Middleware | GSMB | Silver | 1 | No DR, No HA, Out of support OS | TEN-IT-APPS-XOFFER | Kamp, Thomas | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Commercially Available |
| VTW | VISITORWATCH-PROD | Visitor Watch -Registration and badging for visitors to Avaya locations globally | Security | HR | Bronze | 3 | | VWATCH | Ryan, Timothy | Ryan, Timothy | McCarthy, Elizabeth | Parkin, William | Internal/Outsourced | 1-tier | Commercially Available |
| VPP | VOICE-PORTAL-PROD | Voice Portal | Communications/Collaboration | SALES, SVCS | Silver | 1 | No DR, Inadequate Hosting | IT-AVA-FMW | Kirck, Theresa | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Hybrid |
| VAC | VOYAGER-ACMFSO-PROD | Voyager ACM/FSO | Billing/Invoicing | OEFC | Gold | 1 | | AVA-SAUCON-IT | Middien, Sherry | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |
| VAD | VOYAGER-ADJUSTMENTS-PROD | Voyager Adjustments | Billing/Invoicing | | Bronze | 3 | | AVA-SAUCON-IT | Davis, JuliAnna | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Outsourced | 3-tier | Hybrid |

91

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VTC | VTAC-PROD | VTAC SSDP Tools | Web Portal | SVCS | Bronze | 3 | | | STARS | Brost, William | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| WBC | WEBCASTING-PROD | Avaya WebCasting using Vbrick | Communications/Collaboration | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC, R&D, SALES, SVCS | Bronze | 3 | | | IT-VNOC | Snell, E | Bronshtein, Yossi | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | 3-tier | Commercially Available |
| WBF | WEBFOCUS-PROD | WebFocus | Middleware | IT | Bronze | 3 | | | AVA-AP-ADM-LTNT-GLOBAL-2 | Mueller, Bernd | Kuppuswamy, Swamynathan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | other | Home-grown |
| WFR | WEBFRONTEND-PROD | Web Frontend | Enterprise Resource Planning | GSMB | Silver | 2 | | | TEN-IT-APPS-WEBFRONTEND | Brambilla, Elvira | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| WBL | WEBLOGIC-PROD | WebLogic Application Instance - Integration - Linux | Middleware | SALES | Silver | 1 | No DR, Non standard OS, Out of support OS | | IT-AVA-FMW | Brost, William | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 3-tier | Commercially Available |
| WBM | WEBMETHODS-PROD-HB1PCA | WebMethods HP Cluster | Middleware | IT | Bronze | 3 | | | IT-AVA-WEBMETHODS | Brost, William | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| WBM | WEBMETHODS-PROD-SWMPPS | WebMethods Solaris Cluster | Middleware | IT | Bronze | 3 | | | IT-AVA-WEBMETHODS | Brost, William | Swain, Amlan | Ebrahimi, Fariborz | Hassan, Walid | Internal/Insourced | 2-tier | Commercially Available |
| WPD | WEBPDM-PROD | WebPDM | Document/File repository | GSMB | Bronze | 3 | | | AVA-APP-WEBPDM | Hamdorf, Steffen | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |
| WFE | WFE30-PROD | Webfrontend 3.0 | Customer Management | SVCS | Silver | 2 | | | TEN-IT-APPS-WEBFRONTEND | Wilczek, Heiner | Boerner, Dirk | Ebrahimi, Fariborz | Kavousour, Dinyar | Internal/Insourced | 3-tier | Home-grown |

92

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| W QM | WFO-US1-QM-PROD | WFO Quality Monitoring | Resource Management | SVCS | Bron ze | 3 | | STARS | De Seta, Maria Sol | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Out sourced | 3-tier | Home-g rown |
| W WF | WFO-US1-WFM-PROD | WFO Workforce Management | Resource Management | SVCS | Silv er | 2 | | STARS | De Seta, Maria Sol | Cabrera, Jorge Luis | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |
| WI N | WINS-PROD | MS WINS | Infrastructure | IT | Silv er | 2 | | IT-AZALEOS-OPS | Hubbard, Martyn | Zhao, Xin | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| WI S | WIS-PROD | Brazil Warehouse Information System | Business Intelligence/Reporti ng | MLP | Silv er | 1 | No DR, No HA, Inadequ ate Hosting | IT-INFRA-ONSITE-SAOPAU LO | Maiochi, Ricardo Luis | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| W MS | WMS_US-PROD | WMS US | Infrastructure | IT | Bron ze | 3 | | INFRA-LAN-OPS | Sam, Wayne | Sam, Wayne | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| W OC | WOC-SILVERPEAK-PROD | WOC-Silverpeak | Infrastructure | | Bron ze | 3 | | INFRA-BACKBONE-OPS | Bartholome w, John | Sam, Wayne | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | applian ce based | Commer cially Availabl e |
| WK I | WORKITEM-PROD | IBM Rational ClearQuest | Quality | R&D | Silv er | 2 | No DR | THEMIS-WI | Bolyard, Virginia | Bolyard, Virginia | Augun, Barbara | Spengler , Cara | Internal/Inso urced | 3-tier | Commer cially Availabl e |
| W WR | WRT-WORKFORCE-REPORTI NG-PROD | HR IT Workforce Reporting Tool | Business Intelligence/Reporti ng | SVCS | Bron ze | 2 | No DR, Out of support OS | AVA-AP-ADM-HR-WEB-APP S | Melamed, Steven | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Inso urced | 3-tier | Home-g rown |
| XA C | XAC-PROD | XenMobile Application Controller | | | Silv er | 2 | | INFRA-LAN-OPS | Hicks, James | Zhou, Tao | Ebrahimi, Fariborz | Kavousp our, Dinyar | | | |
| XB B | XBBP-PROD | eXtensible Browser Based Platform | Quoting | SALE S | Silv er | 1 | No DR, Out of support OS | AVA-AP-ADM-LTNT-EMEA | Smith, Gregory | Yockey, Stephen | Ebrahimi, Fariborz | Hassan, Walid | Internal/Out sourced | 3-tier | Hybrid |
| XU I | XUI-PROD | TS&D XUI | Administer/Manage /Monitor Systems | SVCS | Silv er | 1 | No DR, Non standard OS, Out of support OS | STARS | Brost, William | Chitneni, Saujanya | Ebrahimi, Fariborz | Kavousp our, Dinyar | Internal/Inso urced | 3-tier | Home-g rown |

93

**Transition Services Agreement (TSA)**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ZSC | ZSCALER-PROXY-PROD | ZScaler Proxy | Security | CAO, FIN, GOV, GSMB, HR, IT, MLP, MRKTG, OEFC R&D, SALES, SVCS | Gold | 1 | | INFRA-SEC-OPS | McCrory, Tony | McCrory, Tony | Ebrahimi, Fariborz | Kavousour, Dinyar | External/Insourced | 1-tier | Home-grown |

US-DOCS\78259466.11

## Service Level Definitions

| Function | Measure | Gold | Silver | Bronze |
|---|---|---|---|---|
| Service Delivery | Availability | > 99.9% (43 minutes per month of unplanned downtime) | > 99.4% (4 hours per month of unplanned downtime) | > 96.6% (1 day per month of unplanned downtime) |
| Service Delivery | Hours of service | 24x7 | 24x5 | 8x5 |
| Incident Mgmt | Response Time | < 15 mins | < 1 hour | < 4 hours |
| Incident Mgmt | Resolution Time | < 2 hours | < 4 hours | < 3 Days |
| Architecture | Redundancy | N+1 (No SPOF) | N+1 (No SPOF) | N |
| Architecture | Compliance | Supported by IT team or they selected delegates/3P End-to-End | Supported by IT team or they selected delegates/3P End-to-End | Some deviations to Architectural standards accepted |
| Infrastructure | Data Center | >= Tier 3 | >= Tier 3 | >= Tier 1 |
| Maintenance | Maintenance Windows | < 24h/month | < 24h/month | < 24h/month |
| Maintenance | Environment Currency (App, DB, OS) | Latest IT Approved/Supported Version | Vendor Supported (no Legacy or Out of Support) | Best Effort |
| Maintenance | Environment Supportability (App, DB, OS) | Supported by IT team or they selected delegates/3P End-to-End | Supported by IT team or they selected delegates/3P End-to-End | Mixed Support Model Accepted |
| Disaster Recovery | Model | Geo-Redundant, Hot or Warm Standby | Cold Standby | Best Effort |
| Disaster Recovery | Recovery Time Objective | < 24h | < 72h | Best Effort |
| Disaster Recovery | Recovery Point Objective | < 24h | < 24h | < 168 |
| 3rd party Software & components | | Varies by contractual commitment | | |

**Transition Services Agreement (TSA)**

**Service Level by Title and Tower**

| No. | Service Tower and Title | Description | Service Level |
|---|---|---|---|
| C1 | ADM<br><br>Application Availability | Percent of Availability | A-High Performance >=99% Availability for 100% of High Performance Applications in each calendar month<br><br>B-Standard Performance - >=99.0% Availability for 100% of Standard Performance Applications in each calendar month<br><br>C-Best Effort >99.0% Availability for 100% of Best Effort Applications in each calendar month<br><br>Calculation: Actual Uptime of Applications in each calendar month divided by the difference between Scheduled Uptime in the same calendar month and Excused Downtime in the same calendar month, multiplied by 100 |
| C2 | Severity 1 Initial Ticket Response Time | Timeliness of Ticket Response<br><br>Time for Severity 1 Tickets | 90% of Severity 1 Tickets will have a Ticket Response Time of Forty Five (45) minutes or less in each calendar month<br>100% of Severity 1 Tickets will have a Ticket Response Time of Ninety (90) minutes or less in each calendar month..<br>**Low Ticket Volume Exception:** Notwithstanding the foregoing, in the event there are five (5) or fewer Severity 1 Tickets in a calendar month, then there will not be a Severity 1 Initial Ticket Response Service Level Failure in that calendar month regardless of the percentage calculation yielded as applied to determining the Forty Five (45) minute Severity 1 Initial Ticket Response Time Service Level.<br>Calculation: Number of Severity 1 Tickets with a Ticket Response Time of Forty Five (45) minutes or less in each calendar month, divided by the total number of Severity 1 Tickets created during the same calendar month, multiplied by 100. |
| C3 | Severity 2 Initial Ticket Response Time | Timeliness of Ticket Response<br><br>Time for Severity 2 Tickets | 90% of Severity 2 Tickets will have a Ticket Response Time of two (02) hours or less in each calendar month and<br>100% of Severity 2 Tickets will have a Ticket Response Time of Four (4) hours or less in each calendar month. |

96

**Transition Services Agreement (TSA)**

| | | | |
|---|---|---|---|
| | | | **Low Ticket Volume Exception:** Notwithstanding the foregoing, in the event there are five (5) or fewer Severity 2 Tickets in a calendar month then there will not be a Severity 2 Initial Ticket Response Service Level Failure in that calendar month regardless of the percentage calculation yielded as applied to determining the two (02) hours Severity 2 Initial Ticket Response Time Service Level.<br><br>Calculation: Number of Severity 2 Tickets with a Ticket Response Time of two (02) hours or less in each calendar month, divided by the total number of Severity 2 Tickets created during the same calendar month, multiplied by 100. |
| C4 | Severity 3 Initial Ticket Response Time | Timeliness of Ticket Response<br><br>Time for Severity 3Tickets | 90% of Severity 3 Tickets will have a Ticket Response Time of two (2) business days or less in each calendar month and<br><br>95% of Severity 3 Tickets will have a Ticket Response Time of three (3 ) business days  or less in each calendar month and<br><br>As to Application Development and Maintenance Services, in the event a Ticket relating to an Applications is opened during non-Business Hours, the Ticket Response Time for the Severity 3 Initial Ticket Response Time will be measured by using the "start time of the next business day" as the "time that a Ticket is created" in the "Ticket Response Time" definition.<br><br>Calculation: Number of Severity 3 Tickets with a Ticket Response Time of two (2)  business days or less, in each calendar month, divided by the total number of Severity 3 Tickets created during the same calendar month, multiplied by 100. |
| C5 | Severity 4 Initial Ticket Response Time | Timeliness of Ticket Response<br><br>Time for Severity 4Tickets | 90% of Severity 4 Tickets will have a Ticket Response Time of two (2) business days or less in each calendar month and<br><br>99.9% of Severity 4 Tickets will have a Ticket Response Time of three (3) business days or less in each calendar month.<br><br>. |

97

**Transition Services Agreement (TSA)**

| | | | |
|---|---|---|---|
| | | | Calculation: Number of Severity 4 Tickets with a Ticket Response Time of two (2) business days or less in each calendar month, divided by the total number of Severity 4 Tickets created during the same calendar month, multiplied by 100. |
| C6 | ADM<br><br>Severity 1<br><br>Ticket Resolution | Timeliness of<br><br>Ticket Resolution Time | 90% of Severity 1 Tickets will have a Ticket Resolution Time of Eight (8) hours or less and<br>100% of Severity 1 Tickets will have a Ticket Resolution Time of twenty-four (24) hours or less, in each calendar month.<br>**Low Ticket Volume Exception:**  Notwithstanding the foregoing, in the event there are five (5) or fewer Severity 1 Tickets in a calendar month then there will not be a Severity 1 Ticket Resolution Service Level Failure in that calendar month regardless of the percentage calculation yielded as applied to determining the Eight (8) hour Severity 1 Ticket Resolution Service Level.<br>Calculation: Number of Severity 1 Tickets with a Ticket Resolution Time of Eight (8) hours or less in each calendar month, divided by the total number of Severity 1 Tickets during the same calendar month, multiplied by 100. |
| C7 | ADM<br><br>Severity 2<br><br>Ticket Resolution | Timeliness of<br><br>Ticket Resolution Time | 90% of Severity 2 Tickets will have a Ticket Resolution Time of Twenty Four (24) hours or less and<br>98% of Severity 2 Tickets will have a Ticket Resolution Time of Forty Eight(48) hours or less, in each calendar month.<br><br><br>**Low Ticket Volume Exception:**  Notwithstanding the foregoing, in the event there are five (5) or fewer Severity 2 Tickets in a calendar month, then there will not be a Severity 2 Ticket Resolution Service Level Failure in that calendar month regardless of the percentage calculation yielded as applied to determining the Twenty Four (24) hour Severity 2 Ticket Resolution Service Level.<br><br>Calculation: Number of Severity 2 Tickets with a Ticket Resolution Time of Twenty Four (24) hours or less in each calendar month, divided by the total number of Severity 2 Tickets during the same calendar month, multiplied by 100. |
| C8 | ADM | Timeliness of Ticket Resolution Time | 90% of Severity 3 Tickets will have a Ticket Resolution Time of Seven (7) business days or less, 95% of Severity 3 Tickets will have a Ticket Resolution Time of Ten (10) business days or less., in each calendar month. |

98

**Transition Services Agreement (TSA)**

| | | | |
|---|---|---|---|
| | Severity 3<br><br>Ticket Resolution | | Calculation: Number of Severity 3 Tickets with a Ticket Resolution Time of Seven (7) business days, or ten(10) business days, as applicable, in each calendar month, divided by the total number of Severity 3 Tickets during the same calendar month, multiplied by 100. |
| C9 | ADM<br><br>Severity 4<br><br>Ticket Resolution | Timeliness of Ticket Resolution Time | 90% of Severity 4 Tickets will have a Ticket Resolution Time of twenty (20) business days and less, 98% of Severity 4 Tickets will have a Ticket Resolution Time of thirty (30) business days or less, in each calendar month.<br><br>Calculation: Number of Severity 4 Tickets with a Ticket Resolution Time of (a) twenty (20) business days and thirty (30) business days, as applicable, in each calendar month, divided by the total number of Severity 4 Tickets during the same calendar month, multiplied by 100. |

99

# Section 9: Sales

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Pricing and Quoting | SAL.2.8 | • Avaya will provide support of the pricing and quoting process tools:<br>– Marketing Promotions Module<br>– DSM (Deals Desk Database)<br>– SBA (Special Bids Database)<br>– SMS/KRS<br>– RFA<br>– SWRT<br>– Customer Agreement Explorer<br>– Proforma Tool, TSSM Template | | Purchaser | Avaya | 12 months | $680 |
| Sales Tools | SAL.5.5 | • Avaya will provide Purchaser access to the below data warehouses:<br>– ADW(Avaya Data Warehouse)<br>– EDW(Enterprise Data Warehouse) are the data warehouses Purchaser may need to support operations | | Purchaser | Avaya | 12 – 24 months | $1,200 |

**Transition Services Agreement (TSA)**

# Section 10: Operations

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Operations – Procurement – Internal Goods and Services Procurement | OPS.5.5 | • Procurement of internal goods and services: Avaya will provide workflow support for purchase order creation, PO approvals, receiving, and supplier management<br>  – Provide training and ad hoc support to answer questions or plan setup, as needed.<br>  – Automated workflow processes are dependent on pre-defined schedule of authorizations; will need to confirm designated authorizers and secure their access to the systems. | | Purchaser | Avaya | 12 months | $1,996 |
| Operations – Procurement – Royalty Tracking | OPS.5.11 | • Avaya will provide Purchaser with detail for royalty payments<br>  – Royalty team will pull monthly or quarterly as applicable reports for royalties owed based on shipped products in SAP<br>  – Royalty team will separate Purchaser specific products and send detailed reports to Purchaser for review and PO creation/payment by Purchaser team<br>  – Royalty team will re-run reports as needed<br>  – Monthly reports detailing any shipments resulting in royalty or license liabilities<br>  – Listing of all contracts, licenses, or royalty agreements<br>  – Shipment of products related to the agreements<br>  – Calculated liabilities resulting from shipments or use of licenses | | Purchaser | Avaya | 12 months | $869 |

101

**Transition Services Agreement (TSA)**

# Section 11: Tax

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Knowledge Transfer | TAX.3.1 | • Avaya tax team will provide Purchaser tax team with historical knowledge transfer, include historical documentation as needed | 4 hours per month for 3 months, then ad hoc up to 4 hours per month for the remaining 3 months | Purchaser | Avaya | 6 months | None |

## B. Excluded Services

The following services would need to be replaced upon the Effective Date and are considered excluded services:

1. Day-to-day functional work (e.g., any tax preparation or filings by Avaya on behalf of Purchaser)
2. Tax Advice

102

**Transition Services Agreement (TSA)**

# Section 12: Accounting & Controlling

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Wipro Services | ACT.4.1 | • Avaya will continue to utilize Wipro services (Global AP, Record to Report, and Financial Planning, Analysis process support and monitor settlements and report on specific AR/AP and inventory on the financials account balances) and charge an amount to Purchaser (until Purchaser creates and transitions to its own contract during the TSA period). Services under this TSA will ramp down as services under new Purchaser contract ramp up<br>One Time Cost TBD (if necessary) | | Purchaser | Avaya | Up to 12 months | $38,513 |
| Wipro Oversight | ACT.1.8 | • Avaya will maintain the Wipro contract and pass through the Purchaser-specific cost. Avaya employees will provide oversight of Wipro for functions utilized by Purchaser, including:<br>– AR Accounting<br>– Cash Accounting<br>– Corporate Accounting<br>– Country Accounting<br>– Fixed Assets<br>– Inter-Entity Accounting<br>– Inventory Accounting<br>– Direct Revenue Accounting<br>– Indirect Revenue Accounting<br>– FP&A<br>– German AP<br>– Cash Payments Hub<br>– AP/GRIR<br>– TREX<br>One Time Cost TBD (if necessary) | | Purchaser | Avaya | 12 months | $6,254 |

103

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Source HOV | ACT.4.2 | • Avaya will continue to utilize Source HOV Accounts Payable services and charge an amount to Purchaser (until Purchaser creates and transitions to its own contract during the TSA period).  Services under this TSA will ramp down as services under new Purchaser contract ramp up<br><br>Source HOV activities include:<br>– Data input<br>– Invoice Matching<br>**Method for performing the TSA:**<br>Avaya will acquire goods and services as an agent for Purchaser based on existing Avaya processes at existing Avaya pricing and conditions to meet Purchaser requirements. Vendor invoices will be processed and settled by Avaya and cost charged to Purchaser.<br>One Time Cost TBD (if necessary) | | Purchaser | Avaya | Up to 12 months | $667 |
| Corporate Accounting & Reporting | ACT.2.4 | • Avaya's accounting & controlling team members will provide book close and general accounts support in the areas of:<br>– Book closing processing (master data management and maintenance)<br>– Corporate accounting<br>– Audit and compliance support (testing support and backup for accounting entries)<br>**Method for performing the TSA:**<br>The Business will be processed in existing Avaya legal entities and will be identified by using master data and order tagging.<br>One Time Cost TBD (if necessary) | | Purchaser | Avaya | Up to 12 months | $9,047 |
| Revenue Accounting[4] | ACT.2.6 | – Avaya's accounting & controlling team members will provide revenue accounting | | Purchaser | Avaya | 12 months | $32,306 |

---

[4] Note to Avaya: Parties to discuss.  Extreme finance will be reaching out to discuss the edits in this section.

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|----------|-----------|----------------------|-------|-----------|----------|----------|--------------|
| | | support in the areas of:<br>— Indirect Accounting<br>— Deferred Revenue- information by customer and release trigger<br>— Revenue Control & Software Cutoff support<br>— Audit Support<br>— Avaya to provide distributor inventory balances by distributor as of Closing or as of the nearest date to Closing that the Distributors report their inventory position.<br>— Avaya shall maintain waterfall schedules and any deferred maintenance services schedules by currency type, invoice #, sku, contract #, start and end date, billing date, purchased business[5] %, customer name, description, currency, amortized amount; remaining amount by month (waterfall). Need details of how percentage allocation to Purchaser was determined [6]; need copies of POs for largest 300 lines.<br>— Provision of information required for Purchaser to determine their revenue recognition on the transactions. Avaya is on a "sales in" revenue recognition basis for its sales to distributors all reporting for sales to distributors will be delivered to Purchaser on sales in basis. Estimates of stock rotations, returns, MDF and other contra-revenue items used to arrive at sell in revenue to be provided.<br>— Avaya to provide VSOE/BESP calculations.<br>— Avaya to provide runoff schedules for deferred carve amortization for monthly | | | | | |

---

[5] Note to Purchaser: Avaya needs more information as to what this is and what the requirements are.

[6] Note to Purchaser: Avaya needs more information as to what this is and what the requirements are.

105

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|----------|-----------|----------------------|-------|-----------|----------|----------|-------------|
| | | waterfalls from RevPro including contingent revenue calculations.<br>– Avaya to perform carve out calculations during period before cut over to Purchaser[7]<br>– Avaya to provide arrangement information.<br>– Avaya to provide FMV dump from RevPro for 12 month history of sales for all SKUs being used for VSOE/BESP determination.<br>– Avaya to provide backup for any other rebate liability and documentation for any continuing rebate programs<br><br>– Avaya shall ensure that all deferred maintenance balances have supporting backup by customer and contract number. Back ups will be maintained by customer for all other activities that could be managed by MJE's.<br><br>– [Avaya shall provide rebate programs and MDF subledgers to Purchaser by customer including expiration policy and dates (Purchaser needs liability account by customer and ongoing calculation of accruals and usage by customer)][8]<br><br>**Method for performing the TSA:**<br>Avaya and its subsidiaries will not transfer their agency type services rights under the Transferred Contracts for the sole purpose of enabling Avaya to | | | | | |

---

[7] Note to Purchaser: Parties to discuss as IT teams to work thru how to segregate the data loaded to Rev Pro.

[8] Note to Purchaser: Service remains open. Avaya does not maintain these rebates by customer balance for Networking only. These are comingled reserves --these rebate and MDF programs are based on the wholistic relationship and value that the business partners and distributors have with Avaya. As a result, Avaya programs crediting consideration are comingled across all of our business units. Avaya will work with Purchaser to devise a reasonable allocation methodology to the NW Business and Avaya will determine a cost for this service.

106

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | provide the administrative services under this TSA as Purchaser's agent including Avaya's ability to ship Purchaser owned product, invoice and collect cash and pay costs on behalf of Purchaser. Avaya will bill customers for Purchaser as an agent. Avaya will bill all costs incurred in completing customer orders to Purchaser. **Avaya and Extreme to work together to determine which accounting principles to apply and to determine a method to perform fair value allocations to this agency based invoicing model. [It is assumed that Purchaser will have a legal entity in all countries where this section of the TSA is implemented; if this is not the case. there would be a further** One Time Cost TBD (if necessary) **]**[9] | | | | | |
| Regional Controllership Support | ACT.2.5 | • Avaya's accounting & controlling team members will provide regional controllership support to Purchaser, including:<br>– EMEA<br>– APAC<br>– AI<br>– support the analysis/extraction for VAT return prep by Extreme<br><br>**Method for performing the TSA**:<br>Entries will be recorded on Avaya's books and transmitted to the Purchaser to be replicated in its books.<br>This service includes the preparation of cutoff entries and other adjustments in accordance with US GAAP. These adjustments will relate to legacy Avaya networking business for the QTC and P2P processes only (Revenue adjustments are not in scope)<br>One Time Cost TBD (if necessary) | | Purchaser | Avaya | 12 months | $47,912<br><br>$8,476 |

---

[9]    Note to Draft:   Open; parties to discuss.

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Inventory Accounting | ACT.2.1 ACT.2.2 | <ul><li>Avaya will provide inventory accounting services for Purchaser, including:</li></ul>— Inventory Management<br>— Support Contract Management<br>— Intercompany transfers of maintenance and service materials<ul><li>As part of such inventory account services, Avaya will provide monthly reports to Purchaser with the following information:</li><li>Monthly finished goods inventory details including the following:<ul><li>Quantity by part number and location</li><li>Cost by part number</li><li>Related inventory reserves by part number and supporting calculations</li><li>Scrap by part number</li><li>Any in transit inventory</li><li>Un-invoiced receipts of inventory (to book accruals)</li><li>Supporting reports/details of inventory transactions by part number including receipts, shipments, scrap, returns</li></ul></li><li>Monthly raw material details including the following:<ul><li>Quantity by part number and location</li><li>Cost by part number</li><li>Related inventory reserves by part number and supporting calculations</li><li>Scrap by part number</li><li>Any in transit inventory</li><li>Un-invoiced receipts of inventory (to book accruals)</li><li>Supporting reports/details of inventory transactions by part number including</li></ul></li></ul> | | Purchaser | Avaya | 12 months | $3,793 |

108

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | receipts, usage, scrap by supplier/location<br>• Is any of the raw inventory considered excess or obsolete<br>• Monthly service or warranty part details including the following:<br>  • Quantity by part number and location<br>  • Cost by part number (How is service inventory costed and valued)<br>  • Related inventory reserves by part number and supporting calculations<br>  • Scrap by part number<br>  • Any in transit inventory<br>  • Supporting reports/details of inventory transactions by part number including receipts, usage, scrap, returns<br>  • Monthly usage of inventory by contract/customer for warranty and repair<br><br>**Method for performing the TSA:**<br>Inventory will continue to be held by Avaya and recorded in Avaya's books prior to being shipped to end customer / Purchaser.<br>[It is assumed that Purchaser will hold a legal entity in all countries where maintenance inventory will be held.][10]<br>One Time Cost TBD (if necessary) | | | | | |
| Accounting Tools | ACT.5.1 | • Avaya will ensure ongoing system access to sales out/inventory for Purchaser employees | Access limited to Purchaser specific data | Purchaser | Avaya | 12 months | $[_] |

---

[10] Note to Avaya: Parties to discuss. Extreme currently has warehouses in the US, Hong Kong and Ireland for finished goods, however the inventory is all booked on the US parent company. Extreme tax to reach out to discuss any issues- please indicate which countries maintenance inventory is currently held.

