## Exhibit C

**Proposed Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF DEBTORS' MOTION
SEEKING ENTRY OF (I) AN ORDER
(A) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF THE DEBTORS' NETWORKING BUSINESS,
(B) APPROVING THE FORM AND MANNER OF NOTICE, (C) SCHEDULING
AN AUCTION AND A SALE HEARING, AND (D) APPROVING PROCEDURES
FOR DETERMINING CURE AMOUNTS, AND (II) AN ORDER AUTHORIZING
AND APPROVING THE SALE OF THE DEBTORS' NETWORKING BUSINESS**

**PLEASE TAKE NOTICE THAT** the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on January 19, 2017 (the "Petition Date").

**PLEASE TAKE FURTHER NOTICE THAT** on March 8, 2017 in connection with the proposed sale (the "Sale") of the Business[2] to Extreme Networks, Inc., or any other Successful Bidder for the Transferred Assets, at an auction for the Transferred Assets (the "Auction"), the Debtors filed a motion (the "Motion") [Docket No. ___] seeking, among other things, the entry of an order approving:  (a) bidding procedures governing the Sale (the "Bidding Procedures");

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9282); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

[2]    Capitalized terms used in this Notice and not immediately defined have the meanings given to such terms in the Motion or Bidding Procedures, as applicable.

(b) the form of asset purchase agreement for the Transferred Assets; (c) payment of a Termination Fee and Purchaser Expense Reimbursement to the Stalking Horse Bidder in certain instances, including if the Successful Bidder at the Auction consummates a transaction; (d) procedures for the assumption and assignment of executory contracts and unexpired leases (the "Assumption Procedures"); and (e) the form and manner of notices.

**PLEASE TAKE FURTHER NOTICE THAT** on April [__], 2017 the Bankruptcy Court entered an order [Docket No. ___] (the "Bidding Procedures Order") granting certain of the relief sought in the Motion, including, among other things, approving: (a) the Bidding Procedures and (b) the Assumption Procedures. Copies of the Bidding Procedures Order (which incorporates the Assumption Procedures) and the Bidding Procedures are enclosed herein.

### Contact Person for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Transferred Assets **must** comply strictly with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any persons interested in making an offer to purchase the Transferred Assets should contact:

| Financial Advisor to Debtors | Counsel to Debtors |
|---|---|
| Centerview Partners<br>31 West 52nd Street<br>New York, New York 10019<br>Attn: John Bosacco and Samuel Greene<br><br>(415) 393-7500 | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Ryan Preston Dahl, Steve Toth, and Brad Giordano<br><br>(312) 862-2000 |

### Obtaining Additional Information

Additional copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available upon request to Prime Clerk, LLC, the Debtors' notice and claims agent, at (855) 252–2156, or by visiting the case website at https://cases.primeclerk.com/avaya/.

### Important Dates and Deadlines

1.      The deadline to submit a Qualified Bid is **4:00 p.m. Eastern Time on May 18, 2017**.

2.      The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") is **4:00 p.m. Eastern Time on May 18, 2017** (the "Sale Objection Deadline").

3.      The Auction for the Transferred Assets, if one is necessary, will commence at **10:00 a.m. Eastern Time on May 23, 2017**, or such other date as determined by the Court, at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022.

4.      A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Honorable Stuart M. Bernstein of the Bankruptcy Court at **10:00 a.m. Eastern Time on May 25, 2017**, or such other date as determined by the Court, at One Bowling Green, New York, New York 10004.

### Filing Objections to the Sale

Any objection to the Motion as it relates to the Sale must:  (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the LBRs for the Southern District of New York; and (d) be filed with this Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline, by the following parties:

| Debtors | Counsel to Debtors |
|---|---|
| Avaya Inc.<br>4655 Great American Parkway<br>Santa Clara, California 95054<br>Attn:  Adele Freedman, VP & Deputy General Counsel | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: Ryan Preston Dahl, Esq.; Steve Toth, Esq.;<br>Brad Giordano, Esq. |
| **Counsel to the Creditors' Committee** | **United States Trustee** |
| Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019<br>Attn: Lorenzo Marinuzzi, Esq.; Jon I. Levine, Esq. | Office of the United States Trustee<br>Southern District of New York<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Attn:  Susan D. Golden, Esq.; Susan Arbeit, Esq. |
| **Counsel to the Agent for the<br>Debtors' Prepetition and Postpetition Lenders** | **Counsel to the Stalking Horse Bidder** |
| Davis Polk & Wardwell LLP<br>450 Lexington Avenue<br>New York, New York 10017<br>Attn: Damian S. Schaible, Esq. | Latham & Watkins LLP<br>140 Scott Drive<br>Menlo Park, California 94025<br>Attn: Tad J. Freese, Esq.; Mark Bekheit, Esq. |

| Counsel to the Ad Hoc Group of First Lien Holders | Counsel to the Ad Hoc Group of Crossover Holders |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>Bank of America Tower<br>New York, New York 10036<br>Attn: Philip C. Dublin, Esq.; Naomi Moss, Esq. | Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038<br>Attn: Sayan Bhattacharyya, Esq.;<br>Kristopher M. Hansen, Esq. |
| **United States Attorney** | **Counsel to the 7.00% First Lien Notes Trustee,<br>9.00% First Lien Notes Trustee, and Second Lien<br>Notes Trustee** |
| Office of the United States Attorney for the Southern<br>District of New York<br>86 Chambers Street, 3rd Floor<br>New York, New York 10007 | Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn: Glenn E. Siegel, Esq.; Joshua Dorchak, Esq.;<br>Rachel Jaffe Mauceri, Esq. |

## **Consequences of Failing to Timely File and Serve an Objection:**

**Any party or entity who fails to timely file and serve an Objection to the Sale on or before the Sale Objection Deadline in accordance with the Bidding Procedures Order shall be forever barred from asserting any Objection to the Sale, including with respect to the transfer of the Transferred Assets of the Debtor estates free and clear of liens, claims, encumbrances, and other interests effected thereunder.**

4

### No Successor or Transferee Liability

      The Stalking Horse Asset Purchase Agreement and proposed Sale Order provide that the Stalking Horse Bidder and/or Successful Bidder, if applicable, will have no responsibility for, and the Transferred Assets will be sold free and clear of, any successor liability, including the following:  (a) any liability or other obligation of the Debtors' estates or related to the Debtors' Transferred Assets other than as expressly set forth in the Stalking Horse Asset Purchase Agreement; or (b) any claims against the Debtors, their estates, or any of their predecessors or affiliates.  Except as expressly provided in the Sale Order or the Stalking Horse Asset Purchase Agreement, the Stalking Horse Bidder or Successful Bidder shall have no liability whatsoever with respect to the Debtors' estates' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' estates' (or their predecessors' or affiliates') obligations (as described below, "Successor Liability") based on any action taken in connection with the Sale, the assumption of the Assumed Liabilities (as defined in the Stalking Horse Asset Purchase Agreement), or the continued operation of the Business on any basis, including under any doctrines of successor, transferee, or vicarious liability (whether based on de facto merger, mere continuation, or any other basis or theory of liability), including (a) any past, present, or future liabilities of Avaya or any of its affiliates to any shareholder, governmental entity, or person, (b) any past, present or future liabilities of Avaya or any of its affiliates arising out of any civil or criminal investigations or claims brought by any governmental entity, including the United States Attorney's Office or the Securities and Exchange Commission, seeking sanctions, penalties, restitution, disgorgement, or other amounts owed or that become owed, and (c) any past, present or future claims of or liability associated with indemnity, advancement, reimbursement or contribution of legal or other expenses incurred by current or former directors, officers, employees, agents, attorneys, or other representatives of Avaya or its affiliates in connection with or arising out of any proceedings, including those referenced in sections (a) and (b) above.

