James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated April 13, 2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AVAYA INC., *et al.*[1] | ) | Case No. 17-10089 (SMB) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11
## PLAN OF REORGANIZATION OF AVAYA INC. AND ITS DEBTOR AFFILIATES

This is not a solicitation of votes to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126. This Disclosure Statement has not been approved by the Bankruptcy Court. This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court. The information in this Disclosure Statement is subject to change. This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

### Important Information for You to Read

The Deadline to vote on the Plan (the "Voting Deadline") is
July 27, 2017 at 5:00 P.M., (Prevailing Eastern Time)
with respect to Classes 3, 4, 5, 6, and 7.

For your vote to be counted, your Ballot must be
actually received by the Notice and Claims Agent
before the applicable Voting Deadline as described herein.

Subject to Bankruptcy Court Approval, the Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor affiliates pursuant to chapter 11 of the Bankruptcy Code (the "Plan"), which is attached hereto as Exhibit A. Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article IX herein.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to: (a) read the entire Disclosure Statement and the Plan carefully; (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article IX of this Disclosure Statement; and (c) consult with its own advisor(s) with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, all documents attached hereto, and the proposed transactions contemplated thereby. Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

The Plan contains a series of releases that are part of the overall compromise and settlement of various potential Claims. In that respect, parties should be aware that, if the Plan is confirmed, they may be receiving and giving releases as set forth in Article VIII of the Plan and Article VII of this Disclosure Statement.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events in the Debtors' chapter 11 cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or

every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.  The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission (the "SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the applicable presentation date and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations.  The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The Debtors are making the statements and presenting the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted.  although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise.  Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed.  Information contained herein is subject to completion, modification, or amendment.  The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The securities described herein will be issued without registration under the United States Securities Act of 1933, as amended, or any similar federal, state, or local law, in reliance on the exemptions set forth in section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable and to the extent that section 1145 is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act, the exemption set forth in section 701

promulgated under the Securities Act or another exemption thereunder. In accordance with section 1125(e) of the Bankruptcy Code, the Debtors or any of their agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, of the Debtors, of an affiliate participating in the Plan with the Debtors, or of a newly organized successor to the Debtors under the Plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims who do not submit Ballots to accept or reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the restructuring transaction contemplated thereby.

This Disclosure Statement has not been approved or disapproved by the SEC nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

*    *    *    *    *

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................2

II.     PRELIMINARY STATEMENT ...........................................................................2

III.    TREATMENT OF CLAIMS AND INTERESTS .................................................2

IV.     SOLICITATION, VOTING, AND CONFIRMATION DEADLINES ...................2

    A.      Solicitation Packages ................................................................................2
    B.      Voting Deadline........................................................................................2
    C.      Voting Procedures.....................................................................................2
    D.      Plan Objection Deadline ...........................................................................2
    E.      Confirmation Hearing ...............................................................................2

V.      THE DEBTORS' BACKGROUND .......................................................................2

    A.      The Avaya Enterprise's Operations and Corporate Structure....................2
    B.      The Debtors' Prepetition Corporate and Capital Structure.........................2
    C.      The Debtors' Board Members and Executives ..........................................2
    D.      Events Leading to the Chapter 11 Cases....................................................2

VI.     EVENTS OF THE CHAPTER 11 CASES .............................................................2

    A.      Expected Timetable of the Chapter 11 Cases ............................................2
    B.      First Day Pleadings and Other Case Matters .............................................2
    C.      The Debtors' DIP Financing and Cash Collateral Motion..........................2
    D.      Statements of Schedules and Claims Bar Date ..........................................2
    E.      Networking Sale .......................................................................................2
    F.      Pending Litigation Proceedings and Claims ..............................................2
    G.      Other Postpetition Matters ........................................................................2
    H.      Corporate Structure Upon Emergence .......................................................2

VII.    SUMMARY OF THE PLAN .................................................................................2

    A.      Overview...................................................................................................2
    B.      Administration Claims and Professional Fee Claims .................................2
    C.      Classification and Treatment of Claims and Interests ................................2
    D.      Means for Implementation of the Plan.......................................................2
    E.      Treatment of Executory Contracts and Unexpired Leases..........................2
    F.      Provisions Governing Distributions...........................................................2
    G.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .....................2
    H.      Settlement, Release, Injunction, and Related Provisions............................2
    I.      Conditions Precedent to Confirmation and Consummation of the Plan ...........2
    J.      Modification, Revocation, or Withdrawal of the Plan ................................2
    K.      Retention of Jurisdiction ...........................................................................2
    L.      Miscellaneous Provisions ..........................................................................2

i

# TABLE OF CONTENTS (CONT'D)

**Page**

VIII.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN .........................2

    A.    Confirmation Hearing .........................................................................................2
    B.    Confirmation Standards ......................................................................................2
    C.    Acceptance by Impaired Classes ........................................................................2
    D.    Confirmation without Acceptance by All Impaired Classes................................2

IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING .............................2

    A.    Bankruptcy Law Considerations.........................................................................2
    B.    Risks Related to Recoveries under the Plan........................................................2
    C.    Risks Related to the Debtors' and the Reorganized HoldCo's Businesses.........................2
    D.    Liquidity Risks....................................................................................................2
    E.    Risks Associated with Forward Looking Statement ...........................................2
    F.    Disclosure Statement Disclaimer........................................................................2
    G.    Liquidation Under Chapter 7 ..............................................................................2

X.    CERTAIN SECURITIES LAW MATTERS..........................................................................2

    A.    New Equity ..........................................................................................................2
    B.    Issuance and Resale of Securities Under the Plan ..............................................2

XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN..................2

    A.    Certain U.S. Federal Income Tax Consequences to the Debtors ........................2
    B.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims, New Debt and Reorganized HoldCo Common Stock............................2
    C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims ...................................................................................................2
    D.    FATCA .................................................................................................................2
    E.    Information Reporting and Backup Withholding ................................................2

XII.    RECOMMENDATION OF THE DEBTORS..........................................................................2

KE 44205447

**EXHIBITS**

EXHIBIT A        Joint Chapter 11 Plan of Reorganization

EXHIBIT B        Corporate Organization Chart as of the Petition Date

EXHIBIT C        Disclosure Statement Order

EXHIBIT D        Valuation Analysis

EXHIBIT E        Liquidation Analysis

EXHIBIT F        Financial Projections

## I.    INTRODUCTION

Avaya Inc. ("Avaya") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* (the "Plan"), dated April 13, 2017.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

---

**The Debtors believe that the Plan is fair and equitable, provides for a larger distribution to the Debtors' Creditors than would otherwise result from Liquidation under chapter 7 of the Bankruptcy Code, and maximizes the value of the Debtors' Estates.  At this time, the Debtors believe this is the best available alternative.  For these reasons and the reasons described herein, the Debtors strongly recommend that you vote to accept the Plan.**

---

**IMPORTANT DATES**
- **Date by which Ballots must be received by the Notice and Claims Agent: July 27, 2017**
- **Date by which objections to the Plan must be filed and served:  July 28, 2017**

---

## II.    PRELIMINARY STATEMENT

The Debtors, together with their 158 non-Debtor affiliates (collectively, the "Avaya Enterprise"), are a global provider of contact center, unified communications, and networking products and services, which serves over two hundred thousand direct and indirect customers, consisting of multinational enterprises, small- and medium-sized businesses, and 911 services as well as government organizations operating in a diverse range of industries.  Indeed, the Avaya Enterprise is critical to supporting and maintaining these businesses and institutions' daily operations.  Privately-held, the Avaya Enterprise reported consolidated adjusted EBITDA ("Adjusted EBITDA") of approximately $940 million on a worldwide basis for the twelve months ended September 30, 2016.[2]

The Avaya Enterprise employed approximately 9,700 employees worldwide as of December 31, 2016.  The Debtors' workforce consists of approximately 3,800 employees, including approximately 550 employees subject to collective bargaining agreements.  The Avaya Enterprise is headquartered in Santa Clara, California, but operates as a global enterprise, including operations across Asia, the Middle East, Europe, South America, and North America.  Globally, the Avaya Enterprise consists of 176 entities organized under the laws of various nations and jurisdictions, including the United States, various members of the European Union, Asia, Africa, South America, and the Middle East.  The Debtors in these Chapter 11 Cases consist of 18 entities, each organized under US law.  An organizational chart illustrating the Avaya Enterprise's corporate structure in summary format as of the

---

[1]    Capitalized terms used but not defined have the same meaning given to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

[2]    EBITDA is defined as net income (loss) before income taxes, interest expense, interest income and depreciation and amortization and excludes the results of discontinued operations. Under the Avaya Enterprise's debt agreements, Adjusted EBITDA is defined as EBITDA further adjusted to exclude certain charges and other adjustments, such as certain one-time charges and pension-related expenses.

4

Petition Date is attached hereto as **Exhibit B**.  As detailed more fully herein, the Debtors entered chapter 11 to undertake a balance sheet restructuring and deleverage their capital structure.

If confirmed and consummated, the Plan will eliminate more than $4.0 billion in debt from the Debtors' balance sheet and will provide the Debtors with the capital necessary to fund distributions to the Debtors' creditors and provide the Debtors with working capital necessary to fund ongoing operations. To effectuate the Plan, the Debtors will pursue a consensual chapter 11 plan of reorganization, and intend to emerge from a chapter 11 filing pursuant to the Plan on an expedited timeline within eight to ten months following the Petition Date.

The Plan eliminates the Debtors' current secured debt load and contemplates that the Holders of the Debtors' unsecured obligations will receive a Cash distribution on account of their Claims.  The Debtors respectfully submit that the Plan maximizes recoveries for the Debtors' stakeholders, right-sizes the Debtors' balance sheet, and preserves the Debtors' ongoing operations.

The Debtors seek Bankruptcy Court approval of the Plan.  Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan.  This Disclosure Statement is being submitted in accordance with such requirements.  This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article V.A hereof);

- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article V.D hereof);

- significant events in the Chapter 11 Cases (Article VI hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article VII.B and Article VII.C hereof);

- certain important effects of Confirmation of the Plan (Article VIII hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article VII.H hereof);

- the statutory requirements for confirming the Plan (Article VIII hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article IX hereof);

- certain securities law matters with respect to the Plan (Article X hereof); and

- certain U.S. federal income tax consequences of the Plan (Article XI hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

KE 44205447

The Debtors' boards of directors, board of managers, and managing members (collectively, the "Authorizing Bodies"), as applicable, have approved the Plan and the transactions contemplated therein and believe the Plan is in the best interests of the Debtors, the Debtors' Estates, and the Debtors' creditors. As such, the Authorizing Bodies recommend that all Holders entitled to vote, accept the Plan by returning their ballots, so as to be actually received by the Debtors' Notice and Claims Agent no later than **July 27, 2017, at 5:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

## III.    TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan. The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only. Risk factors addressing the effects of the actual amount of Allowed classified Claims exceeding the Debtors' estimates, and the effect of such variation on creditor recoveries, and other risks related to Confirmation and the Effective Date of the Plan are addressed in Article IX hereof. To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

Estimated Allowed Claims identified in this Article III are based on the Debtors' books and records after reasonable inquiry, and are presented assuming a hypothetical Effective Date of [September 30], 2017. Actual amounts of Allowed Claims could differ materially from the estimates set forth herein, and actual recoveries could differ materially from such estimates, on account of, among other things, any rejection damages that may occur as a result of the Debtors' rejection of Executory Contracts, including those deemed rejected pursuant to Article V of the Plan.

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7[3] |
|---|---|---|---|---|
| Administrative Claims | Unimpaired | $105,000,000 | 100.0% | [●] |
| Professional Fee Claims | Unimpaired | $60,000,000 | 100.0% | [●] |

---

[3]    The Debtors intend to file their liquidation analysis (the "Liquidation Analysis") in the near term.

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7[3] |
|---|---|---|---|---|
| DIP Facility Claims | Unimpaired | $727,000,000 | 100.0% | [●] |
| Priority Tax Claims | Unimpaired | $15,000,000 | 100.0% | [●] |

The table below summarizes the classification and treatment of all classified Claims against and in, the Debtors under the Plan. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.E of the Plan. For all purposes under the Plan, each Class will apply for each of the Debtors (i.e., there will be twelve (12) Classes for each Debtor).[4]

**The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. In particular, recoveries available to the Holders of General Unsecured Claims are estimates based on information known to the Debtors as of the date hereof and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceed the estimates provided below. In such an instance, the recoveries available to the Holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7[5] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0.00 | 100.0% | [●] |
| 2 | Other Secured Claims | Unimpaired | $0.00 | 100.0% | [●] |
| 3 | Cash Flow Credit Facility Secured Claims | Impaired | $3,234,727,423 | 100.4% | [●] |
| 4 | First Lien Notes Secured Claims | Impaired | $1,299,000,000 | 100.4% | [●] |
| 5 | Second Lien Notes Claim | Impaired | $ 1,439,960,282 | 11.4% | [●] |
| 6 | U.S. Qualified Pension Claims | Impaired | $125,200,000 | 100.0% | [●] |

---

[4]    For the avoidance of doubt, though estimated Allowed Claim amounts and recoveries in the tables below are aggregate Claim amounts and recoveries for all obligated Debtors.

[5]    The Debtors intend to file their Liquidation Analysis in the near term.

| Class | Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Range of % Recovery Under the Plan | Estimated Range of % Recovery Under Chapter 7[5] |
|-------|-------------------|----------------|--------------------------|----------------------------------------------|------------------------------------------------|
| 7 | General Unsecured Claims[6] | Impaired | $250,000,000 | 10.0% | [●] |
| 8 | Prepetition Intercompany Debtor Claims | Unimpaired | N/A | 100.0% | [●] |
| 9 | Subsidiary Claims | Unimpaired | N/A | 100.0% | [●] |
| 10 | Section 510(b) Claims | Impaired | N/A | 0.0% | [●] |
| 11 | Intercompany Interests | Impaired | N/A | 0.0% | [●] |
| 12 | HoldCo Interests | Impaired | N/A | 0.0% | [●] |

## IV.    SOLICITATION, VOTING, AND CONFIRMATION DEADLINES

### A.    Solicitation Packages

On [●], 2017, the Bankruptcy Court entered the Disclosure Statement Order. For purposes of this Article IV, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "Solicitation Package"), including:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and the exhibits to the Plan, including the Plan Supplement);

- the Disclosure Statement Order (without exhibits thereto);

- the Solicitation Procedures;

- the Confirmation Hearing Notice;

- an appropriate ballot with voting instructions with respect thereto, together with a pre-addressed, postage prepaid return envelope;

- a cover letter from the Debtors (1) describing the contents of the Solicitation Package, and (2) urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan; and

---

[6]    Pursuant to the Debtors' books and records, substantially all General Unsecured Claims, including litigation-based Claims, reside at Debtor Avaya Inc. For purposes of the Plan and this Disclosure Statement, Holders of General Unsecured Claims shall receive the same treatment and are presumed to receive a recovery in the ranges indicated in the table above.

KE 44205447

- any supplemental documents the Debtors may File with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

The Solicitation Package may also be obtained: (a) from the Debtors' Notice and Claims Agent by (i) visiting https://cases.primeclerk.com/avaya/Home-Index (free of charge), (ii) writing to Avaya Inc. c/o Prime Clerk LLC 830 Third Avenue 3rd Floor New York, New York 10022 or (iii) calling (855) 252-2156; or (b) for a fee via PACER (except for ballots) at www.nysb.uscourts.gov.

### B.    Voting Deadline

The deadline to vote on the Plan is **July 27, 2017, at 5:00 p.m., prevailing Eastern Time** (the "Voting Deadline"). All votes to accept or reject the Plan must be received by the Notice and Claims Agent by the Voting Deadline.

### C.    Voting Procedures

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan. If you are a Holder of a Claim in Class 3 (Cash Flow Credit Facility Secured Claims), Class 4 (First Lien Notes Secured Claims), Class 5 (Second Lien Notes Claims), Class 6 (U.S. Qualified Pension Claims), and Class 7 (General Unsecured Claims), you may vote to accept or reject the Plan by completing the ballot and returning it in the envelopes provided.

Prime Clerk, LLC is the Notice and Claims Agent. The Notice and Claims Agent is available to answer questions concerning the procedures for voting on the Plan, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is **July 27, 2017, at 5:00 p.m., prevailing Eastern Time**, at the following address: |
| **AVAYA INC.**<br>**C/O PRIME CLERK LLC**<br>**830 3RD AVENUE, 9TH FLOOR**<br>**NEW YORK, NY 10022** |
| If you have any questions on the procedure for voting on the Plan, please call or email the Notice and Claims Agent at:<br><br>(852) 252-2156<br>avayainfo@primeclerk.com |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot. All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each ballot; (b) overnight delivery; or (c) personal delivery, so that the ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline at the

9

return address set forth in the applicable ballot. Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder. By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

### D.    Plan Objection Deadline

The Bankruptcy Court has established **July 28, 2017, at 5:00 p.m., prevailing Eastern Time**, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest, in accordance with the Disclosure Statement Order, so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before the Confirmation Hearing.

### E.    Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled on **August 10, 2017, at [●], prevailing Eastern Time**, before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in Courtroom 723 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be continued from time to time, without further notice other than an adjournment announced in open court, or a notice of adjournment Filed with the Bankruptcy Court and served on any entities who have Filed objections to the Plan. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to parties in interest, subject to the terms of the Plan.

## V.    THE DEBTORS' BACKGROUND

### A.    The Avaya Enterprise's Operations and Corporate Structure

#### 1.    The Avaya Enterprise's Corporate History

The Avaya Enterprise's independent existence dates from 2000, when its equity was spun-off to public shareholders of Lucent Technologies, Inc., itself a spin-off from AT&T. The Avaya Enterprise's equity remained publicly held until October 26, 2007, at which time the Avaya Enterprise was taken private through a transaction that valued the Avaya Enterprise's then-current operations at approximately $8.2 billion and through which the Avaya Enterprise incurred approximately $5.3 billion of funded debt.

The Avaya Enterprise presently serves over 200,000 direct and indirect customers, consisting of multinational enterprises, small- and medium-sized businesses, and "911" services, as well as government

organizations operating in a diverse range of industries, including financial services, manufacturing, retail, transportation, energy, media and communications, healthcare, education, and all branches of government. Indeed, the Avaya Enterprise is critical to supporting and maintaining these businesses' and institutions' daily operations. The Avaya Enterprise markets its products and services in over 100 countries worldwide, relying on approximately 6,500 channel partners for indirect sales which generate a substantial portion of the Avaya Enterprise's total revenue.

### 2.    The Avaya Enterprise's Global Presence

Although the Debtors are headquartered in Santa Clara, California, the Avaya Enterprise is operated on a global basis. Approximately 64% of the Debtors' workforce is located outside of the United States, including approximately 1,200 employees located in Germany. A substantial number of the Debtors' customers are located outside of the United States or otherwise operate on a transnational basis, and 155 of the 176 legal entities in the Avaya Enterprise are organized outside the United States.

The Debtors believe their global footprint is an important selling point in the marketplace. In the fiscal year ended September 30, 2016, the Debtors reported approximately $1.6 billion, or 44% of total revenue as arising outside of the United States. The Avaya Enterprise's subsidiaries organized under non-U.S. law are not debtors in these Chapter 11 Cases.

### 3.    The Avaya Enterprise's Business Operations

As a general matter, the Avaya Enterprise leverages its global presence to offer comprehensive product and services solutions for customers. Indeed, the Avaya Enterprise believes that its global presence is a key selling point to the Avaya Enterprise's customers, particularly those of multinational enterprise scale. The Avaya Enterprise's business operations are divided into four main segments: (a) Unified Communications (the "UC Business"); (b) Contact Center (the "CC Business"); (c) Networking (the "Networking Business"); and (d) Avaya Private Cloud and Managed Services (the "APCS Business"), although some overlap exists between those operations in the ordinary course.

The Avaya Enterprise's UC Business, CC Business, and Networking Business include hardware and software product offerings ("Product"). Client software resides on both Avaya Enterprise-branded and third-party devices—including desk phones, tablets, laptops, and smartphones—and provides end-users with access to Unified Communications capabilities such as: (a) voice and video calling; (b) audio conferencing; (c) instant messaging; and (d) contact directories. Server software, on the other hand, controls communication and collaboration for enterprises, enabling the delivery of Unified Communications and customer service. The Avaya Enterprise's hardware Products include a broad range of desk phones, servers and gateways, and routers.

The Avaya Enterprise's UC Business, CC Business, and Networking Business also include related maintenance and professional services ("Services") providing technical support and installation services for the Avaya Enterprise's Product purchased by end-users, as well as projected-based deployment, design, and optimization services. Finally, the Avaya Enterprise's APCS Business provides on premises and remotely-managed communications services. As described more fully below, the Avaya Enterprise's Product and Service offerings are ultimately sold to end-users through a combination of direct sales by the Avaya Enterprise and indirect sales through channel partners.

### (a)    Product & Service Offerings

Unified Communications.  The UC Business consists of the Avaya Enterprise's Product and Services offerings designed to integrate multiple technologies utilized by end-users into a single unified

11

communications platform ("Unified Communications"), and includes products such as telephones, servers, and communications software. Generally, Unified Communications permits end-users to seamlessly utilize multiple communications devices across a particular communications platform. For instance, using Unified Communications hardware and software, an end-user can begin a conversation on one device (i.e., an Avaya telephone) and continue the same conversation on another (i.e., a computer or mobile device enabled with Avaya software applications). By integrating multiple communications devices, Unified Communications ensures that end-users can manage customer and internal interactions, increasing efficiencies and avoiding communication gaps that may otherwise arise from the use of different products and technologies. The UC Business represented approximately 58% of the Avaya Enterprise's revenue in fiscal 2016.

CC Business. The CC Business is the Avaya Enterprise's platform for helping end-users manage customer call volumes and monitor relevant customer trends and metrics with the aim of improving service delivery and customer retention. The CC Business offerings are predominantly software-based and provide, among other things: (a) intelligent routing and management of incoming customer inquiries, either telephonically or through other channels, such as chat, video, and email; (b) the streamlining of customer service functions through the identification of call trends and the provision of real-time access to historical performance data; and (c) end-users' agents receiving instant on-demand access to customer information in order to increase productivity and better address customer needs. The CC Business is deployed across multiple industries and is relied upon for such critical functions as supporting "911," "311," and other government operators and agencies. Additionally, the CC Business is utilized by multiple major universities and over 1,000 health institutions. The CC Business represented approximately 27% of revenue in fiscal 2016.

Networking Business. The Networking Business is the Avaya Enterprise's computer and data networking offering, which includes the Avaya Enterprise's advanced Software Defined Networking (SDN) fabric technology, a technology that, in broad terms, allows various devices connected to a network, such as servers, computers, and smart phones ("Network Devices"), to communicate directly with each other as opposed to historical network architectures, which required information to pass through multiple Network Devices before reaching a final destination. The Avaya Enterprise's Networking Product offerings include both hardware and software with proprietary Avaya Enterprise software as a differentiating factor. The Networking Business represented approximately 7% of the Avaya Enterprise's revenue in fiscal 2016. As discussed more fully herein, the Debtors, after an expansive marketing process, have determined to sell the Networking Business pursuant to section 363 of the Bankruptcy Code utilizing a "stalking horse" bidder.

