Hearing Date:  May 25, 2017 at 10:00 a.m. (prevailing Eastern Time)

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*,[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9282); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

**SUPPLEMENTAL DECLARATION
OF JOHN BOSACCO IN SUPPORT
OF THE DEBTORS' MOTION SEEKING
ENTRY OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF THE DEBTORS' NETWORKING
BUSINESS, (B) APPROVING THE FORM AND MANNER
OF NOTICE, (C) SCHEDULING AN AUCTION AND A SALE
HEARING, (D) APPROVING PROCEDURES FOR DETERMINING
CURE AMOUNTS, AND (E) EXTENDING THE DEADLINE TO ASSUME
OR REJECT THE BILLERICA LEASE, AND (II) AN ORDER AUTHORIZING
AND APPROVING THE SALE OF THE DEBTORS' NETWORKING BUSINESS**

I, John Bosacco, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, to the best of my knowledge, information, and belief:

1. I am over the age of 18 and competent to testify. I am a Partner in the Restructuring and Recapitalization group at Centerview Partners ("Centerview"),[2] an investment banking advisory firm and financial advisor and investment banker for Avaya Inc. ("Avaya") and certain of its affiliates (together with Avaya, collectively, the "Debtors") prior to and during these chapter 11 cases. I have more than 15 years of experience in investment banking, focusing particularly on advising and executing financing, mergers and acquisitions, and restructuring transactions across a wide range of industries. Prior to Centerview, I was a Managing Director at Miller Buckfire & Co., worked in the restructuring group at Dresdner Kleinwort Wasserstein (predecessor to Miller Buckfire & Co.), and worked in the investment banking divisions of Merrill Lynch and Chase Securities Inc. My representative telecommunications and technology related advisory work includes Alcatel-Lucent, Birch Telecom, Charter Communications, CTC Communications, the merger of Conversent Communications and FiberNet, and the merger of Conversent Communications, CTC Communications and Choice One Communications. My additional investment banking and restructuring experience includes, but is not limited to,

---

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

2

advising Border Media Partners, Caesars Entertainment Corporation (Strategic Alternatives Committee), Charter Communications (Vulcan, Inc.), Citation Corporation, Clear Channel Outdoor, CMS Energy, Crowne Group, Dana Corporation, Dana Credit Corporation, Dow Chemical, Exide Technologies, Greatwide Logistic Services, MACHGen (Secured Lenders), Pacific Crossing Limited, Peabody (Secured Lenders), Polaroid Corporation, RCS Capital, Stolt-Nielsen, Stolt Offshore, Targus Group International, United Australia/Pacific and Workflow Management. Accordingly, I am knowledgeable about restructuring, mergers and acquisitions—including sales pursuant to section 363 of the Bankruptcy Code—and financing transactions across a broad set of industries and subsectors.

2. Centerview is a global advisory-focused investment bank, and Centerview's team of professionals deliver a wide array of merger and acquisition, financial restructuring, and capital structure services to corporations, boards, and key stakeholders around the world. Centerview's Restructuring and Recapitalization group provides a full suite of advisory services for restructuring transactions consummated out of court and in chapter 11.

3. Unless otherwise stated, all facts and statements included in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me or verified by the Debtors or the Debtors' other professional advisors, including Avaya's prepetition financial advisor Goldman, Sachs & Co. ("Goldman"), and/or my opinion based upon (a) my personal knowledge of the Debtors' operations and financial performance, (b) my oversight of the sale process for the Business since late January 2017, (c) information learned from my review of relevant financial and operational data regarding the Debtors, (d) information received from members of the Debtors' management or their other advisors, including but not limited to Goldman, and (e) my experience advising both distressed and non-distressed

3

businesses and companies and their stakeholders in the technology and telecommunications sectors.

