James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229). The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:    4655 Great America Parkway, Santa Clara, CA 95054.

**DEBTORS' SUR-REPLY
TO MARLENE CLARK'S REPLY IN SUPPORT THE MOTION
FOR ORDER COMPELLING COMPLIANCE WITH 11 U.S.C. § 1114(e)
AND APPOINTING AN OFFICIAL COMMITTEE UNDER 11 U.S.C. § 1114(d)**

The above captioned debtors and debtors in possession respectfully submit this sur-reply in response to the Movant's reply filed at [Docket No. 635] (the "Reply") and in further opposition to the Motion.[2]

**Sur-Reply**

**I.    Mrs. Clarke's New Arguments—Raised for
        the First Time in the Reply—Are Improper and Should be Stricken[3]**

1.    Until the Reply was filed on May 21, 2017, the Movant's sole authority for the contention that survivorship benefits arising under the Avaya Inc. Supplemental Pension Plan (the "ASPP") are "retiree benefits" per section 1114(a) was a citation to the definition of "benefit" in an online dictionary.[4]  Movant cited neither statutory law nor caselaw in support of this proposition.[5]  By the Reply, the Movant now raises two new arguments and introduces new sources of law that effect.  First, Movant now asserts that the Third Circuit's construction of a "Death Benefit" arising under a plan maintained by Lucent Technologies Inc. ("Lucent") in In re Lucent Death Benefits ERISA Litigation[6] compels the determination that survivorship benefits under the ASPP are also "retiree benefits" per section 1114.[7]  Second, Movant asserts that the

---

[2]    Capitalized terms used but not immediately defined herein have the meanings set forth in the *Debtors' Objection to Marlene Clark's Motion for Order Compelling Compliance Under 11 U.S.C. § 1114(e) and Appoint an Official Committee Under 11 U.S.C. § 1114(d)* [Docket No. 609] (the "Objection").

[3]    The Debtors respectfully reserve all rights to supplement this sur-reply and present further argument and evidence in opposition to the Motion.

[4]    See Mot. ¶ 13.

[5]    See generally id.

[6]    541 F.3d 250 (3d Cir. 2008)

[7]    See Reply ¶¶ 3–5.

Debtors are both judicially and collaterally estopped from objecting to the Motion as a result of the <u>Lucent Death Benefits</u> opinion.[8]  To be clear, the <u>Lucent Death Benefits</u> case and its application to questions of administrative priority, as well as assertions of judicial and collateral estoppel, were raised for the first time by the Reply.

2.    Bankruptcy Rule 9013 provides that a motion shall "state with particularity the grounds therefor."  Local Bankruptcy Rule 9013-1 similarly provides "each Motion shall specify the rules and statutory provisions upon which it is predicated and the legal authorities that support the requested relief."  These rules reflects the more general proposition that adversaries should have a full and fair opportunity to review the bases for asserted relief, as opposed to being required to engage in "trial by surprise"—which is certainly the case here.  And, while the Debtors believe the Movant's new arguments fail on their merits, the Debtors submit they should be stricken under Bankruptcy Rule 9013 and Local Bankruptcy Rule 9013-1 given the lack of any adequate notice provided by the Movant.[9]

## II.    <u>Lucent Death Benefits</u> and the Movant's Newly-Raised Theories Have No Application Here

3.    The Debtors were spun off from Lucent in 2000.[10]  The litigation underlying the Third Circuit's opinion in <u>Lucent Death Benefits</u> commenced in October 2003,[11] in response to certain acts taken by Lucent to modify employee death benefits (as the name suggests) in

---

[8]    <u>Id.</u> ¶¶ 6–14.

[9]    In the interest of judicial economy, the Debtors have sought to identify certain of the manifest errors raised by such new arguments by this Sur-Reply, but the Debtors respectfully request the opportunity for additional briefing and fact-finding should the Court be inclined not to deny the Motion at this time.

[10]    <u>See</u> *Declaration of Eric Koza (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 22] ¶ 18 (discussing October 2000 Lucent spin-off); *Avaya Inc.,* at Nov. 23, 2015 (Form 10-K), at 44 (same).

