James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
- and -
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated August 24, 2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT CHAPTER 11
PLAN OF REORGANIZATION OF AVAYA INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

This is not a solicitation of votes to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code.  11 U.S.C. §§ 1125, 1126.  This Disclosure Statement has not been approved by the Bankruptcy Court.  This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court.  The information in this Disclosure Statement is subject to change.  This Disclosure Statement is not an offer to sell any securities and is not soliciting an offer to buy any securities.

### Important Information for You to Read

**The Deadline to vote on the Plan (the "Voting Deadline") is [October 27], 2017 at 5:00 P.M., (Prevailing Eastern Time) with respect to Classes 3, 4, 5, and 6.**

**For your vote to be counted, your Ballot must be actually received by the Notice and Claims Agent before the applicable Voting Deadline as described herein.**

Subject to Bankruptcy Court Approval, the Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests for purposes of soliciting votes to accept or reject the First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor Affiliates (the "Plan"), which is attached hereto as Exhibit A.  Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.  Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article IX herein.

The Debtors urge every Holder of a Claim entitled to vote on the Plan to:  (a) read the entire Disclosure Statement and the Plan carefully;  (b) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in Article IX of this Disclosure Statement; and (c) consult with its own advisor(s) with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, all documents attached hereto, and the proposed transactions contemplated thereby.  Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

The Plan contains a series of releases that are part of the overall compromise and settlement of various potential Claims.  In that respect, parties should be aware that, if the Plan is confirmed, they may be receiving and giving releases as set forth in Article VIII of the Plan and Article VII of this Disclosure Statement.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain events in the Debtors' chapter 11 cases.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.  The Debtors do not represent or

warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.

This Disclosure Statement was not Filed with the United States Securities and Exchange Commission (the "SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the applicable presentation date and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

The Debtors are making the statements and presenting the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan and the Plan Support Agreement.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

The securities described herein will be issued without registration under the United States Securities Act of 1933, as amended (the "Securities Act"), or any similar federal, state, or local law, in reliance on the exemptions set forth in section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable and to the extent that section 1145 is either not permitted or not applicable, the exemption set forth in section 4(a)(2) of the Securities Act, the exemption set forth in section 701 promulgated under the Securities Act or another exemption thereunder. In accordance with section 1125(e) of the Bankruptcy Code, the Debtors or any of their agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan, of the Debtors, of an

affiliate participating in the Plan with the Debtors, or of a newly organized successor to the Debtors under the Plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.  For the avoidance of doubt, the securities to be issued in connection with the Second Lien Call Procedures (as described herein), will be issued under section 4(a)(2) of the Securities Act.  All securities issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims who do not submit Ballots to accept or reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the restructuring transaction contemplated thereby.

This Disclosure Statement has not been approved or disapproved by the SEC nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

*        *        *        *        *

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     PRELIMINARY STATEMENT ................................................................................ 1

III.    TREATMENT OF CLAIMS AND INTERESTS ..................................................... 4

IV.     SOLICITATION, VOTING, AND CONFIRMATION DEADLINES ..................... 7

    A.      Solicitation Packages ..................................................................................... 7
    B.      Voting Deadline .............................................................................................. 7
    C.      Voting Procedures ........................................................................................... 7
    D.      Plan Objection Deadline ................................................................................. 8
    E.      Confirmation Hearing ..................................................................................... 9
    F.      Exit Facility .................................................................................................... 9
    G.      New Secured Debt .......................................................................................... 9
    H.      Second Lien Call Procedures ......................................................................... 9
    I.      Management Equity Incentive Plan .............................................................. 10
    J.      General Unsecured Claim Election ............................................................... 10

V.      THE DEBTORS' BACKGROUND ........................................................................ 11

    A.      The Avaya Enterprise's Operations and Corporate Structure ...................... 11
    B.      The Debtors' Prepetition Corporate and Capital Structure .......................... 15
    C.      The Debtors' Board Members and Executives .............................................. 24
    D.      Events Leading to the Chapter 11 Cases ...................................................... 28

VI.     EVENTS OF THE CHAPTER 11 CASES ............................................................. 32

    A.      First Day Pleadings and Other Case Matters ............................................... 32
    B.      The Debtors' DIP Financing and Cash Collateral Motion ........................... 35
    C.      Statements of Schedules, Rule 2015.3 Financial Reports, and Claims Bar Date ........... 37
    D.      Networking Sale ........................................................................................... 38
    E.      Pending Litigation Proceedings and Claims ................................................. 39
    F.      Avoidance Actions ....................................................................................... 40
    G.      Challenge Claims Settlement ....................................................................... 40
    H.      Plan Exclusivity ........................................................................................... 44
    I.      Key Employee Incentive Program Motion ................................................... 46
    J.      April 13 Plan ................................................................................................ 47
    K.      Plan Development; Postpetition Stakeholder Negotiations ........................... 47
    L.      Overview of the Global Plan Settlement ...................................................... 50
    M.      Plan Support Agreement .............................................................................. 56
    N.      Corporate Structure Upon Emergence .......................................................... 59
    O.      Ad Hoc Crossover Group Disclosure Statement Objection ........................... 60

VII.    SUMMARY OF THE PLAN ................................................................................. 62

    A.      Overview ...................................................................................................... 62

i

**TABLE OF CONTENTS (CONT'D)**

B.    Administrative Claims, DIP Financing Claims, Professional Fee Claims and
      Priority Tax Claims.................................................................................................62
C.    Classification and Treatment of Claims and Interests ......................................65
D.    Means for Implementation of the Plan..............................................................74
E.    Treatment of Executory Contracts and Unexpired Leases................................84
F.    Provisions Governing Distributions...................................................................87
G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims....94
H.    Settlement, Release, Injunction, and Related Provisions..................................95
I.    Conditions Precedent to Confirmation and Consummation of the Plan .........100
J.    Modification, Revocation, or Withdrawal of the Plan ....................................101
K.    Retention of Jurisdiction..................................................................................102
L.    Miscellaneous Provisions ................................................................................104

VIII.    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ....107**

A.    Confirmation Hearing.......................................................................................107
B.    Confirmation Standards....................................................................................108
C.    Acceptance by Impaired Classes ......................................................................113
D.    Confirmation without Acceptance by All Impaired Classes............................114

IX.    **CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING .........115**

A.    Bankruptcy Law Considerations.......................................................................115
B.    Risks Related to Recoveries under the Plan.....................................................119
C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses .......120
D.    Liquidity Risks..................................................................................................124
E.    Risks Associated with Forward Looking Statement ........................................124
F.    Disclosure Statement Disclaimer .....................................................................125
G.    Liquidation Under Chapter 7 ...........................................................................126
H.    Risks Related to the Second Lien Call Right....................................................126

X.    **CERTAIN SECURITIES LAW MATTERS.............................................................127**

A.    New Equity ........................................................................................................127
B.    Issuance and Resale of Securities Under the Plan ..........................................127

XI.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..............129**

A.    Certain U.S. Federal Income Tax Consequences to the Debtors .....................131
B.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain
      Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock..........135
C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain
      Allowed Claims ................................................................................................144
D.    FATCA ...............................................................................................................149
E.    Information Reporting and Backup Withholding .............................................149

XII.    **RECOMMENDATION OF THE DEBTORS..........................................................151**

**EXHIBITS**

EXHIBIT A    First Amended Joint Chapter 11 Plan of Reorganization

EXHIBIT B    Corporate Organization Chart as of the Petition Date

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Valuation Analysis

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Financial Projections

EXHIBIT G    New Secured Debt Term Sheet

EXHIBIT H    Second Lien Call Procedures

EXHIBIT I    Plan Support Agreement

EXHIBIT J    Waterfall

## I.    INTRODUCTION

Avaya Inc. ("Avaya") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* (the "Plan"), dated August 24, 2017.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  All capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to them in the Plan.

---

**The Debtors believe that the Plan is fair and equitable, provides for a larger distribution to the Debtors' creditors than would otherwise result from liquidation under chapter 7 of the Bankruptcy Code, and maximizes the value of the Debtors' Estates.  At this time, the Debtors believe the Plan is the best available alternative.  For these reasons and the reasons described herein, the Debtors strongly recommend that each creditor entitled to vote on the Plan vote to accept the Plan.**

**IMPORTANT DATES**

☐ **Date by which Ballots must be received by the Notice and Claims Agent: [October 27], 2017**
☐ **Date by which objections to the Plan must be Filed and served:  [November 1], 2017**
☐ **Date by which the Second Lien Call Right Exercise Form must be received by the Notice and Claims Agent:  [October 27], 2017**

---

## II.    PRELIMINARY STATEMENT

Collectively, the Debtors, together with their 158 non-Debtor affiliates (collectively, the "Avaya Enterprise"), are a global provider of contact center, unified communications, and networking products and services, which serve over 200,000 direct and indirect customers, consisting of multinational enterprises, small- and medium-sized businesses, and 911 services as well as government organizations operating in a diverse range of industries.  Indeed, the Avaya Enterprise is critical to supporting and maintaining these businesses' and institutions' daily operations.  Privately-held, the Avaya Enterprise reported consolidated adjusted EBITDA ("Adjusted EBITDA") of approximately $949.4 million on a worldwide basis for the twelve months ended December 31, 2016.[2]

The Avaya Enterprise employed approximately 8,800 employees worldwide as of July 23, 2017.  The Debtors' workforce consists of approximately 3,100 employees, including approximately 470 employees subject to collective bargaining agreements.  The Avaya Enterprise is headquartered in Santa Clara, California, but operates as a global enterprise, including operations across Asia, the Middle East, Europe, South America, and North America.  Globally, the Avaya Enterprise consists of 176 entities organized under the laws of various nations and jurisdictions, including the United States, various members of the European Union, Asia, Africa, South America, and the Middle East.  The Debtors in these Chapter 11 Cases consist of 18 entities, each organized under U.S. law.  An organizational chart

---

[1]    Capitalized terms used but not defined have the same meaning given to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

[2]    EBITDA is defined as net income (loss) before income taxes, interest expense, interest income and depreciation and amortization and excludes the results of discontinued operations. Under the Avaya Enterprise's debt agreements, Adjusted EBITDA is defined as EBITDA further adjusted to exclude certain charges and other adjustments, such as certain one-time charges and pension-related expenses.

illustrating the Avaya Enterprise's corporate structure in summary format as of the Petition Date is attached hereto as **Exhibit B**.  As detailed more fully herein, the Debtors entered chapter 11 to undertake a balance sheet restructuring and deleverage their capital structure.

As described throughout this Disclosure Statement, the Plan provides for a comprehensive restructuring of the Debtors' pre-bankruptcy obligations, preserves the going-concern value of the Debtors' businesses, maximizes recoveries available to all constituents, and preserves thousands of jobs.  If confirmed and consummated, the Plan will eliminate more than $3.0 billion in debt from the Debtors' balance sheet and will provide the Debtors with the capital necessary to fund distributions to the Debtors' creditors and provide the Debtors with working capital necessary to fund ongoing operations.  Following the Effective Date, the Debtors will emerge from chapter 11 with an improved, delevered balance sheet.  The Debtors intend to emerge from chapter 11 pursuant to the Plan on an expedited timeline within ten to twelve months following the Petition Date.

In developing the Plan, the Debtors engaged in good faith negotiations with many of their key stakeholders, including, among others, the Committee, PBGC and the Ad Hoc First Lien Group.  The Plan is the culmination of those discussions and embodies a global settlement of issues between the Debtors, the Committee, PBGC, and the Ad Hoc First Lien Group (the "Global Plan Settlement").  As further described in this Disclosure Statement, the components of the Global Plan Settlement include, among other things:  (i) the PBGC Settlement (as defined herein), which, among other things, provides for the termination of the Avaya Salaried Pension Plan in exchange for certain consideration, on the terms and conditions set forth therein;[3] (ii) the Valuation Settlement (as defined herein), which establishes a Settled Valuation (as defined herein) for the Avaya Enterprise of $5.721 billion (which includes $201 million attributable to certain of the Debtors' intellectual property) and the allocation of such value under the Plan in the nature of a settlement under section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019; and (iii) the Challenge Claims Settlement (as defined herein), which among other things, settles certain potential Claims and Causes of Action which could have been asserted on behalf of the Debtors.

**The Global Plan Settlement is a comprehensive settlement of all disputes between the Debtors, the Ad Hoc First Lien Group, PBGC, and the Committee.  Each provision of the Global Plan Settlement is essential to the entirety of the agreement, and the provisions or settlements contemplated by the Global Plan Settlement are inextricably intertwined.  If one aspect of the Global Plan Settlement is not approved by the Bankruptcy Court in connection with the Plan and this Disclosure Statement, the remainder of the Global Plan Settlement will no longer be valid or enforceable.**

The Plan materially delevers the Debtors' balance sheet through a material reduction in the Debtors' secured debt load and contemplates that the Holders of the Debtors' general unsecured obligations will receive a distribution in Cash (or, at their election as provided in the Plan and Solicitation Procedures, Reorganized HoldCo Common Stock) on account of their Claims.

**Consistent with the Global Plan Settlement described above, members of the Ad Hoc First Lien Group holding in excess of 55% of the First Lien Debt have entered into an agreement (as the same may be amended, modified, or amended and restated from time to time in accordance with its terms, the "Plan Support Agreement") to support the Plan.  The Plan Support Agreement is attached as Exhibit I to this Disclosure Statement and is further described in Article VI.M of this**

---

[3]    For the avoidance of doubt, the Plan does not terminate the Avaya Hourly Pension Plan, OPEB, or Non-Debtor Pensions, but instead leaves these obligations in place.

**Disclosure Statement. In addition, contemporaneously with the filing of this Disclosure Statement and the Plan, the Debtors have Filed a motion with the Bankruptcy Court seeking approval of the Plan Support Agreement. To the extent the relief requested therein is granted by the Bankruptcy Court, the Plan Support Agreement will be binding on the Debtors.**

The Debtors believe that their businesses and assets have significant value that would be materially impaired in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation, and other analyses prepared by the Debtors with the assistance of their advisors (see **Exhibits D**, **E**, and **F** to this Disclosure Statement), the value of the Debtors is substantially greater as a going concern than in a liquidation. The Debtors also believe that any alternative to Confirmation, such as an attempt by another party to obtain confirmation of a competing plan, could result in significant delays, litigation and additional costs and could have a material negative effect on value by, among other things, causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, which ultimately could reduce the recoveries for all Holders of Allowed Claims.

The Debtors seek Bankruptcy Court approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article V.A hereof);

- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article V.D hereof);

- significant events in the Chapter 11 Cases, including the Global Plan Settlement and the Plan Support Agreement (Article VI hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article VII.B and Article VII.C hereof);

- certain important effects of Confirmation of the Plan (Article VIII hereof);

- releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article VII.H hereof);

- the statutory requirements for confirming the Plan (Article VIII hereof);

- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article IX hereof);

- certain securities law matters with respect to the Plan (Article X hereof); and

- certain U.S. federal income tax consequences of the Plan (Article XI hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

3

The Debtors' boards of directors, boards of managers, and managing members (collectively, the "Authorizing Bodies"), as applicable, have approved the Plan and the transactions contemplated therein and believe the Plan is in the best interests of the Debtors, the Debtors' Estates, and the Debtors' creditors.  As such, the Authorizing Bodies recommend that all Holders of Claims entitled to vote on the Plan, vote to accept the Plan by returning their ballots, so as to be actually received by the Debtors' Notice and Claims Agent no later than **[October 27], 2017, at 5:00 p.m. prevailing Eastern Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

The Plan and all documents to be executed, delivered, assumed, and/or performed in connection with the Consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan and the Plan Support Agreement).

## III.    TREATMENT OF CLAIMS AND INTERESTS

As set forth in Article III of the Plan, and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Financing Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table below summarizes the treatment of all unclassified Claims under the Plan.  The treatment and the projected recoveries of unclassified Claims are described in summary form below for illustrative purposes only.  Risk factors addressing the effects of the actual amount of Allowed Claims exceeding the Debtors' estimates, and the effect of such variation on creditor recoveries, and other risks related to Confirmation and the Effective Date of the Plan are addressed in Article IX hereof.  To the extent that any inconsistency exists between the summary contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

Estimated Allowed Claims identified in this Article III are based on the Debtors' books and records after reasonable inquiry, and are presented assuming a hypothetical Effective Date of September 30, 2017.  Actual amounts of Allowed Claims could differ materially from the estimates set forth in the Plan, and actual recoveries could differ materially from such estimates, on account of, among other things, any rejection damages that may occur as a result of the Debtors' rejection of Executory Contracts, including those deemed rejected pursuant to Article V of the Plan.

The table below summarizes the treatment of all unclassified Claims against the Debtors under the Plan:

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7[4] |
|---|---|---|---|---|
| Administrative Claims | Unimpaired | $150,000,000 | 100.0% | 22.3%-18.9% |
| Professional Fee Claims | Unimpaired | $65,000,000 | 100.0% | 100.0%[5] |
| DIP Financing Claims | Unimpaired | $727,000,000 | 100.0% | 100.0% |
| Priority Tax Claims | Unimpaired | $14,400,000 | 100.0% | 0.0% |

The table below summarizes the classification and treatment of all classified Claims against and Interests in, the Debtors under the Plan. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.G of the Plan.[6] For all purposes under the Plan, each Class will apply for each of the Debtors (i.e., there will be eleven (11) Classes for each Debtor).[7]

**The classification, treatment, and the projected recoveries of classified Claims are described in summary form below for illustrative purposes only and are subject to material change. In particular, recoveries available to the Holders of General Unsecured Claims are estimates based on information known to the Debtors as of the date hereof and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceed the estimates provided below. In such an instance, the recoveries available to the Holders of General Unsecured Claims could be materially lower when compared to the estimates provided below.** To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0.00 | 100.0% | N/A |
| 2 | Other Secured Claims | Unimpaired | $0.00 | 100.0% | N/A |

---

[4]    The Debtors liquidation analysis (the "Liquidation Analysis") is attached hereto as **Exhibit E**.

[5]    Professional Fee Claims in a liquidation under chapter 7 will likely be entitled to full recovery because: (a) Professional Fee Claims are projected to be lower in a hypothetical conversion to chapter 7; and (b) professional fees will benefit from the priority arising under the Carve Out (as defined in the Final DIP Order).

[6]    For the avoidance of doubt, solely with respect to Debtor Avaya Holdings Corp., Class 3 shall consist of all First Lien Debt Claims other than First Lien Notes Claims.

[7]    For the avoidance of doubt, estimated Allowed Claim amounts and recoveries in the tables below are aggregate Claim amounts and recoveries for all obligated Debtors.

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|
| 3 | First Lien Debt Claims | Impaired | $4,377,586,458[8] | 94.5% | 3.3%-5.5% |
| 4 | Second Lien Notes Claims | Impaired | $1,439,960,282[9] | 1.6% | 0.0% |
| 5 | PBGC Claims | Impaired | $1,240,300,000[10] | 37.8% | 0.0% |
| 6 | General Unsecured Claims | Impaired | $305,000,000[11] | 19.7% | 0.0% |
| 7 | Prepetition Intercompany Debtor Claims | Unimpaired | N/A | 100.0% | N/A |
| 8 | Subsidiary Claims | Unimpaired | N/A | 100.0% | N/A |
| 9 | Section 510(b) Claims | Impaired | N/A | 0.0% | N/A |
| 10 | Intercompany Interests | Unimpaired | N/A | 0.0% | N/A |
| 11 | HoldCo Interests | Impaired | N/A | 0.0% | N/A |

---

[8]    Based on the Settled Valuation and other elements of the Global Plan Settlement, including with respect to the treatment of the adequate protection payments made by the Debtors to or for the benefit of Holders of First Lien Debt Claims during the pendency of the Chapter 11 Cases for Plan distribution purposes, the Allowed First Lien Debt Claims in the amount of $4,609,365,976 will be reduced by payments made as adequate protection solely to the extent by which such adequate protection payments exceed the amount of Encumbered Value that is used to satisfy administrative expenses properly allocable to Unencumbered Value for which there is insufficient Unencumbered Value to satisfy, which reduction is estimated to be approximately $232 million as of the date hereof.  The estimated Allowed First Lien Debt Claim set forth above already takes into account the foregoing reduction.

[9]    The Allowed Second Lien Notes Claims also includes accrued but unpaid interest as of the Petition Date.

[10]   The Allowed PBGC Claims include $1,240,300,000 on account of unfunded benefit liabilities with respect to the Avaya Salaried Pension Plan (as defined in the Plan), plus any and all unpaid minimum funding contributions due with respect to the Avaya Salaried Pension Plan (as defined in the Plan).

[11]   The estimated amount of Allowed General Unsecured Claims reflects a preliminary estimate based on the initial review of the Debtors and the Notice and Claims Agent of the Proofs of Claim Filed and Claims scheduled, adjusting for certain multi-debtor, duplicative, and/or amended Claims, as well as certain litigation risk and other assumptions.  Specifically, as is customary for large technology companies, the Debtors are party to a number of pending lawsuits, legal proceedings, and claims.  A number of the Claims filed in these cases as a result of those proceedings contain estimates and allegations that the Debtors disagree with.  As described in Article VI.E below, the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would interfere with the feasibility of the Plan.  However, if the Debtors do not prevail in the pending lawsuits, legal proceedings, and claims, then the actual recovery percentage for Allowed General Unsecured Claims may be substantially lower than estimated.

## IV.    SOLICITATION, VOTING, AND CONFIRMATION DEADLINES

### A.    Solicitation Packages

On August **[●]**, 2017, the Bankruptcy Court entered the Disclosure Statement Order.  For purposes of this <u>Article IV</u>, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order.  Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "<u>Solicitation Package</u>"), including:

- a copy of the Solicitation and Voting Procedures (as defined in the Disclosure Statement Order;

- the Confirmation Hearing Notice;

- a Cover Letter to the Disclosure Statement Order describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- the applicable form of Ballot, including a pre-paid, pre-addressed return envelope;

- the approved Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- a letter from the Committee encouraging the Holders of Claims in Class 6 to accept the Plan; and

- any additional documents that the Court has ordered to be made available.

The Solicitation Package may also be obtained:  (1) from the Debtors' Notice and Claims Agent by (a) visiting https://cases.primeclerk.com/avaya/Home-Index (free of charge), (b) writing to Avaya Inc. c/o Prime Clerk LLC 830 Third Avenue 3rd Floor New York, New York 10022 or (c) calling (855) 252-2156; or (2) for a fee via PACER (except for ballots) at www.nysb.uscourts.gov.

### B.    Voting Deadline

The deadline to vote on the Plan is **[October 27], 2017, at 5:00 p.m., prevailing Eastern Time** (the "<u>Voting Deadline</u>").  All votes to accept or reject the Plan must be received by the Notice and Claims Agent by the Voting Deadline.

### C.    Voting Procedures

The Debtors are distributing this Disclosure Statement, accompanied by a ballot to be used for voting to accept or reject the Plan, to the Holders of Claims entitled to vote to accept or reject the Plan.  If you are a Holder of a Claim in Class 3 (First Lien Debt Claims), Class 4 (Second Lien Notes Claims), Class 5 (PBGC Claims), or Class 6 (General Unsecured Claims), you may vote to accept or reject the Plan by completing the ballot and returning it in the envelopes provided.

Prime Clerk, LLC is the Notice and Claims Agent.  The Notice and Claims Agent is available to answer questions concerning the procedures for voting on the Plan, provide additional copies of all materials, oversee the voting process, and process and tabulate ballots for each Class entitled to vote to accept or reject the Plan.

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Notice and Claims Agent by the Voting Deadline, which is **[October 27], 2017, at 5:00 p.m., prevailing Eastern Time**, at the following address: |
| **AVAYA INC.**<br>**C/O PRIME CLERK LLC**<br>**830 3RD AVENUE, 9TH FLOOR**<br>**NEW YORK, NY 10022** |
| If you have any questions on the procedure for voting on the Plan, please call or email the Notice and Claims Agent at:<br><br>(852) 252-2156<br>avayainfo@primeclerk.com |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  All votes to accept or reject the Plan must be cast by using the appropriate ballot.  All ballots must be properly executed, completed, and delivered according to their applicable voting instructions by:  (i) first class mail, in the return envelope provided with each ballot; (ii) overnight delivery; or (iii) personal delivery, so that the ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline at the return address set forth in the applicable ballot.  Any ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.  Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder.  By signing and returning a ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim has been cast or, if any other ballots have been cast with respect to such Claim, such earlier ballots are superseded and revoked.

All ballots will be accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot, as failing to do so may result in your ballot not being counted.

### D.    Plan Objection Deadline

The Bankruptcy Court has established [November 1], 2017, at 5:00 p.m., prevailing Eastern Time, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline").  All such objections must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest, in accordance with the Disclosure Statement Order, so that they are actually received on or before the Plan Objection Deadline.  The Debtors believe that the Plan Objection Deadline, as established

by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before the Confirmation Hearing.

### E.    Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled on **[November 14], 2017, at [●], prevailing Eastern Time,** before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in Courtroom 723 of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be continued from time to time, without further notice other than an adjournment announced in open court, or a notice of adjournment Filed with the Bankruptcy Court and served on any entities who have Filed objections to the Plan.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing such hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing without further notice to parties in interest, subject to the terms of the Plan.

### F.    Exit Facility

The Plan provides for a new exit facility (the "Exit Facility"), which the Debtors expect to be in the form of a senior secured asset-based credit facility, which will be undrawn at close.

### G.    New Secured Debt

The Plan provides for the issuance of the New Secured Debt, with an aggregate principal amount of not less than $2,925 million (inclusive of any original issue discount) (the "Syndication Amount") in form and substance materially consistent with the New Secured Debt Term Sheet and otherwise acceptable to the Reorganized Debtors and the Requisite First Lien Creditors (as defined in the Plan), and subject to the New Secured Debt Term Sheet attached hereto as **Exhibit G**.  Pursuant to the Plan, Holders of First Lien Debt Claims shall receive, as part of their distribution under the Plan, their Pro Rata share of: (1) if the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount, such Holder will receive its Pro Rata share of the First Lien Cash Distribution; or (2) if the New Secured Debt is syndicated in an amount less than the Syndication Amount, such Holder will receive its Pro Rata share of the (a) unsyndicated portion of the New Secured Debt and (b) Cash in an amount equal to the proceeds from the syndication of the New Secured Debt less the New Secured Debt Cash Deductions.  Pursuant to the Plan, the Debtors must use commercially reasonable efforts to syndicate the New Secured Debt.

### H.    Second Lien Call Procedures

The Plan reflects a call right in favor of Holders of Second Lien Notes Claims with respect to Reorganized HoldCo Common Stock that otherwise will be issued to Holders of First Lien Debt under the Plan (the "Second Lien Call Right"), which call right shall be subject to the Second Lien Call Procedures attached hereto as **Exhibit H**.  Pursuant to Article III.B. of the Plan, each Holder of Second Lien Notes Claims shall receive, if the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount and the Class of Second Lien Notes Claims votes to accept the Plan, the right to exercise the Second Lien Call Right to purchase (a) at least $250,000,000 and no more than $500,000,000 of Reorganized HoldCo Common Stock for Cash or (b) 100% of the First Lien Reorganized HoldCo Equity Distribution for Cash (which shall include all rights to any post-Effective Date distribution of Cash and/or Reorganized HoldCo Common Stock that would otherwise be distributed to Holders of First Lien Debt from the General Unsecured Recovery Cash Pool Account and General Unsecured Recovery Equity

Reserve pursuant to <u>Article IV.G</u> of the Plan), in each case at a price per share equivalent to payment in full of the First Lien Debt Claims less the amount of the First Lien Cash Distribution, which shall be exercised in accordance with the Second Lien Call Procedures. Pursuant to the Second Lien Call Right, Holders of Second Lien Notes Claims have the right to purchase Reorganized HoldCo Common Stock at $284.22[12] per share, which purchase price represents (a) an approximately 26% premium to the value of the Reorganized HoldCo Common Stock under the Plan and (b) recovery of par plus accrued interest on account of the First Lien Debt Claims at the default rate on the First Lien Debt. In order to exercise the Second Lien Call Right, Holders of Second Lien Notes Claims must subscribe for an aggregate amount equal to at least $250 million. For the avoidance of doubt, if the class of Holders of Second Lien Notes Claims does not vote to accept the Plan, or the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount, the Second Lien Call Right shall be null and *void ab initio* without further action by the Debtors or any other party and no distributions shall be made pursuant to <u>Article III.B.4.c.(ii)A</u> of the Plan.

Holders of Second Lien Notes are encouraged to review the Second Lien Call Procedures for more details regarding the Second Lien Call Right. The deadline to submit a Second Lien Call Right Exercise Form is **[October 27], 2017, at 5:00 p.m., prevailing Eastern Time** (the "<u>Second Lien Call Right Exercise Form Deadline</u>"). All Second Lien Call Right Exercise Forms must be received by the Notice and Claims Agent by the Second Lien Call Right Exercise Form Deadline.

## I.    Management Equity Incentive Plan

The Plan provides for a Management Equity Incentive Plan, which would permit the reservation or issuance of Reorganized HoldCo Common Stock, or other Interests in Reorganized HoldCo, on a fully diluted basis, to directors, officers, and employees of the Reorganized Debtors, with awards and terms and conditions thereunder determined by the Reorganized HoldCo Board, except as otherwise set forth in the Executive Employment Agreement. Any Entity voting on the Plan should be aware that the Management Equity Incentive Plan may dilute equity distributions under the Plan, including with respect to distributions of Reorganized HoldCo Common Stock. The terms of the Management Equity Incentive Plan, including the amount of Reorganized HoldCo Common Stock or other Interests in Reorganized Holdco that is reserved thereunder, will be Filed in the Plan Supplement at least 14 days in advance of the Voting Deadline. It is possible that recipients of Reorganized HoldCo Common Stock or other Interests in Reorganized HoldCo under the Management Equity Incentive Plan will have received benefits under the Key Employee Incentive Program described in Article VI.I hereunder or releases as described in Article VII.H hereunder; however, no determination has been made at this time regarding who will or will not receive Reorganized HoldCo Common Stock or other Interests under the Management Equity Incentive Plan as such determination will be made by the Reorganized HoldCo Board.

## J.    General Unsecured Claim Election

Whether or not the Holder of an Allowed General Unsecured Claim votes to accept or reject the Plan, or chooses not to vote on the Plan at all, such Holder has the option to elect to receive a distribution in the form of Reorganized HoldCo Common Stock (with the number of shares being calculated based on the Reorganized Avaya Total Enterprise Value), rather than receive its Pro Rata distribution of Cash from

---

[12]    As more fully set forth in the Second Lien Call Procedures, the price per share and corresponding premium set forth herein assumes that no Holders of Allowed General Unsecured Claims submit a timely a GUC Election (i.e., electing to receive Reorganized HoldCo Common Stock and not Cash on account of such Allowed General Unsecured Claims). The Subscription Amount (as defined in the Second Lien Call Procedures) necessary to acquire all Reorganized HoldCo Common Stock otherwise distributed on account of First Lien Debt pursuant to the Second Lien Call Procedures may be subject to downward adjustment where fewer than all Holders of General Unsecured Claims timely submit GUC Elections.

the General Unsecured Recovery Cash Pool, but that choice may <u>only</u> be exercised through the Holder's ballot.  If this choice is not exercised through a proper indication in and timely submission of such Holder's ballot, the Holder will receive the distribution of Cash from the General Unsecured Recovery Cash Pool, as described in this Disclosure Statement.  For the avoidance of doubt, if a Holder makes an election to receive its Pro Rata Share of Reorganized HoldCo Common Stock, such Holder shall not be entitled to receive its Pro Rata distribution of Cash from the General Unsecured Recovery Cash Pool.

## V.    THE DEBTORS' BACKGROUND

### A.    The Avaya Enterprise's Operations and Corporate Structure

#### 1.    The Avaya Enterprise's Corporate History

The Avaya Enterprise's independent existence dates from 2000, when its equity was spun-off to public shareholders of Lucent Technologies, Inc., itself a spin-off from AT&T.  The Avaya Enterprise's equity remained publicly held until October 26, 2007, at which time the Avaya Enterprise was taken private through a transaction that valued the Avaya Enterprise's then-current operations at approximately $8.2 billion and through which the Avaya Enterprise incurred approximately $5.3 billion of funded debt.

The Avaya Enterprise presently serves over 200,000 direct and indirect customers, consisting of multinational enterprises, small- and medium-sized businesses, and "911" services, as well as government organizations operating in a diverse range of industries, including financial services, manufacturing, retail, transportation, energy, media and communications, healthcare, education, and all branches of government.  Indeed, the Avaya Enterprise is critical to supporting and maintaining these businesses' and institutions' daily operations.  The Avaya Enterprise markets its products and services in over 100 countries worldwide, relying on approximately 6,500 channel partners[13] for indirect sales which generate a substantial portion of the Avaya Enterprise's total revenue.

#### 2.    The Avaya Enterprise's Global Presence

Although the Debtors are headquartered in Santa Clara, California, the Avaya Enterprise is operated on a global basis.  Approximately 65% of the Debtors' workforce is located outside of the United States, including more than 1,100 employees located in Germany.  A substantial number of the Debtors' customers are located outside of the United States or otherwise operate on a transnational basis, and 155 of the 176 legal entities in the Avaya Enterprise are organized outside the United States.

The Avaya Enterprise believes its global footprint is an important selling point in the marketplace.  In the last twelve months ending December 31, 2016, the Debtors reported approximately $1.6 billion, or 44% of total revenue, and $172.6 million or 18% of Adjusted EBITDA, as arising from domestic non-Debtor affiliates or from outside of the United States.[14]  The Avaya Enterprise's subsidiaries organized under non-U.S. law are not debtors in these Chapter 11 Cases.

#### 3.    The Avaya Enterprise's Business Operations

As a general matter, the Avaya Enterprise leverages its global presence to offer comprehensive product and services solutions for customers.  Indeed, the Avaya Enterprise believes that its global

---

[13]    Reflects number of channel partners as of December 31, 2016.

[14]    Such revenue and Adjusted EBITDA excludes revenue and Adjusted EBITDA attributable to the Debtors' international "branch offices."

presence is a key selling point to the Avaya Enterprise's customers, particularly those of multinational enterprise scale. The Avaya Enterprise's business operations are divided into three main segments: (a) Unified Communications (the "UC Business"); (b) Contact Center (the "CC Business"); and (c) Avaya Private Cloud and Managed Services (the "APCS Business"), although some overlap exists between those operations in the ordinary course.[15]

The Avaya Enterprise's UC Business and CC Business include hardware and software product offerings ("Product"). Client software resides on both Avaya Enterprise-branded and third-party devices—including desk phones, tablets, laptops, and smartphones—and provides end-users with access to Unified Communications capabilities such as: (a) voice and video calling; (b) audio conferencing; (c) instant messaging; and (d) contact directories. Server software, on the other hand, controls communication and collaboration for enterprises, enabling the delivery of Unified Communications and customer service. The Avaya Enterprise's hardware Products include a broad range of desk phones, servers and gateways.

The Avaya Enterprise's UC Business and CC Business also include related maintenance and professional services ("Services") providing technical support and installation services for the Avaya Enterprise's Product purchased by end-users, as well as project-based deployment, design, and optimization services. Finally, the Avaya Enterprise's APCS Business provides on premises and remotely-managed communications services. As described more fully below, the Avaya Enterprise's Product and Service offerings are ultimately sold to end-users through a combination of direct sales by the Avaya Enterprise and indirect sales through channel partners.

### (a)    Product & Service Offerings

Unified Communications. The UC Business consists of the Avaya Enterprise's Product and Services offerings designed to integrate multiple technologies utilized by end-users into a single unified communications platform ("Unified Communications"), and includes products such communications software, telephones, and servers. Generally, Unified Communications permits end-users to seamlessly utilize multiple communications devices across a particular communications platform. For instance, using Unified Communications hardware and software, an end-user can begin a conversation on one device (i.e., an Avaya telephone) and continue the same conversation on another (i.e., a computer or mobile device enabled with Avaya software applications). By integrating multiple communications devices, Unified Communications ensures that end-users can manage customer and internal interactions, increasing efficiencies and avoiding communication gaps that may otherwise arise from the use of different products and technologies. The UC Business represented approximately 58% of the Avaya Enterprise's revenue in the last twelve months ending December 31, 2016.

CC Business. The CC Business is the Avaya Enterprise's platform for helping end-users manage customer call volumes and monitor relevant customer trends and metrics with the aim of improving service delivery and customer retention. The CC Business offerings are predominantly software-based and provide, among other things: (i) intelligent routing and management of incoming customer inquiries, either telephonically or through other channels, such as chat, video, and email; (ii) the streamlining of customer service functions through the identification of call trends and the provision of real-time access to historical performance data; and (iii) end-users' agents receiving instant on-demand access to customer information in order to increase productivity and better address customer needs. The CC Business is

---

[15] The Avaya Enterprise's prepetition SEC filings reported segments using the Global Communications Solutions (GCS), Avaya Networking and Avaya Global Services classifications. GCS included UC and CC Product; Avaya Networking included Networking Product; Avaya Global Services included Service offerings (maintenance and professional services) related to UC, CC and Networking Product; Avaya Global Services also included the APCS Business.

deployed across multiple industries and is relied upon for such critical functions as supporting "911," "311," and other government operators and agencies. Additionally, the CC Business is utilized by multiple major universities and over 1,000 health institutions. The CC Business represented approximately 27% of revenue in the last twelve months ending December 31, 2016.

Networking Business. The Networking Business was the Avaya Enterprise's computer and data networking offering until its recent sale to Extreme Networks Inc. The Networking Business represented approximately 7% of the Avaya Enterprise's revenue in the last twelve months ending December 31, 2016. As discussed more fully herein, the Debtors, after an expansive marketing process, determined to sell the Networking Business pursuant to section 363 of the Bankruptcy Code utilizing a "stalking horse" bidder. The sale of the Networking Business was consummated on July 14, 2017.

APCS. The APCS Business provides managed and outsourcing services for customers' communications environments. These services can be procured in standard packages or in fully custom arrangements that include on-premises staffing or private cloud options, as well as the option to install required technologies and infrastructure. The APCS Business provides customers with the option of a recurring operating expense (rather than a one-time capital expenditure) for accessing the Avaya Enterprise's latest communications technologies. In contrast to the Avaya Enterprise's Services offerings (where the end-user of Products contacts the Avaya Enterprise for support only when technical issues are encountered) the APCS Business model entails ongoing monitoring of customers' communications environment to proactively identify issues and provide required support and managed services. The APCS Business represented approximately 8% of the Avaya Enterprise's revenue in the last twelve months ending December 31, 2016.

### (b)    Direct & Indirect Sales Channels

The Avaya Enterprise has a direct or indirect presence in over 100 countries, operating a sales model that recognizes revenue through both direct sales by the Avaya Enterprise ("Direct Sales") and indirect sales by approximately 6,500 third-party channel partners ("Indirect Sales") as of December 31, 2016. As detailed more fully below, only a limited, albeit significant, percentage of the Avaya Enterprise's revenue is generated directly by the Avaya Enterprise. Rather, the Avaya Enterprise generally relies on a broad-based network of channel partners to deliver Product and Services offerings to end-users.

Direct Sales. With respect to Products and Services, Direct Sales are sales made directly by the Avaya Enterprise to end-users. Direct Sales for Product and Services made up approximately 26% (for Product) and 45% (for Services) of the Avaya Enterprise's global revenue, respectively, in the last twelve months ending December 31, 2016.

Indirect Sales for Product. The Avaya Enterprise's Indirect Sales for Product are accomplished through: (i) sales to channel partners ("Tier 1 Partners"), who subsequently sell Product to end-user customers; and (ii) sales to intermediaries ("Distributors") who subsequently sell Product to channel partners ("Tier 2 Partners") who then sell Product to end-users. Indirect Sales through Tier 1 Partners and Tier 2 Partners accounted for approximately 74% of Product revenues in the last twelve months ending December 31, 2016. The Avaya Enterprise recognizes revenues when Product is delivered to Tier 1 Partners and Distributors, with payments subsequently collected by the Avaya Enterprise from the same. With Indirect Sales for Product, the Avaya Enterprise does not collect payments from end-users or Tier 2 Partners.

Individual terms can vary, but in general the agreements utilized by the Avaya Enterprise to contract with Tier 1 Partners, Tier 2 Partners, and Distributors have standard one year terms with

automatic renewals, and may generally be terminated with: (i) 30 days prior notice for Tier 1 Partners and Tier 2 Partners; and (b) 90 days prior notice for Distributors. The agreements, however, do not require Tier 1 Partners, Tier 2 Partners, or Distributors to exclusively purchase or sell the Avaya Enterprise's Product offerings. More fundamentally, Tier 1 Partners, Tier 2 Partners, and Distributors are critical to the Debtors' continued performance.

Indirect Sales for Services. Indirect Sales for Services are accomplished through a combination of: (i) retail sales ("Retail"), (ii) wholesale sales, ("Wholesale"), and (iii) co-delivery sales ("Co-Delivery"). Under the Retail method, channel partners sell Services on behalf of the Avaya Enterprise to end-users through the execution of contracts between the applicable user and the Avaya Enterprise. The Avaya Enterprise is responsible for, and delivers Services to, the end-user in exchange for a commission paid to the applicable Retail partner. Under the Wholesale method, the Avaya Enterprise also delivers Services under the Avaya Enterprise's name and handles customer calls, but the Avaya Enterprise does not contract directly with the end-user as the partner is responsible for billing and collections. Under the Co-Delivery method, the Avaya Enterprise's third-party partners package the Services under the partners' own contractual terms, Services are sold under the third-party partner's name (not the Avaya Enterprise's), and the Avaya Enterprise only fields "escalation" calls from customers as opposed to regular or day-to-day services calls. Indirect Sales accounted for approximately 55% of Services revenues in the last twelve months ending December 31, 2016.

4.    **The Avaya Enterprise's Intellectual Property**

The Avaya Enterprise owns a significant number of patents and files new applications to protect its research and development investments in new products and services, as necessary. As of September 30, 2016, the Avaya Enterprise had approximately 5,400 patents and pending patent applications, including foreign counterpart patents and foreign applications. Of this total, approximately 1,300 patents owned by the Debtors are registered in, or arise under, non-U.S. jurisdictions. The Avaya Enterprise's patents and pending patent applications cover a wide range of products and services involving a variety of technologies, including, but not limited to, Unified Communications (including video, social media, telephony, and messaging), Contact Centers, wireless communications, and Networking. In addition to its patents and patent applications, the Avaya Enterprise also holds: (a) licenses to intellectual property for the manufacture, use, and sale of its products; and (b) various trademarks and copyrights.

Additionally, Avaya has licensed the use of certain of its intellectual property outside the United States to Avaya Holdings, Ltd ("AHL"), a non-Debtor affiliate organized under the laws of Ireland, including certain hardware and software-based telecommunications products, systems, and solutions.[16] AHL is also party to a cost sharing agreement with Avaya regarding the development of intellectual property between Avaya and AHL, and through which AHL holds certain rights to exploit materials developed through these agreements.

---

[16]    Specifically, the Licensing Agreement granted AHL a non-exclusive license over certain of the Avaya Enterprise's then existing intellectual property, including hardware and software-based telecommunications products, systems, and solutions then sold as: (a) Avaya's Customer Relationship Management Solutions ("CRM Solutions"); (b) Avaya's Unified Communications Systems Solutions ("UCS Solutions"); (c) Avaya's Converged Enterprise Solutions ("CE Solutions"); and (d) any derivative or succeeding product of the CRM Solutions, UCS Solutions, and CE Solutions. The Licensing Agreement did not, however, grant AHL any rights with respect to: (a) any professional, maintenance, and other services associated with each of the CRM Solutions, UCS Solutions, and CE Solutions; and (b) any hardware and software-based telecommunications products, systems, and solutions that were then developed, manufactured, and sold as Index, Network Alchemy, and IP Office, or any professional, maintenance, and other services associated with Index, Network Alchemy, or IP Office.

5.       **The Avaya Enterprise's Employees**

The Avaya Enterprise had approximately 8,800 employees as of July 23, 2017 with a limited number of part-time employees, contractors, and temporary employees who are employed either directly or through temporary staffing agencies. The Debtors, in turn, have approximately 3,100 employees. Approximately 470 of the Debtors' employees are subject to collective bargaining agreements with the Communications Workers of America and the International Brotherhood of Electrical Workers.

B.       **The Debtors' Prepetition Corporate and Capital Structure**

1.       **Corporate Structure**

As set forth on the structure chart attached as **Exhibit B**, Debtor Avaya Holdings Corp. ("HoldCo") is the Avaya Enterprise's ultimate parent through its 100% ownership of Avaya. Avaya owns, directly or indirectly, each of the Avaya Enterprise's remaining 174 subsidiaries. The Avaya Enterprise's U.S. entities include HoldCo, Avaya, and 19 Avaya subsidiaries (three of which are non-Debtors). Of these entities, and as set forth on **Exhibit B**, 16 entities[17] are obligors on all of the Debtors' approximately $6.0 billion of prepetition debt, and one, HoldCo, is obligated only on the Cash Flow Credit Facility and Domestic ABL Credit Facility.[18] The substantial majority of the Avaya Enterprise's international subsidiaries, in turn, are direct or indirect subsidiaries of Debtor Sierra Communication International LLC ("Sierra"), a non-operating holding company, which, in turn, is a direct subsidiary of Avaya.[19] Sixty-five percent of Avaya's interest in Sierra is pledged as collateral in support of the Debtors' prepetition funded debt.

2.       **Capital Structure**

The Avaya Enterprise's prepetition capital structure included approximately $6.0 billion[20] in funded debt as of the Petition Date. The majority of the Avaya Enterprise's funded debt is a legacy of the 2007 transaction in which the Avaya Enterprise was taken private. The remainder of the funded debt, in turn, originated as part of the Avaya Enterprise's 2009 acquisition of Nortel Enterprise Systems. The Avaya Enterprise's prepetition funded debt consisted of: (a) the Domestic ABL Credit Facility; (b) the Cash Flow Credit Facility; (c) two series of First Lien Notes; (d) one series of Second Lien Notes; and

---

[17]    Certain US subsidiaries are not obligors with respect to the Avaya Enterprise's prepetition debt, namely: (a) Radvision Government Services, Inc.; (b) Sierra Communication International LLC; (c) Persony, Inc.; and (d) Knoahsoft, Inc. With the exception of Sierra Communication International LLC, these entities are not Debtors in these Chapter 11 Cases.

[18]    The Domestic ABL Credit Facility was repaid with proceeds from the DIP Financing pursuant to the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b) and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* (the "Final DIP Financing Order") [Docket No. 230].

[19]    As of December 31, 2016, non-Debtor domestic affiliates and international operations accounted for approximately 43.6%, or $1.6 billion, of the Avaya Enterprise's $3.6 billion in total revenue. With respect to Adjusted EBITDA, non-Debtor domestic affiliates and international operations accounted for approximately 18.2%, or $172.6 million, of the Avaya Enterprise's $949.4 million in Adjusted EBITDA.

[20]    Total excludes approximately $67.1 million of letters of credit outstanding under the Debtors' Domestic ABL Credit Facility and Foreign ABL Credit Facility.

(e) the Foreign ABL Credit Facility.[21]  The Avaya Enterprise's prepetition indebtedness is also subject to two different intercreditor agreements, generally referred to as (a) the ABL Intercreditor Agreement[22] and (b) the First Lien Intercreditor Agreement.[23]  The ABL Intercreditor Agreement governs the relative contractual rights of lenders under the Domestic ABL Credit Facility, on the one hand, and the Cash Flow Credit Facility, on the other hand, and, pursuant to certain joinders, the relative contractual rights of first lien creditors and holders of Second Lien Notes.  The First Lien Intercreditor Agreement, in turn, governs the relative contractual rights of holders under the First Lien Notes with respect to lenders under the Cash Flow Credit Facility.

### 3.    The Avaya Enterprise's Prepetition Indebtedness

The Avaya Enterprise's prepetition indebtedness can be summarized as follows:

| Indebtedness | Balance Outstanding ($ millions)[24] |
|---|---|
| Domestic ABL Credit Facility[25] | $      55 |
| Cash Flow Credit Facility | 3,235 |
| 7.00% Senior Secured Notes | 1,009 |
| 9.00% Senior Secured Notes | 290 |
| Second Lien Notes | 1,384 |
| Foreign ABL Credit Facility[26] | 50 |
| **Total** | **$ 6,023** |

| Legacy Liabilities | Balance Outstanding ($ millions)[27] |
|---|---|

---

[21]    The Foreign ABL Credit Facility was repaid with proceeds from the Debtors' DIP Financing pursuant to the Interim DIP Financing Order.

[22]    The "ABL Intercreditor Agreement" means that certain amended and restated intercreditor agreement dated as of October 29, 2012 (as amended, restated, modified, and supplemented from time to time) by and among Avaya Inc., the Subsidiary Borrowers party thereto, the Cash Flow Credit Facility Agent, the Domestic ABL Credit Facility Agent, the 7.00% Senior Secured Notes Trustee pursuant to that certain Joinder Agreement dated as of February 11, 2011 (the "7.00% ABL Intercreditor Joinder"), the 9.00% Senior Secured Notes Trustee pursuant to that certain Joinder Agreement dated December 21, 2012 (the "9.00% ABL Intercreditor Joinder," and, together with the 7.00% ABL Intercreditor Joinder, the "First Lien Notes Intercreditor Joinders"), and the Second Lien Notes Trustee pursuant to the Junior Secured Indebtedness Joinder dated March 7, 2013 (the "Junior Secured Indebtedness Designation").

[23]    The "First Lien Intercreditor Agreement" means that certain first lien intercreditor agreement dated as of February 11, 2011 (as amended, restated, modified, and supplemented from time to time) by and among Avaya Inc., the Grantors party thereto, the Cash Flow Credit Facility Agent, the 7.00% Senior Secured Notes Trustee, the 9.00% Senior Secured Notes Trustee pursuant to that certain Joinder Agreement No. 1 dated as of December 21, 2012, and each additional Authorized Representative from time to time party thereto.

[24]    Denotes principal balance outstanding as of December 31, 2016.

[25]    Balance excludes approximately $44.3 million in letters of credit issued thereunder as of the Petition Date.  Such amounts were repaid with proceeds from a draw from the Debtors' DIP Financing.

[26]    Balance excludes approximately $22.8 million in letters of credit issued thereunder as of the Petition Date.  Such amounts were repaid with proceeds from a draw from the Debtors' DIP Financing.

[27]    Denotes balance outstanding as of December 31, 2016.

| | |
|---|---|
| US Pension (underfunded liability) | $ 1,058[28] |
| Non-Qualified Pension Plan | 89 |
| OPEB (underfunded liability) | 259 |
| Non-Debtor Pensions | 555 |
| **Total** | **$ 1,961** |

These obligations are discussed below:

### (a)    Domestic ABL Credit Facility

Avaya Inc., as borrower, Avaya Holdings Corp., as "Holdings," each of the other above-captioned Debtors with the exception of Sierra, as subsidiary guarantors[29] (the "Subsidiary Guarantors"), and Citicorp, USA, Inc., as administrative agent (in such capacity, the "Domestic ABL Credit Facility Agent") entered into that certain credit agreement, amended and restated as of October 29, 2012 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Domestic ABL Credit Agreement"). Under the Domestic ABL Credit Agreement, Avaya had the ability to borrow up $335 million under a revolving credit facility (the "Domestic ABL Credit Facility"), of which, approximately $55 million was outstanding on the Petition Date. The Domestic ABL Credit Facility was repaid on January 24, 2017, with proceeds from the DIP Financing.

### (b)    Cash Flow Credit Facility

Avaya Inc., as borrower, Holdings, as "Holdings," the Subsidiary Guarantors, Citicorp USA, Inc. as administrative agent (in such capacity, the "Cash Flow Credit Facility Agent"), and the lenders that are party thereto from time to time are parties to that certain third amended and restated credit agreement, amended and restated as of December 21, 2012 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Cash Flow Credit Agreement").

The Cash Flow Credit Agreement provided for both a term loan and revolving term credit facility. The revolving term credit facility matured in October 2016, and any amounts outstanding at that time were satisfied. An aggregate principal amount of $3,235 million was outstanding as of the Petition Date under the Cash Flow Credit Facility, consisting of:  (i) $616 million outstanding in term B-3 loans maturing October 26, 2017; (ii) $1 million outstanding in term B-4 loans maturing October 26, 2017; (iii) $537 million outstanding in term B-6 loans maturing March 31, 2018; and (iv) $2,081 million outstanding in term B-7 loans maturing May 29, 2020 (collectively, the "Cash Flow Credit Facility"). Obligations under the Cash Flow Credit Facility are secured by a first priority lien on substantially all assets of each Debtor other than Sierra, including a pledge of 65% of the equity of Sierra and the Sierra Intercompany Note, subject to certain limitations and exclusions.

### (c)    First Lien Notes

---

[28]    Based on the Debtors' estimated termination liability, which is based on September 30, 2016 plan assets, liabilities, and interest rates. PBGC has asserted underfunded liabilities contingent on termination of the U.S. Qualified Pension Plans of $660 million and $1,240.3 million for the Avaya Hourly Pension Plan and Avaya Salaried Pension Plan, respectively. See Proof of Claims 1769 and 1929.

[29]    The Subsidiary Guarantors consist of:  (a) Avaya CALA Inc., (b) Avaya EMEA Ltd., (c) Avaya Federal Solutions, Inc., (d) Avaya Services Inc., (e) Avaya Integrated Cabinet Solutions Inc., (f) Zang, Inc. (f/k/a AvayaLive Inc.), (g) Avaya Management Services Inc., (h) Avaya World Services Inc., (i) Sierra Asia Pacific Inc., (j) Technology Corporation of America, Inc., (k) Ubiquity Software Corporation, (l) VPNet Technologies, Inc., (m) Avaya Holdings LLC, (n) Avaya Holdings Two, LLC, and (o) Octel Communications LLC.

Avaya Inc., as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "7.00% Senior Secured Notes Trustee") issued 7.00% senior secured first lien notes (the "7.00% Senior Secured Notes") pursuant to that certain indenture dated February 11, 2011 (the "7.00% Senior Secured Notes Indenture"). The 7.00% Senior Secured Notes mature on April 1, 2019 and approximately $1,009 million in principal amount remain outstanding as of the Petition Date. Obligations under the 7.00% Senior Secured Notes are secured by substantially all assets of each Debtor other than Holdings and Sierra, including a pledge of 65% of the equity of Sierra and the Sierra Intercompany Note, subject to certain limitations and exclusions, on a pari passu basis with obligations outstanding under the Cash Flow Credit Facility and the 9.00% Senior Secured Notes.

Avaya Inc., as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "9.00% Senior Secured Notes Trustee") issued 9.00% senior secured first lien notes (the "9.00% Senior Secured Notes" and, together with the 7.00% Senior Secured Notes, the "First Lien Notes") pursuant to that certain indenture dated December 21, 2012 (the "9.00% Senior Secured Notes Indenture"). The 9.00% Senior Secured Notes mature on April 1, 2019 and approximately $290 million in principal amount remain outstanding as of the Petition Date. As with the 7.00% Senior Secured Notes, obligations under the 9.00% Senior Secured Notes are secured by substantially all assets of each Debtor other than Holdings and Sierra, including a pledge of 65% of the equity of Sierra and the Sierra Intercompany Note, subject to certain limitations and exclusions, on a pari passu basis with obligations outstanding under the Cash Flow Credit Facility and the 7.00% Senior Secured Notes.

### (d)    Second Lien Notes

Avaya Inc., as issuer, the Subsidiary Guarantors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent, (the "Second Lien Notes Trustee") issued 10.50% second lien notes (the "Second Lien Notes") pursuant to that certain indenture dated March 7, 2013 (the "Second Lien Notes Indenture"). The Second Lien Notes mature on March 1, 2021 and approximately $1,384 million in principal amount remain outstanding as of the Petition Date. The Second Lien Notes are secured on a second priority basis by substantially all assets of each Debtor other than Holdings and Sierra, including a pledge of 65% of the equity of Sierra and the Sierra Intercompany Note, subject to certain limitations and exclusions. Recently, Wilmington Savings Fund Society, FSB replaced The Bank of New York Mellon Trust Company, N.A. as the Second Lien Notes Trustee.

### (e)    Foreign ABL Credit Facility

Certain of the Debtors' non-debtor affiliates as borrowers or guarantors (collectively, the "Foreign ABL Obligors"),[30] Avaya Inc. and the Subsidiary Guarantors, as foreign guarantors, Citibank, N.A., as administrative agent (in such capacity, the "Foreign ABL Agent"), Citibank N.A., Canadian Branch, as Canadian swing line lender, Citibank N.A., London, as European swing line lender, and the lenders that are parties thereto from time to time are parties to that certain credit agreement dated as of June 4, 2015 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "Foreign ABL Credit Agreement"). The Foreign ABL Credit Agreement provided the

---

[30]    The Foreign ABL Obligors include: (a) Avaya Canada Corp., as Canadian borrower, (b) Avaya UK, as U.K. borrower, (c) Avaya International Sales Limited, as Irish borrower, (d) Avaya Deutschland GmbH and Avaya GmbH & Co. KG, as German borrowers (together with the UK Borrower and the Irish Borrowers, the "European Borrowers"), (e) Avaya UK Holdings Limited, as U.K. guarantor, (f) Avaya Holdings Limited, as Irish guarantor, and (g) Avaya Germany GmbH, Tenovis Telecom Frankfurt GmbH & Co. KG, and Avaya Verwaltungs GmbH, as German guarantors.

18

borrowers with access to a $150 million revolving credit facility (the "Foreign ABL Credit Facility"), of which, approximately $50 million, plus additional letters of credit issued and outstanding thereunder with an aggregate face value of approximately $22.8 million were outstanding as of the Petition Date. The Foreign ABL Credit Facility was repaid on January 24, 2017, with proceeds from the DIP Financing.

4.    **The Debtors' Legacy Liabilities and Pending Litigation**

(a)    **US Pension Liabilities**

Avaya sponsors two separate single employer U.S. pension plans, which constitute qualified plans for purposes of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et al. ("ERISA"): (i) the Avaya Pension Plan (the "Avaya Hourly Pension Plan"); and (b) the Avaya Pension Plan for Salaried Employees (the "Avaya Salaried Pension Plan"). The Avaya Hourly Pension Plan is a successor to two prior pension plans maintained by Lucent and AT&T and was assumed by Avaya as part of its spinoff from Lucent in 2000. Hourly Pension Plan beneficiaries include both 6,240 retirees and approximately 545 active employees represented by the Communication Workers of America and the International Brotherhood of Electrical Workers as of December 31, 2016. The Avaya Hourly Pension Plan is an active plan and service costs continue to accrue thereunder. The Avaya Salaried Pension Plan is also a legacy of the Lucent spinoff, and beneficiaries include approximately 1,080 active salaried employees and 6,900 retirees. Unlike the Avaya Hourly Pension Plan, the Avaya Salaried Pension Plan is frozen such that participation and accruals ceased in December 2003. Each of the Avaya Hourly Pension Plan and Avaya Salaried Pension Plan are underfunded, with the Debtors estimating an underfunded liability of approximately $1,058 million as of December 31, 2016, in the aggregate (the "U.S. Qualified Pension Claims"). Minimum funding contributions for the Avaya Hourly Pension Plan and Salaried Pension Plan have averaged $45 million in the aggregate for the Avaya Hourly Pension Plan and $65 million in the aggregate for the Avaya Salaried Pension Plan over the last three fiscal years. Per Proofs of Claims Numbers 1929 and 1769 Filed in these Chapter 11 Cases, PBGC has asserted underfunded liabilities of $660 million and $1,240.3 million for the Avaya Hourly Pension Plan and Salaried Pension Plan, respectively.

As discussed in Article VI of this Disclosure Statement, pursuant to and subject to approval of the PBGC Settlement (as defined herein), PBGC has agreed that it will not oppose a Debtor initiated termination of the Avaya Salaried Pension Plan, as provided by the PBGC Stipulation of Settlement. The Plan provides PBGC with the following recovery for any and all liabilities arising as a result of the termination of the Avaya Salaried Pension Plan, including the Allowed PBGC Claim: (i) Cash in the amount of $300 million and (ii) the issuance to PBGC of 7.5% of Reorganized HoldCo Common Stock, which will be subject to dilution by the Management Equity Incentive Plan. The Plan provides for the continuation of the Avaya Hourly Pension Plan by Avaya Inc. or another Reorganized Debtor acceptable to the Debtors, PBGC and the Ad Hoc First Lien Group, subject to Bankruptcy Court approval of the PBGC Settlement. The PBGC Settlement resolves the above referenced underfunded liability asserted by PBGC, and increases the Reorganized Debtors' cash flow by approximately $250 million on an after-tax basis from 2018 through 2021 due to the elimination of minimum funding contributions with respect to the Avaya Salaried Pension Plan.[31] The aforementioned cash flow forecast is based on the Debtors' projections as of March 2017, based on analyses from actuarial advisors.

---

[31]    This increase in reflected is the Debtors' Financial Projections attached hereto as Exhibit F.

19

       **(b)**       **Avaya Inc. Non-Qualified Supplemental Pension**

Avaya Inc. is the sponsor for the Avaya Inc. Supplemental Pension Plan, which is an unfunded, non-qualified, excess benefit plan established for the purpose of providing deferred compensation and supplemental pension benefits for purposes of ERISA (the "ASPP"). The ASPP is a successor with respect to the Lucent Technologies Supplemental Pension Plan in effect as of September 30, 2000. The ASPP is not insured by PBGC. As of the Petition Date, approximately 830 individuals were beneficiaries of the ASPP.

The Debtors believe Avaya's obligations under the ASPP are General Unsecured Claims that will be discharged upon consummation of the Plan. Marlene Clark, the surviving spouse of a retiree and a beneficiary under the ASPP, Filed a motion for, among other things, a determination that benefits provided to retirees' surviving spouses under the ASPP are "retiree benefits" under Bankruptcy Code section 1114(a), and as a result, cannot be modified without prior Bankruptcy Court authorization and are entitled to administrative priority under section 1114(e). [Docket No. 522]. The Debtors disagree with the arguments raised by Ms. Clark, and Filed an objection to Ms. Clark's motion on May 18, 2017, arguing, among other things, that benefits under the ASPP did not qualify as "retiree benefits" as that term is defined in section 1114 and that Ms. Clark's motion should be denied in its entirety. [Docket No. 609]. Objections to Ms. Clark's motion were also Filed by the Ad Hoc First Lien Group [Docket No. 612], the Ad Hoc Crossover Group [Docket No. 614], and the Committee [Docket No. 676]. Ms. Clark then Filed a reply to the Debtors' objection on May 21, 2017, [Docket No. 635], which was followed by a sur-reply by the Debtors, [Docket No. 653], and a letter reply by Ms. Clark, [Docket No. 670]. The Bankruptcy Court reserved decision on the motion, following a hearing on the same held May 25, 2017. If the Bankruptcy Court grants the motion, the definition of General Unsecured Claim under the Plan (which presumably includes all "claims arising from or related to the [ASPP]") may need to be narrowed.

       **(c)**       **OPEB**

The Debtors currently provide other post-retirement employment benefits or "OPEB" to approximately 13,000 retired employees in the United States. Such benefits are provided to former employees or their beneficiaries who were members of a collective bargaining unit, as well as former salaried employees and their beneficiaries. OPEB benefits include a combination of medical, dental, and other non-pension benefits such as long-term disability and child care. As of December 31, 2016, the Debtors' unfunded OPEB liability totaled approximately $259 million, with annual expenditures by the Debtors with respect to such benefits averaging approximately $38 million in the aggregate over the last three fiscal years. Pursuant to the Plan, OPEB will continue in accordance with, and subject to, their terms and applicable non-bankruptcy law or be modified or terminated in accordance with applicable non-bankruptcy law.

       **(d)**       **Non-Debtor Pensions**

Non-Debtors Avaya GmbH & Co. KG ("Avaya KG") and Avaya Deutschland GmbH ("Avaya Deutschland") sponsor pension plans for approximately 1,200 employees (the "Non-Debtor Pensions"). The Non-Debtor Pensions are legacy liabilities stemming from the Avaya Enterprise's 2004 acquisition of Tenovis, a major European provider of enterprise communications systems and services. When the Avaya Enterprise completed its acquisition of Tenovis, the Avaya Enterprise assumed outstanding obligations under the Non-Debtor Pensions, which were fully unfunded. Unlike pensions maintained in the United States, pension sponsors in Germany do not typically fund obligations in advance of a particular employee's retirement or termination. Rather, pension benefits accrue as an unfunded liability that are then funded as they actually become payable. The Non-Debtor Pensions' unfunded liabilities

totaled approximately $555 million as of December 31, 2016, and cash costs incurred by Avaya KG and Avaya Deutschland with respect to benefits payable under the Non-Debtor Pensions totaled approximately $23 million. Avaya KG benefits from credit support in the form of a "comfort letter" dated as of March 16, 2016 through which AISL, a non-debtor Irish subsidiary of Avaya, agreed to provide certain support for Avaya KG's financial wherewithal. AISL, in turn, is the beneficiary of a similar comfort letter issued by Avaya.[32]

### (e)    Telecom Labs Litigation

Avaya is a party to litigation pending in the United States District Court for the District of New Jersey (the "District Court") captioned *Avaya, Inc. v. Telecom Labs, Inc., et al.*, Case No. 1:06-cv-02490-JBS-KMW (the "TLI/C Litigation"), which has been stayed as a result of the automatic stay in the Chapter 11 Cases. In June 2006, Avaya commenced the TLI/C Litigation by filing a complaint against Telecom Labs, Inc. and Continuant, Inc. (collectively "TLI/C") in the District Court. The complaint alleged that TLI/C, which provided service and maintenance to customers who owned Avaya brand private branch exchange ("PBX") systems and predictive dialer system ("PDS") platforms, had breached contracts with Avaya and improperly used certain software maintenance commands on TLI/C's customers' Avaya brand telephony systems which commands TLI/C obtained through fraudulent and other improper means. TLI/C Filed counterclaims against Avaya, asserting a variety of federal antitrust claims and alleging, among other things, that Avaya (1) unlawfully restricted access by customers and independent service providers to the software maintenance commands on its PBX and PDS systems; (2) monopolized and attempted to monopolize single-brand aftermarkets for Avaya-brand PBX and PDS maintenance; (3) engaged in an illegal conspiracy with its business partners; and (4) engaged in illegal tying of software upgrades and patches. In addition, TLI/C asserted common law causes of action against Avaya, alleging that Avaya made false and misleading accusations about TLI/C to its customers and potential customers amounting to trade libel and tortious interference with contract and prospective economic advantage.

At the summary judgment stage, the district court disposed of TLI/C's common law claims and its PBX upgrades tying claim. Avaya withdrew several of its claims prior to trial. A jury trial on the parties' remaining claims began on September 9, 2013. On January 6, 2014, the District Court dismissed Avaya's remaining claims on directed verdict after the close of Avaya's presentation of evidence. On March 27, 2014, the jury returned a verdict finding Avaya liable on TLI/C's PBX attempted monopolization claim and its PDS tying claim, not liable on the remaining claims, and awarding TLI/C $20 million in damages. On September 17, 2014, the District Court entered an amended final judgment in TLI/C's favor for $62,613,052.10, representing the $20 million damages verdict automatically trebled to $60 million, plus $2,613,052.10 in prejudgment interest (the "Amended Final Judgment").

Avaya appealed the Amended Final Judgment, arguing, inter alia, that the District Court erred in dismissing Avaya's remaining claims as a matter of law, that the improper dismissal impeded Avaya's ability to defend against TLI/C's counterclaims, and that Avaya should be granted judgment as a matter of law on the two claims decided in favor of TLI/C. TLI/C cross-appealed. On September 30, 2016, the United States Circuit Court of Appeals for the Third Circuit reversed the District Court's decision to dismiss Avaya's claims during trial, ruled that the dismissal had tainted the jury's verdict in favor of TLI/C, vacated the jury verdict and Amended Final Judgment in favor of TLI/C, entered judgment as a matter of law for Avaya on TLI/C's PDS patches tying claim, limited TLI/C's PBX attempted monopolization claim to systems purchased before May 1, 2008, rejected TLI/C's cross-appeal, and

---

[32]    No such comfort letter has been issued in support of Avaya Deutschland, although an identical comfort letter was issued in support of Avaya Germany GmbH, a parent company of Avaya KG and Avaya Deutschland. Such comfort letters are discussed at length, below.

remanded the remaining claims for retrial. The Third Circuit denied TLI/C's petition for rehearing and rehearing *en banc* on November 16, 2016. Avaya Filed for bankruptcy before the case was set for retrial.

Avaya's remaining claims at trial have all been reinstated on remand, including claims for breach of contract, fraud, tortious interference with prospective economic advantage, and unfair competition. Avaya seeks damages of more than $20 million. TLI/C's remaining claim for attempted monopolization of an aftermarket for Avaya PBX maintenance seeks $132.6 million in damages (before trebling).

While the appeal was pending, the District Court ordered the appointment of a Special Master to prepare a report and recommendation with respect to TLI/C's application for attorneys' fees and costs. On September 7, 2016, the Special Master recommended an award to TLI/C of $55,582,892.66 in attorneys' fees; $4,328,826.71 in expenses; and $957,757.17 in taxed costs (the "Special Master's Recommendation") through February 28, 2015. In September 2016, the parties each filed motions for reconsideration and advised the Special Master of mathematical errors in the calculations. TLI/C identified mathematical errors that would have increased the Special Master's Recommendation to $62,472,857.77 in attorneys' fees, $4,400,328.25 in expenses, and $957,757.17 in taxed costs. Before those motions were resolved, however, the Third Circuit vacated the judgment for TLI/C. The Recommendation was never finalized by the Special Master, or reviewed and adopted by the District Court, because the Amended Final Judgment that served as a basis for a fee award has been vacated.

TLI/C has Filed Proofs of Claim arising from the TLI/C Litigation asserting claims of not less than $466,754,753.42, which remain unliquidated pending retrial. Avaya disagrees with the amount asserted in TLI/C's Proofs of Claim.

### (f)    SAE Power Litigation

The Debtors and SAE Power Inc. and SAE Power Co. (together, "SAE") engaged in prepetition litigation with respect to alleged misappropriation of SAE's trade secrets, breach of non-disclosure agreements, and related theories currently pending in the Superior Court of New Jersey, Law Division: Essex County (the "Prepetition SAE Litigation"). As of the date hereof, the New Jersey Superior Court had granted summary judgment (subject to the appellate rights of SAE) in favor of the Debtors with respect to all acts complained of by SAE, other than the only remaining dispute of whether the Debtors disclosed confidential information to Delta Products Corp. SAE has asserted a prepetition unsecured claim of $379,414,364.00 on behalf of the Debtors' prepetition liability under the Prepetition SAE Litigation (the "SAE Claim"). On August 11, 2017, SAE filed a motion seeking the allowance and payment of $23,220,971 in alleged administrative expense claims against the Debtors for the continued infringement of SAE's trade secrets [Docket No. 925] (the "SAE Motion"). On August 16, 2017, the Debtors filed an objection to the SAE Motion and SAE Claim [Docket No. 959] (the "SAE Objection"), arguing that the SAE Motion should be denied because it was filed after the Administrative Claims Bar Date, and that SAE failed to produce any evidence to establish its entitlement to administrative priority. The Debtors further argued in the SAE Objection that SAE's Claims should be expunged and disallowed, or in the alternative estimated at $0.00 for voting and Plan feasibility purposes, because SAE failed to support its damages assertion and SAE's Claims are based upon misappropriation allegations which have already been the subject of a summary judgment order significantly limiting SAE's Claims.

SAE has asserted its intention to appeal the summary judgment ruling (through whatever claims process is appropriate and expedient as the Prepetition SAE Litigation has been stayed as a result of the Debtors' chapter 11 filing) dismissing counts of its amended complaint, including, but not limited to, claims of misappropriation of trade secrets, as well as to pursue all remaining counts of its amended complaint including claims against the Debtors relative to alleged dissemination of SAE's confidential information. SAE argues that its Claims are timely filed and asserts that it is prepared to detail the

quantum and methodology used in calculating/estimating its Claims upon the lifting of a certain Protective Order entered in the Prepetition SAE Litigation. SAE further asserts that, depending upon the outcome of its and other litigants' claims, said claims may dramatically increase the amount of Administrative Claims to be paid in full under the Plan, but more importantly may impact certain of the Debtors' go forward valuations, including valuation of intellectual property, trade secrets and proprietary information and associated goodwill which may in turn impact Plan feasibility. The Debtors disagree with SAE's assertions.

5.    **Intercompany Relationships**

(a)    **Intercompany Relationships Generally**

As is customary for a global company of the Avaya Enterprise's size and scale, the Debtors are parties to a series of formal and informal relationships with their affiliates, and the Debtors transact with their affiliates on a regular basis in the ordinary course, including with respect to the Debtors' intellectual property, the majority of which is owned by Avaya. Such transactions include, among other things: (i) research and development costs charged by non-Debtor affiliate, Avaya India Private, Ltd., on a monthly basis to Avaya; (ii) licensing fees and royalties paid to Avaya by various international non-Debtor affiliates for the use of Avaya-owned marks or intellectual property; and (iii) the payment of various obligations to non-Debtor affiliates in the ordinary course pursuant to intercompany arrangements that provide a certain minimum, market-based return for the sale of Avaya products and services. Additionally, certain non-Debtor affiliates of the Avaya Enterprise utilize a comprehensive cash pooling arrangement to manage liquidity. These transactions are, in turn, booked in a number of different ways, including through account receivable/payable relationships, contractual obligations, intercompany loans, and capital contributions. Additionally, certain of the Debtors and/or their affiliates are party to various intercompany letter agreements, or comfort letters, through which the issuing party has agreed to provide credit support for the applicable counterparty under certain circumstances and on the terms and conditions set forth therein (collectively, the "Comfort Letters").[33]

(b)    **Sierra Intercompany Note, AHL Receivable, and AISL Receivable**

Certain of the Debtors' intercompany arrangements were pledged as collateral in support of the Debtors' prepetition indebtedness. In particular, Sierra is party to a note in favor of Avaya dated as of October 26, 2007, which, as of the Petition Date, had a net nominal balance outstanding totaling approximately $1.2 billion (the "Sierra Intercompany Note").[34] Generally, the balance on the Sierra Intercompany Note reflects the recordation of various intercompany transfers by Avaya to various non-Debtor subsidiaries that, in turn, were recorded by Sierra and increased the balance of Sierra's

---

[33]    The Comfort Letters include: (a) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya International Enterprises Limited ("AIEL"); (b) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya France SAS; (c) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya Italia SpA ("Avaya Italia"), which expires on January 29, 2017; (d) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya New Zealand Limited; (e) one (1) letter agreement issued by Avaya in favor of non-Debtor affiliate Avaya Holdings Ltd. (f) one (1) letter agreement issued by Avaya Luxembourg Investment Sarl in favor of non-Debtor affiliate Avaya Italia; (g) one (1) letter agreement issued by AISL in favor of Avaya Germany and one (1) letter agreement issued by AISL in favor of Avaya KG  (together, the "German Comfort Letters"); (h) three (3) letter agreements issued by Avaya in favor of AISL, two of which were specifically issued in support of the German Comfort Letters (collectively, the "AISL Comfort Letters"); (i) one (1) letter agreement issued by AISL in favor of Avaya CIS LLC; (j) one (1) letter agreement issued by AISL in favor of Avaya EMEA Ltd. (Saudi Branch); and (k) one (1) deed, dated October 25, 2012, executed by Avaya Inc. in support of certain obligations of non-Debtor affiliate Aurix Limited.

[34]    The Sierra Intercompany Note was subsequently supplemented as of January 24, 2008.

23

nominal obligation to Avaya pursuant to the Sierra Intercompany Note.  The Sierra Intercompany Note is pledged as collateral in support of the Debtors' prepetition funded debt obligations.

Additionally, the Debtors' books and records include various intercompany notes and receivables due from non-debtor subsidiaries, including net intercompany obligations due to Avaya from AHL and AISL totaling approximately $530 million (the "AHL Receivable")[35] and approximately $107 million (the "AISL Receivable"), respectively, as of the Petition Date.  The AHL Receivable balance reflects, among other things, costs incurred by Avaya payable by AHL pursuant to certain cost sharing arrangements between AHL and Avaya.  The AISL Receivable reflects, among other things, the transfer pricing arrangement undertaken between AISL and Avaya.  The licenses and agreements giving rise to the AHL Receivable and the AISL Receivable were negotiated at arms'-length.

The Sierra Intercompany Note, the AHL Receivable, and the AISL Receivable constitute collateral for the Debtors' prepetition secured funded debt and, therefore, reduce Unencumbered Value.  However, it could be argued that some or all of such notional obligations should be recharacterized as equity, see In re AutoStyle Plastics, Inc., 269 F.3d 726, 748 (6th Cir. 2001) (describing doctrine of recharacterization), or disallowed in whole or in part.  If some or all of such intercompany relationships are recharacterized or disallowed, as applicable, then such value could potentially be available for creditors generally.  To the extent the Sierra Intercompany Note, the AHL Receivable, and the AISL Receivable are treated as valid claims in favor of Avaya against its non-Debtor subsidiaries, the effect of such relationships would be to increase the proportionate share of the Avaya Enterprise's total value attributable to liens securing the Debtors' prepetition funded debt and, therefore reduce Unencumbered Value.

The Global Plan Settlement includes a settlement of these issues and subordinates payments in respect of the foregoing Intercompany Claims to the payments required under the PBGC Settlement with the net effect being no recovery on the Sierra Intercompany Note, as demonstrated in **Exhibit J**.  Distributions to be made under the Plan reflect settlement of the Debtors' intercompany arrangements, including the Sierra Intercompany Note, AHL Receivable and the AISL Receivable.  These settlements considered, among other things, the risk of recharacterization with respect to such Claims.

### (c)    Other Intercompany Claims

In addition to the intercompany claims described above, the Debtors' books and records include various intercompany receivables due from non-debtor subsidiaries.  The existence of these other intercompany claims was also considered in determining recoveries under the Plan and in connection with the Global Plan Settlement.

## C.    The Debtors' Board Members and Executives

As of the date hereof, set forth below are the names, position(s), and biographical information of the current board of directors of Avaya Inc., as well as current key executive officers for the Debtors.  These individuals oversee the businesses and affairs of the Debtors.

### 1.    The Avaya Enterprise's Executives

*Kevin Kennedy*.  Mr. Kennedy has been the Avaya Enterprise's President and Chief Executive Officer ("CEO") and a member of our Board of Directors since December 22, 2008.  Previously, from

---

[35]    The AHL Receivable includes amounts for both notes receivable and accounts receivable.  The notes receivable aspect of the AHL Receivable relates to accrued interest on the accounts receivable.

September 2003 until December 2008, he served as Chief Executive Officer of JDS Uniphase Corporation ("JDSU"), a provider of optical communications products, and from March 2004 until December 2008, he also served as President of JDSU.  He was a member of JDSU's Board of Directors from November 2001 until August 2012 and served as Vice Chairman of their Board of Directors from December 2008 until August 2012.  Mr. Kennedy is also on the Boards of Directors of KLA-Tencor Corporation, a supplier of process control and yield management solutions for the semiconductor industry, and Digital Realty Trust, Inc., which owns, acquires, develops and manages technology-related real estate.  Mr. Kennedy served on the Boards of Directors of Rambus Inc., a developer of a high speed chip-to-chip interface technology, from April 2003 until July 2008 and Polycom Inc., a provider of telepresence, voice and video conferencing solutions, from May 2008 until January 2009.  Mr. Kennedy was selected to serve as a director in light of his role as Chief Executive Officer, the management perspective he brings to board deliberations, his extensive management experience and his experience on multiple public company boards.  Mr. Kennedy is also currently a Presidential Advisory Member of the National Security Telecommunications Advisory Committee.  Mr. Kennedy will be retiring as CEO and member of the Board of Directors effective as of October 1, 2017, but will continue as an advisor to Reorganized HoldCo.

*Eric Koza*.  Mr. Koza has been the Avaya Enterprise's Chief Restructuring Officer ("CRO") since September 2016.  Prior to becoming CRO of the Avaya Enterprise, Mr. Koza advised the Avaya Enterprise in his capacity as Managing Director of Zolfo Cooper, LLC ("Zolfo Cooper").  Mr. Koza has approximately 19 years of experience focused on complex and distressed situations, as executive officer of a public company, financial advisor, principal investor, and director of public and private companies.  Prior to re-joining Zolfo Cooper in 2013, Mr. Koza served as senior vice president, corporate development and financial strategy at Comverse Technology Inc.  In addition, he spent nearly a decade as a principal at Verax Capital Partners and W.R. Huff Asset Management, where he was responsible for investing across the capital structure of distressed and high leveraged companies as a partner in various investment funds.  Notable companies Mr. Koza has been involved with include: NTL Inc; Telewest Global; Impsat Fiber Networks; Guilford Performance Textiles; Motor Coach Industries; Trans World Entertainment; Dominion Petroleum; Harlan Labs; and ICBC Broadcast Holdings.  Mr. Koza graduated with a B.S. from Boston College and has an M.B.A. from Boston University.  Mr. Koza also holds the Chartered Financial Analyst or "CFA" designation.

*James Chirico*.  Mr. Chirico has been the Avaya Enterprise's Chief Operating Officer and Head of Sales since August 2016.  Mr. Chirico is a driving force in the Avaya Enterprise's transformation to a software and services company, and has been fundamental in attaining record operating metrics for the company including profitability and Net Promoter Score (NPS).  His responsibilities include management of Global Sales, Operations, Sales Operations, GSMB, Human Resources and Quality. Previously, he served as our Chief Restructuring Officer, and as the Avaya Enterprise's Executive Vice President, Business Operations and as the Avaya Enterprise's Chief Restructuring Officer and President, Operations.  From January 2, 2008 until February 3, 2009, he served as the Avaya Enterprise's Senior Vice President and President, Operations.  Prior to that time, from February 1998 to November 2007, Mr. Chirico held various senior management positions at Seagate Technology, a designer, manufacturer and marketer of hard disc drives, including Executive Vice President, Global Disc Storage Operations, from February 2006 until November 2007, and Senior Vice President and General Manager, Asia Operations, from September 2000 to February 2006.  Mr. Chirico began his career at IBM in 1980 where he spent 18 years before leaving to join Seagate Technology in 1998.  Mr. Chirico has been appointed CEO, effective as of October 1, 2017.

*Gary Barnett*.  Mr. Barnett has been the Avaya Enterprise's Senior Vice President and General Manager, Engagement Solutions since December 20, 2011.  In this capacity, Mr. Barnett manages the Avaya Enterprise's Contact Center business unit. Prior to that time, from August 2011 until December

2011, he served as the Avaya Enterprise's Vice President and General Manager of UC Applications and from April 2011 until August 2011, he served as the Avaya Enterprise's Vice President of CC Applications. Previously, from October 2005 until April 2011, he served as Executive Vice President and Chief Technology Officer of Aspect Software, Inc., a provider of unified communications and contact center software and services.

*Amy Fliegelman Olli*.   Ms. Fliegelman Olli has been the Avaya Enterprise's Senior Vice President and General Counsel since June 2014.  Ms. Fliegelman Olli is responsible for setting global legal strategies and functional plans for the Avaya Enterprise, including oversight of all legal matters pertaining to the organization.  Previously, she was the General Counsel of CA Technologies, Inc. from September 2006 to June 2014 where she held a similar position of responsibility covering all legal, governance, compliance, internal audit, security, risk management and controls. Ms. Fliegelman Olli also spent 18 years with IBM Corporation, ultimately serving as Vice President and General Counsel for the Americas and Europe.  Ms. Fliegelman Olli will be terminating her employment with the Debtors in August 2017.

*Marc Randall*.   Mr. Randall has been the Avaya Enterprise's Senior Vice President and General Manager, Avaya Networking since December 20, 2011.  Mr. Randall manages the Avaya Enterprise's Avaya Networking business unit.  From January 31, 2011 until December 16, 2011, he served as Vice President and General Manager of Cisco Systems, Inc., a provider of communications and networking products and services.  Previously, from 2008 to 2010, he served as Senior Vice President of Products and Offerings of Brocade, Inc., a provider of network solutions.  Prior to that time, from 2003 until 2008, he served as President, CEO and a Director of Force10 Networks, a provider of data center networking.

*David Vellequette*.   Mr. Vellequette has been the Avaya Enterprise's Senior Vice President, Chief Financial Officer since October 1, 2012.   Mr. Vellequette is responsible for the overall financial governance and management of the Avaya Enterprise's financial operations, including overall responsibility for the Controller's organization, Financial Planning, Treasury, Investor Relations, Tax and IT.  Previously, from July 2004 until September 2012, Mr. Vellequette worked for JDS Uniphase Corporation as Executive Vice President and Chief Financial Officer from June 2005 until August 2012 and Vice President and Operations Controller from July 2004 until June 2005.  Prior to that, Mr. Vellequette was Vice President of Worldwide Sales and Service Operations at Openwave Systems. Between 1992 and 2002, he held positions of increasing responsibility at Cisco Systems, first as corporate controller of StrataCom Corporation (acquired by Cisco in 1996) and later as Vice President of Finance supporting Cisco's service provider line of business.

### 2.    Avaya's Board of Directors

*John Marren*.    Mr. Marren has been a member of Avaya's Board of Directors since August 24, 2012 and Chairman of our Board of Directors since January 29, 2016.  In addition, he previously served as a member of our Board of Directors from October 26, 2007 to April 15, 2011.  Mr. Marren was a Partner of TPG Capital from 2000 until January 2016, where he co-led TPG's technology team.  Mr. Marren serves on the Boards of Directors of Advanced Micro Devices, Inc. and various private companies and he served on the Board of Directors of Freescale Semiconductor, Ltd. from 2007 until 2015.  In addition, Mr. Marren served as Chairman of the Board of MEMC Electronic Materials, Inc. (now known as SunEdison, Inc.), a provider in the semiconductor and solar industries from 2001 to 2012.

*Mary Henry*.  Ms. Henry has been a member of Avaya's Board of Directors since July 1, 2014. Ms. Henry was a partner and managing director of Goldman Sachs, employed there from August 1986 to November 2004, primarily in the firm's Investment Research Division.  Ms. Henry is also on the Boards of Directors of various private companies.

26

*Afshin Mohebbi*.  Mr. Mohebbi has been a member of Avaya's Board of Directors since April 2011.  Mr. Mohebbi has been a Senior Advisor to TPG since 2004.  Previously, Mr. Mohebbi held various executive positions at Qwest Communications International Inc., British Telecom Plc., SBC Communications Inc. and Pacific Telesis Group.  Mr. Mohebbi currently serves on the Board of Directors of DISH Network Corporation and Digital Realty Trust, as well as on the Boards of Directors of various private companies.

*Greg Mondre*.  Mr. Mondre has been a member of Avaya's Board of Directors since October 26, 2007.  Mr. Mondre has been a Managing Partner of Silver Lake since 2012 and a Managing Director of Silver Lake since 2005.  Prior to joining Silver Lake in 1999, he was a principal at TPG and an investment banker at Goldman, Sachs & Co., a global investment banking and securities firm.  Mr. Mondre is on the Boards of Directors of GoDaddy Inc., Motorola Solutions, Inc. and Sabre Corporation. Mr. Mondre is also on the Boards of Directors of various private companies.

*Kiran Patel*.    Kiran Patel has been a member of Avaya's Board of Directors since October 1, 2013.  Mr. Patel served as Executive Vice President and General Manager, Small Business Group of Intuit, a provider of financial software solutions for consumers and small businesses, from December 2008 to September 2013.  He was Senior Vice President and General Manager, Consumer Tax Group from June 2007 to December 2008 and Chief Financial Officer from September 2005 to January 2008.  Mr. Patel also serves on the Boards of Directors of KLA-Tencor Corporation and EXACT, a Dutch software company, and is a trustee of The Charles Schwab Family of Funds.

*Ron Rittenmeyer*.  Ronald Rittenmeyer has been a member of Avaya's Board of Directors since October 1, 2013.  He is currently the Chairman of the Board and Chief Executive Officer of Millennium Health LLC, a leading health solutions company, which position he has held since April 25, 2016.  From 2011 to 2014 Mr. Rittenmeyer served as Chairman, President and Chief Executive Officer of Expert Global Solutions, a global BPO and credit recovery company, employing 40,000 people worldwide.  He led the restructuring and subsequent sale of the credit recovery business, while successfully rebuilding the global customer care business retiring from there in 2014.  Mr. Rittenmeyer is also the retired Chairman, President and Chief Executive Officer of Electronic Data Systems Corporation, a leading global provider of information technology services, business process outsourcing and applications services.  In addition, Mr. Rittenmeyer has been the Chief Executive Officer of Turnberry Advisors LLC, a company that advises businesses on performance optimization, crisis management, information technology effectiveness and interim management, since its formation in 2009.

*Gary Smith*.  Mr. Smith has been a member of Avaya's Board of Directors since December 6, 2011.  Mr. Smith currently serves as President, Chief Executive Officer and Director of Ciena Corporation, a network infrastructure company.  Mr. Smith began serving as Chief Executive Officer of Ciena Corporation in May 2001, in addition to his existing responsibilities as president and director, positions he has held since October 2000.

*Charles Giancarlo*.  Mr. Giancarlo has been a member of Avaya's Board of Directors since June 30, 2008 and was Chairman of our Board of Directors from December 22, 2008 until January 29, 2016.  He served as our President and Chief Executive Officer from June 30, 2008 until December 22, 2008. Mr. Giancarlo was previously a Senior Advisor of Silver Lake from January 2014 until September 30, 2015 and prior to that was Managing Director of Silver Lake since 2007. Mr. Giancarlo is also on the Boards of Directors of Accenture plc, a management consulting business; Arista Networks, Inc., a data center switching company; ServiceNow, an enterprise IT cloud company; Imperva, Inc., a data security company; and various private companies. He served on the Board of Directors of Netflix, Inc., an online movie rental subscription service, from April 2007 until May 2012.

### D.    Events Leading to the Chapter 11 Cases

#### 1.    Prepetition Challenges

##### (a)    Business Model Shift

The "Great Recession," together with the market trends away from hardware-based business communications under the capital expenditure model towards software and services offerings under the operating expense model had a substantial impact on the Avaya Enterprise's operations.  The Avaya Enterprise also faced ongoing competition to its core Unified Communications Product and Service offerings from numerous competitors such as Cisco and Microsoft.  In light of these factors, the Avaya Enterprise experienced significant revenue declines over the past several years.  Despite Adjusted EBITDA remaining resilient during this time period—and in fact growing thanks to the Avaya Enterprise's evolving business mix and successful cost initiatives—significant annual cash requirements largely consumed Adjusted EBITDA and constrained the Avaya Enterprise's cash flows.



##### (b)    Substantial Annual Cash Requirements

The Avaya Enterprise's cash flow profile was also negatively impacted by the substantial costs associated with its debt load, which increased over the last decade.  Annual cash interest payments averaged approximately $440 million since fiscal 2014, with a corresponding impact on cash flow available to fund the research, development, and other investments required to remain competitive in the market.  From fiscal 2014 to fiscal 2016, annual cash requirements averaged approximately $900 million, including:  (i) approximately $440 million in cash interest payments and (ii) annual pension and OPEB funding of approximately $180 million, as well as ongoing cash needs related to restructuring costs, capital expenditures, and cash taxes.



**(c)    October 2017 Debt Maturities**

Approximately $617 million of the Debtors' B-3 and B-4 tranches of indebtedness outstanding under the Cash Flow Credit Facility are scheduled to mature in October 2017.  An event of default occurred under the Domestic ABL Credit Facility, the Cash Flow Credit Facility, and Foreign ABL Credit Facility as of December 29, 2016.

**2.        Prepetition Initiatives**

The Avaya Enterprise undertook a number of initiatives in an effort to improve operating efficiency, performance, streamline costs, and improve its overall balance sheet profile, including:  (a) the implementation of corporate cost-cutting measures, which contributed to annual cost reductions of more than $700 million over three years and (b) more near-term measures such as (i) the analysis of multiple strategic alternatives, including the sale or disposition of various business lines as well as the sale of the Avaya Enterprise as a going concern, and potential capital markets solutions for upcoming debt maturities and (ii) engagement with key creditor constituencies.  The Avaya Enterprise also engaged experienced advisors to assist in its evaluation and review during this process.

**(a)        Cost Cutting Initiatives**

Cognizant of its strained financial position, the Avaya Enterprise instituted broad-based cost initiatives over the past several years to improve overall profitability and address significant ongoing cash requirements including the cost of its debt structure and legacy liabilities. Avaya Enterprise's efforts contributed to a total cost reduction of approximately $700 million during fiscal 2014-2016.  Of these total cost reductions:  (i) approximately $100 million resulted from reducing non-people costs, including vendor renegotiations, process automation initiatives, and reducing costs associated with unused or under-utilized facilities; (ii) approximately $400 million resulted from headcount reductions; and (iii) approximately $200 million resulted from reduction in variable cost associated with declines in Product revenue.  As a result of these initiatives, the Avaya Enterprise increased its profitability, measured by Adjusted EBITDA during fiscal 2014-2016, despite significant revenue erosions over the same time period.

**(b)      M&A, Financing Alternatives**

The Avaya Enterprise also explored various out-of-court restructuring alternatives to address its maturity profile and reduce overall indebtedness.  For example, the Avaya Enterprise worked with its advisors to determine whether a refinancing or extension could be possible with respect to near-term maturities of its funded debt.   Additionally, the Avaya Enterprise considered combinations of asset dispositions and strategic transactions through which it might de-lever or increase liquidity on an out-of-court basis, such as the disposition of non-core business units, certain of the Avaya Enterprise's intellectual property, or a going concern transaction for the Avaya Enterprise as a whole.  For example, the Avaya Enterprise undertook extensive processes to monetize certain of its business units through broad-based market tests in 2016 and 2017 (the "CC Marketing Process" and "Networking Marketing Process," respectively).

### i.      CC Marketing Process

Pursuant to the CC Marketing Process, the Avaya Enterprise, with the assistance of its advisors, contacted approximately 34 potential purchasers, of which 18 attended management meetings with the Avaya Enterprise, 11 provided perspectives on value, and eight provided written bids for the CC Business.  Of these eight written bids, two were selected to enter a final round of bidding.  The Avaya Enterprise analyzed the two final round bids and determined, in consultation with its advisors, to move forward with a sale proposal from a confidential third-party purchaser (the "Confidential Purchaser") to acquire the CC Business for approximately $3.9 billion, subject to a variety of terms and conditions (the "First CC Business Sale Proposal").   Discussions with the Confidential Purchaser eventually broke down and the Avaya Enterprise determined that the First CC Business Sale Proposal was no longer actionable.  Consequently, the Avaya Enterprise terminated the CC Marketing Process.  Subsequent to this termination, the Avaya Enterprise received an updated proposal from a previously involved confidential party purporting to ascribe a purchase price for the CC Business of approximately $3.7 billion, subject to various adjustments and conditions (the "Second CC Business Sale Proposal").  The Avaya Enterprise, however, had no assurance that the Second CC Business Sale Proposal was either viable or that it would be acceptable.

On May 12, 2017, the Confidential Purchaser approached Avaya and expressed interest with respect to making a direct investment in the Avaya Enterprise should the Debtors continue on the path towards a "wholeco" restructuring.  Specifically, the Confidential Purchaser provided Avaya with a non-binding expression of interest to make a "substantial" convertible preferred equity investment in the Avaya Enterprise with the specific amount and implied equity conversion features to be mutually agreed upon by the Confidential Purchaser and the Avaya Enterprise.  After significant diligence and discussions between the Avaya Enterprise and the Confidential Purchaser, the potential transaction was abandoned in the summer of 2017 when the Confidential Purchaser advised the Avaya Enterprise that it would no longer be pursuing an acquisition of the CC Business.

### ii.      Networking Marketing Process

Pursuant to the Networking Marketing Process, the Avaya Enterprise and its advisors contacted 37 parties, including 28 strategic buyers and nine financial sponsors, of which 15 sought further information and entered into nondisclosure agreements with the Avaya Enterprise.  Eleven parties attended an initial meeting with the Avaya Enterprise's management, following which the Avaya Enterprise responded to a number of information requests prior to the submission of first round bids.  The Avaya Enterprise ultimately received four first round bids, including two written bids and two verbal offers.  The two verbal offers, submitted by financial sponsors, ranged in value from $5 million to $65 million, whereas the two written bids submitted by strategic buyers ranged in value from $100 million to

$330 million.  The $330 million bid was based on limited due diligence and an existing operating relationship between the Potential Purchaser and certain Avaya entities related to the Networking Business, and was provided without any proposed form of deal structure, detailed due diligence request, or information about necessary consents or approvals to be obtained.  Despite further engagement by the Avaya Enterprise, the $330 million bidder ultimately never provided a deal structure and did not perform typical due diligence, and subsequently dropped out of bidding citing concerns around its inability to secure requisite regulatory approvals and operate the business in specific jurisdictions, including in the United States and Europe.  The Networking Marketing Process eventually led to the postpetition execution of an Asset Purchase Agreement with Extreme Networks, Inc. ("Extreme") on March 6, 2017, whereby Extreme served as a "stalking horse" bidder and was the purchaser of the Networking Business, which process is detailed more fully in Article VI herein.

### (c)    Prepetition Stakeholder Engagement

Prepetition, the Avaya Enterprise also engaged with creditor groups with the goal of building consensus around a de-leveraging transaction, if reasonably possible.  These stakeholder constituencies consisted of:  (i) an ad hoc group of holders of the Avaya Enterprise's first lien indebtedness (the "Ad Hoc First Lien Group"); (ii) an ad hoc group of cross-holders of both the Avaya Enterprise's first lien debt and the Avaya Enterprise's second lien debt (the "Ad Hoc Crossover Group," and together with the Ad Hoc First Lien Group, the "Ad Hoc Groups"); and (iii) Pension Benefit Guaranty Corp. ("PBGC"), and each stakeholder's respective advisors.  These discussions included, among other things: (i) the provision of a substantial amount of diligence to those constituencies and their advisors (and the payment of associated professional fees); (ii) ongoing dialogue and communication around the Avaya Enterprise, its operations, and its prospects; and (iii) regular in-person and telephonic meetings to discuss the Avaya Enterprise's potential restructuring path, in particular, a potential M&A transaction for the CC Business.

On or about December 21, 2016, the Debtors provided the Ad Hoc Groups with a term sheet setting forth the principal terms of a restructuring proposal (the "Prepetition Proposal").  The Prepetition Proposal contemplated a prenegotiated bankruptcy filing and provided, among other things, that (i) first lien creditors would receive $1.914 billion of new debt and 80% of the equity of the Reorganized Debtors (ii) second lien creditors would receive 20% of the equity of the Reorganized Debtors, and (iii) the Avaya Salaried Pension Plan and Avaya Hourly Pension Plan would remain in place and the Debtors would honor obligations thereunder.  Ultimately, the Debtors' prepetition stakeholder engagement did not lead to a comprehensive and consensual restructuring transaction.

### (d)    DIP Financing

Following extensive, prepetition, arm's-length negotiations, the Debtors successfully negotiated a $725 million debtor-in-possession financing facility (the "DIP Financing"), fully underwritten by Citibank, NA ("Citibank").  The DIP Financing was notable in that it not only provided the Debtors with much needed "Day 1" liquidity, but did so on favorable terms, including a 12 month maturity, attractive pricing, and limited "case control" mechanisms that might unduly hinder the Debtors' ability to maximize the value of these chapter 11 estates as a whole.  The DIP Financing is discussed more fully at Article VI.B hereof.

## VI.    EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Pleadings and Other Case Matters

#### 1.    First and Second Day Pleadings

To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors Filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings included the following:

- Cash Management.  On January 23, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to continue using their existing cash management system, existing bank accounts, and existing business forms [Docket No. 56].    On March 31, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 341].

- Critical Vendors.  On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to satisfy, solely in the Debtors' discretion, the prepetition claims of certain critical vendors and suppliers of goods and services that are essential to the Debtors' day-to-day business operations [Docket No. 65].  On February 10, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 139].

- Customer Programs.  On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to satisfy, solely in the Debtors' discretion, certain prepetition amounts outstanding under the Debtors' customer programs [Docket No. 64].  On February 10, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 141].

- DIP and Cash Collateral.  On January 23, 2017, the Bankruptcy Court entered an interim order, consensually reached between the Debtors and the DIP Lenders approving the use of cash collateral to fund operations and restructuring costs [Docket No. 61] (the "Interim DIP Order").  The Interim DIP Order, among other things, describes the terms and conditions for the use of cash collateral and provides adequate protection in exchange for the use of such cash collateral.  This relief was necessary to ensure that the Debtors could continue to operate in the ordinary course during the Chapter 11 Cases.  On March 10, 2017, the Bankruptcy Court granted such relief pursuant to a final order (the "DIP Financing Order") [Docket No. 230].

- Insurance.  On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to continue operating under insurance coverage for their business entered into prepetition, honor prepetition insurance premium financing agreements, and renew their premium financing agreements in the ordinary course of business [Docket No. 142].

- NOL.  On March 7, 2017, the Bankruptcy Court entered a final order approving notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to beneficial ownership of common and preferred stock [Docket No. 202].

32

- Surety. On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to continue and renew certain surety obligations in the ordinary course of business [Docket No. 144].

- Taxes. On February 10, 2017, the Bankruptcy Court entered an Order authorizing the Debtors to pay certain prepetition sales, use, franchise, and other taxes in the ordinary course of business [Docket No. 145]. Such payments only affect the timing of payment for the vast majority of the amounts at issue.

- Utilities. On February 10, 2017, the Bankruptcy Court entered a final order authorizing the Debtors to establish procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services, and determining that the Debtors are not required to provide any additional adequate assurance [Docket No. 146].

- Wages. On January 24, 2017, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay all employees their wage Claims in the ordinary course of business, (b) pay and honor employee medical and similar benefits, and (c) continue their prepetition benefit programs, including, among others, medical, dental, and 401(k) benefits [Docket No. 66], which Order was Amended on February 10, 2017 [Docket No. 138]. On March 20, 2017, the Bankruptcy Court entered a Final Order granting such relief on a final basis and authorizing the Debtors to continue their prepetition employee incentive programs for non-insiders on a postpetition basis [Docket No. 276].

2.      **Procedural and Administrative Motions**

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also Filed and received authorization to implement several procedural and administrative motions:

- authorizing the joint administration of the Chapter 11 Cases [Docket No. 45];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code [Docket No. 143];

- establishing certain notice, case management, and administrative procedures [Docket No. 160];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 50 largest creditors [Docket No. 140];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 328]; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases [Docket No. 324].

3.        **Retention of Chapter 11 Professionals**

The Debtors also Filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (a) Zolfo Cooper, LLC, as restructuring advisor; (b) Kirkland  Ellis LLP, as counsel to the Debtors; (c) Centerview Partners LLC, as investment banker; (d) Prime Clerk, as claims agent and administrative advisor; (e) The Siegfried Group, LLP, as accounting resource provider; (f) KPMG LLP as tax consultants; (g) PricewaterhouseCoopers LLP, as auditor and accounting services provider; (h) Grant Thornton, as accounting resource provider; (i) Togut, Segal & Segal LLP, as conflicts counsel; (j) Patterson Belknap Webb & Tyler LLP, as special litigation counsel; (k) Wilson Sonsini Goodrich & Rosati, P.C., as special litigation counsel; and (l) Stevens & Showalter, L.L.P., as special patent counsel.

4.        **Appointment of the Statutory Committee of Unsecured Creditors**

On January 31, 2017, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 100], consisting of:  (a) Wistron Corporation; (b) Pension Benefit Guaranty Corporation; (c) Communication Workers of America; (d) Flextronics Telecom Systems, Ltd.; (e) AT&T Services, Inc.; (f) SAE Power Inc. and SAE Power Company; and (g) Network-1 Technologies, Inc.  The Committee also Filed applications and obtained authority to retain:  (a) Morrison & Foerster LLP as lead counsel; (b) Alvarez & Marsal, LLC as financial advisor; and (c) and Jeffries LLC, as investment banker.

5.        **The Ad Hoc Groups**

As described above, two Ad Hoc Groups of the Debtors' secured creditors, the Ad Hoc First Lien Group and the Ad Hoc Crossover Group, were formed prepetition and are involved in these Chapter 11 Cases.  On July 21, 2017, a new ad hoc group, the Ad Hoc Second Lien Group, was formed.

- The Ad Hoc First Lien Group.  The Ad Hoc First Lien Group is comprised of various of the Debtors' stakeholders, including lenders, bondholders, and other parties-in-interest holding interests in the First Lien Debt.  The members of the Ad Hoc First Lien Group hold, in the aggregate, approximately 67% of the First Lien Debt.  The Ad Hoc First Lien Group is currently represented by:  (i) Akin Gump Strauss Hauer & Feld LLP, as counsel and (ii) PJT Partners Inc., as financial advisor (together, the "First Lien Advisors").[36]

- The Ad Hoc Crossover Group.  The Ad Hoc Crossover Group is comprised of various of the Debtors' stakeholders, including lenders, bondholders, and other parties-in-interest holding interests in the First Lien Debt and the Second Lien Notes.  The members of the Ad Hoc Crossover Group hold, in the aggregate, approximately 21% of the First Lien debt and over 58% of the Second Lien Notes.[37]  The Ad Hoc Crossover Group is currently represented by:   (i) Stroock & Stroock & Lavan LLP, as counsel and (ii) Rothschild & Co., as financial advisor.  On or about July 21, 2017, three (3) members

---

[36]    The description of the Ad Hoc First Lien Group contained herein is based on the Ad Hoc First Lien Group's *Seventh Amended Verified Statement Pursuant to Bankruptcy Rule 2019* filed on July 24, 2017 [Docket No. 974].

[37]    The description of the Ad Hoc Crossover Group contained herein is based on the Ad Hoc Crossover Group's *Seventh Supplemental Verified Statement of the Ad Hoc Crossover Group Pursuant to Bankruptcy Rule 2019* filed on August 16, 2017 [Docket No. 960].

of the Ad Hoc Crossover Group also became part of the Ad Hoc Second Lien Group.[38] As of the latest verified statements Filed with the Bankruptcy Court, such members have withdrawn from the Ad Hoc Second Lien Group and remain solely members of the Ad Hoc Crossover Group.

- <u>The Ad Hoc Second Lien Group</u>. The Ad Hoc Second Lien Group is comprised of various of the Debtors' stakeholders, including lenders, bondholders, and other parties-in-interest holding interests in the First Lien Debt and the Second Lien Notes. The members of the Ad Hoc Second Lien Group currently hold, in the aggregate, approximately 8% of the Second Lien Notes.[39] The Ad Hoc Second Lien Group is currently represented by Proskauer Rose LLP, as counsel.

### B.    The Debtors' DIP Financing and Cash Collateral Motion

After a significant marketing process and vigorous negotiations, on the Petition Date, the Debtors Filed the *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(B) And (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C)* [Docket No. 13] (the "<u>DIP Motion</u>").

The Bankruptcy Court entered the Interim DIP Order on January 23, 2017 [Docket No. 61]. Pursuant to the Interim DIP Order, the Debtors were authorized, among other things, to utilize a portion of the initial draw under the DIP Financing to pay, in full, all obligations outstanding under the Domestic ABL Credit Facility and the Foreign ABL Credit Facility. In connection with the repayment of the Foreign ABL Credit Facility, the Debtors' indemnification, subrogation, contribution, and reimbursement rights with respect to the repayment of the Foreign ABL Credit Facility were made part of the collateral securing the DIP Financing and the adequate protection obligations under the DIP Financing Order.

On March 10, 2017, the Court entered the DIP Financing Order [Docket No. 230]. The DIP Financing Order, among other things: (i) approved the DIP Financing; (ii) approved the Debtors' use of cash collateral; (iii) approved the adequate protection packages contained in the DIP Financing; and (iv) overruled any objections to the DIP Motion not otherwise resolved. Pursuant to the DIP Financing Order, the Debtors were authorized to utilize $75.0 million of proceeds from the DIP Financing to fund an account (the "<u>Cash Pool Requirements Account</u>") that, in turn, would provide a liquidity backstop for the Debtors' non-U.S. affiliates through an inter-company borrowing protocol (the "<u>Intercompany Security Protocol</u>"), which was also approved pursuant to the DIP Financing Order.[40]

---

[38]    <u>See</u> *Verified Statement of Ad Hoc Second Lien Group Pursuant to Bankruptcy Rule 2019(c)* filed on July 21, 2017 [Docket No. 838].

[39]    The description of the Ad Hoc Second Lien Group contained herein is based on the *First Supplemental Verified Statement of Ad Hoc Second Lien Group Pursuant to Bankruptcy Rule 2019(c)* filed on August 16, 2017 [Docket No. 951].

[40]    Pursuant to the Intercompany Security Protocol cash transferred from the Debtors to a non-debtor subsidiary outside the ordinary course of business must first be transferred to Debtor Sierra pursuant to an intercompany note from Avaya Inc. to Sierra, which must then be secured by: (i) an equity pledge of 100% of the issued and outstanding interests in Sierra's direct domestic subsidiaries, (ii) an equity pledge of 65% of the issued and outstanding interests in Sierra's direct foreign subsidiaries, and (iii) an applicable intercompany note or general ledger entry. The Intercompany Security Protocol also authorizes the Debtors to limit Sierra's obligations with respect to the intercompany security protocol to an amount equal to: (i) funds actually disbursed, if any, from the Cash Pool Requirements Account; (ii) repayment of the Foreign ABL Credit

1.        **Cash Collateral Milestones**

The DIP Financing Order also approved the following chapter 11 case "milestones" (the "<u>Cash Collateral Milestones</u>"):

- the filing of a chapter 11 plan that is acceptable to the Required Lenders (as defined in the Cash Flow Credit Agreement), on the one hand, and the Debtors, on the other hand (an "<u>Acceptable Plan</u>"), and disclosure statement with respect to the Acceptable Plan (the "<u>Acceptable Disclosure Statement</u>") with this Court within 150 days of the Petition Date;

- entry by this Court of an order approving the Acceptable Disclosure Statement within 180 days of the Petition Date;

- entry by this Court of an order confirming the Acceptable Plan within 250 days of the Petition Date; and

- consummation of the Acceptable Plan within 270 days of the Petition Date; <u>provided</u>, that failure to meet any milestone under the DIP Financing may be cured at any time prior to delivery of a Cash Collateral Adequate Protection Notice (as that term is defined in the DIP Financing Order).

The failure of the Debtors to achieve any of the Cash Collateral Milestones resulted in a Cash Collateral Event of Default (as that term is defined in the DIP Financing Order), which, in turn, will terminate the Debtors' continued use of Cash Collateral on a consensual basis where a Cash Collateral Adequate Protection Notice is delivered in accordance with the DIP Financing Order and as set forth more fully therein.  Upon a Cash Collateral Event of Default, the Cash Flow Credit Agreement Agent is authorized to serve the Debtors with a Cash Collateral Adequate Protection Notice (as that term is defined in the DIP Financing Order), which then requires the Debtors to seek an expedited hearing with the Bankruptcy Court (a "<u>Cash Collateral Hearing</u>") to consider the Debtors' continued use of Cash Collateral on a non-consensual basis.   Following delivery of a Cash Collateral Adequate Protection Notice, however, the Debtors are still authorized to use Cash Collateral until the later of:  (a) a ruling from the Court in respect of the Cash Collateral Hearing; or (b) such time as otherwise agreed to by the Cash Flow Credit Agreement Agent, with the consent of the Required Lenders (as that term is defined in the DIP Financing Order).

As of June 18, 2017, the Debtors had not Filed an Acceptable Plan.  Pursuant to paragraph 16 of the DIP Financing Order, the Debtors' failure to File an Acceptable Plan constitutes a Cash Collateral Event of Default (as defined in the DIP Financing Order).  On June 18, 2017 and through the date hereof, the members of the Ad Hoc First Lien Group constitute the Required Lenders (as defined in the Cash Flow Credit Agreement).

On June 19, 2017, the Debtors received a letter (the "<u>First Lien Letter</u>") from the Ad Hoc First Lien Group, which notified the Debtors that, among other things, the Debtors had defaulted under the DIP Financing Order on June 18, 2017, by not filing an Acceptable Plan within 150 days of the Petition Date.  Despite this default, however, the letter further explained that the Ad Hoc First Lien Group had determined to forbear from directing the Cash Flow Credit Facility Agent to send a Cash Collateral Adequate Protection Notice; <u>provided</u> that the Debtors, the Ad Hoc First Lien Group, and PBGC worked

---

Facility, as an obligation of Sierra subject to the Intercompany Security Protocol; and (iii) the amount of any other intercompany loans created pursuant to the Intercompany Security Protocol.

towards a consensual chapter 11 plan of reorganization. After receiving the First Lien Letter, the Debtors continued to work diligently towards reaching a consensual resolution with the Ad Hoc First Lien Group and PBGC, the successful product of which is embodied in the Global Plan Settlement upon which the Plan is premised, including the PBGC Settlement. As a result of the Global Plan Settlement, the Debtors and the Required Lenders believe that the Plan, as currently proposed, constitutes an Acceptable Plan as defined by the DIP Financing Order.

On July 18, 2017, the Debtors had not yet received approval of an Acceptable Disclosure Statement. Pursuant to paragraph 16 of the DIP Financing Order, the failure to obtain approval of an Acceptable Disclosure Statement constitutes a Cash Collateral Event of Default (as defined in the DIP Financing Order). However, pursuant to section 4(a)(viii) of the Plan Support Agreement, the signatories thereto have agreed to not direct or consent to the delivery of a Cash Collateral Adequate Protection Notice.

## 2.    **Marshaling Waiver**

"Marshaling" refers to the legal doctrine by which, in certain circumstances, a secured lender may be compelled to recover by asserting remedies against certain collateral so as not to prejudice recoveries otherwise available to junior creditors. In re Global Serv. Group, LLC, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) ("Marshaling is an equitable principle designed to protect the rights of a junior creditor by compelling a senior creditor to attempt to collect its claim first from another source unavailable to the junior creditor.").

Paragraph 13 of the DIP Financing Order provides that none of the DIP Agent or the Prepetition Secured Parties (each as defined therein) shall be subject to the equitable doctrine of marshaling, provided that those parties must "use commercially reasonable efforts to use all DIP Collateral or Prepetition Collateral other than Avoidance Actions to repay the DIP Obligations or Adequate Protection Obligations . . . ." As a result of this waiver, it may be argued that value attributable to unencumbered assets should first be attributed to the value of DIP Financing Claims, since the doctrine of marshaling could not be invoked to cause such claims to be satisfied first through proceeds available from assets that were otherwise encumbered as of the Petition Date.

As part of the Global Plan Settlement embodied in the Plan, the value necessary to satisfy the DIP Financing Claims is deemed to be allocated to assets that secured the First Lien Debt Claims. However, it may be argued that the value necessary to satisfy the DIP Financing Claims should be first distributed from unencumbered assets, therefore reducing recoveries available for Unsecured Creditors on a dollar for dollar basis. The Debtors believe that value available for stakeholders other than the Holders of First Lien Debt Claims would be materially reduced versus recoveries available under the Plan if DIP Financing Claims were first allocated to Unencumbered Value.

## C.    **Statements of Schedules, Rule 2015.3 Financial Reports, and Claims Bar Date**

On the Petition Date, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, and (II) Granting Related Relief* seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") up to and including March 4, 2017 [Docket No. 28], which the Court granted on February 10, 2017 [Docket No. 143]. On March 1, 2017, the Debtors Filed a second Motion seeking an extension of the time within which to file the Schedules up to and including April 21, 2017 [Docket No. 186], which the Court granted on March 22, 2017 [Docket No. 301].

37

On March 30, 2017, the Debtors Filed their Schedules.  On May 16, 2017, the Debtors Filed amended Schedules for Debtors Avaya, Inc. and Avaya Federal Solutions, Inc. for the limited purpose of reflecting claims arising from the discharge of obligations arising in connection with the ASPP.  On May 11, 2017, the Debtors Filed their Rule 2015.3 Financial Report [Docket No. 577].

On March 22, 2017, the Bankruptcy Court entered an order approving:  (1) May 8, 2017, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Claims in the Chapter 11 Cases; (2) July 18, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Claims in the Chapter 11 Cases; (3) May 8, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to File certain Claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "Administrative Claims") in the Chapter 11 Cases; (4) May 8, 2017 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File Administrative Claims in the Chapter 11 Cases; (5) procedures for filing proofs of Claim; and (6) the form and manner of notice of the applicable bar dates [Docket No. 301] (the "Bar Date Order").Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a proof of claim in accordance with the Bar Date Order.

On June 23, 2017, the Debtors Filed the *Debtors' First Omnibus (Non-Substantive) Objection to Certain: (I) Amended Claims; (II) Withdrawal Claims; (III) Duplicative Claims; and (IV) Claims Docketed in Error* [Docket No. 762] (the "First Claims Objection"), objecting to approximately 270 Claims.  The First Claims Objection was granted pursuant to an Order entered on July 26, 2017 [Docket No. 858].On July 28, 2017, the Debtors Filed the *Debtors' Second Omnibus Objection to Certain:  (I) Amended Claims; (II) Withdrawn Claims; (III) Duplicate Claims; and (IV) No Liability Claims* [Docket No. 870].  On August 10, 2017, the Debtors Filed the *Debtors' Third Omnibus Objection to Certain: (I) Amended Claims; (II); Withdrawn Claims; (III) Duplicate Claims; and (IV) No Liability Claims* [Docket No. 920].

Because the resolution process for the Claims is currently ongoing, the Claims figures identified in this Disclosure Statement represent estimates only and, in particular, the estimated recoveries set forth in this Disclosure Statement for Holders of General Unsecured Claims could be materially lower if the actual Allowed General Unsecured Claims are higher than the current estimates.

### D.    Networking Sale

On March 8, 2017, the Debtors Filed a motion (the "Bidding Procedures and Sale Motion") seeking the entry of an order (the "Bidding Procedures Order") approving bidding procedures in connection with the sale of the Debtors' networking business ("Networking Business") and the entry of an order (the "Sale Order") authorizing and approving the sale (the "Networking Sale") of the Networking Business [Docket No. 248].  In accordance with the Bidding Procedures and Sale Motion, Extreme Networks, Inc. ("Extreme" or the "Stalking Horse Bidder") entered into an asset purchase agreement dated as of March 7, 2017 (the "Stalking Horse APA"), in which the Stalking Horse Bidder agreed to acquire, for cash consideration and the assumption of liabilities under certain non-Debtor future lease and pension obligations, the Networking Business for a potential transaction value for the Avaya Enterprise of up to $100 million, subject to transaction costs and purchase price adjustments.  The Stalking Horse APA was the result of an extensive marketing effort that began in April 2016.

On April 5, 2017, the Bankruptcy Court entered the Bidding Procedures Order approving bidding procedures, procedures for the assumption and assignment of certain executory contracts, a final bid deadline of May 18, 2017 (the "Bid Deadline"), and, if necessary, an auction to take place at the New

York office of Kirkland & Ellis LLP on May 23, 2017.  Despite an extensive marketing process undertaken by the Debtors following entry of the Bidding Procedures Order, the Debtors did not receive any bids by the Bid Deadline, and accordingly, no auction was held.  On May 31, 2017, the Bankruptcy Court entered the Sale Order approving the Networking Sale [Docket No. 684].  On July 14, 2017, the Debtors consummated the Networking Sale with the Extreme, which resulted in cash proceeds for the Avaya Enterprise of approximately $70.7 million and the assumption of approximately $19.3 million of future obligations, subject to certain adjustments for, among other things, transaction costs, working capital, and deferred revenue as further set forth in the Stalking Horse APA, and the release of up to $10 million in Cash from an indemnity escrow account on or after July 14, 2018.  The Cash proceeds are currently held by Avaya Inc.  Based on the Debtors' preliminary analysis, which will be updated in accordance with the Sale Order and Stalking Horse APA, approximately $27 million of Cash proceeds will be allocated to the Debtors, with the remaining Cash proceeds allocated among non-Debtor entities.  Because the Cash proceeds are currently held by Avaya Inc., this Cash balance and associated intercompany payables due to non-Debtor entities is contemplated in the waterfall model attached hereto as **Exhibit J**.

### E.    Pending Litigation Proceedings and Claims

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their businesses.  The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would (a) have a material adverse effect on their businesses, financial condition, or results of operations or (b) interfere with the feasibility of the Plan.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  The Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.  This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

### 1.    Blackberry Relief from Stay Motion

On February 10, 2017, BlackBerry Limited and BlackBerry Corporation (collectively, "Blackberry") Filed a motion seeking relief from the Bankruptcy Code's "automatic stay" with respect to certain patent infringement litigation currently pending in the United States District Court for the Northern District of Texas (the "Blackberry Relief from Stay Motion").  On April 28, 2017, the Court entered an order granting, in part, the Blackberry Relief from Stay Motion [Docket No. 479] (the "Blackberry Stay Order").  Specifically, the Blackberry Stay Order permitted two motions (the "Pending Motions") pending before the United States District Court for the Northern District of Texas (the "Texas District Court") to be ruled on.  All other aspects of the Blackberry Relief from Stay Motion were adjourned to a status conference initially scheduled for May 25, 2017 (the "Blackberry Status Conference").  As of May 25, 2017, however, the Texas District Court had not ruled on the Pending Motions and the Blackberry Status Conference was further adjourned, first to June 29, 2017, then again, to July 25, 2017, and then further to August 15, 2017.  As of the date hereof, the Texas District Court has yet to rule on the Pending Motions.

2.        **Network-1 Relief from Stay Motion**

On March 7, 2017, Network-1 Technologies, Inc. ("Network-1") Filed a motion seeking relief from the Bankruptcy Code's "automatic stay" with respect to certain patent infringement litigation currently pending in the United States District Court for the Eastern District of Texas (the "Network-1 Relief from Stay Motion"). Subsequently, the Debtors and Network-1 have engaged in good faith negotiations in an effort to resolve their dispute, and, as a result of these negotiations, the Network-1 Relief from Stay Motion has been continued on multiple occasions, with the Network-1 Relief from Stay Motion currently being scheduled for hearing on August 15, 2017.

3.        **CenturyTel Relief from Stay Motion**

On May 4, 2017, CenturyTel Service Group, LLC ("CenturyTel"), Filed a motion seeking relief from the Bankruptcy Code's "automatic stay" with respect to certain agreements for the Debtors' provision of, among other things, data security standards compliance services related to the payment card industry (the "CenturyTel Relief from Stay Motion") [Docket No. 516]. The CenturyTel Relief from Stay Motion was premised on the argument that the Debtors' agreements with CenturyTel were terminable "at convenience," and therefore, CenturyTel was entitled to relief from the automatic stay in order to exercise such remedies. The Debtors did not disagree with CenturyTel as to whether the agreements at issue were terminable "at convenience," and determined not to object to the CenturyTel Relief from Stay Motion. Disagreeing with most of the remaining factual assertions in the CenturyTel Relief from Stay Motion, however, the Debtors Filed a statement of no objection and reservation of rights on May 19, 2017 [Docket No. 632]. On May 25, 2017, the Court granted the CenturyTel Relief from Stay Motion [Docket No. 671].

F.        **Avoidance Actions**

Other than with respect to the Challenge Claims Settlement (described below), the Debtors do not believe that Avoidance Actions arising from preference or similar causes of action under chapter 5 of the Bankruptcy Code would generate material proceeds available for distribution to creditors after consideration of, among other things, the cost of potential litigation, the uncertainty of the outcome of such litigation, and anticipated defenses to Avoidance Actions.

Though the Committee has reserved rights with respect to certain Avoidance Actions in accordance with certain stipulations arising under the DIP Financing Order, such Avoidance Actions are settled or waived pursuant to the Challenge Claims Settlement, as described below, and the Global Plan Settlement more broadly. Successful prosecution of Avoidance Actions identified by the Committee in lieu of such settlements could, but would be unlikely to, increase recoveries available for Holders of General Unsecured Claims as such recoveries, if any, would, in the first instance, need to be used to compensate the Holders of First Lien Debt for the use of Encumbered Value to satisfy administrative expenses properly allocable to Unencumbered Value that are being satisfied by Encumbered Value under the Plan through the Global Plan Settlement. The time, cost, and expense of prosecuting (or defending) such actions to Final Order could also be material and there can be no assurance as to the ultimate disposition as to any such litigation.

G.        **Challenge Claims Settlement**

Pursuant to the Interim DIP Order and DIP Financing Order, certain types of the Debtors' assets were identified as potential carve-outs from the Prepetition Secured Parties' collateral (the "Retained Claims Collateral"), including with respect to any liens asserted against the Retained Claims Collateral on account of the Debtors' prepetition funded debt. The Retained Claims Collateral consists of:

- each of the Debtors' deposit accounts other than the Debtors' main concentration account maintained at JPMorgan, account number ending 4399 (the "Main Concentration Account");

- all intellectual and similar property of every kind and nature now owned by the Debtors, including inventions, designs, patents, copyrights, trademarks, trade secrets, confidential or proprietary technical and business information, knowhow, showhow or other data or information, the intellectual property rights in software and databases and related documentation and all additions, improvements and accessions to, and books and records describing any of the foregoing, in each case registered or arising under non-U.S. law;

- assets of that certain Avaya Inc. Savings Restoration Plan held in the Avaya Inc. Savings Restoration Plan Trust (the "Savings Restoration Plan") and maintained by Fidelity Management Trust Company ("Fidelity"), as Trustee under that certain Trust Agreement between Avaya Inc. and Fidelity dated as of February 26, 2004, and any proceeds therefrom;

- assets of that certain Avaya Inc. Deferred Compensation Plan (the "Deferred Compensation Plan") effective October 1, 2000 (as amended July 30, 2003) held in the Avaya Inc. Deferred Compensation Plan Trust and maintained by Wells Fargo Bank, NA, as Successor Trustee, under that certain Trust Agreement between Avaya Inc. and the Bank of New York effective October 1, 2000, and any proceeds therefrom;

- assets of that certain Executive Life Insurance Program maintained pursuant to various Collateral Assignment Split Dollar Life Insurance Agreements made as of September 1, 1999 (the policies of which are underwritten by MetLife) therefrom;

- commercial tort claims other than that certain action captioned Avaya Inc. v. Telecom Labs, Inc., et. al, 3:06-02490 (D.N.J.);

- proceeds from the Debtors' insurance policies;

- certain of the Debtors' real property; and

- certain of the Debtors' leasehold interests.

By agreement, the Debtors' challenge period with respect to the Retained Claims Collateral has been extended through and including September 8, 2017. See [Docket No. 898].

The DIP Financing Order also provides the Committee with a deadline to assert Challenges (as defined in the DIP Financing Order) with respect to, among other things, the Settled Challenge Claims (as defined below) and the potential Claims and Causes of Action described by the Committee pursuant to correspondence dated June 7, 2017 (the "Letter Claims"). As of the date hereof, the Committee's challenge period with respect to the Settled Challenge Claims and the Letter Claims has been extended to September 8, 2017. See [Docket No. 898].

In connection with their negotiations regarding the terms of the Plan and the Global Plan Settlement, the Debtors, the Ad Hoc First Lien Group, and the Committee agreed to settle or waive all potential Claims and potential Causes of Action which might have been asserted on behalf of the Debtors or their Estates with respect to any lien or security interest purportedly securing the Retained Claims

Collateral (the "Settled Challenge Claims") as well as the Letter Claims (the "Challenge Claims Settlement").

The Challenge Claims Settlement resolves the Settled Challenge Claims and the Settled Letter Claims (as defined in the Plan) through distributions provided to Holders of General Unsecured Claims. The Committee has agreed to waive any Letter Claims that have not been settled. The Debtors and the Committee believe the Challenge Claims Settlement reflected in the Plan reflects a reasonable resolution of the Settled Challenge Claims and the Letter Claims in light of, among other things, the time, delay, and risk associated with litigating such matters to Final Order, the costs associated with such litigation, and the certainty of recoveries provided under the Plan.

A more fulsome description of (a) the material Settled Challenge Claims and (b) the Letter Claims is provided below.

1.    **Settled Challenge Claims**

(a)    **Non-U.S. Intellectual Property**

Among other things, the Challenge Claims Settlement resolves areas of dispute regarding the potentially avoidable liens securing prepetition debt with respect to approximately 1,300 Debtor-owned patents registered in non-U.S. jurisdictions. Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey"), the Debtors' retained intellectual property advisor, determined such patents have a value of approximately $61.9 million.[41]

As a general matter, patents are generally considered a "general intangibles," with the applicable security interest subject to perfection by a duly filed financing statement under Section 9-310 of the Uniform Commercial Code. See U.C.C. § 9-102(a)(42). Such financing statements were duly filed here with respect to "general intangibles" and, potentially, perfecting prepetition liens with respect to such intellectual property. However, the Debtors believe it is unclear as to whether a financing statement filed in accordance with the Uniform Commercial Code is sufficient to perfect a security interest with respect to patents registered in non-U.S. jurisdictions. For example, many jurisdictions in which the Debtors' non-U.S. patents were issued require local filings or registrations to record or perfect a security interest in those assets and the Debtors do not believe that U.S. law would necessarily preempt foreign law in this regard or that non-U.S. jurisdictions would recognize the primacy of the Uniform Commercial Code in this regard. Additionally, the Uniform Commercial Code is itself preempted by treaty obligations of the United States. See UCC § 9-109(c)(1). The United States, in turn, is party to the Patent Law Treaty of 2000, which itself provides a mechanism for the recordation of security interests as set forth more fully therein. It may therefore be argued that financing statements are therefore ineffective and subject to avoidance. See UCC § 9-311(a)(1).

At the same time, the Debtors acknowledge that such an approach would require a relatively untested legal theory and require potentially novel application of U.S. treaty obligations, consideration of U.S. choice of law rules, and application of non-U.S. law across a number of jurisdictions in the context of a lien perfection dispute. The Debtors therefore believe the Challenge Claims Settlement fairly allocates value for the benefit of these chapter 11 estates in light of such uncertainties, as well as the delay and expense associated with such a transaction.

---

[41]    This number does not include patents owned by non-Debtor affiliates. Houlihan Lokey determined such patents have a value of approximately $8.1 million, as indicated in the waterfall model attached hereto as **Exhibit J**.

**(b)    Savings Restoration Plan; Deferred Compensation Programs**

The Savings Restoration Plan and Deferred Compensation Plan are deferred compensation plans maintained for certain highly compensated executives or retirees intended to provide a tax-advantaged deferral of income through an unfunded trust structure, commonly known as a "rabbi trust." Assets associated with such programs totaled approximately $1.9 million as of the Petition Date. Under the relevant documents, assets associated with the Savings Restoration Plan and Deferred Compensation Plan provide that funds shall be held in those trusts for the benefit of the participants and "general creditors." In Bank of America, N.A. v. Moglia, 330 F.3d 942, 944 (7th Cir. 2003), the United States Court of Appeals for the Seventh Circuit found that similar, albeit not identical language in a rabbi trust had the effect of removing such assets from a secured lender's collateral, with the effect of making such assets available for unsecured creditors generally.

Thus, it may be argued that any Liens encumbering such assets are avoidable under a similar theory. However, the Debtors acknowledge that Moglia has not been adopted by the United States Court of Appeals for the Second Circuit and, therefore, such an application could be subject to challenge here.

**(c)    Cash Outside Main Concentration Account**

As of the Petition Date, approximately $15 million in Cash was held outside the Main Concentration Account and was not subject to a control agreement in favor of the Debtors' secured lenders, and therefore, may not be subject to perfected liens in favor of the Debtors' secured creditors. However, certain of this cash may constitute "proceeds" subject to automatic perfection under the relevant provisions of the Uniform Commercial Code, and in any event, would be subject to a complex tracing exercise to establish such status. The Debtors believe that the Challenge Claims Settlement is an efficient resolution of this issue for the benefit of the Debtors' estates.

2.    **Letter Claims**

On June 7, 2017, the Committee delivered correspondence identifying a number of potential Challenges (as defined in the DIP Financing Order) with respect to the Debtors' prepetition debt and related Liens that could be raised by the Committee, including Avoidance Actions such as:

- all liens, claims, and encumbrances incurred by any of the Debtors in connection with a 2007 Leveraged Buyout Transaction, together with any refinancing (or any subsequent refinancing) thereof;

- certain guarantees and/or grants of security interests to secure the Debtors' prepetition debt to the extent provided subsequent to the incurrence of the prepetition debt, including by Ubiquity Software Corporation with respect to the Cash Flow Credit Facility and ABL Credit Facility and Avaya Services Inc. with respect to all prepetition debt;

- the repayment of principal and original issue discount on the term B-2 loans incurred in connection with the acquisition of Nortel's enterprise solutions business;

- a declarative action that Zang, Inc. f/k/a AvayaLive, Inc. did not provide guarantees under the 7.00% Senior Secured Notes Indenture or the Domestic ABL Credit Facility Documents; and

- with respect to the Retained Claims Collateral and certain other assets, (1) a declarative action that such assets fall outside the collateral package granted in the documents evidencing

43

the Debtors' prepetition debt, and (2) the avoidance of improperly perfected or unperfected liens.

As noted above, the Challenge Claims Settlement resolves the Settled Challenge Claims and the Settled Letter Claims through distributions provided to Holders of General Unsecured Claims. The Debtors and the Committee believe the Challenge Claims Settlement reflected in the Plan reflects a reasonable resolution of the Settled Challenge Claims and the Letter Claims in light of, among other things, the time, delay, and risk associated with litigating such matters to Final Order, the costs associated with such litigation, and the certainty of recoveries provided under the Plan.

## H.    Plan Exclusivity

The initial period during which the Debtors had the exclusive right to file a chapter 11 plan expired on May 19, 2017 (the "Initial Exclusivity Deadline"). On April 11, 2017, the Debtors Filed a motion seeking an extension of the Initial Exclusivity Deadline by approximately 120 days through and including September 16, 2017, as well as a corresponding extension of the time in which the Debtors had the exclusive authority to solicit votes thereon through and including September 16, 2017 (the "Exclusivity Extension Motion") [Docket No. 374]. The Exclusivity Extension Motion was originally scheduled for hearing on April 25, 2017, but was adjourned to May 16, 2017, and then again to May 25, 2017, while the Debtors attempted to negotiate a consensual extension with their various stakeholders.

On May 16, 2017, the Ad Hoc First Lien Group Filed an objection to the Exclusivity Extension Motion, arguing that the Debtors' extension should be limited to 30 days (the "Exclusivity Objection") [Docket No. 587]. On May 19, 2017, the Debtors Filed an amended order reflecting negotiations with both the Committee and the Ad Hoc Crossover Group, and limiting the Debtors' requested extension to 60 days, (the "Amended Exclusivity Order") [Docket No. 623]. Also on May 19, 2017, the Committee Filed a statement in support of the relief requested in the Exclusivity Extension Motion as such relief was modified by the Amended Exclusivity Order [Docket No. 629]. On May 24, 2017, the Debtors Filed a reply to the Exclusivity Objection (the "Exclusivity Reply") [Docket No. 652]. Upon completion of the May 25, 2017, hearing on the Exclusivity Extension Motion, the Court entered an Order approving the Exclusivity Extension Motion (the "Exclusivity Extension Order") [Docket No. 673]. Pursuant to the Exclusivity Extension Order, the Debtors exclusive period to file a chapter 11 plan was set to expire on July 18, 2017 (the "Extended Exclusivity Deadline"), and the Debtors' exclusive period to solicit votes in favor of a chapter 11 plan was extended to September 16, 2017. See id.

On July 11, 2017, the Debtors Filed a motion seeking an extension of the Extended Exclusivity Deadline by approximately 60 days through and including September 16, 2017, as well as a corresponding extension of the time in which the Debtors have the exclusive authority to solicit votes thereon through and including November 15, 2017 [Docket No. 798] (the Second Exclusivity Motion"). On July 21, 2017, the Ad Hoc Second Lien Group Filed an objection to the Second Exclusivity Motion [Docket No. 839] (the "Second Lien Exclusivity Objection") urging the Bankruptcy Court to condition any further extensions of the Exclusivity Deadline on the Debtors' agreement to negotiate with the Ad Hoc Second Lien Group "simultaneously with ongoing discussions and to provide the diligence information it requested subject to an agreed form of confidentiality agreement." On July 24, 2017, the Debtors and the Ad Hoc First Lien Group Filed replies to the Second Lien Exclusivity Objection, and on July 26, 2017, the Bankruptcy Court entered an Order granting the Second Exclusivity Motion without conditions (the "Second Amended Exclusivity Order"). [Docket No. 859]. Pursuant to the Second Amended Exclusivity Order, the Debtors' exclusive period to file a plan of reorganization is now set to expire on September 16, 2017, and the time in which the Debtors have the exclusive authority to solicit

votes on a plan of reorganization expires on November 15, 2017 (the "Second Extended Exclusivity Deadline").

1.    **Executory Contracts and Unexpired Leases**

(a)    **Assumption/Rejection Procedures Motion**

On March 1, 2017 the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 188] (the "Contract Procedures Motion") seeking to establish procedures for the rejection, assumption, or assumption and assignment, to the extent applicable, for the Debtors' executory contracts and unexpired leases.  On March 30, 2017, the Bankruptcy Court entered an order granting, in part, the relief requested by the Contract Procedures Motion [Docket No. 339] (the "Contract Procedures Order").

(b)    **Contract Rejection and Assumption**

On February 24, 2017, the Debtors Filed a motion to reject that certain San Francisco 49ers Stadium Executive Suite License Agreement, dated July 19, 2012, between Avaya Inc. and Forty Niners SC Stadium Company LLC *nunc pro tunc* to the date of the filing of the motion and granting related relief (the "49ers Rejection Motion").  On March 21, 2017, the Court entered an order granting the 49ers Rejection Motion [Docket No. 282].

In addition to the 49ers Rejection Motion, the Debtors Filed three separate notices of rejection of certain executory contracts and unexpired leases pursuant to the Contract Procedures Order (the "First Notice of Rejection," the "Second Notice of Rejection," and the "Third Notice of Rejection," respectively).  The Debtors Filed the First Notice of Rejection on April 28, 2017, which identified four unexpired leases and three executory contracts for rejection [Docket No. 486].  No parties objected to the First Notice of Rejection. The Debtors Filed the Second Notice of Rejection on July 26, 2017, which identified one unexpired lease and one executory contract for rejection [Docket No. 864].  No parties objected to the Second Notice of Rejection. The Debtors Filed the Third Notice of Rejection on August 15, 2017, which identified two unexpired leases [Docket No. 941].  As of the filing of this Disclosure Statement, no party had objected to the Third Notice of Rejection.

The Debtors also Filed a motion to assume certain unexpired leases [Docket No. 883] (the "Lease Assumption Motion") on August 1, 2017.  The Debtors received one limited objection to the Lease Assumption Motion from PGIM Real Estate (the "PGIM Objection").  Subsequent to the PGIM Objection, the Debtors entered into a stipulation with PGIM Real Estate on August 15, 2017 [Docket No. 937], to extend the deadline to assume or reject the Debtors' unexpired lease with PGIM Real Estate in Santa Clara, California (the "Santa Clara Lease") through and including September 15, 2017 and to remove the Santa Clara Lease from the relief requested by the Lease Assumption Motion.  The Debtors also entered into a separate stipulation with U.S. Bank National Association ("U.S. Bank N.A.") on August 15, 2017 [Docket No. 936], to extend the deadline to assume or reject the Debtors' unexpired lease with U.S. Bank N.A. in Fairfax, Virginia (the "Fairfax Lease") through and including September 15, 2017.  On August 21, 2017, the Court granted the relief sought in the Lease Assumption Motion and entered an order authorizing the Debtors to assume certain unexpired leases not including the Santa Clara Lease or the Fairfax Lease [Docket No. 976].

### I.    Key Employee Incentive Program Motion

1.    **2Q 2017 KEIP**

On March 1, 2017, the Debtors Filed the Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving the Debtors' 2Q 2017 Key Employee Incentive Program and (II) Granting Related Relief (the "2Q KEIP Motion") [Docket No. 192], seeking authority to pay, in the ordinary course of business, awards to key employees of the Debtors from an aggregate maximum award pool of approximately $3.7 million for the Debtors' second fiscal quarter ending March 31, 2017.  The Debtors' subsequently reduced the size of the aggregate maximum award pool to approximately $3.0 million.  On March 24, 2017, the U.S. Trustee Filed an objection to the 2Q KEIP Motion, arguing, among other things, that the Debtors had not met their statutory burden to make incentive payments to the key employees identified in the 2Q KEIP Motion [Docket No. 313].  On April 21, 2017, after further negotiations between the Debtors and the U.S. Trustee, as well as a hearing on the matter, the Court entered an Order approving the 2Q KEIP Motion in modified form (the "2Q KEIP Order") [Docket No. 441].  Specifically, the 2Q KEIP Order approved the 2Q KEIP, but limited payments to certain individuals.  The 2Q KEIP Motion and the 2Q KEIP Order, together, contain a fulsome description of the 2Q 2017 KEIP participants and targets, and are available on the Bankruptcy Court's docket at the above-referenced docket numbers. The 2Q KEIP participants will be receiving releases as described in Article VII.H hereunder and may receive Reorganized HoldCo Common Stock or other Interests in Reorganized HoldCo under the Management Equity Incentive Plan described in Article IV.I hereunder.

As approved, the 2Q KEIP provided for 2Q KEIP participants to receive incentive awards totaling approximately $2.41 million if the Debtors achieve threshold Adjusted EBITDA of approximately $170 million in 2Q 2017, and up to approximately $3.20 million if the Debtors achieve target Adjusted EBITDA of approximately $205 million in 2Q 2017.  The Debtors achieved Adjusted EBITDA of approximately $199 million in 2Q 2017 and paid approximately $3.06 million in incentive awards to 2Q KEIP participants.

1.    **3Q–4Q 2017 KEIP**

On June 22, 2017, the Debtors Filed the Debtors' Motion Seeking Entry of an Order (I) Approving the Debtors' 3Q–4Q Key Employee Incentive Program and (II) Granting Related Relief (the "3Q–4Q KEIP Motion") [Docket No. 761], seeking authority to pay, in the ordinary course of business, awards to key employees of the Debtors from an aggregate award pool of between $2.1 million and $3.2 million per quarter for the Debtors' third and fourth fiscal quarters ending June 30, 2017, and September 30, 2017, respectively.  On July 11, 2017, the Court entered an Order approving the 3Q-4Q KEIP Motion [Docket No. 796] (the "3Q-4Q KEIP Order"). The 3Q-4Q KEIP Motion and the 3Q-4Q KEIP Order, together, contain a fulsome description of the 3Q-4Q 2017 KEIP participants and targets, and are available on the Bankruptcy Court's docket at the above-referenced docket numbers. The 3Q-4Q KEIP participants will be receiving releases as described Article VII.H hereunder and may receive Reorganized HoldCo Common Stock or other Interests in Reorganized HoldCo under the Management Equity Incentive Plan described in Article IV.I hereunder.

As approved, the 3Q-4Q KEIP provided for 3Q-4Q KEIP participants to receive: (i) incentive awards totaling approximately $2.30 million if the Debtors achieve threshold Adjusted EBITDA of approximately $178 million in 3Q 2017, and up to approximately $2.88 million if the Debtors achieve target Adjusted EBITDA of $219 million in 3Q 2017; and (ii) incentive awards totaling $2,144,490 if the Debtors achieve threshold Adjusted EBITDA of $209 million in 4Q 2017, and up to approximately $2.85 million if the Debtors achieve target Adjusted EBITDA of approximately $252 million in 4Q 2017.  The

Debtors achieved Adjusted EBITDA of approximately $204 million in 3Q 2017 and paid approximately $2.67 million in incentive awards to 3Q 4Q KEIP participants.

### J.    April 13 Plan

On April 13, 2017, the Debtors Filed the *Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* [Docket No. 389] (the "April 13 Plan") and *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* [Docket No. 388] (the "April 13 Disclosure Statement").[42]   The April 13 Plan contemplated, among other things, that the Debtors would honor and maintain both of the U.S. Qualified Pension Plans and required Holders of First Lien Debt to equitize approximately 68.7 percent of their prepetition claims in order to de-leverage the Debtors' business and to permit the Debtors to honor the ongoing costs associated with keeping both pension plans in place.

Prior to and during the Chapter 11 Cases, the Ad Hoc First Lien Group advised the Debtors and their advisors that its members were unwilling to accept a chapter 11 plan that called for Holders of First Lien Debt to receive the bulk of their recovery in the form of equity in the Reorganized Debtors and effectively subordinate their Claims to the Debtors' go forward unsecured obligations, including the U.S. Qualified Pension Plans.  As set forth in the Ad Hoc First Lien Group's objection to the Exclusivity Extension Motion, following the filing of the April 13 Plan, the Ad Hoc First Lien Group reiterated its position that the equitization contemplated by April 13 Plan was unacceptable as, among other things, it effectively would subordinate the First Lien Debt Claims to pension obligations and provide a recovery to junior stakeholders based on what the Ad Hoc First Lien Group characterized as a "flawed" valuation of the Avaya Enterprise.[43]   As detailed in the Exclusivity Reply (described above), the Debtors disagreed with the Ad Hoc First Lien Group's characterization of the April 13 Plan.

Following the filing of the Exclusivity Objection, the Debtors, their advisors, certain principals of the members of the Ad Hoc First Lien Group and the First Lien Advisors engaged in arms' length negotiations regarding the terms of a modified chapter 11 plan.  These negotiations also involved PBGC and its advisors.  Those discussions, described further below, culminated in the parties' support for the Plan and the Global Plan Settlements contained therein.

### K.    Plan Development; Postpetition Stakeholder Negotiations

On May 16, 2016, the Debtors received a term sheet proposal from the Ad Hoc Crossover Group, which contemplated a restructuring pursuant to (i) a sale transaction and (ii) a "wholeco" restructuring transaction (the "Ad Hoc Crossover Group Term Sheet").  Pursuant to the Ad Hoc Crossover Group Term Sheet, distributions under the "wholeco" restructuring would (a) require PBGC to agree to involuntarily terminate the Avaya Salaried Pension Plan and (b) provide (i) Holders of First Lien Debt with a combination of consideration, including 81.2% of the common stock of the reorganized Debtors; (ii) Holders of Second Lien Notes with 18% of the common stock of the reorganized Debtors, (iii) Holders of General Unsecured Claims with 0.8% of the common stock of the reorganized Debtors; and

---

[42]   The hearing for the April 13 Disclosure Statement was originally scheduled for May 25, 2017, but was subsequently adjourned, first to June 29, 2017, then to July 28, 2017, then to August 15, 2017, and then to August 23, 2017.  The hearing for this Disclosure Statement is now scheduled for August 25, 2017.

[43]   See generally *Objection of the Ad Hoc First Lien Group to Debtors Motion Seeking Entry of an Order (I) Extending the Debtors Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 587] (the "Exclusivity Objection").

(iv) PBGC with a $250 million second lien note.[44]  In connection with Ad Hoc Crossover Group Term Sheet, the Ad Hoc Crossover Group sought to engage with the Debtors on proposed modifications to the April 13 Plan.  The Debtors did not provide a counterproposal to the Ad Hoc Crossover Group Term Sheet and continued negotiations with the Ad Hoc First Lien Group, PBGC, and the Committee.

On July 12, 2017, the Ad Hoc Second Lien Group submitted its own restructuring proposal (the "Second Lien Group Proposal").  Three (3) of the four (4) members that were backstop parties under the proposal were listed as three (3) of six (6) members of the Ad Hoc Crossover Group, according to the verified statement of the Ad Hoc Crossover Group Filed with the Bankruptcy Court on June 30, 2017.[45]  These three members later appeared on the verified statement Filed by the Ad Hoc Second Lien Group with the Bankruptcy Court.[46]  As of August 16, those three members had withdrawn from the Ad Hoc Second Lien Group and remained solely members of the Ad Hoc Crossover Group.[47]  The Second Lien Group Proposal contemplated (a) a $400 million rights offering backstop at a 25% discount to an implied equity value, (b) the maintenance of both of the Debtors' pension plans (subject to agreement by the relevant government entity to modify the existing contribution schedule), (c) a $3.75 billion "settlement enterprise value" that, when adjusted for continued maintenance of the Debtors' U.S. Qualified Pension Plans and other legacy liabilities, valued the Debtors at less than $5 billion, (d) a 5% breakup premium and a 5% backstop premium, (e) a 5% new common stock management equity incentive plan, and (f) the provision of: (i) rights offering rights[48] to the commitment parties, (ii) $98 million in cash, $2.75 billion of new debt, and rights offering rights to Holders of First Lien Debt, (ii) rights offering rights to Holders of Second Lien Notes, and (iii) rights to participate in a rights offering for 7.75% of the reorganized equity or a $50 million cash pool to Holders of General Unsecured Claims.   Additionally, in connection with the Second Lien Group Proposal, on July 13, 2017, the Ad Hoc Second Lien Group furnished the Debtors with an initial list of confirmatory diligence requests and indicated its willingness to execute a mutually acceptable confidentiality agreement.  The Debtors did not provide a form of confidentiality agreement, the Ad Hoc Second Lien Group's requested diligence, or a counterproposal to the Second Lien Group Proposal.

In developing the Plan, the Debtors, with the assistance of their advisors, determined that a number of different factors could potentially impact value and distributions available for their stakeholders.  This analysis included consideration of the potential allocation of enterprise value for the entire Avaya Enterprise as between the Debtors and their international affiliates, and the extent to which value attributable to the Avaya Enterprise's international operations could be available for distribution to unsecured creditors.  Additional factors taken into account by the Debtors included the treatment of

---

[44]  Equity distributions in the Ad Hoc Crossover Group Term Sheet were, in each case, subject to dilution by a management equity incentive plan.

[45]  See *Fifth Supplemental Verified Statement of the Ad Hoc Crossover Group Pursuant to Bankruptcy Rule 2019* filed on June 30, 2017 [Docket No. 780].

[46]  See *Verified Statement of Ad Hoc Second Lien Group Pursuant to Bankruptcy Rule 2019(c)* filed on July 21, 2017 [Docket No. 838]

[47]  Compare *Seventh Supplemental Verified Statement of the Ad Hoc Crossover Group Pursuant to Bankruptcy Rule 2019* filed on August 16, 2017 [Docket No. 960] with *First Supplemental Verified Statement of Ad Hoc Second Lien Group Pursuant to Bankruptcy Rule 2019(c)* filed on August 16, 2017 [Docket No. 951].

[48]  According to this proposal, after the commitment parties are able to purchase at least 50% of the rights offering convertible preferred shares, Holders of deficiency claims and General Unsecured Claims are eligible to purchase rights offering convertible preferred shares in the amount of: 47.61% for First Lien Debt, 44.64% for Second Lien Notes, and 7.75% for General Unsecured Claims.

intercompany claims ("Intercompany Claims") and the value attributable to intercompany relationships, the potential impact of the marshaling waiver arising under Paragraph 13 of the DIP Financing Order, the treatment of the adequate protection payments made during the pendency of the Chapter 11 Cases, the allocation of administrative expenses to Encumbered Value and Unencumbered Value in the Avaya Enterprise, the Settled Challenge Claims, the Settled Letter Claims, and the Debtors' inability to achieve a confirmable plan of reorganization absent agreement by Holders of First Lien Debt to voluntarily accept the bulk of their recovery in the form of equity in the Reorganized Debtors given the requirements of section 1129(b)(2)(A) of the Bankruptcy Code and the impact of prospective "controlled group" liability in favor of PBGC. The Plan further reflects the Debtors' consideration of the time, risk, and expense associated with litigating to Final Order, the foregoing issues, among others.  Moreover, the Debtors also considered the views of the Ad Hoc First Lien Group, the Committee, PBGC, and their advisors with respect to the enterprise value for the entire Avaya Enterprise, which was materially lower than the valuation set forth in the Valuation Analysis performed by the Debtors' advisors, attached hereto as **Exhibit D**.

In this process, the Debtors entered into extensive and substantive arm's–length direct negotiations with the Ad Hoc First Lien Group, and PBGC.  These efforts resulted in the Global Plan Settlement, which, as described further below, includes:

- the PBGC Settlement, which, among other things, provides for the termination of the Avaya Salaried Pension Plan in exchange for certain consideration, on the terms and conditions set forth in the Plan;

- the Valuation Settlement, which takes into account, among other things:

    - the differing valuation analyses of the Debtors, the Ad Hoc First Lien Group, and PBGC, as well as the Debtors' consideration of alternative proposals submitted by the Ad Hoc Second Lien Group and the Ad Hoc Crossover Group;

    - the potential costs associated with protracted litigation around the Avaya Enterprise's total enterprise value;

    - the uncertainty and volatility associated with valuing businesses with large amounts of intellectual property; and

    - the value preserved through positive messaging to the market as a result of an efficient and successful emergence from chapter 11; and

- the Waterfall Settlement, which includes, among other things:

    - allocation of value among Debtor and non-Debtor entities;

    - allowance and treatment of intercompany claims;

    - allocation of Secured Claims on account of the repayment of the Foreign ABL Credit Facility with proceeds from the DIP Financing;

    - the recharacterization of a material portion of the adequate protection payments made in respect of the First Lien Debt Claims during the pendency

49

of the Chapter 11 Cases to reduce the principal amount of the First Lien Debt Claims;

- the Challenge Claims Settlement; and

- allocation of expenses of the Chapter 11 Cases.

In subsequent good faith, arm's-length negotiations with the Ad Hoc First Lien Group and the Committee, the parties reached an agreement on the Challenge Claims Settlement as well as the Global Plan Settlement (including the settlements referenced above and in Article VI.L below) and, as a result, the Committee fully supports the Plan.

### L.    Overview of the Global Plan Settlement

Under section 1123(b)(3)(A), a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." Such settlements are appropriate when they constitute a valid exercise of the Debtors' business judgment, and are fair, reasonable and in the best interests of the estate." In re DBSD N. Am. 419 B.R. 179, 210 (Bankr. S.D.N.Y. 2009). In making such a determination, the Court may look to the standards set forth by Bankruptcy Rule 9019. Under Bankruptcy Rule 9019, the Court may approve a settlement so long as it does not fall below the lowest point in the range of reasonableness. This determination is to be made based on:

> [T]he probabilities of ultimate success should the claim be litigated and an educated estimate of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

In re AppliedTheory Corp., Case No. 02-11868, 2008 WL 1869770, at *3 (Bankr. S.D.N.Y. April 24, 2008) (internal citations omitted).

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits under the Plan, the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Global Plan Settlement between and among the Debtors, the Committee, the Ad Hoc First Lien Group, and PBGC, which Global Plan Settlement includes, among other things, compromises with respect to the following issues (the "Plan Issues"): (1) the PBGC Settlement; (2) the Valuation Settlement; (3) the Waterfall Settlement; (4) the Intercompany Settlement; (5) the Challenge Claims Settlement; (6) the Marshalling Settlement; and (7) the Second Lien Recovery Settlement.

### 1.    Global Plan Settlement:  PBGC Settlement

Following extensive negotiations (the "PBGC Settlement Negotiations") that took place over the course of several months between the Debtors, PBGC, and certain members of the Ad Hoc First Lien Group, the foregoing parties agreed to the terms of a settlement with respect to the Debtors' U.S. qualified pension obligations, which terms are memorialized in the PBGC Stipulation of Settlement (as defined in the Plan) (the "PBGC Settlement"). The PBGC Settlement Negotiations involved consideration of, among other things, the parties' respective rights under the Bankruptcy Code, the viability of contested pension termination litigation under ERISA, the Debtors' ability to achieve a confirmable plan of reorganization absent material creditor support, the value impact arising from protracted pension

litigation, and the costs and risks associated with litigating each of the foregoing issues. Additionally, among other things, the parties provided their respective views with respect to value attributable to the impact of controlled group liability and value ascribed to the Debtors' international affiliates.

In particular, the PBGC Settlement Negotiations took into account, among other things:

- PBGC's potential controlled group claims at Debtor Sierra;

- the potential impact of worldwide controlled group liability on the Avaya Enterprise's non-Debtor subsidiaries;

- the potential that contingent termination liability for the U.S. Qualified Pension Plans could exceed $1.9 billion per PBGC's Filed Proofs of Claim;

- PBGC's status as the Debtors' largest single unsecured creditor in the event of termination of one or both U.S. Qualified Pension Plans; and

- PBGC's status as the prospective lone third party creditor at Sierra, and the ability to confirm a Plan at Sierra absent PBGC's consent, see 11 U.S.C. § 1129(a)(10).

The PBGC Settlement Negotiations resulted in the PBGC Settlement, which is subject to separate Court approval,[49] and resolves all outstanding issues among the parties. Pursuant to the PBGC Settlement, PBGC agreed that it would not oppose a termination undertaken by the Debtors with respect to the Avaya Salaried Pension Plan, as provided by the PBGC Stipulation of Settlement, in consideration for the following treatment under the Plan for any and all liabilities arising as a result of the termination of the Avaya Salaried Pension Plan, including the Allowed PBGC Claims: (a) Cash in the amount of $300 million and (b) the issuance to PBGC of 7.5% of Reorganized HoldCo Common Stock, which will be subject to the dilution by the Management Equity Incentive Plan, as set forth in the PBGC Stipulation of Settlement. In order to calculate the value of Reorganized HoldCo Common Stock under the Plan, the Debtors considered the estimated tax-effected book value of their obligations under the Avaya Hourly Pension Plan and the Debtors' OPEB liabilities as of September 30, 2017. The tax-effected book value of unfunded benefit liabilities related to the APPSE is estimated to be approximately $330 million as of September 30, 2017. The consideration provided to PBGC in the PBGC Settlement exceeds (i) the tax effected book value of unfunded benefit liabilities related to the Avaya Salaried Pension Plan and (ii) the net present value of payments through 2021 that the Debtors would be required to make under the Avaya Salaried Pension Plan absent the PBGC Settlement. PBGC believes the consideration provided to PBGC in the PBGC Settlement is significantly less than the unfunded benefit liabilities on a termination basis for the Avaya Salaried Pension Plan. The Ad Hoc Crossover Group believes that the PBGC Settlement reduces the net distributable value available for other creditors. The Debtors disagree with this assertion.

In addition, the Plan provides for the continuation of the Avaya Hourly Pension Plan by the Reorganized Debtors and provides PBGC with certain benefits with respect to the Avaya Hourly Pension Plan.The Debtors believe that the PBGC Settlement and the distributions under the Plan flowing from resolution of the underlying issues are in the best interest of these chapter 11 estates and maximize value for all creditors.

---

[49]    The Debtors anticipate filing a motion seeking separate approval of the PBGC Settlement in conjunction with Plan confirmation in the near term.

The Ad Hoc Crossover Group suggests that to the extent distributions to PBGC under the Plan are on account of its claim or potential claim against Sierra, such distribution may reflect a substantive consolidation of the Debtors' estates or gift from the collateral securing the Debtors' prepetition debt claims. The Debtors disagree with this assertion because the Prepetition Secured Parties do not have Liens on the assets of Sierra.

2. **Global Plan Settlement: Valuation Settlement**

The recoveries provided for under the Plan, which were agreed upon after consultation with the Ad Hoc First Lien Group, the Committee, and PBGC, are based upon a settled valuation (the "Settled Valuation") for the Avaya Enterprise of $5.721 billion, which includes $201 million attributable to certain of the Debtors' intellectual property (the "Valuation Settlement"). Centerview's Valuation Analysis, which is attached hereto as **Exhibit D**, reflects a valuation range of $5.1 billion to $7.1 billion with a midpoint valuation of $6.1 billion, which includes $201 million attributable to certain of the Debtors' intellectual property.

The Ad Hoc First Lien Group believes that the Debtors' Valuation Analysis overstates the value of the Avaya Enterprise. The Debtors considered the issues raised by the Ad Hoc First Lien Group regarding the Valuation Analysis and determined, after consultation with PBGC, that it is well within reason to settle valuation at the Reorganized Avaya Total Enterprise Value. Importantly, the Settled Valuation falls within the Debtors' valuation range set forth in the Valuation Analysis. In arriving at the Reorganized Avaya Total Enterprise Value, the Debtors also considered, among other things, the allocation of such value in light of the PBGC Settlement and the various rights, obligations, and positions held by the Debtors' various creditor constituencies, including the turnover and subordination provisions to which holders of Second Lien Notes are subject pursuant to their respective intercreditor arrangements. The distributions to Holders of First Lien Debt Claims also take into account adjustments made to the aggregate amount of the Allowed First Lien Debt Claims for the payment of adequate protection solely to the extent by which such adequate protection payments exceed the amount of encumbered value that is required to be used to satisfy administrative expenses properly allocable to unencumbered assets. The Settled Valuation is an integral component of the Global Plan Settlement.

3. **Global Plan Settlement: Waterfall Settlement**

Distributions under the Plan are premised on a waterfall model attached hereto as **Exhibit J** that incorporates the settlement of various drivers underlying the allocations contemplated therein (the "Waterfall Settlement"). The Waterfall Settlement is the result of extensive negotiations between the Debtors and the Ad Hoc First Lien Group and involved numerous meetings and discussions between the Debtors' advisors and the First Lien Advisors. The Waterfall Settlement is premised upon the Settled Valuation and takes into account certain considerations in determining allocation of the Reorganized Avaya Total Enterprise Value and the settlement of the Plan Issues serves as the basis for creditor recoveries under the Plan, including:

- the allocation of value among Debtor and non-Debtor entities;

- the allowance and treatment of intercompany claims;

- the allocation of Secured Claims on account of the repayment of the Foreign ABL Credit Facility with proceeds from the DIP Financing;

- the treatment of the adequate protection payments made in respect of the First Lien Debt Claims during the pendency of the Chapter 11 Cases;

- the Challenge Claims Settlement; and

- the allocation of expenses of the Chapter 11 Cases.

As demonstrated in **Exhibit J**, the Debtors believe that Encumbered Value is approximately $5,201 million and Unencumbered Value is approximately $19 million.  After deducting chapter 11 expense allocations from Unencumbered Value, there is no residual unencumbered distributable value.  After deducting various liabilities and settlements from Encumbered Value, as detailed in **Exhibit J**, encumbered distributable value is $4,862 million.

### 4.    Global Plan Settlement: Intercompany Settlement

Pursuant to the Plan, any and all Intercompany Claims are settled and compromised.  In connection with the PBGC and Waterfall Settlements, the Debtors and the Ad Hoc First Lien Group have settled on percentages of recovery for the Sierra Intercompany Note, AHL Receivable, AISL Receivable and Other Intercompany Claims.[50]  In arriving at such percentages, the Debtors considered, among other things, the considerations in Article V.B.5 above.  In order to effectuate the PBGC Settlement, the Ad Hoc First Lien Group has agreed to subordinate any recovery on account of the foregoing Intercompany Claims to PBGC's recovery for the PBGC Claims, which has the effect of no recovery value being allocated to the Sierra Intercompany Note.  The negotiations regarding the other provisions of the Global Plan Settlement and the PBGC Settlement took place in parallel and, absent the consensus reached in both agreements, it is unlikely that the Ad Hoc First Lien Group would have agreed to the Intercompany Settlement.  For the avoidance of doubt, the Intercompany Settlement, including decisions regarding the Sierra Intercompany Note, constitutes a settlement and compromise for purposes of determining the value of Encumbered Value and Unencumbered Value under the Plan.  The values ascribed to Encumbered Value and Unencumbered Value are denoted above and in the waterfall model attached hereto as **Exhibit J**.  Article III.D of the Plan provides that prepetition Intercompany Debtor Claims and Subsidiary Claims may be deemed settled, Reinstated or otherwise Unimpaired, in whole or in part, as of the Effective Date, in each case, at the discretion of the Debtors, with the consent of the Requisite First Lien Creditors, or Reorganized Debtors.

### 5.    Global Plan Settlement: Challenge Claims Settlement

As described above and set forth in the Plan, the Challenge Claims Settlement resolves the Settled Challenge Claims and the Letter Claims and is a good faith settlement between the Debtors' Estates, the Committee, and the Ad Hoc First Lien Group.  The Challenge Claims Settlement resolves these potential Challenges (as defined in the DIP Financing Order) with respect to the Liens securing the Debtors' prepetition debt and provides for distributions under the Plan to Holders of Allowed General Unsecured Claims.

The Challenge Claims Settlement is not reflected in the distributions to Holders of Second Lien Notes Claims or the waterfall model attached hereto as **Exhibit J** because any recovery on account of such settlement that such Holders may be entitled to receive would be subject to turnover under the relevant provisions of their intercreditor agreements.   For example, Section 2.3(c) of the ABL Intercreditor Agreement provides that Holders of Second Lien Notes have waived the right to "contest, protest, or object" to the exercise of remedies by Holders of First Lien Debt with respect to "any right or remedy provided to a secured creditor on account of a Lien, in an Insolvency Proceeding or otherwise."

---

[50]   "Other Intercompany Claims" refers to the net intercompany claims running from the Debtors to the non-Debtor subsidiaries.

Additionally, Section 6.8 of the ABL Intercreditor Agreement provides that, to the extent any Second Lien Noteholder acquires rights under Junior Shared Collateral, it will only exercise such rights "with the prior written consent of each Senior Agent." Section 6.9 of the ABL Intercreditor Agreement further provides that Holders of Second Lien Notes "(whether in the capacity of a secured creditor or an unsecured creditor) shall not propose, vote in favor of, or otherwise directly or indirectly support any plan of reorganization that is inconsistent with the priorities or other provisions of the [ABL Intercredtior Agreement]." As a result of these provisions and others, the Debtors believe that Holders of Second Lien Notes have waived the right to contest the disposition of the Settled Challenge Claims and Settled Letter Claims, including with respect to the allocation of value provided on account of such disputed Liens. The Ad Hoc Crossover Group does not agree with the Debtors' position.

The Plan incorporates such waivers and/or agreements undertaken by Holders of Second Lien Note Claims with respect to the allocation of value provided by the Challenge Claims Settlement on account of General Unsecured Claims. As noted above, the Challenge Claims Settlement resolves the Settled Challenge Claims and the Letter Claims through distributions provided to Holders of General Unsecured Claims. The Debtors and the Committee believe the Challenge Claims Settlement reflected in the Plan reflects a reasonable resolution of the Settled Challenge Claims and the Letter Claims in light of, among other things, the time, delay, and risk associated with litigating such matters to Final Order, the costs associated with such litigation, and the certainty of recoveries provided under the Plan. As with the Intercompany Settlement, it is unlikely that the Ad Hoc First Lien Group would have agreed to the Challenge Claims Settlement in absence of the larger Global Plan Settlement.

### 6. Global Plan Settlement: Marshaling Settlement

As discussed above, the DIP Financing Order provides that none of the DIP Agent or the Prepetition Secured Parties (each as defined therein) shall be subject to the equitable doctrine of marshaling, provided that those parties must "use commercially reasonable efforts to use all DIP Collateral or Prepetition Collateral other than Avoidance Actions to repay the DIP Obligations or Adequate Protection Obligations . . . ." In connection with the Global Plan Settlement, the Debtors and the Ad Hoc First Lien Group considered the potential argument that Unencumbered Value should first be attributed to the value of DIP Financing Claims, because the doctrine of marshaling could not be invoked to cause such claims to be satisfied first through proceeds available from assets that were otherwise encumbered as of the Petition Date.

As part of the Global Plan Settlement, the Ad Hoc First Lien Group agreed to the satisfaction of all DIP Obligations from collateral securing the First Lien Debt Claims. It is unlikely that the Ad Hoc First Lien Group would have agreed to the Marshaling Settlement in the absence of the larger Global Plan Settlement. Pursuant to Section 2.6(c) of the ABL Intercreditor Agreement, Holders of Second Lien Notes have waived "to the fullest extent permitted by law, any right to demand, request, plea or otherwise assert or otherwise claim the benefit of any marshalling, appraisal, valuation or similar right that may otherwise be available under applicable law" with respect to the shared collateral securing the First Lien Debt and Second Lien Notes.

### 7. Global Plan Settlement: Second Lien Recovery Settlement

Throughout the extensive and hard fought negotiations that served as the basis for the Global Plan Settlement, the Debtors and the Ad Hoc First Lien Group were aligned in their views that it was in the best interests of the Debtors' estates to reach a global resolution with respect to all major Plan Issues. As a result of their shared views, and in an effort to address issues raised by certain Holders of Second Lien Notes, the Debtors and the Ad Hoc First Lien Group agreed to a compromise (the "Second Lien Recovery Settlement") that (a) allocates the Second Lien Notes Settlement Equity Distribution to Holders of Second

Lien Notes Claims even though it gives such Holders a greater recovery than they are otherwise entitled and (b) provides Holders of Second Lien Notes Claims with the opportunity to participate in the Second Lien Call Right.

Prior to and during the Chapter 11 Cases, the Ad Hoc Crossover Group disputed the Debtors' valuation of the Avaya Enterprise as being too low. In light of those arguments, and as part of the Global Plan Settlement, the Plan includes a call option in favor of Holders of Second Lien Notes Claims with respect to Reorganized HoldCo Common Stock otherwise issued to Holders of First Lien Debt. In connection with the Second Lien Call Right, Holders of Second Lien Notes Claims are permitted to purchase the Reorganized HoldCo Common Stock at a price per share equivalent to payment in full of the First Lien Debt Claims less the amount of the First Lien Cash Distribution (price of $284.22 per share[51]), which price represents (a) an approximately 26% premium to the value of the Reorganized HoldCo Common Stock under the Plan and (b) a recovery of par plus accrued interest on account of First Lien Debt Claims at the default rate on the First Lien Debt.

Pursuant to Article III.B. of the Plan, each Holder of Second Lien Notes Claims shall receive, if the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount and the Class of Second Lien Notes Claims votes to accept the Plan, the Second Lien Call Right, which shall grant such Holders the right to purchase (a) at least $250,000,000 and no more than $500,000,000 of Reorganized HoldCo Common Stock for Cash or (b) 100% of the First Lien Reorganized HoldCo Equity Distribution for Cash (which shall include all rights to any post-Effective Date distribution of Cash and/or Reorganized HoldCo Common Stock that would otherwise be distributed to Holders of First Lien Debt from the General Unsecured Recovery Cash Pool Account and General Unsecured Recovery Equity Reserve pursuant to Article IV.G of the Plan), in each case at a price per share equivalent to payment in full of the First Lien Debt Claims less the amount of the First Lien Cash Distribution, which shall be exercised in accordance with the Second Lien Call Procedures. In order to exercise the Second Lien Call Right, Holders of Second Lien Notes Claims must subscribe for an aggregate amount equal to at least $250 million. For the avoidance of doubt, if the class of Holders of Second Lien Notes Claims does not vote to accept the Plan, or the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount, the Second Lien Call Right shall be null and *void ab initio* without further action by the Debtors or any other party and no distributions shall be made pursuant to Article III.B.4.c.(ii)A or Article III.B.4.c.(ii)B of the Plan. Pursuant to the Plan, the Debtors must use commercially reasonable efforts to syndicate the New Secured Debt.

The Second Lien Call Procedures are attached hereto as **Exhibit H**, and Holders of Second Lien Notes are encouraged to review those procedures for more details regarding the Second Lien Call Right.

The Debtors believe the Global Plan Settlement is a reasonable exercise of their business judgment and in the best interests of the Debtors' Estates. The Global Plan Settlement, which is supported by the Ad Hoc First Lien Group, enables the Debtors to provide stakeholders with material recoveries and to preserve enterprise value by consensually resolving material disputes that could have otherwise required substantial litigation. The Debtors believe that Global Plan Settlement provides the Debtors with a clear path towards emergence from chapter 11.

---

[51]    As more fully set forth in the Second Lien Call Procedures, the price per share and corresponding premium set forth herein assumes that no Holders of Allowed General Unsecured Claims submit a timely a GUC Election (i.e., electing to receive Reorganized HoldCo Common Stock and not Cash on account of such Allowed General Unsecured Claims). The Subscription Amount (as defined in the Second Lien Call Procedures) necessary to acquire all Reorganized HoldCo Common Stock otherwise distributed on account of First Lien Debt pursuant to the Second Lien Call Procedures may be subject to downward adjustment where fewer than all Holders of General Unsecured Claims timely submit GUC Elections.

M.      **Plan Support Agreement**[52]

After months of extensive negotiations between the Debtors, PBGC, certain members of the Ad Hoc First Lien Group, and the advisors to each of the foregoing parties, certain members of the Ad Hoc First Lien Group have entered into the Plan Support Agreement.[53] Each of the Plan, the PBGC Settlement Term Sheet, the Corporate Governance Term Sheet (as defined in the Plan Support Agreement), the term sheets with respect to the Advisory Agreement and the Executive Employment Agreement (each as defined in the Plan Support Agreement), and the New Secured Debt Term Sheet (as defined in the Plan Support Agreement) are attached as exhibits to and incorporated by reference in the Plan Support Agreement. The Plan Support Agreement provides for the Consenting Creditors to support the Plan and to vote in favor of the Plan so long as their votes have been solicited in accordance with sections 1125 and 1126 of the Bankruptcy Code. The Debtors believe that the Plan Support Agreement will facilitate Confirmation and the Debtors' emergence from chapter 11.

Certain key terms of the Plan Support Agreement include:

- the Plan Support Agreement will be binding on each of the Consenting Creditors on the first business day upon which signature pages shall have been executed by Consenting Creditors holding at least 50% of the First Lien Debt;

- the Plan Support Agreement will be effective and binding on the Debtors on the first business day upon which the Plan Support Agreement is binding on the Consenting Creditors and the Court shall have approved the Debtors' entry into the Plan Support Agreement;

- each of the Restructuring Documents (as defined in the Plan Support Agreement) must be in form and substance reasonably acceptable to the Debtors and the Required First Lien Creditors;

- the Consenting Creditors will support the Plan;

- the Consenting Creditors will vote for the Plan upon solicitation of the Consenting Creditors' votes in accordance with sections 1125 and 1126 of the Bankruptcy Code;

- the Debtors agree to take any and all necessary and appropriate actions to effectuate the PBGC Settlement, pursuant to the PBGC Settlement Term Sheet;

- the Debtors agree to pay the reasonable and documented fees, costs, and expenses of the First Lien Advisors that are not being paid pursuant to the DIP Financing Order;

- the Plan Support Agreement will terminate upon written notice of a Support Termination Event (as defined in the Plan Support Agreement); and

- nothing in the Plan Support Agreement shall require any of the Debtors, or any of their directors or officers, to take or refrain from taking any action such person or entity

---

[52]    This Disclosure Statement provides a summary of the Plan Support Agreement, and is qualified in its entirety by reference to the Plan Support Agreement (as well as the exhibits thereto and definitions therein).

[53]    The Debtors have filed a motion seeking approval of the Plan Support Agreement [Docket No. 902] (the "PSA Motion"). The PSA Motion is currently scheduled to be heard by the Bankruptcy Court on August 25, 2017.

reasonably believes is required to comply with its or their fiduciary duties under applicable law.

The Plan Support Agreement contemplates that the Debtors will use reasonable best efforts to effectuate the transition contemplated by an "advisory agreement" that provides for the retention of Kevin J. Kennedy ("Executive") by Avaya Inc. as an advisor, the term sheet for which is attached as **Exhibit B-1** to the Plan Support Agreement attached hereto as **Exhibit I** (the "Advisory Term Sheet"). The Advisory Term Sheet is subject to definitive documentation which, in turn, is subject to Bankruptcy Court approval in conjunction with Confirmation.  The salient terms of the Advisory Term Sheet are as follows:[54]

- Executive will provide the Company with transition and advisory assistance or otherwise (a) as determined by the Board and the successor CEO, or (b) as reasonably requested by the successor CEO from time to time (the "Advisory Services"), for two years after the Emergence Date including, company strategy and strategic alternatives, (ii) mergers and acquisitions, (iii) matters related to the company's status as a publicly traded enterprise, (iv) customer engagement, (v) technology, research, and development, and (vi) board structure and preparation; provided that Executive may elect to become a consultant 60 days after the Emergence Date;

- Executive acknowledges and agrees that his transition to the role of advisor (a) will not constitute "good reason" to terminate his employment under any of his arrangements with the Company or its affiliates, or (b) constitute termination of employment for purposes of a 2016 Retention Bonus Agreement;

- Executive will (a) receive $1,900,000 in cash per year (the "Annual Advisory Fee") and (b) in addition, Executive will be eligible to receive a maximum total of $2,475,000 (the "Annual Target Bonus") per year in cash based on achievement of performance goals for Executive as established by the CEO in consultation with the Compensation Committee of the Board and Executive in good faith negotiations as set forth in the definitive agreement, provided that Executive's actual annual bonus shall not be less than the Annual Advisory Fee;

- If the company terminates the Advisory Services without "cause", then, subject to Executive's timely execution and non-revocation of a general release of claims in favor of the Company, Executive will receive any unpaid portion of all Advisory Fees and Annual Target Bonuses;

- Executive will continue to be eligible for Company-subsidized medical coverage and shall be reimbursed for reasonable and documented legal fees and expenses incurred in connection with the Executive Term Sheet and related documents; and

- The definitive documentation will provide for reasonable and customary mutual releases and non-disparagement and restrictive covenant obligations, including with respect to compensation previously paid to Executive, avoidance actions, claw-back actions, or similar causes of action.

---

[54]   This description is provided for summary purposes only and is qualified in its entirety by reference to the Advisory Term Sheet.  For purposes of this description, "Company" shall mean "Avaya Inc."

The Plan Support Agreement contemplates that the Debtors will use reasonable best efforts to effectuate the transition contemplated by an "executive employment agreement" that provides for the retention of James M. Chirico, Jr. ("CEO") by Avaya Inc. as Chief Executive Officer, the term sheet for which is attached as **Exhibit B-2** to the Plan Support Agreement attached hereto as **Exhibit I** (the "Executive Employment Term Sheet"). The Executive Employment Term Sheet is subject to definitive documentation which, in turn, is subject to Bankruptcy Court approval in conjunction with Confirmation. The salient terms of the Executive Employment Term Sheet are as follows:[55]

- CEO will serve as President, Chief Executive Officer, and a member of the Company's Board of Directors;

- CEO may select one member of the current Board acceptable to the Ad Hoc First Lien Group to continue as member of the Board;

- CEO will receive: (a) $1,250,000 of base salary, to be annually reviewed for increase by the Compensation Committee of the Board, (b) a target bonus that is 200% of base salary based on meeting reasonably attainable quantitative performance goals to be established by the Compensation Committee, actual bonus may range up to 250% of base salary based on achievement of performance goals, provided that CEO's actual bonus for the first year following the Emergence Date will be no less than the target bonus, and (c) a sign-on bonus of $2,500,000 that will vest in ratable installments upon the first two anniversaries of the Emergence Date (subject to repayment of the unvested portion in the event of termination for "cause" or without "good reason");

- If CEO is terminated other than for "cause" or "good reason," then subject to CEO's timely execution and non-revocation of a general release of claims, CEO shall receive (a) a lump sum payment equal to two times the sum of his base salary and target bonus, and (b) up to 18 months of Company-paid COBRA benefits (if any such termination occurs within 6 months before or 24 months following a change in control, such lump sum payment will be increased to three times the sum of CEO's base salary and target bonus and CEO will receive full vesting of long-term incentive awards);

- CEO will be granted an equity incentive award and equity incentive pool, each to be negotiated by August 31 and mutually agreed upon by the CEO, the Company, and the Ad Hoc First Lien Group; and

- CEO will receive a full Internal Revenue Code Section 280G gross-up for any severance payments and will be reimbursed for reasonable legal fees and expenses incurred in connection with the negotiation and implementation of his employment and compensation agreements.

Neither Mr. Kennedy nor Mr. Chirico were involved in negotiating the Plan, the Plan Support Agreement, or the PBGC Settlement. Rather, such efforts were led by the Debtors' independent CRO, with independent advisors, and under the supervision of the Debtors' board of directors—including with respect to post-Effective Date compensation arrangements for those individuals. As a board member, Mr. Kennedy approved the filing of the Debtors' Plan and entry into the Plan Support Agreement but was

---

[55] This description is provided for summary purposes only and is qualified in its entirety by reference to the Executive Term Sheet. For purposes of this description, "Company" shall mean "Avaya Inc."

recused from participation on board approval of Mr. Kennedy's proposed Executive Employment Term Sheet.

The Plan Support Agreement contemplates a registration rights agreement (the "Registration Rights Agreement") for Holders of Claims receiving Reorganized HoldCo Common Stock under the Plan (including, for the avoidance of doubt, Holders that receive Reorganized HoldCo Common Stock pursuant to the Second Lien Call Right).  Certain terms of the Registration Rights Agreement included in the Corporate Governance Term Sheet attached as Exhibit D of the Plan Support Agreement attached hereto as **Exhibit I**, are as follows:

- Demand Registration—S-1. If the Common Shares are listed on the NYSE or Nasdaq, Holders will not have demand registration rights until Reorganized Holdco is eligible to file a registration statement on Form S-3. If the Common Shares are not listed on the NYSE or Nasdaq, (x) Holders of at least 25% of the outstanding Common Shares may demand that Reorganized Holdco file a registration statement under the Securities Act on Form S-1 (or similar or successor form), covering Common Shares held by such Holders, on an underwritten offering basis and (y) the Board may determine to commence a resale public offering and give all signatories to the registration rights agreement the opportunity to participate on a pro rata basis.

- Demand Registration--S-3. Once Reorganized Holdco is eligible to file a registration statement on Form S-3, Holders of at least 5% of the outstanding Common Shares on a fully-diluted basis may request that Reorganized Holdco file a registration statement under the Securities Act on Form S-3 (or similar or successor form) or conduct a shelf takedown off of a Form S-3 (or similar or successor form), covering common shares held by such Holder on either a resale or underwritten offering basis, to the extent such Holders are affiliates of Reorganized Holdco or otherwise hold restricted or control securities.

- Piggyback Registration. Each Holder who holds at least 2.5% of the outstanding Common Shares on a fully-diluted basis will have the right to include its Common Shares each time Reorganized Holdco proposes for any reason to register any of its Common Shares under the Securities Act (including but not limited to registrations pursuant to demands by Holders). The rights to piggyback registration may be exercised on an unlimited number of occasions. The rights to piggyback registration will be subject to customary cutbacks, exceptions and limitations (including as to exceptions employee plan S-8 filings and acquisition transactions and as to limitations, selection of underwriters, priority and cutbacks).

- Registration Procedures. The registration rights agreement will also contain customary provisions relating to the registration procedures to be followed by Reorganized Holdco, termination of registration rights and indemnification obligations, as well as lock-ups binding on the Holders who execute the registration rights agreement (to the extent required by an applicable underwriter). In addition, Reorganized Holdco will cover out-of-pocket expenses of registrations other than underwriter discounts and commissions.

The Registration Rights Agreement will be Filed in the Plan Supplement at least 14 days in advance of the Voting Deadline.

### N.    Corporate Structure Upon Emergence

The Plan Support Agreement also includes a term sheet that provides a detailed overview of the Reorganized Debtors' corporate structure upon emergence (the "Governance Term Sheet").  Pursuant to the Governance Term Sheet, Reorganized HoldCo will be organized under Delaware law and be managed

by a board of directors consisting initially of anywhere from seven to nine members (the "Reorganized HoldCo Board").  One member of the Reorganized HoldCo Board will be the Chief Executive Officer of Reorganized HoldCo, while the remaining members will be selected by the Requisite First Lien Creditors (as defined in the Plan and the Plan Support Agreement), and the composition of the Reorganized HoldCo Board shall satisfy SEC and NYSE/NASDAQ board/committee independence rules.

The Governance Term Sheet also provides that Reorganized HoldCo will use its best efforts to attempt to obtain a listing of the Reorganized HoldCo Common Stock on the NYSE or NASDAQ upon emergence.  If listing of the Reorganized HoldCo Common Stock on the NYSE or NASDAQ is not possible at emergence, the Reorganized HoldCo Common Stock will be listed on the OTCQX Premier (if the OTCQX Premier is not possible, then OTCQX, and if the OTCQX is not possible, then OTCQB) and Reorganized HoldCo will use its best efforts to obtain a NYSE or NASDAQ listing as soon as possible following emergence.  In line with the intent to list the Reorganized HoldCo Common Stock on the NYSE or NASDAQ, Reorganized HoldCo will also be an SEC filer upon emergence (either on a voluntary or mandatory basis pursuant to Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") or pursuant to Section 12(b) of the Exchange Act as a result of a stock exchange listing).

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### O.    Ad Hoc Crossover Group Disclosure Statement Objection

#### 1.    Second Lien Notes 1111(b) Election

Pursuant to the Ad Hoc Crossover Group's objection to the Disclosure Statement (the "Ad Hoc Crossover Group Disclosure Statement Objection") filed on August 16, 2017, the Ad Hoc Crossover Group argues that Class 4 may be entitled to make an election provided under section 1111(b) of the Bankruptcy Code with respect to the Second Lien Notes (the "Second Lien 1111(b) Election").  The Plan does not contemplate any such election on account of Second Lien Notes.  The Debtors reserve all rights to dispute any such election.

Additionally, Section 6.10 of the ABL Intercreditor Agreement prohibits the Second Lien Notes Trustee, for itself and on behalf of the Holders of Second Lien Notes, from making the Second Lien 1111(b) Election until First Lien Debt has been paid in full, in cash.

#### 2.    Second Lien Notes Diminution in Value Claims

The DIP Financing Order provides that the Holders of Cash Flow Credit Facility Claims, the Holders of First Lien Notes Claims and the Holders of Second Lien Notes Claims are entitled "to adequate protection of their interests in the Debtors' interests in the Prepetition Collateral, in an amount equal to the aggregate diminution in value, if any, of the [Holders' respective] interests in the Debtors'

interests in the Prepetition Collateral from and after the Petition Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of [the Liens of the respective Holders] by the DIP Liens pursuant to the DIP Documents and [the DIP Financing Order] and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code" (the "DIP Adequate Protection Claims").  The Holders of such Claims also received adequate protection liens "for the diminution in the value of the [Holders' respective] interests in the Debtors' interests in the Prepetition Collateral, a valid, perfected replacement security interest in and lien upon all of the Collateral . . . in each case in accordance with the priorities shown in Exhibit B [to the DIP Financing Order]" (the "DIP Adequate Protection Liens").  The Holders of such Claims were also "granted an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of the [Holders' respective DIP Adequate Protection Claims]" (the "DIP 507(b) Claims").  Under the DIP Financing Order, the DIP 507(b) Claims shall be "in the relative priority shown in Exhibit E [of the DIP Financing Order]."[56]

In the Ad Hoc Crossover Group Disclosure Statement Objection, the Ad Hoc Crossover Group has asserted that there has been a diminution in value of the Second Lien Noteholders' interests in the Prepetition Collateral for which there would be a diminution in value claim, but no such claim is included in the estimate of Allowed Administrative Claims.  The Debtors believe there has not been diminution in value giving rise to superpriority administrative expense claims under the DIP Financing Order.  Thus, the Plan does not contemplate the allowance or repayment of any such diminution in value claims.  Such claims, if any would be paid from the sources of consideration for Plan distributions described in Article IV.B of the Plan.  The Debtors reserve all rights to dispute such claims.

Additionally, Section 6.8 of the ABL Intercreditor Agreement prohibits Holders of Second Lien Notes from asserting rights or exercising rights "under Section 363 of 364 of the Bankruptcy Code or any similar provision of any other Debtor Relief law" absent consent from each senior agent.  Section 6.8 of the ABL Intercreditor Agreement further requires Holders of Second Lien notes to exercise any such rights "in the manner requested by the Senior Agents (acting unanimously), including any rights to payments in respect of such rights."  The Debtors are unaware of what consents, if any the Ad Hoc Crossover Group has received with respect to the disposition of such diminution in value claims as required by the ABL Intercreditor Agreement, other than the Ad Hoc Crossover Group's assertion that the entry of the DIP Financing Order constitutes the relevant "consent" by the First Lien Agent.  The section entitled *Reservation of Rights under the ICAs*" in the DIP Financing Order reads as follows: "Except as expressly provided in this Final Order, nothing in this Final Order shall amend, modify or waive the terms or provisions of the [intercreditor agreements] and all parties' rights and remedies under the [intercreditor agreements] are preserved."[57]

3.    **Second Lien Notes Claims Classification**

In the Ad Hoc Crossover Group Disclosure Statement Objection, the Ad Hoc Crossover Group suggests that, under the Debtors' Settled Valuation, Second Lien Notes Claims, PBGC Claims, and General Unsecured Claims should be classified together.  The Debtors disagree with this assertion and believe that the Plan classifies Claims properly and in accordance with section 1122 of the Bankruptcy Code.

---

[56] See DIP Financing Order ¶19-22.

[57]    DIP Financing Order ¶ 36.

VII.    SUMMARY OF THE PLAN

A.    Overview

<u>Article IV</u> of the Plan provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

B.    Administrative Claims, DIP Financing Claims, Professional Fee Claims and Priority Tax Claims

In accordance with section 1123 of the Bankruptcy Code, the Plan does not classify Administrative Claims, DIP Financing Claims, Professional Fee Claims, and Priority Tax Claims.  These Classes are excluded from the Classes of Claims and Interests set forth in <u>Article III</u> of the Plan and have the treatment set forth below.

The Debtors estimate that the amount of Administrative Claims and Priority Tax Claims will amount to approximately $150 million and $14.4 million, respectively, as of the Effective Date.  As described below, the projected recovery under the Plan for Holders of Administrative Claims and Priority Tax Claims is 100%.

Additionally, the Debtors estimate that the total amount of DIP Financing Claims will aggregate approximately $727 million as of the Effective Date.  As described below, the projected recovery under the Plan for Holders of DIP Financing Claims is 100%.

1.    Administrative Claims

The Plan defines an Administrative Claim as any Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:

- the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors;

- compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date;

- all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; and

- all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

The Plan provides that, except with respect to Professional Fee Claims and DIP Financing Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, prior to the Effective Date with consent of the Requisite First Lien Creditors (which consent shall not be unreasonably withheld), or after the Effective Date, the applicable  Reorganized Debtor agrees to less favorable treatment, each Holder of an Allowed Administrative Claim will be paid in full in Cash:  (a) if such Administrative Claim is Allowed as of the Effective Date, not later than forty-five (45) days after the Effective Date or as soon as reasonably practicable thereafter; (b) if such Administrative Claim is not Allowed as of the Effective Date, not later than forty-five (45) days after the Effective Date after entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim will be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims or DIP Financing Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, however that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

Objections to requests for payment of Administrative Claims that are Filed with the Bankruptcy Court (other than Professional Fee Claims and DIP Financing Claims) must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

Notwithstanding the foregoing, requests for payment of fees and expenses of professionals compensated pursuant to the DIP Financing Order are not required to File and serve such requests other than in compliance with the procedures set forth in the DIP Financing Order.

**Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.**

2.        **DIP Financing Claims**

All DIP Financing Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Financing facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment and (iii) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Financing Credit Agreement and the DIP Financing Order.  Except to the extent that a Holder of an Allowed DIP Financing Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Financing Claim, each such Allowed DIP Financing Claim shall be paid in full, in Cash, by the Debtors on the Effective Date with Cash proceeds from the New Secured Debt.

Contemporaneously with the foregoing payment, except with respect to Contingent DIP Obligations (which shall survive the Effective Date and shall continue to be governed by the DIP Financing facility as provided below), the DIP Financing facility and the "Loan Documents" referred to therein shall be deemed canceled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Financing facility shall automatically terminate, and all Collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Financing Agent or the DIP Financing Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Financing Claims shall be automatically discharged and released, in each case without further action by the DIP Financing Agent or the DIP Financing Lenders. The DIP Financing Agent and the DIP Financing Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors.

3.      **Professional Fee Claims**

(a)      **Final Fee Applications**

All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is sixty (60) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

(b)      **Professional Fee Escrow Account**

If the Professional Fee Claims Estimate is greater than zero, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the Exit Facility, the New Secured Debt, or otherwise). The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals; provided that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided, that the Debtors' and Reorganized Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount in any Professional Fee Escrow Account is insufficient to fund payment in full of all Allowed amounts owing to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow Account without any further action or order of the Bankruptcy Court.

(c)      **Professional Fee Claims Estimate**

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date and shall deliver such good faith estimate to the Debtors and to counsel for the Ad Hoc First Lien Group no later than five (5) Business Days prior to the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

(d)        **Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

4.        **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor prior to the Effective Date, with the consent of the Requisite First Lien Creditors (which consent shall not be unreasonably withheld), or after the Effective Date, the Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

5.        **Reclamation Claims**

Pursuant to section 546(c) of the Bankruptcy Code, a seller of goods that sold goods to a debtor in the ordinary course of such seller's business may reclaim such goods if the debtors received the goods while insolvent within 45 days of commencement of a bankruptcy case (each such claim, a "Reclamation Claim"). Section 546(c) of the Bankruptcy Code requires that the seller demand, in writing, reclamation of such goods not later than 45 days after the date of receipt of such goods by the debtor or not later than 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of a case. The Plan does not include any recovery for Reclamation Claims. Rather, pursuant to section 546(c) of the Bankruptcy Code, Reclamation Claims are subject to the prior perfected liens held by other parties on the Debtors' inventory, including claims arising under the Cash Flow Credit Facility, the First Lien Notes, and the Second Lien Notes. Accordingly, the Debtors do not believe that any valid Reclamation Claims exist, and any losses on account of such claims would be a General Unsecured Claim.

C.        **Classification and Treatment of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, the Plan designates the Classes of Claims and Interests identified below. The Plan provides that a Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and will receive distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise been settled before the Effective Date.

As described in Article I of this Disclosure Statement, the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below (and described in more detail in Article III of the Plan).

Article III.G of the Plan provides that certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be deemed eliminated for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejected of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Debt Claims[58] | Impaired | Entitled to Vote |
| 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| 5 | PBGC Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Prepetition Intercompany Debtor Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 8 | Subsidiary Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 11 | HoldCo Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[58]    For the avoidance of doubt, solely with respect to Debtor Avaya Holdings Corp., Class 3 shall consist of all First Lien Debt Claims other than First Lien Notes Claims.

2.      **Treatment of Claims and Interests**

(a)      **Class 1 - Other Priority Claims**

   i.      *Classification*:  Class 1 consists of Other Priority Claims.

   ii.      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, with the consent of the Requisite First Lien Creditors (which consent shall not be unreasonably withheld), or after the Effective Date, the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

   iii.      *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan.

(b)      **Class 2 - Other Secured Claims**

   i.      *Classification*:  Class 2 consists of Other Secured Claims.

   ii.      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, with the consent of the Requisite First Lien Creditors (which consent shall not be unreasonably withheld), or after the Effective Date, the Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Other Secured Claim, each such Holder shall receive at the applicable Debtor's, with the consent of the Requisite First Lien Creditors (which consent shall not be unreasonably withheld), or Reorganized Debtor's discretion:

      (A)      payment in full in cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms in the ordinary course);

      (B)      Reinstatement of such Holder's Allowed Other Secured Claim;

(C)    the applicable Debtor's interest in the collateral securing such Holder's Other Secured Claim; or

(D)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

iii.    *Voting*: Class 2 is Unimpaired under the Plan. Each Holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each Holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan.

**(c)    Class 3 - First Lien Debt Claims**

i.    *Classification*: Class 3 consists of all First Lien Debt Claims, but, for the avoidance of doubt, solely with respect to Debtor Avaya Holdings Corp., Class 3 consists of all First Lien Debt Claims other than First Lien Notes Claims.

ii.    *Allowance*: The First Lien Debt Claims shall be Allowed in amount of \$4,609,365,976 less the Allocation Amount.[59]

iii.    *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of a First Lien Debt Claim shall receive, its Pro Rata share of, as applicable:

(A)

(1)    if the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount, such Holder will receive its Pro Rata share of the First Lien Cash Distribution; or

(2)    if the New Secured Debt is syndicated in an amount less than the Syndication Amount, such Holder will receive its Pro Rata share of the (i) unsyndicated portion of the New Secured Debt and (ii) Cash in an amount equal to the proceeds from the syndication of the New Secured Debt less the New Secured Debt Cash Deductions;

---

[59] Based on the Settled Valuation and other elements of the Global Plan Settlement, including with respect to the treatment of the adequate protection payments made by the Debtors to or for the benefit of Holders of First Lien Debt Claims during the pendency of the Chapter 11 Cases for Plan distribution purposes, the Allowed First Lien Debt Claims in the amount of \$4,609,365,976 will be reduced by payments made as adequate protection solely to the extent by which such adequate protection payments exceed the amount of Encumbered Value that is used to satisfy administrative expenses properly allocable to Unencumbered Value for which there is insufficient Unencumbered Value to satisfy, which reduction is estimated to be approximately \$232 million as of the date hereof. The estimated Allowed First Lien Debt Claim set forth above already takes into account the foregoing reduction.

(B)    the First Lien Reorganized HoldCo Equity Distribution (less any Reorganized HoldCo Common Stock subscribed for through the exercise of the Second Lien Call Right, if any); and/or, as and to the extent applicable;

(C)    subject to the exercise of the Second Lien Call Right, distributions of Cash or Reorganized HoldCo Common Stock, if any, from the General Unsecured Recovery Cash Pool Account and/or the General Unsecured Recovery Equity Reserve, as applicable, pursuant to Article IV.G of the Plan; and

(D)    Cash proceeds from the exercise of the Second Lien Call Right, if any.

iv.    *Voting*: Class 3 is Impaired under the Plan. Each Holder of a First Lien Debt Claim is entitled to vote to accept or reject the Plan.

(d)    **Class 4 - Second Lien Notes Claims**

i.    *Classification*: Class 4 consists of all Second Lien Notes Claims.

ii.    *Allowance*: The Second Lien Notes Claims shall be Allowed in the aggregate amount equal to $1,439,960,282.[60]

iii.    *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims (including with respect to any deficiency Claim), each Holder of Second Lien Notes Claims shall receive, in each case without duplication among the Debtors:

(A)    its Pro Rata share of the Second Lien Notes Settlement Equity Distribution; and

(B)    if Class 4 votes to accept the Plan and the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount:

(1)    Holders of Second Lien Notes Claims shall receive the Second Lien Call Right, which shall be exercised in accordance with the Second Lien Call Procedures.

(2)    For the avoidance of doubt, if Class 4 does not vote to accept the Plan or the New Secured

---

[60]    The Debtors believe the Second Lien Notes Claims are wholly unsecured.

Debt is not syndicated in an amount greater than or equal to the Syndication Amount, the Second Lien Call Right shall be null and *void ab initio* without further action by the Debtors or any other party and no distributions shall be made pursuant to Article III.B.4.c(ii)A of the Plan.

iv.     *Voting*:  Class 4 is Impaired under the Plan.  Each Holder of a Second Lien Notes Claim is entitled to vote to accept or reject the Plan.

**(e)     Class 5 - PBGC Claims**

i.      *Classification*:  Class 5 consists of all PBGC Claims.

ii.     *Allowance*:  The PBGC Claims with respect to the Avaya Salaried Pension Plan shall be Allowed in the aggregate amount not less than the sum of (a) $1,240,300,000, on account of unfunded benefit liabilities with respect to the Avaya Salaried Pension Plan, and (b) any and all unpaid minimum funding contributions due with respect to the Avaya Salaried Pension Plan.

iii.    *Treatment of PBGC Claims with respect to the Avaya Salaried Pension Plan*:  In full and final satisfaction, settlement, release, and compromise of each Allowed PBGC Claim, on the Effective Date PBGC shall receive the treatment pursuant to the PBGC Stipulation of Settlement for the Avaya Salaried Pension Plan, consisting of:

(A)     the PBGC Cash Consideration; and

(B)     7.5% of the Reorganized HoldCo Common Stock, subject to dilution for any Reorganized HoldCo Common Stock issued pursuant to the Management Equity Incentive Plan.

iv.     *Voting*:  Class 5 is Impaired under the Plan.  PBGC is entitled to vote to accept or reject the Plan.

**(f)     Class 6 - General Unsecured Claims**

i.      *Classification*:   Class 6 consists of all General Unsecured Claims.

ii.     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution

70

of the General Unsecured Recovery Amount in Cash from the General Unsecured Recovery Cash Pool; provided that such Holder may irrevocably elect to receive the value of such distribution on account of such Claim in the form of Reorganized HoldCo Common Stock (with the number of shares being calculated based on the Reorganized Avaya Total Enterprise Value) and <u>not</u> Cash pursuant to a duly completed GUC Election that is submitted on or prior to the Voting Deadline.

For the avoidance of doubt, (x) any Holder of an Allowed General Unsecured Claim that does not submit a duly completed GUC Election on or prior to the Voting Deadline shall receive a distribution on account of such Claim in the form of Cash and not Reorganized HoldCo Common Stock and (y) the aggregate value of all distributions in respect of Allowed General Unsecured Claims shall not exceed the General Unsecured Recovery Amount (whether in the form of Cash or Reorganized HoldCo Common Stock).

iii.    *Voting*:  Class 6 is Impaired under the Plan.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**(g)    Class 7 - Prepetition Intercompany Debtor Claims**

i.    *Classification*:  Class 7 consists of all Prepetition Intercompany Debtor Claims.

ii.    *Treatment*:  Except to the extent that a Holder of a prepetition Intercompany Debtor Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each prepetition Intercompany Debtor Claim, each Holder of such prepetition Intercompany Debtor Claim shall receive such treatment as to render such Holder Unimpaired.

iii.    *Voting*:  Class 7 is Unimpaired under the Plan.  Each Holder of a prepetition Intercompany Debtor Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a prepetition Intercompany Debtor Claim will not be entitled to vote to accept or reject the Plan.

**(h)    Class 8 - Subsidiary Claims**

i.    *Classification*: Class 8 consists of all Subsidiary Claims.

ii.    *Treatment*:  Except to the extent that a Holder of a Subsidiary Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Subsidiary Claim, each Holder of such

71

Subsidiary Claim shall receive such treatment as to render such Holder Unimpaired.

iii.    *Voting*:  Class 8 is Unimpaired under the Plan.  Each Holder of a Subsidiary Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Subsidiary Claim will not be entitled to vote to accept or reject the Plan.

**(i)     Class 9 - Section 510(b) Claims**

i.    *Classification*: Class 9 consists of all Section 510(b) Claims.

ii.    *Treatment*:  Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

iii.    *Voting*:  Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

**(j)     Class 10 - Intercompany Interests**

i.    *Classification*:  Class 10 consists of all Intercompany Interests.

ii.    *Treatment*:  Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure existed on the Petition Date unless treated otherwise in connection with a Restructuring Transaction.

iii.    *Voting*:  Holders of Intercompany Interests are deemed to have accepted the Plan.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

**(k)     Class 11 - HoldCo Interests**

i.    *Classification*:  Class 11 consists of all HoldCo Interests.

ii.    *Treatment*: On the Effective Date, all HoldCo Interests shall be cancelled without any distribution on account of such Interests.

iii.    *Voting*:  Holders of HoldCo Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.        **Special Provisions Governing Unimpaired Claims**

The Plan provides that, except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan.  Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

4.        **Special Provision Regarding Prepetition Intercompany Claims and Recharacterization Claims**

Under the Plan, any and all prepetition Intercompany Debtor Claims, Subsidiary Claims, and Recharacterization Claims will be settled and compromised.  Distributions on account of the Allowed Claims resulting from such settlement and compromise will be effected through the distributions to Holders of Allowed Claims pursuant to the Plan.  Notwithstanding the foregoing, prepetition Intercompany Debtor Claims, and Subsidiary Claims may be deemed settled, Reinstated, or otherwise Unimpaired, in whole or in part, as of the Effective Date, in each case, at the discretion of the Debtors, with the consent of the Requisite First Lien Creditors, or Reorganized Debtors.

5.        **Special Provision Regarding Challenge Claims Settlement**

Any and all Settled Challenge Claims and Letter Claims will be settled, compromised, or waived pursuant to Article VIII of the Plan.  Distributions on account of the Allowed General Unsecured Claims resulting from such settlement and compromise will be effected through the distributions to Holders of Allowed General Unsecured Claims pursuant to the Plan.

6.        **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

7.        **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

8.    **Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

9.    **Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

10.    **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

**D.    Means for Implementation of the Plan**

1.    **Substantive Consolidation; General Unsecured Recoveries**

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; provided that the Reorganized Debtors may, consolidate Allowed Claims into one Estate for purposes of distributions from the General Unsecured Recovery Cash Pool or the General Unsecured Recovery Equity Reserve, as applicable.

2.    **Sources of Consideration for Plan Distributions**

The Reorganized Debtors shall fund distributions under the Plan with (a) Cash on hand; (b) the issuance and distribution of Reorganized HoldCo Common Stock; (c) proceeds from the Exit Facility; (d) indebtedness issued pursuant to the New Secured Debt, or the Cash proceeds thereof; and, if applicable, (e) Cash proceeds from the exercise of the Second Lien Call Right.

3.    **Issuance and Distribution of Reorganized HoldCo Common Stock**

The issuance of the Reorganized HoldCo Common Stock shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, applicable Holders of Claims will receive shares of Reorganized HoldCo Common Stock in exchange for their Claims pursuant to Article III.B of the Plan.

All of the shares of Reorganized HoldCo Common Stock issued pursuant to the Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized HoldCo Common Stock under the Plan will be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. On or as soon as reasonably practicable after the Effective Date, Reorganized HoldCo shall cause all the Reorganized HoldCo Common Stock to be registered under the Exchange Act; including, for the avoidance of doubt, any Reorganized HoldCo Common Stock issued in connection with the Second Lien Call Procedures.

For the avoidance of doubt, any claimant's acceptance of Reorganized HoldCo Common Stock, including any issuance and/or distribution of Second Lien Call Shares, if any, shall be deemed as its agreement to the New Reorganized HoldCo Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

### 4. Exit Facility

Reorganized Avaya and one or more Reorganized Debtors will enter into the Exit Facility on the Effective Date, on terms set forth in the Exit Facility Documents.

Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), to the extent not approved by the Court previously, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, including the Exit Facility Documents and any related New Secured Debt Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors with the consent of the Requisite First Lien Creditors or Reorganized Debtors may deem to be necessary to consummate the Exit Facility.

The Plan provides that the Exit Facility Documents will be filed prior to the Confirmation Hearing as part of the Plan Supplement.

### 5. New Secured Debt

On the Effective Date, the Reorganized Debtors will issue the New Secured Debt and provide any related guarantees, on terms set forth in the New Secured Debt Documents. The term sheet for the New Secured Debt is attached as **Exhibit E** to the Plan Support Agreement, which is attached hereto as **Exhibit I**. The Debtors will File the material terms of the New Secured Debt Documents in the Plan Supplement at least 14 days in advance of the Voting Deadline.

The Debtors shall use commercially reasonable efforts to syndicate for Cash the New Secured Debt; provided that if the Debtors do not syndicate the New Secured Debt in an amount greater than or equal to the Syndication Amount, after refinancing the DIP Financing, on the Effective Date, Reorganized Avaya shall issue the (a) unsyndicated portion of the New Secured Debt and (b) Cash proceeds from the syndicated portion of the New Secured Debt to Holders of First Lien Debt Claims in accordance with Article III.B of the Plan.

Confirmation will be deemed approval of the issuance and incurrence of the New Secured Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), to the extent not

approved by the Bankruptcy Court previously, and the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to issue the New Secured Debt and related guarantees, including the New Secured Debt Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors with the consent of the Requisite First Lien Creditors may deem to be necessary to consummate the New Secured Debt.

### 6. Second Lien Call Right

Provided the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount and the Class of Second Lien Notes Claims votes to accept the Plan, Holders of the Second Lien Notes Claims shall have the right, but not the obligation, to exercise the Second Lien Call Right, subject to the terms and conditions set forth in the Second Lien Call Procedures, to purchase (a) at least $250,000,000 and no more than $500,000,000 of Reorganized HoldCo Common Stock for Cash or (b) 100% of the First Lien Reorganized HoldCo Equity Distribution for Cash (which shall include all rights to any post-Effective Date distribution of Cash and/or Reorganized HoldCo Common Stock that would otherwise be distributed to Holders of First Lien Debt from the General Unsecured Recovery Cash Pool Account and General Unsecured Recovery Equity Reserve pursuant to Article IV.G of the Plan), in each case at a price per share equivalent to payment in full of the First Lien Debt Claims less the amount of the First Lien Cash Distribution ($284.22 per share[61]), which price represents (a) an approximately 26% premium to the value of the Reorganized HoldCo Common Stock under the Plan and (b) recovery of par plus accrued interest on account of the First Lien Debt Claims at the default rate on the First Lien Debt.

If the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount or the Class of Second Lien Notes Claims does not vote to accept the Plan, or Holders of Second Lien Notes Claims subscribe for less than $250,000,000 of Reorganized HoldCo Common Stock, then, in accordance with the Second Lien Call Procedures, the Second Lien Call Right shall be null and *void ab initio* and of no force or effect. Pursuant to the Plan, the Debtors must use commercially reasonable efforts to syndicate the New Secured Debt.

### 7. Allowed General Unsecured Claim Recoveries

#### (a) General Unsecured Recovery Cash Pool

On the Effective Date, the Debtors shall establish and fund the General Unsecured Recovery Cash Pool Account with Cash in an amount equal to the General Unsecured Recovery Cash Pool, which shall be held in trust for Pro Rata distributions on account of Allowed General Unsecured Claims as provided in the Plan.

The General Unsecured Recovery Cash Pool Account (x) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors, (y) shall be held in trust to fund distributions as provided in the Plan, and (z) and no Liens, Claims, or Interests shall encumber the General Unsecured Recovery Cash Pool Account in any way (whether on account of the Exit Facility, the New Secured Debt

---

[61]    As more fully set forth in the Second Lien Call Procedures, the price per share and corresponding premium set forth herein assumes that no Holders of Allowed General Unsecured Claims submit a timely a GUC Election (i.e., electing to receive Reorganized HoldCo Common Stock and not Cash on account of such Allowed General Unsecured Claims). The Subscription Amount (as defined in the Second Lien Call Procedures) necessary to acquire all Reorganized HoldCo Common Stock otherwise distributed on account of First Lien Debt pursuant to the Second Lien Call Procedures may be subject to downward adjustment where fewer than all Holders of General Unsecured Claims timely submit GUC Elections.

or otherwise); provided that commencing on the Initial General Unsecured Claims Distribution Date and continuing on each Quarterly Distribution Date thereafter, Cash held in the General Unsecured Recovery Cash Pool Account shall be promptly distributed on a dollar-for-dollar basis for each distribution from the General Unsecured Recovery Equity Reserve (with the number of shares being calculated based on the Reorganized Avaya Total Enterprise Value) to (x) Holders of First Lien Debt Claims or (y) if one or more Holders of Second Lien Notes exercise the Second Lien Call Right with respect to 100% of the First Lien Reorganized HoldCo Equity Distribution, such Holders of Second Lien Notes (and not Holders of First Lien Debt Claims).

**(b)**        **General Unsecured Recovery Equity Reserve**

After the Voting Deadline, the Debtors shall determine General Unsecured Recovery Equity Reserve with the consent of the Committee and the Requisite First Lien Creditors for distributions on account of Allowed General Unsecured Claims where Holders have irrevocably elected to receive distributions on account of such Claims in the form of Reorganized HoldCo Common Stock (and not Cash) pursuant to a duly completed GUC Election; provided that if the Debtors, the Committee, and the Requisite First Lien Creditors cannot agree on such amount, such amount shall be determined by the Bankruptcy Court after notice and a hearing prior to the Effective Date; provided further that in no instance shall the amount of Reorganized HoldCo Common Stock delivered or required to be delivered to the General Unsecured Recovery Equity Reserve on the Effective Date exceed 2.66% of Reorganized HoldCo Common Stock (subject to dilution by the Management Equity Incentive Plan).

Commencing on the Initial General Unsecured Claims Distribution Date and continuing on each Quarterly Distribution Date thereafter, Reorganized HoldCo Common Stock held in the General Unsecured Recovery Equity Reserve shall be distributed on a dollar-for-dollar basis for each distribution from the General Unsecured Recovery Cash Pool Account to (x) Holders of First Lien Debt Claims or (y) if one or more Holders of Second Lien Notes exercise the Second Lien Call Right with respect to 100% of the First Lien Reorganized HoldCo Equity Distribution, such Holders of Second Lien Notes (and not Holders of First Lien Debt Claims).

8.        **Corporate Existence**

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtors Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor will continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law) provided such modifications will be implemented in accordance with the Plan Support Agreement or otherwise be in form and substance acceptable to the Requisite First Lien Creditors.

9.      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, all Executory Contracts and Unexpired Leases assumed by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan will vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.     **Cancellation of Existing Securities**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the Cash Flow Credit Agreement, the 7.00% Senior Secured Notes Indenture, the 9.00% Senior Secured Notes Indenture, and the Second Lien Indenture, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be cancelled, except, with respect to the Cash Flow Credit Agreement, the 7.00% Senior Secured Notes Indenture, and the 9.00% Senior Secured Notes Indenture, as applicable, as necessary to (i) enforce the rights, Claims and interests of the Cash Flow Credit Facility Agent, the 7.00% Senior Secured Notes Trustee, or the 9.00% Senior Secured Notes Trustee, as applicable, and any predecessor thereof vis-a-vis the Cash Flow Credit Facility Secured Parties and any parties other than the Debtors, (ii) to allow the receipt of distributions under the Plan and the subsequent distribution of such amounts in accordance with the terms of the Cash Flow Credit Facility Documents, the 7.00% Senior Secured Notes Indenture, or the 9.00% Senior Secured Notes Indenture, as applicable, and (iii) preserve any rights of the Cash Flow Credit Facility Agent and any predecessor thereof as against any money or property distributable to Holders of Cash Flow Credit Facility Secured Claims, including any priority in respect of payment and the right to exercise any charging lien and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall also continue in effect to allow (x) the 7.00% Senior Secured Notes Trustee and any predecessor trustee under the 7.00% Senior Secured Notes Indenture and (y) the 9.00% Senior Secured Notes Trustee and any predecessor trustee under the 9.00% Senior Secured Notes Indenture, to (A) enforce the rights, Claims and interests of the 7.00% Senior Secured Notes Trustee or the 9.00% Senior Secured Notes Trustee, as applicable, and any predecessor thereof vis-à-vis the 7.00% Senior Secured Noteholders and the 9.00% Senior Secured Noteholders and any parties other than the Debtors, (B) exercise their respective charging liens for the payment of its fees and expenses and for indemnification as provided in the applicable indenture, if not otherwise paid hereunder, and (C) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the 7.00% Senior Secured Notes Trustee or the 9.00% Senior Secured Notes Trustee under the Plan;  (z) the Second Lien Notes Trustee to

78

(A) enforce the rights, Claims and interests of the Second Lien Notes Trustee and any predecessor thereof vis-à-vis the Second Lien Noteholders and any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to the Second Lien Noteholders in accordance with the terms of the Second Lien Notes Indenture, (C) exercise its charging lien for the payment of its fees and expenses and for indemnification as provided in the applicable indenture, if not otherwise paid hereunder, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the Second Lien Notes Trustee under the Plan.  Except for the foregoing, (1) the Cash Flow Credit Facility Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Cash Flow Credit Facility Documents and the Plan, except with respect to such other rights of the Cash Flow Credit Facility Agent that, pursuant to the Cash Flow Credit Facility Documents, survive the termination of the Cash Flow Credit Facility Documents.  Subsequent to the performance by the Cash Flow Credit Facility Agent of its obligations pursuant to the Plan, the Cash Flow Credit Facility Agent and its agents shall be relieved of all further duties and responsibilities related to the Cash Flow Credit Facility Documents, (2) the Second Lien Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the Second Lien Notes Indenture and the Plan, except with respect to such other rights of the Second Lien Notes Trustee that, pursuant to the Second Lien Notes Indenture, survive the termination of the Second Lien Notes Indenture. Subsequent to the performance by the Second Lien Notes Trustee of its obligations pursuant to the Plan, the Second Lien Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the Second Lien Notes Indenture, (3) the 7.00% Senior Secured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.00% Senior Secured Notes Indenture and the Plan, except with respect to such other rights of the 7.00% Senior Secured Notes Trustee that, pursuant to the 7.00% Senior Secured Notes Indenture, survive the termination of the 7.00% Senior Secured Notes Indenture.  Subsequent to the performance by the 7.00% Senior Secured Notes Trustee of its obligations pursuant to the Plan, the 7.00% Senior Secured Notes Indenture and its agents shall be relieved of all further duties and responsibilities related to the 7.00% Senior Secured Notes Indenture, and (4) 9.00% Senior Secured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 9.00% Senior Secured Notes Indenture and the Plan, except with respect to such other rights of the 9.00% Senior Secured Notes Trustee that, pursuant to the 9.00% Senior Secured Notes Indenture, survive the termination of the 9.00% Senior Secured Notes Indenture. Subsequent to the performance by the 9.00% Senior Secured Notes Trustee of its obligations pursuant to the Plan, the 9.00% Senior Secured Notes Trustee and its agents shall be relieved of all further duties and responsibilities related to the 9.00% Senior Secured Notes Indenture.

If the record holder of the First Lien Notes or Second Lien Notes is DTC or its nominee or another securities depository or custodian thereof, and such First Lien Notes or Second Lien Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of the First Lien Notes or Second Lien Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

## 11.    **Corporate Action**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (a) the issuance of the Reorganized HoldCo Common Stock; (b) the selection of the directors and officers for Reorganized HoldCo and the other Reorganized Debtors; (c) assumption of the Executive Employment Agreement and Advisory Agreement by the Reorganized Debtors; (d) implementation of the Restructuring Transactions; and (e) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized HoldCo and the other

Reorganized Debtors, and any corporate action required by the Debtors, Reorganized HoldCo, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized HoldCo, or the other Reorganized Debtors.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized HoldCo, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized HoldCo and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.L of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

### 12.    Restructuring Transactions

Following the Confirmation Date or as soon as reasonably practicable thereafter, the Debtors, may take all actions as may be necessary or appropriate in the Debtors' discretion, with the consent, not to be withheld, conditioned, or delayed, of the Requisite First Lien Creditors prior to the Effective Date and thereafter the Reorganized Debtors, to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate  the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; and (d) all other actions that the Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Restructuring Transactions will be subject to the consent, not to be withheld, conditioned, or delayed, of the Requisite First Lien Creditors prior to the Effective Date and thereafter the Reorganized Debtors and will be structured in a manner that optimizes the tax position of creditors and the Reorganized Debtors.

### 13.    Reorganized Debtors Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtors will file the Reorganized Debtors Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective Reorganized Debtors Organizational Documents, and the Reorganized Debtors may file their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the Reorganized Debtors Organizational Documents.

### 14.    Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the

Confirmation Order, the appropriate state or local governmental officials or agents will forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 15.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to Article VIII of the Plan.** The Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

### 16.    GUC Oversight Administrator

The Committee shall appoint, as of the Effective Date, a GUC Oversight Administrator with duties limited to (a) consultation rights with respect to: (i) the General Unsecured Claims reconciliation and settlement process conducted by or on behalf of the Reorganized Debtors and (ii) the distributions to the Holders of Allowed General Unsecured Claims as provided herein; (b) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the foregoing duties; and (c) such other matters as may be agreed upon between the Debtors, the Committee and the Requisite First Lien Creditors.

For so long as the claims reconciliation process shall continue, the Reorganized Debtors shall provide to the GUC Oversight Administrator reports with respect to the status of the claims reconciliation process every thirty (30) days. The Reorganized Debtors shall provide the GUC Oversight Administrator with advance notice of the Reorganized Debtors' intention to settle certain disputed General Unsecured Claims, and an opportunity to object to such settlements, on terms to be agreed upon between the Reorganized Debtors and the GUC Oversight Administrator.

The GUC Oversight Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, including any professionals retained in these Chapter 11 Cases, and the GUC Oversight Administrator Costs, including reasonable professional fees, shall be paid from the GUC Oversight Administrator Reserve in the ordinary course without further order of the Bankruptcy Court.

For the avoidance of doubt, the Reorganized Debtors shall consult in good faith with the GUC Oversight Administrator regarding the estimation, settlement, or Allowance of General Unsecured Claims, and the GUC Oversight Administrator shall have standing to be heard with respect to matters affecting the estimation, settlement, or Allowance of General Unsecured Claims, and the administration of, and distributions from, each of the General Unsecured Recovery Cash Pool Account and the General Unsecured Recovery Equity Reserve, but the estimation, reconciliation, and settlement of, and making of distributions with respect to, General Unsecured Claims shall be the sole responsibility of the Reorganized Debtors.

Upon the resolution of all disputed General Unsecured Claims, (a) the GUC Oversight Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases, and (b) funds remaining in the GUC Oversight Administrator Reserve, if any, shall be released to the General Unsecured Recovery Cash Pool for distribution to Holders of Allowed General Unsecured Claims pursuant to, and consistent with, Article IV.Gof the Plan.

17.    **Insurance Policies**

(a)    **Director and Officer Liability Insurance**

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors will be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed.

(b)    **Other Insurance Policies**

From and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Nothing in the Plan will affect, impair or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtors under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtors will retain all rights and defenses under such insurance policies, and such insurance policies shall apply to, and be enforceable by and against, the insureds, and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

18.    **Management Equity Incentive Plan**

On the Effective Date, equity grants under the Management Equity Incentive Plan shall be reserved for directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized HoldCo Board except as otherwise provided by the Executive Employment Agreement.

19.    **Employee and Retiree Benefits**

(a)    **U.S. Qualified Pension Plans**

As of the Effective Date, the Debtors shall have obtained termination of the Avaya Salaried Pension Plan in accordance with the PBGC Stipulation of Settlement, and any accrued but unpaid minimum funding contributions due with respect to the Avaya Salaried Pension Plan as of the Effective Date shall be deemed to have been paid in full by the PBGC Cash Consideration (as defined in the Plan).

On the Effective Date, Reorganized Avaya shall assume and continue to maintain the Avaya Hourly Pension Plan in accordance with applicable non-bankruptcy law (and the Reorganized Debtors reserve all of their rights thereunder), and shall pay any aggregate unpaid minimum funding contributions, with interest, for the Avaya Hourly Pension Plan under ERISA or the Internal Revenue Code. The aggregate unpaid minimum funding contributions, with interest for the Avaya Hourly Pension Plan are estimated to be approximately $37.4 million as of September 30, 2017.

After the Effective Date, Reorganized Avaya shall (i) satisfy the minimum funding requirements under 26 §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 for the Avaya Hourly Pension Plan, (ii) pay all required PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 for the Avaya Hourly Pension Plan, and (iii) administer the Avaya Hourly Pension Plan in accordance with the applicable provisions of ERISA and the Internal Revenue Code, and the Reorganized Debtors reserve all of their rights thereunder. If after the Effective Date, Reorganized Avaya enters into a designated Material Transaction (as defined in the PBGC Settlement Term Sheet), Reorganized Avaya Shall, "in addition to making the [required] minimum contributions to the Avaya Hourly Pension Plan for the plan year in which the Material Transaction is consummated, contribute, or cause to be contributed, to the Avaya Hourly Pension Plan the lesser of: (1) $150 million; or (2) an amount equal to the projected minimum required contributions to the Avaya Hourly Pension Plan . . . for the four plan years starting with the plan year immediately following the date of the Material Transaction." Upon such payment, PBGC waives a number of rights and claims related to the Avaya Hourly Pension Plan or the Material Transaction, as further described in the PBGC Settlement Term Sheet attached as Exhibit C to the Plan Support Agreement attached hereto as **Exhibit I**.

With respect to the Avaya Hourly Pension Plan, no provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors, or their successors, from liabilities or requirements imposed under any law or regulatory provision arising after the Effective Date with respect to the Avaya Hourly Pension Plan or PBGC. PBGC and the Avaya Hourly Pension Plan will not be enjoined or precluded from enforcing such liability with respect to the Avaya Hourly Pension Plan as a result of any provision of the Plan, the Confirmation Order, or section 1141 of the Bankruptcy Code.

(b)    **Comfort Letters**

As of the Effective Date, the Reorganized Debtors will assume the AISL Comfort Letter and honor all AISL Comfort Letter Obligations in accordance with applicable non-bankruptcy law, and the Reorganized Debtors reserve all of their rights thereunder.

(c)    **OPEB**

As of the Effective Date, subject to the entry of the PBGC Settlement Order, the Reorganized Debtors will (1) maintain the OPEB in accordance with, and subject to, their terms and applicable non-bankruptcy law, or (2) modify OPEB in compliance with applicable non-bankruptcy law and the Reorganized Debtors reserve all of their rights thereunder.

(d)    **Workers' Compensation Programs**

As of the Effective Date, the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors': (x) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (y) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (z) workers' compensation insurance. All Proofs of Claims on account of workers' compensation will be deemed withdrawn automatically and without any further notice to or

action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan will limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

### E.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than: (a) those that are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) those that have been previously rejected by a Final Order; (c) those that have been previously assumed by a Final Order; (d) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (e) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (f) the Comfort Letters, which will in all events be assumed by the Debtors pursuant to the Plan.  Notwithstanding anything in Article V.A of the Plan to the contrary, the Executive Employment Agreement and Advisory Agreement shall be deemed to be entered into or assumed (as applicable) on the Effective Date.

Entry of the Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

#### 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized**

**Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan.

3.    <b>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</b>

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; provided that nothing in the Plan shall prevent the Reorganized Debtors, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

4.    <b>Dispute Resolution</b>

In the event of a timely filed objection regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, action shall be taken following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

5.    <b>Indemnification Obligations</b>

The Plan provides that each Indemnification Obligation shall be assumed by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

The Debtors shall assume the Indemnification Obligations for the current and former directors, officers, managers, employees, and other professionals of the Debtors, in their capacities as such. Notwithstanding the foregoing, nothing shall impair the ability of Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates or incorporate or formation, limited liability company agreements, other organizational or formation documents, board resolutions,

85

indemnification agreements, employment contracts, or otherwise) arising after the Effective Date; provided that none of the Reorganized Debtors shall amend or restate any Reorganized HoldCo Organizational Documents before or after the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations.

### 6. **Director and Officer Liability Insurance Policies**

Without limiting Article IV.Q of the Plan, all of the Debtors' director and officer liability insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all director and officer liability insurance policies and any agreements, documents, and instruments related thereto.

### 7. **Collective Bargaining Agreement**

All of the Debtors' Collective Bargaining Agreements and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all Collective Bargaining Agreements and any agreements, documents, and instruments related thereto. All Proofs of Claim Filed for amounts due under any Collective Bargaining Agreement shall be considered satisfied by the agreement and obligation to assume and cure in the ordinary course as provided in the Plan.

### 8. **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 9. **Reservation of Rights**

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

10.  **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code.

F.  **Provisions Governing Distributions**

1.  **Reorganized Avaya Total Enterprise Value**

Distributions of Reorganized HoldCo Common Stock under the Plan shall be based upon, among other things, the Reorganized Avaya Total Enterprise Value.  For purposes of distribution, the Reorganized HoldCo Common Stock shall be deemed to have the value assigned to it based upon the Reorganized Avaya Total Enterprise Value regardless of the date of distribution.

2.  **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Effective Date or with respect to General Unsecured Claims, the Initial General Unsecured Claims Distribution Date, or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the on the Effective Date or with respect to General Unsecured Claims the Initial General Unsecured Claims Distribution Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are disputed Claims, distributions on account of any such disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

On the Effective Date, the Reorganized HoldCo Common Stock shall be distributed pursuant to the terms set forth in the Plan.

3.  **Partial Distributions on Account of Allowed General Unsecured Claims**

The Reorganized Debtors shall, in consultation with the GUC Oversight Administrator, be authorized to cause partial distributions to be made on account of Allowed General Unsecured Claims before all General Unsecured Claims are Allowed; provided that the Bankruptcy Court shall have authorized such partial distribution by Final Order after notice and a hearing.

4.  **Rights and Powers of Distribution Agent**

(a)  **Powers of the Distribution Agent**

The Distribution Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order

87

of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

### (b)    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

### 5.    Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the disputed Claim have been resolved by settlement or Final Order or the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

### 6.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### (a)    Record Date for Distribution

On the Distribution Record Date the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

### (b)    Delivery of Distributions

### i.    Initial General Unsecured Claims Distribution Date

Except as otherwise provided in the Plan, on the Initial General Unsecured Claims Distribution Date, the Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the address for each Holder of an Allowed General Unsecured Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

### ii.    Quarterly Distribution Date

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable but in any event no later than thirty (30) days after each Quarterly Distribution Date, the Distribution Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date. Any distribution that is not made on the Effective Date or with respect to General Unsecured Claims, the Initial General Unsecured Claims Distribution Date or on any other date specified in the Plan because the

Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Quarterly Distribution Date after such Claim is Allowed; provided that a distribution with respect to Allowed General Unsecured Claims on such Quarterly Distribution Date shall be subject to the (x) Allowance or disallowance by Final Order of all General Unsecured Claims having occurred or (y) the Bankruptcy Court having authorized a partial distribution on account of Allowed General Unsecured Claims after notice and a hearing upon a motion filed by the Reorganized Debtors. No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.B of the Plan.

### iii.    Delivery of Distributions on account of the First Lien Debt Claims

All distributions to Holders of Cash Flow Credit Facility Claims shall be deemed completed when made to the Cash Flow Secured Credit Facility Agent, which shall be deemed to be the Holder of all Cash Flow Credit Facility Secured Claims for purposes of distributions to be made under the Plan, for distribution to Holders of Cash Flow Credit Facility Claims in accordance with the terms of the Cash Flow Credit Facility Documents.  All distributions on account of Cash Flow Credit Facility Secured Claims may, with the consent of the Cash Flow Credit Facility Agent, be made by the Distribution Agent directly to Holders of Cash Flow Credit Facility Secured Claims in accordance with the terms of the Plan and the Cash Flow Credit Facility Documents.  The Reorganized Debtors shall reimburse the Cash Flow Credit Facility Agent for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the implementation of the Plan, including but not limited to, making distributions pursuant to and in accordance with the Plan.

All distributions to Holders of 7.00% Senior Secured Notes Claims shall be deemed completed when made to (or at the direction of) the 7.00% Senior Secured Notes Trustee, which shall be deemed to be the Holder of all 7.00% Senior Secured Notes Claims for purposes of distributions to be made under the Plan, provided, however, that non-Cash consideration shall not be distributed in the name of the 7.00% Senior Secured Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 7.00% Senior Secured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.00% Senior Secured Notes Indenture and subject to the rights of the 7.00% Senior Secured Notes Trustee to assert its 7.00% Senior Secured Notes Indenture Trustee Charging Lien.

All distributions to Holders of 9.00% Senior Secured Notes Claims shall be deemed completed when made to (or at the direction of) the 9.00% Senior Secured Notes Trustee, which shall be deemed to be the Holder of all 9.00% Senior Secured Notes Secured Claims for purposes of distributions to be made under the Plan, provided, however, that non-Cash consideration shall not be distributed in the name of the 7.00% Senior Secured Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 9.00% Senior Secured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 9.00% Senior Secured Notes Indenture and subject to the rights of the 9.00% Senior Secured Notes Trustee to assert its 9.00% Senior Secured Notes Indenture Trustee Charging Lien.

If the 7.00% Senior Secured Notes Trustee or the 9.00% Senior Secured Notes Trustee, as applicable, is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the cooperation of the 7.00% Senior Secured Notes Trustee or the 9.00% Senior Secured Notes Trustee, as applicable, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the 7.00% Senior Secured Notes Indenture Trustee Charging Lien and the 9.00% Senior Secured Notes Indenture Trustee Charging Lien shall attach to the

property to be distributed in the same manner as if such distributions were made through the 7.00% Senior Secured Notes Trustee or the 9.00% Senior Secured Notes Trustee, as applicable). The 7.00% Senior Secured Notes Trustee and the 9.00% Senior Secured Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a 7.00% Senior Secured Notes Claim or a 9.00% Senior Secured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Reorganized Debtors shall reimburse the 7.00% Senior Secured Notes Trustee and the 9.00% Senior Secured Notes Trustee for any reasonable and documented fees and expenses incurred after the Effective Date solely in connection with making distributions pursuant to and in accordance with the Plan.

iv.    **Delivery of Distributions on account of Second Lien Notes Claims**

All distributions to Holders of Second Lien Notes Claims shall be deemed completed when made to (or at the direction of) the Second Lien Notes Trustee, which shall be deemed to be the Holder of all Second Lien Notes Claims for purposes of distributions to be made hereunder, provided, however, that non-Cash consideration shall not be distributed in the name of the Second Lien Notes Trustee. As soon as practicable in accordance with the requirements set forth in <u>Article VI.F of the Plan</u>**Error! Reference source not found.**, the Second Lien Notes Trustee shall cause such distributions to be made to or on behalf of such Holders in accordance with the Second Lien Notes Indenture and subject to the rights of the Second Lien Notes Trustee to assert its Second Lien Notes Indenture Trustee Charging Lien. If the Second Lien Notes Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Second Lien Notes Trustee's cooperation, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the Second Lien Notes Indenture Trustee Charging Lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Second Lien Notes Trustee). The Second Lien Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Second Lien Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Reorganized Debtors shall reimburse the Second Lien Notes Trustee for any reasonable and documented fees and expenses incurred after the Effective Date solely in connection with making distributions pursuant to and in accordance with the Plan.

(c)    **No Fractional Shares**

No fractional shares of Reorganized HoldCo Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of shares of Reorganized HoldCo Common Stock that is not a whole number, such Reorganized HoldCo Common Stock, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of Reorganized HoldCo Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

**(d)**    **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.F.4 of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been disallowed) and all other unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a holder has not: (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (iii) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

7.    **Securities Registration Exemption**

Except as otherwise set forth immediately below (and with respect to the Second Lien Call Right Shares, if any, to be issued or distributed in connection with the exercise of the Second Lien Call Right, which shares shall be issued or distributed pursuant to the exemption provided under section 4(a)(2) of the Securities Act), all shares of Reorganized HoldCo Common Stock issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  Shares of Reorganized HoldCo Common Stock issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The Reorganized HoldCo Common Stock issued pursuant to section 1145 of the Bankruptcy Code (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the Reorganized HoldCo Common Stock from an "affiliate" in a private transaction within one year of such transfer (or within six months of such transfer if Reorganized HoldCo is a reporting company under the Exchange Act and is current in its reporting obligations at the time of such transfer), and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. Reorganized HoldCo Common Stock issued to Holders of First Lien Claims and Holders of Second Lien Notes Claims, in each case in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act, as applicable.  The recipients of shares of Reorganized Holdco Common Stock will be party to a Registration Rights Agreement that provides for the registration of shares under the Securities Act, subject to the terms and conditions set forth in such Registration Rights Agreement.  Reorganized HoldCo Common Stock underlying the Management Equity Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.  On or as soon as reasonably practicable after the Effective Date, Reorganized HoldCo shall cause all Reorganized HoldCo Common Stock to be registered under the Exchange Act; including, for the avoidance of doubt, any Reorganized HoldCo Common Stock issued in connection with the

Second Lien Call Right.  Class 3 consists of all First Lien Debt Claims, but, for the avoidance of doubt, solely with respect to Debtor Avaya Holdings Corp., Class 3 shall consist of all First Lien Debt Claims other than First Lien Notes Claims.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the Reorganized HoldCo Common Stock through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the Reorganized HoldCo Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized HoldCo Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized HoldCo Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

8.      **Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, Reorganized HoldCo, the Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Debtors shall consult with the Requisite First Lien Creditors and use commercially reasonable efforts to structure the Restructuring Transactions in a manner that will mitigate or eliminate any withholding obligations.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

9.      **Allocations**

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed in the Plan.

10.      **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law or the ABL Intercreditor Agreement, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

11.        **Setoffs and Recoupment**

Except as otherwise expressly provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless: (a) the Debtors have consented (which consent shall not be unreasonably withheld), and (b) such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

12.        **Claims Paid by Third Parties**

(a)        **Claims Paid or Payable by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)        **Claims Payable by Insurance Carriers**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice and Claims Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)        **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.    Allowance of Claims

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim. For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan.

#### 2.    Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the exclusive authority: (a) to File, withdraw, or litigate to judgment objections to Claims;(b) to settle or compromise any disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.O or defenses reserved pursuant to Article VIII.I of the Plan.

#### 3.    Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any disputed Claim or disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

#### 4.    Adjustment to Claims Register Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the

Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.     **Time to File Objections to Claims**

Any objections to Claims shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

### 6.     **Disallowance of Claims**

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.     **Amendments to Claims**

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors.

### 8.     **Distribution After Allowance**

To the extent that a disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date.

### 9.     **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

### H.     **Settlement, Release, Injunction, and Related Provisions**

### 1.     **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to

95

any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, including but not limited to, the Settled Challenge Claims.

If the Plan is confirmed and becomes effective in accordance with its terms, then the Holders of First Lien Debt Claims shall be deemed to have accepted the Challenge Claims Settlement for all purposes in these Chapter 11 Cases.  Pursuant to the Challenge Claims Settlement, each Holder of a First Lien Debt Claim waives any right to a recovery or distribution from the General Unsecured Recovery Cash Pool or the General Unsecured Recovery Equity Reserve on account of its First Lien Debt Deficiency Claim.

If the Plan is confirmed and becomes effective in accordance with its terms, the Committee shall be deemed to have waived any right to assert any of the Letter Claims.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.    <strong>Discharge of Claims and Termination of Interests</strong>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided  in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any intercompany claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

3.    <strong>Debtor Release</strong>

**The Plan contains the following releases provided by the Debtors, which should be read in their entirety:**

96

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the DIP Financing, the Plan Support Agreement, the PBGC Settlement, the formulation, preparation, dissemination, negotiation the Plan, the Disclosure Statement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (b) any Causes of Action held by PBGC against any Entity arising from a breach of fiduciary duty order Title I of The Employee Retirement Income Security Act of 1974 ("ERISA").**

4.    **Third Party Release**

The Plan defines "Releasing Party" as each of the following in their capacity as such: (a) all Holders of Claims who are deemed to accept the Plan; (b) all Holders of Claims who vote to accept the Plan; (c) the Consenting Creditors; (d) PBGC; (e) the Cash Flow Credit Facility Agent and DIP Financing Agent; (f) the Committee; (g) the Committee Members; and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (g), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, and officers, to the extent such director, manager, or officer provides express consent, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**As of the Effective Date, for good and valuable consideration, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, as well as all other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the DIP Financing, the Plan Support Agreement, the PBGC Settlement, the Avaya Salaried Pension Plan and the termination thereof, any Claims or Causes of Action that may exist with respect to all Released Parties as of the Confirmation Date or, with respect to PBGC, as of the termination of the Avaya Salaried Pension Plan, on account of the Avaya Hourly Pension Plan or the Avaya Salaried Pension Plan, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, or any**

**other action or transaction relating in any way to any of the foregoing, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Confirmation Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Confirmation Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan other than with respect to the termination of the Avaya Salaried Pension Plan, for which the foregoing "Third Party Release" shall be effective with respect to any Claim or Cause of Action arising prior to or as of the termination of the Avaya Salaried Pension Plan.  Notwithstanding anything contained in the Plan, the foregoing Third Party Release (a) is applicable only to the maximum extent permitted by law (b) does not release any Causes of Action held by the PBGC against any Entity arising from a breach of fiduciary duty under Title I of ERISA, and (c) does not release any obligations to maintain the Avaya Hourly Pension Plan after the Effective Date in accordance with <u>Article IV.S</u> of the Plan.**

     5.      **Exculpation**

The Plan defines "Exculpated Parties" as, collectively: (a) the Debtors; (b) the Committee Members; (c) the Committee, and (d) with respect to each of the foregoing, such Entity's current and former Interest holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement,  or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that, the foregoing "Exculpation" shall be limited to the extent permitted in section 1125(e) of the Bankruptcy Code.**

6.      **Injunction**

**Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all entities that have held, hold, or may hold Claims or Interests that have been released pursuant to <u>Article VIII.C</u> or <u>Article VIII.D</u> of the Plan, shall be discharged pursuant to <u>Article VIII.B</u> of the Plan, or are subject to exculpation pursuant to <u>Article VIII.E</u> of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Article VIII.E</u> of the Plan with respect to the Exculpated Parties): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such entities or the property or the estates of such entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such entities or against the property of such entities on account of or in connection with or with respect to any such Claims or Interests unless such entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

7.      **Subordination Rights**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, the ABL Intercreditor Agreement or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any Distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any Distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors and their respective property and Claim and Interest Holders and is fair, equitable and reasonable.

8.      **Release of Liens**

Except (a) with respect to the Liens securing (i) the Exit Facility, (ii) New Secured Debt, and (iii) to the extent elected by the Debtors, with the consent of the Requisite First Lien Creditors, with

respect to an Allowed Other Secured Claim in accordance with Article III.B.2 of the Plan, or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

### 9.    Release of Preference Actions

As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable of non-bankruptcy law unless such Cause of Action is specifically identified in the Plan Supplement; provided that, except as expressly provided in Article VIII.I of the Plan or the Confirmation Order, the Reorganized Debtors shall retain the right to assert any Claims assertable in any Avoidance Action as defenses or counterclaims in any Cause of Action brought by any Entity.  For the avoidance of doubt, the Reorganized Debtors shall retain the right, after the Effective Date, to prosecute any Avoidance Action specifically identified in the Plan Supplement.

### I.    Conditions Precedent to Confirmation and Consummation of the Plan

### 1.    Conditions Precedent to the Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B of the Plan):

(a)    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Requisite First Lien Creditors and such Confirmation Order shall be a Final Order;

(b)    the Avaya Salaried Pension Plan shall have been terminated;

(c)    the PBGC Settlement Approval Order shall have been entered and be in effect;

(d)    The Debtors shall have assumed the Avaya Hourly Pension Plan in accordance with Article IV.S.1 of the Plan;

(e)    the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.C of the Plan;

(f)    the General Unsecured Recovery Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.G.1 of the Plan;

(g)     The General Unsecured Recovery Equity Reserve shall have been established in accordance with Article IV.G.2 of the Plan;

(h)     The GUC Oversight Administrator shall have been appointed in accordance with Article IV.P of the Plan;

(i)     The Reorganized Debtors shall have executed the Exit Facility Documents and the New Secured Debt Documents and Avaya Inc. shall have issued the indebtedness contemplated thereby;

(j)     the Plan Support Agreement shall be in full force and effect;

(k)     the conditions precedent to entry into the Exit Facility shall have been satisfied, waived or shall be satisfied contemporaneously with the occurrence of the Effective Date;

(l)     all fees and expenses due to the professionals for the Ad Hoc First Lien Group shall have been paid in Cash and in accordance with the terms of the DIP Financing Order and the Plan Support Agreement; and

(m)     the Debtors have become current on their SEC Filings (as defined in the Plan Support Agreement).

## 2.     Waiver of Conditions

The conditions to the Effective Date of the Plan set forth in Article IX of the Plan may be waived only by consent of the Debtors, with the consent of the Requisite First Lien Creditors, and PBGC solely with respect to the conditions set forth in Article IX.A.3 and Article IX.A.4 and (2) the Committee, solely with respect to Article IX.A.6, Article IX.A.7 and Article IX.A.8 of the Plan, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

## 3.     Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1102(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## 4.     Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## J.     Modification, Revocation, or Withdrawal of the Plan

## 1.     Modification and Amendments

The Debtors, with the consent of the Requisite First Lien Creditors, PBGC (solely with respect to the PBGC Settlement), and the Committee (solely with respect to the treatment provided to Holders of

Allowed General Unsecured Claims and the role of the GUC Oversight Administrator) reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, with the consent of the Requisite First Lien Creditors, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

<strong>2.      Effect of Confirmation on Modifications</strong>

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

<strong>3.      Revocation or Withdrawal of the Plan</strong>

The Debtors reserve the right, with the consent of the Requisite First Lien Creditors (subject to the terms of the Plan Support Agreement), to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

**K.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

102

3.      resolve any matters related to:  (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to <u>Article V</u> of the Plan, any Executory Contracts or Unexpired Leases to the schedule of Executory Contracts and Unexpired Leases to be assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in <u>Article VIII</u> of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to <u>Article VI.L.1</u> of the Plan;

103

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20. hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21. enforce all orders previously entered by the Bankruptcy Court;

22. hear any other matter not inconsistent with the Bankruptcy Code;

23. enter an order concluding or closing the Chapter 11 Cases; and

24. enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

**L.    Miscellaneous Provisions**

1. **Immediate Binding Effect**

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order will be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

2.      **Additional Documents**

On or before the Effective Date, the Debtors, with the consent of the Requisite First Lien Creditors (such consent not to be unreasonably withheld), may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.      **Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930(a) will be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

4.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan will have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

5.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

6.      **Service of Documents**

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors and the Ad Hoc First Lien Group/Requisite First Lien Creditors shall be served on:

| Debtors: | Avaya Inc. |
| | 4655 Great America Parkway |
| | Santa Clara, CA 95054 |
| | Attn.:  Adele Freedman |
| | |
| | with copies to: |
| | |
| Counsel to Debtors | Kirkland & Ellis LLP |
| | Kirkland & Ellis International LLP |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Attn.: James H.M. Sprayregen, P.C., Jonathan S. |
| | Henes, P.C., and Natasha S. Hwangpo |

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 North LaSalle Drive
Chicago, Illinois  60654
Attn.:  Patrick J. Nash, Jr., P.C., Ryan Preston Dahl,
and Bradley Thomas Giordano

Counsel to the Committee

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Attn.:  Lorenzo Marinuzzi, Todd J. Goren, and Erica J.
Richards

Counsel to the Ad Hoc First Lien
Group/Requisite First Lien
Creditors

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn.:  Ira S. Dizengoff and Philip C. Dublin

### 7.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8.    Entire Agreement

The Plan and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 9.    Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable, provided that at the request of the Debtors, with the reasonable consent of the Requisite First Lien Creditors (subject to the terms of the Plan Support Agreement), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors, with the reasonable consent of the Requisite First Lien Creditors (subject to the terms of the Plan Support Agreement).  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent from the Debtors, with the reasonable consent of the Requisite

106

First Lien Creditors (subject to the terms of the Plan Support Agreement); and (c) nonseverable and mutually dependent.

10.    **Dissolution of Committee**

On the Effective Date, the Committee and any other official committees appointed in the Chapter 11 Cases will dissolve; provided, however, that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications, and any relief related thereto, for compensation by Professionals and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party. Upon the dissolution of the Committee, the Committee Members and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

## VIII.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process of the Plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for [November 14], 2017, at [●], prevailing Eastern Time.** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures. Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the Southern District of New York; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the following notice parties set forth below no later than the Plan Objection Deadline. **Unless an objection to the Plan is timely served and Filed, it may not be considered by the Bankruptcy Court.**

| *Counsel to the Debtors* | |
|---|---|
| Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)<br>Ryan Preston Dahl (admitted *pro hac vice*)<br>Bradley Thomas Giordano (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 | James H.M. Sprayregen, P.C.<br>Jonathan S. Henes, P.C.<br>**KIRKLAND & ELLIS LLP**<br>601 Lexington Avenue<br>New York, New York 10022 |

| *Counsel to the DIP Lenders* | *Counsel to the Committee* |
|---|---|
| Davis Polk & Wardell LLP<br>450 Lexington Ave.<br>New York, New York 10017<br>Attn: Damian Shaible, Esq. | Morrison & Foerster LLP<br>250 West 55th Street<br>New York, New York 10019<br>Attn: Lorenzo Marinuzzi, Esq.<br>Jon I. Levine, Esq. |
| *U.S. Trustee* | *Counsel to the Ad Hoc First Lien Group* |
| Office of the United States Trustee<br>The Southern District of New York<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>Attn:  Susan Golden, Esq. | Akin Gump Strauss Hauer & Feld LLP<br>Bank of America Tower<br>New York, New York, 10036<br>Attn: Philip Dublin, Esq.<br>Naomi Moss, Esq. |
| *Counsel to the Ad Hoc Crossover Group* | *Counsel to the Ad Hoc Second Lien Group* |
| Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, New York 10038<br>Attn: Kristopher M. Hansen, Esq.<br>Sayan Bhattacharyya, Esq. | Proskauer Rose LLP<br>Eleven Times Square<br>New York, New York 10036<br>Attn: Martin J. Bienenstock, Esq.<br>Vincent Indelicato, Esq. |

### B.    Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to each of the Debtors.  Because each of the Debtors must satisfy these requirements, it is possible that the Bankruptcy Court will enter a Confirmation Order with respect to certain Debtors and not others.[62]  The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

---

[62]    For example, the Bankruptcy Court may deny Confirmation for one or more of the Debtors if such Debtor fails to obtain the requisite acceptance of the Plan from its Classes, while still confirming the Plan with respect to the other Debtors.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (1) Holders of Claims specified in sections 507(a)(2) and 507(a)(3) will receive, under different circumstances, Cash equal to the amount of such Claim either on the Effective Date (or as soon as practicable thereafter), no later than thirty (30) days after the Claim becomes Allowed, or pursuant to the terms and conditions of the transaction giving rise to the Claim; (2) Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code will receive on account of such Claims Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) or Cash payable over no more than six (6) months after the Petition Date; and (3) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

1.    **The Debtor Releases, Third-Party Releases, Exculpation, and Injunctions Provisions**

Article VIII.C of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are each of the following in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each of the Debtors' Estates; (d) the Shareholders; (e) the Consenting Creditors; (f) PBGC; (g) the Cash Flow Credit Facility Agent and DIP Financing Agent; (h) the Committee; (i) the Committee Members; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and

109

assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII.D of the Plan provides for the release of certain claims and Causes of Action of the Releasing Parties against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "Third-Party Release").  The Releasing Parties are each of the following in their capacity as such: (a) all Holders of Claims who are deemed to accept the Plan; (b) all Holders of Claims who vote to accept the Plan; (c) the Consenting Creditors; (d) PBGC; (e) the Cash Flow Credit Facility Agent and DIP Financing Agent; (f) the Committee; (g) the Committee Members; and (h) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (g), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, and officers, to the extent such director, manager, or officer provides express consent, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

Article VIII.E of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases.  The Exculpated Parties are, collectively: (a) the Debtors; (b) the Committee Members; (c) the Committee, and (d) with respect to each of the foregoing, such Entity's current and former Interest holders (regardless of whether such interests are held directly or indirectly), subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.  Article VIII.F of the Plan permanently enjoins Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged or released pursuant to the Plan, or are subject to exculpation pursuant to the Plan, from asserting such claims, interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

The Plan provides that all Holders of Claims who are entitled to vote on the Plan who vote to accept the Plan will be granting a release of any claims or rights they have or may have as against many individuals and Entities.  The release that these Holders of Claims will be giving is broad and it includes any and all claims that such Holders may have against the Released Parties, which in any way relate to the Debtors, their operations either before or after the Chapter 11 Cases began, any securities of the Debtors, whether purchased or sold, including sales or purchases which have been rescinded, and any transaction that these Released Parties had with the Debtors.  Various Holders of Claims who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a Holder has a claim or the value of the claim nor do the Debtors take a position as to whether a Holder should consent to grant this release.

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[63] Debtor releases are granted by courts in the Second Circuit where the Debtors establish that such releases

---

[63]  See In re Adelphia Commc'ns Corp., 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); In re Oneida Ltd., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

are in the "best interests of the estate."[64]  Courts often find that releases pursuant to a settlement are appropriate.[65]  Additionally, in the Second Circuit, third party releases are permissible where "truly unusual circumstances" render the release terms integral to the success of the plan.[66]  The determination is not a matter of "factors and prongs" but courts have provided some guidance for allowing third party releases.  "Unusual circumstances" include instances in which: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished;(c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[67]  Courts typically allow releases of third party claims against non-debtors where there is the express consent of the party giving the release or where other circumstances in the case justify giving the release.[68]  Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[69]  In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[70]

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan.  The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.  The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan.  The Debtors will be prepared to meet their burden to

---

[64]  See In re Charter Commc'ns, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[65]  See, e.g., Spiegel, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); In re AMR Corp., No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); see also In re Bally Total Fitness Holding Corp., 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); accord In re Adelphia Communications Corp., 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[66]  In re Metromedia Fiber Network, Inc., 416 F.3d 136, 142-43 (2d Cir. 2005).

[67]  Id. at 141.

[68]  In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141 (2d Cir. 2005).

[69]  See, e.g., Oneida, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[70]  See In re Bearing Point, Inc., 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); In re DBSD N. Am., Inc., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), aff'd, In re DBSD N. Am., Inc., No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), aff'd in part, rev'd in part, 634 F.3d 79 (2d Cir. 2011); In re Bally Total Fitness, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); In re WorldCom, Inc., No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); Enron, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.

### 2.    Best Interests of Creditors Test—Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a Claim or an Interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

### 3.    Creditor Recoveries

The Plan provides recoveries to, among others, the Holders of Claims in Class 1, Class 2, Class 3, Class 4, Class 5, and Class 6.  As shown in the Debtors' Liquidation Analysis, and as set forth in the Liquidation Analysis, such recoveries are higher than recoveries estimated to be available if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The recoveries described in this Disclosure Statement that are available to the Holders of Claims are estimates and actual recoveries could differ materially based on, among other things, whether the amount of Claims actually Allowed against the applicable Debtor exceeds the estimates provided herein. The Debtors believe that the treatment of Claims as provided by the Plan complies with the Bankruptcy Code and established case law.

### 4.    Valuation

**The valuation information contained in this Disclosure Statement with regard to the Reorganized Debtors is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.**

The Debtors' advisors have undertaken the Valuation Analysis, attached hereto as **Exhibit D**, to determine the value available for distribution to Holders of Allowed Claims pursuant to the Plan, and to analyze and estimate the recoveries to such Holders thereunder.  Additionally, the estimated valuation of the Reorganized HoldCo Common Stock in this Disclosure Statement is based on the Settled Valuation, and the Settled Valuation used to estimate range of recovery percentages under the Plan for Holders of First Lien Debt Claims, PBGC Claims, and Second Lien Notes Claims.  Accordingly, if the actual enterprise value of the Avaya Enterprise[71] differs from the estimated enterprise value in the Valuation Analysis, the actual value of the Reorganized HoldCo Common Stock and actual distributions to Holders of First Lien Debt Claims, PBGC Claims, and Second Lien Notes Claims may be materially different than the estimations set forth herein.

---

[71]    For purposes of the Valuation Analysis, the Debtors refer to the value of the Avaya Enterprise, and not the value of the Reorganized Debtors.    The Valuation Analysis assumes an emergence date for the Reorganized Debtors of September 30, 2017.  To be consistent with this assumption, the Debtors requested Aon Hewitt to update its calculation of domestic pension, OPEB, and foreign pension underfunding from September 30, 2016 to September 30, 2017, which calculation is utilized in the Valuation Analysis.

5.       **Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation or reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain financial projections, which projections and the assumptions upon which they are based are attached hereto as **Exhibit F** (the "Financial Projections"). Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Debtors' actual revenue results outperformed the Business Plan (as defined in the Financial Projections) by 3% and 7% in the second and third quarter of 2017, respectively. The Debtors' actual adjusted EBITDA also outperformed the Business Plan, as set forth below:

| | FY 2017 | | |
|---|---|---|---|
| *($ in millions)* | **Q1** | **Q2** | **Q3** |
| Projected EBITDA | $216 | $170 | $169 |
| Actual EBITDA | 238 | 199 | 204 |
| *Outperformance ($)* | *$22* | *$29* | *$35* |
| *Outperformance (%)* | *10.2%* | *17.1%* | *20.7%* |

This outperformance is reflected in the projections for Fiscal 2017, which includes actual first quarter and second quarter results, as well as preliminary third quarter results. Notwithstanding the foregoing, the Debtors have not modified projections for Fiscal 2018 and onward at this time.

**C.       Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan, accept the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and more than one-half in number actually voting cast their ballots in favor of acceptance of the Plan, subject to Article III of the Plan. Section 1126(d) of the Bankruptcy Code similarly defines acceptance of a plan

113

by a class of impaired interests, however, Holders of Interests are not entitled to vote on the Plan on account of such Interests.

Article III.F of the Plan provides in full: "If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class." Such "deemed acceptance" by an impaired class in which no class members submit ballots satisfies section 1129(a)(10) of the Bankruptcy Code.[72]

### D.    Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if impaired classes entitled to vote on the plan have not accepted it or if an impaired class is deemed to reject the plan; provided, however, the plan is accepted by at least one impaired class (without regard to the votes of insiders). Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

The test for unfair discrimination applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent but that such treatment be "fair." In general, courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests, and have set forth the basis for the disparate treatment of certain Classes of Claims in Article III of the Plan. Accordingly, the Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for non-consensual Confirmation.

### 2.    Fair and Equitable Test

The fair and equitable test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class, the test sets different standards depending on the type of claims or interests in such class. As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

### (a)    Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) (x) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (y) each holder of a secured claim in the class receives deferred cash payments totaling at least the

---

[72]    In re Tribune Co., 464 B.R. 126, 183 (Bankr. D. Del. 2011) ("Would 'deemed acceptance' by a non-voting impaired class, in the absence of objection, constitute the necessary 'consent' to a proposed 'per plan' scheme? I conclude that it may." (footnote omitted)); see also In re Adelphia Commc'ns Corp., 368 B.R. 140, 259–63 (Bankr. S.D.N.Y. 2007).

allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (ii) the holders of such secured claims realize the indubitable equivalent of such claims.[73]

### (b)    Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest in any property.[74]

### (c)    Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of  (x) the allowed amount of any fixed liquidation preference to which such holder is entitled, and (y) any fixed redemption price to which such holder is entitled; (ii) the value of such interest; or (iii) if the class does not receive the amount as required under clause (i) above, no class of interests junior to the non-accepting class may receive a distribution under the plan.[75]

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING[76]

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or

---

[73]    See 11 U.S.C. § 1129(b)(2)(A).

[74]    See 11 U.S.C. § 1129(b)(2)(B).

[75]    See 11 U.S.C. § 1129(b)(2)(C).

[76]    Additional Risk Factors may be found in Item 1A of the 10-K filed by the Debtors for Fiscal Year 2015 available at: https://www.avaya.com/investors/secfilings/.

equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties in interest will not object.

### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX.A of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.  The Ad Hoc Crossover Group has asserted that in the event that the Administrative Claims substantially exceed the estimates provided hereunder, there can be no assurance that the Debtors will be able to make all distributions contemplated under the Plan and consummate the Plan.

The effectiveness of the Plan is also subject to certain conditions as described in Article IX.A of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.      **Nonconsensual Confirmation**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.      **Continued Risk Upon Confirmation**

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to Chapter 11 Cases, changes in consumer demand for, and acceptance of, their products, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Debtors maintain that they have the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

7.      **The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the

117

Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.　　The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.　　Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.　　Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries that will be set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11.　　Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized HoldCo, or Released Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

### B.    Risks Related to Recoveries under the Plan

#### 1.    The Debtors May Not Achieve Their Projected Financial Results

The Financial Projections attached to this Disclosure Statement as **Exhibit F** will represent the Debtors' management team's best estimate of the Avaya Enterprise's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Avaya Enterprise's operations, as well as the United States and world economies in general, and the particular industry segments in which the Avaya Enterprise operates. The Financial Projections also depend on other factors such as the Debtors' ability to complete the sale of the Networking business and non-core IP assets, and the Debtors' ability to retain and attract key employees. While the Debtors believe that the Financial Projections attached to this Disclosure Statement as **Exhibit F** are reasonable, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control. If the Debtors do not achieve these projected financial results, (a) the value of the Reorganized HoldCo Common Stock may be negatively affected; (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date; and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized HoldCo from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Avaya Enterprise's historical financial statements.

To the extent that the Settled Valuation of the Debtors is below the actual value of the Avaya Enterprise, parties receiving Reorganized HoldCo Common Stock on account of their claims may receive higher recoveries than those set forth in Article III of this Disclosure Statement. The Ad Hoc Crossover Group asserts that, in such a scenario, recoveries to Holders of First Lien Debt Claims could exceed a 100% recovery on account of such Claims. To the extent that the Settled Valuation of the Debtors is above the actual value of the Avaya Enterprise, parties receiving Reorganized HoldCo Stock on account of their claims may receive lower recoveries than those set forth in Article III of this Disclosure Statement.

#### 2.    The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

As a multinational corporation, the Debtors are subject to income taxes in the U.S. and various foreign jurisdictions. Significant judgment is required in determining the Debtors' global provision for income taxes and other tax liabilities. In the ordinary course of a global business, there are many intercompany transactions and calculations where the ultimate tax determination is uncertain. The Debtors' income tax returns are routinely subject to audits by tax authorities. Although the Debtors regularly assess the likelihood of adverse outcomes resulting from these examinations to determine their tax estimates, a final determination of tax audits or tax disputes could have an adverse effect on their results of operations and financial condition. The Debtors are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property and goods and services taxes in the U.S. and various foreign jurisdictions. They are regularly under audit by tax authorities with respect to these non-income taxes and may have exposure to additional non-income tax liabilities which could have an adverse effect on the Debtors' results of operations and financial condition.

In addition, the Debtors' future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of their deferred tax assets or liabilities, or changes in tax laws or their interpretation. Such changes could have a material adverse impact on their financial results.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 129 herein.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1.    The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the Exit Facility, depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3.    The Debtors' Business Depends on Their Ability to Keep Pace with Rapid Technological Changes That Impact Their Industry, and Ability to Grow and Retain the Debtors' Customer Base

The market in which the Debtors operate is characterized by rapid, and sometimes disruptive, technological developments, evolving industry standards, frequent new product introductions and enhancements, changes in customer requirements and a limited ability to accurately forecast future customer orders.  Their future success depends in part on their ability to continue to develop technology

solutions that keep pace with evolving industry standards and changing customer demands. The process of developing new technology is complex and uncertain, and if the Debtors fail to accurately predict customers' changing needs and emerging technological trends, their business could be harmed. The Debtors are required to commit significant resources to developing new products before knowing whether investments will result in products the market will accept. If the industry does not evolve as the Debtors believe it will, or if their strategy for addressing this evolution is not successful, many of their strategic initiatives and investments may be of no or limited value. Furthermore, the Debtors may not execute successfully on their strategic plan due to product planning or timing issues and technical hurdles. This could result in competitors providing those solutions before the Debtors do, in which case the Debtors could lose market share, reducing net revenues and earnings.

Additionally, the Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products and services, including renewals of services contracts. Any migration of customers away from the Debtors' products and services would adversely impact the Debtors' operating results. It is possible that existing customers will decide not to renew or reduce their contracts with the Debtors or not to purchase more of the Debtors' products or services in the future, which could have a material adverse effect on the Debtors' business and results of operations. In these cases, there can be no assurance that the Debtors' will be able to retain these customers.

    4.    **Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' businesses may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

Consumer hesitancy or limited availability of credit may constrict the business operations of the Debtors' end user customers and their channel, development, and implementation partners, and consequently impede their own operations. The consequences may include restrained or delayed investments, late payments, bad debts, and even insolvency among customers and business partners. In addition, the Debtors' prices could come under more pressure due to more intense competition or deflation. Finally, an extended period of economic deterioration could exacerbate the other risks described herein. If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline, the Debtors' operating results may be materially and adversely affected.

    5.    **Acquisitions of Companies, Products, or Technologies, or Internal Restructuring and Cost Savings Initiatives May Disrupt the Debtors' Ongoing Business**

The Debtors have acquired and may continue to acquire companies, products, and technologies that complement their strategic direction. Acquisitions involve significant risks and uncertainties, including:

- inability to successfully integrate the acquired technology and operations into the Debtors' business and maintain uniform standards, controls, policies, and procedures;

- inability to realize synergies expected to result from an acquisition;

- challenges retaining the key employees, customers, resellers and other business partners of the acquired operation; and

- the internal control environment of an acquired entity may not be consistent with the Debtors' standards and may require significant time and resources to improve.

Acquisitions and divestitures are inherently risky. The Debtors' transactions may not be successful and may, in some cases, harm operating results or their financial condition. In addition, if the Debtors use debt to fund acquisitions or for other purposes, their interest expense and leverage may significantly increase. If the Debtors issue equity securities as consideration in an acquisition, current shareholders' percentage ownership and earnings per share may be diluted.

In addition, from time to time, the Debtors may undertake internal restructurings and other initiatives intended to reduce expenses. These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention. Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs. If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

6.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses**

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

7.      **Financial Results May Be Volatile and May Not Reflect Historical Trends**

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

8.      **The Debtors' Substantial Liquidity Needs May Impact Revenue**

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited access to additional financing beyond the DIP Financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and funding from the DIP Financing will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) ability to comply with the terms and condition of the DIP Financing Order; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand, cash flow from operations, and funding from the DIP Financing are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing in excess of the DIP Financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing in excess of the DIP Financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

9.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the

final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10.    The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the software industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 11.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized HoldCo's financial condition and results of operations on a post-reorganization basis.

### D.    Liquidity Risks

The Reorganized Debtors' ability to carry out capital spending that is important to their growth and productivity will depend on a number of factors, including future operating performance and ability to achieve the business plan. These factors will be affected by general economic, financial, competitive, regulatory, business, and other factors that are beyond the Reorganized Debtors' control.

### E.    Risks Associated with Forward Looking Statement

This Disclosure Statement contains certain "forward-looking statements." All statements other than statements of historical fact are "forward-looking" statements for purposes of the U.S. federal and state securities laws. These statements may be identified by the use of forward looking terminology such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "our vision", "plan," "potential," "preliminary," "predict," "should," "will" or "would" or the negative thereof or other variations thereof or comparable terminology. The Debtors have based these forward-looking statements on their current expectations, assumptions, estimates and projections. While the Debtors believe these expectations, assumptions, estimates and projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties, many of which are beyond their control, which may cause their actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. **The financial information contained in this Disclosure Statement has not been audited**. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this

Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

### F.    Disclosure Statement Disclaimer

#### 1.    Information Contained in this Disclosure Statement is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 2.    This Disclosure Statement Has Not Been Approved by the United States Securities and Exchange Commission

This Disclosure Statement has not and will not be filed with the United States Securities and Exchange Commission or any state regulatory authority.   Neither the United States Securities and Exchange Commission nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

#### 3.    No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement

**This Disclosure Statement is not advice to you.**   The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice.   Each Holder of a Claim or an Interest should consult such Holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

#### 4.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors), nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, or Holders of Allowed Claims, or any other parties in interest.

#### 5.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.   The Debtors or Reorganized Debtors, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

#### 6.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of

whether any claims or causes of action of the Debtors or their respective Estates or the Reorganized Debtors are specifically or generally identified in this Disclosure Statement.

### 7. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

### 8. Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 9. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

### G. Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is set forth in Article VIII of this Disclosure Statement, "Statutory Requirements for Confirmation of the Plan," and is also included in the Debtors' Liquidation Analysis.

### H. Risks Related to the Second Lien Call Right

If the class of Holders of Second Lien Notes Claims does not vote to accept the Plan, or the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount, the Second Lien Call Right shall be null and *void ab initio* without further action by the Debtors or any other party and no distributions shall be made pursuant to Article III.B.4.c.(ii)A of the Plan.  The securities to be issued in connection with the Second Lien Call Right (as described herein), will be issued under section 4(a)(2) of the Securities Act.  All securities issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be

transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. On or as soon as reasonably practicable after the Effective Date, Reorganized HoldCo shall cause all the Reorganized HoldCo Common Stock to be registered under the Exchange Act; including, for the avoidance of doubt, any Reorganized HoldCo Common Stock issued in connection with the Second Lien Call Right. For the avoidance of doubt, Holders of Reorganized HoldCo Common Stock issued in connection with the Second Lien Call Right shall be entitled to enter into the Registration Rights Agreement.

## X.    CERTAIN SECURITIES LAW MATTERS

### A.    New Equity

As discussed herein, the Plan provides for the Debtors to distribute Reorganized HoldCo Common Stock to certain Holders of Allowed Claims. The Debtors believe that the Reorganized HoldCo Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (each, a "Blue Sky Law").

### B.    Issuance and Resale of Securities Under the Plan

#### 1.    Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws

All shares of Reorganized HoldCo Common Stock issued under the Plan will be issued in reliance upon (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as described below), or (b) in the case of shares of Reorganized HoldCo Common Stock issued in connection with the exercise of the Second Lien Call Right, section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. All shares of Reorganized Holdco Common Stock issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants, rights, privileges, or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or affiliate or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer and sale of the Reorganized HoldCo Common Stock under the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent that the issuance and distribution of the Reorganized HoldCo Common Stock is covered by section 1145 of the Bankruptcy Code, the Reorganized HoldCo Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Reorganized HoldCo Common Stock generally may be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of those exemptions for any such resale cannot be known unless individual state Blue Sky Laws are examined.

127

The Plan contemplates the application of section 1145 of the Bankruptcy Code to the Reorganized HoldCo Common Stock (except with respect to Reorganized HoldCo Common Stock issued in connection with the exercise of the Second Lien Call Right), but at this time, the Debtors express no view as to whether the issuance of the Reorganized HoldCo Common Stock is exempt from registration pursuant to section 1145 of the Bankruptcy Code and, in turn, whether any Person may freely resell Reorganized HoldCo Common Stock without registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.  The recipients of shares of Reorganized HoldCo Common Stock  will be party to a Registration Rights Agreement that provides for the registration of shares under the Securities Act, subject to the terms and conditions set forth in such Registration Rights Agreement.  Recipients of Shares of Reorganized HoldCo Common Stock are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Reorganized HoldCo Common Stock and the availability of any exemption from registration under the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

**Recipients of the Reorganized HoldCo Common Stock are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Bankruptcy Code, the Securities Act and any applicable state Blue Sky Law.**

2.      **Resale of the Reorganized HoldCo Common Stock by Persons Deemed to be "Underwriters"; Definition of Underwriter**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the Plan, with the consummation of the Plan, or with the offer or sale of securities under the Plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" any person directly or indirectly controlling or controlled by an issuer, or any person under direct or indirect common control with an issuer, of securities.  As a result, the reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer, director or significant shareholder of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly, with respect to officers and directors, if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities, through contract or otherwise.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

128

Resales of the Reorganized HoldCo Common Stock by entities deemed to be "underwriters" (which definition includes "controlling Persons" of an issuer) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act, state Blue Sky Laws, or other applicable law. Under certain circumstances, holders of Reorganized HoldCo Common Stock who are deemed to be "underwriters" may be entitled to resell their Reorganized HoldCo Common Stock pursuant to the limited safe harbor resale provisions for control securities under Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if current information regarding the issuer is publicly available, holding period requirements are met, and, if such Person is an affiliate of the issuer, if volume limitations, notice and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person" of an issuer) with respect to the Reorganized HoldCo Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized HoldCo Common Stock and, in turn, whether any Person may freely resell Reorganized HoldCo Common Stock. The Debtors recommend that potential recipients of Reorganized HoldCo Common Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the Securities Act, other federal securities laws, or applicable state Blue Sky Laws.

### 3.    Management Equity Incentive Plan

The Plan contemplates the implementation of the Management Equity Incentive Plan that shall provide Reorganized HoldCo Common Stock, or other Interests in Reorganized HoldCo, on a fully diluted basis, to directors, officers, and employees of the Reorganized Debtors, with awards and terms and conditions thereunder determined by the Reorganized HoldCo Board, except as otherwise set forth in the Executive Employment Agreement. The Debtors plan to issue such Reorganized HoldCo Common Stock pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by Section 4(a)(2) of the Securities Act.

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of certain Claims, New Secured Debt and the Reorganized HoldCo Common Stock. Except as otherwise specifically provided herein, this discussion assumes that any exchange of a Claim by a Holder for Reorganized HoldCo Common Stock, New Secured Debt and/or Cash will occur with Avaya Inc. (rather than HoldCo). The following discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan (b) that are otherwise not entitled to vote under the Plan or (c) of U.S. Qualified Pension Claims. Any Holders of any such Claims are urged to consult their tax advisors regarding the federal, state, local, non-U.S. and other tax consequences of the Plan. This summary is based on the Internal Revenue Code of 1986, as amended, (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

129

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, or to the Holders of Claims or Holders of New Secured Debt or Reorganized HoldCo Common Stock in light of their individual circumstances, nor does it address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims, New Secured Debt or Reorganized HoldCo Common Stock who are themselves in bankruptcy, persons who received their Claims, New Secured Debt or Reorganized HoldCo Common Stock pursuant to the exercise of an employee stock option or otherwise as compensation (including deferred compensation and pension benefits), and regulated investment companies and those holding, or who will hold, Claims, New Secured Debt or Reorganized HoldCo Common Stock or other certain assets, as part of a hedge, straddle, conversion, or constructive sale transaction) or U.S. Holders (as defined below) whose "functional currency" is not the U.S. dollar. The following summary does not address a Holder of New Secured Debt or a Holder of Reorganized HoldCo Common Stock other than such a Holder that received their New Secured Debt or their Reorganized HoldCo Common Stock in exchange for their Claim pursuant to the Plan. Furthermore, the following summary of certain U.S. federal income tax consequences of the Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., non-income or other tax law or the Medicare tax. This summary assumes that a Holder of Claims holds only Claims in a single Class and holds a Claim, New Secured Debt or Reorganized HoldCo Common Stock as a "capital asset" (within the meaning of section 1221 of the IRC). The following discussion assumes the debt obligation(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor(s) the Holder has the Allowed Claim against. This discussion also assumes that none of the debt obligations underlying the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the New Secured Debt is not treated as a "short-term" debt instrument, a "variable rate debt instrument," or a "contingent payment debt instrument," for U.S. federal income tax purposes, that each of the debt obligations underlying the Allowed Claims and the New Secured Debt is denominated in U.S. dollars and that the New Secured Debt is debt of Avaya Inc. Holders should consult their tax advisors regarding differing and potentially adverse U.S. federal income tax consequences of ownership and disposition of the New Secured Debt if any of the foregoing treatments apply to the New Secured Debt or it is not denominated in U.S. Dollars.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the partner (or other owner) and the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan in accordance with the Plan and as further described herein and in the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim, New Secured Debt or Reorganized Holdco Common Stock. All Holders of Claims, New Secured Debt or Reorganized Holdco Common Stock are urged to consult their tax advisors for the federal, state, local, non-U.S., and other tax consequences of the Plan.

### A. Certain U.S. Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the "issue price" (as described below) of the new debt issued in satisfaction of the existing indebtedness and (z) the fair market value of any other consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes are required to be reduced in the following order: (a) net operating loss ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. Notwithstanding this required ordering of attribute reduction, a debtor with COD Income may make an election to first to reduce the basis of its depreciable assets. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Subject to the discussion below under the heading "Excess Loss Accounts," excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member. Under the Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

In connection with the Restructuring Transactions, Debtors expect to realize significant COD Income. Because the Plan provides that holders of certain Claims will receive Reorganized HoldCo Common Stock and may receive New Secured Debt, the exact amount of any COD Income that will be

131

realized by the Debtors, and accordingly the amount of tax attributes required to be reduced (if any), will depend in part on the fair market value of the Reorganized HoldCo Common Stock and may depend on the "issue price" of the New Secured Debt (as described below) and will not be determinable until the consummation of the Plan. The Debtors expect that the amount of such COD Income will be significant and there will be material reductions in, or elimination of, tax attributes (including NOLs, credits and certain of the Debtors' tax basis in their assets). As discussed below under the heading "Excess Loss Accounts," it is also possible that there will be some amount of currently taxable income as a result of there being an excess loss account in the stock of one or more Debtors and COD Income of such a Debtor in excess of available tax attributes.

The Debtors do not currently expect to realize COD Income in connection with the satisfaction of Class 5 Claims pursuant to the Plan. In particular, for U.S. federal income tax purposes, the discharge of a liability generally does not give rise to COD Income to the extent the payment of such liability would have given rise to a deduction and contributions to a single employer qualified defined benefit plan, such as the Avaya Salaried Pension Plan generally would have been deductible when (and only when) made.

### 2.    Limitation on NOLs and Other Tax Attributes

As discussed above, the Debtors' NOLs will likely be materially reduced after computing the Debtors' taxes for the year in which the Plan is implemented. To the extent that any remain they will be subject to limitation as described below.

### (a)    General Section 382 Annual Limitation

Under section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject in any "post-change year" is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 1.99 percent for August 2017). The annual limitation under section 382 represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five year period following the ownership change, that may be used each year to offset income. The section 382 limitation may be increased to the extent that the Debtors have a net unrealized built-in gain in their assets upon implementation of the Plan, and either recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Limitations on the use of built-in losses may be imposed if the Debtors have a net unrealized built-in loss in their assets upon implementation of the Plan. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The exchange of Reorganized HoldCo Common Stock pursuant to the Plan will result in an ownership change. The Debtors expect to have a net unrealized built-in gain in their assets as of the time the Plan is implemented.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when a debtor company's former shareholders and so called "qualified creditors" of a debtor company in Chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in Chapter 11) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Debtors' section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Debtors would not be required to reduce their NOLs by the amount of certain interest deductions claimed by the Debtors within the prior three-year period and the Reorganized Debtors may undergo a change of ownership within two years without triggering any reduction in their Section 382 annual limitation.

The Debtors have not yet determined whether they are eligible for, or, if so, whether they will elect out of, the 382(l)(5) Exception.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT.  Any unused credit is carried forward indefinitely.

4. **Excess Loss Accounts**

Generally, within a consolidated group, a corporation's basis in the stock of a subsidiary corporation is (a) increased by the income of such subsidiary and any contributions to such subsidiary and (b) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary. If total net reductions exceed the parent's initial basis in the subsidiary stock, that excess is called an "excess loss account" and is treated as negative basis. The consolidated group must recognize income equal to an excess loss account in a subsidiary's stock in certain events, including (i) on the subsidiary's recognition of COD Income (discussed above) where the COD Income is excluded from income and the consolidated group does not reduce its tax attributes by the amount of the excluded COD Income, and (ii) if the stock of the subsidiary is treated as disposed of for no consideration. It is possible that a Debtor will recognize excluded COD Income in excess of available tax attributes and that there could be an excess loss account in the stock of that Debtor. In that case, the Debtors will recognize taxable income in the amount of such excess COD Income, but not to exceed the excess loss account. Furthermore, the Debtors are contemplating a number of Restructuring Transactions and it is possible that under certain circumstances the Debtors could be required to recognize gain equal to their excess loss accounts as a result of certain Restructuring Transactions. In deciding whether and to what extent to simplify their corporate structure, the Debtors will consider current and future cash tax costs and in doing so will take into account the expected cost of triggering any excess loss account into income.

5. **Consequences of Contribution of Claims to HoldCo in exchange for Reorganized HoldCo Common Stock**

It is possible that the exchanges of Claims for Reorganized HoldCo Common Stock, New Secured Debt, if any, and Cash, if any, will be bifurcated such that (a) a portion of the Allowed Class 3 Claims held by a Holder will be exchanged with HoldCo for Reorganized HoldCo Common Stock and a portion of such Claims will be exchanged with Avaya Inc. for New Secured Debt and/or Cash, and (b) the Allowed Class 4 Claims held by a Holder and the Allowed Class 6 Claims held by a Holder that makes an election to receive Reorganized HoldCo Common Stock instead of Cash will be exchanged with HoldCo for Reorganized HoldCo Common Stock. It is the Debtors' intention that any such exchanges of Allowed Class 3 Claims, Allowed Class 4 Claims, and Allowed Class 6 Claims (if applicable) with HoldCo for Reorganized HoldCo Common Stock be structured in order to qualify as a "351 exchange" under the IRC with tax-deferred treatment for certain of such Holders of Claims, as described in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(c) Treatment of First Lien Debtholders that are U.S. Holders if there is a bifurcated exchange in which (i) a portion of their Old Debt is contributed to HoldCo for Reorganized HoldCo Common Stock and (ii) the remaining portion of their Old Debt is transferred to Avaya Inc. in exchange for New Secured Debt and/or Cash","—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—2. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 4 Claims— Treatment of U.S. Holders of Allowed Class 4 Claims assuming that any transfer of Reorganized HoldCo Common Stock in exchange for any Claim will be made by and with HoldCo", and "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt, and Reorganized HoldCo Common Stock— 3. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 6 Claims."

If Allowed Class 3 Claims and/or Allowed Class 4 Claims and/or Allowed Class 6 Claims (if applicable) (or a portion thereof) are contributed to HoldCo in exchange for Reorganized HoldCo Common Stock in a transaction intended to qualify as a tax-deferred 351 exchange under the IRC, HoldCo may recognize a material amount of gain that would not have been recognized had such exchange

134

occurred directly with Avaya Inc. In particular, where one member of a consolidated group (such as HoldCo) acquires the debt of another member of such consolidated group (such as Avaya Inc.), certain complex rules require that such debt be deemed satisfied and reissued immediately after such contribution in a taxable transaction for an amount of cash determined under a set of complex rules. To the extent Claims are contributed to HoldCo in a transaction that qualifies for tax-deferred treatment under Section 351 of the IRC, HoldCo will, subject to certain exceptions, obtain a tax basis in such Claim equal to the Holder's basis, increased by any gain recognized by such Holder. Under one such exception, if a Holder has a built-in loss in its Claim, the tax basis of such Claim is required to be reduced to fair market value unless the Holder of such claim and HoldCo are permitted to make, and make, a joint election to instead reduce the tax basis of the Reorganized HoldCo Common Stock received by such Holder in the exchange. Accordingly, if a Claim is contributed to HoldCo with a built-in gain, such gain will be triggered immediately after such contribution and realized by HoldCo, but HoldCo may not be able to offset such gain with any built-in losses in other contributed Claims. If HoldCo were to recognize gain due to the application of these rules, it is expected that this gain would be offset by, and reduce, the Debtors' NOLs or other applicable tax attributes, however such gain could potentially result in a material tax liability for the Debtors to the extent the Debtors' NOLs and other tax attributes are insufficient to offset such gain. The rules regarding intercompany obligations are complex and highly detailed and you should consult your tax advisor regarding the tax consequences to the Debtors of exchanging a Claim for Reorganized HoldCo Common Stock with HoldCo.

### B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

#### 1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims

Pursuant to the Plan and in full and final satisfaction of their Claims, Holders of Allowed Class 3 Claims (solely for purposes of this discussion, the "First Lien Debtholders" will receive (a) their Pro Rata share of the First Lien Reorganized HoldCo Equity Distribution (reduced to the extent of the exercise of the Second Lien Call Right (if applicable)), (b) Cash (if any) from proceeds of the syndication of the New Secured Debt and from the exercise of the Second Lien Call Right (if applicable) and (c) to the extent the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount, their Pro Rata share of the unsyndicated portion of the New Secured Debt. Solely for purposes of this discussion, the term "Old Debt" means such First Lien Debtholder's beneficial interest in the First Lien Debt Claims.

The U.S. federal income tax consequences of the Plan to U.S. Holders that are First Lien Debtholders will depend, in part, on among other things, whether the Old Debt and the New Secured Debt received (if any) in the exchange both constitute "securities" for U.S. federal income tax purposes. Neither the IRC nor the Treasury Regulations promulgated thereunder defines the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have generally indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the

135

subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. **Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Old Debt and the New Secured Debt as "securities" for U.S. federal income tax purposes.**

> (a)    **Treatment of First Lien Debtholders that are U.S. Holders if such U.S. Holders receive New Secured Debt and the Old Debt and New Secured Debt are both treated as "securities" for U.S. federal income tax purposes**

This section only applies if the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount and the First Lien Debtholders receive New Secured Debt. If that is the case, and the Old Debt and the New Secured Debt are treated as a "securities" for U.S. federal income tax purposes, an exchange with Avaya Inc. of the Old Debt for New Secured Debt and the Reorganized HoldCo Common Stock, if any, and Cash, if any, should, in each case, constitute a "recapitalization" for U.S. federal Income tax purposes.

If the exchange is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder exchanging Old Debt would not recognize loss on the exchange and would generally recognize gain equal to the lesser of:

> i.    the fair market value of the Reorganized HoldCo Common Stock received, if any, <u>plus</u> the amount of Cash received, if any, (other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") (for purposes of this section, "boot"); and

> ii.    the gain realized by the U.S. Holder (i.e., the excess of the "issue price" (as described below) of the New Secured Debt received <u>plus</u> the fair market value of the Reorganized HoldCo Common Stock received, if any, <u>plus</u> the amount of Cash received, if any, (in each case, other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest") over the U.S. Holder's adjusted tax basis in the Old Debt surrendered in the exchange).

The adjusted tax basis of the Old Debt generally will equal a U.S. Holder's purchase price for the Old Debt, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to the Old Debt, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Except as provided below under "—Market Discount" with respect to accrued market discount, any such gain generally will be long-term capital gain if the U.S. Holder held the Old Debt for more than one year at the time of the exchange. Long-term capital gains of a non-corporate taxpayer may be taxed at a preferential rate. The deductibility of capital losses is subject to limitations as described in more detail below under "—Limitations on Use of Capital Losses."

The determination of the "issue price" of the New Secured Debt for purposes of this analysis will depend, in part, on whether the New Secured Debt is traded on an "established securities market" for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market (or that is issued for stock or securities so traded) would be the fair market value of such debt instrument (or such stock or securities so traded) on the issue date as determined by such trading. The issue price of

a debt instrument that is neither so traded nor issued for stock or securities so traded would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Although not free from doubt, the Debtors believe that either the New Secured Debt or the Old Debt will be treated as traded on an established securities market for U.S. federal income tax purposes, but no assurances can be given in this regard. The rules regarding the determination of issue price are complex and highly detailed and you should consult your tax advisor regarding the determination of the issue price of the New Secured Debt.

Except to the extent the New Secured Debt received is attributable to accrued interest on the Old Debt, a U.S. Holder's holding period for the New Secured Debt received will include the period of time during which the U.S. Holder held the corresponding Old Debt, and a U.S. Holder's initial tax basis in the New Secured Debt will equal the adjusted tax basis in the Old Debt immediately prior to the exchange, decreased by the amount of any boot received and increased by the amount of gain, if any, recognized by the U.S. Holder in respect of the exchange. Any portion of the New Secured Debt received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date. A U.S. Holder's initial basis in the Reorganized HoldCo Common Stock will be equal to fair market value and its holding period for the Reorganized HoldCo Common Stock will generally begin the day following the Effective Date.

> **(b)** **Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt**

If (i) either the Old Debt or the New Secured Debt is not treated as a "security" for U.S. federal income tax purposes or (ii) the First Lien Debtholders do not receive any New Secured Debt, the exchange of the Old Debt for the Reorganized HoldCo Common Stock (if any), a Pro Rata share of the unsyndicated portion of the New Secured Debt (if any), and Cash (if any) will, in each case, constitute a fully taxable exchange under section 1001 of the IRC. Accordingly, each First Lien Debtholder that is a U.S. Holder (as applicable) generally should recognize gain or loss in the exchange equal to the difference between (i) the sum of the fair market value of the Reorganized HoldCo Common Stock received, if any, plus the amount of Cash received, if any, plus the "issue price" (as discussed above) of the New Secured Debt received, if any, (in each case, to the extent such consideration is not allocable to accrued but untaxed interest on the Old Debt as discussed below under "—Accrued Interest") and (ii) such U.S. Holder's adjusted tax basis in the Old Debt. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Old Debt in such U.S. Holder's hands, whether the Old Debt constitutes a capital asset in the hands of the U.S. Holder, whether the Old Debt was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Old Debt. If recognized gain is capital gain, it generally would be long-term capital gain if the holder held the Old Debt for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. In addition, see the discussions of accrued interest and market discount below. A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock received should equal the fair market value of such Reorganized HoldCo Common Stock as of the date such Reorganized HoldCo Common Stock is distributed to the U.S. Holder and a U.S. Holder's tax basis in the New Secured Debt received, if any, should equal its "issue price" (as discussed above). A U.S. Holder's holding period for the Reorganized HoldCo Common Stock received and the New Secured Debt received, if any, should each begin on the day following the Effective Date.

137

       **(c)**       **Treatment of First Lien Debtholders that are U.S. Holders if there is a bifurcated exchange in which (i) a portion of their Old Debt is contributed to HoldCo for Reorganized HoldCo Common Stock and (ii) the remaining portion of their Old Debt is transferred to Avaya Inc. in exchange for New Secured Debt and/or Cash**

This section describes the tax consequences to First Lien Debtholders if the exchange is bifurcated into a transfer of (i) a portion of a First Lien Debtholder's Old Debt to HoldCo solely in exchange for Reorganized HoldCo Common Stock (the "HoldCo Exchange"), and (ii) the remaining portion of such First Lien Debtholder's Old Debt to Avaya Inc. in exchange for New Secured Debt and/or Cash (the "Avaya Inc. Exchange"). As described above, it is the Debtors' intention that any such HoldCo Exchange be structured in order to qualify as a "351 exchange" under the IRC generally with tax-deferred treatment for First Lien Debtholders.  It is currently contemplated that the portion of a First Lien Debtholder's Old Debt transferred in the HoldCo would be an amount of such Old Debt with a fair market value equal to the fair market value of the Reorganized HoldCo Common Stock received in exchange therefor, and that the remaining portion of such First Lien Debtholder's Old Debt would be transferred in the Avaya Inc. Exchange.

### *Treatment of HoldCo Exchange*

To the extent a portion of the Old Debt held by the First Lien Debtholders' is contributed to HoldCo solely in exchange for Reorganized HoldCo Common Stock and such contribution constitutes a "351 exchange" under the IRC, a U.S. Holder exchanging such Old Debt would not recognize loss on the exchange and would generally not recognize gain on the exchange (other than to the extent attributable to accrued but untaxed interest on the Old Debt which will be treated as discussed below under "—Accrued Interest").  Except to the extent the Reorganized HoldCo Common Stock received is attributable to accrued interest on the Old Debt, a U.S. Holder's holding period for the Reorganized HoldCo Common Stock received will include the period of time during which the U.S. Holder held the corresponding Old Debt, and a U.S. Holder's initial tax basis in the Reorganized HoldCo Common Stock will equal the adjusted tax basis in the Old Debt immediately prior to the exchange (assuming no joint election has been made by such Holder and HoldCo to reduce the basis of the Holder's stock to fair market value).  Any portion of the Reorganized HoldCo Common Stock received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date.

If the contribution of such Old Debt to HoldCo does not qualify as a "351 exchange" under the IRC, such exchange will constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt."

### *Treatment of Avaya Inc. Exchange*

To the extent a portion of the Old Debt held by the First Lien Debtholders is transferred to Avaya Inc. in exchange for New Secured Debt and/or Cash, the consequences of the transaction will depend on whether the Old Debt and the New Secured Debt received (if any) in the exchange both constitute "securities" for U.S. federal income tax purposes and whether the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount.

If the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount and, as a result, the First Lien Debtholders receive their Pro Rata share of the unsyndicated portion of the New Secured Debt and both the Old Debt and the New Secured Debt constitute "securities," the exchange should constitute a "recapitalization" for U.S. federal Income tax purposes and generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—(a) Treatment of First Lien Debtholders that are U.S. Holders if such U.S. Holders receive New Secured Debt and the Old Debt and New Secured Debt are both treated as "securities" for U.S. federal income tax purposes."

If (i) the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount and, as a result, the First Lien Debtholders receive only Cash (if any) in respect of the Avaya Inc. Exchange, or (ii) the New Secured Debt is not syndicated in an amount greater than or equal to the Syndication Amount and, as a result, the First Lien Debtholders receive their Pro Rata share of the unsyndicated portion of the New Secured Debt and either the Old Debt or the New Secured Debt do not constitute "securities," then any Avaya Inc. Exchange would constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt."

2.    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 4 Claims**

Pursuant to the Plan, U.S. Holders of Allowed Class 4 Claims will receive (a) their Pro Rata share of the Second Lien Notes Settlement Equity Distribution in exchange for their Allowed Class 4 Claims and (b) if and only if Holders of Class 4 Claims vote to accept the Plan and the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount and such Holder exercises its Second Lien Call Right and certain other conditions are met, additional Reorganized HoldCo Common Stock in exchange for Cash.

*Treatment of U.S. Holders of Allowed Class 4 Claims assuming that any transfer of Reorganized HoldCo Common Stock in exchange for any Claim will be made by and with Avaya Inc.*

A U.S. Holder's exchange of an Allowed Class 4 Claim for its Pro-Rata share of the Second Lien Notes Settlement Equity Distribution will constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (a) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (b) such U.S. Holders do not receive any New Secured Debt."

A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock received pursuant to the exercise of any Second Lien Call Right should equal the U.S. Holder's purchase price for such Reorganized HoldCo Common Stock. A U.S. Holder's holding period for such Reorganized HoldCo Common Stock should begin on the day following the Effective Date.

*Treatment of U.S. Holders of Allowed Class 4 Claims assuming that any transfer of Reorganized HoldCo Common Stock in exchange for any Claim will be made by and with HoldCo*

If the transfer of Class 4 Claims by the Holders of Allowed Class 4 Claims to HoldCo constitutes a "351 exchange" under the IRC, such a U.S. Holder exchanging his or her Class 4 Claim would not recognize loss on the exchange and would generally not recognize gain on the exchange (other than to the extent attributable to accrued but untaxed interest on the Class 4 Claims which will be treated as discussed below under "—Accrued Interest"). Except to the extent of any Reorganized HoldCo Common Stock acquired by a Holder in exchange for Cash pursuant to the exercise of any Second Lien Call Right and except to the extent the Reorganized HoldCo Common Stock received is attributable to accrued interest on the Class 4 Claim, a U.S. Holder's holding period for the Reorganized HoldCo Common Stock received will include the period of time during which the U.S. Holder held the corresponding Class 4 Claim, and such U.S. Holder's initial tax basis in the Reorganized HoldCo Common Stock will equal the adjusted tax basis in the Class 4 Claim immediately prior to the exchange (assuming no joint election has been made by such Holder and HoldCo to reduce the basis of the Holder's stock to fair market value).The adjusted tax basis of the Class 4 Claim generally will equal a U.S. Holder's purchase price for the Class 4 Claim, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to the Class 4 Claim, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."Any portion of the Reorganized HoldCo Common Stock received that is attributable to accrued but untaxed interest will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date.

If the transfer of such Class 4 Claim to HoldCo does not qualify as a "351 exchange" under the IRC, except to the extent of any Reorganized HoldCo Common Stock acquired by a Holder in exchange for Cash pursuant to the exercise of any Second Lien Call Right, such exchange will constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt."

A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock received in exchange for Cash pursuant to the exercise of any Second Lien Call Right, should equal the U.S. Holder's purchase price for such Reorganized HoldCo Common Stock. A U.S. Holder's holding period for such Reorganized HoldCo Common Stock should begin on the day following the Effective Date.

3.    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 6 Claims**

Except to the extent a U.S. Holder of Allowed Class 6 Claims agrees to a less favorable treatment or unless such Holder elects to receive Reorganized HoldCo Common Stock and not Cash pursuant to a duly completed and timely submitted GUC Election, pursuant to the Plan U.S. Holders of Allowed Class 6 Claims will receive their Pro Rata share of the General Unsecured Recovery Cash Pool in Cash. Generally, this will constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated

140

as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt."

If a U.S. Holder of Allowed Class 6 Claims elects to receive Reorganized HoldCo Common Stock in lieu of its Pro Rata share of the General Unsecured Recovery Cash Pool in Cash, the tax consequences of the exchange of such a Holder's Class 6 Claim for Reorganized HoldCo Common Stock will depend in part upon whether the transfer of Reorganized HoldCo Common Stock in exchange for the Claim is made by and with Avaya Inc. or by and with HoldCo. If such exchange is made by and with Avaya Inc., the exchange will constitute a fully taxable exchange under section 1001 of the IRC and will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—1. U.S. Federal Income Tax Consequences to Holders of Allowed Class 3 Claims—(b) Treatment of First Lien Debtholders that are U.S. Holders if (i) the Old Debt and the New Secured Debt are not both treated as "securities" for U.S. federal income tax purposes or (ii) such U.S. Holders do not receive any New Secured Debt." If such exchange is made by and with HoldCo, the exchange will generally be subject to the rules described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—2. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 4 Claims— Treatment of U.S. Holders of Allowed Class 4 Claims assuming that any transfer of Reorganized HoldCo Common Stock in exchange for any Claim will be made by and with HoldCo."

4.    **Accrued Interest**

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income for U.S. federal income tax purposes (any such amount of interest solely for purposes of this discussion "accrued but untaxed interest"), such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt underlying the surrendered Allowed Claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued but unpaid interest and then as a payment of principal. Application of these treatments to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

**U.S. Holders should consult their tax advisors concerning the allocation of consideration received in satisfaction of their Claims and the federal income tax treatment of accrued but untaxed interest.**

5.      **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with "original issue discount," ("OID") its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debt constituting its Allowed Claim that was acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the Holder elected to include "market discount" in income as it accrued). To the extent that the surrendered debts that were acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefore and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

6.      **U.S. Federal Income Tax Consequences to U.S. Holders of Reorganized HoldCo Common Stock**

(a)      **Dividends on Reorganized HoldCo Common Stock**

Any distributions made on account of the Reorganized HoldCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of Reorganized HoldCo Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

142

(b)    **Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of Reorganized HoldCo Common Stock. Such gain or loss will generally equal the difference, if any, between the amount realized on the sale, exchange or other taxable disposition and the U.S. Holder's adjusted tax basis in their Reorganized HoldCo Common Stock. A U.S. Holder's adjusted tax basis in their Reorganized HoldCo Common Stock will depend on whether, as described above, the U.S. Holder receives his or her Reorganized HoldCo Common Stock as part of a transaction that is treated as a "351 exchange" for U.S. federal income tax purposes. Any such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder is treated, for federal income tax purposes, as having held the Reorganized HoldCo Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

7.    **U.S. Federal Income Tax Consequences to U.S. Holders of the New Secured Debt**

(a)    **Interest**

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes.

If the "stated redemption price at maturity" of the New Secured Debt exceeds the "issue price" of the New Secured Debt by an amount equal to or greater than a statutorily defined de minimis amount, the New Secured Debt will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the New Secured Debt is the total of all payments due on the New Secured Debt other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

Although not free from doubt, the Debtors believe the issue price (as discussed above) of the New Secured Debt will likely not equal the stated redemption price at maturity of such loan and the New Secured Debt may be treated as issued with OID.

For purposes of determining whether there is OID, the de minimis amount is generally equal to ¼ of 1 percent of the principal amount of the New Secured Debt multiplied by the number of complete years to maturity from their original issue date, or if the New Secured Debt provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted average maturity (as determined under applicable Treasury regulations). If the New Secured Debt is issued with OID, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the New Secured Debt, in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on the New Secured Debt that is attributable to previously accrued OID that has been included in its income. If the amount of OID on the New Secured Debt is de minimis, rather than being characterized as interest, any payment attributable to the de minimis OID will be treated as gain from the sale of the New Secured Debt, and a pro rata amount of such de minimis OID must be included in income as principal payments are received on the New Secured Debt.

143

(b)        **Sale, Exchange or Other Taxable Disposition**

Upon the sale, exchange or other taxable disposition of an interest in the New Secured Debt, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other taxable disposition (other than accrued but untaxed interest, which will be taxable as interest) and the U.S. Holder's adjusted tax basis in their interest in the New Secured Debt. A U.S. Holder's adjusted tax basis in their interest in the New Secured Debt will depend on whether, as described above, the New Secured Debt is considered a "security" for tax purposes and whether the U.S. Holder receives New Secured Debt (if any) as part of a transaction that is treated as a recapitalization for U.S. federal income tax purposes. A U.S. Holder's initial tax basis in New Secured Debt will be increased by any previously accrued OID and decreased by any payments on the New Secured Debt other than qualified stated interest. Any such gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the interest in the New Secured Debt has been held for more than one year at the time of its sale, exchange or other taxable disposition. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to limitations as discussed below.

8.        **Limitations on Use of Capital Losses**

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. U.S. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders generally may only carry over unused capital losses for the five years following the capital loss year, but are generally allowed to carry back unused capital losses to the three years preceding the capital loss year.

C.        **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims**

1.        **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Class 3, Class 4, and Class 6 Claims**

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the Reorganized HoldCo Common Stock and New Secured Debt (as applicable).

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as these consequences are determined for U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock."

144

(a)        **Gain Recognition**

Any gain recognized by a Non-U.S. Holder on the exchange of its Claims generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as described above in connection with U.S. Holders as described above in "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock," the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

(b)        **Accrued Interest**

Subject to the discussions below regarding "FATCA" and backup withholding, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

i.        the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of Parent's stock entitled to vote;

ii.        the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Parent (each, within the meaning of the IRC);

iii.        the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

iv.        such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax generally in the same manner as a U.S. Holder

145

(unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussions below regarding "FATCA" and backup withholding, a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

2.    **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Secured Debt**

(a)    **Dividends on Reorganized HoldCo Common Stock**

Any distributions made with respect to Reorganized HoldCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that exceed such current and accumulated earnings and profits such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares (and, subject to the discussions below regarding "FATCA," and backup withholding and the third bullet point below under "—Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock," to the extent such distribution does not exceed the adjusted tax basis such amount will generally not be subject to withholding). Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange); see discussion below of sale, redemption, or repurchase of Reorganized HoldCo Common Stock. Subject to the discussions below regarding "FATCA" and backup withholding, except as described below, dividends paid with respect to Reorganized HoldCo Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to Reorganized HoldCo Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect

146

to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### (b)      Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock

Subject to the discussion below regarding "FATCA" and backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of Reorganized HoldCo Common Stock unless:

     i.     such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

     ii.     such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

     iii.     the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of Reorganized HoldCo Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors do not believe, based on their current business plans and operations, that the Debtors have been nor any of the Reorganized Debtors will become in the future during the applicable specified testing period a "U.S. real property holding corporation," but there can be no assurance in this regard.  If HoldCo is or becomes a "U.S. real property holding corporation," during the specified testing period, gain recognized by such Non-U.S. Holder on the sale, exchange or other disposition of Reorganized HoldCo Common Stock will be subject to tax at generally applicable U.S. federal income tax rates and a purchaser of Reorganized HoldCo Common Stock from such Non-U.S. Holder would be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition.

### (c)      Payments under the New Secured Debt

Subject to the discussions below regarding "FATCA" and backup withholding, payments to a Non-U.S. Holder with respect to the New Secured Debt that are treated as interest, including payments attributable to any OID (see discussion above) generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

i.      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Reorganized Parent's stock entitled to vote;

ii.     the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Reorganized Parent (each, within the meaning of the IRC);

iii.    the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

iv.     such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

Subject to the discussions below regarding "FATCA" and backup withholding, a Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to interest, including any OID.

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

(d)     **Sale, Exchange or Other Disposition of the New Secured Debt**

Subject to the discussions below regarding "FATCA" and backup withholding, any gain recognized by a Non-U.S. Holder on the sale, exchange or other disposition of the New Secured Debt (other than an amount representing accrued but untaxed interest on the New Secured Debt, which is subject to the rules discussed above under "Payments under the New Secured Debt") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income

148

tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.   Subject to the discussions below regarding "FATCA" and backup withholding, in order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### D.     FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or are subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, including U.S. source interest (including OID) paid in respect of instruments such as the New Secured Debt and dividends, if any, on shares of  Reorganized HoldCo Common Stock), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which includes the New Secured Debt and the Reorganized HoldCo Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends and under current law generally will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Both U.S. Holders and Non-U.S. Holders should consult their tax advisors regarding the possible impact of these rules on such Holder's exchange any of its Claims pursuant to the Plan and on its ownership of New Secured Debt and Reorganized HoldCo Common Stock (if and as applicable).

### E.     Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of an Allowed Claim under the Plan and on certain payments made in respect of the New Secured Debt and Reorganized HoldCo Common Stock (as applicable).  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding, currently at a rate of 28%, with respect to distributions or payments made pursuant to the Plan and on certain payments made in respect of the New Secured Debt and Reorganized HoldCo Common Stock (as applicable) unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).   Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest in light of such Holder's circumstances and income tax situation. All Holders of Claims and Interests should consult with their tax advisors as to the particular tax consequences to them under the Plan, including the applicability and effect of any state, local, non-U.S., or other tax laws, and of any change in applicable tax laws.**

## XII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 24, 2017

Respectfully submitted

Avaya Inc.,
on behalf of itself and each of the other Debtors

By:    */s/ Eric Koza*
Name:  Eric Koza
Title:   Chief Restructuring Officer
           Avaya Inc. and its Affiliated Debtors
           and Debtors in Possession

151

<u>**Exhibit A**</u>

**First Amended Joint Chapter 11 Plan of Reorganization**

**<u>ATTACHED SEPARATELY ON THE DOCKET</u>**

**<u>Exhibit B</u>**

**Corporate Organization Chart**



# Avaya's Corporate Structure

**Debtors**

**Non-Debtor Domestic Subsidiaries**

**Non-Debtor Foreign Subsidiaries**

Avaya Holdings Corp.

Avaya. Inc

Avaya CALA Inc. | Avaya World Services Inc. | Avaya Federal Solutions, Inc. | Avaya Holdings LLC | Avaya Holdings Two, LLC | Avaya Integrated Cabinet Solutions Inc.

Avaya Management Services Inc. | Avaya Services Inc. | Octel Communications LLC | Zang, Inc. | Technology Corporation of America, Inc. | Ubiquity Software Corporation

Avaya EMEA Ltd. | Sierra Asia Pacific Inc. | VPNet Technologies, Inc. | Sierra Communication International LLC | Radvision Government Services, Inc. | Persony Inc. | KnoahSoft, Inc.

**Substantially All Foreign Subsidiaries[1]**

[1] The following foreign entities are subsidiaries of Debtors and not subsidiaries of Sierra Communication International LLC: Avaya Canada Corp.; NImcat Networks General Partnership; 3102455 Nova Scotia Company; Mosaix Limited; Esna Technologies Inc.; Esna Technologies Ltd.; Avaya Mauritius Ltd.; Avaya New Zealand Ltd.; Sipera Systems Private Limited; Avaya Australia Pty Ltd.; Avaya Venezuela S.R.L.; and Knoahsoft Technologies Private Limited.

**<u>Exhibit C</u>**

**Disclosure Statement Order**

**ATTACHED SEPARATELY ON THE DOCKET**

## **Exhibit D**

**Valuation Analysis**

## Valuation Analysis

**The information set forth herein represents a hypothetical valuation of the Avaya Enterprise, on a reorganized basis, which assumes that, among other things, the Avaya Enterprise continues as an operating business. The estimated value set forth in this section does not purport to constitute an appraisal or necessarily reflect the actual market value that might be realized through a sale or liquidation of the Avaya Enterprise, its securities or its assets, which may be materially different than the estimate set forth in this section. Accordingly, such estimated value is not necessarily indicative of the prices at which any securities of the Avaya Enterprise may trade after giving effect to the transactions set forth in the Plan. Any such prices may be materially different than indicated by this valuation.**

**Estimates of the hypothetical enterprise value consist of the aggregate Enterprise Value of the Avaya Enterprise on a going-concern basis plus an estimated value of its intellectual property as of the assumed Effective Date. The Plan does not consolidate the Debtor entities for purposes of measuring Claims or distributions.**

The Debtors have been advised by their financial advisor, Centerview Partners LLC ("Centerview"), with respect to the estimated going concern value of the Avaya Enterprise on a consolidated going-concern basis. The estimated value of the Avaya Enterprise on a consolidated going-concern basis, excluding intellectual property ("IP" or "Patents"), represents the Avaya Enterprise's enterprise value ("Enterprise Value"). The Enterprise Value was subsequently utilized by Zolfo Cooper LLC to determine recoveries to Allowed Claims under its "waterfall" analysis. Enterprise Value plus the value of IP ("Enterprise Value including IP") represents the estimated total value of the Avaya Enterprise. Refer to the subsection titled "Intellectual Property Valuation" for a description of the valuation conducted by Houlihan Lokey IP ("HL") of the Avaya Enterprise's intellectual property. The valuation analysis described herein is based on information as of the date of the Disclosure Statement. The valuation analysis assumes that the reorganization takes place on September 30, 2017 (the "Assumed Effective Date") and is based on projections ("Financial Projections") provided by the Debtors' management ("Management") for the fiscal years ending September 2017 to 2021 (the "Forecast Period").

Based on the Financial Projections and solely for purposes of the Plan, Centerview estimates that the Enterprise Value including IP of the Avaya Enterprise falls within a range from approximately $5.1 billion to approximately $7.1 billion, with a midpoint estimate of approximately $6.1 billion, which consists of the value of the Avaya Enterprise's operations on a going-concern basis plus the value of intellectual property. For purposes of this valuation, Centerview assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Based on assumed debt at emergence of $2.925 billion, cash of $350 million (assuming minimum cash balance of $120 million), capital leases of $31 million, NOL value of $234 million[1] and tax-effected pension and OPEB liabilities excluding APPSE of $824 million, the value of the Reorganized HoldCo Common Stock at the midpoint Enterprise Value is approximately $2.8 billion. This value does not give effect to the potentially dilutive impact of any equity granted or issued under the Management Equity Incentive Plan. Centerview's estimate of Enterprise Value and the Enterprise Value including IP does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

---

[1]    Current NOL value is based on an assumed $4mm loss with respect the sale of the networking business. Actual gain or loss from the networking sale is subject to ongoing review.

After application of the settlements and compromises set forth in <u>Article VI</u> of the Disclosure Statement, the Settlement Enterprise Value including IP is approximately $5.721 billion, which includes $201 million attributable to certain of the Debtors' intellectual property. Based on assumed debt at emergence of $2.925 billion, cash of $350 million (assuming minimum cash balance of $120 million), capital leases of $31 million, NOL value of $85 million[2] and tax-effected pension and OPEB liabilities excluding APPSE of $824 million, the value of the Reorganized HoldCo Common Stock at the Settlement Enterprise Value is approximately $2.3 billion.

**The assumed Enterprise Value range, as of the Assumed Effective Date, reflects work performed by Centerview on the basis of information available to Centerview as of April 7, 2017. Although subsequent developments may affect Centerview's conclusions, neither Centerview nor the Debtors have any obligation to update, revise or reaffirm the estimate.**

**The assumed value of IP, as of the Assumed Effective Date, reflects work performed by HL on the basis of information available to HL as of April 7, 2017. Although subsequent developments may affect HL's conclusions, neither HL nor the Debtors have any obligation to update, revise or reaffirm the estimate.**

When performing its analyses, Centerview assumed that the Financial Projections had been reasonably prepared in good faith and on a basis reflecting the Avaya Enterprise's most accurate currently available estimates and judgments as to the future operating and financial performance of the Avaya Enterprise. Centerview's estimated Enterprise Value range assumes the Avaya Enterprise will achieve its Financial Projections in all material respects, including revenue growth, operating margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value.

In estimating the Enterprise Value, Centerview: (a) reviewed certain historical financial information of the Avaya Enterprise for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Avaya Enterprise; (c) discussed the Avaya Enterprise's operations and future prospects with Management; (d) reviewed certain publicly available financial data for certain publicly traded technology companies; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Centerview conducted a review and analysis of the Avaya Enterprise's businesses, operating assets and liabilities and the Avaya Enterprise's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by Management, including its operational restructuring advisor, Zolfo Cooper LLC, as well as publicly available information.

To calculate the NOL value used in estimating the settlement equity value, Centerview received independent analysis from Avaya's tax advisors, KPMG, detailing NOL balances and projected usage at the midpoint Enterprise Value and Settlement Enterprise Value. Centerview then estimated the present value of the NOLs through discounting the NOL tax savings using the cost of equity, which was subsequently included in the calculation of the value of Reorganized HoldCo Common Stock at each valuation.

Centerview did not independently verify the Financial Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Avaya Enterprise were sought or

---

[2]    Current NOL value is based on an assumed $4mm loss with respect the sale of the networking business. Actual gain or loss from the networking sale is subject to ongoing review.

obtained in connection herewith. The Debtors developed the Financial Projections solely for purposes of the formulation and negotiation of the Plan, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

Centerview's estimated Enterprise Value does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Centerview has not been asked to and does not express any view as to what the trading value of the Avaya Enterprise's securities would be on issuance at any time.

Centerview's estimate of Enterprise Value does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Avaya Enterprise set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Avaya Enterprise, Centerview, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of any securities will depend upon, among other things, the operating performance of the Avaya Enterprise, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received, developments in the Avaya Enterprise's industry and economic conditions generally and other factors which generally influence the prices of securities.

When performing its analyses, HL assumed implementation of the plan post reorganization and that its related Financial Projections were reasonably prepared in good faith and on a basis reflecting the Avaya Enterprise's most accurate currently available estimates and judgments as to the future operating and financial performance of the Avaya Enterprise. HL's estimated IP value range assumes personnel and expenditures relative to continuing to prosecute and maintain its existing and future IP portfolio, and to license and or sell certain of those intellectual property assets in a robust manner.  If the business generally or with respect to IP specifically, performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on estimated IP value.

In estimating the IP value, HL, among other things: (a) reviewed Avaya Enterprise's issued and pending utility patents; (b) reviewed certain internal product, operating data and other information related to the Company's Patent portfolio; (c) discussed the Avaya Enterprise's inventions, Patent portfolio, licensing and other information (past, current and prospective) with Management; (d) reviewed certain publicly available financial data for market sizing, patent applicability, royalty rates and other information germane to patent portfolio monetization; (e) considered certain industry information relevant to monetizing intellectual property in combination with going concern operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although HL conducted a review and analysis of the Avaya Enterprise's businesses, patents, and certain other operating assets and plans, it assumed and relied on the accuracy and completeness of information furnished to it by Management, including its operational restructuring advisor, Zolfo Cooper LLC, as well as publicly available information. HL did not independently verify the Financial Projections, patent related information or other items in connection with preparing estimates of Patent value.

HL's estimated Patent value does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. HL has not been asked to and does not express any view as to what the trading value of the Avaya Enterprise's Patents would be at any given point in time.

HL's estimate of Patent value does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any patents, which may be significantly different than the amounts set forth herein. In general, the value of patents is subject to numerous uncertainties and contingencies (including, but not limited to, level of Company effort, global legal trends, applicability of Company patents to current and future products, level of market adoption of those products, comparative patent positions help by other companies) that are difficult to predict and will fluctuate with changes in any of the foregoing and numerous other factors. As a result, the estimated Patent value of the Avaya Enterprise set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Avaya Enterprise, HL, nor any other person assumes responsibility for any differences between the Patent value and such actual outcomes. Actual market prices of any patent will depend upon, among other things, prevailing royalty rates, conditions in the financial markets, IP legal environment globally (statute, administrative, and case law), conditions in the market for IP, developments in industries and technologies for which the IP is relevant, and economic conditions generally and other factors which generally influence the prices and amenability for sale or licensing of IP.

## A.    VALUATION METHODOLOGY

The following is a brief summary of certain financial analyses performed by Centerview to arrive at its range of estimated Enterprise Values for the Avaya Enterprise. Centerview's estimate of the Enterprise Value of the Avaya Enterprise is based on the results of its discounted cash flow ("DCF") analysis. While Centerview recognizes that two other standard valuation methodologies are frequently used (selected comparable companies analysis and precedent transaction analysis), these methodologies were not utilized to derive estimated Enterprise Value ranges of the Avaya Enterprise due to, among other reasons, the limited comparability to the Avaya Enterprise's business.

An estimate of Enterprise Value is not entirely mathematical, but rather involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Centerview performed certain procedures and reviewed the assumptions with Management on which such analyses were based and other factors, including the projected financial results of the Avaya Enterprise. Centerview's estimated Enterprise Value is highly dependent on the Avaya Enterprise's ability to meet their Financial Projections. Centerview's valuation analysis must be considered as a whole.

i.    Discounted Cash Flow Analysis

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Avaya Enterprise's unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the firm beyond the Forecast Period known as the terminal value. Centerview also excluded pension and OPEB payments from the unlevered cash flows in order to determine Enterprise Value before the impact of underfunded pension and OPEB liabilities. The terminal value can be derived through two generally accepted approaches: (i) applying perpetuity growth rates to the terminal year normalized cash flow; and (ii) applying projected earnings before interest, taxes, depreciation, and amortization ("EBITDA") multiples to the final projected year of the Forecast Period. Centerview utilized the perpetuity growth method to determine the terminal value.  The terminal value is then discounted back to the Assumed Effective Date, by the Discount Rate.

To estimate the Discount Rate, Centerview calculated the cost of equity and the after-tax cost of debt for the Avaya Enterprise, assuming a targeted total debt-to-total capitalization ratio based on an assumed range of the Avaya Enterprise's long term target capitalization. Centerview calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital, the correlation of a publicly traded stock's performance to the return on the broader market as well as taking into consideration the size and situation of the company being valued. To estimate the cost of debt, Centerview relied upon estimated debt cost as provided by certain banks seeking to provide exit financing to the Avaya Enterprise.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Avaya Enterprise, which in turn affect their cost of capital and terminal values.

### ii. Intellectual Property Valuation

HL provided an estimate of value of the Debtors' entire Patent portfolio (the IP analysis is specific to patents and excludes other intellectual property, such as copyrights, trademarks, and trade secrets) as part of the Reorganization process for the Debtors (the "Patent Value"). HL focused on analyzing the Patents as a source of value and potential revenue through a systematic review of the Patents for purposes of enacting a patent monetization program. The indication of value for the Patents assumes a combination of future licensing income and programmatic patent sales of certain groupings of patents. HL utilized a "Relief From Royalty" or "Licensing Income" methodology, a derivation of the Income Approach specific to intangible assets.

The initial effort required to value the Patents included, among other things, a review and categorization of the Patents into defined technology categories. Next, HL mapped the technology categories to specific industries and market participants that may utilize the Patents in their products or services. Separately, HL determined, in collaboration with Management, that the Patents that are likely to be fundamental to an operating business (which were designated "Core Patents") and patents that were not so required, and thus more available for sale to third parties (which were designated "Non-Core Patents"). Core Patents were considered essentially as eligible for certain licensing programs only and not sales, as they are needed to operate the Avaya Enterprise's business going forward. Non-Core Patents were considered eligible for either licensing or sale depending on a number of factors. Additional patent analytic efforts were completed to develop evidence/indications of use by third-parties, which assisted in estimating the potential income that could be generated from the Patents in a monetization program.

The potential licensing income was risk-adjusted for several factors, including, but not limited to, geography, royalty base, royalty rate, timing of licensing income, potential exposure by licensees, effect of existing licenses or future product needs, potential cost of administration, and taxes. Further, HL reviewed and analyzed existing patent licensing agreements currently in place to assess the impact those "encumbrances" have on the potential licensing income.

The potential net licensing income was then discounted to its present value utilizing a rate commensurate with risks associated with enacting a patent monetization program. In this case the risk-adjusted hurdle rate reflects the Avaya Enterprise's cost of equity plus a premium allowing for IP-specific factors. Finally, HL performed several reconciling analyses to determine the reasonableness of the Patent Value, including understanding the implied patent multiple pricing of similar transacted portfolios.

As may be understood from the foregoing, an estimate of the Patent Value requires a very different set of factors than associated with valuing the operations of the Avaya Enterprise. However, such an analysis

does require insight into the impact such monetization efforts may have on the operating entities. HL notes, for example, that the Avaya Enterprise has a history of patent monetization owing to predecessor companies, but has not actively sought to license its portfolio over the last five years. Accordingly, in addition to other factors already noted, specific considerations related to Management's assertiveness with regard to monetization and the market's perception of effectiveness of those efforts over time, could affect the value of the Patents.

**The summary set forth above does not purport to be a complete description of the analyses performed by Centerview and HL. The preparation of a valuation estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description. In performing these analyses, Centerview and HL and the Debtors made numerous assumptions with respect to industry performance, business and economic conditions, and other matters. The analyses performed by Centerview and HL are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.**

*        *        *        *        *

**<u>Exhibit E</u>**

**Liquidation Analysis**

## Liquidation Analysis

### Overview:

This Liquidation Analysis[1] has been prepared assuming that the Debtors hypothetically convert their chapter 11 cases to undertake a liquidation under chapter 7 of the Bankruptcy Code as of September 30, 2017 (the "Conversion Date"). Except as otherwise noted herein, the values reflected in Liquidation Analysis are based upon the Debtors' unaudited books and records as of February 28, 2017, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. It is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") on the Conversion Date to oversee the liquidation of the Debtors' Estates, during which time substantially all of the Debtors' assets would be sold, abandoned, surrendered, or otherwise liquidated, as applicable, and the cash proceeds, net of liquidation-related costs, would then be distributed in accordance with applicable law.

This Liquidation Analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. Although the Debtors consider the estimates and assumptions set forth herein to be reasonable under the circumstances, such estimates and assumptions are inherently subject to significant uncertainties and contingencies beyond the Debtors' control. Accordingly, there can be no assurance that the results set forth by this Liquidation Analysis would be realized if the Debtors were actually liquidated pursuant to chapter 7 of the Bankruptcy Code, and actual results in such a case could vary materially from those presented herein, and distributions available to Holders of Claims and Interests could differ materially from the projected recoveries set forth by this Liquidation Analysis.

**THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.**

**NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.**

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor Affiliates* or the *First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor Affiliates*, both of which are filed contemporaneously herewith, as applicable.

The Debtors have determined, as summarized in the following analysis, that Confirmation of the Plan will provide Holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

**Basis of Presentation:**

The Claim amounts set forth herein are estimates as of the date hereof.  Accordingly, the actual amount and/or priority of Claims Allowed against the Debtors' Estates may differ from the Claim amounts used in this Liquidation Analysis.

As noted above, this Liquidation Analysis is based on the Debtors' books and records as of February 28, 2017, except where otherwise indicated, and the actual value of assets available for distribution in the event of an actual liquidation may differ materially from the assets assumed to be available pursuant to this Liquidation Analysis.

**Global Notes & Assumptions:**

This Liquidation Analysis should be read in conjunction with, and is qualified in its entirety by, the following notes and assumptions:

1.  *Additional Claims*. The cessation of business in a chapter 7 liquidation is likely to cause additional Claims to be asserted against the Debtors' Estates that otherwise would not exist absent such a liquidation. Examples of these kinds of Claims include employee-related Claims, such as severance and WARN Act or similar Claims, tax liabilities, Claims related to the rejection of unexpired leases and executory contracts, and others. These additional Claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code.  No adjustment has been made for these potential Claims in this Liquidation Analysis.

2.  *Intercompany Relationships; Non-Debtor Affiliates*. In order to estimate the Debtors' recovery with respect to certain intercompany balances and investments in a chapter 7 liquidation, this Liquidation Analysis assumes substantially all of the Debtors' non-Debtor subsidiaries will undertake parallel liquidations, whereby the proceeds of such liquidations are, in turn, distributed in accordance with priority of Claims and ownership on an entity-by-entity basis.  The material assumptions (e.g., liquidation costs and asset recovery percentages) made in connection with the foregoing analysis are substantially consistent with those made in connection with the Debtors' hypothetical chapter 7 liquidation, with the following exceptions:

    (a)  Professional Fees:  This analysis assumes professional fees and expenses total approximately 5% of the total liquidation proceeds realized at each non-Debtor subsidiary.

    (b)  Employee Retention Costs and Severance:  This analysis assumes all terminated non-Debtor employees receive severance equal to four-week's salary.  Retention costs and severance are, in turn, estimated at approximately 8% to 10% of liquidation proceeds available at each non-Debtor entity.  However, the severance period and corresponding costs could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests.

(c)    Foreign Cash Pooling:[2]  This analysis assumes a consolidated balance of approximately $66 million in so-called "cash pool" accounts maintained by non-Debtor affiliates (collectively, the "Cash Pool") as of the Conversion Date, based on the Avaya Enterprise's books and records as of April 3, 2017, with that positive balance then attributed to Avaya ECS Ltd., the entity with the highest Cash Pool balance as of such date.  This analysis further assumes entities with positive balances in the Cash Pool as of April 3, 2017 have a series of accounts receivable on their books and records from entities with negative balances in the Cash Pool. Entities with negative cash balances, in turn, are assumed to have a series of corresponding accounts payable on their books and records.

(d)    Secured Indemnification Claims:  Pursuant to Paragraph 10 of the DIP Financing Order, the DIP Financing is collateralized by, among other things, secured indemnification claims arising in favor of certain Debtors as a result of the Foreign ABL Discharge (as defined in the DIP Financing Order) (the "Secured Indemnification Claims").  This analysis assumes that certain proceeds arising from the liquidation of the applicable non-Debtors are used to satisfy such Secured Indemnification Claims and, therefore, repay indebtedness under the DIP Financing on a dollar-for-dollar basis.

3.    *Length of liquidation process*. The Liquidation Analysis assumes a process of 12 months from the Conversion Date to conduct the orderly disposition of substantially all the Debtors' assets, to collect receivables, to arrange for distributions, and to wind-down the Debtors' Estate.  However, the wind-down of the Debtors' non-Debtor subsidiaries may be substantially more complex and require significantly more time, which delays and associated costs could materially reduce the recoveries contemplated herein.

4.    *Networking Sale*.  As stated above, this Liquidation Analysis is based on the Debtors' books and records as of February 28, 2017.  Solely for purposes of this Liquidation Analysis, it is assumed that the sale of the Debtors' "networking" business segment has not occurred and, as a result, the Debtors' books and records include related assets and liabilities.  Though the sale of the Debtors' "networking" business segment closed on Friday, July 14, 2017,[3]  the Debtors do not believe that this assumption materially impacts the results of this Liquidation Analysis.

**Specific Notes to the Liquidation Analysis:**

**A.    Gross Liquidation Proceeds**

1.    *Cash*

- The liquidation proceeds of Cash and Cash equivalents for all Debtor entities holding Cash is estimated to be 100% of the projected balance at the Conversion Date per the Debtors' projections as of March 31, 2017, less:

---

[2]    Cash pooling arrangements undertaken by certain of the Debtors' non-Debtor subsidiaries are described more fully in the Debtors' motion seeking entry of the DIP Financing Order [Docket No. 16].

[3]    See *Notice of Closing of Sale of the Debtors' Networking Business* [Docket No. 818].

(a)     the $75 million of funds held in the Cash Pool Requirements Account (as defined in the DIP Financing Order), which is assumed to be immediately liquidated to repay DIP Financing Claims, reducing DIP Financing Claims on a dollar-for-dollar basis; and

(b)     approximately $69.7 million of Cash currently collateralizing letters of credit under the DIP L/C Facility, which is addressed below.

- Cash is allocated among entities based on the proportional Cash balances as of April 3, 2017.

2.     *External Accounts Receivable; Other Receivables*

- The Liquidation Analysis assumes that the Trustee will retain a limited staff to handle a collection effort for outstanding trade accounts receivable at the Debtors.

- The Liquidation Analysis further assumes the Debtors will implement programs to collect receivables related to sales of both (1) products and (2) services, certain of which will be unperformed as of the Conversion Date. Historically, approximately 60% of the Debtors billings have been attributable to services sales, with the remaining 40% deriving from product sales. Thus, this Liquidation Analysis assumes that the Debtors' accounts receivable balance as of the Conversion Date is comprised of approximately 60% services sales and 40% product sales.

- For purposes of the Liquidation Analysis, the liquidation proceeds of receivables from revenue were estimated to range from 40% to 67% of net book value, which is based on, among other things, the anticipated challenges associated with collecting receivables for unperformed services.

- Substantially all of the balance of Other Receivables on the Debtors' books and records consists of estimated recoveries against insurance claims under the Debtors' workers compensation policies. This Liquidation Analysis assumes no recovery for Other Receivables.

3.     *Intercompany Balances*

- The Debtors' collection from intercompany balances depends on, among other things, the available proceeds from Debtor and non-Debtor liquidations and the characterization or recharacterization of such balances under applicable law. The ultimate treatment of such balances in a chapter 7 liquidation cannot be guaranteed with any certainty.

- The "Low Recovery Scenario" contemplated by the Liquidation Analysis assumes no recovery with respect to intercompany balances, including accounts receivable and intercompany notes receivable.

- The "High Recovery Scenario" contemplated by the Liquidation Analysis assumes that intercompany accounts receivable and intercompany notes receivable balances are netted against mutual intercompany obligations. Such balances are then projected to receive recoveries from the applicable Debtor or non-Debtor counterparties on a *pari passu* basis with third party receivables at those entities.

4.   *Inventory, Net*

- The Debtors' inventory is divided into three major categories for purposes of this Liquidation Analysis: (1) raw material, (2) finished goods; and (3) in-transit inventory. Inventory is stated on the Debtors' books and records at the lower of (1) cost or (2) market value. The Debtors' determination of market value is based on current inventory levels, expectations of future demand, and the product life cycles for the various inventory types.

- "Raw material" includes maintenance inventory and deferred costs of goods sold. This Liquidation Analysis assumes a 5-10% recovery for this category of inventory.

- "Finished goods" consists of newer and older generations of equipment, with the latter in significant majority. This Liquidation Analysis assumes a 35-75% recovery for this category of inventory.

- "In-transit" inventory includes inventory that has typically been installed but has not yet been billed to the customer. This Liquidation Analysis assumes a 70-90% recovery for this category of inventory.

5.   *Prepaid Expenses; Collateralized Letters of Credit*

- Prepaid expenses consist of several prepaid accounts, including, but not limited to: vendor deposits, insurance, taxes, and deferred charges. This Liquidation Analysis assumes no recoveries from prepaid expenses.

- Collateralized letters of credit consist of letters of credit issued and outstanding with approximately $69.7 million notional value. These letters of credit are collateralized by approximately an equivalent amount of Cash in a segregated collateral account. The Liquidation Analysis assumes that such letters of credit will be drawn as of the Conversion Date, that such cash collateral will be used to fully satisfy resulting Claims and, therefore, that no such Cash will otherwise be available for distribution.

6.   *Property, Plant & Equipment, Net ("PP&E")*

- PP&E includes computer systems, telecommunications equipment, leasehold improvements, furniture and fixtures, and other equipment of the Debtors.

- This Liquidation Analysis assumes a recovery of 50-70% on the net book value for all material categories of PP&E aside from leasehold improvements.

- The Debtors do not own any material real property. This Liquidation Analysis assumes no value is recoverable from the Debtors' leased real property in a chapter 7 liquidation following analysis conducted by the Debtors' retained real estate advisor,[4] Newmark Grubb Knight Frank**.**

7.   *Intangible Assets; Patent Portfolio*

---

[4]   See [Docket No. 448].

- Intangible assets include capitalized software and internal use software. Given the competitive market dynamics, this Liquidation Analysis assumes that competitors maintain their own internal use software and therefore any Debtor-owned internally used software will have no recoverable value.

- The Debtors' retained intellectual property advisor,[5] Houlihan Lokey Financial Advisors, Inc. ("Houlihan Lokey"), assessed the Avaya Enterprise's patent portfolio as having a chapter 7 liquidation value range of $145.9 million to $353.5 million, with a midpoint of $249.7 million, excluding trustee fees. This analysis further attributes approximately $234.9 million (or approximately 94%) of such value to patents owned by Debtors (which, for purposes of this Liquidation Analysis, is attributed to Avaya Inc.'s books and records) and approximately $14.8 million (or approximately 6%) to patents owned by non-Debtor affiliates.

- The "High Recovery Scenario" contemplated by this Liquidation Analysis assumes that Debtor-owned patents registered or arising under non-U.S. law are unencumbered by the Prepetition Collateral (as defined in the DIP Financing Order). This Liquidation Analysis further assumes that the recoverable value obtained for these assets will be used to repay the DIP Financing Claims.

- The "Low Recovery Scenario" contemplated by this Liquidation Analysis assumes that proceeds from the disposition of all Debtor-owned patents are encumbered.

8. *Equity Investments in Subsidiaries*

- The Liquidation Analysis determines that Sierra will realize proceeds available for distribution ranging from $44.4 million to $47.6 million from investments in non-Debtor subsidiaries in a hypothetical chapter 7 liquidation. Solely in the "Low Recovery Scenario" contemplated by this Liquidation Analysis, whereby intercompany accounts receivable and notes receivable are disregarded for purposes of this Liquidation Analysis, Avaya Inc., and Avaya Holdings LLC will recover approximately $8.5 million $11.3 million, respectively. However, equity values that may be realized by Sierra or other Debtors in a hypothetical chapter 7 liquidation could be materially reduced by the assertion of "controlled group" liability by PBGC directly against non-Debtor subsidiaries.

9. *Other Long Term Assets*

- This category includes, among other long-term assets, certain insurance policies, assets maintained by the Avaya Inc. Savings Restoration Plan (the "ASRP"), and assets maintained by the Avaya Inc. Deferred Compensation Plan (the "ADCP").

- This Liquidation Analysis assumes a 100% recovery for certain reversionary balances potentially due to the Debtors upon the surrender or termination of officer life insurance policies, the ASRP and the ADCP totaling approximately $3.3 million. This Liquidation Analysis further assumes that these balances will first be used to repay DIP Financing Claims.

---

[5]   See [Docket Nos. 290, 447].

10.    *Avoidance Actions*

- Proceeds from Avoidance Actions may be available for distribution to Holders of Administrative Claims, Priority Claims, and General Unsecured Claims in accordance with the priorities established by the Bankruptcy Code. The Debtors, however, believe that recoveries from such actions, if any, would be speculative in nature and have not included any such proceeds in the Liquidation Analysis.

11.    *Goodwill; Deferred Tax Assets*

- This Liquidation Analysis ascribes no value to goodwill or deferred tax assets.

**B.    Liquidation Costs**

12.    *Post Conversion Cash Flow; Employee Retention Costs; Severance*

- This Liquidation Analysis assumes the cessation of the Debtors' ordinary course operations, and, as a result, assumes no cash flow from operations following the Conversion Date.

- This Liquidation Analysis assumes the Trustee will employ a substantially reduced employee base in order to facilitate the orderly liquidation of the Debtors' Estates. These individuals will primarily be responsible for overseeing and maintaining certain of the Debtors' operations, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses, and concluding the administrative liquidation of the businesses after the sale of substantially all of the Debtors' assets.

- The Liquidation Analysis assumes that the Trustee will reduce employee headcount to minimal staff over the estimated 12-month period, although the majority of any such employee-related reductions are assumed to be incurred following an initial six month period after the Conversion Date.

- This Liquidation Analysis assumes that all terminated employees receive severance equal to two-weeks' salary. However, the severance period and corresponding costs could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests.

- Based on the Debtors' headcount census and annualized projected payroll expenses and taxes as of April 2017, retention costs and severance are, together, estimated at approximately 4% of the liquidation proceeds realized at each Debtor. For purposes of this Liquidation Analysis, the Debtors' retention costs and severance are assumed to be incurred at Avaya Inc.

13.    *Estate Wind Down Costs*

- Estate wind down costs consist primarily of the regularly occurring general and administrative costs which will be required to operate the Debtors' businesses for a 12-month period after the Conversion Date.

- This Liquidation Analysis estimates wind down costs at approximately 2% of the Debtors' projected 2017 non-GAAP gross general and administrative expenses, which

equates to approximately 1-2% of the aggregate liquidation proceeds realized at each Debtor. For purposes of this Liquidation Analysis, such costs are assumed to be incurred solely by Avaya Inc.

14.    *Chapter 7 Trustee Fees and Other Professional Fees*

- <u>Chapter 7 Trustee Fees</u>. Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the case by the trustee to parties in interest.  For purposes of this Liquidation Analysis, these fees are simplified to 3% of liquidation proceeds realized, excluding Cash, at each Debtor entity.

- <u>Professional Fees</u>.  Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' assets, will be entitled to payment in full prior to any distribution to chapter 11 Administrative Claims and Other Priority Claims.  This Liquidation Analysis estimates professional fees to be approximately 3% of the total liquidation proceeds realized at each Debtor entity, which is based on expected fees and expenses of legal, financial, and other professionals as well as the complexity of the Debtors' liquidation and wind-down.

C.    **Claims**

15.    *Carve-Out*

- Paragraph 7 of the DIP Financing Order provides that certain unpaid holdback and accrued professional fees and expenses (as described below) shall be entitled to priority above DIP Financing Claims as well as Claims and fees to which the DIP Financing Claims are senior.  The Liquidation Analysis estimates this amount at approximately $42.2 million.

- This total includes approximately $22.2 million of accrued but unpaid fees and expenses incurred by Professionals retained by the Debtors and the Committee,[6] fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, $50,000 of fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code, plus $20,000,000 payable under the Post-Carve Out Trigger Notice Cap (as defined in the DIP Financing Order).

- Claims benefiting from the Carve-Out (as defined in the DIP Financing Order) are allocated to Avaya Inc. for purposes of this Liquidation Analysis.

16.    *DIP Financing Claims*[7]

---

[6]    Such amount, for purposes of this Liquidation Analysis only, does not include any "success," "transaction," or similar fee.

[7]    Capitalized terms used but not defined in this note shall have the meanings ascribed to them in the DIP Financing Order.

- This Liquidation Analysis assumes that DIP Financing Claims will total approximately $580.3 million as of the Conversion Date, which represents the projected pro forma balance owed under the DIP Financing Credit Agreement, net of (1) the application of $75 million of Cash held in the Cash Pool Requirements Account, (2) the application of approximately $44.5 to $44.7 million recovered from Intercompany Security Protocol Claims (as defined below), and (3) the application of $25.0 to $25.2 million recovered from the Secured Indemnification Claims.[8]

- This Liquidation Analysis further assumes that DIP Financing Claims will first be satisfied by recourse to proceeds solely from assets other than Prepetition Collateral.

17. *First Lien Debt Claims*

- This Liquidation Analysis assumes that the aggregate principal amount indebted, plus accrued interested as of the Petition Date, under the First Lien Debt is approximately $4,609 million.[9]

- This Liquidation Analysis concludes that First Lien Debt Claims will receive approximately 3.3% to 5.5% in a chapter 7 liquidation.

18. *Second Lien Notes Claims*

- This Liquidation Analysis assumes that the aggregate principal amount indebted, plus accrued interest as of the Petition Date, under the Second Lien Notes is approximately $1,440 million.

- This Liquidation Analysis concludes that Second Lien Notes Claims will receive no recovery in a chapter 7 liquidation.

19. *Other Secured Claims*

- Based on the Debtors' books and records, this Liquidation Analysis assumes that there will be no Other Secured Claims outstanding on the Conversion Date.

20. *Administrative Claims*

- Administrative Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (1) Claims arising pursuant to section 503(b)(9) of the Bankruptcy Code; (2) postpetition trade payables; (3) accrued postpetition employee obligations; (4) accrued taxes; (5) accrued utility payments; and (6) post-petition intercompany payables.

- This Liquidation Analysis assumes there will be approximately $200.2 to $236.0 million Administrative Claims outstanding as of the Conversion Date, which includes approximately $50 million of Administrative Claims at Sierra resulting from the Foreign

---

[8]    For the avoidance of doubt, recoveries from the Secured Indemnification Claims and the Intercompany Security Protocol Claims, collectively, are assumed to repay the approximately $69.7 million of indebtedness outstanding under the Debtors' DIP Financing related to the Foreign ABL Discharge, thereby reducing DIP Financing Claims on a dollar-for-dollar basis.

[9]    This Liquidation Analysis does not reflect the impact of potential actions by the Trustee or other parties in interest seeking to recharacterize adequate protection payments as principal payments.

ABL Discharge pursuant to the Intercompany Security Protocol (in each case, as defined in the DIP Financing Order) (the "Intercompany Security Protocol Claims"). The amount of Administrative Claims provided above is an estimate based on information known to the Debtors as of the date hereof. As a result, the total amount of Administrative Claims allowed in the Chapter 11 Cases could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.

- This Liquidation Analysis concludes that the Intercompany Security Protocol Claims will recover approximately 88.8% to 89.2% in a chapter 7 liquidation. The Liquidation Analysis concludes that all other Administrative Claims will receive no recovery in a chapter 7 liquidation.

21.    *Other Priority Claims*

- The Debtors' books and records do not identify material Claims that may be entitled to priority pursuant to section 507 of the Bankruptcy Code, except as may be otherwise set forth in the Plan or this Liquidation Analysis.

- This Liquidation Analysis assumes no Other Priority Claims will be outstanding as of the Conversion Date at all Debtors aside from Avaya Inc., at which approximately $15 million of Other Priority Claims is assumed. However, the pool of Other Priority Claims allowed in the Chapter 11 Cases could differ materially from the assumptions set forth by this Liquidation Analysis, thereby reducing recoveries available to Holders of Claims and Interests in a chapter 7 liquidation.

- The Liquidation Analysis concludes that Other Priority Claims will receive no recovery in a chapter 7 liquidation

22.    *PBGC Claims*

- This Liquidation Analysis assumes the termination of the Debtors' U.S. Qualified Pension Plans gives rise to an unsecured Claim of approximately $1,098 million[10] asserted by the PBGC on a joint and several basis against each Debtor. This Liquidation Analysis further assumes that the PBGC is not successful to the extent that it pursues "controlled group" liability claims against non-Debtor subsidiaries. The Debtors note that PBGC has filed Claims for prospective termination liability totaling $1,900 million [Claim Nos. 1929, 1769].

- PBGC Claims includes approximately $125.2 million of unpaid minimum funding contributions as of the Conversion Date.

- The Liquidation Analysis concludes that PBGC Claims will receive no recovery in a chapter 7 liquidation.[11]    However, and as noted above, PBGC may seek to assert

---

[10]    For purposes of this Liquidation Analysis, the amount of this Claim is based on the estimated termination liability, which is based on September 30, 2016 plan assets, liabilities, and interest rates. For the avoidance of doubt, this estimate is not intended to be, and does not constitute, a concession, admission or allowance of any Claim by the Debtors.

[11]    Though the U.S. Qualified Pension Claims will be paid pro rata with General Unsecured Claims in a chapter 7 liquidation, they are delineated in this Liquidation Analysis for ease of presentation.

"controlled group" liability claims directly against the Debtors' non-Debtor subsidiaries in a hypothetical chapter 7 liquidation. PBGC may therefore be able to realize value on account of such claims by obtaining recoveries directly from such non-Debtor affiliates, and such recoveries may be material.

23.    *General Unsecured Claims*

- General Unsecured Claims arising in a hypothetical chapter 7 liquidation may include, among other things: (1) prepetition trade Claims; (2) prepetition rejection damages Claims; (3) Claims for damages arising from the termination or rejection of the Debtors' various supply agreements or contracts; (4) Claims related to OPEB termination; and (5) numerous other types of prepetition liabilities. General Unsecured Claims do not include Intercompany Claims, which are described below. In addition, General Unsecured Claims do not include, among other things, Claims on account of any deficiency Claims that may be asserted against the Debtors, which amounts would be speculative in nature.

- This Liquidation Analysis assumes there will be approximately $305 million of non-OPEB General Unsecured Claims as of the Conversion Date, which is based on the Debtors' projections as of the Petition Date. In addition, this Liquidation Analysis assumes approximately $259 million of General Unsecured Claims related to the Debtors' OPEB obligations.[12] The amount of General Unsecured Claims is an estimate based on information known to the Debtors as of the date hereof. As a result, the amount of General Unsecured Claims allowed in the Chapter 11 Cases could differ materially from the assumptions set forth by this Liquidation Analysis.

- The Liquidation Analysis concludes that General Unsecured Claims will receive no recovery in a chapter 7 liquidation.

24.    *Subsidiary Claims*

- Subsidiary Claims includes Claims assumed to be asserted by non-Debtors, including Claims resulting from Avaya Inc.'s obligations under the Comfort Letters.

- This Liquidation Analysis concludes that Subsidiary Claims will receive no recovery in a chapter 7 liquidation.

25.    *Prepetition Intercompany Debtor Claims*

- Prepetition Intercompany Debtor Claims includes Claims assumed to be asserted by Debtors.

- This Liquidation Analysis concludes that Prepetition Intercompany Debtor Claims will receive no recovery in a chapter 7 liquidation.

26.    *Section 510(b) Claims*

---

[12]    For purposes of this Liquidation Analysis, the aggregate amount of these Claims is assumed based on the book value of the Debtors' OPEB obligations as of December 31, 2016. For the avoidance of doubt, this estimate is not intended to be, and does not constitute, a concession, admission or allowance of any Claim by the Debtors.

- This Liquidation Analysis assumes that there will be no recoveries on account of Section 510(b) Claims in a chapter 7 liquidation.

27.    *Intercompany Interests*

- This Liquidation Analysis concludes there will be no recoveries on account of Intercompany Interests in a chapter 7 liquidation.

28.    *HoldCo Interests*

- This Liquidation Analysis concludes there will be no recoveries on account of HoldCo Interests in a chapter 7 liquidation.

**AVAYA INC., et al.**

Liquidation Proceeds and Claims Recovery Summary

*$ millions*

| | Recovery Estimate $ | |
|---|---|---|
| | Low | High |
| **Gross Liquidation Proceeds** | $914.3 | $1,020.1 |
| | | |
| **Less: Liquidation Costs** | | |
| Payroll / Overhead | ($40.0) | ($40.0) |
| Trustee Fees | (13.3) | (16.5) |
| Prof. Fees | (27.4) | (30.6) |
| G&A | (13.8) | (13.8) |
| Total Liquidation Adjustments | ($94.5) | ($100.9) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | **$819.8** | **$919.2** |

**AVAYA INC., et al.**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$819.8** | **$919.2** |
| | | | | | | |
| **Less: Carve-Out** | $42.2 | $42.2 | 100.0% | 100.0% | $42.2 | $42.2 |
| Proceeds Available for DIP Facility Claims | | | | | **$777.5** | **$877.0** |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 100.0% | 100.0% | 580.3 | 580.3 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$197.2** | **$296.6** |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 3.3% | 5.5% | 152.5 | 252.1 |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$44.7** | **$44.5** |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$44.7** | **$44.5** |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | **$44.7** | **$44.5** |
| **Less: Administrative Claims** | 200.2 | 236.0 | 22.3% | 18.9% | 44.7 | 44.5 |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Priority Claims** | 15.0 | 15.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| **Less: General Unsecured Claims** | 564.0 | 564.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Inc.**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $468.9 | $468.9 | 100% | 100% | $468.9 | $468.9 |
| Accounts receivable (External) | A2 | 187.9 | 187.9 | 42% | 63% | 78.8 | 118.1 |
| Accounts receivable (Internal) | A3 | - | 743.6 | N/A | 7% | - | 52.2 |
| Other receivable (External) | A2 | 10.5 | 10.5 | 0% | 0% | - | - |
| Notes receivable (Internal) | A3 | - | 1,535.8 | N/A | 0% | - | 2.4 |
| Inventory | A4 | 78.7 | 78.7 | 31% | 52% | 24.5 | 41.0 |
| Prepaid expenses and other current assets | A5 | 206.5 | 206.5 | 0% | 0% | - | - |
| Property, plant and equipment | A6 | 90.5 | 90.5 | 34% | 47% | 30.3 | 42.4 |
| Deferred Tax | A11 | 3.1 | 3.1 | 0% | 0% | - | - |
| Intangible Assets / Intellectual Property | A7 | 514.3 | 514.3 | 46% | 46% | 234.9 | 234.9 |
| Investments (including consolidated subs) | A8 | (2,636.6) | (2,636.6) | N/A | N/A | 8.5 | - |
| Other Long Term Assets | A9 | 35.6 | 35.6 | 9% | 9% | 3.3 | 3.3 |
| Goodwill | A11 | 3,600.4 | 3,600.4 | 0% | 0% | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$2,559.8** | **$4,839.1** | **33%** | **20%** | **$849.2** | **$963.2** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | ($40.0) | ($40.0) |
| Trustee Fees | B3 | | | | | (11.4) | (14.8) |
| Prof. Fees | B3 | | | | | (25.5) | (28.9) |
| G&A | B2 | | | | | (13.8) | (13.8) |
| Total Liquidation Adjustments | | | | | | ($90.7) | ($97.5) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$758.5** | **$865.7** |

**Avaya Inc.**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$758.5** | **$865.7** |
| **Less: Carve-Out** | $42.2 | $42.2 | 100.0% | 100.0% | $42.2 | $42.2 |
| Proceeds Available for DIP Facility Claims | | | | | **$716.3** | **$823.5** |
| **Less: DIP Financing Claims** | 563.8 | 571.4 | 100.0% | 100.0% | 563.8 | 571.4 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$152.5** | **$252.1** |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 3.3% | 5.5% | 152.5 | 252.1 |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Secured Claims** | - | - | 0.0% | 0.0% | - | - |
| Proceeds Available for Administrative Claims | | | | | **$0.0** | **$0.0** |
| **Less: Administrative Claims** | 146.4 | 177.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Priority Claims** | 15.0 | 15.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| **Less: General Unsecured Claims** | 563.9 | 563.9 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| **Less: Subsidiary Claims** | N/A | N/A | 0.0% | 0.0% | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Federal Systems**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery Recovery Estimate % Low | High | Recovery Estimate $ Low | High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | 7.8 | 7.8 | 40% | 60% | 3.1 | 4.7 |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | | |
| Other receivable (External) | A2 | - | - | N/A | N/A | | |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | | |
| Inventory | A4 | 0.2 | 0.2 | 70% | 90% | 0.1 | 0.2 |
| Prepaid expenses and other current assets | A5 | 5.0 | 5.0 | 0% | 0% | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | | |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | | |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | | |
| Other Long Term Assets | A9 | - | - | N/A | N/A | | |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$12.9** | **$12.9** | **25%** | **37%** | **$3.2** | **$4.8** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.1) | (0.1) |
| Prof. Fees | B3 | | | | | (0.1) | (0.1) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.2) | ($0.3) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$3.0** | **$4.5** |

**Avaya Federal Systems**
Distribution Summary
*$ millions*

| | Claims Low | High | % Recovery Low | High | $ Recovery Low | High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$3.0** | **$4.5** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $3.0 | $4.5 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.5% | 0.8% | 3.0 | 4.5 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | 3.3 | 4.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Zang Inc.**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.4 | $0.4 | 100% | 100% | $0.4 | $0.4 |
| Accounts receivable (External) | A2 | (0.0) | (0.0) | 0% | 0% | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | 0.2 | 0.2 | 0% | 0% | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | (1.9) | (1.9) | 0% | 0% | - | - |
| Intangible Assets / Intellectual Property | A7 | 3.4 | 3.4 | 0% | 0% | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$2.0** | **$2.0** | **19%** | **19%** | **$0.4** | **$0.4** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | (0.0) | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.0) | ($0.0) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.4** | **$0.4** |

**Zang Inc.**
Distribution Summary
*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.4** | **$0.4** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | **$0.4** | **$0.4** |
| | | | | | | |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.1% | 0.1% | 0.4 | 0.4 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Administrative Claims** | 0.1 | 0.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: General Unsecured Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya EMEA Inc.**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.1 | $0.1 | 100% | 100% | $0.1 | $0.1 |
| Accounts receivable (External) | A2 | 0.9 | 0.9 | 45% | 67% | 0.4 | 0.6 |
| Accounts receivable (Internal) | A3 | - | 11.6 | N/A | 6% | - | 0.7 |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | 19.8 | N/A | 0% | - | - |
| Inventory | A4 | 0.3 | 0.3 | 5% | 10% | 0.0 | 0.0 |
| Prepaid expenses and other current assets | A5 | 1.7 | 1.7 | 0% | 0% | - | - |
| Property, plant and equipment | A6 | 0.1 | 0.1 | 34% | 47% | 0.0 | 0.0 |
| Deferred Tax | A11 | 0.7 | 0.7 | 0% | 0% | - | - |
| Intangible Assets / Intellectual Property | A7 | 0.0 | 0.0 | 0% | 0% | - | - |
| Investments (including consolidated subs) | A8 | (1.6) | (1.6) | N/A | N/A | - | - |
| Other Long Term Assets | A9 | 0.0 | 0.0 | 7% | 7% | 0.0 | 0.0 |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$2.2** | **$33.6** | **26%** | **4%** | **$0.6** | **$1.5** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.0) | (0.0) |
| Prof. Fees | B3 | | | | | (0.0) | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.0) | ($0.1) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.5** | **$1.4** |

**Avaya EMEA Inc.**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
| | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.5** | **$1.4** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.5 | $1.4 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.1% | 0.2% | 0.5 | 1.4 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | 0.2 | 3.5 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Asia Pacific Inc.**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $1.4 | $1.4 | 100% | 100% | $1.4 | $1.4 |
| Accounts receivable (External) | A2 | 1.2 | 1.2 | 44% | 67% | 0.5 | 0.8 |
| Accounts receivable (Internal) | A3 | - | 5.1 | N/A | 10% | - | 0.5 |
| Other receivable (External) | A2 | 0.1 | 0.1 | 0% | 0% | - | - |
| Notes receivable (Internal) | A3 | - | 6.6 | N/A | 0% | - | - |
| Inventory | A4 | 0.4 | 0.4 | 5% | 10% | 0.0 | 0.0 |
| Prepaid expenses and other current assets | A5 | 0.5 | 0.5 | 0% | 0% | - | - |
| Property, plant and equipment | A6 | 0.1 | 0.1 | 34% | 47% | 0.0 | 0.0 |
| Deferred Tax | A11 | 0.2 | 0.2 | 0% | 0% | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | 5.5 | 5.5 | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$9.4** | **$21.0** | **21%** | **13%** | **$2.0** | **$2.7** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.0) | (0.0) |
| Prof. Fees | B3 | | | | | (0.1) | (0.1) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.1) | ($0.1) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$1.9** | **$2.6** |

**Avaya Asia Pacific Inc.**
Distribution Summary
*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | $1.9 | $2.6 |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $1.9 | $2.6 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.3% | 0.5% | 1.9 | 2.6 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | 0.0 | 0.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Managed Services Inc.**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | (0.0) | (0.0) | 0% | 0% | - | - |
| Accounts receivable (Internal) | A3 | - | 0.0 | N/A | 37% | - | 0.0 |
| Other receivable (External) | A2 | 0.0 | 0.0 | 0% | 0% | - | - |
| Notes receivable (Internal) | A3 | - | 1.6 | 0% | 0% | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | 7.2 | 7.2 | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$7.2** | **$8.8** | **0%** | **0%** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | (0.0) |
| Prof. Fees | B3 | | | | | - | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | ($0.0) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya Managed Services Inc.**
Distribution Summary
*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
| --- | --- | --- | --- | --- | --- | --- |
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | 0.0 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya World Services Inc.**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | 2.5 | N/A | 0% | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | 0.0 | N/A | 0% | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | 0.0 | 0.0 | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | | | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$2.5** | **0%** | **0%** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya World Services Inc.**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | **$0.0** | **$0.0** |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | **$0.0** | **$0.0** |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**VPNET Technologies Inc**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | 0.3 | N/A | 0% | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | (0.0) | (0.0) | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **($0.0)** | **$0.3** | **0%** | **0%** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**VPNET Technologies Inc**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Administrative Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(h) Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| | | | | | | |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Technology Corp of America**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | 0.3 | 0.3 | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.3** | **$0.3** | **0%** | **0%** | **$0.0** | **$0.0** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Technology Corp of America**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(h) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**AVAYA Holdings TWO, LLC**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Recovery Estimate % Low | Recovery Estimate % High | Recovery Estimate $ Low | Recovery Estimate $ High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | 0.1 | N/A | 6% | - | 0.0 |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | 0.8 | N/A | 0% | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$0.9** | | **0%** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | (0.0) |
| Prof. Fees | B3 | | | | | - | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | ($0.0) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**AVAYA Holdings TWO, LLC**
Distribution Summary

*$ millions*

| | Claims Low | Claims High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | 0.0 | 0.0 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| | | | | | | |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| | | | | | | |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Ubiquity Software Corp**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery Recovery Estimate % Low | Recovery Estimate % High | Recovery Estimate $ Low | Recovery Estimate $ High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | (0.0) | (0.0) | 0% | 0% | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **($0.0)** | **($0.0)** | **0%** | **0%** | **$0.0** | **$0.0** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Ubiquity Software Corp**
Distribution Summary

*$ millions*

| | Claims Low | Claims High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya CALA Inc.**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | 4.4 | 4.4 | N/A | N/A | 0.0 | 0.0 |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$4.4** | **$4.4** | **1%** | **1%** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.0) | (0.0) |
| Prof. Fees | B3 | | | | | (0.0) | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.0) | ($0.0) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya CALA Inc.**
Distribution Summary
*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
| | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | 0.0 | 0.0 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(h) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Holdings LLC**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery Recovery Estimate % Low | Recovery Estimate % High | Recovery Estimate $ Low | Recovery Estimate $ High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | (25.4) | (25.4) | N/A | N/A | 11.3 | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **($25.4)** | **($25.4)** | **N/A** | **N/A** | **$11.3** | **$0.0** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.3) | - |
| Prof. Fees | B3 | | | | | (0.3) | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.7) | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$10.6** | **$0.0** |

**Avaya Holdings LLC**
Distribution Summary
*$ millions*

| | Claims Low | Claims High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$10.6** | **$0.0** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $10.6 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 1.8% | 0.0% | 10.6 | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Integrated Cabinet Solutions Inc**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | (0.0) | (0.0) | 0% | 0% | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | 0.0 | 0% | 0% | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | 0.0 | 0.0 | 34% | 47% | 0.0 | 0.0 |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | 0.0 | 0.0 | 0% | 0% | - | - |
| Investments (including consolidated subs) | A8 | 0.0 | 0.0 | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$0.1** | **34%** | **25%** | **$0.0** | **$0.0** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (0.0) | (0.0) |
| Prof. Fees | B3 | | | | | (0.0) | (0.0) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($0.0) | ($0.0) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya Integrated Cabinet Solutions Inc**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
| | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | **$0.0** | **$0.0** |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | 0.0 | 0.0 |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | **$0.0** | **$0.0** |
| **Less: Administrative Claims** | 0.0 | 0.1 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| **Less: General Unsecured Claims** | 0.0 | 0.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Octel Communications LLC**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$0.0** | **N/A** | **N/A** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Octel Communications LLC**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
| | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | **$0.0** | **$0.0** |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | **$0.0** | **$0.0** |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | **$0.0** | **$0.0** |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | **$0.0** | **$0.0** |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | **$0.0** | **$0.0** |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | **$0.0** | **$0.0** |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | **$0.0** | **$0.0** |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | **$0.0** | **$0.0** |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | **$0.0** | **$0.0** |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | **$0.0** | **$0.0** |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Services Inc.**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Recovery Estimate % Low | Recovery Estimate % High | Recovery Estimate $ Low | Recovery Estimate $ High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$0.0** | **N/A** | **N/A** | **$0.0** | **$0.0** |
| | | | | | | | |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya Services Inc.**
Distribution Summary

*$ millions*

| | Claims Low | Claims High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| | | | | | | |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 4,609.4 | 4,609.4 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | 1,440.0 | 1,440.0 | 0.0% | 0.0% | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Sierra Communication International LLC**
Liquidation Proceeds Summary

*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Recovery Estimate % | | Recovery Estimate $ | |
| | | | | Low | High | Low | High |
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | 0.0 | N/A | 100% | - | 0.0 |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | 50.6 | N/A | 6% | - | 2.9 |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | (1,065.9) | (1,065.9) | N/A | N/A | 47.6 | 44.4 |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **($1,065.9)** | **($1,015.3)** | **N/A** | **N/A** | **$47.6** | **$47.4** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | (1.4) | (1.4) |
| Prof. Fees | B3 | | | | | (1.4) | (1.4) |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | ($2.9) | ($2.8) |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$44.7** | **$44.5** |

**Sierra Communication International LLC**
Distribution Summary

*$ millions*

| | Claims | | % Recovery | | $ Recovery | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$44.7** | **$44.5** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $44.7 | $44.5 |
| **Less: DIP Financing Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $44.7 | $44.5 |
| **Less: First Lien Debt Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $44.7 | $44.5 |
| **Less: Second Lien Notes Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Secured Claims | | | | | $44.7 | $44.5 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $44.7 | $44.5 |
| **Less: Administrative Claims** | 50.2 | 50.2 | 89.2% | 88.8% | 44.7 | 44.5 |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**Avaya Holdings Corp.**
Liquidation Proceeds Summary
*$ millions*

| Assets | Notes | Low Pro Forma Value at 9/30/17 | High Pro Forma Value at 9/30/17 | Potential Recovery Recovery Estimate % Low | Recovery Estimate % High | Recovery Estimate $ Low | Recovery Estimate $ High |
|---|---|---|---|---|---|---|---|
| Gross Liquidation Proceeds: | | | | | | | |
| Cash | A1 | $0.0 | $0.0 | N/A | N/A | $0.0 | $0.0 |
| Accounts receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Accounts receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Other receivable (External) | A2 | - | - | N/A | N/A | - | - |
| Notes receivable (Internal) | A3 | - | - | N/A | N/A | - | - |
| Inventory | A4 | - | - | N/A | N/A | - | - |
| Prepaid expenses and other current assets | A5 | - | - | N/A | N/A | - | - |
| Property, plant and equipment | A6 | - | - | N/A | N/A | - | - |
| Deferred Tax | A11 | - | - | N/A | N/A | - | - |
| Intangible Assets / Intellectual Property | A7 | - | - | N/A | N/A | - | - |
| Investments (including consolidated subs) | A8 | - | - | N/A | N/A | - | - |
| Other Long Term Assets | A9 | - | - | N/A | N/A | - | - |
| Goodwill | A11 | - | - | N/A | N/A | - | - |
| **Total Assets / Gross Liquidation Proceeds** | | **$0.0** | **$0.0** | **N/A** | **N/A** | **$0.0** | **$0.0** |
| **Less: Liquidation Costs** | | | | | | | |
| Payroll / Overhead | B1 | | | | | $0.0 | $0.0 |
| Trustee Fees | B3 | | | | | - | - |
| Prof. Fees | B3 | | | | | - | - |
| G&A | B2 | | | | | - | - |
| Total Liquidation Adjustments | | | | | | $0.0 | $0.0 |
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | | **$0.0** | **$0.0** |

**Avaya Holdings Corp.**
Distribution Summary
*$ millions*

| | Claims Low | Claims High | % Recovery Low | % Recovery High | $ Recovery Low | $ Recovery High |
|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution to Creditors** | | | | | **$0.0** | **$0.0** |
| **Less: Carve-Out** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for DIP Facility Claims | | | | | $0.0 | $0.0 |
| **Less: DIP Financing Claims** | 580.3 | 580.3 | 0.0% | 0.0% | - | - |
| Proceeds Available for Cash Flow Credit Facility Secured Claims | | | | | $0.0 | $0.0 |
| **Less: First Lien Debt Claims** | 3,234.7 | 3,234.7 | 0.0% | 0.0% | - | - |
| Proceeds Available for Second Lien Notes Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Second Lien Notes Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Other Secured Claims | | | | | $0.0 | $0.0 |
| **Less: Other Secured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Administrative Claims | | | | | $0.0 | $0.0 |
| **Less: Administrative Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Other Priority Claims | | | | | $0.0 | $0.0 |
| **Less: Other Priority Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for PBGC Claims | | | | | $0.0 | $0.0 |
| **Less: PBGC Claims** | 1,223.2 | 1,223.2 | 0.0% | 0.0% | - | - |
| Proceeds Available for General Unsecured Claims | | | | | $0.0 | $0.0 |
| **Less: General Unsecured Claims** | - | - | N/A | N/A | - | - |
| Proceeds Available for Subsidiary Claims | | | | | $0.0 | $0.0 |
| **Less: Subsidiary Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Prepetition Intercompany Debtor Claims | | | | | $0.0 | $0.0 |
| **Less: Prepetition Intercompany Debtor Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Section 510(b) Claims | | | | | $0.0 | $0.0 |
| **Less: Section 510(b) Claims** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for Intercompany Interests | | | | | $0.0 | $0.0 |
| **Less: Intercompany Interests** | N/A | N/A | N/A | N/A | - | - |
| Proceeds Available for HoldCo Interests | | | | | $0.0 | $0.0 |
| **HoldCo Interests** | N/A | N/A | N/A | N/A | - | - |

**<u>Exhibit F</u>**

**Financial Projections**

**Financial Projections**

In connection with the Disclosure Statement,[1] the Debtors' management team ("Management") prepared financial projections ("Financial Projections") for the Avaya Enterprise for fiscal years 2017 through 2021 (the "Projection Period"). The Financial Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Avaya Enterprise's operations. **Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Avaya Enterprise's financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.**

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

**These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Avaya Enterprise's independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.**

**Principal Assumptions for the Financial Projections**

The Financial Projections are based on, and assume the successful implementation of, the Avaya Enterprise's business plan ("Business Plan"). Both the Business Plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Avaya Enterprise, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Avaya Enterprise. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring in Bankruptcy Court. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Avaya Enterprise to achieve the projected results of operations. See "Risk Factors."

In deciding whether to vote to accept or reject the Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. See "Risk

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* (the "Disclosure Statement").

Factors." Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("ASC 852"), the Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors expect that they will be required to implement fresh start accounting upon emergence, they have not yet completed the work required to quantify the impact to the Financial Projections. When the Debtors fully implement fresh start accounting, differences are anticipated and such differences could be material.

### Safe Harbor Under The Private Securities Litigation Reform Act of 1995

The Financial Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "Exchange Act"). Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and members of its management team with respect to the timing of, completion of, and scope of the current restructuring, Plan, Business Plan, bank financing, and debt and equity market conditions and the Avaya Enterprise's future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

### Select Risk Factors Related to the Financial Projections

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond Management's control. Many factors could cause actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements. A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article IX of the Disclosure Statement.

### Financial Projection General Assumptions

Basis of presentation (non-GAAP)

- Non-GAAP P&L excludes certain expenses including intangibles amortization, stock-based compensation, restructuring charges, and impairment charges, as well as interest expense and taxes

- Fiscal 2017 projections include fiscal Q1 and Q2 actual results as well as fiscal Q3 preliminary results The Company's Networking business, for modeling purposes, is assumed to be sold on 6/30/17 (quarter-end Q3 fiscal 2017)

- Fiscal 2018-2021 projections including expenses, cash flows, Adjusted EBITDA addbacks and balance sheet items reflect the at-emergence termination of the Avaya Pension Plan for Salaried Employees (APPSE)

- Balance sheet projections include adjustments for fresh start accounting and other emergence sources and uses for illustrative purposes only; projections are non-GAAP and not created in accordance with American Institute of Certified Public Accountants Statement of Position 90-7

Non-GAAP P&L

- Revenue

  - Includes hardware and software product offerings across the Company's UC, CC, and Networking businesses; also includes related maintenance and professional services revenue, as well as APCS revenue for managed communications services. The Company's offerings are ultimately sold to end-users through a combination of direct sales and indirect sales through channel partners.

- Standard cost

  - Primarily consists of outsourced manufacturing costs associated with hardware product revenues, as well as software royalty costs

- Other cost of goods sold (OCOGS)

  - Primarily consists of salaries and related overhead costs of personnel engaged in manufacturing, logistics and procurement and other supply chain provisioning activities including freight, warranty costs

- Services cost of goods sold (SCOGS)

  - Primarily consists of salaries and related overhead costs of personnel engaged in support and services, as well as APCS platform costs and other outsourced costs.

- Research and development expense (R&D)

  - Primarily include personnel costs, outside engineering costs, professional services, prototype costs, test equipment, software usage fees and related overhead expenses.

- Sales, marketing, general and administrative expense (SG&A)

  - Sales and marketing expenses primarily include personnel costs, sales commissions, travel, marketing promotional and lead generation programs, trade shows, professional services fees and related overhead expenses.

  - General and administrative expenses consist primarily of salary and benefit costs for executive and administrative staff, the use and maintenance of administrative offices, including depreciation expense, logistics, information systems and legal, financial, human resources, and other corporate functions.

- Adjusted EBITDA addbacks for Non-GAAP P&L

  - Primarily consists of depreciation expense addbacks and other comprehensive income (OCI) addback; the OCI addback comprises of amortization expense (gain) related to the pension and other post-employment benefits (OPEB )

- Adjusted EBITDAP

  - Reflects Adjusted EBITDA less OCI addback plus pension/OPEB/LTD/FAS112 expense; The Adjusted EBITDAP metric removes non-cash components from Adjusted EBITDA, including adjusting to remove the OCI addback, which is a non-cash boost to Adjusted EBITDA in the projection period, as well as to remove the net pension and OPEB expense, which is a non-cash deduction to Adjusted EBITDA in the projection period.

<u>Cash Flows</u>

- Working capital

  - Driven by ordinary course changes in accounts receivable, accounts payable, inventory and deferred revenue

- Restructuring payments

  - Payments associated with severance for headcount reductions due to termination or relocation of job functions and exiting and consolidation of facilities; primarily reflects payments for initiatives already executed as of year-end fiscal 2017

- Pension and OPEB contributions

  - Primarily reflects US and non-US pension contributions required to satisfy minimum applicable amounts under existing law and regulations, as well as payments for other postretirement liabilities

- Other operating cash flow

  - Primarily reflects adjustments to Adjusted EBITDA to remove non-cash components, including adjusting to remove the OCI addback, which is a non-cash boost to Adjusted EBITDA in the projection period, as well as to remove the net pension and OPEB expense, which is a non-cash deduction to Adjusted EBITDA in the projection period.

  - Other items reflect timing differences between recognition of expense in the P&L vs. actual timing of cash payments related to prepaid expenses, business partner rebates, payroll and benefits, other assets and liabilities, etc.

- Cash Interest and Cash Taxes

  - Cash Interest is based on pro forma debt of $2.925 billion and cash interest rate of 6.00%; presented without debt paydowns for illustrative purposes in the projection period. Cash Taxes based on analyses conducted by the Company's tax advisors in conjunction with the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtor affiliates, and reflect the usage of post-emergence US NOLs

- Capital expenditures

  - Primarily reflects corporate IT, real estate, APCS and other investments

- Other

- Proceeds from sale of assets

  - Reflects net cash proceeds from the expected sale of Networking

- IP monetization

  - Reflects expected proceeds from certain non-core IP assets

- Other activities

  - Reflects payments associated with existing sale-leaseback and property contracts

<u>Selected Balance Sheet Items</u>

- Accounts Receivable

  - Accounts receivable are recorded net of reserves for sales returns and allowances and provisions for doubtful accounts. Allowances are based on analyses of historical trends, aging of accounts receivable balances and the creditworthiness of customers.

- Inventory

  - Inventory includes goods awaiting sale (finished goods), equipment that is being installed at customer locations for various installations that are not yet complete and goods to be used in connection with providing maintenance services.

- Deferred Tax Assets

  - Projections are illustrative and reflect the value of tax-deductible future US pension contributions as well as post-emergence NOLs.

- Plant Property & Equipment

  - Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is determined using a straight-line method over the estimated useful lives of the assets.

- Intangibles

  - Intangible assets include acquired technology, customer relationships, trademarks and trade names and other intangibles. Intangible assets with finite lives are amortized using the straight-line method over the estimated economic lives of assets, which range from two to fifteen years.

- Goodwill

  - Includes illustrative fresh start accounting adjustment at emergence (pro forma year end fiscal 2017). Goodwill is held constant over the projection period for illustrative purposes.

- Deferred Revenue

- Reflects amounts related to prepaid maintenance, deferred projects, advance payments and other items.

- Pension and OPEB

  - Book value of US pension plans, non-US pension plans and the postretirement plans (OPEB). Projections based on estimates from the Company's actuarial advisors.

- Business Restructuring Reserve

  - Liability recorded for business restructuring activities. A business restructuring is defined as an exit or disposal activity that is planned and controlled by management and materially changes either the scope of a business or the manner in which that business is conducted. Includes headcount and real estate footprint reductions.

| Non-GAAP P&L<br>$ in millions | Actual<br>FY16 | Proj<br>FY17 | ABP<br>FY18 | ABP<br>FY19 | ABP<br>FY20 | ABP<br>FY21 |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Product | $1,755 | $1,376 | $1,116 | $1,091 | $1,116 | $1,152 |
| y-o-y growth | (14%) | (22%) | (19%) | (2%) | 2% | 3% |
| Services | $1,947 | $1,829 | $1,663 | $1,601 | $1,577 | $1,569 |
| y-o-y growth | (5%) | (6%) | (9%) | (4%) | (1%) | (1%) |
| **Total Revenue** | **$3,702** | **$3,205** | **$2,778** | **$2,691** | **$2,693** | **$2,721** |
| y-o-y growth | (9%) | (13%) | (13%) | (3%) | 0% | 1% |
| **Non-GAAP Gross Margin** | **$2,278** | **$1,967** | **$1,738** | **$1,702** | **$1,712** | **$1,740** |
| GM % | 62% | 61% | 63% | 63% | 64% | 64% |
| **Non-GAAP Operating Costs** | | | | | | |
| R&D | $273 | $227 | $186 | $174 | $167 | $162 |
| SG&A | $1,249 | $1,094 | $951 | $897 | $861 | $834 |
| **Non-GAAP Operating Income** | **$756** | **$647** | **$601** | **$630** | **$684** | **$743** |
| Depreciation / other addbacks | $121 | $102 | $93 | $80 | $77 | $78 |
| OCI addbacks | $62 | $95 | $14 | $20 | $19 | $17 |
| **Adjusted EBITDA** | **$940** | **$844** | **$708** | **$731** | **$781** | **$839** |
| Margin % | 25% | 26% | 25% | 27% | 29% | 31% |
| *Memo* | | | | | | |
| **Adjusted EBITDAP** | **$906** | **$796** | **$712** | **$731** | **$777** | **$833** |
| Margin % | 24% | 25% | 26% | 27% | 29% | 31% |

| Cash Flow Metrics<br>$ in millions | Actual<br>FY16 | Proj<br>FY17 | ABP<br>FY18 | ABP<br>FY19 | ABP<br>FY20 | ABP<br>FY21 |
|---|---|---|---|---|---|---|
| Adjusted EBITDA | $940 | $844 | $708 | $731 | $781 | $839 |
| Change in Working Capital | $110 | ($51) | ($49) | ($24) | ($13) | ($21) |
| Restructuring Payments | ($121) | ($76) | ($57) | ($40) | ($24) | ($20) |
| Pension / OPEB Payments | ($160) | ($100) | ($93) | ($86) | ($65) | ($60) |
| Other Operating Activities | ($175) | ($237) | ($20) | ($24) | ($21) | ($25) |
| Cash Interest | ($428) | ($339) | ($176) | ($176) | ($176) | ($176) |
| Cash Taxes | ($51) | ($43) | ($48) | ($100) | ($161) | ($181) |
| **Operating Cash Flow** | **$114** | **($2)** | **$266** | **$282** | **$322** | **$355** |
| | | | | | | |
| Capital Expenditures | ($95) | ($63) | ($67) | ($66) | ($64) | ($63) |
| Acquisitions | ($20) | ($4) | $0 | $0 | $0 | $0 |
| Divestitures | $0 | $0 | $0 | $0 | $0 | $0 |
| Proceeds from Sale of Assets | $16 | $70 | $10 | $0 | $0 | $0 |
| IP Monetization Proceeds | $0 | $0 | $125 | $0 | $0 | $0 |
| Other Activities | ($24) | ($22) | ($24) | ($1) | $0 | $0 |
| **Total Other Cash Flow** | **($123)** | **($19)** | **$44** | **($67)** | **($64)** | **($63)** |
| FX | ($10) | $0 | $0 | $0 | $0 | $0 |
| **Total Cash Flow** | **($19)** | **($21)** | **$310** | **$215** | **$258** | **$292** |
| | | | | | | |
| **Memo** | | | | | | |
| Total Cash | | $350 | $660 | $874 | $1,132 | $1,424 |
| Total Debt | | $2,925 | $2,925 | $2,925 | $2,925 | $2,925 |

| Balance Sheet<br>$ in millions | Proj<br>FY17 | Adj. | PF<br>FY17 | ABP<br>FY18 | ABP<br>FY19 | ABP<br>FY20 | ABP<br>FY21 |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $584 | ($234) | $350 | $660 | $874 | $1,132 | $1,424 |
| Accounts Receivable, Net | $461 | | $461 | $446 | $437 | $437 | $448 |
| Inventory | $113 | | $113 | $118 | $113 | $110 | $109 |
| Other Current Assets | $167 | | $167 | $145 | $141 | $141 | $142 |
| **Total Current Assets** | **$1,325** | | **$1,091** | **$1,369** | **$1,564** | **$1,820** | **$2,123** |
| | | | | | | | |
| Deferred Tax Assets | $119 | $158 | $277 | $184 | $129 | $108 | $87 |
| PP&E | $215 | | $215 | $189 | $175 | $161 | $146 |
| Intangibles | $392 | | $392 | $350 | $320 | $292 | $265 |
| Goodwill | $3,629 | $2,478 | $6,107 | $6,107 | $6,107 | $6,107 | $6,107 |
| Other LT Assets | $99 | | $99 | $86 | $83 | $83 | $84 |
| **Total Assets** | **$5,779** | | **$8,181** | **$8,285** | **$8,378** | **$8,572** | **$8,812** |
| | | | | | | | |
| Accounts Payable | $343 | ($50) | $293 | $256 | $246 | $243 | $240 |
| Deferred Revenue | $721 | | $721 | $670 | $641 | $629 | $620 |
| Total Debt | $6,699 | ($3,774) | $2,925 | $2,925 | $2,925 | $2,925 | $2,925 |
| Pension and OPEB | $1,641 | ($624) | $1,017 | $920 | $836 | $775 | $715 |
| LT Disability and FAS112 | $144 | | $144 | $146 | $148 | $151 | $155 |
| Business Restr. Reserve | $115 | | $115 | $64 | $30 | $17 | $9 |
| Other Liabilities | $712 | | $712 | $618 | $598 | $599 | $605 |
| **Total Liabilities** | **$10,374** | | **$5,926** | **$5,598** | **$5,424** | **$5,339** | **$5,268** |
| Shareholders Equity | ($4,595) | $6,850 | $2,256 | $2,687 | $2,954 | $3,233 | $3,544 |
| **Total Liabilities and Equity** | **$5,779** | | **$8,181** | **$8,285** | **$8,378** | **$8,572** | **$8,812** |

**<u>Exhibit G</u>**

**New Secured Debt Term Sheet**

**NEW SECURED DEBT TERM SHEET--REORGANIZED DEBTORS**

The following term sheet (this "Term Sheet") presents certain preliminary material terms in respect of the New Secured Debt of the Reorganized Debtors. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan Support Agreement to which this Term Sheet is attached as **Exhibit E**.

*THIS TERM SHEET IS NOT AN EXHAUSTIVE LIST OF ALL THE TERMS AND CONDITIONS IN RESPECT OF THE NEW SECURED DEBT OF THE REORGANIZED DEBTORS NOR DOES IT CONSTITUTE AN OFFER TO SELL OR BUY, NOR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION SHALL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE LAWS.*

| Term | Description |
|---|---|
| **Borrower:** | Avaya Inc., and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from the Company upon its emergence from bankruptcy (the "Borrower"). |
| **Guarantors:** | The obligations of the Borrower in respect of the New Secured Debt (the "Borrower Obligations"), will be guaranteed by the direct parent company of the Borrower ("Holdings"), and the Borrower's existing and future, direct and indirect, material wholly-owned domestic subsidiaries that are restricted subsidiaries, that are identified on Exhibit 1 attached hereto, on a joint and several basis, subject to customary exceptions an exclusions (Holdings and such subsidiaries, collectively, the "Guarantors") and as otherwise provided in the New Secured Debt Documents.<br><br>The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party." |
| **Definitive Documents:** | The agreements documenting the New Secured Debt shall be set forth in the New Secured Debt Documents filed as part of the Plan Supplement not later than ten (10) days prior to the deadline to accept or reject the Amended Plan.<br><br>The New Secured Debt Documents shall be materially consistent with this Term Sheet and otherwise acceptable to the Requisite First Lien Creditors and the Debtors. |
| **Collateral:** | The New Secured Debt shall be secured by liens on substantially all of the Loan Parties' assets, subject to customary exceptions and exclusions; provided that such liens shall be junior to liens incurred to secure the Exit Facility with respect to assets that otherwise would be ABL Priority Collateral (to be defined to include customary ABL priority collateral) and as may otherwise be set forth in the New Secured Debt Documents. |
| **Administrative Agent:** | To be determined by the Debtors in consultation with the Ad Hoc First Lien Group. |
| **Lead Arrangers and Joint Bookrunners:** | To be determined by the Debtors in consultation with the Ad Hoc First Lien Group. |

| Term | Description |
|---|---|
| **Commitment:** | Not less than $2,925 million (the "Commitment", and the loans made thereunder, the "Loans"). |
| **Lenders:** | The group of lenders arranged by the Lead Arrangers (collectively, the "Lenders") other than certain disqualified lenders; provided that if the Commitment is not fully-syndicated in an amount equal to at least $2,925 million, the unsubscribed portion of the Commitment less than $2,925 shall be distributed to Holders of First Lien Debt Claims in accordance with the Amended Plan (such subscribed portion, the "Syndicated Debt," and such unsubscribed portion, the "Takeback Debt"). |
| **Incremental Facilities:** | To be determined. |
| **Use of Proceeds:** | The proceeds of the Loans will be (i) used repay in full all amounts outstanding on the Effective Date with respect to the DIP Financing, (ii) used to fund distributions under the Plan and (iii) thereafter, used for working capital and general corporate purposes of the Borrower and its subsidiaries. |
| **Maturity:** | Expected to be seven years after the Effective Date or such maturity as may be necessary to facilitate a successful syndication. |
| **Amortization:** | To be determined, but acceptable to the Company and the Requisite First Lien Creditors. |
| **Takeback Debt** | The Takeback Debt under the Amended Plan may be issued on a second priority or "last out" basis with respect to the Syndicated Debt and shall be on terms acceptable to the Requisite First Lien Creditors and the Debtors with such terms to be set forth in the Plan Supplement; provided that to the extent necessary, any such Takeback Debt shall subject to one or more intercreditor agreements reasonably acceptable to the Debtors and the Requisite First Lien Creditors. |
| **Interest Rate:** | To be determined, but acceptable to the Company and the Requisite First Lien Creditors. |
| **Default Rate:** | The Loans will bear interest at the applicable interest rate plus 200 bps per annum, to be payable with respect to overdue amounts and under certain other customary circumstances. |
| **Upfront Fee/OID:** | The New Secured Debt may provide for a fee payable in the form of original issue discount or upfront fee on the Effective Date to facilitate a successful syndication. |
| **Agency Fee:** | To be agreed with the Administrative Agent. |
| **Optional Prepayments:** | Expected to include 101 soft call protection for no more than 12 months, otherwise prepayable at par. |
| **Mandatory Prepayments:** | Including: |

| Term | Description |
|------|-------------|
| | (1) excess cash flow sweep (subject to leverage-based stepdowns to be agreed)<br><br>(2) asset sale sweep (subject to customary re-investment rights)<br><br>(3) debt sweep (except for debt permitted under the credit agreement for the New Secured Debt). |
| **Representations and Warranties:** | Usual and customary for financings of this type. |
| **Covenants:** | Usual and customary for financings of this type. |
| **Voting; Amendments:** | Usual and customary for financings of this type. |
| **Cost and Yield Protection:** | Usual and customary for financings of this type. |
| **Events of Default:** | Usual and customary for financings of this type. |

*      *      *      *      *

**EXHIBIT 1**

**Subsidiary Guarantors**

1. Avaya Cala Inc.

2. Avaya EMEA Ltd.

3. Avaya Federal Solutions, Inc.

4. Avaya Holdings LLC

5. Avaya Holdings Two, LLC

6. Avaya Integrated Cabinet Solutions Inc.

7. Avaya Management Services Inc.

8. Avaya Services Inc.

9. Avaya World Services Inc.

10. Octel Communications LLC

11. Sierra Asia Pacific Inc.

12. Technology Corporation of America, Inc.

13. Ubiquity Software Corporation

14. VPNet Technologies, Inc.

15. Zang, Inc.

**<u>Exhibit H</u>**

**Second Lien Call Procedures**

**<u>ATTACHED SEPARATELY ON THE DOCKET</u>**

## Exhibit I

**Plan Support Agreement**

**EXECUTION VERSION**

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THIS PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PLAN SUPPORT AGREEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

## FIRST AMENDED PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (together with all exhibits, annexes, and schedules hereto, including the Amended Plan and the Term Sheets (each as defined below), in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of August 6, 2017, is made and entered into by and among: (a) the Debtors listed on **Exhibit A** hereto (collectively, the "***Company***"); (b) the parties set forth on the signature pages hereto, on behalf of certain affiliates of those parties and/or managed funds, accounts or sub-accounts of any such parties or their affiliates that are parties hereto from time to time and that hold First Lien Debt Claims and Second Lien Notes Claims (each as defined below) (collectively, the "***Initial Holders***"); and (c) each Joining Party (as defined below) (such Joining Parties, together with the Initial Holders, the "***Holder Parties***"). The Company and each Holder Party are collectively referred to herein as the "***Parties***" and each individually as a "***Party***."

## RECITALS

**WHEREAS**, reference is made to:

(a)    that certain credit facility ("***Cash Flow Credit Facility***") provided by the Third Amended and Restated Credit Agreement, dated as of October 26, 2007 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Cash Flow Credit Facility Agreement***"), among Avaya Inc. ("***Avaya***"), as borrower, Avaya Holdings Corp. ("***HoldCo***"), as holdings, the subsidiary guarantors party thereto, Citibank, N.A., as administrative agent (in such capacity, the "***First Lien Agent***") and each of the lenders from time to time party thereto (such lenders, the "***First Lien Lenders***"), and including those certain guaranties entered into in respect of the Cash Flow Credit Facility;

(b)    that certain Indenture, dated as of February 11, 2011, for the 7.0% Senior Secured Notes due 2019 (as the same may have been amended, modified, supplemented, or amended and restated from time to time, the "***7.0% Senior Secured Notes Indenture***"), by and among Avaya, as issuer, the subsidiary guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee and notes collateral agent (the "***First Lien Trustee***"), pursuant to which Avaya issued those certain 7.00% Senior Secured Notes due 2019 (the "***7.0% Senior Secured Notes***") to the holders thereof (such holders, the "***7.0% Senior Secured Noteholders***");

(c)    that certain Indenture, dated as of December 21, 2012, for 9.0% Senior Secured Notes due 2019 (as the same may have been amended, modified, supplemented,

or amended and restated from time to time, the "***9.0% Senior Secured Notes Indenture***" and, together with the 7.0% Senior Secured Notes Indenture, the "***First Lien Indentures***"), by and among Avaya, as issuer, the subsidiary guarantors party thereto and the First Lien Trustee, as trustee and notes collateral agent, pursuant to which Avaya issued those certain 9.00% Senior Secured Notes due 2019 (the "***9.0% Senior Secured Notes***" and, together with the 7.0% Senior Secured Notes, the "***First Lien Notes***") to the holders thereof (such holders, the "***9.0% Senior Secured Noteholders***" and, together with 7.0% Senior Secured Noteholders, the "***First Lien Noteholders***");

(d)     that certain Indenture, dated as of March 7, 2013, for the 10.5% Senior Secured Notes due 2021 (as the same may have been amended, modified, supplemented, or amended and restated from time to time, the "***Second Lien Indenture***"), by and among Avaya, as issuer, the subsidiary guarantors named on the signature pages thereto and Wilmington Savings Fund Society, FSB, as trustee and notes collateral agent (the "***Second Lien Trustee***"), pursuant to which Avaya issued those certain 10.50% Senior Secured Notes due 2021 (the "***Second Lien Notes***") to the holders thereof (such holders, the "***Second Lien Noteholders***");

(e)     that certain Amended and Restated Intercreditor Agreement, dated as of October 29, 2012, among Citicorp USA, Inc., the First Lien Agent and each junior agent from time to time party thereto (the "***ABL Intercreditor Agreement***"); and

(f)     that certain first lien intercreditor agreement dated as of February 11, 2011, among Avaya, the First Lien Agent, The Bank of New York Mellon Trust Company, N.A. and the additional parties thereto (the "***First Lien Intercreditor Agreement***" and, together with the ABL Intercreditor Agreement, the "***Intercreditor Agreements***").

**WHEREAS**, on January 19, 2017, each of the Debtors commenced voluntary cases (collectively, the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").

**WHEREAS**, on April 13, 2017, the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* [Docket No. 388] and the *Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* [Docket No. 389].

**WHEREAS**, as of June 18, 2017, the Debtors had not filed a chapter 11 plan that was acceptable to the Required Lenders (as defined in the Cash Flow Credit Facility Agreement) on the one hand, and the Debtors, on the other hand (an "***Acceptable Plan***").

**WHEREAS**, pursuant to paragraph 16 of the DIP Financing Order (as defined below), the Debtors' failure to file an Acceptable Plan constitutes a Cash Collateral Event of Default (as defined in the DIP Financing Order).

**WHEREAS**, a Cash Collateral Event of Default occurred on June 18, 2017 and is continuing (the "***June 18 Cash Collateral Default***").

**WHEREAS**, on June 18, 2017 and through the Agreement Effective Date, the members of the Ad Hoc Group constitute the Required Lenders (as defined in the Cash Flow Credit Facility Agreement) and could direct the First Lien Agent to deliver a Cash Collateral Adequate Protection Notice (as defined in the DIP Financing Order).

**WHEREAS**, on June 19, 2017, the Ad Hoc Group sent a letter to the board of directors of Avaya Inc. advising that the Ad Hoc Group would forbear from exercising remedies pursuant to the DIP Financing Order with respect to the June 18 Cash Collateral Default in order to make progress towards achieving an Acceptable Plan.

**WHEREAS**, as of July 18, 2017, the Debtors had not yet received approval of an Acceptable Disclosure Statement (as defined in the DIP Financing Order).

**WHEREAS**, pursuant to paragraph 16 of the DIP Financing Order, the failure to obtain approval of an Acceptable Disclosure Statement constitutes a Cash Collateral Event of Default.

**WHEREAS**, another Cash Collateral Event of Default occurred on July 18, 2017 and is continuing.

**WHEREAS**, pursuant to paragraph 28(h) of the DIP Financing Order, the Debtors must file any Claim, Challenge, or action on account of liens asserted to the Retained Claims Collateral (as defined in the DIP Financing Order) on or before the first business day following two (2) months after the Petition Date (the "Debtors' Retained Claims Challenge Period").

**WHEREAS**, the Debtors' Retained Claims Challenge Period may be extended by agreement of the Debtors and (a) the Prepetition Domestic ABL Agent, (b) the Prepetition Cash Flow Agent, (c) the Prepetition First Lien Notes Trustees, and (d) the Second Lien Notes Trustee.

**WHEREAS**, pursuant to the *Second Joint Stipulation Extending (I) the Debtors' Retained Claims Challenge Period and (II) the Committee's Challenge Period* [Docket No. 791], the Debtors' Retained Claims Challenge Period was extended through and including August 9, 2017.

**WHEREAS**, claims of the First Lien Lenders under the Cash Flow Credit Facility are referred to herein collectively as the "***First Lien Lender Claims***," and claims of the First Lien Noteholders under the First Lien Indentures are referred to herein collectively as the "***First Lien Notes Claims***" (together with the First Lien Lender Claims, the "***First Lien Debt Claims***").

**WHEREAS,** claims of the Second Lien Noteholders under the Second Lien Indenture are referred to herein collectively as the "***Second Lien Notes Claims***" (together with the First Lien Debt Claims, the "***Debt Claims***").

**WHEREAS**, the Cash Flow Credit Facility Agreement, the First Lien Indentures, the Intercreditor Agreements and the Second Lien Indenture are referred to herein collectively as the "***Debt Documents***."

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1.      Definitions.  The following terms shall have the following meanings:

(a)      "**Ad Hoc Group**" shall mean members of the ad hoc group as set forth in the *Fifth Amended Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 758], as such statement may be further amended from time to time.

(b)      "**Agreement Effective Date**" shall mean, (i) with respect to the Holder Parties, the first day on which each of the conditions set forth at Section 9(a) have been satisfied, and (ii) with respect to the Debtors, the first day on which each of the conditions set forth at Section 9(b) have been satisfied.

(c)      "**DIP Financing Order**" shall mean that certain *Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) And 364(E), And (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363 (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 And 507(B)* [Docket No. 229].

(d)      "**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order.

2.      The Proposed Restructuring.

(a)      The Parties hereby agree to implement a restructuring (the "**Restructuring**") transaction for the Company in accordance with and subject to the terms and conditions set forth in this Agreement, including (i) the *First Amended Joint Chapter 11 Plan of Reorganization of Avaya Inc. and Its Debtor Affiliates* in substantially the form attached as **Exhibit B** hereto (together with all exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms herein and therein, the "**Amended Plan**"), (ii) the term sheet setting forth the principal terms of the proposed settlement (the "**PBGC Settlement**") with Pension Benefit Guaranty Corporation ("**PBGC**") attached as **Exhibit C** hereto (the "**PBGC Settlement Term Sheet**"), (iii) the term sheet setting forth the principal terms relating to corporate governance of the Reorganized Debtors (as defined in the Amended Plan) attached as **Exhibit D**

4

hereto (the "***Corporate Governance Term Sheet***"), and (iv) the term sheet setting forth the principal terms of the New Secured Debt (as defined in the Amended Plan) attached as **Exhibit E** hereto (the "***New Secured Debt Term Sheet***" and, collectively with the PBGC Settlement Term Sheet, and the Corporate Governance Term Sheet, the "***Term Sheets***").[1]

(b)    The Restructuring will be effectuated through the solicitation, confirmation and consummation of the Amended Plan, which shall be on terms and conditions consistent with this Agreement and otherwise reasonably acceptable to (i) the Company, (ii) Holder Parties that hold at least 50.1% or more in principal amount of the First Lien Debt Claims held by all Holder Parties  as of the time of such determination (collectively, the "***Requisite First Lien Creditors***") and (iii) to the extent set forth in, and pursuant to the terms of, the PBGC Settlement Term Sheet, PBGC.

(c)    The documents related to or otherwise utilized to implement or effectuate the Restructuring (collectively, the "***Restructuring Documents***") shall mean:

(i)    the Amended Plan, the related disclosure statement (such disclosure statement, together with any exhibits, schedules, attachments or appendices thereto, in each case as may be amended, supplemented or otherwise modified from time to time in accordance with the terms herein and therein, the "***Amended Disclosure Statement***"), and any other documents and/or agreements relating to the Amended Plan and/or the Amended Disclosure Statement, including (x) a motion seeking approval of the Amended Disclosure Statement, the procedures for the solicitation of votes in connection with the Amended Plan pursuant to Bankruptcy Code sections 1125 and 1126 (the "***Solicitation***"), the forms of ballots and notices and related relief (such motion, together with all exhibits, appendices, supplements, and related documents, the "***Disclosure Statement Motion***"), (y) a proposed order of the Bankruptcy Court approving the Disclosure Statement Motion (together with all exhibits, appendices, supplements and related documents, the "***Disclosure Statement Order***") and (z) a proposed order of the Bankruptcy Court approving the Amended Plan pursuant to Bankruptcy Code section 1129 (together with all exhibits, appendices, supplements and related documents, the "***Confirmation Order***");

(ii)    (A) the organizational and governance documents of Reorganized Debtors, including certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, identity of proposed members of the boards of directors (or similar governing bodies), limited partnership agreements, shareholders agreements (or equivalent governing documents) and

---

[1]    Each of the Amended Plan, the PBGC Settlement Term Sheet, the Corporate Governance Term Sheet, and the New Secured Debt Term Sheet are expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein.  In the event of any inconsistency between the Amended Plan, on the one hand, and any Term Sheet or the remainder of this Agreement, on the other hand, the Amended Plan shall govern.  In the event of any inconsistency between any Term Sheet, on the one hand, and the remainder of this Agreement, on the other hand, the applicable Term Sheet shall govern.

registration rights agreements (collectively, the "***Governance Documents***") and (B) any financing or funding documents (whether in the form of debt or equity) entered into by the Reorganized Debtors upon or in connection with the consummation of the Restructuring, including  the Exit Facility (as defined in the Amended Plan), and the New Secured Debt (as defined in the Amended Plan) and/or any other similar exit facility or indebtedness that is incurred or issued by the Reorganized Debtors or any of their respective subsidiaries in connection with the Restructuring;

(iii)    a motion seeking the approval of the Debtors' entry into and performance under this Agreement pursuant to Bankruptcy Code section 363 authorizing, among other things, the payment of certain fees, expenses and other amounts hereunder, and granting related relief (the "***PSA Approval Motion***"), and an order approving the PSA Approval Motion (the "***PSA Order***");

(iv)    all material documentation implementing the PBGC Settlement, including, but not limited to, (a) a stipulation between the Debtors and PBGC (the "***PBGC Stipulation***"), (b) a motion seeking approval of the PBGC Settlement and distress termination of the Avaya Salaried Pension Plan (as defined in the Amended Plan) (the "***PBGC Settlement Motion***"), and (c) an order approving the PBGC Settlement Motion (the "***PBGC Settlement Order***");

(v)    all documentation related to the management equity incentive plan (the "***MEIP***");

(vi)    the agreement providing for the retention of Kevin J. Kennedy as an advisor to the Reorganized Debtors (the "***Advisory Agreement***"), the terms of which are set forth in the term sheet attached as **Exhibit B-1** hereto, and the agreement providing for the employment of James M. Chirico, Jr., as Chief Executive Officer of the Reorganized Debtors (the "***Executive Employment Agreement***") the terms of which are set forth in the term sheet attached as **Exhibit B-2** hereto; and

(vii)    such other definitive documentation relating to  the Restructuring as is necessary or desirable to consummate the Restructuring and the Amended Plan.

(d)    Each of the Restructuring Documents shall be consistent in all respects with, and shall contain, the terms and conditions set forth in this Agreement, including the Exhibits attached hereto, and shall otherwise be in form and substance reasonably acceptable to the Company and the Requisite First Lien Creditors; provided, that, each of the Governance Documents shall be determined by and acceptable to the Requisite First Lien Creditors in their sole discretion; provided further, that, each of the PBGC Stipulation and the PBGC Settlement Order shall be in form and substance consistent with the PBGC Settlement Term Sheet and otherwise acceptable to the Company, PBGC, and the Requisite First Lien Creditors.

3.      <u>Representations of the Parties</u>.    Each of the Holder Parties, severally and not jointly, and each of the entities comprising the Company, jointly and severally, but, solely with respect to the Company, subject to any necessary Bankruptcy Court approval (including entry of the PSA Order), as and to the extent applicable, hereby represents and warrants that, as of the Agreement Effective Date, the following statements are true, correct and complete:

(a)      It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)      The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or (B) its charter or bylaws (or other similar governing documents) or (ii) except, with respect to the Company only, for customary bankruptcy, insolvency and reorganization type default and notice provisions, to the knowledge of such Party, conflict with, result in a breach of or constitute a default under (with or without notice or lapse of time or both) any contractual obligation to which it is a party or it or its assets are bound, in each case, other than any such violation, conflict, breach or default with respect to which a waiver has been obtained prior to the Agreement Effective Date and which waiver has not been subsequently revoked.

(c)      This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(d)      The execution and delivery by such Party of this Agreement does not require any authorization of, filing with, registration of or before, consent from, approval of or other action by or notice to any federal, state or other governmental authority or regulatory body, in each case, other than any such authorization, filing, registration, consent, approval, action or notice which has been obtained, provided, or otherwise satisfied prior to the Agreement Effective Date and which authorization, filing, registration, consent, approval, action, or notice has not been subsequently revoked (excluding, as to performance, applicable approval of the Bankruptcy Court).

(e)      If such Party is a Holder Party, such Holder Party (i) either (A) is the sole legal and beneficial owner of the Claims (as such term is defined by section 101(5) of the Bankruptcy Code) set forth below its name on its signature page hereof (or the Joinder (as defined below)), in each case, free and clear of any and all claims, liens and encumbrances (other than those imposed by securities laws applicable to unregistered securities), or (B) has sole investment and voting discretion with respect to such Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Claims to the terms of this Agreement; (ii) holds no other Claims that are not identified below its name on its signature page hereof; (iii) has full power and authority to act on behalf of, vote and consent to matters concerning such  Claims in respect to matters

relating to the Restructuring contemplated by this Agreement and dispose of, convert, assign and transfer such Claims (with respect to each Holder Party, all of such Claims under clauses (A) and (B) and any additional Claims it owns, has such control over from time to time, or acquires after the Agreement Effective Date, collectively, its "***Participating Claims***").  Further, such Holder Party has made no prior written assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other written agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Participating Claims that are subject to this Agreement, the terms of which written agreement are, as of the date hereof, inconsistent with the representations and warranties of such Holder Party herein or would render such Holder Party otherwise unable to comply with this Agreement and perform its obligations hereunder.

(f)      If such party is a Holder Party, such Holder Party (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

(g)      If such party is a Holder Party, the Amended Plan is an Acceptable Plan.

4.      <u>Agreements of the Parties</u>.

(a)      From the Agreement Effective Date, until the date that is the earlier of (i) the effective date of the Amended Plan and (ii) the termination of this Agreement pursuant to <u>Section 6</u> (such date, the "***End Date***") and subject to the terms and conditions hereof and except as the Company and the Requisite First Lien Creditors may expressly release a Holder Party in writing from any of the following obligations, each Holder Party:

(i)      agrees not to directly or indirectly (x) propose, file, seek, solicit, support or vote for any restructuring, refinancing, workout, plan of arrangement, plan of reorganization or other recapitalization transaction for the Company other than as contemplated by this Agreement, or (y) take any action or commence any proceeding to delay, impede, interfere or oppose, directly or indirectly, or seek any modification of the Amended Plan or any Restructuring Document, other than as expressly permitted by this Agreement;

(ii)      agrees (x) to vote (when solicited to do so in accordance with this Agreement after receipt of a Disclosure Statement approved by the Bankruptcy Court and by the applicable deadline for doing so) its Participating Claims to accept the Amended Plan and not to change or withdraw such vote and (y) not object to, or vote any of such Participating Claims to reject the Amended Plan;

(iii)      shall not, except to the extent expressly contemplated under this Agreement, direct the First Lien Agent, the First Lien Trustee, the Second Lien Trustee, or any other individual, a partnership, a joint venture, a limited liability

company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association (a "***Person***") to exercise any right or remedy for the enforcement, collection, or recovery of any of the Participating Claims, and any other claims against, or interests in, the Company;

(iv)    promptly notify the Debtors, in writing, of any material governmental or third-party complaints, litigations, investigations, or hearings (or written communications indicating that the same may be contemplated or threatened) with respect to the Restructuring;

(v)    upon request by the Debtors and/or their advisors, promptly provide, through Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***"), the Debtors or their advisors, as applicable, the aggregate principal amount of each of such Holder Party's Claims, on an issuance-by-issuance basis as of the date of such request;

(vi)    to the extent applicable, agrees not to opt-out of any Third Party Release contemplated by the Amended Plan;

(vii)    without limiting the consent, approval or other rights or obligations contained herein, agrees, in its capacity as a holder of Participating Claims, to (A) (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Restructuring Documents, (2) exercise any and all necessary and appropriate rights, and execute and deliver any and all necessary and appropriate documentation, including any direction letters, in each case, in its capacity as a holder of Participating Claims in furtherance of the Restructuring and the Restructuring Documents, to the extent such actions have been approved by the Requisite First Lien Creditors or as otherwise contemplated or required by this Agreement, and (3) use commercially reasonable efforts to obtain any and all governmental, regulatory, and/or third-party approvals (including, as applicable, Bankruptcy Court approvals) required for the Restructuring, if any, (B) use commercially reasonable efforts to cause the milestones set forth in <u>Section 6(d)</u> to be satisfied, (C) not take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (I) inconsistent with this Agreement or the Restructuring Documents or (II) otherwise inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Restructuring, and (D) not encourage any entity to undertake any action set forth in <u>Section 4(a)(vii)(C)(I)</u> or <u>(II)</u>;

(viii)    shall not direct or consent to the delivery of a Cash Collateral Adequate Protection Notice; and

(ix)    so long as this Agreement remains in effect, shall consent to the Debtors' requests for extensions of the Debtors' Retained Claims Challenge Period; provided that upon termination of this Agreement, the Debtors' Retained

Claims Challenge Period shall expire seven (7) days after the date of such termination.

Notwithstanding the foregoing, nothing in this Section 4(a) shall require any Holder Party to incur expenses, liabilities or other monetary obligations, or agree to any monetary commitments, undertakings, concessions, indemnities or other monetary arrangements that could result in the incurrence of expenses, liabilities or other monetary obligations, or provide any information that it determines, in its reasonable discretion, to be commercially sensitive or confidential, other than as expressly set forth in this Agreement.

(b)    The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Holder Parties to, provide any new financing or credit support.

(c)    Subject to Section 4(f), each Holder Party agrees that, from the Agreement Effective Date until the End Date, it shall not sell, assign, grant, transfer, convey, hypothecate or otherwise dispose of (each, a "*Transfer*") any Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Participating Claims, except to a party that (i) is a Holder Party, subject to Section 4(d) or (ii) executes and delivers a Joinder to Akin Gump, the Company, and Kirkland & Ellis LLP ("*K&E*") at least two (2) business days prior to settlement of the relevant Transfer in accordance with Section 14 hereof, and any such Participating Claims automatically shall be deemed to be subject to the terms of this Agreement. With respect to any Transfers effectuated in accordance with clause (ii) above, (A) such transferee shall be deemed to be a Holder Party for purposes of this Agreement, subject to Section 4(e), and (B) the Company shall be deemed to have acknowledged such Transfer.

(d)    This Agreement shall in no way be construed to preclude any Holder Party from acquiring additional Claims; provided, however, that any such additional Claims automatically shall be deemed to be Participating Claims and shall be subject to all of the terms of this Agreement and each such Holder Party agrees that such additional Participating Claims shall be subject to this Agreement. Each Holder Party agrees to provide to Akin Gump, the Company, and K&E notice in accordance with Section 14 hereof (i) of the acquisition of any additional Participating Claims and (ii) whether such Claims were acquired from an existing Holder Party, within two (2) business days of the consummation of the transaction acquiring such additional Participating Claims.

(e)    Any Person that receives or acquires a portion of the Participating Claims pursuant to a Transfer of such Participating Claims by a Holder Party hereby agrees to be bound by all of the terms of this Agreement (as such terms may be amended from time to time in accordance with the terms hereof) (any such Person, together with each holder of Participating Claims that becomes a Holder Party pursuant to Section 20 each a "*Joining Party*") by executing and delivering (in accordance with Section 14 hereof) to Akin Gump, the Company, and K&E a joinder in the form attached hereto as **Exhibit F** (the "*Joinder*"). The Joining Party shall thereafter be deemed to be a "Holder Party" and a Party for all purposes under this Agreement and all of the Claims then held by such Joining Party shall be deemed Participating Claims hereunder. Each Joining Party shall indicate, on the appropriate schedule annexed to its Joinder, the number and amount of Claims held by such Joining Party. With respect to the Participating Claims held by the Joining Party upon consummation of the Transfer of such Participating

10

Claims, the Joining Party hereby, and without further action, makes the representations and warranties of the Holder Parties set forth in Section 3 to the other Parties.

(f)     Notwithstanding anything herein to the contrary, (i) any Holder Party may Transfer any of its Participating Claims to an entity that is acting  in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Holder Party; provided, however, that the Qualified Marketmaker subsequently Transfers all right, title and interest in such Participating Claims to a transferee that is or becomes a Holder Party as provided above, and the transfer documentation between the transferring Holder Party and such Qualified Marketmaker shall contain a requirement that provides as such; and (ii) to the extent any Holder Party is acting in its capacity as a Qualified Marketmaker, it may Transfer any Participating Claims that it acquires from a holder of such Participating Claims that is not a Holder Party without the requirement that the transferee be or become a Holder Party. Notwithstanding the foregoing, if, at the time of the proposed Transfer of such Participating Claims to the Qualified Marketmaker, such Participating Claims (x) may be voted on (1) the Amended Plan or (2) any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), recapitalization, restructuring or similar transaction involving the Company, other than the Restructuring (an "*Alternative Transaction*"), the proposed transferor Holder Party must first vote such Participating Claims in accordance with the requirements of Section 4(a), or (y) have not yet been and may not yet be voted on the Amended Plan or any Alternative Transaction and such Qualified Marketmaker does not Transfer such Participating Claims to a subsequent transferee prior to the third (3rd) business day prior to the expiration of the voting deadline (such date, the "*Qualified Marketmaker Joinder Date*"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first business day immediately following the Qualified Marketmaker Joinder Date, become a Holder Party with respect to such Participating Claims in accordance with the terms hereof (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Holder Party with respect to such Participating Claims at such time that the transferee of such Participating Claims becomes a Holder Party with respect to such Participating Claims). For these purposes, "*Qualified Marketmaker*" means an entity that (X) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Participating Claims, or enter with customers into long and/or short positions in Claims, in its capacity as a dealer or market maker in such Claims and, and (Y) is in fact regularly in the business of making a market in claims, interests and/or securities of issuers or borrowers.

(g)     Notwithstanding anything else set forth in this Section 4 (including clauses (c) and (e)), a Holder Party may Transfer Second Lien Notes Claims (but not any other Participating Claims) without the transferee thereof being required to execute and deliver a Joinder and become a Joining Party and a Holder Party with respect to such Second Lien Notes Claims.

(h)     Any Transfer of Participating Claims that does not comply with this Section 4 shall be deemed null and void *ab initio* in all respects and without further action by any Person.

5.      <u>Agreements, Representations and Warranties of the Company</u>.

(a)      Subject to the terms and conditions hereof, unless the Requisite First Lien Creditors expressly release the Company in writing from any of the following obligations (which release may be withheld, conditioned or delayed by the Requisite First Lien Creditors in their sole discretion):

(i)      From the Agreement Effective Date until the End Date, the Company agrees to use commercially reasonable efforts (A) to prepare or cause to be prepared the applicable Restructuring Documents within the Company's control (including all relevant motions, applications, orders, agreements and other documents), (B) to provide draft copies of the Restructuring Documents, any documents filed in connection with recognition or other proceedings, if any, filed in any foreign jurisdictions, and all other pleadings and documents the Company intends to file with the Bankruptcy Court, in each case, to Akin Gump as soon as reasonably practicable, but in no event less than three (3) days before such documents are to be filed with the Bankruptcy Court; <u>provided</u> that each such pleading or document shall be consistent in all material respects with, and shall otherwise contain, the terms and conditions set forth in this Agreement and such other terms and conditions as are reasonably acceptable to the Company and the Requisite First Lien Creditors; and (C) without limiting any approval rights set forth herein, to consult in good faith with Akin Gump regarding the form and substance of any of the foregoing documents in advance of the filing, execution, distribution or use (as applicable) thereof.

(ii)      Without limiting the consent, approval or other rights contained herein, the Company agrees to, in accordance with this Agreement, including the milestones set forth in <u>Section 6(d)</u>, use commercially reasonable efforts to (A) (1) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Restructuring Documents, including to support and to take any and all necessary and appropriate actions to effectuate, the PBGC Settlement pursuant to the terms of the PBGC Settlement Term Sheet, (2) file the Amended Plan and the Amended Disclosure Statement with the Bankruptcy Court, (3) as soon as practicable following entry of the Disclosure Statement Order by the Bankruptcy Court, use commercially reasonable efforts to cause the solicitation of votes to approve the Amended Plan and seek entry of the Confirmation Order, (4) in accordance with the terms of this Agreement, take any and all necessary and appropriate actions in furtherance of the Restructuring and the Restructuring Documents, and (5) use commercially reasonable efforts to obtain any and all governmental, regulatory, and/or third-party approvals (including, as applicable, Bankruptcy Court approvals) required for the Restructuring, if any, (B) use commercially reasonable efforts to cause the milestones set forth in <u>Section 6(d)</u> to be satisfied so as to not allow a Support Termination Event (as defined below) to occur, and (C) not take any actions, or fail to take any actions, where such taking or failing to take actions would be, in either case, (i) inconsistent with this Agreement or the Restructuring Documents

or (ii) otherwise inconsistent with, or reasonably expected to prevent, interfere with, delay or impede the implementation or consummation of, the Restructuring.

(iii)    The Company shall use reasonable best efforts to effectuate the transitions contemplated by the Advisory Agreement and the Executive Employment Agreement.

(iv)    The Company agrees to consult with the Ad Hoc Group in connection with any financing or funding (whether in the form of debt or equity) to be incurred or issued by the Reorganized Debtors upon or in connection with the consummation of the Restructuring, including the Exit Facility (as defined in the Amended Plan), the New Secured Debt and/or any other exit facility or indebtedness that is incurred or issued by the Reorganized Debtors or any of their respective subsidiaries in connection with the Restructuring.

(v)    The Company agrees to file timely a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (A) directing the appointment of an examiner or a trustee, (B) converting any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or (C) dismissing any of the Chapter 11 Cases.

(vi)    The Company agrees not to enter into any settlement, compromise or agreement with any authorized representative of any of its retirees or current or former employees or a retiree committee, unless such settlement, compromise or agreement is in form and substance reasonably acceptable to the Company and the Requisite First Lien Creditors.

(vii)    The Company shall use commercially reasonable efforts to obtain entry of the PSA Order, which order shall include a waiver or modification of the automatic stay to provide any notices contemplated by and in accordance with this Agreement, by the Bankruptcy Court as soon as practicable following the Agreement Effective Date, but in no event later than August 31, 2017, or as soon as the Bankruptcy Court's calendar will permit, but in any case not later than seven (7) days thereafter.

(viii)    The Company agrees to file timely a formal written response in opposition to, and defend against, any objection filed with the Bankruptcy Court by any Person with respect to the PBGC Settlement and any related agreements and/or documents.

(ix)    Subject to the terms of the Company's confidentiality obligations, the Company shall promptly following receipt thereof, share any proposals received by the Company with respect to the terms of an alternative transaction with the Holder Parties' Advisors, including, but not limited to, non-binding term sheets.

(b)    The Company agrees to file, within three (3) business days of entry of the PSA Order, and diligently prosecute a motion or application (the "Adequate Protection Motion"),

seeking to amend the DIP Financing Order for additional adequate protection, including the payment of fees, costs, and expenses that are not otherwise provided for under the DIP Financing Order, of (x) PJT Partners LP, as financial advisor ("**PJT**," and together with Akin Gump, the "***Holder Parties' Advisors***") to the Ad Hoc Group in accordance with the engagement letter attached hereto as **Exhibit G** (the "***PJT Letter***") and (y) any consultants or other advisors retained on behalf of the Ad Hoc Group; provided that, for the avoidance of doubt, upon approval of the Bankruptcy Court of such additional adequate protection, the Company hereby agrees to comply with all of its obligations under the PJT Letter, including any transaction fee.

(c)       From the Agreement Effective Date until the End Date, the Company shall (i) use commercially reasonable efforts to operate the business of the Company and its direct and indirect subsidiaries in the ordinary course in a manner that is consistent with this Agreement and past practices, and use commercially reasonable efforts to preserve intact the Company's business organization and relationships with third parties (including lessors, licensors, suppliers, distributors and customers) and employees, (ii) subject to applicable non-disclosure agreements and the terms thereof, use commercially reasonable efforts to keep the Holder Parties reasonably informed about the operations of the Company and its direct and indirect subsidiaries, (iii) subject to applicable non-disclosure agreements and the terms thereof, use commercially reasonable efforts to provide the Holder Parties any information reasonably requested regarding the Company or any of its direct and indirect subsidiaries and provide, and direct the Company's employees, officers, advisors and other representatives to provide, to the Holder Parties' Advisors, (A) reasonable access during normal business hours to the Company's books, records and facilities, subject to reasonable safety precautions, and (B) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, (iv) promptly notify the Holder Parties of any governmental or third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) (v) use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring (including the Bankruptcy Court's approval of the relevant Restructuring Documents); and (vi) not (x) grant to any officer, director, or insider any increase in severance or termination pay without the consent of Requisite First Lien Creditors, (y) establish, adopt or enter into any key employee retention plan (KERP), key employee incentive plan (KEIP) or other similar plan or program without the reasonable consent of the Requisite First Lien Creditors, or (z) grant any material increase in compensation or benefits to any officer, director, or insider of the Company without the consent of the Requisite First Lien Creditors (such consent not to be unreasonably withheld); provided, however that this Section 5(c)(vi)(x) through (z) shall not apply to any programs filed with, or approved by, the Bankruptcy Court prior to the Agreement Effective Date.

(d)       From the Agreement Effective Date until the End Date, the Company shall (i) use reasonable best efforts to (A) complete and file all necessary or desirable filings with the Securities and Exchange Commission ("***SEC***") in order for Reorganized HoldCo to obtain a listing on the NYSE or NASDAQ on the effective date of the Amended Plan, including filing all required current reports on Form 8-K, a Form 10-K for the fiscal year ended September 30, 2016 and the Form 10-Qs for the quarterly periods ended December 31, 2016, March 31, 2017 and June 30, 2017, and otherwise become current on Avaya's reporting obligations under the

14

Securities Exchange Act of 1934"), in each case no later than three (3) days prior to the effective date of the Amended Plan, or (B) in consultation with the Requisite First Lien Creditors, file a Form 10 for HoldCo with the SEC no later than sixty-three (63) days prior to the effective date of the Amended Plan (such filings in clauses (i)(A) and (i)(B), collectively, the "*SEC Filings*"), (ii) provide draft copies of the SEC Filings to Akin Gump as soon as reasonably practicable before such documents are to be filed with the SEC, (iii) without limiting any approval or other rights set forth herein or in the Corporate Governance Term Sheet, (A) consult in good faith with Akin Gump regarding the form and substance of any of the foregoing documents in advance of the filing, and (B) cooperate in good faith with Akin Gump and the Ad Hoc Group, and use reasonable best efforts, to obtain a listing of the equity interests of Reorganized HoldCo on the NYSE or NASDAQ on the effective date of the Amended Plan.

(e)     Within three (3) business days of the Agreement Effective Date, the Company shall pay to the First Lien Notes Trustee cash in an amount equal to $600,000, which is the amount paid by the First Lien Notes Trustee to Greenhill & Co., LLC, as financial advisor to the First Lien Notes Trustee.  Such amounts shall be for the benefit of, or reimbursement for, First Lien Noteholders, which shall be remitted pro rata to First Lien Noteholders as of the Agreement Effective with no portion thereof being retained by the First Lien Notes Trustee.

6.    Termination of Obligations.  Following written notice to the Company or the Holder Parties, as applicable, in accordance with Section 14 hereof, this Agreement may be terminated as follows and, except as otherwise provided herein, all obligations of the Parties shall immediately terminate and be of no further force and effect upon such termination (each such termination event, a "*Support Termination Event*"):

(a)     by the mutual written consent of the Company and the Requisite First Lien Creditors;

(b)     by the Requisite First Lien Creditors upon a material breach by the Company of its undertakings, representations, warranties or covenants set forth in this Agreement, including the Company's obligations under Section 5 hereof, which breach or failure to act remains uncured for a period of three (3) business days after the receipt of written notice in accordance with Section 14 hereof of such breach from the Requisite First Lien Creditors;

(c)     by the Company, as applicable, upon the occurrence of any of the following events:

(i)     after the Voting Deadline (as defined in the Amended Plan), upon the breach by any Holder Party of its obligations pursuant to Section 4(a)(ii) hereof; provided however that the foregoing shall not apply if the Class of First Lien Debt Claims otherwise votes to accept the Amended Plan in accordance with section 1126 of the Bankruptcy Code and any applicable order of the Bankruptcy Court;

(ii)     without limiting Section 4(a)(ii) hereof, upon a material breach by one or more Holder Parties of their commitments or agreements hereunder, which breach remains uncured for a period of three (3) business days after the receipt of

15

written notice in accordance with Section 14 hereof of such breach from the Company; provided that the foregoing shall not apply if non-breaching Holder Parties with power to vote in favor of the Amended Plan, at the time or during the continuation of such material breach, hold in excess of $66^2/3\%$ in aggregate principal amount of all First Lien Debt Claims;

(iii)    if the board of directors of any Debtor at any time determines in good faith (after consultation with outside counsel) that continued performance under this Agreement would be inconsistent with its fiduciary duties; or

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any ruling or order denying any requisite approval of, impeding or enjoining the confirmation or consummation of the Amended Plan or any other aspect of the Restructuring.

(d)    by the Requisite First Lien Creditors, as applicable, upon the occurrence of any of the following events:

(i)    on or prior to August 7, 2017 and concurrently with the filing of the Amended Plan, unless the Company shall have filed a Cleansing Document (as defined in the applicable confidentiality agreements by and between Avaya and certain of the Holder Parties), as required by such confidentiality agreements;

(ii)    at 5:00 p.m. prevailing Eastern Time on August 31, 2017 or as soon as the Bankruptcy Court's calendar will permit, but in any case not later than seven (7) days thereafter, unless the Bankruptcy Court shall have entered the PSA Order, which order shall include a waiver or modification of the automatic stay to provide any notices contemplated by and in accordance with this Agreement;

(iii)    at 5:00 p.m. prevailing Eastern Time on August 7, 2017 unless the Company shall have filed the (A) Amended Plan, (B) Amended Disclosure Statement and (C) Disclosure Statement Motion; provided that the Company's obligations with respect to the Disclosure Statement Motion may be satisfied by supplementing the pleading filed at [Docket No. 390] in the Chapter 11 Cases as may be reasonably appropriate to reflect the Amended Plan and Amended Disclosure Statement as provided herein;

(iv)    at 5:00 p.m. prevailing Eastern Time on August 31, 2017 or as soon as the Bankruptcy Court's calendar will permit, but in any case not later than seven (7) days thereafter, unless the Bankruptcy Court shall have entered the Disclosure Statement Order in form and substance reasonably acceptable to the Company and the Requisite First Lien Creditors;

(v)    at 5:00 p.m. prevailing Eastern Time on October 31, 2017 unless the Bankruptcy Court shall have entered the PBGC Settlement Order in form and substance reasonably acceptable to the Company and the Requisite First Lien Creditors that has become a Final Order;

(vi)    at 5:00 p.m. prevailing Eastern Time on November 30, 2017 unless the Bankruptcy Court shall have entered a Confirmation Order in form and substance reasonably acceptable to the Company and the Requisite First Lien Creditors that has become a Final Order;

(vii)    at 5:00 p.m. prevailing Eastern Time on the earlier of (A) 20 days after the entry of the Confirmation Order and (B) December 15, 2017 unless there shall have occurred a substantial consummation (as defined in Bankruptcy Code section 1101) of the Amended Plan (Section 6(d)(i) through Section 6(d)(vii), collectively the "Milestones");

provided that the failure to occur of any of the Milestones on or within the timeframes contemplated by Section 6(d)(i) through Section 6(d)(vii) may be cured at any time prior to delivery of a notice purporting to terminate this Agreement on account of such Milestone.

(viii)    upon the filing by the Company of any motion or other request for relief seeking to (A) dismiss any of the Chapter 11 Cases, (B) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code other than as contemplated by the Restructuring, or (C) appoint a trustee or an examiner pursuant to Bankruptcy Code section 1104 in any of the Chapter 11 Cases;

(ix)    upon the entry of an order by the Bankruptcy Court (A) dismissing any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code other than as contemplated by the Restructuring, or (C) appointing a trustee or an examiner with expanded powers pursuant to Bankruptcy Code section 1104 in any of the Chapter 11 Cases;

(x)    upon the Company's withdrawal, waiver, amendment or modification, or the filing of (or announced intention to file) a pleading seeking to withdraw, waive, amend or modify, any term or condition of any of the Restructuring Documents or any documents related thereto, including motions, notices, exhibits, appendices and orders, in a manner not reasonably acceptable in form and substance to the Requisite First Lien Creditors, which remains uncured for a period of three (3) business days after the receipt of written notice in accordance with Section 14 hereof;

(xi)    the Company files, proposes or otherwise supports any plan of liquidation, asset sale of all or substantially all of the Company's assets or plan of reorganization other than as contemplated herein, which remains uncured for a period of three (3) business days after the receipt of written notice in accordance with Section 14 hereof;

(xii)    an order is entered by the Bankruptcy Court granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure on the same) on any of

the Company's assets other than in respect of insurance proceeds or with respect to assets having a fair market value of less than $25,000,000 in the aggregate;

(xiii)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction (including the Bankruptcy Court), of any ruling or order denying any requisite approval of, delaying, impeding or enjoining the confirmation or consummation of the Amended Plan or any other aspect of the Restructuring;

(xiv)   a failure by the Company to file the Adequate Protection Motion within three (3) business days of the entry of the PSA Order;

(xv)   a failure by the Company to pay the fees and expenses set forth in Section 5(b) of this Agreement within fifteen (15) business days of receipt by the Company of an invoice related to such reasonable fees and expenses, which shall contain a summary detail of services performed to enable the Debtors to determine the reasonableness thereof;

(xvi)   the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the claims and liens of the First Lien Lenders under the Cash Flow Credit Facility or the claims and liens of the First Lien Noteholders under the First Lien Indentures, without the written consent of the Requisite First Lien Creditors;

(xvii)   other than Chapter 11 Cases, the entry of an order by any court of competent jurisdiction granting the relief sought in an involuntary proceeding against any entity non-Debtor subsidiary of the Company seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of any such entity, or of a substantial part of the assets of any such non-Debtor subsidiary, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of 15 days after the filing thereof);

(xviii)   if any non-Debtor subsidiary of the Company (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as provided for in this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official for the Company or for a substantial part of the Company's assets, (D) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (E) makes a general assignment or arrangement for the

benefit of creditors or (F) takes any corporate action for the purpose of authorizing any of the foregoing; or

(xix)   any breach of, or any default under, the documentation related to such DIP Facility (together with the DIP Financing Order, the "***DIP Facility Documents***") resulting in an acceleration of obligations outstanding under the DIP Facility.

Upon the termination of this Agreement pursuant to this Section 6, this Agreement shall forthwith become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party; provided, however, that in no event shall any such termination relieve a Party from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, notwithstanding any termination of this Agreement by any other Party, and (ii) obligations under this Agreement which expressly survive any such termination pursuant to Section 17; provided further, however, that (i) the right to terminate this Agreement under this Section 6, other than Section 6(c)(iii), shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a Support Termination Event and (ii) any Support Termination Event may be waived only in accordance with this Agreement and the procedures established by Section 10, in which case the Support Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties shall be restored, subject to any modification set forth in such waiver.  Upon termination of this Agreement, any and all consents, agreements, undertakings, tenders, waivers, forbearances, votes and ballots delivered by a Holder Party prior to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Company or any other party.  For the avoidance of doubt, the automatic stay arising pursuant to Bankruptcy Code section 362 shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

7.     Good Faith Cooperation; Further Assurances.  The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Further, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement (provided, that nothing set forth in this Section 7 shall require any Holder Party to provide any information that it determines, in its reasonable discretion, to be sensitive or confidential or to take any actions other than in its capacity as a holder of Participating Claims).  Each of the Parties hereby covenants and agrees (a) to negotiate in good faith and in a timely manner (giving effect to the milestones set forth in Section 6) the Restructuring Documents and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Restructuring Documents.

8.    Remedies.  All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party (for the avoidance of doubt, if there is a breach of the Agreement by a Holder Party, money damages shall be an insufficient remedy to the other Holder Parties or the Company and either the Company or the Holder Parties can seek specific performance as against another Holder Party); provided, however, that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

9.    Conditions to Effectiveness.

(a)    This Agreement shall be effective and binding upon each of the Holder Parties hereto upon the first business day on which counterpart signature pages to this Agreement shall have been executed and delivered to the Debtors by Holder Parties holding no less than 50% in aggregate principal amount of the First Lien Debt Claims; provided that if the Agreement Effective Date with respect to the Debtors does not occur prior to the expiration of the Milestone set forth by Section 6(d)(ii) hereof, this Agreement shall be null and void *ab initio* and of no force and effect and without any further action by any Party.

(b)    This Agreement shall be effective and binding upon the Debtors upon the first business day on which the following conditions shall have occurred:

(i)    this Agreement shall have become effective with respect to the Holder Parties as provided by Section 9(a) hereof and shall not have been terminated; and

(ii)    the Bankruptcy Court shall have entered the PSA Approval Order.

10.    Amendments and Modifications; Waivers.

(a)    This Agreement may be amended or modified only upon written approval of both (i) the Company and (ii) the Requisite First Lien Creditors; provided, however, that (A) in no event shall this Agreement be so amended or modified with respect to any Holder Party in any manner that would adversely affect such Holder Party's legal rights under this Agreement in a disproportionate or discriminatory manner (as compared to all other Holder Parties), without such Holder Party's prior written consent; and (B) any amendments to this Section 10 or to the defined terms "Requisite First Lien Creditors" or "Holder Party"  shall require the written consent of each Holder Party.  Any amendment or modification of any condition, term or provision to this Agreement must be in writing.  Any amendment or modification made in compliance with this Section 10 shall be binding on all of the Parties, regardless of whether a particular Party has executed or consented to such amendment or modification.

(b)    At any time prior to the End Date, the Company, on the one hand, and the Requisite First Lien Creditors, on the other, to the extent legally permitted, may (i) extend the

time for the performance of any of the obligations of any other Party, (ii) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements, covenants or conditions for the benefit of such Party contained herein. Any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.

11.  Independent Analysis.  Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

12.  Representation by Counsel.  Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

13.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Bankruptcy Court. By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

14.  Notices.  All notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally, (b) when sent by electronic mail (“*e-mail*”) or facsimile, (c) one (1) business day after deposit with an overnight courier service or (d) three (3) business days after mailed by certified or registered mail, return receipt requested, with postage prepaid to the Parties at the following addresses, facsimile numbers or e-mail addresses (or at such other addresses, facsimile numbers or e-mail addresses for a Party as shall be specified by like notice):

**If to the Company:**

Avaya Inc.
4655 Great America Parkway
Santa Clara, CA 95054-1233
Facsimile: (408) 562-2853
Attn: Amy Fliegelman Olli
Email: aolli@avaya.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Facsimile: (212) 446-4900
Attn:   Jonathan S. Henes, P.C.
Email: jonathan.henes@kirkland.com

- and -

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois  60654
Attn:   James H.M. Sprayregen, P.C.
        Patrick J. Nash, Jr., P.C.
        Ryan Preston Dahl
Email: james.sprayregen@kirkland.com
        patrick.nash@kirkland.com
        ryan.dahl@kirkland.com

**If to the Holder Parties**:  To each Holder Party at the addresses, facsimile numbers or e-mail addresses set forth below the Holder Party's signature page to this Agreement (or to the signature page to a Joiner in the case of any Holder that becomes a party hereto after the Agreement Effective Date)

with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, Bank of America Tower
New York, New York 10036
Facsimile: (212) 872-1002
Attn:   Ira S. Dizengoff
        Philip C. Dublin
        Naomi Moss
Email: idizengoff@akingump.com
        pdublin@akingump.com
        nmoss@akingump.com

15.    <u>Reservation of Rights</u>.  Except as expressly provided in this Agreement, including <u>Section 3</u> hereof, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict (a) the ability of any Party to protect and preserve its rights, remedies and interests, including the Debt Claims and any other claims against the Company or other parties, including any claim arising under or related to the DIP Financing Order or that certain Superpriority Secured Debtor-in-Possession Credit Agreement dated as of January 24, 2017, including any and all fees, interest paid in kind, and accrued but unpaid interest and fees arising under such credit agreement (the "***DIP Facility Claims***"), or its full participation in the Chapter 11 Cases or any

other proceeding, including the rights of a Holder Party under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, in each case, so long as the exercise of any such right does not breach such Holder Party's obligations hereunder; (b) the ability of a Holder Party to purchase, sell or enter into any transactions in connection with the Participating Claims, subject to the terms hereof; (c) any right of any Holder Party (i) under the Debt Documents or the DIP Facility Documents, or which constitutes a waiver or amendment of any provision of any Debt Document or the DIP Facility Documents or (ii) under any other applicable agreement, instrument or document that gives rise to a Holder Party's Participating Claims, or which constitutes a waiver or amendment of any provision of any such agreement, instrument or document, subject to the terms of Section 4(a) hereof; (d) the ability of a Holder Party to consult with its advisors (including the Holder Parties' Advisors), other Holder Parties or the Company; (e) the ability of a Holder Party to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents; or (f) in each case the Company's right to contest any and all such actions or assert that such actions in fact breach this Agreement.  Without limiting the foregoing sentence in any way, after the termination of this Agreement pursuant to Section 6, the Parties fully reserve any and all of their respective rights, remedies, claims and interests, subject to Section 6, in the case of any claim for breach of this Agreement.  Further, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Restructuring Documents.

16.    Rule of Interpretation.    Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include votes or voting on a plan of reorganization under the Bankruptcy Code. Time is of the essence in the performance of the obligations of each of the Parties.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to any Articles, Sections, Exhibits and Schedules are to such Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein (including any exhibits, schedules or attachments thereto) are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

17.    Survival.  Notwithstanding (a) any sale of the Participating Claims in accordance with Section 4 or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 5(b), 12-23, 24(a), 25, and 26 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided however that the Company's obligation to pay fees and expenses as set forth in Section 5(b) shall survive only with respect to those

reasonable and documented fees and expenses invoiced to the Company for the period through and including the date this Agreement is terminated; provided further that nothing herein shall modify the Debtors' requirement pursuant to the DIP Financing Order to pay the fees and expenses of the advisors to the Ad Hoc Group.

18.    Successors and Assigns; Severability; Several Obligations.  Subject to Section 4, this Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction.  The agreements, representations and obligations of the Holder Parties under this Agreement are, in all respects, several and not joint and several.

19.    Third-Party Beneficiaries.  This Agreement is intended for the benefit of the Parties and no other Person shall be a third party beneficiary hereof or have any rights hereunder.

20.    Counterparts; Additional Holder Parties.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.  Any holder of Debt Claims that is not already an existing Holder Party may execute the Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Holder Party" and a party for all purposes under this Agreement.

21.    Entire Agreement.  This Agreement and the Exhibits and Schedules attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations between and among the Company and the Holder Parties (and their respective advisors) with respect to the subject matter hereof; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Holder Party shall continue in full force and effect as provided therein.

22.    Headings.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

23.    Settlement Discussions.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

24.    <u>Publicity</u>.

(a)    The Company shall not (i) use the name of any Holder Party in any communication (including a press release, pleading or other publicly available document) (other than a communication with the legal, accounting, financial and other advisors to the Company who are under obligations of confidentiality to the Company with respect to such communication, and whose compliance with such obligations the Company shall be responsible for) without such Holder Party's prior written consent, such consent not to be unreasonably withheld or (ii) disclose to any Person, other than legal, accounting, financial and other advisors to the Company (who are under obligations of confidentiality to the Company with respect to such disclosure, and whose compliance with such obligations the Company shall be responsible for), the principal amount or percentage of the Participating Claims held by any Holder Party or any of its respective subsidiaries; <u>provided</u>, <u>however</u>, that the Company shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, Debt Claims and Participating Claims held by the Holder Parties as a group.  Notwithstanding the foregoing, the Parties hereby consent to the disclosure by the Company in the Restructuring Documents or as otherwise required by law or regulation, of the execution, terms and contents of this Agreement, <u>provided</u>, <u>however</u>, that (i) if the Company determines that it is required to attach a copy of this Agreement to any Restructuring Document or any other filing or similar document relating to the transactions contemplated hereby, it will redact any reference to a specific Holder Party and such Holder Party's holdings and (ii) if disclosure is required by applicable law, advance notice of the intent to disclose shall be given by the disclosing Party to each Holder Party (who shall have the right to seek a protective order prior to disclosure), it being agreed that there is no requirement to include such information in any filing with the Securities and Exchange Commission.

(b)    Notwithstanding the foregoing, the Company will provide to the Holder Parties' Advisors all material press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company relating to this Agreement or the transactions contemplated hereby and any amendments thereof, and will use commercially reasonable efforts to take to the Holder Parties' Advisors' views with respect to such communications into account.  The Company will provide to the Holder Parties' Advisors in advance all material mass written communications with customers, vendors and employees (including representatives of employees) relating to the transactions contemplated by this Agreement, and will use commercially reasonable efforts to take to the Holder Parties' Advisors' views with respect to such communications into account.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any confidentiality or non-disclosure agreement between the Company and any Holder Party, including the confidentiality and non-disclosure provisions contained in the Debt Documents or the DIP Facility Documents.

25.    <u>Fiduciary Duties/Relationship Among the Holder Parties</u>.

(a)    Notwithstanding anything to the contrary herein, nothing in this Agreement shall require any of the Debtors, or any of their directors or officers, including with respect to each subsidiary, to take or refrain from taking any action such person or entity reasonably believes is required to comply with its or their fiduciary duties under applicable law.

(b)        None of the Holder Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any First Lien Lender, any First Lien Noteholder, any Second Lien Noteholder, the Company, or any of the Company's creditors or other stakeholders, and there are no commitments among or between the Holder Parties.   It is understood and agreed that any Holder Party may trade in any debt or equity securities of the Company without the consent of the Company or any other Holder Party, subject to applicable securities laws and Section 4(d) of this Agreement.   No prior history, pattern or practice of sharing confidences among or between any of the Holder Parties and/or the Company shall in any way affect or negate this understanding and agreement.

26.      No Solicitation.   This Agreement and transactions contemplated herein are the product of negotiations among the Parties, together with their respective representatives. Notwithstanding anything herein to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Amended Plan or any plan of reorganization for the purposes of Bankruptcy Code sections 1125 and 1126 or otherwise.   The Company will not solicit acceptances of the Amended Plan from any party until such party has been provided with copies of a Disclosure Statement containing adequate information as required by Bankruptcy Code section 1125.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**AVAYA HOLDINGS CORP.**

By: _____

Name:
Title:

**AVAYA INC.**

By: _____

Name:
Title:

**AVAYA CALA INC.**

By: _____

Name:
Title:

**AVAYA EMEA LTD.**

By: _____

Name:
Title:

**AVAYA FEDERAL SOLUTIONS, INC.**

By: _____

Name:
Title:

**AVAYA HOLDINGS LLC**


By: _____

Name:
Title:

**AVAYA HOLDINGS TWO LLC**


By: _____

Name:
Title:

**AVAYA
INTEGRATED CABINET SOLUTIONS INC.**


By: _____

Name:
Title:

**AVAYA MANAGEMENT SERVICES INC.**


By: _____

Name:
Title:

**AVAYA SERVICES INC.**


By: _____

Name:
Title:

**AVAYA WORLD SERVICES INC.**


By: _____

Name:
Title:


**OCTEL COMMUNICATIONS LLC**


By: _____

Name:
Title:


**SIERRA ASIA PACIFIC INC.**


By: _____

Name:
Title:


**SIERRA COMMUNICATION
INTERNATIONAL LLC**


By: _____

Name:
Title:


**TECHNOLOGY CORPORATION
OF AMERICA**


_____

By:

Name:
Title:

**UBIQUITY SOFTWARE CORPORATION**

By: _____

Name:
Title:

**VPNET TECHNOLOGIES, INC.**

By: _____

Name:
Title:

**ZANG, INC.**

By: _____

Name:
Title:

\*        \*        \*        \*        \*

*Signature Page to Plan Support Agreement*

Dated: _____

**HOLDER PARTY**

Name of Institution: _____

By: _____
Name: _____
Title: _____

Telephone: _____
Facsimile: _____

**First Lien Lender Claims (B-3)**

$ _____

**First Lien Lender Claims (B-4)**

$ _____

**First Lien Lender Claims (B-6)**

$ _____

**First Lien Lender Claims (B-7)**

$ _____

**First Lien Notes Claims (7%)**

$ _____

**First Lien Notes Claims (9%)**

$ _____

**Second Lien Notes Claims**

$ _____

**Other Claims (identify/describe type)**

$ _____

*Signature Page to Plan Support Agreement*

NOTICE ADDRESS:

[_____]
[_____]
Attention:  [_____]
Facsimile: [_____]
E-mail: [_____]

\*        \*        \*        \*        \*

*Signature Page to Plan Support Agreement*

## **EXHIBIT A**

THE COMPANY

1.      Avaya Inc.

2.      Avaya CALA Inc.

3.      Avaya EMEA Ltd.

4.      Avaya Federal Solutions, Inc.

5.      Avaya Holdings Corp.

6.      Avaya Holdings LLC

7.      Avaya Holdings Two, LLC

8.      Avaya Integrated Cabinet Solutions Inc.

9.      Avaya Management Services Inc.

10.     Avaya Services Inc.

11.     Avaya World Services Inc.

12.     Octel Communications LLC

13.     Sierra Asia Pacific Inc.

14.     Sierra Communication International, LLC

15.     Technology Corporation of America, Inc.

16.     Ubiquity Software Corporation

17.     VPNet Technologies, Inc.

18.     Zang, Inc.

# **EXHIBIT B**

AMENDED PLAN

[Attached.]

**ATTACHED SEPARATELY ON THE DOCKET**

## **EXHIBIT B-1**

ADVISORY AGREEMENT TERM SHEET

[Attached.]

**Summary of Terms for**
**Advisory Services Agreement**

The following (this "Term Sheet") is a summary of the material terms and conditions of the transition and services arrangement for Kevin J. Kennedy ("Executive"), President and Chief Executive Officer of Avaya, Inc. (the "Company"). Executive is approaching his tenth year anniversary at Avaya, Inc. and has decided it is time to make a transition at the end of this fiscal year as the Company completes its reorganization process and heads into the future. Executive has agreed to provide the Company with transition and consulting services on the terms set forth below that will be memorialized in a Definitive Agreement (as defined herein).

| Term | Summary |
|---|---|
| *Transition Date; Advisory Services:* | • Transition Date. Commencing upon the earlier of October 1, 2017 or the Company's emergence from chapter 11 (the "Transition Date"), Executive will resign from all positions, offices and directorships with the Company and any of its affiliates and subsidiaries other than with respect to the provision of Advisory Services (as defined herein). |
| | • Advisory Services.[1] Executive will from the Transition Date provide the Company with transition and advisory assistance or as otherwise determined by the Board and the Chief Executive Officer,[2] or as otherwise reasonably requested by the Chief Executive Officer from time to time (collectively, the "Advisory Services"). Upon announcement of the transition, Executive agrees to facilitate an orderly transition with respect to the provision of Advisory Services.[3] |
| | • The Advisory Services that may be requested by the Chief Executive Officer shall include advisory services by Executive with respect to (i) Company strategy and strategic alternatives, (ii) mergers and acquisitions, (iii) matters related to the Company's status as a publicly traded enterprise, (iv) customer engagement, (v) technology, research, and development, (vi) board structure and preparation, and (vii) other matters as the Chief Executive Officer may reasonably request from time to time. |
| | • Executive acknowledges and agrees that his transition to the role of Advisor will not constitute (i) "good reason" to terminate his employment under any of his arrangements with the Company or any of its affiliates or subsidiaries (including, |

---

[1] The Definitive Documentation will provide that the services to be provided by the Executive prior to the Emergence Date (as defined herein) will be transition services and the services provided post-Emergence Date will be consulting services. For the avoidance of doubt, Executive will be a consultant to the Company post-Emergence Date and not an employee of the Company and the terms contained in this Term Sheet shall be modified to reflect as such including with respect to medical coverage which, once Executive becomes a consultant, will be replaced by reimbursement for COBRA premiums or, if at any time during the Consulting Services COBRA is exhausted, cost of purchasing insurance no less favorable than Executive's existing medical coverage from the Company (or if such medical coverage is unavailable, the cost of out of pocket medical expenses) for a total of 30 months from the Emergence Date.

[2] References to the Chief Executive Officer herein refer to the person designated as the successor to Executive as Chief Executive Officer (the "Successor CEO") in the press release issued by the Company on the date it announces entry into the Plan Support Agreement to which this Term Sheet is attached.

[3] The orderly transition on the Transition Date shall include Executive transitioning CEO duties to the Successor CEO as determined by the Board.

| Term | Summary |
|------|---------|
| | without limitation, that certain Executive Employment Agreement dated November 26, 2008 (the "Employment Agreement") and that certain Executive Change in Control Agreement dated May 13, 2016 (the "CIC Agreement")) or (ii) a termination of employment for purposes of that certain *Retention Bonus Agreement*, by and between the Company and Executive dated as of **[DATE]**, 2016 (the "Retention Bonus Agreement"). |
| | • Post-Emergence Advisory Period. From the effective date of the Company's Chapter 11 Plan (the "Emergence Date") until the second anniversary of the Emergence Date (the "Post-Emergence Advisory Period"), subject to earlier termination as set forth below, Executive will continue to serve as an Advisor and to provide the Advisory Services to the Company's Chief Executive Officer; provided that, at Executive's option, Executive may elect to become a consultant (and not an employee) 60 days after the Emergence Date (as defined herein). |
| | • Compensation. Until the Emergence Date, Executive will continue to receive his current base salary and be eligible to receive a bonus under the Company's Key Employee Incentive Plan. As compensation for providing the Advisory Services for the Post-Emergence Advisory Period, Executive will receive a total of $1,900,000 in cash per year (the "Annual Advisory Fee"), payable monthly in advance commencing on the day after the Emergence Date and pro-rated for any partial months of service.[4] |
| | • Additionally, during the Post-Emergence Advisory Period Executive will be eligible to receive a maximum total of $2,475,000 (the "Annual Target Bonus")[5] per year in cash based on achievement of performance goals for Executive that are reasonably within Executive's control as established by the CEO in  consultation with the Compensation Committee of the Board and Executive in good faith negotiations and as set forth in the Definitive Agreement; provided that, in any event, Executive's actual annual bonus shall be not less than 100% of the Annual Advisory Fee. |
| | • If the Company terminates the Advisory Services prior to the second anniversary of the Emergence Date without "Cause"[6] (as defined below), then subject to Executive's timely execution and non-revocation of a general release of claims in favor of the Company, Executive will receive any unpaid portion of all Advisory Fees and all Annual Target Bonuses (which, for the avoidance of doubt, shall be reduced by any bonus actually paid prior to such date) payable through the Post-Emergence Advisory Period on the 5th business day following his termination. For the avoidance of doubt, Executive will not be entitled to any compensation following termination of the Post-Emergence Advisory Period, except as set forth |

---

[4] References to Annual Advisory Fees will be referred to as Annual Consulting Fees in the Definitive Documentation.

[5] References to Annual Target Bonuses will be referred to as Annual Consulting Completion Bonuses in the Definitive Documentation

[6] The concept of "without Cause" and related definition shall be changed to "for any reason other than a Disqualifying Reason" in the Definitive Documentation to more accurately reflect the consulting arrangement.

2

| Term | Summary |
|------|---------|
| | in the preceding sentence. |
| | • <u>Medical Coverage</u>. Until the first anniversary of the Emergence Date, Executive will continue to be eligible for Company-subsidized medical coverage in accordance with the terms in effect as of the Emergence Date.[7] |
| *Legal Fees:* | • The Company shall pay directly or reimburse Executive for his reasonable and documented legal fees and expenses incurred in connection with the negotiation and implementation of this Term Sheet and any related documents. |
| *Other Requirements:* | • As a condition to the Company's entry into the arrangement described above, Executive and the Company will terminate, by mutual agreement, the Employment Agreement and the CIC Agreement, in each case, effective as of the Transition Date and without payment of any amounts thereunder, and effective as of the Transition Date, Executive will cease participation in the Avaya Inc. Involuntary Separation Plan for Senior Officers. |
| *Definitive Agreement* | • The agreements and undertakings set forth herein shall be subject to completion of a definitive agreement materially consistent with this Term Sheet and otherwise reasonably acceptable to Executive, the Company and Requisite First Lien Creditors as defined in the Plan Support Agreement to which this Term Sheet is attached (the "<u>Definitive Agreement</u>"). |
| | • Executive and Company shall use commercially reasonable efforts to complete the Definitive Agreement on or before August 24, 2017. |
| | • The Definitive Documentation will provide for a reasonable and customary non-competition clause and other restrictive covenants on terms mutually acceptable to Company, the Executive and the Requisite First Lien Creditors and which reasonably permit Executive to accept other employment. |
| | • The Definitive Agreement shall be subject to bankruptcy court approval in conjunction with confirmation of the Company's chapter 11 plan. |
| | • In connection with the Definitive Agreement, Company and Executive will negotiate in good faith regarding Executive's access to necessary administrative support to facilitate Executive's performance of requested Advisory Services |
| *Publicity* | • The Company shall consult with Executive in good faith regarding any press release announcing the commencement of Advisory Services by Executive. |
| *Releases* | • The Definitive Agreement shall provide for reasonable and customary mutual releases and non-disparagement and restrictive covenant obligations, including with respect to compensation previously paid to Executive, avoidance actions, clawback actions, or similar causes of action. |
| *Definitions:* | • For purposes of this Term Sheet, "<u>Cause</u>" means any of Executive's: (1) failure to perform his Advisory Services that continues for more than ten days following the Company's written notice of such failure, (2) fraud or intentional misconduct with the performance of his Advisory Services, (3) material breach of any material Company policy, or (4) material breach of any restrictive covenants to which he is subject (including, without limitation, those referenced in Section 4 of the Employment Agreement). |

---

[7] References to Medical Coverage will be changed in the Definitive Documentation to reflect provisions consistent with footnote 1 hereof.

# **EXHIBIT B-2**

EXECUTIVE EMPLOYMENT AGREEMENT TERM SHEET

[Attached.]

**Project Arrowhead – Summary of Equity and Compensation Arrangements**

The following is a summary of the material terms and conditions of (i) the compensation arrangements for Mr. James Chirico (the "CEO") and (ii) the equity incentive program (the "Equity Program") to be sponsored by Avaya Inc. (the "Company") for management employees (each, an "Employee") of the Company and its subsidiaries (the "Company Group"), including the CEO.

| **CEO Compensation Matters** | |
|---|---|
| *Positions:* | • President, Chief Executive Officer and a member of the Company's Board of Directors (the "Board"). <br> • The CEO may select one member of the current Board acceptable to the Ad Hoc First Lien Group to continue as a member of the Board. |
| *Cash Compensation:* | • Base Salary: $1,250,000, to be annually reviewed for increase (but not decrease) by the Compensation Committee (the "Committee") of the Board (as increased from time to time, the "Base Salary"). <br> • Target Bonus: 200% of Base Salary (the "Target Bonus"), based on meeting reasonably attainable quantitative performance goals to be established by the Committee in good faith after discussion with the CEO. Actual bonus payout may range up to 250% of Base Salary, based on achievement of performance goals; provided that the CEO's actual bonus for the first full year following the effective date of the Company's Chapter 11 Plan (the "Emergence Date") will be no less than the Target Bonus. <br> • Sign-On Bonus: One-time cash payment of $2,500,000 that will vest in ratable installments upon the first two anniversaries of the Emergence Date. The CEO will be required to repay the unvested portion (on an after-tax basis) in the event he is terminated for Cause or terminates without Good Reason (each as defined below) prior to the second anniversary of the Emergence Date. |
| *Normal Severance:* | • Upon a termination of the CEO's employment other than for Cause (not due to death or disability) or due to his resignation for Good Reason (each, a "Qualifying Termination"), then subject to his timely execution and non-revocation of a release of claims, the CEO will receive: (a) a lump sum payment equal to two times the sum of his Base Salary and Target Bonus; and (b) up to 18 months' Company-paid COBRA benefits. |
| *Change in Control ("CIC") Severance:* | • Upon a Qualifying Termination within the 6-month period preceding or the 24-month period following a CIC, then subject to his timely execution and non-revocation of a release of claims, the CEO will receive: (a) a lump sum amount equal to three times the sum of his Base Salary and Target Bonus; (b) up to 18 months' Company-paid COBRA benefits; and (c) full vesting of all outstanding long-term incentive awards whether cash-based or equity-based, with any exercisable awards to remain outstanding until the expiration of their term. |
| *Other:* | • Full Code Section 280G gross-up payment. <br> • Indemnification and directors' and officers' insurance. <br> • Company to pay the CEO's expenses in any good faith dispute. <br> • The Company shall pay directly or reimburse CEO for his reasonable legal fees and expenses incurred in connection with the negotiation and implementation of this term sheet and any related documents (including without limitation any employment agreement and documentation relating to the incentive equity grants he receives). |
| *Incentive Equity Opportunity:* | • Upon the Emergence Date, the CEO will be granted an incentive equity award, the terms of which will be negotiated by August 31, 2017 and mutually agreed upon by the CEO, the Company and the Ad Hoc First Lien Group. |
| *Definitions:* | • "Cause" means any of the CEO's: (1) material breach of the CEO's duties and responsibilities as a senior officer of the Company (other than as a result of incapacity |

due to physical or mental illness) which is demonstrably willful and deliberate on the CEO's part, and which is committed in bad faith or without reasonable belief that such breach is in the best interests of the Company or its affiliated companies and subsidiaries; (2) conviction of (including a plea of guilty or nolo contendere to) a felony; (3) commission of fraud involving the Company or its subsidiaries; or (4) material violation of a material provision of the Company's Code of Conduct or any statutory or common law duty of loyalty to the Company or its subsidiaries; <u>provided</u> that prior to terminating the CEO for Cause under clauses (1) or (4) above, the Company must provide the CEO with written notice of the alleged circumstances constituting Cause and at least 15 days in which to cure such circumstances.

- "<u>Good Reason</u>" means the occurrence, without the CEO's express written consent (which may be withheld for any reason or no reason), of any of the events or conditions described in the following subsections (i) through (vii), <u>provided</u> that the CEO provides notice to the Company within 60 days following the first occurrence of any such event or condition and the CEO does not fully correct the situation within 30 days after such notice of Good Reason: (i) a material reduction by the Company in the CEO's Base Salary; (ii) a material breach of the CEO's employment agreement which shall include a material reduction or material negative change by the Company in the type or level of compensation and benefits (other than Base Salary) to which the CEO is entitled under the employment agreement, other than any such reduction or change that is part of and consistent with a general reduction or change applicable to all senior officers of the Company; (iii) a material failure by the Company to pay or provide to the CEO any compensation or benefits to which the CEO is entitled; (iv) a change in the CEO's status, positions, titles, offices or responsibilities that constitutes a material and adverse change from the CEO's status, positions, titles, offices or responsibilities as in effect immediately before such change; or the assignment to the CEO of any duties or responsibilities that are materially and adversely inconsistent with the CEO's status, positions, titles, offices or responsibilities as in effect immediately before such assignment; or any removal of the CEO from or failure to reappoint or reelect the CEO to any of such positions, titles or offices; <u>provided</u> that termination of the CEO's employment by the Company for Cause, by the CEO other than for Good Reason, or as a result of Executive's death or "disability" shall not be deemed to constitute or result in Good Reason under this subsection (iv); (v) the Company changing the location of the CEO's principal working location to a location more than 50 miles from such location as in effect immediately prior to the Emergence Date; or (vi) any material breach by the Company of the employment agreement or any other agreement between the Company and the CEO incorporated by reference in the employment agreement. Any resignation for Good Reason following the 30-day correction period set forth above must occur no later than the date that is six months following the initial occurrence of one of the foregoing events or conditions without the CEO's express written consent.

| **Equity Program** | |
|---|---|
| *General:* | • Upon the Emergence Date, there will be reserved and established an incentive equity pool.   The value of the incentive equity pool and the terms and conditions of the incentive equity program (including, without limitation, forms of awards, allocation of awards, vesting, manner of satisfying tax obligations, preemptive and tag rights, restrictive covenants, final documentation and Company payment of attorney's fees associated with negotiation and implementation thereof) will be negotiated by August 31, 2017 and mutually agreed upon by the CEO, the Company and the ad hoc first lien committee. |

# **EXHIBIT C**

PBGC SETTLEMENT TERM SHEET

[Attached.]

**AVAYA HOLDINGS CORP.**
**AVAYA SALARIED PENSION PLAN**
**SETTLEMENT TERM SHEET**[1]

The following summary (the "Term Sheet") sets forth certain principal terms of a settlement (the "PBGC Settlement") between the Debtors (as defined herein) and PBGC (as defined herein) concerning the Avaya Salaried Pension Plan (as defined herein). This Term Sheet is confidential and may not be distributed without the Debtors' express written consent.

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution, and delivery of definitive documentation acceptable to the Debtors, the Ad Hoc First Lien Group, and PBGC. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive documentation necessary for the settlement contemplated by this Term Sheet. This Term Sheet is subject to ongoing review and approval by, and is not binding upon, the Parties (as defined herein), is subject to material change, and is being distributed for discussion purposes only.

| Term | Description |
|---|---|
| *The Parties; Avaya Pension Plans* ||
| Debtors | Avaya Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") in the Chapter 11 Cases. |
| PBGC | Pension Benefit Guaranty Corporation ("PBGC"). |
| Ad Hoc First Lien Group | The ad hoc group comprising certain holders of First Lien Debt as set forth in the *Sixth Amended Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 845], as the same may be amended from time to time (the "Ad Hoc First Lien Group" and, collectively with the Debtors and PBGC, the "Parties"). |
| Avaya Salaried Pension Plan | The Avaya Inc. Pension Plan for Salaried Employees (the "Avaya Salaried Pension Plan"), a qualified defined benefit pension plan. |
| Avaya Hourly Pension Plan | Avaya Pension Plan for hourly employees (the "Avaya Hourly Pension Plan"), a qualified defined benefit pension plan. |
| *The PBGC Settlement* ||
| Documentation | The PBGC Settlement will be effectuated through a settlement agreement (the "Settlement Agreement"), which shall be materially consistent with this Term Sheet and otherwise acceptable to the Parties. |

---

[1] Capitalized terms used in this term sheet and not immediately defined have the meanings given to such terms in the *Joint Chapter 11 Plan of Reorganization of Avaya Inc. and its Debtors Affiliates* [Docket No. 389] (the "Filed Plan").

| Term | Description |
|------|-------------|
| | The Debtors shall file a motion (the "Settlement Approval Motion") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of the Settlement Agreement. The Settlement Agreement shall be subject to entry by the Bankruptcy Court of an order (the "Settlement Approval Order") granting the relief requested in the Settlement Approval Motion.<br><br>The Settlement Approval Order shall be materially consistent with this Term Sheet, the Settlement Agreement and otherwise acceptable to the Parties.<br><br>The Debtors shall modify the Filed Plan (the "Modified Plan") incorporating the PBGC Settlement. |
| Pension Termination and Continuation | PBGC will not oppose a distress termination motion undertaken by the Debtors under section 4041 of the Employee Retirement Income Security Act of 1974 (as amended from time to time, "ERISA") of the Avaya Salaried Pension Plan (the "Pension Termination"), subject to PBGC's reasonable approval of the motion. Subject to (i) the completion of a distress termination application (the "Termination Application") in accordance with the requirements of 29 U.S.C. § 1341 and the related regulations; (ii) entry of the Settlement Approval Order; (iii) decision of PBGC's final decision maker approving the distress termination; and (iv) confirmation of the Modified Plan, on or before the effective date of the Modified Plan, PBGC and Avaya Inc., as the plan administrator for the Avaya Salaried Pension Plan, will execute a termination and trusteeship agreement: (x) terminating the Avaya Salaried Pension Plan as of the date specified by the Debtors in the Termination Application and (y) appointing PBGC as the statutory trustee of the Avaya Salaried Pension Plan.<br><br>The Modified Plan shall provide for the continuation of the Avaya Hourly Pension Plan by Avaya Inc. or another Reorganized Debtor acceptable to the Parties, subject to the PBGC Settlement becoming effective. |
| Settlement Consideration | The Settlement Agreement shall provide PBGC with the following recovery for any and all liabilities arising as a result of the Pension Termination under the Modified Plan, including the Allowed ASPP Claim (as defined herein): (i) Cash in the amount of $300 million (the "PBGC Cash Consideration"), and (ii) the issuance to PBGC of 7.5% of Reorganized HoldCo[2] Common Stock, which shall receive the same minority shareholder protections as other holders of Reorganized HoldCo Common Stock (if any)[3] (the "PBGC Equity Consideration," and, together with the PBGC Cash Consideration, the "Settlement Consideration"), which shall, prior to and including the effective date of the Modified Plan, |

---

[2]    For purposes of this Term Sheet, "Reorganized HoldCo" means the particular Reorganized Debtors whose equity is distributed under the Modified Plan to holders of Claims, including PBGC in respect of the Settlement Consideration.

[3]    Reorganized HoldCo will either be public or with public-like governance (*i.e.*, no minority rights or majority rights such as drags).

KE 48104220

| Term | Description |
|------|-------------|
| | only be subject to dilution by the MEIP unless PBGC consents to any other dilution.[4] |
| | The Settlement Consideration shall be issued or distributed to PBGC, as applicable, on the effective date of the Modified Plan. |
| | The Settlement Consideration shall be in full and final satisfaction, settlement, and release of any and all Claims or liabilities arising from, or related to, the Avaya Salaried Pension Plan and the termination thereof, including, without limitation, any "controlled group" liability, termination premiums, underfunding liability, minimum funding requirements, PBGC premiums or other amounts that are due and owing or may become due and owing to PBGC or the Avaya Salaried Pension Plan on account of the Avaya Salaried Pension Plan and/or the termination thereof; provided that PBGC shall not release any cause of action against any party arising from a breach of fiduciary duty under Title I of ERISA. |
| Excess Contribution for Avaya Hourly Pension Plan[5] | If after the effective date of the Modified Plan, Reorganized HoldCo or any of its subsidiaries or successors engages in a Material Transaction (as defined herein), the Reorganized Debtors shall, in addition to making the minimum contributions to the Avaya Hourly Pension Plan required under 26 U.S.C. §§ 412 and 430 (including installments required under 26 U.S.C. § 430(j)(3)) for the plan year in which the Material Transaction is consummated, contribute, or cause to be contributed, to the Avaya Hourly Pension Plan the lesser of: (1) $150 million; or (2) an amount equal to the projected minimum required contributions to the Avaya Hourly Pension Plan in the amounts determined by the Avaya Hourly Pension Plan's enrolled actuary and reasonably agreed to by PBGC under ERISA § 303 and 29 U.S.C. § 1083 for the four plan years starting with the plan year immediately following the date of the Material Transaction (this clause (2) being the "Projected Contributions"), (the lesser of (1) or (2) the "Excess Contribution"). |
| | The Avaya Hourly Pension Plan's enrolled actuary shall project the minimum required contributions that will be due under ERISA § 303, using assumptions consistent with ERISA § 303(h), for the four plan years immediately following that plan year. PBGC shall have 21 days to review the Avaya Hourly Pension Plan's enrolled actuary's calculation of the projected minimum required contributions to the Avaya Hourly Pension Plan under ERISA § 303, 29 U.S.C. § 1083 for the four plan years immediately following the date of the Material Transaction after the Reorganized Debtors submit such calculation to PBGC, and PBGC shall not unreasonably withhold agreement to such calculation. The Reorganized Debtors shall contribute, or cause to be contributed, the |

---

[4]    PBGC Equity Consideration based on an emergence capital structure of approximately $2.925 billion of funded debt and $350 million of cash. Provided however, that the total midpoint equity value as calculated by the Debtors in the Disclosure Statement shall be no less than $2 billion.

[5]    This language to be included in the Settlement Agreement.

3

| Term | Description |
|------|-------------|
| | Excess Contribution to the Avaya Hourly Pension Plan upon consummation of a Material Transaction for the benefit of the Avaya Hourly Pension Plan or PBGC. The Reorganized Debtors shall not at any time elect to the extent allowed under 26 U.S.C. §430(f)(6)(B), to create or increase any Avaya Hourly Pension Plan prefunding balance (as defined in 26 U.S.C. §430(f)(6)) by using (a) all or any portion of any Excess Contribution, or (b) all or any portion of any excess described in 26 U.S.C. §430(f)(6)(B) that is attributable to the Excess Contribution.<br><br>PBGC agrees that upon payment of the Excess Contribution, it waives:<br><br>A. any and all rights to initiate termination of the Avaya Hourly Pension Plan under ERISA § 4042 on grounds that are not legally supportable absent a Material Transaction, or any and all other rights to object to, prevent or delay a Material Transaction, to the extent, if any, such rights exist notwithstanding this Agreement;<br><br>B. any and all claims that PBGC may have against any Reorganized Debtor under ERISA §§ 4062(e), 29 U.S.C. § 1362(e) relating to the Material Transaction;<br><br>C. any and all termination liability claims arising from any later termination of the Avaya Hourly Pension Plan against former members of the Reorganized Debtors' controlled group as defined under ERISA §§ 4001(a) (14), 29 U.S.C. § 1301(a) (14), including but not limited to:<br><br>    i. any claims that may otherwise be brought against former controlled group members or former contributing sponsors under ERISA §§ 4062, 4063, 4064, and 4069; 29 U.S.C. § 1362, 1363, 1364; and<br><br>    ii. any and all rights of PBGC to file a lien against former controlled group members or former contributing sponsors under ERISA § 4068, 29 U.S.C. § 1368;<br><br>and such entities shall be third party beneficiaries with standing to enforce the foregoing waiver;<br><br>D. and any and all claims against all counterparties to a Material Transaction and such counterparties' affiliates, and such entities shall be third party beneficiaries with standing to enforce the foregoing waiver; and<br><br>E. any rights to any proceeds (primary or derivative) from a Material Transaction, and PBGC shall not bring any claim against any of the foregoing persons, any of the Parties identified in subsections C and D above, stockholders in the Reorganized Debtors, or direct or indirect recipients of proceeds of a Material Transaction, |

4

| Term | Description |
|------|-------------|
|      | asserting any right to any such proceeds, and such entities shall be third party beneficiaries with standing to enforce the foregoing waiver or agreement not to bring claims with respect to such proceeds.  In connection with and prior to consummation of a Material Transaction, PBGC shall execute reasonable documentation for the benefit of the foregoing persons to such effect affirming its waivers and releases (but for the avoidance of doubt such waivers and releases shall exist independently of such documentation).<br><br>Unless expressly waived in the Settlement Agreement, PBGC retains its rights to initiate termination under ERISA §4042(a), after the occurrence of a Material Transaction on grounds that are not legally supportable absent a Material Transaction.<br><br>A "<u>Material Transaction</u>" shall mean any one or more of the following transactions:<br><br>   A.  any transaction or series of related transactions involving:  (a) any merger, consolidation, share exchange, business combination, issuance of securities, direct or indirect acquisition of securities, recapitalization, tender offer, exchange offer or other similar transaction in which (x) the Reorganized HoldCo or any of their direct or indirect subsidiaries or successors (collectively, the "<u>Company</u>" and each individual entity comprising the Company, a "<u>Company Entity</u>") is a constituent party or is otherwise involved and (y) a Person or "group" (as defined in the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder) of Persons directly or indirectly acquires beneficial or record ownership of securities constituting a majority or more of the outstanding securities of any class of voting securities of such Person owning, holding, or with the right to use all or substantially all of the assets constituting the Contact Center business (including any dividend made with the proceeds of such a transaction), or (b) any direct or indirect sale, lease, exchange, transfer, license, acquisition or disposition of any business or businesses or of assets or rights that constitute or account for all or substantially all of the assets constituting the Contact Center business (including any dividend made with the proceeds of such a transaction);<br><br>   B.  any direct or indirect sale, lease, exchange, transfer, license, acquisition or disposition of any business or businesses or of assets or rights by any Company Entity (whether in one or a series of transactions, including any dividend made with the proceeds of such a transaction) that constitute or account for more than 28%, but less than or equal to 66%, of the Company Entities' EBITDA on a consolidated basis calculated based on the 4-year aggregate EBITDA for the period covering the two fiscal years preceding the date of the transaction plus the two fiscal years following the date |

5

| Term | Description |
|---|---|
| | of the transaction, <u>provided</u> <u>that</u> if Reorganized HoldCo is listed on the New York Stock Exchange or NASDAQ, the enterprise value of the Company Entities immediately prior to the announcement of a Material Transaction shall be used instead of EBITDA (i.e., the purchase consideration to be compared against enterprise value of the Company Entities on a consolidated basis, which is calculated as the sum of the market value of equity plus the market value of net debt, the book value of tax affected, where applicable, GAAP pension liability and the book value of, tax affected GAAP OPEB liability); <br><br>C. sale or issuance (whether in one or a series of related transactions, including any dividend made with the proceeds of such a transaction) by any Company Entity of: (a) any capital stock or other security of any Company Entity; or (b) any instrument convertible into or exercisable or exchangeable for any capital stock or other security of any Company Entity, which, in each case, represents majority ownership, as measured by voting and economic control, of Company Entities that represent more than 28%, but less than or equal to 66%, of the Company Entities' EBITDA on a consolidated basis calculated based on the 4-year aggregate EBITDA for the period covering the two fiscal years preceding the date of the transaction plus the two fiscal years following the date of the transaction, <u>provided</u> <u>that</u> if Reorganized HoldCo is listed on the New York Stock Exchange or NASDAQ, the enterprise value of the Company Entities immediately prior to the announcement of a Material Transaction shall be used instead of EBITDA (i.e., the purchase consideration to be compared against enterprise value of the Company Entities on a consolidated basis, which is calculated as the sum of the market value of equity plus the market value of net debt, the book value of, where applicable, tax affected GAAP pension liability and the book value of tax affected GAAP OPEB liability); or <br><br>D. if any Company Entity (a) pays any dividend (or series of dividends) or makes any other distribution (or series of distributions), in each case, in respect of any shares of capital stock of any Company Entity (a "<u>Dividend</u>") or (b) repurchases, redeems or otherwise reacquires any shares of capital stock or other securities of a Company Entity (a "<u>Stock Repurchase</u>"), and which Dividend or Stock Repurchase[6], in the aggregate is more than $150 million but less than or equal to $1 billion; provided that if the individual transaction or cumulative dollar amount of a series of transactions pursuant to (a) or (b) is less than or equal to $450 million, the Excess Contribution shall be in an amount equal to 50% of the difference between the transaction amount and $150 million, up to a maximum of the lesser of (i) $150 million or (ii) |

---

[6] Reflects amount ultimately paid to shareholders.

KE 48104220

| Term | Description |
|---|---|
| | the Projected Contributions; <u>provided</u> <u>further</u> that the threshold for a Dividend or Stock Repurchase shall be net of any transaction fees and/or costs; <u>provided</u> <u>further</u> that this clause (D) shall only apply to a dividend or distribution, the proceeds of which were received on account of the issuance or the incurrence of indebtedness by a Company Entity.<br><br>Notwithstanding anything set forth in clauses (A) through (D) above, none of the following transactions shall constitute a Material Transaction:<br><br>   i.   A sale of securities of any Company Entity by a stockholder or security holder of any Company Entity that does not constitute a Material Transaction described in clause (A) through (D) above;[7]<br><br>   ii.   A transaction or series of related transactions by any Company Entity involving:  (a) any merger, consolidation, share exchange, business combination, issuance of securities, direct or indirect acquisition of securities, recapitalization, tender offer, exchange offer or other similar transaction in which a Company Entity is a constituent corporation and  a Person or "group" (as defined in the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder) of Persons directly or indirectly acquires beneficial or record ownership of securities constituting 100% of the outstanding securities of any class of voting securities of the Company's ultimate parent entity or (b) any Company Entity making any direct or indirect sale, lease, exchange, transfer, license, acquisition or disposition of any business or businesses or of assets, in the aggregate, that constitute or account for all of the assets of the Company Entities that does not constitute a Material Transaction described in clause (A), (B), (C), or (D) above (such transaction or series of related transactions, a "<u>Wholeco Sale</u>");<br><br>   iii.   Any issuance or sale by any Company Entity of securities that does not constitute a Material Transaction described in clause (A), (B), (C), or (D) above;<br><br>   iv.   Any issuance or sale by any Company Entity of any indebtedness, including any issuance of a note, bond, debenture or other instrument or other security evidencing indebtedness by the Company that does not constitute a Material Transaction described in clause (A), (B), (C), or (D) above; |

---

[7]   This covers sales of stock by stockholders.

KE 48104220

| Term | Description |
|------|-------------|
| | v.    A listing of the securities on any securities exchange or quotation of the securities on any inter-dealer quotation; <br><br> vi.    Any repurchase of securities by any Company Entity of capital stock or securities that does not constitute a Material Transaction described in clause (D) above; or <br><br> vii.    Any restructuring, re-domestication, change of corporate form, corporate re-organization or similar transaction involving a Company Entity in which the ultimate beneficial ownership is not affected. <br><br> The Reorganized Debtors shall provide to PBGC advance notice of a Material Transaction pursuant to clauses A, B, or C above. Such notice will be no less than 21 days in advance of the closing of the transaction and will include: (i) a general description of the transaction; (ii) the supporting calculations to validate the transaction as a Material Transaction, to the extent a calculation is required; (iii) the Projected Contributions; and (iv) the transaction agreement(s) and related documentation, as they become available prior to closing. <br><br> The Reorganized Debtors shall provide to PBGC notification no later than the closing of a Material Transaction pursuant to clause D above, or a Dividend or Stock Repurchase that exceeds $1 billion in aggregate. Notification will include: (i) a general description of the transaction; and (ii) the information necessary to validate the transaction as exceeding the $1 billion threshold. Once such Dividends or Stock Repurchases exceed $1 billion in the aggregate, the Reorganized Debtors will hold all proceeds in excess of $1 billion in escrow for a period of no less than 30 days after the closing of the transaction, provided that this escrow requirement will expire on the 7th anniversary of the date of the Effective Date of the Modified Plan. The PBGC will reserve all its rights with respect to the transaction and the proceeds in escrow. <br><br> The Reorganized Debtors shall provide to PBGC 40 days notification prior to the closing of a transaction or first of a series of related transactions constituting a Wholeco Sale. Notification will include: (i) a general description of the transaction; and (ii) the transaction agreement(s) and related documentation, as they become available prior to closing. <br><br> The Reorganized Debtors shall provide to PBGC 30 days notification prior to the execution of documentation for a transaction that would otherwise be a Material Transaction per clauses B or C above, but exceeds the 66% threshold (excluding a Wholeco Sale or a Material Transaction identified in clause A, above). Notification will include: (i) a general description of the transaction; (ii) the supporting calculations to validate the transaction as exceeding the 66% threshold; (iii) the Projected Contributions; and (iv) |

8

| Term | Description |
|---|---|
| | the transaction agreement(s) and related documentation, as they become available prior to closing.  The PBGC will have the option to either treat the transaction as a Material Transaction and receive an Excess Contribution, or reserve all its rights as if the transaction was not a Material Transaction, provided that the PBGC shall have 10 days after the execution of documentation for such transaction to make its election.  If the transaction closing occurs prior to the end of such 10 day period after execution of documentation, all sale proceeds from the transaction will be placed in escrow until the PBGC makes a decision with respect to its election. |
| Plan Modification | The Debtors shall file the Modified Plan, which shall provide for the treatment of the Avaya Salaried Pension Plan consistent with this Term Sheet and the PBGC Settlement.  Subject to the PBGC Settlement becoming effective, the Modified Plan shall provide for continuation of the Avaya Hourly Pension Plan.  The Modified Plan shall otherwise be in form and substance acceptable to the Debtors and the Ad Hoc First Lien Group and shall not be inconsistent with ERISA; provided that the provisions in the Modified Plan relating to the PBGC Settlement shall be in form and substance materially consistent with the Settlement Agreement, including with respect to any releases given by PBGC, and otherwise acceptable to PBGC.

The Modified Plan shall provide that PBGC shall have an Allowed Claim with respect to the Avaya Salaried Pension Plan in an amount not less than the sum of (i) $1,240,300,000, on account of unfunded benefit liabilities with respect to the Avaya Salaried Pension Plan, and (ii) any and all unpaid minimum funding contributions due with respect to the Avaya Salaried Pension Plan (the "Allowed ASPP Claim"). |
| Modified Plan Support | The Settlement Agreement shall provide that PBGC, following the Bankruptcy Court's approval of a disclosure statement, will vote all of its Claims to accept, and otherwise support, the Modified Plan, and that PBGC shall agree to reasonable release, exculpation, and injunction provisions included in the Modified Plan (which shall provide for a release with respect to any claims or causes of action with respect to parties other than the Debtors and their subsidiaries as of the effective date of the Modified Plan on account of the Avaya Hourly Pension Plan) and shall not opt out of any Third Party Release provided therein; provided that PBGC shall not release any cause of action against any party arising from a breach of fiduciary duty under Title I of ERISA. |
| Proofs of Claim | Upon the receipt by PBGC of the PBGC Cash Consideration and the PBGC Equity Consideration, any Proof(s) of Claim relating to the Avaya Salaried Pension Plan filed by PBGC in the Chapter 11 Cases shall be deemed withdrawn with prejudice and expunged without any further action by PBGC.  The Debtors and/or the Notice and Claims Agent shall revise the Claims Register accordingly. |

9

| Term | Description |
|------|-------------|
| **Other Provisions** | |
| Notifications; Confidentiality | Post-Effective Date notices or notifications provided hereunder shall be subject to entry into a customary confidentiality agreement reasonably acceptable to the Reorganized Debtors and PBGC, which agreement shall take into account PBGC's status as a U.S. government agency. |
| Conditions Precedent | It shall be a condition to the effective date of the Modified Plan that: <br><br> (a) The Settlement Approval Order shall have been entered and shall have become a final order; <br><br> (b) Pension Termination shall have occurred and PBGC shall have assumed trusteeship of the Avaya Salaried Pension Plan; and <br><br> (c) The Avaya Hourly Pension Plan shall continue in effect. |
| Releases | The PBGC Settlement shall provide for release, exculpation, and injunction provisions acceptable to the Debtors and the Ad Hoc First Lien Group; provided that, for the avoidance of doubt, it is agreed that such provisions of the PBGC Settlement shall release and discharge any and all Claims or liabilities arising from, or related to, the Avaya Salaried Pension Plan and the termination thereof with respect to the Debtors, its officers, directors, Shareholders, plan fiduciaries, non-debtor Affiliates, controlled group members and any successors of any of the foregoing whether arising prior to or after the Petition Date; provided that PBGC shall not release any cause of action against any party arising from a breach of fiduciary duty under Title I of ERISA. |
| Fiduciary Duties | Notwithstanding anything to the contrary herein, nothing in this Term Sheet shall require any of the Debtors, or any of their directors or officers, including with respect to each subsidiary, to take or refrain from taking any action such person or entity reasonably believes is required to comply with its or their fiduciary duties under applicable law. |

\*    \*    \*    \*    \*

KE 48104220

# **EXHIBIT D**

CORPORATE GOVERNANCE TERM SHEET

[Attached.]

**CORPORATE GOVERNANCE TERM SHEET--REORGANIZED HOLDCO**

The following term sheet (this "**Term Sheet**") presents certain preliminary material terms in respect of the corporate governance of Reorganized Holdco, that would be reflected in the certificate of incorporation, bylaws, and registration rights agreement (the "**Organizational Documents**") of Reorganized Holdco to be adopted upon the consummation of the Restructuring. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan Support Agreement to which this Term Sheet is attached.

*THIS TERM SHEET IS NOT LEGALLY BINDING OR AN EXHAUSTIVE LIST OF ALL THE TERMS AND CONDITIONS IN RESPECT OF THE GOVERNANCE OF REORGANIZED HOLDCO NOR DOES IT CONSTITUTE AN OFFER TO SELL OR BUY, NOR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION SHALL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE LAWS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION.*

| | |
|---|---|
| **General:** | Reorganized Holdco will be a Delaware corporation managed by a board of directors (the "**Board**"), which will be responsible for overseeing the operation of Reorganized Holdco's business. Reorganized Holdco will be managed on a day-to-day basis by its Chief Executive Officer and other senior executive officers with oversight from the Board. |
| **Common Shares:** | The Organizational Documents will provide that the equity interests of Reorganized Holdco be evidenced by one class of common stock, par value $0.01 per share (each such share, a "**Common Share**" and each holder thereof, a "**Holder**"). |
| **SEC Reporting:** | On or as soon as reasonably practicable after the Effective Date, Reorganized HoldCo shall cause the Common Shares to be registered under Section 12 of the Securities Exchange Act. |
| **Stock Exchange Listing:** | Reorganized Holdco will use its best efforts to attempt to obtain a listing of its Common Shares on the NYSE or NASDAQ at emergence; if such a listing is not possible, Reorganized Holdco will use its best efforts to obtain a listing of its Common Shares on the OTCQX Premier (if the OTCQX Premier is not possible, the OTCQX, and if the OTCQX is not possible, the OTCQB) and will use its best efforts attempt to obtain a NYSE or NASDAQ listing as soon as possible following emergence. |
| **Board of Directors:** | The Board will be comprised of 7-9 directors and shall serve for an initial term of 12 months (the "**Initial Term**"). |
| | One (1) director shall be the Chief Executive Officer of Reorganized Holdco. |
| | The remaining initial directors shall be selected by the Requisite First Lien Creditors, and the composition of the Board shall satisfy SEC and NYSE/NASDAQ board/committee independence rules. |

| | |
|---|---|
| | Following expiration of the Initial Term, the entire Board will be nominated/elected in accordance with customary public company board procedures (e.g., no ongoing right to serve). There shall be no cumulative voting for directors. The Board shall not be staggered or classified. |
| **Board Vacancies:** | Upon the resignation, removal for cause, death or incapacity of a director, the vacancy resulting from such resignation, removal for cause, death or incapacity shall be filled by the Board, in each until the next annual meeting of the Holders. |
| **Chairman of the Board:** | The Chairman of the Board will be determined by a majority vote of the Board; *provided*, that such Chairman will not also serve as the Chief Executive Officer. |
| **Board Committees:** | The committees of the Board will be appointed by a majority of the Board, subject to compliance with SEC and NYSE/NASDAQ independence requirements. |
| **Board Observers:** | There shall be no Board observers. |
| **Transfer Restrictions on Common Shares:** | The Common Shares shall be freely tradable/transferable following emergence and not subject to any ROFR/ROFO, tag-along rights, drag-along rights or any similar provisions, subject to any transfer restrictions necessary to preserve tax attributes. |
| **Registration Rights Agreement:** | The registration rights agreement will provide the following benefits to the Holders party thereto: <br><br> • *Demand Registration—S-1.* If the Common Shares are listed on the NYSE or Nasdaq, Holders will not have demand registration rights until Reorganized Holdco is eligible to file a registration statement on Form S-3. If the Common Shares are not listed on the NYSE or Nasdaq, (x) Holders of at least 25% of the outstanding Common Shares may demand that Reorganized Holdco file a registration statement under the Securities Act on Form S-1 (or similar or successor form), covering Common Shares held by such Holders, on an underwritten offering basis and (y) the Board may determine to commence a resale public offering and give all signatories to the registration rights agreement the opportunity to participate on a pro rata basis. <br><br> • *Demand Registration--S-3.* Once Reorganized Holdco is eligible to file a S-3 registration statement on Form S-3, Holders of at least 5% of the outstanding Common Shares on a fully-diluted basis may request that Reorganized Holdco file a registration statement under the Securities Act on Form S-3 (or similar or successor form) or conduct a shelf takedown off of a Form S-3 (or similar or successor form), covering common shares held by such Holder on |

| | either a resale or underwritten offering basis, to the extent such Holders are affiliates of Reorganized Holdco or otherwise hold restricted or control securities. |
| | |
| | • *Piggyback Registration*. Each Holder who holds at least 2.5% of the outstanding Common Shares on a fully-diluted basis will have the right to include its Common Shares each time Reorganized Holdco proposes for any reason to register any of its Common Shares under the Securities Act (including but not limited to registrations pursuant to demands by Holders).  The rights to piggyback registration may be exercised on an unlimited number of occasions. The rights to piggyback registration will be subject to customary cutbacks, exceptions and limitations (including as to exceptions employee plan S-8 filings and acquisition transactions and as to limitations, selection of underwriters, priority and cutbacks). |
| | |
| | • *Registration Procedures*. The registration rights agreement will also contain customary provisions relating to the registration procedures to be followed by Reorganized Holdco, termination of registration rights and indemnification obligations, as well as lock-ups binding on the Holders who execute the registration rights agreement (to the extent required by an applicable underwriter).  In addition, Reorganized Holdco will cover out-of-pocket expenses of registrations other than underwriter discounts and commissions. |
| **Corporate Opportunities:** | The Organizational Documents will provide for the renunciation of Reorganized Holdco's interest in business opportunities that are presented to directors or Holders, in each case, other than such directors or Holders that are employees, consultants or officers of Reorganized Holdco (and the renunciation shall apply to any Chairman of the Board that is not otherwise an employee, consultant or officer of Reorganized Holdco). |
| **Affiliate Transactions:** | Affiliate transactions shall be subject to Delaware corporate law and fiduciary duties. |
| **Amendments:** | The Organizational Documents will not be amended without the approval of a majority of the Board and a majority of the outstanding Common Shares. |
| **Holder Approvals:** | Other Holder approvals only as required by Delaware law (e.g., mergers/sale of substantially all assets). |
| **Other Terms:** | The Organizational Documents will also provide for other customary terms, including, without limitation, the time, place and manner of calling of regular and special meetings of Holders and directors, actions that may be taken by the Board or the Holders without a meeting, the titles and duties of officers of Reorganized |

3

|  | Holdco and the manner of appointment, removal and replacement thereof, and indemnification and exculpation of directors, officers and other appropriate persons. |
|---|---|
| **Defined Terms:** | "**Affiliate**" means any person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified. |
|  | "**Control**" means the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. |

# **EXHIBIT E**

NEW SECURED DEBT TERM SHEET

[Attached.]

## NEW SECURED DEBT TERM SHEET--REORGANIZED DEBTORS

The following term sheet (this "Term Sheet") presents certain preliminary material terms in respect of the New Secured Debt of the Reorganized Debtors. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan Support Agreement to which this Term Sheet is attached as **Exhibit E**.

*THIS TERM SHEET IS NOT AN EXHAUSTIVE LIST OF ALL THE TERMS AND CONDITIONS IN RESPECT OF THE NEW SECURED DEBT OF THE REORGANIZED DEBTORS NOR DOES IT CONSTITUTE AN OFFER TO SELL OR BUY, NOR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION SHALL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE LAWS.*

| Term | Description |
|---|---|
| **Borrower:** | Avaya Inc., and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred from the Company upon its emergence from bankruptcy (the "Borrower"). |
| **Guarantors:** | The obligations of the Borrower in respect of the New Secured Debt (the "Borrower Obligations"), will be guaranteed by the direct parent company of the Borrower ("Holdings"), and the Borrower's existing and future, direct and indirect, material wholly-owned domestic subsidiaries that are restricted subsidiaries, that are identified on Exhibit 1 attached hereto, on a joint and several basis, subject to customary exceptions an exclusions (Holdings and such subsidiaries, collectively, the "Guarantors") and as otherwise provided in the New Secured Debt Documents.<br><br>The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party." |
| **Definitive Documents:** | The agreements documenting the New Secured Debt shall be set forth in the New Secured Debt Documents filed as part of the Plan Supplement not later than ten (10) days prior to the deadline to accept or reject the Amended Plan.<br><br>The New Secured Debt Documents shall be materially consistent with this Term Sheet and otherwise acceptable to the Requisite First Lien Creditors and the Debtors. |
| **Collateral:** | The New Secured Debt shall be secured by liens on substantially all of the Loan Parties' assets, subject to customary exceptions and exclusions; provided that such liens shall be junior to liens incurred to secure the Exit Facility with respect to assets that otherwise would be ABL Priority Collateral (to be defined to include customary ABL priority collateral) and as may otherwise be set forth in the New Secured Debt Documents. |
| **Administrative Agent:** | To be determined by the Debtors in consultation with the Ad Hoc First Lien Group. |
| **Lead Arrangers and Joint Bookrunners:** | To be determined by the Debtors in consultation with the Ad Hoc First Lien Group. |

| Term | Description |
|---|---|
| **Commitment:** | Not less than $2,925 million (the "Commitment", and the loans made thereunder, the "Loans"). |
| **Lenders:** | The group of lenders arranged by the Lead Arrangers (collectively, the "Lenders") other than certain disqualified lenders; provided that if the Commitment is not fully-syndicated in an amount equal to at least $2,925 million, the unsubscribed portion of the Commitment less than $2,925 shall be distributed to Holders of First Lien Debt Claims in accordance with the Amended Plan (such subscribed portion, the "Syndicated Debt," and such unsubscribed portion, the "Takeback Debt"). |
| **Incremental Facilities:** | To be determined. |
| **Use of Proceeds:** | The proceeds of the Loans will be (i) used repay in full all amounts outstanding on the Effective Date with respect to the DIP Financing, (ii) used to fund distributions under the Plan and (iii) thereafter, used for working capital and general corporate purposes of the Borrower and its subsidiaries. |
| **Maturity:** | Expected to be seven years after the Effective Date or such maturity as may be necessary to facilitate a successful syndication. |
| **Amortization:** | To be determined, but acceptable to the Company and the Requisite First Lien Creditors. |
| **Takeback Debt** | The Takeback Debt under the Amended Plan may be issued on a second priority or "last out" basis with respect to the Syndicated Debt and shall be on terms acceptable to the Requisite First Lien Creditors and the Debtors with such terms to be set forth in the Plan Supplement; provided that to the extent necessary, any such Takeback Debt shall subject to one or more intercreditor agreements reasonably acceptable to the Debtors and the Requisite First Lien Creditors. |
| **Interest Rate:** | To be determined, but acceptable to the Company and the Requisite First Lien Creditors. |
| **Default Rate:** | The Loans will bear interest at the applicable interest rate plus 200 bps per annum, to be payable with respect to overdue amounts and under certain other customary circumstances. |
| **Upfront Fee/OID:** | The New Secured Debt may provide for a fee payable in the form of original issue discount or upfront fee on the Effective Date to facilitate a successful syndication. |
| **Agency Fee:** | To be agreed with the Administrative Agent. |
| **Optional Prepayments:** | Expected to include 101 soft call protection for no more than 12 months, otherwise prepayable at par. |
| **Mandatory Prepayments:** | Including: |

2

| Term | Description |
|------|-------------|
|  | (1) excess cash flow sweep (subject to leverage-based stepdowns to be agreed)<br><br>(2) asset sale sweep (subject to customary re-investment rights)<br><br>(3) debt sweep (except for debt permitted under the credit agreement for the New Secured Debt). |
| **Representations and Warranties:** | Usual and customary for financings of this type. |
| **Covenants:** | Usual and customary for financings of this type. |
| **Voting; Amendments:** | Usual and customary for financings of this type. |
| **Cost and Yield Protection:** | Usual and customary for financings of this type. |
| **Events of Default:** | Usual and customary for financings of this type. |

\*    \*    \*    \*    \*

3

## **EXHIBIT 1**

**Subsidiary Guarantors**

1. Avaya Cala Inc.

2. Avaya EMEA Ltd.

3. Avaya Federal Solutions, Inc.

4. Avaya Holdings LLC

5. Avaya Holdings Two, LLC

6. Avaya Integrated Cabinet Solutions Inc.

7. Avaya Management Services Inc.

8. Avaya Services Inc.

9. Avaya World Services Inc.

10. Octel Communications LLC

11. Sierra Asia Pacific Inc.

12. Technology Corporation of America, Inc.

13. Ubiquity Software Corporation

14. VPNet Technologies, Inc.

15. Zang, Inc.

## <u>EXHIBIT F</u>

### JOINDER

The undersigned ("***Transferee***") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of [●], 2017 (the "***Agreement***"), by and among the Debtors listed on **<u>Exhibit A</u>** to the Agreement, and the holders of First Lien Debt Claims and Second Lien Debt Claims against the Company, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Joining Party" and "Holder Party" under the terms of the Agreement.

The Transferee hereby makes the representations and warranties of the Holder Parties set forth in <u>Section 3</u> of the Agreement to the other parties thereto and agrees to be bound by the terms and conditions of the Agreement to the same extent a transferor was thereby bound.  This Joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  Capitalized terms not otherwise defined in this Joinder shall have the meanings assigned to such terms in the Agreement.

Date Executed:  _____

**TRANSFEREE**

Name of Institution:  _____

By:  _____
Name:  _____
Its:  _____
Telephone:  _____
Facsimile:  _____

**First Lien Lender Claims (B-3)**

$  _____

**First Lien Lender Claims (B-4)**

$  _____

**First Lien Lender Claims (B-6)**

$  _____

**First Lien Lender Claims (B-7)**

$  _____

**First Lien Notes Claims (7%)**

$ _____

**First Lien Notes Claims (9%)**

$ _____

**Second Lien Notes Claims**

$ _____

**Other Claims (identify/describe type)**

$ _____

NOTICE ADDRESS:

e-mail: [_____]

with a copy to (which shall not constitute notice):

e-mail: [_____]

\*       \*       \*       \*       \*

# **EXHIBIT G**

PJT ENGAGEMENT LETTER

[Attached.]

PJT Partners 

July 17, 2017

Ira S. Dizengoff, Esq.
Partner
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036-6745

Dear Mr. Dizengoff:

This letter confirms the understanding and agreement (the "**Agreement**") between PJT Partners LP ("**PJT Partners**") and Akin Gump Strauss Hauer & Feld LLP ("**Counsel**"), as counsel to certain unaffiliated creditors as named in the Fifth Amended Verified Statement Pursuant to Bankruptcy Rule 2019, dated June 22, 2017 (Dkt. No. 758), as the same may be amended from time to time (collectively, the "**Ad Hoc Committee**") consisting of lenders under that certain Credit Agreement, dated as of October 26, 2007 (as amended, supplemented, or otherwise modified from time to time), and holders of the 7.00% Senior Secured Notes due 2019 and the 9.00% Senior Secured Notes due 2019 (collectively, the "**First Lien Debt**"), governed by their respective credit agreements or indentures (the "**Credit Documents**") of Avaya Inc. (together with any direct or indirect parent, affiliates and subsidiaries, the "**Company**"), regarding the retention of PJT Partners on an exclusive basis by Counsel effective as of May 4, 2016 (the "**Effective Date**") as its investment banker for the purposes set forth herein. Reference is hereby made to that certain letter agreement dated August 18, 2016 by and among PJT Partners, Counsel and the Company (the "**Prior Agreement**"). The Prior Agreement is hereby amended, replaced and restated in its entirety by this Agreement.

Under this Agreement, PJT Partners will provide investment banking services to Counsel in connection with a possible restructuring of certain liabilities of the Company and will assist Counsel and the Ad Hoc Committee in analyzing, structuring, negotiating and effecting a Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "**Restructuring**" shall mean, collectively, (i) any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of the Company and/or sale or other disposition of substantially all of the assets of the Company affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, trade claims, general unsecured claims and preferred stock (collectively, the "**Obligations**"), and/or (ii) any complete or partial repurchase, refinancing, extension or repayment by the Company of any of the Obligations, in each case so long as the applicable transaction(s) constitutes, either in single transaction or series of transactions, the entirety of the transactions contemplated by the Company in connection with its satisfaction of substantially all of the First Lien Debt.

The investment banking services to be rendered by PJT Partners will, if appropriate and at the request of Counsel, include the following:

(a)    assist in the evaluation of the Company's businesses and prospects;

(b)    assist in the evaluation of the Company's long-term business plan and related financial projections;

(c)    assist in the development of financial data and presentations to the Ad Hoc Committee;

(d)    analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(e) analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of creditors of the Company;

(f) evaluate the Company's debt capacity and alternative capital structures;

(g) participate in negotiations among the Ad Hoc Committee, the Company and its other creditors, suppliers, lessors and other interested parties;

(h) value consideration offered by the Company to creditors of the Company in connection with a Restructuring;

(i) provide expert witness testimony concerning any of the subjects encompassed by the other investment banking services; and

(j) provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, PJT Partners shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. PJT Partners makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. PJT Partners is retained under this Agreement solely to provide advice regarding a Restructuring and is not being retained to provide "crisis management" or any legal, tax, accounting or actuarial advice. It is understood and agreed that nothing contained herein shall constitute a commitment, express or implied, on the part of PJT Partners to underwrite, purchase or place any securities, in a financing or otherwise.

It is agreed that the Company will pay the following fees to PJT Partners for its investment banking services (all fees and expenses payable to PJT Partners pursuant to this Agreement shall be payable solely by the Company. Neither counsel nor the members of the Ad Hoc Committee shall have any obligation to pay PJT Partners' fees or expenses).

(i) a monthly advisory fee (the "Monthly Fee") in the amount of $175,000 in cash, with the first Monthly Fee payable upon the execution of this Agreement and additional installments of such Monthly Fee payable in advance on each monthly anniversary of the Effective Date. Fifty percent (50%) of all Monthly Fees earned and payable from and after the date that a disclosure statement in respect of a Chapter 11 plan filed by the Company is approved by the bankruptcy court shall be credited against the Restructuring Fee (as defined below) to the extent such Restructuring Fee is paid;

(ii) an additional fee (the "Restructuring Fee") equal to $7,000,000. Except as otherwise provided herein, a Restructuring shall be deemed to have been consummated upon (a) the binding execution and effectiveness of all necessary waivers, consents, amendments, sale agreements or restructuring agreements by which the obligations of the Company under the Credit Documents have been restructured or refinanced; or (b) the confirmation and consummation of a Chapter 11 plan or any other Restructuring pursuant to an order of the Bankruptcy Court or any other applicable court, in the case of an in-court restructuring. The Restructuring Fee will be earned on consummation of a Restructuring and will be payable, in cash, on the consummation of a Restructuring; and

(iii) reimbursement of all reasonable out-of-pocket expenses incurred during this engagement, including, but not limited to, travel and lodging, direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals, reasonable fees and expenses of PJT Partners' counsel (without the requirement that the retention of such counsel be approved by the court in any Bankruptcy Case) and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses. In connection therewith the Company shall pay PJT Partners on

the Effective Date and maintain thereafter a $75,000 expense advance for which PJT Partners shall account upon termination of this Agreement.

All amounts herein are stated in U.S. dollars and all payments under this Agreement shall be paid in immediately available funds in U.S. dollars, free and clear of any tax, assessment or other governmental charge (with appropriate gross-up for withholding taxes). If any amount to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted in U.S. dollars at the prevailing exchange rate on the date such amount is paid.

The Company and Counsel acknowledge and agree that PJT Partners' restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by Counsel during the term of PJT Partners' engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company, Counsel and the Ad Hoc Committee of PJT Partners' services hereunder could not be measured merely by reference to the number of hours to be expended by PJT Partners' professionals in the performance of such services. The Company and Counsel also acknowledge and agree that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of PJT Partners and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for PJT Partners and that the actual time and commitment required of PJT Partners and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which PJT Partners may be required to address in the performance of its services hereunder, PJT Partners' commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for PJT Partners' services for engagements of this nature in an out-of-court context, the Company and Counsel agree that the fee arrangements hereunder (including the Monthly Fee and the Restructuring Fee) are reasonable.

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or the arranging of debt or equity capital (except as provided above), issuing fairness opinions or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between PJT Partners and the appropriate party.

The Company will furnish or cause to be furnished to PJT Partners such information as PJT Partners believes appropriate to its assignment (all such information so furnished being the "Information"). Information provided by the Company to PJT shall be subject to the terms of the confidentiality agreement, dated May 9, 2016, entered into between PJT Partners and the Company, a copy of which is attached hereto as Attachment B. The Company further agrees that it will provide PJT Partners with reasonable access to the Company and its directors, officers, employees, accountants, counsel and other advisers. To the best of the Company's knowledge, the Information will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. During the term of the engagement, the Company shall inform PJT Partners promptly upon becoming aware of any material developments relating to the Company which the Company reasonably expects may impact on the proposed Restructuring or if the Company becomes aware that any Information provided to PJT Partners is, or has become, untrue, unfair, inaccurate or misleading in any way. Furthermore, the Company warrants and undertakes to PJT Partners in respect of all Information supplied by the Company, that the Company has not obtained any such Information other than by lawful means and that disclosure to PJT Partners will not breach any agreement or duty of confidentiality owed to third parties. Counsel recognizes and confirms that PJT Partners (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment.

PJT Partners and the Company acknowledge and agree that the work product produced by PJT Partners pursuant to this Agreement is for the purpose of facilitating the rendering by Counsel of legal advice to the Ad Hoc Committee and constitutes attorney work product, and that any communication to Counsel, including, without limitation, any correspondence, analyses, reports and related materials that PJT Partners prepares, constitutes confidential and privileged communications.

Except as required by applicable law, any advice to be provided by PJT Partners under this Agreement shall not be disclosed publicly or made available to third parties (other than Counsel's other professional advisors or, if appropriate in Counsel's judgment, in any filings in a Chapter 11 proceeding) without the prior written consent of PJT Partners. In the event disclosure is required by subpoena or court order, the Company will provide PJT Partners with reasonable advance notice and permit PJT Partners to comment on the form and content of the disclosure. All services, advice and information and reports provided by PJT Partners to Counsel in connection with this assignment shall be for the sole benefit of Counsel as legal advisor to the Ad Hoc Committee and shall not be relied upon by any other person, other than the members of the Ad Hoc Committee.

In connection with this Agreement, it is agreed that the Company will indemnify PJT Partners and its agents, representatives, members and employees. A copy of our standard form of indemnification agreement is attached to this Agreement as Attachment A. PJT Partners acknowledges Counsel and the members of the Ad Hoc Committee have no obligation to indemnify PJT Partners. None of PJT Partners nor its affiliates and its and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling PJT Partners or any of its affiliates shall have any liability (whether direct or indirect, in contract or tort or otherwise) to Counsel, the Ad Hoc Committee, in their individual capacities and as a group, and their respective successors, agents, personal representatives, affiliates, officers, partners, employees and assigns for or in connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by such persons that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from the gross negligence or willful misconduct of PJT Partners.

PJT Partners' engagement hereunder may be terminated upon 30 days' written notice without Cause (as defined below) by either Counsel or PJT Partners; termination for Cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses accrued through the date of termination, the status of PJT Partners as an independent contractor, the limitation as to whom PJT Partners shall owe any duties, and any other provision of this Agreement that, by its terms, survives termination, will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A and (c) PJT Partners shall be entitled to the Restructuring Fee and the Discretionary Fee in the event that at any time prior to the expiration of 12 months following the termination of this Agreement a definitive agreement with respect to a Restructuring is executed and a Restructuring is thereafter consummated, so long as such termination is without Cause. As used herein, "Cause" shall mean a final judicial determination of the gross negligence, bad faith or willful misconduct of PJT Partners in performing the services that are the subject of this Agreement.

The Company represents that neither it nor any of its affiliates under common control, nor, to the knowledge of the Company, any of their respective directors or officers, is an individual or entity ("Person") that is, or is owned or controlled by a Person that is: (i) a Person with whom dealings are prohibited or restricted under U.S. economic sanctions (including those administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control and the U.S. Department of State) or under sanctions imposed by the United Nations Security Council, Canada, the European Union, or member countries of the European Union; (ii) a Person subject to anti money laundering prohibitions, restrictions, or sanctions imposed by the United States, Canada, the European Union, member countries of the European Union, or any other relevant jurisdiction; or (iii) to the knowledge of the Company, not in compliance in all material respects with all applicable anti-money laundering laws and Sanctions laws.

Counsel and the Company should be aware that PJT Partners and/or its affiliates may be providing or may in the future provide financial or other services to other parties with conflicting interests. Consistent with PJT Partners' policy to hold in confidence the affairs of its clients, PJT Partners will not use confidential information obtained

from Counsel except in connection with PJT Partners' services to, and PJT Partners' relationship with, Counsel, nor will PJT Partners use on Counsel's behalf any confidential information obtained from any other client. Notwithstanding anything to the contrary provided elsewhere herein, Counsel and the Company expressly acknowledge and agree that none of the provisions of this Agreement shall in away restrict PJT Partners from being engaged or mandated by any third party, or otherwise participating or assisting with any transaction not involving Company.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Counsel and the Company hereby agree that any action or proceeding brought by Counsel or the Company against PJT Partners based hereon or arising out of PJT Partners' engagement hereunder, shall be brought and maintained by Counsel or the Company exclusively in the courts of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York; provided, if the Company has commenced a Chapter 11 case, all legal proceedings by or against the company arising after such case is commenced may be brought in the Bankruptcy Court handling such case. Counsel and the Company irrevocably submit to the jurisdiction of the courts of the State of New York located in the City and County of New York and the United States District Court for the Southern District of New York and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of PJT Partners' engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings. Counsel and the Company hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

**Notices.** Any notices required or permitted to be given hereunder by either party hereto to the other will be given in writing (i) by personal delivery, email or facsimile transmission, (ii) by nationally-recognized overnight delivery company or (iii) by prepaid first class, registered or certified mail, postage prepaid, in each case addressed to the other party hereto as set forth on Schedule I (or to such other address as the other party hereto may request in writing by notice given pursuant to this section). Notices will be deemed received on the earliest of: (a) if personally delivered, emailed or sent via facsimile, the same day; (b) if sent by overnight delivery company, on the second working day after the day it was sent; or (c) if sent by mail, when actually received.

This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. A facsimile of a signed copy of this Agreement or other copy made by reliable mechanical means may be relied upon as an original.

[SIGNATURE PAGE FOLLOWS]

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to PJT Partners the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____

Name: Michael J. Genereux

Title: Partner

Accepted and Agreed to as of the date first written above:

AVAYA HOLDINGS CORP. on behalf of itself and its direct and indirect subsidiaries that are guarantors or obligors on the First Lien Debt

By: _____

Name: Amy Fliegelman Olli

Title: SVP + GC

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____

Name: Ira S. Dizengoff

Title: Partner

ATTACHMENT A

July 17, 2017

PJT Partners LP
280 Park Avenue
New York, NY 10017

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

We acknowledge that Counsel (as defined in the Engagement Letter) has engaged PJT Partners LP ("**PJT Partners**") to advise and assist in connection with the matters referred to in the letter of agreement dated as of July 17, 2017 (the "**Engagement Letter**"). In the event that PJT Partners becomes involved in any capacity in any claim, suit, action, proceeding, investigation or inquiry (including, without limitation, any shareholder or derivative action or arbitration proceeding) (collectively, a "**Proceeding**") in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, the Company agrees to indemnify, defend and hold PJT Partners and its affiliates, and their respective current and former directors, officers, agents, employees, attorneys and other representatives and the successors and assigns of all of the foregoing persons (each an "**Indemnified Party**") harmless to the fullest extent permitted by law, from and against any losses, claims, damages, fines, penalties, liabilities and expenses ("**Losses**") , whether they be joint or several, in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that such Losses resulted solely from the gross negligence, bad faith or willful misconduct of such Indemnified Party. In the event that any Indemnified Party becomes involved in any capacity in any Proceeding (regardless of whether or not such or any Indemnified Party is a party to or the subject of such Proceeding) in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter (including, without limitation, in enforcing the Engagement Letter), the Company will reimburse such Indemnified Party for its legal and other expenses (including the cost of any investigation and preparation) as such expenses are incurred by such Indemnified Party in connection therewith. The Company also agrees to cooperate with any Indemnified Party and to give, and so far as it is able to procure the giving of, all such information and render all such assistance to such Indemnified Party as such Indemnified Party may reasonably request in connection with any Proceeding and not to take any action which might reasonably be expected to prejudice the position of any Indemnified Party in relation to any Proceeding without the consent of PJT Partners (such consent not to be unreasonably withheld). In the event that any Indemnified Party is requested or authorized by the Company or required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, arising as a result of or in connection with the matters referred to in the Engagement Letter, the Company will, so long as PJT Partners is not a party to the Proceeding in which the information is sought, pay PJT Partners the fees and expenses of its counsel incurred in responding to such a request.

If such indemnification were not to be available due to a finding that the applicable Losses resulted solely from the gross negligence, bad faith or willful misconduct of any Indemnified Party, the Company agrees to contribute to

the Losses involved in the proportion appropriate to reflect the relative benefits received or sought to be received by the Company and its security holders and affiliates and other constituencies, on the one hand, and the Indemnified Party, on the other hand, in connection with the matters contemplated by the Engagement Letter, or, if such allocation is determined by a court or arbitral tribunal to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of the Company or its security holders and affiliates or other constituencies, on the one hand, and of the Indemnified Parties, on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Parties shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by PJT Partners from the Company in connection with the engagement.  The Company agrees that for the purposes of this paragraph the relative benefits received, or sought to be received, by the Company and its security holders and affiliates and other constituencies, on the one hand, and the Indemnified Party, on the other hand, in connection with the matters contemplated by the Engagement Letter shall be deemed to be in the same proportion that the total value received or paid or contemplated to be received or paid by the Company or its security holders or affiliates and other constituencies, as the case may be, as a result of or in connection with the matters (whether or not consummated) for which PJT Partners has been retained to perform financial services bears to the fees paid to PJT Partners under the Engagement Letter; provided, that in no event shall the Company contribute less than the amount necessary to assure that the Indemnified Parties, taken together, are not liable for Losses in excess of the amount of fees actually received by PJT Partners pursuant to the Engagement Letter (exclusive of amounts paid for reimbursement of expenses under the Engagement Letter).

The Company agrees that no Indemnified Party shall have any liability to the Company or any person asserting claims on behalf of or in right of the Company in connection with any matter in any way relating to or referred to in the Engagement Letter or arising out of the matters contemplated by the Engagement Letter, including, without limitation, related services and activities prior to the date of the Engagement Letter, except to the extent that it shall be determined by a court of competent jurisdiction in a judgment that has become final in that it is no longer subject to appeal or other review that any Losses incurred by the Company resulted solely from the gross negligence, bad faith or willful misconduct of PJT Partners.

If any Proceeding shall be brought, threatened or asserted against an Indemnified Party in respect of which indemnity or contribution may be sought against the Company, PJT Partners shall promptly notify the Company in writing; provided that failure to so notify the Company shall not relieve the Company from any liability which the Company may have on account of this indemnity or otherwise, except to the extent the Company shall have been actually materially prejudiced by such failure.  The Company, upon the written request of such Indemnified Party, shall or, upon written notice to such Indemnified Party, may elect to, assume the defense of such Proceeding, at the Company's own expense, with counsel reasonably satisfactory to such Indemnified Party.  Such Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the Company has agreed in writing to pay such fees and expenses, (b) the Company has failed to assume the defense, pursue the defense reasonably diligently or to employ counsel in a timely manner, (c) outside counsel to such Indemnified Party has advised such Indemnified Party that in such Proceeding there is an actual or potential conflict of interest or a conflict on any material issue between the Company's position and the position of such Indemnified Party or (d) the named parties to any such Proceeding (including any impleaded parties) include such Indemnified Party and the Company, and outside counsel to such Indemnified Party has advised such Indemnified Party that there may be one or more legal defenses available to such Indemnified Party which are different from or in addition to those available to the Company.

The Company agrees that, without PJT Partners' prior written consent (which shall not be unreasonably withheld, conditioned or delayed), it will not settle, compromise or consent to the entry of any judgment in any pending or threatened Proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not an Indemnified Party is an actual or potential party to such Proceeding), unless such settlement, compromise or consent (a) includes an explicit and unconditional release from the settling, compromising or consenting party of each Indemnified Party from all liability arising out of such Proceeding and (b) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, due care, loyalty, expertise or reputation of any Indemnified Party or any action or

inaction by each Indemnified Party. No Indemnified Party seeking indemnification, reimbursement or contribution under this letter agreement will, without the Company's prior written consent (which shall not be unreasonably withheld, conditioned or delayed), settle, compromise, consent to the entry of any judgment or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification, reimbursement or contribution may be sought.

The Company's reimbursement, indemnification and contribution obligations under this letter agreement shall be in addition to any liability which the Company may otherwise have at law or in equity, shall not be limited by any rights PJT Partners or any other Indemnified Party may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company, PJT Partners and any other Indemnified Party.

This letter agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.   A facsimile of a signed copy of this letter agreement or other copy made by reliable mechanical means may be relied upon as an original.

[SIGNATURE PAGE FOLLOWS]

The provisions of this Agreement shall apply to the Engagement, as well as any additional engagement of PJT Partners by us in connection with the matters which are the subject of the Engagement, and any modification of the Engagement or additional engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This agreement and the Engagement Letter shall be governed by, and construed in accordance with the laws of the State of New York applicable to contracts executed in and to be performed in that state.

Very truly yours,

Avaya Holdings Corp.

By: _____
Name: *Amy Fliegelman Olli*
Title: *SVP, GC*

Accepted and Agreed to as of the date first written above:

PJT PARTNERS LP

By: PJT Management, LLC, its general partner

By: _____
Name: Michael J Genereaux
Title: Partner

Confidentiality Agreement, dated May 9, 2016, by and between PJT Partners and Avaya Holdings Corp

Notices

All notices related to financial matters, including billing, shall be addressed to the following:

If to PJT Partners:
    PJT Partners LP
    280 Park Avenue
    New York, NY 10017
    Attention: David Figur, Director of Finance
    Email: figur@pjtpartners.com
    Tel: 212.364.5056

If to the Company:
    Avaya Holdings Corp
    [Address]
    [Address]
    Attention: [name, title]
    Email: _____
    Tel. _____


All other notices, shall be addressed to the following:

If to PJT Partners:
    PJT Partners LP
    280 Park Avenue
    New York, NY 10017
    Attention: General Counsel
    Email: cuminale@pjtpartners.com
    Tel: 212.364.7170

If to Counsel:
    Akin Gump Strauss Hauer & Feld LLP
    One Bryant Park
    New York, NY 10036-6745
    Attention: [name, title]
    Email: _____
    Tel: _____

**Exhibit J**

**Waterfall**



**① Waterfall**

| Distributable TEV | |
|---|---|
| TEV | $5,520 |
| Less Avaya Hourly Pension Plan | (165) |
| | $5,355 |

**② Debtors aside from Sierra (U.S. Guarantors)**

| Domestic Split | 72.5% |
|---|---|
| TEV | $3,883 |

**Foreign / U.S. Non-Guarantors**

| Int'l Split | 27.5% |
|---|---|
| TEV | $1,473 |

**③ Sierra, its Foreign Subsidiaries and other U.S. Non-Guarantors**

| Assets | |
|---|---|
| TEV | $1,384 |
| Excess Cash on Hand | 32 |
| Intellectual Property Value | 8 |
| | $1,425 |

| Liabilities | |
|---|---|
| PBGC Settlement | ($469) |
| Foreign Pension | (516) |
| Capital Leases | (13) |
| Intercompany Security Protocol | (50) |
| Foreign Intercompany (412)[4] | (377) |
| Sierra Intercompany (333)[5] | - |
| | ($1,425) |

| Equity Value | |
|---|---|
| Value to U.S. Guarantors | $— |

**④ Non-Sierra Foreign Subsidiaries**

| Assets | |
|---|---|
| TEV | $88 |
| Excess Cash on Hand | 13 |
| | $101 |

| Liabilities | |
|---|---|
| Foreign Intercompany (47)[6] | ($47) |
| Capital Leases | (0) |
| | ($47) |

| Equity Value | |
|---|---|
| Value to U.S. Guarantors | $54 |

**⑤ Encumbered Value**

| Assets | |
|---|---|
| TEV | $3,883 |
| 65% Equity | 35 |
| Excess Cash on Hand | 344 |
| Cash Pool Requirements Account | 75 |
| Intellectual Property Value | 193 |
| Net Operating Loss Value | 85 |
| Bankruptcy Costs | 113 |
| Intercompany Recovery | 474 |
| | $5,201 |

| Liabilities | |
|---|---|
| Second Lien Recovery Settlement | ($23) |
| Challenge Claims Settlement | (60) |
| OPEB | (144) |
| Bankruptcy Costs[2] | (94) |
| Capital Leases | (18) |
| | ($339) |

| Distributable Value | |
|---|---|
| Net Value | $4,862 |

**⑥ Unencumbered Value**

| Assets | |
|---|---|
| 35% Equity | $19 |
| | $19 |

| Liabilities | |
|---|---|
| Bankruptcy Costs | (19) |
| | ($19) |

| Distributable Value | |
|---|---|
| Net Value | $— |

**⑤ Waterfall - Encumbered Value** — $4,862

| Claim | Face Value | Recovery % | Recovery $ |
|---|---|---|---|
| DIP Financing Claims | $725 | 100.0% | $725 |
| First Lien Debt Claims[1] | 4,378 | 94.5% | 4,137 |
| Second Lien Notes Claims | 1,440 | 0.0% | - |
| General Unsecured Claims | 305 | 0.0% | - |
| Residual Equity | | | $— |

**⑥ Waterfall - Unencumbered Value** — $—

| Claim | Face Value | Recovery % | Recovery $ |
|---|---|---|---|
| DIP Financing Claims | $— | 0.0% | $— |
| First Lien Debt Deficiency Claims[3] | 240 | 0.0% | - |
| Second Lien Notes Deficiency Claims | 1,440 | 0.0% | - |
| General Unsecured Claims | 305 | 0.0% | - |
| Residual Equity | | | $— |

**⑦ Total Recovery**

| Claim | Recovery $ | Recovery % | Equity Splits |
|---|---|---|---|
| DIP Financing Claims | $725 | 100.0% | 0.0% |
| First Lien Debt Claims | 4,137 | 94.5% | 91.5% |
| Second Lien Notes Claims | 23 | 1.6% | 1.0% |
| General Unsecured Claims[7] | 60 | 19.7% | 0.0% |
| PBGC Claims | 469 | 37.8% | 7.5% |

General Note: Numbers are approximate and are based on an assumed Emergence Date of 9/30/17.

(1)    Adequate protection payments treated as principal paydowns, and bankruptcy costs in excess of Unencumbered Value are added back pursuant to Article III.B.3 of the Plan.

(2)    Represents the portion of bankruptcy costs not reimbursed from Unencumbered Value.

(3)    Does not reflect a potential increase in the First Lien Debt Deficiency Claim due to recovery at multiple U.S. Guarantors.

(4)    Net Intercompany ("I/C") balances due to U.S. Guarantors from foreign subsidiaries of Sierra and other U.S. non-guarantors. Projected 9/30/17 net I/C balances are $554 million (probability weighted net I/C balances at 9/30/17 projected to be $412 million). Balances include the AHL Receivable, AISL Receivable and various other intercompany notes and receivables due from foreign subsidiaries of Sierra and other U.S. non-guarantors to U.S. Guarantors.

(5)    Net I/C balances due to U.S. Guarantors from Sierra. Projected 9/30/17 net I/C balances are $1,264 million (probability weighted net I/C balances at 9/30/17 projected to be $333 million). Balances include the Sierra Intercompany Note.

(6)    Net I/C balances due to U.S. Guarantors from non-Sierra foreign subsidiaries. Projected 9/30/17 net I/C balances and projected probability weighted net I/C balances are $47 million.

(7)    Assumes the consideration provided under the Plan to Holders of General Unsecured Claims is in Cash.

| | Waterfall Settlement |
|---|---|
| Settled Total Enterprise Value ("TEV")[1] | ✓ TEV of $5,520 million |
| Step ① | **Subtract $165 million tax effected book value ("TEBV") of Avaya Hourly Pension Plan[2] from TEV** |
| Step ② | **Split value between Debtors aside from Sierra ("U.S. Guarantors") (72.5%) and foreign & U.S. non-guarantors (27.5%)** |
| Step ③ | **Sierra and Foreign Subsidiaries Waterfall** |
| Value Split | ✓ Allocate 94% of foreign & U.S. non-guarantor value to Sierra, its foreign subsidiaries and other U.S. non-guarantors ($1,384 million) |
| Additions to Value | ✓ Add: (1) Excess cash on hand of $32 million[3] + (2) Non-Debtor intellectual property ("IP") value of $8 million = $40 million |
| Deductions from Value | ✓ Subtract: (1) Avaya Salaried Pension Plan PBGC Settlement of $469 million + (2) foreign pension liability of $516 million + (3) capital leases of $13 million + (4) I/C due from Sierra to Avaya Inc. of $50 million per Intercompany Security Protocol[4] + (5) foreign I/Cs[5] of $377 million[6] + (6) Sierra I/C's[5] of $0 million[7] = $1,425 million |
| Value to U.S. Guarantors | ✓ $0 million Encumbered Value / $0 million Unencumbered Value |
| Step ④ | **Non-Sierra Foreign Subsidiaries Waterfall** |
| Value Split | ✓ Allocate 6% of foreign & US non-guarantor value to non-Sierra foreign subs ($88 million) |
| Additions to Value | ✓ Add: (1) Excess cash on hand of $13 million[3] |
| Deductions from Value | ✓ Subtract: (1) capital leases of less than $1 million + (2) foreign I/C's[5] of $47 million[8] = $47 million |
| Value to U.S. Guarantors | ✓ $35 million (65%) Encumbered Value / $19 million (35%) Unencumbered Value |
| Step ⑤ | **Calculate Distributable Encumbered value ($4,862 million)** |
| Value Split | ✓ Allocate 100% of U.S. Guarantor value to Encumbered Value ($3,883 million) |
| Additions to Value | ✓ Add: (1) equity value from non-Sierra foreign subsidiaries of $35 million + (2) Excess cash on hand of $344 million[3] + (3) Cash Pool Requirements Account[4] of $75 million + (4) Debtor IP value of $193 million + (5) domestic Net Operating Loss ("NOL") value of $85 million + (6) bankruptcy costs reimbursement of $113 million[9] + (7) recovery on I/C receivables due from foreign / U.S. non-guarantors to U.S. Guarantors (including the Intercompany Security Protocol) of $474 million = $1,318 million |
| Deductions from Value | ✓ Subtract: (1) Second Lien Recovery Settlement of $23 million + (2) Challenge Claims Settlement of $60 million + (3) TEBV of OPEB[2] of $144 million + (4) bankruptcy costs of $94 million + (5) capital leases of $18 million = $339 million |
| Waterfall – Encumbered Value | ✓ Distribute remaining Encumbered Value in order of lien priority, starting with the repayment of DIP Financing Claims entirely out of distributable Encumbered Value |
| Step ⑥ | **Calculate Distributable Unencumbered value ($0 million)** |
| Additions to Value | ✓ Add: (1) equity value from non-Sierra foreign subs of $19 million |
| Deductions from Value | ✓ Subtract: (1) bankruptcy costs of the lesser of $113 million or the available Unencumbered Value ($19 million) |
| Waterfall – Unencumbered Value | ✓ Distribute remaining Unencumbered Value to deficiency claims and General Unsecured Claims on a pro rata basis, if any |
| Step ⑦ | **Determine Recoveries from Waterfalls in Step 5 and 6** |

General Note: Numbers are approximate and are based on an assumed Emergence Date of 9/30/17.

(1) TEV does not include certain intellectual property valued at approximately $201 million by Houlihan Lokey, $193 million of which is added to Encumbered Value in Step 5.
(2) TEBV of Avaya Hourly Pension Plan and OPEB projected at 9/30/17 using a tax rate of 38.4%.
(3) Net of minimum cash. Total minimum cash assumed to be $120 million consisting of $40 million U.S. Guarantors, $22 million at non-Sierra foreign subsidiaries, $58 million at Sierra, its foreign subsidiaries and other U.S. non-guarantors.
(4) As defined in the DIP Financing Order.
(5) Net I/C receivable balances due to U.S. Guarantors from foreign / U.S. non-guarantors are projected as of 9/30/17.
(6) Assumes approximately 92% blended recovery on probability weighted projected net I/C balances totaling $412 million due to U.S. Guarantors at 9/30/17.
(7) Assumes 0% recovery on probability weighted projected net I/C balances totaling $333 million due to U.S. Guarantors at 9/30/17.
(8) Assumes 100% recovery on probability weighted projected net I/C balances totaling $47 million due to U.S. Guarantors at 9/30/17.
(9) Represents fees and expenses of certain Debtor Professionals, Creditors' Committee professional fees, U.S. Trustee fees and Priority Tax Claims.