James H.M. Sprayregen, P.C.
Jonathan S. Henes, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
- and -
Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ryan Preston Dahl (admitted *pro hac vice*)
Bradley Thomas Giordano (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

Dated October 24, 2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AVAYA INC., *et al.*[1] | ) Case No. 17-10089 (SMB) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DISCLOSURE STATEMENT SUPPLEMENT**
**FOR THE SECOND AMENDED JOINT CHAPTER 11**
**PLAN OF REORGANIZATION OF AVAYA INC. AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Avaya Inc. (3430); Avaya CALA Inc. (9365); Avaya EMEA Ltd. (9361); Avaya Federal Solutions, Inc. (4392); Avaya Holdings Corp. (9726); Avaya Holdings LLC (6959); Avaya Holdings Two, LLC (3240); Avaya Integrated Cabinet Solutions Inc. (9449); Avaya Management Services Inc. (9358); Avaya Services Inc. (9687); Avaya World Services Inc. (9364); Octel Communications LLC (5700); Sierra Asia Pacific Inc. (9362); Sierra Communication International LLC (9828); Technology Corporation of America, Inc. (9022); Ubiquity Software Corporation (6232); VPNet Technologies, Inc. (1193); and Zang, Inc. (7229).  The location of Debtor Avaya Inc.'s corporate headquarters and the Debtors' service address is:  4655 Great America Parkway, Santa Clara, CA 95054.

THE DEBTORS ARE SENDING YOU THIS DOCUMENT (THIS "DISCLOSURE STATEMENT SUPPLEMENT") AS A SUPPLEMENT TO THE *DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AVAYA INC. AND ITS DEBTOR AFFILIATES* [DOCKET NO. 1106] (THE "DISCLOSURE STATEMENT") BECAUSE YOU ARE A CREDITOR THAT IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE *DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. [•]] (AS MAY BE AMENDED OR MODIFIED FROM TIME TO TIME AND WITH ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "SECOND AMENDED PLAN"), FILED ON OCTOBER 24, 2017,, WHICH HAS BEEN AMENDED WITH REGARD TO, AMONG OTHER THINGS, THE TREATMENT OF CERTAIN CLAIMS UNDER THE *DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* [DOCKET NO. 1104] (THE "FIRST AMENDED PLAN").[2]

THE DEBTORS COMMENCED SOLICITING VOTES TO APPROVE THE FIRST AMENDED PLAN ON AUGUST 25, 2017, PURSUANT TO THE TERMS OF THE ORDER APPROVING THE DISCLOSURE STATEMENT AND RELATED SOLICITATION PROCEDURES [DOCKET NO. 1028] (THE "DISCLOSURE STATEMENT ORDER"). THIS DISCLOSURE STATEMENT SUPPLEMENT SUMMARIZES, AMONG OTHER THINGS, CERTAIN MODIFICATIONS TO THE FIRST AMENDED PLAN INCLUDED IN THE SECOND AMENDED PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE SECOND AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE SECOND AMENDED PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE SECOND AMENDED PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SUPPLEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT SUPPLEMENT, THE SECOND AMENDED PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE SECOND AMENDED PLAN.

MOREOVER, NEITHER THE DISCLOSURE STATEMENT NOR THIS DISCLOSURE STATEMENT SUPPLEMENT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE SECOND AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT SUPPLEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT

---

[2]    All capitalized terms used but not otherwise defined in this Disclosure Statement Supplement shall have the meaning ascribed to them in the Second Amended Plan or the Disclosure Statement, as applicable.

SUPPLEMENT. CLAIMANTS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS, OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE SECOND AMENDED PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN, IN THE SECOND AMENDED PLAN, AND IN THE DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT SUPPLEMENT CONTAINS A SUMMARY OF CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND EVENTS PRECEDING THE DEBTORS' FILING THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH EVERY DETAIL OF SUCH EVENTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]

# ARTICLE I
## SUPPLEMENTAL DISCLOSURE OF EVENTS IN THE CHAPTER 11 CASES

### A.   The First Amended Plan Objections

Subsequent to the filing of the First Amended Plan on August 7, 2017, the Debtors received certain objections from the Ad Hoc Crossover Group to the Disclosure Statement [Docket No. 955] (including a joinder from the Second Lien Notes Trustee [Docket No. 957]) and the First Lien Plan Support Agreement [Docket No. 973] (collectively, the "Crossover Objections"). As set forth more fully therein, the Ad Hoc Crossover Group and Second Lien Notes Trustee asserted the First Amended Plan was patently unconfirmable for a number of reasons, including that the First Amended Plan: (i) was not proposed in good faith; (ii) was not fair and equitable to the Second Lien Notes Claims; (iii) discriminated unfairly against the Second Lien Notes Claims; and (iv) disregarded substantial diminution in value claims on account of the Second Lien Notes.

On August 25, 2017, the Bankruptcy Court entered the Disclosure Statement Order approving the adequacy of the Disclosure Statement and authorizing the Debtors to solicit acceptances and rejections of the First Amended Plan. The Debtors initially set a hearing to confirm the First Amended Plan for November 15, 2017.

### B.   The Mediation

On September 13, 2017, the Bankruptcy Court ordered the Debtors, the Committee, the Ad Hoc First Lien Group, the Ad Hoc Crossover Group, and the Second Lien Notes Trustee to participate in non-binding mediation in an effort to resolve the Ad Hoc Crossover Group's stated objections to the First Amended Plan (the "Mediation"), with United States Bankruptcy Judge, Hon. Cecelia G. Morris (the "Mediator") appointed as mediator [Docket No. 1160]. In the *Supplemental Order Regarding Assigned Mediation* [Docket No. 1286], the parties to the mediation included: (i) the Debtors, (ii) the Committee, (iii) the Ad Hoc First Lien Group, (iv) the Ad Hoc Crossover Group, (v) PBGC, and (vi) the Second Lien Notes Trustee (collectively, the "Mediation Parties"). The Mediation Parties engaged in two days of Mediation on October 10 and 11, 2017, in an effort to consensually resolve the Crossover Objections. The result of the Mediation is reflected in the Second Amended Plan, as well as the Debtors' entry into that certain plan support agreement dated as of October 23, 2017 (the "Crossover Plan Support Agreement"), amendments to the First Lien Plan Support Agreement and PBGC Stipulation of Settlement, and the filing of the Second Amended Plan on a consensual basis with all of the Mediation Parties, the foundation of which was the Modified Global Plan Settlement (defined below).

