```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X
In re:                                           :
                                                 :
         AVAYA, INC.,                            :     Chapter 11
                                                 :     Case No. 17-10089 (SMB)
                       Debtor.                   :
-------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER GRANTING SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT AND ALLOWING CLAIM 3103 IN PART

**A P P E A R A N C E S:**

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022

    James H.M. Sprayregen, P.C.
    Jonathan S. Henes, P.C.
        Of Counsel

   - and -

300 North LaSalle Street
Chicago, Illinois 60654

    Patrick J. Nash, Jr., P.C.
    Christina L. Briesacher, Esq.
        Of Counsel

*Attorneys for Avaya Inc.*

ALAN WATTENMAKER
c/o AMI, CFC AWvAV
127 West 83rd Street
Apartment 501
New York, New York 10024-0501

*Pro Se*

**STUART M. BERNSTEIN**
**UNITED STATE BANKRUPTCY JUDGE:**

Alan Wattenmaker, a former employee of the debtor Avaya, Inc. ("Avaya"),[1] filed secured, priority claim no. 3103 in the amount of "$170,000.00 +" (the "*Claim*") on May 5, 2017.[2] The Court granted partial summary judgment to Avaya relating to its *Objection*[3] to the *Claim*, (*Memorandum Decision and Order Granting Motion for Partial Summary Judgment*, dated Apr. 22, 2019 ("*Prior Decision*") (ECF Doc. # 2329)), and identified three open issues that needed to be resolved before the *Objection* could be fully adjudicated.   Avaya has now made a supplemental motion for summary judgment on these issues.  (*Avaya Inc.'s Supplemental Motion for Summary Judgment and Memorandum of Law in Support*, dated May 10, 2019 ("*Motion*") (ECF Doc. # 2341).)  Wattenmaker opposes the *Motion*.  (*See (Updated) Notice of Claimant's Opposition to Avaya Inc.'s Supplemental Summary Judgment Motion with Regard to Claim 3103*, dated June 13, 2019 ("*Opposition*") (ECF Doc. # 2372).)

For the reasons that follow, the *Motion* is granted, and the *Claim* is allowed to the extent set forth in this decision.

---

[1]    References to Avaya include its predecessor, Lucent Technologies Inc., where appropriate.

[2]    A copy of Wattenmaker's claim is annexed as Exhibit B to the *Debtors' Sur-Reply in Support of Debtors' Objection to Proof of Claim Number 3103 Filed by Alan Wattenmaker*, dated Apr. 19, 2018 ("*Sur-Reply*") (ECF Doc. # 1942).  "ECF Doc." refers to the docket entry on the CM/ECF case docket.

[3]    *Debtor's Eighth Omnibus Objection to Certain: (I) Amended Claims; (II) No Liability Claims; and (III) Claims to Be Modified*, dated Feb. 5, 2018 ("*Objection*") (ECF Doc. # 1785).

## BACKGROUND

The background is set forth in the *Prior Decision*, familiarity with which is assumed. I limit the background discussion to the facts necessary to explain this decision.

Avaya hired Wattenmaker on April 20, 1998 and terminated him from employment on June 11, 2009. In June 2012, he commenced an action against Avaya in the New York Supreme Court claiming discrimination based on age, religion and disability. The parties settled the action following mediation on or about November 26, 2013 and memorialized the terms in a Settlement Term Sheet.[4] The Settlement Term Sheet provided in relevant part that (i) Avaya would reinstate Wattenmaker for one day on January 13, 2014 and Wattenmaker would voluntarily retire the same day; (ii) Wattenmaker would be entitled to sixteen years of service credit (as opposed to his actual service credit of roughly eleven years); (iii) Wattenmaker would get the pension, employment retirement medical benefits and the retirement benefits to which he would be entitled under the collective bargaining agreement with the Communications Workers of America ("CWA"), based on the retirement date of January 13, 2014; and (iv) Avaya would pay Wattenmaker $92,000.00 (Settlement Term Sheet at ¶¶ 2, 3.) The Settlement Term Sheet contemplated a more formal agreement but the parties never executed one. Further litigation ensued and the Supreme Court concluded in a decision

---

[4] A copy of the Settlement Term Sheet is annexed to the *Declaration of Christina L. Briesacher in Support of Avaya Inc.'s Motion for Summary Judgment*, dated Nov. 21, 2018 ("*Briesacher Declaration*") (ECF Doc. # 2250, at ECF pp. 227-28 of 271).