109

**Transition Services Agreement (TSA)**

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

# Section 13: FP&A

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| FP&A Tools | FPA.5.1 FPA.5.2 FPA.5.3 FPA.5.4 FPA.5.5 FPA.5.6 | • Avaya will ensure access for Purchaser employees to below systems to enable execution of FP&A functions including: <br> – PAC Reporting <br> – Royalties Reporting <br> – Channel Analytics cube <br> – Opportunity Analytics cube <br> – Bookings Cube <br> – Maintenance Cube <br> – Contract TCV (contract demand and financial analytics) | Access limited to Purchaser specific data | Purchaser | Avaya | 12 Months | $[_] |
| Corporate FP&A Support | FPA.2.1 | • Avaya will provide corporate FP&A services to Purchaser including: <br> – Profit/Loss Reporting <br> – Balance Sheet Reporting <br> – Actual vs. Plan <br> – Margins <br> – SG&A Analysis | | Purchaser | Avaya | 6 months | $1,608 |
| Services FP&A Support | FPA.2.4 | • Until Purchaser is able to develop its services FP&A function, Avaya will provide services FP&A support activities consistent with current practices to Purchaser including: <br> – Data Extractions & Analysis <br> – Service Setup <br> – Bill & Hold Analysis <br> – Selling Cycle Extracts & Analysis <br> – Discount Analysis <br> – Monthly close activities (incl. posting of accruals, balance sheet reserve analysis, Manual Journal Entries) | | Purchaser | Avaya | 6 months | $9,168 |

111

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Sales/APS FP&A Support | FPA.2.5 | • Until Purchaser is able to develop its APS FP&A function, Avaya will provide APS FP&A support activities consistent with current practices to Purchaser including:<br>– Forecasting<br>– Planning<br>– Expense Management<br>– Delivery cost analysis<br>– Utilization analysis<br>– Capacity<br>– Margin Analysis<br>– Indirect Reserve/Channel Accounting | | Purchaser | Avaya | 6 months | $13,938 |
| Knowledge Transfer | FPA.2.6 | • Avaya will provide knowledge transfer support and answer general questions as needed around including:<br>– Royalties<br>– Corporate FP&A<br>– Product Hierarchy<br>– Reporting Structure | Available for the following defined hours:<br>– 15hr/month<br>– 10hr/month<br>– Up to 10hr/mo<br>– Up to 10 hr/mo<br>– Up to 3 hr/mo | Purchaser | Avaya | 6 months | None |
| GSS FP&A Support | FPA.2.7 | • Avaya will provide a collection of customer & business facing activities:<br>– Bill Hold analysis<br>– Discounting<br>– Renewal set-up<br>– Data analytics associated with billing | | Purchaser | Avaya | 12 months | $4,813 |

112

**Transition Services Agreement (TSA)**

# Section 14: Treasury

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Knowledge Transfer | TR.2.8 | • Avaya will provide knowledge transfer support and answer general questions from Purchaser treasury | Available up to 10 hours per month for duration of the service. | Purchaser | Avaya | 3 months | None |

113

US-DOCS\78259466.11

**Transition Services Agreement (TSA)**

# Section 15: Supply Chain

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Provisioning – Transportation | SUP.1 | • Avaya will cover all transportation required for provisioning - from manufacturer to warehouse, warehouse to customer delivery (inbound and outbound transport), etc.<br>• Purchaser will be charged the exact (actuals) amount per unit per code - NOT an estimated amount.<br><br>Day 1:<br>• Avaya will continue to provide transportation for Purchaser provisioning.<br>*Note:<br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate.  Monthly billings will reflect  cost, be substantiated by amount of kgs transported (per kg rate) and meet agreed upon SLAs. | | Purchaser | Avaya | Up to 12 months | $210,399* |
| Provisioning – Warehouse | SUP.2 | • Avaya will cover all warehousing usage and contracts with warehouse providers.<br>• Pass through on transactional costs, and agreed-upon percentage of fixed overhead costs.<br>• Pass through on OPEX of the warehouse in Dietzenbach, Germany<br><br>Day 1:<br>• Avaya will continue to provide warehousing access for Purchaser provisioning.<br>*Note:<br>The cost associated with this service is variable | Same level of warehousing space etc. provided. | Purchaser | Avaya | Up to 12 months | $131,460* |

114

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate. Monthly billings will reflect cost incurred, be substantiated with units received, units ship, units kitting and an allocation of fixed cost determined by units percentage total and meet agreed upon SLAs. | | | | | |
| Provisioning – Duties | SUP.3 | • Avaya will cover cost of duties for all Networking products shipped. Pass through (actual) costs for legal importation duties. (Part number by duty). <br>• Note: Avaya uses Giant for 3rd party importation paperwork, etc. <br>• Some importation covered in the US directly taken out of Avaya's account - will pass along costs for US Treasury, Avaya also supports documentation. Any responsibilities related to administrative / documentation are covered under HC TSA for Supply Chain. <br><br>Day 1: <br>• Avaya will continue to pay for Purchaser Provisioning duties <br>*Note: <br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate. Monthly billings will reflect cost incurred, be substantiated by amount of units as a percentage of total units times the average duty rate in each affected jurisdiction and meet agreed upon SLAs. | Same level of duty management / payment provided. | Purchaser | Avaya | Up to 12 months | $68,428* |

115

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Services – Transportation | SUP.4 | • Avaya to cover all transportation required for servicing - includes the cost of all transportation associated with services - paid for product return, customer product replacement, and new parts & product to repair facility<br><br>Day 1:<br>• Avaya will continue to provide transportation for Purchaser Services<br>*Note:<br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate.   Monthly billings will reflect cost incurred, be substantiated by amount of kgs transported (per kg rate) and meet agreed upon SLAs. |  | Purchaser | Avaya | Up to 12 months | $75,211* |
| Services – Warehouse | SUP.5 | • Avaya to cover all warehousing required for servicing - transactional vs. fixed cost breakdown - TBD<br><br>Day 1:<br>• Avaya will continue to provide warehousing for the Business Note:<br>*Note:<br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate.  Monthly billings will reflect cost incurred, be substantiated units received, units ship, units kitting and an allocation of fixed cost determined by units percentage total) and meet agreed upon SLAs. |  | Purchaser | Avaya | Up to 12 months | $66,565* |

116

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Services – Duties | SUP.6 | <ul><li>Avaya to cover all duties required for imported inventory related to servicing - tracked by countries, by part</li><li>Pass through (actual) cost from Avaya to Purchaser</li><li>Third party provider is Excel Xma</li></ul>Day 1:<ul><li>Avaya will continue to manage duties (payment) for Purchaser Services</li></ul>*Note:<br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate.  Monthly billings will reflect cost incurred, be substantiated by amount of units as a percentage of total units times the average duty rate in each affected jurisdiction and meet agreed upon SLAs. | | Purchaser | Avaya | Up to 12 months | $17,187* |
| Services – Repair | SUP.7 | <ul><li>Avaya to cover all repair costs required for servicing: includes labor + parts + packaging + any potential fixed costs</li></ul>Day 1:<ul><li>Avaya will continue to service repair requests from Purchaser Services</li></ul>*Note:<br>The cost associated with this service is variable impacted by product revenue and service returns; consequently the cost indicated for this TSA item is an estimate.  Monthly billings will reflect cost incurred, be substantiated by number of units times the contracted rate (variable cost) and a percentage of total units times the fixed cost , and meet agreed upon SLAs. | | Purchaser | Avaya | Up to 12 months | $197,671* |

117

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Other - Professional Svcs – OEFC | SUP.8 | • Avaya will continue to provide OEFC (Order to Cash) support to Networking. Service support includes: collections, billing, order entry, automation, printing cost for US invoice.<br><br>– Collections: Collections process includes: calling customers (live or auto-dial), confirming customer payment or dispute, managing dispute process, and managing agreement cancellations. International team also uses outsourced partners.<br><br>– Order Entry: Avaya order management personnel gain operational efficiencies by distributing work based on order volume, not products ordered. As such, all personnel are trained to continue processing Purchaser orders. Order entry is highly automated from quote to order to invoicing such that the majority of orders are 'touchless', meaning they do not require handling by order management personnel. Exception orders that require handling will be supported by Avaya order entry personnel.<br><br>– Invoicing: Invoice creation is a highly automated process that is driven by the order entry process. When an order is closed, it automatically generates an invoice within SAP. This automated process is considered 'touchless'. Exception invoices that require handling will be supported by Avaya order entry personnel. There are three options to distribute invoices: print vendor, email, and online website (US only). This is a manual process and complexity is driven by country | | Purchaser | Avaya | Up to 12 months | $85,812 |

118

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | and customer profile.<br><br>Day 1:<br>• Avaya will continue to manage OEFC function for Purchaser<br>• Monthly billings will reflect actual cost incurred and meet agreed upon SLAs. | | | | | |
| Other - Professional Svcs – Baxter | SUP.9 | • Avaya to cover 3rd party software that also does planning services for maintenance<br>• Tool cost is considered under Corporate IT<br><br>Day 1:<br>• Avaya will continue to manage relationship with Baxter for Purchaser demand planning<br>• Monthly billings will reflect actual cost incurred and meet agreed upon SLAs. | | Purchaser | Avaya | Up to 12 months | $7,111 |
| Other - Professional Svcs – Products | SUP.10 | • Avaya to cover services from On Process, Sutherland, Wipro, WWT, Infosys, LiteON, Tapfin, and other. Includes headcount for contractors used for quality<br><br>Day 1:<br>• Avaya will continue to manage for Purchaser<br>• Monthly billings will reflect actual cost incurred and meet agreed upon SLAs. | | Purchaser | Avaya | Up to 12 months | $32,226 |
| HC - overall PC TSA | SUP.11 | • Avaya will continue to provide assistance (in terms of ongoing functional support) for the following areas:<br>— Supply Chain (6 FTEs): ongoing demand planning, supply chain, logistics, and analytics support<br>— OEFC (15 FTEs): ongoing order entry, billing, collections, automation support<br>— GSO (2 FTEs): ongoing support for COUPA / back-end SAP entry correction and royalty | | Purchaser | Avaya | Up to 12 months | $356,549* |

119

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | payment tracking (please note these are accounted for in OPS.5.6 and OPS.5.11)<br>— Management (10 FTEs): ongoing 21% MLP Management support to oversee support for supply chain, OEFC, GSO, and any other continued operational support<br><br>Day 1:<br>• Avaya will continue to support operations for NW<br>• Monthly billings will reflect actual cost incurred and meet agreed upon SLAs.<br>• *Monthly billings will reflect actual costs incurred, be substantiated as agreed upon SLAs as follow:<br>  - Direct Labor 23 FTEs (Supply Chain, OEFC and GSO): Avaya will use Purchaser sales order quantity as a percentage of total hardware sales order times the number of FTEs allocated to deliver the business capability to the Purchaser using an average labor costs rate ($106k per year) for the duration of the Supply Chain TSA's. Upon termination of each Supply Chain TSA item, the Direct Labor FTEs associated will also be terminated at the end of the month of termination effective date. Management Labor 10 FTEs: Avaya will use Purchaser sales order quantity as a percentage of total hardware sales order times a percentage of active Supply Chain TSA items using an average labor costs rate ($185k per year) for the duration of the Supply Chain TSA's. Upon termination of each Supply Chain TSA item, the Management Labor FTEs | | | | | |

120

**Transition Services Agreement (TSA)**

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| | | associated will also be terminated at the end of the month of termination effective date. | | | | | |
| Other- Data Base Access | SUP.12 | • Avaya will continue to provide access to the following databases:<br>- Defects Management<br>- NCI<br>- PJ Cube<br>- Warehouse<br>- Transportation<br>- Authentic Avaya<br>- Lab Cube<br>- Facilities Management<br>- CRO<br>- LFS | | Purchaser | Avaya | Up to 12 months | $[_] |

121

**Reverse Transition Services Agreement (rTSA)**

# Exhibit B
# Reverse Transition Service Schedule

**Exhibit B – Reverse TSA Sections:**

- Section 1: Services – APS
- Section 2: Services – Maintenance
- Section 3: HR
- Section 4: Real Estate

**Reverse Transition Services Agreement (rTSA)**

# Section 1: APS

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| In-flight project implementation | APS.2.6 | • Access to professional services staff that are going with the Business in order to support in-flight projects transferred to Avaya during transition period to complete implementation or project work | Complete projects based on scope of work and within the established timelines<br><br>Charged on a variable basis at $110 per hour | Avaya | Purchaser | 12 months or completion of identified projects | $[_]<br><br>$[0] net, based on assumption that reverse TSA APS.2.6 will offset the cost |

123

**Reverse Transition Services Agreement (rTSA)**

# Section 2: Maintenance

## A. Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Cross-business Products and Obligations | GSS.2.9 | • Purchaser to provide support for Avaya's maintenance and support products and obligations. Services include:<br>— Tier 1 - 3 services for interoperability support issues<br><br>Based on current client established SLAs on contractual agreements | Charged on a variable basis at $78 per hour | Avaya | Purchaser | 12 months | $[0] net, based on assumption that TSA GSS.2.10 will offset the cost |
| Support Services | GSS.2.11 | • Purchaser will provide support to Avaya's APCS products and obligations. Services include:<br>- Tier 1 – 3 services for interoperability support issues related to APCS<br><br>Based on current client established SLAs on contractual agreements | Charged on a variable basis at $78 per hour | Avaya | Purchaser | 12 months | $1,050 estimated base on historical usage |

124

**Reverse Transition Services Agreement (rTSA)**

# Section 3: HR

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Monthly Cost |
|---|---|---|---|---|---|---|---|
| Background Screening – Knowledge Transfer | HR.2.8 | • Purchaser to provide consultation for employee background screening services to Avaya until Avaya can effectively replace knowledge.  Role includes:<br>– New Hire Processing<br>– Customer Contract management | Available up to 10 hours per month | Avaya | Purchaser | 12 months | None |

125

**Reverse Long Term Agreement (rLTA)**

# Exhibit C
# Reverse Long Term Agreement

The parties will sign a separate Long Term Support Agreement for Purchaser to provide support for Business products being used internally by Avaya.

**Exhibit C – Reverse LTA Sections:**

- Section 1: IT

**Reverse Transition Services Agreement (rTSA)**

# Section 1: IT

## A.  Service Schedule

| Category | Identifier | Detailed Requirements | Notes | Recipient | Provider | Duration | Annual Cost |
|---|---|---|---|---|---|---|---|
| Infrastructure - Datacenter Facilities | IT.1a | • IT uses Avaya Network equipment & will need an agreement to support (failures, bug fixes, etc.).<br>• FY15-16 spend on equipment was $2.76M<br>• Estimated annual spend on an agreement @ 10% would be $0.28M<br>Day 1:<br>• Support for Avaya Network equipment continues | 99.9% Availability<br><br>Bug fixes addressed w/in 48 hrs. | Avaya | Purchaser | Annual Renewal | $276,000 |

127

## Exhibit B

**Purchaser Transition Services**

**Exhibit C**

**Excluded Seller Services**

## Exhibit D

## Excluded Purchaser Services

**<u>Exhibit E-1</u>**

**IT Firewall Policies**

## FORM OF INTELLECTUAL PROPERTY LICENSE AGREEMENT

This INTELLECTUAL PROPERTY LICENSE AGREEMENT (this "**Agreement**") is dated as of [●], 2017 (the "**Effective Date**") and is by and between AVAYA INC., a Delaware corporation ("**Avaya**"), and EXTREME NETWORKS, INC., a Delaware corporation ("**Purchaser**"). Avaya and Purchaser are each sometimes referred to herein individually as a "**Party**" and are collectively referred to herein as the "**Parties**." Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).[1]

WHEREAS, Purchaser and Avaya have entered into that certain Asset Purchase Agreement, dated March 7, 2017 (the "**Purchase Agreement**"), pursuant to which Avaya has agreed to, and to cause the applicable Sellers to, sell, transfer, assign and deliver to Purchaser, and Purchaser has agreed to purchase, acquire and accept from the applicable Sellers, all of Avaya's and the applicable Sellers' right, title and interest in and to the Transferred Assets, all upon the terms and subject to the conditions set forth in the Purchase Agreement, which assets include the Transferred Intellectual Property;

WHEREAS, the Avaya Parties (as defined below) own certain Intellectual Property and Technology (each as defined in the Purchase Agreement) that are used in the Business as of the Effective Date but that are not included in the Transferred Intellectual Property and the Avaya Parties desire to grant, and the Purchaser Parties (as defined below) desire to receive, a limited license to such Intellectual Property and Technology solely in accordance with the terms and conditions of this Agreement; and

WHEREAS, the Transferred Intellectual Property includes certain Intellectual Property and Technology that is used in the Retained Business (as defined below) and the Purchaser desires to grant, and the Avaya Parties desire to receive, a limited license to such Transferred Intellectual Property solely in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## 1.    DEFINITIONS

1.1    <u>Certain Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"**Acquired Business**" shall have the meaning set forth in <u>Section 2.4(c)</u>.

"**Acquirer**" shall have the meaning set forth in <u>Section 9.1(a)</u>.

"**affiliate**" shall have the meaning ascribed to such term in the Purchase Agreement.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Assigning Party Products**" means, with respect to a person or a Divested Business, the products and services of such person's business or such Divested Business, as applicable, that (a) are covered by the licenses granted to such person or such Divested Business hereunder as of the effective

---

[1]    **Note to Draft**: Prior to execution, Avaya may, in its discretion, add additional signatory entities that are legal owners of certain licensed IP.

date of a Change of Control Event with respect to such person in accordance with Section 9.1(a)(i) or the assignment of this Agreement by such person in accordance with Section 9.1(a)(ii); and (b) (i) which such person or Divested Business was licensing or selling on a commercial basis prior to the effective date of such Change of Control Event or such assignment, or (ii) were under development by such person or Divested Business prior to the effective date of such Change of Control Event or such assignment (as evidenced by written or electronic records of such person) and are licensed or sold by such person or Divested Business on a commercial basis within twelve (12) months after the effective date of such Change of Control Event or such assignment; and (iii) any Natural Evolutions of the products and services described under clauses (i) and (ii) above.

"**Avaya**" shall have the meaning set forth in the Preamble.

"**Avaya Licensed Other Intellectual Property**" means all Intellectual Property (other than Patents, trademarks, and domain name registrations) and Technology (including any Software and related Source Code) owned by the Avaya Parties as of the Closing in or to any of the following: (a) Software incorporated in the Business Products (other than Legacy Business Products); (b) user and technical documentation; (c) marketing materials; (d) specifications; and (e) engineering drawings, in each case of (a) through (e) that relate to the Business Products (other than Legacy Business Products) and are owned by the Avaya Parties as of the Closing and used in connection with the operation of the Business by the Avaya Parties prior to or as of the Closing. "Avaya Licensed Other Intellectual Property" does not include the Avaya Retained Specified Software or, except as provided in the preceding sentence, any Excluded Intellectual Property, but does include, for the avoidance of doubt, the System Manager Software.

"**Avaya Licensed Patents**" means all Patents owned by the Avaya Parties as of the Closing and used in connection with or otherwise necessary for the operation of the Business as operated by the Avaya Parties prior to or as of the Closing.

"**Avaya Licensed Products**" means the Avaya Retained Products, including all Natural Evolutions thereof.

"**Avaya Parties**" means Avaya and each of its subsidiaries.

"**Avaya Retained Products**" means any products and services of the Avaya Parties as part of the Retained Business, but excluding, for the avoidance of doubt, the Business Products.

"**Avaya Retained Specified Software**" means the SAL Software and the SLAMon Software.

"**Avaya Subcontractors**" means any Contractor doing work on behalf of an Avaya Party and who are bound by written agreements that include terms and conditions at least as protective of the Transferred Other Intellectual Property as the terms and conditions in this Agreement, and in no event less than reasonable protections of the Transferred Other Intellectual Property.

"**Business Products**" shall have the meaning ascribed to such term in the Purchase Agreement.

"**Change of Control Event**" shall have the meaning set forth in Section 9.1(a)(i).

"**Confidential Information**" shall have the meaning set forth in Section 8.1.

2

"**Contractor**" means, with respect to a Party, an independent third party contracted by such Party or any of its affiliates to perform services for and on behalf of such Party or such Party's affiliates, including: distribution, re-sale, integration, installation, development, design, manufacture, production, testing, and service and support.

"**Corporate Reorganization**" means, with respect to a Party, a corporate reorganization of such Party in which the ultimate ownership of such Party immediately prior to such reorganization is the same as the ultimate ownership of such Party immediately after such reorganization.

"**Divested Business**" shall have the meaning set forth in Section 9.1(a)(ii).

"**Effective Date**" shall have the meaning set forth in the Preamble.

"**Electronic Delivery**" shall have the meaning set forth in Section 9.6.

"**Excluded Intellectual Property**" means any Intellectual Property or Technology (a) provided or otherwise made available under the Transition Services Agreement or (b) used in connection with any Avaya Party's provision of the Seller Transition Services (as defined in the Transition Services Agreement).

"**Improvements**" shall have the meaning set forth in Section 4.1.

"**Licensed Business Products**" means the Business Products, including all Natural Evolutions thereof, but in all cases excluding any Avaya Retained Product.

"**Licensed Intellectual Property**" means the Licensed Patents and the Licensed Other Intellectual Property.

"**Licensed Patents**" means the Avaya Licensed Patents and the Transferred Patents.

"**Licensed Other Intellectual Property**" means the Avaya Licensed Other Intellectual Property, the Transferred Other Intellectual Property, and the Avaya Retained Specified Software.

"**Merger Sub**" means a subsidiary of an Acquirer that is formed or created solely for the purpose of effecting an applicable Change of Control Event.

"**Natural Evolutions**" means, with respect to an Avaya Retained Product or a Business Product, logical evolutions, expansions, enhancements, adaptations, derivatives, and modifications of such Avaya Retained Product or Business Product, including any new versions, releases of such Avaya Retained Product for use in the Retained Business or Business Product for use in the Business.

"**Object Code**" means the fully compiled version of a software program that can be executed by a computer and used by an end user of that program without further compilation.

"**Parties**" and "**Party**" shall have the meaning given to such terms in the Preamble.

"**Patents**" means any patents and patent applications, including all reissues, divisions, renewals, extensions, provisional, continuations and continuations-in-part thereof, and foreign counterparts thereto.

"**Purchase Agreement**" shall have the meaning set forth in the Preamble.

3

"**Purchaser**" shall have the meaning set forth in the Preamble.

"**Purchaser Parties**" means Purchaser and each of its subsidiaries.

"**Purchaser Subcontractors**" means any Contractor doing work on behalf of a Purchaser Party and who are bound by written agreements that include terms and conditions at least as protective of the Avaya Licensed Other Intellectual Property as the terms and conditions in this Agreement, and in no event less than reasonable protections of the Avaya Licensed Other Intellectual Property.

"**Retained Business**" means the business(es) of the Avaya Parties as of or prior to Closing, other than the Business.

"**SAL Software**" means the Software products owned by the Avaya Parties as of the Closing and known as of the Closing as "Secure Access Link Gateway," whether delivered individually or as part of the "Avaya Diagnostic Server" Software product package, or through any other Software product or package.

"**SLAMon Software**" means the Software products owned by the Avaya Parties as of the Closing and known as of the Closing as "SLAMon Server version 2.0" and "SLAMon Server version 2.5."

"**Source Code**" means one or more statements in human-readable form, including comments, definitions, and annotations, which are generally formed and organized to the syntax of a computer or programmable logic programming language, together with any and all text, data and data structures, diagrams, manuals, instructions, procedures, build scripts, test scripts, compilation tools, and other information that describe the foregoing.

"**Specified Business Products**" means the Business Products known as of the Closing as "SDN Fx Healthcare Solution ("Surge")" and "AFO, provided that, in the case of Surge, this includes only versions and releases of such Business Product existing as of the Closing, and, in the case of AFO, this includes only those versions and releases of such Business Product in existence as of or prior to August 1, 2017.

"**subsidiary**" shall have the meaning ascribed to such term in the Purchase Agreement.

"**Switching Products**" means networking switching products.

"**System Manager Software**" means the "Single Sign-On (SSO)," "Role-based Access Control (RBAC)," "Trust Management (TM)," and "Licensing (WebLM)" components of the Software product known as of the Closing as "Avaya Aura System Manager." For the avoidance of doubt, "System Manager Software" does not include the Software products known as of the Closing as "WebLM Plug-in" and "WebLG."

"**Transferred Other Intellectual Property**" means all Intellectual Property (other than Patents, trademarks, and domain name registrations) and Technology (including any Software and related Source Code) included in the Transferred Intellectual Property, including, for the avoidance of doubt, the Transferred Specified Software.

"**Transferred Patents**" means all Patents included in the Transferred Intellectual Property.

4

"**Transferred Specified Software**" means the Software products known as of the Closing as "Pod Visualization Manager," "Management Server Console," "Pod Utility Module," and "Visualization Performance and Fault Management (VPFM)."

"**Transition Services Agreement**" means that certain Transition Services Agreement, dated [●], 2017, by and between Avaya and Purchaser.

## 2.    LICENSE TO THE PURCHASER PARTIES

2.1    License to Avaya Licensed Patents.  Subject to the terms and conditions of this Agreement, Avaya, on behalf of the Avaya Parties, hereby grants to the Purchaser Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable, non-transferable (except as provided in Section 9.1) license under the Avaya Licensed Patents to make, have made, develop, use, lease, sell and offer for sale (directly or indirectly), import, support and service (and to practice or have practiced any methods involved in any of the foregoing) and otherwise dispose of the Licensed Business Products.

2.2    License to Avaya Licensed Other Intellectual Property.  Subject to the terms and conditions of this Agreement, Avaya, on behalf of the Avaya Parties, hereby grants to the Purchaser Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable (except as provided in the following sentence), non-transferable (except as provided in Section 9.1) license under the Avaya Licensed Other Intellectual Property (a) to use, reproduce, prepare derivative works of, perform, display, and distribute (through multiple tiers of distribution) the Avaya Licensed Other Intellectual Property (other than Software) and (b) with respect to any Avaya Licensed Other Intellectual Property consisting of Software, to (i) use, reproduce, perform, display, modify, enhance, and create derivative works of the Source Code version of such Software, (ii) compile the Source Code version of such Software into the Object Code version of such Software, and (iii) use, reproduce, perform, display and distribute (through multiple tiers of distribution) the Object Code version of such Software, in each case of (a) and (b), in connection with making, having made, using, selling, offering for sale, importing, supporting and servicing, and otherwise disposing of, the Licensed Business Products.  The Purchaser Parties may sublicense the rights granted in this Section 2.2 to Purchaser Subcontractors solely for the purposes of such Purchaser Subcontractors performing work on behalf of a Purchaser Party.

2.3    Avaya Retained Specified Software.

(a)    *SLAMon Software*.  Subject to the terms and conditions of this Agreement, Avaya, on behalf of the Avaya Parties, hereby grants to the Purchaser Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable (except as provided in the following sentence), non-transferable (except as provided in Section 9.1) license under, to the extent owned by an Avaya Party as of the Closing, the Intellectual Property (other than Patents, trademarks, and domain name registrations) and Technology in and to the SLAMon Software to (a) use, reproduce, perform, display, modify, enhance, and create derivative works of the Source Code version of the SLAMon Software, (b) compile the Source Code version of the SLAMon Software into the Object Code version of the SLAMon Software, and (c) use, reproduce, perform, display, and distribute (through multiple tiers of distribution) the Object Code version of the SLAMon Software, in each case of (a) through (c) solely in connection with making, having made, using, selling, offering for sale, importing, support and servicing, and otherwise disposing of, the Switching Products.  The Purchaser Parties may sublicense the rights granted in this Section 2.3(a) to Purchaser Subcontractors solely for the purposes of such Purchaser Subcontractors performing work on behalf of a Purchaser Party.

5

(b)      *SAL Software*.  Subject to the terms and conditions of this Agreement, Avaya, on behalf of the Avaya Parties, hereby grants to the Purchaser Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable (except as provided in the following sentence), non-transferable (except as provided in Section 9.1) license under, to the extent owned by an Avaya Party as of the Closing, the Intellectual Property (other than Patents, trademarks, and domain name registrations) and Technology in and to the SAL Software to (i) use, reproduce, perform, display, modify, enhance, and create derivative works of the Source Code version of such Software, (ii) compile the Source Code version of such Software into the Object Code version of such Software, and (iii) use, reproduce, perform, display and distribute (through multiple tiers of distribution) the Object Code version of such Software, in each case of (i) through (iii), in connection with making, having made, using, selling, offering for sale, importing, supporting and servicing, and otherwise disposing of, the Specified Business Products.  The Purchaser Parties may sublicense the rights granted in this Section 2.3(b) to Purchaser Subcontractors solely for the purposes of such Purchaser Subcontractors performing work on behalf of a Purchaser Party.

2.4      Certain Limitations.

(a)      Anti-Foundry.  The licenses granted pursuant to Sections 2.1, 2.2, and 2.3 do not extend to any products or services that are (i) designed by or for a third party without substantial input from a Purchaser Party and manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred from a Purchaser Party to such third party (or to customers of, or as directed by, such third party), (ii) designed, manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred through or by a Purchaser Party for or on behalf of a third party for the purpose of attempting to make such product or service licensed, exhausted, or immune under any Avaya Licensed Patent, or (iii) designed, manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred through or by a Purchaser Party as a reseller for or on behalf of a third party. With respect to clause (iii), a Licensed Business Product that would otherwise be licensed under this Agreement shall not cease to be so licensed as a result of the inclusion in such product of a third party product, provided that such Licensed Business Product shall not be licensed under this Agreement with respect to such third party product on a stand-alone basis.  By way of example, if a Purchaser Party includes a third party chipset in a Licensed Business Product that would otherwise be licensed under this Agreement in the absence of the inclusion of such chipset, such Licensed Business Product shall not cease to be so licensed by virtue of clause (iii), but such chipset shall not be licensed under this Agreement on a stand-alone basis.  For clarity and without limiting the foregoing, if a Purchaser Party includes in one of its products a third party product and such inclusion results in such Purchaser Party product not constituting a "Licensed Business Product," such Purchaser Party product shall no longer be licensed under this Agreement.

(b)      Subsidiaries.  Except as otherwise provided in Section 9.1(c), the licenses granted to any Purchaser subsidiary pursuant to Sections 2.1, 2.2, and 2.3 shall continue for only as long as such person is a subsidiary of Purchaser and shall immediately terminate when such person ceases to be a subsidiary of Purchaser.

(c)      Certain Transactions.  If any Purchaser Party acquires any business, product line, or person (each, an "**Acquired Business**"), whether by transfer of assets, merger, transfer of equity interests, or otherwise, the licenses granted pursuant to Sections 2.1, 2.2, and 2.3 shall not extend to, and the Licensed Business Products shall not include, any product or service of such Acquired Business, even if such Acquired Business is transferred to, merged with, or licensed to any Purchaser Party (in any manner).

6

2.5     Transfer of Licensed Intellectual Property by Avaya.  Nothing herein shall prevent an Avaya Party from selling, assigning, encumbering, pledging, or transferring, in whole or in part, any of the Avaya Licensed Patents, Avaya Licensed Other Intellectual Property, or Avaya Retained Specified Software, provided that any such sale, assignment, or transfer shall be subject to the licenses granted to Purchaser Parties herein.

2.6     Downstream Rights.  The licenses granted to the Purchaser Parties pursuant to Section 2.1 attach to and are transferred with any Licensed Business Product covered by, incorporating or using any Avaya Licensed Patent, and pass to each distributor, reseller, customer, Contractor, vendor, and end-user of such Licensed Business Product.  For the avoidance of doubt, the only license provided to distributors, resellers, customers, Contractors, vendors, and end-users of such Licensed Business Products relates solely and specifically to such Licensed Business Products and shall not apply in any way to any other products or services used, sold, or otherwise made available by distributors, resellers, customers, Contractors, vendors, and end-users.

2.7     Reservation of Rights.  All rights not granted to the Purchaser Parties herein are expressly reserved.  Without limiting the foregoing, Purchaser acknowledges and agrees that, as between the Parties, Avaya or one of the other Avaya Parties owns the Avaya Licensed Patents, Avaya Licensed Other Intellectual Property, and Avaya Retained Specified Software and that, except as expressly provided in this Agreement, no other rights or licenses, express or implied, are granted by Avaya or one of the other Avaya Parties to the Purchaser Parties hereunder, and that the Purchaser Parties shall not exercise any of their rights with respect to any Avaya Licensed Patents, Avaya Licensed Other Intellectual Property, and Avaya Retained Specified Software, in each case other than as expressly permitted under this Agreement.

2.8     Disclosure and Delivery.  Except as set forth in the Purchase Agreement, the Purchaser Parties acknowledge and agree that the Avaya Parties have no technology transfer, delivery, support, maintenance, training, consulting, or other similar obligations.

3.      **LICENSE TO THE AVAYA PARTIES**

3.1     License to Transferred Patents. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to the Avaya Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable, non-transferable (except as provided in Section 9.1) license under the Transferred Patents to make, have made, develop, use, lease, sell and offer for sale (directly and indirectly), import, support and service (and to practice or have practiced any methods involved in any of the foregoing), and otherwise dispose of, the Avaya Licensed Products.

3.2     License to Transferred Other Intellectual Property.  Subject to the terms and conditions of this Agreement, Purchaser hereby grants to the Avaya Parties a non-exclusive, royalty-free, fully paid-up, worldwide, irrevocable, non-sublicensable (except as provided in the following sentence), non-transferable (except as provided in Section 9.1) license under the Transferred Other Intellectual Property (a) to use, reproduce, prepare, derivative works of, perform, display, and distribute (through multiple tiers of distribution) the Transferred Other Intellectual Property (other than Software) and (b) with respect to any Transferred Other Intellectual Property consisting of Software, to (i) use, reproduce, perform, display, modify, enhance, and create derivative works of the Source Code version of such Software, (ii) compile the Source Code version of such Software into the Object Code version of such Software, and (iii) use, reproduce, perform, display and distribute (through multiple tiers of distribution) the Object Code version of such Software, in each case of (a) and (b), in connection with making, having

7

made, using, selling, offering for sale, importing, supporting and servicing, and otherwise disposing of, the Avaya Licensed Products. The Avaya Parties may sublicense the rights granted in this <u>Section 3.2</u> to Avaya Subcontractors solely for the purposes of such Avaya Subcontractors performing work on behalf of an Avaya Party.

        3.3      <u>Certain Limitations</u>.