**<u>Exhibit D</u>**

**Declaration of John Bosacco**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )  Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | )  Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | )  (Jointly Administered) |
| | ) |

**DECLARATION OF JOHN BOSACCO**
**IN SUPPORT OF THE DEBTORS' MOTION SEEKING**
**ENTRY OF (I) AN ORDER (A) APPROVING BIDDING**
**PROCEDURES IN CONNECTION WITH THE SALE OF THE**
**DEBTORS' NETWORKING BUSINESS, (B) APPROVING THE FORM**
**AND MANNER OF NOTICE, (C) SCHEDULING AN AUCTION AND A**
**SALE HEARING, (D) APPROVING PROCEDURES FOR DETERMINING**
**CURE AMOUNTS, AND (E) EXTENDING THE DEADLINE TO ASSUME**
**OR REJECT THE BILLERICA LEASE, AND (II) AN ORDER AUTHORIZING**
**AND APPROVING THE SALE OF THE DEBTORS' NETWORKING BUSINESS**

I, John Bosacco, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, to the best of my knowledge, information, and belief:

1.      I am over the age of 18 and competent to testify.  I am a Partner in the Restructuring and Recapitalization group at Centerview Partners ("Centerview"),[2] which has its principal office at 31 West 52nd Street, New York, New York 10019, an investment banking advisory firm and financial advisor and investment banker for Avaya Inc. ("Avaya") and certain of its affiliates (together with Avaya, collectively, the "Debtors") prior to and during these

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9282); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

chapter 11 cases. I submit this declaration in support of the *Debtors' Motion Seeking Entry of (i) an Order (a) Approving Bidding Procedures in Connection with the Sale of the Debtors' Networking Business, (b) Approving the Form and Manner of Notice, (c) Scheduling an Auction and A Sale Hearing, and (d) Approving Procedures for Determining Cure Amounts, and (e) Extending the Deadline to Assume or Reject the Billerica Lease, and (ii) an Order Authorizing and Approving the Sale of the Debtors' Networking Business* [Docket No. ___] (the "Motion") pursuant to Rule 6004 of the Federal Rules of Bankruptcy Procedure and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York 6004-1.

2.      Unless otherwise stated, all facts and statements included in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me or verified by the Debtors or the Debtors' other professional advisors, including Avaya's prepetition financial advisor Goldman, Sachs & Co. ("Goldman"), and/or my opinion based upon (a) my personal knowledge of the Debtors' operations and financial performance, (b) my oversight of the sale process (the "Sale Process") for the Business since late January 2017, (c) information learned from my review of relevant financial and operational data regarding the Debtors, (d) information received from members of the Debtors' management or their other advisors, including but not limited to Goldman, and (e) my experience advising both distressed and non-distressed businesses and companies and their stakeholders in the technology and telecommunications sectors.

3.      I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

2

## **Expertise of the Financial Advisor**

4.      I am a Partner in the Restructuring and Recapitalization group at Centerview, primarily staffed out of Centerview's office at 31 West 52nd Street, New York, New York 10019.  I have more than 15 years of experience in investment banking, focusing particularly on advising and executing financing, mergers and acquisitions, and restructuring transactions across a wide range of industries.    Prior to Centerview, I was a Managing Director at Miller Buckfire & Co., worked in the restructuring group at Dresdner Kleinwort Wasserstein (predecessor to Miller Buckfire & Co.), and worked in the investment banking divisions of Merrill Lynch and Chase Securities Inc.  My representative telecommunications and technology related advisory work includes Alcatel-Lucent, Birch Telecom, Charter Communications, CTC Communications, the merger of Conversent Communications and FiberNet, and the merger of Conversent Communications, CTC Communications and Choice One Communications.  My additional investment banking and restructuring experience includes, but is not limited to, advising Border Media Partners, Caesars Entertainment Corporation (Strategic Alternatives Committee), Charter Communications (Vulcan, Inc.), Citation Corporation, Clear Channel Outdoor, CMS Energy, Crowne Group, Dana Corporation, Dana Credit Corporation, Dow Chemical, Exide Technologies, Greatwide Logistic Services, MACHGen (Secured Lenders), Pacific Crossing Limited, Peabody (Secured Lenders), Polaroid Corporation, RCS Capital, Stolt-Nielsen, Stolt Offshore, Targus Group International, United Australia/Pacific and Workflow Management.  Accordingly, I am knowledgeable about restructuring, mergers and acquisitions—including sales pursuant to section 363 of the Bankruptcy Code, and financing transactions across a broad set of industries and subsectors.

5.      Centerview is a global advisory-focused investment bank, and Centerview's team of professionals deliver a wide array of merger and acquisition, financial restructuring, and

3

capital structure services to corporations, boards, and key stakeholders around the world. Centerview's Restructuring and Recapitalization group provides a full suite of advisory services for restructuring transactions consummated out of court and in chapter 11.

<strong><u>The Marketing Process</u></strong>

6.      By the Motion, the Debtors seek authority to sell certain assets (as defined in the APA, the "<u>Transferred Assets</u>").[3]   The Sale is the result of ongoing restructuring negotiations related to the Debtors and is an important step towards maximizing the value of the Debtors' estates for all stakeholders.

7.   Avaya retained Centerview in March 2016 to assist the board of directors and management team in evaluating strategic and capital structure alternatives to address the Debtors' burdensome balance sheet.  Such potential alternatives included, but were not limited to, the divestiture of noncore assets, for which Avaya also retained Goldman in March 2016 as financial advisor in connection with any possible divestitures.   Accordingly, it is my understanding that in April 2016 Goldman assisted Avaya in launching a marketing process of Avaya's networking business (the "<u>Business</u>") and between April and September 2016, Goldman and Avaya contacted 37 parties, including 28 strategic buyers and nine financial sponsors, which, based on prior experience and an assessment of the market, were most likely to be interested in acquiring the Business.  After receiving a high level overview of the business (including only public information), I understand that 15 parties entered into nondisclosure agreements with Avaya, and 11 parties attended an initial meeting regarding the Business with Avaya.

8.      Subsequent to these meetings and prior to the submission of first round bids, I am informed that Avaya and Goldman responded to a number of information requests by interested

---

[3]    Assets of the Business include property of certain non-Debtor affiliates.