APCS. The APCS Business provides managed and outsourcing services for customers' communications environments. These services can be procured in standard packages or in fully custom arrangements that include on-premises staffing or private cloud options, as well as the option to install required technologies and infrastructure. The APCS Business provides customers with the option of a recurring operating expense (rather than a one-time capital expenditure) for accessing the Avaya Enterprise's latest communications technologies. In contrast to the Avaya Enterprise's Services offerings (where the end-user of Products contacts the Avaya Enterprise for support only when technical issues are encountered) the APCS Business model entails ongoing monitoring of customers' communications environment to proactively identify issues and provide required support and managed services. Presently, the APCS Business represents approximately 8% of the Avaya Enterprise's revenue in fiscal 2016.

### (b) Direct & Indirect Sales Channels

The Avaya Enterprise has a direct or indirect presence in over 100 countries, operating a sales model that recognizes revenue through both direct sales by the Avaya Enterprise ("Direct Sales") and

indirect sales by approximately 6,500 third-party channel partners ("<u>Indirect Sales</u>") as of September 30, 2016. As detailed more fully below, only a limited, albeit significant, percentage of the Avaya Enterprise's revenue is generated directly by the Avaya Enterprise. Rather, the Avaya Enterprise generally relies on a broad-based network of channel partners to deliver Product and Services offerings to end-users.

    <u>Direct Sales</u>. With respect to Products and Services, Direct Sales are sales made directly by the Avaya Enterprise to end-users. Direct Sales for Product and Services made up approximately 26% (for Product) and 46% (for Services) of the Avaya Enterprise's global revenue, respectively, in fiscal 2016.

    <u>Indirect Sales for Product</u>. The Avaya Enterprise's Indirect Sales for Product are accomplished through: (a) sales to channel partners ("<u>Tier 1 Partners</u>"), who subsequently sell Product to end-user customers; and (b) sales to intermediaries ("<u>Distributors</u>") who subsequently sell Product to channel partners ("<u>Tier 2 Partners</u>") who then sell Product to end-users. Indirect Sales through Tier 1 Partners and Tier 2 Partners accounted for approximately 74% of Product revenues in fiscal 2016. The Avaya Enterprise recognizes revenues when Product is delivered to Tier 1 Partners and Distributors, with payments subsequently collected by the Avaya Enterprise from the same. With Indirect Sales for Product, the Avaya Enterprise does not collect payments from end-users or Tier 2 Partners.

    Individual terms can vary, but in general the agreements utilized by the Avaya Enterprise to contract with Tier 1 Partners, Tier 2 Partners, and Distributors have standard one year terms with automatic renewals, and may generally be terminated with: (a) 30 days prior notice for Tier 1 Partners and Tier 2 Partners; and (b) 90 days prior notice for Distributors. The agreements, however, do not require Tier 1 Partners, Tier 2 Partners, or Distributors to exclusively purchase or sell the Avaya Enterprise's Product offerings. More fundamentally, Tier 1 Partners, Tier 2 Partners, and Distributors are critical to the Debtors' continued performance.

    <u>Indirect Sales for Services</u>. Indirect Sales for Services are accomplished through a combination of: (a) retail sales ("<u>Retail</u>"), (b) wholesale sales, ("<u>Wholesale</u>"), and (c) co-delivery sales ("<u>Co-Delivery</u>"). Under the Retail method, channel partners sell Services on behalf of the Avaya Enterprise to end-users through the execution of contracts between the applicable user and the Avaya Enterprise. The Avaya Enterprise is responsible for, and delivers Services to, the end-user in exchange for a commission paid to the applicable Retail partner. Under the Wholesale method, the Avaya Enterprise also delivers Services under the Avaya Enterprise's name and handles customer calls, but the Avaya Enterprise does not contract directly with the end-user as the partner is responsible for billing and collections. Under the Co-Delivery method, the Avaya Enterprise's third-party partners package the Services under the partners' own contractual terms, Services are sold under the third-party partner's name (not the Avaya Enterprise's), and the Avaya Enterprise only fields "escalation" calls from customers as opposed to regular or day-to-day services calls. Indirect Sales accounted for approximately 54% of Services revenues in fiscal 2016.

    **4.**     **The Avaya Enterprise's Intellectual Property**

    The Avaya Enterprise owns a significant number of patents and files new applications to protect its research and development investments in new products and services, as necessary. As of September 30, 2016, the Avaya Enterprise had approximately 5,400 patents and pending patent applications, including foreign counterpart patents and foreign applications. The Avaya Enterprise's patents and pending patent applications cover a wide range of products and services involving a variety of technologies, including, but not limited to, Unified Communications (including video, social media, telephony, and messaging), Contact Centers, wireless communications, and Networking. In addition to

its patents and patent applications, the Avaya Enterprise also holds: (a) licenses to intellectual property for the manufacture, use, and sale of its products; and (b) various trademarks and copyrights.

Additionally, Avaya has licensed the use of certain of its intellectual property outside the United States to Avaya Holdings, Ltd ("AHL"), a non-Debtor affiliate organized under the laws of Ireland, including certain hardware and software-based telecommunications products, systems, and solutions.[7] AHL is also party to a cost sharing agreement with Avaya regarding the development of intellectual property between Avaya and AHL, and through which AHL holds certain rights to exploit materials developed through these agreements.

### 5.    The Avaya Enterprise's Employees

The Avaya Enterprise has approximately 9,700 employees as of December 31, 2016, with a limited number of part-time employees, contractors, and temporary employees who are employed either directly or through temporary staffing agencies. The Debtors, in turn, have approximately 3,800 employees. Approximately 550 of the Debtors' employees are subject to collective bargaining agreements with the Communications Workers of America and the International Brotherhood of Electrical Workers.

### B.    The Debtors' Prepetition Corporate and Capital Structure

### 1.    Corporate Structure

As set forth on the structure chart attached as **Exhibit B**, Debtor Avaya Holdings is the Avaya Enterprise's ultimate parent through its 100% ownership of Avaya. Avaya owns, directly or indirectly, each of the Avaya Enterprise's remaining 174 subsidiaries. The Avaya Enterprise's US entities include Avaya Holdings, Avaya, and 19 Avaya subsidiaries (three of which are non-Debtors). Of these entities, and as set forth on **Exhibit B**, 16 entities[8] are obligors on all of the Debtors' approximately $6.0 billion of prepetition debt, and one, Avaya Holdings Corp. ("Avaya Holdings"), is obligated only on the Prepetition Cash Flow Credit Facility and Prepetition Domestic ABL Credit Facility Facility.[9] The substantial majority of the Avaya Enterprise's international subsidiaries, in turn, are direct or indirect subsidiaries of

---

[7] Specifically, the Licensing Agreement granted AHL a non-exclusive license over certain of the Avaya Enterprise's then existing intellectual property, including hardware and software-based telecommunications products, systems, and solutions then sold as: (a) Avaya's Customer Relationship Management Solutions ("CRM Solutions"); (b) Avaya's Unified Communications Systems Solutions ("UCS Solutions"); (c) Avaya's Converged Enterprise Solutions ("CE Solutions"); and (d) any derivative or succeeding product of the CRM Solutions, UCS Solutions, and CE Solutions. The Licensing Agreement did not, however, grant AHL any rights with respect to: (a) any professional, maintenance, and other services associated with each of the CRM Solutions, UCS Solutions, and CE Solutions; and (b) any hardware and software-based telecommunications products, systems, and solutions that were then developed, manufactured, and sold as Index, Network Alchemy, and IP Office, or any professional, maintenance, and other services associated with Index, Network Alchemy, or IP Office.

[8] Certain US subsidiaries are not obligors with respect to the Avaya Enterprise's prepetition debt, namely: (a) Radvision Government Services, Inc.; (b) Sierra Communication International LLC; (c) Persony, Inc.; and (d) Knoahsoft, Inc. With the exception of Sierra Communication International LLC, these entities are not Debtors in these Chapter 11 Cases.

[9] The Prepetition Domestic ABL Credit Facility was repaid with proceeds from the DIP Facility pursuant to the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* (the "Final DIP Financing Order") [Docket No. 230].

14

Debtor Sierra Communication International LLC ("Sierra"), a non-operating holding company, which, in turn, is a direct subsidiary of Avaya.[10]  Sixty-five percent of Avaya's interest in Sierra is pledged as collateral in support of the Debtors' prepetition funded debt.

### 2.    Capital Structure

The Avaya Enterprise's prepetition capital structure included approximately $6.0 billion[11] in funded debt as of the Petition Date.  The majority of the Avaya Enterprise's funded debt is a legacy of the 2007 transaction in which the Avaya Enterprise was taken private.  The remainder of the funded debt, in turn, originated as part of the Avaya Enterprise's 2009 acquisition of Nortel Enterprise Systems.  The Avaya Enterprise's prepetition funded debt consisted of: (a) the Prepetition Domestic ABL Credit Facility; (b) the Prepetition Cash Flow Credit Facility; (c) two series of First Lien Notes; (d) one series of Second Lien Notes; and (e) the Prepetition Foreign ABL Credit Facility.[12]  The Avaya Enterprise's prepetition indebtedness is also subject to two different intercreditor agreements, generally referred to as (a) the ABL Intercreditor Agreement[13] and (b) the First Lien Intercreditor Agreement.[14]  The ABL Intercreditor Agreement governs the relative contractual rights of lenders under the Prepetition Domestic ABL Credit Facility, on the one hand, and the Prepetition Cash Flow Credit Facility, on the other hand and, pursuant to certain joinders, the relative contractual rights of first lien creditors and holders of Second Lien Notes.  The First Lien Intercreditor Agreement, in turn, governs the relative contractual rights of holders under the First Lien Notes with respect to lenders under the Prepetition Cash Flow Credit Facility.

### 3.    The Avaya Enterprise's Prepetition Indebtedness

The Avaya Enterprise's prepetition indebtedness can be summarized as follows:

---

[10]  In fiscal 2016, international operations accounted for approximately $1.6 billion of the Avaya Enterprise's $3.7 billion in total revenue.

[11]  Total excludes approximately $67.3 million of letters of credit outstanding under the Debtors' Prepetition Domestic ABL Credit Facility and Prepetition Foreign ABL Credit Facility.

[12]  The Prepetition Foreign ABL Facility was repaid with funds from a draw against the Debtors' DIP Facility pursuant to the Interim DIP Financing Order.

[13]  The "ABL Intercreditor Agreement" means that certain amended and restated intercreditor agreement dated as of October 29, 2012 (as amended, restated, modified, and supplemented from time to time) by and among Avaya Inc., the Subsidiary Borrowers party thereto, the Prepetition Cash Flow Agent, the Prepetition Domestic ABL Agent, the 7.00% First Lien Notes Trustee pursuant to that certain Joinder Agreement dated as of February 11, 2011 (the "7.00% First Lien Notes ABL Intercreditor Joinder"), the 9.00% First Lien Notes Trustee pursuant to that certain Joinder Agreement dated December 21, 2012 (the "9.00% First Lien Notes ABL Intercreditor Joinder," and, together with the 7.00% First Lien Notes ABL Intercreditor Joinder, the "First Lien Notes Intercreditor Joinders"), and the Second Lien Notes Trustee pursuant to the Junior Secured Indebtedness Joinder dated March 7, 2013 (the "Junior Secured Indebtedness Designation").

[14]  The "First Lien Intercreditor Agreement" means that certain first lien intercreditor agreement dated as of February 11, 2011 (as amended, restated, modified, and supplemented from time to time) by and among Avaya Inc., the Grantors party thereto, the Prepetition Cash Flow Agent, the 7.00% First Lien Notes Trustee, the 9.00% First Lien Notes Trustee pursuant to that certain Joinder Agreement No. 1 dated as of December 21, 2012, and each additional Authorized Representative from time to time party thereto.

15

| Indebtedness | Balance Outstanding ($ millions)[15] |
|---|---:|
| Prepetition Domestic ABL Credit Facility[16] | $    55 |
| Prepetition Cash Flow Credit Facility | 3,235 |
| 7.00% First Lien Notes | 1,009 |
| 9.00% First Lien Notes | 290 |
| 10.50% Second Lien Notes | 1,384 |
| Prepetition Foreign ABL Credit Facility[17] | 50 |
| **Total** | **$ 6,023** |

| Legacy Liabilities[18] | Balance Outstanding ($ millions)[19] |
|---|---:|
| US Pension (underfunded liability) | $ 1,056 |
| Non-Qualified Pension Plan | 90 |
| OPEB (underfunded liability) | 259 |
| **Total** | **$ 1,405** |

These obligations are discussed below:

(a)        **Prepetition Domestic ABL Credit Facility**

Avaya Inc., as borrower, Avaya Holdings Corp. ("Holdings"), as "Holdings," each of the other above-captioned Debtors with the exception of Sierra, as subsidiary guarantors[20] (the "Subsidiary Guarantors"), as guarantors, and Citicorp, USA, Inc., as administrative agent (in such capacity, the "Prepetition Domestic ABL Agent") entered into that certain credit agreement, amended and restated as of October 29, 2012 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Prepetition Domestic ABL Credit Agreement"). Under the Prepetition Domestic ABL Credit Agreement, Avaya had the ability to borrow up $335 million under a revolving credit facility (the "Prepetition Domestic ABL Credit Facility"), of which, approximately $55 million was outstanding on the Petition Date. The Prepetition Domestic ABL Credit Facility was repaid on January 24, 2017, with proceeds from the DIP Facility.

---

[15]    Denotes balance outstanding as of December 31, 2016.

[16]    Balance excludes approximately $44.4 million in letters of credit issued thereunder as of December 31, 2016. Such amounts were repaid with proceeds from a draw from the Debtors' DIP Facility.

[17]    Balance excludes approximately $23.0 million in letters of credit issued thereunder as of December 31, 2016. Such amounts were repaid with proceeds from a draw from the Debtors' DIP Facility.

[18]    Excludes approximately $527.8 million of unfunded liability as of December 31, 2016 with respect to the Non-Debtor Pensions, which are discussed below.

[19]    Denotes balance outstanding as of December 31, 2016.

[20]    The Subsidiary Guarantors consist of: (a) Avaya CALA Inc., (b) Avaya EMEA Ltd., (c) Avaya Federal Solutions, Inc., (d) Avaya Services Inc., (e) Avaya Integrated Cabinet Solutions Inc., (f) Zang, Inc. (f/k/a AvayaLive Inc.), (g) Avaya Management Services Inc., (h) Avaya World Services Inc., (i) Sierra Asia Pacific Inc., (j) Technology Corporation of America, Inc., (k) Ubiquity Software Corporation, (l) VPNet Technologies, Inc., (m) Avaya Holdings LLC, (n) Avaya Holdings Two, LLC, and (o) Octel Communications LLC.

16

### (b)    Prepetition Cash Flow Facility

Avaya Inc., as borrower, Holdings, as "Holdings," the Subsidiary Guarantors, Citicorp USA, Inc. as administrative agent (in such capacity, the "Prepetition Cash Flow Agent"), and the lenders that are party thereto from time to time are parties to that certain third amended and restated credit agreement, amended and restated as of December 21, 2012 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Prepetition Cash Flow Credit Agreement").

The Prepetition Cash Flow Credit Agreement provided for both a term loan and revolving term credit facility.  The revolving term credit facility matured in October 2016, and any amounts outstanding at that time were satisfied.  An aggregate principal amount of $3,235 million is outstanding as of the Petition Date under the Prepetition Cash Flow Credit Facility, consisting of:    (a) $616 million outstanding in term B-3 loans maturing October 26, 2017; (b) $1 million outstanding in term B-4 loans maturing October 26, 2017; (c) $537 million outstanding in term B-6 loans maturing March 31, 2018; and (d) $2,081 million outstanding in term B-7 loans maturing May 29, 2020 (collectively, the "Prepetition Cash Flow Credit Facility").  Obligations under the Prepetition Cash Flow Credit Facility are secured by a first priority lien on substantially all the borrowers' and guarantors' assets, subject to certain limitations and exclusions.

### (c)    First Lien Notes

Avaya Inc., as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "7.00% First Lien Notes Trustee") issued 7.00% first lien notes (the "7.00% First Lien Notes") pursuant to that certain indenture dated February 11, 2011 (the "7.00% First Lien Notes Indenture").  The 7.00% First Lien Notes mature on April 1, 2019 and approximately $1,009 million in principal amount remain outstanding as of the Petition Date.  Obligations under the 7.00% First Lien Notes are secured by substantially all assets of each Debtor other than Holdings, subject to certain limitations and exclusions, on a pari passu basis with obligations outstanding under the Prepetition Cash Flow Credit Facility and the 9.00% First Lien Notes.

Avaya Inc., as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "9.00% First Lien Notes Trustee") issued 9.00% first lien notes (the "9.00% First Lien Notes" and, together with the 7.00% First Lien Notes, the "First Lien Notes") pursuant to that certain indenture dated December 21, 2012 (the "9.00% First Lien Notes Indenture").  The 9.00% First Lien Notes mature on April 1, 2019 and approximately $290 million in principal amount remain outstanding as of the Petition Date.  As with the 7.00% First Lien Notes, obligations under the 9.00% First Lien Notes are secured by substantially all assets of each Debtor other than Holdings, subject to certain limitations and exclusions, on a pari passu basis with obligations outstanding under the Prepetition Cash Flow Credit Facility and the 7.00% First Lien Notes.

### (d)    Second Lien Notes

Avaya Inc., as issuer,  the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "Second Lien Notes Trustee") issued 10.50% second lien notes (the "Second Lien Notes") pursuant to that certain indenture dated March 7, 2013 (the "Second Lien Notes Indenture").  The Second Lien Notes mature on March 1, 2021 and approximately $1,384 million in principal amount remain outstanding as of the Petition Date. The Second Lien Notes are secured on a second priority basis by substantially all assets of each Debtor other than Holdings and Sierra, subject to certain limitations and exclusions.

KE 44205447

(e)    **Prepetition Foreign ABL Credit Facility**

Certain of the Debtors' non-debtor affiliates as borrowers or guarantors (collectively, the "Foreign ABL Obligors"),[21] Avaya Inc. and the Subsidiary Guarantors, as foreign guarantors, Citibank, N.A., as administrative agent (in such capacity, the "Prepetition Foreign ABL Agent"), Citibank N.A., Canadian Branch, as Canadian swing line lender, Citibank N.A., London, as European swing line lender, and the lenders that are parties thereto from time to time are parties to that certain credit agreement dated as of June 4, 2015 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Prepetition Foreign ABL Credit Agreement"). The Prepetition Foreign ABL Credit Agreement provided the borrowers with access to a $150 million revolving credit facility (the "Prepetition Foreign ABL Credit Facility"), of which, approximately $50 million, plus additional letters of credit issued and outstanding thereunder with an aggregate face value of approximately $22.7 million were outstanding as of the Petition Date. The Prepetition Foreign ABL Credit Facility was repaid on January 24, 2017, with proceeds from the DIP Facility.

4.    **The Debtors' Legacy Liabilities**

(a)    **US Pension Liabilities**

Avaya sponsors two separate single employee U.S. pension plans, which constitute qualified plans for purposes of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et al. ("ERISA"): (a) the Avaya Pension Plan (the "Hourly Pension Plan"); and (b) the Avaya Pension Plan for Salaried Employees (the "Salaried Pension Plan"). The Hourly Pension Plan is a successor to two prior pension plans maintained by Lucent and AT&T and was assumed by Avaya as part of its spinoff from Lucent in 2000. Hourly Pension Plan beneficiaries include both 6,340 retirees and approximately 550 active employees represented by the Communication Workers of America and the International Brotherhood of Electrical Workers as of September 30, 2016. The Hourly Pension Plan is an active plan and service costs continue to accrue thereunder. The Salaried Pension Plan is also a legacy of the Lucent spinoff, and beneficiaries include approximately 1,080 active salaried employees and 6,900 retirees. Unlike the Hourly Pension Plan, the Salaried Pension Plan is frozen such that participation and accruals ceased in December 2003. Each of the Hourly Pension Plan and Salaried Pension Plan are underfunded, with an estimated underfunding liability of approximately $1.056 billion as of December 31, 2016, in the aggregate (the "U.S. Qualified Pension Claims"). Minimum funding contributions for the Hourly Pension Plan and Salaried Pension Plan have averaged $115 million in the aggregate over the last three fiscal years. Pursuant to the Plan, the U.S. Qualified Pension Claims will be honored and maintained in accordance with applicable non-bankruptcy law.

(b)    **Avaya Inc. Non-Qualified Supplemental Pension**

Avaya Inc. is the sponsor for the Avaya Inc. Supplemental Pension Plan, which is a non-qualified plan established for purpose of providing an unfunded excess benefit plan and providing deferred compensation and supplemental pension benefits for purposes of ERISA (the "ASPP"). The ASPP is a successor with respect to the Lucent Technologies Supplemental Pension Plan in effect as of September 2000. The ASPP is not insured by PBGC. As of the Petition Date, approximately 830 individuals were beneficiaries of the ASPP. By its terms, obligations arising under the the ASPP are

---

[21]    The Foreign ABL Obligors include: (a) Avaya Canada Corp., as Canadian borrower, (b) Avaya UK, as U.K. borrower, (c) Avaya International Sales Limited, as Irish borrower, (d) Avaya Deutschland GmbH and Avaya GmbH & Co. KG, as German borrowers (together with the UK Borrower and the Irish Borrowers, the "European Borrowers"), (e) Avaya UK Holdings Limited, as U.K. guarantor, (f) Avaya Holdings Limited, as Irish guarantor, and (g) Avaya Germany GmbH, Tenovis Telecom Frankfurt GmbH & Co. KG, and Avaya Verwaltungs GmbH, as German guarantors.

KE 44205447

general unsecured obligations of Avaya. Pursuant to the Plan, Avaya's obligations under the Avaya Inc. Supplemental Pension Plan will be discharged as General Unsecured Claims of Avaya's chapter 11 estate.[22]

### (c)    OPEB

The Debtors currently provide other post-retirement employment benefits or "OPEB" to approximately 13,000 retired employees in the United States. Such benefits are provided to former employees or their beneficiaries who were members of a collective bargaining unit, as well as former salaried employees and their beneficiaries. OPEB benefits include a combination of medical, dental, and other non-pension benefits such as long-term disability and child care. As of December 31, 2016, the Debtors' unfunded OPEB liability totaled approximately $259 million, with annual expenditures by the Debtors with respect to such benefits averaging approximately $38 million in the aggregate over the last three fiscal years. Pursuant to the Plan, OPEB will continue in accordance with, and subject to, their terms and applicable non-bankruptcy law.