4. In connection with the Motion and the Bidding Procedures Order, I submit this supplemental declaration (this "Supplemental Declaration") to update and supplement the disclosures contained in my declaration in support of the Motion (the "Original Declaration") in accordance with I submit this declaration in support of the *Debtors' Motion Seeking Entry of (I) an Order (A) Approving Bidding Procedures in Connection with the Sale of the Debtors' Networking Business, (B) Approving the Form and Manner of Notice, (C) Scheduling an Auction and A Sale Hearing, and (D) Approving Procedures for Determining Cure Amounts, and (E) Extending the Deadline to Assume or Reject the Billerica Lease, and (II) an Order Authorizing and Approving the Sale of the Debtors' Networking Business* [Docket No. 223] (the "Motion") pursuant to Rule 6004 of the Federal Rules of Bankruptcy Procedure and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York 6004-1. I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

5. My Original Declaration attested to the sufficiency of the marketing process for the Transferred Assets prior to the filing of the Motion and the sound business purpose for the sale of the Transferred Assets. On April 5, 2017, the Court entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of the Debtors' Networking Business, (B) Approving the Stalking Horse Asset Purchase Agreement, (C) Approving the Form and Manner of Notice, (D) Scheduling an Auction and a Sale Hearing, (E) Approving Procedures for Determining Cure Amounts, and (F) Extending the Assumption/Rejection Deadline for the Billerica Lease* [Docket No. 356] (the "Bidding Procedures Order").

**The Sale Process**

6. By the Motion, the Debtors seek authority to sell certain assets (as defined in the APA, the "Transferred Assets").[3] The Sale is an important step towards maximizing the value of the Debtors' estates for all stakeholders.

7. Following the filing of the Motion, Centerview contacted 64 parties, including 41 strategic buyers, 13 financial sponsors, and 10 intellectual property non-practicing entities, which, based on Centerview's prior experience and an assessment of the market, were most likely to be interested in acquiring the Transferred Assets. Certain of the contacted parties had been contacted during the Debtors previous marketing process, while other parties were new potentially interested buyers.

8. Six of these parties entered into nondisclosure agreements, including four strategic buyers and two financial sponsors. Four of these parties received a presentation by Avaya's management, including three strategic buyers and one financial sponsor. From these four parties the Debtors received two Preliminary Bids, including a joint Preliminary Bid between a strategic buyer and a financial sponsor (the "Joint Preliminary Bid"), and a separate Preliminary Bid from a strategic buyer (the "Strategic Preliminary Bid").

9. The Joint Preliminary Bid was received by Centerview on April 3, 2017, and indicated a potential purchase price of $105 million, less the assumption of any non-debtor dark leases, to be financed with a combination of debt and equity. Following a period of due diligence, including access to the same virtual data room provided to the Stalking Horse Bidder, the financial sponsor determined it was not interested in submitting a Qualified Bid. The

---

[3] Assets of the Business include property of certain non-Debtor affiliates.

strategic buyer was unable to find a different financial sponsor to back a Qualified Bid, and therefore did not submit a Qualified Bid.

10. The Strategic Preliminary Bid was received by Centerview on May 11, 2017, and indicated a potential purchase price of $104.75 million, including the assumption of specified lease obligation liabilities. The Preliminary Bid indicated the strategic buyer had sufficient cash to support a transaction at a potential purchase price of $104.75 million or higher. After a brief period of due diligence, including access to the same virtual data room provided to the Stalking Horse Bidder, the strategic buyer indicated it was not interested in submitting a Qualified Bid.

11. Because no Qualified Bids were received by the Qualified Bid Deadline of May 18, 2017, the Debtors determined, in their business judgment, that no auction was necessary.

12. Based on my understanding of the prepetition eight-month marketing process and the extensive arm's-length and good faith negotiations between the parties, as discussed in the Original Declaration, and the subsequent marketing process following the filing of the Motion, the terms of the Stalking Horse APA have been subjected to a robust market test. Based on my experience and the extensive due diligence which I understand was conducted on the Business by Extreme, as discussed in the Original Declaration, I believe that the prepetition marketing process provided sufficient time to ensure the best possible purchase terms for an acquisition of the Business. The subsequent marketing process following the filing of the Motion further confirmed that the best possible purchase terms for an acquisition of the Business have been reached. Thus, I believe that the consummation of the Sale contemplated under the Stalking Horse APA represents the highest and best transaction available for the Business.

**Conclusion**

13. Based on the circumstances described in the Original Declaration, and the subsequent marketing process undertaken following the filing of the Motion, I believe that the terms of the Stalking Horse APA reflect the highest and best available bid for such assets, and that the sale of the Business is in the best interests of the Debtors' estates.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 23, 2017
New York, New York

*/s/ John Bosacco*
John Bosacco
Partner
Centerview Partners