[11]    <u>See</u> *Complaint*, <u>Foss v. Lucent Techs. Inc.</u>, Case No. 03-05017 (D.N.J. Oct. 23, 2003) [Docket No. 1].

February 2003[12]. The Third Circuit ultimately ruled on the appellate litigation arising in that matter in August 2008.[13] No Debtor-entity appears to have ever been party to that litigation.[14] In other words, the benefit plan at issue in the Lucent Death Benefits case was maintained by a separate company when that matter was litigated between 2003, and that litigation was defended by parties other than the Debtors.

4.    Moreover, the Reply's blanket assertion that "the Lucent Technologies Inc. Management Pension Plan (the 'Lucent Plan') [] is the predecessor to the [ASPP]"[15] is without support in the Reply. The Movant does not identify a single connection between the "Lucent Plan" identified in the Lucent Death Benefits case and the ASPP. Rather, the Reply only makes reference to Avaya financial statements referencing the "Lucent Technologies Inc. Management Plan" without any specific connection to the ASPP.

5.    Yet the assertion that the ASPP is somehow a "successor" —even if true[16]—is a red herring. Again, the Debtors were not parties to Lucent Death Benefits litigation (which, again, was commenced three years after the Debtors were spun off from Lucent). As discussed below, whatever construction Lucent Death Benefits may have adopted for a Lucent plan cannot be binding on the Debtors. Nor does the ASPP even contain the same "Death Benefit" that was the actual subject matter of the Lucent Death Benefits analysis. Movant therefore has no

---

[12]    See 541 F.3d at 253.

[13]    See id. at 250 (noting opinion filed on August 28, 2008).

[14]    See, e.g., Lucent Death Benefits, 541 F.3d at 253 (identifying defendant); Amended Complaint, In Lucent Death Benefits ERISA Litigation, Case No. 03-05017 (D.N.J. Nov. 10, 2005), ¶¶ 21–24 (same).

[15]    Reply at p.1.

[16]    It appears that the "Lucent Technologies Inc. Management Pension Plan," construed in Lucent Death Benefits may also be a different plan than the ASPP. The ASPP states "The Plan is a successor to the Lucent Technologies Inc. Supplemental Pension Plan in effect as of September 30, 2000," (ASPP p.1.), whereas the plan sub judice in Lucent Death Benefits was the "Lucent Technologies Inc. Management Pension Plan," 541 F.3d at 252. The ASPP was also amended and restated as of January 1, 2009. (ASPP p.1.)

3

reasonable basis to assert that Lucent Death Benefits raises issues that are "identical" to those raised by the present Motion—separate and apart from the fact that Lucent Death Benefits in no way considered application of of section 1114,[17] questions of administrative priority, and the Bankruptcy Code's more fundamental concern with the preservation of estate assets and creditor priorities.

6.      Consequently, the Movant's new argument that Lucent Death Benefits somehow precludes the Debtors from challenging the Motion fails to satisfy even basic standards of plausibility.    In terms of judicial estoppel, that doctrine applies only in limited circumstances where the same party is, among other things, making inconsistent statements before a tribunal.[18] Here, the Movant simply ignores the basic fact that the Debtors were not party to the Lucent Death Benefits litigation.[19]  The Movant's recourse to collateral estoppel similarly fails.  First, there is no reasonable argument that the Debtors had a "full and fair" opportunity to litigate in the Lucent Death Benefits case, since (a) the Debtors were never a party to that case, (b) that case involved litigation on a benefit plan that was not maintained by the Debtors, and (c) that litigation related to actions undertaken by Lucent (not the Debtors) three years after the Debtors were spun off from Lucent.[20]

---

[17]    For example, and as discussed more fully below, the ERISA Death Benefits case did not consider whether section 1114 of the Bankruptcy Code was actually intended to apply to pension programs.

[18]    See generally New Hampshire v. Maine, 532 U.S. 742, 750 (2001).

[19]    See, e.g., Reply at ¶ 7 ("The Debtors' Position Herein is Clearly Inconsistent with Lucent's Position in the ERISA Death Benefits Litigation.").