### C.   The Modified Global Plan Settlement

The Second Amended Plan is premised on a global settlement between the Mediation Parties (the "Modified Global Plan Settlement"), as further set forth in the First Lien Plan Support Agreement and Crossover Plan Support Agreement, which modifies the First Amended Plan as follows:[3]

- The First Lien Reorganized HoldCo Equity Distribution will now equal 90.5% of the Reorganized HoldCo Common Stock less the General Unsecured Recovery Equity Reserve (subject to dilution by the Management Equity Incentive Plan and Warrants);

---

[3]   The summary provided herein is provided for informational purposes only and is qualified in its entirety by reference to the Second Amended Plan. In the event of any inconsistency between this Disclosure Statement Supplement and the Second Amended Plan, the Second Amended Plan will govern.

- the Second Lien Notes Settlement Equity Distribution will now equal 4.0% of the Reorganized HoldCo Common Stock (subject to dilution by the Warrants and the Management Equity Incentive Plan) and each Holder of a Second Lien Notes Claim will also receive its Pro Rata share of Warrants for an additional 5.132% of Reorganized HoldCo Common Stock (calculated as of the Effective Date and not including any shares issuable upon exercise of the Warrants and not including, and subject to dilution on account of, equity issued under the Management Equity Incentive Plan and, for the avoidance of doubt, any other share issuances following the Effective Date);

- the Second Lien Call Right is eliminated;

- PBGC will now receive on account of the PBGC Claims 5.5% of the Reorganized HoldCo Common Stock (subject to dilution for the Warrants and for any Reorganized HoldCo Common Stock issued pursuant to the Management Equity Incentive Plan) and the PBGC Cash Consideration will now equal $340.0 million; and

- the General Unsecured Recovery Cash Pool will be reduced from $60.0 million to $57.5 million, and the Reorganized Debtors will pay the GUC Oversight Administrator Costs incurred after the Effective Date through the first (1st) anniversary of the Effective Date in an amount not to exceed $500,000 in the aggregate.

### D.    Second Amended Plan

The Debtors have modified the First Amended Plan to reflect the terms of the Modified Global Plan Settlement among the Mediation Parties.[4]  As described more fully herein, and subject in all respects to the terms of the Second Amended Plan itself, the Second Amended Plan, among other things, provides that the First Lien Debt Claims, Second Lien Notes Claims, PBGC Claims, and General Unsecured Claims will receive the treatments set forth in Article III of the Second Amended Plan.

The Debtors believe that Confirmation of the Second Amended Plan represents the best avenue for the Debtors to reorganize and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have therefore prepared this Disclosure Statement Supplement to provide further disclosure with respect to the value-maximizing restructuring transactions encompassed in the Second Amended Plan and described herein and in the Disclosure Statement.

The table below summarizes the classification and treatment of all classified Claims against and Interest in, the Debtors under the Second Amended Plan.  The Second Amended Plan shall apply as a separate plan of reorganization for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth in the Second Amended Plan.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes.  Claims or Interests shall be treated as set forth in Article III.B of the Second Amended Plan.  For all purposes under the Plan, each Class will apply for each of the Debtors.[5]

---

[4]    The Second Amended Plan is attached hereto as **Exhibit A**.  A blackline of the Second Amended Plan that shows the revisions to the First Amended Plan is attached hereto as **Exhibit B.**

[5]    For the avoidance of doubt, estimated Allowed Claim amounts and recoveries in the table below are aggregate Claim amounts and recoveries for all obligated Debtors.

KE 49802002

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Second Amended Plan | Estimated % Recovery Under the First Amended Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0.00 | 100.0% | 100.0% | N/A |
| 2 | Other Secured Claims | Unimpaired | $0.00 | 100.0% | 100.0% | N/A |
| 3(A) | First Lien Debt Claims with respect to each Debtor other than Avaya Holdings Corp. and Sierra Communication International LLC | Impaired | $4,377,586,458[6] | 92.6% | 94.5% | 3.3%-5.5% |
| 3(B) | First Lien Debt Claims with respect to Debtor Avaya Holdings Corp. | Impaired | $3,116,346,187[7] | 92.6% | 94.5% | 0.0% |

---

[6]    Based on the Settled Valuation and other elements of the Modified Global Plan Settlement, including with respect to the treatment of the adequate protection payments made by the Debtors to or for the benefit of Holders of First Lien Debt Claims during the pendency of the Chapter 11 Cases for Plan distribution purposes, the Class 3(A) Allowed First Lien Debt Claims in the amount of $4,609,365,976 will be reduced by payments made as adequate protection solely to the extent by which such adequate protection payments exceed the amount of Encumbered Value that is used to satisfy administrative expenses properly allocable to Unencumbered Value for which there is insufficient Unencumbered Value to satisfy, which reduction is estimated to be approximately $232 million as of the date hereof.  The estimated Class 3(A) Allowed First Lien Debt Claims set forth above already takes into account the foregoing reduction.  For the avoidance of doubt there are no First Lien Debt Claims with respect to the Second Amended Plan for Sierra Communication International LLC.

[7]    Based on the Settled Valuation and other elements of the Modified Global Plan Settlement, including with respect to the treatment of the adequate protection payments made by the Debtors to or for the benefit of Holders of First Lien Debt Claims during the pendency of the Chapter 11 Cases for Second Amended Plan distribution purposes, with respect to the Second Amended Plan for Avaya Holdings Corp., the Class 3(B) Allowed First Lien Debt Claims in Class 3(B) in the amount of $3,281,346,976 will be reduced by the HoldCo Allocation Amount, which reduction is estimated to be approximately $165 million as of the date hereof.  The estimated Class 3(B) Allowed First Lien Debt Claim set forth above already takes into account the foregoing reduction.