dated July 22, 2016 that the Settlement Term Sheet was a binding agreement. *Wattenmaker v. Avaya, Inc.*, Index No. 102877/2012 (N.Y. Sup. Ct. July 22, 2016).[5]

Following the commencement of the chapter 11 case, Wattenmaker filed the *Claim*.[6] The principal components of the *Claim* were the $92,000 Avaya agreed to pay pursuant to the Settlement Term Sheet and Wattenmaker's pension benefits. He also claimed he was entitled to "retirement benefits TBD," interest from January 2014 (also to be determined) and "expenses TBD." After Avaya filed the *Objection*, Wattenmaker updated his computations in an email to Avaya as follows:

> Payment due $92,000, pension 49 months @2000/mo. = $98,000, Legal expenses approximately $30,000, interest from approximately January, 2014 @ 5% $11,000/year, times = 5 years = $55,000, expenses TBD = approximate total $275,000

(*Sur-Reply* at ¶ 4 & Ex. C.) When informal attempts to resolve the *Objection* failed, Avaya filed the *Supplemental Declaration of James Kobar in Support of the Debtors' Eighth Omnibus Objection to Certain: (I) Amended Claims; (II) No Liability Claims; and (III) Claims to Be Modified with Respect to Claim No. 3103*, dated July 11, 2018 ("*Kobar Declaration*") (ECF Doc. # 2094) in support of the *Objection*.

The *Prior Decision* concluded that Wattenmaker was entitled to a monthly pension benefit in the sum of $1,123.68 beginning on February 1, 2013 and an allowed unsecured claim in the sum of $92,000.00 plus interest on that claim to the petition date. The Court rejected Wattenmaker's arguments including his contentions that he

---

[5]   A copy of this decision is annexed to the *Briesacher Declaration*, at ECF pp. 230-38.

[6]   Wattenmaker actually filed twenty-five claims but all of his claims except the *Claim* have been expunged. (*Avaya's Motion for Summary Judgment and Memorandum of Law in Support*, dated Nov. 21, 2018, at 2 n.3 (ECF Doc. # 2248).)

4

was still employed by Avaya and that Avaya had breached the Settlement Term Sheet or that he was entitled to retirement benefits that Avaya had failed to provide. At the conclusion of the *Prior Decision*, the Court identified three open questions that were not addressed in Avaya's motion: (1) Wattenmaker's right to legal fees and "expenses TBD"; (2) whether Wattenmaker's refusal to accept his pension checks stopped the running of interest on the unpaid amounts; and (3) the date on which interest started to accrue on the $92,000.00 under N.Y.C.P.L.R. § 5001. Wattenmaker had argued that interest started to accrue the date the Settlement Term Sheet was signed — November 26, 2013. Avaya argued that it started to accrue the date the New York Supreme Court entered a judgment in September 2016 after it determined that the Settlement Term Sheet was binding. Avaya has now acceded to the November 26, 2013 date and agrees that interest accrues at the C.P.L.R. rate of 9% per annum, (*Motion* at 7-8), leaving only the first two open questions to consider.