        (a)      <u>Anti-Foundry</u>. The licenses granted pursuant to <u>Sections 3.1</u> and <u>3.2</u> do not extend to any products or services that are (i) designed by or for a third party without substantial input from an Avaya Party and manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred from an Avaya Party to such third party (or to customers of, or as directed by, such third party), (ii) designed, manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred through or by an Avaya Party for or on behalf of a third party for the purpose of attempting to make such product or service licensed, exhausted, or immune under any Transferred Patent, or (iii) designed, manufactured, reproduced, sold, leased, licensed, distributed, provided, or otherwise transferred through or by an Avaya Party as a reseller for or on behalf of a third party. With respect to clause (iii), an Avaya Licensed Product that would otherwise be licensed under this Agreement shall not cease to be so licensed as a result of the inclusion in such product of a third party product, <u>provided</u> that such Avaya Licensed Product shall not be licensed under this Agreement with respect to such third party product on a stand-alone basis. By way of example, if an Avaya Party includes a third party chipset in an Avaya Licensed Product that would otherwise be licensed under this Agreement in the absence of the inclusion of such chipset, such Avaya Licensed Product shall not cease to be so licensed by virtue of clause (iii), but such chipset shall not be licensed under this Agreement on a stand-alone basis. For clarity and without limiting the foregoing, if an Avaya Party includes in one of its products a third party product and such inclusion results in such Avaya Party product not constituting an "Avaya Licensed Product," such Avaya Party product shall no longer be licensed under this Agreement.

        (b)      <u>Subsidiaries</u>. Except as otherwise provided in <u>Section 9.1(c)</u>, the licenses granted to any Avaya subsidiary pursuant to <u>Section 3.1</u> and <u>3.2</u> shall continue for only as long as such person is a subsidiary of Avaya and shall immediately terminate when such person ceases to be a subsidiary of Avaya.

        (c)      <u>Certain Transactions</u>. If any Avaya Party acquires any Acquired Business, whether by transfer of assets, merger, transfer of equity interests, or otherwise, the licenses granted pursuant to <u>Sections 3.1</u> and <u>3.2</u> shall not extend to, and the Avaya Licensed Products shall not include, any product or service of such Acquired Business, even if such Acquired Business is transferred to, merged with, or licensed to any Avaya Party (in any manner).

        3.4      <u>Transfer of Transferred Intellectual Property</u>. Nothing herein shall prevent Purchaser from selling, assigning, encumbering, pledging, or transferring, in whole or in part, any of the Transferred Patents or Transferred Other Intellectual Property, <u>provided</u> that any such sale, assignment, or transfer shall be subject to the licenses granted to the Avaya Parties herein.

        3.5      <u>Downstream Rights</u>. The licenses granted to the Avaya Parties pursuant to <u>Section 3.1</u> attach to and are transferred with any Avaya Licensed Product covered by, incorporating or using any Transferred Patent, and pass to each distributor, reseller, customer, Contractor, vendor, and end-user of such Avaya Licensed Product. For the avoidance of doubt, the only license provided to distributors, resellers, customers, Contractors, vendors, and end-users of such Avaya Licensed Products relates solely and specifically to such Avaya Licensed Products and shall not apply in any way to any

8

other products or services used, sold, or otherwise made available by distributors, resellers, customers, Contractors, vendors, and end-users.

       3.6     Reservation of Rights.  All rights not granted to the Avaya Parties herein are expressly reserved.  Without limiting the foregoing, Avaya acknowledges and agrees that, as between the Parties, Purchaser owns the Transferred Patents and Transferred Other Intellectual Property and that, except as expressly provided in this Agreement, no other rights or licenses, express or implied, are granted by Purchaser or one of the other Purchaser Parties to the Avaya Parties hereunder, and that the Avaya Parties shall not exercise any of its rights with respect to any Transferred Patents and Transferred Other Intellectual Property, in each case other than as expressly permitted under this Agreement.

       3.7     No Technology Transfer.  The Avaya Parties acknowledge and agree that the Purchaser Parties have no technology transfer, delivery, support, maintenance, training, consulting, or other similar obligations under this Agreement.

## 4.     IMPROVEMENTS

       4.1     Ownership.  The ownership of any improvements, modifications, or derivative works, in each case made after the Effective Date, of or resulting from any Licensed Patents or Licensed Other Intellectual Property or the subject matter described or claimed therein or covered thereby (collectively, "**Improvements**") shall be determined in accordance with Laws applicable to Intellectual Property.

       4.2     No License.  It is expressly understood and agreed that no rights or licenses, express or implied, are granted hereunder by either Party in or to such Improvements made by it or any of its subsidiaries.  Neither Party nor any of its subsidiaries shall have any obligation to provide the other Party or any of its subsidiaries with any such Improvement or tangible embodiment thereof.  Any decision to apply for a Patent or other protection on any Improvement shall be at the sole discretion and expense of the Party or subsidiary that owns such Improvement.

## 5.     PROSECUTION AND MAINTENANCE; ENFORCEMENT AND DEFENSE

       5.1     Control of Prosecution and Maintenance.  The Avaya Parties shall have the sole and exclusive right (but not the obligation) at their sole expense to obtain, prosecute (including carrying out any interferences, reissue proceedings, and reexaminations), and maintain throughout the world the Avaya Licensed Patents, the Avaya Licensed Other Intellectual Property, and the Avaya Retained Specified Software, and Purchaser shall have the sole and exclusive right (but not the obligation) at its sole expense to obtain, prosecute (including carrying out any interferences, reissue proceedings, and reexaminations), and maintain throughout the world the Transferred Patents and the Transferred Other Intellectual Property.

       5.2     Control of Enforcement and Defense.  The Avaya Parties shall have the sole and exclusive right (but not the obligation) at their sole expense to enforce and defend the Avaya Licensed Patents, the Avaya Licensed Other Intellectual Property, and the Avaya Retained Specified Software, and Purchaser shall have the sole and exclusive right (but not the obligation) at its sole expense to enforce and defend the Transferred Patents and the Transferred Other Intellectual Property, in each case including the institution of any action for infringement.  Each Party or its applicable subsidiary, as applicable, as licensor, shall have the sole and exclusive right to control the prosecution of any such

9

action it commences and shall be entitled to retain any and all damages awarded or paid pursuant to any settlement of such action.

## 6.    TERM AND TERMINATION

6.1    Term; Termination.  The term of this Agreement shall commence on the Effective Date and shall continue thereafter until all of the Licensed Intellectual Property has expired or been finally adjudicated invalid or has entered the public domain.  This Agreement may not be terminated under any circumstance (including, without limitation, any breach) without the mutual written agreement of the Parties.  Notwithstanding the foregoing, nothing in this Agreement shall limit a Party's rights to seek damages or any other remedies available at law or in equity (other than a termination of this Agreement) for a breach of this Agreement.

6.2    Effect of Termination; Survival.  If this Agreement expires or is terminated as provided in Section 6.1, all rights and obligations of each Party and its subsidiaries under this Agreement (including, without limitation, the licenses granted hereunder) shall immediately terminate; provided, however, that the provisions contained in Sections 2.6, 2.7, 3.5, 3.6, 4, 5, 6, 7, 8 and 9 of this Agreement shall survive such expiration or termination.

## 7.    DISCLAIMER; EXCLUSION OF CERTAIN DAMAGES

7.1    DISCLAIMER.  EACH PARTY AND ITS SUBSIDIARIES MAKE NO, AND SPECIFICALLY DISCLAIM ALL, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY INTELLECTUAL PROPERTY AND TECHNOLOGY LICENSED TO ANY OF THEM HEREUNDER OR OTHERWISE WITH RESPECT TO THIS AGREEMENT OR THE MATTERS CONTEMPLATED HEREBY, AND EACH PARTY, ON BEHALF OF ITSELF AND ITS SUBSIDIARIES, ACKNOWLEDGES AND AGREES THAT SUCH INTELLECTUAL PROPERTY AND TECHNOLOGY IS LICENSED "AS IS," WITHOUT WARRANTY OF ANY KIND (INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF NON-INFRINGEMENT, SUFFICIENCY, QUALITY, USEFULNESS, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE); PROVIDED, HOWEVER, THAT THIS AGREEMENT SHALL NOT IN ANY WAY LIMIT THE REPRESENTATIONS AND WARRANTIES OF ANY PERSON UNDER THE PURCHASE AGREEMENT.

7.2    EXCLUSION OF CERTAIN DAMAGES.  EXCEPT FOR BREACHES OF OBLIGATIONS OF CONFIDENTIALITY, MISAPPROPRIATION OR MISUSE OF LICENSED INTELLECTUAL PROPERTY, OR BREACHES OF THE PARTIES' OBLIGATIONS UNDER SECTIONS 2.1, 2.2, 2.3, 3.1, OR 3.2, AS APPLICABLE, IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS SUBSIDIARIES BE LIABLE UNDER THIS AGREEMENT FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, FOR LOST OR ANTICIPATED PROFITS, REVENUES OR OPPORTUNITIES OR BUSINESS INTERRUPTION), OR FOR ANY DAMAGES CALCULATED BY REFERENCE TO A MULTIPLIER OF REVENUE, PROFITS, EBITDA OR SIMILAR METHODOLOGY, WHETHER OR NOT FORESEEABLE OR CAUSED BY OR RESULTING FROM THE ACTIONS OF SUCH PARTY OR ANY OF ITS SUBSIDIARIES AND WHETHER OR NOT BASED ON OR IN WARRANTY, CONTRACT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE OR STRICT LIABILITY) OR OTHERWISE.

10

## 8.    **CONFIDENTIALITY**

8.1    Confidentiality.  Each Party shall, and shall cause their respective affiliates and Representatives, (a) to keep confidential the terms of this Agreement and all information, materials, and processes relating to, or source code and trade secrets owned by, a Party or any affiliate of such Party obtained by the other Party or any affiliate thereof at any time (whether prior to or after the date hereof) relating to, arising out of, or in connection with the Licensed Intellectual Property but shall not include (i) information that is or becomes generally available to the public other than by release in breach of the provisions of this Agreement, (ii) information that becomes available on a non-confidential basis to a Party from a source other than the other Party to this Agreement or its subsidiaries, (iii) is in the possession of the receiving Party prior to disclosure by the disclosing Party (provided that any information regarding the Business or the Transferred Intellectual Property in the possession of any Avaya Party prior to the Effective Date shall not be subject to this provision) or (iv) information that is independently developed by the receiving Party without the use or reference to any information obtained from the providing Party ("**Confidential Information**"), (b) not to disclose such Confidential Information except where such disclosure (i) is reasonably necessary to perform or receive, or settle any dispute regarding, their respective duties, benefits, or rights under this Agreement, or to comply with an obligation under an indenture, or (ii) is required by applicable Law or the rules and regulations of any stock exchange or quotation services on which such Party's stock is traded or quoted, and (c) not to use any Confidential Information other than for the purposes of performance or receipt of their respective duties, benefits, or rights under this Agreement.  Without limiting the generality of the foregoing, each Party shall cause its Representatives to exercise the same level of care with respect to Confidential Information relating to the other Party or any of its affiliates as it would with respect to similar proprietary information, materials, and processes relating to itself or any of its affiliates.  Notwithstanding any provision of this Section 8.1 to the contrary, a Party or its subsidiaries may disclose such portion of Confidential Information relating to the other Party or its affiliates to the extent, but only to the extent, the disclosing Party, or its applicable subsidiary, reasonably believes that such disclosure is required by judicial or administrative process or by other requirements of applicable Law or the rules and regulations of any stock exchange or quotation services on which such Party's stock is traded or quoted; provided that if permissible under applicable Law, rules or regulations and reasonably practicable under the circumstances, the disclosing Party, or its applicable subsidiary, first notifies the other Party, or its applicable affiliate, of such requirement and allows such Party, or its applicable affiliate a reasonable opportunity to (i) seek a protective order or other appropriate remedy to prevent such disclosure, (ii) consult with the disclosing Party with respect to the such Party's taking steps to resist or narrow the scope of such request or legal process or (iii) waive compliance, in whole or in part, with the terms of this Section 8.1. In the event that such protective order or other remedy is not obtained, or the Party whose Confidential Information is required to be disclosed waives compliance, in whole or in part, with the terms of this Section 8.1, the Party disclosing the Confidential Information or its affiliate or Representative, as the case may be, shall use commercially reasonable efforts to (y) disclose only that portion of the Confidential Information that such Party is advised in writing by its legal counsel is legally required to be disclosed and (z) ensure that all Confidential Information that is so disclosed will be accorded confidential treatment.  The obligations of the Parties and their respective affiliates and Representatives under this Section 8.1 shall remain in effect until the expiration of the applicable statute of limitations following the expiration or termination of this Agreement, except for the obligation to keep confidential the trade secrets of any Party or its subsidiaries, which obligation shall not expire.  If this Agreement expires or is terminated, each Party and its respective affiliates will, and will cause its respective officers and employees, and will use its commercially reasonable efforts to cause its Representatives to, destroy or deliver to the other Party, upon request, all documents and other materials, and all copies thereof, obtained by such Party or its subsidiaries or on its behalf from the other Party in

connection with this Agreement that are subject to such confidence.  For clarity and notwithstanding anything to the contrary herein, the Confidential Information of Purchaser shall not include any Excluded Assets, and the Confidential Information of Avaya shall not include any Transferred Assets.

## 9. **MISCELLANEOUS**

9.1    Assignment.

(a)    General.  Neither this Agreement nor any of the rights and obligations of the Parties or their respective subsidiaries hereunder may be assigned by Purchaser or its subsidiaries, on the one hand, or Avaya or its subsidiaries, on the other hand, without the prior written consent of Avaya (in the case of Purchaser) or Purchaser (in the case of Avaya), as applicable; provided that each Party may, without the consent of the other Party, assign this Agreement or the rights and obligations hereunder:

(i)    in whole (A) to any of its affiliates, (B) subject to Section 9.1(b), to a person that succeeds to all or substantially all of the business or assets of such Party and its subsidiaries to which this Agreement relates in connection with a merger or sale of all or substantially all of such Party's assets or stock (each, a "**Change of Control Event**"), or (C) in connection with a Corporate Reorganization of such Party; or

(ii)    subject to Section 9.1(c), in part to a third party acquirer of all or substantially all of the assets of a business or product line (in each case to which this Agreement relates) of the assigning Party or any of its subsidiaries (such business or product line, a "**Divested Business**"). Subject to this Section 9.1(a), this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Any attempted assignment or transfer in violation of this Section 9.1 shall be null and void.

(b)    Effect of Change of Control Event.  If, as a result of a Change of Control Event, the assigning Party remains a separate, independent legal entity and is operated as a separate business (or is merged into a Merger Sub or then-current subsidiary of the applicable Party), then the licenses granted to such assigning Party and its subsidiaries under this Agreement shall not be affected as a result of such Change of Control Event but shall in no event extend to the third party acquirer (the "**Acquirer**") or any of its affiliates existing immediately prior to the Change of Control Event or any of its or their past, current, or future products or services.  If, as a result of a Change of Control Event, the assigning Party does not remain a separate, independent legal entity and operate as a separate business, then the licenses granted to such assigning Party and its subsidiaries shall be limited to the Assigning Party Products of such Party and its subsidiaries and shall not otherwise extend to the Acquirer or any of its affiliates or any of their past, current, or future products or services.

(c)    Effect of Divestiture.  Upon an assignment by a Party pursuant to Section 9.1(a)(ii), the licenses granted to the assignee and its subsidiaries following such assignment shall be limited to the Assigning Party Products of such Party and its subsidiaries that are the subject of such assignment and shall not extend to any past, current, or future products or services of such assignee or any of its affiliates existing immediately prior to such assignment.

9.2    Rights in Bankruptcy.  All rights and licenses granted under or pursuant to this Agreement, including those in Article 2 and Article 3, are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code or analogous provisions of applicable Law

12

outside the United States, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code or analogous provisions of applicable Law outside the United States.  The Parties agree that each of the Purchaser Parties and Avaya Parties, as licensees of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the U.S. Bankruptcy Code or any other provisions of applicable Law outside the United States that provide similar protections for Intellectual Property.

       9.3    <u>No Third-Party Beneficiaries</u>.  Except as expressly provided with respect to a Party's subsidiaries, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give to any person, other than the Parties and such successors and assigns, any legal or equitable rights hereunder.

       9.4    <u>Notices</u>.  All notices, requests, permissions, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given (a)  when delivered, if delivered personally to the intended recipient, (b) one (1) Business Day following sending by overnight delivery via a national courier service and (c) when delivered by fax or email (in each case in this clause (c) (i) followed by delivery of an original via overnight courier and (ii) solely if receipt is confirmed prior to 5 p.m. at the place of receipt on a Business Day (or the following Business Day if receipt is confirmed after 5 p.m. at the place of receipt or a day other than a Business Day)) and, in each case, addressed to a Party at the following address for such Party:

      (a) if to Avaya,

          Avaya Inc.
          4655 Great America Parkway
          Santa Clara, California 95054
          Attention: Corporate Secretary
          Facsimile: (408) 562-2853
          Email: afreedman@avaya.com

          with copies to (which shall not constitute notice):

          Kirkland & Ellis LLP
          300 North LaSalle
          Chicago, Illinois 60654
          Attention:  Steve Toth
          Facsimile: (312) 862-2200
          Email: steve.toth@kirkland.com

      (b) if to Purchaser,

>    Extreme Networks, Inc.
>    6480 Via Del Oro
>    San Jose, CA 95119
>    Attention: Katy Motiey, Chief Administrative Officer –
>    HR, Legal & Corporate Secretary
>    Email: kmotiey@extremenetworks.com
>
>    with copies to (which shall not constitute notice):
>
>    Latham & Watkins LLP
>    140 Scott Drive
>    Menlo Park, California 94024
>    Attention: Tad Freese
>    Facsimile: (650) 463-2600
>    Email: tad.freese@lw.com

or to such other address(es) as shall be furnished in writing by any such Party to the other Party hereto in accordance with the provisions of this <u>Section 9.4</u>.

       9.5    <u>Interpretation</u>.  References to defined terms in the singular shall include the plural and references to defined terms in the plural shall include the singular.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if."  The descriptive headings of the several Articles, Sections, and subsections of this Agreement are inserted for convenience only, do not constitute a part of this Agreement, and shall not affect in any way the meaning or interpretation of this Agreement.  All references herein to "Articles," "Sections," or "Exhibits" shall be deemed to be references to Articles or Sections hereof or Exhibits hereto unless otherwise indicated.  The terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, including all Exhibits.  The use of "or" is not intended to be exclusive unless expressly indicated otherwise.  The terms  "include," "includes" or "including" shall be deemed to be followed by the words "without limitation". Reference to any agreement (including this Agreement), document or instrument shall mean such agreement, document, or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.  Reference to any legislation or to any provision of any legislation shall include any modification, amendment, re-enactment thereof, any legislative provision substituted therefor, and all rules, regulations, and statutory instruments issued or related to such legislation.

       9.6    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when each Party shall have received counterparts hereof signed by the other Party.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg, or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of either Party, the other Party shall re-execute the original form of this Agreement and deliver such form to the other Party.  No Party shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each Party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

14

9.7    <u>Entire Agreement</u>.  This Agreement, and the Exhibits annexed hereto, and the other agreements, certificates, and other documents contemplated hereby constitute the entire understanding between the Parties with respect to the subject matter hereof, and supersede all other understandings and negotiations with respect thereto.  The Parties agree to define their rights, liabilities, and obligations with respect to such understanding and the transactions contemplated hereby exclusively in contract pursuant to the express terms and provisions of this Agreement, and the Parties expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement.

9.8    <u>Severability</u>.  If that any provision contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any jurisdiction, such provision shall be ineffective as to such jurisdiction to the extent of such invalidity, illegality or unenforceability without invalidating or affecting the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

9.9    <u>Governing Law</u>.  This Agreement, the negotiation, execution or performance of this Agreement and any disputes arising under or related hereto (whether for breach of contract, tortious conduct or otherwise) shall be governed and construed in accordance with the Laws of the State of New York, without reference to its conflicts of Law principles.

9.10    <u>Jurisdiction</u>.  Each Party irrevocably agrees that any Proceeding against it arising out of or in connection with this Agreement or the transactions contemplated by this Agreement or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have jurisdiction, the state courts of New York located in New York County, and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts <u>in personam</u> with respect to any such Proceeding and waives to the fullest extent permitted by Law any objection that it may now or hereafter have that any such Proceeding has been brought in an inconvenient forum.  Notwithstanding the foregoing, any final judgment in any suit, action or other Proceeding may be enforced in other jurisdictions by suit on the judgment in any other manner provided by applicable Law.

9.11    <u>Service of Process</u>.  Each of the Parties consents to service of any process, summons, notice or document which may be served in any Proceeding in the Bankruptcy Court or the United States District Court for the Southern District of New York or the state courts of New York located in New York County, each in any manner permitted by applicable Law and agrees that service of process on such Party as provided for notices in <u>Section 9.4</u> (other than by fax or email) to such party's respective address set forth in <u>Section 9.4</u> is reasonably calculated to give actual notice and shall be deemed effective service of process on such Person.

9.12    <u>Waiver of Jury Trial</u>.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR DISPUTES RELATING HERETO.  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS
IN THIS <u>SECTION 9.12</u>.

      9.13    <u>Amendments and Waivers</u>.  This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, agreements or conditions hereof may be waived only by an instrument in writing signed by each of the Parties or, in the case of a waiver, by or on behalf of the Party waiving compliance.  No course of dealing between the Parties or any of their subsidiaries or Representatives shall be effective to amend or waive any provision of this Agreement.

      9.14    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement (including the Exhibits hereto), on the one hand, and the provisions of the Purchase Agreement (including the schedules and exhibits thereto), on the other hand, the provisions of the Purchase Agreement shall control.

      9.15    <u>Joint Drafting</u>.  The Parties have been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by each of the Parties, and no rule of construction will be invoked respecting the authorship of this Agreement.

[SIGNATURE PAGE FOLLOWS]

16

IN WITNESS WHEREOF, Avaya and Purchaser have duly executed this Agreement as of the date first written above.


AVAYA INC.

By: _____
Name:
Title:


EXTREME NETWORKS, INC.

By: _____
Name:
Title:

**Exhibit E-2**

**IT Firewall Policies**

US-DOCS\77191498.6

## BNY MELLON, NATIONAL ASSOCIATION

## ESCROW AGREEMENT

This Escrow Agreement, dated as of March 7, 2017 (this "Escrow Agreement"), is made by and among Extreme Networks, Inc., a Delaware corporation, having its principal place of business at 6480 Via Del Oro, San Jose CA 95119 ("Purchaser"), Avaya Inc., a Delaware corporation, having its principal place of business at 4655 Great America Parkway, Santa Clara, CA (the "Company" and together with Purchaser, the "Escrow Parties"), and BNY Mellon, National Association, a national banking association with its principal place of business at BNY Mellon Center, Pittsburgh, PA 15258 (the "Escrow Agent").

WHEREAS, Purchaser and the Company have entered into an Asset Purchase Agreement (as amended, the "Purchase Agreement"), dated as of the date hereof, pursuant to which Purchaser is purchasing certain assets and assuming certain liabilities from the Company and its subsidiaries.  The Purchase Agreement provides that Purchaser shall deposit the Escrow Funds (defined below) in segregated escrow accounts titled in the name of the Escrow Agent for the benefit of Purchaser and the Company to be held by the Escrow Agent solely for the purposes and in accordance with the terms of the Purchase Agreement and this Escrow Agreement;

WHEREAS, in accordance with the terms and subject to the conditions of the Purchase Agreement, Purchaser is depositing with the Escrow Agent an amount in cash equal to $10,000,000 (the "Deposit Amount") to be held in an escrow account (the "Deposit Escrow Account") and disposed of as provided herein;

WHEREAS, in accordance with the terms and subject to the conditions of the Purchase Agreement, at the Closing, Purchaser will deposit with the Escrow Agent an amount in cash equal to $10,000,000 (the "Indemnity Escrow Amount") (the date on which such deposit is made, the "Closing Date") to be held in an escrow account (the "Indemnity Escrow Account" and, together with the Deposit Escrow Account, the "Escrow Accounts") and disposed of as provided herein;

WHEREAS, the Escrow Agent is willing to serve as escrow agent and hold the Escrow Funds (as defined below) in accordance with the terms and conditions hereof; and

WHEREAS, capitalized terms used but not otherwise defined herein shall have the respective meanings given them in the Purchase Agreement.  Notwithstanding the foregoing, it is expressly understood and agreed by the parties hereto that all references herein to the Purchase Agreement are for the convenience of the parties hereto other than the Escrow Agent, and the Escrow Agent shall have no obligation or duties with respect thereto.

NOW, THEREFORE, in consideration of the premises and agreements of the parties contained in this Escrow Agreement, the parties agree as follows.

1.    Appointment of Agent.  The Escrow Parties appoint the Escrow Agent as their agent to hold in escrow, and to administer the disposition of, the Escrow Funds in accordance with the terms of this Escrow Agreement, and the Escrow Agent accepts such appointment.

2.      Establishment of Escrow.

(a)      Simultaneously with the execution and delivery of this Escrow Agreement, Purchaser shall deliver the Deposit Amount to the Escrow Agent (by wire transfer of immediately available U.S. funds in accordance with the payment instructions of the Escrow Agent), and the Escrow Agent shall promptly acknowledge in writing to all parties hereto upon receipt of any funds received, which funds shall be deposited in the Deposit Escrow Account in accordance herewith.  All amounts held in the Deposit Escrow Account, including any interest and other income received in respect thereof less distributions therefrom in accordance with this Escrow Agreement, are hereinafter referred to as the "Deposit Escrow Funds."  At the Closing, the Escrow Parties shall also provide notice to the Escrow Agent that such date is the Closing Date.

(b)      At the Closing, Purchaser shall deliver the Indemnity Escrow Amount to the Escrow Agent (by wire transfer of immediately available U.S. funds in accordance with the payment instructions of the Escrow Agent), and the Escrow Agent shall promptly acknowledge in writing to all parties hereto upon receipt of any funds received, which funds shall be deposited in the Indemnity Escrow Account in accordance herewith.  All amounts held in the Indemnity Escrow Account, including any interest and other income received in respect thereof, less distributions thereof in accordance with this Escrow Agreement, are hereinafter referred to as the "Indemnity Escrow Funds" (and together with the Deposit Escrow Funds, the "Escrow Funds").

3.      Customer Identification and TIN Certification.

(a)      To help the government fight the funding of terrorism and money laundering activities, Federal laws require all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account.  Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement.  For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification.  For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents, as it deems necessary to confirm the legal existence of the entity.

(b)      At the time of or prior to execution of this Escrow Agreement, any Escrow Party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9 (or the appropriate IRS Form W-8, in the case of non U.S. persons), and every individual executing this Escrow Agreement on behalf of an Escrow Party shall provide to the Escrow Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Escrow Agent.  The Escrow Parties agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the

2

Escrow Agent may require in order to comply with its established practices, procedures and policies.

(c)    The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 (or the appropriate IRS Form W-8, in the case of non U.S. persons) information provided to the Escrow Agent by Purchaser.  The Escrow Parties understand that, in the event one or more tax identification number is not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds.

(d)    Purchaser and the Company agree that all amounts in the Escrow Accounts (including, but not limited to, interest or other earnings on amounts therein) (the "Escrow Income") shall be treated as owned by, and (in the case of Escrow Income) earned by, Purchaser, whether or not distributed to Purchaser, for federal income tax purposes (and for purposes of corresponding provisions of foreign, state and local income tax law) including, in each case, for applicable reporting purposes. The Escrow Agent shall disburse funds within thirty (30) days following the end of each calendar year from the Escrow Funds to Purchaser ("Tax Distributions") equal to forty percent (40%) of the Escrow Income for the prior calendar year, provided that the Escrow Agent shall not be liable to the Purchaser or otherwise for failing to timely make any annual distribution in accordance herewith. In the event the Escrow Agent fails to make an annual distribution as provided in the foregoing sentence, the Purchaser may deliver to the Escrow Agent a written request that such distribution be made and the Escrow Agent shall make such distribution to the Purchaser within three (3) Business Days (as defined below) after receipt of such notice.  Notwithstanding the foregoing, the Escrow Agent shall have no obligation to distribute interest or other income earned with respect to the Escrow Accounts until such interest or other income becomes due and payable in accordance with the terms of the accounts in which the Escrow Funds are deposited in accordance with Section 2 above.  For the avoidance of doubt, such Tax Distributions shall become the property of Purchaser and shall no longer be treated as part of the Escrow Funds for any purposes of this Escrow Agreement.

(e)    The Company will be required to prepare and file any and all income tax returns applicable to the Company's receipt of the Escrow Funds pursuant to a disbursement under Section 5 of this Escrow Agreement with the IRS and all required state and local departments of revenue in all years income is earned in any particular tax year to the extent required under the provisions of the Code. The Escrow Parties agree that for purposes of income tax reporting the Escrow Agent shall be deemed the payor of any interest or other income earned on deposits of the Escrow Accounts.  With respect to distributions made under this Escrow Agreement other than distributions of interest and other income earned on the Escrow Accounts, the Escrow Agent shall not be deemed the payor thereof.  The Escrow Agent's function of making distributions is solely ministerial and upon express direction of Purchaser and the Company.

(f)    The Escrow Agent shall have no duty to prepare or file any information reports (including without limitation IRS Forms 1099-B) other than such information reports of

3

interest earned on the Escrow Fund as the Escrow Agent is required to prepare and file in the ordinary course of its business.

4.  <u>Deposit of the Escrow Funds</u>.  The Escrow Agent shall deposit the Escrow Funds in one or more deposit accounts at BNY Mellon, National Association in accordance with this Escrow Agreement and such joint written instructions and directions as may from time to time be provided to the Escrow Agent by the Escrow Parties.  In the event that the Escrow Agent does not receive joint written instructions, the Escrow Agent shall deposit the Escrow Funds in a checking with interest account at BNY Mellon, National Association.  Deposits shall in all instances be subject to the Escrow Agent's standard funds availability policy.  The Escrow Agent shall not be responsible for any loss due to interest rate fluctuation or early withdrawal penalty.  The Escrow Parties understand that deposits of the Escrow Funds are not necessarily insured by the United States Government or any agency or instrumentality thereof, or of any state or municipality, and that such deposits do not necessarily earn a fixed rate of return.  In no instance shall the Escrow Agent have any obligation to provide investment advice of any kind.  The Escrow Agent shall not be liable or responsible for any loss resulting from any deposits made pursuant to this <u>Section 4</u>, other than as a result of the fraud, bad faith, gross negligence or willful misconduct of the Escrow Agent.

5.  <u>Release of the Escrow Funds</u>.  The Escrow Agent will hold all the Escrow Funds in accordance with the provisions of this Escrow Agreement and will not distribute the Deposit Escrow Funds or Indemnity Escrow Funds except in accordance with the express terms and conditions of this Escrow Agreement.

(a)     <u>Deposit Escrow Account</u>.  Within three (3) Business Days after the Escrow Agent's receipt of (i) a written direction executed by Purchaser and the Company substantially in the form of <u>Exhibit A</u> hereto, directing Escrow Agent to disburse all or a portion of the Deposit Escrow Funds (a "<u>Joint Instruction</u>"), or (ii) a Final Order (as defined below), in each case, the Escrow Agent shall release, by wire transfer of immediately available funds to the account or accounts designated in such Joint Instruction or Final Order, all or any portion (if less than all) of the Deposit Escrow Funds designated in such Joint Instruction or Final Order, as applicable, by wire transfer of immediately available funds to the account or accounts as set forth in the Joint Instruction or Final Order.  The Company and Purchaser shall deliver to the Escrow Agent Joint Instructions to effect disbursement of Deposit Escrow Funds when and as contemplated by the Purchase Agreement.  As used in this Escrow Agreement, the term "Business Day" shall mean any day on which the Escrow Agent is open for escrow handling business in Pittsburgh, Pennsylvania.

(b)     <u>Indemnity Escrow Account</u>.