4

parties.  I understand that Avaya and Goldman asked potential buyers to submit first round bids containing, among other things, an indication of valuation for the Business, expected time required to close the purchase of the Business, and anticipated financing sources to fund the transaction, and set August 15, 2016 as the deadline for the submission of first round bids.  I am informed by Avaya and Goldman that four interested parties (the "Potential Purchasers") ultimately provided their preliminary views on valuation as part of their first round bids, of which two submitted written bids.  I understand that the verbal offers ranged from $5 million to $65 million for 100% of the business (both financial sponsors), and the written offers ranged from $100 million to $330 million for 100% of the business (both strategic buyers).  I am further informed by Avaya and Goldman that the strategic buyer's written bid of up to $330 million was based on limited due diligence and an existing operating relationship between the Potential Purchaser and certain Avaya entities related to the Business, and was provided without any proposed form of deal structure, detailed due diligence request, or information about necessary consents or approvals to be obtained.  I also understand that Avaya determined that two of the four Potential Purchasers would not be invited to proceed due to verbal offers that were significantly less attractive than the other bids. I am informed that the other two Potential Purchasers were provided with access to an electronic diligence data room (which contained information on the business, including relevant contracts, financial and accounting information, and other relevant information regarding a potential transaction).

9.      It is my understanding that Goldman and Avaya continued to work with these two Potential Purchasers to satisfy diligence requests and clarify proposal terms.  I am informed that the $330 million Potential Purchaser showed limited interest in conducting due diligence or engaging with management on deal terms or transaction negotiations.  Additionally, I understand

that Goldman and Avaya continued to work with another potentially interested party, which

provided a view on value of up to $70 million after the first round bid deadline, a portion of

which would be subject to performance post-closing of the transaction.  I am informed, however,

that this bidder declined to engage further despite repeated follow-up from Goldman and Avaya.

10.     Further, by November 2016, it is my understanding that the $330 million Potential

Purchaser declined to continue bidding citing multiple concerns, including its perceived inability

to secure requisite regulatory approvals and operate the business in specific jurisdictions,

including in the United States and Europe, as well as revenue trajectory and lack of profitability

within the Business.  I am informed that, despite repeated requests, the $330 million Potential

Purchaser had still not produced a proposed deal structure, provided feedback on the proposed

contract, or performed typical detailed due diligence for their initial bid.

11.     As a result, I am informed that Avaya focused efforts on the most viable

purchaser at the time, Extreme Networks Inc. ("Extreme").  It is my understanding that starting

on December 19, 2016, Avaya and Goldman facilitated extensive due diligence for Extreme on

the operations of the Business, and began negotiating the terms of a stalking horse asset purchase

agreement (the "APA"), including numerous related documents and schedules, bidding

procedures, and a proposed form of sale order.

12.     Following the commencement of these chapter 11 cases on January 19, 2017,

Centerview began to assume responsibility for advising Avaya on the Sale and Sale Process.

At the time Centerview assumed this role, the draft APA contemplated by Avaya and Extreme

included a total potential value of up to $100 million, consisting of at least approximately

$68 million in cash proceeds (before transaction costs and purchase price adjustments), up to

approximately $22 million of aggregate, undiscounted value in the assumption of future dark

lease and pension obligations of certain Avaya non-Debtor entities (with any reduction of this amount to be offset by an increase in cash proceeds), and the ultimate release of up to $10 million in cash to the Avaya Enterprise from an indemnity escrow account one year after closing.

13.     On or about January 27, 2017, Centerview had assumed the role of financial advisor to Avaya as it related to the Sale and the Sale Process with Extreme.  On or about February 13, 2017, Avaya and Extreme reached agreement on the material terms of the Sale, and Centerview shared a presentation summarizing the proposed transaction as well as the strategic and business rationale with advisors to the Committee, the Ad Hoc Group of First Lien Holders, and the Ad Hoc Group of Crossover Holders (together, collectively, the "Creditors' Advisors"). Following this presentation, Centerview continued to answer questions and provide further diligence as requested by various of the Creditors' Advisors.

14.     On or about February 17, 2017 the board of directors authorized the approval of the APA and the associated Sale Process contemplated by the Bidding Procedures Motion.

15.     Based on my understanding of the prepetition eight-month marketing process and the extensive arm's-length and good faith negotiations between the parties, the terms of the APA have been subjected to a robust market test.  Based on my experience and the extensive due diligence which I understand was conducted on the Business by Extreme, I believe that the prepetition marketing process provided sufficient time to ensure the best possible purchase terms for an acquisition of the Business.  Additionally, I have been told by Avaya that the Business is non-core and had been marketed unsuccessfully on two prior occasions, in 2010 and 2012.  I also understand that Avaya management, with the assistance of Zolfo Cooper, prepared a keep-sell analysis of the Business, the result of which showed that the sale was significantly better for Avaya than retaining the Business.  Thus, I believe that the consummation of the Sale

7

contemplated under the APA represents the highest and best transaction available for the Business. Additionally, the Debtors are committed to achieving the highest or otherwise best bid for the Business by marketing such assets and conducting a competitive bidding process, as set forth in the Bidding Procedures, and, if necessary, conducting an auction for the Business.

### Sound Business Purpose for the Bidding Procedures

16.     In connection with negotiating the APA, the Debtors and their advisors worked diligently to develop the Bidding Procedures. The Bidding Procedures are designed to ensure that a process is put in place that will minimize the risk that Extreme terminates negotiations—leaving the Debtors without a stalking horse bidder for the Business—while at the same time attempting to maximize recoveries for creditors and other stakeholders. With these goals in mind, I believe that the Bidding Procedures set forth an appropriate process to test the value of the Debtors' Business within the timeframe required by Extreme. The fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by market exposure and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. Moreover, notice of this process will be widely circulated to interested parties.

17.     Furthermore, because the Bidding Procedures also preserve the Debtors' ability to solicit and develop qualified bids, Centerview intends to continue marketing the Business by contacting parties previously contacted in connection with a potential purchase of the Business, as well as additional parties that may be interested in purchasing the Business, to the extent such parties might exist, with the goal of eliciting a topping bid to the extent one exists, or if one does not exist, subjecting the Sale to a robust market test. As such, I believe the Bidding Procedures: (a) provide adequate time for interested parties to conduct due diligence, arrange financing, and construct and submit informed competing bids; (b) help ensure that the Debtors are maximizing

8

creditor recoveries while working towards the efficient completion of the chapter 11 cases in a timely manner; and (c) provide the Debtors' Sale Process with finality. Importantly, the Bidding Procedures do not impact the Debtors' ability to exercise their fiduciary duties to pursue an alternative restructuring strategy.

18.    The timeframe set forth in the Bidding Procedures, including approval of the Sale Order on or before July 4, 2017, was explicitly requested by Extreme. I have been advised by Extreme that this timeframe is driven by Extreme's desire to announce and close a transaction quickly. More importantly, Avaya management believes that a prolonged stay in chapter 11 will lead to business deterioration. Accordingly, the Debtors also seek to complete the transaction quickly, in order to maximize the value of the Business. The inclusion of milestone dates in the Bidding Procedures is meant to act as a guideline to ensure a fair but efficient Sale Process. In no way, however, will the milestone dates trigger any termination rights in either party other than the entry of the Sale Order and the outside closing date provided in the APA. In my opinion, the Debtors cannot risk losing Extreme as a stalking horse bidder if the Business is to be sold in a way that maximizes creditor recoveries, and therefore the proposed bidding procedures—which benefit both parties—have a sound business purpose.