### (d)    Non-Debtor Pensions

Non-Debtors Avaya GmbH & Co. KG ("Avaya KG") and Avaya Deutschland GmbH ("Avaya Deutschland") sponsor pension plans for approximately 1,200 employees (the "Non-Debtor Pensions"). The Non-Debtor Pensions are legacy liabilities stemming from the Avaya Enterprise's 2004 acquisition of Tenovis, a major European provider of enterprise communications systems and services. When the Avaya Enterprise completed its acquisition of Tenovis, the Avaya Enterprise assumed outstanding obligations under the Non-Debtor Pensions, which were fully unfunded. Unlike pensions maintained in the United States, pension sponsors in Germany do not typically fund obligations in advance of a particular employee's retirement or termination. Rather, pension benefits accrue as an unfunded liability that are then funded as they actually become payable. As of September 30, 2016, the Non-Debtor Pensions' unfunded liabilities totaled approximately $558 million, and in fiscal 2016, cash costs incurred by Avaya KG and Avaya Deutschland with respect to benefits payable under the Non-Debtor Pensions totaled approximately $21 million. Avaya KG benefits from credit support in the form of a "comfort letter" dated as of March 16, 2016 through which AISL, a non-debtor Irish subsidiary of Avaya, agreed to provide certain support for Avaya KG's financial wherewithal. AISL, in turn, is the beneficiary of a similar comfort letter issued by Avaya.[23]

### 5.    Intercompany Relationships

### (a)    Intercompany Relationships Generally

As is customary for a global company of the Avaya Enterprise's size and scale, the Debtors are parties to a series of formal and informal relationships with their affiliates, and the Debtors transact with their affiliates on a regular basis in the ordinary course. Such transactions include, among other things: (a) research and development costs charged by non-Debtor affiliate, Avaya India Private, Ltd., on a monthly basis to Avaya; (b) licensing fees and royalties paid to Avaya by various international non-Debtor affiliates for the use of Avaya-owned marks or intellectual property; and (c) the payment of

---

[22]    The Debtors intend to supplement their applicable Schedules of Assets and Liabilities to reflect claims arising from the discharge of obligations arising in connection with the ASPP.

[23]    No such comfort letter has been issued in support of Avaya Deutschland, although an identical comfort letter was issued in support of Avaya Germany GmbH, a parent company of Avaya KG and Avaya Deutschland. Such comfort letters are discussed at length, below.

various obligations to non-Debtor affiliates in the ordinary course pursuant to intercompany arrangements that provide a certain minimum, market-based return for the sale of Avaya products and services. These transactions are, in turn, booked in a number of different ways, including through account receivable/payable relationships, contractual obligations, intercompany loans, and capital contributions. Additionally, certain of the Debtors and/or their affiliates are party to various intercompany letter agreements, or comfort letters, through which the issuing party has agreed to provide credit support for the applicable counterparty under certain circumstances and on the terms and conditions set forth therein (collectively, the "Comfort Letters").[24]

### (b)    Sierra Intercompany Note, AHL Receivable, and AISL Receivable

Certain of the Debtors' intercompany arrangements were pledged as collateral in support of the Debtors' prepetition indebtedness. In particular, Sierra is party to a note in favor of Avaya dated as of October 26, 2007, which, as of the Petition Date, had a nominal balance outstanding totaling approximately $1.2 billion (the "Sierra Intercompany Note").[25] Generally, the balance on the Sierra Intercompany Note reflects the recordation of various intercompany transfers by Avaya to various non-Debtor subsidiaries that, in turn, were recorded by Sierra and increased the balance of Sierra's nominal obligation to Avaya pursuant to the Sierra Intercompany Note. The Sierra Intercompany Note is pledged as collateral in support of the Debtors' prepetition funded debt obligations.

Additionally, the Debtors' books and records include various intercompany receivables due from non-debtor subsidiaries, including two such receivables due to Avaya from AHL and AISL totaling approximately $518 million (the "AHL Receivable") and approximately $128 million (the "AISL Receivable"), respectively, as of the Petition Date. The AHL Receivable balance reflects, among other things, costs incurred by AHL on account of certain cost sharing arrangements between AHL and Avaya. The AISL Receivable reflects, among other things, the transfer pricing arrangement undertaken between AISL and Avaya.

To the extent the Sierra Intercompany Note, the AHL Receivable, and the AISL Receivable are treated as valid claims in favor of Avaya against its non-debtor subsidiaries, the effect of such relationships could be to increase the proportionate share of the Avaya Enterprise's total value attributable to liens securing the Debtors' prepetition funded debt and, therefore reduce, unencumbered value available for distribution to unsecured creditors. Conversely, it may be argued that some or all of such notional obligations should be recharacterized as equity, see In re AutoStyle Plastics, Inc., 269 F.3d 726, 748 (6th Cir. 2001) (describing doctrine of recharacterization), or disallowed in whole or in part. If some or all of such intercompany relationships are recharacterized or disallowed, as applicable, then such value could potentially be available for creditors generally.

---

[24]    The Comfort Letters include: (a) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya International Enterprises Limited ("AIEL"); (b) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya France SAS; (c) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya Italia SpA ("Avaya Italia"), which expires on January 29, 2017; (d) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya New Zealand Limited; (e) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya Holdings Ltd. (f) one (1) letter agreement issued by Avaya Luxembourg Investment Sarl in favor of non-Debtor affiliate Avaya Italia; (g) one (1) letter agreement issued by AISL in favor of Avaya Germany and one (1) letter agreement issued by AISL in favor of Avaya KG (together, the "German Comfort Letters"); (h) three (3) letter agreements issued by Avaya in favor of AISL, two of which were specifically issued in support of the German Comfort Letters (collectively, the "AISL Comfort Letters"); (i) one (1) letter agreement issued by AISL in favor of Avaya CIS LLC; and (j) one (1) letter agreement issued by AISL in favor of Avaya EMEA Ltd. (Saudi Branch).

[25]    The Sierra Intercompany Note was subsequently supplemented as of January 24, 2008.

### C.    The Debtors' Board Members and Executives

As of the date hereof, set forth below are the names, position(s), and biographical information of the current board of directors of Avaya Inc., as well as current key executive officers for the Debtors. These individuals oversee the businesses and affairs of the Debtors.

### 1.    The Avaya Enterprise's Executives

*Kevin Kennedy*.  Mr. Kennedy has our President and Chief Executive Officer and a member of our Board of Directors since December 22, 2008.  Previously, from September 2003 until December 2008, he served as Chief Executive Officer of JDS Uniphase Corporation ("JDSU"), a provider of optical communications products, and from March 2004 until December 2008, he also served as President of JDSU.  He was a member of JDSU's Board of Directors from November 2001 until August 2012 and served as Vice Chairman of their Board of Directors from December 2008 until August 2012.  Mr. Kennedy is also on the Boards of Directors of KLA-Tencor Corporation, a supplier of process control and yield management solutions for the semiconductor industry, and Digital Realty Trust, Inc., which owns, acquires, develops and manages technology-related real estate.  Mr. Kennedy served on the Boards of Directors of Rambus Inc., a developer of a high speed chip-to-chip interface technology, from April 2003 until July 2008 and Polycom Inc., a provider of telepresence, voice and video conferencing solutions, from May 2008 until January 2009.  Mr. Kennedy was selected to serve as a director in light of his role as Chief Executive Officer, the management perspective he brings to board deliberations, his extensive management experience and his experience on multiple public company boards.  Mr. Kennedy is also currently a Presidential Advisory Member of the National Security Telecommunications Advisory Committee.

*Eric Koza*.  Mr. Koza has been the Avaya Enterprise's Chief Restructuring Officer ("CRO") since September 2016.  Prior to becoming CRO of the Avaya Enterprise, Mr. Koza advised the Avaya Enterprise in his capacity as Managing Director of Zolfo Cooper, LLC ("Zolfo Cooper").  Mr. Koza has approximately 19 years of experience focused on complex and distressed situations, as executive officer of a public company, financial advisor, principal investor, and director of public and private companies.  Prior to re-joining Zolfo Cooper in 2013, Mr. Koza served as senior vice president, corporate development and financial strategy at Comverse Technology Inc.  In addition, he spent nearly a decade as a principal at Verax Capital Partners and W.R. Huff Asset Management, where he was responsible for investing across the capital structure of distressed and high leveraged companies as a partner in various investment funds.  Notable companies Mr. Koza has been involved with include: NTL Inc; Telewest Global; Impsat Fiber Networks; Guilford Performance Textiles; Motor Coach Industries; Trans World Entertainment; Dominion Petroleum; Harlan Labs; and ICBC Broadcast Holdings.  Mr. Koza graduated with a B.S. from Boston College and has an M.B.A. from Boston University.  Mr. Koza also holds the Chartered Financial Analyst or "CFA" designation.

*James Chirico*.  Mr. Chirico has been the Avaya Enterprise's Chief Operating Officer and Head of Sales since August 2016.  Mr. Chirico is a driving force in the Avaya Enterprise's transformation to a software and services company, and has been fundamental in attaining record operating metrics for the company including profitability and Net Promoter Score (NPS).  His responsibilities include management of Global Sales, Operations, Sales Operations, GSMB, Human Resources and Quality.  Previously, he served as our Chief Restructuring Officer from, and as the Avaya Enterprise's Executive Vice President, Business Operations from and as the Avaya Enterprise's Chief Restructuring Officer and President, Operations.  From January 2, 2008 until February 3, 2009, he served as the Avaya Enterprise's Senior Vice President and President, Operations.  Prior to that time, from February 1998 to November 2007, Mr. Chirico held various senior management positions at Seagate Technology, a designer, manufacturer and marketer of hard disc drives, including Executive Vice President, Global Disc Storage Operations, from

February 2006 until November 2007, and Senior Vice President and General Manager, Asia Operations, from September 2000 to February 2006. Jim began his career at IBM in 1980 where he spent 18 years before leaving to join Seagate Technology in 1998.

*Gary Barnett*. Mr. Barnett has been the Avaya Enterprise's Senior Vice President and General Manager, Engagement Solutions since December 20, 2011. In this capacity, Mr. Barnett manages the Avaya Enterprise's Contact Center business unit. Prior to that time, from August 2011 until December 2011, he served as the Avaya Enterprise's Vice President and General Manager of UC Applications and from April 2011 until August 2011, he served as the Avaya Enterprise's Vice President of CC Applications. Previously, from October 2005 until April 2011, he served as Executive Vice President and Chief Technology Officer of Aspect Software, Inc., a provider of unified communications and contact center software and services.

*Amy Fliegelman Olli*. Ms. Fliegelman Olli has been the Avaya Enterprise's Senior Vice President and General Counsel since June 2014. Ms. Fliegelman Olli is responsible for setting global legal strategies and functional plans for the Avaya Enterprise, including oversight of all legal matters pertaining to the organization. Previously, she was the General Counsel of CA Technologies, Inc. from September 2006 to June 2014 where she held a similar position of responsibility covering all legal, governance, compliance, internal audit, security, risk management and controls. Ms. Fliegelman Olli also spent 18 years with IBM Corporation, ultimately serving as Vice President and General Counsel for the Americas and Europe.

*Marc Randall*. Mr. Randall has been the Avaya Enterprise's Senior Vice President and General Manager, Avaya Networking since December 20, 2011. Mr. Randall manages the Avaya Enterprise's Avaya Networking business unit. From January 31, 2011 until December 16, 2011, he served as Vice President and General Manager of Cisco Systems, Inc., a provider of communications and networking products and services. Previously, from 2008 to 2010, he served as Senior Vice President of Products and Offerings of Brocade, Inc., a provider of network solutions. Prior to that time, from 2003 until 2008, he served as President, CEO and a Director of Force10 Networks, a provider of data center networking.

*Michael Runda*. Mr. Runda has been the Avaya Enterprise's Senior Vice President and President, Avaya Client Services since May 2012. Mr. Runda manages the Avaya Enterprise's Avaya Client Services (ACS) business unit. From October 2011 until May 2012, he served as the Avaya Enterprise's Vice President, Global Support Services. Prior to that time, from 2010 until 2011, he served as Chief Executive Officer of KCS Academy, where he was responsible for the startup of the KCS Academy, a subsidiary of the Consortium for Service Innovation. The Academy develops and delivers executive legal and technical support and consulting practices. From 2006 until 2010, he served as the Vice President of Global Support for Intuit Corporation. In 2004 to 2006, he led Global Services for Symantec, and he lead Oracle global support services from 1996 to 2004. Previous to that, Mr. Runda held sales and services leadership positions in IBM, Unisys and Harris corporations.

*David Vellequette*. Mr. Vellequette has been the Avaya Enterprise's Senior Vice President, Chief Financial Officer since October 1, 2012. Mr. Vellequette is responsible for the overall financial governance and management of the Avaya Enterprise's financial operations, including overall responsibility for the Controller's organization, Financial Planning, Treasury, Investor Relations, Tax and IT. Previously, from July 2004 until September 2012, Mr. Vellequette worked for JDS Uniphase Corporation as Executive Vice President and Chief Financial Officer from June 2005 until August 2012 and Vice President and Operations Controller from July 2004 until June 2005. Prior to that, Mr. Vellequette was Vice President of Worldwide Sales and Service Operations at Openwave Systems. Between 1992 and 2002, he held positions of increasing responsibility at Cisco Systems, first as corporate

22

controller of StrataCom Corporation (acquired by Cisco in 1996) and later as Vice President of Finance supporting Cisco's service provider line of business.

### 2.    Avaya's Board of Directors

*John Marren*.  Mr. Marren has been a member of our Board of Directors since August 24, 2012 and Chairman of our Board of Directors since January 29, 2016.  In addition, he previously served as a member of our Board of Directors from October 26, 2007 to April 15, 2011.  Mr. Marren was a Partner of TPG Capital from 2000 until January 2016, where he co-led TPG's technology team.  Mr. Marren serves on the Boards of Directors of Advanced Micro Devices, Inc. and various private companies and he served on the Board of Directors of Freescale Semiconductor, Ltd. from 2007 until 2015.  In addition, Mr. Marren served as Chairman of the Board of MEMC Electronic Materials, Inc. (now known as SunEdison, Inc.), a provider in the semiconductor and solar industries from 2001 to 2012.  Mr. Marren's related industry experience in working with companies controlled by private equity sponsors, and affiliation with TPG, which has the right to select three of our directors, led to the conclusion that he should serve as a director our Company.

*Mary Henry*.  Ms. Henry has been a member of Avaya's Board of Directors since July 1, 2014.  Ms. Henry was a partner and managing director of Goldman Sachs, employed there from August 1986 to November 2004, primarily in the firm's Investment Research Division.  Ms. Henry is also on the Boards of Directors of various private companies.

*Afshin Mohebbi*.  Mr. Mohebbi has been a member of our Board of Directors since April 2011.  Mr. Mohebbi has been a Senior Advisor to TPG since 2004.  Previously, Mr. Mohebbi held various executive positions at Qwest Communications International Inc., British Telecom Plc., SBC Communications Inc. and Pacific Telesis Group.  Mr. Mohebbi currently serves on the Board of Directors of DISH Network Corporation and Digital Realty Trust, as well as on the Boards of Directors of various private companies.  Mr. Mohebbi's related industry experience, service as an executive officer and director of other companies, experience in working with companies controlled by private equity sponsors, and affiliation with TPG, which has the right to select three of our directors, led to the conclusion that he should serve as a director our Company.

*Greg Mondre*.  Mr. Mondre has been a member of our Board of Directors since October 26, 2007.  Mr. Mondre has been a Managing Partner of Silver Lake since 2012 and a Managing Director of Silver Lake since 2005.  Prior to joining Silver Lake in 1999, he was a principal at TPG and an investment banker at Goldman, Sachs & Co., a global investment banking and securities firm.  Mr. Mondre is on the Boards of Directors of GoDaddy Inc., Motorola Solutions, Inc. and Sabre Corporation.  Mr. Mondre is also on the Boards of Directors of various private companies.  Mr. Mondre's experience in financial matters, service as a director of other companies, experience in working with companies controlled by private equity sponsors and affiliation with Silver Lake, which has the right to select three of our directors, led to the conclusion that he should serve as a director of our Company.

*Kiran Patel*.    Kiran Patel has been a member of our Board of Directors since October 1, 2013.  Mr. Patel served as Executive Vice President and General Manager, Small Business Group of Intuit, a provider of financial software solutions for consumers and small businesses, from December 2008 to September 2013.  He was Senior Vice President and General Manager, Consumer Tax Group from June 2007 to December 2008 and Chief Financial Officer from September 2005 to January 2008.  Mr. Patel also serves on the Boards of Directors of KLA-Tencor Corporation and EXACT, a Dutch software company, and is a trustee of The Charles Schwab Family of Funds.  Mr. Patel's experience as a Chief Financial Officer, his experience with software, the cloud and global management, as well as his independence from the Company, led to the conclusion that he should serve as a director of the Company.

23

*Ron Rittenmeyer*.  Ronald Rittenmeyer has been a member of our Board of Directors since October 1, 2013.  He is currently the Chairman of the Board and Chief Executive Officer of Millennium Health LLC, a leading health solutions company, which position he has held since April 25, 2016.  From 2011 to 2014 Mr. Rittenmeyer served as Chairman, President and Chief Executive Officer of Expert Global Solutions, a global BPO and credit recovery company, employing 40,000 people worldwide.  He led the restructuring and subsequent sale of the credit recovery business, while successfully rebuilding the global customer care business retiring from there in 2014.  Mr. Rittenmeyer is also the retired Chairman, President and Chief Executive Officer of Electronic Data Systems Corporation, a leading global provider of information technology services, business process outsourcing and applications services.  In addition, Mr. Rittenmeyer has been the Chief Executive Officer of Turnberry Advisors LLC, a company which advises businesses on performance optimization, crisis management, information technology effectiveness and interim management, since its formation in 2009.  Mr. Rittenmeyer is currently on the Board of Directors of American International Group, Inc. (AIG), Tenet Healthcare Corporation, IMS Health Inc. and various private companies.  Mr. Rittenmeyer's service as an executive officer and director of other companies and his designation by TPG, which has the right to select three of our directors, led to the conclusion that he should serve as a director of our Company.

*Gary Smith*.  Mr. Smith has been a Director of the Company since December 6, 2011.  Mr. Smith currently serves as President, Chief Executive Officer and Director of Ciena Corporation ("Ciena"), a network infrastructure company.  Mr. Smith began serving as Chief Executive Officer of Ciena in May 2001, in addition to his existing responsibilities as president and director, positions he has held since October 2000.  Mr. Smith also serves on the Board of Directors of CommVault Systems, Inc., a provider of data and information management software applications and related services, a position he has held since May 2004.  Mr. Smith's nearly 30 years of experience in the global telecommunications industry and independence from the Company, led to the conclusion that he should serve as a director of the Company.

*Charles Giancarlo*.  Mr. Giancarlo has been a member of our Board of Directors since June 30, 2008 and was Chairman of our Board of Directors from December 22, 2008 until January 29, 2016. He served as our President and Chief Executive Officer from June 30, 2008 until December 22, 2008. Mr. Giancarlo was previously a Senior Advisor of Silver Lake from January 2014 until September 30, 2015 and prior to that was Managing Director of Silver Lake since 2007.  Mr. Giancarlo is also on the Boards of Directors of Accenture plc, a management consulting business; Arista Networks, Inc., a data center switching company; ServiceNow, an enterprise IT cloud company; Imperva, Inc., a data security company; and various private companies. He served on the Board of Directors of Netflix, Inc., an online movie rental subscription service, from April 2007 until May 2012. Mr. Giancarlo's related industry experience, experience in financial matters, service as an executive officer and director of other companies, prior service as our Chief Executive Officer, experience in working with companies controlled by private equity sponsors, and affiliation with Silver Lake, which has the right to select three of our directors, led to the conclusion that he should serve as a director of our Company.

### D.      Events Leading to the Chapter 11 Cases

### 1.      Prepetition Challenges

#### (a)      Business Model Shift

The "Great Recession," together with the market trends away from hardware-based business communications under the capital expenditure model towards software and services offerings under the operating expense model had a substantial impact on the Avaya Enterprise's operations.  The Avaya Enterprise also faced ongoing competition to its core Unified Communications Product and Service

24

offerings from numerous competitors such as Cisco and Microsoft. In light of these factors, the Avaya Enterprise experienced significant revenue declines over the past several years. Despite Adjusted EBITDA remaining resilient during this time period—and in fact growing thanks to Avaya Enterprise's evolving business mix and successful cost initiatives—significant annual cash requirements largely consumed Adjusted EBITDA and constrained the Avaya Enterprise's cash flows.



**(b)      Substantial Annual Cash Requirements**

The Avaya Enterprise's cash flow profile was also negatively impacted by the substantial costs associated with its debt load, which increased over the last decade. Annual cash interest payments averaged approximately $440 million since fiscal 2014, with a corresponding impact on cash flow available to fund the research, development, and other investments required to remain competitive in the market. From fiscal 2014 to fiscal 2016, annual cash requirements averaged approximately $900 million, including: (a) approximately $440 million in cash interest payments and (b) annual pension and OPEB funding of approximately $180 million, as well as ongoing cash needs related to restructuring costs, capital expenditures, and cash taxes.



25

(c)    **October 2017 Debt Maturities**

Approximately $617 million of the Debtors' B-3 and B-4 tranches of indebtedness outstanding under the Prepetition Cash Flow Credit Facility are scheduled to mature in October 2017. An event of default occurred under the Prepetition Domestic ABL Credit Facility, the Prepetition Cash Flow Credit Facility, and Prepetition Foreign ABL Credit Facility as of December 29, 2016.

2.    **Prepetition Initiatives**

The Avaya Enterprise undertook a number of initiatives in an effort to improve operating efficiency, performance, streamline costs, and improve its overall balance sheet profile, including: (a) the implementation of corporate cost-cutting measures, which contributed to annual cost reductions of more than $700 million over three years and (b) more near-term measures such as (i) the analysis of multiple strategic alternatives, including the sale or disposition of various business lines as well as the sale of the Avaya Enterprise as a going concern, and potential capital markets solutions for upcoming debt maturities and (ii) engagement with key creditor constituencies. The Avaya Enterprise also engaged experienced advisors to assist in its evaluation and review during this process.

(a)    **Cost Cutting Initiatives**

Cognizant of its strained financial position, the Avaya Enterprise instituted broad-based cost initiatives over the past several years to improve overall profitability and address significant ongoing cash requirements including the cost of its debt structure and legacy liabilities. Avaya Enterprise's efforts contributing to a total cost reduction of approximately $700 million during fiscal 2014-2016. Of these total cost reductions: (a) approximately $100 million resulted from reducing non-people costs, including vendor renegotiations, process automation initiatives, and reducing costs associated with unused or under-utilized facilities; (b) approximately $400 million resulted from headcount reductions; and (c) approximately $200 million resulted from reduction in variable cost associated with declines in Product revenue. As a result of these initiatives, the Avaya Enterprise increased its profitability, measured by Adjusted EBITDA during fiscal 2014-2016, despite significant revenue erosions over the same time period.