[20]    See LaFleur v. Whitman, 300 F.3d 256, 274 (2d Cir. 2002) ("Our inquiry with regard to the 'full and fair opportunity' prong of the collateral estoppel doctrine is whether [the party] was fully able to raise the same factual or legal issues [asserted in the prior proceeding].")

7.      <u>Second</u>, <u>Lucent Death Benefits</u> involved facts and issues distinct from the treatment of supplemental pension benefits under the Bankruptcy Code here.  In that case, the program at issue was a specific "Death Benefit" that provided a form of life insurance benefit upon a participating employee's death.[21]  No such "Death Benefit" exists under the ASPP. <u>Lucent Death Benefits</u> also did not address whether the survivorship provision of a supplemental pension had the effect of causing that benefit to become a "welfare benefit" for purposes of ERISA—let alone whether such a payment should be entitled to administrative priority via section 1114.  Indeed, the Third Circuit's decision in <u>Lucent Death Benefits</u> was specifically predicated on the Third Circuit's finding that "the pensioner death benefit neither provides retirement income to employees nor results in a deferral of income by employees.  Nor does the pensioner death benefit directly relate to an accrued benefit by paying out an accumulated amount of accrued benefits."[22]

8.      By contrast, the ASPP is—by its terms—a form of deferred compensation: "The Avaya Inc. Supplemental Pension Plan ('the Plan') is intended to constitute both (i) an unfunded excess benefit plan . . . and (ii) an unfunded plan primarily for the purposes of providing deferred compensation and pension benefits."[23]  Put another way, the ASPP is precisely the sort of plan <u>distinguished</u> by the <u>Lucent Death Benefits</u> court when it found that the plan at issue "neither provides retirement income to employees nor results in a deferral of income."  This distinction

---

[21]   <u>See</u> 541 F.3d at 254.

[22]   <u>Id.</u> at 255 (internal citations omitted).  Movant's reliance on <u>Rombach v. Nestle USA, Inc.</u>, 211 F.3d 190 (2d Cir. 2000) is similarly misplaced.  <u>Nestle</u> stands for the unremarkable proposition that a disability payment—a lump sum triggered by the employee's departure because of a back injury—is a disability benefit (and not a pension) because the benefit was triggered by a workplace injury.  <u>Nestle</u> in no way addressed whether a deferred compensation plan such as the ASPP could somehow be deemed a "welfare plan" because of a survivorship provision.

[23]   ASPP p.1.

5

between the ASPP and that plan construed in <u>Lucent Death Benefits</u> also carries into the plan description addressed in <u>Lucent Death Benefits</u>. That is, the Lucent Technologies Inc. Management Pension Plan classified itself as <u>both</u> a pension plan and welfare plan, thus allowing for both pension benefits and welfare benefits to arise under the same plan.[24] Conversely, the ASPP's own description identifies the ASPP as being a deferred compensation plan.[25] Thus, Movant's 11th hour recourse to collateral estoppel fails because the plan subject to analysis in <u>Lucent Death Benefits</u> was in no ways "identical" (or even relevant) to the matter under consideration here.

9.    Nor could <u>Lucent Death Benefits</u> decide the "same issue" as a matter of collateral estoppel since, as noted above, consideration of administrative priority, section 1114(a), or the intent and purpose of Bankruptcy Code's priority scheme as a whole were simply inapplicable in that non-bankruptcy litigation. The Debtors in fact dispute the Movant's contention that ERISA—and not the Bankruptcy Code—somehow controls here. While caselaw interpreting ERISA may assist in the present inquiry, <u>Howard Delivery Service, Inc. v. Zurich American Ins. Co.</u>[26] and its progeny are clear that such analysis must ultimately be directed by the more fundamental principles of the Bankruptcy Code.[27]

10.    In this regard, it is hornbook law that administrative priorities are narrowly construed.[28] This rule applies with full force to questions of priority with respect to putative

---

[24]    541 F.3d at 255 ("The Plan is classified as both a pension plan and a welfare plan under [ERISA]." (quoting plan)).

[25]    ASPP p.1.

[26]    547 U.S. 651 (2006).