KE 49802002

| Class | Classified Claims | Plan Treatment | Estimated Allowed Claims | Estimated % Recovery Under the Second Amended Plan | Estimated % Recovery Under the First Amended Plan | Estimated % Recovery Under Chapter 7 |
|---|---|---|---|---|---|---|
| 4 | Second Lien Notes Claims with respect to each Debtor other than Avaya Holdings Corp. and Sierra Communication International LLC[8] | Impaired | $1,439,960,282[9] | 8.1% | 1.6% | 0.0% |
| 5 | PBGC Claims | Impaired | $1,240,300,000[10] | 37.3% | 37.8% | 0.0% |
| 6 | General Unsecured Claims | Impaired | $305,000,000[11] | 18.9% | 19.7% | 0.0% |
| 7 | Prepetition Intercompany Debtor Claims | Unimpaired | N/A | 100.0% | 100.0% | N/A |
| 8 | Subsidiary Claims | Unimpaired | N/A | 100.0% | 100.0% | N/A |
| 9 | Section 510(b) Claims | Impaired | N/A | 0.0% | 0.0% | N/A |
| 10 | Intercompany Interests | Unimpaired | N/A | 0.0% | 0.0% | N/A |
| 11 | HoldCo Interests | Impaired | N/A | 0.0% | 0.0% | N/A |

[8]    For the avoidance of doubt, there are no Second Lien Claims with respect to the Second Amended Plan for Avaya Holdings Corp. and Sierra Communication International LLC.

[9]    The Allowed Second Lien Notes Claims also includes accrued but unpaid interest as of the Petition Date.

[10]    The Allowed PBGC Claims include $1,240,300,000 on account of unfunded benefit liabilities with respect to the Avaya Salaried Pension Plan (as defined in the Plan), plus any and all unpaid minimum funding contributions due with respect to the Avaya Salaried Pension Plan (as defined in the Plan).

[11]    The estimated amount of Allowed General Unsecured Claims reflects a preliminary estimate based on the initial review of the Debtors and the Notice and Claims Agent of the Proofs of Claim Filed and Claims scheduled, adjusting for certain multi-debtor, duplicative, and/or amended Claims, as well as certain litigation risk and other assumptions. Specifically, as is customary for large technology companies, the Debtors are party to a number of pending lawsuits, legal proceedings, and claims. A number of the Claims Filed in these cases as a result of those proceedings contain estimates and allegations that the Debtors disagree with. As described in Article VI.E of the Disclosure Statement, the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would interfere with the feasibility of the Plan. However, if the Debtors do not prevail in the pending lawsuits, legal proceedings, and claims, then the actual recovery percentage for Allowed General Unsecured Claims may be substantially lower than estimated.

4

## ARTICLE II
## SUMMARY OF PLAN MODIFICATIONS

This section provides a summary of the material modifications to the structure and means for implementation of the Second Amended Plan and the classification and treatment of Claims and Interests under the Second Amended Plan, and is qualified in its entirety by reference to the Second Amended Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement Supplement include summaries of the provisions contained in the Second Amended Plan and in the documents referred to therein. The statements contained in this Disclosure Statement Supplement do not purport to be precise or complete statements of all the terms and provisions of the Second Amended Plan or documents referred to therein, and reference is made to the Second Amended Plan and to such documents for the full and complete statement of such terms and provisions of the Second Amended Plan or documents referred to therein.

The Second Amended Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Second Amended Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against, and Interests in, the Debtors, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Second Amended Plan, and other parties in interest. In the event of any conflict between this Disclosure Statement Supplement, the Disclosure Statement, and the Second Amended Plan or any other operative document, the terms of the Second Amended Plan and/or such other operative document shall control.

### A.    Modifications to the Treatment of Claims

The treatment of Claims against each Debtor (as applicable) pursuant to the Second Amended Plan has been modified solely as set forth below.

1.    Class 3(A) - First Lien Debt Claims with respect to each Debtor other than Avaya Holdings Corp. and Sierra Communication International LLC.

(c)    *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of a First Lien Debt Claim, in each case without duplication among the Debtors, shall receive, its Pro Rata share of, as applicable:

(i)    if the New Secured Debt is syndicated in an amount greater than or equal to the Syndication Amount, such Holder will receive its Pro Rata share of the First Lien Cash Distribution; or

(ii)    if the New Secured Debt is syndicated in an amount less than the Syndication Amount, such Holder will receive its Pro Rata share of the (i) unsyndicated portion of the New Secured Debt and (ii) Cash in an amount equal to the proceeds from the syndication of the New Secured Debt less the New Secured Debt Cash Deductions;

KE 49802002

      (iii)      the First Lien Reorganized HoldCo Equity Distribution;[12] and

      (iv)      distributions of Cash or Reorganized HoldCo Common Stock, if any, from the General Unsecured Recovery Cash Pool Account and/or the General Unsecured Recovery Equity Reserve, as applicable, pursuant to <u>Article IV.F</u> of the Second Amended Plan.

      (v)      On the Effective Date, each Holder of an Allowed Class 3A Claim shall be deemed to have received its Pro Rata share of the Allocation Amount of adequate protection payments as payments of principal on account of such Claims.

2.    <u>Class 3(B) - First Lien Debt Claims with respect to Debtor Avaya Holdings Corp.</u>

    (c)    *Treatment*:

      (i)      On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of a First Lien Debt Claim, in each case without duplication among the Debtors, shall receive, its Pro Rata share of, as applicable, the recoveries provided on account of Class 3(A).

      (ii)      On the Effective Date, each Holder of an Allowed Class 3B Claim shall be deemed to have received its Pro Rata share of the HoldCo Allocation Amount of adequate protection payments as payments of principal on account of such Claims.

3.    <u>Class 4 - Second Lien Notes Claims with respect to each Debtor other than Avaya Holdings Corp. and Sierra Communication International LLC</u>

    (c)    *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims (including with respect to any deficiency Claim), each Holder of Second Lien Notes Claims[13] shall receive, in each case without duplication among the Debtors:

      (i)      its Pro Rata share of the Second Lien Notes Settlement Equity Distribution;[14] and

---

[12]  "<u>First Lien Reorganized HoldCo Equity Distribution</u>" means 90.5% of the Reorganized HoldCo Common Stock less the General Unsecured Recovery Equity Reserve (subject to dilution by the Warrants and the Management Equity Incentive Plan).