## DISCUSSION

### A.    Legal Fees and Expenses and Other Benefits

Under Federal Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the Federal Bankruptcy Rules constitutes *prima facia* evidence of the validity and amount of the debt. To meet this standard, the claimant must allege facts sufficient to support the claim. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Lehman Bros. Holdings, Inc.*, 602 B.R. 564, 574 (Bankr. S.D.N.Y. 2019). If he does, the burden of going forward shifts to the objector to submit some evidence to rebut the *prima facie* validity of the claim. *Allegheny*, 954 F.2d at 173; *In re Dreier, LLP*, 544 B.R. 760, 766 (Bankr. S.D.N.Y. 2016), *aff'd*, No. 16CV575-LTS-RLE, 2016 WL

5

3920358 (S.D.N.Y. July 15, 2016), *aff'd*, 683 F. App'x 78 (2d Cir. 2017). If the objector meets this burden, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence. *Allegheny*, 954 F.2d at 174; *In re Residential Capital, LLC*, 552 B.R. 50, 68 (S.D.N.Y. 2015)

Except for the $92,000, the *Claim* does not allege facts sufficient to support the claim. The *Claim* includes a monetary demand, in part unliquidated, and attaches the Settlement Term Sheet, the New York Supreme Court's decision and order enforcing the Settlement Term Sheet and the Notice of Entry of Judgment but nothing else. The attachments do not show that any debts for legal fees, legal expenses or other benefits exist and the *Claim* does not liquidate those sums. The Settlement Term Sheet does state that in addition to $92,000.00, Wattenmaker is entitled to the "pension, employment retirement medical benefits and retirements" under the relevant collective bargaining agreement ("CBA") but the *Claim* does not attach the CBA or identify the benefits to which Wattenmaker thinks he is entitled but has been denied. Thus, the *Claim* is not *prima facie* evidence of the debt except for $92,000 which is not in dispute.

Even if the *Claim* is *prima facie* evidence of the debt, Avaya has rebutted it and shifted the ultimate burden of persuasion back to Wattenmaker. The Court has already dealt with the pension. Under the "American Rule," a litigant must bear his own attorneys' fees, unless a contract or statute provides otherwise. *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015). Wattenmaker has not identified any basis to award legal fees and the Court is aware of none. In addition, while Federal Bankruptcy Rule 7054(b), made applicable to this contested matter by Federal Bankruptcy Rule

6

9014(c), may authorize an award of costs to the prevailing party, Wattenmaker has not prevailed.

This leaves Wattenmaker's retirement benefits which apparently refers to retirement health care and medical benefits. He contends that Avaya was obligated to pay for his medical insurance, copays, and associated expenses and he is entitled to be reimbursed. However, he says he cannot quantify his claim because the Court has not yet determined what those benefits are and Avaya has refused to answer discovery requests (and the Court has stayed discovery) relating to the scope of those benefits. (*Opposition* at 5.)

Wattenmaker is mistaken. The record includes a letter dated Aug. 1, 2016, from Avaya to Wattenmaker, explaining his health benefits. (*See Kobar Declaration*, Ex. F, at ECF pp. 239-44 of 244.) The letter contains hyperlinks to the various health care plans. Importantly, the letter states that effective January 1, 2017, Avaya will no longer be providing medical and prescription drug coverage to represented retirees like Wattenmaker who retired before October 15, 2015. After that date, retirees had to go into the marketplace and buy their own coverage through an exchange. (*Id.*, Ex. F, at ECF p. 239 of 244.) In addition, Avaya would no longer offer a subsidy to represented retirees to cover their Medicare Part B premiums. (*Id.*, Ex. F, at ECF p. 242 of 244.) While Avaya would fund a Health Reimbursement Account ("HRA") of up to $2,200.00 per annum for a single represented retiree, the retiree had to meet eligibility requirements. (*Id.*, Ex. F, at ECF p. 241 of 244.) The letter advised Wattenmaker of the time and place of in-person/live meetings and telephonic educational meetings

7

sponsored by the exchange identified in the letter. (*Id.*, Ex. F, at ECF pp. 242-43 of 244.)