(i)     If, from time to time prior to the earlier of the date that is twelve (12) months following the Closing Date and the date on which the Indemnity Escrow Funds have been reduced to zero (the "<u>Indemnity Escrow Expiration Date</u>"), a Purchaser Indemnitee makes a claim for indemnity (each, an "<u>Escrow Claim</u>") pursuant to Section 9.01 of the Purchase

4

Agreement, then Purchaser may request such payment from the Indemnity Escrow Funds by providing written notice of such Escrow Claim (each such notice, a "Claim Notice"), prior to the Indemnity Escrow Expiration Date, to the Escrow Agent and the Company at the same time, describing in such Claim Notice the general nature of, and grounds for, such Escrow Claim, the reasons such Purchaser Indemnitee is entitled to indemnification pursuant to the Purchase Agreement, the estimated amount, if known, of indemnification such Purchaser Indemnitee is entitled thereof and the method of computation thereof (with it being understood, however, that the Escrow Agent will have no duty or obligation to verify or otherwise determine any such Purchaser Indemnitee's rights under the Purchase Agreement). The Escrow Agent shall be entitled to disregard any Escrow Claim received after the Indemnity Escrow Expiration Date.

(ii)     Unless and until the Escrow Agent has received a Joint Instruction directing the payment from the Indemnity Escrow Funds of all or a portion of any Escrow Claim set forth in a Claim Notice received by the Escrow Agent, then the portion of such Escrow Claim that is not so directed for payment from the Indemnity Escrow Funds will be deemed to be an "Open Claim," and the Escrow Agent will reserve within the Indemnity Escrow Account (which reservation will not preclude payment of all or any portion of any amounts in respect of any other Escrow Claims required to be paid to Purchaser or its designee pursuant to this Section 5) an amount equal to the amount of the Open Claim (which amount for each Open Claim is referred to herein as a "Claim Reserve").

(iii)    The amount constituting the Claim Reserve for each Open Claim will be paid by the Escrow Agent from the Indemnity Escrow Funds only in accordance with a Joint Instruction or a final judgment, order or decree filed, entered or issued by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (or, if applicable, such other court contemplated by Section 19 (each a "Final Order")) directing delivery of the Indemnity Escrow Funds or any portion thereof. The delivery to the Escrow Agent of a judgment, order or decree of the Bankruptcy Court shall constitute a representation to the Escrow Agent that such judgment, order or decree is a Final Order, and the Escrow Agent shall be entitled to rely thereon without any further duty of inquiry. The Escrow Agent will, within three (3) Business Days after receiving a Joint Instruction or Final Order, pay to Purchaser or the Company, as applicable, or as otherwise directed by Purchaser or the Company, as applicable, in writing from the Indemnity Escrow Funds the amount, if any, set forth in such Joint Instruction or Final Order for payment from the Indemnity Escrow Funds.

(iv)     No later than three (3) Business Days following the Indemnity Escrow Expiration Date, the Escrow Agent will distribute, from the Indemnity

Escrow Account, to the Company, an amount equal to (A) all of the then-remaining Indemnity Escrow Funds <u>minus</u> (B) the aggregate Claim Reserve for which Open Claims for indemnification were asserted against the Indemnity Escrow Funds in accordance with <u>Section 5(b)(i)</u> above and which are not yet resolved (or, to the extent finally resolved, have not been paid from the Indemnity Escrow Funds) as of the Indemnity Escrow Expiration Date (the "<u>Final Claim Amount</u>").  Following the Indemnity Escrow Expiration Date, within three (3) Business Days after it is finally determined in accordance with the Purchase Agreement that all or any portion of the Final Claim Amount is not owed to Purchaser thereunder, Purchaser and the Company will deliver a Joint Instruction to the Escrow Agent directing the Escrow Agent to distribute from the Indemnity Escrow Funds all or a portion of the Final Claim Amount; <u>provided</u> that the remaining Indemnity Escrow Funds in the Indemnity Escrow Account, after giving effect to such distribution, is at least equal to the aggregate Claim Reserve for which Open Claims were properly asserted against the Indemnification Escrow Funds prior to, and were not resolved prior to, the Indemnity Escrow Expiration Date and which are not yet resolved (or, to the extent finally resolved in favor of Purchaser, have not been paid from the Indemnity Escrow Funds).

(c)    <u>Joint Instructions</u>.   Notwithstanding anything to the contrary in this Escrow Agreement, if the Escrow Agent receives a Joint Instruction, the Escrow Agent shall disburse the Escrow Funds pursuant to such Joint Instruction.  The Escrow Agent shall have no obligation to follow any directions set forth in any Joint Instruction unless and until the Escrow Agent is satisfied, in its sole discretion, that the persons executing said Joint Instruction are authorized to do so.

(d)    <u>No Liability for Deficiency</u>.   Notwithstanding anything to the contrary in this Escrow Agreement, if any amount to be released at any time or under any circumstances exceeds the balance in the Indemnity Escrow Account, the Escrow Agent shall release the balance in the Indemnity Escrow Account and shall have no liability or responsibility to the Escrow Parties for any deficiency.

6.    <u>Methods of Payment</u>.  All payments required to be made by the Escrow Agent under this Escrow Agreement shall be made by wire transfer or by check in accordance with written payment instructions contained in <u>Exhibit B</u> or otherwise provided in writing to the Escrow Agent by the party receiving the funds.  Any wire transfers shall be made subject to, and in accordance with, the Escrow Agent's normal funds transfer procedures in effect from time to time.  The Escrow Agent shall be entitled to rely upon all bank and account information provided to the Escrow Agent by any of the Escrow Parties.  The Escrow Agent shall have no duty to verify or otherwise confirm any written wire transfer instructions but it may do so in its discretion on any occasion without incurring any liability to any of the Escrow Parties for failing to do so on any other occasion.  Any such verification may include, but not be limited to, a telephone call to the party receiving the funds or to one or more of the Escrow Parties in accordance with <u>Section 14</u>.  The Escrow Parties agree that any such call back is a commercially reasonable security

6

procedure and that the Escrow Agent may record such calls according to the Escrow Agent's standard operating procedures or as the Escrow Agent deems appropriate for security and/or service purposes. The Escrow Agent shall process all wire transfers based on bank identification and account numbers rather than the names of the intended recipient of the funds, even if such numbers pertain to a recipient other than the recipient identified in the payment instructions. The Escrow Agent shall have no duty to detect any such inconsistencies and shall resolve any such inconsistencies by using the account number. Each of the Escrow Parties shall provide to the Escrow Agent a separate <u>Exhibit B</u> containing their wire transfer information. The Escrow Parties shall promptly notify the Escrow Agent of any changes to their wire transfer information contained in <u>Exhibit B</u>, and the Escrow Agent may rely on the wire transfer information contained in <u>Exhibit B</u> until notified of a change in writing.

7.    <u>Responsibilities and Liability of Escrow Agent</u>.

(a)    <u>Duties Limited</u>. The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement. The Escrow Agent's duties shall be determined only with reference to this Escrow Agreement and applicable laws and it shall have no implied duties. The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to make inquiry into or consider, any term or provision of any agreement between any of the Escrow Parties and/or any other third party or as to which the escrow relationship created by this Escrow Agreement relates, including without limitation any documents referenced in this Escrow Agreement.

(b)    <u>Limitations on Liability of Escrow Agent</u>. Except in cases of the Escrow Agent's bad faith, willful misconduct or gross negligence, the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Escrow Agreement or the Escrow Agent's duties, has been duly authorized to do so, and (iii) in acting or failing to act in good faith on the advice of any counsel retained by the Escrow Agent. The Escrow Agent shall not be liable for any mistake of fact or law or any error of judgment, or for any act or omission, except as a result of its bad faith, willful misconduct or gross negligence. The Escrow Agent shall not be responsible for any loss incurred upon any action taken under circumstances not constituting bad faith, willful misconduct or gross negligence.

In connection with any payments that the Escrow Agent is instructed to make by wire transfer, the Escrow Agent shall not be liable for the acts or omissions of (i) any Escrow Party or other person providing such instructions, including without limitation errors as to the amount, bank information or bank account number; or (ii) any other person or entity, including without limitation any Federal Reserve Bank, any transmission or communications facility, any funds transfer system, any receiver or receiving depository financial institution, and no such person or entity shall be deemed to be an agent of the Escrow Agent.

7

Without limiting the generality of the foregoing, it is agreed that in no event will the Escrow Agent be liable for any lost profits or other indirect, special, incidental or consequential damages which the parties may incur or experience by reason of having entered into or relied on this Escrow Agreement or arising out of or in connection with the Escrow Agent's services, even if the Escrow Agent was advised or otherwise made aware of the possibility of such damages; nor shall the Escrow Agent be liable for acts of God, acts of war, breakdowns or malfunctions of machines or computers, interruptions or malfunctions of communications or power supplies, labor difficulties, actions of public authorities, or any other similar cause or catastrophe beyond the Escrow Agent's reasonable control.

In the event that the Escrow Agent shall be uncertain as to its duties or rights under this Escrow Agreement, or shall receive any certificate, statement, request, notice, advice, instruction, direction or other agreement or instrument from any other party with respect to the Escrow Funds which, in the Escrow Agent's reasonable and good faith opinion, is in conflict with any of the provisions of this Escrow Agreement, or shall be advised that a dispute has arisen with respect to the Escrow Funds or any part thereof, the Escrow Agent shall be entitled, without liability to any person, to refrain from taking any action other than to keep safely the Escrow Funds until the Escrow Agent shall be directed otherwise in accordance with Joint Instruction or an order of a court with jurisdiction over the Escrow Agent.  The Escrow Agent shall be under no duty to institute or defend any legal proceedings, although the Escrow Agent may, in its discretion and at the expense of the Escrow Parties as provided in subsections (c) or (d) immediately below, institute or defend such proceedings.

(c)     Indemnification of Escrow Agent.  The Escrow Parties jointly and severally agree to indemnify the Escrow Agent for, and to hold it harmless against, any and all claims, suits, actions, proceedings, investigations, judgments, deficiencies, damages, settlements, liabilities and expenses (including reasonable legal fees and expenses of attorneys chosen by the Escrow Agent) as and when incurred, arising out of or based upon any act, omission, alleged act or alleged omission by the Escrow Agent or any other cause, in any case in connection with the acceptance of, or performance or non-performance by the Escrow Agent of, any of the Escrow Agent's duties under this Escrow Agreement, except as a result of the Escrow Agent's fraud, bad faith, willful misconduct or gross negligence.

(d)     Authority to Interplead.  The Escrow Parties authorize the Escrow Agent, if the Escrow Agent is threatened with litigation or is sued, to interplead all interested parties in any court of competent jurisdiction and to deposit the Escrow Funds with the clerk of that court.  In the event of any dispute under this Escrow Agreement, the Escrow Agent shall be entitled to petition a court of competent jurisdiction and shall perform any acts ordered by such court.

8.     Termination.  This Escrow Agreement and all the obligations of the Escrow Agent under this Escrow Agreement shall terminate upon the earliest to occur of the release of the entire Escrow Funds by the Escrow Agent in accordance with this Escrow Agreement or the deposit of the Escrow Funds by the Escrow Agent in accordance with Section 7(d) hereof.

8

9.     <u>Removal of Escrow Agent</u>.  The Escrow Parties acting together shall have the right to terminate the appointment of the Escrow Agent by giving no less than thirty (30) days' prior written notice, specifying the date upon which such termination shall take effect. Thereafter, the Escrow Agent shall have no further obligation to the Escrow Parties except to hold the Escrow Funds as depository and not otherwise.  The Escrow Parties agree that they will jointly appoint a banking corporation, trust company or attorney as successor escrow agent.  Escrow Agent shall refrain from taking any action until it shall receive Joint Instruction from the Escrow Parties designating the successor escrow agent. Escrow Agent shall deliver all of the then remaining balance of the Escrow Funds to such successor escrow agent in accordance with such instructions and upon delivery of the Escrow Funds, the Escrow Agent shall have no further duties or responsibilities with respect to the escrow established hereunder.

10.    <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign and be discharged from its duties and obligations hereunder at any time by giving no less than thirty (30) days' prior written notice of such resignation to the Escrow Parties, specifying the date when such resignation will take effect.  Thereafter, the Escrow Agent shall have no further obligation to the Escrow Parties except to hold the Escrow Funds as depository and not otherwise.  In the event of such resignation, the Escrow Parties agree that they will jointly appoint a banking corporation, trust company, or attorney as successor escrow agent within thirty (30) days of notice of such resignation.  Escrow Agent shall refrain from taking any action until it shall receive Joint Instruction from the Escrow Parties designating the successor escrow agent.  Escrow Agent shall deliver all of the then remaining balance of the Escrow Funds to such successor escrow agent in accordance with such instructions and upon delivery of the Escrow Funds, the Escrow Agent shall have no further duties or responsibilities with respect to the escrow established hereunder.

11.    <u>Accounting</u>.  On a monthly basis, the Escrow Agent shall render a written statement setting forth the balance of the Escrow Funds, all interest earned and all distributions made, which statements shall be delivered to the addresses set forth in <u>Section 14</u> below.

12.    <u>Survival</u>.  Notwithstanding anything in this Escrow Agreement to the contrary, the provisions of <u>Section 7</u> shall survive any resignation or removal of the Escrow Agent, and any termination of this Escrow Agreement.

13.    <u>Escrow Agent Fees, Costs, and Expenses</u>.  The Escrow Agent shall charge an initial administrative fee of $2,500, payable in advance upon the execution of this Escrow Agreement, and an annual administrative fee of $500, with the annual fee due on each annual anniversary date of this Escrow Agreement, which annual fees shall be invoiced. All administrative fees shall be deemed to have been earned when charged, and, if the Agreement is terminated at any time for any reason, whether voluntarily or involuntarily, the fee shall not be reduced or refunded.  Additionally, the Escrow Agent shall be entitled to be reimbursed for its customary fees and charges for any wire transfers or other depository services rendered in connection with the Escrow Funds and any delivery

9

charges or other out of pocket expenses incurred in connection the Escrow Funds. The Escrow Parties each acknowledge their joint and several obligation to pay any fees, expenses and other amounts owed to the Escrow Agent pursuant to this Escrow Agreement. The Escrow Parties agree that the Escrow Agent shall be entitled to pay itself for any fees, expenses or other amounts owed to the Escrow Agent out of the amounts held in the Escrow Funds and grant to the Escrow Agent a first priority security interest in the Escrow Funds to secure all obligations owed by them to the Escrow Agent under this Escrow Agreement.  The Escrow Parties further agree that the Escrow Agent shall be entitled to withhold any distribution otherwise required to be made from the Escrow Funds if any fees, expenses or other amounts owed to the Escrow Agent remain unpaid on the date such distribution would otherwise be made.

14.   <u>Notices</u>.  All notices under this Escrow Agreement shall be transmitted to the respective parties, shall be in writing and shall be considered to have been duly given or served when personally delivered to any individual party, or on the first (1st) business day after the date of deposit with an overnight courier for next day delivery, postage paid, or on the third (3rd) business day after deposit in the United States mail, certified or registered, return receipt requested, postage prepaid, or upon the receipt of  a fax or an email during normal business hours, addressed in all cases to the party at his or its address set forth below, or to such other address as such party may designate, provided that notices will be deemed to have been given to the Escrow Agent on the actual date received.  Any notice, request, demand, claim, or other communication hereunder directing the Escrow Agent to act or to refrain from acting shall include signatures of the authorized representative(s) of the requesting party(ies), and in the case of electronic mail the signature(s) shall be contained on a non-editable attachment (e.g., PDF) to the electronic mail.

If to Purchaser:

Extreme Networks, Inc.
6480 Via Del Oro
San Jose, CA 95119
Attention:      Katy Motiey
Telecopy:       (408) 904-7002
Email: kmotiey@extremenetworks.com

Copy to (but which shall not constitute notice to Purchaser):

Latham & Watkins
140 Scott Drive
Menlo Park, California 94024
Attention:      Tad Freese
Telecopy:       (650) 463-2600
Email: tad.freese@lw.com

If to the Company:

Avaya Inc.
4655 Great America Parkway
Santa Clara, California 95054
Attention:      Nancy Jordan
Telecopy:      (408) 562-2853
Email:           njordan@avaya.com

Copy to (but which shall not constitute notice to the Company):

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL  60654
Attention:      Richard J. Campbell, P.C.
                     Steve Toth
Telecopy:      (312) 862-2200
Email: richard.campbell@kirkland.com
           steve.toth@kirkland.com

If to the Escrow Agent:

BNY Mellon, National Association, Escrow Agent
c/o Escrow Services
Banking Services Support Center; Suite 154-0655
500 Ross Street
Pittsburgh, PA 15262
Phone:          (412) 234-7796 / (412) 234-2350 / (412) 234-8797
Telecopy:      (732) 667-4499 / (615) 932-4035
Email: escrowservices@bnymellon.com

Copy to (which shall not constitute notice to the Escrow Agent):

Abendroth, Berns & Warner LLC
40 Grove Street, Suite 375
Wellesley, MA 02482
Attention:      Bruce D. Berns, Esq.
Telecopy:      (781) 237-8891
Email: bruce@abwllc.com

Any notice may be given on behalf of any party by its authorized representative.  In all cases the Escrow Agent shall be entitled to rely on a copy or a fax or email transmission of any document with the same legal effect as if it were the original of such document.  The Escrow Parties shall promptly notify the Escrow Agent of any changes to the contact information contained in this Section 14 and the Escrow Agent may rely on the contact information contained in this Section 14 until notified of a change.

To facilitate the performance by the Escrow Agent of its duties and obligations hereunder, including resolving any issues arising hereunder (but not the giving of notice as provided above), the Escrow Parties agree that the Escrow Agent may contact the following representatives of each of the Escrow Parties identified below, or such other individuals as any of the Escrow Parties may identify by written notice to the Escrow Agent:

> Purchaser:
>
> Benjamin Drew Davies – ddavies@extremenetworks.com; (408) 579-2520
> Katayoun Motiey – kmotiey@extremenetworks.com; (408) 579-3237
> Quentin Wright – qwright@extremenetworks.com; (408) 579-2531
>
> The Company:
>
> Adele Freedman – afreedman@avaya.com; (408) 562-3400

15.    <u>Modifications; Waiver</u>.  This Escrow Agreement may not be altered or modified without the express prior written consent of all of the parties to this Escrow Agreement.  No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.

16.    <u>Further Assurances</u>.  If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Escrow Agreement and the transactions contemplated by this Escrow Agreement, the Escrow Parties shall execute and deliver any and all such agreements or other documents, and do all things reasonably necessary or appropriate to carry out fully the provisions of this Escrow Agreement.

17.    <u>Assignment</u>.  This Escrow Agreement shall inure to the benefit of and be binding upon the successors, heirs, personal representatives, and permitted assigns of the parties.  This Escrow Agreement is freely assignable by the Escrow Parties; provided, however, that no assignment by such party, or it successors or assigns, shall be effective unless prior written notice of such assignment is given to the other parties, including, without limitation, the Escrow Agent; and provided, further, that any assignee satisfies the Escrow Agent's requirements set forth in <u>Section 3</u> above.  This Escrow Agreement may not be assigned by the Escrow Agent, except that upon prior written notice to the Escrow Parties, the Escrow Agent may assign this Escrow Agreement to an affiliated or successor bank or other qualified bank entity.

18.    <u>Section Headings</u>.  The section headings contained in this Escrow Agreement are inserted for purposes of convenience of reference only and shall not affect the meaning or interpretation of this Escrow Agreement.

19.  <u>Governing Law</u>.  This Escrow Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to principles of conflicts of law.  In connection with any proceedings commenced regarding this Escrow Agreement, the parties hereto irrevocably and unconditionally submit to the jurisdiction of the Bankruptcy Court, if brought prior to the entry of a final decree closing the jointly administered proceedings under Chapter 11 of Title 11 of the United States Code, sections 101 *et. seq.*, styled *In re Avaya Inc., et al.*, Case No. 17-10089 (SMB) (S.D.N.Y., filed January 19, 2017).

20.  <u>Complete Agreement</u>. This Escrow Agreement and the documents referred herein contain the entire understanding of the parties hereto with respect to the transactions contemplated hereby and any prior agreements or understandings, whether oral or written, are entirely superseded hereby.

21.  <u>Business Days</u>. To the extent any payment or other action or delivery is required to be made on a date which is not a Business Day, then the period required for such payment, action or delivery will automatically be extended to the next Business Day immediately following. All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

22.  <u>Severability</u>. Whenever possible, each provision of this Escrow Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Escrow Agreement is held to be prohibited by or invalid under applicable Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

23.  <u>Third Party Beneficiaries.</u> Except as set forth herein, nothing herein shall expressed or implied is intended or will be construed to confer upon or to give any Person other than the Escrow Agent, the Company and Purchaser any rights or remedies under or by reason of this Escrow Agreement.

24.  <u>Specific Performance</u>. The obligations of the Escrow Parties and the Escrow Agent are unique in that time is of the essence, and any delay in performance hereunder by any party will result in irreparable harm to the other parties hereto. Accordingly, any party may seek specific performance and/or injunctive relief before any court of competent jurisdiction in order to enforce this Escrow Agreement or to prevent violations of the provisions hereof, and no party will object to specific performance or injunctive relief as an appropriate remedy. The Escrow Agent acknowledges that its obligations, as well as the obligations of any party hereunder, are subject to the equitable remedy of specific performance and/or injunctive relief.

25.  <u>Counterparts and Facsimile Execution</u>.  This Escrow Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  The exchange of copies of this Escrow Agreement and of signature pages by facsimile transmission, pdf or other electronic

means shall constitute effective execution and delivery of this Escrow Agreement as to the parties and may be used in lieu of the original Agreement for all purposes (and such signatures of the parties transmitted by facsimile, pdf or other electronic means shall be deemed to be their original signatures for all purposes).

26. <u>Waiver of Jury Trial</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 22</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties have executed this Escrow Agreement as of the date first written above.

**PURCHASER:**

EXTREME NETWORKS, INC.

BY: _____

NAME: Benjamin Drew Davies
TITLE: EVP, Chief Financial Officer

*[Signature Page to Escrow Agreement]*

**THE COMPANY:**

AVAYA INC.

BY: _____

NAME: Tamara K. Anthony
TITLE: Assistant Treasurer

*[Signature Page to Escrow Agreement]*

**ESCROW AGENT:**

BNY MELLON, NATIONAL ASSOCIATION

BY: _____

NAME: Diana J Burnell

TITLE: Vice President

*[Signature Page to Escrow Agreement]*

<u>**EXHIBIT A**</u>

**JOINT WRITTEN INSTRUCTIONS
FOR RELEASE OF ESCROW FUNDS**

Pursuant to Section 5 of the Escrow Agreement dated as of March 7, 2017, by and among Extreme Networks, Inc., a Delaware corporation ("<u>Purchaser</u>"), Avaya Inc., a Delaware corporation (the "<u>Company</u>" and together with Purchaser, the "<u>Escrow Parties</u>") and BNY Mellon, National Association (the "<u>Escrow Agent</u>"), Purchaser and the Company hereby instruct the Escrow Agent to release $[_____] from the [Deposit][Indemnity][1] Escrow Fund in accordance with the following instructions:

**Wire Instructions:**

Account Name:          _____
Account Number:       _____
Bank Name:               _____
Bank ABA Number:    _____
Bank Address:            _____
                                    _____
For credit to:             _____
Special Instructions:  _____
                                    _____

**Bank Check:**

Payee Name:             _____
Mailing Address:        _____
                                    _____
                                    _____

**PURCHASER:**                                          **THE COMPANY:**

EXTREME NETWORKS, INC.                      AVAYA INC.


By: _____               By: _____
Name:                                                      Name:
Title:                                                        Title:

Date:                                                        Date:

---

[1]Substitute appropriate term used in the escrow agreement for the escrowed funds from which the distribution is to be made.



# EXTREME RESELLER AGREEMENT
## (DIRECT)

This Extreme Reseller Agreement (the "Agreement") is made as of the last date executed below (the "Effective Date") between Extreme Networks, Inc., a Delaware corporation with its principal place of business at 6480 Via Del Oro, San Jose, CA  95118 USA ("Extreme") and Avaya Inc., a company with its principal place of business at 4655 Great America Parkway Santa Clara, CA 95054 ("Reseller" or "Channel Partner").

WHEREAS, Extreme is in the business of developing and selling certain networking Products (as defined below) and providing Services (as defined below); and

WHEREAS, Reseller wishes to be appointed, and Extreme wishes to appoint Reseller and its Affiliates who are lawfully able to resell Products and Services,  as  authorized Resellers of Products and Services in the Authorized Territory (as defined below) under the terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      <u>Definitions</u>.  In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

1.1      "Affiliate" means, with respect to Reseller, any corporation, firm, partnership or other entity that is controlled by, or is under common control with, Reseller.  "Affiliate" means, with respect to Extreme, any corporation, firm, partnership or other entity that is controlled by, or is under common control with, Extreme.

1.2      "Authorized Territory" means all countries in which Reseller sells Products and Services. Additional territories may be added upon written approval from Extreme. "End User" means a purchaser of the Products or End User Services who acquires such Products or End User Services for ordinary business usage and not for purposes of further distribution or resale.

1.3      "End User Documentation" means Product documentation, Product specifications and other related materials.

1.4      "End User Services" mean Extreme's support and maintenance services for End Users, if available for resale in accordance with the Reseller Program Guide and as set forth on the Price List.

1.5      "Extreme" shall mean Extreme Networks, Inc. and its approved subsidiaries and affiliates authorized to accept purchase orders hereunder (including Extreme Networks Ireland Limited).

1.6      "ExtremeWorks Services Agreement" means Extreme's then-current applicable ExtremeWorks terms and conditions, subject to revision from time to time in Extreme's sole discretion, and available at http://www.extremenetworks.com/about-extreme/terms-of-support.aspx.

1.7      "Intellectual Property Rights" mean any and all current and future (i) rights associated with works of authorship; including but not limited to copyrights, moral rights, and mask-work rights; (ii) patent rights, rights of priority, and design rights; (iii) trade secret rights, (iv)  trademark rights (including service mark rights) and trade dress rights; (v) all other intellectual and industrial property rights of every kind and nature which may exist anywhere in the world, whether registered or unregistered; and (vi) any and all applications and registrations, renewals, extensions, provisionals, continuations, continuations-in-part, divisions, reissues or reexaminations of any of the foregoing.

1.8      "Lead-time" means the lead time for each Product, as reasonably practicable, given to Reseller's requested shipping date, and based on Extreme's then-current lead times for the Products.



1.9    "Managed Services" means Reseller-provided services for Products installed in either Reseller's or an End User's network; Managed Services include, without limitation, automated client notifications, configuration management, incident and problem management, service desk, and monitoring.

1.10    "Managed Solution" means Reseller's use of the Products to provide Services as an outsourced or managed service provider to manage and support Products or Services sold to End Users; Managed Solution fees are calculated based on usage levels during a period of time where Reseller retains title to the hardware and operates the Products located on Reseller's or End User's premises as a service to End Users or to be accessed by End User in the operation of End User's internal businesses.

1.11    "Open Source Software" means a program in which the source code is freely available to the general public for use and/or modification from its original design, the license of which contains no obligations of warranty or indemnification.

1.12    "Price List" means Extreme's suggested retail price list applicable to the delivery location in effect at the time of order acceptance by Extreme, which price list is subject to revision from time to time in Extreme's sole discretion.

1.13    "Products" mean Extreme commercial networking products as identified in the Price List, including (i) hardware products with embedded Software, (ii) Software Products in object code form, (iii) End User Documentation, and (iv) other materials related to the foregoing, if any, supplied to Reseller in a commercial package.

1.14    "Reseller Program Guide" means the then current Channel Partner Program Guide for the Authorized Territory published by Extreme which sets forth the requirements for Resellers to participate in Extreme channel programs.  Extreme may change the Reseller Program Guide at any time with thirty (30) days' prior notice, or as expressly stated otherwise in the Reseller Program Guide, to Reseller by email, notification on Extreme's website, or any other method permitted under this Agreement.

1.15    "Services" mean the End User Services and any other services provided by Extreme under this Agreement in accordance with the applicable program guide.

1.16    "Software" or "Software Products" mean Extreme software products in object code form which are either sold separately or embedded into Extreme hardware products.  Software Products are licensed to the End User under the then-current software license terms for the Software Product in effect at the time of order acknowledgement by Extreme.

1.17    "Support Plan" means the Extreme support and maintenance plan for a Product, as described at http://learn.extremenetworks.com/rs/extreme/images/Extreme-Networks-Support-Program.pdf, including Extreme's obligations and End User or Reseller entitlements.

1.18    "Trademarks" mean "Extreme Networks" and the applicable Product trademarks as listed in Extreme's usage guidelines, subject to revision from time to time in Extreme's sole discretion.

2.    Appointment.  Subject to the terms and conditions set forth herein, Extreme appoints Reseller and its Affiliates as non-exclusive, authorized resellers of the Products and Services in the Authorized Territory and Reseller hereby accepts such appointment.  Future Products or Services are deemed added to this Agreement at such time as they are added to the Price List, unless otherwise specified by Extreme in writing.  Extreme has the right to discontinue the distribution or availability of any Product or Service at any time upon one-hundred eighty (180) days' prior notice to Reseller by email, notification on Extreme's website, or any other method permitted under this Agreement.  Extreme reserves the right to distribute the Products and Services in the Authorized Territory directly and indirectly through other resellers and distribution channels.



3. __Rights and Restrictions.__

3.1    __Distribution of the Products and Services.__  Extreme grants to Reseller the non-exclusive, non-transferable license to purchase the Products and Services from Extreme and to distribute such Products and Services to End Users located in, and for use in, the Authorized Territory, or use the Products in providing a Managed Service or Managed Solution to End Users located in the Authorized Territory.

3.2    __Reseller Prohibitions.__  Reseller agrees not to distribute the Products or Services (i) by mail order; (ii) in bulk for redistribution; (iii) to other resellers; (iv) by Internet, on-line service or other electronic means (except any Software releases solely as authorized by Extreme) (provided, however, that Reseller may use the Internet for the purpose of marketing the Products or Services or accepting online orders in conjunction with Reseller's direct sales force); or (v) to any entity whom Reseller knows or should reasonably conclude will use the Products primarily for purposes of benchmark or similar testing or in connection with timeshare or service bureaus.

3.3    __Restrictions on Copying and Reverse Engineering.__  As a material consideration for this Agreement, Reseller expressly agrees not to translate, disassemble, reverse compile or reverse engineer the Products, including the Software Products, in whole or in part, except to the extent such prohibition is restricted by applicable law.  Reseller will not copy, modify, create derivative works, rent, lease, loan or use for timesharing or service bureau purposes any Products except as part of a Managed Service or Managed Solution, including Software Products, in whole or in part without the prior written approval of Extreme, which approval may be withheld in Extreme's sole discretion..

3.4    __No Removal of Markings.__  Reseller agrees to comply with all legends that appear on or in the Products and not to remove or destroy any patent, copyright, logo, trademark, trade name, proprietary marking, or confidentiality legend placed upon or contained within Products, containers or End User Documentation supplied by Extreme.