### Sound Business Purpose for the Use of a Stalking Horse and Bid Protections

19.    Extreme's bid (the "Stalking Horse Bid") will establish a floor for further bidding that may increase the consideration received in exchange for the Transferred Assets for the benefit of the Debtors' estates. I believe that the Bid Protections are necessary to induce Extreme to provide the Stalking Horse Bid and that the Bid Protections were necessary to induce a stalking horse bidder to provide a stalking horse bid. Accordingly, I believe that the Bid Protections will maximize the value of the Business, and thus the Debtors' Estates, and are a valid and sound exercise of the Debtors' business judgment.

9

20.    More specifically, I understand that the Bid Protections were, and remain, a critical component of Extreme's commitment.  Extreme has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third-parties.  I believe the parties negotiated the requested Bid Protections in good faith and at arm's length with significant give-and-take.  I also believe that if the Court does not approve the Bid Protections, there is significant risk that Extreme will elect not to serve as the "stalking horse" to the detriment of the Debtors' estates.

21.    The Termination Fee contained in the Bid Protections represents approximately 3.00% of the total potential value to the Avaya Enterprise of approximately $100 million.  This total potential value includes at least approximately $68 million in cash proceeds (before transaction costs and purchase price adjustments), up to approximately $22 million of aggregate, undiscounted value in the assumption of future dark lease and pension obligations of certain Avaya non-Debtor entities (with any reduction of this amount to be offset by an increase in cash proceeds), and the ultimate release of up to $10 million in cash to the Avaya Enterprise from an indemnity escrow account one year after closing.  Pursuant to closing the transaction, the Avaya Enterprise would be responsible for paying up to approximately $5 million in severance costs to employees of the Business not transferred to Extreme.  In my experience, a termination fee of 3.00% is in the range of termination fees that I have seen and negotiated in prior sale transactions conducted in chapter 11.  Moreover, I understand that the Termination Fee, and the Bid Protections generally, were the subject of extensive, good faith, and arm's-length negotiations among the Debtors and Extreme.  Based on my understanding, I believe that the Termination Fee is a valid and sound exercise of the Debtors' business judgment and should be approved.

22.    Similarly, the Purchaser Expense Reimbursement represents a maximum of 0.75% of the total potential value of $100 million for the purchase of the Transferred Assets. The $750,000 cap on the Purchaser Expense Reimbursement, in my opinion, is a fair reflection of the expenses Extreme has incurred through the process of conducting due diligence and negotiating the terms of the APA.    Furthermore, I understand that the Purchaser Expense Reimbursement was vigorously debated in good faith and at arm's-length among the Debtors and Extreme through several iterations of draft purchase agreements.    Based on my understanding, I believe that the Purchaser Expense Reimbursement, and the Bid Protections generally, are valid and sound exercises of the Debtors' business judgment and should be approved.

23.    It is my understanding that the Debtors used Extreme's reluctance to move from these terms to negotiate other concessions from Extreme such as the requirement for a $10 million deposit by Extreme in order to enter into the APA, and the removal of a no-shop provision which was originally contemplated under the APA.    This $10 million deposit into an escrow account of the Debtors, representing 10% of the base purchase price of $100 million, before adjustments, helps to ensure that the Sale will close by requiring Extreme to forfeit the Deposit if Extreme fails to close the transaction in accordance with certain terms of the APA. Further, the APA now explicitly allows the Debtors to respond to any inquiries or offers to purchase the Business and supply information relating to the Business to prospective purchasers even before entry of the Bidding Procedures Order, which represents further risk to Extreme potentially losing out on its bid.    Such risk to Extreme, after already expending significant time and money in pursuit of the Business, plus the benefit to the Debtors' estates of utilizing a stalking horse bidder, evidence the fact that the Bid Protections are the product of a bargained for exchange and represent rational business judgment by the Debtors.    Accordingly, the Bid

11

Protections are valid and sound exercises of the Debtors' business judgment and should be approved.

### Cause Exists to Extend the Deadline to Assume or Reject the Billerica Lease

24.     It is my understanding that the leased space under the Billerica Lease currently houses extensive lab equipment of the Debtors.  Should the Billerica Lease ultimately be rejected by the Successful Bidder, the Debtors require sufficient time to move such lab equipment out of the site.  Indeed, such a move necessarily cannot begin until the Sale Order has been entered, yet that date is scheduled to take place on May 25, 2017, after the Assumption/Rejection Deadline.  Nevertheless, the Debtors require at least eight weeks to move their lab equipment out of the Billerica site, meaning their rejection, if necessary, could not happen until eight weeks after the Assumption/Rejection Deadline.  Accordingly, it is my belief that the Debtors require an additional 90 days to assume or reject the Billerica Lease.

25.     Furthermore, pending Avaya's decision to assume or reject the Billerica Lease, the Debtors have informed me that they intend to perform all of their undisputed obligations arising from and after the Petition Date in a timely fashion to the extent required by section 365(d)(3) of the Bankruptcy Code.  Consistent with this decision, Avaya has performed all undisputed obligations arising under the Billerica Lease.  Therefore, I believe that the requested extension of time to assume or reject the Billerica Lease will not prejudice or otherwise affect the substantive rights of the Billerica Lease Counterparty, and the facts demonstrate that sufficient cause exists for the Court to extend the Assumption/Rejection Deadline for the Billerica Lease an additional 90 days, through and including August 17, 2017.

### Conclusion

26.     Based on these circumstances, the prepetition marketing process, and my experience, I believe that the terms of the APA reflect the highest and best available bid for such

assets, that the Bidding Procedures will achieve the highest or otherwise best bid for the

Business, that the Bid Protections were necessary to induce a stalking horse bid for the Business,

which will ultimately maximize value to the Debtors' estates, and that cause exists for the

Debtors to extend the deadline to assume or reject the Billerica Lease an additional 90 days.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is

true and correct to the best of my knowledge, information, and belief.


Dated: March 8, 2017                              */s/ John Bosacco*
New York, New York                                John Bosacco
                                                  Partner
                                                  Centerview Partners

**<u>Exhibit E</u>**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*,[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER (I) APPROVING THE SALE
### OF THE DEBTORS' NETWORKING BUSINESS
### FREE AND CLEAR OF ALL CLAIMS, LIENS, RIGHTS,
### INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING THE
### DEBTORS TO ENTER INTO AND PERFORM THEIR OBLIGATIONS
### UNDER THE ASSET PURCHASE AGREEMENT; AND (III) ASSUME
### AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the portion of the motion, dated March 8, 2017 (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (A) authorizing and approving the entry into and performance under the terms and conditions of the Asset Purchase Agreement substantially in the form attached hereto as **Exhibit A** (the "APA"), whereby the Debtors have agreed to sell, and [●] (the "Successful Bidder")[3] to purchase the Business, and the Debtors have agreed to transfer and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9282); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is: 4655 Great America Parkway, Santa Clara, CA 95054.