(b)    **M&A, Financing Alternatives**

The Avaya Enterprise also explored various out-of-court restructuring alternatives to address its maturity profile and reduce overall indebtedness. For example, the Avaya Enterprise worked with its advisors to determine whether a refinancing or extension could be possible with respect to near-term maturities of its funded debt. Additionally, the Avaya Enterprise considered combinations of asset dispositions and strategic transactions through which it might de-lever or increase liquidity on an out-of-court basis, such as the disposition of non-core business units, certain of the Avaya Enterprise's intellectual property, or a going concern transaction for the Avaya Enterprise as a whole. For example, the Avaya Enterprise undertook extensive processes to monetize certain of its business units through broad-based market tests in 2016 and 2017 (the "CC Marketing Process" and "Networking Marketing Process," respectively).

i.    **CC Marketing Process**

Pursuant to the CC Marketing Process, the Avaya Enterprise, with the assistance of its advisors, contacted approximately 34 potential purchasers, of which 18 attended management meetings with the Avaya Enterprise, 11 provided perspectives on value, and eight provided written bids for the CC Business. Of these eight written bids, two were selected to enter a final round of bidding. The Avaya

Enterprise analyzed the two final round bids and determined, in consultation with its advisors, to move forward with a sale proposal from a confidential third-party purchaser (the "Confidential Purchaser") to acquire the CC Business for approximately $3.9 billion (the "First CC Business Sale Proposal"). Discussions with the Confidential Purchaser eventually broke down and the Avaya Enterprise determined that the First CC Business Sale Proposal was no longer actionable. Consequently, the Avaya Enterprise terminated the CC Marketing Process. Subsequent to this termination, the Avaya Enterprise received an updated proposal from a previously involved confidential party purporting to ascribe a purchase price for the CC Business of approximately $3.7 billion, subject to various adjustments and conditions (the "Second CC Business Sale Proposal"). At the time, however, the Avaya Enterprise had no assurance that the Second CC Business Sale Proposal was either viable or that it would be acceptable.

## ii.    Networking Marketing Process

Pursuant to the Networking Marketing Process, the Avaya Enterprise and its advisors contacted 37 parties, including 28 strategic buyers and nine financial sponsors, of which 15 sought further information and entered into nondisclosure agreements with the Avaya Enterprise. 11 parties attended an initial meeting with the Avaya Enterprise's management, following which the Avaya Enterprise responded to a number of information requests prior to the submission of first round bids. The Avaya Enterprise ultimately received four first round bids, including two written bids and two verbal offers. The two verbal offers, submitted by financial sponsors, ranged in value from $5 million to $65 million, whereas the two written bids submitted by strategic buyers ranged in value from $100 million to $330 million. The $330 million bid was based on limited due diligence and an existing operating relationship between the Potential Purchaser and certain Avaya entities related to the Networking Business, and was provided without any proposed form of deal structure, detailed due diligence request, or information about necessary consents or approvals to be obtained. Despite further engagement by the Avaya Enterprise, the $330 million bidder ultimately never provided a deal structure and did not perform typical due diligence, and subsequently dropped out of bidding citing concerns around its inability to secure requisite regulatory approvals and operate the business in specific jurisdictions, including in the United States and Europe. The Networking Marketing Process eventually led to the execution of an Asset Purchase Agreement with Extreme Networks, Inc. ("Extreme") on March 6, 2017, whereby Extreme would serve as a "stalking horse" bidder in an auction process conducted pursuant to section 363 of the Bankruptcy Code, which process is detailed more fully in Article VI herein.

## (c)    Stakeholder Engagement

Prepetition, the Avaya Enterprise also engaged with creditor groups with the goal of building consensus around a de-leveraging transaction, if reasonably possible. These stakeholder constituencies consisted of: (a) an ad hoc group of holders of the Avaya Enterprise's first lien indebtedness (the "Ad Hoc First Lien Group"); (b) an ad hoc group of cross-holders of both the Avaya Enterprise's first lien debt and the Avaya Enterprise's second lien debt (the "Ad Hoc Crossover Group," and together with the Ad Hoc First Lien Group, the "Ad Hoc Groups"); and (c) Pension Benefit Guaranty Corp. ("PBGC"), and each group's respective advisors. These discussions included, among other things: (a) the provision of a substantial amount of diligence to those constituencies and their advisors (and the payment of associated professional fees); (b) ongoing dialogue and communication around the Avaya Enterprise, its operations, and its prospects; and (c) regular in-person and telephonic meetings to discuss the Avaya Enterprise's potential restructuring path. Among other things, the Debtors also sought to engage with those constituencies around both M&A-focused and "standalone" restructuring alternatives. The Debtors' prepetition stakeholder engagement did not lead to a comprehensive and consensual restructuring transaction.

(d)    **DIP Financing**

Following extensive, prepetition, arm's-length negotiations, the Debtors successfully negotiated a $725 million DIP facility (the "DIP Facility"), fully underwritten by Citibank, NA ("Citibank"). The DIP Facility was notable in that it not only provided the Debtors with much needed "Day 1" liquidity, but did so on favorable terms, including a 12 month maturity, attractive pricing, and limited "case control" mechanisms that might unduly hinder the Debtors' ability to maximize the value of these chapter 11 estates as a whole. The DIP Facility is discussed more fully at Article VI.C hereof.

## VI.    EVENTS OF THE CHAPTER 11 CASES

### A.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. Should the Debtors' projected timelines prove accurate, and consistent with the terms set forth in the Plan, the Debtors could emerge from chapter 11 within 218 days of the Petition Date (i.e., **August 25, 2017**) or earlier if the Debtors' Plan is confirmed on **August 10, 2017**, or soon thereafter. **No assurances can be made, however, that the Bankruptcy Court will enter any proposed orders discussed below, either at all, or on the timetable anticipated by the Debtors.**

### B.    First Day Pleadings and Other Case Matters

#### 1.    First and Second Day Pleadings

To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below. The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings included the following:

- Cash Management. On January 23, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to continue using their existing cash management system, existing bank accounts, and existing business forms [Docket No. 56]. On March 31, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 341].

- Critical Vendors. On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to satisfy, solely in the Debtors' discretion, the prepetition claims of certain critical vendors and suppliers of goods and services that are essential to the Debtors' day-to-day business operations [Docket No. 65]. On February 10, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 139].

- Customer Programs. On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to satisfy, solely in the Debtors' discretion, certain prepetition amounts outstanding under the Debtors' customer programs [Docket No. 64]. On February 10, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 141].

28

- <u>DIP and Cash Collateral</u>. On January 23, 2017, the Bankruptcy Court entered an interim order, consensually reached between the Debtors and the DIP Lenders approving the use of cash collateral to fund operations and restructuring costs [Docket No. 61] (the "<u>Interim DIP Order</u>"). The Interim DIP Order, among other things, describes the terms and conditions for the use of cash collateral and provides adequate protection in exchange for the use of such cash collateral. This relief was necessary to ensure that the Debtors could continue to operate in the ordinary course during the Chapter 11 Cases. On March 10, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 230].

- <u>Insurance</u>. On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to continue operating under insurance coverage for their business entered into prepetition, honor prepetition insurance premium financing agreements, and renew their premium financing agreements in the ordinary course of business [Docket No. 142].

- <u>NOL</u>. On March 7, 2017, the Bankruptcy Court entered a final order approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to beneficial ownership of common and preferred stock [Docket No. 202].

- <u>Surety</u>. On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to continue and renew certain surety obligations in the ordinary course of business [Docket No. 144].

- <u>Taxes</u>. On February 10, 2017, the Bankruptcy Court entered an Order authorizing the Debtors to pay certain prepetition sales, use, franchise, and other taxes in the ordinary course of business [Docket No. 145]. Such payments only affect the timing of payment for the vast majority of the amounts at issue.

- <u>Utilities</u>. On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to establish procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide any additional adequate assurance [Docket No. 146].

- <u>Wages</u>. On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay all employees their wage Claims in the ordinary course of business, (b) pay and honor employee medical and similar benefits, and (c) continue their prepetition benefit programs, including, among others, medical, dental, and 401(k) benefits [Docket No. 66], which Order was Amended on February 10, 2017 [Docket No. 138]. On March 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis and authorizing the Debtors to continue their prepetition employee incentive programs for non-insiders on a postpetition basis [Docket No. 276].

## 2. Procedural and Administrative Motions

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions:

KE 44205447

- authorizing the joint administration of the Chapter 11 Cases [Docket No. 45];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code [Docket No. 143];

- establishing certain notice, case management, and administrative procedures [Docket No. 160];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 50 largest creditors [Docket No. 140];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 328]; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases [Docket No. 324].

### 3.    Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include:  (a) Kirkland & Ellis LLP, as counsel to the Debtors; (b) Centerview Partners LLC, as investment banker; (c) Prime Clerk, as claims agent and administrative advisor; (d) The Siegfried Group, LLP, as accounting resource provider; (e) KPMG LLP as tax consultants; (f) PricewaterhouseCoopers LLP, as auditor and accounting services provider; (g) Grant Thornton, as accounting resource provider; and (h) Togut, Segal & Segal LLP, as conflicts counsel.

### 4.    Appointment of the Statutory Committee of Unsecured Creditors

On January 31, 2017, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee") [Docket No. 100], consisting of:  (a) Wistron Corporation; (b) Pension Benefit Guaranty Corporation; (c) Communication Workers of America; (d) Flextronics Telecom Systems, Ltd.; (e) AT&T Services, Inc.; (f) SAE Power Inc. and SAE Power Company; and (g) Network-1 Technologies, Inc.

The Creditors' Committee Filed applications to retain Morrison & Foerster LLP as lead counsel [Docket No. 298], Alvarez & Marsal, LLC as financial advisor [Docket No. 299], and Jeffries LLC as investment banker [Docket No. 300].  A final hearing on the retention of the Creditors' Committee's professionals is currently scheduled for April 25, 2017.

### 5.    The Ad Hoc Groups

As previously discussed, two ad hoc groups of the Debtors' secured creditors, the Ad Hoc First Lien Group and the Ad Hoc Crossover Group, formed prepetition and are currently active in these Chapter 11 Cases.

- The Ad Hoc First Lien Group.  The Ad Hoc First Lien Group is comprised of various of the Debtors stakeholders, including lenders, bondholders, and other parties-in-interest holding interests in:  (i) the Debtors' Prepetition Cash Flow Credit Facility; (ii) the Debtors' 7.00% First Lien Notes; (iii) the Debtors' 9.00% First Lien Notes; (iv) the

Debtors' 10.50% Second Lien Notes; and (v) the Debtors' DIP Facility. The Ad Hoc First Lien Group is currently represented by: (i) Akin Gump Strauss Hauer & Feld LLP, as counsel and (ii) PJT Partners Inc., as investment banker.[26]

- The Ad Hoc Crossover Group. The Ad Hoc Crossover Group is comprised of various of the Debtors stakeholders, including lenders, bondholders, and other parties-in-interest holding: (i) 41.16% of the Debtors' Prepetition Cash Flow Credit Facility; (ii) 36.23% of the Debtors' 7.00% First Lien Notes; (iii) 30.61% of the Debtors' 9.00% First Lien Notes; (iv) 88.07% of the Debtors' 10.50% Second Lien Notes; (v) 32.05% of the Debtors' DIP Facility; and (vi) certain amounts of outstanding Class W common stock warrants. The Ad Hoc Crossover Group is currently represented by: (i) Stroock & Stroock & Lavan LLP, as counsel and (ii) Rothschild & Co., as investment banker.[27]

## C.    The Debtors' DIP Financing and Cash Collateral Motion

After a significant marketing process and vigorous negotiations, on the Petition Date, the Debtors Filed the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) And (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* [Docket No. 13] (the "DIP Motion").

The Bankruptcy Court entered an interim order approving the DIP Motion on January 23, 2017 (the "Interim DIP Order") [Docket No. 61]. Pursuant to the Interim DIP Order, the Debtors were authorized, among other things, to utilize a portion of the initial draw under the DIP Facility to pay, in full, all obligations outstanding under the Prepetition Domestic ABL Credit Facility and the Prepetition Foreign ABL Credit Facility.

On March 10, 2017, the Court entered an order approving the DIP Motion on a final basis (the "Final DIP Order") [Docket No. 230]. The Final DIP Order, among other things: (i) approved the DIP Facility; (ii) approved the Debtors' use of cash collateral; (iii) approved the adequate protection packages contained in the DIP Facility; and (iv) overruled any objections to the DIP Motion not otherwise resolved. Pursuant to the Final DIP Order, the Debtors were authorized to utilize $75.0 million of proceeds from the DIP Facility to fund an account (the "Cash Pool Requirements Account") that, in turn, would provide a liquidity backstop for the Debtors' non-U.S. affiliates through an inter-company borrowing protocol (the "Intercompany Security Protocol"), which was also approved pursuant to the Final DIP Order.[28]

---

[26]    The description of the Ad Hoc First Lien Group contained herein is based off of the Ad Hoc First Lien Group's *Second Amended Verified Statement Pursuant to Bankruptcy Rule 2019* filed on March 15, 2017 [Docket No. 246] (the "First Lien 2019 Statement"). Pursuant to the First Lien 2019 Statement, certain members of the Ad Hoc First Lien Group also hold positions under the Prepetition Domestic ABL Facility and the Prepetition Foreign ABL Facility. The Prepetition Domestic ABL Facility and the Prepetition Foreign ABL Facility were paid off in connection with the Debtor's initial draw against the DIP Credit Facility under the Interim DIP Order.

[27]    The description of the Ad Hoc Crossover Group contained herein is based off of the Ad Hoc Crossover Group's *Third Supplemental Verified Statement of the Ad Hoc Crossover Group Pursuant to Bankruptcy Rule 2019* filed on March 20, 2017 [Docket No. 278].

[28]    Pursuant to the Intercompany Security Protocol cash transferred from the Debtors to a non-debtor subsidiary outside the ordinary course of business must first be transferred to Debtor Sierra pursuant to an intercompany note from Avaya Inc. to

31

### 1.    Cash Collateral Milestones

The Final DIP Order also approved the following chapter 11 case "milestones" (the "<u>Cash Collateral Milestones</u>"):

- the filing of a chapter 11 plan that is acceptable to the Required Lenders (as defined in the Prepetition Cash Flow Credit Agreement), on the one hand, and the Debtors, on the other hand (an "<u>Acceptable Plan</u>"), and disclosure statement with respect to the Acceptable Plan (the "<u>Acceptable Disclosure Statement</u>") with this Court within 150 days of the Petition Date;

- entry by this Court of an order approving the Acceptable Disclosure Statement within 180 days of the Petition Date;

- entry by this Court of an order confirming the Acceptable Plan within 250 days of the Petition Date; and

- consummation of the Acceptable Plan within 270 days of the Petition Date; <u>provided</u>, that failure to meet any milestone under the DIP Facility may be cured at any time prior to delivery of a Cash Collateral Adequate Protection Notice (as that term is defined in the Final DIP Order).

The failure of the Debtors to achieve any of the Cash Collateral Milestones will result in a Cash Collateral Event of Default (as that term is defined in the Final DIP Order), which, in turn, will terminate the Debtors' continued use of Cash Collateral on a consensual basis where a Cash Collateral Adequate Protection Notice is delivered in accordance with the Final DIP Order and as set forth more fully therein. Upon a Cash Collateral Event of Default, the Cash Flow Credit Agreement Agent is authorized to serve the Debtors with a Cash Collateral Adequate Protection Notice (as that term is defined in the Final DIP Order), which then requires the Debtors to seek an expedited hearing with the Bankruptcy Court (a "<u>Cash Collateral Hearing</u>") to consider the Debtors' continued use of Cash Collateral on a non-consensual basis. Following delivery of a Cash Collateral Adequate Protection Notice, however, the Debtors are still authorized to use Cash Collateral until the later of:  (a) a ruling from the Court in respect of the Cash Collateral Hearing; or (b) such time as otherwise agreed to by the Cash Flow Credit Agreement Agent, with the consent of the Required Lenders (as that term is defined in the Final DIP Order).

### 2.    Marshaling Waiver

"Marshaling" refers to the legal doctrine by which, in certain circumstances, a secured lender may be compelled to recover by asserting remedies against certain collateral so as not to prejudice recoveries otherwise available to junior creditors.  <u>In re Global Serv. Group, LLC</u>, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) ("Marshaling is an equitable principle designed to protect the rights of a junior creditor by compelling a senior creditor to attempt to collect its claim first from another source unavailable to the junior creditor.").

---

Sierra, which must then be secured by:  (i) an equity pledge of 100% of the issued and outstanding interests in Sierra's direct domestic subsidiaries, (ii) an equity pledge of 65% of the issued and outstanding interests in Sierra's direct foreign subsidiaries, and (iii) an applicable intercompany note or general ledger entry.  The Intercompany Security Protocol also authorizes the Debtors to limit Sierra's obligations with respect to the intercompany security protocol to an amount equal to: (i) funds actually disbursed, if any, from the Cash Pool Requirements Account; (ii) repayment of the Prepetition Foreign ABL Credit Facility, as an obligation of Sierra subject to the Intercompany Security Protocol; and (iii) the amount of any other intercompany loans created pursuant to the Intercompany Security Protocol.

Paragraph 13 of the Final DIP Order provides that none of the DIP Agent or the Prepetition Secured Parties (each as defined therein) shall be subject to the equitable doctrine of marshaling, provided that those parties must "use commercially reasonable efforts to use all DIP Collateral or Prepetition Collateral other than Avoidance Actions to repay the DIP Obligations or Adequate Protection Obligations . . . ." As a result of this waiver, it may be argued that value attributable to unencumbered assets should first be attributed to the value of DIP Facility Claims, since the doctrine of marshaling could not be invoked to cause such claims to be satisfied first through proceeds available from assets that were otherwise encumbered as of the Petition Date.

### D.    Statements of Schedules and Claims Bar Date

On the Petition Date, the Debtors Filed a the *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief* seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") up to and including March 4, 2017 [Docket No. 28], which the Court granted on February 10, 2017 [Docket No. 143]. On March 1, 2017, the Debtors filed a second Motion seeking an extension of the time within which to file the Schedules up to and including April 21, 2017 [Docket No. 186], which the Court granted on March 22, 2017 [Docket No. 301].

On March 30, 2017, the Debtors filed their Schedules. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a proof of claim.

On March 22, 2017, the Bankruptcy Court entered an order approving: (1) May 8, 2017, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Claims in the Chapter 11 Cases; (2) July 18, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Claims in the Chapter 11 Cases; (3) May 8, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to File certain Claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "Administrative Claims") in the Chapter 11 Cases; (4) May 8, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Administrative Claims in the Chapter 11 Cases; (5) procedures for filing proofs of Claim; and (6) the form and manner of notice of the applicable bar dates [Docket No. 301] (the "Bar Date Order").

Because the resolution process for the Claims is currently ongoing, the Claims figures identified in this Disclosure Statement represent estimates only and, in particular, the estimated recoveries set forth in this Disclosure Statement for Holders of General Unsecured Claims could be materially lower if the actual Allowed General Unsecured Claims are higher than the current estimates.

### E.    Networking Sale

On March 8, 2017, the Debtors filed a motion (the "Bidding Procedures and Sale Motion") seeking the entry of an order (the "Bidding Procedures Order") approving bidding procedures in connection with the sale of the Debtors networking business ("Networking Business") and the entry of an order (the "Sale Order") authorizing and approving the sale (the "Networking Sale") of the Networking Business [Docket No. 248]. In accordance with the Bidding Procedures and Sale Motion, Extreme Networks, Inc. (the "Stalking Horse Bidder") entered into an asset purchase agreement dated as of

March 7, 2017 (the "Stalking Horse APA"), in which the Stalking Horse Bidder agreed to acquire, for cash consideration and the assumption of liabilities under certain non-Debtor future lease and pension obligations, the Networking Business for a potential transaction value for the Avaya Enterprises of up to $100 million, subject to transaction costs and purchase price adjustments.

On April 5, 2017, the Bankruptcy Court entered the Bidding Procedures Order, which contemplates an approximately 75-day bidding and sale process and a final bid deadline of May 18, 2017, an auction to take place at the New York office of Kirkland & Ellis LLP on May 23, 2017, and a hearing on the Sale Order scheduled for May 25, 2017.  Should the Stalking Horse Bidder ultimately win the auction, or should the Debtors receive no bids, the Debtors and the Stalking Horse Bidder expect to close the transaction in June of 2017.

## F.    Pending Litigation Proceedings and Claims

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their businesses.  The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their businesses, financial condition, or results of operations.

With certain exceptions, the filing of the Chapter 11 Cases operate as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.  This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

### 1.    Blackberry Relief from Stay Motion

On February 10, 2017, BlackBerry Limited and BlackBerry Corporation (collectively, "Blackberry") filed a motion seeking relief from the Bankruptcy Code's "automatic stay" with respect to certain patent infringement litigation currently pending in the United States District Court for the Northern District of Texas (the "Blackberry Relief from Stay Motion").  Initially, Blackberry sought to have the Blackberry Relief from Stay Motion heard on March 3, 2017.  Prior to that date, however, the Debtors and Blackberry agreed to adjourn the hearing until March 22, 2017.  On March 15, 2017, the Debtors and Blackberry again agreed to adjourn the hearing on the Blackberry Relief from Stay Motion until April 25, 2017.

### 2.    Network-1 Relief from Stay Motion

On March 7, 2017, Network-1 Technologies, Inc. ("Network-1") filed a motion seeking relief from the Bankruptcy Code's "automatic stay" with respect to certain patent infringement litigation currently pending in the United States District Court for the Eastern District of Texas (the "Network-1 Relief from Stay Motion").  The Network-1 Relief from Stay Motion is currently scheduled for hearing on April 25, 2017.

KE 44205447

### G.    Other Postpetition Matters

### 1.    Retained Claims Collateral Analysis

Pursuant to the Interim DIP Order and Final DIP Order, certain types of the Debtors' assets were identified as potential carve-outs from the DIP Lenders collateral (the "Retained Claims Collateral"), including with respect to any liens asserted against the Retained Claims Collateral on account of the Debtors' prepetition funded debt.  The Retained Claims Collateral consists of:

- each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399;

- all intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing, any of the foregoing, in each case registered or arising under non-U.S. law (collectively, the "Retained Claims Collateral IP");

- assets of that certain Avaya Inc. Savings Restoration Plan held in  the Avaya Inc. Savings Restoration Plan Trust and maintained by Fidelity Management Trust Company ("Fidelity"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom (the "Retained Claims Collateral ASRP");

- assets of that certain Avaya Inc. Deferred Compensation Plan effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by Wells Fargo Bank, NA, as Successor Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom (the "Retained Claims Collateral Deferred Compensation Plan");

- assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom;

- commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.);

- proceeds from the Debtors' insurance policies (the "Retained Claims Collateral Insurance Proceeds");

- certain of the Debtors real property (the "Retained Claims Collateral Real Property"); and

- certain of the Debtors' leasehold interests (the "Retained Claims Collateral Leasehold Interests").