[27]    <u>See</u> <u>Zurich Am.</u>, 547 U.S. at 662, 667; <u>see, e.g.</u>, <u>In re Delphi Corp.</u>, Case No. 05-44481, 2009 WL 637315, at *3 (Bankr. S.D.N.Y. March 10, 2009).

[28]    <u>See</u> <u>Trs. of Amalgamated Pension Funds v. McFarlin's, Inc.</u>, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the

employee benefit plans, where the Supreme Court has said:  "[W]e are guided in reaching our decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed.  Every claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities." [29]  This rule similarly applies to questions of asserted priority under section 1114. [30]

11.    The Movant has failed to meet this burden here—and <u>Lucent Death Benefits</u> does not prove otherwise (nor could it).  In fact, the Movant has not identified a single case in which a court has determined that a pension plan's survivorship provision causes such benefits to be "retiree benefits" per section 1114(a) of the Bankruptcy Code.  Instead, the Reply either mischaracterizes the relevant opinions or attempts to distinguish such case law by recourse to irrelevant or non-existent distinctions.

12.    Movant's approach with respect to <u>In re Farmland Industries, Inc.</u>[31] is instructive this regard.  In the Reply, Movant cites <u>Farmland Industries</u> as follows:

> However, a spouse's entitlement to payments under a plan that is triggered on her retiree-husband's death, plainly <u>does</u> qualify as a death benefit under the statute.  <u>See</u> <u>In re Farmland Indus., Inc.</u>, 294 B.R. 903, 921 (Bankr. W.D. Mo. 2003) ("Because these plans and programs provide benefits in the event of death, they constitute 'retiree benefits' within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114.")[32]

---

presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").

[29]  <u>Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.</u>, 547 U.S. 651, 667 (2006) (citations omitted).

[30]  <u>See</u> <u>Delphi</u>, 2009 WL 637315, at *3.

[31]  294 B.R. 903 (Bankr. W.D. Mo. 2003).

[32]  Reply ¶ 16.

This statement is seriously misleading. The "plans and programs" referenced by the excerpted <u>Farmland</u> passage were three separate executive life insurance programs that, by their terms, were, as the names suggests, plainly life insurance policies.[33] By contrast, the <u>Farmland</u> court determined deferred compensation plans, as opposed to life insurance plans, "are not encompassed within § 1114."[34] Read correctly, then, the cited passage from <u>Farmland</u> supports only the argument that a "spouse's entitlement to payments under a <u>life insurance</u> plan" are covered by section 1114 but in no way supports Movant's assertion that a survivorship provision in a deferred compensation program causes that plan to 'qualify as a death benefit.'

13.    The Movant's efforts to distinguish <u>Lyondell</u>, <u>Exide</u>, and <u>WorldCom</u> plays similarly fast and loose with the analysis undertaken by those courts. With regard to <u>Exide</u> and <u>WorldCom</u>, Movant attempts to distinguish those cases on the basis that "the death benefit belonged not to the retiree but to the designated beneficiary," as opposed to a situation where (as here) the beneficiary is actually prosecuting a claim.[35] But <u>Exide</u> and <u>WorldCom</u>'s determination that a survivorship provision did not create a "retiree benefit" was unrelated to any determination that the individual retiree (rather a beneficiary) was the moving party.[36] In this regard, both courts rightly determined that the survivorship provision built into a supplemental pension does not provide an "additional benefit" to the survivor; rather, such a survivorship

---

[33]    See <u>Farmland</u>, 294 B.R. at 909–11 (discussing life insurance plans). The un-excerpted passage reads in full: "<u>Under the Director Life Plan, the Supplemental Life Plan, and the Executive Life Plan</u>, the Debtors have provided varying amounts of life insurance benefits under various arrangements to Farmland's directors and top executives. Because <u>these plans and programs</u> provide benefits in the event of death, they constitute "retiree benefits" within the meaning of § 1114(a) and are therefore governed by the provisions of § 1114 that have been set out above." <u>Farmland</u>, 294 B.R. at 921 (emphasis added).

[34]    <u>Id.</u> at 921.