[13]  "<u>Second Lien Notes Claims</u>" means any Claim, including any deficiency Claim, against any Debtor arising from or based upon the Second Lien Notes or the Second Lien Notes Indenture, including any Second Lien Diminution in Value Claim. "<u>Second Lien Diminution in Value Claim</u>" means any Claim against the Debtors arising from or related to diminution in value, if any, with respect to the Liens or collateral securing the Second Lien Notes as of the Petition Date, including, if any, any Claims (x) asserting priority under section 507(b) of the Bankruptcy Code on account of the Second Lien Notes (or Liens or collateral securing the Second Lien Notes) or (y) arising under Paragraphs 22(a), 22(b), and/or 22(c) of the DIP Financing Order.

[14]  "<u>Second Lien Notes Settlement Equity Distribution</u>" means a distribution of 4.0% of the Reorganized HoldCo Equity, subject to dilution by the Warrants and the Management Equity Incentive Plan.

KE 49802002

(ii)    its Pro Rata share of the Warrants.

4.    Class 5 - PBGC Claims.

(c)    *Treatment of PBGC Claims with respect to the Avaya Salaried Pension Plan*:  In full and final satisfaction, settlement, release, and compromise of each Allowed PBGC Claim, on the Effective Date PBGC shall receive the treatment pursuant to the PBGC Stipulation of Settlement for the Avaya Salaried Pension Plan, consisting of:

(i)    the PBGC Cash Consideration;[15] and

(ii)    5.5% of the Reorganized HoldCo Common Stock, subject to dilution for the Warrants and for any Reorganized HoldCo Common Stock issued pursuant to the Management Equity Incentive Plan.

5.    Class 6 - General Unsecured Claims.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each such Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata distribution of the General Unsecured Recovery Amount[16] in Cash from the General Unsecured Recovery Cash Pool;[17] provided that such Holder may irrevocably elect to receive the value of such distribution on account of such Claim in the form of Reorganized HoldCo Common Stock (with the number of shares being calculated based on the Reorganized Avaya Total Enterprise Value and subject to dilution for the Warrants and Management Equity Incentive Plan) and not Cash pursuant to a duly completed GUC Election that is submitted on or prior to the Voting Deadline.

For the avoidance of doubt, (x) any Holder of an Allowed General Unsecured Claim that does not submit a duly completed GUC Election on or prior to the Voting Deadline shall receive a distribution on account of such Claim in the form of Cash and not Reorganized HoldCo Common Stock and (y) the aggregate value of all distributions in respect of Allowed General Unsecured Claims shall not exceed the General Unsecured Recovery Amount (whether in the form of Cash or Reorganized HoldCo Common Stock).

---

[15]    "PBGC Cash Consideration" means Cash in an amount equal to $340,000,000, subject to the terms and conditions of the PBGC Settlement.

[16]    "General Unsecured Recovery Amount" means $57,500,000 in aggregate value, less any GUC Oversight Administrator Costs not reimbursed by the Debtors as provided in the Second Amended Plan, in the form of Cash, Reorganized HoldCo Common Stock or a combination of Cash and Reorganized HoldCo Common Stock.

[17]    "General Unsecured Recovery Cash Pool" means Cash in the amount of up to $57,500,000 on account of the Challenge Claims Settlement to (x) fund distributions as provided herein on account of General Unsecured Claims and (y) pay the GUC Oversight Administrator Costs to the extent such costs are not reimbursed by the Reorganized Debtors as provided in the Second Amended Plan.  "GUC Oversight Administrator Costs" means the reasonable costs and expenses of the GUC Oversight Administrator, including reasonable professionals' fees and expenses; provided that the Reorganized Debtors shall reimburse such fees and expenses incurred through the first (1st) anniversary of the Effective Date in an amount not to exceed $500,000 in the aggregate.

7

### B.    Modifications to the Released Parties

Article VIII of the Second Amended Plan has been amended to include Crossover Consenting Creditors,[18] the Second Lien Notes Trustee, and the First Lien Agents as beneficiaries of the Debtor Release and the Third-Party Release, and to add such parties and Holders of Claims who are deemed to accept the Plan and who do not timely submit a duly completed opt-out form in accordance with the Continued Solicitation Order as parties granting such releases.

### C.    Modifications to the Conditions Precedent to the Confirmation Date

1.    Addition of Conditions Precedent to the Effective Date.  Article IX.A of the Second Amended Plan has been amended to add additional conditions, including:

(a)    The Warrant Agreement shall have been executed and all conditions precedent to the issuance of the Reorganized HoldCo Common Stock and the Warrants, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(b)    the Crossover Plan Support Agreement shall be in full force and effect;

(c)    all Ad Hoc First Lien Group Professional Fees, First Lien Notes Trustee Professional Fees, Ad Hoc Crossover Group Fees, Second Lien Notes Trustee And Professional Fees, Cash Flow Credit Facility Agent Professional Fees, and DIP Financing Agent Professional Fees shall have been paid in Cash and in accordance with the terms of the DIP Financing Order, or to the extent not otherwise paid in accordance with the DIP Financing Order, as applicable.

### D.    Modifications to the Plan Supplement

2.    Addition of Documents to the Plan Supplement.  Definition 163 of the Second Amended Plan has been amended to add additional documents, including:

(a)    the GUC Settlement Procedures, which are the procedures governing the rights of the GUC Oversight Administrator with respect to the Allowance of General Unsecured Claims by the Reorganized Debtors (which shall include, for the avoidance of doubt (i) advance notice of the Reorganized Debtors' intention to settle disputed General Unsecured Claims above a certain threshold and an opportunity to object to such settlements, and (ii) the right to file objections to, or motions to estimate, General Unsecured Claims above a certain threshold), on terms to be agreed upon among the Debtors, the Committee, and the Requisite First Lien Creditors, in consultation with the Requisite Crossover Creditors; and

(b)    the Registration Rights Agreement, which is that certain Reorganized HoldCo registration rights agreement, the material terms of which shall be included in the Plan Supplement and shall be reasonably acceptable to the Debtors, the Requisite First Lien Creditors, and the Requisite Crossover Creditors.

---

[18]    "Crossover Consenting Creditors" means the Holder Parties (as defined in the Crossover Plan Support Agreement).