One obstacle in dealing with this matter is that Wattenmaker views it as an educational experience rather than a litigation. As noted, he expects the Court to identify his benefits and then and only then will he be able to quantify his claim. The Court has explained in the past to Wattenmaker that it is not its function to identify his benefits for him; he must identify the benefits that he claims he has not received and assert them as part of his claim. He, not Avaya, knows how much he has paid for health benefits, and he, not Avaya, has the information necessary to liquidate his claim. The aforementioned letter and the hyperlinks provided him with all the information he needed to do determine his health benefits, at least for periods after January 1, 2017, and since he has not identified any earlier health benefits he claims to have been denied, I cannot conclude that the earlier plans are relevant. Furthermore, although he might be eligible to receive reimbursements from the HRA, he has not shown that he meets the requirements for an HRA reimbursement.

Accordingly, Wattenmaker's claims relating to health benefits (or any other retirement benefits) are expunged subject to reconsideration, *see* 11 U.S.C. § 502(j), if he can identify any pre-petition benefits that that he was entitled to receive but was denied.

**B.     Interest on Pension Payments**

Avaya had been paying Wattenmaker a monthly pension in the amount of $754.21, based on his original June 11, 2009 termination date. The first pension check was sent on December 1, 2017. (*Kobar Declaration* at ¶ 19.) Because he was entitled to nearly five years of past due pension payments, his first check also included a retroactive payment in the sum of $44,188.23, less withholding taxes. The retroactive payment included interest calculated in accordance with the pension plan at the rate prescribed in section 417(e) of the Internal Revenue Code. (*Id.* at ¶¶ 19-23.) The total payment in the sum of $43,319.94 was sent on December 1, 2017, but was apparently misaddressed. (*See Business Records Affidavit* [of Brendon Banks], dated Jan. 22, 2019 ("*Banks Affidavit*"), Ex. A, at ECF p. 262 of 332 (ECF Doc. # 2322).) A replacement check was subsequently issued and cashed. (*Id.*)

In or around May 2018, Avaya recomputed Wattenmaker's pension payments based on the January 13, 2014 retirement date established by the Settlement Term Sheet. As a result, his period of service increased to 15.75 and he was entitled to a monthly pension payment of $1,106.12. (*Kobar Declaration* at ¶¶ 26-27.) Avaya began paying that amount effective June 1, 2018. On or about that date, Avaya sent Wattenmaker a check in the sum of $23,180.42 covering the June 1, 2018 pension payment at the new rate plus a catch-up payment to cover the difference between $754.21 and $1,106.12. The catch-up payment included interest calculated in the same manner as before and a deduction for withholding taxes. (*See Kobar Declaration* at ¶ 27; *Banks Affidavit*, Ex. A, at ECF p. 268 of 332.) The check became stale (*i.e.*, Wattenmaker did not cash it), and Avaya stopped payment. (*Banks Affidavit*, Ex. A, at

9

ECF p. 268 of 332.) It appears that the July 1, 2018 and August 1, 2018 checks also went uncashed. (*Id.*, Ex. A, at ECF pp. 269-70 of 332.)

In the latter part of 2018, Avaya agreed to increase Wattenmaker's service period to sixteen years to coincide with a statement in the Settlement Term Sheet. His monthly pension benefit rose to $1,123.68, the amount the Court concluded in the *Prior Decision* was the proper amount. On or about September 1, 2018, Avaya sent Wattenmaker a check in the sum of $3,588.42. (*Banks Declaration*, Ex. A at ECF p. 271 of 332.) The check covered the September 1, 2018 pension payment at the new rate plus a catch-up payment plus interest minus withholding taxes. (*See Kobar Declaration* at ¶¶ 33, 36-37.) At this point, Avaya had caught up and going forward would pay Wattenmaker $1,123.68 minus withholding taxes each month. (*Id.* at ¶ 34.) It appears that this check was also not cashed. (*See Banks Declaration*, Ex. A at ECF p. 271 of 332.)

The uncashed pension payments became an issue for Avaya. By letter dated Sept. 5, 2018, (*Banks Affidavit*, Ex. G, at ECF p. 332 of 332), Avaya informed Wattenmaker that he currently had three or more uncashed pension payments and consequently, Avaya was "stopping further payments from being issued until we are able to verify the payments are not lost or misdirected." The letter asked Wattenmaker to contact the customer service center to update his payment delivery information and recommended that he use direct deposit. It appears that he did not respond with the requested information.