3.5    __Reseller Program Guide.__  Notwithstanding any terms in this Agreement, the Reseller Program Guide, or other Extreme documentation, Reseller's discounts and participation in Extreme marketing or sales programs is as a "Diamond Partner" ( a certain designated status identified in the "Channel Partner Program Participation Level") for the first nine (9) months of this Agreement following the Effective Date. Thereafter, Reseller's Channel Partner Program Participation Level shall be as agreed by the parties, or absent agreement otherwise, shall be as set forth in the Reseller Program Guide. After the first nine (9) months of this Agreement following the Effective Date, Extreme reserves the right to change Reseller's Channel Partner Program Participation Level upon thirty (30) days' prior written notice (by email or any other method permitted under this Agreement) if Reseller otherwise fails to meet the requirements set forth in the Reseller Program Guide for the Diamond Partner Channel Partner Program Participation Level.

3.6    __Government Rights.__  If Software Products are being acquired by the U.S. Government, the Software and related End User Documentation are commercial computer software and commercial computer software documentation developed exclusively at private expense, and (a) if acquired by or on behalf of a civilian agency, will be subject to the terms of this computer software license as specified in 48 C.F.R. 12.212 of the Federal Acquisition Regulations and its successors; and (b) if acquired by or on behalf of units of the Department of Defense ("DoD") will be subject to the terms of this commercial computer software license as specified in 48 C.F.R. 227.7202, DoD FAR Supplement and its successors.

3.7    __Unauthorized Payments to Third Parties.__

3.7.1    Neither Reseller, nor any party acting on its behalf (including its agents, directors or employees) will (i) make, offer, or will cause to be made or offered, any payment, loan or gift of money or anything of value directly or indirectly to (a) any official or employee of any government, or any agency or instrumentality thereof; (b) any political party or official thereof or any candidate for political office; or (c) any other person to influence any act or decision of such person or party in order to retain or obtain business for, or gain any improper advantage for, either Reseller or Extreme Networks in connection with any transaction related to the Reseller Program; or (ii) take any action which would constitute a violation of the U.S. Foreign Corrupt Practices

EXTREME DIRECT RESELLER AGREEMENT
EXTREME NETWORKS, INC. CONFIDENTIAL AND PROPRIETARY



Act, the U.K. Bribery Act, the anti-corruption laws of Reseller's Authorized Territory, or any other applicable anti-bribery laws or international anti-bribery standards.

3.7.2    In addition, no payment shall be made to anyone for any reason on behalf of or for the benefit of Extreme Networks which is not properly and accurately recorded in the Reseller's books and records, including amount, purpose and recipient, all of which shall be maintained with supporting documentation.

3.7.3    In the event Extreme Networks has reason to believe that a breach of this Section has occurred or will occur, Extreme Networks may, without penalty, (a) withhold further delivery of Products and other performance under the Channel Partner Program until such time as it has received confirmation to its satisfaction that no breach has or will occur or (b) terminate Reseller's participation in the Channel Partner Program immediately in accordance with the Reseller Agreement.  Upon Extreme Networks' request, Reseller will complete and return a certification of compliance with this provision in a form acceptable to Extreme Networks in its sole discretion.  In addition, upon Extreme Networks' request and at its expense, Reseller's employees most knowledgeable of a suspected breach will also complete and return such certification.

4.    Terms.

4.1    Orders.  The terms and conditions of this Agreement will apply to any and all purchase orders submitted by Reseller and will supersede any different or additional terms on Reseller's purchase orders.  Each order shall be submitted by Reseller or its Affiliate, as applicable, to Extreme or Extreme's Affiliate for the particular country of delivery and/or performance. EACH SUCH ORDER SHALL CONSTITUTE A SEPARATE CONTRACT BETWEEN THE CONTRACTING PARTIES AND WILL INCORPORATE THE TERMS AND CONDITIONS OF THIS AGREEMENT. With respect to each such order, references in this Agreement to Reseller shall mean either Reseller executing this Agreement or its affiliate submitting the order, as the case may be, and references in this Agreement to Reseller shall mean the designated Reseller affiliate placing the order

4.2    Affiliates.

4.2.1    Affiliates of Reseller may purchase Services from Extreme under this Agreement on a per order basis.  Reseller hereby warrants that it is empowered to enter into this Agreement on behalf of such Affiliates and to bind (and does so bind) such Affiliates to the terms and conditions of this Agreement.

4.2.2    Any breach by Reseller or by an Affiliate of a) this Agreement, or b) any other agreement with Extreme or an Extreme affiliate, shall entitle Extreme to terminate this Agreement and all other agreements with Reseller or Affiliates in accordance with Section 12 (Term &Termination).

4.2.3    Limitations of liability set forth in Sections 13 and 14 of this Agreement shall be deemed an aggregate limit of liability, not per Affiliate, regardless of whether any Affiliates have executed a separate agreement with Extreme or an Extreme affiliate permitting such Affiliate to purchase under the terms of this Agreement.

4.3    Reseller shall submit purchase orders for Products and Services to Extreme. Except for and unless otherwise directed by Extreme, all orders must specify the name and location of the End User to whom Reseller will provide the Products or Services.  Each purchase order must be acknowledged and accepted by Extreme in writing prior to Extreme incurring any obligation under such purchase order.  Extreme shall accept orders in a timely manner. Extreme reserves the right to reject any order.

4.4    Reseller's purchase orders to purchase Products will be placed upon receipt by Reseller of purchase orders from End Users. Extreme will use commercially reasonable efforts to make deliveries in a timely manner of accepted orders, however, requested delivery dates must observe at least the Lead-time for the Products. In any case, Extreme will not be liable for any damages to Reseller or to any other person for Extreme's failure to fill any orders or for any delay in delivery or error in filling any orders for any reason whatsoever.  If requested



quantities of Products in a purchase order exceed Extreme's available inventory, Extreme will allocate its available inventory as Extreme deems equitable.

4.5    Cancellation.  Reseller may, prior to shipment of Product, terminate any portion or the total quantity of any purchase order for Product placed under this Agreement.  Reseller's liability to Extreme with respect to such cancellation shall be limited to the following:

| Number of Days Prior to Scheduled Shipment Date | Cancellation Charge (% of Purchase Price) |
| --- | --- |
| 0-7 calendar days | 15% |
| 16+ | 0% |

4.6    Price.  The prices for the Products and Services will be those set forth in the Price List in effect at the time Extreme ships the Products to Reseller or accepts the order for Services, as applicable, less any applicable discount.  Extreme reserves the right to change its Price List and any applicable discounts upon at least forty five (45) days prior written notice, by email, notification on Extreme's website, or any other method permitted under this Agreement, to Reseller.

4.7    Price Increase.  Extreme will give Reseller at least forty five (45) days' prior written notice, by email, notification on Extreme's website, or any other method permitted under this Agreement, of a price increase for any Product or Service.  If Reseller has extended written quotes to End Users at the former price prior to receipt of such notice, Reseller may, during the notice period, place orders for Products or Services for such quotes at the former price (provided, however, that such quotes only qualify if they are valid for ninety (90) consecutive days or less from the date generated for the End User).

4.8    Price Decrease.  Extreme will notify Reseller by email, notification on Extreme's website, or any other method permitted under this Agreement, of a price decrease for any Product or Service.  Extreme will grant Reseller a corresponding price reduction on ordered Products not yet shipped to Reseller as of the effective date of such price decrease.

4.9    Taxes and Duties.  The prices on the Price List do not include, and Reseller will pay, indemnify, and hold Extreme harmless from, any and all sales, use, excise, import or export, value added or similar tax that is not based on Extreme's net income or any duty, fee or charge (collectively the "Taxes") and any penalties or interest associated with any of the Taxes, imposed by any governmental authority with respect to any payment to be made by Reseller to Extreme under this Agreement or any Product or Services to be delivered by Extreme under this Agreement.

4.10    Shipments.  All shipments will be made EX WORKS (Extreme's facility or place of manufacture) (INCOTERMS 2010) to Reseller's shipping address.  Delivery will be deemed complete and risk of loss or damage to the Products will pass to Reseller when the Products are placed at the disposal of Reseller.  Reseller will instruct Extreme at the time of the order as to which carrier Extreme should use to transport Products.  Reseller will pay all costs, including, without limitation, costs of transportation, insurance, export and import fees, customs brokerage expenses and similar charges.  Reseller, at its expense, will make and negotiate any claims against any carrier, insurer, customs broker, freight forwarder or customs collector.  All Products will be deemed accepted by Reseller upon shipment.  Products may not be returned except as provided in Section 10 ("Warranty") or under a current maintenance support entitlement.

4.11    Payment.

4.11.1    Extreme will initiate the payment process by sending Reseller an invoice for Products within 10 Business Days of shipment, pursuant to Section 4.10, above.



4.11.2   All invoices will: (i) quote prices in U.S. Dollars unless otherwise agreed between Extreme and Reseller in writing; (ii) reference the applicable Purchase Order; and (iii) be sent electronically.

4.11.3   Except as otherwise reasonably required by Extreme, all payments will be due within forty-five (45) days after the date of Extreme's invoice.  Invoices for Products will be issued on or after the actual date of shipment of such Products.  Invoices for Services will be issued in advance for the entire term of Service.  Payment for the Products and Services and shipping costs and other amounts due will be made in United States dollars by check, irrevocable letter of credit, wire transfer or other means satisfactory to Extreme. Shipments, deliveries, and performance of work will at all times be subject to the approval of Extreme's credit department.

4.11.4   All sums not paid when due will accrue interest daily at the lesser of an annual rate of eighteen percent (18%) or the highest rate permissible by applicable law on the unpaid balance until paid in full.  If Reseller promptly notifies Extreme in writing of a good faith commercial dispute directly relating to any particular invoice, its failure to pay within the above time period will not be deemed a breach hereof by Reseller.  In the event such good faith dispute is not resolved within thirty (30) days following Extreme's receipt of such notice, Extreme may suspend its performance hereof, if it is commercially reasonable under the circumstances, without being deemed in breach as a result of such suspension and its performance times will be adjusted, accordingly.

4.11.5   Extreme reserves the right, at any time and in its sole discretion, to modify the credit terms or to terminate any credit extended to Reseller.  Shipments, deliveries, and performance of work will at all times be subject to the approval of Extreme's credit department.

5.      Services.

5.1      Orders for Services.  Each order of one Support Plan is only valid for a single unit or units of the Product for which Service is purchased and paid for.  All orders for Services must include the name and location of the End User, receiving the Services, the Support Plan being purchased and the model number and serial number of the Product to be supported or such information must be provided to Extreme in writing promptly following the purchase of the Services.  Extreme will not be obligated to provide Services for a Product unless Extreme has received such information.  Each purchase order for Services must be acknowledged and accepted by Extreme in writing prior to Extreme incurring any obligation under such purchase order. Extreme shall make commercially reasonable efforts to accept valid orders upon seven (7) business days of receipt. Extreme reserves the right to reject any order for Services.  All orders for Services placed with Extreme will be non-cancelable, and all support fees and training fees, if applicable, paid to Extreme shall be non-refundable, except in cases of Extreme's failure to cure a breach of its obligations in delivering such Services, provided, however, any claimed refund will be subject to any counterclaims or defenses of Extreme.  End User shall be responsible for any other travel and living expenses incurred in connection with the Services or on-site Service calls that are not expressly included in End User's applicable support plan.

5.2      Services Term.  The Services start date shall be determined as follows:  (a) for the initial purchase of Service, the Service start date shall be the original shipment date of the covered Product from Extreme Networks (if Reseller purchases the Product directly from Extreme Networks) or the POS transaction date (if Reseller purchases the Product through an Extreme Networks authorized Distributor), unless otherwise indicated on Extreme's quote to the Reseller, and (b) for Service renewals, the Service start date shall be the date on which the prior Service period ended.  Reseller shall be responsible for the Service Fees from such Service start date.  The Service end date will be 12 months from the Service start date, unless otherwise specified in writing by Extreme Networks. Unless either party provides notice at least sixty (60) days prior to the end of the End User Services term of its intent not to renew the End User Services, the End User Services will automatically renew for one (1) year subject to payment being received by Extreme for such End User Services.

5.3      Reinstatement and Inspection.  If Services are not ordered concurrently with any Product orders after the Effective Date, or are not promptly renewed each year, Extreme may, at its option, commence such Services upon payment of the applicable support fee and a reinstatement fee.  If a Product is purchased in used condition, Extreme may, at its option, inspect the Product and commence Services for such Product upon payment of the applicable support fee, a reinstatement fee and Extreme's inspection fee.



5.4    Support for End of Life.

5.4.1    Product End of Life.  In the event Extreme discontinues or otherwise ceases to make available to its customers a particular Product model number, Extreme will continue to offer Services for such Product in accordance with its then-current End of Life Policy available at http://www.extremenetworks.com/support/end-of-sale-and-end-of-support-products/ . The Services shall remain in effect with respect to other Products, if any, then covered.

5.4.2    Support Plan End of Life.  Extreme reserves the right to discontinue any Support Plan in its sole discretion upon sixty (60) days' notice, by email, notification on Extreme's website, or any other method permitted under this Agreement, to Reseller; however, Extreme will continue to provide services under such discontinued Support Plan through the end of any prepaid support period so long as the Reseller is not in breach of any of its obligations under this Agreement.

5.5    End User Services.  In countries where End User Services are available from Extreme, Reseller may purchase such End User Service as set forth on Extreme's then-current Price List by submitting an order for such End User Service either at the time of the purchase of the Product to which it relates or at any time thereafter, subject to Section 5.3 ("Reinstatement and Inspection"), Section 5.4 ("Support for End of Life") and Extreme's acceptance of such order at its reasonable discretion.  Extreme will provide the End User Services to End Users in accordance with the ExtremeWorks Services Agreement.  In the event that Reseller fails to purchase any End User Service for a Product for any reason, Extreme may at its option sell End User Services for such Product directly or indirectly to the End User or renew End User Services for such Product, as applicable, in which case the End User will pay any fees for such End User Services directly to Extreme.

5.6    Reseller Services. Subject to the qualification requirements applicable thereto, and subject to authorization from Extreme under a separate writing, Reseller may purchase Reseller Services from Extreme pursuant to the terms and conditions of Exhibit A ("Reseller Services").

6.    Reseller Obligations.

6.1    Resources.  Reseller will maintain, at its expense, adequate facilities and personnel to perform its obligations under this Agreement.  Reseller will maintain a trained sales organization with sufficient numbers of sales and support staff trained in the Products to market, sell and assist in the support of Products and Services in the Authorized Territory pursuant to marketing plans reviewed by Extreme.  Reseller shall, at its cost, cause at least one of its employees from each of Reseller's locations to successfully complete Extreme's sales training program as offered by Extreme or its authorized representatives.  Reseller shall maintain one salesperson so trained at each of its locations during the term of this Agreement.

6.2    Records and Audit.  Reseller agrees to maintain complete, clear and accurate records relating to its activities under this Agreement, including, without limitation, its inventory and sales of each Product and Service (including reseller and end user information) (the "Records"), and retain such Records for such time period as may be required by law and commercially reasonable prudent practices, but not less than two (2) years.  Such Records will be maintained in accordance with standard business practices and Generally Accepted Accounting Principles.  Reseller will permit Extreme, or persons designated by Extreme, at Extreme's cost, to audit the Records to ensure compliance by Reseller with its obligations to Extreme.  Any such audit shall be conducted during regular business hours and in such a manner as to not unduly interfere with normal business activities of Reseller.   If the audit reveals an underpayment of amounts owed to Extreme, Reseller will promptly pay any such shortfall, and if such underpayment is more than 5% for the audited period, Reseller will further pay, or reimburse Extreme for, the cost of the audit, including professional fees.

6.3    Marketing.  Reseller agrees to use commercially reasonable efforts to market and distribute the Products and End User Services in the Authorized Territory, and agrees that its marketing and advertising efforts will be of high quality, in good taste, and will preserve the professional image and reputation of Extreme and the Products and End User Services.  Reseller will include in all such advertising all applicable copyright and trademark notices (subject to the trademark license in Section 8 ("Trademark License")) as they appear on or in the Products or as specified by Extreme from time to time.  Reseller shall (i) notify Extreme prior to



making a translation of material relating to Extreme, and (ii) provide a copy of the translated material via facsimile to Extreme for Extreme's written approval prior to use of the translated material.  Extreme will provide a reasonable amount of advertising material, as requested by Reseller, for use in Reseller's efforts to market the Products.

7.     <u>Return Process</u>.  If Reseller is returning the Product to Extreme, Reseller must first obtain a Return Material Authorization ("RMA") number from Extreme.  Reseller must return the entire contents of the defective Product and dated End User proof of purchase for the defective Product, if requested by Extreme, marked with the RMA number, to a receiving point designated by Extreme within thirty (30) days of Reseller's receipt of the RMA number from Extreme.  Shipping cartons that are not marked with RMA numbers will be rejected by Extreme and returned to Reseller via collect freight.  Extreme will pay the transportation charges (excluding taxes, duties and customs) in accordance with the Support Plan purchased for such Product.  Products returned to Extreme may be repaired or replaced by Extreme at Extreme's sole discretion.  Replacement Products may be new or refurbished Products.  In the event that Extreme evaluates and determines there is "no trouble found" in greater than twenty-five percent (25%) of the Products or parts returned in a ninety (90) day period, Extreme reserves the right to charge Reseller a service charge of twenty percent (20%) of the List Price per unit.

8.     <u>Trademark License</u>.  Extreme grants to Reseller a non-exclusive, non-transferable, limited license to use the Trademarks solely in Reseller's advertising and promoting the Products and Services, in accordance with applicable law and Extreme's Trademark usage guidelines, as provided by Extreme from time to time.  Reseller expressly acknowledges and agrees that it will not adopt, use or register as a trademark, service mark, trade name, business name, corporate name or domain name or any part thereof, any word or symbol or combination thereof that is similar to any Trademark.  Reseller will not add or affix to any Product or its packaging any mark or designation that has not been approved by Extreme in writing.  Reseller may not in any way combine any Trademark with any other mark or designation without prior written approval of Extreme.  Reseller agrees not to affix any Trademark to any product other than the Product to which it pertains.  Reseller understands and agrees that (i) Reseller will not have or acquire any right in or to any Trademark, and (ii) all use by Reseller of any Trademark hereunder, and goodwill associated therewith, will inure to the exclusive benefit of Extreme, and (iii) Extreme owns the exclusive right, title and interest in and to the Trademarks, and (iv) Reseller will not, directly or indirectly, in any country or location, dispute the ownership of any Trademark.  Only Extreme, and not Reseller, is entitled to register the Trademarks or similar trademarks in any class of products or services worldwide.

9.     <u>Ownership of Intellectual Property Rights and Non-Disclosure</u>.

9.1     <u>Intellectual Property Rights</u>.  Reseller acknowledges that the Products are proprietary to Extreme and its suppliers, and that Extreme and its suppliers retain exclusive ownership of all Intellectual Property Rights in and to the Products, including in and to any Software Products and Trademarks.  Reseller will take all reasonable measures to protect Extreme's Intellectual Property Rights in any Product.  Except as expressly provided herein, Reseller is not granted any right to any Intellectual Property Rights with respect to any Product.

9.2     <u>Non-Disclosure</u>.  Each party may be exposed to certain confidential information of the other party including but not limited to information concerning the business, technology, and customers of the party, which the party knows or should know is the other party's confidential and proprietary information (herein "<u>Confidential Information</u>").  Each party agrees that while this Agreement is in effect and for a period of three (3) years thereafter, it will not: (i) use the Confidential Information for any purpose other than to perform under this Agreement; or (ii) disclose to any third party any Confidential Information without the prior written consent of the disclosing party.  Each party may disclose Confidential Information only to its employees or contractors on a need to know basis and as is reasonably necessary to allow the party to perform under this Agreement; provided that each such employee or contractor is under a written obligation of nondisclosure which protects the Confidential Information under terms at least as stringent as these terms.  This Section will not apply to Confidential Information after such information is made public by the disclosing party.  Except as set forth herein or in a separate non-disclosure agreement between Extreme and Reseller, neither Extreme nor Reseller has any obligation of confidentiality to the other.  If any Confidential Information is required to be disclosed by a party as a matter of law or by order of a court or other legal process, such party will promptly notify the other party of such obligation to disclose and reasonably assist the other party in obtaining a protective order or otherwise limiting such disclosure.  Each party agrees to keep confidential and not to disclose the terms and conditions of this Agreement to any third party other than (i) in confidence to its affiliates, actual or potential investors, banks, lawyers, accountants and other



professional advisors; (ii) in connection with the enforcement of its rights under this Agreement; (iii) as may be required by law, including, without limitation, in connection with the requirements of a public offering or securities filing, and (iv) in confidence in connection with a merger or acquisition or a proposed merger or acquisition. The existence of this Agreement is not confidential.

10.    Warranty.

10.1    Warranty. Extreme warrants the Products solely to End Users, as of the date of purchase by End User, and pursuant to the terms and conditions of the Extreme standard warranty posted on http://www.extremenetworks.com/support/policies/ or for software, subject to the software license agreement posted on http://www.extremenetworks.com/company/legal/. Extreme warrants the End User Services solely to End Users and pursuant to the ExtremeWorks Services Agreement. No warranty is extended to Reseller.

10.2    Warranty Service. Upon the return of a defective hardware product by an End User to Reseller that qualifies under the warranty provisions as posted on Extreme's external website as of the date of purchase, Reseller shall promptly return the defective hardware product to the source from which Reseller obtained it (e.g., Extreme or Extreme's authorized agents) to provide warranty service for such Product. Reseller shall return the hardware product to Extreme in accordance with Section 7 ("Return Process").

10.3    Limitations and Disclaimer of Warranties and Conditions. ALL PRODUCTS AND SERVICES ARE PROVIDED TO RESELLER "AS IS" AND WITHOUT WARRANTY OF ANY KIND. EXTREME EXPRESSLY DISCLAIMS ALL WARRANTIES, TERMS AND CONDITIONS, WHETHER EXPRESS, IMPLIED (in fact or by operation of law), STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY, TERM OR CONDITION OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, CORRESPONDENCE WITH DESCRIPTION, ABSENCE OF HIDDEN DEFECTS, ANY WARRANTY OF NON-INFRINGEMENT, AND ANY WARRANTY, TERM OR CONDITION THAT MAY ARISE BY REASON OF USAGE OF TRADE, CUSTOM, COURSE OF DEALING OR COURSE OF PERFORMANCE. RESELLER EXPRESSLY AGREES THAT RESELLER MAY NOT MAKE ANY WARRANTY OR REPRESENTATION, WHETHER EXPRESS, IMPLIED OR OTHERWISE ON BEHALF OF EXTREME AND WILL INDEMNIFY AND HOLD HARMLESS EXTREME IN THE EVENT OF ANY VIOLATION OF THIS SECTION 10.3.

11.    Indemnification.

11.1    Extreme Intellectual Property Indemnity. Extreme will defend or, at its option, settle, any claim, action or proceeding brought against Reseller by a third party to the extent it relates to or is based on, a claim or allegation that any item of Product directly infringes a copyright or trade secret or a United States or European Union patent of a third party, and pay any and all damages and costs finally awarded against Reseller in any such action or proceeding that are attributable to any such claim or incurred by Reseller through settlement thereof, but Extreme will not be responsible for any compromise made or expense incurred without its consent. Extreme's obligation to defend and pay hereunder is subject to the condition that Reseller (a) gives Extreme prompt written notice of any such claim; (b) permits Extreme to have sole control over the defense (including selection of counsel) and investigation and all negotiations for the settlement and compromise of any such claim, including any appeals; (c) reasonably cooperates with Extreme in the investigation, defense or settlement of any such claim, and provides all available information, assistance and authority, at Extreme's expense, to enable Extreme to investigate, defend, compromise or settle such claim; and (d) not enter into any settlement or compromise of any such claim without Extreme's prior written approval. Extreme will have no obligation or liability to Reseller with respect to any claim of infringement which is based upon (i) a modification of a Product by anyone other than Extreme; (ii) a combination of a Product with any third party software or hardware where such combination is the cause of such infringement; (iii) the use of a version of a Product other than the then-current version if infringement would have been avoided by the use of the then-current version and such current version was made available; or (iv) a claim against any Open Source Software. Upon notice of an alleged infringement or if in Extreme's opinion such a claim is likely, Extreme will have the right, at its sole option and expense, to (x) obtain for Reseller the right to continue to distribute the applicable Products; (y) modify the applicable Products so that they become non-infringing or substitute other non-infringing hardware or software with similar operating capabilities; or (z) if Extreme determines that neither (x) nor (y) described above are commercially reasonable, Extreme may terminate Reseller's distribution



rights for the applicable Products in the applicable territories and upon return of such all affected Products by Reseller to Extreme, Extreme will refund the fees paid by Reseller for the infringing copies of the Products, less depreciation on a five (5) year straight line basis. THIS <u>SECTION 11.1</u> ("EXTREME INTELLECTUAL PROPERTY INDEMNITY") SETS FORTH EXTREME'S SOLE AND EXCLUSIVE LIABILITY AND RESELLER'S SOLE AND EXCLUSIVE REMEDIES FOR INFRINGEMENT BY THE PRODUCTS OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS OF ANY KIND.

          11.2   <u>Reseller Indemnity</u>.  Reseller agrees to defend, indemnify and hold harmless Extreme from and against any and all damages, liabilities, costs, expenses (including reasonable attorneys' fees, expert fees and other legal expenses) and settlement amounts incurred in connection with any suit, claim, or action by any third party against Extreme as a result of the actual or alleged (i) negligence, misrepresentation, error or omission on the part of Reseller or its representatives relating to or concerning the Products or Services; (ii) failure by Reseller to distribute the Products in the form shipped by Extreme; (iii) infringement of a patent, copyright, trade secret or other Intellectual Property Right of a third party by a product or service of Reseller; or (iv) breach by Reseller of any of its obligations under Section 15.8 ("Export"). Reseller's obligation to defend and pay hereunder is subject to the condition that Extreme (a) gives Reseller prompt written notice of any such claim; (b) permits Reseller to have sole control over the defense (including selection of counsel) and investigation and all negotiations for the settlement and compromise of any such claim, including any appeals; (c) reasonably cooperate with Reseller in providing available information, assistance and authority, at Reseller's expense, to enable Reseller to investigate, defend, compromise or settle such claim; and (d) not enter into any settlement or compromise of any such claim that will impair any rights of Extreme or cause Extreme to pay monies without Extreme's prior written approval.  THIS SECTION 11.2 ("RESELLER INDEMNITY") SETS FORTH RESELLER'S SOLE AND EXCLUSIVE LIABILITY AND EXTREME'S SOLE AND EXCLUSIVE REMEDIES FOR CLAIMS, ACTIONS, OR PROCEEDINGS OF ANY KIND BROUGHT BY THIRD PARTIES ALLEGING THOSE CLAIMS SET FORTH IN SUBSECTIONS (i) THROUGH (iv).

     12.   <u>Term and Termination</u>.

          12.1   <u>Term</u>.  Unless terminated by either party in accordance with <u>Section 12.2</u> ("Termination"), the term of this Agreement shall commence as of the Effective Date of this Agreement and shall continue for one (1) year thereafter and shall automatically renew from year to year.

          12.2   <u>Termination</u>.  This Agreement may be terminated earlier and at any time:

               12.2.1   by either party, for its convenience, upon sixty (60) days' prior written notice to the other party; or

               12.2.2   by Extreme, immediately upon written notice to Reseller, if Reseller breaches or violates any provision of <u>Sections 3</u> ("Rights and Restrictions"), <u>8</u> ("Trademark License") or <u>9</u> ("Ownership of Intellectual Property Rights and Non-Disclosure"); or

               12.2.3   by either party, immediately upon written notice to the other party, if such other party fails to perform or otherwise defaults in any of its obligations (other than those covered by <u>Section 12.2.2</u> above) under this Agreement and fails to cure such failure or default within thirty (30) days after written notice thereof to such other party; or

               12.2.4   by either party, immediately upon written notice to the other party, if the other party is insolvent or makes any arrangement with its creditors generally, or has a receiver appointed for all or a substantial part of its business or properties, or an insolvency, bankruptcy or similar proceeding is brought by or against such other party and involving such other party as debtor, and if brought against such other party is not dismissed within sixty (60) days from its institution, or if such other party goes into liquidation or otherwise ceases to function as a going concern.  Furthermore, Extreme may cancel the shipment of any Products ordered by Reseller that have not yet been shipped at the time of such notice, unless otherwise restricted by any court of competent jurisdiction, including but not limited to a bankruptcy court.



      12.3    <u>Effect of Termination</u>.  Upon expiration or termination of this Agreement, for whatever reason:

      12.3.1    Reseller's status as an Extreme authorized reseller will immediately terminate.  Reseller will immediately cease using the Trademarks and discontinue all representations that it is an Extreme reseller.  Extreme will be entitled to (i) reject all or part of any orders received from Reseller after notice but prior to the effective date of termination; and/or (ii) require Reseller's performance of any outstanding orders notwithstanding the fact that delivery dates for such orders may extend beyond the effective date of termination.  Notwithstanding any credit terms extended to Reseller prior to that time, any Products shipped during such period will be paid for in full by certified or cashier's check prior to shipment.

      12.3.2    Reseller will submit to Extreme within ten (10) days after the effective date of termination a summary of the number of the respective Products owned by Reseller as of the effective date of termination.  Extreme may, at its option, repurchase any or all such Products from Reseller upon written notice, by email or any other method permitted under this Agreement, to Reseller within a reasonable period after receiving the inventory summary, at prices to be agreed upon between Extreme and Reseller, but in no event greater than the respective prices paid by Reseller for such Products.  After Extreme's receipt of such Products from Reseller, Extreme will issue an appropriate credit to Reseller's account and refund any amount greater than the outstanding balance due Extreme.

      12.3.3    The payment date of all monies due Extreme will automatically be accelerated so that they will become due and payable on the effective date of termination, even if longer terms had been provided previously, unless otherwise restricted or prohibited by any court of competent jurisdiction, including but not limited to a bankruptcy court.

      12.3.4    By thirty (30) days from the effective date of termination, Reseller will return or destroy all copies of the Confidential Information.  At the request of Extreme,  a Reseller employee with appropriate signatory approvals will certify in writing that Reseller has complied with its obligations hereunder.

      12.4    <u>Survival of Terms</u>.  The following Sections will survive any expiration or termination of this Agreement for whatever reason:  <u>Sections 3.3</u> ("Restrictions on Copying and Reverse Engineering"), <u>3.5</u> ("No Removal of Markings"), <u>3.7</u> ("Government Rights"), <u>3.8</u> ("Unauthorized Payments to Third Parties"), <u>4.6</u> ("Taxes and Duties"), <u>4.7</u> ("Shipments"), <u>4.8</u> ("Payment"), <u>5.4</u> ("Support for End of Life"), <u>6.2</u> ("Records and Audit"), <u>7</u> ("Return Process"), <u>8</u> ("Trademark License"), <u>9</u> ("Ownership of Intellectual Property Rights and Non-Disclosure"), <u>10</u> ("Warranty"), but only as to Products or Services sold prior to the effective date of expiration or termination of this Agreement, <u>11</u> ("Indemnification"), <u>12.3</u> ("Effect of Termination"), <u>12.4</u> ("Survival of Terms"), <u>13</u> ("No Consequential Damages"), <u>14</u> ("Limitation on Liability") and <u>15</u> ("Miscellaneous").