[2] Capitalized terms used in this Order and not immediately defined have the meanings given to such terms in the Motion or the APA, as applicable.

[3] This Form of Order will serve as the Form Order for any transaction completed pursuant to the Bidding Procedures.

the Successful Bidder has agreed to assume certain liabilities (specifically as set forth and
defined in the APA, the "Assumed Liabilities") (collectively, and including all actions taken or
required to be taken in connection with the implementation and consummation of the APA, the
"Sale"); (B) authorizing and approving the sale of the Transferred Assets of the Debtors' estates
(the "Debtors' Transferred Assets") free and clear of any and all liens, claims, interests and
encumbrances; (C) authorizing the assumption and assignment to the Successful Bidder of the
Transferred Contracts and Assumed Leases in accordance with the provisions of the order
approving the bidding procedures and granting certain related relief
(the "Bidding Procedures Order") and the APA; and (D) granting other relief; and the Court
having entered the Bidding Procedures Order on April [__], 2017; and an auction conducted in
accordance with the Bidding Procedures (the "Auction") having been held on May 23, 2017,
pursuant to the Bidding Procedures Order; and the Successful Bidder having submitted the
highest and best offer at the Auction; and the Court having conducted a hearing on the Motion on
May 25, 2017 (the "Sale Hearing"), at which time all interested parties were offered an
opportunity to be heard with respect to the Motion; and the Court, having reviewed and
considered the Motion and the APA, approved the Bidding Procedures Order and all objections
to the Sale and the APA filed in accordance with the Bidding Procedures Order; and having
heard statements of counsel and the evidence presented in support of the relief requested in the
Motion at the Sale Hearing; and it appearing that due notice of the Motion, the APA, the Bidding
Procedures Order and the Auction has been provided; and it appearing that the relief requested in
the Motion is in the best interests of the Debtors, their estates, their stakeholders and all other
parties-in-interest; and it appearing that the Court has jurisdiction over this matter; and it further

appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY FINDS AS FOLLOWS:**

### Jurisdiction, Venue and Final Order

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rule of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

### Notice of the Sale, APA, Sale Hearing, Auction and the Cure Payments

C.    As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA and the Sale has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 2002, 6004, 6006 and 9014.  The Debtors have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing, the APA, and the Sale as required by the Bidding Procedures Order.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the APA or the Sale is required.

D.    A reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

E.    In accordance with the Bidding Procedures Order, the Debtors have served a notice of their intent to assume and assign the Transferred Contracts and Assumed Leases and of the Cure Payments upon each non-Debtor counterparty to a Transferred Contract or Assumed Lease.  The service and provision of such notice was good, sufficient, and appropriate under the circumstances and no further notice need be given in respect of assumption and assignment of the Transferred Contracts and Assumed Leases or establishing a Cure Payment for the respective Transferred Contracts and Assumed Leases.  Non-Debtor counterparties to the Transferred Contracts and Assumed Leases have had an adequate opportunity to object to assumption and assignment of the applicable Transferred Contracts and Assumed Leases and the Cure Payments set forth in the notice (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the non-Debtor counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code).  All objections, responses, or requests for adequate assurance, if any, have been resolved.

**Highest and Best Offer**

F.    As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, the Debtors conducted an Auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The Auction was duly noticed and conducted in a noncollusive, fair, and good faith manner and the Auction process set forth in the Bidding Procedures Order

4

afforded a full, fair, and reasonable opportunity for any interested party to make a higher or otherwise better offer to purchase the Transferred Assets and assume the Assumed Liabilities.

G.      The Transferred Assets were adequately marketed by the Debtors, and the consideration provided by the Successful Bidder under the APA constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the sale of the Transferred Assets and the assumption of the Assumed Liabilities.   The Debtors' determination that the consideration provided by the Successful Bidder under the APA constitutes the highest and best offer for the Transferred Assets constitutes a valid and sound exercise of the Debtors' business judgment.

H.      Approval of the Motion and the APA, and the consummation of the Sale contemplated thereby, is in the best interests of the Debtors, their respective creditors, estates, and other parties in interest.   The Debtors have demonstrated good, sufficient, and sound business reasons and justifications for entering into the Sale and the performance of their obligations under the APA.

I.      The consummation of the Sale outside a plan of reorganization pursuant to the APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.

J.      Entry of an order approving the APA and all the provisions thereof is a necessary condition precedent to Successful Bidder's consummation of the Sale, as set forth in the APA.

K.      The APA was not entered into, and none of the Debtors or the Successful Bidder, have entered into the APA or propose to consummate the Sale, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors.   None of the Debtors or the Successful Bidder is entering into the APA, or proposing to consummate the Sale, fraudulently,

for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer
Claims whether under the Bankruptcy Code or under the laws of the United States, any state,
territory, possession thereof or the District of Columbia or any other applicable jurisdiction with
laws substantially similar to the foregoing.

L.    The Successful Bidder has complied in all respects with the Bidding Procedures
Order and any other applicable order of this Court in negotiating and entering into the APA, and
the Sale and the APA likewise comply with the Bidding Procedures Order and any other
applicable order of this Court.

### Good Faith of Successful Bidder

M.    The APA and the Sale contemplated thereunder were proposed, negotiated, and
entered into by and among the Debtors and the Successful Bidder without collusion, in good
faith, and at arm's-length.

N.    Neither the Successful Bidder, nor any of its affiliates, present or contemplated
members, officers, directors, shareholders, or any of their respective successors and assigns
(each such entity individually and taken together, the "Successful Bidder Group") is an "insider"
of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, or their
affiliates.  The Successful Bidder Group is entering into the Sale in good faith and is a good faith
buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to
the full protection of that provision, and otherwise has proceeded in good faith in all respects in
connection with this proceeding.  Neither the Debtors nor the Successful Bidder Group have
engaged in any action or inaction that would cause or permit the APA to be avoided or impose
any costs or damages under section 363(n) of the Bankruptcy Code.

**No Fraudulent Transfer**

O.      The consideration provided by the Successful Bidder pursuant to the APA for its

purchase of the Transferred Assets and the assumption of the Assumed Liabilities constitutes

reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform

Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and under the laws of the

United States, any state, territory, possession, or the District of Columbia.

P.      The Successful Bidder is not a continuation of the Debtors or their respective

estates and the Successful Bidder is not holding itself out to the public as a continuation of the

Debtors or their respective estates and the Sale does not amount to a consolidation, merger, or de

facto merger of the Successful Bidder and the Debtors.