The Interim DIP Order and Final DIP Order also provided the Debtors with a budget of approximately $150,000 from the DIP Facility to be utilized in connection with the Debtors investigation of the security interests and liens associated with the Retained Claims Collateral (the "Investigation

Budget Cap"). On March 16, 2017, the Debtors entered into *Stipulation Extending the Debtors' Retained Claims Challenge Period*, extending Debtors' challenge period with respect to any Claims, Challenges, and actions that the Debtors may assert in connection with the Retained Claims Collateral through and including May 19, 2017. The Debtors' analysis with respect to, among other things, questions of lien perfection and the value, if any that may be realized from the Retained Claims Collateral for the benefit of their estates, remains ongoing.

### 2.    Plan Exclusivity

The time during which the Debtors have the exclusive right to file a chapter 11 plan is currently set to expire on May 19, 2017 (the "Exclusivity Deadline"). On April 11, 2017, the Debtors filed a motion seeking an extension of the Exclusivity Deadline by approximately 120 days through and including September 16, 2017, as well as a corresponding extension of the time in which the Debtors have the exclusive authority to solicit votes thereon through and including September 16, 2017 (the "Exclusivity Extension Motion"). The Exclusivity Extension Motion is set for hearing on April 25, 2017.

### 3.    Executory Contracts and Unexpired Leases

#### (a)    Assumption/Rejection Procedures Motion

On March 1, 2017 the Debtors filed the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief [Docket No. 188] (the "Contract Procedures Motion") seeking to establish procedures for the rejection, assumption, or assumption and assignment, to the extent applicable, for the Debtors' executory contracts and unexpired leases. On March 30, 2017, the Bankruptcy Court entered an order granting, in part, the relief requested by the Contract Procedures Motion [Docket No. 339].

#### (b)    49ers Rejection Motion

On February 24, 2017, the Debtors filed a motion to reject that certain San Francisco 49ers Stadium Executive Suite License Agreement, dated July 19, 2012, between Avaya Inc. and Forty Niners SC Stadium Company LLC *nunc pro tunc* to the date of the filing of the motion and granting related relief (the "49ers Rejection Motion"). On March 21, 2017, the Court entered an order granting the 49ers Rejection Motion [Docket No. 282].

### 4.    Key Employee Incentive Program Motion

On March 1, 2017, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving the Debtors' 2Q 2017 Key Employee Incentive Program and (II) Granting Related Relief* (the "KEIP Motion") [Docket No. 192], seeking authority to pay, in the ordinary course of business, awards to key employees of the Debtors from an aggregate maximum award pool of approximately $3.7 million for the Debtors' second fiscal quarter ending March 31, 2017. The Debtors' subsequently reduced the size of the aggregate maximum award pool to approximately $3.0 million. The KEIP Motion remains pending at this time.

### H.    Corporate Structure Upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other

KE 44205447

form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

## VII.    SUMMARY OF THE PLAN

The Plan reflects the evaluation and analysis undertaken by the Debtors with respect to a number of different of business, financial, and legal considerations.  Among other things, the Debtors, with the assistance of their advisors, considered both overall enterprise value and the extent to which such value may be available for distribution to the Debtors' different classes of stakeholders in light of such parties' legal and equitable rights, including any asserted rights to default interest.

The recoveries and treatment provided under the Plan further reflects consideration of the potential allocation of enterprise value for the entire Avaya Enterprise as between the Debtors and their international affiliates, and the extent to which value attributable to the Avaya Enterprise's international operations could be available for distribution to unsecured creditors.  Additional factors taken into account by the Debtors include the potential treatment of intercompany claims as Claims and/or value, if any, attributable to such intercompany relationships, and the potential impact of the marshaling waiver arising under Paragraph 13 of the Final DIP Order.  The Plan further reflects the Debtors' consideration of the time, risk, and expense associated with litigating to Final Order, the foregoing issues.

The Plan is therefore proposed in the nature of a settlement pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Debtors believe that confirmation of the Plan is in the best interests of their creditors and these Chapter 11 Estates.

### A.    Overview

Article VII  provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

KE 44205447

**B.**      **Administration Claims and Professional Fee Claims**

**1.**      **Administrative Claims**

Except with respect to Professional Fee Claims and DIP Financing Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor agrees to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash:  (a) if such Administrative Claim is Allowed as of the Effective Date, not later than forty-five (45) days after the Effective Date or as soon as reasonably practicable thereafter and (b) if such Administrative Claim is not Allowed as of the Effective Date, not later than not later than forty-five (45) days after the Effective Date after entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims or DIP Financing Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, however that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

Objections to requests for payment of Administrative Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims and DIP Financing Claims) must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

**Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.**

**2.**      **DIP Financing Claims**

Except to the extent that a Holder of an Allowed DIP Financing Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Financing Claim, each such Allowed DIP Financing Claim shall be paid in full, in Cash, by the Debtors on the Effective Date.

**3.**      **Professional Fee Claims**

**(a)**      **Final Fee Applications**

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

**(b)**      **Professional Fee Escrow Account**

If the Professional Fee Claims Estimate is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the

38

Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Facility, the New Debt, or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (y) shall be held in trust for the Professionals; provided that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided, that the Debtors' and Reorganized Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount in any Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow Account without any further action or order of the Bankruptcy Court.

### (c)    Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date and shall deliver such good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

### (d)    Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

KE 44205447

### 5. Reclamation Claims

Pursuant to section 546(c) of the Bankruptcy Code, a seller of goods that sold goods to a debtor in the ordinary course of such seller's business may reclaim such goods if the debtors received the goods while insolvent within 45 days of commencement of a bankruptcy case (each such claim, a "Reclamation Claim"). Section 546(c) of the Bankruptcy Code requires that the seller demand, in writing, reclamation of such goods not later than 45 days after the date of receipt of such goods by the debtor or not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of a case. The Plan does not include any recovery for Reclamation Claims. Rather, pursuant to section 546(c) of the Bankruptcy Code, Reclamation Claims are subject to the prior perfected liens held by other parties on the Debtors' inventory, including claims arising under the Cash Flow Credit Facility, the First Lien Notes, and the Second Lien Notes. Accordingly, the Debtors do not believe that any valid Reclamation Claims exist, and any losses on account of such claims would be a General Unsecured Claim.

### C. Classification and Treatment of Claims and Interests

### 1. Summary of Classification

Claims and Interests, except for Administrative Claims, including DIP Claims, Professional Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.E of the Plan.

### (a) Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|-------|------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Cash Flow Credit Facility Secured Claims | Impaired | Entitled to Vote |

KE 44205447

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 4 | First Lien Notes Secured Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 6 | U.S. Qualified Pension Claims | Impaired | Entitled to Vote |
| 7 | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Prepetition Intercompany Debtor Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 9 | Subsidiary Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | HoldCo Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### 2. Treatment of Claims and Interests

(a) **Class 1 - Other Priority Claims**

    i. *Classification*: Class 1 consists of Other Priority Claims.

    ii. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course) or pursuant to such other terms as may be agreed to by the Holder of an Other Priority Claim and the Debtors.

    iii. *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan.

(b) **Class 2 - Other Secured Claims**

    i. *Classification*: Class 2 consists of Other Secured Claims.

41

ii.  *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such Holder shall receive at the Reorganized Debtors' discretion:

a.  payment in full in cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms in the ordinary course);

b.  Reinstatement of such Holder's Allowed Other Secured Claim; or

c.  such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

iii.  *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan.

**(c)  Class 3 - Cash Flow Credit Facility Secured Claims**

i.  *Classification*:  Class 3 consists of all Cash Flow Credit Facility Secured Claims.

ii.  *Allowance*:  The Cash Flow Credit Facility Secured Claims shall be Allowed in the aggregate amount of $3,234,727,423.

iii.  *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a Cash Flow Credit Facility Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Cash Flow Credit Facility Secured Claim, each Holder of a Cash Flow Credit Facility Secured Claim shall receive, ratably with the Allowed First Lien Notes Secured Claims, and in each case without duplication among Debtors:

a.  95.0% of Reorganized HoldCo Common Stock, subject to dilution by the Management Equity Incentive Plan; and

b.  $1,418,000,000 of Cash proceeds from the syndication of the New Debt; provided that to the extent the New Debt is not fully syndicated, after refinancing the DIP Financing, such Holder will receive its Pro Rata share of

42

the unsubscribed portion of New Debt less than $1,418,000,000 on a dollar-for-dollar basis.

    iv.   *Voting*: Class 3 is Impaired under the Plan. Each Holder of a Cash Flow Credit Facility Secured Claim will be entitled to vote to accept or reject the Plan.

**(d)**    **Class 4 - First Lien Notes Secured Claims**

    i.   *Classification*: Class 4 consists of all First Lien Notes Secured Claims.

    ii.   *Allowance*: The First Lien Notes Secured Claims shall be Allowed in the aggregate amount of $1,299,000,000.

    iii.   *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of a First Lien Notes Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Secured Claim, each Holder of a First Lien Notes Secured Claim shall receive, ratably with the Allowed Cash Flow Credit Facility Secured Claims, and in each case without duplication among Debtors:

        a.   95.0% of Reorganized HoldCo Common Stock, subject to dilution by the Management Equity Incentive Plan; and

        b.   $1,418,000,000 of Cash proceeds from the syndication of the New Debt; <u>provided</u> <u>that</u> to the extent the New Debt is not fully syndicated, after refinancing the DIP Financing, such Holder will receive its Pro Rata share of the unsubscribed portion of New Debt less than $1,418,000,000 on a dollar-for-dollar basis.

    iv.   *Voting*: Class 4 is Impaired under the Plan. Each Holder of a First Lien Notes Secured Claim will be entitled to vote to accept or reject the Plan.

**(e)**    **Class 5 - Second Lien Notes Claims**

    i.   *Classification*: Class 5 consists of all Second Lien Notes Claims.

    ii.   *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate amount equal to $1,384,000,000, plus any accrued but unpaid interest as of the Petition Date.

    iii.   *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a Holder of an

Allowed Second Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Claim, each Holder of a Second Lien Notes Claim shall receive, without duplication among Debtors, its Pro Rata Share of 5.0% of Reorganized HoldCo Common Stock, subject to dilution by the Management Equity Incentive Plan.

iv.    *Voting*:  Class 5 is Impaired under the Plan.  Each Holder of a Second Lien Notes Claim will be entitled to vote to accept or reject the Plan.

**(h)    Class 6 - U.S. Qualified Pension Claims**

i.    *Classification*:  Class 6 consists of all U.S. Qualified Pension Claims.

ii.    *Allowance:*  On the Effective Date, except to the extent that a Holder of a U.S. Qualified Pension Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each U.S. Qualified Pension Claim, each such Holder shall be Reinstated pursuant to section 1124 of the Bankruptcy Code.

iii.    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable (or, if a Pension Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), except to the extent that a Holder of an Allowed U.S. Qualified Pension Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each U.S. Qualified Pension Claim, the unpaid portion of minimum funding contributions due with respect to the U.S. Qualified Pension Plans plus any accrued but unpaid interest thereon payable at the Federal Judgment Rate shall be paid into the pension trust.

iv.    *Voting*:  Class 6 is Impaired under the Plan.  Each Holder of a U.S. Qualified Pension Claim will be entitled to vote to accept or reject the Plan.

**(i)    Class 7 - General Unsecured Claims**

i.    *Classification*:  Class 7 consists of all General Unsecured Claims.

ii.    *Treatment*:  Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each General Unsecured Claim, each Holder of such General Unsecured Claim shall receive a Pro Rata

44

distribution in Cash from the General Unsecured Recovery Pool in an amount not to exceed 10.0% of such Holder's Allowed General Unsecured Claim.

    iii.    *Voting*: Class 7 is Impaired under the Plan. Each Holder of a General Unsecured Claim will be entitled to vote to accept or reject the Plan.

**(h)**    **Class 8 - Prepetition Intercompany Debtor Claims**

    i.    *Classification*: Class 8 consists of all Prepetition Intercompany Debtor Claims.

    ii.    *Treatment*: Except to the extent that a Holder of a prepetition Intercompany Debtor Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each prepetition Intercompany Debtor Claim, each Holder of such prepetition Intercompany Debtor Claim shall receive such treatment as to render such Holder Unimpaired.

    iii.    *Voting*: Class 8 is Unimpaired under the Plan. Each Holder of a prepetition Intercompany Debtor Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of a prepetition Intercompany Debtor Claim will not be entitled to vote to accept or reject the Plan.

**(i)**    **Class 9 - Subsidiary Claims**

    i.    *Classification*: Class 9 consists of all Subsidiary Claims.

    ii.    *Treatment*: Except to the extent that a Holder of a Subsidiary Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Subsidiary Claim, each Holder of such Subsidiary Claim shall receive such treatment as to render such Holder Unimpaired.

    iii.    *Voting*: Class 9 is Unimpaired under the Plan. Each Holder of a Subsidiary Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of a Subsidiary Claim will not be entitled to vote to accept or reject the Plan.

**(j)**    **Class 10 - Section 510(b) Claims**

    i.    *Classification*: Class 10 consists of all Section 510(b) Claims.

    ii.    *Treatment*: Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will

45

be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

    iii.    *Voting*: Holders of Section 510(b) Claims are deemed have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(k)**    **Class 11 - Intercompany Interests**

    i.    *Classification*: Class 11 consists of all Intercompany Interests.

    ii.    *Treatment*: Intercompany Interests shall be, at the option of the Reorganized Debtors, either: (a) Reinstated as of the Effective Date; or (b) cancelled without any distribution on account of such Interests.

    iii.    *Voting*: Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**(l)**    **Class 12 - Holdco Interests**

    i.    *Classification*: Class 12 consists of all HoldCo Interests.

    ii.    *Treatment*: On the Effective Date, all Existing Interests shall be cancelled without any distribution on account of such Interests.

    iii.    *Voting*: Holders of HoldCo Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**3.**    **Special Provisions Governing Unimpaired Claims**

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

KE 44205447

4.     **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

5.     **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.     **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

7.     **Presumed Acceptance and Rejection of the Plan**

To the extent Class 11 Intercompany Interests are Reinstated, each Holder of a Claim in Class 11 is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  To the extent Class 11 Intercompany Interests are cancelled, each Holder of a Claim in Class 11 is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

8.     **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

9.     **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

KE 44205447

### D.    Means for Implementation of the Plan

#### 1.    No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

#### 2.    Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan with (1) Cash on hand; (2) the issuance and distribution of Reorganized HoldCo Common Stock; (3) proceeds from the Exit Facility; and (4) indebtedness issued pursuant to the New Debt, or the Cash proceeds thereof.

#### 3.    Issuance and Distribution of Reorganized HoldCo Common Stock

The issuance of the Reorganized HoldCo Common Stock shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, Reorganized HoldCo shall issue all shares of Reorganized HoldCo Common Stock to Avaya Inc. (on a reorganized basis) and Avaya Inc. (on a reorganized basis) upon receipt, shall distribute all shares of Reorganized HoldCo Common Stock to the Holders of Claims or Interests pursuant to Article III.B of the Plan.

All of the shares of Reorganized HoldCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized HoldCo Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. On the Effective Date, none of the Reorganized HoldCo Common Stock will be registered under the Securities Act or listed on a national securities exchange, the Reorganized Debtors will not be reporting companies under the Securities Exchange Act, the Reorganized Debtors shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, and the Reorganized Debtors shall not be required to file monthly operating reports with the Bankruptcy Court after the Effective Date.

#### 4.    Exit Facility

Avaya Inc. and one or more Debtors (on a reorganized basis) shall enter into the Exit Facility on the Effective Date, on terms set forth in the Exit Facility Credit Agreement.

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Avaya Inc. and one or more Debtors (on a reorganized basis) in connection therewith), to the extent not approved by the Court previously, and Avaya Inc. and one or more Debtors (on a reorganized basis) are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Credit Agreement, without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Avaya Inc. and one or more Debtors (on a reorganized basis) may deem to be necessary to consummate the Exit Facility.

### 5.    New Debt

Avaya Inc. and one or more Debtors (on a reorganized basis) shall enter into the New Debt on the Effective Date, on terms set forth in the New Debt Documents.

The Debtors shall use commercially reasonable efforts to syndicate for Cash the New Debt; provided that if the Debtors do not syndicate for Cash at least $1,418,000,000 of New Debt, after refinancing the DIP Financing, on the Effective Date, Avaya Inc. (on a reorganized basis) shall issue New Debt to Holders of Cash Flow Credit Facility Secured Claims and First Lien Notes Secured Claims in accordance with Article III.B of the Plan.

Confirmation shall be deemed approval of the New Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Avaya Inc. and one or more Debtors (on a reorganized basis) in connection therewith), to the extent not approved by the Court previously, and the Avaya Inc. and one or more Debtors (on a reorganized basis) are authorized to execute and deliver those documents necessary or appropriate to obtain the New Debt, including the New Debt Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as Avaya Inc. and one or more Debtors (on a reorganized basis) may deem to be necessary to consummate the New Debt.

### 6.    General Unsecured Recovery Pool Account

On the Effective Date, the Debtors shall establish and fund the the General Unsecured Recovery Pool Account with Cash in an amount equal to the General Unsecured Recovery Pool, which shall be held in trust for Pro Rata distributions on account of General Unsecured Claims as provided herein.

The General Unsecured Recovery Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors, (y) shall be held in trust to fund distributions as provided herein, and (z) and no Liens, Claims, or Interests shall encumber the General Unsecured Recovery Pool Account in any way (whether on account of the Exit Facility, the New Debt, or otherwise); provided that funds remaining in the General Unsecured Recovery Pool Account, if any, after all Allowed General Unsecured Claims have been paid in full shall be remitted to the Reorganized Debtors.

### 7.    Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized HoldCo Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

49

### 8.       Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 9.       Cancellation of Existing Securities

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (a) the obligations of the Debtors under the Cash Flow Credit Agreement, the 7.00% Senior Secured Notes Indenture, the 9.00% Senior Secured Notes Indenture, and the Second Lien Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided that notwithstanding Confirmation and the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan.

### 10.      Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (a) the issuance of the Reorganized HoldCo Common Stock; (b) the selection of the directors and officers for Reorganized HoldCo and the other Reorganized Debtors; (c) assumption of the Executive Employee Agreements by the Reorganized Debtors; (d) implementation of the Restructuring Transactions; and (e) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized HoldCo and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized HoldCo, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized HoldCo, or the other Reorganized Debtors.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized HoldCo, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or

50

desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized HoldCo and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.J of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 11.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors, may take all actions as may be necessary or appropriate in the Debtors' sole discretion to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate  the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; and (d) all other actions that the Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 12.    Reorganized HoldCo Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date Reorganized Holdco will file the Reorganized HoldCo Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized HoldCo Organizational Documents of Reorganized Holdco will prohibit the issuance of non-voting equity securities.  After the Effective Date, Reorganized Holdco may amend and restate Reorganized HoldCo New Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized HoldCo Organizational Documents.

### 13.    Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 14.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence,

prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** The Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### 15.    Director and Officer Liability Insurance

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

### 16.    Management Equity Incentive Plan

On the Effective Date, equity grants equal to [10.0]% of the Reorganized HoldCo Common Stock (on a fully diluted basis) shall be reserved for continuing directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Debtors and set forth in the Plan Supplement.

### 17.    Employee and Retiree Benefits

#### (a)    U.S. Qualified Pension Plans

As of the Effective Date, the Reorganized Debtors shall honor and maintain the U.S. Qualified Pension Plans in accordance with applicable non-bankruptcy law, and the Reorganized Debtors reserve all of their rights thereunder.

#### (b)    Comfort Letters

As of the Effective Date, the Reorganized Debtors shall assume the AISL Comfort Letter and honor all AISL Comfort Letter Obligations in accordance with applicable non-bankruptcy law, and the Reorganized Debtors reserve all of their rights thereunder.

#### (c)    OPEB

As of the Effective Date, the Reorganized Debtors shall continue the OPEB in accordance with, and subject to, their terms and applicable non-bankruptcy law, and the Reorganized Debtors reserve all of their rights thereunder.

KE 44205447

### (d)    Workers' Compensation Programs

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors': (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

### E.    Treatment of Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (a) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) those that have been previously rejected by a Final Order; (c) those that have been previously assumed by a Final Order; (d) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (e) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (f) the Comfort Letters, which shall in all events be assumed by the Debtors pursuant to the Plan.  Notwithstanding anything in Article V.A of the Plan to the contrary, the Executive Employee Agreements shall be deemed to be entered into or assumed (as applicable) on the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date.

In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

2. **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan.

3. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; provided that nothing herein shall prevent the Reorganized Debtors, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

4. **Dispute Resolution**

In the event of a timely filed objection regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, action shall be taken following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

5. **Indemnification Obligations**

Notwithstanding anything in the Plan to the contrary each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of

the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; provided that none of the Reorganized Debtors shall amend or restate any Reorganized HoldCo Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.

### 6.        Director and Officer Liability Insurance Policies

Without limiting Article IV.O of the Plan, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto.

### 7.        Collective Bargaining Agreement

All of the Debtors' Collective Bargaining Agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all Collective Bargaining Agreements and any agreements, documents, and instruments related thereto. All Proofs of Claim Filed for amounts due under any Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided herein.

### 8.        Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9.        Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory

Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 10. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

### F. Provisions Governing Distributions

### 1. Timing and Calculations of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or with respect to General Unsecured Claims, the Initial General Unsecured Claims Distribution Date, or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the on the Effective Date or with respect to General Unsecured Claims the Initial General Unsecured Claims Distribution Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are disputed Claims, distributions on account of any such disputed Claims shall be made pursuant to the provisions set forth in <u>Article VII</u> of the Plan. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

On the Effective Date, Avaya Inc. (on a reorganized basis) shall distribute the Reorganized HoldCo Common Stock pursuant to the terms set forth in the Plan.

### 2. Rights and Powers of Distribution Agent

### (a) Powers of the Distribution Agent

The Distribution Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

### (b) Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

KE 44205447

3.        **Special Rules for Distributions to Holders of Disputed Claims and Interests**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a disputed Claim or Interest until all such disputes in connection with such disputed Claim or Interest have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim or Interest and a disputed Claim or Interest shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the disputed Claim or Interest have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to holders of Allowed Claims or Interests, as applicable, in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a disputed Claim or Interest, as applicable, in such Class that becomes an Allowed Claim or Interest after the date or dates that such dividends or other distributions were earlier paid to holders of Allowed Claims or Interests in such Class.

4.        **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)        **Record Date for Distribution**

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

(b)        **Delivery of Distributions**

i.    **Initial General Unsecured Claims Distribution Date**

Except as otherwise provided herein, on the Initial General Unsecured Claims Distribution Date, the Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the address for each Holder of an Allowed General Unsecured Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

ii.    **Quarterly Distribution Date**

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable but in any event no later than thirty (30) days after each Quarterly Distribution Date, the Distribution Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date. Any distribution that is not made on the Effective Date or with respect to General Unsecured Claims, the Initial General Unsecured Claims Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Quarterly Distribution Date after such Claim is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A of the Plan.