[35]    Reply ¶ 18.

[36]    See <u>WorldCom</u>, 364 B.R. at 549–50; <u>Exide</u>, 378 B.R. at 768–69.

8

provision simply changes the timing and method by which deferred income or pensions are ultimately distributed.[37]   And, of course, this precise question was addressed in <u>Lyondell</u>, in which (as here) the beneficiary in question was the party prosecuting the relevant motion.[38]

### III.    Movant's Argument Would Result In a Limitless and Unwarranted Expansion of Section 1114(a).

14.    At core, the Movant's argument is that the survivorship provisions of a pension program necessarily cause that program to be a "retiree benefit" entitled to administrative priority under section 1114—even if the pension benefits payable to an individual retiree were not, in themselves, entitled to such priority.   In the Movant's words, section 1114 "expressly affords priority to surviving spouses' death benefits but not to retiree's pension benefits."[39]

15.    But this response would result in a practically unlimited expansion of the administrative priority provisions of section 1114.   By law, every qualified single employer pension plan must provide survivor rights to beneficiaries.[40]   And, as a matter of practice, non-qualified, supplemental pension plans (like the ASPP) will include similar survivorship provisions such as those addressed by each of <u>Exide</u>, <u>WorldCom,</u> and <u>Lyondell</u>.   Under Movant's argument, however, such survivorship rights must be afforded administrative priority since they would then constitute a "death benefit" for purposes of section 1114.   Movant's proposed construction would then cause a radical expansion of administrative liability with respect to any pension plan.

16.    When Congress amends the Bankruptcy Code (as it did to enact section 1114),

---

[37]    <u>See, e.g.,</u> <u>WorldCom</u>, 364 B.R. at 550.

[38]    <u>See</u> 445 B.R. at 301.

[39]    Reply ¶ 30.

[40]    <u>See</u>  29 U.S.C. §§ 1055(a)(1), (c)(1)(A)(i), (c)(2)(A).

9

Congress is presumed to know that it does not write on a blank slate—including with respect to the narrow construction afforded to administrative priorities.[41]    Thus, a departure from established practice—particularly where questions of statutory priority are concerned—require a clear indicia of Congressional intent.  As the Supreme Court has recently said:  "The importance of the priority system leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure."[42]  Thus, by arguing that Congress actually intended for all pensions to contain a latent "death benefit" subject to section 1114, Movant must also be able to identify some clear indicia that Congress actually intended such a radical growth of administrative liability.

17.    Of course, no such indicia is found in the statute, and the Movant has not identified a single opinion reaching that conclusion, either.  In fact, the opposite is true.  The legislative history to section 1114 makes clear that Congress did <u>not</u> intend such a revolutionary expansion of administrative priority to all pension survivor benefits:  "This bill is not intended to affect current law treatment of pension benefits in Chapter 11 proceedings."[43]  In this regard, then, <u>Lyondell</u>, <u>Farmland</u>, <u>WorldCom</u>, and <u>Exide</u> all "got it right" in refusing to expand the definition of section 1114 in so broad a fashion as to encompass a customary pension survivorship provision.

*[Remainder of Page Intentionally Left Blank]*

---

[41]    See <u>Delphi</u>, 2009 WL 637315, at *3; <u>see also</u> <u>Dewsnup v. Tim</u>, 502 U.S. 410, 419 (1992).

[42]    <u>Czyzewski v. Jevic Holding Corp.</u>, 137 S. Ct. 973, 984 (2017).

[43]    S. Rep. No. 100-119, at 4 (1987), <u>reprinted in</u> 1988 U.S.C.C.A.N. 683, 685.  The legislative history of the final version of section 1114 consists primarily of the Senate Report and various statements by Senators and Members of Congress during passage of S. 548 and H.R. 2969.  <u>Collier on Bankruptcy</u> ¶ 1114.LH.

## Conclusion

WHEREFORE, for the foregoing reasons and as set forth in the Objection, the Debtors

request that the Court enter an Order denying the Motion.

Dated:  May 24, 2017
New York, New York

*/s/ Jonathan S. Henes, P.C.*

James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*