KE 49802002

## ARTICLE III
## CONTINUED SOLICITATION AND VOTING PROCEDURES

On October [__], 2017, the Bankruptcy Court entered the *Order (I) Approving the Debtors' Continued Solicitation of the Second Amended Plan and the Adequacy of the Supplemental Disclosure in Connection Therewith, (II) Establishing Certain Deadlines and Procedures in Connection with Plan Confirmation and Shortening Notice with Respect Thereto, (III) Approving the Form of Ballot in Connection Therewith, and (IV) Granting Related Relief* [Docket No. ____] (the "Continued Solicitation Order"). Among other things, the Continued Solicitation Order provides the following dates and deadlines related to confirmation of the Second Amended Plan:

- **Plan Supplement Deadline**. Establishing the date that is ten days prior to the Voting Deadline, **November 6, 2017**, as the deadline for filing and serving the Plan Supplement;

- **Voting Deadline**: **November 16, 2017, at 5:00 p.m.**, prevailing Eastern Time. **All** Ballots must be properly executed, completed, and delivered so that they are **actually received** (the "Voting Deadline") by Prime Clerk LLC (the "Notice and Claims Agent");

- **Plan Objection Deadline**: **November 16, 2017, at 5:00 p.m.**, prevailing Eastern Time (the "Second Amended Plan Objection Deadline"). All objections to confirmation of the Second Amended Plan must be filed with the Bankruptcy Court and served so as to be **actually received** by the appropriate notice parties.

- **Confirmation Hearing**: **November 21, 2017** as the date for the hearing at which the Bankruptcy Court will consider confirmation of the Second Amended Plan (the "Confirmation Hearing Date").

Other than as set forth in the Continued Solicitation Order, all provisions of the Disclosure Statement Order remain in full force and effect; including, for the avoidance of doubt, (a) August 25, 2017 being set as the Voting Record Date; and (b) the following as the deadlines for any objection by a contract or lease counterparty (each, an "Assume/Reject Objection") to a proposed rejection or assumption of an executory contract or unexpired lease or the related cure cost (each, a "Proposed Assumption/Rejection"): (i) the Plan Objection Deadline as the deadline for any Assume/Reject Objection to a Proposed Assumption/Rejection as set forth in the Debtors' Plan Supplement, or (ii) thirty days following the Effective Date date as the deadline for any Assume/Reject Objection to a Proposed Assumption/Rejection to the extent the Debtors modify the Assumed Executory Contract/Unexpired Lease Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule in accordance with the Plan, solely with respect to such modification; provided, that if a Holder of a Claim timely submits a new Ballot on the Second Amended Plan, such Ballot will replace any previously submitted Ballot on the First Amended Plan. For the avoidance of doubt, if a Ballot is submitted for the First Amended Plan and no subsequent Ballot is received for the Second Amended Plan, the Ballot received for the First Amended Plan shall count towards the Second Amended Plan.

The Second Amended Plan, the Disclosure Statement, the Continued Solicitation Order, the Disclosure Statement Order, and all other pleadings in the Chapter 11 Cases may also be obtained by (i) visiting https://cases.primeclerk.com/avaya, (ii) writing to the Notice and Claims Agent at Avaya Inc. Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022, (iii) calling the Notice and Claims Agent at (855) 252-2156, (iv) emailing avayaballots@primeclerk.com, or (v) for a fee via PACER at http://www.nysb.uscourts.gov.

## ARTICLE IV
## ADDITIONAL RISK FACTORS

**A.      The Debtors May Not Be Able to Consummate the Transactions Contemplated by the Modified Global Plan Settlement.**

In the event that either the First Lien Plan Support Agreement or the Crossover Plan Support Agreement is terminated in accordance with its terms, the Debtors may be unable to consummate the Second Amended Plan and the First Lien Consenting Creditors or Crossover Consenting Creditors may terminate their support for the Second Amended Plan prior to the Confirmation or Consummation of the Second Amended Plan.  This loss would result in the loss of support for the Second Amended Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Second Amended Plan.

**B.      The Debtors May Not Be Able to Satisfy the Conditions Precedent to Consummation of the Second Amended Plan.**

To the extent that the Debtors are unable to satisfy the conditions precedent to consummation of the Second Amended Plan, the Debtors may be unable to consummate the Second Amended Plan and the First Lien Consenting Creditors or Crossover Consenting Creditors may terminate their support for the Second Amended Plan prior to the Confirmation or Consummation of the Second Amended Plan.  This loss would result in the loss of support for the Second Amended Plan by important creditor constituents.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Second Amended Plan.

## ARTICLE V
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences of the modifications to the treatment of Allowed Claims in Class 4 as modified under the Second Amended Plan to certain U.S. Holders (defined below).  The following discussion does not address the U.S. federal income tax consequences to Holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) in Classes other than Class 4.  This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement Supplement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Second Amended Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed in this Disclosure Statement Supplement.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances, nor does it address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers, subchapter S corporations, trusts, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, persons who are related to the Debtors

within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims in Class 4, Reorganized HoldCo Common Stock or Warrants who are themselves in bankruptcy, persons who received their Claims in Class 4, Reorganized HoldCo Common Stock or Warrants pursuant to the exercise of an employee stock option or otherwise as compensation (including deferred compensation and pension benefits), and those holding, or who will hold, Claims in Class 4, or Reorganized HoldCo Common Stock or Warrants or other certain assets, as part of a hedge, straddle, conversion, or constructive sale transaction) or U.S. Holders (as defined below) whose "functional currency" is not the U.S. dollar. The following summary does not address a Holder of Reorganized HoldCo Common Stock or Warrants other than such a Holder that received their Reorganized HoldCo Common Stock or Warrants in exchange for their Claim in Class 4 pursuant to the Second Amended Plan (or in the case of Reorganized HoldCo Common Stock that received such stock pursuant to the exercise of a Warrant). This summary assumes that a Holder of Claims in Class 4 holds Claims only in Class 4.  Furthermore, the following summary of certain U.S. federal income tax consequences of the Second Amended Plan does not purport to address any aspect of state, local, estate, gift, non-U.S., non-income or other tax law or the Medicare tax.  Lastly, the following discussion assumes (i) each Holder of a Claim holds its Claim as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the IRC, (ii) the debt obligations(s) underlying each Claim is properly treated as debt (rather than equity) of the applicable Debtor, (iii) that none of the debt obligations underlying the Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and (iv) that each of the debt obligations underlying the Claims in Class 4 is denominated in U.S. dollars.