At an October 25, 2018 hearing, Avaya's counsel informed me that Wattenmaker was not cashing his checks and that Avaya had sent him the aforementioned letter.

(*Transcript of Oct. 25, 2018 Hr'g*, at 62:13-20 (ECF Doc. # 2236).)  The Court asked Wattenmaker why he was not cashing his checks.  He responded:

> I don't want to take money that may not be mine.  Until the determined --
> the judge who makes the final determination, this money is not my money.
> I don't want to accept money that's not mine.

(*Id.* at 63:8-11.)  The Court advised Avaya to follow its usual procedure if Wattenmaker did not respond to its letter.  (*Id.* at 63:15-18.)  Avaya's counsel confirmed that Avaya was ready, willing and able to send him the checks once it received his response, (*id.* at 63:19-23), and the checks were available for cashing at his convenience.  (*Id.* at 64:5-6.)

The issue of uncashed checks came up once again at a January 2019 hearing.  I asked Wattenmaker if he wanted Avaya to send him his pension payments and he responded, "[n]ot at this point." (*Transcript of Jan. 8, 2019 Hr'g*, at 18:10-15 (ECF Doc. # 2282).)  I explained that any further tender was futile and he was not going to be entitled to interest on payments he refused to accept.  (*Id.* at 18:16-20.)  Even though Avaya was willing to pay Wattenmaker his monthly pension of $1,123.68, Wattenmaker insisted that he would only accept the monthly payment of $754.21 which he considered the undisputed amount.  (*Id.* at 20:9-21:5.)  In the end, the Court informed Wattenmaker that Avaya intended to send him monthly checks in the sum of $1,123.68 less withholding taxes and Wattenmaker responded that he would not cash them:

> THE COURT: All right. The checks they're going to send you are $1,123.68
> less whatever the withholding is, right, that's the monthly check?  The
> current amount.
>
> MS. BORDI: Going forward it's 1,123.68 minus –
>
> THE COURT: Okay.  Do you want them to send you those checks?
>
> MR. WATTENMAKER: They can do anything they want, *I won't cash
> them.*

11

(*Id.* at 21:11-18 (emphasis added).)

Under New York law, the refusal of an unconditional tender of money stops the running of interest based on principles of estoppel. *Koch v. Greenberg*, 14 F. Supp. 3d 247, 285 (S.D.N.Y. 2014) (citing cases), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). Wattenmaker stopped cashing his pension checks and the catch-up payments once Avaya increased his pension from $754.21 to $1,106.12 on or about June 1, 2018, and has confirmed that he will not cash his monthly pension checks in the sum $1,123.68. In light of Wattenmaker's statement, any tender of that amount would be futile. If he does not want to accept a greater amount, which Avaya agrees it owes and this Court has determined is his due, no one can make him. If he decides that he wants to receive his uncashed payments and future payments, he must comply with the directions set forth in Avaya's September 5, 2018 letter. (*Banks Affidavit*, Ex. G, at ECF p. 332 of 332.).

Accordingly, the *Motion* is granted as follows: (1) Wattenmaker's claim for $92,000.00 plus interest at the annual rate of 9% from November 26, 2013 to the January 19, 2017 petition date is allowed as a general unsecured claim; (2) Wattenmaker's claim for attorneys' fees, legal costs and expenses and retirement benefits is disallowed; (3) Wattenmaker is not entitled to interest after June 1, 2018 on any unpaid balance of his pension payments; and (4) Avaya may follow its internal procedures and not make any remittance of the unpaid balance or future pension payments until Wattenmaker complies with the directions set forth in Avaya's September 5, 2018 letter to Wattenmaker. (*Banks Affidavit*, Ex.

G, at ECF p. 332 of 332.)  The Court has considered Wattenmaker's other arguments and concludes that they lack merit.

So ordered.

Dated:   New York, New York
         September 16, 2019

/s/ <i>Stuart M. Bernstein</i>
STUART M. BERNSTEIN
United States Bankruptcy Judge