      13.    <u>No Consequential Damages</u>. EXCEPT IN CASES OF (A) EITHER PARTY'S LIABILITY FOR BODILY INJURY OR DEATH; (B) RESELLER'S OBLIGATIONS SET FORTH IN SECTION 3.2 (RESELLER PROHIBITIONS), 3.3 (RESTRICTIONS ON COPYING AND REVERSE ENGINEERING), AND SECTION 9.1 (INTELLECTUAL PROPERTY RIGHTS); (C) EITHER PARTY'S VIOLATION OF SECTION 9.2 (NON-DISCLOSURE); OR (D) RESELLER'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 11.2 (i), (ii) and (iv) (RESELLER INDEMNITY), UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES OF ANY KIND OR NATURE WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS (EVEN IF THEY ARISE AS A DIRECT OR IMMEDIATE CONSEQUENCE OF THE EVENT THAT GENERATED THE DAMAGES), LOST BUSINESS, LOST REVENUE OR LOST SAVINGS, LOSS OF USE, LOSS OR DAMAGE TO DATA OR GOODS OR INTERRUPTION OF BUSINESS, IN EACH CASE HOWEVER CAUSED, AND WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF WARRANTY, STRICT LIABILITY OR OTHERWISE, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY EXCLUSIVE REMEDY PROVIDED HEREIN.  IN NO EVENT WILL EITHER PARTY BE LIABLE FOR THE COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES.



14.    Limitation on Liability.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, EXCEPT IN CASES OF (A) EITHER PARTY'S LIABILITY FOR BODILY INJURY OR DEATH; (B) EITHER PARTY'S BREACH OF SECTION 9.2 (NON-DISCLOSURE) OR SECTION 11 (INDEMNIFICATION); AND (C) AS TO RESELLER, SECTION 3.2 (RESELLER PROHIBITIONS), 3.3 (RESTRICTIONS ON COPYING AND REVERSE ENGINEERING), AND SECTION 9.1 (INTELLECTUAL PROPERTY RIGHTS), EACH PARTY'S AGGREGATE LIABILITY FROM OR IN RELATION TO THIS AGREEMENT AND THE PRODUCTS AND SERVICES, WHETHER ARISING IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, SHALL BE LIMITED TO EITHER (A) THE TOTAL AMOUNT PAID OR PAYABLE BY RESELLER TO EXTREME FOR THE PRODUCTS OR SERVICES GIVING RISE TO THE CLAIM IN THE MOST RECENT FULL CALENDAR YEAR PRECEDING EITHER PARTY'S INITIAL NOTICE OF ANY CLAIM OR POTENTIAL CLAIM HEREUNDER; OR (B) ONE MILLION DOLLARS ($1,000,000), WHICHEVER IS GREATER.  THIS LIMITATION IS CUMULATIVE AND SHALL APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE AND NOT PER INCIDENT.

15.    Miscellaneous.

15.1    Notices.  Notices will be sent to the address set forth above, attention Legal Department, unless a party notifies the other party in writing of an alternative contact and address for notices.  Any notices permitted or required under this Agreement will be in writing and will be deemed given when delivered in person, by overnight courier upon written verification of receipt, by confirmed facsimile, or by certified or registered mail, return receipt requested, five (5) days after deposit in the mail.

15.2    Assignment.  This Agreement may not be assigned by Reseller by operation of law or otherwise without the prior written approval of Extreme, which approval shall not be unreasonably withheld. Extreme's rights and obligations, in whole or in part, under this Agreement may be assigned or delegated by Extreme to any affiliated company or subsidiary or in connection with a merger, reorganization, consolidation or sale of all or substantially all of Extreme's assets.  This Agreement shall bind and inure to the benefit of the parties and their successors and permitted assigns.

15.3    Waiver; Severability.  The waiver by either party of a breach of any provisions contained herein shall be in writing and shall in no way be construed as a waiver of any succeeding breach of such provision or the waiver of the provision itself.  In the event that any provision of this Agreement shall be unenforceable or invalid under any applicable law or be so held by applicable court decision, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole, and, in such event, such provision shall be changed and interpreted so as to best accomplish the objectives of such provision within the limits of applicable law or applicable court decisions.

15.4    Injunctive Relief.  It is expressly agreed that a violation of Sections 3 ("Rights and Restrictions"), 8 ("Trademark License") or 9 ("Ownership of Intellectual Property Rights and Non-Disclosure") of this Agreement could cause irreparable harm to a party and that a remedy at law would be inadequate.  Therefore, in addition to any and all remedies available at law, a party will be entitled to seek injunctive relief or other equitable remedies in the event of any threatened or actual violation of any or all of the provisions hereof.

15.5    Controlling Law; Venue.  This Agreement shall be governed in all respects exclusively by the laws of the State of California and the United States of America without regard to conflicts of law principles. The United Nations Convention on the International Sale of Goods is hereby expressly excluded from application to this Agreement.  All disputes arising under this Agreement shall be brought in Superior Court of the State of California in Santa Clara County or the Federal District Court of San Jose, as permitted by law, and Reseller consents to personal jurisdiction in such courts.

15.6    Timing of Disputes.  All disagreements or controversies of any kind whether claimed in tort, contract or otherwise concerning this Agreement shall be brought within two (2) years after the occurrence of the event giving rise to the disagreement or controversy.

15.7    No Agency.  Nothing contained herein shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties.



15.8    Export.  Reseller acknowledges that it must comply with all applicable laws and regulations of the United States that may restrict the export, re-export, or transshipment of certain commodities and technical information, including the Products, the Services and technical information relating thereto, in any medium.  Reseller will obtain and maintain all approvals and licenses, including export licenses, permits and authorizations, from the appropriate governmental authorities as may be required to enable Reseller to fulfill its obligations under this Agreement and shall comply with all applicable laws, rules, policies and procedures of the United States government.  Reseller acknowledges that, unless prior written authorization is obtained from the relevant authorities in the United States, it will not export, re-export, or transship, directly or indirectly, any Products, Services or technical information relating thereto, in any medium that would be in contravention to any applicable laws and regulations of the United States then in effect.  Reseller shall indemnify and hold harmless Extreme for any violation or alleged violation by Reseller of such laws or regulations.  Reseller's obligations pursuant to this Section shall survive and continue after any termination of rights under this Agreement.

15.9    Force Majeure.  Neither party will have the right to claim damages if this Agreement is terminated as a result of the other party's failure or delay in performance due to circumstances beyond its reasonable control (except for obligations relating to fees payable under this Agreement), including, but not limited to, labor disputes, strikes, lockouts, shortages of or inability to obtain labor, energy, components, raw materials or supplies, war, riot, insurrection, epidemic, natural disasters, governmental action or terrorism.

15.10    Counterparts; Facsimile Signatures.  This Agreement may be signed in multiple counterparts that together shall form a single agreement as if the parties had executed the same document.  The parties agree that execution of this Agreement evidenced by facsimile or electronic signature constitutes due execution and delivery thereof and that a photocopy or facsimile copy of the executed Agreement will be binding on and admissible by the parties to the same extent as an executed original.

15.11    Entire Agreement.  This Agreement (including Exhibits and any then current applicable Reseller Program Guide or other program guide) constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes, and its terms govern, all prior and all contemporaneous proposals, negotiations, commitments, understandings, agreements or other communications between the parties, oral or written, regarding such subject matter.  Any prior agreements between Extreme and Reseller covering the subject matter of this Agreement are hereby terminated.

15.12    Amendment.  This Agreement may not be modified except by a subsequently dated written amendment signed on behalf of Extreme and Reseller by their duly authorized representatives.

Therefore, the parties hereto have caused this Agreement to be executed by their duly authorized representatives on the date shown below.

EXTREME NETWORKS, INC.                    AVAYA INC.

By:  _____        By:  _____

Print Name:_____        Print Name:_____

Title:  _____        Title:  _____

Date:  _____        Date:  _____



EXHIBIT A

Reseller Services

1.  **Definitions.**  As used in this exhibit regarding PartnerWorks Program Services (the "Services Terms"), the following terms have the meanings set forth below.  Unless otherwise defined herein, all defined terms shall have the meaning set forth in the Agreement.

1.1  "Certified Engineers" means Reseller's engineers providing services to End Users who have been trained and certified by Extreme, as further defined within the applicable Extreme PartnerWorks Program Guide, by complying with Extreme's then-current certification requirements, as solely determined by Extreme and as set forth at www.extremenetworks.com/solutions/technical-training.aspx at the "Channel Partners" link.

1.2  "Defect" means a failure of any Product to operate in accordance with Extreme's technical specifications as set forth in the Documentation.

1.3  "PartnerWorks Program Guide" means the then current guidelines published by Extreme for the Authorized Territory which sets forth the requirements for qualified Resellers to participate in Extreme's PartnerWorks program.  Extreme may change the PartnerWorks Program Guide at any time pursuant to notice to Reseller by email, publication on Extreme's website, or any other method permitted under this Agreement.

1.4  "Releases" means Updates and Upgrades, collectively.  No Alpha or Beta or non-production versions shall be considered Releases.

1.5  "Reseller Services" means the support and maintenance services for Resellers, if available in accordance with the applicable program guide and as set forth on the Price List, provided by Extreme to Resellers pursuant to these Services Terms and the applicable Support Plan.

1.6  "GTAC" means Extreme's Global Technical Assistance Center.

1.7  "Update" means a new version of a Software Product that includes defect corrections, bug fixes and/or minor enhancements that operate within the framework of the specifications for the current Upgrade of the Software Product, but does not include substantive features or functions not performed by the prior Release of the Software Product.

1.8  "Upgrade" means a new version of a Software Product that includes substantive features or functions not performed by the prior Release of the Software Product.

2.  Reseller Qualification and Requirements.  Upon execution of the Agreement (except as set forth below) and until the expiration or termination of this Support Exhibit, Reseller must meet the following requirements:

2.1  Minimum Performance Requirements.  Reseller's discounts and participation in Extreme's PartnerWorks program is subject to, and Reseller must meet the minimum performance requirements set forth in, the PartnerWorks Program Guide. Reseller's initial participation level in the PartnerWorks Program shall be PartnerWorks / PartnerWorks Plus, except and unless as separately communicated in writing from Extreme (the "PartnerWorks Program Participation Level").  In the event that, at any time, Reseller does not meet the requirements for such PartnerWorks Program Participation Level or any other requirements of the PartnerWorks Program Guide, in addition to any other rights under this Agreement, Extreme may, at its sole option, (a) change Reseller's PartnerWorks Program Participation Level upon thirty (30) days prior written notice (by email or any other method permitted under this Agreement), (b) terminate this Support Exhibit immediately, or (c) prohibit Reseller from purchasing Reseller Services until such time as the Reseller demonstrates compliance with the terms of the PartnerWorks Program Guide.

2.2  End User Support.  Reseller shall be solely responsible for providing support to the End User in accordance with Reseller's PartnerWorks Program Participation Level.  All support provided to End Users by Reseller shall be at Reseller's expense.  Reseller will have the resources and qualified technical staff needed to provide the required support level in accordance with Reseller's PartnerWorks Program Participation Level, and to meet any other requirements of this Support Exhibit and any other resource requirements set forth in the



PartnerWorks Program Guide. Reseller may purchase training for potential and existing Certified Engineers from Extreme or Extreme's authorized training partners on an "as-available" basis at such authorized training partner's then-current rates. Reseller shall provide and update, as appropriate, contact information for the Certified Engineers, including address, phone number and email address.

2.3    Reseller Assistance.  Reseller agrees to provide Extreme with reasonable access to the Products for which problems are reported and all back-ups and Reseller information services, technical personnel, facilities, and premises as required in connection with the performance of the Reseller Services.  To efficiently resolve problems and perform local hardware diagnostics, Reseller shall provide modem level access for all Reseller sites if permitted by the End User.  Reseller may provide passwords and/or activate the modem when needed.  Reseller's failure to provide such access or information may delay the Reseller Services and/or result in Extreme's inability to perform the Reseller Services; in such cases, Extreme shall not be liable for any consequences relating to or resulting from such delay or failure to perform.

3.    Releases and Corrections.  In accordance with the Support Plan purchased for the applicable Product, the Reseller Services may include the following:

3.1    Releases.  Extreme or its authorized representatives will make available to Reseller all Releases made generally available by Extreme only for Products for which Reseller has an active contract for Reseller Services.  The content of all Releases shall be decided upon by Extreme in its sole discretion.  Updates for Products for which Reseller has an active contract for Reseller Services shall be provided to Reseller at no additional charge during the term of this Support Exhibit for Reseller's use to support its End Users.  Extreme shall impose additional charges for Upgrades.  Reseller agrees to distribute to End Users any Updates made available to Reseller for each Product covered by the Reseller Services and ensure implementation of such Updates.  Reseller shall distribute and install only one (1) copy of a Release for each Product under an active contract for Reseller Services, and Reseller is prohibited from installing Releases on any Product which is not covered under an active contract for Reseller Services.

3.2    Corrections.  Extreme shall use commercially reasonable efforts to provide a correction or workaround for any reported and reproducible Defect in any Product for which the Reseller Services have been purchased with a level of effort commensurate with the severity level; provided that Extreme shall have no obligation to correct all Defects in the Products.  Reseller shall notify Extreme TAC above of the nature and severity of such Defect and the specific serial number of the applicable Product, and provide Extreme with enough information to locate and reproduce the Defect.  Extreme shall not be responsible for correcting any Defect not attributable to Products or any Defect listed under Section 4 ("Exclusions").

4.    Exclusions.  The Reseller Services provided by Extreme hereunder will not include support and maintenance of any third party software or hardware not provided by Extreme.  Extreme is not required to provide any services for problems arising out of:  (i) Reseller's failure to implement all Updates issued under the Reseller Services; (ii) alterations of or additions to the Products performed by parties other than Extreme; (iii) accident, natural disasters, terrorism, negligence, or misuse of the Products (such as, without limitation, operation outside of environmental specifications or in a manner for which the Products were not designed); (iv) interconnection of the Products with other products not supplied by Extreme; or (v) certain components, including but not limited to the following: spare fan trays, blank panels, cables, cable kits, rack mount kits, brackets, antennas, GBICs and miniGBICs.  Extreme shall only be obligated to support the then-current revision of the Products and the immediately prior revision.  Support for any earlier revisions or for other problems not covered under the Reseller Services may be obtained at Extreme's then-current rates for special technical services and on Extreme's then-current terms and conditions for such services, subject to acceptance by Extreme at its sole discretion.

5.    License and Warranties.  All Releases provided under the Reseller Services are licensed subject to and warranted in accordance with the terms and conditions of the Software license agreement provided with the Release.  Replacement Products provided hereunder are warranted for the remaining warranty period of the original Product, if any, as specified in the warranty card which shipped with the original Product.  Nothing in the Reseller Services shall be construed as expanding or adding to the warranty set forth on the warranty card or the Software license agreement.  Extreme will use all reasonable commercial efforts to provide the support requested by Reseller under the Reseller Services in a professional and workmanlike manner.  In the event that Extreme fails to meet this



warranty, Extreme may re-perform the Reseller Services, but Extreme cannot guarantee that every question or problem raised by Reseller will be resolved.

     6.     <u>Required Purchases and Discounts</u>.

     6.1     <u>Required Purchases</u>.  Notwithstanding anything to the contrary in the Agreement, for each Product purchased following the Effective Date, Reseller must purchase either Reseller Services or End User Services concurrently with such purchase.  Upon renewal of the Services, or for the purchase of Services for Products purchased prior to the Effective Date, Reseller may order either Reseller Services or End User Services.

     6.2     <u>Discounts</u>.  Any discounts for Reseller Services, if applicable, shall be set forth in the PartnerWorks Program Guide.

     7.     <u>Term and Termination</u>.

     7.1     The term of this Support Exhibit shall commence on the Effective Date and, unless terminated earlier, will continue until expiration or termination of the Agreement.  This Support Exhibit may be terminated earlier and at any time:

     7.1.1     by either party, for its convenience, upon sixty (60) days' prior written notice to the other party, notwithstanding the continuing effect of the Agreement;

     7.1.2     by Extreme, immediately upon written notice to Reseller, if Extreme reasonably determines that Reseller has failed to meet its obligations under Section 2 ("Reseller Qualification and Requirements") and Reseller has not cured such failure within ten (10) days of written notice; or

     7.1.3     by either party, immediately upon written notice to the other party, if such other party fails to perform or otherwise defaults in any of its obligations under this Support Exhibit and fails to cure such failure or default within thirty (30) days after written notice thereof to such other party.  Failure of Reseller to purchase either Reseller Services or End User Services concurrently with the purchase of each Product purchased following the Effective Date, as required by Section 6.1 ("Required Purchases") above, is deemed a material breach for purposes of this Section.

     7.2     <u>Effect of Termination</u>.  Upon the expiration or termination of this Support Exhibit: (i) Reseller's status as an Extreme authorized reseller of Reseller Services will immediately terminate and Reseller shall immediately discontinue all representations that it is an Extreme authorized reseller of Reseller Services; (ii) all unpaid support fees and other charges payable for Reseller Services shall become immediately due and payable; (iii) all support fees and training fees paid prior to the effective date of termination shall be non-refundable; and (iv) Extreme will no longer have any obligation to provide Reseller Services to Reseller or any End Users for the Products pursuant to this Support Exhibit; provided however that Extreme will continue to provide Reseller Services during any prepaid support period so long as this Support Exhibit was not terminated for Reseller's breach.  The following Sections will survive any expiration or termination of this Support Exhibit for whatever reason: Sections 5 ("License and Warranties") and 7.2 ("Effect of Termination").

# AVAYA

## HARDWARE AND SOFTWARE OEM AND RESALE AGREEMENT TERM SHEET

### ("TERM SHEET")

This Term Sheet is made part of the Asset Purchase Agreement (the "APA") entered into by Extreme Networks, Inc. and Avaya, Inc. and is effective on the effective date of the APA. The parties agree that, as part of the APA, the parties will need to enter into a Hardware and Software OEM and Resale Agreement ("OEM Agreement") which will allow Avaya and its affiliates ("Avaya") to use/integrate certain Extreme hardware and software products ("Products") with and into certain Avaya offerings ("Integrated Products"). This Term Sheet outlines the material terms and conditions that the parties agree should be incorporated into the OEM Agreement, as written, or as the parties otherwise agree in writing. The parties agree to negotiate in good faith and finalize the terms and conditions of the OEM Agreement with the intent to finalize and execute the OEM Agreement no later than eight (8) weeks from the effective date of this Term Sheet.

## 1. SCOPE

1.1     The right to sell/license the Extreme Products as part of, or for use with, the Integrated Products shall be:

1.1.1     Worldwide.

1.1.2     The term of the OEM Agreement shall be for a limited period of time, as agreed by the parties.

1.1.3     The OEM Agreement shall survive any termination or expiration of the APA until all customer agreements have been terminated or have expired. All software licenses to customers shall survive any termination or expiration. Notwithstanding any continuation of this OEM Agreement upon expiration or termination of the APA, each party acknowledges that the OEM Agreement shall always be interpreted as being limited in duration to a definite term and that the other party has made no commitments whatsoever regarding the duration or renewal of the OEM Agreement beyond those expressly stated therein.

1.1.4     Avaya shall the right to sell/license the Products for use with Integrated Products directly or indirectly through Avaya's partners.

1.1.5     The Integrated Products may be used by Avaya, its partners, and their respective customers in environments such as on-premises, hosted solutions and subscription models.

1.1.6     The Products shall be branded as Avaya products and licensed/sold under Avaya's terms and conditions provided such terms and conditions are consistent with the terms and conditions of the OEM Agreement.

1.1.7    Avaya shall have the right to have Avnet (or a similarly situated subcontractor, contractor or contract manufacturer) exercise Avaya's rights on Avaya's behalf to manufacture, support and sell/license the Integrated Products, pursuant to the terms of the OEM Agreement.

## 2.    PRICING, TAXES AND ORDERING.

2.1.    Purchase Price. For Products, pricing shall be as set forth in Attachment A to this Term Sheet. All Purchase Prices will be in U.S. Dollars.

2.2.    Taxes. Avaya is responsible for all sales, use, value added and similar taxes, however designated, imposed or payable, to any federal, state, local or foreign tax or government authority on the Products provided by Extreme under the OEM Agreement (individually and collectively, "Taxes"); provided, however, that Avaya shall not be responsible for any Taxes on the income of Extreme.

2.3.    Avaya may order Product(s) under the OEM Agreement by issuing Purchase Orders to Extreme. Extreme must accept any Purchase Order that meets the requirements of the OEM Agreement. Avaya will pay Extreme software license fees in arrears on a quarterly basis for the software licenses distributed to and activated by end users during the preceding quarter. Avaya will provide Extreme with a rolling 12 month non-binding forecast of Avaya's Product requirements. The forecast is merely to provide Extreme with an estimate of Avaya's Product needs, based upon historical data. Product Lead Times shall be no more than 30 days.  Minimum Order Quantities ("MOQs") shall be one (1).

## 3.    INVOICING AND PAYMENT.

3.1.    All invoices provided to Avaya related to the purchase of Products will be paid subject to the payment terms of the Reseller Agreement, entered into by the parties in conjunction with the APA on or about February 16, 2017.

3.2.    All invoices will: (i) quote prices in U.S. Dollars unless otherwise agreed between Extreme and the ordering party in writing; (ii) reference the applicable Purchase Order, and where applicable, release; and (iii) be sent electronically, in a mutually agreeable format.

## 4.    PRODUCT WARRANTIES.

Extreme warrants the Products solely to Avaya as set forth in Attachment E.

Upon the return of a defective hardware product by an End User to Avaya that qualifies under the warranty provisions set forth above, Avaya shall promptly return the defective Product to the source from which Avaya obtained it (e.g., Extreme or Extreme's authorized agents) to provide warranty service for such Product.

## 5.    QUALITY, SUPPORT AND MAINTENANCE REQUIREMENTS.

Extreme acknowledges Avaya's support and maintenance requirements set forth in Attachment C and the logistics and the quality requirements as set forth in Attachment B and D, and believes that, as to Attachment C, those requirements are, in general, similar to the Extreme "PartnerWorks"

2

support options. Extreme shall provide PartnerWorks support to Avaya available as in the Partner Program Guide, attached as Attachment F.

Avaya may purchase End User Services as set forth on Extreme's then-current Price List by submitting an order for such End User Service either at the time of the purchase of the Product to which it relates or at any time thereafter.

In addition, Extreme agrees to provide the Product necessary to support Avaya's current and future customers in accordance with the terms of such customer support agreements. Avaya may, at its option, elect to continue receiving maintenance and support under the terms of Attachment C for the duration of the OEM Agreement for any Product that is subject to termination or expiration, provided that Avaya continues to pay the applicable fees as set forth therein.

6.    **INDEMNIFICATION** – To be negotiated based on industry standard norms.

7.    **LIMITATION OF LIABILITY**

WITH THE EXCEPTION OF INDEMNIFICATION OBLIGATIONS AND BREACHES OF CONFIDENTIALITY, (A) NIETHER PARTY SHALL BE LIABLE FOR TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE ARISING OUT OF THIS AGREEMENT OR THE SALE OF PRODUCTS, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING THE POSSIBILITY OF NEGLIGENCE OR STRICT LIABILITY), OR OTHERWISE, EVEN IF THE PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE, AND EVEN IF ANY OF THE LIMITED REMEDIES IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND (B) IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER UNDER THIS AGREEMENT EXCEED THE GREATER OF: (I) FIVE MILLION DOLLARS (USD$5,000,000) OR (II) TWO TIMES THE FEES PAID AND PAYABLE UNDER THE OEM AGREEMENT IN THE 12 MONTHS IMMEDIATELY PRECEDING THE EVENT WHICH GAVE RISE TO SUCH CLAIM.

8.    **FORWARD AND BACKWARD COMPATABILITY**

Extreme and Avaya will meet and work together on a mutually agreed process with respect to forward compatibility of the Integrated Products and the Products. The parties will examine the current versions of each to determine their functional compatibility, ease of integration, and additional functionality of the two. In addition, the parties will share with each other their respective product roadmaps. Nothing in this Section will preclude the parties from agreeing to have Extreme engage in design services to make the Products and the applicable Avaya products compatible.

9. **END-OF-LIFE**

Product End of Life. In the event Extreme discontinues or otherwise ceases to make available to its customers a particular Product model number, Extreme will continue to offer Services for such Product in accordance with its then-current End of Life Policy at:
http://www.extremenetworks.com/support/end-of-sale-and-end-of-support-products/.       The Services shall remain in effect with respect to other Products, if any, then covered.

Support Plan End of Life. Extreme reserves the right to discontinue any Support Plan in its sole discretion upon sixty (60) days' notice, by email, notification on Extreme's website, or any other method permitted under this Agreement, to Avaya; however, Extreme will continue to provide services under such discontinued Support Plan through the end of any prepaid support period so long as the Avaya is not in breach of any of its obligations under this Agreement.

10. **CONFIDENTIALITY**

Confidential Information shall be exchanged in accordance with existing confidentiality provisions/agreements, but in any case, each party agrees to keep in strict confidence all information regarding this Term Sheet and related negotiations. Upon expiration or termination of this Term Sheet, each party upon request will promptly return to the other party all documents, contracts, records, or other information received by it that disclose or embody confidential information of the other party. The provisions of this paragraph shall survive expiration or termination of this Term Sheet.

11. **GOVERNING LAW**

This Term Sheet shall be governed by the same laws governing the APA. Upon execution of the OEM Agreement this Term Sheet will be of no force or effect. Each party shall bear its own expenses in connection with the negotiation and execution of the OEM Agreement.

**EXTREME NETWORKS, INC.**          **AVAYA INC.**

Signed: _____          Signed: _____

Printed                            Printed
Name: _____            Name: _____

Title: _____           Title: _____

Date: _____            Date: _____

Ver. 2/16/17      Hardware and Software OEM and Resale Agreement Term Sheet      Confidential Information

# ATTACHMENT A
## PRODUCTS, PRICING, CONTACT INFORMATION

## I.  CONTACT INFORMATION:

**Avaya Inc.:**

| | |
|---|---|
| Avaya Inc. | |
| Global Sourcing Organization | |
| OEM Hardware Procurement | |
| 1300 W. 120th Ave. | |
| Westminster, CO 80234 | |
| | |
| With a copy to: | |
| VP Commercial Law | |
| Avaya Inc. <br> 4655 Great America Parkway <br> Santa Clara, CA 95054-1233 <br> USA | |
| +1 908 953 8006 | |

**Extreme Networks, Inc.:**
**Notice Information:**

| | |
|---|---|
| **Extreme Networks, Inc.** | |
| Attn:  Legal Department | |
| 6480 Via Del Oro | |
| San Jose, CA 95119 | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

## II.  PRODUCTS, PRICING:

1.  **Extreme's pricing to Avaya for Products and Support shall be as follows:**

   a.  Hardware, Software and Upgrade Advantage Support will be sold to Avaya at a seventy five percent (75%) discount off of List Price.

   b.  Support Advantage (for Product software) and on-site and parts support for Products will both be sold to Avaya at a forty five percent (45%) discount off of List Price

Ver. 2/16/17        Hardware and Software OEM and Resale Agreement Term Sheet        Confidential Information

c. Avaya shall pay Extreme for Level 4 support, for support advantage for existing CPOD support end-user customer contracts, on a prorated basis, based on the percentage of support revenue currently used by Avaya to provide Level 4 support.

| Extreme Active Product List Price | | |
|---|---|---|
| VENDOR PN | PRODUCT | LIST PRICE |
| AA1403015-E6 | SFP+ SR MMF 300M | $995.00 |
| AA1403019-E6 | SFP+ DIRECT ATTACH CABLE 3M | $338.00 |
| AA1404029-E6 | QSFP+ TO QSFP+ DAC CABLE 1M | $445.00 |
| AA1419043-E6 | SFP 1000BASE-T (RJ-45) | $389.00 |
| AH2735001-3.0 | COM 3.0.1 (Base 50 devices) | $4,570.00 |
| AH2735003 | COM Upgrade 50-250 devices | $2,900.00 |
| AH2735006-3.0 | BCM Base (100 Devices) | $2,420.00 |
| AH2735010-1.0 | VPS 1.0.2 (20 Devices) | $3,935.00 |
| AH2735012-3.0 | VSN (SPBm) 3.0 Mgmt | $1,825.00 |
| AH3313149-2.0 | IPFM 2.0.2 (4 Devices) | $7,670.00 |
| AL1905E08-E5 | VSP4850 Redunant 300w/AC PSU | $466.00 |
| EB1639243PA | IDE R9 STARTER KIT BYOD LIC:DS | $4,995.00 |
| EC4800E78-E6 | VSP 4850GTS with 48 10/100/1000 & 2 SFP ports plus 2 SFP+ ports | $7,835.00 |
| EC4810015 | VSP4K Premier LIC | $5,615.00 |
| EC7200A1B-E6 | VSP 7254XSQ B2F - AC PSU NO PC | $34,295.00 |
| EC7205A1B-E6 | VSP 7200 460W AC PSU B2F (NO PC) | $695.00 |
| EC8011002-E6 | VSP 8K Chas Rck Mnt Kit - 300-900MM | $495.00 |

Ver. 2/16/17       Hardware and Software OEM and Resale Agreement Term Sheet       Confidential Information

## ATTACHMENT B: LOGISTICS REQUIREMENTS

These Material Terms and Logistics Requirements are part of the OEM and Resale Agreement between Avaya and Extreme (the "Agreement"). They apply if and to the extent Avaya purchases or receives Products or Materials, as applicable, under the OEM Agreement. Capitalized terms not otherwise defined herein will have the meanings set forth in the APA. For the purposes of this Attachment, unless expressly stated otherwise, the term "Material" will mean Product and/or Material.

1.        SHIPPING. Material will be shipped in accordance with the Incoterms as stated on Avaya's Purchase Orders. The Delivery Date for each Purchase Order will be 30 days or less from the date the Order is received by Extreme or as agreed upon by Extreme and Avaya as set forth in the Purchase Order.

2.        INVOICING FOR GOODS. Extreme will, through routing and weight, render separate invoices for each shipment within 24 hours of shipment.

3.        NON-EXCLUSIVE MARKET RIGHTS. This Agreement neither grants to Extreme an exclusive right or privilege to sell to Avaya any or all Material, which Avaya may require, nor requires the purchase of any Material or other products from Extreme by Avaya.

4.        SPECIFICATIONS OR DRAWINGS. Extreme will provide Avaya with at least 30 days prior written notice of any change proposed to be made by Extreme in the Material furnished pursuant to said Technical Specification under this Agreement.

5.        MATERIAL CHANGES. Extreme agrees to notify Avaya in writing at least 30 days in advance of any change proposed to be made in accordance with this Agreement, or in the Specification and Documentation covered by this Agreement that would impact upon: (i) reliability; (ii) requirements of the Specification; or (iii) Form, Fit or Function (as defined below).

6.        SAFETY CERTIFICATION. All Material purchased under this Agreement will be designed to be in compliance with the applicable Underwriters Laboratories ("UL") and Canadian Standards Association ("CSA") rules and regulations or any other rules and regulations as may be necessary for sale of Material in a specified country. In addition, should Avaya indicate that Material is intended to be sold outside the United States then Extreme will advise Avaya of countries where Material meets local requirements and is approved for sale. REGISTRATION AND RADIATION STANDARDS.