**Validity of Transfer**

Q.      Each Debtors' board of directors or managing members, as applicable, has

authorized the execution and delivery of the APA, the sale of the Transferred Assets and the

assumption of the Assumed Liabilities to the Successful Bidder.  The Debtors and their affiliates:

(i) have full corporate power and authority to execute and deliver the APA and all other

documents contemplated thereby, as applicable; (ii) have all of the power and authority

necessary to consummate the Sale; and (iii) have taken all action necessary to authorize and

approve the APA and to consummate the Sale, and no further consents or approvals are required

for the Debtors to consummate the transactions contemplated by the APA, except as otherwise

set forth in the APA.  The Debtors' Transferred Assets constitute property of the Debtors' estates

within the meaning of section 541(a) of the Bankruptcy Code and title thereto is presently vested

in the Debtors' estates.

## **Section 363(f) Is Satisfied**

R.      The sale of the Debtors' Transferred Assets to the Successful Bidder under the terms of the APA meets the applicable provisions of section 363(f) of the Bankruptcy Code such that the sale of the Debtors' Transferred Assets will be free and clear of any and all liens, claims, interests, and encumbrances, and except as expressly provided in the APA with respect to the Assumed Liabilities, the (i) transfer of the Debtors' Transferred Assets to the Successful Bidder and (ii) assumption and/or assignment to the Successful Bidder of the Transferred Contracts and Assumed Leases and Assumed Liabilities will be free and clear of all liens, claims, interests, and encumbrances and will not subject the Successful Bidder to any liability for any liens, claims, interests, and encumbrances whatsoever (including, without limitation, under any theory of equitable law, antitrust, or successor or transferee liability).   All holders of liens, claims, interests, and encumbrances who did not object, or withdrew their objections to the Sale, are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code, and all holders of liens, claims, interests, and encumbrances are adequately protected—thus satisfying section 363(e) of the Bankruptcy Code—by having their liens, claims, interests, and encumbrances, if any, attach to the proceeds of the Sale ultimately attributable to the property against or in which they assert liens, claims, interests, and encumbrances, or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such holder had prior to the Sale, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

S.      The Successful Bidder would not have entered into the APA and would not consummate the sale of the Transferred Assets, thus adversely affecting the Debtors, their estates, creditors, employees, and other parties in interest, if the sale of the Debtors' Transferred

8

Assets was not free and clear of all liens, claims, interests, and encumbrances or if the Successful

Bidder would, or in the future could, be liable for any Claims, including, without limitation and

as applicable, certain liabilities that expressly are not assumed by the Successful Bidder as set

forth in the APA or in this Order.  The Successful Bidder asserts that it will not consummate the

Sale unless the APA specifically provides, and this Court specifically orders, that neither the

Successful Bidder, nor its assets, or the Debtors' Transferred Assets, will have any liability

whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity,

whether by payment, setoff or otherwise, directly or indirectly, any Claim or successor or

transferee liability for any of the Debtors.

T.      The transfer of the Debtors' Transferred Assets to the Successful Bidder under the

APA will be a legal, valid, and effective transfer of all of the legal, equitable, and beneficial

right, title, and interest in and to the Debtors' Transferred Assets free and clear of all liens,

claims, interests, and encumbrances.  The Debtors may sell their interests in the Transferred

Assets free and clear of all liens, claims, interests, and encumbrances because, in each case, one

or more of the standards set forth in section 363(f) has been satisfied.

**Assumption and Assignment of the Transferred Contracts and Assumed Leases**

U.      The assumption and assignment of the Transferred Contracts and Assumed Leases

pursuant to the terms of this Order are integral to the APA, are in the best interests of the Debtors

and their respective estates, creditors, and other parties in interest, and represent the reasonable

exercise of sound and prudent business judgment by the Debtors.

V.      The Debtors have met all requirements of section 365(b) of the Bankruptcy Code

for each of the Transferred Contracts and Assumed Leases.  The Debtors and/or the Successful

Bidder, as applicable under the APA, have (i) cured and/or provided adequate assurance of cure

of any default existing prior to the Closing under all of the Transferred Contracts and Assumed

Leases, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (ii) provided

compensation or adequate assurance of compensation to any counterparty for actual pecuniary

loss to such party resulting from a default prior to the Closing under any of the Transferred

Contracts and Assumed Leases, within the meaning of section 365(b)(1)(B) of the Bankruptcy

Code.  Each of the Transferred Contracts and Assumed Leases is free and clear of all liens,

claims, interests, and encumbrances against the Successful Bidder.

W.    The Successful Bidder has provided adequate assurance of its future performance

under the Transferred Contracts and Assumed Leases within the meaning of sections

365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the

Bankruptcy Code, the Transferred Contracts and Assumed Leases to be assumed and assigned

under the APA shall be assigned and transferred to, and remain in full force and effect for the

benefit of, the Successful Bidder notwithstanding any provision in the contracts or other

restrictions prohibiting their assignment or transfer.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

## General Provisions

1.    The Motion is granted to the extent set forth herein.

2.    All objections to the Motion or the relief requested therein that have not been

withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation

filed with the Court or as resolved in this Order, and all reservations of rights included therein,

are, except as provided in other orders of the Court, hereby overruled on the merits with

prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto

10

are deemed to consent to the relief sought therein including, without limitation, all non-Debtor counterparties to the Transferred Contracts and Assumed Leases.

3.    Where appropriate herein, findings of fact shall be deemed conclusions of law and conclusions of law shall be deemed findings of fact.

### Approval of the APA

4.    The APA, all of the terms and conditions thereof, and all of the transactions contemplated therein, are approved in all respects.  The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

5.    The Debtors are authorized to:  (a) take any and all actions necessary or appropriate to perform, consummate, implement and close the Sale, including the sale to Successful Bidder of the Transferred Assets, in accordance with the terms and conditions set forth in the APA and this Order; (b) provide transition services to the Successful Bidder in accordance with the form of transition services agreement attached to the APA as Exhibit G; (c) to assume and assign any and all Transferred Contracts and Assumed Leases; and (d) to take all further actions and to execute and deliver the APA and any and all additional instruments and documents that may be (i) reasonably requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder, or reducing to possession, the Transferred Assets (including, but not limited to, all necessary transition services to be provided to Successful Bidder by the Debtors), (ii) necessary, appropriate or desirable to the performance of the obligations contemplated by the APA, and (iii) as may be

reasonably requested by Successful Bidder to implement the APA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.

6.      All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Transferred Assets to Successful Bidder in accordance with the APA and this Order.

7.      Nothing contained in any chapter 11 plan confirmed in these chapter 11 cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the APA or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA shall control.

### Sale and Transfer Free and Clear of Liens, Claims, Interests, and Encumbrances

8.      At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Successful Bidder pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code free and clear of any and all liens, Claims, interests, and encumbrances.  Such transfer shall constitute a legal, valid, binding, and effective transfer of such Transferred Assets.  All persons or entities, presently or on or after the Closing, in possession of some or all of the Debtors' Transferred Assets, are directed to surrender possession of the Transferred Assets to the Successful Bidder or its respective designees on the Closing or at such time thereafter as the Successful Bidder may request.