57

### iii.    Delivery of Distributions on account of the Cash Flow Credit Facility Secured Claims

All distributions to Holders of Cash Flow Credit Facility Secured Claims shall be deemed completed when made to the Cash Flow Credit Agreement Agent, which shall be deemed to be the Holder of all Cash Flow Credit Facility Secured Claims for purposes of distributions to be made under the Plan. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the Cash Flow Credit Agreement Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with the Cash Flow Credit Facility Documents.

### iv.    Delivery of Distributions on account of 7.00% Senior Secured Notes Secured Claims

All distributions to Holders of 7.00% Senior Secured Notes Secured Claims shall be deemed completed when made to (or at the direction of) the 7.00% Senior Secured Notes Agent, which shall be deemed to be the Holder of all 7.00% Senior Secured Notes Secured Claims for purposes of distributions to be made under the Plan. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 7.00% Senior Secured Notes Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.00% Senior Secured Notes Indenture and subject to the rights of The Bank of New York Mellon Trust Company, N.A. to assert its 7.00% Senior Secured Notes Indenture Trustee Charging Lien.

### iii.    Delivery of Distributions on account of 9.00% Senior Secured Notes Secured Claims

All distributions to Holders of 9.00% Senior Secured Notes Secured Claims shall be deemed completed when made to (or at the direction of) the 9.00% Senior Secured Notes Agent, which shall be deemed to be the Holder of all 9.00% Senior Secured Notes Secured Claims for purposes of distributions to be made under the Plan. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 9.00% Senior Secured Notes Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with the 9.00% Senior Secured Notes Indenture and subject to the rights of The Bank of New York Mellon Trust Company, N.A. to assert its 9.00% Senior Secured Notes Indenture Trustee Charging Lien.

### iv.    Delivery of Distributions on account of Second Lien Claims

All distributions to Holders of Second Lien Notes Claims shall be deemed completed when made to (or at the direction of) the Second Lien Notes Agent, which shall be deemed to be the Holder of all Second Lien Notes Claims for purposes of distributions to be made under the Plan. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the Second Lien Notes Agent shall cause such distributions to be made to or on behalf of such Holders in accordance with the Second Lien Notes Indenture and subject to the rights of Wilmington Savings Fund Society, FSB to assert its Second Lien Notes Indenture Trustee Charging Lien.

### (c)    No Fractional Shares

No fractional shares of Reorganized HoldCo Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares of Reorganized HoldCo Common Stock that is not a whole number, such Reorganized HoldCo Common Stock, as applicable,

shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of Reorganized HoldCo Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

### (d)    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.D.4 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been disallowed) and all other unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

### 5.    Securities Registration Exemption

The offering, issuance, and distribution of any Securities pursuant to the Plan are exempted from applicable federal and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 4(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof.

### 6.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Reorganized HoldCo, the Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### 7.    Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

### 8.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim, except as otherwise provided herein with respect to the distributions on account of the Cash Flow Credit Facility Secured Claims and First Lien Notes Secured Claims.

### 9.    Setoffs and Recoupment

Except as otherwise expressly provided herein, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.  In no event shall any holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless: (a) the Debtors have consented (which consent shall not be unreasonably withheld), and (b) such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 10.    Claims Paid by Third Parties

#### (a)    Claims Paid or Payable by Third Parties

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the applicable Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

#### (b)    Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent

KE 44205447

of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (c)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.    Allowance of Claims

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim. For the avoidance of doubt, there is no requirement to file a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.

### 2.    Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the exclusive authority: (a) to File, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.N of the Plan.

### 3.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any disputed Claim or disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

KE 44205447

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.        Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.        Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

### 6.        Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.        Amendments to Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.

### 8.        No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed as set forth in <u>Article VII</u> of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such disputed Claim becomes an Allowed Claim.

### 9.        Distribution After Allowance

To the extent that a disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed

KE 44205447

portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.

### 10.     Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

### H.     Settlement, Release, Injunction, and Related Provisions

### 1.     Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 2.     Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided  in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any intercompany claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with

respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

3.      **Debtor Release**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on the Confirmation Date and effective as of the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation the Plan, the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

4.      **Third Party Release**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on the Confirmation Date and effective as of the Confirmation Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the the Plan, the Disclosure Statement, or any other action or transaction relating in any way to any of the foregoing, contract, instrument, release, or other agreement or document created or entered into in connection with the the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  Notwithstanding anything contained herein, the foregoing "Third Party Release" is applicable only to the maximum extent permitted by law.**

5.      **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement,  or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from to an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that, the foregoing "Exculpation" shall be limited to the extent permitted in section 1125(e) of the Bankruptcy Code.

6.      **Injunction**

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Article VIII.C</u> or <u>Article VIII.D</u> of the Plan, shall be discharged pursuant to <u>Article VIII.B</u> of the Plan, or are subject to exculpation pursuant to <u>Article VIII.E</u> of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Article VIII.E</u> of the Plan with respect to the Exculpated Parties): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such Claims or Interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

65

### 7.    Setoffs and Recoupment

Other than with respect to any DIP Financing Claim, the Debtors may, but shall not be required to, setoff against or recoup from a Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

### 8.    Subordination Rights

Any distributions under the Plan to Holders shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### 9.    Release of Liens

Except (a) with respect to the Liens securing (i) the Exit Facility, (ii) New Debt, and (iii) to the extent elected by the Debtors with respect to an Allowed Other Secured Claim in accordance with Article III.B.2 of the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## I.    Conditions Precedent to Confirmation and Consummation of the Plan

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that, unless waived pursuant to the provisions of Article IX.C of the Plan, each of the Plan, Disclosure Statement, and Plan Supplement (including, with respect to any amendments, modifications, supplements and exhibits thereto related to the foregoing) shall be in form and substance acceptable to the Debtors.

### 2.    Conditions Precedent to the Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.C of the Plan):

      (a)      the Confirmation Order shall have been entered;

      (b)      the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.B of the Plan;

KE 44205447

(c)     the General Unsecured Recovery Pool Account shall have been established and funded in Cash in accordance with <u>Article IV.F</u> of the Plan;

(d)     Avaya Holdings Corp. shall have issued all shares of Reorganized Holdco Common Stock to Avaya Inc.;

(e)     Avaya Inc. shall have distributed all received shares of Reorganized HoldCo Common Stock as contemplated herein;

(f)     Avaya Inc. shall have executed the New Debt Documents and Avaya Inc. shall have issued the indebtedness contemplated thereby; and

(g)     the Exit Facility Credit Agreement shall have been executed and the conditions precedent to the transactions contemplated thereby shall have been satisfied or waived.

### 3.      Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived only by consent of the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

### 4.      Substantial Consummation

"Substantial consummation" of the Plan, as defined by Section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### 5.      Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

### J.      Modification, Revocation, or Withdrawal of the Plan

### 1.      Modification and Amendments

The Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

KE 44205447

## 2. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## 3. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

## K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V of the Plan, any Executory Contracts or Unexpired Leases to the schedule of Executory Contracts and Unexpired Leases to be assumed; and

KE 44205447

(c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in <u>Article VIII</u> of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Article VI.J.1</u> of the Plan;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.     enforce all orders previously entered by the Bankruptcy Court;

22.     hear any other matter not inconsistent with the Bankruptcy Code;

23.     enter an order concluding or closing the Chapter 11 Cases; and

24.     enforce the injunction, release, and exculpation provisions set forth in <u>Article VIII</u> of the Plan.

**L.     Miscellaneous Provisions**

**1.     Immediate Binding Effect**

Subject to <u>Artcile IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

**2.     Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

KE 44205447

3.      **Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

5.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6.      **Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| Debtors: | Avaya Inc.<br>4655 Great America Parkway<br>Santa Clara, CA 95054<br>Attn.:  Amy Fliegelman Olli, Adele Freedman |
| | with copies to: |
| Counsel to Debtors | Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.: James H.M. Sprayregen, P.C., Jonathan S. Henes, P.C., and Natasha S. Hwangpo |
| | Kirkland & Ellis LLP<br>Kirkland & Ellis International LLP<br>300 North LaSalle Drive<br>Chicago, Illinois  60654<br>Attn.:  Patrick J. Nash, Jr., P.C., Ryan Preston Dahl, and Bradley Thomas Giordano |

71

### 7. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8. Entire Agreement

The Plan and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 9. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable, provided that at the request of the Debtors (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

### 10. Dissolution of Committee

On the Effective Date, the Committee shall be dissolved and the Committee Members shall be deemed released of all of their duties, responsibilities, and obligations in connection with the Chapter 11 Cases and its implementation; provided that the Committee's Professionals shall be authorized to file and seek allowance of final fee applications and reimbursement of Committee Member expenses.

## VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for August 10, 2017, at [●], prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement

KE 44205447

and Solicitation Procedures. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth below no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court**.

| *Counsel to the Debtors* | |
|---|---|
| Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) <br> Ryan Preston Dahl (admitted *pro hac vice*) <br> Bradley Thomas Giordano (admitted *pro hac vice*) <br> **KIRKLAND & ELLIS LLP** <br> 300 North LaSalle <br> Chicago, Illinois 60654 | James H.M. Sprayregen, P.C. <br> Jonathan S. Henes, P.C. <br> **KIRKLAND & ELLIS LLP** <br> 601 Lexington Avenue <br> New York, New York 10022 |
| *Counsel to the DIP Lenders* | *Proposed Counsel to the Creditors' Committee* |
| Davis Polk & Wardell LLP <br> 450 Lexington Ave. <br> New York, New York 10017 <br> Attn: Damian Shaible, Esq. | Morrison & Foerster LLP <br> 250 West 55th Street <br> New York, New York 10019 <br> Attn: Lorenzo Marinuzzi, Esq. <br> Jon I. Levine, Esq. |
| *U.S. Trustee* | *Counsel to the Ad Hoc First Lien Group* |
| Office of the United States Trustee <br> The Southern District of New York <br> 201 Varick Street, Suite 1006 <br> New York, New York 10014 <br> Attn: Susan Golden, Esq. | Akin Gump Strauss Hauer & Feld LLP <br> Bank of America Tower <br> New York, New York, 10036 <br> Attn: Philip Dublin, Esq. <br> Naomi Moss, Esq. |
| *Counsel to the Ad Hoc Crossover Group* | |
| Stroock & Stroock & Lavan LLP <br> 180 Maiden Lane <br> New York, New York 10038 <br> Attn: Kristopher M. Hansen, Esq. <br> Sayan Bhattacharyya, Esq. | |

B.    **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to <u>each</u> of the Debtors. Because each of the Debtors must satisfy these requirements, it is possible that the Bankruptcy Court will enter a Confirmation Order with respect to certain Debtors and not others.[29] The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy

---

[29] For example, the Bankruptcy Court may deny Confirmation for one or more of the Debtors if such Debtor fails to obtain the requisite acceptance of the Plan from its Classes, while still confirming the Plan with respect to the other Debtors.

KE 44205447

Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that:  (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than thirty (30) days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six (6) months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

74

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### 1.    The Debtor Releases, Third-Party Releases, Exculpation, and Injunctions Provisions

Article VIII.C of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are, in each case solely in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each of the Debtors' Estates; (d) the Shareholders; (e) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII.D of the Plan provides for releases of certain claims and Causes of Action against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third-Party Release"). The Holders of Claims and Interests who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include: (a) all Holders of Claims who are deemed to accept the Plan; (b) all Holders of Claims who vote to accept the Plan; and (c) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (b), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, and officers, to the extent such director, manager, or officer provides express consent, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII.E of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The Exculpated Parties are, in each case solely in their capacity as such: (a) the Debtors; (b) the Committee Members; and (c) with respect to each of the foregoing, such Entity's current and former Interest holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII.F of the Plan permanently enjoins Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged or released pursuant to the Plan, or are subject to exculpation pursuant to the Plan, from asserting such claims, interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

75

The Plan provides that all Holders of Claims who are entitled to vote on the Plan who vote to accept the Plan will be granting a release of any claims or rights they have or may have as against many individuals and Entities.  The release that these Holders of Claims will be giving is broad and it includes any and all claims that such Holders may have against the Released Parties, which in any way relate to the Debtors, their operations either before or after the Chapter 11 Cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.  Various Holders of Claims who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a Holder has a claim or the value of the claim nor do the Debtors take a position as to whether a Holder should consent to grant this release.

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[30] Debtor releases are granted by courts in the Second Circuit where the Debtors establish that such releases are in the "best interests of the estate."[31]  Courts often find that releases pursuant to a settlement are appropriate.[32]  Additionally, in the Second Circuit, third party releases are permissible where "truly unusual circumstances" render the release terms integral to the success of the plan.[33]  The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases.  "Unusual circumstances" include instances in which: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[34]  Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release.[35]  Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[36]  In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[37]

---

[30]    See In re Adelphia Commc'ns Corp., 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); In re Oneida Ltd., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[31]    See In re Charter Commc'ns, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[32]    See, e.g., Spiegel, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); In re AMR Corp., No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); see also In re Bally Total Fitness Holding Corp., 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); accord In re Adelphia Communications Corp., 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[33]    In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142-43 (2d Cir. 2005).

[34]    Id. at 141.

[35]    In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir. 2005).

[36]    See, e.g., Oneida, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[37]    See In re Bearing Point, Inc., 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, In re DBSD N. Am., Inc., No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); In re Bally Total Fitness, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); In re WorldCom, Inc., No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

### 2.    Best Interests of Creditors Test—Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

### 3.    Creditor Recoveries

The Plan provides recoveries to, among others, the Holders of Claims in Class 1, Class 2, Class 3, Class 4, Class 5, Class 6, and Class 7. As will be shown in the Debtors' Liquidation Analysis, when filed, and as further discussed in Article II above, the Holders of General Unsecured Claims may not be entitled to any recovery if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The recoveries described in this Disclosure Statement that are available to the Holders of Claims are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided herein. The Debtors reserve, as applicable, the Debtors' or the Reorganized Debtors' right to recalibrate, as applicable, the recoveries based on, as applicable, the Debtors' or Reorganized Debtors' reasonable business judgment to account for, among other things, the Claims asserted against the Debtors' Estates after the occurrence of the Claims Bar Date.

The Debtors believe that the treatment of Claims in Classes 8, 9, 10, 11, and 12 complies with the established case law in the United States Bankruptcy Court for the Southern District of New York because the Debtors do not believe the Holders of such Claims would be entitled to a recovery in a liquidation scenario, as will be reflected in the Debtors' Liquidation Analysis, when filed

### 4.    Valuation

**The valuation information contained in this Disclosure Statement with regard to the Reorganized Debtors is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.**

---

negotiations"); Enron, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

KE 44205447

The Debtors' advisors have undertaken the Valuation Analysis, attached hereto as **Exhibit D**, to determine the value available for distribution to Holders of Allowed Claims pursuant to the Plan, and to analyze and estimate the recoveries to such Holders thereunder.  Additionally, the estimated valuation of the Reorganized HoldCo Common Stock in this Disclosure Statement is based on the Valuation Analysis, and is used to estimate range of recovery percentages under the Plan for Holders of Cash Flow Credit Facility Claims, First Lien Notes Claims, and Second Lien Notes Claims.  Accordingly, if the actual enterprise value of the Avaya Enterprise[38] differs from the estimated enterprise value in the Valuation Analysis, the actual value of the Reorganized HoldCo Common Stock and actual distributions to Holders of Cash Flow Credit Facility Claims, First Lien Notes Claims, and Second Lien Notes Claims may be materially different than the estimations set forth herein.

### 5.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit F** (the "Financial Projections").  Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement.  Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

### C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan.  A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and more than one-half in number actually voting cast their ballots in favor of acceptance of the Plan, subject to Article III of the Plan.  Section 1126(d) of the Bankruptcy Code similarly defines acceptance of a plan

---

[38]    For purposes of the Valuation Analysis, the Debtors refer to the value of the Avaya Enterprise, and not the value of the Reorganized Debtors.  The Valuation Analysis assumes an emergence date for the Reorganized Debtors of September 30, 2017.  To be consistent with this assumption, the Debtors requested Aon Hewitt to update its calculation of domestic pension, OPEB, and foreign pension underfunding from September 30, 2016 to September 30, 2017, which calculation is utilized in the Valuation Analysis.

by a class of impaired interests, however, Holders of Interests are not entitled to vote on the Plan on account of such Interests.

Article III.F of the Plan provides in full: "If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class." Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code.[39]

### D.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; provided, however, the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests, and have set forth the basis for the disparate treatment of certain Classes of Claims in Article III of the Plan. Accordingly, the Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

### 2.    Fair and Equitable Test

The fair and equitable test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and

---

[39]    In re Tribune Co., 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); see also In re Adelphia Commc'ns Corp., 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

KE 44205447

(y) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.[40]

### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest in any property.[41]

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of  (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.[42]

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING[43]

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

---

[40]    See 11 U.S.C. § 1129(b)(2)(A).

[41]    See 11 U.S.C. § 1129(b)(2)(B).

[42]    See 11 U.S.C. § 1129(b)(2)(C).

[43]    Additional Risk Factors may be found in Item 1A of the 10-K filed by the Debtors for Fiscal Year 2015 available at: https://www.avaya.com/investors/secfilings/.

KE 44205447

1.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties in interest will not object.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX.A of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

3.      **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

4.      **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

The effectiveness of the Plan is also subject to certain conditions as described in Article IX.B of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

KE 44205447

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to Chapter 11 Cases, changes in consumer demand for, and acceptance of, their products, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Debtors maintain that they have the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the

Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries that will be set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized HoldCo, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

### B.       Risks Related to Recoveries under the Plan

#### 1.       The Debtors May Not Be Able to Achieve Their Projected Financial Results

The Financial Projections attached to this Disclosure Statement as **Exhibit F** will represent the Debtors' management team's best estimate of the Avaya Enterprise's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Avaya Enterprise's operations, as well as the United States and world economies in general, and the particular industry segments in which the Avaya Enterprise operates.  The Financial Projections also depend on other factors such as the Debtors' ability to complete the sale of the Networking business and non-core IP assets, and the Debtors' ability to retain and attract key employees.  While the Debtors believe that the Financial Projections attached to this Disclosure Statement as **Exhibit F** are reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control.  If the Debtors do not achieve these projected financial results, (a) the value of the Reorganized HoldCo Common Stock may be negatively affected; (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date; and (c) the Debtors may be unable to service their debt obligations as they come due.  Moreover, the financial condition and results of operations of the Reorganized HoldCo from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Avaya Enterprise's historical financial statements.

#### 2.       The Reorganized HoldCo Common Stock Will Not Be Publicly Traded

There can be no assurance that an active market for the Reorganized HoldCo Common Stock will develop, nor can any assurance be given as to the prices at which such stock might be traded.  The Reorganized HoldCo Common Stock to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange.  Further, the Reorganized HoldCo Common Stock to be issued under the Plan has not been registered under the Securities Act or Securities Exchange Act, any state securities laws or the laws of any other jurisdiction.  Absent such registration, the Reorganized HoldCo Common Stock may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws.  As explained in more detail in Article X herein, certain recipients of Reorganized HoldCo Common Stock will be able to resell such securities without registration pursuant to the exemption provided by Rule 144 of the Securities Act, subject to any restrictions set forth in the certificate of incorporation and bylaws of the Debtors.

#### 3.       The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

As a multinational corporation, the Debtors are subject to income taxes in the U.S. and various foreign jurisdictions.  Significant judgment is required in determining the Debtors' global provision for income taxes and other tax liabilities. In the ordinary course of a global business, there are many intercompany transactions and calculations where the ultimate tax determination is uncertain. The Debtors' income tax returns are routinely subject to audits by tax authorities.  Although the Debtors regularly assess the likelihood of adverse outcomes resulting from these examinations to determine their tax estimates, a final determination of tax audits or tax disputes could have an adverse effect on their results of operations and financial condition.  The Debtors are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property and goods and services taxes in the U.S. and various foreign jurisdictions.  They are regularly under audit by tax authorities with respect to these non-income taxes and may have exposure to additional non-income tax liabilities which could have an adverse effect on the Debtors' results of operations and financial condition.

In addition, the Debtors' future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of their deferred tax assets or liabilities, or changes in tax laws or their interpretation. Such changes could have a material adverse impact on their financial results.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 94 herein.

### C.    Risks Related to the Debtors' and the Reorganized HoldCo's Businesses

#### 1.    The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the Exit Facility, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

KE 44205447

3.    **The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base**

The market in which the Debtors operate is characterized by rapid, and sometimes disruptive, technological developments, evolving industry standards, frequent new product introductions and enhancements, changes in customer requirements and a limited ability to accurately forecast future customer orders. Their future success depends in part on their ability to continue to develop technology solutions that keep pace with evolving industry standards and changing customer demands. The process of developing new technology is complex and uncertain, and if the Debtors fail to accurately predict customers' changing needs and emerging technological trends, their business could be harmed. The Debtors are required to commit significant resources to developing new products before knowing whether investments will result in products the market will accept. If the industry does not evolve as the Debtors believe it will, or if their strategy for addressing this evolution is not successful, many of their strategic initiatives and investments may be of no or limited value. Furthermore, the Debtors may not execute successfully on their strategic plan due to product planning or timing issues and technical hurdles. This could result in competitors providing those solutions before the Debtors do, in which case the Debtors could lose market share, reducing net revenues and earnings.

Additionally, the Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, including renewals of services contracts. Any migration of customers away from the Debtors' products and services would adversely impact the Debtors' operating results. It is possible that existing customers will decide not to renew or reduce their contracts with the Debtors or not to purchase more of the Debtors' products or services in the future, which could have a material adverse effect on the Debtors' business and results of operations. In these cases, there can be no assurance that the Debtors' will be able to retain these customers.

4.    **Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' businesses may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

Consumer hesitancy or limited availability of credit may constrict the business operations of the Debtors' end user customers and their channel, development, and implementation partners, and consequently impede their own operations. The consequences may include restrained or delayed investments, late payments, bad debts, and even insolvency among customers and business partners. In addition, the Debtors' prices could come under more pressure due to more intense competition or deflation. Finally, an extended period of economic deterioration could exacerbate the other risks described herein. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline, the Debtors' operating results may be materially and adversely affected.

KE 44205447

5.    **Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Business**

The Debtors have acquired and may continue to acquire companies, products and technologies that complement their strategic direction. Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and

- the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky. The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition. In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase. If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses. These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention. Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs. If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

6.    **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

87

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 7.        Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 8.        The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited access to additional financing beyond the DIP Facility. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and funding from the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) ability to comply with the terms and condition of the Interim DIP Order and Final DIP Order; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and funding from the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing in excess of the DIP facility. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing in excess of the DIP Facility is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

KE 44205447

9.      **The Reorganized HoldCo May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized HoldCo may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized HoldCo's financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized HoldCo may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized HoldCo's businesses and financial stability, however, could be material.