For purposes of this discussion, a "U.S. Holder" is a Holder (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity.  Partners (or other owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Second Amended Plan.

To the extent of any inconsistencies or conflict between the summary in this section of the Disclosure Statement Supplement and the section of the Disclosure Statement entitled "XI. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," (for purposes of this discussion, the "Disclosure Statement Tax Section") this summary shall supersede the Disclosure Statement Tax Section.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Second Amended Plan in accordance with the Second Amended Plan and as further described herein and in the Second Amended Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

Except as otherwise specifically provided herein, this discussion assumes that any exchange of any Allowed Claim in Class 4 for Reorganized HoldCo Common Stock and Warrants will occur with Avaya Inc. (rather than HoldCo).

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, NON-U.S., AND OTHER TAX CONSEQUENCES OF THE SECOND AMENDED PLAN.**

**A.** *Consequences to U.S. Holders of Allowed Claims in Class 4*

*Receipt of Second Lien Notes Settlement Equity Distribution and Warrants*

Under the Second Amended Plan, as part of the exchange of its Allowed Claim in Class 4 a U.S. Holder of such Claim shall receive its Pro Rata share of the Second Lien Notes Settlement Equity Distribution and its Pro Rata share of the Warrants.

Treatment of U.S. Holders of Allowed Claims in Class 4 assuming that any transfer of Reorganized HoldCo Common Stock and Warrants in exchange for any such Claims will be made by and with Avaya Inc.

If any transfer of Reorganized HoldCo Common Stock and Warrants in exchange for any Allowed Claim in Class 4 will be made by and with Avaya Inc., this will constitute a fully taxable exchange under section 1001 of the IRC for a U.S. Holder of such Allowed Claim. Accordingly, each U.S. Holder of an Allowed Claim in Class 4 generally should recognize gain or loss in the exchange equal to the difference between (i) the sum of the fair market value of the Reorganized HoldCo Common Stock received plus the fair market value of the Warrants received (in each case, to the extent such consideration is not allocable to accrued but unpaid interest on such claim which will be treated as discussed in the section of the Disclosure Statement Tax Section entitled "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—4. Accrued Interest") and (ii) such U.S. Holder's adjusted tax basis in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of such Claim in such U.S. Holder's hands, whether such Claim constitutes a capital asset in the hands of the U.S. Holder, whether such Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to such Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held such Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. In addition, see the discussion regarding market discount in the section of the Disclosure Statement Tax Section entitled "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—5. Market Discount." A U.S. Holder's tax basis in any Reorganized HoldCo Common Stock and Warrants received should equal the fair market value of such Reorganized HoldCo Common Stock and Warrants, respectively, as of the date such Reorganized HoldCo Common Stock and Warrants are distributed to the U.S. Holder (other than any Reorganized HoldCo Common Stock and Warrants received that are attributable to any accrued but unpaid interest which will have an initial tax basis in a U.S. Holder's hands equal to such accrued interest). A U.S. Holder's holding period for the Reorganized HoldCo Common Stock and Warrants received should each begin on the day following the Effective Date.

Treatment of U.S. Holders of Allowed Claims in Class 4 if some or all of the transfer of Reorganized
HoldCo Common Stock in exchange for a portion of any such Claim will be made by and with HoldCo

It is possible that some or all of the transfer of Reorganized HoldCo Common Stock and Warrants in exchange for any Allowed Claims in Class 4 will be made by and with HoldCo. This section describes the tax consequences to a U.S. Holder of an Allowed Claim in Class 4 that exchanges at least a portion of such Claim with HoldCo for at least some amount of Reorganized HoldCo Common Stock.

To the extent the transfer of Reorganized HoldCo Common Stock in exchange for a portion of an Allowed Claim in Class 4 is made by and with HoldCo and such transfer constitutes a "351 exchange" under the IRC, a U.S. Holder exchanging the Class 4 Claim (or portion thereof) in such exchange would not recognize loss on the exchange and would generally not be required to recognize income or gain on the exchange other than (x) to the extent any Warrants received, if any, and the Reorganized HoldCo Common Stock received are attributable to accrued but untaxed interest on the Class 4 Claim, which will be treated as discussed in the section of the Disclosure Statement Tax Section entitled "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—4. Accrued Interest" and (y) in an amount equal to the lesser of (i) such U.S. Holder's "realized gain" from the exchange (generally the excess of the sum of the fair market value of the Reorganized HoldCo Common Stock received and the Warrants received in the exchange, if any, over such U.S. Holder's adjusted tax basis in the Class 4 Claim (or portion thereof) exchanged) or (ii) the fair market value of the Warrants received, if any (in each of the case of clauses (i) and (ii) of this sentence, not including the fair market value of any Warrants received, if any, and the Reorganized HoldCo Common Stock received (as applicable) that are attributable to accrued but unpaid interest on the Class 4 Claims (or the applicable portion thereof)). If any such gain described in clause (y) of the previous sentence is capital gain it would generally be long-term capital gain if the U.S. Holder's holding period for the Class 4 Claim (or portion thereof) so exchanged was more than one year at the time of the exchange. In addition, see the discussion regarding market discount in the section of the Disclosure Statement Tax Section entitled "—B. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Certain Allowed Claims, New Secured Debt and Reorganized HoldCo Common Stock—5. Market Discount." Except to the extent the Warrants received in the exchange, if any, are attributable to accrued but unpaid interest on the Class 4 Claim (or portion thereof), the U.S. Holder's tax basis in the Warrants received in the exchange, if any, would be equal to the fair market value of such Warrants at the time of the exchange and the U.S. Holder will have a holding period in such Warrants that begins the day following the Effective Date.