## ATTACHMENT C: MAINTENANCE AND SUPPORT

Avaya requests the following maintenance and support services on the part of Extreme and Avaya:

1.    Avaya Support Obligations

A.    Sale of Services.    Avaya will offer to its customers maintenance and support Services ("ExtremeWorks") on the Product on an optional basis and will place Purchase Orders with Extreme for such ExtremeWorks Services in accordance with the terms of the OEM Agreement. Avaya will perform account management and control, invoicing and payment processing, and all other customer facing activities and obligations related to the Services provided in accordance with the terms of the OEM Agreement, unless otherwise agreed by the parties in writing. In connection with each resale of the Product, Avaya will offer maintenance and support Services to new End Users and renew service agreements with the existing Customers as applicable.  Such maintenance and support Services will be sold under terms between Avaya and the respective End User, and will consist of Services from both Avaya and the Extreme as described in this Attachment. Each support related Purchase Order submitted by Avaya to Extreme will identify the support option selected, if any, as provided at: http://www.extremenetworks.com/support/customer-care-2/ (Support Services).

B.    Invoicing and Payment (applies to this Attachment only.)

    i.    Initial term and Renewals. The maintenance and support Services term between Extreme and Avaya with respect to a specific End User will be one year from the date of such maintenance and support Service as provided on Avaya's or the applicable Ordering Party's Purchase Order unless a shorter or longer Services term is specified in the Purchase Order. Support coverage periods will be adjusted upon a request from Avaya to allow for Customer acceptance periods or Customer requests to co-terminate all its services agreements. Extreme will invoice the annual (or as adjusted per above) fee for the Service option selected by Avaya or the applicable Ordering Party for the respective End User, as specified at Attachment A. The maintenance and support Services fee will be invoiced by Extreme within ten (10) days of a receipt of the Purchase Order from Avaya or the Ordering Party, quarterly.  Failure to submit invoices in a timely manner (and within the same fiscal time period) may jeopardize payments to Extreme in part or in full.  In case (i) Avaya/ Ordering Party or its End User elects not to renew the service agreement, (ii) Extreme terminates maintenance and support Services for nonpayment, or (iii) maintenance and support Services have otherwise lapsed with respect to any Product, Avaya may reinstate Services by purchasing a new service agreement which will commence upon the date Extreme acknowledges Avaya's or the applicable Ordering Party's Purchase Order for such Services.  Reinstatement may be conditioned upon Extreme inspection of the Integrated Product to be supported, and the payment by Avaya of any fees associated with such inspection and reinstatement in accordance with the payment terms of the Reseller Agreement.

    ii.    Cancellations.  In the event of an End User cancellation of a service agreement with Avaya, an Ordering Party or Avaya Reseller for Extreme's supported Integrated Product, Avaya will have the ability to cancel associated maintenance and support Services with Extreme upon thirty (30) days written notice without penalty. Any prepayments for maintenance and support Services will be refunded or credited against future support purchases.

9

C.    Services Support

    i.  Avaya, Ordering Party or Avaya's Resellers are responsible for providing (Tiers I through III) technical support.

    ii.  Avaya or Ordering Party (as applicable) will maintain facilities and other resources sufficient to provide technical service, support and assistance as provided under this Agreement.

3.    Extreme Obligations

A.    Training.  Extreme will provide online product and post-sales support training for Avaya personnel with respect to each Release of Product listed in Attachment A as of the Effective Date, and all Product added thereafter during the Term and any Renewal Terms of the OEM Agreement.  This online training will be equivalent to those training opportunities made available to other Support Service customers.

B.    Technical Support Lab Software.  Extreme will provide to Avaya, at no cost 5 copies of Product which is representative of the products covered by this Agreement (including all Updates and Upgrades) for use in support labs to replicate Troubles and to provide support as defined at section 2 above.

C.    Services Support (All support will be available to Avaya 24x7x52 or 8x5x52 customer local time)

    i. Extreme will provide Avaya and Ordering Party with solution support engineering - product management and design & development (Tier IV). This support will include Extreme undertaking the following:

        1.    Receipt of Avaya's or Ordering Party's request for assistance through Extreme's technical assistance center.

        2..    Troubleshooting and resolution of Product related problems via telephone, remote dial in connection, and/or on-site. Extreme will analyze the system malfunction, or remotely access the system to verify existence of the problem and condition under which it exits or reoccurs.

        3.    Providing recommendations to clear fault and or provide updated software and/or hardware to resolve the fault.

        4.    Commencing remedial maintenance Services activities, including software maintenance (bug) fixes, documentation and update release.

        5.    Extreme will provide support Services for each customer support plan purchased for which Extreme has received payment from Avaya or Ordering Party.  See Post Agreement Termination Support Obligations section 3.K.i.

Ver. 2/16/17    Hardware and Software OEM and Resale Agreement Term Sheet    Confidential Information

| Extreme Discontinued Product List for Support | |
|---|---|
| **VENDOR PN** | **PRODUCT** |
| AL4800A79-E6 | ERS4826 GTS, 24P BaseT w/SFP+ Uplink |
| AL1905A08-E5 | ERS4826 Redundant 300w/AC PSU |
| AL700001B-E6 | VSP 7024XLS 24 PORT SFP+ B2F BASE |
| AL7000MT1-E6 | VSP7008 XT 8 Port BaseT MDA |
| AL7000A0B-E6 | VSP 7000 AC PSU B2F No PC |
| AL5911001-E6 | ERS5900 FOUR POST RACK MOUNT KIT |
| AL7018001-E6 | 0.6m 7K Fiber Interconnect Stack Cable |
| EC4800E78-E6 | VSP 4850GTS with 48 10/100/1000 & 2 SFP ports plus 2 SFP+ ports |
| AL1905E08-E5 | VSP4850 Redundant 300w/AC PSU |

Ver. 2/16/17        Hardware and Software OEM and Resale Agreement Term Sheet        Confidential Information

## ATTACHMENT D: QUALITY TERMS

**QUALITY REQUIREMENTS**

1. EXTREME PERFORMANCE

Avaya will measure and track overall quality performance of Extreme based on adherence to all requirements and will use various tools (Audit Assessment scores, DOA/field return data analysis, customer claims/escalations, surveys, test and inspection results, CAR results, etc.) to continually rate and score Extreme concerning overall quality performance during the term of the OEM Agreement. These scores and ratings will be used to evaluate Extreme's ongoing quality performance.

2. ISO AND ENVIRONMENTAL COMPLIANCE

Extreme commits to ensure that all contract manufacturing Extremes which contribute to the design, production, delivery and service of Product sold to Avaya are certified to ISO9001:2000 and ISO 14001 or equivalent by an accredited Registrar by the effective date of this agreement. The foregoing notwithstanding, in cases where certification plans are in process after the effective date, Extreme will provide estimated completion dates to Avaya within 30 days of the effective date of this agreement. Extreme shall provide Avaya copies of Extremes ISO certificates, and/or other industry Certificates upon request.

Ver. 2/16/17    Hardware and Software OEM and Resale Agreement Term Sheet    Confidential Information

# Extreme Networks
# Product Warranty

Additional Extreme Networks product warranty information may be found at:
http://www.extremenetworks.com/support/policies

THIS WARRANTY IS GIVEN TO THE ORIGINAL PURCHASING END USER AND IS APPLICABLE
ONLY TO PRODUCTS AND LICENSED MATERIALS AS LISTED HEREIN AND SOLD OR
DISTRIBUTED TO SUCH END USER BY EXTREME NETWORKS, INC. (INCLUDING EXTREME
NETWORKS IRELAND LIMITED, A WHOLLY OWNED SUBSIDIARY, COLLECTIVELY "EXTREME")
OR AN AUTHORIZED EXTREME CHANNEL PARTNER.

PRODUCT REGISTRATION WITHIN 30 DAYS AFTER PURCHASE IS REQUIRED TO VALIDATE
PRODUCT WARRANTY TO ENSURE FULL AVAILABILITY OF SERVICES ELIGIBILITY. FAILURE
TO DO SO MAY RESULT IN DELAYS IN RECEIVING WARRANTY SUPPORT.



# Extreme Networks Product Warranty

## Table 1 — Extreme Product Warranty Summary of Entitlements

| WARRANTY | DURATION OF WARRANTY "WARRANTY PERIOD" | GLOBAL TECHNICAL ASSISTANCE CENTER* | ESUPPORT | SOFTWARE/ FIRMWARE SUPPORT | HARDWARE REPLACEMENT [1] |
|---|---|---|---|---|---|
| 1 Year Warranty | One Year | One Year | One Year | 90 Days defective Software Media Replacement | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| 5 Year Warranty | Five Years | Five Years | Five Years | Two years for Base Operational Software [2] Updates | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| Limited Lifetime Warranty – 10 Business Day Ship | Product Lifetime [3] | Product Lifetime | Product Lifetime | Product Lifetime for Base Operational Software Updates and Upgrades [4]<br><br>One Year for Advanced Software License Updates [5] | Advanced exchange replacement hardware is shipped within 10 business days |
| Limited Lifetime Warranty With Express Advanced Hardware Replacement [6] | Product Lifetime | Product Lifetime | Product Lifetime | Product Lifetime for Base Operational Software Updates [7] | Advanced exchange replacement hardware shipped next business day from RMA approval time |
| Limited Lifetime Warranty 15 Day Return To Factory Ship | Product Lifetime | Product Lifetime | Product Lifetime | One year for Base Operational Software Updates | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| Limited Lifetime Warranty With Express Advanced Hardware Replacement-2 | Product Lifetime | Product Lifetime | Product Lifetime | Product Lifetime for Base Operational Software Updates and Upgrades | Advanced exchange replacement hardware shipped next business day from RMA approval time |
| Software Warranty [8] | 90 Days | 90 Days | 90 Days | 90 Days | N/A |
| 1 Month Warranty (WiNG) [8] | 1 Month for Hardware | 90 Days | 1 Month | N/A | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| 3 Month Warranty (WiNG) [8] | 3 Months | 90 Days | 3 Months | N/A | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| 1 Year Warranty (WiNG) [8] | One Year | 90 Days | 1 Year | 90 Days — Defective software media replacement | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |
| Limited Lifetime Warranty [8] (WiNG) | Product Lifetime | 90 Days | Product Lifetime | 90 Days — Defective software media replacement | Return and Replace — Hardware shipped within 10 business days of receipt of defective asset |

* 8 AM to 5 PM (Monday to Friday) local End User's time.

[1] Actual delivery times may vary depending on specific End User location.

[2] Base Operational Software as defined by Extreme below.

[3] Product Lifetime is as further defined and conditioned by Extreme below.

[4] Updates and Upgrades are as further defined by Extreme below.

[5] Advanced Software License and Advanced Software License Updates are as further defined by Extreme below.

[6] Advanced exchange replacement hardware delivered next business day from RMA approval time for A2, B2/C2, B3/C3, G3 products in North America, Western Europe and Australia only. Advance Hardware Replacement as further defined and conditioned by Extreme below.

[7] Sustaining / Maintenance update releases as defined by Extreme below.

[8] This warranty is also applicable to the WLAN and ADSP products acquired from Zebra technologies by Extreme Networks. Provisions provided under the Extreme Warranty are continuations of the Zebra warranty provisions in place at the time of the acquisition.



# Product (Limited) Warranty

## HARDWARE PRODUCT WARRANTY

Subject to the limitations and conditions set forth herein, Extreme warrants to the original purchasing End User that each unit of Extreme hardware products ("Hardware Products" or "Products") will be free from defects in material and workmanship under normal use consistent with Extreme's published written specifications for the Product at the time of shipment. Warranty Period is for the duration specified in Table 1 – Product Warranty, beginning from the date of shipment. Breach of warranty will be enforceable against Extreme only if written notice of such breach is received by Extreme within the applicable Warranty Period.

## SOFTWARE PRODUCT WARRANTY

Subject to the limitations and conditions set forth herein, Extreme warrants that commencing on the Warranty Start Date and continuing for a period of ninety (90) days: (a) the media on which the Software is furnished will be free of defects in materials and workmanship under normal use and (b) the Software substantially conforms to the documentation. Except for the foregoing limited warranty, the Software is provided "AS IS". This limited warranty extends only to the Software purchased from an approved source by an End User who is the first registered end user. End User's sole and exclusive remedy and the entire liability of Extreme and its suppliers under this limited warranty will be (i) replacement of the defective media and/or (ii) at Extreme's sole option, repair or replacement of the Software subject to the condition that any error or defect constituting a breach of this limited warranty is reported to Extreme within the warranty period. In no event does Extreme warrant that the Software is error free or that End User will be able to operate the Software without problems or interruptions. In addition, due to the continual development of new techniques for intruding upon and attacking networks, Extreme does not warrant that the Software or any equipment, system or network on which the Software is used will be free of vulnerability to intrusion or attack.

**Remedies** — In the event of a failure of any Product to comply with the foregoing warranty during the applicable warranty period, Extreme shall, at its sole option, repair or replace the Product (which may include a workaround) or refund the fees paid for such Product following return of such Product. The foregoing sets forth Customer's sole and exclusive remedies for breach of warranty.

To ensure timely receipt of Product Warranty entitlements as described herein, end-user customer must register your Extreme products. Product registration is required within 30 days after purchase to validate product warranty. Failure to do so may result in delays in receiving warranty support. Product warranty registration is available at:

http://www.extremenetworks.com/support/product-registration

To determine the applicable warranty for a particular product reference the Product Warranty Table.

## DEFINITIONS USED IN THIS POLICY

**Documentation** — Extreme supplied or published then-current technical documentation describing the features and functions of the associated Products.

**Warranty Start Date** — Used in this policy is from the date of shipment of the Product from Extreme, or in the case of resale by an Extreme authorized reseller, commencing not more than 90 days after shipment by Extreme.

**Warranty Duration – Product Lifetime** — Except where otherwise defined, a period of time commencing on the Warranty Start Date from Extreme (see below) and ending on five years from the Product's announced end-of-sale date in accordance with Extreme's End of Life policy described at: http://www.extremenetworks.com/support/policies/end-of-life-policy/. For purposes of further clarity, end-of-sale dates are defined in the Extreme End of Life Policy. Extreme Wireless Controllers Product Lifetime warranty duration is one year from the Product's end-of-sale date.

**Base Operational Software** — Embedded software that is required to operate an Extreme-branded network device and is offered for sale as an inclusive component of such hardware network device product as further described in Extreme's published price list applicable to such hardware product ("Covered Product").

**Feature Packs and Advanced Software Licenses** — Defined as software enabled pursuant to authorized use of an Extreme-issued license key that enables certain optional embedded software features in an Extreme Networks network device and is offered for sale as an optional component of such hardware network device product as further described in Extreme Networks' published price list applicable to such hardware product ("Covered Product").

**Advanced Software License Updates** — Minor releases of Advanced Software Licenses that are optional embedded software features of Covered Products.

**Application Software** — Defined as software that is not required to operate a network device, such as management software or other standalone software. It is not an enhancement to the Base Operational Software and may reside on another network device.

**Upgrade and Update Software / Firmware Release Schema — A.B.C.**

- A = Major Release Number. Major software releases are upgrades.
- B = Minor / Sustaining Release Number. Minor / Sustaining releases are updates.
- C = Maintenance / Sustaining Release Number. Maintenance / Sustaining releases are updates.



# EXTREME PRODUCT WARRANTY ENTITLEMENTS

**Global Technical Assistance Center —** Customer is entitled as part of this warranty to utilize Extreme warranty support line via email, Web form or telephone available from 8 AM to 5 PM (Monday to Friday) local End User's time for basic hardware and operational software troubleshooting assistance in connection with warranty claims, including RMA's (excluding installation, configuration and general networking troubleshooting).

**eSupport —** Customer shall also have access to Extreme Customer Support Website by registering the Product and/or FRU at: http://www.extremenetworks.com/support/product-registration/, which may include, but is not limited to: (i) information about status and/or review of known hardware and/or software issues/problems, (ii) access to technical documentation, (iii) the ability to log a case, (iv) information about the status of outstanding RMAs.

**Base Operational Software – Updates and Upgrades —** Customer is entitled to receive any Base Operational Software or Base Operational Software upgrades/updates that Extreme may develop and generally release on Covered Products.

**Base Operational Software: Updates —** Customer is entitled to receive any Base Operational Software updates (i.e., sustaining and/or maintenance releases) that Extreme may develop and generally release on Covered Products.

**Hardware Replacement: Advanced Exchange Next Business Day Ship —** Extreme Networks must process the RMA relating to the defective product per the Advanced Exchange Warranty RMA Times section of the Extreme Networks Service Availability Matrix, Monday through Friday, in order to ship the replacement product to your site, by the end of day of the Next Business Day. Otherwise Second Business Day shipment will be provided for RMA's processed after the time indicated.

Extreme will use all commercially reasonable efforts to pick pack and ship the hardware replacement using a commercial delivery service to customers' site. The replacement part will be shipped via ground shipping with shipping charges prepaid. Shipments are designed to achieve 2-4 business day delivery from an Extreme regional parts depot to the customer delivery site. Variation in business delivery days is possible depending on country of destination or geographical location with the country or other factors.

Extreme pays for the return freight of the product to Extreme, including any applicable taxes, duties and custom fees. Extreme pays the freight of the unit shipped to customer, excluding any applicable taxes, duties and custom fees.

Customer is responsible for returning the defective Product to an Extreme-authorized third party repair facility. In the event that you fail to return the defective Product within ten (10) business days of receipt of the replacement FRU, Extreme reserves the right to require customer to pay the full, or portion of the, List Price of the FRU or product component. Extreme will send an invoice to customer that will reflect the amount to be paid.

**Hardware Replacement: Return and Replace —** Extreme will make commercially reasonable efforts, at its expense, to see the shipping of a repaired or replacement FRU (feature, function and fit compatible) within 10 or 15 business days (depending upon affected product) of receipt of the defective FRU at an Extreme facility.

Extreme will use all commercially reasonable efforts to pick pack and ship the hardware replacement using a commercial delivery service to customers' site. The replacement part will be shipped via ground shipping with shipping charges prepaid. Shipments are designed to achieve 2-4 business day delivery from an Extreme regional parts depot to the customer delivery site. Variation in business delivery days is possible depending on country of destination or geographical location with the country or other factors.

Customer pays for the return freight of the product to Extreme's designated location, including any applicable taxes, duties and custom fees. Extreme pays the freight of the unit shipped to Customer, excluding any applicable taxes, duties and custom fees.

**Advanced Hardware Replacement —** Extreme provides for the advanced shipment of replacement hardware. After a request for a replacement Field Replaceable Unit (FRU) is validated for warranty entitlement by Extreme Global Technical Assistance Center (GTAC) and a Return Material Authorization (RMA) number is processed, a new field replaceable unit (FRU), Extreme will make commercially reasonable efforts, to pick, pack and ship the replacement FRU per the Hardware Replacement provisions as stated in Table 1 (Warranty Summary of Entitlements) using a commercial delivery service to customer's site.

Extreme will use all commercially reasonable efforts to pick pack and ship the hardware replacement using a commercial delivery service to customers' site. The replacement part will be shipped via ground shipping with shipping charges prepaid. Shipments are designed to achieve 2-4 business day delivery from an Extreme regional parts depot to the customer delivery site. Variation in business delivery days is possible depending on country of destination or geographical location with the country or other factors.

**Hardware Replacement: General Provisions —** Extreme is not responsible for any delays related to export or customs regulations or processes, or transportation issues. Actual delivery times may vary depending on specific customer location.

**Dead on Arrival (DOA) —** For up to 30 days from the date of shipment of the Product from Extreme (or in the case of resale by an Extreme authorized reseller or channel partner, commencing not more than 90 days after shipment by Extreme), Extreme will provide Advanced Hardware Replacement of affected field replaceable unit (FRU) of Hardware Products that fail to operate within 24 hours of initial installation.

For purposes of this DOA policy, "fail to operate" shall mean a material failure to substantially perform in accordance with the Hardware Products' published Documentation.



**Warranty Duration: Integrated Component Coverage** — For certain product families some Integrated Components, such as power supplies, fans, and cables, may have their own separate warranty duration which may be different than the product it is embedded in. For a listing, reference *Table 2 - Integrated Component Coverage* below.

## Table 2 — Integrated Components Coverage

The following components that are integrated within a product may have separate warranty provisions:

| PRODUCT FAMILY | FANS | POWER SUPPLIES[9] |
|---|---|---|
| I-Series | N/A | 3 Years |
| 7100G | 5 Years | 5 Years |

[9] *External Redundant Power Supplies are included in the warranty coverage for the A, B, and C Series. Redundant Power Supply Cables that are shipped with External Redundant Power Supplies are covered under the Redundant Power Supply Warranty.*

**Appliance Products and Products Sold Within a Bundle** — For products that are sold in a "bundled" manner noted as either a Bundle or as an Appliance in further defined in Extreme's published price list, the warranty provision provided is per each individual Product Part Number that comprises the bundle, unless otherwise noted in the price list.

## Warranty Assumptions

Extreme is not responsible for any delays related to export or customs regulations or processes, in the event of force majeure, or due to transportation issues. Actual delivery times may vary depending on specific customer location.

Replacement Products will be warranted for the remaining warranty period of the original Products that were replaced, and may be new or refurbished products. If a warranty claim is invalid for any reason and Extreme agrees to repair the returned Product even though it is not under warranty, Extreme reserves the right to charge for services performed and expenses incurred by Extreme in repairing, handling and shipping the returned Product. Expendable parts, such as fuses, lamps, filters, and other parts that are regularly replaced due to normal use are excluded from this limited Product Warranty.

As to Products repaired or replaced during the original warranty period for such Product, the warranty period on the replacement Product or the repaired Product shall terminate 30 days after shipment to End User or upon the termination of the original warranty period, whichever is longer.

Unless required for operational reasons or as otherwise agreed between customer and Extreme in a separate writing, replacement FRU will be at the then-current minimum hardware, software and software release levels as published by Extreme for the Product being replaced.

As to any out-of-warranty Products repaired, modified or replaced by Extreme at Extreme's regular published charges, the warranty period with respect to the material and workmanship hereunder shall expire 30 days after the date of shipment of said Product to End User.

## Warranty Exclusions

### LIMITATION

The warranties set forth above shall not apply to: (i) any third party software or hardware, whether or not such third party software or hardware is or was provided by Extreme; (ii) any Products that have been modified or repaired by anyone or any entity other than Extreme or as authorized by Extreme in writing; or (iii) any Products which have not been maintained in accordance with any handling or operating instructions supplied by Extreme, or that have been subjected to any unusual or non-standard physical or electrical stress, misuse, negligence, accidents, or causes beyond Extreme's control. The warranties and corresponding entitlements set forth herein are for the benefit of and shall apply only to end user customer.

## Disclaimer of Warranties

EXCEPT FOR THE EXPRESS WARRANTIES AND CONDITIONS SET FORTH HEREIN, EXTREME MAKES NO OTHER WARRANTIES OR CONDITIONS RELATING TO THE PRODUCTS AND/OR FRU(s) PROVIDED, AND SPECIFICALLY AND EXPRESSLY DISCLAIMS ANY OTHER EXPRESS, IMPLIED OR STATUTORY WARRANTIES AND FURTHER EXPRESSLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, ACCURACY OF INFORMATION, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS. IN NO EVENT WILL EXTREME BE LIABLE TO CUSTOMER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES OF ANY KIND (INCLUDING BUT NOT LIMITED TO ANY LOST PROFITS OR LOST SAVINGS, LOSS OF USE OR INTERRUPTION OF BUSINESS, OR PROCUREMENT OF SUBSTITUTE GOODS), HOWEVER CAUSED, WHETHER ARISING IN CONTRACT, TORT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF EXTREME WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND WHETHER OR NOT ANY REMEDY PROVIDED HEREIN SHOULD FAIL OF ITS ESSENTIAL PURPOSE. EXTREME TOTAL LIABILITY UNDER THIS WARRANTY TO CUSTOMER IN RELATION TO THE PRODUCT(S) AND/OR FRU(S) AND FULFILLMENT OF WARRANTY SERVICES AS DEFINED HEREIN SHALL BE LIMITED TO THE AMOUNTS PAID TO EXTREME FOR SUCH PRODUCT(S) AND/OR FRU(S).

### USE OF SUBCONTRACTORS

Extreme reserves the right to engage third party subcontractors to perform any services defined herein on behalf of Extreme.



http://www.extremenetworks.com/contact / Phone +1-408-579-2800

©2016 Extreme Networks, Inc. All rights reserved. Extreme Networks and the Extreme Networks logo are trademarks or registered trademarks of Extreme Networks, Inc. in the United States and/or other countries. All other names are the property of their respective owners. For additional information on Extreme Networks Trademarks please see http://www.extremenetworks.com/company/legal/trademarks/. Specifications and product availability are subject to change without notice. 10021-1116-11

FREQUENTLY ASKED QUESTIONS

# Extreme Networks
# Product Warranty FAQ

## Where Can I Find Details of the Extreme Networks Product Warranties?

The Extreme Product Warranty document is located on our support website:
http://www.extremenetworks.com/support/policies

## How Can I Determine Which Warranty Applies to My Product?

Please go to our Warranty Look-Up Tool.

## What Is the Role of the Extreme Networks Warranty?

The purpose of a product warranty is to remedy manufacturing defects in materials and workmanship that keep the products from working substantially in accordance with the published specifications. It is not intended to address issues relating to the proper installation and operation of devices or systems.

## What Is Included in the Extreme Networks Warranty?

Warranties provide a limited liability for Extreme to repair and / or replace defects in Extreme Networks hardware or software products. Warranties are generally limited in both the duration and the support they offer. Please refer to the summary of entitlements table in the Product Warranty document for an overview of what is included in the Extreme's product warranties

## Why Is Warranty Not Sufficient for Supporting the Evolving Network?

As your business network evolves and become more complex, Extreme Networks Services, ranging from traditional maintenance and support options through proactive managed services offerings, help protect and extend the life of your network, ensuring you get the most value out of your network investment.

## If My Product Has a Limited Lifetime Warranty, Should I Buy a Maintenance Contract?

Product warranties provide limited protection to address potential manufacturing defects. Relying solely on product warranties, even a Limited Lifetime Warranty, is not a recommended strategy for ensuring the efficient operation of your network, particularly in business critical environments.

## What Extreme Networks Services Are Not Included in Product Warranties?

Product warranties do not include services, such as 24x7 GTAC phone support to report problems, ask product-related questions, and receive break-fix technical assistance for covered products, accelerated advance hardware replacement options, hardware delivery commitments, onsite support, managed services, or any type of professional service, such as installations and configuration support. Additionally, access to operational software upgrades is not available with some warranties.

For specifics, please refer to Table 1 of the warranty document located at: http://www.extremenetworks.com/support/policies

## Can I Get Technical Assistance on My Product From Extreme for Situations That Are Not Related to a Warranty?

Coverage of your Extreme Networks equipment with a maintenance contract will provide you with 24x7x365 access to our Global Technical Assistance Center (GTAC) for assistance on non-warranty related issues on covered products. We also have a very active online community – The Hub - and an ever expanding Knowledgebase – GTAC Knowledge - which our partners and customers can use as an alternative to opening a case with GTAC for assisted support. If you don't have a maintenance contract, you can also purchase GTAC assisted support on a fee per event basis.


Extreme®
Connect Beyond the Network

## Where Can I Find More Information on Extreme Networks Services Available for My Products?

Extreme Networks services can be purchased from Extreme or an authorized Extreme Networks partner. Please refer to http://www.extremenetworks.com/support/customer-care and your Extreme Networks Sales representative or authorized channel partner for additional information on available services.

## Who Is Eligible to Start a Warranty Claim?

The warranty on Extreme Network products is available only to the original purchasing end-user entity and is applicable only to products and licensed materials sold or distributed to the end-user by Extreme Networks or an authorized Extreme Networks Channel Partner.

## Are Product Warranties Transferable?

Extreme product warranties are not transferrable. If the original end-user transfers their Extreme Network product to a third party, any remaining Extreme Network product warranty ceases upon that transfer, and no subsequent third party or user is eligible to obtain warranty service on that product. Support on transferred equipment can be obtained through the purchase of a maintenance contract. Please contact your Extreme Networks Sales representative or authorized channel partner for additional information on requirements and support options available for transferred equipment.

## How Do I Get Warranty Support?

Contact your local Extreme Networks GTAC via phone (business hours only), email, or web. The GTAC contact information can be found at: http://www.extremenetworks.com/support/contact

Please have the following information available:

- Product name (example, Summit X670V-48x)
- Serial number of the product—found on the outside of the product or via the Command Line Interface (CLI)
- Complete description of the product failure

Once Extreme has determined that your product is having a failure covered under warranty, they will issue a Return Material Authorization (RMA) number for replacement of the defective product. Detailed instructions for processing an RMA can found in the GTAC Users Guide.

## What Technical Support Comes With a Product Warranty?

Extreme warranty support is provided via email, Web form or telephone available from 8 AM to 5 PM (Monday to Friday) local End User's time, for basic hardware and operational software troubleshooting assistance in connection with warranty claims, including RMA's (excluding installation, configuration and general networking troubleshooting).

## What Technical Support Is Available With a Maintenance Contract?

With a maintenance contract, a customer is entitled to 24x7x365 GTAC phone support, to report problems, ask product related questions and receive technical assistance on Extreme Networks Hardware and Software products.

## Is the Product Warranty Available Worldwide?

Yes, product warranties are available wherever Extreme Networks products are sold. Actual delivery times of replacement parts will vary depending on customer location.

## What is the Difference Between ...

- Limited Lifetime Warranty with Express Advanced Hardware Replacement
- Limited Lifetime Warranty with Express Advanced Hardware Replacement-2

The key difference between these two warranties is with the level of access to operational software.

**Limited Lifetime Warranty With Express Advanced Hardware Replacement** — This warranty provides access to the base operational software release that came with the product at time of shipment, plus any sustaining releases made available on that major release throughout the life of the product.

**Limited Lifetime Warranty With Express Advanced Hardware Replacement-2** — This provides access to all major and minor software releases on the base operational software license throughout the life of the product.



## What is the Difference Between ...

- Base Operational Software
- Advanced Operational Software

**Base Operational Software** — Is embedded software required to operate an Extreme Networks branded device and is offered for sale as an inclusive component of the network device.

**Advanced Operational Software and "Feature Packs"** — Software-enabled pursuant to authorized use of an Extreme-issued license key that enables certain optional embedded software features in an Extreme Networks network device and is offered for sale as an optional component of such hardware network device.

## What is the Warranty on Advanced Operational Software?

Advanced Software licenses and Feature Packs have a 90 day software warranty. For additional details on this warranty, please refer to the Extreme Product Warranty document.

## What Is the Difference Between a Software Update and a Software Upgrade?

Using the software/firmware release schema of A.B.C, A is defined as a major software release. Major software releases are upgrades. B is defined as a minor or sustaining software release and are considered to be an update. C is defined as a maintenance or sustaining software release and are considered to be an update.

## What Is the Warranty Period for Modular Power Supplies and Fan Trays in Stackable Switches?

The modular power supplies and fan trays in the stackable switches generally carry the same hardware warranty as the switches they plug into. So a fan tray used on a stackable edge switch that has a Limited Lifetime Warranty will also have a Limited Lifetime Warranty. For the 7100G Series switches, the PoE power supplies and fans carry a 5 year warranty. When in doubt, please refer to the Warranty Look-Up Tool.

## What Is the Warranty Period for Modular Power Supplies and Fan Trays in Chassis Switches?

All chassis power supplies and fans carry a 1 Year Warranty, with the exception of the K-Series fans which have a Limited Lifetime – 10 Business Day Ship Warranty.