9.      This Order:  (a) shall be effective as a determination that, as of the Closing, (i) no Claims other than Assumed Liabilities will be assertable against the Successful Bidder or any of its respective assets, (ii) the Debtors' Transferred Assets shall have been transferred to the Successful Bidder free and clear of all liens, claims, interests and encumbrances, and (iii) the

12

conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.    The Debtors' Transferred Assets are sold free and clear of any reclamation rights.    For the avoidance of doubt, all liens, claims, interests, and encumbrances on the Transferred Assets attach to the proceeds of the Sale ultimately attributable to the property against which such liens, claims, interests, and encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such liens, claims, interests, and encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein, provided, that the allocation of proceeds of the Sale per the terms of the APA shall be non-binding with respect to the ultimate allocation of value among the Debtors or any of their non-Debtor subsidiaries for any purpose in connection with the Debtors' chapter 11 cases including, but not limited to, the value of any of the Debtors or their non-Debtor subsidiaries, distributions under any chapter 11 plan or creditor recoveries and all parties rights with respect to any such allocation or valuation are expressly

preserved.   For the avoidance of doubt, the Successful Bidder shall not be liable for the allocation of proceeds among the Debtors or their non-Debtor subsidiaries.

10.      Except as otherwise provided in the APA, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding Claims arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' Transferred Assets, and the ownership, sale, or operation of the Debtors' Transferred Assets prior to Closing or the transfer of the Debtors' Transferred Assets to the Successful Bidder, are hereby forever barred, estopped, and permanently enjoined from asserting such Claims against the Successful Bidder, its property or the Transferred Assets.   Following the Closing, no holder of any Claim shall interfere with the Successful Bidder's title to or use and enjoyment of the Debtors' Transferred Assets based on or related to any such Claim, or based on any action the Debtor may take in their chapter 11 cases.

11.      If any person or entity that has filed financing statements, mortgages, mechanic's Claims, lis pendens, or other documents or agreements evidencing Claims against or in the Debtors or the Debtors' Transferred Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims that the person or entity has with respect to the Debtors or the Debtors' Transferred Assets or otherwise, then only with regard to the Transferred Assets that are purchased by the Successful Bidder pursuant to the APA and this Order:  (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the

14

Debtors' Transferred Assets; (b) the Successful Bidder is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens, Claims, interests, and encumbrances against the Successful Bidder and the Debtors' Transferred Assets; and (c) upon consummation of the Sale, the Successful Bidder may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Claims and liens that are extinguished or otherwise released pursuant to this Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Debtors' Transferred Assets.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.  Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Debtors' Transferred Assets free and clear of Claims and liens shall be self-executing, and neither the Debtors nor the Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

### No Successor or Transferee Liability

12.    The Successful Bidder Group shall not be deemed, as a result of any action taken in connection with the APA, the consummation of the Sale contemplated by the APA, or the transfer, operation, or use of the Transferred Assets to:  (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for the Successful Bidder, with respect to any obligations as an assignee under the Transferred Contracts and Assumed Leases arising after the Closing); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors

including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, ERISA, tax law, labor law, products liability law, employment law, environmental law, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine.

13.    The Successful Bidder shall not have any responsibility for:  (a) any liability or other obligation of the Debtors or related to the Transferred Assets other than as expressly set forth in the APA or (b) any Claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the APA with respect to the Successful Bidder, the Successful Bidder shall have no liability whatsoever with respect to the Debtors, (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "Successor or Transferee Liability") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Transferred Assets prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities with respect to the Successful Bidder, the Successful Bidder shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.), the Comprehensive Environmental Response Compensation and Liability Act, the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of

16

1973 (as amended), or the National Labor Relations Act, 29 U.S.C. § 151, et seq. (the "NLRA").

or any foreign, federal, state or local labor, employment (including any rights under any pension,

multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the

Employee Retirement Income Security Act of 1974, health or welfare, compensation or other

employee benefit plans, agreements, practices, and programs, including, without limitation, any

pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time

contributed to or had any liability or potential liability)), or environmental law by virtue of the

Successful Bidder's purchase of the Transferred Assets or assumption of the Assumed

Liabilities.  Without limitation of the foregoing, the Successful Bidder Group shall have no

liability or obligation with respect to any environmental liabilities of the Debtors or any

environmental liabilities associated with the Transferred Assets except to the extent they are

Assumed Liabilities with respect to the Successful Bidder.  The Successful Bidder shall have no

liabilities on account of any taxes arising, accruing or payable under, out of, in connection with,

or in any way relating to the operation of the Transferred Assets prior to the Closing.

14.    Except as provided in the APA for the Assumed Liabilities, with respect to the

Successful Bidder, nothing in this Order or the APA shall require the Successful Bidder Group

to:  (a) continue or maintain in effect, or assume any liability in respect of any employee,

pension, welfare, fringe benefit or any other benefit plan, trust arrangement, or other agreements

to which the Debtors are a party or have any responsibility therefor including, without limitation,

medical, welfare, and pension benefits payable after retirement or other termination of

employment; or (b) assume any responsibility as a fiduciary, plan sponsor, or otherwise, for

making any contribution to, or in respect of the funding, investment or administration of any

employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

15.    Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Successful Bidder, or its assets (including the Transferred Assets), with respect to any:  (a) Claim or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any lien, claim, interest, or encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing, or refusing to renew any license, permit, or authorization to operate any of the Transferred Assets or conduct any of the businesses operated with such assets.

## **Good Faith of Purchaser**

16.    The Sale contemplated by the APA is undertaken by the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the Sale (including the assumption and assignment of the Transferred Contracts and Assumed Leases), unless such authorization and consummation of such sale are duly and properly stayed pending such appeal.

18

17.    Neither the Debtors nor the Successful Bidder have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by the Successful Bidder for the Transferred Assets under the APA is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

**Assumption and Assignment of Transferred Contracts and Assumed Leases**

18.    The Debtors are authorized and directed at the Closing to assume and assign each of the Transferred Contracts and Assumed Leases to the Successful Bidder free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 365 of the Bankruptcy Code and to execute and deliver to the Successful Bidder such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts and Assumed Leases to the Successful Bidder.  The payment of the applicable Cure Payments (if any) shall:  (a) effect a cure of all defaults existing thereunder as of the Closing; (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default; and (c) together with the assumption of the Transferred Contracts and Assumed Leases by the Debtors and the assignment of the Transferred Contracts and Assumed Leases to the Successful Bidder, constitute adequate assurance of future performance thereof.

19.    Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Payments, the Transferred Contracts and Assumed Leases to be assumed and assigned under the APA shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Successful Bidder notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer.  Any provisions in any Transferred Contract or Assumed Lease that prohibits or conditions the assignment of such Transferred Contract or

Assumed Lease or allow the counterparty to such Transferred Contract or Assumed Lease to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Transferred Contract or Assumed Lease, constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Successful Bidder of the Transferred Contracts and Assumed Leases have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Transferred Contracts and Assumed Leases, and such Transferred Contracts and Assumed Leases shall remain in full force and effect for the benefit of the Successful Bidder. Each non-Debtor counterparty to the Transferred Contracts and Assumed Leases shall be forever barred, estopped, and permanently enjoined from: (a) asserting against the Debtors or the Successful Bidder or their respective property any assignment fee, acceleration, default, breach or Claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control provisions in such Transferred Contracts and Assumed Leases, or any purported written or oral modification to the Transferred Contracts and Assumed Leases and (b) asserting against the Successful Bidder (or its property, including the Transferred Assets) any Claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the Debtors existing as of the Closing or arising by reason of the Closing except for the Assumed Liabilities.