10.     **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations**

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the software industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

11.     **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of such plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized HoldCo's financial condition and results of operations on a post-reorganization basis.

D.      **Liquidity Risks**

The Reorganized Debtors' ability to carry out capital spending that is important to their growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan. These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

E.      **Risks Associated with Forward Looking Statement**

This Disclosure Statement contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision", "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology. The Debtors have based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtors

89

believe these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

### F.    Disclosure Statement Disclaimer

#### 1.    Information Contained in this Disclosure Statement is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 2.    This Disclosure Statement Has Not Been Approved by the United States Securities and Exchange Commission

This Disclosure Statement has not and will not be filed with the United States Securities and Exchange Commission or any state regulatory authority. Neither the United States Securities and Exchange Commission nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

#### 3.    No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice. Each Holder of a Claim or an Interest should consult such Holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

#### 4.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, or Holders of Allowed Claims, or any other parties in interest.

#### 5.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or Reorganized Debtors, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of

KE 44205447

whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 6.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### 7.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

### G.    Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is set forth in <u>Article VIII</u> of this Disclosure Statement, "<u>Statutory Requirements for Confirmation of the Plan</u>," and will also be included in the Debtors' Liquidation Analysis, when filed.

KE 44205447

## X.    CERTAIN SECURITIES LAW MATTERS

### A.    New Equity

As discussed herein, the Plan provides for the Debtors to distribute Reorganized HoldCo Common Stock to certain Holders of Allowed Claims.  The Debtors believe that the Reorganized HoldCo Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (each, a "<u>Blue Sky Law</u>").

### B.    Issuance and Resale of Securities Under the Plan

#### 1.    Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer and sale of the Reorganized HoldCo Common Stock under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent that the issuance and distribution of the Reorganized HoldCo Common Stock is covered by section 1145 of the Bankruptcy Code, the Reorganized HoldCo Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Reorganized HoldCo Common Stock generally may be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

The Plan contemplates the application of section 1145 of the Bankruptcy Code to the Reorganized HoldCo Common Stock, but at this time, the Debtors express no view as to whether the issuance of the Reorganized HoldCo Common Stock is exempt from registration pursuant to section 1145 of the Bankruptcy Code and, in turn, whether any Person may freely resell Reorganized HoldCo Common Stock without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.  Recipients of the Reorganized HoldCo Common Stock are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Reorganized HoldCo Common Stock and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

**<u>Recipients of the Reorganized HoldCo Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state Blue Sky Law.</u>**

### 2. Resale of the Reorganized HoldCo Common Stock by Persons Deemed to be "Underwriters;" Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer, of securities.  As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Reorganized HoldCo Common Stock by entities deemed to be "underwriters" (which definition includes "controlling Persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law.  Under certain circumstances, holders of Reorganized HoldCo Common Stock who are deemed to be "underwriters" may be entitled to resell their Reorganized HoldCo Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met by the holder of the securities.  The issuer of the Reorganized HoldCo Common Stock, however, does not intend to file periodic reports under the Securities Act or seek to list the Reorganized HoldCo Common Stock for trading on a national securities exchange.  Consequently, "current public information" (as such term is defined in Rule 144) regarding the issuer of the Reorganized HoldCo Common Stock is not expected to be available for purposes of sales of Reorganized HoldCo Common Stock under Rule 144 by holders who are deemed to be "underwriters."  Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person" of an issuer) with respect to the Reorganized HoldCo Common Stock would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized HoldCo Common Stock and, in turn, whether any Person may freely resell Reorganized HoldCo Common Stock.  The Debtors recommend that potential recipients of Reorganized HoldCo Common Stock consult their own counsel concerning their ability to freely trade

KE 44205447

such securities without compliance with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

### 3.  Management Equity Incentive Plan

The Plan contemplates the implementation of the MEIP, which will be included with the Plan Supplement and will reserve up to [10.0]% of the Reorganized HoldCo Common Stock for issuance.  The MEIP will be established and implemented by the Reorganized HoldCo Board as soon as reasonably practicable following the Effective Date.  The Debtors plan to issue such Reorganized HoldCo Common Stock pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by Section 4(a)(2) of the Securities Act.

## XI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of certain Claims, New Debt and the Reorganized HoldCo Common Stock.  The following discussion does not address the U.S. federal income tax consequences to Holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (ii) that are otherwise not entitled to vote under the Plan or (iii) of U.S. Qualified Pension Claims.  Any Holders of any such Claims are urged to consult their tax advisors regarding the federal, state, local, non-U.S. and other tax consequences of the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended, (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to  the Debtors, or to the Holders of Claims or Holders of New Debt or Reorganized HoldCo Common Stock in light of their individual circumstances, nor does it address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims, New Debt or Reorganized HoldCo Common Stock who are themselves in bankruptcy, persons who received their Claims, New Debt or Reorganized HoldCo Common Stock pursuant to the exercise of an employee stock option or otherwise as compensation, and regulated investment companies and those holding, or who will hold, Claims, New Debt or Reorganized HoldCo Common Stock or other certain assets, as part of a hedge, straddle, conversion, or constructive sale transaction) or U.S. Holders (as defined below) whose "functional currency" is not the U.S. dollar. The following summary does not address a Holder of New Debt or a Holder of Reorganized HoldCo Common Stock other than such a Holder that received their New Debt or their Reorganized HoldCo Common Stock in exchange for their Claim pursuant to the Plan. Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., non-income or other tax law or the

94

Medicare tax. This summary assumes that a Holder of Claims holds only Claims in a single Class and holds a Claim, New Debt or Reorganized HoldCo Common Stock as a "capital asset" (within the meaning of section 1221 of the IRC). The following discussion assumes the debt obligation(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against. This discussion also assumes that none of the debt obligations underlying the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the New Debt is not treated as a "short-term" debt instrument, a "variable rate debt instrument," or a "contingent payment debt instrument," for U.S. federal income tax purposes and that each of the debt obligations underlying the Allowed Claims and the New Debt is denominated in U.S. dollars. Holders should consult their tax advisors regarding differing and potentially adverse U.S. federal income tax consequences of ownership and disposition of the New Debt if any of the foregoing treatments apply to the New Debt or it is not denominated in U.S. Dollars. Lastly, this discussion assumes that the Restructuring Transactions will be completed in accordance with the Plan and as further described herein and in the Plan and that any transfer of Reorganized HoldCo Common Stock or New Debt in exchange for any Claim will be made by and with Avaya Inc.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim, New Debt or Reorganized Holdco Common Stock. All Holders of Claims, New Debt or Reorganized Holdco Common Stock are urged to consult their tax advisors for the federal, state, local, non-U.S., and other tax consequences of the Plan.**

A.    Certain U.S. Federal Income Tax Consequences to the Debtors

1.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the "issue price" (as described below) of the new debt issued in satisfaction of the existing indebtedness and (z) the

fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes are required to be reduced in the following order: (a) net operating loss ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. Notwithstanding this required ordering of attribute reduction, a debtor with COD Income may make an election to first to reduce the basis of its depreciable assets. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Subject to the discussion below under the heading "Excess Loss Accounts," excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member. Under the Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

In connection with the Restructuring Transactions, Debtors expect to realize significant COD Income. Because the Plan provides that holders of certain Claims will receive Reorganized HoldCo Common Stock and may receive New Debt, the exact amount of any COD Income that will be realized by the Debtors, and accordingly the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the Reorganized HoldCo Common Stock and may depend on the "issue price" of the New Debt (as described below) and will not be determinable until the consummation of the Plan. The Debtors expect that the amount of such COD Income will be significant and there will be material reductions in, or elimination of, tax attributes (including NOLs, credits and certain of the Debtors' tax basis in their assets). As discussed below under the heading "Excess Loss Accounts," it is also possible that there will be some amount of currently taxable income as a result of there being an excess loss account in the stock of one or more Debtors and COD Income of such a Debtor in excess of available tax attributes.

### 2.        Limitation on NOLs and Other Tax Attributes

As discussed above, the Debtors' NOLs will likely be materially reduced after computing the Debtors' taxes for the year in which the Plan is implemented. To the extent that any remain they will be subject to limitation as described below.

### (a)        General Section 382 Annual Limitation

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-

Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject in any "post-change year" is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 2.09 percent for April 2017). The annual limitation under section 382 represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five year period following the ownership change, that may be used each year to offset income. The Section 382 Limitation may be increased to the extent that the Debtors have a net unrealized built-in gain in their assets upon implementation of the Plan, and either recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Limitations on the use of built-in losses may be imposed if the Debtors have a net unrealized built-in loss in their assets upon implementation of the Plan. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The exchange of Reorganized HoldCo Common Stock pursuant to the Plan will result in an ownership change. The Debtors expect to have a net unrealized built-in gain in their assets as of the time the Plan is implemented.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when a debtor company's former shareholders and so called "qualified creditors" of a debtor company in Chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in Chapter 11) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Debtors' section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Debtors would not be required to reduce their NOLs by the amount of certain interest deductions claimed by the Debtors within the prior three-year period and the Reorganized Debtors may undergo a change of ownership within two years without triggering any reduction in their Section 382 annual limitation.

The Debtors have not yet determined whether they are eligible for, or, if so, whether they will elect out of, the 382(l)(5) Exception.

### 3. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT. Any unused credit is carried forward indefinitely.

### 4. Excess Loss Accounts

Generally, within a consolidated group, a corporation's basis in the stock of a subsidiary corporation is (a) increased by the income of such subsidiary and any contributions to such subsidiary and (b) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary. If total net reductions exceed the parent's initial basis in the subsidiary stock, that excess is called an "excess loss account" and is treated as negative basis. The consolidated group must recognize income equal to an excess loss account in a subsidiary's stock in certain events, including (x) on the subsidiary's recognition of COD Income (discussed above) where the COD Income is excluded from income and the consolidated group does not reduce its tax attributes by the amount of the excluded COD Income, and (y) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will recognize excluded COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the excess loss account. Furthermore, the Debtors are contemplating a number of Restructuring Transactions and it is possible that under certain circumstances the Debtors could be required to recognize gain equal to their excess loss accounts as a result of certain Restructuring Transactions. In deciding whether and to what extent to simplify their corporate structure, the Debtors will consider and attempt to minimize current and future cash tax costs and in doing so will take into account the expected cost of triggering any excess loss account into income.

### B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Certain Allowed Claims, New Debt and Reorganized HoldCo Common Stock

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

98

1.    **U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 and Class 4 Claims**

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class 3 Claims (solely for purposes of this discussion, the "Cash Flow Credit Facility Holders") and Holders of Allowed Class 4 Claims (solely for purposes of this discussion, the "First Lien Noteholders") will, in each case, receive (a) their Pro Rata share of 95.0% of Reorganized HoldCo Common Stock (subject to dilution by the Management Equity Incentive Plan) (b) Cash proceeds (if any) from the syndication of the New Debt and (c) to the extent the New Debt is not fully syndicated, their Pro Rata share of the unsubscribed portion of the New Debt.

Solely for purposes of this discussion, the term "Old Debt" means, in the case of a Cash Flow Credit Facility Holder, such Holder's beneficial interest in the Cash Flow Credit Facility, and in the case of a First Lien Noteholder, such Holder's beneficial interest in the First Lien Notes, as the case may be.

The U.S. federal income tax consequences of the Plan to U.S. Holders that are Cash Flow Credit Facility Holders and U.S. Holders that are First Lien Noteholders will depend, in part, on among other things, whether the Old Debt and the New Debt received (if any) in the exchange both constitute "securities" for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. **Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Old Debt and the New Debt as "securities" for U.S. federal income tax purposes.**

(a)    **Treatment of Cash Flow Credit Facility Holders and First Lien Noteholders that are U.S. Holders if such U.S. Holders receive New Debt and the Old Debt and New Debt are both treated as "securities" for U.S. federal income tax purposes**

This section only applies if the New Debt is not fully syndicated and the Cash Flow Credit Facility Holders and the First Lien Noteholders receive New Debt. If that is the case, and the Old Debt and the New Debt are treated as a "securities" for U.S. federal income tax purposes, the exchange of the Old Debt for New Debt and the Reorganized HoldCo Common Stock and Cash, if any, should, in each case, constitute a "recapitalization" for U.S. federal Income tax purposes.

If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder exchanging Old Debt would not recognize loss on the exchange and would generally recognize gain equal to the lesser of:

i.    the fair market value of the Reorganized HoldCo Common Stock received plus the amount of Cash received, if any, (other than to the extent attributable to

99

accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") ("boot"); and

ii.      the gain realized by the U.S. Holder (i.e., the excess of the "issue price" (as described below) of the New Debt received <u>plus</u> the fair market value of the Reorganized HoldCo Common Stock received <u>plus</u> the amount of Cash received, if any,  (in each case, other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") over the U.S. Holder's adjusted tax basis in the Old Debt surrendered in the exchange).

The adjusted tax basis of the Old Note generally will equal a U.S. Holder's purchase price for the Old Note, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to the Old Note, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Except as provided below under "—Market Discount" with respect to accrued market discount, any such gain generally will be long-term capital gain if the U.S. Holder held the Old Notes for more than one year at the time of the exchange. Long-term capital gains of a non-corporate taxpayer may be taxed at a preferential rate. The deductibility of capital losses is subject to limitations as described in more detail below under "—Limitations on Use of Capital Losses."

The determination of the "issue price" of the New Debt for purposes of this analysis will depend, in part on whether the New Debt is traded on an "established securities market" for U.S. federal income tax purposes.  The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).  [Although not free from doubt, the Debtors believe that either the New Debt or the Old Debt that is tendered for New Debt will be treated as traded on an established securities market for U.S. federal income tax purposes,] in which case the issue price of the New Debt would be equal to its fair market value, but no assurances can be given in this regard. The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the New Debt.

Except to the extent the New Debt received is attributable to accrued interest on the Old Debt, a U.S. Holder's holding period for the New Debt received will include the period of time during which the U.S. Holder held the corresponding Old Debt, and a U.S. Holder's initial tax basis in the New Debt will equal the adjusted tax basis in the Old Debt immediately prior to the exchange, decreased by the amount of any boot received and increased by the amount of gain, if any, recognized by the U.S. Holder in respect of the exchange.  Any portion of the New Debt received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date. A U.S. Holder's initial basis in the Reorganized HoldCo Common Stock will be equal to fair market value and its holding period for the Reorganized HoldCo Common Stock will generally begin the day following the Effective Date.

(b)    **Treatment of Cash Flow Credit Facility Holders and First Lien Noteholders that are U.S. Holders if (i) the Old Debt and the New Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Debt**

If (i) either the Old Debt or the New Debt is not treated as a "security" for U.S. federal income tax purposes or (ii) the Cash Flow Credit Facility Holders and First Lien Noteholders, as applicable, do not receive any New Debt, the exchange of the Old Debt for the Reorganized HoldCo Common Stock, a Pro Rata share of the unsubscribed portion of the New Debt (if any), and Cash (if any) will, in each case, constitute a fully taxable exchange under section 1001 of the IRC. Accordingly, each Cash Flow Credit Facility Holder that is a U.S. Holder and each First Lien Noteholder that is a U.S. Holder (as applicable) generally should recognize gain or loss in the exchange equal to the difference between (1) the sum of the fair market value of the Reorganized HoldCo Common Stock received <u>plus</u> the amount of Cash received, if any, <u>plus</u> the "issue price" (as discussed above) of the New Debt received, if any, (in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the Old Debt as discussed below under "—Accrued Interest") and (2) such U.S. Holder's adjusted tax basis, if any, in the Old Debt. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Old Debt in such U.S. Holder's hands, whether the Old Debt constitutes a capital asset in the hands of the U.S. Holder, whether the Old Debt was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Old Debt. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held the Old Debt for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock received should equal the fair market value of such Reorganized HoldCo Common Stock as of the date such Reorganized HoldCo Common Stock is distributed to the U.S. Holder and a U.S. Holder's tax basis in the New Debt received, if any, should equal its "issue price" (as discussed above). A U.S. Holder's holding period for the Reorganized HoldCo Common Stock received and the New Debt received, if any, should each begin on the day following the Effective Date.

2.    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 5 Claims**

Pursuant to the Plan, U.S. Holders of Allowed Class 5 Claims will receive their Pro Rata Share of 5.0% of the Reorganized HoldCo Common Stock (subject to dilution by the Management Equity Incentive Plan). This will constitute a fully taxable exchange under section 1001 of the IRC. Accordingly, each U.S. Holder of such Claim should generally recognize gain or loss equal to the difference between (1) the fair market value of the Reorganized HoldCo Common Stock to the extent such consideration is not allocable to accrued but untaxed interest (which will be treated as discussed below under —Accrued Interest) that is received in exchange for the Claim; and (2) such U.S. Holder's adjusted tax basis, if any, in the obligation constituting such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held its Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock received

KE 44205447

should equal the fair market value of such Reorganized HoldCo Common Stock. A U.S. Holder's holding period for the Reorganized HoldCo Common Stock should begin on the day following the Effective Date.

### 3.  Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income for U.S. federal income tax purposes (any such amount of interest solely for purposes of this discussion "accrued but untaxed interest"), such amount should be taxable to the U.S. Holder as ordinary interest income.  Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt underlying the surrendered Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued but unpaid interest and then as a payment of principal.  Application of these treatments to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

**U.S. Holders should consult their tax advisors concerning the allocation of consideration received in satisfaction of their Claims and the federal income tax treatment of accrued but untaxed interest.**

### 4.  Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with "original issue discount," ("OID") its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the Holder elected to include "market discount" in income as it accrued).  To the extent that the surrendered debts that were acquired with market discount

are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefore and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

### 5.     U.S. Federal Income Tax Consequences to U.S. Holders of Reorganized HoldCo Common Stock

#### (a)     Dividends on Reorganized HoldCo Common Stock

Any distributions made on account of the Reorganized HoldCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of Reorganized HoldCo Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

#### (b)     Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of Reorganized HoldCo Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the Reorganized HoldCo Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

### 6.     U.S. Federal Income Tax Consequences to U.S. Holders of the New Debt

#### (a)     Interest

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Debt exceeds the "issue price" of the New Debt by an amount equal to or greater than a statutorily defined de minimis amount, the New Debt will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the New Debt is the total of all payments due on the New Debt other than payments of

"qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

Although not free from doubt, the Debtors believe the issue price (as discussed above) of the New Debt will likely not equal the stated redemption price at maturity of such loan and the New Debt may be treated as issued with OID.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the New Debt multiplied by the number of complete years to maturity from their original issue date, or if the New Debt provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury regulations). If the New Debt is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Debt, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Debt that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Debt is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the New Debt, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the New Debt.

### (b)    Sale, Exchange or Other Taxable Disposition

Upon the sale, exchange or other taxable disposition of an interest in the New Debt, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Debt. A U.S. Holder's adjusted tax basis in their interest in the New Debt will depend on whether, as described above, the New Debt is considered a "security" for tax purposes and whether the U.S. Holder receives New Debt (if any) as part of a transaction that is treated as a reorganization for U.S. federal income tax purposes. A U.S. Holder's initial tax basis in New Debt will be increased by any previously accrued OID and decreased by any payments on the New Debt other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Debt has been held for more than one year at the time of its sale, exchange or other taxable disposition. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential rates of U.S. federal income tax in respect of long-term capital gains. The deductibility of capital losses is subject to limitations as discussed below.

### 7.    Limitations on Use of Capital Losses

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders generally may only carry over unused capital losses for the five years following the capital loss year, but are generally allowed to carry back unused capital losses to the three years preceding the capital loss year.

### C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

#### 1.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Class 3, Class 4, and Class 5 Claims

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Reorganized HoldCo Common Stock and New Debt (as applicable).

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as these consequences are determined for U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Debt and Reorganized HoldCo Common Stock."

#### (a)    Gain Recognition

Any gain recognized by a Non-U.S. Holder on the exchange of its Claims generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as described above in connection with U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Debt and Reorganized HoldCo Common Stock," the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### (b)    Accrued Interest

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

i.  the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Parent's stock entitled to vote;

ii.  the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Parent (each, within the meaning of the IRC);

iii.  the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

iv.  such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

**2.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Debt**

**(a)    Dividends on Reorganized HoldCo Common Stock**

Any distributions made with respect to Reorganized HoldCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a Non-U.S. Holder receives distributions that exceed such current and accumulated earnings and profits such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares (and, subject to the discussion below regarding "FATCA," and the third bullet point below under "—Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock," to the extent such distribution does not exceed the adjusted tax basis such amount will generally not be subject to withholding).  Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange); see discussion below of sale, redemption, or repurchase of Reorganized HoldCo Common Stock.  Subject to the discussion below regarding "FATCA," except as described below, dividends paid with respect to Reorganized HoldCo Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal

106

withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Reorganized HoldCo Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (b)    Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of Reorganized HoldCo Common Stock unless:

    i.    such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

    ii.    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

    iii.    the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of Reorganized HoldCo Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). [The Debtors do not believe, based on their current business plans and operations, that the Debtors have been nor any of the Reorganized Debtors will become in the future during the applicable specified testing period a "U.S. real property holding corporation," but there can be no assurance in this regard.] If Avaya Holdings is or becomes a "U.S. real property holding corporation," during the specified testing period, gain recognized by such Non-U.S. Holder on the sale, exchange or other disposition of Reorganized HoldCo Common Stock will be subject to tax at generally applicable U.S. federal income tax rates and a purchaser of Reorganized HoldCo Common Stock from such Non-U.S. Holder would be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition.

KE 44205447

(a)     **Payments under the New Debt**

Subject to the discussion below regarding "FATCA," payments to a Non-U.S. Holder with respect to the New Debt that are treated as interest, including payment attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

> i.     the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Reorganized Parent's stock entitled to vote;
>
> ii.    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Parent (each, within the meaning of the IRC);
>
> iii.   the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or
>
> iv.    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussion below regarding "FATCA," a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(b)     **Sale, Exchange or Other Disposition of the New Debt**

Subject to the discussion below regarding "FATCA," any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of the New Debt (other than an amount representing accrued but untaxed interest on the New Debt, which is subject to the rules discussed above under "Payments under the New Debt") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an

income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  Subject to the discussion below regarding "FATCA," in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### D.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, including U.S. source interest (including OID) paid in respect of instruments such as the New Debt and dividends, if any, on shares of  Reorganized HoldCo Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which includes the New Debt and the Reorganized HoldCo Common Stock).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such Holder's exchange any of its Claims pursuant to the Plan and on its ownership of New Debt (if any) and Reorganized HoldCo Common Stock.