Except to the extent the Reorganized HoldCo Common Stock received is attributable to accrued but unpaid interest on the Class 4 Claim (or portion thereof) exchanged, a U.S. Holder's holding period for the Reorganized HoldCo Common Stock received in such an exchange will include the period of time during which the U.S. Holder held the corresponding Class 4 Claim, and such U.S. Holder's initial tax basis in the Reorganized HoldCo Common Stock will equal the adjusted tax basis in such Class 4 Claim (or portion thereof) exchanged immediately prior to the exchange (assuming no joint election has been made by such Holder and HoldCo to reduce the basis of the Holder's stock to fair market value), decreased by the fair market value of the Warrants received in the exchange, if any, and increased by the amount of gain recognized, if any. The adjusted tax basis of the Class 4 Claim (or applicable portion thereof) generally will equal a U.S. Holder's purchase price for the Class 4 Claim, as reduced in the event that the U.S. Holder claimed a bad debt deduction with respect to the the Class 4 Claim, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest."

Any portion of the Reorganized HoldCo Common Stock received in the exchange or Warrants received, if any, that are attributable to accrued but unpaid interest will have an initial tax basis in a U.S.

13

Holder's hands equal to such accrued interest and a holding period that begins the day following the Effective Date.

If any such exchange of the Class 4 Claim (or portion thereof) to HoldCo does not qualify as a "351 exchange" under the IRC, such exchange will constitute a fully taxable exchange under section 1001 of the IRC subject to the rules described above in "—A. Consequences to U.S. Holders of Allowed Claims in Class 4—Receipt of Second Lien Notes Settlement Equity Distribution and Warrants—Treatment of U.S. Holders of Allowed Claims in Class 4 assuming that any transfer of Reorganized HoldCo Common Stock and Warrants in exchange for any such Claims will be made by and with Avaya Inc."

Regardless of whether any such exchange does qualify as a "351 exchange," any transfer of Reorganized HoldCo Common Stock and/or Warrants in exchange for a portion of any such Claims that is made by and with Avaya Inc. will be a fully taxable exchange under section 1001 of the IRC subject to the rules described above in "—A. Consequences to U.S. Holders of Allowed Claims in Class 4—Receipt of Second Lien Notes Settlement Equity Distribution and Warrants—Treatment of U.S. Holders of Allowed Claims in Class 4 assuming that any transfer of Reorganized HoldCo Common Stock and Warrants in exchange for any such Claims will be made by and with Avaya Inc."

*Exercise, Sale or Other Disposition, or Expiration of Warrants*

Except as discussed below with respect to the cashless exercise of a Warrant, in general, a U.S. Holder will not be required to recognize income, gain or loss upon the exercise of a Warrant by payment of the exercise price. A Holder's tax basis in a share of Reorganized HoldCo Common Stock received upon exercise will be equal to the sum of (1) the U.S. Holder's tax basis in the Warrant and (2) the exercise price of the Warrant. A U.S. Holder's holding period in the Reorganized HoldCo Common Stock received upon exercise will commence on the day after such U.S. Holder exercises the Warrants.

The tax consequences of a cashless exercise of a Warrant are not clear under current tax law. A cashless exercise may be tax-deferred, either because the exercise is not a gain realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either tax-deferred situation, a U.S. Holder's basis in the Reorganized HoldCo Common Stock received would equal the U.S. Holder's basis in the Warrant. If the cashless exercise were treated as not being a gain realization event, a U.S. Holder's holding period in the Reorganized HoldCo Common Stock would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the Warrant. If the cashless exercise were treated as a recapitalization, the holding period of the Reorganized HoldCo Common Stock would include the holding period of the Warrant.

It is also possible that a cashless exercise could be treated in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. Holder could be deemed to have surrendered Warrants equal to the number of shares of Reorganized HoldCo Common Stock having a value equal to the exercise price for the total number of Warrants to be exercised. The U.S. Holder would generally recognize capital gain or loss in an amount equal to the difference between the fair market value of the Reorganized HoldCo Common Stock represented by the Warrants deemed surrendered and the U.S. Holder's tax basis in the Warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the Reorganized HoldCo Common Stock received would equal the sum of the fair market value of the Reorganized HoldCo Common Stock represented by the Warrants deemed surrendered and the U.S. Holder's tax basis in the Warrants exercised. A U.S. Holder's holding period for the Reorganized HoldCo Common Stock would commence on the date following the date of exercise (or possibly the date of exercise) of the Warrant.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, there can be no assurance which, if any, of the alternative tax consequences and holding periods described

above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the tax consequences of a cashless exercise.

In the case of any sale transaction involving Reorganized HoldCo in which the consideration paid to non-employee stockholders of Reorganized HoldCo consists in whole or in part of securities that occurs prior to the expiration date of the Warrants that causes the Warrants to automatically become exercisable for the kind and amount of securities the U.S. Holder of the Warrants would have owned immediately after such sale transaction if such U.S. Holder had exercised the Warrants in respect of such shares of Reorganized Holdco Common Stock immediately before the effective date of the transaction, there is a risk that for U.S. federal income tax purposes the Warrants will be treated as having been "exchanged" by the U.S. Holders of such warrants for "new warrants." The tax consequences to U.S. Holders of any such deemed exchange would depend on the facts of the particular transaction. U.S. Holders of Warrants are urged to consult their tax advisor regarding the tax consequences of exercise, disposition and expiration of the Warrants in connection with any such sale transaction.

For U.S. federal income tax purposes, gain or loss realized on the sale or other taxable disposition of a Warrant (including an exchange of the Warrant for cash if Reorganized HoldCo is sold prior to the expiration date of the Warrants in a transaction in which all of the consideration paid to non-employee stockholders of Reorganized HoldCo consists of cash and certain other conditions are met) generally will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder held the Warrant for more than one year at the time of the sale or other disposition. The amount of the gain or loss will equal the difference between the U.S. Holder's tax basis in the Warrants disposed of and the amount realized on the disposition.

If a Warrant expires (or is deemed to expire for no consideration in the case of certain sale transactions if certain conditions are met) without being exercised, a U.S. Holder will generally recognize a capital loss in an amount equal to such U.S. Holder's tax basis in the Warrant. This loss generally will be long-term capital loss if, at the time of the expiration, the U.S. Holder's holding period in the Warrant is more than one year. The deductibility of capital losses is subject to limitations.

The rules applicable to the treatment of warrants are complex, particularly in the context of warrants acquired in a complex transaction such as this one. U.S. Holders of Warrants are urged to consult their tax advisors to review and determine the tax consequences associated with the receipt, exercise, disposition and expiration of the Warrants.