## What Is the Warranty Period for Transceivers?

Transceivers carry a one year warranty.

## When Does the Warranty Begin?

The warranty begins at the date of product shipment from Extreme, or in the case of resale by an Extreme authorized reseller, commencing not more than ninety (90) days after shipment by Extreme.

## What Is Extreme Network's Policy on Dead-On-Arrival (DOA) Failures?

All hardware products include Advance Part Replacement (Next Business Day Shipment) during the first 30 days after product shipment. For up to thirty (30) days from the date of shipment of the Product from Extreme (or in the case of resale by an Extreme authorized reseller or channel partner, commencing not more than ninety (90) days after shipment by Extreme), Extreme will provide Advanced Hardware Replacement of affected field replaceable unit (FRU) of Hardware Products that fail to operate within twenty-four (24) hours of initial installation. For purposes of this DOA policy, "fail to operate" shall mean a material failure to substantially perform in accordance with the Hardware Products' published Documentation.

## What Does "Lifetime" Mean?

Lifetime is a period beginning on the warranty start date and ending five (5) years from the product's announced end-of-sale date. The duration of warranty for Extreme Wireless Controllers having a lifetime warranty is one (1) year from the product's end-of-sale date.

## What Does "Next Business Day" Mean?

If an eligible part covered under either the Limited Lifetime Warranty with express Advanced Hardware Replacement or the Limited Lifetime Warranty with express Advanced Hardware Replacement-2 requires a hardware replacement, Extreme Networks will use commercially reasonable efforts, after a request for replacement is approved, to ship the replacement part before the end of the next business day (NBD). Extreme Networks must process the RMA relating to the defective product per the Advanced Exchange Warranty RMA Times section of the Extreme Networks Service Availability Matrix, Monday through Friday, in order to ship the replacement product to your site, by the end of day of the Next Business Day. Otherwise Second Business Day shipment will be provided for RMA's approved after the time indicated. Extreme is not responsible for any delays related to export or customs regulations or processes, or transportation issues. Actual delivery times may vary depending on specific customer location.


Extreme
Connect Beyond the Network

## Are Replacement Parts Received Under My Warranty New?

Replacement parts may be new or refurbished.

## What Is the Warranty for Replacement Parts?

The warranty period on the replacement product or repaired product terminates thirty (30) days after shipment to the end-user or upon the termination of the original warranty period of the product replaced, whichever is longer.

## What Are My Responsibilities as a Customer for Returning Parts Under Advance Replacement?

Customers are responsible for returning the defective product to an Extreme-authorized third party repair facility. In the event that you fail to return the defective product within ten (10) business days of receipt of the replacement Field replaceable Unit (FRU), Extreme reserves the right to require customer to pay the full, or portion of the list price of the FRU or product component. Extreme will send the customer an invoice that will reflect the amount to be paid.

## Who Pays for Transportation, Taxes, Duties, and Custom Fees?

If the warranty on your defective product provides advanced hardware replacement, Extreme pays the freight of the unit shipped to the customer. The customer is responsible for payment of any taxes, duties or custom fees for receiving the replacement part. Extreme will pay the freight, taxes, duties and custom fees to return the defective product to Extreme's designated repair location.

If the warranty on the defective product provides return and replacement services, the customer pays for the return freight of the product to Extreme's designated location, including any applicable taxes, duties and custom fees. Extreme pays the freight of the replacement unit shipped to the customer, excluding any applicable taxes, duties and custom fees.

## What Type of Actions, Events or Activities Invalidate My Product Warranty?

The following conditions or events will invalidate a product warranty: Products that have been modified or repaired by anyone or any entity other than Extreme or as authorized by Extreme in writing; Products which have not been maintained in accordance with any handling or operating instructions supplied by Extreme, or that have been subjected to any unusual or non-standard physical or electrical stress, misuse, negligence, accidents, or causes beyond Extreme's control.

Additionally, Extreme Networks does not provide any warranty or compliance statement pertaining to any third-party non-approved hardware. Use of non-approved optics modules and corresponding interface modules is solely at your own risk and without any liability, warrant, or service obligation by Extreme Networks. Extreme recommends use and integration of only manufacturer certified hardware as expressly referenced within the applicable Extreme Networks product documentation. The customer assumes all risks associated with using third-party modules in Extreme Networks switches.

## What Are My Expectations For Parts Shipments Covered Under An Advanced Hardware Replacement Warranty Claim?

Extreme will use all commercially reasonable efforts to pick pack and ship the hardware replacement using a commercial delivery service to customers' site. The replacement part will be shipped via ground shipping with shipping charges prepaid. Shipments are designed to achieve 2-4 business day delivery from an Extreme regional parts depot to the customer delivery site. Variation in business delivery days is possible depending on country of destination or geographical location with the country or other factors.

## What About the WLAN and ADSP Products that Extreme Acquired From Zebra Technologies?

The warranty entitlements provided by Extreme are consistent with the original warranty provided by Zebra at the time of Extreme's acquisition for these products. Although the actual name of the warranty has been slightly modified, the provisions remain unchanged.



http://www.extremenetworks.com/contact / Phone +1-408-579-2800

©2016 Extreme Networks, Inc. All rights reserved. Extreme Networks and the Extreme Networks logo are trademarks or registered trademarks of Extreme Networks, Inc. in the United States and/or other countries. All other names are the property of their respective owners. For additional information on Extreme Networks Trademarks please see http://www.extremenetworks.com/company/legal/trademarks. Specifications and product availability are subject to change without notice. 10573-1116-11

# Extreme Networks PartnerWorks

2017 PROGRAM GUIDE

PROGRAM GUIDE

# Extreme Networks PartnerWorks Program Guide

## TABLE OF CONTENTS

Definitions                                    2

Overview                                       3

PartnerWorks Program Definition                3

Key Elements of the Program                    3

Major Benefits of the
ExtremeWorks and
PartnerWorks Programs                          5

ExtremeWorks and PartnerWorks
Alignment with Partners                        6

Eligibility and Requirements of
PartnerWorks Program                           6

Program Requirements for all
PartnerWorks Partners                          6

Partner Qualification Form                     6

Service Entitlements –
Purchase Requirements                          7

Maintenance of Certification and
Qualification Requirements                     7

Lab Equipment Requirements                     8

Spares                                         8

Performance Incentive Metrics                  8

Additional Entitlements and
Procedures                                     9

Standard Product Warranty                      9

## Definitions

- "Certified Engineers" means Channel Partner's engineers providing services to End Users who have been trained and certified by Extreme, as further defined within the applicable Extreme PartnerWorks Program Guide, by complying with Extreme's then-current certification requirements, as solely determined by Extreme and as set forth at www.extremenetworks.com/solutions/technical-training.aspx at the "Channel Partners" link.

- "Defect" means a failure of any Product to operate in accordance with Extreme's technical specifications as set forth in the Documentation.

- "PartnerWorks Program Guide" means the then current guidelines published by Extreme for the Authorized Territory which sets forth the requirements for qualified Channel Partners to participate in Extreme's PartnerWorks Program. Extreme may change the PartnerWorks Program Guide at any time pursuant to notice to Channel Partner by email, publication on Extreme's website, or any other method permitted under this Agreement.

- "Releases" means Updates and Upgrades, collectively. No Alpha or Beta or non-production versions shall be considered Releases.

- "Channel Partner Services" means the support and maintenance services for Channel Partners, if available in accordance with the applicable program guide and as set forth on the Price List, provided by Extreme to Channel Partner pursuant to these Services Terms and the applicable Support Plan.

- "GTAC" means Extreme's Global Technical Assistance Center.

- "Update" means a new version of a Software Product that includes defect corrections, bug fixes and/or minor enhancements that operate within the framework of the specifications for the current release of the Software Product, but does not include substantive features or functions not performed by the prior Release of the Software Product.

- "Upgrade" means a new version of a Software Product that includes substantive features or functions not performed by the prior Release of the Software Product.

- Operational Software is defined as software that is required to operate a network device. The core operational software product is embedded on the network device it is operating.



Dead on Arrival (DOA)
Coordination                                    9

Extreme Networks Support
Website Access                                  9

Accessing Extreme Networks
GTAC                                            9

Certified Engineers – Level One
GTAC Bypass                                     10

Frequently Asked Questions                      10

Program Questions                               10

Additional Questions                            11

Appendix A – PartnerWorks
Program Certification
Requirements                                    13

Resellers                                       13

- Application Software is defined as software that is not required to run a network device, such as network management software. It is not an enhancement to the operational software and may reside on another network device.

## Overview

Extreme Networks® offers a comprehensive set of channel service programs designed to help partners gain a competitive edge by enhancing service capabilities and enabling implementation and delivery of services helping increase revenue and customer satisfaction.

PartnerWorks service solutions are for partners desiring to provide customers the partner's own brand of value-added service and support offers, but who require technical support escalation and hardware replacement options from Extreme Networks to fully support customer networks. In the PartnerWorks Program support model, partners remain the primary point of contact for end customers, selling and delivering partner-branded service while having access to Extreme Networks technical expertise, software support, and logistics infrastructure.

PartnerWorks partners must meet stringent certification and qualification standards, as well as demonstrate ongoing performance relative to the ability to sell, renew, and deliver high-quality services under the partner's own brand. Partners participating in the PartnerWorks Program may also resell ExtremeWorks® to expand their geographical reach and to complement the partner's technical expertise on the full Extreme Networks product line.

To help Extreme Networks partners provide a high level of support to the end customer, Extreme Networks offers a suite of support elements as part of its PartnerWorks Program solution, including access to the:

- Operational & Application Software Updates and Upgrades
- Global Technical Assistance Center (GTAC)
- Extreme Networks support web site
- Advanced hardware replacement or Return and Replace hardware replacement options
- Onsite technical support services

The PartnerWorks Program service solution, as well as information on the structure of the PartnerWorks Program requirements and implementation, are explained in this Program Guide.

To ensure that you are receiving the most up-to-date information on requirements and benefits for your program, you can access the most recent version of the Extreme Networks PartnerWorks Program Guide for your specific region on Extreme Networks Partner web site.

## PartnerWorks Program Definition

### KEY ELEMENTS OF THE PROGRAM

Partners are increasingly seeing the value in offering a broad range of service and support solutions to customers for Extreme Networks equipment. Selling advanced services not only offers the potential for increased revenue and profitability, but also the potential for increased customer satisfaction and the opportunity for repeat business.

To help our partners meet diverse product portfolio needs, geographic reach for service and support delivery, and the changing needs of technology and spares investment, Extreme Networks has designed a suite of services as part of its



Channel Support programs. These include Global Technical Assistance Center
(GTAC) support, Extreme Networks support web site, operational and application
software updates and upgrades, product user documentation, access to a
knowledge database and spares or parts replenishment.

There are two key programs as part of Extreme Networks Channel Support solution.
The first is the ExtremeWorks program, for partners who desire or need to sell the
complete suite of Extreme Networks support services to end user customers and
would like Extreme Networks to deliver all services directly.

The second Channel Support program is the PartnerWorks Program, designed for
select qualified partners who desire to sell, and have the ability to provide, partner-



*ExtremeWorks Program Go-to-Market Model*

branded service to support Extreme Networks products, but need additional
technical expertise, software support and downloads, and logistics infrastructure
assistance from Extreme Networks.



*PartnerWorks Go-to-Market Model*

Extreme Networks currently offers two PartnerWorks Program support solutions:
PartnerWorks and PartnerWorks Plus. Not all support solutions will be available
in all regions. Please contact your Channel Account Manager for availability
information.

Qualified PartnerWorks Program partners can select, on a product-by-product
basis, ExtremeWorks, PartnerWorks, or PartnerWorks Plus support solutions.

# Major Benefits of the ExtremeWorks and PartnerWorks Programs

## THE EXTREMEWORKS PROGRAM CAN BENEFIT PARTNERS BY:

- Allowing the partner to maintain ownership of the customer relationship through the selling and managing of support contracts
- Providing an additional source of revenue for partners to sell services in addition to product
- Enabling partners to sell services without an investment in a support-logistics infrastructure
- Allowing partners to allocate resources to services or systems more aligned with the partner's core competencies
- Enabling partners to take on new Extreme Networks products or technologies without having to invest in spares and training

## THE PARTNERWORKS PROGRAM CAN BENEFIT PARTNERS BY:

- Promoting and sustaining differentiation from other partners by demonstrating to customers the ability to deliver and provide your own high quality technical services
- Providing the potential for increased partner service revenue on an ongoing basis
- Helping to increase customer satisfaction and retention with a single point of contact

| DELIVERABLE | EXTREME WORKS | PARTNERWORKS | PARTNERWORKS PLUS |
|---|---|---|---|
| Service Sales | Partner provides to end user | Partner provides to end user | Partner provides to end user |
| Contract Administration | Partner provides to end user | Partner provides to end user | Partner provides to end user |
| GTAC Level 1 | Extreme Networks provides to end user | Partner provides to end user | Partner provides to end user |
| GTAC Level 2 | Extreme Networks provides to end user | Partner provides to end user | Partner provides to end user |
| GTAC Level 3 | Extreme Networks provides to end user | Extreme Networks provides to Partner | Extreme Networks provides to Partner |
| Extreme Networks Support Site | Extreme Networks provides to end user | Extreme Networks provides to Partner; Partner provides to end user | Extreme Networks provides to Partner; Partner provides to end user |
| Operational Software maintenance updates and major upgrades | Extreme Networks provides to end user | Extreme Networks provides to Partner; Partner provides to end user | Extreme Networks provides to Partner; Partner provides to end user |
| Application Software maintenance updates and major upgrades | Extreme Networks provides to end user | Extreme Networks provides to Partner; Partner provides to end user | Extreme Networks provides to Partner; Partner provides to end user |
| Parts delivery options | Extreme Networks provides to end user | Extreme Networks delivers to end user | Extreme Networks delivers to partner central depot location |
| Onsite technician and parts delivery | Extreme Networks provides to end user | Extreme Networks delivers to end user | NA - Onsite technician available only with PartnerWorks |

## ExtremeWorks and PartnerWorks Alignment with Partners

The combination of ExtremeWorks and PartnerWorks provides a partner with the ability to align the service delivery model with the partner's service delivery infrastructure. PartnerWorks meets the needs of partners who have invested in the ability to directly deliver technical services to end user customers with the partner's own brand.

Additionally, when a PartnerWorks partner needs to augment its service offerings, quickly add new products and technologies to its portfolio, or reach outside its own geographical support area capabilities, then the partner can choose to sell ExtremeWorks services. This gives the partner the ability to maintain the customer relationship without developing additional infrastructure to deliver direct technical support to its customers.

## Eligibility and Requirements of PartnerWorks Program

Qualified Extreme Networks partners must meet the PartnerWorks Program requirements in order to be eligible for the PartnerWorks Program and must continue to maintain such program requirements in order to continue to participate in the PartnerWorks Program.

Silver, Gold, Diamond & Platinum partners are all eligible to join the PartnerWorks Programs.

Extreme Networks may accept partners into the PartnerWorks Program at its sole discretion and reserves the right to deny any partner from participating in the PartnerWorks Program for any reason.

## Partner Qualification Form

To apply for the Extreme Networks PartnerWorks Program, Extreme Networks partners must complete the partner qualification form to confirm that the partner meets all of the program requirements. The form is also a commitment and assessment by the partner of its readiness to participate and comply with the program requirements. Your Channel Account Manager will complete this form with you.

### PROGRAM REQUIREMENTS FOR ALL PARTNERWORKS PARTNERS

The partner must fulfill ALL of the following requirements in order to be eligible for the PartnerWorks Program:

- Be a qualified Extreme Networks channel partner regionally participating at the Silver, Gold, Platinum or Diamond level and meet all the requirements of the Extreme Networks regional channel program.

- Complete the partner qualification form and execute an agreement with Extreme Networks containing PartnerWorks legal terms and conditions ("PartnerWorks Agreement").

- Have the capability and means to provide customers direct technical support, 24 hours a day, 7 days a week, 365 days a year for PartnerWorks/ PartnerWorks Plus Partners.



Extreme®
Connect Beyond the Network

- Use a Customer Relationship Management (CRM) system.
- Outfit and maintain a lab with Extreme Networks equipment for problem replication and education and provide Level 1 and Level 2 support.
- Meet or exceed the minimum acceptable PartnerWorks performance criteria.
- Supply end user information at the time of each purchase of product or service.
- Attach an appropriate service agreement on each Extreme Networks product purchased*(1)
- Maintain a defined number of certified engineers depending upon the partner's channel partner program level and PartnerWorks Program participation level (see Appendix A).

## SERVICE ENTITLEMENTS - PURCHASE REQUIREMENTS

Partners are required to purchase a service agreement on certain purchased assets *(1). This is independent of where or how the partner purchased the asset, whether purchased directly from Extreme Networks, or from an authorized distributor or reseller. The Service purchased can be of any service entitlement type (i.e., ExtremeWorks, PartnerWorks, or PartnerWorks Plus) and any service level within that program (such as Next Business Day AHR or 4-hour AHR, etc) and for any full term.

> NOTE: *(1) Please refer to the mandatory attach table located in the "Worldwide Reference Information Workbook" located in the pricing section on your regional Partner Portal.

> Partners may sell renewals for the initial service agreement. Subsequent renewals should be dated and priced from the date of expiration of the previous agreement. Lapses in service entitlement may be subject to reinstatement fees. Partners who do not meet these criteria are in default of the PartnerWorks Program.

> The terms and conditions of Extreme's performance of support and services are as posted here: http://www.extremenetworks.com/company/legal/terms-of-support/. In the event of any conflict between the language in this Program Guide and Extreme's published terms and conditions, Extreme's published terms and condition shall govern.

## MAINTENANCE OF CERTIFICATION AND QUALIFICATION REQUIREMENTS

PartnerWorks partners must maintain a certain number of Extreme Certified Expert (ECE) - Networking certified engineers, as applicable, who must stay current on such certification. ECE certifications are valid for only two years before re-certification is required. The minimum number of ECE - Networking certified engineers per Partner is set forth in Appendix A.

For more information on ECE-Networking and ECE certification requirements, please refer to the Extreme Networks technical training page at: http://extremenetworks.com/education/certifications/ at the "Channel Partners" link.



### LAB EQUIPMENT REQUIREMENTS

Lab requirements, at a minimum requires a partner to have sufficient lab equipment to replicate hardware and or software problems for a specific class of products, i.e. wired, wireless, and network management. In some cases this may require additional equipment to cover next generation hardware and software products. As part of PartnerWorks requirements the Partner must maintain a lab equipped with products in order to effectively perform level 1 and 2 support on all Extreme Networks products sold and supported by the partner. A list of recommended lab equipment, for your reference, per product class is located at your regional PartnerNet support portal.

Extreme reserves the right to audit a PartnerWorks Partner lab requirements on a 6-12 month basis.

- The lab is not to be used for demonstration or evaluation of sales.
- Evidence of a process, procedure, or guidelines for using the lab must be shown at time of audit.
- All partners are required to have the necessary lab equipment to perform a successful demonstration of their technical expertise at the time of their onsite audit.

## Spares

For each product for which a PartnerWorks partner has purchased PartnerWorks Plus, such partner is required to maintain an inventory of spare products sufficient to meet the partner's service requirements for such product. The partner is solely responsible for meeting the partner's customer service level requirements and for maintaining spare products to meet such requirements.

## Performance Incentive Metrics

Performance metrics are used in the PartnerWorks Program to measure each partner's effort and success in selling and delivering service. The performance metric values and ranges are determined from Extreme Networks' experience with partners around the world, as well as the first-hand experience of selling the ExtremeWorks brand of service.

Metrics are directly controlled by each partner's individual performance and are not influenced by Extreme Networks or other partner's performance. The PartnerWorks Program puts direct control of the partner's performance in the hands of the partner. Please refer to the separate Performance Incentive Metrics document on the Partner portal for more details.

## Service Discounts

ExtremeWorks, PartnerWorks, and PartnerWorks Plus can be ordered in the same manner as hardware and software. Contact your authorized Extreme Networks distributor for all services related discounts.



# Additional Entitlements and Procedures

## STANDARD PRODUCT WARRANTY

Extreme Networks offers a product warranty to the end user customer on each of the products it sells – see the Extreme Networks website at http://extremenetworks.com/support/policies/#warrantyTag for current warranty information per product.

The partner is responsible for interacting with the end user customer on all warranty claims and for handling the return of defective hardware units to Extreme Networks. Warranty service is provided on either a "Return & Replace" or advanced hardware replacement basis in accordance with the warranty.

## DEAD ON ARRIVAL (DOA) COORDINATION

As part of the overall relationship with the end user customer, Extreme Networks will replace certain products that are "Dead on Arrival" to the end user customer. Please refer to the Extreme Networks product warranty page on the Extreme Networks website for further information.

## EXTREME NETWORKS SUPPORT WEB SITE

Partners participating in the PartnerWorks Program who have purchased a service entitlement will receive support and maintenance directly from Extreme Networks and are provided with web access to the Extreme Networks Support web site.

An Extreme Networks Support web site account provides partners with access to a wide range of tools, including:

- Track and Manage Contract Entitlements, RMAs and Service Requests (SRs)
- Software Downloads (only for assets with current service entitlement)
- Product Documentation
- Release Notes and Tech Tips
- Solutions Guides

## ACCESSING EXTREME NETWORKS GTAC

### Contacting GTAC

PartnerWorks partners may receive support service from the Extreme Networks Global Technical Assistance Center (GTAC) for any asset or product that has a current PartnerWorks or PartnerWorks Plus entitlement. Contact with the GTAC may be made (i) by telephone; (ii) by email, or (iii) via the Extreme Networks Support website. For all issues that are of a "network down" level, contact with the Extreme Networks GTAC should only be made via telephone.

Any communication to, or contact of, Extreme Networks GTAC with respect to a product that has a current PartnerWorks or PartnerWorks Plus entitlement may be made solely by the PartnerWorks partner's certified engineer. GTAC reserves the right not to respond or to refuse service to the partner in the event GTAC is contacted by the partner's employees or agents other than certified engineers or in reference to a product that does not have a current PartnerWorks or PartnerWorks Plus entitlement.



**Attempted direct GTAC contact by partners' end customer**

Extreme Networks GTAC will not accept service inquires directly from partners' end customers participating in the PartnerWorks Program. All maintenance and support requests to Extreme Networks GTAC by partner's end users with respect to a product that has a current PartnerWorks or PartnerWorks Plus entitlement shall be forwarded to the partner's certified engineers.

**GTAC response to partner's service requests**

Extreme Networks GTAC will respond to all service requests from partner in accordance with Extreme Networks standard response and escalation procedures based on the severity of the defect, as determined by Extreme Networks.

PartnerWorks Program participants should reference the GTAC User Guide located on the Extreme Networks Partner Portal for additional details regarding GTAC processes and procedures.

## CERTIFIED ENGINEERS – LEVEL ONE GTAC BYPASS

Recognizing the certification achieved by ECE-Networking-certified engineers, Extreme Networks allows ECE-Networking-certified engineers to bypass Level 1 GTAC resources when opening cases and go directly to Level 2, which may have a positive impact on problem resolution times.

# Frequently Asked Questions

## PROGRAM QUESTIONS

**When must a PartnerWorks partner meet the qualification criteria?**

If the partner does not fully meet all of the partner qualification criteria at the time of signing the PartnerWorks Agreement, the partner has 90 days after the signing of the agreement to meet the qualification criteria and must continue to maintain its qualification requirements in order to remain in the program.

**Where is the PartnerWorks Program available?**

The Extreme Networks PartnerWorks Program is available in all regions that Extreme Networks serves; however, there are limitations as to the availability of certain service plan entitlements in some geographic locations. Please contact your Channel Account Manager for more information about availability.

**Can a PartnerWorks partner choose to participate in both ExtremeWorks and PartnerWorks?**

Partners have different business models, business needs, and service strategies. Some sell branded service; others have a model that favors reselling Extreme Networks support services. Partners who participate in the PartnerWorks Program have the option, on a per-asset basis, to choose either the ExtremeWorks or PartnerWorks Program as the appropriate service solution, where ExtremeWorks or PartnerWorks is available. Partners who do not participate or who do not yet qualify for PartnerWorks may only resell ExtremeWorks support solutions.

**When must the lab equipment purchase requirement be fulfilled?**

The required lab equipment should be in place at the time of the execution of the PartnerWorks Agreement, but in no event later than 90 days after the agreement has been signed.



**Do you require that a PartnerWorks partner purchase PartnerWorks on all equipment?**

The PartnerWorks Program requires that a PartnerWorks partner commit to buying a service entitlement (i.e., PartnerWorks, PartnerWorks Plus, or ExtremeWorks) on all Extreme Networks products purchased. Please refer to the mandatory attach table located in the "Worldwide Reference Information Workbook" located in the pricing section on your regional Partner Portal. Partners may sell renewals for the initial service agreement. Subsequent renewals should be dated and priced from the date of expiration of the previous agreement. Lapses in service entitlement may be subject to reinstatement fees.

## ADDITIONAL QUESTIONS

**What exactly is a Level 1 or Level 2 type incident versus a Level 3 type incident?**

All PartnerWorks/PartnerWorks Plus service-enabled partners must provide support to end customers covered under PartnerWorks Program purchases. Partners will accept and process all inbound support calls originating from their Extreme Networks customers, including calls for warranty support.

PartnerWorks/PartnerWorks Plus partners are required to perform the following service delivery functions to their end user customers:

- General product information and configuration support
- Collection of relevant technical problem identification information
- Filter of non-technical problems from actual technical problems
- Provide end customer support including the following:
  - 24x7 phone support
  - Processing all initial incoming technical queries from customers
  - Assisting customers in resolving software issues through appropriate software updates and software upgrades
  - Assisting customers in resolving hardware issues

PartnerWorks/PartnerWorks Plus partners are required to perform the following service delivery functions prior to contacting the Extreme Networks GTAC in behalf of their end user customers:

- Problem isolation
- Determination of defects in product specifications
- Lab simulation and reasonable interoperability testing where applicable
- Duplication of customer problems
- Defining action plans for problem resolution
- Analyzing system logs including, but not limited to, error logs, core files, etc.
- Escalating technical issues not previously resolved by partners internal support infrastructure
- Assisting customers in resolving hardware issues, including the return material authorization ("RMA") process, as necessary.

Extreme Networks provides the following GTAC services to partners certified ECE-Networking engineers participating in the PartnerWorks Program. These services are provided remotely:


Extreme
Connect Beyond the Network

- 24x7x365 worldwide coverage
- Create a Service Request number for each GTAC case
- Case management, escalation and real time access to case status and details
- The provision of a software fix, patch or workaround
- High level technical assistance and troubleshooting of problems not diagnosed during the partner's support efforts.

**Does participating in the PartnerWorks Program affect currently supported products?**

Any products, systems, or system management solutions that have active support agreements in place when entering the PartnerWorks Program will carry forward with the same level and definition of support.

**Can I transition existing installed assets currently under a support contract to the new PartnerWorks Program?**

A partner may elect to transition existing installed and covered products to the new PartnerWorks Program when the renewal anniversary date for that service contract occurs, and choose to renew the service agreement in the PartnerWorks Program. The partner will only be able to renew those agreements in the PartnerWorks Program if they qualify or it may renew those agreements with ExtremeWorks service. Please refer to the Service Partner of Record Policy located on the Partner portal for specific details.

**What happens if a partner has purchased a multi-year agreement on a system, and the system subsequently goes into End-of-Sale (EOS) or End-of-Life (EOL)?**

Service is provided to end of current contract term without change. Renewal of service is subject to End of Support Plan Policy located on the Extreme Networks web site.

**Can a partner buy a new support agreement on a product that is now at End-of-Sale?**

Yes, a partner may buy a new support agreement, in the first 12 months following the end of sale date, but the support agreement term may not exceed the remaining supportable life as defined by the EOL policy.

**A partner has purchased one level of support for spares, but a different level of support on the same product for its customer. What happens to the entitlements?**

In this example, the partner needs to replace the customer's asset with a spare (and return the customer's system back to Extreme Networks). One of the many benefits of the PartnerWorks Program is the ability for a partner to mix and match the levels of service to maximize its service business plan. As a result, a partner may have PartnerWorks Plus 10 day return and replace (Return & Replace) on a spare unit, but PartnerWorks Plus next business day (NBD) level of service on the customer's unit.

By selecting PartnerWorks Plus, the partner takes ownership of the responsibility to provide and deliver the spare replacement to its customer. When the customer unit (product A, with PartnerWorks Plus NBD coverage) fails or needs to be replaced, the partner ships the replacement product (product B, with PartnerWorks Plus Return & Replace coverage) to the customer, and at the same time, requests a replacement from Extreme Networks (product C with no coverage).

When the partner requests the replacement from Extreme Networks (who will note that the product being replaced has a PartnerWorks Plus level of coverage), Extreme Networks will request the serial number of the spare being delivered to



the customer to ensure that all entitlements can be properly mapped. The Extreme Networks GTAC will ask for the replacement serial number when the RMA is being approved. If the partner cannot provide that information at that time, the RMA may still be approved.

However, it is the partner's responsibility to provide the replacement serial number and RMA number to Extreme Networks in order for the entitlements to be properly mapped. When the full transaction is complete, Product A will have been returned to Extreme Networks and set to "no support". Product B, which started with coverage of PartnerWorks Plus Return & Replace coverage, has now been mapped to the original customer with PartnerWorks Plus NBD coverage, and the system shipped from Extreme Networks (product C) that originally had "no support" has now been updated with the original coverage of the partner's spare, or PartnerWorks Plus Return & Replace.

**Who pays for the freight when a product is returned?**

If the product that has a support agreement has an AHR type of coverage, then Extreme Networks pays the freight of the unit shipped to the partner or the customer, as well as the return freight for the unit being returned to Extreme Networks, excluding any applicable taxes, duties and custom fees.

If the unit being replaced has Return & Replace level of service, the partner or customer pays for the return of the product to Extreme Networks, excluding any applicable taxes, duties and custom fees. Extreme Networks pays the freight of the unit shipped to the partner or the customer, excluding any applicable taxes, duties and custom fees.

# Appendix A

## CERTIFICATION REQUIREMENTS

| PARTNERWORKS PROGRAM CERTIFICATION REQUIREMENTS | | | | |
|---|---|---|---|---|
| | **DIAMOND** | **PLATINUM** | **GOLD** | **SILVER** |
| Required # of Engineers | A & B Countries = (3) ECE-Networking<br><br>C Countries = (2) ECE-Networking | (2) ECE-Networking | (2) ECE-Networking | (2) ECE-Networking |

*Extreme Networks reserves the right to change this program and its requirements of PartnerWorks partners at any time, including but not limited to discounts and participation requirements. All information in this document is Extreme Networks Confidential Information and subject to the confidentiality provisions of the PartnerWorks Agreement and the reseller agreement between Extreme Networks and the partner.*



http://www.extremenetworks.com/contact / Phone +1-408-579-2800

©2016 Extreme Networks, Inc. All rights reserved. Extreme Networks and the Extreme Networks logo are trademarks or registered trademarks of Extreme Networks, Inc. in the United States and/or other countries. All other names are the property of their respective owners. For additional information on Extreme Networks Trademarks please see http://www.extremenetworks.com/company/legal/trademarks. Specifications and product availability are subject to change without notice. 10807-0716-01