20. Upon the Closing and the payment of the relevant Cure Payments, if any, the Successful Bidder shall be deemed to be substituted for the Debtors as a party to the applicable

Transferred Contracts and Assumed Leases and the Debtors shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Transferred Contracts and Assumed Leases. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Successful Bidder or the Debtors as a result of the assumption and assignment of the Transferred Contracts and Assumed Leases. The failure of the Debtors or the Successful Bidder to enforce at any time one or more terms or conditions of any Transferred Contract or Assigned Lease shall not be a waiver of such terms or conditions or of the right of the Debtors or the Successful Bidder, as the case may be, to enforce every term and condition of such Transferred Contract or Assumed Lease. The validity of the assumption and assignment of any Transferred Contract or Assumed Lease to the Successful Bidder shall not be affected by any existing dispute between the Debtors and any counterparty to such Transferred Contract or Assigned Lease. Any party that may have had the right to consent to the assignment of any Transferred Contract or Assumed Lease is deemed to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

21.     The assignments of each of the Transferred Contracts and Assumed Leases are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**Other Provisions**

22.     To the maximum extent permitted by applicable law, and in accordance with the APA, the Successful Bidder shall be authorized, as of the Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the Debtors with respect to the Transferred Assets. To the extent the Successful Bidder cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect while the Successful Bidder, with assistance from the Debtors, works promptly and

21

diligently to apply for and secure all necessary government approvals for new issuance of Licenses to the Successful Bidder. The Debtors shall maintain the Licenses in good standing to the fullest extent allowed by applicable law for the Successful Bidder's benefit until equivalent new Licenses are issued to the Successful Bidder.

23. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or License relating to the operation of the Transferred Assets sold, transferred or conveyed to the Successful Bidder on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale contemplated by the APA.

24. The Successful Bidder shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided however that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

25. The terms and provisions of the APA and this Order shall be binding in all respects upon the Debtors, their affiliates, their estates, all creditors of (whether known or unknown) and holders of equity interests in any Debtor, any holders of Claims against or on all or any portion of the Transferred Assets, all non-Debtor counterparties to the Transferred Contracts and Assumed Leases, the Successful Bidder, and all of their respective successors and assigns including, but not limited to, any subsequent trustee(s), examiner(s) or receiver(s) appointed in any of the Debtors' chapter 11 cases or upon conversion to Chapter 7 under the Bankruptcy Code, as to which trustee(s), examiner(s) or receiver(s) such terms and provisions likewise shall be binding. The APA shall not be subject to rejection or avoidance by the

Debtors, their estates, their creditors, their shareholders, or any trustee(s), examiner(s), or receiver(s).

26.    Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

27.    This Order approves the transfer to the Successful Bidder of only those Avoidance Actions related exclusively to the Business.

28.    Upon the closing of the Sale, this Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Transferred Assets and Transferred Contracts and Assumed Leases or a bill of sale transferring good and marketable title in the Transferred Assets and Transferred Contracts and Assumed Leases to the Successful Bidder pursuant to the terms of the APA.

29.    The APA may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not, based on the Debtors' judgment, have a material adverse effect on the Debtors' estates or their creditors, and, with respect to the Debtors, such amendment, supplement, or modification shall be in consultation with the DIP Agent and the Ad Hoc Groups.  The Debtors shall provide the DIP Agent and the Ad Hoc Groups with notice of any modification, amendment, or supplement of the APA or any material and related agreement, document, or other instrument at least two business days in advance of such modification, amendment, or supplement.

30.     If the Successful Bidder fails to close the Sale, the Back-up Bidder is required to consummate the Sale pursuant to the Back-up Bid and on the same terms otherwise set forth in this Order, without further Order of this Court.

31.     The Court shall retain exclusive jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Successful Bidder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.   This Court retains jurisdiction to compel delivery of the Transferred Assets, to protect the Successful Bidder and its assets, including the Transferred Assets, against any Claims and Successor and Transferee Liability and to enter orders, as appropriate, pursuant to sections 105, 363 or 365 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Transferred Assets and the Transferred Contracts and Assumed Leases to the Successful Bidder.

32.     Notwithstanding the possible applicability of Rules 6004(h), 6006(d), 7062 and 9014 of the Bankruptcy Rules or otherwise, the terms and conditions of this Order shall be effective immediately upon entry and the Debtors and the Successful Bidder are authorized to close the sale immediately upon entry of this Order.

33.     This Order and the APA shall be binding in all respects upon all creditors of (whether known or unknown), and holders of equity interests in, the Debtors, any holders of Claims or liens in, against, or on all or any portion of the Transferred Assets, all non-Debtor counterparties to the Transferred Contracts and Assigned Leases, all successors and assigns of the Successful Bidder, the Debtors and their affiliates and subsidiaries, and any subsequent

trustees appointed in these chapter 11 cases or upon a conversion to chapter 7 under the
Bankruptcy Code, and shall not be subject to rejection.  Nothing contained in any chapter 11 plan
confirmed in these chapter 11 cases, any order confirming any such chapter 11 plan, or any order
approving wind-down or dismissal of these chapter 11 cases or any subsequent chapter 7 cases
shall conflict with or derogate from the provisions of the APA or this Order, and to the extent of
any conflict or derogation between this Order or the APA and such future plan or order, the
terms of this Order and the APA shall control.

34.     All time periods set forth in this Order shall be calculated in accordance with
Bankruptcy Rule 9006(a).

35.     To the extent there are any inconsistencies between the terms of this Order and
the APA, the terms of this Order shall control.

36.     The APA and the Sale contemplated hereunder shall not be subject to any bulk
sales laws or any similar law of any state or jurisdiction.

37.     Notwithstanding the relief granted herein and any actions taken hereunder,
nothing contained in the Motion or this Order or any payment made pursuant to this Order shall
constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim
or lien against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or
lien, or the assumption or adoption of any agreement, contract, or lease under section 365 of the
Bankruptcy Code.

38.     Notwithstanding anything to the contrary in this Order, any payment made
hereunder, and any authorization herein, shall be subject to the requirements (if any) imposed on
the Debtors under any order(s) of this Court approving the postpetition secured debtor in

25

possession financing facility and the use of cash collateral (any such order, a "<u>Financing Order</u>").

In the event of any conflict between the terms of this Order and a Financing Order, the terms of

the applicable Financing Order shall control (solely to the extent of such conflict).    For the

avoidance of doubt, nothing herein shall modify, alter, or otherwise affect the rights or remedies

of the DIP Agent or the DIP Lenders under the DIP Credit Agreement except with respect to the

Transferred Assets.

New York, New York
Dated: _____, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Successful Bidder Asset Purchase Agreement**