### E.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of an Allowed Claim under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding, currently at a rate of 28%, with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **The U.S. federal income tax consequences of the Plan are complex.   The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of such Holder's circumstances and income tax situation.   All Holders of Claims and Interests should consult with their tax advisors as to the particular tax consequences to them under the Plan, including the applicability and effect of any state, local, non-U.S., or other tax laws, and of any change in applicable tax laws.**

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  April 13, 2017

Respectfully submitted,

Avaya Inc.,
on behalf of itself and each of the other Debtors

By:    /s/ *Eric Koza*
Name: Eric Koza
Title:  Chief Restructuring Officer
          Avaya Inc. and its Affiliated Debtors
          and Debtors in Possession

## Exhibit A

**Joint Chapter 11 Plan of Reorganization**

[FILED SEPARATELY]

**<u>Exhibit B</u>**

**Corporate Organization Chart**

KE 44205447

# Avaya's Corporate Structure



[1] The following foreign entities are subsidiaries of Debtors and not subsidiaries of Sierra Communication International LLC:  Avaya Canada Corp.; NImcat Networks General Partnership; 3102455 Nova Scotia Company; Mosaix Limited; Esna Technologies Inc.; Esna Technologies Ltd.; Avaya Mauritius Ltd.; Avaya New Zealand Ltd.; Sipera Systems Private Limited; Avaya Australia Pty Ltd.; Avaya Venezuela S.R.L.; and Knoahsoft Technologies Private Limited.

**<u>Exhibit C</u>**

**Disclosure Statement Order**

[FILED SEPARATELY]

**<u>Exhibit D</u>**

**Valuation Analysis**

## VALUATION ANALYSIS

**The information set forth herein represents a hypothetical valuation of the Avaya Enterprise, on a reorganized basis, which assumes that, among other things, the Avaya Enterprise continues as an operating business. The estimated value set forth in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Avaya Enterprise, its securities or its assets, which may be materially different than the estimate set forth in this section. Accordingly, such estimated value is not necessarily indicative of the prices at which any securities of the Avaya Enterprise may trade after giving effect to the transactions set forth in the Plan. Any such prices may be materially different than indicated by this valuation.**

**Estimates of the hypothetical enterprise value consist of the aggregate Enterprise Value of the Avaya Enterprise on a going-concern basis plus an estimated value of its intellectual property as of the assumed Effective Date. The Plan does not consolidate the Debtor entities for purposes of measuring Claims or distributions.**

The Debtors have been advised by their financial advisor, Centerview Partners LLC ("Centerview"), with respect to the estimated going concern value of the Avaya Enterprise on a consolidated going-concern basis. The estimated value of the Avaya Enterprise on a consolidated going-concern basis, excluding intellectual property ("IP" or "Patents"), represents the Avaya Enterprise's enterprise value ("Enterprise Value"). The Enterprise Value was subsequently utilized by Zolfo Cooper LLC to determine recoveries to Allowed Claims under its "waterfall" analysis. Enterprise Value plus the value of IP ("Enterprise Value including IP") represents the estimated total value of the Avaya Enterprise. Refer to the subsection titled "Intellectual Property Valuation" for a description of the valuation conducted by Houlihan Lokey IP ("HL") of the Avaya Enterprise's intellectual property. The valuation analysis described herein is based on information as of the date of the Disclosure Statement. The valuation analysis assumes that the reorganization takes place on September 30, 2017 (the "Assumed Effective Date") and is based on projections ("Financial Projections") provided by the Debtors' management ("Management") for the fiscal years ending September 2017 to 2021 (the "Forecast Period").

Based on the Financial Projections and solely for purposes of the Plan, Centerview estimates that the Enterprise Value including IP of the Avaya Enterprise falls within a range from approximately $5.1 billion to approximately $7.1 billion, with a midpoint estimate of approximately $6.1 billion, which consists of the value of the Avaya Enterprise's operations on a going-concern basis plus the value of intellectual property. For purposes of this valuation, Centerview assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Based on assumed debt at emergence of $2.0 billion, cash of $350 million, capital leases of $31 million and tax-effected pension and OPEB liabilities of $1.1 billion, and after application of the settlements and compromises set forth in Article III of the Disclosure Statement, the implied range of value for the the Reorganized HoldCo Common Stock is approximately $2.3 billion to approximately $4.3 billion, with a midpoint estimate of approximately $3.3 billion. These values do not give effect to the potentially dilutive impact of any equity granted or issued under the MEIP. Centerview's estimate of Enterprise Value and the Enterprise Value including IP does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**The assumed Enterprise Value range, as of the Assumed Effective Date, reflects work performed by Centerview on the basis of information available to Centerview as of April 7, 2017. Although subsequent developments may affect Centerview's conclusions, neither Centerview nor the Debtors have any obligation to update, revise or reaffirm the estimate.**

**The assumed value of IP, as of the Assumed Effective Date, reflects work performed by HL on the basis of information available to HL as of April 7, 2017. Although subsequent developments may affect HL's conclusions, neither HL nor the Debtors have any obligation to update, revise or reaffirm the estimate.**

When performing its analyses, Centerview assumed that the Financial Projections had been reasonably prepared in good faith and on a basis reflecting the Avaya Enterprise's most accurate currently available estimates and judgments as to the future operating and financial performance of the Avaya Enterprise. Centerview's estimated Enterprise Value range assumes the Avaya Enterprise will achieve its Financial Projections in all material respects, including revenue growth, operating margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value.

In estimating the Enterprise Value, Centerview: (a) reviewed certain historical financial information of the Avaya Enterprise for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Avaya Enterprise; (c) discussed the Avaya Enterprise's operations and future prospects with Management; (d) reviewed certain publicly available financial data for certain publicly traded technology companies; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Centerview conducted a review and analysis of the Avaya Enterprise's businesses, operating assets and liabilities and the Avaya Enterprise's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by Management, including its operational restructuring advisor, Zolfo Cooper LLC, as well as publicly available information.

Centerview did not independently verify the Financial Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Avaya Enterprise were sought or obtained in connection herewith. The Debtors developed the Financial Projections solely for purposes of the formulation and negotiation of the Plan, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

Centerview's estimated Enterprise Value does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Centerview has not been asked to and does not express any view as to what the trading value of the Avaya Enterprise's securities would be on issuance at any time.

Centerview's estimate of Enterprise Value does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the

KE 44205447

estimated Enterprise Value range of the Avaya Enterprise set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Avaya Enterprise, Centerview, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of any securities will depend upon, among other things, the operating performance of the Avaya Enterprise, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received, developments in the Avaya Enterprise's industry and economic conditions generally and other factors which generally influence the prices of securities.

When performing its analyses, HL assumed implementation of the plan post reorganization and that its related Financial Projections were reasonably prepared in good faith and on a basis reflecting the Avaya Enterprise's most accurate currently available estimates and judgments as to the future operating and financial performance of the Avaya Enterprise. HL's estimated IP value range assumes personnel and expenditures relative to continuing to prosecute and maintain its existing and future IP portfolio, and to license and or sell certain of those intellectual property assets in a robust manner. If the business generally or with respect to IP specifically, performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on estimated IP value.

In estimating the IP value, HL, among other things: (a) reviewed Avaya Enterprise's issued and pending utility patents; (b) reviewed certain internal product, operating data and other information related to the Company's Patent portfolio; (c) discussed the Avaya Enterprise's inventions, Patent portfolio, licensing and other information (past, current and prospective) with Management; (d) reviewed certain publicly available financial data for market sizing, patent applicability, royalty rates and other information germane to patent portfolio monetization; (e) considered certain industry information relevant to monetizing intellectual property in combination with going concern operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although HL conducted a review and analysis of the Avaya Enterprise's businesses, patents, and certain other operating assets and plans, it assumed and relied on the accuracy and completeness of information furnished to it by Management, including its operational restructuring advisor, Zolfo Cooper LLC, as well as publicly available information. HL did not independently verify the Financial Projections, patent related information or other items in connection with preparing estimates of Patent value.

HL's estimated Patent value does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. HL has not been asked to and does not express any view as to what the trading value of the Avaya Enterprise's Patents would be at any given point in time.

HL's estimate of Patent value does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any patents, which may be significantly different than the amounts set forth herein. In general, the value of patents is subject to numerous uncertainties and contingencies (including, but not limited to, level of Company effort, global legal trends, applicability of Company patents to current and future products, level of market adoption of those products, comparative patent positions help by other companies) that are difficult to predict and will fluctuate with changes in any of the foregoing and numerous other factors. As a result, the estimated

Patent value of the Avaya Enterprise set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Avaya Enterprise, HL, nor any other person assumes responsibility for any differences between the Patent value and such actual outcomes. Actual market prices of any patent will depend upon, among other things, prevailing royalty rates, conditions in the financial markets, IP legal environment globally (statute, administrative, and case law), conditions in the market for IP, developments in industries and technologies for which the IP is relevant, and economic conditions generally and other factors which generally influence the prices and amenability for sale or licensing of IP.

## A. VALUATION METHODOLOGY

The following is a brief summary of certain financial analyses performed by Centerview to arrive at its range of estimated Enterprise Values for the Avaya Enterprise. Centerview's estimate of the Enterprise Value of the Avaya Enterprise is based on the results of its discounted cash flow ("DCF") analysis. While Centerview recognizes that two other standard valuation methodologies are frequently used (selected comparable companies analysis and precedent transaction analysis), these methodologies were not utilized to derive estimated Enterprise Value ranges of the Avaya Enterprise due to, among other reasons, the limited comparability to the Avaya Enterprise's business.

An estimate of Enterprise Value is not entirely mathematical, but rather involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Centerview performed certain procedures and reviewed the assumptions with Management on which such analyses were based and other factors, including the projected financial results of the Avaya Enterprise. Centerview's estimated Enterprise Value is highly dependent on the Avaya Enterprise's ability to meet their Financial Projections. Centerview's valuation analysis must be considered as a whole.

i.   Discounted Cash Flow Analysis

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Avaya Enterprise's unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the firm beyond the Forecast Period known as the terminal value. Centerview also excluded pension and OPEB payments from the unlevered cash flows in order to determine Enterprise Value before the impact of underfunded pension and OPEB liabilities. The terminal value can be derived through two generally accepted approaches: (i) applying perpetuity growth rates to the terminal year normalized cash flow; and (ii) applying projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") multiples to the final projected year of the Forecast Period. Centerview utilized the perpetuity growth method to determine the terminal value.  The terminal value is then discounted back to the Assumed Effective Date, by the Discount Rate.

To estimate the Discount Rate, Centerview calculated the cost of equity and the after-tax cost of debt for the Avaya Enterprise, assuming a targeted total debt-to-total capitalization ratio based on an assumed

range of the Avaya Enterprise's long term target capitalization. Centerview calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital, the correlation of a publicly traded stock's performance to the return on the broader market as well as taking into consideration the size and situation of the company being valued. To estimate the cost of debt, Centerview relied upon estimated debt cost as provided by certain banks seeking to provide exit financing to the Avaya Enterprise.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Avaya Enterprise, which in turn affect their cost of capital and terminal values.

ii.   Intellectual Property Valuation

HL provided an estimate of value of the Debtors' entire Patent portfolio (the IP analysis is specific to patents and excludes other intellectual property, such as copyrights, trademarks, and trade secrets) as part of the Reorganization process for the Debtors (the "Patent Value"). HL focused on analyzing the Patents as a source of value and potential revenue through a systematic review of the Patents for purposes of enacting a patent monetization program. The indication of value for the Patents assumes a combination of future licensing income and programmatic patent sales of certain groupings of patents. HL utilized a "Relief From Royalty" or "Licensing Income" methodology, a derivation of the Income Approach specific to intangible assets.

The initial effort required to value the Patents included, among other things, a review and categorization of the Patents into defined technology categories. Next, HL mapped the technology categories to specific industries and market participants that may utilize the Patents in their products or services. Separately, HL determined, in collaboration with Management, that the Patents that are likely to be fundamental to an operating business (which were designated "Core Patents") and patents that were not so required, and thus more available for sale to third parties (which were designated "Non-Core Patents"). Core Patents were considered essentially as eligible for certain licensing programs only and not sales, as they are needed to operate the Avaya Enterprise's business going forward. Non-Core Patents were considered eligible for either licensing or sale depending on a number of factors. Additional patent analytic efforts were completed to develop evidence/indications of use by third-parties, which assisted in estimating the potential income that could be generated from the Patents in a monetization program.

The potential licensing income was risk-adjusted for several factors, including, but not limited to, geography, royalty base, royalty rate, timing of licensing income, potential exposure by licensees, effect of existing licenses or future product needs, potential cost of administration, and taxes. Further, HL reviewed and analyzed existing patent licensing agreements currently in place to assess the impact those "encumbrances" have on the potential licensing income.

The potential net licensing income was then discounted to its present value utilizing a rate commensurate with risks associated with enacting a patent monetization program. In this case the risk-adjusted hurdle rate reflects the Avaya Enterprise's cost of equity plus a premium allowing for IP-specific factors. Finally, HL performed several reconciling analyses to determine the reasonableness of the Patent Value, including understanding the implied patent multiple pricing of similar transacted portfolios.

As may be understood from the foregoing, an estimate of the Patent Value requires a very different set of factors than associated with valuing the operations of the Avaya Enterprise. However, such an analysis does require insight into the impact such monetization efforts may have on the operating entities. HL notes, for example, that the Avaya Enterprise has a history of patent monetization owing to predecessor companies, but has not actively sought to license its portfolio over the last five years. Accordingly, in addition to other factors already noted, specific considerations related to Management's assertiveness with regard to monetization and the market's perception of effectiveness of those efforts over time, could affect the value of the Patents.

**The summary set forth above does not purport to be a complete description of the analyses performed by Centerview and HL. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description. In performing these analyses, Centerview and HL and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions, and other matters. The analyses performed by Centerview and HL are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.**

\*    \*    \*    \*    \*

**Exhibit E**

**Liquidation Analysis**

[TO COME]

**<u>Exhibit F</u>**

**Financial Projections**

KE 44205447

## Financial Projections

In connection with the Disclosure Statement,[45] the Debtors' management team ("Management") prepared financial projections ("Financial Projections") for the Avaya Enterprise for fiscal years 2017 through 2021 (the "Projection Period").  The Financial Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Avaya Enterprise's operations.  **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized.  As described in detail in the Disclosure Statement, a variety of risk factors could affect the Avaya Enterprise's financial results and must be considered.  Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability.  The Avaya Enterprise's independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

### Principal Assumptions for the Financial Projections

The Financial Projections are based on, and assume the successful implementation of, the Avaya Enterprise's business plan ("Business Plan").  Both the Business Plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Avaya Enterprise, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Avaya Enterprise. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring in Bankruptcy Court.  Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results.  These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Avaya Enterprise to achieve the projected results of operations. See "Risk Factors."

---

[45] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* (the "Disclosure Statement").

In deciding whether to vote to accept or reject the Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections.  See "Risk Factors."  Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("ASC 852"), the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value."  The Financial Projections account for the reorganization and related transactions pursuant to the Plan.  While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections.  When the Debtors fully implement fresh start accounting, differences are anticipated and such differences could be material.

**Safe Harbor Under The Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "Exchange Act"). Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and members of its management team with respect to the timing of, completion of, and scope of the current restructuring, Plan, Business Plan, bank financing, and debt and equity market conditions and the Avaya Enterprise's future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article IX of the Disclosure Statement.

**Financial Projection General Assumptions**

Basis of presentation (non-GAAP)

- Non-GAAP P&L excludes certain expenses including intangibles amortization expense, stock-based compensation, restructuring charges, and impairment charges, as well as interest expense and taxes
- Cash Flows exclude bankruptcy-specific items such as restructuring professional fees and emergence cash sources and uses

<u>Non-GAAP P&L</u>

- Revenue
    - o Includes hardware and software product offerings across the Avaya Enterprise's UC Business, CC Business, and Networking Business; also includes related maintenance and professional services ("<u>Services</u>") revenue, as well as APCS Business revenue for managed communications services. The Avaya Enterprise's offerings are ultimately sold to end-users through a combination of direct sales and indirect sales through channel partners.
- Standard cost
    - o Primarily consists of outsourced manufacturing costs associated with hardware product revenues, as well as software royalty costs
- Other cost of goods sold (OCOGS)
    - o Primarily consists of salaries and related overhead costs of personnel engaged in manufacturing, logistics and procurement and other supply chain provisioning activities including freight, warranty costs
- Services cost of goods sold (SCOGS)
    - o Primarily consists of salaries and related overhead costs of personnel engaged in support and services, as well as APCS platform costs and other outsourced costs.
- Research and development expense (R&D)
    - o Primarily include personnel costs, outside engineering costs, professional services, prototype costs, test equipment, software usage fees and related overhead expenses.
- Sales, marketing, general and administrative expense (SG&A)
    - o Sales and marketing expenses primarily include personnel costs, sales commissions, travel, marketing promotional and lead generation programs, trade shows, professional services fees and related overhead expenses.
    - o General and administrative expenses consist primarily of salary and benefit costs for executive and administrative staff, the use and maintenance of administrative offices, including depreciation expense, logistics, information systems and legal, financial, human resources, and other corporate functions.
- Adjusted EBITDA addbacks for Non-GAAP P&L
    - o Primarily consists of depreciation expense addbacks and other comprehensive income ("<u>OCI</u>") addback; the OCI addback comprises of amortization expense (gain) related to the pension and OPEB.

<u>Cash Flows</u>

- Working capital
    - o Driven by ordinary course changes  in accounts receivable, accounts payable, inventory and deferred revenue
- Restructuring payments
    - o Payments associated with severance for headcount reductions due to termination or relocation of job functions and exiting and consolidation of facilities; primarily reflects payments for initiatives already executed as of year-end fiscal 2017
- Pension and OPEB contributions
    - o Primarily reflects US and non-US pension contributions required to satisfy minimum applicable amounts under existing law and regulations, as well as payments for other postretirement liabilities
- Other operating cash flow
    - o Primarily reflects adjustments to Adjusted EBITDA to remove non-Cash components, including adjusting to remove the OCI addback, which is a non-Cash boost to Adjusted

EBITDA in the projection period, as well as to remove the net pension and OPEB expense, which is a non-cash deduction to Adjusted EBITDA in the projection period.

- o Other items reflect timing differences between recognition of expense in the P&L vs. actual timing of Cash payments related to prepaid expenses, business partner rebates, payroll and benefits, other assets, and liabilities, etc.
- Cash Taxes
  - o FY17+ cash tax estimates based on analysis from Company's tax advisors; assumptions include $2.0 billion pro forma debt (at 6% cash interest) and tax treatment under 382(l)(6) with zero debt repayment in the projection period.
- Capital expenditures
  - o Primarily reflects corporate IT, real estate, APCS, and other investments
- Other
  - o Proceeds from sale of assets
    - ▪ Reflects upfront portion of cash proceeds from the expected sale of Networking
  - o IP monetization
    - ▪ Reflects expected proceeds from certain non-core IP assets
  - o Other activities
    - ▪ Reflects payments associated with existing sale-leaseback and property contracts

| Non-GAAP P&L<br>$ in millions | Actual<br>2016 | Proj<br>2017 | Proj<br>2018 | Proj<br>2019 | Proj<br>2020 | Proj<br>2021 |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Product | $1,755 | $1,340 | $1,116 | $1,091 | $1,116 | $1,152 |
| y-o-y growth | (14%) | (24%) | (17%) | (2%) | 2% | 3% |
| Services | $1,947 | $1,835 | $1,663 | $1,601 | $1,577 | $1,569 |
| y-o-y growth | (5%) | (6%) | (9%) | (4%) | (1%) | (1%) |
| **Total Revenue** | **$3,702** | **$3,175** | **$2,778** | **$2,691** | **$2,693** | **$2,721** |
| y-o-y growth | (9%) | (14%) | (12%) | (3%) | 0% | 1% |
| Standard Cost | $486 | $384 | $279 | $262 | $264 | $267 |
| OCOGS | $155 | $128 | $109 | $100 | $97 | $95 |
| SCOGS | $783 | $739 | $665 | $633 | $618 | $609 |
| **Non-GAAP Gross Margin** | **$2,278** | **$1,925** | **$1,726** | **$1,696** | **$1,714** | **$1,751** |
| GM % | 62% | 61% | 62% | 63% | 64% | 64% |
| **Non-GAAP Operating Costs** | | | | | | |
| R&D | $273 | $238 | $188 | $175 | $167 | $160 |
| SG&A | $1,249 | $1,116 | $961 | $902 | $859 | $825 |
| | | | | | | |
| **Non-GAAP Operating Income** | **$756** | **$571** | **$577** | **$618** | **$688** | **$766** |
| Depreciation / other addbacks | $121 | $110 | $93 | $80 | $77 | $78 |
| OCI addbacks | $62 | $95 | $99 | $100 | $89 | $76 |
| **Adjusted EBITDA** | **$940** | **$777** | **$769** | **$798** | **$855** | **$920** |
| Margin % | 25% | 24% | 28% | 30% | 32% | 34% |
| | | | | | | |
| Memo | | | | | | |
| **Adjusted EBITDAP** | **$906** | **$729** | **$712** | **$731** | **$777** | **$833** |
| Margin % | 24% | 23% | 26% | 27% | 29% | 31% |

| **Cash Flow Metrics**<br>$ in millions | Actual<br>FY16 | Proj<br>FY17 | Proj<br>FY18 | Proj<br>FY19 | Proj<br>FY20 | Proj<br>FY21 |
|---|---|---|---|---|---|---|
| Adjusted EBITDA | $940 | $777 | $769 | $798 | $855 | $920 |
| Change in Working Capital | $110 | $4 | ($49) | ($24) | ($13) | ($21) |
| Restructuring Payments | ($121) | ($85) | ($57) | ($40) | ($24) | ($20) |
| Pension / OPEB Payments | ($160) | ($192) | ($178) | ($165) | ($102) | ($101) |
| Other Operating Activities | ($175) | ($160) | ($81) | ($91) | ($95) | ($107) |
| Cash Interest | ($428) | ($120) | ($120) | ($120) | ($120) | ($120) |
| Cash Taxes | ($51) | ($39) | ($80) | ($103) | ($168) | ($188) |
| **Operating CF** | **$114** | **$184** | **$204** | **$254** | **$332** | **$363** |
| | | | | | | |
| Capital Expenditures | ($95) | ($68) | ($67) | ($66) | ($64) | ($63) |
| Acquisitions | ($20) | ($4) | $0 | $0 | $0 | $0 |
| Divestitures | $0 | $0 | $0 | $0 | $0 | $0 |
| Proceeds from Sale of Assets | $16 | $60 | $10 | $0 | $0 | $0 |
| IP Monetization Proceeds | $0 | $0 | $125 | $0 | $0 | $0 |
| Other Activities | ($24) | ($21) | ($24) | ($1) | $0 | $0 |
| **Total Other CF** | **($123)** | **($33)** | **$44** | **($67)** | **($64)** | **($63)** |
| FX | ($10) | ($11) | $0 | $0 | $0 | $0 |
| **Total CF** | **($19)** | **$140** | **$248** | **$187** | **$268** | **$301** |
| | | | | | | |
| **Memo** | | | | | | |
| Projected Ending Cash | NA | $350 | $598 | $785 | $1,053 | $1,354 |
| Projected Ending Debt | NA | $2,000 | $2,000 | $2,000 | $2,000 | $2,000 |