*Constructive Dividends on Warrants*

Under Section 305 of the Code, if certain adjustments are made (or not made) to the number of shares to be issued upon the exercise of a Warrant or to the Warrant's exercise price, a U.S. Holder may be deemed to have received a constructive distribution with respect to the Warrant, which could result in adverse consequences for the U.S. Holder, including the inclusion of dividend income. The rules governing constructive distributions are complex and U.S. Holders are urged to consult their tax advisors on the tax consequences of any such constructive distribution.

*Tax Consequences of Ownership and Disposition of Reorganized HoldCo Common Stock received pursuant to the exercise of a Warrant*

Distributions on, and the sale exchange or other disposition of, Reorganized HoldCo Common Stock received pursuant to the exercise of a Warrant generally will be subject to the rules described in the section of the Disclosure Statement Tax Section entitled "—U.S. Federal Income Tax Consequences to U.S. Holders of Reorganized HoldCo Common Stock."

**B.      *Consequences to Non-U.S. Holders of Allowed Claims in Class 4***

The following discussion includes only certain U.S. federal income tax consequences of the modifications to the treatment of Allowed Claims in Class 4 to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Second Amended Plan to such Non-U.S. Holder and the ownership and disposition of the Reorganized HoldCo Common Stock and the Warrants.

*Receipt of Second Lien Notes Settlement Equity Distribution and Warrants*

Whether a Non-U.S. Holder realizes income, gain or loss on the exchange of such Non-U.S. Holder's Allowed Claim in Class 4 and the amount of such income, gain or loss is determined in the same manner as these consequences are determined for U.S. Holders as described above under "—(A) Consequences to U.S. Holders of Allowed Claims in Class 4—Receipt of Second Lien Notes Settlement Equity Distribution and Warrants." The recognition of gain and the receipt of amounts attributable to accrued and unpaid interest in the exchange are subject to the rules described in the sections of the Disclosure Statement Tax Section entitled "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims—1. U.S. Federal Income Tax Consequences to Non U.S. Holders of Allowed Class 3, 3(A), Class 3(B), Class 4, and Class 6 Claims—(a) Gain Recognition" and "—1. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Class 3, 3(A), Class 3(B), Class 4, and Class 6 Claims—(b) Accrued Interest," respectively.

*Exercise, Sale or Other Disposition, or Expiration of Warrants*

The U.S. federal income tax characterization of a Non-U.S. Holder's exercise or lapse of a Warrant generally will correspond to the U.S. federal income tax characterization of the exercise or lapse of a Warrant by a U.S. Holder, as described above under "—(A) Consequences to U.S. Holders of Allowed Claims in Class 4—Exercise, Sale or Other Disposition, or Expiration of Warrants." However, if an expiration of a Warrant gives rise to capital loss or if a cashless exercise of Warrants results in a taxable exchange, as described above under "—(A) Consequences to U.S. Holders of Allowed Claims in Class 4—Exercise, Sale or Other Disposition, or Expiration of Warrants," the rules described in the section of the Disclosure Statement Tax Section entitled "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims—2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Secured Debt—(b) Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock" generally would apply.

The sale or other disposition of Warrants (including any deemed exchange) will generally be subject to the rules described in the section of the Disclosure Statement Tax Section entitled "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims—2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Secured Debt—(b) Sale, Redemption, or Repurchase of Reorganized HoldCo Common Stock."

*Constructive Dividends on Warrants*

Any constructive distributions a Non-U.S. Holder may be deemed to receive as generally determined by the rules described above under "—(A) Consequences to U.S. Holders of Allowed Claims in Class 4—Constructive Dividends on Warrants," will generally be subject to the rules described in the section of the Disclosure Statement Tax Section entitled "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims—2. U.S. Federal Income Tax

Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Secured Debt—(a) Dividends on Reorganized HoldCo Common Stock." The rules governing constructive distributions are complex and Non-U.S. Holders are urged to consult their tax advisors on the tax consequences of any such constructive distribution. In the case of any constructive dividend, it is possible that any U.S. federal tax on the constructive dividend would be withheld from shares of Reorganized HoldCo Common Stock, or from sales proceeds subsequently paid or credited or other amounts payable or distributable to a Non-U.S. Holder.

*Tax Consequences of Ownership and Disposition of Reorganized HoldCo Common Stock received pursuant to the exercise of a Warrant*

Distributions on, and the sale exchange or other disposition of, Reorganized HoldCo Common Stock received pursuant to the exercise of a Warrant generally be subject to the rules applicable to Reorganized HoldCo Common Stock described in the section of the Disclosure Statement Tax Section entitled "—C. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims—2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of Reorganized HoldCo Common Stock and New Secured Debt."

**C.     *FATCA, Information Reporting and Backup Withholding***

For purposes of the FATCA rules that are described in the section of the Disclosure Statement Tax Section entitled "—D. FATCA," any constructive distributions on the Warrants and any distributions on Reorganized HoldCo Common Stock are "withholdable payments" and "gross proceeds" includes gross proceeds from the sale or other disposition of the Warrants and Reorganized HoldCo Common Stock.

The information reporting and backup withholding rules described in the section of the Disclosure Statement Tax Section entitled "—E. Information Reporting and Backup Withholding," may apply in respect of the receipt of the Warrants and the Reorganized HoldCo Common Stock and to certain payments made (or deemed made in the case of constructive distributions on the Warrants) in respect of the Warrants and the Reorganized HoldCo Common Stock.

**ARTICLE VI
RECOMMENDATION AND CONCLUSION**

In the opinion of the Debtors, the Second Amended Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Second Amended Plan vote to accept the Second Amended Plan and support Confirmation of the Plan.

Dated:  October 24, 2017              Respectfully submitted,

                                      Avaya Inc.,
                                      on behalf of itself and each of the other Debtors


                                      By:      */s/ Eric Koza*
                                      Name:   Eric Koza
                                      Title:   Chief Restructuring Officer
                                               Avaya Inc. and its Affiliated Debtors and Debtors
                                               in Possession

**<u>Exhibit A</u>**

**Second Amended Plan**

**[Filed Separately on the Docket]**

KE 49802002

## Exhibit B

**Second Amended Plan (Blackline Version)**

**[Filed Separately on the Docket]**

KE 49802002